# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEREK BROWN and | * | Civil Action No. 22-00847 |
| JULIA BARECKI-BROWN | * | |
| | * | SECTION: L |
| VERSUS | * | |
| | * | HONORABLE ELDON E. FALLON |
| DERRICK BURMASTER, SHAUN | * | |
| FERGUSON, and the CITY OF | * | DIVISION: 4 |
| NEW ORLEANS | * | |
| | * | HONORABLE KAREN WELLS ROBY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Memorandum in Opposition to City of New Orleans and
### Chief Ferguson's Motion to Dismiss *Monell* Claim

On April 10, 2021, NOPD officer Derrick Burmaster fired his gun and killed Apollo, Plaintiffs' 18-week-old Catahoula puppy. Plaintiffs sued. In that suit, they brought a *Monell* claim against the City of New Orleans and Chief Ferguson in his official capacity (together, the "City") for failure to adequately train, supervise, and discipline Officer Burmaster.[1]

The City has filed a Motion to Dismiss, asking this Court to dismiss only Plaintiffs' *Monell* claim.[2] (The City does not ask for dismissal of any of the other claims, such as negligence, conversion, indemnity, or respondeat superior for state law claims.) The City argues that Plaintiffs' complaint does not contain sufficient factual allegations to support a *Monell* claim.

The motion should be denied for three reasons. First, because it is premature – the City is waiting on the outcome of the upcoming Chief's Hearing to take an official position on the appropriateness of Burmaster's shooting. For that reason, it is not yet known whether the City will satisfy *Monell* by ratifying Burmaster's conduct.

Second, because the complaint sets out facts sufficient to support a *Monell* claim: it details

---

[1] R. Doc. 36 at ¶¶ 112-117.
[2] R. Doc. 45-1.

how the City retained Burmaster as an officer despite dozens of examples of uses of force, repeated complaints about force, sustained acts of misconduct, and even the shooting and killing of another dog.

And third, because Plaintiffs seek leave to amend the complaint to add factual allegations about the specific deficiencies in NOPD's training of Burmaster. In particular, NOPD took a training curriculum developed by the U.S. Department of Justice's COPS program and then omitted or removed all the training about how an approaching dog is "almost always friendly" and how officers should not "view a dog running toward them as a threat" – which is exactly what happened with Burmaster and Apollo.

For these reasons, City Defendants' Motion should be denied.

## I.   ANALYSIS

### A.   Standard of Review

Dismissal under Rule 12(b)(6) is disfavored and should be rarely granted.[3] Under the 12(b)(6) standard, all well-pleaded facts must be viewed in the light most favorable to the plaintiff.[4] Plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim. *Id.* Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6]

---

[3] *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).
[4] *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (en banc).
[5] *Id., quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[6] Id.

**B.    Defendants' motion should be denied as premature because the City has not yet decided whether it will ratify Burmaster's conduct or not.**

When an authorized policymaker approves a subordinate's decision and the basis for it, such ratification can be chargeable to the government entity.[7] *Monell* liability through ratification is generally limited to when "the subordinate's actions are sufficiently extreme,"[8] and cannot be proved by simple failure to investigate[9] or good faith statements made in defending complaints.[10]

Here, the complaint describes extreme conduct by a subordinate – Officer Burmaster chose to aim, shoot, and kill the *smaller* of two dogs on residential property.[11] The dog was an eighteen-week-old puppy that weighed just over 22 pounds and was less than a foot and a half tall.[12] He used a gun even though NOPD policy specifically authorizes the use of TASERs on animals.[13] Burmaster fired his gun in the direction of a residential home he knew to be occupied (because it was the one he was responding to a call for service to),[14] and wounded another officer with shrapnel.

