# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEREK BROWN and | * | CIVIL ACTION |
| JULIA BARECKI-BROWN | * | |
| | * | DOCKET NUMBER: 22-00847 |
| VERSUS | * | |
| | * | SECTION: L |
| DERRICK BURMASTER, SHAUN | * | |
| FERGUSON, and the CITY OF | * | HONORABLE ELDON E. FALLON |
| NEW ORLEANS | * | |
| | * | DIVISION: 4 |
| | * | |
| | * | HONORABLE KAREN WELLS ROBY |

**************************************************************************

## REPLY IN SUPPORT OF CITY OF SHAUN FERGUSON'S AND THE CITY OF NEW ORLEANS' RULE 12(b)(6) MOTION TO DISMISS *MONELL* CLAIM AS CONTAINED IN PLAINTIFFS SECOND AMENDED COMPLAINT

Defendants, the City of New Orleans and Shaun Ferguson, Superintendent of the New Orleans Police Department (the "City Defendants") submit the following reply to Plaintiffs' Memorandum in Opposition to City of New Orleans and Superintendent's Motion to Dismiss *Monell* Claim (Doc. 71) (the "Opposition"). As is shown below, none of the three arguments asserted in the Opposition have merit.

### 1. The Second Amended Complaint overstates the applicability of the "COPS" program and mischaracterizes the contents of NOPD training program.

Plaintiffs contend that the NOPD training program provided to Defendant Burmaster, entitled "The Problem of Dog-Related Incidents and Encounters" (the "NOPD training program"),[1] was inadequate because it differed from a publication associated with a component of the U.S. Department of Justice (the "COPS publication").[2] However, nothing in the COPS

---

[1] The NOPD program is attached as Exhibit 1. Plaintiffs refer to and quote the NOPD training program on numerous occasions in their Second Amended Complaint (see Doc. 60, ¶¶ 117, 119-123, 130-135) and Opposition (see Doc. 71, pp. 1-2, 3-5, and footnotes 12, 13 and 15). In addition, Plaintiffs attached the entire NOPD program as an exhibit to their Memorandum in Opposition to City of New Orleans and Chief Ferguson's Motion to Dismiss *Monell* Claim (Doc. 56-2). It is therefore appropriate to include the NOPD program as an exhibit to this Reply.

[2] See Doc. 60, ¶ 120 (citing the COPS publication); Doc. 71, pp. 3-4 ("NOPD's training omits or removes key elements that are part of the COPS training."). The COPS publication is cited and relied upon by Plaintiffs in their Second

publication indicates that it was intended as an official policy of the U.S. Department of Justice or a standard of care applicable to law enforcement.[3] To the contrary, the COPS publication clarifies:

> The opinions contained herein are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.[4]

Further, the COPS publication was not even created by the U.S. Department of Justice but rather was created by persons in non-governmental roles as result of private and academic grants. According to the COPS publication,

> *The Problem of Dog-Related Incidents and Encounters* was developed under the auspices of the University of Illinois Center for Public Safety and Justice, Institute of Government and Public Affairs, and made possible by a grant from the national Canine Research Council, LLC.[5]

For these reasons, the mere fact that the NOPD program may be different from the COPS publication provides no basis upon which to conclude that the NOPD program was inadequate or that NOPD was deliberately indifferent in adopting its training policy.

In any event, the differences between the NOPD program and the COPS publication are small and not material. Most differences arise due to editorial choices because the NOPD program is an eleven-page PowerPoint presentation and the COPS publication is a forty-five-page white paper.[6] There is no hidden motivation, as suggested by Plaintiffs, by the NOPD program's not

---

Amended Complaint (Doc. 60, ¶¶ 120-22, 1124-129, 135) and the Opposition (Doc. 71, pp. 2-5, footnotes 15-24). In addition, a complete copy of the COPS publication was previously filed by Plaintiffs. See Doc. 56-3. It is therefore appropriate to attach the excerpt of the COPS publication as Exhibit 2 to this Reply. The Office of Community Oriented Policing Services ("COPS") is a component of the U.S. Department of Justice that "awards grants to state, local, and tribal law enforcement agencies to hire and train community policing professionals, acquire and deploy cutting-edge crime-fighting technologies, and develop and test innovative policing strategies." Exhibit 2, p. 4 (also located at Doc. 56-3, p. 4).

