1

2                     UNITED STATES DISTRICT COURT

3                EASTERN DISTRICT FOR THE STATE OF LOUISIANA

4

5        * * * * * * * * * * * * * * * * * * * * * * * * * *

6

7                         DEREK BROWN and

8                       JULIA BARECKI-BROWN

9                             VERSUS

10         DERRICK BURMASTER, SHAUN FERGUSON, and the

11                      CITY OF NEW ORLEANS

12

13       * * * * * * * * * * * * * * * * * * * * * * * * * *

14        CIVIL ACTION NO. 22-00847          DIVISION: 4

15        SECTION: L

16

17          The 30(b)(6) deposition of DEBRA PRUITT taken on

18              Monday, March 6, 2023, starting at 10:00 a.m. at

19         New Orleans City Hall, 1300 Perdido Street, Room 5E03,

20                  New Orleans, Louisiana 70112.

21

22     CARRIE A. HARTILL

23     CERTIFIED COURT REPORTER

24     STATE OF LOUISIANA

25



Debra Pruitt                                               March 06, 2023
                                                                  Page 2

```
 1   APPEARANCES:
 2   FOR THE CITY OF NEW ORLEANS AND CITY DEFENDANTS:
 3        JAMES M. ROQUEMORE, ESQ
 4        CITY OF NEW ORLEANS
 5        NEW ORLEANS, LOUISIANA
 6        EMAIL: james.roquemore@nola.gov
 7
 8        FOR THE DEFENDANT, DERRICK BURMASTER:
 9        C. THEODORE ALPAUGH, III, ESQ.
10        FRATERNAL ORDER OF POLICE LEGAL COUNSEL
11        639 LOYOLA AVENUE, SUITE 2130
12        NEW ORLEANS, LOUISIANA 70113
13        PHONE: (504) 529-4141
14        EMAIL: cta@gustebarnett.com
15
16   FOR THE PLAINTIFF DEREK BROWN AND JULIA BARECKI-BROWN:
17        TARAK ANADA, ESQ.
18        JONES WALKER LLP
19        201 ST. CHARLES AVENUE, SUITE 4900
20        NEW ORLEANS, LA 70170
21        PHONE: (504) 582-8322
22        EMAIL: tanada@joneswalker.com
23
24
25
```



1   ALSO FOR PLAINTIFFS:

2   WILLIAM BROCK MOST, ESQ.

3   MOST & ASSOCIATES

4   201 SAINT CHARLES AVENUE, SUITE 114

5   NEW ORLEANS, LA 70170

6   PHONE: (504) 509-5023

7   EMAIL: williammost@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1
2                              INDEX
3                                                          PAGE
4    DIRECT EXAMINATION:
5    BY MR. ANADA . . . . . . . . . . . . . . . . . . .   8
6    CROSS-EXAMINATION:
7    BY MR. ALPAUGH   . . . . . . . . . . . . . . . . .   78
8
9    EXHIBITS
10   Debra Pruitt            DESCRIPTION            PAGE
11   EXHIBIT NO.  8        NOD  . . . . . . . . . . . . .   8
12   EXHIBIT NO. 20        NOPD ASI . . . . . . . . . . .   19
13   EXHIBIT NO. 37     NOPD PIB REPORT BY SGT PRUITT . . .   46
14   EXHIBIT NO. 19     EMAIL       . . . . . . . . . . .   47
15   EXHIBIT NO. 27   NOPD OPERATIONS MANUAL CH 41.3.10. .   51
16
17
18
19
20
21
22
23
24
25



```
 1
 2                   S T I P U L A T I O N
 3              It is stipulated and agreed by and
 4         between counsel that the deposition of
 5                   DEBRA PRUITT,
 6         is hereby being taken pursuant to the Rules
 7         of Court, including applicable articles of
 8         the Louisiana Code of Civil Procedure.
 9              The formalities of sealing and
10         certification are hereby waived.  The
11         witness waives the right to read and sign
12         the deposition.  The party responsible for
13         the service of the discovery material shall
14         retain the original.
15              All objections are to be made in
16         accordance with the Rules of Court, including
17         applicable articles of the Louisiana Code of
18         Civil Procedure.
19                              * * *
20              Carrie A. Hartill, Certified Court
21         Reporter in and for the State of Louisiana,
22         officiated in administering the oath to the
23         witness.
24
25    Debra Pruitt,
```



1    1300 Perdido Street, Room 5E03,

2    after being duly sworn to tell the truth,

3    the whole truth, and nothing but the truth,

4    was examined and testified as follows:

5            VIDEOGRAPHER:

6                 This is media Unit One of the video

7            deposition of Sergeant Debra Pruitt in the

8            matter of Derek Brown and Julia Barecki-Brown

9            versus Derrick Burmaster et al, filed in the

10           United States District Court, Eastern District

11           of Louisiana.

12                Civil Action Number 22-00847.

13           Today is Monday, March 6, 2023.  And the time

14           is 10:04 a.m.  This deposition is being taken

15           at the New Orleans City attorney's office at

16           the request of Jones Walker.

17                The videographer is Tammy Hupin.  The court

18           reporter is Carrie Hartill.  We are with Magna

19           Legal Services.

20                 Will counsel please, state their appearances

21           and whom they represent.

22           MR. ROQUEMORE:

23                James Roquemore on behalf of the City of New

24           Orleans and the city dependants.

25           MR. ALPAUGH:



 1              Ted Alpaugh representing Derrick

 2         Burmaster.

 3         MR. ANADA:

 4              Tarak Anada and William Most

 5         representing the plaintiffs.

 6         VIDEOGRAPHER:

 7              And will the court reporter please, swear

 8         in the witness?

 9         COURT REPORTER:

10              Do you solemnly swear or affirm that the

11         testimony you are about to give will be the

12         truth, the whole truth and nothing but the

13         truth?

14         THE WITNESS:

15              Yes.

16         MR. ANADA:

17              Good morning, Sergeant Pruitt.

18         THE WITNESS:

19              Good morning.

20    EXAMINATION BY MR. ANADA:

21    Q. How are you today?

22    A. I'm well.  How about yourself?

23    Q. Very well.  It's nice to see you again.  I

24    appreciate your time today.

25    A.  Of course.



1  Q.  We value your time, so I'm going to attempt to

2  be as efficient as possible today.  I'm going to mark

3  the following document as Exhibit 1 it's the notice of

4  the 30(b)6).

5          MR. MOST:

6              That's Exhibit 8.

7          BY MR. ANADA:

8              Okay.  I'll mark it as Exhibit 8.

9          MR. ALPAUGH:

10             You have copies of that for everybody?

11         MR. ANADA:

12             Yeah.

13 EXAMINATION BY MR. ANADA:

14 Q. Sergeant Pruitt, am I correct that you've given

15 depositions before in the past?

16 A. I have to say this is my first deposition.

17 Q. Okay.

18 A. I've testified millions of times, but.

19 Q. Understood, understood.  Just a couple quick

20 instructions about the deposition.  I'm going to ask

21 you a series of questions.  If any of them are unclear,

22 or you're confused by them, please let me know. And

23 I'll restate it.  Otherwise, I'll assume you understood

24 the question.

25     If you need to take a break anytime, let me know.



1  And we'll accommodate you.  I would just ask that we

2  don't do a break while a question is pending.

3  A.  Okay.

4  Q.  Sorry, Sergeant Pruitt, are you aware of the

5  difference between a 30(b)(6) deposition and a regular

6  deposition of a witness?

7  A.  No.

8  Q. Okay.  A 30(b)(6) deposition is a deposition

9  where you're testifying on behalf of a corporation or

10  an entity in this case, the City of New Orleans.  What

11  I've handed you is the notice of 30(b)(6) deposition

12  issued in this matter.  Have you had a chance to review

13  this document?

14  A.  Yes, I've looked it over.

15  Q.  You've reviewed it prior to today, right?

16  A.  No.

17  Q.  Okay.  You have not, okay.  What did you do to

18  prepare for the deposition today?

19  A.  I met with the city attorney --

20  Q.  And obviously, don't don't disclose any of the

21  contents of your communication.

22  A.  Of course.  Yeah.

23  Q.  You met with city attorney how many times?

24  A.  Just once.

25  Q.  Okay.  When was that?



Debra Pruitt                                                    March 06, 2023
                                                                      Page 10

```
 1   A.   Last week.

 2   Q.   How long did it last?

 3   A.   Maybe 30 minutes.

 4   Q.   Did you review any documents to prepare for

 5   today's deposition?

 6   A.   Yes.

 7   Q.   What are those?

 8   A.   Reports.  My reports.  Shannon Brewer's report.

 9   Initial reports.

10   Q.   Okay.  Just to be clear.  What document are you

11   referring to when you say "your report"?

12   A.   My incident report.

13   Q.   Okay.  Any other documents besides what you

14   have stated?

15   A.   No.

16   Q.   Did you review any videos in preparation for

17   today's deposition?

18   A.   No.

19   Q.   Did you review any photographs?

20   A.   Yes.

21   Q.   What photographs did you review?

22   A.   Scene photographs.

23   Q.   Looking at Exhibit No. 8.  Is it correct that

24   you've been designated by The City to discuss specific

25   topics?
```



1   A.   Yes.

2   Q.   What, what topic numbers are those?

3   A.   The first one is the facts of the shooting

4   incident at issue in this lawsuit.  And then number 8

5   is PIB's investigation into and conclusions

6   regarding the shooting of Apollo and any other policy

7   violations related to that incident.

8   Q.   And are you prepared to talk about those two

9   topics today?

10  A.   Yes.

11           MR. ROQUEMORE:

12               Tarak, before we get going, I believe for

13           number 8, there's a we're also sharing the topic

14           eight with Shannon Jones Brewer who's going to

15           be deposed on March 8.

16           MR. ANADA:

17               And could you just state for the record

18           how, how the topic is being split?

19           MR. ROQUEMORE:

20               Sure.  Sergeant, Sergeant Pruitt handled

21           the PIB criminal aspect of the investigation.

22           Then there is an administrative aspect that

23           Shannon Jones Brewer conducted.

24               So their areas of specific knowledge

25           are going to be divided that way, I believe



1          that Sergeant Brewer or Sergeant Pruitt is

2          prepared to give an outline of the the entire

3          PIB investigation process, though, if you wish

4          to ask her questions along those lines.

5     MR. ANADA:

6          Thank you.

7   BY MR. ANADA:

8   Q.   Sergeant Pruitt, could you just give me a

9   little bit of background information?  When did you

10  join the NOPD?

11  A.   November of 2007.

12  Q.   And what was your rank when you first joined?

13  A.   I was a police recruit.

14  Q.   What's your -- what's your current rank right

15  now?

16  A.   Police Sergeant.

17  Q.   All right.  What are your job duties as a

18  Sergeant?  At the moment.

19  A.   Right now I work for the Public Integrity

20  Bureaus' Force Investigation Team.  I'm assigned to the

21  criminal side of the team where we investigate uses of

22  force.

23       We, specifically we get called out to what, I

24  guess, level four uses of force, which include firearm

25  discharges, and other aspects.



1      We are also charged with basically, we do criminal

2   investigations.  We do administrative investigations as

3   it as it -- as far as like, formal disciplinary

4   investigations on things like unauthorized force and

5   such.

6   Q.  And are you always specifically assigned to the

7   criminal aspect of these investigations?

8   A.  Yes, sir.

9   Q.  Have you ever been assigned to the

10  administrative aspect of these investigations?

11  A.  No, sir.

12  Q.  Can you just kind of, basically, tell me the

13  process of any kind of review or investigation of an

14  officer's conduct as it relates to the criminal aspect

15  of shooting investigations of NOPD officers?

16  A.  Yeah, you know, we look at the entire

17  investigation and look and see if there's any possible

18  criminal criminality to it.  You know, did they violate

19  any criminal laws when they took action?  That's what

20  we look at.

21  Q.  Okay.  And are you tasked with conducting that

22  analysis anytime any member of the NOPD uses force?

23  A.  Yes.  When we look at force, if we see

24  something that looks like it could be criminal, then we

25  open up a criminal investigation.



1   Q.  Okay.  This, this might be impossible to answer,

2   but I'm gonna ask any way.  Do you know what percentage

3   of use of force incidents you or any of your colleagues

4   with a similar role, do you know, like, what percentage

5   actually end up in a criminal investigation being

6   opened?

7   A.  No.

8   Q.  Do you know if it's more or less than half of

9   them?

10  A.  I'm not sure.

11  Q.  Would you say that it's relatively uncommon for

12  for you to open up a criminal investigation in response

13  to a use of force incident by NOPD?

14  A.  It's not uncommon.  I mean, it happens.

15  Q.  How many times has that happened in 2023?  To

16  your, to your knowledge?

17  A.  We have one right now.

18  Q.  Okay.  Do you know, same question for 2022, if

19  you know

20  A.  '22?  I don't know.

21  Q.  Do you know if it's more than 100?

22  A.  Oh, no.

23  Q.  Do you think it's less than 10?

24  A.  I'm not sure.

25  Q.  Okay.



1   A.   Yeah.

2   Q.   Do you have any reason to believe that the

3   number of criminal investigations would be much

4   different in '22 than in '23?

5   A.   No.

6   Q.   Same question with 2021.

7   A.   No.

8   Q.   And just to be clear, in 2021 [sic], it is now

9   March, one fourth of the year, and there has been one

10  criminal investigation, correct?

11  A.   Yes.

12  Q.   And do you understand that the incident that

13  this lawsuit relates to took place on April 10, 2021?;

14  is that correct?

15  A.   Yes.

16  Q.   All right.  One of the topics that you've been

17  designated testify about, as reflected on Exhibit 8 are

18  "The facts of the shooting incident at issue in this

19  lawsuit."

20  I think the most efficient way to ask you about

21  this topic is to just ask you to state in your words,

22  what you believe the facts of the shooting incident at

23  issue in this lawsuit to be.

24  A.   Okay.

25  Q.   Okay.  Please state in your words, what the



```
 1   facts of the shooting incident at issue in this lawsuit
 2   are.
 3   A.   Okay.
 4   Q.   And you're free to look at a document to
 5   refresh your recollection if you so choose.
 6   A.   Okay.  So, in April of 2021, Officer Burmaster,
 7   and Officer Roussel respond to a call for service.  I
 8   believe it was a disturbance at 1420 Felicity Street?
 9   Q.   Yes.
10   A.   Officer Burmaster arrived first and met with
11   the 9-1-1 caller, who stated that he heard someone
12   screaming, and maybe some things being broken.
13       And that was happening -- That was coming from 1420
14   Felicity Street.  And the caller, the complainant,
15   stated that he believed it was coming from the lower
16   level.
17       So Officer Burmaster asked the complainant to go
18   inside, he would take care of it.  And he waited for
19   Officer Roussel to arrive.  Officer Roussel arrived and
20   Officer Burmaster explained what he had learned.
21       The officers began walking in the direction of the
22   residence and they were on the sidewalk and the
23   residence was probably -- they were approaching the
24   residence.
25       So they were walking on the same sidewalk
```



1  as where the residence was.  And you can hear Officer

2  Burmaster (indicating), you know, making kissy kissing

3  sounds like as if he was trying to call for an animal.

4  Q.  But let me just interject right there, if you

5  don't mind.  At the time he made these kissing sounds,

6  where was Officer Burmaster in relation to the the

7  property of 1420 Felicity?

8  A.  So they were just about to get in front of the

9  property.  I want to say that they were probably at the

10  borderline between the property and the next.  So they

11  were very close.

12  Q.  Would you describe the kissing sounds he made

13  as loud?

