1              UNITED STATES DISTRICT COURT
          EASTERN DISTRICT FOR THE STATE OF LOUISIANA

2

3        * * * * * * * * * * * * * * * * * * * * * *

4                      DEREK BROWN and
                    JULIA BARECKI-BROWN

5                         VERSUS

6        DERRICK BURMASTER, SHAUN FERGUSON, and the
                   CITY OF NEW ORLEANS

7        * * * * * * * * * * * * * * * * * * * * * *

8          CIVIL ACTION NO. 22-00847        DIVISION: 4

9          SECTION: L

10

11        The 30(b)(6) deposition of CHRIS GOODLY taken on

12             Monday, March 7, 2023, starting at 1:45 p.m. at

13        New Orleans City Hall, 1300 Perdido Street, Room 5E03,

14             New Orleans, Louisiana 70112.

15

16

17

18

19

20

21

22

23   CARRIE A. HARTILL

24   CERTIFIED COURT REPORTER

25   STATE OF LOUISIANA



Chris Goodly                                           March 07, 2023
                                                             Page 2

```
 1   APPEARANCES:

 2   FOR THE CITY OF NEW ORLEANS AND CITY DEFENDANTS:

 3    JAMES M. ROQUEMORE, ESQ

 4    CITY OF NEW ORLEANS

 5    NEW ORLEANS, LOUISIANA

 6    EMAIL: james.roquemore@nola.gov

 7

 8   FOR THE DEFENDANT, DERRICK BURMASTER:

 9    C. THEODORE ALPAUGH, III, ESQ.

10    FRATERNAL ORDER OF POLICE LEGAL COUNSEL

11    639 LOYOLA AVENUE, SUITE 2130

12    NEW ORLEANS, LOUISIANA 70113

13    PHONE: (504) 529-4141

14    EMAIL: cta@gustebarnett.com

15

16   FOR THE PLAINTIFF DEREK BROWN AND JULIA BARECKI-BROWN:

17    TARAK ANADA, ESQ.

18    JONES WALKER LLP

19    201 ST. CHARLES AVENUE, SUITE 4900

20    NEW ORLEANS, LA 70170

21    PHONE: (504) 582-8322

22    EMAIL: tanada@joneswalker.com

23

24

25
```



1   ALSO REPRESENTING THE PLAINTIFFS:

2   WILLIAM BROCK MOST, ESQ.

3   MOST & ASSOCIATES

4   201 SAINT CHARLES AVENUE, SUITE 114

5   NEW ORLEANS, LA 70170

6          PHONE: (504) 509-5023

7   EMAIL: williammost@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2                          INDEX

3                                              PAGE

4   DIRECT EXAMINATION:

5   BY MR. MOST . . . . . . . . . . . . . . . . . .   6

6   CROSS-EXAMINATION:

7   BY MR. ALPAUGH   . . . . . . . . . . . . . . .   86

8   FOLLOW-UP:

9   BY MR. MOST . . . . . . . . . . . . . . . . .   97

10

11                        EXHIBITS

12                     DESCRIPTION              PAGE

13  EXHIBIT NO. 8      NOD          . . . . . . . . .   10

14  EXHIBIT NO. 24     NOPD OPERATIONS MANUEL . . . . .   15

15  EXHIBIT NO. 20     NOPD ASI   . . . . . . . . . .   26

16  EXHIBIT NO. 29     USE OF FORCE BOARD minutes . . .   30

17

18

19

20

21

22

23

24

25



```
 1

 2                 S T I P U L A T I O N

 3        It is stipulated and agreed by and

 4   between counsel that the deposition of

 5                 CHRIS GOODLY,

 6   is hereby being taken pursuant to the Rules

 7   of Court, including applicable articles of

 8   the Louisiana Code of Civil Procedure.

 9        The formalities of sealing and

10   certification are hereby waived.  The

11   witness waives the right to read and sign

12   the deposition.  The party responsible for

13   the service of the discovery material shall

14   retain the original.

15        All objections are to be made in

16   accordance with the Rules of Court, including

17   applicable articles of the Louisiana Code of

18   Civil Procedure.

19                      * * *

20        Carrie A. Hartill, Certified Court

21   Reporter in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25
```



```
 1
 2   CHRISTOPHER GOODLY,
 3   after being duly sworn,
 4   testified as follows:
 5        MR. MOST:
 6             Good afternoon.  My name is William Most.
 7             I am one of the lawyers for the plaintiffs in
 8             the Brown V. Burmaster case that we're here for
 9             today.  And could you just give us your full
10             name for the record?
11        THE WITNESS:
12             Christopher Goodly.
13   EXAMINATION BY MR. MOST:
14    Q.  And do you currently have a title?
15    A.  It's retired but I was the Chief Deputy Superintendent
16   for the New Orleans Police Department.
17    Q. Would you like me to call you Chief or Mr. Goodly?  Or
18   what would you prefer?
19    A. Chris.  Or Goodly, it doesn't matter.
20    Q. It sounds good.  Mr. Goodly, have you ever given a
21   deposition before?
22    A. Yes.
23    Q. Approximately how many?
24    A. I don't know probably under ten.
25    Q. What kind of cases were those in?
```



1   A. The last one.  I don't recall.  Let me see that was a

2   deposition on -- Oh, you know what it was on Mr. Burkhardt,

3   Stanley Burkhardt case, I gave a deposition on some material

4   that the department did or did not have in regards to a

5   sexual case that the department was defending about

6   maybe a year or a little bit over a year ago.

7       Stanley Burkhart was a former police officer that got

8   convicted of some sexual assault cases back in the late 70's,

9   or early 80's or something, and they were looking for some

10  records that the department did not produce or could not

11  produce at that time.

12  Q. So since you've done depositions before you understand

13  that you're under oath here today.

14  A. Yes.

15  Q. That you understand that your answers here today have

16  the same force as if we're in a courtroom with a

17  judge and jury?

18  A. Yes.

19  Q. Is there anything such as medication, illness, fatigue,

20  or anything else that would prevent you from understanding my

21  questions and providing truthful and complete answers?

22  A. No, not at this time, no.

23  Q. Will you let me know if anything comes up?

24  A. Sure.

25  Q. And as you know, from prior depositions, we can take a break



1    at anytime.  So just let me or your lawyer know if you need to

2    take a break.  Although I'll tell you in advance,

3    that I may ask you about any documents you reviewed or

4    who you talked to during the break, okay?

5     A. Okay.

6     Q. And you're already doing this great, but to make things

7    easier on our court reporter.  If you'll wait for me to finish my

8    questions before you answer, I'll try and do you the same courtesy

9    of waiting until you're finished talking before I ask the

10   next one, all right?

11    A. Sure

12    Q. One thing I'll ask you is that if I ask a question that is

13   confusing, or you don't understand, will you agree now that you'll

14   let me know that that's the case rather than just trying to

15   answer it anyway.

16    A. Sure.

17    Q. And, Mr. Goodly, what's your just big picture understanding

18   of what's the case that we're here about today?

19    A. So Derrick Burmaster, a police officer, was involved in a shooting

20   of a animal.  A dog, if you will.  And that's what we're here to

21   talk about today, I'm assuming.

22    Q. That's right.  And this is a little bit different than some of

23   the depositions you may have done in that you're here in

24   essentially two roles today.  One is that you've been

25   designated as a witness to speak on behalf of the City of New



1    Orleans on certain topics.

2        Do you understand that?

3    A. Sure.

4    Q. And the other thing is that, I don't know if you're aware of

5    this, plaintiffs have designated you as an expert.

6        Plaintiffs have assessed your expertise and think that

7    you're an expert in certain police practices.  And so the

8    plaintiffs have designated you as an expert so that you, if

9    called to the stand, can provide your opinion on certain topics.

10       All right?

11   A. Sure.

12   Q. So we may distinguish at certain points in this

13   deposition, when I'm asking for your expert opinion and

14   when I'm asking you to speak on behalf of the City of

15   New Orleans, all right?

16   A. Okay.

17   Q. But I'll assume unless you or I say otherwise, that

18   the testimony you give is for both unless one of

19   us says otherwise?  All right. You agree with that?

20   A. Wait, that repeat that?

21   Q. Sure. When you're giving answers here today, unless

22   you say otherwise, or unless I asked you otherwise,

23   we'll assume that you're giving both your expert opinion

24   and the testimony of the City of New Orleans

25   unless one of us says otherwise.  Agreed?



1    A. Okay.

2           MR. ALPAUGH:

3               If I'm -- you say you designated

4          as an expert, you appointed many times where

5          in federal court the here we have no report

6          from this man.  The next report deadline has

7          long since passed. So I'll object to any expert

8          testimony you're trying to elicit from

9          him because it's too late.

10         MR. MOST:

11             So There's an expert report requirement for

12         retained experts. Mr. Goodly is not a

13         retained expert.

14         We're not paying him.  He doesn't work for us.

15         But objection noted.

16         THE WITNESS:

17              And I have never been designated as an expert

18         witness in any regard, either.

19         MR. MOST:

20              Well, who knows? It could be something

21         you do in the future.

22   EXAMINATION BY MR. MOST:

23    Q. Okay, so you understand that with regard to your

24   testimony on behalf of the City of New Orleans,

25   when I'm asking you questions, I'm asking questions of



1  the city, and you're also providing the answers of

2  the city, right?

3   A. Answers of the City in my best opinion --

4   Q. Uh-huh (affirmative)

5   A. All right.

6   Q. And we may -- we may or may not run into this,

7  but in a normal deposition, "I don't know" is a

8  perfectly good answer if it's truthful, but with a

9  deposition where someone is designated to speak on

10 behalf of a government entity, "I don't know" may not

11 be a sufficient answer, but we'll just address that

12 as we come to it, all right?

13  A. Sure.

14  Q. So Mr. Goodly, could you walk me through what you

15 did to prepare for this deposition?

16  A. So I looked at, I met with the city attorney, and I

17 looked at notes and materials and kind of briefed myself for,

18 you know, the possible questions that may come up, to better

19 prepare myself for the answers that I may provide.

20  Q. So aside from the city attorney, did you talk to

21 anyone to prepare for this deposition?

22  A. No.

23  Q. And you've talked about notes and materials; what

24 documents are you talking about there?

25  A. So I'll reviewed the portion of the police



1  reports, some materials that were provide it as to

2  his prior performance, meaning like the PIB records,

3  Public Integrity Bureau cases, and things of that nature.

4  Q. You're just talking about police reports.

5  Are you talking about the ASI or administrative shooting?

6  A. Yes, correct.

7  Q. Any other police reports other than the ASI?

8  You looked at?

9  A. The actual Use of Force Review Board conclusion

10  materials, or the recommendation material from the

11  use of force review board on this incident.

12  Q. Okay, so that would be the minutes of the use of

13  force review board?

14  A. In so many word, yes.

15  Q. And you talked about the document about Mr. Burmaster's

16  background?  Are you talking about PIB short form or long

17  form or something else?

18  A. We reviewed the short form.  And also some PIB related

19  materials, some case notes data I didn't go into that many

20  depths I just want to see what the general analysis of this

21  PIB cases were.

22  Q. Okay. Did you look at those on paper?

23  A.  Yes, it was paper.

24  Q. And was that here in this office?

25  A. Yes.



```
 1          MR. MOST:

 2              Jim, are those available so that later,

 3          if we wanted to just look at what he reviewed,

 4          that can be provided?

 5          Is there a stack somewhere?

 6          MR. ROQUEMORE:

 7              There's not a -- He just looked at generally,

 8          the material that we produced and I don't

 9          have a list of things that I showed him, I

10          don't have a trial notebook for him.

11          MR. MOST:

12              Okay.

13   BY MR. MOST:

14    Q. Okay, so, Mr. Goodly, when someone is asked to

15   give expert testimony, often, there'll be questions

16   about the person's sort of background education, training

17   and stuff like that.

18       So I'm gonna ask you about those topics. So

19   could you walk us back to what degrees you got in

20   terms of education, whether high school, college or

21   post college.

22    A. So once again, I'll say that I've never been designated

23   as an expert witness, but I will give you my biography

24   of of my educational background.

25       So I graduated from what, McDonough 35 Senior High
```



1  School in 1993.  I went to Southern University here

2  in New Orleans.  I retained a Bachelor's of Arts

3  in criminal justice with a minor in Business

4  Administration.  That was in 2001. And I completed

5  that.  I then retained a Master of Arts and criminal

6  justice, same university in 2004.

7      I joined the police department in 1997.  I was

8  assigned to the Eighth District for five years.

9  I was promoted to sergeant in 2003, where I then was

10  assigned to the first district.  I moved over to

11  the fifth district, where I became a detective

12  supervisor.

13      That was in 2003 to 2005.  No, 2004, actually.

14  I went to the traffic division as a supervisor over

15  there until 2009, where I was promoted to Lieutenant.

16  I then became a commander, it was an appointed position,

17  in 2011. I was assigned to the fifth district police

18  district as a commander of the district.

19      2016, I was moved over to the academy, the

20  education and training division.  I stayed there for two

21  years.  And then I was appointed to Deputy Chief for the

22  Management Services Bureau in 2018.

23      And in 2021, in December of 2021, I was appointed to

24  Chief Deputy Superintendent for the New Orleans Police

25  Department where I retired at the beginning of this year.



Chris Goodly                                    March 07, 2023
                                                    Page 15

1   Q. So you were a police officer continuously from 1996 to?

2   A. 97.

3   Q. 97. To 2023?

4   A. Yes.

5   Q. So you were a police officer for 26 years?

6   A. Almost, almost 26.

7   Q. And so just walking through that a little bit.

8   So you had an undergraduate degree that was at least

9   partly in criminal justice, right?

10

11  A. Yes.

12  Q. And so you took coursework about police practices,

13  police procedure, things like that.

14  A. Yeah, it was more along the lines of relative

15  to law, you know, pre-law classes, really.

16  Q. And then while you were a police officer, you

17  also got a master's degree?

18  A. Yes.

19  Q. And did -- what was some of the coursework that

20  you took consist of in that master's program?

21  A. I mean, you're going back 20 years ago.  I know

22  I did papers in kind of coursework dealing with,

23  ironically, black male violence.

24      And we talked about at the time that was

25  currently a topic was, I mean, Al-Qaeda, Jihad,



1   you know, the the war, the holy war, if you will.

2       That's the type of topical areas that we were

3   focused on.

4   Q. So and so your coursework, it sounds like dealt

5   with some of the range of scenarios that police

6   officers might deal with?

7   A. Somewhat.  You know.  I learned most of my policing,

8   actually in the Academy and through reinforcement of,

9   you know, in-service training throughout the years,

10  but most of the educational side from policing did

11  not come from the university work, it made me a better

12  grasp for how to apply the law, if you will.

13  Q. So you did learn about at least in some aspects,

14  the application of the law to policing?

15  A. Yeah, I mean, grand jury, petit jury,

16  all that stuff I learned that at Southern.

17  Q. And you said you also receive training at the

18  Academy.  How long was the Academy

19  program when you went to the Academy?

20  A. So when I went in 1997, it was approximately

21  16 weeks.  Current day, it's right now, I believe,

22  when I left it was at 27 weeks, the post

23  requirements or the police officer standards for

24  training in Louisiana, in the 90's was approximately

25  I want to say, about 300 hours minimum to attain



Chris Goodly                                   March 07, 2023
                                                     Page 17

1  a post course.  It elevated to, right now I believe,

2  like 500.

3      And then the consent decree.  When we entered

4  into a consent decree, it put us at 880 hours

5  that the New Orleans Police Department had to do.

6  Right now we're at 27 weeks of training,

7  we're well over that number, as well.  I think it was

8  last -- when I left the Academy, it was like at 1,012

9  hours minimum for police officer to get out the

10 Academy.

11 Q. And when you were at the academy, it covered topics

12 like the appropriate use of force, correct?

13 A. Yes.

14 Q. And actions that officers can take to protect their

15 own safety, agree?

16 A. Yes, we do scenario based training a lot.  And yes, we

17 cover a variety of aspects that an officer will encounter.

18 Q. So you learned about -- you learned, had class work

19 about use of force and other topics.  And then, also,

20 physical scenarios that you ran through?

21 A. Yes, reinforced.

22 Q. And then you actually -- it sounds like you actually

23 practiced as an on the street police officer for

24 some period of time.

25 A. Yes.



1  Q. And then you were elevated to a supervisory and

2  management role at some point, right?

3  A. Correct

4  Q. And in that role you had to counsel, train, educate

5  other officers, right?

6  A. Yeah, mentor.  I mean, a lot of stuff goes into

7  that supervisory capacity.  Yes.

8  Q. Were you ever a field training officer?

9  A. No.

10  Q. And then at some point, you had a supervisory

11  role at the academy, correct?

12  A. Well, I was the commander of the Academy, if

13  you will.  So, I mean, I oversaw the day-to-day

14  operation of the entire education training staff,

15  you know?

16     So a direct supervision of like, training

17  aspects, I would oversee that, but I wasn't

18  directly engaged in one-on-one scenario based

19  training.

20  Q. So you were the person at the top in charge

21  of the whole Academy?

22  A. Correct.

23  Q. Maybe analogous to the president of a college

24  or something?

25  A. Tomato tomato, but yeah, I guess you call it that.



1  I just called it the designee of the Academy, you

2  know?

3  Q. Sure. And your role was part of the

4  administrative -- at certain times did issues

5  around curriculum and the content of training cross

6  your desk and involve you?

7  A. So we have a curriculum director. So I won't say

8  the majority of the curriculum crosses my desk.

9  I did give some knowledge based as to what the

10  expectations were to the curriculum director.

11     As well as, give some insights as to what

12  works or what do we need in training, and

13  I would like to see that adopted.

14     So most of the stuff that the curriculum

15  director develop, it actually was in his

16  roles and responsibility.

17  And if I saw an issue with it, I would address it.

18  Q. Okay. So you were keeping track of what was being

19  trained so that you could provide guidance if

20  it needed to be changed or improved, things along

21  those lines?

22  A. That would be.

23  Q. And then, your final role at an NOPD was, you say

24  was Assistant Chief?

25  A. Yes, Chief Deputy Superintendent. It's the Assistant



1  Chief of police.

2   Q. So you were -- you reported to the chief of -- the

3  superintendent?

4   A. Yes.

5   Q. And were you Assistant Chief over a particular

6  topic area?

7   A. I was over the Field Operations Bureau.  The department

8  is broken up into different Bureaus and the

9  Field Operations Bureau is basically the street cops.

10   Q. And Derrick Burmaster in the incident that

11  we'll be talking more about he was operating

12  as part of the Field Operations Bureau at that time?

13   A. At the time of the incident, yes.  But I believe

14  on the date that that actually incident happened

15  I was not -- I've got to look at the date, but

16  I don't think I was over the Field Operation

17  Bureau at the time of the actual incident.

18   Q. Okay.  And did you take any notes to prepare

19  for today's deposition?

20   A. No.

21   Q. So let's look at --

22       MR. MOST:

23         Let's see, could we use

24       the Exhibits, I'll just show him the same ones that

25       have been marked?



1    Q. I'm gonna show you a Mr. Goodly Exhibit 8; do you see this?

2    A. Yes.

3    Q. Is this is a document that you've seen before?

4    A. I've not seen this actual document, I have seen something

5    similar to it, though.

6    Q. So let's see.  Do you see your name on the first page

7    here?  There's the bottom of the first page.

8    A. Yes.  Typo, but yes.

9    Q. Did I misspell?  What is the typo?

10   A. There's no "E" in my last name, that's all.

11   It's a common mistake.

12   Q. Thank you.  And the numbers after your name

13   345. I'm sorry. 3, 4, 6, 7, 10, and 11; do

14   you see those topics?

15   A. Yes.

16   Q. Okay.  So those are some of the topics that the City

17   has designated you to speak about, are

18   you prepared to testify about those topics?

19   A.  To the best of my ability, I'm ready.

20   Q. And before we move on from the topic of your

21   training, so you went to the Academy and then you also

22   had, I believe you said in-service training?

23   A. Yes.  The department sets in-service training

24   annually for every officer on the job.

25   Q. Okay.  So each of the years of your almost 26 years



1   on the force, you received additional training beyond

2   what you received, or to reinforce what you received in

3   the academy, agreed?

4   A.  Correct.

5   Q.  And when you were at NOPD, were you a member of any

6   professional associations?

7   A. I mean, the at one point I was probably a member

8   of all of the Police Associations of New Orleans.

9   (indiscernible) of Police, a member of the ICP, a member

10  of the Black Organization of police, member of NOBU,

11  National Organization of Black Law Enforcement Executives,

12  you know, so.

13   Q. And the IACP; that's the International Association

14  of Chiefs of Police?

15   A. Correct.

16   Q. And as a member of IACP, did you receive their bulletins

17  and training documents?

18   A. Yes.

19   Q. And IACP sends out bulletins and training documents that

20  keeps law enforcement officers abreast in best practices,

21  changes to the law, and assignments things along those

22  lines, correct?

23   A. Entries to the topic that you're interested in, so yes.

24   Q. So that was one way you kept yourself abreast of

25  continuing developments in best practices and similar



1   topics, agreed?

2    A. I would say that'd be fair, yes.

3    Q. And as a -- in your roles, one of your job functions

4   was to serve on the Use of Force Review Board; is

5   that correct?

6    A. Yes.

7    Q. And the Use of force Review Board is a body

8   within NOPD that reviews officers actions,

9   and will, at times, vote on whether the officer's

10  actions were justified or not justified, correct?

11   A. Yes, but on certain circumstances.

12  Meaning like, Uses of Force are broken down into

13  categories levels, if you will.

14      And the highest level would be a level four.  The

15  Use of Force Review Board was enacted to review each

16  Level 4 incident that the department had.

17      And render a decision on whether the use of

18  force used by the utilized by the officer or

19  officers was within policy or out of policy.

20  There was a little bit of dynamics had change

21  when I was leaving. We used to vote justified/

22  non-justified, they started getting into this

23  paradigm, they're saying like, well, one officer may

24  be justified and the other officer may not be justified

25  and want to break it down into that category. The



1    recommendation at the time that I left was that we

2    just say, is it within policy or not within policy.

