UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEREK BROWN** and | * | **CIVIL ACTION** |
| **JULIA BARECKI-BROWN** | * | |
| | * | **NO. 22-847** |
| **versus** | * | |
| | * | **SECTION "L"** |
| **DERRICK BURMASTER, SHAUN** | * | **JUDGE FALLON** |
| **FERGUSON,** and the **CITY OF NEW** | * | |
| **ORLEANS** | * | **MAGISTRATE DIVISION "4"** |
| | * | **MAGISTRATE JUDGE ROBY** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

**MAY IT PLEASE THE COURT:**

Defendant, Derrick Burmaster (Burmaster"), respectfully submits his Memorandum in Support of Motion for Summary Judgment seeking dismissal of the claims of Plaintiffs, Derek Brown and Julia Barecki-Brown ("Browns"). Burmaster is entitled to qualified immunity from Browns' claims as there was no violation of Browns' constitutional rights. Alternatively, even assuming a constitutional violation occurred—which is denied— the Browns cannot demonstrate that Burmaster's alleged conduct violated a constitutional right that was clearly established at the time of the challenged conduct. Based on the law and argument below, Burmaster is entitled to qualified immunity from the claims asserted by the Browns. Burmaster respectfully requests that his Motion be granted and the Browns' claims be dismissed, with prejudice.

**FACTUAL BACKGROUND**

**A.      Statement of the Proceedings**

Plaintiffs, the Browns, filed suit against the defendants herein pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343. They claim that in killing their dog Burmaster violated the U.S. Constitution

and state law, and also violated NOPD policy.[1]

**B.      Statement of the Facts**

Senior Police Officer Derrick Burmaster has been a member of the New Orleans Police Department for twenty-three years.[2]  During that time he has responded to many calls for service, including calls where dogs were present.  He has been bitten several times by dogs while on calls. Accordingly, when he responds to a call for service at a location, he will look for food and water bowls, dog feces and any other indications that there is an animal present.[3]  He also makes "kissing" noises as he approaches to draw out any animal.[4]

On the night of April 10, 2021 Officer Burmaster responded to a disturbance for service regarding a home at 1420 Felicity Street.  Officer Burmaster arrived first and spoke to the complainant who told him he heard a woman shouting and things breaking at a house across the street. [5]  He indicated that the house was 1420 Felicity Street, a multi-family house, and indicated that the disturbance came from the downstairs apartment.[6]

After Officer Roussel arrived, Officer Burmaster briefed him and then they walked across Felicity Street and approached the house.  As Officer Burmaster neared the house, he made "kissing"

---

[1]Second Amended Complaint, Rec. Doc. 60, ¶ 52.

[2]Exhibit "A", Deposition of Burmaster, p. 15, ll. .7-9.

[3]Exhibit "A", p. 261, l. 1 - p. 262, l. 9.

[4]Exhibit "A", p. 34, l. 23 - p. 35, l. 7.

[5]Exhibit "A", p. 34, ll. 4-22.

[6]*Id.*

-2-

noises to draw out any dogs.[7]  There was no response and he also noticed that there was nothing in

the yard to indicate dogs were present.[8]  He even said on his video "no dogs."[9]  Upon determining

that it was safe to enter the property, Officer Roussel opened the gate and Officer Burmaster entered

the yard followed by Officer Roussel.  As they were walking to the first-floor apartment and well

inside the gate, Officer Burmaster heard barking and then two dogs ran down the stairs.[10]  The larger

of the two dogs ran towards Officer Roussel while the smaller one ran directly towards Officer

Burmaster.[11]  Officer Burmaster testified in his deposition that the dogs were not behaving in a

friendly manner but rather were behaving aggressively and that he was certain that the dog coming

at him was going to bite him:

> 91
> 17    Q.  Okay.  And you talked in your
> 18  interview with PIB that you were certain the
> 19  dog was going to bite you?
> 20    A.  Oh, yes.  That dog was going to bite
> 21  me, no doubt.
> 22    Q.  You're certain of that?
> 23    A.  Yes.
> 24    Q.  Why?
> 25    A.  The dog was coming -- Watch the
> 92
> 1  video.  The dog was coming at me, aggressive,
> 2  barking.  I heard barking.  I thought that -- I
> 3  was certain that dog was going to bite me.

---

[7]Exhibit "A", p. 43, l. 25 - p. 44, l. 12; Burmaster BWC video, Exhibit "B", timestamp 21:41:03 - 21:41:07 (the timestamps are in the upper right hand corner of the BWC videos.

[8]Exhibit "A", p. 45, ll. 6-17.

[9]Exhibit "B", timestamp 21:41:07 - 21:41:09.

[10]Exhibit "A", p. 51, ll. 11-14.

[11]Exhibit "B", timestamp 21:41:25 - 21:41:30.

