# In the Matter of:

*Derek Brown and Julia Barecki-Brown*

*vs.*

*Derrick Burmaster, Shawn Fergusan, and the City of New Orleans*

## Officer Derrick Burmaster

March 10, 2023

**EXHIBIT A**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and JULIA            Civil Action No.
BARECKI-BROWN                    22-847

VERSUS                           SECTION: L

DERRICK BURMASTER,               HONORABLE ELDON E.
SHAWN FERGUSAN,                  FALON
and the CITY OF
NEW ORLEANS       DIVISION:  4

                                 HONORABLE KAREN WELLS
                                 ROBY

* * * * * * * * * * * * * * * * * * * *

PUBLIC VERSION

    Videotaped deposition of OFFICER DERRICK P. BURMASTER, 505 North Sibley, Metairie, Louisiana 70003, taken at the CITY ATTORNEY'S OFFICE, located at 1300 Perdido Street, 5E03, New Orleans, Louisiana 70112, commencing at 9:58 A.M., on Friday, the 10th day of March, 2023.

APPEARANCES:

   JONES WALKER
   (By:  Tarak Anada, Esquire)
   201 St. Charles Avenue
   51st Floor
   New Orleans, Louisiana  70170

        - AND -

**EXHIBIT A**

```
 1   APPEARANCES (continued):
 2
     MOST & ASSOCIATES
 3   (By:  William Most, Esquire)
     201 St. Charles Avenue
 4   Suite 114 PMB 101
     New Orleans, Louisiana  70170
 5      (Attorneys for the Plaintiffs,
         Derek Brown and Julia Barecki-Brown)
 6
 7   GUSTE, BARNETT, SCHLESINGER, HENDERSON
     & ALPAUGH, L.L.P.
 8   (By:  C. Theodore Alpaugh, III, Esquire)
     639 Loyola Avenue
 9   Suite 2130
     New Orleans, Louisiana  70113
10      (Attorneys for the Defendant,
         Officer Derrick P. Burmaster)
11
12   CITY OF NEW ORLEANS
     (By:  James Roquemore, Esquire)
13   1300 Perdido Street
     5E03
14   New Orleans, Louisiana
        (Attorneys for the Defendants,
15       City of New Orleans and Shaun
         Ferguson)
16
17
18   ALSO PRESENT:
19
     Derek Brown
20
     Tammy Hupin, Videographer
21
22
     REPORTED BY:
23
24   KATHY ELLSWORTH SHAW, CCR, RPR
     Certified Court Reporter
25   (No. 049519)
```

**EXHIBIT A**

```
 1            E X A M I N A T I O N   I N D E X
 2
 3                                                    PAGE
 4
 5   EXAMINATION BY MR. MOST.........................6
            RE-EXAMINATION........................263
 6
 7   EXAMINATION BY MR. ROQUEMORE..................251
 8
 9               E X H I B I T   I N D E X
10
     EXHIBIT NO. 2.................................197
11
     EXHIBIT NO. 3.................................200
12
     EXHIBIT NO. 6.................................201
13
     EXHIBIT NO. 7.................................205
14
     EXHIBIT NO. 9.................................114
15
     EXHIBIT NO. 19................................192
16
     EXHIBIT NO. 23B...............................147
17
     EXHIBIT NO. 24.................................28
18
     EXHIBIT NO. 28................................117
19
     EXHIBIT NO. 30................................221
20
     EXHIBIT NO. 47................................182
21
22   HIGHLY SENSITIVE PROTECTED MATERIAL
23
     PAGE 236 LINE 14 THROUGH PAGE 238 LINE 16
24
25              *     *     *     *     *
```

**EXHIBIT A**

```
 1                S T I P U L A T I O N
 2           It is stipulated and agreed by
 3   and among counsel for the parties hereto that
 4   the deposition of the aforementioned witness is
 5   hereby being taken under the Federal Rules of
 6   Civil Procedure, for all purposes, in
 7   accordance with law;
 8           That the formalities of reading and
 9   signing are specifically waived.
10           That the formalities of filing, sealing,
11   and certification are specifically waived;
12           That all objections, save those
13   as to the form of the question and the
14   responsiveness of the answer, are hereby
15   reserved until such time as this
16   deposition, or any part thereof, may be
17   used or sought to be used in evidence.
18           *     *     *     *     *
19           KATHY ELLSWORTH SHAW, certified
20   Court Reporter, State of Louisiana,
21   officiated in administering the oath to
22   the witness.
23
24
25
```