The question then is whether the City ratifies Burmaster's actions. NOPD's Public Integrity Bureau and Use of Force Review Board investigated and found the shooting to be unjustified.[15] But at the initial status conference in this matter, NOPD's counsel informed the Court that it was the City's then-position that Burmaster's shooting was justified.[16] After the status conference, Plaintiff's counsel asked how the City's position could be contrary to its own findings. The City's

---

[7] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
[8] *World Wide Street Preachers v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009)
[9] *Praprotnik, supra,* at 131 ("the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority. . . .")
[10] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) ("Good faith statements made in defending complaints against municipal employees do not demonstrate ratification.").
[11] R. Doc. 36 (Amended Complaint) at ¶ 4.
[12] Id. at ¶¶ 4-5.
[13] Id. at ¶ 35.
[14] Id. at ¶ 38.
[15] Id. at ¶ ¶ 61-66.
[16] See R. Doc. 19 (setting initial status conference).

counsel explained that the City's position about the shooting was tentative – its final position will be developed after Burmaster's disciplinary Chief's Hearing. In the intervening months, that hearing has been repeatedly rescheduled. As a result, the City has not formulated its official position on the Burmaster shooting.

Accordingly, the *Monell* question is premature. It cannot be resolved until the City conducts the Chief's Hearing, finalizes its position on the shooting, and thus informs the Court as to whether it ratifies the shooting or not. For that reason, the Court should deny the pending motion without prejudice to the City raising the issue later in the case.

**C.   The motion should be denied because the complaint pleads detailed allegations for the improper retention of Burmaster.**

In the Fifth Circuit, a municipality "may be held liable for decisions about hiring and retention" if the plaintiff can show "'deliberate indifference' to the known or obvious consequence[s] of such decisions."[17]

Deliberate indifference exists "where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to [retain] would be the deprivation of a third party's constitutional rights."[18]

To show deliberate indifference, the connection between the background of the individual and the specific violation alleged must be strong, as the plaintiff "must show that the hired officer was highly likely to inflict the particular type of injury [he] suffered."[19] One way to show this is

---

[17] *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).
[18] *Gomez, supra, citing Gros v. City of Grand Prairie*, 209 F.3d 431, 433-34 (5th Cir. 2000), *citing Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998).
[19] *Gomez, supra; see also Board of Comm'rs of Bryan Cty. v. Brown*, 520 US 397, 412 (1997).

to show a pattern of conduct that indicates a "proclivity" towards violence.[20] This theory of *Monell* liability is not new; it was developed in a series of cases four decades ago.[21]

Here, Plaintiff's complaint alleges that Burmaster is a "frequent user of force," with over thirty recorded uses of force.[22] That force has resulted in repeated complaints about Burmaster's use of force, including one initiated by a member of NOPD.[23] Burmaster's repeated use of complaint-generating force made it likely that he would continue to inappropriately use force like he did in using his gun to shoot and kill an eighteen-week-old puppy.

Buttressing these allegations about the use of force are the other instances of Burmaster's misconduct. The complaint notes that "NOPD has sustained a range of rule violations by Burmaster, including violations regarding verbal intimidation, moral conduct, professionalism, performance of duty, neglect of duty, [and] failure to comply with instructions."[24] It adds that "Burmaster has had dozens of allegations of NOPD rule violations brought against him, and at least **twenty** of them were sustained by NOPD."[25] The complaint provides examples of Burmaster publicly expressing contempt for reforming NOPD's civil service (in the form of a social media post depicting Batman slapping Robin in the face after saying he would "reform civil service") and contempt for NOPD's ethics test.[26] These allegations add to the inappropriateness of NOPD's choice to continue having Burmaster on the force.

---

[20] *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).
[21] *See, e.g., Turpin v. Mailet*, 619 F2d 196 (2nd Cir. 1980) (allowing Monell claim to be premised on failure to discipline); *McKenna v. City of Memphis*, 785 F.2d 560 (6th Cir. 1986) (jury question of whether city failed to "adequately to discipline . . . its officers").
[22] R. Doc. 36 at ¶¶ 72-73.
[23] R. Doc. 36 at ¶ 73.
[24] Id. at ¶ 74.
[25] Id. at ¶ 75 (emphasis in original).
[26] Id. at ¶¶ 99-100.