[3] See Plaintiffs' statement at Doc. 71, p. 5 ("the **US DOJ says** officers should be trained . . . that a dog running at an officer is 'almost always friendly.'") (emphasis added).

[4] Exhibit 2 (excerpt of the COPS publication), p. 2 (also located at Doc. 56-3, p.2).

[5] Exhibit 2 (Excerpts of COPS publication), p. 6.

[6] See Exhibit 2, p. 7; and Exhibit 1.

including the specific phrase that a dog running at an officer is "almost always friendly."[7] To find such a motivation would require unwarranted speculation.

Moreover, an examination of the contents of the NOPD program demonstrates its adequacy, constitutional reasonableness, and consistency with the COPS publication. For example, the NOPD program sets forth a problem-solving model to assist officers in "Identifying & Resolving problematic dog-related issues," referred to as "S.A.R.A.," with the following elements:

- **S**canning: Identifying the problem
- **A**nalysis: Learning as much as possible about the problem to identify causes
- **R**esponse: Looking for long-term, creative, specific solutions
- **A**ssessment: Evaluating the effectiveness of the response.[8]

Consistent with the COPS publication, the NOPD program advises officers that "[a]most all dogs will try to bluff or threaten before resorting to actual contact" and that "This training will assist you in making careful assessments when first encountering a dog."[9] The NOPD program advises that "how an officer reads and responds to a dog's behavior is often the most important factor in determining whether a dog will bite, attack, or withdraw."[10] The NOPD program provides training regarding assessing the risk of a dog encounter such as "giv[ing] attention to the behavior of the dog(s) and the situation" and "scan[ning] the surroundings for escape routes, and look[ing] for barriers that can be used for protection in case escalation."[11] Further the NOPD program gives officers specific tactics to assess and manage a dog's behavior by use of body language, facial expressions, and vocalizations, and, among other things, states that "[s]taring at the dog's face should be avoided, as this can create an eye contact challenge."[12]

---

[7] Doc. 71, p. 5.
[8] Exhibit 1, p. 3 (see also Doc. 56-2, p. 3) (emphasis in original).
[9] *Id.*, p. 4.
[10] *Id.*, p. 5.
[11] *Id.*, p. 7.
[12] *Id.*, p. 8.

Finally, consistent with the primary lesson contained in the COPS publication, the NOPD program advises that force-continuum principles be applied to dogs and that "[o]fficers should understand that no single dog presents a plausible risk of fatality to an able-bodied adult accompanied by other humans."[13] In particular, the NOPD program describes the following appropriate use of force continuum as it relates to animals: "physical presence, verbal commands, mechanical repellants (baton, bite stick), electronic repellants (stun gun, Taser), physical capture, and deadly force."[14] As to shooting the dog, the NOPD program advises: "Shooting a dog should always be the option of **last resort**."[15]

The NOPD program concludes by training officers with respect to the NOPD use of force policy applicable to dangerous animals. The NOPD program sets forth the entire rule:

> **Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety** and alternative methods are not reasonably available or would likely be ineffective. **The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area**. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, **officers should develop reasonable contingency plans** for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal **if circumstances reasonably dictate that a contingency plan has failed** or becomes impractical.[16]

There is no serious dispute that Defendant Burmaster received training as to appropriate use of force in connection to dog encounters, which included the NOPD program. The NOPD program trained officers on methods to appropriately assess the risks in dog encounters, practical methods to manage and mitigate dangers in such encounters and provided clear guidance regarding use of force upon dogs, which authorized shooting a dog only as a last resort in order to prevent

---

[13] *Id.*, p. 9.
[14] *Id.*, p. 10.
[15] *Id.*, p. 11 (emphasis in original).
[16] *Id.*, p. 12 (emphasis in original) (quoting NOPD Operations Manual, Chapter 1.3, para. 32).

imminent harm to human safety. In order for Plaintiffs' *Monell* claim regarding training to proceed it would be necessary to reach a wholly implausible and unsupported conclusion that NOPD purposefully made editorial choices with respect to the content of the NOPD program with deliberate indifference towards increasing the risk of shooting dogs. This conclusion is fully contradicted by the content of the NOPD program. The actual contents of the NOPD program demonstrate the adequacy of training provided to Defendant Burmaster as to use of force upon dogs and show the opposite of deliberate indifference. For these reasons, the Plaintiffs' *Monell* claim fails on a failure to train ground. See *Zarnow v. City of Wichita Falls, Tex*. 614 F.3d. 161, 170 (5th Cir. 2010) (listing elements of failure to train Monell claim: (1) inadequate training; (2) deliberate indifference; (3) causation).[17]