14  A.  I mean, I could hear them.  I can hear them

15  just, you know, from him making them from his camera.

16  So I don't know how loud, I don't know what other people

17  could have -- how loud you know, it was to others.

18  Q.  Would you agree that the audio coming from

19  Officer Burmaster -- That's what you heard right?  The

20  audio coming from his body worn camera?

21  A.  Yes.

22  Q.  Would you agree that his own body worn camera

23  would pick that kissing noise up at a much greater

24  volume than say, a body worn camera or some kind of

25  recording device inside the property of 1420?



1   A.   I mean, he wears his body worn camera on his

2   chest, so his mouth and his chest are right there, so.

3   Q.   It would be unreasonable for me to conclude

4   that the volume at which we can hear the kissing sounds

5   on the body worn camera are the same as the volume that

6   those kissing sounds would have been at the upstairs of

7   1420 Felicity Street on the front porch, correct?

8           MR. ROQUEMORE:

9               Objection form.

10          MR. ALPAUGH:

11              Same objection.

12          MR. ANADA:

13              Okay.  So when there's an objection,

14          there's going to be lots of objections.  Once

15          your counsel is done making the objection

16          unless he tells you not to answer the question,

17          after he's done making the objection, I would

18          ask that you go ahead and answer the question.

19          THE WITNESS:

20              Okay.  I don't know how to answer that.  I

21          could hear it from his body cam because it was

22          -- he's making the noise and it's being

23          recorded on his chest.  I don't know how loud

24          it was for others to hear.  Do you want me to

25          continue?



```
1    EXAMINATION BY MR. ANADA:
2    Q.  Just one more question.  I'm going to read from
3    -- Can we mark this?
4            MR. MOST:
5                Sure.  That is.
6            MR. ANADA:
7                I'm just going to finish my line of
8            kissing noises question before you --
9            THE WITNESS:
10               Sure.
11           MR. ANADA:
12               -- go back so we don't have to hopscotch
13           around.
14           MR. MOST:
15               This is Exhibit 20.
16           MR. ANADA:
17               I'm going to mark the following document
18           as Exhibit 20.  It's entitled Administrative
19           Shooting Investigation 2021/03, from Detective
20           Shannon Brewer to Captain Sabrina Richardson.
21           If you can turn to page 8 of that document,
22           Sergeant Pruitt.
23   A. Uh-huh (affirmative).
24   EXAMINATION BY MR. ANADA:
25   Q.  If you can read the second full paragraph on
```



1  page eight starts with "Officer Burmaster stated."

2  A.  (reading) "Officer Burmaster stated when he trains

3  officers or when he responds to call like that, he

4  tells them the same thing: Be aware of the dogs and

5  about the danger of animals when responding to calls.

6      Sergeant Pruitt asked Officer Burmaster where he was

7  when he made kissing noises.  He responded a couple

8  feet from the house.  Officer Burmaster stated the dogs

9  should have heard him as they came from the second

10 floor balcony.

11     Sergeant Pruitt advised the kissing noises were

12 made outside of the gate before entering the perimeter

13 of the property and asked if he thought his noises were

14 premature.  Officer Burmaster stated his noises were

15 loud and was at the gate when he made them. No further

16 kisses -- kissing noises were made."

17 Q.  Thank you appreciate that.  I'm going to read

18 -- I'm going to focus on this sentence: "Sergeant

19 Pruitt asked Officer Burmaster where he was when he

20 made kissing noises and he was responded, "A couple of

21 feet from the house."

22 You've watched Officer Burmaster's body camera

23 footage, right?

24 A.  Yes.

25 Q.  And you've also watched Officer Roussel's body



1  camera footage, right?

2  A.  Yes.

3  Q.  Am I correct that he was not a couple of feet

4  from the house when he made the kissing noises?

5  A.  So the house is going to be set back from the

6  sidewalk.  So, I mean, if you're speaking literally,

7  like, if he's a couple of feet from literally the house,

8  no, he was not okay.

9  Q.  Yeah, I'm just asking as a factual matter --

10  A.  Right.

11  Q.  Was he or was he not a couple of feet from the

12  house when he made the kissing noises based on your

13  review of the body camera?

14  A.  No.

15  Q.  Okay, so So this statement made to you that he

16  was a couple of feet from the house, when he made the

17  kissing noises is factually inaccurate, correct.

18  A.  Again, if you're speaking, just from like,

19  literally the house.  He was not a couple of feet from

20  the structural house.  And I took it to he was a couple

21  of feet from approaching the house.

22      Like, from -- the I say the perimeter of the

23  residence.  That's how I took it.

24  Q. Okay, but that's not what he said, right?  He

25  said a couple of feet from the house?



1  A.  It -- he wasn't specific.  And I, Yeah.

2  Q.  Is this interview?  Was this interview

3  recorded?

4  A.  Yes.

5  Q.  Okay.  And was that -- it was it was videod, was

6  it not?

7  A.  Yes.

8  Q.  Next sentence, "Officer Burmaster stated that the

9  dog should have heard him as they came from the second

10 floor balcony."  Do you have any idea what Officer

11 Burmaster bases that on?

12         MR. ROQUEMORE:

13              Objection, form.

14         MR. ALPAUGH:

15              Same objection.

16         THE WITNESS:

17              His perspective of because they came down

18         the steps.

19 EXAMINATION BY MR. ANADA:

20 Q.  So was he telling you that the dogs came down

21 the steps in response to his kissing noises?

22 A.  Let me read that sentence where was it, let me

23 see?

24 Q.  It's in that same second full paragraph right

25 in the middle.  "Officer Burmaster stated the dogs



1  should have."

2  A.  "Should have heard him as they came from the

3  second storey balcony."

4  Q.  I read that as Burmaster telling you that the

5  dogs came down from the second floor balcony in

6  response to his kissing noises.  Is that how you

7  interpreted it?

8  A.  I interpret it as: if the dogs are in the

9  perimeter, and he made the noises that they would have

10  responded no matter where they were in the yard.  If

11  that makes sense.  That's how I took it.

12  Q.  If they heard him, right?

13  A.  Yes.

14  Q.  All right, next sentence. (reading) "Sergeant Pruitt

15  advised the kissing noises were made outside of the

16  gate before entering the perimeter of the property and

17  asked if he thought his noises were premature."

18  Can I ask you, what what prompted you to ask him

19  that question?

20  A.  I guess.

21  Q.  Let me rephrase the question.

22  A.  Okay.

23  Q.  Did you ask him this question because you felt

24  the kissing noises were premature?  Made where they were

25  rather than actually inside the property?  Inside the



```
 1   yard?

 2   A.  Because they were -- the kissing noises started

 3   before they actually got like, to the gate.  So and

 4   then stopped at that point, you know, so that's why.

 5   Q.  So you thought that that may be premature?

 6   A.  Yeah.

 7   Q.  Prompting you to -- Okay.  Let me ask you this.

 8   It would have been much more prudent for Officer

 9   Burmaster to to make these types of noises to

10   investigate whether a canine was present on the

11   property when he was inside the gate and closer to the

12   property, correct?

13           MR. ROQUEMORE:

14               Objection to form.

15           MR. ALPAUGH:

16               Object to form.

17           THE WITNESS:

18               Speaking from experience, I don't want to

19           wait until I get into somebody's gated

20           perimeter to start making any kind of noise to

21           alert an animal.

22               I am definitely going to

23           start whistling or clapping or making some type

24           of have noise to before I go in someone's gated

25           property, because that way if something does
```



```
 1             come out, I'm on the other side.
 2             So, repeat the question.
 3   EXAMINATION BY MR. ANADA:
 4   Q.  Well, I will but, actually, that prompted another
 5   question, while it's on my mind.
 6   A.  Yeah.
 7   Q.  You would do more than making kissing noises to
 8   investigate whether a canine was was on a property you
 9   were about to enter, correct?
10   A.  I would like, probably whistle or you know,
11   something like that, make some type of noise.
12   Q.  More than kissing noises?
13   A.  I would probably whistle or, you know, make
14   some noise to see if something is going to come out.
15   Q.  Like clapping your hands?
16   A.  Maybe.
17   Q.  Okay.  How many times have you interviewed
18   Officer Burmaster in regards to this incident?
19   A.  Once.
20   Q.  And is it page 8 of Exhibit 20; is that
21   reflective of that one interview?
22   A.  Yes.
23   Q.  I'm going to go down to the paragraph third to
24   last which starts with, "Officer Burmaster the only
25   way."  Just read that paragraph, you don't need to
```



1  read it into the record, just read it read it yourself.

2  It's two sentences.  Have you finished reading?

3  A.  Yeah.

4  Q.  Okay.  "Officer Burmaster stated that one dog

5  looked to be a Pit bull."  There were no Pit bulls

6  involved in this incident, am I correct?

7  A.  Correct.

8  Q.  Okay.  So Officer Burmaster's assessment in

9  that sentence was incorrect, right?

10  A.  Yes.

11  Q.  I'm going to read from the next paragraph,

12  "Officer Burmaster stated that the dog that the dog

13  attacked him," I'm going to stop right there.

14      Am I correct that no dogs attacked Officer

15  Burmaster on April 10, 2021?

16  A.  What's your definition of attacked?

17  Q.  What's your definition of attacked?

18  A.  I can describe what the dog's approach to

19  Burmaster; if that makes sense.

20  Q.  Sure.  I mean.

21  A.  So the dog ran to -- ran at him.  And that --

22  he perceived that as an attack.  He felt that he was

23  being attacked in that manner because the dog was

24  running at him.

25  Q.  How close did the dog get to him?  And which



1  dog are we talking about?  There's two dogs.

2  A.  Yes, Apollo.  Yeah.

3  Q.  That's the puppy, right?

4  A.  Yeah, the Catahoula.

5  Q.  If I remember correctly, that was a 22 pound

6  puppy?

7  A.  Yeah, 20-something-pound.

8  Q.  Have you ever seen a cat that weighs 22

9  pounds?

10  A.  Yes.

11  Q.  Okay.  So it could be the size of a cat, house

12  cat, right?

13  A.  Yes.

14  Q.  Do you know did this 22 pound puppy

15  even make it down the steps before Burmaster shot it?

16  A.  Yes.

17  Q.  Okay.  How close do you do you think the puppy

18  got to Burmaster during the course of this "attack"?

19  A.  So he was probably a couple of feet from him

20  before he was fatally shot.

21  Q.  How -- It's interesting you qualified your

22  answer that way, how far was the puppy from the first

23  time he was shot?

24  A.  The dog was, I guess, several feet away.  But

25  the dog continued to come at the officer as he



 1    continued to fire.

 2    Q.  Okay.  So several feet away when Burmaster

 3    chose to use lethal force on the dog, right?

 4    A.  Yes.

 5    Q.  Do you know if it was more than three feet

 6    away?

 7    A.  I'm not sure.

 8    Q.  All right.  I'm going to read from the last

 9    paragraph on page 8.  "He further stated the dogs were

10    barking but he was not sure which, or if both dogs were

11    barking."  Is your understanding that prior to the time

12    he used lethal force on this 22 pound puppy, he was

13    unaware if that puppy was barking or not?  Per his

14    statements to you?

15    A.  Yes.

16    Q.  Okay.  So am I correct that based on his

17    statements to you during this interview, basically, he

18    said a 22 pound puppy was running in his direction and

19    he shot it; is that right?

20    A.  Yes.

21    Q.  Have you ever had a 22 pound puppy run in your

22    direction?

23    A.  Yes.

24    Q.  Did you shoot it?

25    A.  No.



1    Q.   Why not?

2    A.   Because that would that's -- I mean, that's my

3    response.  You know, I believe that every individual

4    responds differently based on their experiences and

5    training.  So...

6    Q.   Did you have different training than

7    Officer Burmaster?

8    A.   No.

9    Q.   Okay.  Based on your training, you have had

10   puppies run in your direction, and you haven't shot

11   them, correct?

12   A.   Yes.

13   Q.   And you made that decision -- How many times

14   has this happened?

15   A.   I mean, I've encountered animals on many

16   occasions during my course of working for the police

17   department.

18   Q.   Okay.  So more than a couple of times?

19   A.   Yes.

20   Q.   All right.  Based on your training, in each

21   instance that a puppy ran towards you in a line of

22   duty, each time that happened you chose not to shoot

23   the puppy, correct?

24   A.   Yes.

25   Q.   Okay.  Was there anything in your training that



```
 1  suggested or counseled you to shoot a small puppy
 2  running towards you?
 3  A.  I mean, in as far as the department is
 4  concerned, you know, if there is a situation where it
 5  calls for it, it's -- you can do that, yes.
 6  Q.  What kind of situation would call for it?
 7  A.  A -- well, being attacked is a situation.
 8  Q.  You -- How are you?  How do you define that word as you
 9  just used it in that sentence, "attacked"?
10  A.  If an animal is, I guess, if you feel
11  threatened.  If the animal's coming at you, is going to
12  bite you.  Or if you're physically actually being
13  attacked.
14  Q.  Okay.
15  A.  Contact is being made by an animal.
16  Q.  Got it.  Is there anything in the training you
17  and Officer Burmaster received you state that was
18  the same?  At least in respect to shooting or force -- use
19  of force on animals?  Is there anything that would --
20          MR. ROQUEMORE:
21              She didn't actually say it was the same.
22          I was just gonna, so I'll interpose it --
23  EXAMINATION BY MR. ANADA:
24  Q.  Are you aware of any differences between the
25  training, you've received as as it relates to use of
```



 1  force against animals versus the training Burmaster has

 2  received?

 3  A.  No.

 4  Q.  Okay.  All right.  Is there anything in your

 5  training that counsels you, or suggests that you should

 6  -- that you are authorized to use lethal force

 7  against a puppy that's running to you that you do not

 8  know whether it's barking or not?

 9  A.  I mean, that is a very specific -- that's very

10  specific what you're asking me.

11  Q.  Yeah.

12  A.  And the policy isn't that specific.  It's kind

13  of very general.

14  Q.  Okay.

15  A.  So like I said before, I think that it's really

16  individual, you know, it's based on the individual

17  who's experiencing that incident.

18  Q.  Got it.  All right.  Would you agree if you

19  were the individual one thing you would assess on

20  whether or not to shoot a small puppy is -- that was

21  that was running your direction, am I correct that one

22  of the things you would assess before making the

23  decision to shoot or not shoot is: if the puppy was

24  barking.  Would that be relevant in your calculus?

25  A.  I mean, that could be a factor.



1  Q.  Would it be if you were in this situation?

2  A.  It could be.

3  Q.  You said it could be, what situation would it

4  not be?

5  A.  I mean, I would have to be experiencing it to

6  really know.  I mean, it's, it's hard to, to guess at

7  how I would respond to something, you know.  I mean,

8  nothing says that an animal who's running towards you

9  isn't going to be aggressive just because he's not

10  barking.

11  Q.  Got it.  Is another thing you would consider

12  the size of the animal?

13  A.  Sure.

14  Q.  If the animal was a size of a puppy, would you

15  agree that would mitigating -- that would, that would

16  counsel you towards not shooting?

17  A.  And again, you know, the size of the dog isn't

18  doesn't determine the aggressive -- how the

19  aggressiveness of an animal.  Little dogs can be very

20  aggressive.  And large dogs can be aggressive and vice

21  versa.

22  So, I think that it really depends on the animal

23  itself.

24  Q.  Based on your view of the body camera footage,

25  other than running in the direction of Officer



1   Burmaster, did this 22 pound puppy give any other

2   indication that he was going to attack Burmaster?

3   A.  I mean, the dog didn't have a chance to make

4   contact with the officer.  The dog ran at him.