3        But yes, at the time of this incident, it was

4    justified or not justified.

5     Q. And just ballpark, roughly, how many votes do

6    you think you participated in as a member of these --

7     A. Votes?  So the dynamics had changed,

8    because even when the use of force was created,

9    I was actually a non-voting member, meaning the

10   only people that were voting members were the

11   deputy chiefs or the Field Operations Bureau.

12   The Investigative Services Bureau and the Public

13   Integrity Bureau.

14       Unless the superintendent designated like

15   another one, just based on the circumstances

16   at hand.  But, even when I was at the Academy, the

17   non-voting members were participating in a use

18   of force review board because it's designed to

19   actually make the department better.  I mean,

20   correct inefficiencies and the training aspect is

21   key.  So that's where I might have sat on maybe

22   20 or 30.  Voted on 5, 10, maybe.

23    Q. And when you say you sat on maybe 20, often

24   at a Use of Force Review Board meeting

25   there will be multiple sort of critical incidents



1    that are reviewed at one meeting, right?

2     A. Yes, it can be more than one, correct.

3     Q. So you might have participated in discussion of

4    maybe 60 or 80 individual events?

5     A. No.  I'm giving you a cumulative.  I mean,

6    you know, one use of force could have had

7    one, it could have had five, and then just

8    on average, the normal one would maybe be

9    two or three, you know.

10        And I've sat on probably 20 of those.

11    So the average of those may be about 20 to 30,

12    if you will.

13    Q. Great.  Okay, so I'm gonna move on to our specific

14    topics.  So Topic No. 3 is an NOPD policy on handling

15    animals in the field; are you prepared to testify about

16    that topic?

17    A. To the best of my ability, yeah.

18    Q. And I've got available to us NOPD policies 1.3, and

19    Use of Force, and 1.7.1 use of CEW.

20    So we can refer to those as necessary.

21    A.  Okay.

22    Q.  But, you know, in a general sense, an off -- an

23    NOPD officer cannot shoot an animal, say a dog,

24    in the absence of an objectively legitimate an

25    imminent threat to himself or another,



1   would you agree?

2    A. Yes.  That's not just for an animal,

3   though, but go ahead.

4    Q. Sure.  Right.  And we're talking specifically here

5   about an animal.  So I don't mean to limit it to that.

6    A.  Yeah, I understood.

7    Q.  Yeah.  Is the Use of Force standard similar for

8   an officer shooting a person versus shooting an animal?

9    A. You have to identify an active threat, and

10  it has to be an imminent danger.

11      And you believe that, that force word neutralize

12  that threat, so, yes.

13   Q. And it has to be an objectively --

14   A.  Reasonable.

15   Q.  -- Yeah, an objectively reasonable action.  So if

16  an officer had some crazy, subjective belief,

17  that can't be the basis for a legitimate use of

18  force, under a NOPD policy, would you agree?

19   A. I'm not sure, you're gonna have to --

20   Q. Sure.

21   A. -- repeat what you mean on that one.

22   Q. So let's say someone has a terrible phobia of

23  people with tattoos, right?  An officer can't just

24  shoot someone with a tattoo and say, I'm terrified

25  of people with phobias.



1      That would be unjustified, it requires some

2   objective danger for an officer to be justified

3   in firing their weapon, would you agree?

4    A. You have to articulate a reasonable

5   threat and that threat has to be agreed bodily

6   harm before you can use deadly force.

7    Q. Right.  So it has to be something that's

8   reasonable outside the officers head,

9   it has to be objectively reasonable, the

10  circumstances surrounding the officer, agreed?

11   A. Yes.  And that's up to the individual person.

12  He has to articulate within his perception,

13  perspective.

14  And clearly identify, you know, why he or she,

15  you know, made that decision to use that force.

16   Q. So I'm gonna mark as Exhibit 24.  Exhibit 24, do

17  you see that this is an NOPD Operations Manual

18  Chapter 1.3?

19   A. Correct.

20   Q. And the NOPD Operations Manual, that's the --

21  that represents the policies of the department,

22  correct?

23   A. Yes, this chapter represents the use of force

24  policy, correct.

25   Q. And so, The Operations Manual is; these are the



1   rules that officers are expected to

2   follow when they act as officers, agree?

3    A. Yes.

4    Q. These aren't suggestions, these are mandatory

5   on officers, agreed?

6    A. I will concur. Yes.

7    Q. So if you will go to paragraph 24, which is on

8   page 10 of chapter 1.3.  I'm sorry, paragraph 32,

9   which is on page 11.

10   A. Dangerous animals?

11   Q. Yeah.  Are you familiar with this?  This

12  paragraph 32, dangerous animals?

13   A. I've seen it before, yes.

14          MR. ROQUEMORE:

15              William, just before we get further,

16          this is a revised: 10/2/22.  I just want to make

17          sure that Mr. Goodly is aware that this

18          is a later revision than what happened --

19          THE WITNESS:

20              Yeah.  And that's what I wanted to bring

21          up, because I did note the date that it was

22          revised happened after the incident

23          occurred too.

24  BY MR. MOST:

25   Q. Right.  So that was actually going to be my next



1   question, as written here, was this section revised

2   or was this section applicable to?

3       A.  This section looks to be applicable that in

4   it did not change as a result of this case.

5   I do not know, I can't confirm that without

6   consulting with like, the Professional Standards

7   and Accountability Bureau.

8       Who actually revises all NOPD policies, but it

9   appears to be the same or similar in nature.

10   Q. So as far as you know, this, this text here is

11   what would have applied to Officer Burmaster

12   at the time he shot the dog, in --

13   A. I believe so.

14   Q. Okay.  And when we talk, when I talked about

15   the dog, unless I speak otherwise, I'm talking about

16   the shooting of the dog name of Apollo in 2021, will

17   you understand that?

18   A. Yes.

19   Q. Okay.  So this -- I just want to go through

20   this paragraph here.  So the first sentence says,

21   (reading) "Officers are authorized to use firearms

22   to stop an animal in circumstances in which the animal

23   reasonably appears to pose an imminent threat to human

24   safety.  And alternative methods are not reasonably

25   available, or would likely be ineffective."



1   Do you see that sentence?

2    A. Yes.

3    Q. So for an officer to fire his or her weapon at an

4   animal, two things have to be true: there has to be --

5   It has to reasonably appear that the animal poses

6   an imminent threat to human safety; that's one thing, right?

7    A. Yes, according to the policy.  Yes.

8    Q. And the other thing that has to be true is that

9   alternative methods are not reasonably available

10  or would likely be ineffective, correct?

11   A. That's in the policy, yes.

12   Q. And if either of those two things are not met,

13  then the officer should not be firing his weapon

14  at the animal, agreed?

15   A. That would be a violation of the policy.

16   Q. Right.  And also something the officer should

17  not do, agreed?

18   A. Yes.

19   Q. Another thing is that, "The officer must be

20  cognizant of the surroundings when shooting at an

21  animal and ensure that there is no risk to people

22  in the area;" do you see that sentence?

23   A. Correct.  Yes, I do.

24   Q. So even if those first two criteria are met in

25  the first sentence, the officer also has to ensure



```
 1   there's no risk to people in the area, correct?
 2    A. Yes.
 3    Q. And that might apply if, for example, the officers
 4   firing his -- his or her weapon in a residential
 5   neighborhood, correct?
 6    A. Correct.
 7    Q. Or if another officer is either in or near the
 8   line of fire, correct?
 9    A. Yeah, so a dynamic situation.  But yes, all those
10   should be considered.
11    Q. And in circumstances, the next sentence says,
12    "Under circumstances in which officers
13   have sufficient advance notice that a potentially
14   dangerous animal may be encountered, officers
15   should develop reasonable contingency plans for
16   dealing with the animal;" do you see that?
17    A. Let me read that again.  Let's see.
18       Correct, yes.
19    Q. So in a circumstance -- that means that in
20   a circumstance where an officer thinks, you know,
21   there might be a dog or some other animal present,
22   the officer should come up with?
23    A. A contingency plan, that's reasonable, yeah.
24    Q. And that means things other than firing their
25   weapon at the animal, right?
```



1    A. If reasonable, correct.

2    Q. And then the final sentence says,

3  "Nothing in this chapter shall prohibit an officer

4  from shooting a dangerous animal, if circumstances

5  reasonably dictate that a contingency plan has

6  failed or becomes impractical," right?

7    A.  Yes.

8    Q.  And so this paragraphs -- This is what governs

9  when an officer should or shouldn't shoot a dog,

10  correct?

11    A. Animals.  But yes, are inclusive of dogs.

12    Q. And CEW, do you see where CEW is mentioned as

13  an example of a contingency plan?

14    A. CEW, animal control officer, correct, yes.

15    Q. A CEW, it's an abbreviation for?

16    A. Controlled Electronic Weapon.  AKA a taser, if you will.

17    Q. So a taser is specifically identified as a

18  potential way for dealing with even dangerous

19  animals, correct?

20    A. If reasonable, correct.

21    Q. And a taser can be used in two ways.  It can be

22  used either to fire prongs, or it can be used in

23  drive stun mode, correct?

24    A. Yeah, but our policy prohibits the use of drive stun.

25    Q. Does it prohibit the use of drive stun against animals?



1   A. I'll have to check.  I think it just -- we don't

2   practice the use of drive stunning.

3          COURT REPORTER:

4             I'm sorry, drive?

5          MR. MOST:

6             Drive stun.  D-R-I-V-E space S-T-U-N.

7   BY MR. MOST:

8   A. There's one exception to that, though: unless

9   it is to complete a cycle, if we fire from a form afar,

10  and it failed to make contact with one of the probes

11  or in, you're authorized to use the drive stun to

12  complete that cycle, if you will.

13  Q.  Makes sense.  So NOPD prohibits the use of

14  drive stun mode of CEW's for pain compliance, correct?

15  A. Yes, we are trying to accomplish neuromuscular

16  incapacitation.  That's when the body locks up.

17  Q. Could -- would NOPD policy allow for the use of

18  drive stun mode for an officer to defend against an

19  animal?

20  A. Yeah, if it's a deadly force situation then you can

21  use pretty much anything to accomplish the mission and

22  neutralize the threat, so.

23  Q. So if an officer believes they're in a deadly

24  force or serious bodily injury situation, they

25  could use drive stun mode of a CEW to defend



1   themselves against a dangerous animal?

2    A. If reasonable and practical.

3    Q. Okay.  So that takes us to topic 4 which

4   is "NOPD policy and training on the range

5   of appropriate uses of force to a threat that

6   does or does not present a threat of

7   serious bodily harm."

8        Are you prepared to testify about that topic?

9    A. As ready as I'm gonna be.

10   Q. Any reason to think you're not able to testify

11   about that?

12   A. No, sir.

13   Q. Okay.  So you've you were present at the Use

14   of Force Review Board hearing for the incident

15   where Officer Burmaster shot the dog Apollo, correct?

16   A. Yes.

17   Q. And so you watched body camera footage of the

18   shooting, correct.

19   A. Watched body camera, reviewed notes,  Yes, correct.

20   Q. Did you watch the video only at that Use of Force

21   Review Board hearing, or did you watch it another time?

22   A. I believe I watched it before because normally when

23   they submit a packet they send you all the

24   documents with it.

25        So I think I did watch it before and then watched it



1   again at the The Use of Force Review Board.

2    Q. And so you saw that Officer Burmaster was in a

3   situation where there were two dogs running

4   downstairs -- down a set of stairs and one of

5   them ran towards Burmaster, correct?

6    A. Yes.

7    Q. And the one that came towards Burmaster was

8   a puppy of approximately 22 pounds?

9    A. I just said smaller dog, a smaller animal but

10  yes, if you were classified as a puppy.

11     I didn't know the age, you know, the dynamics

12  of dogs growing and all that stuff.  But yes,

13  it was a small dog.

14   Q. Sure.  And did you review -- you said you

15  reviewed that ASI -- the Administrators

16  Shooting Investigation report today, right?

17   A. Not today, no.

18   Q. Not today?

19   A. Not today.

20   Q. Okay.  But sometime recently?

21   A. Yes.

22   Q. Did you also review the ASI at the time of the

23  Use Of Force Review Board?

24   A. Correct, yes, I did.

25   Q. And did you review the portion of the ASI



1  that said, "The dog fatally wounded by

2  Officer Burmaster did not present an imminent

3  threat towards Officer Burmaster;" do you see

4  that part?

5   A. I recall that being said, yes.  I recall

6  that actually at the Use of Force Review

7  Board, as well.

8   Q. And do you agree with that statement?

9   A. At the time we voted non justified, and

10  I did concur with those findings, yes.

11   Q. So you voted that the shooting was not

12  justified because, in your opinion, the dog

13  Burmaster shot did not present an

14  imminent threat towards him, agreed?

15   A. At the time, the smaller dog did not

16  pose an imminent threat to himself or another

17  at the time he fired those shots.

18   Q. So that dog did not pose a threat of

19  serious bodily harm to Burmaster, or another

20  human, agreed?

21   A. At the time he fired the shot, I did

22  conclude that, yes.

23   Q. And you're saying that both as in your

24  opinion, and also as as speaking for the City

25  of Baton Rouge -- I'm sorry, New Orleans, agreed?



1    A. I'll give you this, the Use of Force

2   Review Board is just a recommendation --

3    Q. Uh-huh (affirmative).

4    A. -- and the ultimate, you know, concurrence

5   for the City of New Orleans would have rested

6   with the Superintendent of Police at the time.

7   You know, and that would have been Sean Ferguson.

8       I don't know if he actually concurred

9   with the recommendations or not.

10   Q. Okay.  So we'll come back to that, we got

11   a topic at the end about that process.

12   A.  Sure.

13   Q.  But at least in your opinion, we've covered

14   your opinion, agreed?

15   A. Sure.

16   Q. And so the force that Burmaster chose to use

17   was he unholstered his gun and fired

18   shots at the dog, correct?

19   A. Yes, that's what I recall.

20   Q. And I want to just go through other uses of --

21   other means of force that could have been

22   used as an alternative, all right?

23   A. Okay.

24   Q.  So Burmaster could have used, if there

25   was a serious threat of harm, he could have used



1  the taser either for to fire prongs for

2  neuromuscular incapacitation, or in drive

3  stun mode to defend himself, correct?

4   A. So if it was reasonable and practical, and he

5  had that available as a means, he should have at

6  least tried to use those considerations.

7   Q. Did you see anything that led you to believe

8  that use of the TASER would not be

9  reasonable?

10   A. No.

11   Q. Did you see anything that led you to believe

12  the TASER was not available to him?

13   A. Let's see on that one.  I don't think he had his --

14  Did he have his TASER?  I have to refresh my memory.

15  I don't recall.

16   Q. If he had a TASER on him, it would have

17  been available to him, correct?

18   A. So at the time that he would have to

19  articulate, you know, even at the time, he

20  fired his TASER, just like his weapon, articulated

21  why he felt it was necessary to neutralize that

22  portion at the time.

23       There was a variety of considerations

24  that were reviewed and he just went to the

25  very last one on a force continuum, if you will.



1   He went to drawing his weapon.

2       So there was a variety of tactics that --

3   he could have flared his arm to see if the

4   dog would have retreated.  He could have

5   used verbal dialogues.  Started screaming at the

6   dog.  Call out to the owners, if it was

7   practical.

8       But, at the very nature that he fired his

9   weapon, I didn't, and it's just my opinion, I

10  didn't feel like he reached the level of fearing

11  for great bodily harm when he fired the shot.

12  Q. Sure.  So the Use of Force Continuum, I

13  think is helpful.  So the Use of Force

14  Continuum; that's something that's described

15  in police practices.  It's also described in NOPD's

16  Operations Manual, right?

17  A.  Yes.

18  Q.  And the Use of Force Continuum is sort

19  of a range of options that are available to

20  police in terms of escalating severity, correct?

21  A. Yes.

22  Q. So at the lower end is, yeah, verbal statements,

23  and at the very top end is firing your gun, correct?

24  A. Deadly force, correct.

25  Q. Right.  And so you're saying that Burmaster



1   skipped all the lower things and went straight

2   to deadly force with a gun, correct?

3    A. In that situation, yes.

4    Q. So lower level things he could have used

5   we've covered: he could have used a TASER

6   if he had one, right?

7    A. Yes.  It was an option.

8    Q. It was an option.

9    A. An option.

10   Q. Either to fire the prongs, or to use defensively

11  in drive stun mode, correct?

12   A. Well, drive stun mode, if he was in drive

13  stun in my review, it would have been a

14  deadly force situation in order to drive stun

15  an animal like that, you know.

16      If the animal's close enough where he can

17  drive stun then he probably would have had

18  other options, as well.  That's just how I

19  look at it.  I assessed it.  I put myself  in

20  those shoes and give an honest opinion as to what

21  I would have done and then what could we

22  have done differently.

23   Q. Sure.

24   A. So in my review, if he was in drive stun mode,

25  then that was a deadly force encounter in his perception.



1    Q. Right.  So that would be a very serious use of

2    force, but it would be less serious than firing

3    his gun, correct?

4    A. Well, according to the policy.

5    Q. Right.  How long does it take approximately,

6    to pull a TASER and put it into drive

7    stun mode?

8    A. That's debatable.  And put it into drive stun mode?

9    Q.  Uh-huh (affirmative).

10   A.  You would have to actually take the cartridge off of

11   it and still fire the weapon, turn it on.

12       So, it can be done probably in under two, three seconds.

13   But that's still two or three seconds that could be lost,

14   if you will.

15   Q. Sure.  Okay.  So other less serious things on the Use

16   of Force Continuum that would have been available to

17   Burmaster would be using his fists or his feet to deter a

18   dog, correct?

19   A. Could have kicked at the dog, shooed the dog, yes.

20   Q. Did you see anything that made you think that

21   using his fists or his feet was unavailable or

22   unreasonable for him to use?

23   A. Wait up, repeat that again?

24   Q. Sure.  So from what you saw of the incident,

25   did you see anything or hear anything that led you



1  to believe that Burmaster's fists or feet would

2  be an unreasonable tactic with regard to the dog?

3   A. It would have been a consideration that he

4  could have at least attempted to implore.

5   Q. Sure.  Generally, officers are supposed to go

6  up the Use of Force Continuum if lower level

7  things don't work, right?

8   A. If practical and reasonably objective, correct.

9   Q. Any reason it'd be impractical or unreasonable for

10  Burmaster to try his fists or his feet first?

11   A.  I don't know that if it was a dynamic situation

12  like that-- I, just giving you my opinion,

13  I would have tried other means before I resorted

14  to that against that weight of dog, that type of dog,

15  if you will.

16     I just didn't see it to be reasonable at that point.

17   Q. Right.  It was a little dog.

18   A. Yes.

19   Q. He could have maybe kicked it away.

20   A. And the perception of not just a little dog, but

21  the totality of the circumstances, that's what

22  was weighed.

23     Because we're forgetting there was two dogs

24  on there. One was a bigger dog, and appeared

25  to be a little bit more aggressive.  The other one,



1   not to say it wasn't a feisty puppy, you know,

2   but the nature of the dynamic of the incident,

3   it appeared that the officer was focused on the larger dog,

4   but when the smaller dog came at him, that's what startled,

5   in my view, his perception to fire on the smaller dog.

6       Because the reaction time to look at the larger dog

7   did not come into play.  I would have been much more

8   comfortable, just my review, of him saying that I

9   thought the larger dog was about to attack me and

10  I wanted to focus my attention on the larger dog.

11      Now the smaller dog did not articulate,

12  in my humblest opinion, a imminent threat that would create

13  serious bodily harm on me -- on him, I should say.

14   Q. And as you pointed out, officers have to consider

15  the totality of the circumstances when assessing

16  whether to use force, right?

17   A. Correct.

18   Q. And so in your opinion, given the totality of the

19  circumstances, it was unreasonable for Officer Burmaster

20  to shoot the dog, the smaller dog, agreed?

21   A. At that time, correct.

22   Q. Are the are the shoes that officers wear, are they

23  have a steel toed?

24   A. There's regulations.  Proper footwear, I think that's

25  in the uniform policy, but you know, they don't have



1    to have steel toed shoes to be on this profession; that's an

2    option.

3     Q. Yep.  So another option that could be available

4    to an officer dealing with an animal coming towards

5    them would be to use a baton, if if the officer was

6    carrying one, correct?

7     A. If it was reasonable and practical, yes, that

8    would be an option for them.

9     Q. Right.  And a baton could be -- might be an

10   effective way of deterring a small animal, agreed?

11    A. Yes.

12    Q. And an Officer -- another option for an Officer

13   with a small animal coming towards

14   them is to retreat, correct?

15    A. If that's reasonable and practical, yes.

16    Q. Did you see any indication that it was unreasonable

17   or impractical for Burmaster to retreat from the dog?

18    A. By looking at the dynamics that he was

19   faced, it was highly unlikely that he could have

20   retreated in a fashion that his partner did.

21       Just based on, you know, his movement in

22   the actual area that they were in versus his

23   partner.  You know, his partner was readily

24   accessible.  And I think close, if you will. to retreat.

25   As where as his stance was a little bit, you know,



1  made it a little bit more unpractical to retreat

2  in that fashion.

3      Against, that that larger animal.

4  But, you know, there was still certain things

5  when the smaller animal was in this area,

6  he was still, in my opinion, focused on the

7  larger animal.

8   Q. So could you tell from the video whether

9  there was -- so there was the a gate that

10  Burmaster's partner retreated through it, right?

11   A. Yes.

12   Q. Do you recall if there was also a larger

13  vehicle gate closer to Burmaster?

14   A. I know they were both within a gated area,

15  you know, when the initial incident first occurred

16  they were both in the same gated area.

17      I don't know which gate was elevated, I think

18  the partner may have had a slight elevation on the

19  gate versus Burmaster. I'm not sure of that

20  dynamic though.

21   Q. Okay.  But if there had been a vehicle gate

22  close to Burmaster; that's something he possibly

23  could have retreated through if if there had been

24  one like that, agreed?

25   A. I mean, if it was practical and reasonable.



1   I mean, like I said, I don't know the dynamics.

2   If he could even considered that, you know,

3   you got certain gates -- he knew he came

4   through a gate that opened.