4      Q.   You were certain it was going to
5   bite you because it was coming at you?
6      A.   Yeah.
7      Q.   Anything else besides --
8      A.   It wasn't coming with its tail
9   wagging, happy and jovial like.  It was coming
10   at me in a manner that made me think that he
11   was going to bite the -- bite my leg, bite --
12   bite me somewhere else.  The dog was very
13   agile.  It could reach from here down, you
14   know.  (Indicating.)
15      Q.   Okay.  So from the fact that the dog
16   was coming at you and not wagging its tail, you
17   were certain it was going to bite you?
18      A.   It was coming at me in -- in -- in a
19   threatening manner.[12]

Officer Burmaster had just seconds to react.  He realized he did not have time to escape out

of the gate as Officer Roussel did nor was he able to find any cover.[13]  He had to defend himself so

he drew his gun and fired three shots at the smaller of the two dogs which was coming straight for

him.  The shots resulted in its death.  The larger of the two dogs then ran back up the stairs[14] and, as

it no longer posed a threat, Officer Burmaster was then able to safely exit the yard.

No more than five seconds elapsed between Officer Burmaster becoming aware of the dogs

and the last shot.[15]  The entire incident is captured on Officer Burmaster's and Officer Roussel's

Body Worn Cameras.[16]

---

[12]Exhibit "A", p 91, l. 17 - p. 92, l. 19.

[13]Exhibit "A", p. 80, l. 12 - p. 81 l. 6.

[14]Exhibit "B", timestamp 21:41:25 - 21:41:30.

[15]*Id.*

[16]Exhibit "B", timestamp 21:39:33 - 21:41:33; Exhibit "C", Roussel BWC, timestamp
21:40:43 - 21:41:31.

Officer Roussel testified that Burmaster started making "kissing" noise before he got to the Brown's house and stopped when he was in front of the Brown's house.[17]  No dogs came down from the Brown's house nor did he see any evidence of dogs in the yard.[18]  Officer Roussel testified that when they went into the gate they were satisfied that there were no dogs in the yard and that they would not have entered the yard if they knew dogs were present.[19]  Officer Roussel testified that when he heard the barking he turned to go out of the gate.[20]  He testified that there were not one but two dogs present and that both were a threat.[21]  He testified that the presence of two dogs rather than one changed his perception of the threat as dogs work in packs.[22]  He testified that he only had a matter of seconds to get out of the gate.[23]  As a matter of fact, when Officer Roussel's BWC is viewed you hear the gate slam and the first shot virtually simultaneously.[24]

Sgt. Pruitt was assigned to the Public Integrity Bureau Force Investigation Team ("FIT").[25] She was charged with conducting a criminal investigation of the incident which happens whenever

---

[17]Exhibit "D", Deposition of John Roussel, p. 76, l. 6 - p. 77, l. 9.

[18]Exhibit "D", p. 77, l. 13 - p. 78, l. 1.

[19]Exhibit "D", p. 78, ll. 2-10.

[20]Exhibit "D", p. 78, l. 18 0 p. 79, l. 1.

[21]Exhibit "D", p. 79, ll. 4-18

[22]Exhibit "D", p. 83, l. 1 - p. 85, l. 5.

[23]Exhibit "D", p. 82, ll. 9-13.

[24]Exhibit "C", Roussel BWC, timestamp 21:41:27 - 21:41:31

[25]Exhibit "E", Deposition of Debra Pruitt, p. 12, l. 9 - p. 13, l. 5.

there is any shooting involved.[26]  As part of her investigation she took a statement of Officer Burmaster.  When questioned about her interview of Officer Burmaster, she testified that he related what he experienced.[27]  Sgt. Pruitt prepared a report as a result of her investigation.[28]  As a result of her investigation, she determined that there was no criminal conduct by Officer Burmaster and that he was justified in his actions.[29]

Simultaneously then-Officer, now Sgt. Shannon Jones-Brewer ("Sgt. Brewer") was conducting the Administrative Shooting Investigation ("ASI") on behalf of the Force Investigation Team.[30]  As a result of that investigation, Sgt. Brewer found that Officer Burmaster was not credible based on the fact that he remembered firing three shots in his criminal statement but in his administrative statement he said it was all a blur.[31]  However, when questioned at length regarding the "credibility assessment", Sgt. Brewer could only point to that section of her report as a whole and admitted that the "credibility assessment" was merely a listing of what happened.[32]  She also found that he had committed five policy violations[33] but admitted that even despite her findings, to date

---

[26]Exhibit "E", p. 34, l. 6 - p. 35, l. 7.

[27]Exhibit "E", p. 35, l. 8 - p. 37, l. 12.

[28]Exhibit "F", Report of Debra Pruitt, Exhibit 37 to Exhibit "E".

[29]Exhibit "E", p. 78, ll. 5-18; Exhibit "F", p. 37.

[30]Exhibit "G", Deposition of Shannon Brewer, p. 16, l. 23 - p. 17, l. 2.

[31]Exhibit "G", p. 61, l. 19 - 62, l. 18.

[32]Exhibit "G", p. 101, l. 10 - p. 105, l. 8.

[33]Exhibit "G", p. 68, l. 8 - p. 19, l.

Officer Burmaster had not received any discipline.[34]  The ASI was then reviewed by the Use of Force Review Board which determined that, based upon their review of the BWC videos and Sgt. Brewer's investigation that the shooting was not justified.[35]  It should be noted that Officer Burmaster was not present at the Use of Force Review Board.  Further he has yet to receive a *Loudermill*[36] due process hearing nor has he been assessed any discipline by the appointing authority.