**EXHIBIT A**

```
 1        Q.   Okay.  Could you give us the very
 2   short version of your educational and
 3   professional background?
 4        A.   I have a high school diploma.  I
 5   have -- I'm -- I'm taking classes with LSU,
 6   but I'm pausing right now.
 7        Q.   Okay.  And how long have you been a
 8   police officer?
 9        A.   Twenty-three years.
10        Q.   Entirely with the New Orleans Police
11   Department?
12        A.   (Witness nods head affirmatively.)
13        Q.   And it will help for the record
14   if --
15        A.   Yes.
16        Q.   Yeah.  And this is a -- a question I
17   ask of all witnesses.  It's not specific to
18   you, but have you ever been arrested?
19        A.   Yes.
20        Q.   What were you arrested for?
21        A.   Simple battery, domestic.
22        Q.   And when was that?
23        A.   I would have to look that up.
24        Q.   Was it in the last two years?
25        A.   No.  It was many years ago.  My
```

**EXHIBIT A**

1  see.  Let me go handle it, 'cuz it sounded like
2  it was a domestic even though it came out as a
3  fight.
4              So I got there way before Roussell
5  and I parked down the street.  I got out the
6  car and I started smoking a cigarette while I
7  was waiting for Roussell to pull up.  A man
8  from on the other side -- across the street, on
9  the other side of a fence, told me that he
10 could hear a woman yelling.  This is what he
11 tells me.  But he couldn't hear the male.  And
12 he heard things breaking.  So I -- I considered
13 that it was a domestic, you know, and then I
14 waited for Roussell.
15             And then when Roussell pulled up, I
16 broke -- Usually what I like to do is tell the
17 responding officers what information I've
18 learned before they arrived so that we could
19 all be prepared.  The man told me -- I believe
20 I also told Roussell that it was the bottom
21 apartment.  So that's where we were headed
22 at -- at the time when this happened.
23             I train all my recruits to -- to
24 avoid shooting dogs, to avoid coming in contact
25 with dogs.  And I tell them what to look for

**EXHIBIT A**

1  when going to a -- a house that is surrounded
2  by a fence. You look for food and water bowls,
3  anything that would indicate that the -- a dog.
4  And what I did was, you know, I was approaching
5  the house, I went (indicating kissing noises),
6  to see if I could summon a dog to come out if
7  there was a dog behind the fence.
8          Also, things he had to consider is
9  this is -- looks like an apartment complex to
10 me. I don't know. Maybe it's a four-plex or
11 something. So I would -- I considered that at
12 the same time because why would somebody have a
13 loose animal on the other side of that fence if
14 other people had to live there and go there?
15 I didn't see any dog crap or anything like
16 that. Nothing indicated that there was a dog.
17         So with that, I decided to go into
18 the fence. I have to go there. They're
19 calling the police. It's a domestic. I had --
20 If I were to not go inside the fence, I'd get
21 written up for not doing my job. And I don't
22 know if, you know, he's dead because she was
23 the one that was told to be -- you know, that I
24 would consider to have been the aggressor, the
25 aggressive person because I can't -- I don't

**EXHIBIT A**

```
 1   when you're on the street?
 2        A.   I -- Well, I mean, I don't know if
 3   you would word it like that.
 4        Q.   How would you word it?
 5        A.   I would take precautions to not have
 6   to shoot a dog or come into contact with a dog.
 7        Q.   On each call for service?
 8        A.   Yes.
 9        Q.   Okay.
10        A.   Unless it's a walk in at the
11   station, you know.  I don't have to worry about
12   that.  We have a lot of free-roaming animals in
13   the streets as well, so you have to be cautious
14   for those people and keep your eyes open for
15   them.
16        Q.   Are you thinking about that on every
17   shift?
18        A.   Oh, yeah, definitely.
19        Q.   Okay.
20        A.   Officer safety is always thought
21   about throughout the day.
22        Q.   Uh-huh (indicating affirmatively).
23        A.   Not just specific about dogs, but
24   for anything.
25        Q.   You said as you approached the
```