The City argues that most of Burmaster's employment history is irrelevant here, because most of his prior uses of force invovled humans, whereas this case involves the shooting of a dog.[27] (One of the incidents, however, did involve Burmaster shooting and killing a dog prior to Apollo.[28])

But this Court already rejected that argument, in the context of Plaintiff's Motion to Compel.[29] The Court granted the Motion to Compel as to Burmaster's prior uses of force – even force used on humans – finding that they were relevant to Plaintiff's *Monell* claim.

And finally, the City claims that Plaintiff has not "articulated the manner" in which Burmaster's discipline was inadequate.[30] But the complaint is explicit: it alleges that Defendants "retained [Burmaster] past the point of reasonableness."[31] That is to say, Defendants should have terminated Burmaster's employment long ago. If they had, Burmaster would not have had the opportunity to shoot and kill Apollo.

For these reasons, Plaintiffs have provided sufficient factual allegations to support a *Monell* claim premised on the City's choice to retain Burmaster on the force. The motion should be denied.

**D.    In the alternative, Plaintiffs seek leave to amend the complaint to add specific additional factual allegations about training.**

Plaintiffs' complaint also brings a *Monell* claim for Defendants' failure to adequately train Burmaster.[32] The City's motion contends that the allegations regarding training are insufficient. The City is not completely off-base in this regard; the complaint's allegations about training are thin. Plaintiffs, however, have developed additional information that can cure the problem.

---

[27] R. Doc. 45-1 at 7.
[28] R. Doc. 36 at ¶¶ 68-70.
[29] R. Doc. 41 (Opposition to Motion to Compel) at 9 ("Complaints concerning Defendant Burmaster's interactions with humans, including use of force, are not relevant to City Defendants' hiring, training or supervision with respect to Defendant Burmaster's interactions with dogs.")
[30] R. Doc. 45-1 at 8.
[31] R. Doc. 36 at ¶ 96.
[32] R. Doc. 36 at ¶¶ 114-117.

First, Defendants' counsel initially represented that "Officer Burmaster has not received any training specific to handling animals."[33] Defendants' counsel more recently have said that that is wrong, and Burmaster did take a dog-related training course. Defendants' counsel has agreed to determine which is true and provide an updated interrogatory response.[34]

If it is true that Burmaster received no training whatsoever related to animals, Plaintiffs seek leave to amend the complaint to allege that fact, as no training at all would be a clear deficiency in training.

If, however, Burmaster did receive NOPD's dog-related training (attached here as Exhibit B, and entitled "The Problem of Dog-Related Incidents and Encounters"), Plaintiffs request leave to add allegations about specific deficiencies in that training program.[35]

First, NOPD's dog-related training is deficient on its own terms. On page 2, NOPD's curriculum says that "[b]asic and in-service training should include . . . Partnering with animal control and other animal services . . . [and] Information on local resources."[36] But NOPD's curriculum does not actually suggest any partnering with other services, and does not include any information on local resources.[37] It therefore fails to meet its own explicit standard for sufficiency.

Second, NOPD's training appears to be cribbed from the U.S. Department of Justice's COPS curriculum with the same title.[38] But NOPD's training omits or removes key elements that are part of the COPS training. For example, NOPD omits the fact that "serious [dog] bites are relatively

---

[33] R. Doc. 34-6 (Corr. of Counsel) (emphasis added).
[34] Ex. A (Corr. of Counsel).
[35] NOPD Defendants have also indicated in the last few days that Officer Burmaster received an online ASPCA training about investigating animal abuse, but they have not yet provided the contents of the training. There is no present indication that the ASPCA training addresses use of force on animals.
[36] Ex. B at 2.
[37] Ex. B.
[38] Attached here as Exhibit C. For example, slide 2 of NOPD's training is copied verbatim from page 21 of the COPS training. Same with slide 2 of NOPD's training and page 26 of the COPS training. (For the COPS training, page numbers refer to the page of the PDF.)