## 2. **The City's motion is not premature due to potential future discipline of Officer Burmaster**.

Plaintiffs argue that their *Monell* Claim cannot be dismissed because the City has not completed an internal disciplinary procedure – a "Chief's Hearing" – concerning Defendant Burmaster's actions that are the subject of this case. Plaintiffs speculate that the result of the Chief's Hearing may support a claim of municipal liability based on ratification.[18] However, the Court issued an Amended Scheduling Order on December 22, 2022 (Doc. 63) which provided that "[a]mendments to pleadings . . . shall be filed no later than January 3, 2023, with leave of Court."

---

[17] Similarly unavailing is Plaintiffs' argument that NOPD training was "deficient" because an NOPD program slide recommended "Partnering with animal control and other animal services" and "Information on local resources" but did not "actually suggest any partnering with other services, and [did] not include any information on local resources." See Exhibit 1, p. 2, Doc. 71, p. 3.  This argument criticizes the contents of a single slide in the NOPD program. The criticism is minor. In any event, to be valid (which it is not) the argument requires speculation that NOPD officers do not have access to information about animal control, animal services or other local resources. This speculation is unwarranted given the specific NOPD policy regarding dog encounters, which provides that officers "should develop reasonable contingency plans" for dealing with animal encounters, including among other things use of an "animal control officer." See Exhibit 1, p. 12.

[18] Among the possible outcomes of the Chief's Hearing are: (1) a decision may be made by that Defendant Burmaster violated NOPD policies and procedures; (2) a decision may be made that Defendant Burmaster did not violate NOPD policies and procedures; (3) a decision may be made which is appealed; or (4) a hearing and decision may be postponed.

Trial in this matter is scheduled to begin April 3, 2023. Plaintiffs have amended their complaint twice in this action but have not asserted a claim based on alleged ratification. Delay in ruling on the City Defendant's motion to dismiss would cause undue burden with respect to preparation of defenses by the City Defendants.

Further, to survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must base their grounds for entitlement to relief on allegations made in their complaint, not on some speculative future event.[19] See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (factual allegations when assumed to be true must "raise a right to relief above the speculative level."). Plaintiffs' hypothetical *Monell* claim based on ratification is speculative and cannot serve as a defense to a motion to dismiss.

In any event, Plaintiffs' hypothetical claim of ratification is without merit. Ratification by a municipality in the context of a *Monell* claim is limited to "extreme factual situations." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir.2009). This is not an extreme factual situation. As an example, in *Peterson,* a plaintiff was observed by law enforcement to be sleeping in the back of his truck in the very early hours of morning at a drinking establishment. The plaintiff failed to cooperate with law enforcement, and officers arrested the plaintiff. During the arrest, an officer conducted a "hard knee strike" to the plaintiff's thigh while the plaintiff was handcuffed. The officer's conduct was investigated by the police chief, who decided that the officer did not use excessive force. The plaintiff argued that the police chief's decision constituted ratification. The Fifth Circuit Court of Appeal disagreed.

---

[19] In their Opposition, Plaintiffs contend that previous counsel for the City Defendants during an initial status conference "informed the Court that it was the City's then-position that Burmaster's shooting was justified." Doc. 71, p. 6. Even assuming the accuracy of this alleged statement, this statement is not a policy statement by the City of New Orleans. To the contrary, Plaintiffs specifically allege that the City of New Orleans' Public Integrity Bureau found Officer's Burmaster's shooting of Plaintiffs' dog was unjustified (Doc. 60, ¶¶ 61-62) and that the NOPD's Use of Force Review Board concluded that the shooting was unjustified (Doc. 60, ¶¶ 65-66).

The Court in *Peterson* found that a question of fact existed as to whether the officer used excessive force. However, the Court held that the officer's conduct was not sufficiently extreme to support a claim of ratification. *Id*. at 848. In its analysis, the Court compared *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), which found and extreme situation where officers "poured" gunfire onto a truck and killed an innocent occupant, and *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998), where no ratification was found in a case where an officer shot a fleeing suspect in the back.

In this case, Officer Burmaster used his firearm to defend himself after two barking dogs suddenly emerged out of the darkness of a porch and ran at his partner and him.[20] Officer Burmaster may argue that he was located inside the Plaintiffs' gate on a driveway and did not have any reasonable route of escape. Even construing the facts most favorably to Plaintiffs, a contention that this case involves "extreme conduct" as described in *Peterson* is not plausible and should be rejected.