5   Q.  Okay.  Other than running at him.  Was there

6   anything that you observed that indicated that the dog

7   was going to attack Officer Burmaster?

8   A.  I mean, I don't know if the dog would have or

9   not, because we didn't get a chance to see that.

10  Q.  I got it.  But based on what you did see, can

11  you articulate for me any other fact that indicates the

12  dog was gonna attack Burmaster, other than the fact

13  that as you describe it, it was running at him?

14  A.  No, just that the dog was running at him.

15  Q.  Okay.  So you can't articulate any other things

16  the dog did, while it was alive, to indicate that it

17  would attack Burmaster besides running at him?

18  A.  Correct.

19  Q.  Do you believe that any police officer is

20  justified in shooting any animal that's running in

21  their direction?

22  A.  It's -- I believe that, you know, an officer

23  has to articulate themselves in the actions that they

24  take towards any anything that they do.  So it depends.

25  Q.  All right.  Going back to page 6.  Which is the



```
 1  beginning of the summary of Officer Derrick Burmaster's

 2  criminal statement.  Let me ask you this.  This was an

 3  instance like, the one instance you've had in 2023.

 4      This was an instance where you did escalate this

 5  incident to a criminal investigation, right?

 6  A.  So it's it -- when we get cases like this, it's

 7  always going to be a criminal investigation.

 8  Q.  What do you mean cases like this?

 9  A.  A shooting investigation.

10  Q.  Okay.

11  A.  Yeah.

12  Q.  Is that only when it's a lethal

13  shooting, or any shooting?

14  A.  It doesn't matter.

15  Q.  Okay.  And I think earlier you testified that

16  an incident is escalated to a criminal investigation,

17  if the officer's conduct might be criminal in nature;

18  is that right?

19  A.  Right.  So, just to clarify, we receive, we

20  look at uses of force in different ways.  So when we

21  get called out on like a shooting, if it was between

22  people or whatever, it's automatically going to be a

23  criminal investigation.

24      Compared to let's just say, some officers used

25  force and there were allegations that maybe the
```



1   officer was excessive, something like that.

2       Where it would normally probably just be looked at

3   administratively, we make sure that it's not something

4   that we need to look into criminally.  So, hopefully,

5   that clears that up.

6       Because we do all of our cases,

7   all of our shooting cases, are criminal cases.

8   Q.  At some point during your interview of Derrick

9   Burmaster.  You asked him, and I'm specifically looking

10  at paragraph 4 on page 6 of Exhibit 20.

11  "Sergeant Pruitt asked Officer Burmaster to explain

12  what happened next.  Officer Burmaster opened his phone

13  and began reading from the phone.

14  Officer Burmaster read from the phone."

15      Is that, something that officers normally do

16  when they're being interviewed?

17  A.  So yeah, for this case, Officer Burmaster was

18  adamant to read his force statement.

19  And force statements are taken and are given,

20  basically, they go to the administrative portion of the

21  case so we keep those separate; that's not something

22  that a criminal investigator would receive.

23      But he wanted to read his force statement.  Which I

24  believe we just were, like, look, can you try to do it

25  in your own words.  We'll keep that for the



```
 1   administrative portion of the investigation.
 2   Q.  And he refused that, right?  He refused to give
 3   you in his own words not just read the --
 4   A.  No he did.
 5   Q.  -- statement.
 6   A.  He did.  He gave us a statement.
 7   Q.  Did you find him credible during this interview?
 8   A.  Yeah, I mean, I don't think he -- he wasn't
 9   lying about what happened.  It was what he experienced.
10   Q.  At the conclusion of your interview, did you
11   feel that his -- I'm going to actually withdraw that.
12   At the conclusion of your interview, did you
13   believe that Officer Burmaster's assessment of the
14   threat that this 22 pound puppy posed to him was
15   unreasonable?
16   A.  Could you?
17   Q.  Officer Burmaster clearly perceived a major
18   threat from this 22 pound puppy, correct?
19   A.  Did he perceive that, yes.
20   Q.  Okay.  And after you interviewed him did you
21   believe that his assessment of that threat was
22   reasonable?  Objectively.
23   A.  Right.  I mean, he felt the dog was going to
24   attack him and bite him and cause him to go to the
25   hospital.
```



1  Q.  It was -- he was specifically worried the dog

2  would bite his penis, correct?

3  A.  Yeah.

4  Q.  Okay.  So, objectively did you consider, after

5  interviewing him, Burmaster's assessment of the threat

6  that this 22 pound puppy posed him to be reasonable?

7          MR. ROQUEMORE:

8              Objection form.

9          MR. ALPAUGH:

10             Same objection.

11         THE WITNESS:

12             I mean, that was his perception.

13  EXAMINATION BY MR. ANADA:

14  Q.  I understand that was his perception, but the

15  question I'm asking is a little bit different.  Did you

16  believe after interviewing him that his perception of

17  the threat was appropriate?  Objectively.

18  A.  I mean, the only way I can answer that, is that

19  he experienced that.  And that he made those choices

20  based on what he was going through.

21  Q.  Going back to, to whether -- to what I've -- what

22  I asked you previously about puppies running towards

23  you; that's happened to you before, right?

24  A.  Uh-huh (affirmative).

25  Q.  Okay.  Am I correct to understand that, in your



1   mind, the puppy running towards you without any other

2   kind of threat is not enough to shoot the puppy?

3   A.  For me?  You're asking me, like, how I would

4   respond?

5   Q. Yeah, absolutely.  You would need more than

6   just a puppy running towards you to shoot it, right?

7   There would have to be some other indication of a

8   threat, right?

9   A.  Yes.

10  Q.  Okay.  And could you tell me what those other

11  indications could be?  Barking?

12  A.  Yeah, I mean, it would take a lot for me to

13  shoot an animal; that's just based on my experience.

14  Q.  Right.

15  A.  I've worked at an animal hospital before, way

16  my younger years.

17  Q.  Sure.

18  A.  So I have I have experience, like real

19  experience with animals.

20  Q.  Got it.  You have the same training as

21  Burmaster had with respect to use of force against

22  animals, right?

23  A.  Yes.

24  Q.  Okay.  You said it would take a lot for you to

25  shoot an animal.



```
 1   A.   Yes.
 2   Q.   You've you've reviewed Officer Burmaster's body
 3   cam video?
 4   A.   Yes.
 5   Q.   And you've reviewed Officer Roussel's body cam
 6   video?
 7   A.   Yes.
 8   Q.   Okay.  Putting aside the larger dog that
 9   Burmaster incorrectly stated was a Pit bull, was the
10   threat as you've observed on a lot of camera footage,
11   that Apollo posed, would that have been enough to make
12   you, Sergeant Pruitt, lethally shoot this 22 pound
13   puppy?
14           MR. ALPAUGH:
15               Object to the form of the question.
16           MR. ROQUEMORE:
17               Same objection.
18           THE WITNESS:
19               No.
20           MR. ANADA:
21               What's the base of the objection?  I'm
22           gonna try and cure it.
23           MR. ALPAUGH:
24               You're trying to split out something --
25           it's the totality of circumstances.  You have two
```



```
 1              dogs coming down and you're trying to say --
 2              trying to get rid of the one other dog that's
 3              there.
 4                   So I'm sorry, you're not giving a full
 5              recitation of the facts based on what actually
 6              happened.
 7              MR. ANADA:
 8                   Fair.  Okay.
 9    EXAMINATION BY MR. ANADA:
10    Q.  Same question, I withdraw the part about
11    putting aside the dog that was not a Pit bull.  Same
12    answer?
13    A.  Yes.
14    Q.  Okay.  Thank you.
15              MR. ANADA:
16                   What was your form objection, the same as
17              his?
18              MR. ROQUEMORE:
19                   Basically, facts not in evidence.
20              MR. ANADA:
21                   Okay.  Okay, thank you.
22    EXAMINATION BY MR. ANADA:
23    Q.  Could an expandable baton be a useful non-
24    lethal tool to use against a puppy running against you
25    -- running towards you?
```



1    A.   Yes.

2    Q.   Burmaster was required to be carrying an

3    expandable baton or ASP?  What is ASP?

4    A.   ASP, it's the same.

5    Q.   Okay.  What's Pr-24?

6    A.   It's a one that doesn't expand.  Basically

7    they're all a form of batons.

8    Q.   Okay.  He was required to be carrying a baton

9    on April 10 2021, correct?

10   A.   Yes.

11   Q.   And this is because of the NOPD policy?

12   A.   Yes.

13   Q.   And he violated that policy by not caring a

14   baton, correct?

15   A.   I didn't do his administrative investigation

16   that would have come out in Sergeant Brewer's

17   investigation as far as how he was hired.

18   Q.   Okay.  I'll direct you to page 15 of Exhibit 20,

19   2nd full paragraph, last sentence.

20   I'll read into the record, "Officer Burmaster stated he

21   was not equipped with his Pr-24/expandable baton or ASP

22   at the time of this incident and did not attempt any

23   less lethal options."

24       Would you agree that he violated NOPD's policies

25   and procedures by not carrying his baton on April 10,



```
 1    2021?
 2            MR. ALPAUGH:
 3                Objection to the form.
 4            MR. ROQUEMORE:
 5                Objection to the form.  She did the PIB
 6            for the criminal investigation, that's part
 7            of the administrative.
 8            So if you're asking her personally, then that's
 9            okay, I will allow that.
10            But I don't want to get into 30(b)(6) topics.
11            MR. ANADA:
12                Agreed.
13    BY MR. ANADA:
14    Q.  Personally?
15    A.  Yes.
16    Q.  You would agree that he violated the policy
17    by not carrying his expandable baton.
18    A.  Yes.
19    Q.  And you would agree that an expandable baton
20    would have been a useful non lethal means to to
21    mitigate whatever threat Apollo -- that he believed
22    Apollo may have posed towards him on April 10, 2021.
23    A.  Yes.
24    Q.  Okay.  Would that fact not be relevant to the
25    criminal investigation?
```



 1   A.  It's, I mean, basically, it's what he had

 2   available at the time.

 3   Q.  Uh-huh (affirmative).

 4   A.  You know, so that what was taken into

 5   consideration.

 6   Q.  Would the fact that -- was the fact that he

 7   violated NOPD policy by not carrying the baton on April

 8   10, 2021; was that fact considered in the criminal

 9   investigation?

10   A.  He had other options.  He had a taser.

11   Q.  Okay.

12   A.  So, any -- I mean, there are other things that

13   would have been available that he chose not to use.

14   Q.  Okay.  How did the fact that Officer Burmaster

15   had a taser on him factor into the criminal

16   investigation?

17   A.  It didn't I mean, basically, I am looking into

18   whether his lethal force was a criminal issue.

19   Q.  Okay.  And what's the status of that

20   investigation?

21   A.  My investigation?

22   Q.  Yeah.

23   A.  It was, he did not -- There were no criminal.

24   There were no criminal charges against him.  Basically,

25   I looked at -- I'm looking at that last page.



Debra Pruitt                                          March 06, 2023
                                                          Page 44

 1   Q.   On Exhibit 20?

 2   A.   I don't know if you have it in here, but in

 3   regard to -- is it okay if I look at -- this is

 4   my report.

 5   Q.   Sure, absolutely.

 6   A.   It's in the last page of my report.  So,

 7   "Relative to cruelty to animals."

 8          MR. MOST:

 9              Could we go off the record for a minute to

10          discuss this report.

11   (Hour long break)

12          VIDEOGRAPHER:

13                  We're back on the record, the

14          time is 12:05 p.m.

15   EXAMINATION BY MR. ANADA:

16   Q.   Sergeant Pruitt, I'm going to mark as Exhibit

17   37, Your Investigative Report reflecting your criminal

18   investigation.

19       Do you have that document in front of you?

20   A.   Yes.

21   Q.   Is it 37 pages long?

22   A.   Yes.

23          MR. MOST:

24              Just before we go on.  This is the

25          criminal investigatory report.  It's marked as



```
 1              Bates 2153 to 2189.  There's a confidential
 2              marker at the top, but per our discussions
 3              during the break, this is not designated as a
 4              confidential document agreed, Jim?
 5         MR. ROQUEMORE:
 6              That is correct, Mr. Most, William.
 7    EXAMINATION BY MR. ANADA:
 8    Q.  Sergeant Pruitt, you prepared this report,
 9    correct?  You're familiar with its contents?
10    A.  Yes.
11    Q.  Do you have any -- Did you take any handwritten
12    notes in connection with your criminal investigation
13    regarding Derrick Burmaster?
14    A.  Yes.
15    Q.  Where are those handwritten notes?
16    A.  They would be, I guess, at my office like,
17    usually just have a notebook and as we are
18    investigating just writing down.
19    Q.  Do you still have it?
20    A.  I have to check and see.
21    Q.  Okay.
22    A.  Probably.
23    Q.  You never -- you never gave it to your lawyers
24    to produce in discovery in this case?
25    A.  No.
```



```
1    Q.  We'd ask that if you have not destroyed those
2    notes to maybe not destroy them.
3    A.  Yes, sir.
4            MR. ROQUEMORE:
5                Wait, can you repeat that?
6            MR. ANADA:
7                She's got handwritten notes, we never
8        got them.
9            MR. ROQUEMORE:
10               I know, but what did you ask her?
11       I just want to make sure that I understand what
12       you decided.
13           MR. ANADA:
14               I told her if she hasn't destroyed them
15       please, don't destroy them.
16           MR. ROQUEMORE:
17               Okay.
18           MR. ROQUEMORE:
19               Tarak, did you give her Exhibit No. 37?
20           MR. ANADA:
21               She has it in front of her.  But this one
22       has notes on it.  If you want to give her your
23       copy?
24           MR. ROQUEMORE:
25               I just want to make sure your exhibits are
```



```
 1              together.  Her copy actually she wrote she made a
 2              handwritten notes at the top.
 3         MR. ANADA:
 4              Okay.  That's fine.  That's a clean copy.
 5              Could I get a copy to give to the witness and
 6              counsel?
 7         MR. MOST:
 8              We'll also distribute No. 19.
 9    EXAMINATION BY MR. ANADA:
10    Q.  Sergeant Pruitt, let's look at Exhibit 19.  If
11    you could just review this document, I don't need you
12    to read every word of it, but just skim it to your
13    satisfaction.
14    Let me know when you're done and I'll ask you some
15    questions about this document.
16    A.  Okay.
17    Q.  Were you aware that Officer
18    Burmaster shot and killed a dog at 1418 Ferdinand
19    Street?
20    A.  Yes.
21    Q.  -- on January 1, 2012 --
22    A.  Yes.
23    Q.  You were familiar with this?
24    A.  Uh-huh (affirmative).
25    Q.  Did you -- Have you ever seen this document
```



 1  before that I marked as Exhibit 19?

 2  A.  Yes.  Not - Well, not this email, but I've seen

 3  the information in regard to the shooting.

 4  Q.  Okay.  All right.  Did you factor in this

 5  incident on January 1, 2012, into your criminal

 6  investigation?

 7  A.  No.

 8  Q.  Did you factor in Burmaster's fear of being bit

 9  in the penis by Apollo into your criminal

10  investigation?

11  A.  No.

12  Q.  Are you aware of any other incidents besides

13  the one at issue in this case and the one on January 1,

14  2012 reflected on Exhibit 19?

15  A.  Don't know, no.

16  Q.  Okay.  Are you aware of any incident where

17  Derrick Burmaster shot a dog where he was not concerned

18  that his penis would be bitten?

19  A.  No.

20  Q.  Okay.  From your -- from what?  What you have

21  reviewed he's had that concern, that same concern every

22  time he shot a dog, right?