5       I don't know if he knew another dynamic,

6   well, if I try this, hopefully that gate's

7   open, you know, when seconds count,

8   you got to think in terms of practicality and

9   reasonableness.

10      I just don't know that that one, though.

11  Q. Right.  So, so maybe retreat wasn't an option,

12  but I think we've covered that things that

13  could have been: An option for him to at least

14  try would have been on the lower end you said

15  flailing his arms to try to deter the dog.  Screaming

16  to deter the dog, using his fists and feet to

17  repel the dog.

18      Using his TASER in either drive stun mode or shoot

19  the prongs; those are all things that could have

20  been reasonable and practical, given the

21  circumstances, correct?

22  A. Correct.  Or even even I say retreat, just

23  create distance to where he was at to see what

24  the dog's actions were gonna be if he started moving

25  backwards, you know.  I don't know.



1  Q. Okay, so even if he couldn't have fully retreated

2  out of the gate, he could have at least walked

3  backwards or walked in a direction to create more

4  distance between him and the dog, agreed?

5  A. If that was an option that was practical or

6  reasonable, yes.

7  Q. Did you see anything from what you viewed to

8  suggest it would not have been practical or

9  reasonable for him to create more distance between

10 him and the dog?

11 A. If -- at the time when we were reviewing at

12 the time he fired the shots, it was not, in my

13 opinion, reasonable at the time, because he

14 had not tried any of those things in my view.

15     And if you're saying time, you know, we

16 gauge time as well.  And I was just -- and I still

17 am this way, I put myself in the shoes of the

18 officer at the time of the incident and say,

19 would I have fired?  Or would not have fired?

20 Or what I would have done differently.

21     And at the time, he fired the shot at Apollo,

22 at the dog, I was not comfortable saying I

23 wouldn't have pulled the trigger at this point.  I'm

24 not in a threat on this particular animal at the time.

25 And that's how I view not justified at the time.



1   Q. Would you have even pulled your gun out of

2   the holster?

3   A. I mean, it's a dynamic situation.  So I don't

4   know, you know, if the thought process is,

5   you know, the animal, what's to follow the animal?

6   I may have, I don't know, you know,

7   the animal could be a precursor to something even

8   more, you know, what if the owners were

9   volatile, you know?

10   Q. Okay, so you might have pulled your gun out of

11   the holster, but you wouldn't have fired.

12   A. At the time he discharged, I would not have

13   fired.  I would not have shot my weapon.

14   Q. So part of NOPD officers -- Well, let me

15   just before we move on.  And that was the all the

16   members of the use of force review board unanimously

17   agreed with you that it was unjustified.

18   A. Yeah, the voting members, we all agreed at the

19   time that it was not justified.

20   Q. And you were both head of the Field Operations

21   Bureau at one time and also in charge of the academy

22   at another time, right?

23   A. Yes.

24   Q. And so.  And so you know, that officers are

25   required by policy to carry certain equipment



1   with with with them when they go out into the field, correct.

2    A. A variety of tools on their toolbelt, correct.

3    Q. Right.  One of those tools that officers, NOPD

4   officers are required to carry is a baton, correct?

5    A. Either a expandable baton or an ASPA, expandable

6   or regular baton.  Yes, it's an intermediate weapon.

7    Q. So they can choose which of those two batons

8   to carry, but they have to carry a baton, agreed?

9    A. Correct.

10   Q. And officers are trained that they're required

11   to carry a baton, correct?

12   A. Yes.

13   Q. Similarly, officers are required to wear body

14   armor when they go out into the field, correct?

15   A. Yes.

16   Q. It's not an option, they have to do it, correct?

17   A. It's mandated by policy.

18   Q. And officers are trained in that mandate that

19   they're required to wear body armor in the

20   field, correct?

21   A. Yes.

22   Q. Are officers mandated or allowed to wear a cup

23   over their genitals?

24   A.  I'm not certain about any portion of that being

25   in the policy.



1   Q.  Yeah.  I don't think -- I haven't seen where it's
2   required, but are officers are allowed to do it like,
3   if they choose to, could they wear a cup in
4   the field?
5   A. Well, if it's not in policy, and they're wearing
6   it discreetly, there's no policy against it. So it wouldn't
7   be prohibited.  It wouldn't be prohibiting them from,
8   you know, utilizing that resource, if you will.
9   Q. So if an officer let's say there was an officer who
10  had an unusual fear of animals biting his penis, one
11  thing he could do to mitigate that would be to wear
12  a cup that would be allowed, correct?
13  A. I'll say this, I don't think there's any
14  policy against it.
15  Q. Okay.  The reason why officers are required to
16  wear body armor in the field is because if they
17  don't, they're putting themselves at risk, correct?
18  A. The dynamics of the job.  I mean, they're faced
19  with sometimes volatile in daily encounters, you know,
20  so that's a safety measure, it's a safety precaution.
21      And it was it's been implemented within the policy
22  for years.
23  Q. So an officer who chooses not to wear body armor and
24   leave their body armor at home, is violating policy
25  and increasing their own risk of being harmed, correct?



1    A. I don't want to say they're increasing their

2    chances of being harmed that's not a fair statement

3    to say that if an officer doesn't wear the their body

4    armor, they're subjected to more violence than the

5    person that is, no, I don't I don't agree with that one.

6    Q. No, I understand.  I guess what I'm saying is:

7    an officer who chooses to violate policy and leave their

8    body armor at home is increasing the risk that

9    they may be harmed from a violent scenario,

10   if one occurs; would you agree with that?

11   A. Wait up say that again, because I have my

12   perception on that one.

13   Q. Sure, so.  Officers are required to wear body

14   armor to reduce the risk of injury to the

15   officer if there's a violent situation, right?

16   A. I'll take that.  Yes.

17   Q. And so an officer who violates that policy, and

18   leaves their body armor at home is increasing the

19   risk that they're going to suffer injury if

20   there's a violent scenario?

21   A. Yes.

22   Q. Similarly, an officer who chooses to violate

23   policy and not carry a baton, they are limiting

24   the options available to them.  If there is a

25   violent scenario, agreed?



1  A. Yes, if you don't equip yourself with every

2  tool you have at your disposal and within policy

3  then in fact, you are reducing the limitation --

4  or you are increasing the limitation that

5  you may have for neutralizing any encounter.

6  Q. Okay, so we're gonna move on to Topic 6,

7  which is NOPD's supervision of Burmaster.

8  Here we're going to talk about the big picture

9  about of how NOPD managers officers under

10  under NOPD's control; are you prepared to testify

11  about that topic?

12  A. As best as I am, I'm ready.

13  Q. Okay.  So NOPD trains its officers at the Academy,

14  and then also does in-service training, right?

15  A. Yeah. So the training of officers initially

16  when you're a recruit at the Academy, I mean,

17  brand new from the time I came on, it was 16 weeks,

18  and increased to modern day now, over 27 weeks at

19  the initial onset.

20       And then there's annual in-service training, in

21  the minimum requirements at the time, I think it was

22  normally 40 hours and then with the inception of

23  the Consent Decree it went up to 64 hours for your annually.

24  Q. Another way that officers are trained is by being

25  paired with a field training officer, right.



1  A. That's part of the initial training, when they

2  come out of the Academy, they did another 16 weeks

3  with a field training officer, and they go through

4  phases of that as well.

5      I mean, the initial onset is like four phases.

6  The initial phase, phase one with purely

7  being in observational mode for like a period of

8  two weeks.  Phase two, they would be

9  operating as a one person unit basically, the

10  field training officer is getting the recruit or

11  the newer officer, if you will, up to speed with

12  policy, procedures, paperwork, you know,

13  court appearance, things of that nature.

14      Phase three would be a more of a proactive

15  two person unit, responding hot calls,

16  vehicle stops, traffic stops, things of that nature.

17      And then Phase four is the roles are a little

18  bit reversed, where now the field training

19  officer is observing the newer officer do all the

20  work that he's -- he or she is supposed

21  to be doing and operating in the capacity of a police

22  officer and making sure they're getting right, making

23  sure they understand how to apply the law, how to make

24  arrests;  things of that nature.

25  Q. And not every NOPD officer is a field training



1  officer, right?

2   A. No.

3   Q. Do you know roughly it's like one in five, one

4  in ten officers are an FTO?

5   A. So being at the Academy, for some reason,

6  I kept track of these numbers at the time and

7  between 2016 and 2018, I would say.

8      We were trying to beef up the field training

9  officers.  So it was hovering, I want to, if I

10  recall, maybe in the 40's, and then we got it up

11  to like 72, 75 at its peak, I don't know what it

12  is currently at modern day.

13      But we were dealing with a probably a 1,200

14  person department at the time.  And about 700 or so maybe

15  assigned to the Field Operations Bureau.

16  So 70 into 700, maybe about ten percent.

17   Q. Okay.  So yeah, less than one in ten Officers

18  at NOPD are selected to be a field training

19  officer, agreed?

20   A. Yes, I would agree with that.

21   Q. And officers are selected to be field training

22  officers if NOPD decides these are good examples of

23  policing to train new recruits, agreed?

24   A. Yes, it's a higher standard.  Correct, right.

25   Q. So field training officers are selected by NOPD



Chris Goodly

March 07, 2023
Page 55

1  to say, this is what new recruits should emulate as

2  they're learning to be police, correct?

3   A. Yes.  And there incentives in it.  I think

4  there's a pension in it, as well for being a field

5  training officer.

6   Q. And Derrick Burmaster was a field training officer?

7   A. At the time of this incident, I'd have to look at

8  that I'm not sure I mean, what his status was as far

9  as being a field training officer.

10  Q. That's okay.  And an officer, a field training

11 officer can be -- can lose their designation as a field

12 training officer, right?

13  A. Yes, you can take away those privileges.  Yes, if you

14 will.

15  Q. So if NOPD sees a field training officer acting

16 in a way they shouldn't they can remove them from

17 that program, correct?

18  A. Yes.

19  Q. And so if -- So, if an officer is -- continues

20 to be a field training officer, even after say an

21 accusation of misconduct, that's because New Orleans Police

22 Department is saying, regardless of this one incident, this

23 is still an officer that we want recruits to emulate

24 and be trained by, agreed?

25      MR. ROQUEMORE:



1              Objection form.  This has gone beyond

2         the 30(b)(6) designations.

3         MR. MOST:

4              You can, you can answer unless your

5         lawyer tells you not to.

6         THE WITNESS:

7              Repeat it for me.

8         MR. ROQUEMORE:

9              Sure and this is subject to the same

10        objection.

11   EXAMINATION BY MR. MOST:

12    Q. If there's a field training officer who's subject to

13   say, an allegation of a policy violation or something

14   else, and NOPD chooses to keep that officer as a field

15   training officer NOPD is in essence saying this is still

16   an officer that we want recruits to emulate and be

17   trained by, agreed?

18    A. No, you just said allegation based and if,

19   you know, we based on the allegation not true facts,

20   the allegation has to be review, investigated, and

21   also substantiated.

22        And if all of those factors are given consideration

23   it's, it's the type of violation, it's the nature of

24   violation it's the fact that there's many, many

25   variables to consider or remove somebody from



1   assignment that goes into that.

2        So not that the department or any one that has

3   the autonomy to make those decision are saying,

4   albeit, I agree or disagree, I'm gonna keep

5   this person in the same position.

6        I mean, there's a lot of factors that go into

7   that decision making process of whether they keep

8   somebody or remove somebody.

9        So on the surface it's within the best interests

10  of the department versus the needs of the employee.

11  So I won't say that there's more to Burmaster

12  being an FTO or not, it's a stamp of approval for the

13  department, no, I won't say that.

14   Q. Okay.  But he's at least someone -- if he was

15  an FTO. He's at least someone that department

16  chose and selected to be a role model for other

17  officers, correct.

18   A. He's held to a higher standard so I mean,

19  role model, yeah, I mean, you want

20  somebody that's in field training capacity that

21  has the knowledge, you know, a keen knowledge

22  of, you know, the streets and a few other dynamic

23  but because of an allegation that's not gonna,

24  you know, substantiate or negate the fact that

25  he or she stayed in a certain position or remains



1  in a certain assignment, or even in a certain

2  district, if you will.

3   Q. So, in one of his interviews, Mr. Burmaster said,

4  "This is a problem in our city, dogs roaming the city

5  and attacking people."

6      In your experience with NOPD, is that a major

7  problem that NOPD dealt with dogs roaming the city

8  and attacking people?

9   A. Okay.  So I put it like this, there have been reports

10  of citizens being attacked by dogs as well as

11  officers being attacked by dogs throughout my career.

12      Is it a major issue?  I don't see it.  But that's

13  just my opinion.

14   Q.  Sure.

15   A.  Like I said, we've had encounters with -- dog

16  encounters.  We've had even some fatalities that

17  I've been on with dogs encountering people.

18  Our officers have fired weapons at animals,

19  vicious animals, including dog before.

20      So that's an opinion of the officer,

21  but it's not uncommon.

22   Q. Sure.  It's not uncommon, but this wasn't

23  a major consistent problem facing NOPD officers

24  during your tenure, agreed?

25  A. I had bigger fish to fry, yeah, we had bigger problems.



1    Yes.
2     Q. Sure.  So you didn't, in your experiences an NOPD
3    officer see a consistent pattern of dogs attacking people
4    in a consistent and serious basis?
5     A. Well, not in my capacity.
6     Q. Right.
7     A. I knew it was not uncommon, but it was not in
8    my capacity to say it was a major thing.  We
9    were dealing with violent crime and that's where
10   my attention was focused on, primarily.
11    Q. Did you ever hear of dogs biting officers' penises?
12    A. Not that characterization of the incident, no.
13   That was -- I've never heard -- I've not --
14   I've not heard that before.
15    Q.  You say you haven't heard that before.
16   I mean, you're aware of that Burmaster
17   said he was afraid of this dog biting his penis?
18    A.  I mean, I've heard that in this case.  I've
19   heard that in this case. But most people when
20   they describe they'll being attacked they would
21   be like, "I thought it was going to bite me,"
22   but they, you know, unless you elaborate.
23       And Derrick, elaborated on where he would
24   perceive to be bitten at.
25   Most people just say, "I just thought I was gonna



1   get bit."  "Where you thought you was gonna get bit?"

2   "I don't know, on the leg or in the face."

3    Q. So it sounds like Derrick Burmaster's the

4   only officer you've heard specifically saying

5   he was afraid of getting in the penis.

6    A. This is the only case that I recall that

7   I heard an officer say that they feared

8   that they would get bitten in the penis.

9    Q. Are you aware that Officer Burmaster shot

10  another dog before Apollo?

11   A.  Yes.

12   Q.  Are you aware that he also said in that

13  case, something about protecting his groin?

14   A. That might have been the description at the

15  time?  Yeah.  I don't recall the exact

16  area that he said he would be bitten in,

17  in the last case.

18   Q. If he's was specifically afraid of being

19  bitten in the groin, in both the times

20  he's shot and killed dogs; those would be --

21  those two times would be the only two times

22  you've heard an NOPD officer express that

23  fear in your entire almost 26 years on the force?

24   A. That I recall, yep.

25       And I don't recall the last one. I mean, I



1   know he did discharge his weapon at an animal

2   in 2012 and when I was working with him,

3   but I don't know what area of the body that he

4   was saying he was gonna perceive the threat as

5   the bodily harm.

6    Q. Sure.  And setting aside just fear of being

7   bit in the groin or the penis, have you ever

8   heard of an NOPD Officer actually being

9   bit by a dog in the penis?

10   A. Not that I recall.

11   Q. Have you ever heard of any NOPD Officer

12  being bit by any kind of animal in penis

13  or testicles or groin in a way?

14   A. Any NOPD Officer?  No, but I believe

15  one of our canines did bite someone in the

16  groin area.  I don't know what timeframe,

17  it's probably been in the excess of ten years,

18  but I have heard it originate, yes.

19   Q. Okay.  So and NOPD canine unit bit a

20  non-NOPD member in the groin.

21   A.  I think on one of the canine rolls

22  I think somebody got bitten around the groin region.

23  I don't want to say exactly the groin, but

24  in the groin region.

25   Q. So I think we've covered Topic 10 which is



1   NOPD policy on the equipment Burmaster should

2   have been carrying.

3       Moving on to Topic 11.  Well, let me back up.

4   In your opinion, was it reasonable for a Burmaster

5   to feel -- to fear that this puppy was gonna bite him in

6   the penis?

7    A. At the time he discharged his weapon, I did

8   not feel that the perceived threat or the puppy

9   Apollo -- the dog Apollo, the animal was in

10  a proximity and/or situation where he was in

11  great bodily harm to discharge his weapon.

12   Q. And so you didn't see anything that indicated

13  to you that the dog was likely to bite

14  Burmaster in the penis.

15   A. No, not during my review.  No.

16   Q. Okay.  So we're gonna move on to Topic 11,

17  which is the Use of Force Review Board's

18  investigation hearing and conclusions;

19  are you prepared to testify about that?

20   A. To the best of my ability, let's do it.

21   Q. So at the Use of Force Review Board hearing,

22  there were three voting members, yourself,

23  Deputy Superintendent Paul Noel and

24  Deputy Superintendent Linda Westbrook, correct?

25   A.  Correct.



1  Q.  And all three of you unanimously agreed

2  that Burmaster's shooting of the dog Apollo was

3  unjustified, agreed?

4  A. Yes.

5  Q. And prior to your vote, there had been an

6  administrative investigation by the Public

7  Integrity Bureau, correct?

8  A. Yes.

9  Q. The Public Integrity Bureau is NOPD's

10  internal affairs department, correct?

11  A. Correct.

12  Q. And a team of the Public Integrity Bureau

13  did an administrative investigation to

14  determine whether or not the shooting was

15  justified, correct?

16  A. Yes.

17         MR. ROQUEMORE:

18             I'm going to object.  That kind of

19         miss characterizes the purpose of the

20         investigation.

21         MR. MOST:

22             Okay, thank you.

23  EXAMINATION BY MR. MOST:

24  Q. And the -- at the Public Integrity Bureau

25  level: Detective Brewer, Sergeant Helou and



1    Captain Sabrina Richardson all found the shooting

2    to be outside of policy, correct?

3             MR. ROQUEMORE:

4                  Objection, form.

5             THE WITNESS:

6                  So if I recall, I know they did an

7             administrative investigation.  They rendered a

8             disposition I believe the disposition is still --

9             even though they rendered and I want to say

10            sustain for unauthorized use of force,

11            it is still pending.

12                 I believe it's still pending at the time.

13            I don't know the actual disposition that the

14            Superintendent of Police actually rendered on that.

15   BY MR. MOST:

16    Q. Yeah, that's all right.  And we'll cover that in a

17   separate topic.

18       I'm going to hand you Exhibit 20 here. You see on,

19   if you go to page 17 towards the end where it says

20   "summary and conclusion"?

21            MR. ROQUEMORE:

22                 William, do you have extra copies?

23            MR. MOST:

24                 I believe I handed you -- It's the ASI.

25            MR. ALPAUGH:



1           I'm sorry, you're referring to what part?

2       MR. MOST:

3           Sure, it's page 17, the paragraph that's

4       entitled Summary and Conclusions.

5   EXAMINATION BY MR. MOST:

6    Q. Are you there, Mr. Goodly?

7    A. Sure.

8    Q. Okay.  You see that the conclusion of this

9   administrative shooting investigation was that

10  (READING) "Officer Burmaster's discharge occurred due to

11  Officer Burmaster observing the dogs and firing

12   his weapon out of fear and not because the dog

13  presented a threat of serious bodily injury or

14  death to Officer Burmaster."  Do you see that?

15   A. Yes.

16   Q. And then on the last page, you see that it's

17  submitted by Detective Brewer and then Sergeant

18  Helou and Captain Richardson concur?

19   A. Yes.

20   Q. So in terms of NOPD officers who reviewed the

21  evidence and reached a conclusion, Detective Brewer,

22  Sergeant Helou, Captain Richardson, Deputy

23  Superintendent Noel, Deputy Superintendent Westbrook,

24  and yourself all unanimously concluded that it

25  was an unjustified shooting, by Burmaster, agree?



1          MR. ROQUEMORE:

2               Objection to form.

3          MR. MOST:

4               You can answer it.

5          THE WITNESS:

6               So the investigator prepared a

7          recommendation.  And you just read it

8          into the record.

9          And yes, the people that you indicated

10         concur with the conclusion of the investigator:

11         Sergeant Helou, Captain Sabrina Richardson,

12         and as a result of that presentation

13         presented by the use of force review board,

14         all of those voting members, myself, Deputy Chief

15         Westbrook, at the time, and Deputy Chief Paul Noel

16         all at the time rendered the decision that the

17         shooting was not justified.

18    BY MR. MOST:

19     Q. Okay, so Brewer, Helou, Richardson, Noel, Westbrook,

20    and Goodly all agreed it was unjustified, agreed?

21     A. Yes.

22     Q. Are you aware of anyone who voted that it was justified

23    anywhere in the Chain of Command?

24     A. Chain of Command?  Not that I'm aware of.

25     Q. And of course we're setting aside for the moment



1    what may be still pending.

2        Do you recall that at the Use of Force Review

3    Board hearing Captain Albert of the Special

4    Operations Division said he did not see an attack?

5            MR. ROQUEMORE:

6                Objection to form.

7            THE WITNESS:

8                I don't recall.

9    BY MR. MOST:

10   Q.  Yeah, it's okay.  I'm going to designate this

11   as Exhibit 29.  This document it says Use of Force

12   Board at the top.  Do you see this, Mr. Goodly?

13    A. Yes, sir.

14    Q. Do you see that this says minutes in the upper

15   left front page?

16    A. Yes.

17    Q. So this is the -- these are the minutes of

18   the Use of Force Review Board hearing

19   about Mr. Burmaster?

20    A. One, two, three, yes it is.

21    Q. 2021-03; that's the ASI number --

22    A. Correct, yes.

23    Q. And that's a consistent tracking number for

24   this shooting investigation?

25    A. Yes, sir.



1    Q. Look at the last page.  Do see that it says,

2    in the middle of the page, "Captain Albert SOD

3    stated, 'After watching all video he noted Officer

4    Burmaster said, no dogs -- said the dogs were

5    attacking him.  And the barking was what

6    caused him to believe it was an attack.'