At the request of the Use of Force Review Board, Sgt. David Duplantier of the NOPD Training Academy reviewed Officer Burmaster's actions, met with Officer Burmaster and prepared a report.[37]  Sgt. Duplantier supervises that portion of the Academy that teaches use of force, including involving dogs, and instructs in this area.  Further he was designated by the City to testify as its representative in the City's 30(b)(6) deposition in the area of "training on how officers are to handle animals in the field, including NOPD's development of that training."[38]  Sgt. Duplantier personally taught a course at inservice at the Academy regarding use of force on animals and dogs in particular.[39]  He also testified that officers took a training provided by the ASPCA as well as training using Daily Training Bulletins ("DTB").[40]

---

[34]Exhibit "G", p. 67, ll. 18-21

[35]Exhibit "G", p. 26, ll. 2-16.

[36]*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)

[37]Exhibit "I", "Policy Tactics Training Recommendations", Exhibit 40 to Exhibit "H", Deposition of David Duplantier, hereinafter "report"..

[38]Exhibit "H", p. 21 ll. 10-12.

[39]Exhibit "H", p. 27, ll. 3-25; p. 30, l. 5 - p. 32, l. 8.

[40]Exhibit "H", p. 24, l. 23 - p. 25, l. 18.

In his report and testimony, he testified that it was his opinion that Officer Burmaster acted

properly and that Officer Burmaster's response fell within reason:

> It is the opinion of Sgt. Duplantier that the incident was tragic and unfortunate; however, Officer Burmaster acted properly. He attempted to identify a potential threat but found himself faced with a quick difficult decision. Outside of the animal in question, Officer Burmaster placed no one else in harm's way. As police officers, our decisions to use force and the amount of force used must be based on reasonableness. That reasonableness is considered when determining if a situation is considered an imminent threat to ourselves or others. Though there may be officers that may have addressed the charging animal in a different fashion, Officer Burmaster's decision to use lethal force towards the dog falls within reason.
>
> Having undergone the tactical debrief with Officer Burmaster, it is the recommendation of Sgt. David Duplantier that the officer return to full duty.[41]

Sgt. Duplantier testified that Officer Burmaster had no viable alternative:

```
                                  96
         11        A.   So when Officer Burmaster ended up going to
         12   achieve this combat L, he went to the left.  The other
         13   officer went to the right, which put him closer to the
         14   gate, actually.  Officer Burmaster -- shortly after
         15   getting in there, the dogs came charging out.  So by
         16   the time, there was really nowhere else for him to go.
         17   He wasn't going to jump the fence.  He's not going to
         18   outrun the dog.
         19        And my findings were, based on the response
         20   of the dog -- and I'm going to say this for the record.
         21   I feel bad about what happened, right.  But his
         22   decision-making at that point -- I don't know what else
         23   he could have done.  And I've even reached out, said,
         24   "Well, okay.  If y'all found him to be wrong, give me
         25   an alternative response," which I have not been able to
                                  97
          1   get.
          2        Q.   When you say you reached out, you reached out
          3   to who?
          4        A.   To -- I spoke with PIB.  I spoke with --
          5             MR. ANADA:  Form.
```

---

[41]Exhibit "H", p. 5.

6      A.   I think it was Sergeant Helou in PIB,
7  referencing that.  I never spoke with Officer -- I'm
8  sorry, Sergeant Brewer firsthand with it.  But I did
9  speak with Sergeant Helou since he was the one that
10  sent me the PTTR.
11          But for the most part -- I mean -- and I
12  didn't -- as we went through it, like I said, the only
13  thing I could tell him was, "Look, maybe if you paused
14  a few seconds, you might have gotten alerted by the
15  dog."  But he did make an attempt to try and alert any
16  animal inside curtilage of the residence.
17          The fact that he got jammed into the corner
18  was a big factor, and the dog's response.  The dog is
19  just being a dog. It's his house, his domain, so I get
20  it.  But unfortunately, the dog being a dog put the
21  officer in a situation where he had to do something.[42]

*   *   *

98
6   So unfortunately, to the behest of everybody
7  else, I didn't find anything wrong with his actions.
8  Once again, I said I'm open minded.  If somebody can
9  show me a better tactical response, I'm willing to
10  listen, but I didn't -- I didn't see another
11  alternative method.
12  BY MR. ALPAUGH:
13      Q.   So you felt, in the circumstances, he acted
14  properly?
15      A.   Yes, sir.[43]

*   *   *

99
15      A.   The fact that -- the fact that there were two
16  dogs -- neither dog really took a position that I would
17  consider -- or I think the average person would
18  consider that it was a warning, right.  They were
19  barking, but they were coming towards him.  They were

---

[42]Exhibit "H", p. 96 l. 11 - p. 97, l. 21.

[43]Exhibit "H", p. 99, ll. 6-15.