**EXHIBIT A**

```
 1   property, you made kissing noises?
 2        A.   Yes.
 3        Q.   And you did that because -- Do you
 4   make kissing noises on every call for service?
 5        A.   No.  This particular house was
 6   surrounded by a fence so I wanted to -- if
 7   there was a dog, that would make the dog make
 8   itself known.
 9        Q.   Uh-huh (indicating affirmatively).
10        A.   And then I could evaluate another
11   method of getting somebody to come out the
12   house.
13        Q.   Because in New Orleans, some houses
14   have front-gated yards?
15        A.   Uh-huh (indicating affirmatively).
16        Q.   And sometimes people in New Orleans
17   let their dogs unleashed in their front-gated
18   yards?
19        A.   Yes.
20        Q.   And so you anticipated that there
21   could be dogs in this particular front-gated
22   yard; right?
23        A.   When I was walking up, but when I --
24   You know, I -- I pretty much figured that there
25   wasn't dogs, and I actually verbally said, "No
```

**EXHIBIT A**

```
 1   present, you're thinking about that.  If
 2   there's no dogs, you're thinking about the
 3   absence of dogs?  Would you agree?
 4        A.   Uh-huh (indicating affirmatively).
 5        Q.   Is that a yes?
 6        A.   Yeah.
 7        Q.   The only reason I say yes is because
 8   "uh-huh" sometimes doesn't show up well on the
 9   transcript.
10        A.   Okay.
11        Q.   And then once you were inside the
12   gate, you heard barking; correct?
13        A.   Yes, after I was well inside the
14   gate.
15        Q.   Did you hear the barking of one dog
16   or more than one dog?
17        A.   More than -- I don't recall.  I
18   heard barking.  I can't say.
19        Q.   Well, you started to say more and
20   then you said you don't recall.  Which is it?
21        A.   I mean, I don't -- I don't remember
22   how many dogs I heard -- I heard barking.  I
23   heard barking.
24        Q.   Uh-huh (indicating affirmatively).
25        A.   And it put -- It got me scared and
```

**EXHIBIT A**

 1        Q.   Okay.  And this is the written
 2   policy.  Is there -- To your understanding,
 3   there is no unwritten policy or unwritten rules
 4   or guidelines that NOP -- PD officers follow
 5   other than this written policy?
 6        A.   That's the policy.
 7        Q.   Okay.  And I think when you
 8   encountered Apollo on the -- on the night of --
 9   in -- in April of 2021, can you walk us through
10   some of the -- some major points of how you
11   followed this training?
12        A.   So look for any indication that
13   there was a dog there.  I -- I knew that there
14   was a possibility there -- there could be, and
15   in those situations, I'd take measures such as,
16   you know, look for the food and water bowl, dog
17   toys, dog poo in the yard, any, you know, other
18   thing that might indicate the presence of a
19   dog.  Also, I did attempt to make the noises
20   that would make the dog make itself known.
21   None of those factors were there.
22             Usually if you think a dog is there,
23   you can call the -- have the dispatcher call
24   the complainant and have them step outside.
25   That wasn't an option in this case because the

**EXHIBIT A**

```
 1   caller was across the street and didn't know
 2   who these two people were that were -- that
 3   were arguing.  So we didn't have a -- a call
 4   back number to be able to call to take that
 5   prevention.
 6            So I entered the yard with my
 7   partner confident that there was likely not to
 8   be a dog in there and -- which is when the two
 9   dogs presented themselves.
10        Q.   And there's been some talk about
11   having a -- a reasonable contingency plan.  A
12   reasonable contingency plan would includes
13   certain things like, like you mentioned,
14   jumping on a police car, jumping over a fence,
15   running away --
16        A.   Those -- Yeah.
17        Q.   -- things along those lines; right?
18        A.   Right.
19        Q.   Can you say whether or not when you
20   were inside the gate at the driveway and you
21   first were -- were put on notice that a dog may
22   be in -- in the property and coming towards
23   you, before you saw the dog when you first
24   heard the dog bark, did you have sufficient
25   advance notice to --
```

**EXHIBIT A**