rare" and that the "overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required."[39] The COPS training notes that "[f]ewer than 2 percent of the individuals visiting an emergency room complaining of a dog bite require hospitalization," and compares that to 5.7 percent for people assaulted by a human.[40] And that "even as the canine population has steadily increased over the past three decades, the number of reported dog bites has drastically decreased."[41] COPS concludes that "dogs are seldom dangerous."[42]

The COPS training includes – and NOPD omits – a video of "a real-time example of a safe, effective use of the Taser®—which ensures the safety of the officers, bystanders, and dogs."[43]

And directly on point to the case here, the COPS training notes that a factor contributing to dog-related incidents is "Insufficiently Trained Police Officers" who "view a dog running toward them as a threat (the dog could be friendly and merely greeting the officer)."[44] The COPS training specifically noted that:

> An approaching dog: Most dogs happily greet a new human. Some will be so enthusiastic about greeting that they will do this at a full run and then launch themselves at the officer. Absent any of the warning signals described below, **an approaching dog is almost always friendly**. A dog who feels threatened will usually try to keep his distance.[45]

The COPS training also includes specific tactics that NOPD omits or removes. For example, the COPS training notes that "when encountering a dog, officers should stop all forward movement and turn their bodies to the side. Officers should drop their eyes and

---

[39] Ex. C at 11.
[40] *Id.*
[41] *Id.* at 12.
[42] *Id.* at 13.
[43] *Id.* at 16.
[44] *Id.* at 15.
[45] *Id.* at 25 (emphasis added).

watch the dog using peripheral vision."[46]

The NOPD training also omits or removes the fact that all dogs hit with TASER darts but not immobilized "fled the scene and did not attack."[47]

In summary, NOPD derived its training on the US DOJ COPS program – but specifically cut out everything about how a dog running at an officer is "almost always friendly" and other crucial elements. It is plausible that if NOPD had not cut these facts out of its training, Burmaster would not have felt the need to shoot and kill multiple dogs, including a puppy running toward him. Accordingly, this Court should grant Plaintiffs leave to amend the complaint to add these facts in support of their *Monell* claim. NOPD Defendants have consented to such a motion, and Plaintiff will file it along with this Opposition.

**E.    Defendants are correct that they are not vicariously liable for Burmaster's constitutional violations. Plaintiff's complaint does not suggest otherwise.**

Defendants' final argument is that they "cannot be held vicariously liable for the alleged constitutional violation of Defendant Burmaster."[48] That is true. But they do not cite to any section of Plaintiffs' complaint suggesting that Plaintiffs seek to hold them vicariously liable for constitutional claims. Indeed, the complaint's section on vicarious liability is couched specifically in terms of Louisiana Civil Code Art. 2320.[49] The parties are in agreement that any vicarious liability would be for state law claims, not federal claims. The motion should be denied.

### III.    CONCLUSION

Defendants' Motion to Dismiss Plaintiffs' *Monell* Claim should be denied on its merits, or alternatively denied as moot if this Court grants Plaintiff's Consent Motion for Leave to Amend.

---

[46] *Id*. at 34
[47] *Id*. at 37.
[48] R. Doc. 45-1 at 13.
[49] R. Doc. 36 at ¶¶ 103-106.

Respectfully Submitted:

_/s/ William Most_
WILLIAM MOST (La. Bar No. 36914)
DAVID LANSER (La. Bar No. 37764)
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Tel: 504.509-5023
Email: williammost@gmail.com

TARAK ANADA (#31598)
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8322
Facsimile: (504) 589-8322
E-Mail: tanada@joneswaker.com