### 3. Plaintiffs fail to show a sufficiently strong connection between Officer Burmaster's background and the shooting of Plaintiffs' dog.

A *Monell* claim based on allegedly improper retention must demonstrate a municipality's "deliberate indifference" to "known or obvious consequences" of decisions in hiring and retaining an officer. See *Gomez v. Galman*, 18 4th 769, 778 (5th Cir. 2021). To show deliberate indifference, "the connection between the background of the individual and the specific violation alleged must be strong," as a plaintiff "must show that the hired officer was ***highly likely*** to inflict the ***particular type of injury he suffered***." *Id*. (punctuation omitted, emphasis added) (quoting *Gros v. City of Grand Prairie*, 209 F.3d 431, 434 (5th Cir. 2000) (no deliberate indifference by municipality shown in case involving sexual assault by officer where officer's background consisted of

---

[20] See Doc. 60, ¶¶ 29-32, 37.

sustained and unsustained complaints regarding use of force, problems with accepting supervision, and instances of unprofessional conduct).

Here, Plaintiffs allege that Officer Burmaster used force (without providing any details as to the use of force) on multiple occasions.[21] In addition, Plaintiffs label Officer Burmaster as a "frequent user of force" and recount prior allegations, unbounded by any temporal limitation, of "a range of rule violations" other than use of force. Plaintiffs' generalized allegations of use of force and disciplinary issues fail to meet the high standard as articulated by *Gomez, supra* (cited by Plaintiffs in their Opposition) to support a *Monell* claim based on improper retention. See *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 389 (1997)). Further, Plaintiffs do not allege a pattern of misconduct towards animals or misuse of firearms by Officer Burmaster.

In *Gomez*, a plaintiff was harassed and beaten unconscious at a local bar by two off-duty police officers. *Id*. at 774. For one officer, the plaintiff alleged two instances of misconduct on the part of one officer which he contended showed deliberate indifference on the part of the municipality in retaining the officer. One instance involved an illegal, invasive, and public strip search of an arrestee in his custody. The second involved an instance where the officer damaged a side mirror by hitting and headbutting it. The Court noted that these instances were "egregious." However, the instances were too unlike the "specific constitutional violation alleged" by the plaintiff to make it "plainly obvious" that the office had a "proclivity toward such brutal violence as alleged here." *Id*. at 778. Here, as in *Gomez*, Plaintiffs' allegations are unlike the shooting of a

---

[21] Doc. 56, p. 5.

dog. The prior complaints fail to establish a connection between Officer Burmaster's background and the shooting of the dog. Therefore, they fail to support a *Monell* claim for improper retention.[22]

**WHEREFORE**, the City of New Orleans and Shaun Ferguson, Superintendent of the New Orleans Police Department, pray that their Motion to Dismiss be granted and the *Monell* Claim, as alleged in Plaintiffs' Second Amended Complaint, be dismissed.

Respectfully submitted:

*/s/ James M. Roquemore*_____
**JAMES M. ROQUEMORE, LSB #40035**
ASSISTANT CITY ATTORNEY
**CORWIN ST. RAYMOND, LSB #31330**
CHIEF DEPUTY CITY ATTORNEY
**DONESIA D. TURNER, LSB #23338**
CITY ATTORNEY
1300 PERDIDO STREET, SUITE 5E03
NEW ORLEANS, LOUISIANA 70112
TEL: (504) 658-9800
FACSIMILE: (504) 658-9868
James.Roquemore@nola.gov
*Counsel for Shaun Ferguson and the City of New Orleans*

---

[22] Plaintiffs mistakenly argue that this Court's Order (Doc. 61) on Plaintiffs Motion to Compel determined that Plaintiff's general allegations regarding Officer Burmaster's use of force demonstrated a strong connection between Officer Burmaster's history and the shooting of the dog as required under the stringent standards required by the entirety of the *Monell* progeny. Rather, the Court held that Officer Burmaster's records regarding use of excessive force "are relevant as required under Rule 26," meaning that the records met the minimal threshold of relevance necessary to be discoverable. See *Woods v. City of St. Luis Police Dep't*, No. 4:07CV931 SNLJ, 2009 U.S. Dist. LEXIS 49622, 2009 WL 1650093, at *2 9E.D. Mo. June 12, 2009).