23  A.  Yes.

24  Q.  Not just when he shot Apollo, correct?

25  A.  Correct.



1   Q.  Was there any body camera footage that you know

2   of reflecting this 2012 incident?

3   A.  Not that I know of.

4   Q.  Do you know what the NOPD's body cam policies

5   were in -- on January 1, 2012?

6   A.  I don't know what year we started wearing

7   cameras.  I don't know if we had them in '12.

8   So, yeah, I'm not sure.

9   Q.  How would you find that information out if

10  you had to look it up?

11  A.  It would probably be in the body worn camera

12  policy --

13  Q.  Okay.

14  A.  Because the policy would have had to start when

15  you started to wear them.

16  Q.  All right.  We're going to talk about that

17  document.  But real quick let's talk about Exhibit 10.

18  Do you have that in front of you?

19  A.  Yes.

20  Q.  If you could just review the, it looks like three

21  sentences.

22  A.  Yes.

23  Q.  You're familiar with this document?

24  A.  Yes.

25  Q.  Is it true that on June 17, 2021, you asked the



1  assistant District Attorney Paige Cline, whether the

2  DA's office will or will not pursue charges about

3  Derrick -- pursue charges on Derrick Burmaster relating

4  to the incident at issue in this case?

5  A.  Yes.

6  Q.  And what prompted you to pose that question to

7  DA Cline?

8  A.  Because Chief Westbrook always wanted us to --

9  when we have a completed case, to have the DA's office

10  look at the case to see if they would pick up charges

11  on on the subject.

12      And they, as you can see the response, they said, Paige

13  Cline said we are not going to second you.  We don't

14  usually review all of your decisions, but I was just doing

15  what our chief asked me to do.

16  Q.  Was -- Did you provide Paige Cline's answers to

17  Chief Westbrook?

18  A.  Yes.

19  Q.  What was his reaction to that?

20  A.  Her reaction --

21  Q.  Sorry, her.

22  A.  No, it's just they -- she was just -- the fact

23  that we do it, is all that she asks.  So as long as we,

24  you know, give them the report and they look at it and,

25  you know, she's happy with that.



1   Q. Can you explain to me what you interpreted the

2   sentence "We are not going to second" to you as?  I

3   just, I don't fully understand that.  How did you

4   understand that?

5   A.  That they're not going to, I guess, second guess

6   our decisions --

7   Q.  Okay.

8   A.  -- So they trust that we make the proper

9   decision.

10  Q.  So the DA's office declined to look into the

11  matter?

12  A.  Yes.

13  Q.  We're going to mark as Exhibit 27, NOPD's

14  Chapter 41.3.10 of its operations manual entitled, Body

15  Worn Camera.  27, right?  That's Exhibit 27.  I'm not

16  going to ask you, Sergeant Pruitt, to review this

17  entire document, I'm just going to ask you some

18  questions about some specific language.

19      It's your understanding that prior to entering -- or

20  approaching the Brown's residents, Officer Burmaster

21  obtained a statement from a neighbor as part of his

22  investigation?

23  A.  Yes.

24  Q.  And that neighbor was the one that presumably

25  had called 9-1-1?



1    A.   Yes.

2    Q.   And that neighbor had made statements to

3    Officer Burmaster about what they heard and why they

4    called 9-1-1?

5    A.   Yes.

6    Q.   Okay.  And am I correct that that interaction,

7    the statements made by that individual to Officer

8    Burmaster were not captured on body camera footage.

9    A.   It was.

10   Q.   It was?

11   A.   Yes.

12        MR. ANADA:

13             Do we have footage?

14        MR. MOST:

15             I don't think so, but we can follow-up

16        about that.

17   BY MR. ANADA:

18   Q.   You've seen footage about that?

19   A.   Yeah, cause I documented in my report.  So I

20   believe I remember, you know, him activating his camera

21   and getting out and interacting with the -- if I, if

22   I'm remembering correctly.

23   Q.   Okay.  All right.  I'm going to mark as Exhibit

24   37, your report, Sergeant Pruitt.

25   A.   Uh-huh (affirmative).



1  Q.  Again, I'm not going to ask you to review all

2  of this.  I know that you're familiar with it.  Were

3  you more familiar with the April 10, 2021, incident

4  involving Apollo when you wrote this report

5  than you are today?

6  A.  I remember it pretty well, still.  I would say.

7  Q.  Do you think you remembered it even better at

8  the time you wrote this report?

9  A.  Probably, because it was actually new and

10 fresh.

11 Q.  Okay.  I think you told me today that based on

12 your review of the body camera footage of the two

13 Officers, Roussel and Burmaster, that Apollo "ran at

14 Burmaster", did I interpret your -- Am I accurately

15 stating your testimony given earlier today?

16 A.  Yes.

17 Q.  Okay.  If you could look at page two of

18 Exhibit 37, do you see the second paragraph that says

19 "The officers walked towards"?

20 A.  Yes.

21 Q.  Okay.  You you wrote this paragraph based on

22 your review of the Officer's body worn camera, correct?

23 A.  Yes.

24 Q.  Okay.  Am I correct that you did not describe

25 anywhere in this report that Apollo "ran at Officer



1  Burmaster," but instead specifically described it as

2  "two dogs rushed down the staircase"?

3  A.  Yeah, because they had to come down before they

4  came at him.

5  Q.  Okay.  Later in that that paragraph, you didn't

6  use the words "came at Burmaster" you just said the two

7  dogs -- "The smaller of the two dogs ran towards Officer

8  Burmaster"?

9  A.  Yes.

10  Q.  On this same page it states that you were

11  assigned as the lead criminal investigator.  Were there

12  other criminal investigators underneath you?

13  A.  No.

14  Q.  Okay.  So you were the one and only, okay.

15  A.  Yes.

16  Q.  All right, if you could go to page three of Exhibit

17  37, I'm going to direct you to the second paragraph.

18  If you could just read that second paragraph, and I'll

19  ask you some questions about it.  You don't need to

20  read it into the record.

21  A.  Okay.  You can ask me a question.

22  Q.  Okay.  There was not just one exit through the

23  iron gate, correct?  There were two, right?

24  A.  There was a pedestrian entrance and then there

25  was a driveway entrance.



```
 1   Q.   Okay.  Did Officer Burmaster ever attempt to
 2   exit through the driveway entrance?
 3   A.   No.
 4   Q.   Did he ever testify that he considered it, but
 5   chose not to explore that option?
 6   A.   No, the only thing he considered was going over
 7   the fence.  But he said that because it was pointy,
 8   that's not something that he didn't want to try.
 9   Q.   So he didn't even consider exiting through the
10   vehicle entryway, right?
11         MR. ROQUEMORE:
12             Objection to form.
13         MR. ALPAUGH:
14             Same objection.
15   EXAMINATION BY MR. ANADA:
16   Q.   To your knowledge?
17         THE WITNESS:
18             Correct.
19         MR. ANADA:
20             Okay.
21   EXAMINATION BY MR. ANADA:
22   Q.   He never told you he considered it in during
23   your interview of him, right?
24   A.   No.
25   Q.   Okay.  Do you recall where that vehicle
```



1   entryway was in relation to where Burmaster was

2   standing when he fired his shots?

3   A.   It would have -- so he was standing in the

4   driveway, so it would have been behind him.

5   Q.   Okay.  It was much closer to him -- I mean, it

6   was directly behind him, right?

7   A.   It was behind him, yeah.

8   Q.   Okay.  Was it closer to him than the pedestrian

9   entryway?

10  A.   Yes.

11  Q.   Okay.  In your opinion, would it have been

12  prudent for him to consider exiting the property

13  through the vehicle exit?

14  A.   Well being that they entered through the -- we'll

15  say the pedestrian entrance, I don't know that -- and I

16  don't know if he's ever been to this residence before,

17  so I don't know if he -- it was a conscious thing that

18  that was actually there.

19       And I can't remember just like as far as like,

20  that there were any locking mechanisms on there.

21  So but, yeah.

22  Q.   So so let me just re-ask my question.

23  A.   Okay.

24  Q.   Do you personally believe it would have been

25  prudent for him to at least consider using the drive --



1  vehicle gate as a means to evade the situation?

2  A.  If it was assessable, it would have been an

3  option.

4  Q.  Based on your review of the body camera

5  footage, can you think of any reason why it would not have

6  been assessable to Officer Burmaster?

7  A.  Yeah, I don't know because I don't -- like I

8  said, I don't know if he was aware of that.  Of there

9  actually being a driveway because it's all like wrought

10  iron fence, so I'm not sure that he knew that was an

11  option.

12  Q.  Did you see anything in the body camera that

13  would have obstructed his view of the vehicle entryway?

14  A.  No.

15  Q.  If you could turn to page 10 of Exhibit 37, if

16  you look at the timestamp 7:06, am I correct that you

17  concluded that Officer Burmaster had already pulled his

18  firearm from the holster and held it up pointing

19  towards the staircase before any of the dogs came down

20  the steps?

21  A.  Yes.

22  Q.  Am I correct that based on the body camera

23  footage, it would be your conclusion that at this time

24  he did not even consider the use of his conducted

25  energy weapon?



1   A.  Yeah.  Because he, he didn't take his taser

2   out.  He took his gun out.

3   Q.  Right.  He went straight to lethal force before

4   considering the taser, right?

5   A.  Yes.

6   Q.  And this was at the time the dogs had not even

7   come down the steps.

8   A.  They were coming down the steps.

9   Q.  Well, it seems to me that you wrote here that:

10  "Before the dogs came down the steps, Officer Burmaster

11  already released his firearm from the holster and held

12  it up pointing towards the staircase."  Am I misreading

13  that?

14  A.  Which?

15  Q.  It's at timestamp 7:06 on page 10, second

16  sentence.

17  A.  Okay.  And so, what I'm saying is before they actually

18  are down at the -- their level is -- so before they

19  actually made -- cleared the stairs --

20  Q.  Okay.

21  A.  -- Before they cleared the stairs, he

22  unholstered his weapon.

23  Q.  Okay.  Got it.  And Apollo was the second dog,

24  higher up towards the upstairs residence, right?

25  A.  Yes.



1    Q.  And when he unholsters his firearm and pointed

2    it, that was before even the first dog, the lead dog,

3    had finished coming down the steps?  Per your.

4    A.  Right.  So he hears -- they hear, they hear

5    the dog, and in response -- they're coming down the

6    steps so he unholstered his weapon at that point.

7    Q.  Officer Burmaster did have a CEW taser at that

8    moment, correct?

9    A.  Yes.

10   Q.  As per an NOPD policy?

11   A.  Yes.

12   Q.  Do you have any facts to suggest that it was

13   non operational at the time?

14   A.  That would be part of the administrative

15   investigation.

16   Q.  Okay.  But you don't, you're not aware of any

17   facts that it wasn't operational, right?

18   A.   No.

19   Q.  You're not aware of -- to your knowledge, he

20   was trained by NOPD and the use of CEW and when it's

21   appropriate and when it's not, right?

22   A.  Yes.

23   Q.  If you could turn to page 12 of Exhibit 37.  And

24   I would direct your attention to timestamp 17:36, if

25   you could read that paragraph not into the record but



1  by yourself and let me know when you're done and I'll

2  ask you some questions about it.

3  A.  Okay.

4  Q.  According to your report at timestamp 17:36, on

5  page 12.  During his interview Officer Burmaster was

6  specifically asked if he tried jumping the fence to

7  evade the situation, am I right?

8  A.  Yes.

9  Q.  His response was, "I couldn't get over

10  the fence fast enough," am I right?

11  A.  Yes.

12  Q.  His response did not say anything about spikes,

13  right?

14  A.  Right.

15  Q.  He was just -- he didn't do it because he

16  couldn't get over the fence fast enough.

17  A.  Okay.  That's, that's my error.  I apologize.

18  Q.  Okay.  How is it your error?  Are those not his

19  words in quote --

20  A.  No, no, no.  I'm saying the spike, the thing.

21  The comment that I made about the spikes; that's my

22  error.

23  Q.  Okay.  So he never said anything about the

24  spikes?

25  A.  No.  That's -- How you're reading it is what he



```
 1   said.
 2   Q.  Right.  Okay.  So he has never articulated any
 3   kind of hindrance to his ability to get over the fence
 4   because of spikes, correct?
 5   A.  From what I'm reading here.  If some -- like,
 6   when I we do the statement, and it's, I have to like
 7   look and see if that's in there.
 8   Q.  Okay.  But this is -- you drafted this report,
 9   right?
10   A.  Yes, I did
11   Q.  In the part of the report where it discusses
12   Officer Burmaster being question about whether he tried
13   to jump the fence.  Your response states that he says "I
14   couldn't get it get it over fast enough," but it doesn't
15   mention anything about his fear of getting hurt by the
16   spikes, right?
17   A.  No, not in his conversation with another
18   officer.
19   Q.  All right.  Are NOPD officers supposed to
20   consider the efficacy of each bullet they fire?
21   A.  Yes.
22   Q.  Okay.  They're not supposed to just blindly
23   shoot for an unknown number of times, right?
24   A.  You have to articulate each, each shot that you
25   fire.
```



1  Q.  Got it.  And to be able to properly do that, it

2  only makes sense that you have to know how many shots

3  you've fired, right?

4  A.  In a lot of cases where officers have to use

5  their weapon and shoot their gun, it's not uncommon for

6  them to remember how many shots they fired.

7  Q.  Okay.

8  A.  So that's, that's it's like a -- there's like a

9  whole psychology and all, thing that goes with that.

10 But it's -- that's not uncommon for them to miss, you

11 know, to say, I don't know, or there's two or three and

12 it was like 15.  You know --

13 Q.  Yeah.

14 A.  Yeah.  So it's, that's a thing.

15 Q.  Understood and I understand, understand.  Would

16 you agree that if I was an officer, and I shot somebody

17 four times, that I wouldn't be able to have evaluated

18 the need to shoot the fourth shot if I didn't even know

19 I shot four bullets?

20        MR. ROQUEMORE:

21            Objection to form.

22        MR. ALPAUGH:

23            Objection.

24 EXAMINATION BY MR. ANADA:

25 Q.  You have to know you fired a shot to be able to



1   evaluate whether you should have fired it, right?

2   A.  Right.  So in, and in cases where, you know,

3   officers are shooting someone or something.

4   Explanation -- as far as explanation of when choosing

5   to stop firing is based on their situation.

6       So it's more of, okay, what started -- what

7   prompted you, you know, what was the threat when you

8   started to fire?

9       And then what was your -- what was  the decision

10  in you stopping --

11  Q. Got it.

12  A. -- No longer firing.

13  Q.  How many?  You've just done one criminal

14  investigation on an officer shooting in 2023, so far,

15  right?

16  A.  I have to think about that.  Do I have more than

17  one case this year?  At least one.

18  Q.  Okay.  Did you, in that case, I'm not going to

19  ask about the specifics of that, did you in that case,

20  conclude that the officer in fact, had criminal

21  liability or had committed -- had violated a criminal law

22  or statute?

23  A.  No.

24  Q.  Okay.  Do you remember how many criminal

25  investigations you did in relation to Officer shootings



1   in 2022?

2   A.   It's a number of them.

3   Q.   Okay.   How many of those did you conclude that

4   an officer did in fact, violate a criminal law or

5   statute?

6           MR. ROQUEMORE:

7                Okay, I'm gonna I'm gonna object here. Is

8           this a 30(b)(6) question?