7         Chief Noel asked Captain Albert if he

8    believed this to be true. Captain Albert said

9    he did not see an attack.  But officer Burmaster

10   had a perception of an attack.  Officer

11   Burmaster did not describe any threat."

12   Do you see that part?

13   A. Yes, I do.

14   Q. So this these minutes are reflecting the fact

15   that Captain Albert commented at the hearing

16   that he did not see an attack although Officer

17   Burmaster may have perceived one, Albert did

18   not see one.

19   And that Officer Burmaster did not describe any

20   threat from Captain Albert's perspective; is that

21   a fair characterization?

22        MR. ROQUEMORE:

23             Object to form.

24        MR. ALPAUGH:

25             Same objection.



1   EXAMINATION BY MR. MOST:

2    A. Can you repeat that?  I don't want to speculate

3   for Captain Albert.

4    Q. So it says "Captain Albert said he did not

5   see an attack," right?

6    A. "Captain Albert said he did not see an attack."

7   Correct, he said that.

8    Q. And it says "Officer Burmaster did not describe

9   any threat."  That's?

10   A.  Yeah, he didn't have -- "Officer Burmaster did

11  not describe any threat," yes; that's in there.

12   Q. Okay.  And Captain Albert was representing

13  the Special Operations Division?

14   A. Yes.

15   Q. That's kind of like SWAT?

16   A. It is a composite of the SWAT team, as well, yes.

17   Q. And Special Operations Division, although

18  they're not a voting member of the Use of

19  Force board, they are often present to provide

20  comment and input and voice the perspective

21  of the Special Operations Division?

22   A. Yes, they're deemed to be like, the subject matter

23  experts for like, use of force situations as well.

24  Just to give a different perspective outside of the

25  Academy and educational training division, yes.



1    Q. And would you agree that Special Operations

2   Division at use of force Review Board hearings

3   tends to be the voice that is most strongly in

4   favor of justifying the officer's actions and

5   use of force scenarios?

6           MR. ROQUEMORE:

7                Object to form.

8           MR. ALPAUGH:

9                Objection to form.

10          THE WITNESS:

11               I don't think any one entity or bureau

12               or division supersedes another.  So it's a

13               general perspective.  But you know, most

14               of the times we weigh in on what the appropriate

15               person with the most expertise has on a

16               situation.  And we'll give that high regard.

17               But not to say that one individual, one

18               division influences the other, no, not in my view.

19   EXAMINATION BY MR. MOST:

20    Q. Maybe I misspoke.  I don't mean to suggest that SOD

21   has like, doesn't particularly listen to or a particular

22   weight or anything.  It just tends to be the SOD,

23   when they give an opinion at one of these hearings

24   is usually in favor of justifying the officer's use of force;

25   would you agree that that's a typical?



1              MR. ROQUEMORE:

2                  Objection to form.

3              MR. ALPAUGH:

4                  Same objection.

5              THE WITNESS:

6                  I'll say it again, I don't think one

7              division or bureau has a higher standard than

8              than another one.

9                  I mean, if we're dealing with, say for

10             instance, canine situations and that's

11             what this was dealing with.  So Captain Albert,

12             as well as the SOT, Special Operations Team,

13             housed the canine division, So we want to

14             see what the subject matters that handled the

15             canines have to say about the situation.

16   BY MR. MOST:

17    Q. Let me see if I can phrase it a different way.

18    So at Use of Force Review Board hearings, there's a

19   presentation by PIB, right?

20   A. Correct.

21   Q. And then there's sort of a period of discussion

22   where different members, whether voting or

23   non-voting members of the board discuss the use

24   of force, give their perspective, give their

25   opinion and there's kind of a open discussion



1   among the members of the board, right?

2   A. Correct.

3   Q. And it's at least in my observation that it

4   seems like SOD is sort of often advocating in

5   favor of finding the officer's use of force

6   justified; is that in your observation, as well?

7           MR. ROQUEMORE:

8               Objection form.

9           MR. ALPAUGH:

10              Same objection.

11          THE WITNESS:

12              No, I mean.  I don't want to say "advocate."

13          They give their opinion.  And then it's up to

14          the board members to decide you know, how much

15          weight we want to give, but that doesn't

16          have any overbearing influence on me

17          one way or another.

18  BY MR. MOST:

19   Q. Okay.  So looking at page 2 of Exhibit 29.

20  I guess, 2 and to page 3.  This lists a range

21  of policy violations that were sustained; do you

22  see this?

23   A.  Yes.

24   Q.  Okay.  And so these were the the policies that

25  PIB found that Burmaster had violated?



Chris Goodly                                    March 07, 2023
                                                    Page 73

 1          MR. ROQUEMORE:

 2              Objection to form.

 3          MR. ALPAUGH:

 4              Same objections.

 5          THE WITNESS:

 6              I would have to compare them to what's

 7          actually incorporated in the administrative

 8          shooting investigative report. (reviewing)

 9          But it appears paragraph 11, 32.

10          By appearance it appears to be similar to

11          the same violation that are actually in the

12          ASI report.

13  BY MR. MOST:

14   Q. Okay.  So there was a finding that Officer

15  Burmaster had violated policy by when he in

16  his removal of his gun from his holster, right?

17   A. Let me make sure, I've got to see what's

18  sustained, you said "removing his gun from his holster"?

19      (reviewing) I would just say there's sustained violations.

20  But once again, those are just dispositions.

21  The ultimate rendering of the disciplinary action

22  is still pending.

23   Q.  Right.  So, I understand that this may not be the

24  final word on the matter, but at least at this stage,

25  that there was -- a whether or not it becomes the



1  final word on the matter, PIB determined that

2  Burmaster had violated policy regarding the removal

3  of his gun from the holster, right?

4      That's the first one.

5   A.  Yes, it says, "Officers shall not draw or exhibit

6  their firearm unless the circumstances around the incident

7  create an objectively reasonable belief

8  that a situation may escalate to the point which lethal

9  force will be authorized.  Once an officer determines

10 that use of deadly force is no longer likely,

11 the officer shall reholster the weapon."

12 So that's the verbiage in there.  I'd

13 have to look at the policy to see if they

14 actually are relating it to paragraph 11 or 13(a).

15     That's what I'm saying.  You've got -- it's listing

16 the violation and then is given a little

17 reference to which one they violated so

18 I'm assuming, without looking at the policy that it's

19 referencing 11, but I can't be certain.

20

21  Q. Do you want to just, you can look at the policy

22 there.

23  A. Okay.  Yes, this is related to 11.

24  Q. I'm just trying to put these into plain language,

25 so there was one policy violation about Burmaster



1  removing his gun from the holster or failing to

2  reholster it, right; that was the first one?

3   A. Yes.

4   Q. And then the second one was about his use of

5  deadly or lethal force

6   A. Yes.  Correct.

7   Q. And then the third policy violation was about

8  his use of a firearm on an animal?

9   A. Dangerous animals, correct.

10  Q. And then the fourth one, I guess,

11 it doesn't have a description on it.

12  A. I guess, that's what I'm --

13       MR. ANADA:

14          If you go to the next page --

15  A.  Yeah, it goes straight to violation number five

16 on the next page.

17  Q. And the final one is about the failure to wear

18 body armor, right?

19  A. Yes

20  Q. Okay.  So if you look at page three.  You

21 see where it says, third paragraph down

22 from the top, it says "NOTE: Officer Burmaster

23 could not be found in violation of Rule 2,

24 Moral Conduct, Paragraph 6, Unauthorized force --

25  A.  It only applies to a person.



1    Q.  Right.

2   So at the time that the language of that rule,

3   when we talked about use of force against a person

4   and so that was the reason Burmaster wasn't

5   found in violation of this Moral Conduct Rule,

6   correct?

7    A. That would appear to be correct at the time

8   from this note on page three, yes.

9    Q. Right.  But if the language at the time had

10  included animals, he might have been in

11  violation of that rule, as well?

12          MR. ROQUEMORE:

13              Objection to form.

14          THE WITNESS:

15              If it was worded that way,

16          yes.

17  BY MR. MOST:

18   Q. So next, I'm gonna move on to Topics 12

19  to 13.  Anything else you'd like to comment on?

20   A.  Let me see.  No.

21   Q.  Topic 12 is about the Chief's Hearing

22  process and what conclusions that reached and I

23  understand that that process may not be concluded

24  yet, but we'd like to cover it, are you

25  prepared to talk about that?



1    A. As ready as I'm going to be, yes, sir.

2    Q. So, I will admit that my understanding of the

3    Chief's Hearing process is kind of fuzzy.

4    What I understand is that PIB reaches

5    conclusions about whether there's been rule

6    violations and then that is confirmed through

7    the Chief's Hearing process -- confirmed or

8    rejected through the Chief's Hearing process?

9    A. So that's -- from my review, it's -- it's

10   a three member panel, at the time.  It could

11   be more, it could be less but the Superintendent

12   designates you know a three member panel

13   to do the Chief's Hearing.

14        And what we look at is not an absolution

15   of like if the investigator did a sustained

16   or not sustained.  It's the appropriation of,

17   we consider any mitigating or aggravating

18   circumstances, and we may concur with the

19   findings, we may overturn the findings.

20        And render a disposition to the

21   Superintendent with the ultimate authority to agree

22   with the recommendations or not.

23   So once those violations, those dispositions

24   are rendered, it's not an absolution even

25   from the the Chief's Hearing -- the Deputy Chief's



1   Hearing.  The only person that has the ultimate

2   authority to impose that action is the Superintendent.

3    Q. So POB does an investigation.

4    A. Yes.

5    Q. It says we've determined that this officer has

6   violated these policies.  Then there's a Chief's

7   Hearing by which a three board -- a three member

8   panel makes recommendations to the Superintendent?

9    A. At the time, yes.

10    Q. And then the Superintendent makes the final

11   decision about whether something is in

12   violation of the policy,

13    A. He can oppose action, he can agree, disagree,

14   impose any action, or no action at all.

15    Q. So when we talk about the Chief's Hearing,

16   we're talking about, does that referring to the

17   Chief of Police?

18    A. The Chief's Hearing is actually the review of

19   the rendering of disposition appointed through

20   any investigation, any administrative

21   investigation.

22       And then we apply the penalty matrix to the

23   the disposition that are sustained, and we

24   hear the mitigating or aggravating circumstances

25   that we may adopt, and you know, we can keep



1   it at the presumptive penalty, we apply the

2   penalty matrix to the charges that are being

3   filed.  Or the violations that were rendered.

4       And then we give a recommendation to the

5   Superintendent as to what penalties should

6   apply to the individual officer.  And he or

7   she can, you know, concur, agree or

8   disagree and oppose whatever penalty he or

9   she wants to impose on them or no penalties at all.

10   Q. So POB does an investigation and says,

11   we've found what we think are these policy

12   violations.  Then the Chief's Hearing panel

13   says, Okay, we either agree or disagree

14   those are policy violations.  And here's our

15   recommended punishment if there's policy violations,

16   and then the Superintendent makes the final call.

17   A. Correct.

18   Q. Okay.  And it's my understanding that there

19   has not been a Chief's Hearing yet for

20   Burmaster's shooting of Apollo; is that your

21   understand, as well?

22   A. I'm not aware.

23        MR. MOST:

24            So why don't we take a quick break?

25        (Brief break)



1          COURT REPORTER:

2               On the record.

3  EXAMINATION BY MR. MOST:

4   Q. So Mr. Goodly, there has not yet been

5  a Chief's Hearing for Burmaster's shooting of

6  Apollo, right?

7   A. Not that I'm aware.  No, there's

8  no final disposition that I'm aware that has

9  been rendered by the Superintendent of the Police.

10   Q. Okay.  And you'd be aware if there was, right?

11  A disposition?

12   A. In this position?  If I was still on the job,

13  yeah, I'd probably be aware of it, but in

14  this current capacity, no I'm not aware.

15   Q. Well, I guess what I'm trying to figure out

16  is do you know whether there has been a Chief's Hearing

17  or not?  Like, do you have any knowledge about whether

18  there has or has not been a Chief's Hearing?

19          MR. ROQUEMORE:

20               We'll stipulate that there has not been

21          a Chief's Hearing, okay?

22          MR. MOST:

23               Okay.  Right, that's what I'm trying to

24          get to.  Okay.

25  EXAMINATION BY MR. MOST:



1  Q. So there's -- you don't have any reason to disagree

2  with Mr. Roquemore, right.

3  A. No.

4  Q. Okay. So, although everybody in the Chain of

5  Command that we already discussed, has

6  found it to be unjustified, the shooting of Apollo

7  by Burmaster, NOPD's final decision maker has

8  not yet made a decision about whether it was

9  justified or not, agreed?

10  A. That's correct.  To my understanding, yes.

11  Q. Okay. So, even almost two years after the

12  incident, NOPD has not made a final decision

13  about whether it was justified or unjustified,

14  agreed?

15  A. The Superintendent has not reached a

16  decision on this matter; that I'm aware of.

17  Q. So that the City of New Orleans is still

18  yet to decide whether the shooting was justified

19  or unjustified, agreed?

20  A. A decision by the Ultimate Authority has not

21  been rendered.

22  Q. Any idea of when a decision will be made?

23  A. Not under my purview.

24  Q. Okay.  So Topic 13 is NOPD's conclusions about

25  the basis for each shot fired by Officer Burmaster



 1  and whether each shot was justified or not.

 2      Are you prepared to testify

 3  about that, given the limitations we've discussed.

 4   A. Yes, sir.

 5   Q. So it sounds to me like NOPD has not yet

 6  decided whether the first shot was justified

 7  or unjustified, agreed?

 8   A. Final conclusion, yes, I agree.

 9   Q. So every officer in the Chain of Command that

10  has so far weighed in on it, has found the first

11  shot to be unjustified, but there isn't a final

12  decision, agreed?

13   A. Correct.

14   Q. And the same is true for the second and

15  third shots, agreed?

16   A. To summarize it, all the shots were not

17  justified.

18          MR. ROQUEMORE:

19              Let me just impose a cautionary

20          objection.  That we did have officer Pruitt --

21          Sergeant Pruitt today, who depending on if

22          we put her in the chain of command.  She did offer her

23          opinion.  And it was what it was.

24          MR. MOST:

25              Okay.  Yeah, Pruitt's testimony was what it was.



1           Can we just step out here real quick?

2           OFF RECORD

3           We may be done. Okay.

4           COURT REPORTER:

5                3:38, Back on the record.

6    EXAMINATION BY MR. MOST:

7     Q. Okay.  So, Mr. Goodly, it's my understanding that

8    setting aside whether or not Mr. Burmaster's actions

9    were criminal or not, setting that aside, the City

10   has never taken a position that his shooting

11   was justified, would you agree?

12    A.  The Superintendent has not rendered a decision

13   on the administrative investigation, yes.

14    Q.  Right.  So neither the Superintendent, nor anyone

15   below the Superintendent as yet found the shooting to

16   be justified setting aside criminal liability, correct?

17    A. Correct.

18    Q. Then the other thing was that he Use of Force

19   review board -- Use of Force Review Board had its

20   vote about justified, not justified, but it also made

21   some policy and training recommendations, right?

22   If you look at page 3 of the minutes.

23    A. "Training recommendation Officer Burmaster will

24   receive de-escalation training."

25    Q.  Right.  So you and the other members of the Use



1    of Force Review Board determined that Burmaster should

2    receive some additional training to try and prevent

3    this from happening again, right?

4     A. Yes.

5     Q. Specifically, de-escalation training, right?

6     A. Right.

7     Q. So that in the future, he would not, hopefully jump

8    to the most serious use of force as a first impulse, correct?

9     A. Yeah, that's the part of the reason why the

10   Academy of data assess it and see what's the training

11   that we can offer -- that they can offer, have available

12   to them to make the person better.

13    Q.  Right.  And that was premised on the idea that

14   the training he had up until this point, clearly was

15   not sufficient to prevent him from taking these actions,

16   agreed?

17    A. I won't agree with that, I'm not saying that the

18   training he received thus far was inadequate, but we

19   always could use more training.  I'm not gonna agree

20   with that training that he received thus far could

21   have, you know.  I just don't -- I don't agree with

22   he didn't receive enough training; I'm not gonna say that.

23   We can always use more training.  I always advocate for

24   that.

25        But, you know, the training he received thus far up until



 1  the time of this incident, was it inadequate?  No, I don't
 2  agree with that.
 3   Q. Then why would more training help him?
 4   A. Because it reinforces, you know, certain skill sets.
 5  It's always great to be abreast of your current craft.
 6   Q. So if he had had this reinforced -- maybe he
 7  had received de-escalation training at one point, but
 8  if he had had it reinforced prior to this incident
 9  it might have helped avoid this incident?
10          MR. ALPAUGH:
11              Objection to the form of the question.
12          MR. ROQUEMORE:
13              Same objection.
14          THE WITNESS:
15              That's speculatory in my opinion.
16  EXAMINATION BY MR. MOST:
17   Q.  Sure.  But what's your opinion?  Having it reinforced
18  could have helped avoid this incident?
19          MR. ALPAUGH:
20              Same objection.
21          THE WITNESS:
22              I don't know about this type of training.
23          I mean, de-escalation tactical consideration,
24          more dog training; any one of those could have
25          possibly changed the outcome.



1          We don't know.

2    BY MR. MOST:

3    Q.  But your hope, at least, was reinforcing this would

4    prevent a reoccurrence of this incident, correct?

5    A. Correct.

6    Q. Yeah.  So you're not saying that the training and

7    reinforcement he received prior to this incident,

8    you're not saying it definitely was adequate, all

9    you're saying is you're not gonna say it was inadequate,

10   agreed?

11   A. I'll take that, yeah.  All right.

12         MR. NADA:

13              The answer was a "yes"?

14         THE WITNESS:

15              Yes.

16   Q.  Okay, I think that's all the questions, we've got saving

17   any additional questions prompted by these gentleman's

18   question.  Ted, do you want to ask anything?

19         MR. ALPAUGH:

20              Yeah, I don't have a whole lot,

21         but I do have some.

22   CROSS-EXAMINATION BY MR. ALPAUGH:

23   Q.  They asked about FTO's, do you know if Burmaster was an FTO

24   at the time this happened?

25    A. At the time of this incident, looking at the actual



 1  use of Force Review Board minutes. It did make a

 2  note in there that said Sergeant Davis asked, if Officer Burmaster

 3  should be reviewed for being an FTO.

 4      That's indicative that at the time of this incident he

 5  will probably an FTO.

 6  Q. Okay. So as an FTO, he trained other officers in tactics

 7  and things like that, right?

 8  A.  Yes.

 9  Q.  Now the issue about the Chief's Hearing, just so it's

10  clear for record, that Chief's Hearing it is what's referred

11  to as a pre-disciplinary hearing?  Where the Chief decided

12  on whether the discipline was going to be imposed?

13  A. Yes.

14  Q. Is that also call a Laudermill Hearing?  Are you familiar with

15  Laudermill, are you familiar with that term?

16  A.  No.

17  Q.  Again, in that situation, which hasn't happened yet.

18  They, they, they listen to that, the officer gets a chance

19  to present his side of the story.  And then and present any

20  mitigating evidence.  And then they make a recommendation

21  as to one: whether the items are sustained or not sustained,

22  and if sustained, what the penalty is going to be.

23  A. Yes, there's also some other -- I mean, they can

24  exonerate the office, as well.

25  Q.  Correct.



1    A.  It'd be conformant with the policy meaning, you know,

2    even though he's -- did the action it would within policy

3    in the Board's opinion, and it should be exonerated as well.

4       So they also (indiscernible) disposition as well.

5    Q.   And that's happened before where an officer comes in

6    and sustained complaints and the Board exonerates him?

7    A. Correct.

8    Q. Do you know how much time elapsed between the time

9    Officer Burmaster became aware of the dog and the time

10   he shot?

11      And I can refer you to the ASI which is Exhibit 20,

12   if you have that.  Page 11.

13      It says, "The summary of Officer Burmaster BWC.

14   A. I'm following.

15   Q. Do you want to take a quick read to that and then

16   I'll ask some questions about it.

17   A. Okay (complying).

18   Q. If you go down to the end of this I think it's the

19   sixth line where it's starting, with "at".  And it says,

20   "At he 7:04 timestamp, Officer Burmaster can be heard

21   saying "oh shit" and in the background you hear the

22   sound of the dogs approaching," would that be in your

23   estimation the time he first became aware of the dogs?

24   A. At 7:04 timestamp, yeah that would be a plausible

25   conclusion at when he said the "Oh, shit," that



1  something was rapidly developing, yeah.

2   Q. All right.  The next timestamp we have is 7:06,

3  and what happens there according to this report?

4   A. "At 7:06 Officer Roussel exited the front gate while

5  Officer Burmaster drew his firearm," so 2 seconds.

6   Q. Right.  And then --

7   A. "At 7:07 Officer Roussel could be heard saying

8  "get back, get back" and he is observed retreating or

9  exiting the front gate with the larger dog approaching

10 him -- would be -- and barking," that will be Officer Roussel.

11 "The larger dog remained at the front gate of the yard."

12 Q.  At the next second 7:08?

13 A.  "At 7:08 via Officer Burmaster's body worn camera

14 in the left corner of the BWC video, the other dog

15 approached" -- or another dog approached according to

16 this, "approached Officer Burmaster," this would be

17 the smaller dog presumably Apollo.

18 "Officer Burmaster aimed his weapon in the direction

19 of the second dog and discharged, one shot in the

20 direction of the second dog."  7:09, you want me to continue?

21  Q. 7:09, yeah.

22  A. "7:09 timestamp, Officer Burmaster fired a second shot.

23 The second dog is observed to the right side of Officer

24 Burmaster with the dog's head facing downward.

25 Officer Burmaster fired a third shot shortly



1   thereafter -- or shortly after."

2   Q. Okay.  And just stop right there as this is

3   all what happened to Apollo.

4   And what we really have here is, and this starts at 7:04

5   and two seconds later Burmaster draws a firearm.

6       A second later, Roussel is yelling "get back,"

7   and at 8 seconds, which is 4 seconds after this

8   whole thing started is when the first shot's fired,

9   4 seconds. Okay.