20   charging towards him.  I didn't find it unreasonable
21   for him to believe that the dog was attacking him.
22   BY MR. ALPAUGH:
23      Q.   Would it be unreasonable to believe that also
24   there's a potential the other dog would attack him as
25   well?
                      100
 1      A.   Dogs are pack animals, so it's not
 2   unreasonable to believe that it.  Is it guaranteed the
 3   second dog would have done it?  Don't know.  But dogs
 4   are pack animals, so it's possible that factor -- that
 5   factor loomed as well.
 6      Q.   Would you describe what "pack animals" means?
 7      A.   Meaning they work together.  There's
 8   generally -- one is over the other.  One is a leader;
 9   one is the follower.  If the bigger dog was the leader,
10   then it's possible that the other dog would followed or
11   vice versa.
12          So they do hang together.  Dogs hunt together.
13   They tend to eat together.  They are individuals, but
14   they function and they feel more comfortable when
15   they're in a group.  As long as they been -- let me say
16   this.  They don't -- like people, they don't all get
17   along.  But generally, if they do have some type bond
18   between them, they will follow each other.
19      Q.   Officer Burmaster told you he felt he and the
20   other officer were both in imminent danger at the time
21   this happened.  Correct?
22          MR. ANADA:  Form; scope.
23      A.   Yes, sir.[44]

Sgt. Duplantier testified that, taking all of this into account, he determined that it was a

reasonable use of force and he thouthg that Officer Burmaster's actions were proper under the

circumstances.[45]

Sgt. Duplantier was asked regarding the finding of the Use of Force Review Board and,

---

[44]Exhibit "H", p. 99, l. 15 - p. 100, l. 23.

[45]Exhibit "H", p. 101, ll. 13-24.

specifically its composition, Sgt. Duplantier testified that while he is in charge of use of force and

tactics, this was not the area of expertise of former Chief Goodly, former Deputy Chief Paul Noel

and definitely not the area of expertise of former Deputy Chief Arlinda Westbrook, nor was it the

area of expertise of Sgt. Brewer.[46]  As Sgt. Duplaintier testified:

> 105
> 21   Q.   So of these people -- all those people, you're
> 22   the only one qualified to evaluate this?
> 23        MR. ANADA:  Object to form; scope.
> 24      A.  I find myself to have a deeper working
> 25   knowledge than they do.[47]

Sgt. Duplaintier testified that his comments and findings were based on NOPD policy and

use of force[48] and was the official position of the NOPD Training Academy:

> 110
> 4    Q.   Your determinations of whether or not
> 5    Burmaster violated policy contained in Exhibit 40 is
> 6    NOPD's official position on that subject, right?
> 7      A.   From the training academy standpoint, yes.  As
> 8    the trainers and training academy, yes.
> 9      Q.   It's not just your opinion?
> 10     A.   No.  That's why the signature of the
> 11   lieutenant -- my supervisor at the time, she -- she
> 12   reviewed it and approved it.[49]

Officer Burmaster was placed in an untenable situation.  He entered the Browns' yard after

taking precautions as he was trained and, as a result, neither he nor Officer Roussel had any idea that

dogs were present.  Then, when he was well into the yard and well away from the gate, he heard

---

[46]Exhibit "H", p. 104, l. 18 - p. 105, l. 19.

[47]Exhibit "H", p. 105, ll.

[48]Exhibit "H". P. 108, l. 18 - p. 109, l. 7.

[49]Exhibit "H" p. 110, ll. 4-12.

barking and in a matter of seconds had two dogs charging down the stairs, one going directly for him which he believed was going to do him great bodily harm.  He had now way to escape.  Under the circumstances, he had no choice but to shoot and kill the dog.

## LAW AND ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[50]  A dispute is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.[51]  A fact issue is "material" if its resolution could affect the outcome of the action.[52]

"Although [qualified immunity is] nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised."[53]  This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."[54]  "[Q]uestions of immunity ordinarily should be decided by the court, not by the jury[55] because "[t]he entitlement is an immunity from suit rather than a mere defense to liability."[56]

---

[50]Fed. R. Civ. P. 56(a).

[51]*Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[52]*Id.*

[53]*Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[54]*Id.* (internal quotation marks omitted).

[55]*Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

[56]*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

-12-

"The plaintiff's burden is a formidable one." *Roy v. City of Monroe*, 950 F.3d 245 (5th Cir. 2020). A plaintiff bringing a constitutional violation claim has the ultimate burden to show that a defendant violated a constitutional right - - that is, the plaintiff must make this showing whether or not qualified immunity is involved. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319,330 (5th Cir. 2020) and *Morgan v. Swanson*, 659 F.3d 359,371 (5th Cir. 2011).

**B.      Burmaster is entitled to Qualified Immunity**

The dispositive inquiry is whether it would have been clear to a reasonable officer in the situation faced by Burmaster that it was unlawful to shoot and kill a dog that was behaving aggressively towards him.  Burmaster is alleged to have violated the Browns' federal and state Fourth, Fifth and Fourteenth amendment rights by depriving them of their dog.[57]  The question therefore presented to the Court is whether Burmaster is entitled to qualified immunity for shooting and killing the Brown's dog.  With all due respect to the Browns, the answer is "yes".

**1.      Qualified Immunity Standard.**

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.[58]  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[59]

---

[57] Second Amended Complaint, Rec. Doc. 60.