9           MR. ANADA:

10               No.

11          MR. ROQUEMORE:

12               Is this an individual.

13          And the relevance of this question is?

14          MR. ANADA:

15               Well, I just want to know if she's ever

16          concluded that any officer has ever --

17          MR. ROQUEMORE:

18               And the relevance of that is?

19          MR. ANADA:

20               It shows that that there's a bias towards

21          not ever concluding that there's a criminal

22          violation, which we think is very relevant to

23          this case.

24          MR. ROQUEMORE:

25               If you're able to.



```
1           THE WITNESS:
2                Yeah, no.
3    EXAMINATION BY MR. ANADA:
4    Q.  Okay. So you didn't ever conclude that any
5    officer in 2022 that you can remember, was -- violated a
6    criminal law or statute?
7    A.   No.
8    Q.  What about 2021?  Same question.
9    A.   No.
10   Q.  What about ever in your entire life?  Have you
11   ever conducted a criminal investigation of a police
12   officer and concluded that the police officer did in
13   fact violate a criminal law or statute?
14   A.   No.
15   Q.  And this is based on hundreds of
16   investigations?
17   A.   This is -- so you're just speaking of my public
18   integrity Bureau force investigation team and
19   investigations?
20   Q.  Yeah.  Like the same type of investigation you
21   did for Burmaster
22   A.   Yeah.  So it's probably, I mean, if we're
23   just talking about shootings, maybe six or so a year
24   average.  Maybe 24 cases.  But that -- out of --
25   that's an estimate, that's not a real number.
```



1  Q.  No, I understand.  I understand.

2  A.  But of of all of the shooting investigations

3  that I've done, I've not found any criminal intent from

4  an officer.

5  Q.  Okay.  So I know you qualified your answer a

6  little bit there.  Can I broaden the question?  What

7  about all investigations you've done, criminal

8  investigations regarding an officer shooting?  How many

9  times have you concluded that an officer violated any

10  kind of criminal law or statute?

11  A.  I haven't had any.

12  Q.  I'm sorry.  Like, you've never concluded that

13  on any investigation?

14  A.  Correct.  Not against a police officer, no.

15  Q.  Okay.  And is that, is that out of hundreds?

16  A.  No, I wouldn't say hundreds.  I wouldn't say

17  hundreds.

18  Q.  What would you say?  Estimate?

19  A.  I have more criminal shooting investigations

20  than I would any other type of -- it's less than that.

21  It's probably, we're talking about looking at a regular

22  use of force --

23  Q.  Right.

24  A.  -- That may have a criminal aspect to it.

25  Q.  Sure.



1   A.   And it's probably like, less than 10.

2   Q.   Okay, on top of the --

3   A.   That have been considered for criminal aspects

4   that have not qualified for criminal charges.

5   Q.   Okay.  Understood.  You've -- and just to make

6   sure I understand, you have never once in your role as

7   a officer with the New Orleans Police Department ever

8   concluded that any police officer had ever violated any

9   criminal law or statute by firing his weapon, right?

10  A.   Yes.

11  Q.   If you could turn to page 24 of Exhibit 37. I'm

12  going to direct you to like, the third to last

13  paragraph that starts with -- Actually, they all start

14  with something very similar.  So I'm going to say this,

15  this paragraph ends with the words "without firing his

16  weapon"; do you see that?

17  A.   I see it.

18  Q.   Okay.  Would you mind reading that two sentence

19  paragraph into the record.

20  A.   (reading) "Officer Roussel stated when he exited the

21  gate, he held it open for Officer Burmaster to exit

22  quickly because Officer Roussel believed he was close

23  enough to also exit in time.

24       Officer Roussel wasn't able to say whether or not

25  Officer Burmaster would or would not have made it



```
1   out without firing his weapon."
2   Q.  And part of your investigation involved
3   reviewing both Officer Roussel and Officer Burmaster's
4   body worn camera, correct?
5   A.  Yes.
6   Q.  Do you agree, based on your review of the
7   footage with Officer Roussel's assessment that
8   Burmaster was close enough to also exit in time?
9   A.  He was, he was next to him.  So Officer
10  Roussel had the opportunity to run and get out.  So, I
11  mean.
12  Q.  He also believe Burmaster had that same
13  opportunity, right?
14  A.  Yes.
15  Q.  That's why he held the gate open.
16  A.  Yes.
17  Q.  Okay.  Do you disagree with that based on your
18  review of the body worn camera footage?
19  A.  I don't disagree.
20  Q.  Okay.  All right.  Turning to the next
21  paragraph here.  It ends with "in that situation"; do
22  you see that?
23  A.  Next page?
24  Q.  No, I'm sorry, the same page just the next
25  paragraph down.
```



1   A.  Yes.

2   Q.  Okay.  I'll read it into the record this time.

3   "When Sergeant Pruitt asked Officer Roussel if there was

4   anything he wanted to add.  Officer Roussel stated that

5   he went over the BWC he noticed he touched Officer

6   Burmaster and as he's running to the gate, he noticed

7   Officer Burmaster go for his gun."

8   Help me understand, what does that mean, "he

9   touched Officer Burmaster"?

10  A.  So I think that after they heard the dog, and,

11  like, he reached out to Officer Burmaster as Officer

12  Burmaster was, I guess, deciding at that point to

13  unholster his gun, and then was like, "oh, no, I gotta

14  go."

15  Q.  Why did he reached out?  Do we know why he

16  reached out to him?

17  A.  No, I don't know.

18  Q.  Did he indicate to you that it was to counsel

19  Burmaster to not use lethal force at that moment?

20  A.  No, no, I don't think so.

21  Q.  Okay.  So it's unknown reason why he reached

22  out to him.

23  A.  Yeah.

24  Q.  Okay.  I'm gonna continue reading.  "Officer

25  Roussel stated that his natural instinct was to flee



Debra Pruitt

1   and Officer Burmaster's instinct was to stand his

2   ground.  Officer Roussel stated that he would not have

3   taken his gun out in that situation."

4        Do you understand that to mean that if Officer

5   Roussel was in Burmaster's shoes, Officer Roussel would

6   not have taken his gun out in that situation?

7   A.   Yes.

8   Q.   Okay.  Do you disagree with Officer Russell's

9   assessment there?

10            MR. ALPAUGH:

11                Object to form.

12            THE WITNESS:

13                That's his opinion.

14  BY MR. ANADA:

15  Q. Right.  Well, I'm asking you, personally, do

16  you disagree with that assessment?  What if you were e

17  in Burmaster's shoes?  Would you agree with Officer

18  Roussel that he would not have taken his gun out in

19  that situation?

20            MR. ALPAUGH:

21                Object to the form.

22  EXAMINATION BY MR. ANADA:

23  Q.   Would you be taking your gun out in that

24  situation?

25  A.   No.



1  Q.  Okay.  If you could turn to page 36 of 37.  And

2  I'm gonna direct you to the third full paragraph that

3  starts "Officer John Roussel arrived on scene."

4  A.  Uh-huh (affirmative).

5  Q.  If you look at the last sentence, "The yard was

6  secured with an iron fence and had two openings, a

7  pedestrian entrance and a vehicle entrance."

8      I've now seen a reference to the vehicle entrance

9  multiple times in your report.  Why is the vehicle

10  entrance significant?  Such that you chose to include

11  it -- referenced, make reference to it multiple times

12  in your report?

13  A.  I'm just used to documenting things.  I try to be

14  very specific and be able to create a picture when

15  someone reads.  So that was -- it was to document where

16  the two -- what, what was the method of being able

17  to get into that yard.

18  Q.  Or what was the method being able to get out of

19  the yard, right.

20  A.  Fair, yes.

21  Q.  Okay.  And you can't think of any reason right

22  now that, based on your investigation, that the vehicle

23  entrance was not an adequate method to exit the yard?

24  A.  No, I can't.

25  Q.  Turning to page 37.  Am, I correct that you



1    concluded that the owners, the Brown's, had properly

2    secured their yard to prevent the dogs from escaping?

3    A.  Correct.

4    Q.  Okay.  And what's the significance of that?

5    Why did you include that in your conclusion?

6    A.  Just to show I like to like, on behalf of them,

7    you know, any and as far as if there was any wrongdoing

8    on their part.

9    Q.  Understood.  So you base -- based on what I just

10   read, you concluded that there was not any wrongdoing

11   on the Brown's part, correct?

12   A.  Correct.

13   Q.  I think that throughout your interviews or

14   throughout the documents we've discussed today, there's

15   been several references to Burmaster accusing the

16   Browns of intentionally letting the dogs loose and kind

17   of like siccing the dogs on him; do you remember those

18   those comments from Burmaster?

19   A.  Yes.

20   Q.  Did you find any evidence at all on your

21   investigation to substantiate the accusation that the

22   Browns intentionally let the dogs out to intimidate or

23   scare Burmaster?

24   A.  No.

25   Q.  Okay.  Besides Burmaster, have you ever, in the



 1  course of your investigations, or just as your -- in

 2  your experience as a member of the NOPD, have you heard

 3  other officers express a fear of their penises being

 4  bitten by dogs?

 5  A.  No.

 6  Q.  Just just Burmaster, right?

 7  A.  Yes.

 8  Q.  How many officers are in the NOPD?

 9  A.  I don't know.

10  Q.  Is it correct that dogs get shot multiple times

11  every year by the NOPD?

12  A.  Yes.

13  Q.  Okay.  And to your knowledge, as the Chief

14  Criminal Investigator of the Public Integrity Bureau,

15  no other officer has ever expressed a fear of their

16  penis being bitten by a dog?

17  A.  Not to me.

18  Q.  Okay.  And you haven't ever seen any

19  documentation to that effect where they expressed it to

20  someone else besides you, right?

21  A.  No.

22  Q.  Okay.  You remember putting in your report

23  something about -- where was this?

24      I read something in either this report he just gave

25  us or the previous narrative, where you questioned



1    Burmaster about why he didn't consider his hands and

2    feet is an effective tool of mitigating the threat from

3    the dog; do you remember that?

4    A.   Do I remember his answer?  I don't.

5    Q.   Do you remember discussing that with him?

6    A.   Yes.

7    Q.   Okay.  Tell me about that.  Are -- in your

8    opinion are hands and feet effective means to mitigate a

9    threat posed by a 22 pound puppy?

10   A.   Yes.

11   Q.   How so?  How could those tools be useful in

12   mitigating a threat from a 22 pound puppy?

13   A.   I mean, you can use your foot to kick.

14   Q.   Okay.  Did Officer Burmaster consider using

15   either of these two non-lethal tools to mitigate any

16   threat he believed that Apollo was posing to his

17   safety?

18             MR. ROQUEMORE:

19                  Objection form.

20             MR. ALPAUGH:

21                  Same objection.

22             THE WITNESS:

23                  No.

24             MR. ANADA:

25                  Okay, okay.  Can I get a chance to fix it?



```
 1              What's the basis of the objection?
 2         MR. ROQUEMORE:
 3              It has to do with what you're asking her
 4         what's in Burmaster's mind at the time.
 5         MR. ALPAUGH:
 6              Right.
 7         MR. ROQUEMORE:
 8              You can ask her -- So she doesn't know
 9         what's in his head.
10         MR. ANADA:
11              Okay.  I didn't think I was asking that.
12         Let me -- maybe it was a bad question.
13    BY MR. ANADA:
14    Q.  Okay.  Based on your investigation, did
15    Burmaster first attempt to use his hands or
16    feet to mitigate the threat posed by Apollo?
17    A.  No.
18    Q. And am I correct that you believe the use of
19    hands and feet could be an effective way to mitigate a
20    threat posed by a 22 pounds puppy?
21    A.  It could be.
22    Q.  How many non-lethal options did Burmaster fail
23    to use before he resorted to lethal force?
24    A.  I mean, there there could have been there -- I
25    mean, I guess it depends on what, what's available.
```



 1   You know.

 2   Q.  Okay.

 3   A.  And you know, with how fast things were

 4   happening, the reaction you know, so it's kind of a

 5   things are happening quickly.

 6   You know, using the first thing that comes to your

 7   mind, based on the threat that you perceive.

 8   Q.  Understood.  He did not use his hands or feet

 9   before resorting to lethal force, right?

10   A.  Correct.

11   Q.  He did not use his baton before resorting to

12   lethal force, correct?

13   A.  Right.

14   Q.  He did not use his taser before resorting to

15   lethal force, correct?

16   A.  No.

17   Q.  Okay.  If you turn your page to the first page

18   of Exhibit 37, can you help me understand if you look

19   at the top right-hand corner, you've checked the box

20   "cleared by except"?

21   A.  Exception.

22   Q.  Yeah, so help me understand what that means.

23   "Cleared by exception".

24   A.  So, it's so it's -- so the status of -- the

25   status of the criminal investigation it could be if



```
 1    it's a, if you can't come to a conclusion it would be
 2    like an open investigation.  If it was cleared by
 3    arrest, you would mark that off.
 4        Cleared by exception just means that there was no
 5    -- there was no findings that there would, you know,
 6    the officer would be, you know, charged criminally.
 7    So it's just it's completed, it's a complete
 8    investigation without an arrest.  It's not open and,
 9    yeah.
10    Q.  Got it.  Okay.  Thanks for explaining that.
11    Okay.  So, in your investigation, you concluded that
12    there was insufficient evidence that Burmaster
13    committed a crime by shooting Apollo, correct?
14    A.  Yes.
15    Q.  But you did not, in your investigation, assess
16    whether he'd committed a constitution violation or a
17    tort, correct?
18    A.  No.
19    Q.  Have you ever heard of the term hexagon system?
20    A.  No.
21    Q.  Thank you very much.  We really appreciate your
22    time, Sergeant Pruitt.  I'll turn it over to your
23    counsel in case he has some questions for you.
24            MR. ROQUEMORE:
25                The City has no questions.
```



```
 1            MR. ALPAUGH:
 2                 I just have a couple.  I won't be all
 3            that long.  Thanks for coming here today.
 4    CROSS-EXAMINATION BY MR. ALPAUGH:
 5    Q.  They've been fairly thorough of this.
 6    There's only really one thing I wanted to
 7    direct you to and that is on Exhibit 37.  Page
 8    37, second to last paragraph.  Would you read
 9    that, please?
10    A.  "Sergeant Pruitt did not find officer
11    Burmaster violated R.S. 14:102- Relative to
12    Cruelty to Animals; simple and aggravated or any
13    other municipal or state violation.  Sergeant
14    Pruitt found Officer Burmaster justified in his
15    actions."
16    Q.  And that last sentence is still your
17    opinion today?
18    A.  Yes.
19    Q.  Okay, you're speaking this sentence, he
20    just asked you, "Sergeant Pruitt found Officer
21    Burmaster justified in his action."
22         You're only saying that in the context of a
23    criminal investigation, right?
24    A.  Yes.
25    Q.  You're not talking about whether he
```



1  violated any NOPD policies, whether he was

2  liable in the administrative proceeding,

3  whether he was constitutionally liable; this

4  statement is strictly limited to whether or not

5  he committed a crime, right?

6  A.  Correct.

7        MR. ANADA:

8            Okay. That's it. Thank you.

9        VIDEOGRAPHER:

10            So, this concludes the deposition.

11       We're now off the record the time is 12:54 p.m.

12       COURT REPORTER:

13            Would either of you like copies of this

14       deposition?

15       MR. ALPAUGH:

16            Yes, yes, yes.

17       MR. ROQUEMORE:

18            Yes.

19

20   (The deposition was concluded at 12:54 p.m.)