10      And that's how much time he had to make a

11  decision, correct?

12  A.  Timestamp.  From the first shot to when he said

13  the "oh, shit" factor kicked in --

14  7:04 timestamp.  7:06, 7:08, "the larger dog remained

15  at front gate, at that point another dog

16  approached" --

17  Q.  7:08 is when the first shots start.

18  A.  "Aimed the weapon in the direction of the second

19  dog and discharged one shot" so 4 seconds, right.

20  Q.  So this whole thing took 4 seconds.

21  A.  For the first shot.

22  Q.  For the first shot.  One more second he had

23  the other two, so it's over in 5 seconds.

24  A.  Yes.

25  Q.  And that's based on the timestamp on the body



1  worn camera which is -- Okay.  All right.

2      Now, you said these situations are dynamic; what

3  do you mean by that?

4   A. Meaning they rapidly evolve and there's certain

5  instances where the totality of the circumstances are

6  rapidly evolving in certain elements that will only

7  consider the actual discharge of the firearm against

8  the dog, but there are certain elements that need

9  to be considered,as well.

10      The height of the officer, the weight of the officer,

11  can be also his abilities.

12      Different natures of weather plays a dynamic in it.

13  You know, if the surfaces are slippery versus not

14  slippery, all of those dynamics that are given weights

15  and consider, you know, with the situation around that.

16   Q. By the same token, that's also what the officer is

17  facing all those situations is facing himself is

18  facing those situations.

19   A. Yes.

20   Q. And he has to integrate all of those.

21   A. He's got to take every variable into consideration

22  when making that decision, yes.

23

24   Q. And let's talk about the TASER for a second.  The TASER,

25  when he's shooting a TASER -- when you deploy TASER --



1  first of all, how long does it take you to get the TASER

2  out and actually aim it?

3   A. I mean, we try to call that a drill, but normally

4  try to get it in two seconds, you know.

5   Q. And so let's say you do that you shoot the TASER,

6  the probes spread apart, correct?

7   A. Yes.  But I'm going to give you this consideration,

8  we only train with tasers if shooting at targets that are

9  stature that's like a human sized man or woman.  And not against

10  animals.

11     And you know, size actually matters when it comes to

12  those dynamics of the use of that TASER, as well.

13   Q. So the animal's smaller than a human.

14   A. In some circumstances may be considered impractical

15  to try to shoot a little animal with a big TASER that

16  you know is going to have a spread, if you will, from those

17  prongs reaching -- The mission is to try to accomplish

18  neuromuscular incapacitation, to neutralize that,

19  that threat or that that perceived threat.

20   Q. Right. And if those prongs spread out at the speed

21  they do, given what we have here in this situation with

22  this dog, would the likelihood of those prongs hitting

23  that dog be quite less than hitting a human?

24   A. It would be severely reduced, yeah.

25   Q. And then if you miss, what happens?



1   A. You got to consider another option, tactical

2   considerations.

3   Q.  And this is all in 4 seconds.  So he perceives

4   the dog, 2 seconds he pulls his taser. Okay?  And it

5   doesn't -- one more second to shoot it?

6   A.  Wait you said 2 seconds?

7   Q.  You said 2 seconds to pull it out.  And then --

8   A.  I mean, you could probably get a discharge in

9   two seconds, as well.

10  Q. And it doesn't work.

11  A. Then you got to consider another option.

12  Q. Then you have a real problem because you've got

13  this animal up close on you, this taser

14  hasn't worked and you were asked about drive stun.

15  So how do you -- How do you convert over

16  to drive stun.

17  A.  So if the -- there's two different dynamics, the

18  drive stun mode you  actually have to take the

19  cartridge off --

20  Q. Right.

21  A.  -- to actually get a complain compliance and

22  that's all a drive stun would do.

23      But if if they had discharged the CEW, or the

24  taser, and one of the prongs hit, then you can

25  achieve neuromuscular incapacitation, if you actually



1  still keep the cartridge lodged on and complete the

2  cycle to the skin or the contact, you can still get

3  a lock up, if you will.

4  Q. But neither situation when you're trying to

5  achieve -- Let's say one prong goes in and you're trying

6  to achieve neuromuscular muscular incapacitation, don't

7  you have to get to get right up close and personal?

8  A. Yeah, you have to get close.  Close contact,

9  close quarters.

10  Q.  And what happens -- and if you miss?

11  A.  You won't achieve it and there's still that

12  that movement or whatever that situation is, you

13  have not achieved the neuromuscular.

14      So basically, the animal or person would

15  still have body movement.

16  Q. Okay.  Let's go to the situation where you miss

17  entirely.  So then if he shoots the taser, miss entirely,

18  then you have to pull the cartridge out, right?

19  A. Yes.

20  Q. And that takes how long?  About a second?

21  A.  Hopefully.  It may take longer, but you know, hopefully.

22  Q.  So we can conceive -- If it was a shot and a miss

23  with the taser, and Officer Burmaster tried to pull the

24  cartridge off, you might be at the four second mark

25  right then and there.



1  A. It would prolong the duration.  But yeah, depending

2  on how well versed you are accomplished to doing that

3  because it could take a few more seconds then this

4  actual situation would call for.

5  Q. And then you still have to stick your hand in

6  against the animal and engage the drive stun?

7  A. Yes.

8  Q. And that's a risk in and of itself, is it not?

9  A. Yes.  It would become close quarters contact, yes.

10  Q. Now, you were talking about the Board and I guess

11  what you've received your trial, objectively what you

12  what you saw, objectively, correct?

13  A.  Correct.

14  Q.  The Board is not trying to put itself inside the

15  officer's head are they?

16  A. No, I don't believe -- I think, when the mission of that

17  Board is to say, What could we have done differently?

18  Better?  And just to make the officer as well as the

19  department better.  That's the whole true objective of

20  that actual Board to review those matters.

21  Q. Right.  But I mean, you're not you're not looking at

22  it from the point of view of the officer, you're looking at

23  the point of view of looking at, in retrospect, as to what

24  actually happened.

25      You have the ability of hindsight, you're looking back



1   in hindsight, this is what happened, this is what went wrong.

2    A. And so I give you this, I know where you're going

3   with this.  So when we say, Monday morning quarterback,

4   and that Board is actually designed for Monday morning

5   quarterbacking.

6        It's not an absolution.  And it is a recommendation

7   that we review and I do attempt to put myself and eyes

8   and ears and try to get the general perspective of what

9   the officer/officers were thinking at the time, so I

10  can be better informed about the weights of my decision

11  when I say, I can tell them what they did wrong.

12       But if I do that, I gotta tell them how to

13  do it right.  That's just a general philosophy I have.

14  I'm never going to tell somebody what they did wrong

15  unless I can tell them how to get it right.

16       Otherwise I have to agree with the decision they made.

17   Q. But again, that's not the purpose of the Board,

18  the purpose of the board is to Monday morning quarterback.

19   A. That's a function of it -- just trying to make

20  the department better.

21   Q. Right.  Okay.  Give me a second, John, I might

22  just be finished.

23       And once the Board makes its decision, it's finished

24  at that point, correct?

25   A. From the use of force perspective?



1   Q.  Yes.

2   A.  When you say "Finished" I mean it's still got the

3   administrative review that still ongoing.

4   Q. I'm saying that this is the end of the Use of Force

5   Board's participation.

6   A. Yes, correct, yes.

7   Q. When it's issued its decision.

8   Just let me a ask question about body armor.  What area of

9   the body does the body armor protect?

10   A. It protects up from the mid chest area down to a

11   portion, depending on your size and weight,

12   to your mid to lower abdominal area.  And your back as well.

13          MR. ALPAUGH:

14              Okay, Chris, thank you very much I appreciate.

15          MR. ROQUEMORE:

16              The City has no questions.

17              Did do you guys?

18   FOLLOW-UP BY MR. MOST:

19          MR. MOST:

20              I've got a couple follow-ups.

21   Q. So Mr. Alpaugh asked you about the 4 seconds from "oh, shit"

22   to the first shot being fired, right?

23   A. Yes.

24   Q. Do you know that when Burmaster said "oh shit," that's

25   the first he perceived the dogs?  Or that's just



1  counting from when he said, "oh, shit" verbally?

2   A. Repeat that.

3   Q. Yeah, let me rephrase it.  So are you sure that when

4  he said "oh shit," that was at the same time as

5  Burmaster first perceiving the dogs?

6   A. Well, in review of the video evidence, as well

7  as the case facts, it was presumed that one could

8  logically conclude under the auspices of working

9  in the capacity that police officer that "oh, shit"

10  means "oh, shit, something is about to transpire"

11  you know?  And a perception of that, that's when

12  I believe he feared that, you know, there were now

13  something that he feared of.

14     The dynamics are rapidly about to evolve at the 7:04 mark.

15   Q. But he might have been aware of the dogs prior to

16  "oh, shit," but it's your opinion that "oh, shit"

17  is when he realized there was a problem.

18  A. I think he realized that the dynamics were rapidly

19  changing because up until that point, I think they

20  wanted to believe that there were no dogs.

21  Q.  And so let's say Burmaster only had 4 seconds to

22  make a decision.  Is 4 seconds, are NOPD Officers

23  trained on how to deal with scenarios in which

24  they have to make a decision in a matter of 4

25  or fewer seconds?



1   A. Yeah.  We do scenario based training or drills

2   if you will, where seconds count, so.

3

4   Q. So, in fact, there's talk about split second

5   decision making, which is less than a second, correct?

6   A. Yes.  The terminology is split second, so I'm going

7   to agree with you on split second.

8   Q. And four seconds is sufficient for an NOPD

9   officer to make a choice about whether to use

10  lethal force, correct?

11  A. That's gonna be a wide range of disparity.

12  I mean, if you have time, you utilize the time.

13  You make the most of that time, if you got time

14  to make those decisions, I can't put a specific second

15  to say what, what second mark would make the right or

16  wrong decision.

17  Q. So let me rephrase that.  You voted unjustified at the

18  Use of Force Review Board hearing, because even if Burmaster

19  had 4 seconds to make a decision, he should not have made the

20  decision to use lethal force, correct?

21  A. So my review and my opinion based on the circumstances

22  that he was faced, at the time, I voted not justified with

23  him discharging that weapon at that animal at that very

24  time, under those circumstances.

25      Now had those circumstances change as they rapidly may,



1    but at the time he squeezed the trigger.  I did not feel

2    he was justified, in my opinion, at that time.

3     Q. Was part of your decision making the proximity of

4    Officer Roussel?

5     A. It was the totality of the circumstances.  It was

6    all of the dynamics involved, you know?

7     Q. Mr. Alpaugh talked to you about what happens if

8    one prong from the CEW misses.  So you need two prongs

9    to hit for a CEW to affect neuromuscular incapacitation, right?

10    A. Yes.

11    Q. But if one prong hits there's still going to be a current

12   that's applied to the recipient, right?

13    A. Yes.  They -- I don't know about how much of a shock

14   you may feel.  Some, some may not feel anything, although

15   it could be producing electricity.

16       I mean, that's a variable that, you know, the manufacturer

17   would have to explain. I mean, you know, bodyweight, movement

18   and all that, type of clothing it goes into, you may feel it.

19   It may hit the skin, it may be in a puffy jacket, where there's

20   no penetration with the skin, and it may not have an arc

21   enough to feel anything.

22       So that's the dynamic involved with that too.

23    Q. Sure.  But if one prong had hit Apollo who was not

24   wearing any clothes, it may have administered a shock

25   that would -- could have deterred Apollo, would you agree?



 1        MR. ROQUEMORE:

 2             Objection, speculation.

 3        MR. ALPAUGH:

 4             Same objection.

 5        THE WITNESS:

 6             I don't know.  Cause that's a dynamic for the

 7        tool and the animal.  I mean, you know, you're

 8        saying that if one prong hit, Apollo could have

 9        had enough fur that, you know, he may not have felt

10        anything.

11             I mean he could have had a bone density skin,

12        you know?  I just don't know.

13  BY MR. MOST:

14   Q.  Sure.  So you saw roughly what size Apollo was, right?

15   A. Yes.

16   Q. Not too much larger than a football, right?

17   A. It was a small animal, a small dog.

18   Q. So if Burmaster had tried to use a CEW on Apollo

19  and it failed, one option would have been to simply

20  kick Apollo away, agreed?

21   A. That would have been an option.

22   Q. Apollo was also approximately the size of a large

23  cat, right?

24   A. A small dog.

25   Q. That's okay.  You're not a biologist, that's okay.



1    Maybe I misheard you, but did you say that NOPD

2    Officers are not trained on CEW use on animals.

3     A. We don't practice -- Even at the Academy, we don't

4    practice shooting targets at animals.  We use a -- or they

5    use a poster board of a average size male and they train to

6    complete those practical by discharging the taser,

7    make sure that they got sufficient prong

8    coverage against that poster board.

9        We don't use any posters of animals, snakes, dogs,

10   or and anything like that.  It's only an average size

11   male that they shoot that at.

12    Q. So there's no practical training on use of

13   CEW's on animals, is there a classroom training on

14   use of CEW's on animals?

15    A. We talk about -- Well, at one point they were

16   talking about, you know, the effects of a taser that

17   could be on an animal.  And that it may be a

18   productive tool, and useful tool, but that's

19   not an absolute tool.

20    Q. You talked with Mr. Alpaugh about the Monday

21   morning quarterbacking aspect of the Use of Force

22   Review Board.

23    A. Sure.

24    Q. The aspects of the Use of Force Review Board

25   hearing that are Monday morning quarterbacking



1  are things like, policy recommendations,

2  training recommendations, things like that,

3  right?

4   A. Absolutely.

5   Q. However, the vote on whether an officer's use

6  of force was justified or unjustified;

7  that's based on the information that was available

8  to the officer at the time, correct?

9   A. When you say "based on the information that

10  was available to the officer at the time", to make that

11  decision?

12   Q.  Right.

13   A.  Yes.

14   Q. So that aspect of it is not Monday morning

15  quarterbacking, agreed?

16   A. No, no, that.

17   Q. It's not.

18   A. It's not.

19   Q. So Paragraph 62 of Chapter 1.7.1, I'll just read

20  it to you.  "The CEW has proven to be an effective

21  tool against dangerous animals, and may reduce the

22  need for greater, more injurious force against

23  such animals." Is that -- Is there training

24  on that aspect of an NOPD's Operations Manual

25  during Academy or in-service training?



1    A. When you say "training," we discuss, I believe,

2   they even show a video where at one point, I know,

3   they showed a video of an officer tasing a dog

4   but it wasn't a practical exercise.

5       It wasn't a scenario based exercise.  It was

6   just a video of how the -- and it was a rather large

7   animal that was, I believe, attacking a SPCA employee

8   at the time.

9       Either that or an actual officer, he would have

10  successfully neutralize the dog, and then once

11  accomplished, and I'll reiterate, it was a rather

12  large dog.  And once they achieve the NMI, the

13  neuromuscular incapacitation.

14      After the cycle stopped, the dog ran off.

15  But once again, that was a dynamic that, you know, time

16  dynamic situation.  Was it reasonably effective?

17  In that case?  Yes.  What if that officer or

18  that person that was discharging that would have

19  missed?  Don't know the outcome.

20  I can tell you that when we watched the video,

21  it was successful in that point where the dog

22  did retreat.  Did it return?  I just don't know that.

23   Q. Is it easier to make a connection with prongs

24  from an CEW on an object with a low center of mass

25  like a dog than someone standing vertically?



1    A. I don't know, because we train from a person

2  that's standing.  Actually, if a person is lying

3  on a side, we have to manipulate the CEW to turn

4  because it's two pronged but the first prong,

5  actually hits straight, the second prong, I believe

6  is on a 15 degree angle and the further away, the

7  wider it expands.

8       The closer you are, you know, the closer the actual

9  prongs stay.  But I want to say you have to have maybe an

10  inch of spread to achieve the neuromuscular incapacitation.

11  That's why if you're too close, they want you to actually

12  step back and discharge on human beings, if you will,

13  so you can achieve NMI.

14       But, you know, weight, size, all that actually

15  matters as variables that, you know, may have successful

16  versus unsuccessful outcomes with achieving that mission.

17    Q. Okay.  That's it for our questions.  Anybody else?

18           MR. ROQUEMORE:

19               Thank you.

20           MR. ALPAUGH:

21               Thank you.

22

23  (The deposition was concluded at 4:15)

24

25

1

2                  R E P O R T E R ' S   P A G E

3

4       I, CARRIE A. HARTILL, Certified Court Reporter in and for

5    the State of Louisiana, the officer before whom this sworn

6    testimony was taken, do hereby state;

7       That due to the spontaneous discourse of this proceeding,

8    where necessary, dashes (--) have been used to indicate pauses,

9    changes in thought, and/or talkovers; that same is the proper

10   method for a Court Reporter's transcription of a proceeding, and

11   that dashes (--) do not indicate that words or phrases have been

12   left out of this transcript;

13      That any words and/or names which could not be verified

14   through reference material has been denoted with the phrase

15      "(phonetically spelled)."

16

17

18

19

20

21

22                               _____

23                               Carrie A. Hartill, BA-CCR

24                               Certified Court Reporter

25                               Louisiana License #2018009



1

2                    C E R T I F I C A T I O N

3          This certification is valid only for a transcript

4    accompanied by my original signature and original required seal

5    on this page.

6          I, Carrie Hartill, Certified Court Reporter, in and for the

7    State of Louisiana, as the officer before whom this testimony was

8    taken, do hereby certify that Chris Goodly, to whom the oath

9    was administered, after having been duly sworn by me upon

10   authority of R.S. 37:2554, did testify as hereinbefore set forth

11   in the foregoing 105 pages;

12         That this testimony was reported by me in the Stenomask

13   reporting method, was prepared and transcribed by me or under my

14   personal direction and supervision, and is a true and correct

15   transcript to the best of my ability and understanding;

16         That the transcript has been prepared in compliance with

17   transcript format guidelines required by statute or by rules of

18   the board, that I am informed about the complete arrangement,

19   financial or otherwise, with the person or entity making

20   arrangements for deposition services; that I have acted in

21   compliance with the prohibition on contractual relationships, as

22   defined by Louisiana Code of Civil Procedure Article 1434 and in

23   rules and advisory opinions of the board; that I have no actual

24   knowledge of any prohibited employment or contractual

25   relationship, direct or indirect, between a court reporting firm



1  and any party litigant in this matter nor is there any such

2  relationship between myself and a party litigant in this matter.

3  I am not related to counsel or to the parties herein, nor am I

4  otherwise interested in the outcome of this matter.

5

6

7

8

9

10                                    _____

11                                     Carrie A. Hartill, BA-CCR

12                                    Certified Court Reporter

13                                    Louisiana License #2018009

14

15

16

17

18

19

20

21

22



Chris Goodly

**1**

**1,012**  17:8

**1,200**  54:13

**1.3**  25:18 27:18 28:8

**1.7.1**  25:19 103:19

**10**  21:13 24:22 28:8 61:25

**10/2/22**  28:16

**11**  21:13 28:9 62:3,16 73:9 74:14, 19,23 88:12

**12**  76:18,21

**13**  76:19 81:24

**13(a)**  74:14

**15**  105:6

**16**  16:21 52:17 53:2

**17**  64:19 65:3

**1993**  14:1

**1996**  15:1

**1997**  14:7 16:20

**2**

**2**  72:19,20 75:23 89:5 93:4,6,7

**20**  15:21 24:22,23 25:10,11 64:18 88:11

**2001**  14:4

**2003**  14:9,13

**2004**  14:6,13

**2005**  14:13

**2009**  14:15

**2011**  14:17

**2012**  61:2

**2016**  14:19 54:7

**2018**  14:22 54:7

**2021**  14:23 29:16

**2021-03**  67:21

**2023**  15:3

**22**  35:8

**24**  27:16 28:7

**26**  15:5,6 21:25 60:23

**27**  16:22 17:6 52:18

**29**  67:11 72:19

**3**

**3**  21:13 25:14 72:20 83:22

**30**  24:22 25:11

**30(b)(6)**  56:2

**300**  16:25

**32**  28:8,12 73:9

**345**  21:13

**35**  13:25

**3:38**  83:5

**4**

**4**  21:13 23:16 34:3 90:7,9,19,20 93:3 97:21 98:21,22,24 99:19

**40**  52:22

**40's**  54:10

**4:15**  105:23

**5**

**5**  24:22 90:23

**500**  17:2

**6**

**6**  21:13 52:6 75:24

**60**  25:4

**62**  103:19

**64**  52:23

**7**

**7**  21:13

**70**  54:16

**70's**  7:8

**700**  54:14,16

**72**  54:11

**75**  54:11

**7:04**  88:20,24 90:4,14 98:14

**7:06**  89:2,4 90:14

**7:07**  89:7

**7:08**  89:12,13 90:14,17

**7:09**  89:20,21,22

**8**

**8**  21:1 90:7

**80**  25:4

**80's**  7:9

**880**  17:4

**9**

**90's**  16:24

**97**  15:2,3

**A**

**abbreviation**  32:15

**abdominal**  97:12

**abilities**  91:11

**ability**  21:19 25:17 62:20 95:25

**abreast**  22:20,24 85:5

**absence**  25:24

**absolute**  102:19

**Absolutely**  103:4

**absolution**  77:14,24 96:6

**academy**  14:19 16:8,18,19 17:8, 10,11 18:11,12,21 19:1 21:21 22:3 24:16 48:21 52:13,16 53:2 54:5 69:25 84:10 102:3 103:25