[58] *Thomas v. City of New Orleans*, 883 F. Supp. 669, 681 (E.D. La. 2012) (citing *Reichle v. Howards*, 566 U.S. 658, 663 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Loughlin v. Tweed*, No. CIV.A. 15-649, 2015 WL 3646777, at *6 (E.D. La. 2015).

[59] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

As noted above, qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law."[60] The doctrine applies "regardless of whether the government official's error is a 'mistake of law, a mistake of fact or mistake based on mixed questions of law and fact.'"[61]

The purpose of qualified immunity is to shield public servants not only from liability, but also from defending a lawsuit. Once a defendant invokes the qualified immunity defense, the plaintiff carries the burden of demonstrating its inapplicability because of clearly established law.[62] "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear that every *reasonable official* would have understood that what he is doing violates that right.'"[63] Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not divest officials of qualified immunity.[64] Courts must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison.[65]

Under the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), this Court is not restricted with respect to the order in which it analyzes the "constitutional violation" prong and

---

[60]*Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).

[61] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[62]*Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

[63]*Ashcroft v. al-Kidd*, 563 U.S. 731, (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).

[64]*Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)

[65]*Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) (citing *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

the "clearly established law" prong of qualified immunity.

   2.   **The Browns cannot point to any clearly established law to defeat qualified immunity.**

Even assuming that The Browns can create a factual issue as to whether any constitutional violation occurred, Burmaster is nonetheless entitled to qualified immunity because the Browns cannot show a violation of clearly established law. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[66] Burmaster does not dispute that the Fourth Amendment right to be free from unreasonable search and seizure is clearly established. However, the United States Supreme Court has repeatedly instructed that clearly established law should not be defined at a high level of generality.[67] "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."[68] Rather, the question must be "frame[d] . . . with specificity and granularity."[69]

With the more specific inquiry the Supreme Court requires, "the question becomes whether there is either 'directly controlling authority . . . establishing the illegality of such conduct' or 'a

---

[66]*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).

[67]*Ashcroft*, 563 U.S. at 742 (2011).

[68]*Id.*

[69]*Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)).

consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'"[70]  Although the Supreme Court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[71]  In *White*[72], the Court reminded lower courts that clearly established law must be "particularized" to the facts of the case.  The judgment of the appellate court was vacated because it relied on general constitutional principles that did not identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ..." U.S. Const. amend. IV.[73]  To prove a violation of the Fourth Amendment, the person must show that she had a subjective expectation of privacy in the object of the challenged search and that her expectation is one that society would view as reasonable.  *California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811, 90 L. Ed. 2d 210 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656 (1984) (footnote omitted). The applicability of the Fourth Amendment thus depends on "whether the person

---

[70]*Gonzalez v. Huerta,* 826 F.3d 854, 858 (5th Cir. 2016) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

[71] *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citing *White v. Pauly*, 137 S.Ct. 548, 551 (2017),

[72]*White v. Pauly*, *supra*.

[73]The Fourth Amendment is made applicable to the states by the Fourteenth Amendment.

invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted).

### 3.     Burmaster did not violate the Constitution in killing the Browns' dog.

Officer Burmaster had no advance notice that he would encounter dogs on the Browns' property.  The evidence, which is undisputed and clear, both from Burmaster's and Roussel's BWCs and from their depositions, is that both Burmaser and Roussel thought that no dogs were present and that they were totally surprised by the presence of the dogs and their aggressive behavior.  When an incident is captured on video, the Fifth Circuit has held that the Court should look to the video:

> Nevertheless, because there is video and audio recording of the event, we are not required to accept factual allegations that are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Rather, we should "view[ ] the facts in the light depicted by the videotape." *Id.* at 381, 127 S.Ct. 1769.

*Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021), cert. denied sub nom *Tucker v. City of Shreveport, Louisiana*, 211 L. Ed. 2d 388, 142 S. Ct. 419 (2021).  The BWC videos, along with Burmaster's testimony as well as that of Sgt. Duplantier of the NOPD Training Academy established that, in the short time he had to react, Burmaster had no non-lethal options available to him.  The only alternative would have been to let the dog attack or bite Burmaster first, before he would be authorized to defend himself by using his weapon.

A similar situation presented itself in *Lane v. Rechfertig*, 2017 WL 5653870 (W.D. Tex. Jan. 25, 2017).  In that case an office responded to a residential alarm call.  When he got to the residence, he noted a sign on the front window that stated "Beware Rottweiler on Duty."  The officer announced his presence and then waited for backup.  Once backup arrived, they entered the residence

and, while conducting a protective sweep, encountered a Rottweiler which they shot and killed. The owner of the dog filed a civil rights action against the officers and the City. The officers claimed qualified immunity. The Court dismissed the Fourth Amendment claim on that basis, observing as follows:

> Nevertheless, even assuming the scant and at times contradictory facts alleged in Lane's complaint are sufficient to state a claim for unreasonable seizure under the Fourth Amendment, they are insufficient to demonstrate a constitutional right was clearly established such that a reasonable officer in the Individual Defendants' situation would have understood their conduct violated that right. Officer Rechtfertig had *no advance notice of a dog on the property* when he responded to the residence alarm call. Even though Lane alleges the sign posted on the front window warned visitors of the presence of a Rottweiler, there were *no other visible signs of a dog, such as food bowls or toys*. Nor did Officer Rechtfertig *hear or see a dog after he announced his presence at the doorway* of the residence 5–10 times. Thus, the officers were *surprised when a large Rottweiler appeared*. Officers Rivera and Rechtfertig, who were conducting a sweep of a hallway and bedroom area, made a *split-second decision to act in self-defense in a tense, uncertain, and rapidly evolving situation*. Qualified immunity *shields the Individual Defendants from liability for this decision*. See *Stephenson[74]*, 632 Fed.Appx. at 185 (concluding the officer was entitled to qualified immunity where the officer shot a dog after being startled by a dog which was "showing its teeth"); *Grant[75]*, 625 Fed.Appx. at 672 (granting qualified immunity where a surprised officer shot a dog when the dog showed its teeth and charged towards the officer's legs); Romero v. Bexar Cty., 993 F. Supp. 2d 658, 662 (W.D. Tex. 2014) ("It is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat."). Because Lane has failed to plead facts sufficient to defeat the Individual Defendants' qualified immunity defense, dismissal of his Fourth Amendment claim is warranted.[76]

The Fifth Circuit addressed qualified immunity in the context of killing a pet dog in the case of *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015). That case involved an officer responding to a call of a man brandishing a gun. When the officer got out of his car he drew his

---

[74]*Stephenson v. McClelland*, 632 Fed.Appx. 177 (5th Cir. 2015).

[75]*Grant v. City of Hous.*, 625 Fed.Appx. 670, 674 (5th Cir. 2015).

[76]*Lane v. Rechtfertig*, 2017 WL 5653870, at *4 (W.D. Tex. Jan. 25, 2017), emphasis added.

weapon as the man was not complying with his commands.  The following took place:

> As Officer Duncan approached Karlton, he was surprised by a large dog, which was later identified as the 50–pound, three-year-old boxer belonging to the Stephensons. Officer Duncan testified that the dog bared its teeth and jumped on him. Karlton claimed, however, that the dog did not jump and was "smiling." It is undisputed, however, that the dog was in the front yard without a leash and appeared suddenly as Officer Duncan reached Karlton. Officer Duncan fired one shot at the dog, testifying that he did so because he feared for his safety. Officer Duncan then proceeded to detain and search Karlton. The dog died later that day.

*Stephenson v. McClelland*, 632 F. App'x 177, 180 (5th Cir. 2015).  The parents of the man filed suit alleging, among other claims, a Fourth Amendment claim for the unreasonable seizure (death) of their dog.  In upholding the District Courts dismissal of the Fourth Amendment claim, the Fifth Circuit stated:

> This court has held that the killing of a dog can constitute a seizure within the meaning of the Fourth Amendment. See *Grant v. City of Houston*, No. 14–20653, 625 Fed.Appx. 670, 674 (5th Cir.2015). The Fourth Amendment requires that a seizure be objectively reasonable. In making such a determination, we look to the totality of the circumstances, balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "We analyze this question from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]' " and " 'allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Plumhoff v. Rickard*, —— U.S. ——, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) (second alteration in original) (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865).[77]

The Court then went on to state:

> Viewing the facts in the light most favorable to the nonmovants, we conclude that Plaintiffs have not produced sufficient evidence to demonstrate that a constitutional right was clearly established such that a reasonable officer in Officer Duncan's situation would have understood that his conduct violated that right. *Officer Duncan did not know there would be a dog present during his encounter with Karlton and*

---

[77]*Stephenson v. McClelland*, 632 F. App'x 177, 184 (5th Cir. 2015)

*was surprised by its presence.* While Karlton knew his family pet to be friendly and nonaggressive, *Officer Duncan did not.* Officer Duncan was startled by a large dog that was showing its teeth (whether baring them aggressively or "smiling"). *Officer Duncan was forced to make a split-second judgment in a tense situation and he acted to protect himself.* See *Grant*, 625 Fed.Appx. at 672 (granting qualified immunity where an officer shot a dog after being surprised when the dog showed its teeth and charged towards the officer's legs); cf. *Kincheloe v. Caudle*, No. A–09–CA–010 LY, 2009 WL 3381047, at *8 (W.D.Tex. Oct. 16, 2009) (fact issues precluded summary judgment where a plaintiff testified that a police officer fired two shots, killing a pit bull who was merely walking toward bushes in the front yard); *Romero v. Bexar Cty.*, 993 F.Supp.2d 658, 662 (W.D.Tex.2014) ("It is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." (citing *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir.2003))). Accordingly, we conclude that Officer Duncan is entitled to qualified immunity on these claims.[78]

Another Fifth Circuit case cited by the Courts in *Lane* and *Stephenson* is *Grant v. City of Hous.*, 625 Fed.Appx. 670, 674 (5th Cir. 2015). In *Grant* a dog owner brought § 1983 action against the city and police officers alleging the illegal search of her residence, seizure of her money, and the killing of her dog. The relevant facts are that a number of Houston Police Department officers were dispatched to execute an arrest warrant for the brother of the plaintiff who was at her residence. While searching the premises, the officers heard barking which turned out to be the plaintiff's dog, which had been secured in a bathroom. One of the officers was an experienced dog handler and in order to remove the dog from the immediate search area took it downstairs and placed him in the garage. Later two officers went downstairs to search bottom floor, including the garage. When they arrived at the garage they noticed a pit bull in a kennel situated against the garage wall. One of the officers, Simpson, started searching the contents. The following then took place:

> As Simpson bent down to inspect the luggage, he "heard the loud, sharp sound of aggressive barking and snarling coming from behind [him]." Thinking that the pit bull might have escaped from its kennel, Simpson turned around and saw Buster, "a medium-sized, yellow, mixed-breed dog, with its ears folded back along the top of

---

[78]*Stephenson v. McClelland*, 632 F. App'x 177, 185 (5th Cir. 2015), emphasis added.

its head, its teeth showing, its head lowered, and standing in an aggressive stance." As Simpson turned to face Buster, the dog charged towards the officer's legs, "snapping its teeth and turning its head sideways so that it could bite [his] leg." Simpson kicked Buster twice, but the dog continued its aggressive approach. After retreating to a corner, Simpson drew his pistol and fired at Buster. Simpson's first shot caused Buster to collapse onto the floor, but the dog quickly recovered and continued to charge at Simpson. Simpson's second shot penetrated Buster's neck, instantly killing the dog.[79]

In upholding the grant of qualified immunity, the Fifth Circuit stated:

Here, the officers had no advance notice that a dog was present on the premises to be searched. Moreover, Officer Fisher, an experienced dog handler, took reasonable precautions to isolate Buster while the house was being searched. Finally, while Buster's killing doubtlessly presents a grave intrusion on Grant's property rights, in this case, unlike in *Hells Angels*[80], the governmental interest of safety provides a sound justification. The evidence in the record indicates that Simpson was genuinely surprised by Buster's presence and aggression, and Grant has marshalled only a scintilla of evidence to dispute the expert and eyewitness testimony indicating that Simpson exhausted all non-lethal options prior to using lethal force against the dog. Naquin, Bocanegra, Gracia, Russell, and Cromier could not have foreseen that Simpson would be forced to resort to such force in the course of searching the garage.[81]

It is anticipated that Plaintiffs will contend that Burmaster's alleged negligent failure to follow NOPD procedures results in a Fourth Amendment violation. With respect, that contention has been addressed in this Circuit and answered in the negative. First, with regard to negligence itself, the Court has stated:

The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest. There is no question about the fundamental interest in a person's own life, but it does not follow that a negligent taking of life is a constitutional deprivation. The government

---

[79]*Grant v. City of Houston*, 625 F. App'x 670, 672 (5th Cir. 2015) .

[80]*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir.2005).

[81]*Grant v. City of Houston*, 625 F. App'x 670, 676 (5th Cir. 2015).

has the right to employ deadly force under some circumstances, and there are interests to be balanced in deciding the reach of constitutional demand. See *Tennessee v. Garner*, 471 U.S. at ——, 105 S.Ct. at 1700, 85 L.Ed.2d at 8–9.[82]

Second, with regard to a claim of negligence due to alleged failure to follow police procedures, this holding in *Young* was applied in the case of *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992) where the Court stated:

> Our holding in *Young v. City of Killeen* is instructive. In that case a police officer observed a drug transaction between Young and another person. The officer approached the suspects in his car with the light flashing. Young attempted to flee in his car, but the officer blocked Young's path. The officer left his car and told Young to get out of his. When Young reached under his seat for what appeared to be a weapon, the officer shot and killed him. Under those facts, the court found that the actions of the officer were not excessive to the need. In so holding, the court stated that if Young's action gave the officer cause to believe that he was under a threat of serious harm, then the officer's use of deadly force was not a constitutional violation. Young is pertinent to the instant case for another reason. The Plaintiffs have charged that the force Lowery employed was excessive, at least in part *because Lowery may not have followed established police procedures in displaying his badge and identifying himself while in plain clothes*. The implication is that Lowery thereby *manufactured the circumstances* that gave rise to the fatal shooting. *We rejected a similar argument in Young*. There, the district court found that the officer had acted negligently and contrary to good police procedure. On appeal, we noted that "[t]he sense in which [the district court] finds excessive force is that the force would have been avoided if [the policeman] had approached Young as required by proper police procedures." We found to the contrary, however, that regardless of what had transpired up until the shooting itself, Young's movements gave the officer reason to believe, at that moment, that there was a threat of physical harm. We said: *The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest.* There is no question about the fundamental interest in a person's own life, but it *does not follow that a negligent taking of life is a constitutional deprivation*. We do not mean to imply that we in any way find Lowery's actions leading up to the shooting to be negligent. We merely explain that *even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections*.[83]

---

[82] *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985)

[83] *Fraire v. City of Arlington*, 957 F.2d 1268, 1275–76 (5th Cir. 1992), emphasis added.

Officer Burmaster acted properly and in accordance with procedure.  His shooting of the Browns' dog was justified and does not constitute a Constitutional violation.