21

22

23

24

25



Debra Pruitt

March 06, 2023
Page 80

1

2          R E P O R T E R ' S   P A G E

3

4       I, CARRIE A. HARTILL, Certified Court Reporter in and for

5    the State of Louisiana, the officer before whom this sworn

6    testimony was taken, do hereby state;

7       That due to the spontaneous discourse of this proceeding,

8    where necessary, dashes (--) have been used to indicate pauses,

9    changes in thought, and/or talkovers; that same is the proper

10   method for a Court Reporter's transcription of a proceeding, and

11   that dashes (--) do not indicate that words or phrases have been

12   left out of this transcript;

13      That any words and/or names which could not be verified

14   through reference material has been denoted with the phrase

15   "(phonetically spelled)."

16

17

18

19

20

21

22    _____

23    Carrie A. Hartill, BA-CCR

24    Certified Court Reporter

25    Louisiana License #2018009



1

2                    C E R T I F I C A T I O N

3        This certification is valid only for a transcript

4   accompanied by my original signature and original required seal

5   on this page.

6        I, Carrie Hartill, Certified Court Reporter, in and for the

7   State of Louisiana, as the officer before whom this testimony was

8   taken, do hereby certify that Debra Pruitt, to whom the oath

9   was administered, after having been duly sworn by me upon

10  authority of R.S. 37:2554, did testify as hereinbefore set forth

11  in the foregoing 105 pages;

12       That this testimony was reported by me in the Stenomask

13  reporting method, was prepared and transcribed by me or under my

14  personal direction and supervision, and is a true and correct

15  transcript to the best of my ability and understanding;

16       That the transcript has been prepared in compliance with

17  transcript format guidelines required by statute or by rules of

18  the board, that I am informed about the complete arrangement,

19  financial or otherwise, with the person or entity making

20  arrangements for deposition services; that I have acted in

21  compliance with the prohibition on contractual relationships, as

22  defined by Louisiana Code of Civil Procedure Article 1434 and in

23  rules and advisory opinions of the board; that I have no actual

24  knowledge of any prohibited employment or contractual

25  relationship, direct or indirect, between a court reporting firm



1  and any party litigant in this matter nor is there any such

2  relationship between myself and a party litigant in this matter.

3  I am not related to counsel or to the parties herein, nor am I

4  otherwise interested in the outcome of this matter.

5

6

7

8

9

10                                     _____

11                                     Carrie A. Hartill, BA-CCR

12                                     Certified Court Reporter

13                                     Louisiana License #2018009

14

15

16

17

18

19

20

21

22

23

24

25



## 1

**1**  8:3 47:21 48:5,13 49:5

**10**  14:23 15:13 26:15 41:9,25 42:22
43:8 49:17 53:3 57:15 58:15 67:1

**100**  14:21

**10:04**  6:14

**12**  49:7 59:23 60:5

**12:05**  44:14

**12:54**  79:11,20

**1300**  6:1

**1418**  47:18

**1420**  16:8,13 17:7,25 18:7

**14:102-**  78:11

**15**  41:18 62:12

**17**  49:25

**17:36**  59:24 60:4

**19**  47:8,10 48:1,14

## 2

**20**  19:15,18 25:20 35:10 41:18 44:1

**20-something-pound**  27:7

**2007**  12:11

**2012**  47:21 48:5,14 49:2,5

**2021**  15:6,8,13 16:6 26:15 41:9
42:1,22 43:8 49:25 53:3 65:8

**2021/03**  19:19

**2022**  14:18 64:1 65:5

**2023**  6:13 14:15 34:3 63:14

**2153**  45:1

**2189**  45:1

**22**  14:20 15:4 27:5,8,14 28:12,18,
21 33:1 36:14,18 37:6 39:12 74:9,
12 75:20

**22-00847**  6:12

**23**  15:4

**24**  65:24 67:11

**27**  51:13,15

**2nd**  41:19

## 3

**30**  10:3

**30(b)(6)**  9:5,8,11 42:10 64:8

**30(b)6**  8:4

**36**  71:1

**37**  44:17,21 46:19 52:24 53:18
54:17 57:15 59:23 67:11 71:1,25
76:18 78:7,8

## 4

**4**  35:10

**41.3.10**  51:14

## 5

**5E03**  6:1

## 6

**6**  6:13 33:25 35:10

## 7

**7:06**  57:16 58:15

## 8

**8**  8:6,8 10:23 11:4,13,15 15:17
19:21 25:20 28:9

## 9

**9-1-1**  16:11 51:25 52:4

## A

**a.m.**  6:14

**ability**  61:3

**absolutely**  38:5 44:5

**accommodate**  9:1

**accurately**  53:14

**accusation**  72:21

**accusing**  72:15

**action**  6:12 13:19 78:21

**actions**  33:23 78:15

**activating**  52:20

**adamant**  35:18

**add**  69:4

**adequate**  71:23

**administrative**  11:22 13:2,10
19:18 35:20 36:1 41:15 42:7 59:14
79:2

**administratively**  35:3

**advised**  20:11 23:15

**affirm**  7:10

**affirmative**  19:23 37:24 43:3
47:24 52:25 71:4

**aggravated**  78:12

**aggressive**  32:9,18,20

**aggressiveness**  32:19

**agree**  17:18,22 31:18 32:15 41:24
42:16,19 62:16 68:6 70:17

**agreed**  42:12 45:4

**ahead**  18:18

**alert**  24:21

**alive**  33:16

**allegations**  34:25

**Alpaugh**  6:25 7:1 8:9 18:10 22:14
24:15 37:9 39:14,23 42:2 55:13
62:22 70:10,20 74:20 75:5 78:1,4
79:15

**Anada**  7:3,4,16,20 8:7,11,13 11:16
12:5,7 18:12 19:1,6,11,16,24 22:19
25:3 30:23 37:13 39:20 40:7,9,15,
20,22 42:11,13 44:15 45:7 46:6,13,
20 47:3,9 52:12,17 55:15,19,21
62:24 64:9,14,19 65:3 70:14,22
74:24 75:10,13 79:7

**analysis**  13:22



**animal** 17:3 24:21 30:10,15 32:8,
12,14,19,22 33:20 38:13,15,25

**animal's** 30:11

**animals** 20:5 29:15 30:19 31:1
38:19,22 44:7 78:12

**answers** 50:16

**anytime** 8:25 13:22

**Apollo** 11:6 27:2 39:11 42:21,22
48:9,24 53:4,13,25 58:23 74:16
75:16 77:13

**apologize** 60:17

**appearances** 6:20

**approach** 26:18

**approaching** 16:23 21:21 51:20

**April** 15:13 16:6 26:15 41:9,25
42:22 43:7 53:3

**areas** 11:24

**arrest** 77:3,8

**arrive** 16:19

**arrived** 16:10,19 71:3

**articulate** 33:11,15,23 61:24

**articulated** 61:2

**asks** 50:23

**ASP** 41:3,4,21

**aspect** 11:21,22 13:7,10,14 66:24

**aspects** 12:25 67:3

**assess** 31:19,22 77:15

**assessable** 57:2,6

**assessment** 26:8 36:13,21 37:5
68:7 70:9,16

**assigned** 12:20 13:6,9 54:11

**assistant** 50:1

**assume** 8:23

**attack** 26:22 27:18 33:2,7,12,17
36:24

**attacked** 26:13,14,16,17,23 30:7,
9,13

**attempt** 8:1 41:22 55:1 75:15

**attention** 59:24

**attorney** 9:19,23 50:1

**attorney's** 6:15

**audio** 17:18,20

**authorized** 31:6

**automatically** 34:22

**average** 65:24

**aware** 9:4 20:4 30:24 47:17 48:12,
16 57:8 59:16,19

---

**B**

---

**back** 19:12 21:5 33:25 37:21 44:13

**background** 12:9

**bad** 75:12

**balcony** 20:10 22:10 23:3,5

**Barecki-brown** 6:8

**barking** 28:10,11,13 31:8,24 32:10
38:11

**base** 39:21 72:9

**based** 21:12 28:16 29:4,9,20 31:16
32:24 33:10 37:20 38:13 40:5
53:11,21 57:4,22 63:5 65:15 68:6,
17 71:22 72:9 75:14 76:7

**bases** 22:11

**basically** 13:1,12 28:17 35:20
40:19 41:6 43:1,17,24

**basis** 75:1

**Bates** 45:1

**baton** 40:23 41:3,8,14,21,25 42:17,
19 43:7 76:11

**batons** 41:7

**began** 16:21 35:13

**beginning** 34:1

**behalf** 6:23 9:9 72:6

**believed** 16:15 42:21 67:22 74:16

**bias** 64:20

**bit** 12:9 37:15 48:8 66:6

**bite** 30:12 36:24 37:2

**bitten** 48:18 73:4,16

**blindly** 61:22

**body** 17:20,22,24 18:1,5,21 20:22,
25 21:13 32:24 39:2,5 49:1,4,11
51:14 52:8 53:12,22 57:4,12,22
68:4,18

**borderline** 17:10

**box** 76:19

**break** 8:25 9:2 44:11 45:3

**Brewer** 11:14,23 12:1 19:20

**Brewer's** 10:8 41:16

**broaden** 66:6

**broken** 16:12

**Brown** 6:8

**Brown's** 51:20 72:1,11

**Browns** 72:16,22

**bull** 26:5 39:9 40:11

**bullet** 61:20

**bullets** 62:19

**bulls** 26:5

**Bureau** 65:18 73:14

**Bureaus'** 12:20

**Burmaster** 6:9 7:2 16:6,10,17,20
17:2,6,19 20:1,2,6,8,14,19 22:8,11,
25 23:4 24:9 25:18,24 26:4,12,15,
19 27:15,18 28:2 29:7 30:17 31:1
33:1,2,7,12,17 35:9,11,12,14,17
36:17 38:21 39:9 41:2,20 43:14
45:13 47:18 48:17 50:3 51:20 52:3,
8 53:13,14 54:1,6,8 55:1 56:1 57:6,
17 58:10 59:7 60:5 61:12 65:21
67:21,25 68:8,12 69:6,7,9,11,12,19
72:15,18,23,25 73:6 74:1,14 75:15,
22 77:12 78:11,14,21

**Burmaster's** 20:22 26:8 34:1
36:13 37:5 39:2 48:8 68:3 70:1,5,
17 75:4

**BWC** 69:5

---

**C**

---

**calculus** 31:24

**call** 16:7 17:3 20:3 30:6



**called** 12:23 34:21 51:25 52:4

**caller** 16:11,14

**calls** 20:5 30:5

**cam** 18:21 39:3,5 49:4

**camera** 17:15,20,22,24 18:1,5 20:22 21:1,13 32:24 39:10 49:1,11 51:15 52:8,20 53:12,22 57:4,12,22 68:4,18

**cameras** 49:7

**canine** 24:10 25:8

**Captain** 19:20

**captured** 52:8

**care** 16:18

**caring** 41:13

**Carrie** 6:18

**carrying** 41:2,8,25 42:17 43:7

**case** 9:10 35:17,21 45:24 48:13 50:4,9,10 63:17,18,19 64:23 77:23

**cases** 34:6,8 35:6,7 62:4 63:2 65:24

**cat** 27:8,11,12

**Catahoula** 27:4

**CEW** 59:7,20

**chance** 9:12 33:3,9 74:25

**Chapter** 51:14

**charged** 13:1 77:6

**charges** 43:24 50:2,3,10 67:4

**check** 45:20

**checked** 76:19

**chest** 18:2,23

**chief** 50:8,15,17 73:13

**choices** 37:19

**choose** 16:5

**choosing** 63:4

**chose** 28:3 29:22 43:13 55:5 71:10

**circumstances** 39:25

**city** 6:15,23,24 9:10,19,23 10:24 77:25

**Civil** 6:12

**clapping** 24:23 25:15

**clarify** 34:19

**clean** 47:4

**clear** 10:10 15:8

**cleared** 58:19,21 76:20,23 77:2,4

**clears** 35:5

**Cline** 50:1,7,13

**Cline's** 50:16

**close** 17:11 26:25 27:17 67:22 68:8

**closer** 24:11 56:5,8

**colleagues** 14:3

**comment** 60:21

**comments** 72:18

**committed** 63:21 77:13,16 79:5

**communication** 9:21

**Compared** 34:24

**complainant** 16:14,17

**complete** 77:7

**completed** 50:9 77:7

**concern** 48:21

**concerned** 30:4 48:17

**conclude** 18:3 63:20 64:3 65:4

**concluded** 57:17 64:16 65:12 66:9,12 67:8 72:1,10 77:11 79:20

**concludes** 79:10

**concluding** 64:21

**conclusion** 36:10,12 57:23 72:5 77:1

**conclusions** 11:5

**conduct** 13:14 34:17

**conducted** 11:23 57:24 65:11

**conducting** 13:21

**confidential** 45:1,4

**confused** 8:22

**connection** 45:12

**conscious** 56:17

**consideration** 43:5

**considered** 43:8 55:4,6,22 67:3

**constitution** 77:16

**constitutionally** 79:3

**contact** 30:15 33:4

**contents** 9:21 45:9

**context** 78:22

**continue** 18:25 69:24

**continued** 27:25 28:1

**conversation** 61:17

**copies** 8:10 79:13

**copy** 46:23 47:1,4,5

**corner** 76:19

**corporation** 9:9

**correct** 8:14 10:23 15:10,14 18:7 21:3,17 24:12 25:9 26:6,7,14 28:16 29:11,23 31:21 33:18 36:18 37:2, 25 41:9,14 45:6,9 48:24,25 52:6 53:22,24 54:23 55:18 57:16,22 59:8 61:4 66:14 68:4 71:25 72:3, 11,12 73:10 75:18 76:10,12,15 77:13,17 79:6

**correctly** 27:5 52:22

**counsel** 6:20 18:15 32:16 47:6 69:18 77:23

**counseled** 30:1

**counsels** 31:5

**couple** 8:19 20:7,20 21:3,7,11,16, 19,20,25 27:19 29:18 78:2

**court** 6:10,17 7:7,9 79:12

**create** 71:14

**credible** 36:7

**crime** 77:13 79:5

**criminal** 11:21 12:21 13:1,7,14,18, 19,24,25 14:5,12 15:3,10 34:2,5,7, 16,17,23 35:7,22 42:6,25 43:8,15, 18,23,24 44:17,25 45:12 48:5,9 54:11,12 63:13,20,21,24 64:4,21 65:6,11,13 66:3,7,10,19,24 67:3,4, 9 73:14 76:25 78:23



**criminality** 13:18

**criminally** 35:4 77:6

**CROSS-EXAMINATION** 78:4

**cruelty** 44:7 78:12

**cure** 39:22

**current** 12:14

**D**

**DA** 50:7

**DA's** 50:2,9 51:10

**danger** 20:5

**Debra** 6:7

**decided** 46:12

**deciding** 69:12

**decision** 29:13 31:23 51:9 63:9

**decisions** 50:14 51:6

**declined** 51:10

**define** 30:8

**definition** 26:16,17

**department** 29:17 30:3 67:7

**dependants** 6:24

**depends** 32:22 33:24 75:25

**deposed** 11:15

**deposition** 6:7,14 8:16,20 9:5,6,8,
11,18 10:5,17 79:10,14,20

**depositions** 8:15

**Derek** 6:8

**Derrick** 6:9 7:1 34:1 35:8 45:13
48:17 50:3

**describe** 17:12 26:18 33:13 53:24

**designated** 10:24 15:17 45:3

**destroy** 46:2,15

**destroyed** 46:1,14

**Detective** 19:19

**determine** 32:18

**device** 17:25

**difference** 9:5

**differences** 30:24

**differently** 29:4

**direct** 41:18 54:17 59:24 67:12
71:2 78:7

**direction** 16:21 28:18,22 29:10
31:21 32:25 33:21

**directly** 56:6

**disagree** 68:17,19 70:8,16

**discharges** 12:25

**disciplinary** 13:3

**disclose** 9:20

**discovery** 45:24

**discuss** 10:24 44:10

**discussed** 72:14

**discusses** 61:11

**discussing** 74:5

**discussions** 45:2

**distribute** 47:8

**District** 6:10 50:1

**disturbance** 16:8

**divided** 11:25

**document** 8:3 9:13 10:10 16:4
19:17,21 44:19 45:4 47:11,15,25
49:17,23 51:17 71:15

**documentation** 73:19

**documented** 52:19

**documenting** 71:13

**documents** 10:4,13 72:14

**dog** 22:9 26:4,12,21,23,25 27:1,24,
25 28:3 32:17 33:3,4,6,8,12,14,16
36:23 37:1 39:8 40:2,11 47:18
48:17,22 58:23 59:2,5 69:10 73:16
74:3