**accessible**  44:24

**accomplish**  33:15,21 92:17

**accomplished**  95:2 104:11



**Accountability** 29:7

**accusation** 55:21

**achieve** 93:25 94:5,6,11 104:12 105:10,13

**achieved** 94:13

**achieving** 105:16

**act** 28:2

**acting** 55:15

**action** 26:15 73:21 78:2,13,14 88:2

**actions** 17:14 23:8,10 46:24 70:4 83:8 84:15

**active** 26:9

**actual** 12:9 20:17 21:4 44:22 64:13 86:25 91:7 95:4,20 104:9 105:8

**additional** 22:1 84:2 86:17

**address** 11:11 19:17

**adequate** 86:8

**administered** 100:24

**Administration** 14:4

**administrative** 12:5 19:4 63:6,13 64:7 65:9 73:7 78:20 83:13 97:3

**Administrators** 35:15

**admit** 77:2

**adopt** 78:25

**adopted** 19:13

**advance** 8:2 31:13

**advocate** 72:12 84:23

**advocating** 72:4

**afar** 33:9

**affairs** 63:10

**affect** 100:9

**affirmative** 11:4 37:3 41:9

**afraid** 59:17 60:5,18

**afternoon** 6:6

**age** 35:11

**aggravating** 77:17 78:24

**aggressive** 42:25

**agree** 8:13 9:19 17:15 26:1,18 27:3 28:2 36:8 51:5,10 54:20 57:4 65:25 70:1,25 77:21 78:13 79:7,13 82:8 83:11 84:17,19,21 85:2 96:16 99:7 100:25

**agreed** 9:25 22:3 23:1 27:5,10 28:5 30:14,17 36:14,20,25 37:14 43:20 44:10 45:24 47:4 48:17,18 49:8 51:25 54:19,23 55:24 56:17 58:24 63:1,3 66:20 81:9,14,19 82:7,12,15 84:16 86:10 101:20 103:15

**ahead** 26:3

**aim** 92:2

**aimed** 89:18 90:18

**AKA** 32:16

**Al-qaeda** 15:25

**albeit** 57:4

**Albert** 67:3 68:2,7,8,15,17 69:3,4, 6,12 71:11

**Albert's** 68:20

**allegation** 56:13,18,19,20 57:23

**allowed** 49:22 50:2,12

**Alpaugh** 10:2 64:25 68:24 70:8 71:3 72:9 73:3 85:10,19 86:19,22 97:13,21 100:7 101:3 102:20 105:20

**alternative** 29:24 30:9 37:22

**ANADA** 75:13

**analogous** 18:23

**analysis** 12:20

**and/or** 62:10

**angle** 105:6

**animal** 8:20 25:23 26:2,5,8 29:22 30:4,5,14,21 31:14,16,21,25 32:4, 14 33:19 34:1 35:9 40:15 44:4,10, 13 45:3,5,7 47:24 48:5,7 61:1,12 62:9 75:8 92:15 93:13 94:14 95:6 99:23 101:7,17 102:17 104:7

**animal's** 40:16 92:13

**animals** 25:15 28:10,12 32:11,19, 25 50:10 58:18,19 75:9 76:10 92:10 102:2,4,9,13,14 103:21,23

**annual** 52:20

**annually** 21:24 52:23

**answers** 7:15,21 9:21 11:1,3,19

**anytime** 8:1

**Apollo** 29:16 34:15 47:21 60:10 62:9 63:2 79:20 80:6 81:6 89:17 90:3 100:23,25 101:8,14,18,20,22

**appearance** 53:13 73:10

**appeared** 42:24 43:3

**appears** 29:9,23 73:9,10

**applicable** 29:2,3

**application** 16:14

**applied** 29:11 100:12

**applies** 75:25

**apply** 16:12 31:3 53:23 78:22 79:1, 6

**appointed** 10:4 14:16,21,23 78:19

**approached** 89:15,16 90:16

**approaching** 88:22 89:9

**appropriation** 77:16

**approval** 57:12

**approximately** 6:23 16:20,24 35:8 41:5 101:22

**arc** 100:20

**area** 20:6 30:22 31:1 44:22 45:5, 14,16 60:16 61:3,16 97:8,10,12

**areas** 16:2

**arm** 39:3

**armor** 49:14,19 50:16,23,24 51:4, 8,14,18 75:18 97:8,9

**arms** 46:15

**arrests** 53:24

**articulate** 27:4,12 38:19 43:11

**articulated** 38:20

**Arts** 14:2,5

**ASI** 12:5,7 35:15,22,25 64:24 67:21 73:12 88:11

**ASPA** 49:5



**aspect** 24:20 102:21 103:14,24

**aspects** 16:13 17:17 18:17 102:24

**assault** 7:8

**assess** 84:10

**assessed** 9:6 40:19

**assessing** 43:15

**assigned** 14:8,10,17 54:15

**assignment** 57:1 58:1

**assignments** 22:21

**Assistant** 19:24,25 20:5

**Association** 22:13

**associations** 22:6,8

**assume** 9:17,23

**assuming** 8:21 74:18

**attack** 43:9 67:4 68:9,10,16 69:5,6

**attack.'** 68:6

**attacked** 58:10,11 59:20

**attacking** 58:5,8 59:3 68:5 104:7

**attain** 16:25

**attempt** 96:7

**attempted** 42:4

**attention** 43:10 59:10

**attorney** 11:16,20

**auspices** 98:8

**authority** 77:21 78:2 81:20

**authorized** 29:21 33:11 74:9

**autonomy** 57:3

**average** 25:8,11 102:5,10

**avoid** 85:9,18

**aware** 9:4 28:17 59:16 60:9,12
    66:22,24 79:22 80:7,8,10,13,14
    81:16 88:9,23 98:15

**B**

**Bachelor's** 14:2

**back** 7:8 13:19 15:21 37:10 62:3
    83:5 89:8 90:6 95:25 97:12 105:12

**background** 12:16 13:16,24 88:21

**backwards** 46:25 47:3

**ballpark** 24:5

**barking** 68:5 89:10

**based** 17:16 18:18 19:9 24:15
    44:21 56:18,19 90:25 99:1,21
    103:7,9 104:5

**basically** 20:9 53:9 94:14

**basis** 26:17 59:4 81:25

**baton** 36:25 44:5,9 49:4,5,6,8,11
    51:23

**batons** 49:7

**beef** 54:8

**beginning** 14:25

**behalf** 8:25 9:14 10:24 11:10

**beings** 105:12

**belief** 26:16 74:7

**believed** 68:8

**believes** 33:23

**big** 8:17 52:8 92:15

**bigger** 42:24 58:25

**biography** 13:23

**biologist** 101:25

**bit** 7:6 8:22 15:7 23:20 42:25 44:25
    45:1 53:18 60:1 61:7,9,12,19

**bite** 59:21 61:15 62:5,13

**biting** 50:10 59:11,17

**bitten** 59:24 60:8,16,19 61:22

**black** 15:23 22:10,11

**board** 12:9,11,13 23:4,7,15 24:18,
    24 34:14,21 35:1,23 36:7 37:2
    48:16 62:21 66:13 67:3,12,18
    69:19 70:2 71:18,23 72:1,14 78:7
    83:19 84:1 87:1 88:6 95:10,14,17,
    20 96:4,17,18,23 99:18 102:5,8,22,
    24

**Board's** 62:17 88:3 97:5

**bodily** 27:5 33:24 34:7 36:19 39:11
    43:13 61:5 62:11 65:13

**body** 23:7 33:16 34:17,19 49:13,19

50:16,23,24 51:3,8,13,18 61:3
    75:18 89:13 90:25 94:15 97:8,9

**bodyweight** 100:17

**bone** 101:11

**bottom** 21:7

**brand** 52:17

**break** 7:25 8:2,4 23:25 79:24,25

**Brewer** 63:25 65:17,21 66:19

**briefed** 11:17

**bring** 28:20

**broken** 20:8 23:12

**Brown** 6:8

**bulletins** 22:16,19

**bureau** 12:3 14:22 20:7,9,12,17
    24:11,12,13 29:7 48:21 54:15 63:7,
    9,12,24 70:11 71:7

**Bureaus** 20:8

**Burkhardt** 7:2,3

**Burkhart** 7:7

**Burmaster** 6:8 8:19 20:10 29:11
    34:15 35:2,5,7 36:2,3,13,19 37:16,
    24 39:25 41:17 42:10 43:19 44:17
    45:13,19,22 52:7 55:6 57:11 58:3
    59:16 60:9 62:1,4,14 65:11,14,25
    67:19 68:4,9,11,17,19 69:8,10
    72:25 73:15 74:2,25 75:22 76:4
    81:7,25 83:23 84:1 86:23 87:2
    88:9,13,20 89:5,16,18,22,24,25
    90:5 94:23 97:24 98:5,21 99:18
    101:18

**Burmaster's** 12:15 42:1 45:10
    60:3 63:2 65:10 79:20 80:5 83:8
    89:13

**Business** 14:3

**BWC** 88:13 89:14

**C**

**call** 6:17 18:25 39:6 79:16 87:14
    92:3 95:4

**called** 9:9 19:1

**calls** 53:15



**camera** 34:17,19 89:13 91:1

**canine** 61:19,21 71:10,13

**canines** 61:15 71:15

**capacity** 18:7 53:21 57:20 59:5,8 80:14 98:9

**Captain** 64:1 65:18,22 66:11 67:3 68:2,7,8,15,20 69:3,4,6,12 71:11

**career** 58:11

**carry** 48:25 49:4,8,11 51:23

**carrying** 44:6 62:2

**cartridge** 41:10 93:19 94:1,18,24

**case** 6:8 7:3,5 8:14,18 12:19 29:4 59:18,19 60:6,13,17 98:7 104:17

**cases** 6:25 7:8 12:3,21

**cat** 101:23

**categories** 23:13

**category** 23:25

**caused** 68:6

**cautionary** 82:19

**center** 104:24

**CEW** 25:19 32:12,14,15 33:25 93:23 100:8,9 101:18 102:2 103:20 104:24 105:3

**CEW's** 33:14 102:13,14

**chain** 66:23,24 81:4 82:9,22

**chance** 87:18

**chances** 51:2

**change** 23:20 29:4 99:25

**changed** 19:20 24:7 85:25

**changing** 98:19

**chapter** 27:18,23 28:8 32:3 103:19

**characterization** 59:12 68:21

**characterizes** 63:19

**charge** 18:20 48:21

**charges** 79:2

**check** 33:1

**chest** 97:10

**chief** 6:15,17 14:21,24 19:24,25

20:1,2,5 66:14,15 68:7 78:17 87:11

**Chief's** 76:21 77:3,7,8,13,25 78:6, 15,18 79:12,19 80:5,16,18,21 87:9, 10

**chiefs** 22:14 24:11

**choice** 99:9

**choose** 49:7 50:3

**chooses** 50:23 51:7,22 56:14

**chose** 37:16 57:16

**Chris** 6:19 97:14

**Christopher** 6:2,12

**circumstance** 31:19,20

**circumstances** 23:11 24:15 27:10 29:22 31:11,12 32:4 42:21 43:15,19 46:21 74:6 77:18 78:24 91:5 92:14 99:21,24,25 100:5

**citizens** 58:10

**city** 8:25 9:14,24 10:24 11:1,2,3, 16,20 21:16 36:24 37:5 58:4,7 81:17 83:9 97:16

**class** 17:18

**classes** 15:15

**classified** 35:10

**classroom** 102:13

**clear** 87:10

**close** 40:16 44:24 45:22 93:13 94:7,8,9 95:9 105:11

**closer** 45:13 105:8

**clothes** 100:24

**clothing** 100:18

**cognizant** 30:20

**college** 13:20,21 18:23

**comfortable** 43:8 47:22

**command** 66:23,24 81:5 82:9,22

**commander** 14:16,18 18:12

**comment** 69:20 76:19

**commented** 68:15

**common** 21:11

**compare** 73:6

**complain** 93:21

**complaints** 88:6

**complete** 7:21 33:9,12 94:1 102:6

**completed** 14:4

**compliance** 33:14 93:21

**complying** 88:17

**composite** 69:16

**conceive** 94:22

**conclude** 36:22 98:8

**concluded** 65:24 76:23 105:23

**conclusion** 12:9 64:20 65:8,21 66:10 82:8 88:25

**conclusions** 62:18 65:4 76:22 77:5 81:24

**concur** 28:6 36:10 65:18 66:10 77:18 79:7

**concurred** 37:8

**concurrence** 37:4

**Conduct** 75:24 76:5

**confirm** 29:5

**confirmed** 77:6,7

**conformant** 88:1

**confusing** 8:13

**connection** 104:23

**consent** 17:3,4 52:23

**consideration** 42:3 56:22 85:23 91:21 92:7

**considerations** 38:6,23 93:2

**considered** 31:10 46:2 92:14

**considered,as** 91:9

**consist** 15:20

**consistent** 58:23 59:3,4 67:23

**consulting** 29:6

**contact** 33:10 94:2,8 95:9

**content** 19:5

**contingency** 31:15,23 32:5,13

**continue** 89:20



**continues** 55:19

**continuing** 22:25

**continuously** 15:1

**continuum** 38:25 39:12,14,18 41:16 42:6

**control** 32:14 52:10

**Controlled** 32:16

**convert** 93:15

**convicted** 7:8

**copies** 64:22

**cops** 20:9

**corner** 89:14

**correct** 12:6 17:12 18:3,11,22 22:4,15,22 23:5,10 24:20 25:2 27:19,22,24 30:10,23 31:1,5,6,8,18 32:1,10,14,19,20,23 33:14 34:15, 18,19 35:5,24 37:18 38:3,17 39:20, 23,24 40:2,11 41:3,18 42:8 43:17, 21 44:6,14 46:21,22 49:1,2,4,9,11, 14,16,20 50:12,17,25 54:24 55:2, 17 57:17 62:24,25 63:7,10,11,15 64:2 67:22 69:7 71:20 72:2 75:6,9 76:6,7 79:17 81:10 82:13 83:16,17 84:8 86:4,5 87:25 88:7 90:11 92:6 95:12,13 96:24 97:6 99:5,10,20 103:8

**counsel** 18:4

**count** 46:7 99:2

**counting** 98:1

**couple** 97:20

**coursework** 15:12,19,22 16:4

**court** 8:7 10:5 33:3 53:13 80:1 83:4

**courtesy** 8:8

**courtroom** 7:16

**cover** 17:17 64:16 76:24

**coverage** 102:8

**covered** 17:11 37:13 40:5 46:12 61:25

**craft** 85:5

**crazy** 26:16

**create** 43:12 46:23 47:3,9 74:7

**created** 24:8

**crime** 59:9

**criminal** 14:3,5 15:9 83:9,16

**criteria** 30:24

**critical** 24:25

**cross** 19:5

**CROSS-EXAMINATION** 86:22

**crosses** 19:8

**cumulative** 25:5

**cup** 49:22 50:3,12

**current** 16:21 80:14 85:5 100:11

**curriculum** 19:5,7,8,10,14

**cycle** 33:9,12 94:2 104:14

---

**D**

**D-R-I-V-E** 33:6

**daily** 50:19

**danger** 26:10 27:2

**dangerous** 28:10,12 31:14 32:4, 18 34:1 75:9 103:21

**data** 12:19 84:10

**date** 20:14,15 28:21

**Davis** 87:2

**day** 16:21 52:18 54:12

**day-to-day** 18:13

**de-escalation** 83:24 84:5 85:7,23

**deadline** 10:6

**deadly** 27:6 33:20,23 39:24 40:2, 14,25 74:10 75:5

**deal** 16:6 98:23

**dealing** 15:22 31:16 32:18 44:4 54:13 59:9 71:9,11

**dealt** 16:4 58:7

**death** 65:14

**debatable** 41:8

**December** 14:23

**decide** 72:14 81:18

**decided** 82:6 87:11

**decides** 54:22

**decision** 23:17 27:15 57:3,7 66:16 78:11 81:7,8,12,16,20,22 82:12 83:12 90:11 91:22 96:10,16,23 97:7 98:22,24 99:5,16,19,20 100:3 103:11

**decisions** 99:14

**decree** 17:3,4 52:23

**deemed** 69:22

**defend** 33:18,25 38:3

**defending** 7:5

**defensively** 40:10

**degree** 15:8,17 105:6

**degrees** 13:19

**density** 101:11

**department** 6:16 7:4,5,10 14:7,25 17:5 20:7 21:23 23:16 24:19 27:21 54:14 55:22 57:2,10,13,15 63:10 95:19 96:20

**depending** 82:21 95:1 97:11

**deploy** 91:25

**deposition** 6:21 7:2,3 9:13 11:7,9, 15,21 20:19 105:23

**depositions** 7:12,25 8:23

**depths** 12:20

**deputy** 6:15 14:21,24 19:25 24:11 62:23,24 65:22,23 66:14,15 77:25

**Derrick** 8:19 20:10 55:6 59:23 60:3

**describe** 59:20 68:11,19 69:8,11

**description** 60:14 75:11

**designate** 67:10

**designated** 8:25 9:5,8 10:3,17 11:9 13:22 21:17 24:14

**designates** 77:12

**designation** 55:11

**designations** 56:2

**designed** 24:18 96:4



Chris Goodly

**designee** 19:1

**desk** 19:6,8

**detective** 14:11 63:25 65:17,21

**deter** 41:17 46:15,16

**determine** 63:14

**determined** 74:1 78:5 84:1

**determines** 74:9

**deterred** 100:25

**deterring** 44:10

**develop** 19:15 31:15

**developing** 89:1

**developments** 22:25

**dialogues** 39:5

**dictate** 32:5

**differently** 40:22 47:20 95:17

**direct** 18:16

**direction** 47:3 89:18,20 90:18

**directly** 18:18

**director** 19:7,10,15

**disagree** 57:4 78:13 79:8,13 81:1

**discharge** 61:1 62:11 65:10 91:7
93:8 105:12

**discharged** 48:12 62:7 89:19
90:19 93:23

**discharging** 99:23 102:6 104:18

**disciplinary** 73:21

**discipline** 87:12

**discreetly** 50:6

**discuss** 71:23 104:1

**discussed** 81:5 82:3

**discussion** 25:3 71:21,25

**disparity** 99:11

**disposal** 52:2

**disposition** 64:8,13 77:20 78:19,
23 80:8,11 88:4

**dispositions** 73:20 77:23

**distance** 46:23 47:4,9

**distinguish** 9:12

**district** 14:8,10,11,17,18 58:2

**division** 14:14,20 67:4 69:13,17,
21,25 70:2,12,18 71:7,13

**document** 12:15 21:3,4 67:11

**documents** 8:3 11:24 22:17,19
34:24

**dog** 8:20 25:23 29:12,15,16 31:21
32:9 34:15 35:9,13 36:1,12,15,18
37:18 39:4,6 41:18,19 42:2,14,17,
20,24 43:3,4,5,6,9,10,11,20 44:17
46:15,16,17 47:4,10,22 58:15,19
59:17 60:10 61:9 62:9,13 63:2
65:12 85:24 88:9 89:9,11,14,15,17,
19,20,23 90:14,15,19 91:8 92:22,
23 93:4 101:17,24 104:3,10,12,14,
21,25

**dog's** 46:24 89:24

**dogs** 32:11 35:3,12 42:23 58:4,7,
10,11,17 59:3,11 60:20 65:11 68:4
88:22,23 97:25 98:5,15,20 102:9

**downstairs** 35:4

**downward** 89:24

**draw** 74:5

**drawing** 39:1

**draws** 90:5

**drew** 89:5

**drill** 92:3

**drills** 99:1

**drive** 32:23,24,25 33:2,4,6,11,14,
18,25 38:2 40:11,12,14,17,24 41:6,
8 46:18 93:14,16,18,22 95:6

**due** 65:10

**duly** 6:3

**duration** 95:1

**dynamic** 31:9 42:11 43:2 45:20
46:5 48:3 57:22 91:2,12 100:22
101:6 104:15,16

**dynamics** 23:20 24:7 35:11 44:18
46:1 50:18 91:14 92:12 93:17
98:14,18 100:6

**E**

**early** 7:9

**ears** 96:8

**easier** 8:7 104:23

**educate** 18:4

**education** 13:16,20 14:20 18:14

**educational** 13:24 16:10 69:25

**effective** 44:10 103:20 104:16

**effects** 102:16

**Eighth** 14:8

**elaborate** 59:22

**elaborated** 59:23

**elapsed** 88:8

**electricity** 100:15

**Electronic** 32:16

**elements** 91:6,8

**elevated** 17:1 18:1 45:17

**elevation** 45:18

**elicit** 10:8

**employee** 57:10 104:7

**emulate** 55:1,23 56:16

**enacted** 23:15

**encounter** 17:17 40:25 52:5

**encountered** 31:14

**encountering** 58:17

**encounters** 50:19 58:15,16

**end** 37:11 39:22,23 46:14 64:19
88:18 97:4

**enforcement** 22:11,20

**engage** 95:6

**engaged** 18:18

**ensure** 30:21,25

**entered** 17:3

**entire** 18:14 60:23

**entitled** 65:4



**entity** 11:10 70:11

**Entries** 22:23

**equip** 52:1

**equipment** 48:25 62:1

**escalate** 74:8

**escalating** 39:20

**essence** 56:15

**essentially** 8:24

**estimation** 88:23

**events** 25:4

**evidence** 65:21 87:20 98:6

**evolve** 91:4 98:14

**evolving** 91:6

**exact** 60:15

**EXAMINATION** 6:13 10:22 56:11
63:23 65:5 69:1 70:19 80:3,25 83:6
85:16

**examples** 54:22

**exception** 33:8

**excess** 61:17

**Executives** 22:11

**exercise** 104:4,5

**exhibit** 21:1 27:16 64:18 67:11
72:19 74:5 88:11

**Exhibits** 20:24

**exited** 89:4

**exiting** 89:9

**exonerate** 87:24

**exonerated** 88:3

**exonerates** 88:6

**expandable** 49:5

**expands** 105:7

**expectations** 19:10

**expected** 28:1

**experience** 58:6

**experiences** 59:2

**expert** 9:5,7,8,13,23 10:4,7,11,13,
17 13:15,23

**expertise** 9:6 70:15

**experts** 10:12 69:23

**explain** 100:17

**express** 60:22

**extra** 64:22

**eyes** 96:7

---

**F**

---

**face** 60:2

**faced** 44:19 50:18 99:22

**facing** 58:23 89:24 91:17,18

**fact** 52:3 56:24 57:24 68:14 99:4

**factor** 90:13

**factors** 56:22 57:6

**facts** 56:19 98:7

**failed** 32:6 33:10 101:19

**failing** 75:1

**failure** 75:17

**fair** 23:2 51:2 68:21

**familiar** 28:11 87:14,15

**fashion** 44:20 45:2

**fatalities** 58:16

**fatally** 36:1

**fatigue** 7:19

**favor** 70:4,24 72:5

**fear** 50:10 60:23 61:6 62:5 65:12

**feared** 60:7 98:12,13

**fearing** 39:10

**federal** 10:5

**feel** 39:10 62:5,8 100:1,14,18,21

**feet** 41:17,21 42:1,10 46:16

**feisty** 43:1

**felt** 38:21 101:9

**Ferguson** 37:7

**fewer** 98:25

**field** 18:8 20:7,9,12,16 24:11 25:15

48:20 49:1,14,20 50:4,16 52:25
53:3,10,18,25 54:8,15,18,21,25
55:4,6,9,10,11,15,20 56:12,14
57:20