**4.      The Browns do not have a Fifty Amendment claim**.

The Browns have made a claim under the Fifth Amendment as set forth in the Second Amended Complaint.[84]  While not explaining this contention in the Second Amended Complaint, for purposes of this Motion it is assumed that the Browns are making a claim of unlawful taking. This identical claim was made in *Lane, supra*.  I dismissing that claim, the Court stated:

> Lane alleges the Individual Defendants violated the Fifth Amendment by shooting and killing his dog without providing just compensation. The Takings Clause of the Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides, "nor shall private property be taken for public use, without just compensation." As many circuit courts have held, however, the Takings Clause does not apply to property damages "as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 336 (7th Cir. 2011); see also *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1154 (Fed. Cir. 2008) (citing *Bennis v. Michigan*, 516 U.S. 442, 452 (1996)). In responding to a residential alarm call and investigating a possible forced entry, the Individual Defendants acted pursuant to the state's police power. As explained above, the officers reasonably believed the dog posed a threat and made split-second judgments to act in self-defense. The shooting of Lane's dog, while unfortunate, occurred incident to a justified use of police powers.[85]

The Browns' Fifth Amendment claim must be dismissed.

**5.      The Browns cannot defeat Burmaster's right to qualified immunity.**

Based on the foregoing, to defeat  Burmaster's immunity defense, The Browns must prove that entering the Brown's yard and shooting a dog that was aggressively and swiftly coming at Burmaster somehow violated the Browns constitutional rights, and that right was clearly established

---

[84]Second Amended Complaint, Rec. Doc. 60, ¶ 77.

[85]*Lane v. Rechtfertig,*, 2017 WL 5653870, at *5 (W.D. Tex. Jan. 25, 2017).

at the time of the action.  Existing law must have placed the constitutionality of Burmaster's conduct "beyond debate."[86]  This is because qualified immunity is intended to give "governmental officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."[87]

Even if Burmaster is incorrect regarding the threat to him, which is denied, Burmaster is still entitled to qualified immunity.  With all due respect to the Browns, they cannot carry the burden of proving that it is clearly established law that making a split second decision to shoot a dog that is aggressively charging at an officer is unconstitutional.  Essentially, Officer Burmaster is entitled to qualified immunity because he could have reasonably believed that his conduct was not barred by law and existing precedent does not place the constitutional question beyond debate.[88]

## C.   PLAINTIFF'S CLAIMS FOR PUNITIVE OR EXEMPLARY DAMAGES MUST BE DISMISSED.

Plaintiff requests an award of exemplary damages.[89]  Punitive damages in civil rights actions may only be imposed against defendants in their individual capacity if the conduct that allegedly violates the plaintiff's constitutional rights is "malicious, wanton, or oppressive."[90]  Notwithstanding

---

[86]*D.C. v. Wesby*, 138 S. Ct. 577, 589-90, 199 L. Ed. 2d 453 (2018) (Quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).

[87]*Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244–5 (2012) quoting Ashcroft, 563 U.S. 731,741 131 S.Ct. 2074, L.Ed.2d 1149 (2011) (internal quotation marks omitted).'"This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

[88]*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013).

[89]Second Amended Complaint, Rec. Doc. 60, ¶ 140 (d).

[90]*Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982).

that Plaintiff's claims under §1983 are barred by qualified immunity and, therefore, Plaintiff cannot prevail, Plaintiff has not alleged any specific facts against Burmaster, and there is no evidence adduced to date, to establish malicious, wanton or oppressive conduct to warrant the consideration of punitive damages.  To obtain punitive damages under §1983, the defendant's conduct must be "shown to be motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others."[91]  Thus, in the absence of a showing of willful, wanton, or malicious behavior, Burmaster cannot be liable for punitive damages.  Plaintiff cannot, and has not, established that Burmaster's alleged behavior was malicious, wanton, or oppressive or that he was motivated by evil motive or intent.  Consequently, Plaintiff's allegations against Burmaster do not rise to the level necessary under the law for exemplary damages to be available.

The claim for punitive damages must be dismissed.

### CONCLUSION

The Browns cannot carry their burden to negate Burmaster's right to qualified immunity. Burmaster reasonably believed that his conduct was not barred by existing law and that current precedent does not place the constitutional question beyond debate.  Further, plaintiff has not established the basis for a claim for punitive or exemplary damages.

Accordingly, all claims against Burmaster under federal and state law must be dismissed with prejudice and at the Browns cost.

---

[91]*Smith v. Wade*, 461 U.S. 30, 56 (1983).

Respectfully submitted:

/s/ C. Theodore Alpaugh, III
**C. THEODORE ALPAUGH, III, T.A. (#02430)**
**CLAUDE A. SCHLESINGER (#15042)**
GUSTE, BARNETT, SCHLESINGER & ALPAUGH, L.L.P.
639 Loyola Avenue, Suite 2130
New Orleans, Louisiana 70113-7103
Telephone:     (504) 529-4141
Facsimile:     (504) 561-0326
Email:          cta@gustebarnett.com

**Attorneys for Defendant,**
**DERRICK BURMASTER**

D:\GBSA, L.L.P.\CTAData - Documents\CTA CORP CLIENTS\FOP.Burmaster, Derrick\MSJ\MMO.summary.judgment.CTA.031982023.wpd