**dog's** 26:18

**dogs** 20:4,8 22:20,25 23:5,8 26:14
27:1 28:9,10 32:19,20 40:1 54:2,7
57:19 58:6,10 72:2,16,17,22 73:4,
10

**drafted** 61:8

**drive** 56:25

**driveway** 54:25 55:2 56:4 57:9

**duly** 6:2

**duties** 12:17

**duty** 29:22

**E**

**earlier** 34:15 53:15

**Eastern** 6:10

**effect** 73:19

**effective** 74:2,8 75:19

**efficacy** 61:20

**efficient** 8:2 15:20

**email** 48:2

**encountered** 29:15

**end** 14:5

**ends** 67:15 68:21

**energy** 57:25

**enter** 25:9

**entered** 56:14

**entering** 20:12 23:16 51:19

**entire** 12:2 13:16 51:17 65:10

**entitled** 19:18 51:14

**entity** 9:10

**entrance** 54:24,25 55:2 56:15
71:7,8,10,23

**entryway** 55:10 56:1,9 57:13

**equipped** 41:21

**error** 60:17,18,22

**escalate** 34:4

**escalated** 34:16

**escaping** 72:2

**estimate** 65:25 66:18

**et al** 6:9

**evade** 57:1 60:7

**evaluate** 63:1



Debra Pruitt

March 06, 2023
Index: evaluated..hands

**evaluated** 62:17

**evidence** 40:19 72:20 77:12

**EXAMINATION** 7:20 8:13 19:1,24
22:19 25:3 30:23 37:13 40:9,22
44:15 45:7 47:9 55:15,21 62:24
65:3 70:22

**examined** 6:4

**exception** 76:21,23 77:4

**excessive** 35:1

**Exhibit** 8:3,6,8 10:23 15:17 19:15,
18 25:20 35:10 41:18 44:1,16
46:19 47:10 48:1,14 49:17 51:13,
15 52:23 53:18 54:16 57:15 59:23
67:11 76:18 78:7

**exhibits** 46:25

**exit** 54:22 55:2 56:13 67:21,23
68:8 71:23

**exited** 67:20

**exiting** 55:9 56:12

**expand** 41:6

**expandable** 40:23 41:3 42:17,19

**experience** 24:18 38:13,18,19
73:2

**experienced** 36:9 37:19

**experiences** 29:4

**experiencing** 31:17 32:5

**explain** 35:11 51:1

**explained** 16:20

**explaining** 77:10

**explanation** 63:4

**explore** 55:5

**express** 73:3

**expressed** 73:15,19

---
**F**
---

**fact** 33:11,12 42:24 43:6,8,14
50:22 63:20 64:4 65:13

**factor** 31:25 43:15 48:4,8

**facts** 11:3 15:18,22 16:1 40:5,19
59:12,17

**factual** 21:9

**factually** 21:17

**fail** 75:22

**Fair** 40:8 71:20

**fairly** 78:5

**familiar** 45:9 47:23 49:23 53:2,3

**fast** 60:10,16 61:14 76:3

**fatally** 27:20

**fear** 48:8 61:15 73:3,15

**feel** 30:10 36:11

**feet** 20:8,21 21:3,7,11,16,19,21,25
27:19,24 28:2,5 74:2,8 75:16,19
76:8

**Felicity** 16:8,14 17:7 18:7

**felt** 23:23 26:22 36:23

**fence** 55:7 57:10 60:6,10,16 61:3,
13 71:6

**Ferdinand** 47:18

**filed** 6:9

**find** 36:7 49:9 72:20 78:10

**findings** 77:5

**fine** 47:4

**finish** 19:7

**finished** 26:2 59:3

**fire** 28:1 61:20,25 63:8

**firearm** 12:24 57:18 58:11 59:1

**fired** 56:2 62:3,6,25 63:1

**firing** 63:5,12 67:9,15 68:1

**fix** 74:25

**flee** 69:25

**floor** 20:10 22:10 23:5

**focus** 20:18

**follow-up** 52:15

**foot** 74:13

**footage** 20:23 21:1 32:24 39:10
49:1 52:8,13,18 53:12 57:5,23
68:7,18

**force** 12:20,22,24 13:4,22,23 14:3,

13 28:3,12 30:18,19 31:1,6 34:20,
25 35:18,19,23 38:21 43:18 58:3
65:18 66:22 69:19 75:23 76:9,12,
15

**form** 18:9 22:13 24:14,16 37:8
39:15 40:16 41:7 42:3,5 55:12
62:21 70:11,21 74:19

**formal** 13:3

**found** 66:3 78:14,20

**fourth** 15:9 62:18

**free** 16:4

**fresh** 53:10

**front** 17:8 18:7 44:19 46:21 49:18

**full** 19:25 22:24 40:4 41:19 71:2

**fully** 51:3

---
**G**
---

**gate** 20:12,15 23:16 24:3,11 54:23
57:1 67:21 68:15 69:6

**gated** 24:19,24

**gave** 36:6 45:23 73:24

**general** 31:13

**give** 7:11 12:2,8 33:1 36:2 46:19,
22 47:5 50:24

**giving** 40:4

**Good** 7:17,19

**gotta** 69:13

**greater** 17:23

**ground** 70:2

**guess** 12:24 23:20 27:24 30:10
32:6 45:16 51:5 69:12 75:25

**gun** 58:2 62:5 69:7,13 70:3,6,18,23

---
**H**
---

**half** 14:8

**handed** 9:11

**handled** 11:20

**hands** 25:15 74:1,8 75:15,19 76:8



Debra Pruitt

March 06, 2023
Index: handwritten..knew

**handwritten** 45:11,15 46:7 47:2

**happened** 14:15 29:14,22 35:12 36:9 37:23 40:6

**happening** 16:13 76:4,5

**happy** 50:25

**hard** 32:6

**Hartill** 6:18

**head** 75:9

**hear** 17:1,14 18:4,21,24 59:4

**heard** 16:11 17:19 20:9 22:9 23:2, 12 52:3 69:10 73:2 77:19

**hears** 59:4

**held** 57:18 58:11 67:21 68:15

**hexagon** 77:19

**higher** 58:24

**hindrance** 61:3

**hired** 41:17

**holster** 57:18 58:11

**hopscotch** 19:12

**hospital** 36:25 38:15

**hour** 44:11

**house** 20:8,21 21:4,5,7,12,16,19, 20,21,25 27:11

**hundreds** 65:15 66:15,16,17

**Hupin** 6:17

**hurt** 61:15

**I**

**idea** 22:10

**impossible** 14:1

**inaccurate** 21:17

**incident** 10:12 11:4,7 14:13 15:12, 18,22 16:1 25:18 26:6 31:17 34:5, 16 41:22 48:5,16 49:2 50:4 53:3

**incidents** 14:3 48:12

**include** 12:24 71:10 72:5

**incorrect** 26:9

**incorrectly** 39:9

**indicating** 17:2

**indication** 33:2 38:7

**indications** 38:11

**individual** 29:3 31:16,19 52:7 64:12

**information** 12:9 48:3 49:9

**Initial** 10:9

**inside** 16:18 17:25 23:25 24:11

**instance** 29:21 34:3,4

**instinct** 69:25 70:1

**instructions** 8:20

**insufficient** 77:12

**integrity** 12:19 65:18 73:14

**intent** 66:3

**intentionally** 72:16,22

**interacting** 52:21

**interaction** 52:6

**interesting** 27:21

**interject** 17:4

**interpose** 30:22

**interpret** 23:8 53:14

**interpreted** 23:7 51:1

**interview** 22:2 25:21 28:17 35:8 36:7,10,12 55:23 60:5

**interviewed** 25:17 35:16 36:20

**interviewing** 37:5,16

**interviews** 72:13

**intimidate** 72:22

**investigate** 12:21 24:10 25:8

**investigating** 45:18

**investigation** 11:5,21 12:3,20 13:13,17,25 14:5,12 15:10 19:19 34:5,7,9,16,23 36:1 41:15,17 42:6, 25 43:9,16,20,21 44:18 45:12 48:6, 10 51:22 59:15 63:14 65:11,18,20 66:13 68:2 71:22 72:21 75:14 76:25 77:2,8,11,15 78:23

**investigations** 13:2,4,7,10,15 15:3 63:25 65:16,19 66:2,7,8,19 73:1

**Investigative** 44:17

**investigator** 35:22 54:11 73:14

**investigators** 54:12

**investigatory** 44:25

**involved** 26:6 68:2

**involving** 53:4

**iron** 54:23 57:10 71:6

**issue** 11:4 15:18,23 16:1 43:18 48:13 50:4

**issued** 9:12

**J**

**James** 6:23

**January** 47:21 48:5,13 49:5

**Jim** 45:4

**job** 12:17

**John** 71:3

**join** 12:10

**joined** 12:12

**Jones** 6:16 11:14,23

**Julia** 6:8

**jump** 61:13

**jumping** 60:6

**June** 49:25

**justified** 33:20 78:14,21

**K**

**kick** 74:13

**killed** 47:18

**kind** 13:12,13 17:24 24:20 30:6 31:12 38:2 61:3 66:10 72:16 76:4

**kisses** 20:16

**kissing** 17:2,5,12,23 18:4,6 19:8 20:7,11,16,20 21:4,12,17 22:21 23:6,15,24 24:2 25:7,12

**kissy** 17:2

**knew** 57:10



**knowledge** 11:24 14:16 55:16 59:19 73:13

**L**

**language** 51:18

**large** 32:20

**larger** 39:8

**law** 63:21 64:4 65:6,13 66:10 67:9

**laws** 13:19

**lawsuit** 11:4 15:13,19,23 16:1

**lawyers** 45:23

**lead** 54:11 59:2

**learned** 16:20

**Legal** 6:19

**lethal** 28:3,12 31:6 34:12 40:24 41:23 42:20 43:18 58:3 69:19 75:23 76:9,12,15

**lethally** 39:12

**letting** 72:16

**level** 12:24 16:16 58:18

**liability** 63:21

**liable** 79:2,3

**life** 65:10

**limited** 79:4

**lines** 12:4

**literally** 21:6,7,19

**locking** 56:20

**long** 10:2 44:11,21 50:23 78:3

**longer** 63:12

**looked** 9:14 26:5 35:2 43:25

**loose** 72:16

**lot** 38:12,24 39:10 62:4

**lots** 18:14

**loud** 17:13,16,17 18:23 20:15

**Louisiana** 6:11

**lower** 16:15

**lying** 36:9

**M**

**made** 17:5,12 20:7,12,15,16,20 21:4,12,15,16 23:9,15,24 29:13 30:15 37:19 47:1 52:2,7 58:19 60:21 67:25

**Magna** 6:18

**major** 36:17

**make** 24:9 25:11,13 27:15 33:3 35:3 39:11 46:11,25 51:8 67:5 71:11

**makes** 23:11 26:19 62:2

**making** 17:2,15 18:15,17,22 24:20,23 25:7 31:22

**manner** 26:23

**manual** 51:14

**March** 6:13 11:15 15:9

**mark** 8:2,8 19:3,17 44:16 51:13 52:23 77:3

**marked** 44:25 48:1

**marker** 45:2

**matter** 6:8 9:12 21:9 23:10 34:14 51:11

**means** 42:20 57:1 74:8 76:22 77:4

**mechanisms** 56:20

**media** 6:6

**member** 13:22 73:2

**mention** 61:15

**met** 9:19,23 16:10

**method** 71:16,18,23

**middle** 22:25

**millions** 8:18

**mind** 17:5 25:5 38:1 67:18 75:4 76:7

**minute** 44:9

**minutes** 10:3

**misreading** 58:12

**mitigate** 42:21 74:8,15 75:16,19

**mitigating** 32:15 74:2,12

**moment** 12:18 59:8 69:19

**Monday** 6:13

**morning** 7:17,19

**mouth** 18:2

**multiple** 71:9,11 73:10

**municipal** 78:13

**N**

**narrative** 73:25

**natural** 69:25

**nature** 34:17

**neighbor** 51:21,24 52:2

**nice** 7:23

**noise** 17:23 18:22 24:20,24 25:11, 14

**noises** 19:8 20:7,11,13,14,16,20 21:4,12,17 22:21 23:6,9,15,17,24 24:2,9 25:7,12

**non-** 40:23

**non-lethal** 74:15 75:22

**NOPD** 12:10 13:15,22 14:13 41:11 43:7 59:10,20 61:19 73:2,8,11 79:1

**NOPD's** 41:24 49:4 51:13

**notebook** 45:17

**notes** 45:12,15 46:2,7,22 47:2

**notice** 8:3 9:11

**noticed** 69:5,6

**November** 12:11

**number** 6:12 11:4,13 15:3 61:23 64:2 65:25

**numbers** 11:2

**O**

**object** 24:16 39:15 64:7 70:11,21

**objection** 18:9,11,13,15,17 22:13, 15 24:14 37:8,10 39:17,21 40:16 42:3,5 55:12,14 62:21,23 74:19,21 75:1



**objections** 18:14

**objectively** 36:22 37:4,17

**observed** 33:6 39:10

**obstructed** 57:13

**obtained** 51:21

**occasions** 29:16

**office** 6:15 45:16 50:2,9 51:10

**officer** 16:6,7,10,17,19,20 17:1,6,
19 20:1,2,6,8,14,19,22,25 22:8,10,
25 24:8 25:18,24 26:4,8,12,14
27:25 29:7 30:17 32:25 33:4,7,19,
22 34:1 35:1,11,12,14,17 36:13,17
39:2,5 41:20 43:14 47:17 51:20
52:3,7 53:25 54:7 55:1 57:6,17
58:10 59:7 60:5 61:12,18 62:16
63:14,20,25 64:4,16 65:5,12 66:4,
8,9,14 67:7,8,20,21,22,24,25 68:3,
7,9 69:3,4,5,7,9,11,24 70:1,2,4,5,8,
17 71:3 73:15 74:14 77:6 78:10,14,
20