**figure** 80:15

**filed** 79:3

**final** 19:23 32:2 73:24 74:1 75:17
78:10 79:16 80:8 81:7,12 82:8,11

**finding** 72:5 73:14

**findings** 36:10 77:19

**finish** 8:7

**finished** 8:9 96:22,23 97:2

**fire** 30:3 31:8 32:22 33:9 38:1
40:10 41:11 43:5

**firearm** 74:6 75:8 89:5 90:5 91:7

**firearms** 29:21

**fired** 36:17,21 37:17 38:20 39:8,11
47:12,19,21 48:11,13 58:18 81:25
89:22,25 90:8 97:22

**firing** 27:3 30:13 31:4,24 39:23
41:2 65:11

**fish** 58:25

**fists** 41:17,21 42:1,10 46:16

**flailing** 46:15

**flared** 39:3

**focus** 43:10

**focused** 16:3 43:3 45:6 59:10

**follow** 28:2 48:5

**FOLLOW-UP** 97:18

**follow-ups** 97:20

**footage** 34:17

**football** 101:16

**footwear** 43:24

**force** 7:16 12:9,11,13 17:12,19
22:1 23:4,7,12,15,18 24:8,18,24
25:6,19 26:7,11,18 27:6,15,23
33:20,24 34:5,14,20 35:1,23 36:6
37:1,16,21 38:25 39:12,13,18,24
40:2,14,25 41:2,16 42:6 43:16
48:16 60:23 62:17,21 64:10 66:13
67:2,11,18 69:19,23 70:2,5,24
71:18,24 72:5 74:9,10 75:5,24 76:3



MAGNA
LEGAL SERVICES

Chris Goodly

83:18,19 84:1,8 87:1 96:25 97:4 99:10,18,20 102:21,24 103:6,22

**forgetting** 42:23

**form** 12:16,17,18 33:9 56:1 64:4 66:2 67:6 68:23 70:7,9 71:2 72:8 73:2 76:13 85:11

**found** 64:1 72:25 75:23 76:5 79:11 81:6 82:10 83:15

**fourth** 75:10

**front** 67:15 89:4,9,11 90:15

**fry** 58:25

**FTO** 54:4 57:12,15 86:23 87:3,5,6

**FTO's** 86:23

**full** 6:9

**fully** 47:1

**function** 96:19

**functions** 23:3

**fur** 101:9

**future** 10:21 84:7

**fuzzy** 77:3

**G**

**gate** 45:9,13,17,19,21 46:4 47:2 89:4,9,11 90:15

**gate's** 46:6

**gated** 45:14,16

**gates** 46:3

**gauge** 47:16

**gave** 7:3

**general** 12:20 25:22 70:13 96:8,13

**generally** 13:7 42:5

**genitals** 49:23

**gentleman's** 86:17

**give** 6:9 9:18 13:15,23 19:9,11 37:1 40:20 69:24 70:16,23 71:24 72:13,15 79:4 92:7 96:2,21

**giving** 9:21,23 25:5 42:12

**good** 6:6,20 11:8 54:22

**Goodly** 6:2,12,17,19,20 8:17 10:12 11:14 13:14 21:1 28:17 65:6 66:20 67:12 80:4 83:7

**gotta** 96:12

**government** 11:10

**governs** 32:8

**graduated** 13:25

**grand** 16:15

**grasp** 16:12

**great** 8:6 25:13 39:11 62:11 85:5

**greater** 103:22

**groin** 60:13,19 61:7,13,16,20,22, 23,24

**growing** 35:12

**guess** 18:25 51:6 72:20 75:10,12 80:15 95:10

**guidance** 19:19

**gun** 37:17 39:23 40:2 41:3 48:1,10 73:16,18 74:3 75:1

**guys** 97:17

**H**

**hand** 24:16 64:18 95:5

**handed** 64:24

**handled** 71:14

**handling** 25:14

**happened** 20:14 28:18,22 86:24 87:17 88:5 90:3 95:24 96:1

**happening** 84:3

**harm** 27:6 34:7 36:19 37:25 39:11 43:13 61:5 62:11

**harmed** 50:25 51:2,9

**head** 27:8 48:20 89:24 95:15

**hear** 41:25 59:11 78:24 88:21

**heard** 59:13,14,15,18,19 60:4,7,22 61:8,11,18 88:20 89:7

**hearing** 34:14,21 62:18,21 67:3,18 68:15 76:21 77:3,7,8,13,25 78:1,7, 15,18 79:12,19 80:5,16,18,21 87:9, 10,11,14 99:18 102:25

**hearings** 70:2,23 71:18

**height** 91:10

**held** 57:18

**Helou** 63:25 65:18,22 66:11,19

**helped** 85:9,18

**helpful** 39:13

**high** 13:20,25 70:16

**higher** 54:24 57:18 71:7

**highest** 23:14

**highly** 44:19

**hindsight** 95:25 96:1

**hit** 93:24 100:9,19,23 101:8

**hits** 100:11 105:5

**hitting** 92:22,23

**holster** 48:2,11 73:16,18 74:3 75:1

**holy** 16:1

**home** 50:24 51:8,18

**honest** 40:20

**hope** 86:3

**hot** 53:15

**hours** 16:25 17:4,9 52:22,23

**housed** 71:13

**hovering** 54:9

**human** 29:23 30:6 36:20 92:9,13, 23 105:12

**humblest** 43:12

**I**

**IACP** 22:13,16,19

**ICP** 22:9

**idea** 81:22 84:13

**identified** 32:17

**identify** 26:9 27:14

**illness** 7:19

**imminent** 25:25 26:10 29:23 30:6 36:2,14,16 43:12



**implemented** 50:21

**implore** 42:4

**impose** 78:2,14 79:9 82:19

**imposed** 87:12

**impractical** 32:6 42:9 44:17 92:14

**improved** 19:20

**impulse** 84:8

**in-service** 16:9 21:22,23 52:14,20 103:25

**inadequate** 84:18 85:1 86:9

**incapacitation** 33:16 38:2 92:18 93:25 94:6 100:9 104:13 105:10

**incentives** 55:3

**inception** 52:22

**inch** 105:10

**incident** 12:11 20:10,13,14,17 23:16 24:3 28:22 34:14 41:24 43:2 45:15 47:18 55:7,22 59:12 74:6 81:12 85:1,8,9,18 86:4,7,25 87:4

**incidents** 24:25

**included** 76:10

**including** 58:19

**inclusive** 32:11

**incorporated** 73:7

**increased** 52:18

**increasing** 50:25 51:1,8,18 52:4

**indication** 44:16

**indicative** 87:4

**indiscernible** 22:9 88:4

**individual** 25:4 27:11 70:17 79:6

**ineffective** 29:25 30:10

**inefficiencies** 24:20

**influence** 72:16

**influences** 70:18

**information** 103:7,9

**informed** 96:10

**initial** 45:15 52:19 53:1,5,6

**initially** 52:15

**injurious** 103:22

**injury** 33:24 51:14,19 65:13

**input** 69:20

**inside** 95:14

**insights** 19:11

**instance** 71:10

**instances** 91:5

**integrate** 91:20

**Integrity** 12:3 24:13 63:7,9,12,24

**interested** 22:23

**interests** 57:9

**intermediate** 49:6

**internal** 63:10

**International** 22:13

**interviews** 58:3

**investigated** 56:20

**investigation** 35:16 62:18 63:6, 13,20 64:7 65:9 67:24 78:3,20,21 79:10 83:13

**investigative** 24:12 73:8

**investigator** 66:6,10 77:15

**involve** 19:6

**involved** 8:19 100:6,22

**ironically** 15:23

**issue** 19:17 58:12 87:9

**issued** 97:7

**issues** 19:4

**items** 87:21

**J**

**jacket** 100:19

**Jihad** 15:25

**Jim** 13:2

**job** 21:24 23:3 50:18 80:12

**John** 96:21

**joined** 14:7

**judge** 7:17

**jump** 84:7

**jury** 7:17 16:15

**justice** 14:3,6 15:9

**justified** 23:10,21,24 24:4 27:2 36:9,12 47:25 48:19 63:15 66:17, 22 72:6 81:9,13,18 82:1,6,17 83:11,16,20 99:22 100:2 103:6

**justifying** 70:4,24

**K**

**keen** 57:21

**keeping** 19:18

**key** 24:21

**kick** 101:20

**kicked** 41:19 42:19 90:13

**killed** 60:20

**kind** 6:25 11:17 15:22 61:12 63:18 69:15 71:25 77:3

**knew** 46:3,5 59:7

**knowledge** 19:9 57:21 80:17

**L**

**language** 74:24 76:2,9

**large** 101:22 104:6,12

**larger** 43:3,6,9,10 45:3,7,12 89:9, 11 90:14 101:16

**late** 7:8 10:9

**Laudermill** 87:14,15

**law** 15:15 16:12,14 22:11,20,21 53:23

**lawyer** 8:1 56:5

**lawyers** 6:7

**learn** 16:13

**learned** 16:7,16 17:18

**learning** 55:2

**leave** 50:24 51:7

**leaves** 51:18



**leaving** 23:21

**led** 38:7,11 41:25

**left** 16:22 17:8 24:1 67:15 89:14

**leg** 60:2

**legitimate** 25:24 26:17

**lethal** 74:8 75:5 99:10,20

**level** 23:14,16 39:10 40:4 42:6 63:25

**levels** 23:13

**liability** 83:16

**Lieutenant** 14:15

**likelihood** 92:22

**limit** 26:5

**limitation** 52:3,4

**limitations** 82:3

**limiting** 51:23

**Linda** 62:24

**lines** 15:14 19:21 22:22

**list** 13:9

**listen** 70:21 87:18

**listing** 74:15

**lists** 72:20

**lock** 94:3

**locks** 33:16

**lodged** 94:1

**logically** 98:8

**long** 10:7 12:16 16:18 41:5 92:1 94:20

**longer** 74:10 94:21

**looked** 11:16,17 12:8 13:7

**lose** 55:11

**lost** 41:13

**lot** 17:16 18:6 57:6 86:20

**Louisiana** 16:24

**low** 104:24

**lower** 39:22 40:1,4 42:6 46:14 97:12

**lying** 105:2

## M

**made** 16:11 27:15 41:20 45:1 81:8, 12,22 83:20 96:16 99:19

**major** 58:6,12,23 59:8

**majority** 19:8

**make** 8:6 24:19 28:16 33:10 53:23 57:3 73:17 84:12 87:1,20 90:10 95:18 96:19 98:22,24 99:9,13,14, 15,19 102:7 103:10 104:23

**maker** 81:7

**makes** 33:13 78:8,10 79:16 96:23

**making** 53:22 57:7 91:22 99:5 100:3

**male** 15:23 102:5,11

**man** 10:6 92:9

**management** 14:22 18:2

**managers** 52:9

**mandate** 49:18

**mandated** 49:17,22

**mandatory** 28:4

**manipulate** 105:3

**Manual** 27:17,20,25 39:16 103:24

**manufacturer** 100:16

**mark** 27:16 94:24 98:14 99:15

**marked** 20:25

**mass** 104:24

**Master** 14:5

**master's** 15:17,20

**material** 7:3 12:10 13:8

**materials** 11:17,23 12:1,10,19

**matrix** 78:22 79:2

**matter** 6:19 69:22 73:24 74:1 81:16 98:24

**matters** 71:14 92:11 95:20 105:15

**Mcdonough** 13:25

**meaning** 12:2 23:12 24:9 88:1 91:4

**means** 31:19,24 37:21 38:5 42:13 98:10

**measure** 50:20

**medication** 7:19

**meeting** 24:24 25:1

**member** 22:5,7,9,10,16 24:6,9 61:20 69:18 77:10,12 78:7

**members** 24:10,17 48:16,18 62:22 66:14 71:22,23 72:1,14 83:25

**memory** 38:14

**mentioned** 32:12

**mentor** 18:6

**met** 11:16 30:12,24

**methods** 29:24 30:9

**mid** 97:10,12

**middle** 68:2

**minimum** 16:25 17:9 52:21

**minor** 14:3

**minutes** 12:12 67:14,17 68:14 83:22 87:1

**misconduct** 55:21

**misheard** 102:1

**missed** 104:19

**misses** 100:8

**mission** 33:21 92:17 95:16 105:16

**misspell** 21:9

**misspoke** 70:20

**mistake** 21:11

**mitigate** 50:11

**mitigating** 77:17 78:24 87:20

**mode** 32:23 33:14,18,25 38:3 40:11,12,24 41:7,8 46:18 53:7 93:18

**model** 57:16,19

**modern** 52:18 54:12

**moment** 66:25

**Monday** 96:3,4,18 102:20,25 103:14



Chris Goodly

**Moral** 75:24 76:5

**morning** 96:3,4,18 102:21,25 103:14

**move** 21:20 25:13 48:15 52:6 62:16 76:18

**moved** 14:10,19

**movement** 44:21 94:12,15 100:17

**moving** 46:24 62:3

**multiple** 24:25

**muscular** 94:6

---

## N

**NADA** 86:12

**National** 22:11

**nature** 12:3 29:9 39:8 43:2 53:13, 16,24 56:23

**natures** 91:12

**needed** 19:20

**negate** 57:24

**neighborhood** 31:5

**neuromuscular** 33:15 38:2 92:18 93:25 94:6,13 100:9 104:13 105:10

**neutralize** 26:11 33:22 38:21 92:18 104:10

**neutralizing** 52:5

**newer** 53:11,19

**NMI** 104:12 105:13

**NOBU** 22:10

**Noel** 62:23 65:23 66:15,19 68:7

**non-justified** 23:22

**non-nopd** 61:20

**non-voting** 24:9,17 71:23

**NOPD** 19:23 22:5 23:8 25:14,18,23 26:18 27:17,20 29:8 33:13,17 34:4 48:14 49:3 52:9,13 53:25 54:18,22, 25 55:15 56:14,15 58:6,7,23 59:2 60:22 61:8,11,14,19 62:1 65:20 81:12 82:5 98:22 99:8 102:1

**NOPD's** 39:15 52:7,10 63:9 81:7, 24 103:24

**normal** 11:7 25:8

**note** 28:21 75:22 76:8 87:2

**notebook** 13:10

**noted** 10:15 68:3

**notes** 11:17,23 12:19 20:18 34:19

**notice** 31:13

**number** 17:7 67:21,23 75:15

**numbers** 21:12 54:6

---

## O

**oath** 7:13

**object** 10:7 63:18 68:23 70:7 104:24

**objection** 10:15 56:1,10 64:4 66:2 67:6 68:25 70:9 71:2,4 72:8,10 73:2 76:13 82:20 85:11,13,20 101:2,4

**objections** 73:4

**objective** 27:2 42:8 95:19

**objectively** 25:24 26:13,15 27:9 74:7 95:11,12

**observation** 72:3,6

**observational** 53:7

**observed** 89:8,23

**observing** 53:19 65:11

**occurred** 28:23 45:15 65:10

**occurs** 51:10

**offer** 82:22 84:11

**office** 12:24 87:24

**officer** 7:7 8:19 15:1,5,16 16:23 17:9,17,23 18:8 21:24 23:18,23,24 25:23 26:8,16,23 27:2,10 29:11 30:3,13,16,19,25 31:7,20,22 32:3, 9,14 33:18,23 34:15 35:2 36:2,3 43:3,19 44:4,5,12 47:18 50:9,23 51:3,7,15,17,22 52:25 53:3,10,11, 19,22,25 54:1,19 55:5,6,9,10,11, 12,15,19,20,23 56:12,14,15,16 58:20 59:3 60:4,7,9,22 61:8,11,14 65:10,11,14 68:3,9,10,16,19 69:8, 10 73:14 74:9,11 75:22 78:5 79:6 81:25 82:9,20 83:23 87:2,18 88:5,

9,13,20 89:4,5,7,10,13,16,18,22, 23,25 91:10,16 94:23 95:18,22 98:9 99:9 100:4 103:8,10 104:3,9, 17

**officer's** 23:9 70:4,24 72:5 95:15 103:5

**officer/officers** 96:9

**officers** 16:6 17:14 18:5 22:20 23:8,19 27:8 28:1,2,5 29:21 31:3, 12,14 42:5 43:14,22 48:14,24 49:3, 4,10,13,18,22 50:2,15 51:13 52:9, 13,15,24 54:4,9,17,21,22,25 57:17 58:11,18,23 65:20 74:5 87:6 98:22 102:2

**officers'** 59:11

**one-on-one** 18:18

**ongoing** 97:3

**onset** 52:19 53:5

**open** 46:7 71:25

**opened** 46:4

**operating** 20:11 53:9,21

**operation** 18:14 20:16

**Operations** 20:7,9,12 24:11 27:17,20,25 39:16 48:20 54:15 67:4 69:13,17,21 70:1 71:12 103:24

**opinion** 9:9,13,23 11:3 36:12,24 37:13,14 39:9 40:20 42:12 43:12, 18 45:6 47:13 58:13,20 62:4 70:23 71:25 72:13 82:23 85:15,17 88:3 98:16 99:21 100:2

**oppose** 78:13 79:8

**option** 40:7,8,9 44:2,3,8,12 46:11, 13 47:5 49:16 93:1,11 101:19,21

**options** 39:19 40:18 51:24

**order** 40:14

**Organization** 22:10,11

**originate** 61:18

**Orleans** 6:16 9:1,15,24 10:24 14:2,24 17:5 22:8 36:25 37:5 55:21 81:17

**outcome** 85:25 104:19

**outcomes** 105:16



**overbearing** 72:16

**oversaw** 18:13

**oversee** 18:17

**overturn** 77:19

**owners** 39:6 48:8

---

**P**

**packet** 34:23

**pain** 33:14

**paired** 52:25

**panel** 77:10,12 78:8 79:12

**paper** 12:22,23

**papers** 15:22

**paperwork** 53:12

**paradigm** 23:23

**paragraph** 28:7,8,12 29:20 65:3
73:9 74:14 75:21,24 103:19

**paragraphs** 32:8

**part** 19:3 20:12 36:4 48:14 53:1
65:1 68:12 84:9 100:3

**participated** 24:6 25:3

**participating** 24:17

**participation** 97:5

**partly** 15:9

**partner** 44:20,23 45:10,18

**passed** 10:7

**pattern** 59:3

**Paul** 62:23 66:15

**paying** 10:14

**peak** 54:11

**penalties** 79:5,9

**penalty** 78:22 79:1,2,8 87:22

**pending** 64:11,12 67:1 73:22

**penetration** 100:20

**penis** 50:10 59:17 60:5,8 61:7,9,12
62:6,14

**penises** 59:11

**pension** 55:4

**people** 24:10 26:23,25 30:21 31:1
58:5,8,17 59:3,19,25 66:9

**perceive** 59:24 61:4

**perceived** 62:8 68:17 92:19 97:25

**perceives** 93:3

**perceiving** 98:5

**percent** 54:16

**perception** 27:12 40:25 42:20
43:5 51:12 68:10 98:11

**perfectly** 11:8

**performance** 12:2

**period** 17:24 53:7 71:21

**person** 18:20 26:8 27:11 51:5
53:9,15 54:14 57:5 70:15 75:25
76:3 78:1 84:12 94:14 104:18
105:1,2

**person's** 13:16

**personal** 94:7

**perspective** 27:13 68:20 69:20,24
70:13 71:24 96:8,25

**petit** 16:15

**phase** 53:6,8,14,17

**phases** 53:4,5

**philosophy** 96:13

**phobia** 26:22

**phobias** 26:25

**phrase** 71:17

**physical** 17:20

**PIB** 12:2,16,18,21 71:19 72:25 74:1
77:4

**picture** 8:17 52:8

**plain** 74:24

**plaintiffs** 6:7 9:5,6,8

**plan** 31:23 32:5,13

**plans** 31:15

**plausible** 88:24

**play** 43:7

**plays** 91:12

**POB** 78:3 79:10

**point** 18:2,10 22:7 42:16 47:23
74:8 84:14 85:7 90:15 95:22,23
96:24 98:19 102:15 104:2,21

**pointed** 43:14

**points** 9:12

**police** 6:16 7:7 8:19 9:7 11:25
12:4,7 14:7,17,24 15:1,5,12,13,16
16:5,23 17:5,9,23 20:1 22:8,9,10,
14 37:6 39:15,20 53:21 55:2,21
64:14 78:17 80:9 98:9

**policies** 25:18 27:21 29:8 72:24
78:6

**policing** 16:7,10,14 54:23

**policy** 23:19 24:2 25:14 26:18
27:24 30:7,11,15 32:24 33:17 34:4
41:4 43:25 48:25 49:17,25 50:5,6,
14,21,24 51:7,17,23 52:2 53:12
56:13 62:1 64:2 72:21 73:15 74:2,
13,18,21,25 75:7 78:12 79:11,14,
15 83:21 88:1,2 103:1