**officer's** 13:14 34:17 53:22

**officers** 13:15 16:21 20:3 34:24
35:15 53:13,19 61:19 62:4 63:3
73:3,8

**open** 13:25 14:12 67:21 68:15
77:2,8

**opened** 14:6 35:12

**openings** 71:6

**operational** 59:13,17

**operations** 51:14

**opinion** 56:11 70:13 74:8 78:17

**opportunity** 68:10,13

**option** 55:5 57:3,11

**options** 41:23 43:10 75:22

**Orleans** 6:15,24 9:10 67:7

**outline** 12:2

**owners** 72:1

**P**

**p.m.** 44:14 79:11,20

**pages** 44:21

**Paige** 50:1,12,16

**paragraph** 19:25 22:24 25:23,25
26:11 28:9 35:10 41:19 53:18,21
54:5,17,18 59:25 67:13,15,19
68:21,25 71:2 78:8

**part** 40:10 42:6 51:21 59:14 61:11
68:2 72:8,11

**past** 8:15

**pedestrian** 54:24 56:8,15 71:7

**pending** 9:2

**penis** 37:2 48:9,18 73:16

**penises** 73:3

**people** 17:16 34:22

**perceive** 36:19 76:7

**perceived** 26:22 36:17

**percentage** 14:2,4

**perception** 37:12,14,16

**Perdido** 6:1

**perimeter** 20:12 21:22 23:9,16
24:20

**personally** 42:8,14 56:24 70:15

**perspective** 22:17

**phone** 35:12,13,14

**photographs** 10:19,21,22

**physically** 30:12

**PIB** 11:21 12:3 42:5

**PIB's** 11:5

**pick** 17:23 50:10

**picture** 71:14

**Pit** 26:5 39:9 40:11

**place** 15:13

**plaintiffs** 7:5

**point** 24:4 35:8 59:6 69:12

**pointed** 59:1

**pointing** 57:18 58:12

**pointy** 55:7

**police** 12:13,16 29:16 33:19 65:11,
12 66:14 67:7,8

**policies** 41:24 49:4 79:1

**policy** 11:6 31:12 41:11,13 42:16
43:7 49:12,14 59:10

**porch** 18:7

**portion** 35:20 36:1

**pose** 50:6

**posed** 36:14 37:6 39:11 42:22 74:9
75:16,20

**posing** 74:16

**pound** 27:5,14 28:12,18,21 33:1
36:14,18 37:6 39:12 74:9,12

**pounds** 27:9 75:20

**Pr-24** 41:5

**Pr-24/expandable** 41:21

**premature** 20:14 23:17,24 24:5

**preparation** 10:16

**prepare** 9:18 10:4

**prepared** 11:8 12:2 45:8

**present** 24:10

**pretty** 53:6

**prevent** 72:2

**previous** 73:25

**previously** 37:22

**prior** 9:15 28:11 51:19

**procedures** 41:25

**proceeding** 79:2

**process** 12:3 13:13

**produce** 45:24

**prompted** 23:18 25:4 50:6 63:7

**Prompting** 24:7

**proper** 51:8

**properly** 62:1 72:1

**property** 17:7,9,10,25 20:13
23:16,25 24:11,12,25 25:8 56:12

**provide** 50:16

**prudent** 24:8 56:12,25

**Pruitt** 6:7 7:17 8:14 9:4 11:20 12:1,
8 19:22 20:6,11,19 23:14 35:11



Debra Pruitt

39:12 44:16 45:8 47:10 51:16
52:24 69:3 77:22 78:10,14,20

**psychology** 62:9

**public** 12:19 65:17 73:14

**pulled** 57:17

**puppies** 29:10 37:22

**puppy** 27:3,6,14,17,22 28:12,13,
18,21 29:21,23 30:1 31:7,20,23
32:14 33:1 36:14,18 37:6 38:1,2,6
39:13 40:24 74:9,12 75:20

**pursue** 50:2,3

**putting** 39:8 40:11 73:22

---

### Q

**qualified** 27:21 66:5 67:4

**question** 8:24 9:2 14:18 15:6
18:16,18 19:2,8 23:19,21,23 25:2,5
37:15 39:15 40:10 50:6 54:21
56:22 61:12 64:8,13 65:8 66:6
75:12

**questioned** 73:25

**questions** 8:21 12:4 47:15 51:18
54:19 60:2 77:23,25

**quick** 8:19 49:17

**quickly** 67:22 76:5

**quote** 60:19

---

### R

**R.S.** 78:11

**ran** 26:21 29:21 33:4 53:13,25 54:7

**rank** 12:12,14

**re-ask** 56:22

**reached** 69:11,15,16,21

**reaction** 50:19,20 76:4

**read** 19:2,25 20:17 22:22 23:4
25:25 26:1,11 28:8 35:14,18,23
36:3 41:20 47:12 54:18,20 59:25
69:2 72:10 73:24 78:8

**reading** 20:2 23:14 26:2 35:13
60:25 61:5 67:18,20 69:24

**reads** 71:15

**real** 38:18 49:17 65:25

**reason** 15:2 57:5 69:21 71:21

**reasonable** 36:22 37:6

**recall** 55:25

**receive** 34:19 35:22

**received** 30:17,25 31:2

**recitation** 40:5

**recollection** 16:5

**record** 11:17 26:1 41:20 44:9,13
54:20 59:25 67:19 69:2 79:11

**recorded** 18:23 22:3

**recording** 17:25

**recruit** 12:13

**reference** 71:8,11

**referenced** 71:11

**references** 72:15

**referring** 10:11

**reflected** 15:17 48:14

**reflecting** 44:17 49:2

**reflective** 25:21

**refresh** 16:5

**refused** 36:2

**regard** 44:3 48:3

**regular** 9:5 66:21

**related** 11:7

**relates** 13:14 15:13 30:25

**relating** 50:3

**relation** 17:6 56:1 63:25

**Relative** 44:7 78:11

**released** 58:11

**relevance** 64:13,18

**relevant** 31:24 42:24 64:22

**remember** 27:5 52:20 53:6 56:19
62:6 63:24 65:5 72:17 73:22 74:3,
4,5

**remembered** 53:7

**remembering** 52:22

**repeat** 25:2 46:5

**rephrase** 23:21

**report** 10:8,11,12 44:4,6,10,17,25
45:8 50:24 52:19,24 53:4,8,25 60:4
61:8,11 71:9,12 73:22,24

**reporter** 6:18 7:7,9 79:12

**reports** 10:8,9

**represent** 6:21

**representing** 7:1,5

**request** 6:16

**required** 41:2,8

**residence** 16:22,23,24 17:1 21:23
56:16 58:24

**residents** 51:20

**resorted** 75:23

**resorting** 76:9,11,14

**respect** 30:18 38:21

**respond** 16:7 32:7 38:4

**responded** 20:7,20 23:10

**responding** 20:5

**responds** 20:3 29:4

**response** 14:12 22:21 23:6 29:3
50:12 59:5 60:9,12 61:13

**restate** 8:23

**review** 9:12 10:4,16,19,21 13:13
21:13 47:11 49:20 50:14 51:16
53:1,12,22 57:4 68:6,18

**reviewed** 9:15 39:2,5 48:21

**reviewing** 68:3

**Richardson** 19:20

**rid** 40:2

**right-hand** 76:19

**role** 14:4 67:6

**Room** 6:1

**Roquemore** 6:22,23 11:11,19
18:8 22:12 24:13 30:20 37:7 39:16
40:18 42:4 45:5 46:4,9,16,18,24
55:11 62:20 64:6,11,17,24 74:18
75:2,7 77:24 79:17



**Roussel** 16:7,19 53:13 67:20,22, 24 68:3,10 69:3,4,25 70:2,5,18 71:3

**Roussel's** 20:25 39:5 68:7

**run** 28:21 29:10 68:10

**running** 26:24 28:18 30:2 31:7,21 32:8,25 33:5,13,14,17,20 37:22 38:1,6 40:24,25 69:6

**rushed** 54:2

**Russell's** 70:8

---

**S**

**Sabrina** 19:20

**safety** 74:17

**satisfaction** 47:13

**scare** 72:23

**scene** 10:22 71:3

**screaming** 16:12

**secured** 71:6 72:2

**sense** 23:11 26:19 62:2

**sentence** 20:18 22:8,22 23:14 26:9 30:9 41:19 51:2 58:16 67:18 71:5 78:16,19

**sentences** 26:2 49:21

**separate** 35:21

**Sergeant** 6:7 7:17 8:14 9:4 11:20 12:1,8,16,18 19:22 20:6,11,18 23:14 35:11 39:12 41:16 44:16 45:8 47:10 51:16 52:24 69:3 77:22 78:10,13,20

**series** 8:21

**service** 16:7

**Services** 6:19

**set** 21:5

**Shannon** 10:8 11:14,23 19:20

**sharing** 11:13

**shoes** 70:5,17

**shoot** 28:24 29:22 30:1 31:20,23 38:2,6,13,25 39:12 61:23 62:5,18

**shooting** 11:3,6 13:15 15:18,22

16:1 19:19 30:18 32:16 33:20 34:9, 13,21 35:7 48:3 63:3,14 66:2,8,19 77:13

**shootings** 63:25 65:23

**shot** 27:15,20,23 28:19 29:10 47:18 48:17,22,24 61:24 62:16,18, 19,25 73:10

**shots** 56:2 62:2,6

**show** 72:6

**shows** 64:20

**sic** 15:8

**siccing** 72:17

**side** 12:21 25:1

**sidewalk** 16:22,25 21:6

**significance** 72:4

**significant** 71:10

**similar** 14:4 67:14

**simple** 78:12

**sir** 13:8,11 46:3

**situation** 30:4,6,7 32:1,3 57:1 60:7 63:5 68:21 70:3,6,19,24

**size** 27:11 32:12,14,17

**skim** 47:12

**small** 30:1 31:20

**smaller** 54:7

**solemnly** 7:10

**somebody's** 24:19

**someone's** 24:24

**sounds** 17:3,5,12 18:4,6

**speaking** 21:6,18 24:18 65:17 78:19

**specific** 10:24 11:24 22:1 31:9,10, 12 51:18 71:14

**specifically** 12:23 13:6 35:9 37:1 54:1 60:6

**specifics** 63:19

**spike** 60:20

**spikes** 60:12,21,24 61:4,16

**split** 11:18 39:24

**staircase** 54:2 57:19 58:12

**stairs** 58:19,21

**stand** 70:1

**standing** 56:2,3

**start** 24:20,23 49:14 67:13

**started** 24:2 49:6,15 63:6,8

**starts** 20:1 25:24 67:13 71:3

**state** 6:20 11:17 15:21,25 30:17 78:13

**stated** 10:14 16:11,15 20:1,2,8,14 22:8,25 26:4,12 28:9 39:9 41:20 67:20 69:4,25 70:2

**statement** 21:15 34:2 35:18,23 36:5,6 51:21 61:6 79:4

**statements** 28:14,17 35:19 52:2,7

**states** 6:10 54:10 61:13

**stating** 53:15

**status** 43:19 76:24,25

**statute** 63:22 64:5 65:6,13 66:10 67:9

**steps** 22:18,21 27:15 57:20 58:7,8, 10 59:3,6

**stop** 26:13 63:5

**stopped** 24:4

**stopping** 63:10

**storey** 23:3

**straight** 58:3

**Street** 6:1 16:8,14 18:7 47:19

**strictly** 79:4

**structural** 21:20

**subject** 50:11

**substantiate** 72:21

**suggest** 59:12

**suggested** 30:1

**suggests** 31:5

**summary** 34:1

**supposed** 61:19,22

**swear** 7:7,10



Debra Pruitt

March 06, 2023
Index: sworn..wear

**sworn** 6:2

**system** 77:19

---

**T**

**taking** 70:23

**talk** 11:8 49:16,17

**talking** 27:1 65:23 66:21 78:25

**Tammy** 6:17

**Tarak** 7:4 11:12 46:19

**taser** 43:10,15 58:1,4 59:7 76:14

**tasked** 13:21

**team** 12:20,21 65:18

**Ted** 7:1

**telling** 22:20 23:4

**tells** 18:16 20:4

**term** 77:19

**testified** 6:4 8:18 34:15

**testify** 15:17 55:4

**testifying** 9:9

**testimony** 7:11 53:15

**thing** 20:4 31:19 32:11 55:6 56:17
  60:20 62:9,14 76:6 78:6

**things** 13:4 16:12 31:22 33:15
  43:12 71:13 76:3,5

**thought** 20:13 23:17 24:5

**threat** 36:14,18,21 37:5,17 38:2,8
  39:10 42:21 63:7 74:2,9,12,16
  75:16,20 76:7

**threatened** 30:11

**time** 6:13 7:24 8:1 17:5 27:23
  28:11 29:22 41:22 43:2 44:14
  48:22 53:8 57:23 58:6 59:13 67:23
  68:8 69:2 75:4 77:22 79:11

**times** 8:18 9:23 14:15 25:17 29:13,
  18 61:23 62:17 66:9 71:9,11 73:10

**timestamp** 57:16 58:15 59:24
  60:4

**today** 6:13 7:21,24 8:2 9:15,18
  11:9 53:5,11,15 72:14 78:3,17

**today's** 10:5,17

**told** 46:14 53:11 55:22

**tool** 40:24 74:2

**tools** 74:11,15

**top** 45:2 47:2 67:2 76:19

**topic** 11:2,13,18 15:21

**topics** 10:25 11:9 15:16 42:10

**tort** 77:17

**totality** 39:25

**touched** 69:5,9

**trained** 59:20

**training** 29:5,6,9,20,25 30:16,25
  31:1,5 38:20

**trains** 20:2

**true** 49:25

**trust** 51:8

**truth** 6:2,3 7:12,13

**turn** 19:21 57:15 59:23 67:11 71:1
  76:17 77:22

**Turning** 68:20 71:25

**type** 24:23 25:11 65:20 66:20

**types** 24:9

---

**U**

**Uh-huh** 19:23 37:24 43:3 47:24
  52:25 71:4

**unauthorized** 13:4

**unaware** 28:13

**unclear** 8:21

**uncommon** 14:11,14 62:5,10

**underneath** 54:12

**understand** 15:12 37:14,25 46:11
  51:3,4 62:15 66:1 67:6 69:8 70:4
  76:18,22

**understanding** 28:11 51:19

**understood** 8:19,23 62:15 67:5
  72:9 76:8

**unholster** 69:13

**unholstered** 58:22 59:6

**unholsters** 59:1

**Unit** 6:6

**United** 6:10

**unknown** 61:23 69:21

**unreasonable** 18:3 36:15

**upstairs** 18:6 58:24

---

**V**

**vehicle** 55:10,25 56:13 57:1,13
  71:7,8,9,22

**versa** 32:21

**versus** 6:9 31:1

**vice** 32:20

**video** 6:6 39:3,6

**videod** 22:5

**videos** 10:16

**view** 32:24 57:13

**violate** 13:18 64:4 65:13

**violated** 41:13,24 42:16 43:7
  63:21 65:5 66:9 67:8 78:11 79:1

**violation** 64:22 77:16 78:13

**violations** 11:7

**volume** 17:24 18:4,5

---

**W**

**wait** 24:19 46:5

**waited** 16:18

**walked** 53:19

**Walker** 6:16

**walking** 16:21,25

**wanted** 35:23 50:8 69:4 78:6

**watched** 20:22,25

**ways** 34:20

**weapon** 57:25 58:22 59:6 62:5
  67:9,16 68:1

**wear** 49:15



**wearing** 49:6

**wears** 18:1

**week** 10:1

**weighs** 27:8

**Westbrook** 50:8,17

**whistle** 25:10,13

**whistling** 24:23

**William** 7:4 45:6

**withdraw** 36:11 40:10

**word** 30:8 47:12

**words** 15:21,25 35:25 36:3 54:6
60:19 67:15

**work** 12:19

**worked** 38:15

**working** 29:16

**worn** 17:20,22,24 18:1,5 49:11
51:15 53:22 68:4,18

**worried** 37:1

**writing** 45:18

**wrongdoing** 72:7,10

**wrote** 47:1 53:4,8,21 58:9

**wrought** 57:9

---

Y

---

**yard** 23:10 24:1 71:5,17,19,23 72:2

**year** 15:9 49:6 63:17 65:23 73:11

**years** 38:16

**younger** 38:16