**portion** 11:25 35:25 38:22 49:24
97:11

**pose** 29:23 36:16,18

**poses** 30:5

**position** 14:16 57:5,25 80:12
83:10

**possibly** 45:22 85:25

**post** 13:21 16:22 17:1

**poster** 102:5,8

**posters** 102:9

**potential** 32:18

**potentially** 31:13

**pounds** 35:8

**practical** 34:2 38:4 39:7 42:8 44:7,
15 45:25 46:20 47:5,8 102:6,12
104:4

**practicality** 46:8

**practice** 33:2 102:3,4

**practiced** 17:23

**practices** 9:7 15:12 22:20,25



39:15

**pre-disciplinary** 87:11

**pre-law** 15:15

**precaution** 50:20

**precursor** 48:7

**prefer** 6:18

**premised** 84:13

**prepare** 11:15,19,21 20:18

**prepared** 21:18 25:15 34:8 52:10
62:19 66:6 76:25 82:2

**present** 31:21 34:6,13 36:2,13
69:19 87:19

**presentation** 66:12 71:19

**presented** 65:13 66:13

**president** 18:23

**presumed** 98:7

**presumptive** 79:1

**pretty** 33:21

**prevent** 7:20 84:2,15 86:4

**primarily** 59:10

**prior** 7:25 12:2 63:5 85:8 86:7
98:15

**privileges** 55:13

**proactive** 53:14

**probes** 33:10 92:6

**problem** 58:4,7,23 93:12 98:17

**problems** 58:25

**procedure** 15:13

**procedures** 53:12

**process** 37:11 48:4 57:7 76:22,23
77:3,7,8

**produce** 7:10,11

**produced** 13:8

**producing** 100:15

**productive** 102:18

**profession** 44:1

**professional** 22:6 29:6

**program** 15:20 16:19 55:17

**prohibit** 32:3,25

**prohibited** 50:7

**prohibiting** 50:7

**prohibits** 32:24 33:13

**prolong** 95:1

**promoted** 14:9,15

**prompted** 86:17

**prong** 94:5 100:8,11,23 101:8
102:7 105:4,5

**pronged** 105:4

**prongs** 32:22 38:1 40:10 46:19
92:17,20,22 93:24 100:8 104:23
105:9

**Proper** 43:24

**protect** 17:14 97:9

**protecting** 60:13

**protects** 97:10

**proven** 103:20

**provide** 9:9 11:19 12:1 19:19
69:19

**provided** 13:4

**providing** 7:21 11:1

**proximity** 62:10 100:3

**Pruitt** 82:20,21

**Pruitt's** 82:25

**Public** 12:3 24:12 63:6,9,12,24

**puffy** 100:19

**pull** 41:6 93:7 94:18,23

**pulled** 47:23 48:1,10

**pulls** 93:4

**punishment** 79:15

**puppy** 35:8,10 43:1 62:5,8

**purely** 53:6

**purpose** 63:19 96:17,18

**purview** 81:23

**put** 17:4 40:19 41:6,8 47:17 58:9
74:24 82:22 95:14 96:7 99:14

**putting** 50:17

---

**Q**

---

**quarterback** 96:3,18

**quarterbacking** 96:5 102:21,25
103:15

**quarters** 94:9 95:9

**question** 8:12 29:1 85:11 86:18
97:8

**questions** 7:21 8:8 10:25 11:18
13:15 86:16,17 88:16 97:16 105:17

**quick** 79:24 83:1 88:15

---

**R**

---

**ran** 17:20 35:5 104:14

**range** 16:5 34:4 39:19 72:20 99:11

**rapidly** 89:1 91:4,6 98:14,18 99:25

**reached** 39:10 65:21 76:22 81:15

**reaches** 77:4

**reaching** 92:17

**reaction** 43:6

**read** 31:17 66:7 88:15 103:19

**readily** 44:23

**reading** 29:21 65:10

**ready** 21:19 34:9 52:12 77:1

**real** 83:1 93:12

**realized** 98:17,18

**reason** 34:10 42:9 50:15 54:5 76:4
81:1 84:9

**reasonable** 26:14,15 27:4,8,9
31:15,23 32:1,20 34:2 38:4,9 42:16
44:7,15 45:25 46:20 47:6,9,13 62:4
74:7

**reasonableness** 46:9

**recall** 7:1 36:5 37:19 38:15 45:12
54:10 60:6,15,24,25 61:10 64:6
67:2,8

**receive** 16:17 22:16 83:24 84:2,22

**received** 22:1,2 84:18,20,25 85:7



86:7 95:11

**recently** 35:20

**recipient** 100:12

**recommendation** 12:10 24:1
37:2 66:7 79:4 83:23 87:20 96:6

**recommendations** 37:9 77:22
78:8 83:21 103:1,2

**recommended** 79:15

**record** 6:10 66:8 80:2 83:2,5 87:10

**records** 7:10 12:2

**recruit** 52:16 53:10

**recruits** 54:23 55:1,23 56:16

**reduce** 51:14 103:21

**reduced** 92:24

**reducing** 52:3

**refer** 25:20 88:11

**reference** 74:17

**referencing** 74:19

**referred** 87:10

**referring** 65:1 78:16

**reflecting** 68:14

**refresh** 38:14

**regard** 10:18,23 42:2 70:16

**region** 61:22,24

**regular** 49:6

**regulations** 43:24

**reholster** 74:11 75:2

**reinforce** 22:2

**reinforced** 17:21 85:6,8,17

**reinforcement** 16:8 86:7

**reinforces** 85:4

**reinforcing** 86:3

**reiterate** 104:11

**rejected** 77:8

**related** 12:18 74:23

**relating** 74:14

**relative** 15:14

**remained** 89:11 90:14

**remains** 57:25

**removal** 73:16 74:2

**remove** 55:16 56:25 57:8

**removing** 73:18 75:1

**render** 23:17 77:20

**rendered** 64:7,9,14 66:16 77:24
79:3 80:9 81:21 83:12

**rendering** 73:21 78:19

**reoccurrence** 86:4

**repeat** 9:20 26:21 41:23 56:7 69:2
98:2

**repel** 46:17

**rephrase** 98:3 99:17

**report** 10:5,6,11 35:16 73:8,12
89:3

**reported** 20:2

**reporter** 8:7 33:3 80:1 83:4

**reports** 12:1,4,7 58:9

**representing** 69:12

**represents** 27:21,23

**required** 48:25 49:4,10,13,19
50:2,15 51:13

**requirement** 10:11

**requirements** 16:23 52:21

**requires** 27:1

**residential** 31:4

**resorted** 42:13

**resource** 50:8

**responding** 53:15

**responsibility** 19:16

**rested** 37:5

**result** 29:4 66:12

**retained** 10:12,13 14:2,5

**retired** 6:15 14:25

**retreat** 44:14,17,24 45:1 46:11,22
104:22

**retreated** 39:4 44:20 45:10,23

47:1

**retreating** 89:8

**retrospect** 95:23

**return** 104:22

**reversed** 53:18

**review** 12:9,11,13 23:4,7,15 24:18,
24 34:14,21 35:1,14,22,23,25 36:6
37:2 40:13,24 43:8 48:16 56:20
62:15,17,21 66:13 67:2,18 70:2
71:18 77:9 78:18 83:19 84:1 87:1
95:20 96:7 97:3 98:6 99:18,21
102:22,24

**reviewed** 8:3 11:25 12:18 13:3
25:1 34:19 35:15 38:24 65:20 87:3

**reviewing** 47:11 73:8,19

**reviews** 23:8

**revised** 28:16,22 29:1

**revises** 29:8

**revision** 28:18

**Richardson** 64:1 65:18,22 66:11,
19

**risk** 30:21 31:1 50:17,25 51:8,14,
19 95:8

**roaming** 58:4,7

**role** 18:2,4,11 19:3,23 57:16,19

**roles** 8:24 19:16 23:3 53:17

**rolls** 61:21

**Roquemore** 13:6 28:14 55:25
56:8 63:17 64:3,21 66:1 67:5 68:22
70:6 71:1 72:7 73:1 76:12 80:19
81:2 82:18 85:12 97:15 101:1
105:18

**Rouge** 36:25

**roughly** 24:5 54:3 101:14

**Roussel** 89:4,7,10 90:6 100:4

**rule** 75:23 76:2,5,11 77:5

**rules** 28:1

**run** 11:6

**running** 35:3



MAGNA ▶
LEGAL SERVICES

Chris Goodly

## S

**S-T-U-N** 33:6

**Sabrina** 64:1 66:11

**safety** 17:15 29:24 30:6 50:20

**sat** 24:21,23 25:10

**saving** 86:16

**scenario** 17:16 18:18 51:9,20,25 99:1 104:5

**scenarios** 16:5 17:20 70:5 98:23

**school** 13:20 14:1

**screaming** 39:5 46:15

**Sean** 37:7

**seconds** 41:12,13 46:7 89:5 90:5, 7,9,19,20,23 92:4 93:3,4,6,7,9 95:3 97:21 98:21,22,25 99:2,8,19

**section** 29:1,2,3

**sees** 55:15

**selected** 54:18,21,25 57:16

**send** 34:23

**sends** 22:19

**Senior** 13:25

**sense** 25:22 33:13

**sentence** 29:20 30:1,22,25 31:11 32:2

**separate** 64:17

**sergeant** 14:9 63:25 65:17,22 66:11 82:21 87:2

**serve** 23:4

**Services** 14:22 24:12

**set** 35:4

**sets** 21:23 85:4

**setting** 61:6 66:25 83:8,9,16

**severely** 92:24

**severity** 39:20

**sexual** 7:5,8

**shit** 88:21,25 90:13 97:21,24 98:1, 4,9,10,16

**shock** 100:13,24

**shoes** 40:20 43:22 44:1 47:17

**shooed** 41:19

**shoot** 25:23 26:24 32:9 43:20 46:18 92:5,15 93:5 102:11

**shooting** 8:19 12:5 26:8 29:16 30:20 32:4 34:18 35:16 36:11 63:2, 14 64:1 65:9,25 66:17 67:24 73:8 79:20 80:5 81:6,18 83:10,15 91:25 92:8 102:4

**shoots** 94:17

**short** 12:16,18

**shortly** 89:25 90:1

**shot** 29:12 34:15 36:13,21 39:11 47:21 48:13 60:9,20 81:25 82:1,6, 11 88:10 89:19,22,25 90:12,19,21, 22 94:22 97:22

**shot's** 90:8

**shots** 36:17 37:18 47:12 82:15,16 90:17

**show** 20:24 21:1 104:2

**showed** 13:9 104:3

**side** 16:10 87:19 89:23 105:3

**similar** 21:5 22:25 26:7 29:9 73:10

**Similarly** 49:13 51:22

**simply** 101:19

**sir** 34:12 67:13,25 77:1 82:4

**situation** 31:9 33:20,24 35:3 40:3, 14 42:11 48:3 51:15 62:10 70:16 71:15 74:8 87:17 91:15 92:21 94:4, 12,16 95:4 104:16

**situations** 69:23 71:10 91:2,17,18

**sixth** 88:19

**size** 92:11 97:11 101:14,22 102:5, 10 105:14

**sized** 92:9

**skill** 85:4

**skin** 94:2 100:19,20 101:11

**skipped** 40:1

**slight** 45:18

**slippery** 91:13,14

**small** 35:13 44:10,13 101:17,24

**smaller** 35:9 36:15 43:4,5,11,20 45:5 89:17 92:13

**snakes** 102:9

**SOD** 68:2 70:20,22 72:4

**sort** 13:16 24:25 39:18 71:21 72:4

**SOT** 71:12

**sound** 88:22

**sounds** 6:20 16:4 17:22 60:3 82:5

**Southern** 14:1 16:16

**space** 33:6

**SPCA** 104:7

**speak** 8:25 9:14 11:9 21:17 29:15

**speaking** 36:24

**Special** 67:3 69:13,17,21 70:1 71:12

**specific** 25:13 99:14

**specifically** 26:4 32:17 60:4,18 84:5

**speculate** 69:2

**speculation** 101:2

**speculatory** 85:15

**speed** 53:11 92:20

**split** 99:4,6,7

**spread** 92:6,16,20 105:10

**squeezed** 100:1

**stack** 13:5

**staff** 18:14

**stage** 73:24

**stairs** 35:4

**stamp** 57:12

**stance** 44:25

**stand** 9:9

**standard** 26:7 54:24 57:18 71:7

**standards** 16:23 29:6

**standing** 104:25 105:2



**Stanley** 7:3,7

**start** 90:17

**started** 23:22 39:5 46:24 90:8

**starting** 88:19

**startled** 43:4

**starts** 90:4

**stated** 68:3

**statement** 36:8 51:2

**statements** 39:22

**stature** 92:9

**status** 55:8

**stay** 105:9

**stayed** 14:20 57:25

**steel** 43:23 44:1

**step** 83:1 105:12

**stick** 95:5

**stipulate** 80:20

**stop** 29:22 90:2

**stopped** 104:14

**stops** 53:16

**story** 87:19

**straight** 40:1 75:15 105:5

**street** 17:23 20:9

**streets** 57:22

**strongly** 70:3

**stuff** 13:17 16:16 18:6 19:14 35:12

**stun** 32:23,24,25 33:6,11,14,18,25
38:3 40:11,12,13,14,17,24 41:7,8
46:18 93:14,16,18,22 95:6

**stunning** 33:2

**subject** 56:9,12 69:22 71:14

**subjected** 51:4

**subjective** 26:16

**submit** 34:23

**submitted** 65:17

**substantiate** 57:24

**substantiated** 56:21

**successful** 104:21 105:15

**successfully** 104:10

**suffer** 51:19

**sufficient** 11:11 31:13 84:15 99:8
102:7

**suggest** 47:8 70:20

**suggestions** 28:4

**summarize** 82:16

**summary** 64:20 65:4 88:13

**superintendent** 6:15 14:24 19:25
20:3 24:14 37:6 62:23,24 64:14
65:23 77:11,21 78:2,8,10 79:5,16
80:9 81:15 83:12,14,15

**supersedes** 70:12

**supervision** 18:16 52:7

**supervisor** 14:12,14

**supervisory** 18:1,7,10

**supposed** 42:5 53:20

**surface** 57:9

**surfaces** 91:13

**surrounding** 27:10

**surroundings** 30:20

**sustain** 64:10

**sustained** 72:21 73:18,19 77:15,
16 78:23 87:21,22 88:6

**SWAT** 69:15,16

**sworn** 6:3

---

**T**

**tactic** 42:2

**tactical** 85:23 93:1

**tactics** 39:2 87:6

**takes** 34:3 94:20

**taking** 84:15

**talk** 8:21 11:20 29:14 52:8 76:25
78:15 91:24 99:4 102:15

**talked** 8:4 11:23 12:15 15:24 29:14
76:3 100:7 102:20

**talking** 8:9 11:24 12:4,5,16 20:11
26:4 29:15 78:16 95:10 102:16

**targets** 92:8 102:4

**taser** 32:16,17,21 38:1,8,12,14,16,
20 40:5 41:6 46:18 91:24,25 92:1,
5,12,15 93:4,13,24 94:17,23 102:6,
16

**tasers** 92:8

**tasing** 104:3

**tattoo** 26:24

**tattoos** 26:23

**team** 63:12 69:16 71:12

**Ted** 86:18

**tells** 56:5

**ten** 6:24 54:4,16,17 61:17

**tenure** 58:24

**term** 87:15

**terminology** 99:6

**terms** 13:20 39:20 46:8 65:20

**terrible** 26:22

**terrified** 26:24

**testicles** 61:13

**testified** 6:4

**testify** 21:18 25:15 34:8,10 52:10
62:19 82:2

**testimony** 9:18,24 10:8,24 13:15
82:25

**text** 29:10

**that'd** 23:2

**that--** 42:12

**there'll** 13:15

**thing** 8:12 9:4 30:6,8,19 50:11 59:8
83:18 90:8,20

**things** 8:6 12:3 13:9 15:13 19:20
22:21 30:4,12 31:24 40:1,4 41:15
42:7 45:4 46:12,19 47:14 53:13,16,
24 87:7 103:1,2

**thinking** 96:9

**thinks** 31:20



**thought** 43:9 48:4 59:21,25 60:1

**threat** 25:25 26:9,12 27:5 29:23 30:6 33:22 34:5,6 36:3,14,16,18 37:25 43:12 47:24 61:4 62:8 65:13 68:11,20 69:9,11 92:19

**time** 7:11,22 15:24 17:24 20:12,13, 17 24:1,3 29:12 34:21 35:22 36:9, 15,17,21 37:6 38:18,19,22 43:6,21 47:11,12,13,15,16,18,21,24,25 48:12,19,21,22 52:17,21 54:6,14 55:7 60:15 62:7 64:12 66:15,16 76:2,7,9 77:10 78:9 85:1 86:24,25 87:4 88:8,9,23 90:10 96:9 98:4 99:12,13,22,24 100:1,2 103:8,10 104:8,15

**timeframe** 61:16

**times** 10:4 19:4 23:9 60:19,21 70:14

**timestamp** 88:20,24 89:2,22 90:12,14,25

**title** 6:14

**today** 6:9 7:13,15 8:18,21,24 9:21 35:16,17,18,19 82:21

**today's** 20:19

**toed** 43:23 44:1

**token** 91:16

**tomato** 18:25

**tool** 52:2 101:7 102:18,19 103:21

**toolbelt** 49:2

**tools** 49:2,3

**top** 18:20 39:23 67:12 75:22

**topic** 15:25 20:6 21:20 22:23 25:14,16 34:3,8 37:11 52:6,11 61:25 62:3,16 64:17 76:21 81:24

**topical** 16:2

**topics** 9:1,9 13:18 17:11,19 21:14, 16,18 23:1 25:14 76:18

**totality** 42:21 43:15,18 91:5 100:5

**track** 19:18 54:6

**tracking** 67:23

**traffic** 14:14 53:16

**train** 18:4 54:23 92:8 102:5 105:1

**trained** 19:19 49:10,18 52:24 55:24 56:17 87:6 98:23 102:2

**training** 13:16 14:20 16:9,17,24 17:6,16 18:8,14,16,19 19:5,12 21:21,22,23 22:1,17,19 24:20 34:4 52:14,15,20,25 53:1,3,10,18,25 54:8,18,21,25 55:5,6,9,10,12,15,20 56:12,15 57:20 69:25 83:21,23,24 84:2,5,10,14,18,19,20,22,23,25 85:3,7,22,24 86:6 99:1 102:12,13 103:2,23,25 104:1

**trains** 52:13

**transpire** 98:10

**trial** 13:10 95:11

**trigger** 47:23 100:1

**true** 30:4,8 56:19 68:8 82:14 95:19

**truthful** 7:21 11:8

**turn** 41:11 105:3

**type** 16:2 42:14 56:23 85:22 100:18

**typical** 70:25

**typo** 21:8,9

---

**U**

**Uh-huh** 11:4 37:3 41:9

**ultimate** 37:4 73:21 77:21 78:1 81:20

**unanimously** 48:16 63:1 65:24

**unauthorized** 64:10 75:24

**unavailable** 41:21

**uncommon** 58:21,22 59:7

**undergraduate** 15:8

**understand** 7:12,15 8:13 9:2 10:23 29:17 51:6 53:23 73:23 76:23 77:4 79:21

**understanding** 7:20 8:17 77:2 79:18 81:10 83:7

**understood** 26:6

**unholstered** 37:17

**uniform** 43:25

**unit** 53:9,15 61:19

**university** 14:1,6 16:11

**unjustified** 27:1 48:17 63:3 65:25 66:20 81:6,13,19 82:7,11 99:17 103:6

**unpractical** 45:1

**unreasonable** 41:22 42:2,9 43:19 44:16

**unsuccessful** 105:16

**unusual** 50:10

**upper** 67:14

**utilize** 99:12

**utilized** 23:18

**utilizing** 50:8

---

**V**

**variable** 91:21 100:16

**variables** 56:25 105:15

**variety** 17:17 38:23 39:2 49:2

**vehicle** 45:13,21 53:16

**verbal** 39:5,22

**verbally** 98:1

**verbiage** 74:12

**versed** 95:2

**versus** 26:8 44:22 45:19 57:10 91:13 105:16

**vertically** 104:25

**vicious** 58:19

**video** 34:20 45:8 68:3 89:14 98:6 104:2,3,6,20

**view** 43:5 47:14,25 70:18 95:22,23

**viewed** 47:7

**violate** 51:7,22

**violated** 72:25 73:15 74:2,17 78:6

**violates** 51:17

**violating** 50:24

**violation** 30:15 56:13,23,24 73:11 74:16,25 75:7,15,23 76:5,11 78:12

**violations** 72:21 73:19 77:6,23 79:3,12,14,15



Chris Goodly

March 07, 2023
Index: violence..yelling

**violence** 15:23 51:4

**violent** 51:9,15,20,25 59:9

**voice** 69:20 70:3

**volatile** 48:9 50:19

**vote** 23:9,21 63:5 83:20 103:5

**voted** 24:22 36:9,11 66:22 99:17, 22

**votes** 24:5,7

**voting** 24:10 48:18 62:22 66:14 69:18 71:22

---

**W**

---

**wait** 8:7 9:20 41:23 51:11 93:6

**waiting** 8:9

**walk** 11:14 13:19

**walked** 47:2,3

**walking** 15:7

**wanted** 13:3 28:20 43:10 98:20

**war** 16:1

**watch** 34:20,21,25

**watched** 34:17,19,22,25 104:20

**watching** 68:3

**ways** 32:21

**weapon** 27:3 30:3,13 31:4,25 32:16 38:20 39:1,9 41:11 48:13 49:6 61:1 62:7,11 65:12 74:11 89:18 90:18 99:23

**weapons** 58:18

**wear** 43:22 49:13,19,22 50:3,11, 16,23 51:3,13 75:17

**wearing** 50:5 100:24

**weather** 91:12

**weeks** 16:21,22 17:6 52:17,18 53:2,8

**weigh** 70:14

**weighed** 42:22 82:10

**weight** 42:14 70:22 72:15 91:10 97:11 105:14

**weights** 91:14 96:10

**Westbrook** 62:24 65:23 66:15,19

**wide** 99:11

**wider** 105:7

**William** 6:6 28:15 64:22

**woman** 92:9

**word** 12:14 26:11 73:24 74:1

**worded** 76:15

**work** 10:14 16:11 17:18 42:7 53:20 93:10

**worked** 93:14

**working** 61:2 98:8

**works** 19:12

**worn** 89:13 91:1

**wounded** 36:1

**written** 29:1

**wrong** 96:1,11,14 99:16

---

**Y**

---

**yard** 89:11

**year** 7:6 14:25

**years** 14:8,21 15:5,21 16:9 21:25 50:22 60:23 61:17 81:11

**yelling** 90:6

