# NEW ORLEANS POLICE DEPARTMENT

**INCIDENT REPORT** — SUPPLEMENTAL REPORT PAGE 1 OF 37

**ITEM NUMBER:** D-13802-21

## EVENT

| Field | Value |
|---|---|
| SIGNAL | 103 |
| INCIDENT | Disturbance |
| DATE/TIME OCCURRED | 04/10/2021 9:33PM |
| DIST/ZONE/SUB | 6/E/04 |
| STATUS | OPEN; CLEARED BY ARREST; CLEARED BY EXCEPT. (checked); WARRANT ISSUED; UNFOUNDED |
| BULLETIN REQUIRED | YES / NO |
| LOCATION OF OCCURRENCE | 1420 Felicity Street |
| DATE/TIME OF REPORT | 05/25/2021 12:00PM |
| LIGHTING | F |

## VICTIM/REPORTING PERSON

**VICTIM / WITNESS / REPORTING PERSON / INTERVIEW (X)**

- Name: Burmaster, Derrick
- HOME ADDRESS: X — ZIP CODE 70113
- HOME PHONE: X
- BUSINESS ADDRESS: 1930 Martin Luther King Boulevard — ZIP CODE 70113
- BUSINESS PHONE: 504-658-6080
- RACE: X  SEX: X
- SOCIAL SECURITY NUMBER: X
- DRIVERS LICENSE NUMBER: X
- OCCUPATION: Police Officer
- SOBRIETY: X  INJURY: X  TREATED: X
- VICTIM TYPE: X

**VICTIM / WITNESS / REPORTING PERSON / INTERVIEW (X)**

- Name: Brown, Derrick
- DATE OF BIRTH OR AGE: [redacted]
- RACE: W  SEX: M
- HOME ADDRESS: 1420 Felicity Street — ZIP CODE 70130
- BUSINESS ADDRESS: X
- SOCIAL SECURITY NUMBER: X
- DRIVERS LICENSE NUMBER: X
- OCCUPATION: X
- SOBRIETY: X  INJURY: X  TREATED: X
- VICTIM TYPE: X

## OFFENDER NO. 1

- ARRESTED / WANTED (X) / MISSING / RUNAWAY
- CHARGES: X
- ARRESTEE ARMED AT TIME OF ARREST: UNARMED / HANDGUN / SHOTGUN / RIFLE / KNIFE / OTHER WEAPON / AUTOMATIC / SEMI-AUTOMATIC
- ARREST TYPE: ON VIEW / SUMMONS / EXISTING WARRANT

## DESCRIPTION

(Build, Oddities, Scars, Tattoos, Apparel, Speech, Accent, Facial Oddities, Eyes, Nose, Teeth, Hair Color, Hair Style, Facial Hair, Complexion — form checkboxes, none marked)

## CODES

(Race, Victim Type, Sobriety, Injury, Treated, Victim Relationship To Offender code tables)

## ADM

| Field | Value |
|---|---|
| DETECTIVE | Reporting |
| REPORTING OFFICER | Debra N. Pruitt |
| BADGE | 449 |
| SUPERVISOR | Sabrina Richardson  Capt. [signature] |
| BADGE | 48 |
| REPORTING CAR # | 2148 |

**EXHIBIT 37**

**New Orleans Police Department**
**Public Integrity Bureau**
**Force Investigation Team**
**Supplemental #1**

**Date: April 10, 2021** **Time: 9:33PM** **Item: D-13802-21**

**Offense:** Disturbance **District:** 6/E/04 **Weapon:** Glock model 17, 9mm

**Location:** 1420 Felicity Street, New Orleans, Louisiana, 70130

**Gist:**

On Saturday, April 10, 2021, at about 9:33AM, New Orleans Police Officers Derrick Burmaster and John Roussel were dispatched to a disturbance in the 1400 block of Felicity Street. The officers met with the 911 caller and learned a disturbance occurred at 1420 Felicity Street. Both officers relocated to 1420 Felicity Street and approached an iron fence securing the property. Officer Burmaster audibly checked for a dog in the yard before entering by making kissing noises. After there was no response from any animals, both officers entered the unlocked gate and proceeded toward the two-story home.

The officers walked toward a door on the first level and as they neared an exterior staircase, two dogs rushed down the staircase. Officer Roussel immediately ran for the gate and exited the yard as the larger of two dogs chased behind. Officer Burmaster immediately removed his firearm and remained stationary as the smaller of the two dogs ran toward him. Officer Burmaster fired at the smaller dog three times, who collapsed and died on scene.

On Saturday, April 10, 2021, at about 9:57PM, New Orleans Police Department's Force Investigation Team were notified of the Level Four Use of Force by New Orleans Police Officer Derrick Burmaster. On Saturday, April 10, 2021, at about 10:40PM, Sergeant Debra Pruitt arrived on scene, and was assigned lead criminal investigator.

**Involved Officer: Officer Derrick Burmaster**

**Wounds:**
**(Apollo)**

Dorsoventral through and through gunshot wound with fracture of 2 ribs and pulmonary laceration
Partial fractures of both forelimbs and right rear limb
(Multiple projectile fragments were recovered during the necropsy)

**Location of Offense:**

1420 Felicity Street
New Orleans, Louisiana, 70130

---

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

**EXHIBIT F**

**Date and Time of Offense:**

Saturday, April 10, 2021 Time: 9:33PM

**Scene Description**

On Saturday, April 10, 2021, at about 10:40PM, the temperature was 70 degrees Fahrenheit, the sky was partly cloudy, and the ground was free of moisture. 1420 Felicity Street was in the New Orleans Police Sixth District, between Prytania Street and Coliseum Street. Felicity Street was cordoned at Prytania and Coliseum Streets denying access to vehicle and pedestrian traffic.

1420 Felicity Street was a multi-family, two-story home located on the west side of Felicity Street located in the middle of the block. The residence was secured with a black, wrought-iron fence surrounding the yard. The fence had two secured openings, one being the pedestrian entryway and the other a vehicle entryway. Two black mailboxes hung south of the pedestrian entryway with faded white stickers. The pedestrian entryway was unlocked and opened to the front yard of 1420 Felicity Street. The ground at the pedestrian entryway was paved with various shades of red brick and was raised using three levels of steps. A large heat lamp was on its side from the second level of brick step as disc-shaped top was smashed onto the concrete pavers below. The brick paved walkway led to an exterior staircase to the front of the residence. The remainder of the yard was paved using various shaped concrete pavers with grass and rocks between. On each side of the yard was garden space with various plants and trees.

The first level of the residence was a rental with the front door observed at the front side of the residence on the left as it is viewed from the street. Past the concrete paved lot, the lower residence had a small patio with the upper-level staircase covering above. The staircase was on the right side of the residence as it was viewed from the street and it led to the second-level residence. The door to the second level was marked with the number 1420 and it was on the left side of the residence as it was viewed from the street. The house was white in color with tan shutters and light blue steps on the staircase.

Within the area of the concrete pavers toward the wrought-iron fence lay a deceased canine, Apollo.

Apollo was approximately a five-month-old, male, Catahoula Leopard Dog weighing 23.7 lbs. Apollo had a white and merle hair coat and light blue eyes. Apollo was positioned on his left side, his body facing westbound. Blood pooled near Apollo's chest and stomach. Defects were observed on Apollo's front legs and feet, exposing the bone in some areas. Upon further observation, a defect was observed between the shoulder blade near the neck and on the chest. Additional defects were observed on Apollo's forelimbs and right rear limb.

Two spent casings were located on scene, one at the pedestrian entrance inside the yard and one at the vehicle entrance just outside the gated perimeter. The officer's round count determined he fired three times. The on-scene investigators canvassed the scene for the third casing but met with negative results. The third casing was located on the following day following a clean-up of the yard by the owner Derek Brown. The casing was located in the street a few feet from the curb in front of 1420 Felicity Street.

**Evidence:**

**On Saturday, April 10, 2021, the following items were collected by Crime Lab Technician Lashay Robbins at 1420 Felicity Street:**

12:59AM: Cone #1: One DNA swab from WIN 9mm luger spent casing.
The swab was collected and retained. No testing was required of the item.

12:59AM: Cone #1: WIN 9mm luger spent casing (sidewalk in front of 1420 Felicity Street)
The spent casing was compared found to be fired from the weapon in this case.

1:00AM: Cone #2: One DNA swab from WIN 9mm luger spent casing
The swab was collected and retained. No testing was required of the item.

1:00AM: Cone #2: WIN 9mm luger spent casing (front yard of 1420 Felicity Street)
The spent casing was compared found to be fired from the weapon in this case.

1:02AM: One swab of blood from Apollo (front yard of 1420 Felicity Street)
The swab was collected and retained. No testing was required of the item.

**On Sunday, April 11, 2021, the following items were collected by Crime Lab Technician Charmaine Smith at 1420 Felicity Street:**

4:19PM: One WIN 9mm luger spent casing (street in front of 1420 Felicity Street)
The spent casing was compared found to be fired from the weapon in this case.

**On Thursday, April 15, the following items were collected by Sergeant Debra Pruitt following a necropsy of Apollo at 491 Skip Bertman Drive, Baton Rouge (LSU's Veterinary School of Medicine).**

1:33PM: One clear bag containing jacket projectile from right hind limb
One clear bag containing (4) bullet fragments from left ear
One clear bag containing bullet fragments from right forearm
One clear bag containing multiple bullet fragments from left forelimb
No information was obtained from the fragments removed from Apollo.

1:33PM: One clear bag containing multiple pieces of plant/tree debris
The debris was retained as items removed from Apollo's fur during the necropsy. No testing was required of the items.

**Weapon Used by Officer:**

Glock 17, 9mm handgun
Serial # NO2261PD

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

**-Interviewed Subjects-**

Mrs. Julie Barecki-Brown, white female, date of birth [redacted] 1420 Felicity Street, New Orleans, Louisiana 70130, Phone number: [redacted]

Mr. Derek Brown, white male, date of birth [redacted] 1420 Felicity Street, New Orleans, Louisiana 70130
Phone number: [redacted]

Ms. Heather Kleen, white female, date of birth [redacted]
Phone number: [redacted]

Mr. Walter Juarez, Hispanic male, date of birth [redacted]
Number: [redacted]

Mrs. Wendy Lane, white female, date of birth [redacted] and Mr. Ashley Lane, white male, date of birth [redacted] New Orleans, Louisiana 70130, phone number: [redacted]

Mr. Bryan Perilloux, white male, date of birth [redacted] Ms. Karen Brown, white female, date of birth [redacted] phone number: [redacted], and Ms. Olga Aaragon, white female, date of birth [redacted] phone number: [redacted], [redacted] New Orleans, Louisiana 70130

Mr. Michael Gottwald, white male, date of birth [redacted] New Orleans, Louisiana, 70130 Phone number: [redacted]

Ms. Nadine Haders, white female, date of birth [redacted] New Orleans, Louisiana, 70130 Phone number: [redacted]

Ms. Mary Warner, white female, date of birth [redacted] New Orleans, Louisiana, 70130 Phone number: [redacted]

Ms. Melissa Puglia, white female, date of birth [redacted], [redacted] New Orleans, Louisiana, 70130, Phone number: [redacted]

Mr. Drew Lafontant, white male, date of birth [redacted], [redacted], [redacted] New Orleans, Louisiana, 70130, Phone number: [redacted]

Mr. Travis Hanson, white male, date of birth [redacted] Phone number: [redacted]

Mr. Don King, white male, date of birth [redacted] Phone number [redacted]

Ms. Christina Phan, Asian female, date of birth [redacted] Phone number [redacted]

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

**Investigation:**

On Saturday, April 10, 2021 at about 10:04PM, Sergeant Debra Pruitt, unit 2148 of the New Orleans Police Department's Public Integrity Bureau's Force Investigation Team (PIB-FIT), was notified by Force Investigation Sergeant Clinton Givens of a critical firearms discharge. The location given was 1420 Felicity Street, New Orleans, Louisiana, 70130. Sergeant Pruitt learned New Orleans Police; Sixth District Officers were involved. Sergeant Debra Pruitt was assigned lead investigator.

On Tuesday, April 21, 2020, Sergeant John Helou, of PIB's Force Investigation Team made the following notifications via telephone:

- 10:01 P.M – PIB FIT Sergeant Clinton Givens
- 10:03 P.M. – PIB FIT Detective Shannon Jones-Brewer
- 10:10 P.M. – PIB Deputy Chief Arlinda Westbrook
- 10:11 P.M. – PIB Captain Sabrina Richardson
- 10:20 P.M. – NOPD Command Desk – Sergeant Helou requested Crime Lab and a representative from the NOPD's range staff to the scene.
- 10:23 P.M. – Federal Consent Decree Monitor Jonathan Aronie – Notified via voicemail and later acknowledged notification at 11:26 P.M.
- 10:25 P.M. – Federal Consent Decree Monitor Chet Epperson
- 10:30 P.M. – Independent Police Monitor Susan Hutson
- 10:31 P.M. – Officer Demetrius Smith, assigned to the City Attorney's Office – Left voicemail message and later notified in further detail at 10:55 P.M.

On Saturday, April 10, 2021, a member of the New Orleans Police Department's Sixth District was involved in a critical firearm discharge. On Saturday, April 10, 2021, Officer Derrick Burmaster and Officer John Roussel were dispatched on a disturbance in the 1400 block of Felicity Street. The 911 caller met with Officer Burmaster and pointed out the residence where disturbance coming from, 1420 Felicity Street.

Officer Roussel arrived on scene and was briefed by Officer Burmaster as they walked toward 1420 Felicity Street. Officer Burmaster made kissing noises as they approached 1420 Felicity Street from the sidewalk. Officer Burmaster verbally noted there was no dog in the secured front yard of 1420 Felicity Street prior to entering the wrought iron fence with Officer Roussel.

After entering the secured front yard of 1420 Felicity Street, the officers walked straight to the first-floor door. Before reaching the residence door, two dogs emerged from the second story porch down the staircase to the front yard. Officer Roussel immediately ran to the pedestrian gate out of the yard. Officer Burmaster remained in the fenced front yard as the dogs ran down the staircase into the yard. Bucho, a sixty-five-pound Black Mouth Kurr, entered the yard first and ran toward Officer Roussel who exited the yard. Apollo entered the yard after Bucho, split from Bucho and ran toward Officer Burmaster. Officer Burmaster pointed his firearm and fired three times striking Apollo dead. Bucho retreated back toward the residence.

On Saturday, April 10, 2021, at about 10:40PM, Sergeant Debra Pruitt arrived on scene and observed Felicity Street cordoned at the intersection of Felicity Street and Prytania Street and Felicity Street and Coliseum Street. Sergeant Pruitt was met by Sergeant Clarence Mitchell of the Sixth District, B-Platoon. Sergeant Mitchell advised Officer Derrick Burmaster and Officer John Rousell were on a call for service related

EXHIBIT F

to a disturbance at 1420 Felicity Street. The officers entered the yard and were approached by a dog who was shot by Officer Burmaster. Officer Roussel was struck by bullet fragments and transported to University Medical Center for treatment. Sergeant Mitchell directed Sergeant Pruitt to the front yard of 1420 Felicity Street where Apollo was surrounded by his grieving owners, Mr. Derek Brown and Mrs. Julie Barecki-Brown. Neighbor Ms. Heather Kleen sat nearby supporting the Brown's. Sergeant Mitchell requested SPCA to the scene at Sergeant Pruitt's request.

Sergeant Pruitt observed Apollo was positioned on his left side, his body facing westbound. Mrs. Julie Barecki-Brown was seated on the ground near Apollo's head as Mr. Brown and Ms. Kleen sat on the brick steps nearby. Blood was pooled near Apollo's chest and stomach. Defects were observed on Apollo's front and rear legs and feet, exposing the bone in some areas. Upon further observation, a defect was observed between the shoulder blade near the neck and on the chest. Sergeant Pruitt learned from Mrs. Brown, Apollo was a five-month-old, male, Catahoula puppy.

Mr. and Mrs. Brown respectfully adhered to Sergeant Pruitt's request of clearing the area of the shooting to preserve any evidence in the area. The Brown's and Ms. Kleen retired to their residences and waited for the Force Investigation Team members for further information. Investigating members began canvassing the yard for evidence and located two spent casings, one at the pedestrian entrance inside the yard and one at the vehicle entrance just outside the gated perimeter.

New Orleans Police Department's Crime Lab members A. Sparacino, T. Smith, and L. Robbins arrived on scene. An extra light was placed in the courtyard of 1420 Felicity Street by the team, lighting the dimly lit areas of the yard. Members of the crime lab processed the scene by photographing, measuring, and sketching.

Sergeant Clinton Givens of the Force Investigation Team assisted Sergeant Pruitt by conducting an audio recorded interview with both Mr. and Mrs. Brown and Ms. Kleen.

**Synopsis of Mr. Derek Brown's statement:**

Mr. Brown stated his wife was upset with him because he was not answering her phone calls. When Mr. Brown arrived home, he discovered his wife's phone was damaged and they began arguing. Mr. Brown stated neither of them called the police to their residence and later learned from the officers a neighbor called.

Mr. Brown stated they did not know the police were at the residence, there were no announcements of their presence. The residence door was in the open position, not uncommon for them. They released the dogs from the residence to relieve themselves and get exercise and then heard two or three gunshots and then a dog yelping. Mr. Brown immediately relocated outside after the gunshots and observed two police officers. Mr. Brown stated he observed one white officer and one black officer. The officers were outside the gated perimeter. Mr. Brown stated the white police officer was apologetic for shooting the dog.

Mr. Brown owned a larger dog who was a good guard dog, Mr. Brown did not recall hearing the dog bark. The larger dog was known to bark at everything that comes through the front gate. Mr. Brown stated they have had the deceased dog, Apollo, a Catahoula, for over a month and he was approximately three months old when they received him.

**End of Interview**

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

**Synopsis of Mrs. Julie Barecki-Brown's statement:**

Mrs. Brown stated she and her husband were having a fight but were not expecting the police. Mrs. Brown stated their dogs were outside to relieve themselves. The front door was in the open position and the dogs were allowed to go outside. Mrs. Brown stated she heard the gate open immediately followed by two to four gunshots. She and her husband immediately went outside and observed two police officers (a white officer and a black officer) backing away from the opened gate. The officers were attired in their uniform of light blue shirt, dark pants.

Mrs. Brown stated the dog was dying following the shooting. Mrs. Brown stated she did not recall the officers saying anything and they seemed to not know what they were doing. Mrs. Brown recalled the white officer holding his gun at his side. Mrs. Brown described the officers as shocked.

Mrs. Brown stated she and her husband responded by screaming saying, "this is our baby!"

**End of Interview**

**Synopsis of Ms. Heather Kleen's statement:**

Ms. Kleen stated the Brown's were heard arguing but when the shooting occurred the arguing had ceased. There was no indication of the police being on the property. Ms. Kleen stated after she heard approximately four gunshots the Browns came down from their residence down to their injured dog, Apollo. Ms. Kleen relocated outside and observed Mr. Brown at the gate as a black police officer was shaking his head at the shot dog. The white police officer was outside the gate. Ms. Kleen stated what the officers did was extreme.

**End of Interview**

Following the statements taken by Sergeant Clinton Givens, Sergeant Pruitt learned of a second dog present during the shooting incident. Sergeant Pruitt relocated with Crime Lab upstairs to the Brown's residence. Mr. Brown leashed the dog, learned to be Bucho a sixty-five-pound Black Mouth Kurr. Mr. Brown presented Bucho who was growling at the time for photographs by the Crime Lab Technicians.

Sergeant Pruitt learned Command Desk made several attempts to notify SPCA only being able to leave a message. As the processing of the scene was coming to an end Sergeant Pruitt knew Apollo would need to be properly preserved pending a necropsy. Sergeant Pruitt contacted the New Orleans Coroner's Office however they were be unable to take Apollo into storage. Sergeant Pruitt contacted Metairie Small Animal Hospital, a 24-hour Veterinary Hospital located at 101 Metairie Road, Metairie, Louisiana 70005.

Sergeant Pruitt received consent from Metairie Small Animal Hospital to bring Apollo who would be stored at the facility in a freezer until the ASPCA was open and he could be transferred.

On Saturday, April 10, 2021, Sergeant Pruitt documented the following evidence pickup:

12:59AM: Cone #1: One DNA swab from WIN 9mm luger spent casing.

12:59AM: Cone #1: WIN 9mm luger spent casing (sidewalk in front of 1420 Felicity Street)

1:00AM: Cone #2: One DNA swab from WIN 9mm luger spent casing.

1:00AM: Cone #2: WIN 9mm luger spent casing (front yard of 1420 Felicity Street)

1:02AM: One swab of blood from Apollo (front yard of 1420 Felicity Street)

**End of evidence collection**

Following the evidence collection, Sergeant Pruitt got a closer look at Apollo with Crime Lab. Sergeant Pruitt closely observed Apollo on each side of his body for defects related to the shooting. Sergeant Pruitt noted defects to the front and rear forelegs, one defect to the back near the shoulders and one defect to the chest area. Additional photographs were taken of the defects by Crime Lab.

Sergeant Pruitt prepared for the collection of Apollo. Prior to Apollo's collection, the Brown family took time with their fifteen-year-old daughter and visited with the family pet for the last time. Following their visit, Sergeant Pruitt used a large paper bag and with the assistance of Mr. Derek Brown placed Apollo inside. Sergeant Pruitt used a black plastic bag provided by Sergeant Givens and placed the contents in it. Sergeant Pruitt carried Apollo's remains to her police unit and he was placed on the rear seat.

The scene was cleared, and Sergeant Pruitt relocated to Metairie Small Animal Hospital and arrived on Sunday, April 11, 2021 at about 2:00AM. Sergeant Pruitt carried Apollo inside the hospital and into a room with a deep freezer. Sergeant Pruitt placed Apollo into the freezer and planned later on the same day for Apollo's transfer to the ASPCA.

Sergeant Pruitt reviewed the following BWC footage:

**Synopsis of Officer Derrick Burmaster's BWC footage**

Officer Burmaster arrived on Felicity Street, parked on the east side of Felicity Street facing Coliseum Street. The Mayfair Condominiums were on the left and 1420 Felicity Street on the right. The front yard of 1420 Felicity Street was in view however, a vehicles parked in front of the residence blocked the sidewalk, the wrought iron fence, and the inside of the yard. Officer Burmaster opened the door to his patrol car and was heard asking, "what's going on?" and closed the car door.

A white male subject behind an iron fenced parking lot stated: Its coming from over there, bottom left apartment, possibly domestic, heard screaming and items breaking, only heard one person. Officer Burmaster directed the man back inside stating he would take care of it.

06:13: Officer Roussel pulled up behind Officer Burmaster's vehicle and exited. Officer Burmaster advised, the witness stated he heard only one voice yelling and directed Officer Roussel to the location as they walked together.

06:42: The officers walked on the sidewalk in front of 1422 Felicity Street then to 1420 Felicity Street. Officer Burmaster made kissing noises as he will still in front of 1422 Felicity and at the edge of 1420 Felicity Street.

06:46: As Officer Burmaster approached the pedestrian gate he said, no dogs.

06:50: Officer Roussel opened the pedestrian gate, entered and Officer Burmaster followed behind.

The yard was illuminated by a standing lamp nearest the pedestrian entrance and by a light affixed on the residence nearest the lower-level door and a light illuminated from the upstairs residence.

06:58: The pedestrian gate slammed twice behind both officers as they entered the yard.

07:03: As the officers walked from the open courtyard toward the covered porch of the first level the officers stopped as the deep low voice of a dog was heard. One of the officers responded, "Oh shit!"

07:06: As Officer Roussel quickly turned to his left and fled, Officer Burmaster remained in the same position. Before the dogs came down the steps, Officer Burmaster already released his firearm from the holster and held it up pointing toward the staircase.

Officer Burmaster's BWC was poisoned on the left side of his jacket near the zipper below the star and crescent.

07:08: Officer Burmaster's turned his body to the left and as the smaller of the two dogs ran down the elevated brick steps. Officer Burmaster fired the first shot toward the smaller dog as he cleared the steps. The dog continued forward, and Officer Burmaster fired a second time. As the dog neared Officer Burmaster, the dog's head was in the downward position and was fired upon a third time by Officer Burmaster. The dog tumbled over on his side crying.

07:12: As Officer Burmaster was making his way out of the yard a woman was heard screaming. Officer Burmaster yelled, "It's the police!" and Officer Roussel walked away rubbing the underside of his right arm.

07:15 Officer Burmaster continued to say, it's the police as the owners emerged screaming and the once standing heat lamp was knocked over by the owner Derek Brown as he screamed, "What the fuck!"

The following was the conversation between Officer Burmaster and the Brown's"

Officer Burmaster: "Sorry man."

Mrs. Brown: (screaming) Oh my God, what did you do, what did you do! No, No, No! What did you do! followed by a scream

Officer Burmaster: I'm so sorry. (transmission to the radio): It was me Sarge, it was a dog.

Mrs. Brown cried out: That's a baby, That's a puppy! What the fuck is wrong with you! It's a puppy!

Officer Burmaster: I'm sorry, I made noises to see if the dog would come down and no dog came down. Damn it! (transmission to the radio): Sarge just a dog.

Officer Burmaster: I'm so sorry. Why did ya'll let the dogs out?

Mrs. Brown: (sobbing) No! How could you do that, how could you shoot a puppy?

Officer Burmaster: I didn't mean, ma'am.

CONFIDENTIAL

NEW ORLEANS POLICE DEPARMENT Item: D-13802-21 Page 11 of 37

Mrs. Brown: How could you shoot puppy? How could you do this? How could you, he's a baby, he's three months old now

Officer Burmaster: (transmission to radio) 647, I need an EMS unit over here

Dispatcher: whatcha have for EMS

Officer Burmaster: One of the officers has a small cut on his arm, a graze.

Mrs. Brown: No!

Officer Burmaster: Ma'am, when I came up, I made kissy noises to get a dog, if there was a dog behind the fence.

Mrs. Brown: It doesn't matter what you did, it's not okay for you to use a fucking gun

Officer Burmaster: Why did you let the dog out ma'am

Mrs. Brown: No, it's not okay. No, how could you do that!

Officer Burmaster: I'm so sorry.

Mrs. Brown: You can't do this!

Officer Burmaster: Ma'am I'm so sorry

Mrs. Brown: He's a baby, he's fifteen months old, he was our baby. No!

Officer Burmaster: (transmission over the radio) ma'am can you start another unit.

Officer Burmaster: Ma'am I'm so sorry

Mrs. Brown: I don't care what you say

Officer Burmaster: I made kissy noises to get, if there was a dog behind the fence to get the dog to come out

Mrs. Brown: Just go, can you please not talk to us, please. How could you shoot a puppy? You just shot a fucking puppy. This is the love our life.

Officer Burmaster: I'm sorry man, I tried to…

Mrs. Brown: No! Oh my God! No, no, no

Mr. Brown: What were you people doing here?

Officer Burmaster: The neighbors called because there was a woman yelling and breaking things in this house.

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

EXHIBIT F
CITY DEFENDANTS - 002163

Mrs. Brown: I was yelling, I wasn't breaking things, how could you have shot our fucking puppy! You shot our fucking puppy! What the fuck! This is not, I can't!

Officer Burmaster: I'm sorry

Mrs. Brown: I just can't! This is why guns aren't fucking okay! This is why they're not fucking okay, Jesus fucking Christ. This was the love of our life, how is this possible, he killed him, how is this possible.

Officer Burmaster stepped away from the residence.

Officer Daniel Berrincha approached and asked Officer Burmaster if he was okay, Officer Burmaster stated he was upset and explained he made kissy noises so if there was a dog on the other side of the fence they would come out and no dog came out. So, Me and Roussel thought it would be safe to go in there and try to knock on the door and they let their dogs out. It was a disturbance.

Officer Burmaster relocated to the other side of the street and asked if a rank was coming out.

15:14: Officer Burmaster explained what happened to Sergeant Clarence Mitchell. Sergeant Mitchell relocated to yard observed the dog. Sergeant Mitchell advised the dispatcher it was a dog shooting and EMS was needed for an injured officer. Officer Burmaster told Sergeant Mitchell: **"it scared; it startled the junk out of me Sarge"**

16:32: Mr. Brown walked out of his yard to Sergeant Mitchell and Officer Burmaster. Officer Burmaster: "I'm so sorry man."

Mr. Brown: "so, you're the one who shot my dog?"

Officer Burmaster: "Yes sir, I apologize to you. The dogs were inside, and we went to come to the bottom door and ya'll let the dogs out."

Sergeant Mitchell instructed Officer Burmaster to go to his car. Officer Burmaster relocated to his vehicle and continued to ask Officer Roussel who was nearby, why would they let the dogs out.

17:36: Officer Burmaster continued to discuss the incident with another officer (the officer was unknown as he was in his patrol car and unable to be seen due to the darkness of the area) who asked if the dog was running towards him, Officer Burmaster replied yes. The officer asked if he tried jumping the fence, Officer Burmaster stated: "I couldn't get over the fence fast enough" Officer: "Oh, so you were already in the yard and the dog was running toward you?" Officer Burmaster: "Yeah."

17:59: EMS sprint car arrived: Officer Roussel told the paramedic he had shrapnel. The medic asked if he wanted to go to the hospital, Officer Roussel declined. The medic identified the object as lead, picked it out and dropped it. The medic was unsure if he removed everything, and recommended a tetanus shot and getting it checked for additional pieces that may possibly remained.

Officer Roussel relocated to Tulane Medical Center with the medic for additional treatment.

22:40: Sergeant Mitchell approached Officer Burmaster who said, "I had no choice". Sergeant Mitchell said he

needed a public safety statement is anybody hurt, anybody else been hit. Officer Burmaster's answer was not audible. Sergeant Mitchell responded, "alright," and walked away.
Officer Burmaster asked Sergeant Mitchell what happens next. Sergeant Mitchell stated the FIT team would come out. He could not ask him any more questions other where the evidence would be located. Officer Burmaster stated inside the gate. "You don't know how many times you shot?" Officer Burmaster said I don't know. Sergeant Mitchell instructed Officer Burmaster to sit in his car and asked if he had any crime scene tape. Officer Burmaster commented he did not really want to go back over there. Sergeant Mitchell sent him over to Officer Roussel's vehicle, parked behind his.

30:30 – Officer Franklin walked over asking Officer Burmaster if he was good. Officer Burmaster answered yes stating he felt bad about the dog. Officer Franklin stated, Yeah me too. Officer Franklin stated he heard screaming and that it was a firearm discharge and wanted to make sure he was good. Officer Franklin stated he did the right thing by walking away, by not letting them continue to see him. Officer Burmaster stated that was the last thing he needed to happen. Officer Franklin commented, exactly and walked away.

36:09: Sergeant Mitchell handed Officer Burmaster his phone with Sixth District Lt. Kevin Burns on speaker phone. Lt. Burns asked Officer Burmaster if he was alright, he replied yes sir. Lt. Burns explained the process of the investigation involving FIT and that he could talk to his attorney, the Chaplin, or his family if he chooses to.

Following the conversation, Sergeant Mitchell instructed Officer Burmaster to have a seat in the car. Officer Burmaster commented it was hard to sit down. Officer Burmaster stated, "Sarge it was 100% legit you saw it on camera." Sergeant Mitchell signaled for Officer Burmaster to stop talking, stating, "Don't say nothing, it's for your own good, take my word for it."

50:25: Sergeant Mitchell advised Officer Burmaster he would write a report about the call he was dispatched to and while responding there was a firearms discharge.

1:09: Sergeant Pruitt arrived and met with Sergeant Clarence Mitchell.

1:10: Officer Burmaster tells Officer Franklin he feels better because it's been a few minutes compared to at first when it happened.

1:25: Sergeant Mitchell instructed Officer Burmaster to turn his BWC off.

**End of Officer Burmaster's BWC footage**

## Synopsis of Officer Derrick Burmaster's ICC footage

Officer Burmaster arrived on Felicity Street, parked on the east side of Felicity Street facing Coliseum Street. The Mayfair Condominiums were on the left and 1420 Felicity Street on the right. The front yard of 1420 Felicity Street was in view however, a vehicles parked in front of the residence blocked the sidewalk, the wrought iron fence, and the inside of the yard. Officer Burmaster opened the door to his patrol car and was heard asking, "what's going on?" and closed the car door.

About five minutes after Officer Burmaster's arrival, Officer Burmaster and Officer John Roussel were observed walking on the sidewalk to 1420 Felicity Street.

06:24: entered the yard

06:35: Officer Roussel ran from inside the yard back to the gate

06:39: As Officer Roussel was exiting the gate, Officer Burmaster was observed walking backward as three gunshots were heard

06:41: Officer Burmaster cautiously retreated out of the yard and a woman began screaming

The remainder of the video footage did not provide any further footage of the incident.

**End of Officer Burmaster's ICC Footage**

**Synopsis of Officer John Roussel's BWC footage**

Officer Roussel arrived on scene, exited his vehicle and met Officer Burmaster as he was standing on the sidewalk.

02:00: Officer Roussel stated he was advised by the complainant that he heard a female yelling. Officer Burmaster and Officer Roussel walked across the street as Officer Burmaster said, it's over here, let me show you.

02:20: The officers walked on the sidewalk in front of 1422 Felicity Street then to 1420 Felicity Street. Officer Burmaster made kissing noises as he will still in front of 1422 Felicity and at the edge of 1420 Felicity Street.

02:24: As Officer Burmaster approached the pedestrian gate he said, no dogs.

02:28: Officer Roussel opened the pedestrian gate and entered.

The yard was illuminated by a standing lamp nearest the pedestrian entrance and by a light affixed on the residence nearest the lower-level door and a light illuminated from the upstairs residence.

02:37: The pedestrian gate slammed twice behind both officers as they entered the yard.

02:42: As the officers walked from the open courtyard toward the covered porch of the first level the officers stopped as the deep low voice of a dog was heard. One of the officers responded, "Oh shit!"

02:43: As Officer Roussel quickly turned to his left to flee, Officer Burmaster's right hand automatically went for his firearm. Officer Roussel's right hand reached out toward Officer Burmaster as he fled to the pedestrian entrance as a large dog was howling.

02:45: Officer Roussel reached out grabbing the standing lamp near the pedestrian entrance as a large dog was howling and Officer Burmaster was heard saying, "get back!"

02:46: Officer Roussel grabbed the pedestrian gate with his left hand opening it.

02:47: As Officer Roussel was making his way through the opened gate three gunshots were fired.

02:48: Officer Roussel exited the pedestrian gate and held onto the it as a large tan dog with a black mussel ran toward the fence. When the shots were fired, the dog stopped before reaching the pedestrian gate and ran back to the residence.

02:49: Officer Roussel yelled, "Hey!" as he lifted his right arm looked at the underside as there were cries of a dog from within the yard.

02:51: As Officer Burmaster was making his way out of the yard a woman was heard screaming. Officer Burmaster yelled, "It's the police!" and Officer Roussel walked away rubbing the underside of his right arm.

03:01: Officer Burmaster continued to say, it's the police as the owners emerged screaming and the once standing heat lamp was knocked over by the owner Derek Brown as he screamed expletives.

The following was the conversation between Officer Burmaster and the Brown's"

Officer Burmaster: "Sorry man."

Mrs. Brown: (screaming) what did you do! No, No, No! What did you do!

Officer Burmaster: I'm sorry.

Mrs. Brown cried out: It's a baby, it's a puppy! What the fuck is wrong with you!

Officer Burmaster: I'm sorry, I made noises to see if the dog would come down and no dog came down. I'm so sorry. Why did ya'll let the dogs out?

Mrs. Brown: Why did you do that? How could you shoot a puppy?

Officer Burmaster: I didn't mean, mam. When I came up, I made kissy noises to get a dog

It doesn't matter what you did, it's not okay for you to use a gun, no its not okay. No, how could you do that

I'm sorry, ma'am I'm so sorry

He's a baby, he's (unable to understand)

Ma'am I'm so sorry

Mrs. Brown: I don't care what you say

Officer Burmaster: I made kissy noises to get, if there was a dog behind the fence to get the dog to come out

Mrs. Brown: Just go, can you please not talk to us, please. How could you shoot a puppy? You just shot a fucking puppy. This is the love our life

Officer Burmaster: I'm sorry man, I tried to...

Mr. Brown: What were you doing here

Officer Burmaster: The neighbors called because there was a woman here yelling and breaking things in this house.

Mrs. Brown: I was yelling, I wasn't breaking things, how could you have shot our fucking puppy! You shot our fucking puppy! What the fuck! This is not, I can't!

Officer Burmaster: I'm sorry

Mrs. Brown: This is why guns aren't fucking okay! This is why they're not fucking okay, Jesus fucking Christ. This was the love of our life, how is this possible, he killed him, how is this possible

Officer Roussel stepped away from the residence.

12:43: Officer Burmaster relocated over to Officer Roussel away from the Brown family. Officer Burmaster stated, "why would they let the dogs out?" Officer Roussel replied, "who knows"

13:09: Officer Burmaster continued to discuss the incident with another officer stating, "I couldn't get over the fence fast enough" Officer: Oh, so you were already in the yard and the dog was running toward you. Officer Burmaster: Yeah

13:42: EMS sprint car arrived: Officer Roussel told the paramedic he had shrapnel. The medic asked if he wanted to go to the hospital, officer Roussel declined. The medic identified the object as lead, picked it out and dropped it. The medic was unsure if he removed everything, and recommended a tetanus shot and getting it checked for additional pieces that may possibly remained.

Officer Roussel relocated to Tulane Medical Center with the medic for additional treatment.

**End of Officer Roussel's BWC footage.**

**Synopsis of Officer John Roussel's ICC footage**

Officer Roussel parked his vehicle a short distance behind Officer Burmaster's vehicle on the eastside of Felicity Street. As Officer Roussel pulled up, Officer Burmaster was observed standing on the sidewalk on the same side where the officers parked.

01:33: After Officer Roussel exited his patrol car he and Officer Burmaster walked across the street to 1420 Felicity Street.

02:12: Three gunshots were heard followed by a woman screaming.

The footage captured from the in-car camera was dark did not capture any further footage of the incident.

**End of Officer Roussel's ICC Footage**

Members of the New Orleans Police, Public Integrity Bureau assisted in the investigation. The following information was documented by the respective investigators.

*"On Saturday, April 10, 2021, at 9:57 P.M., Sergeant John Helou, unit 2141 of the Public Integrity Bureau's Force Investigation Team (PIB FIT) received a telephone call from 6th District Assistant Commander Lieutenant Kevin Burns, Jr. Lieutenant Burns informed Sergeant Helou of a critical firearm discharge in the 6th District, specifically the 1400 block of Felicity Street. Officer Derrick Burmaster reportedly discharged his firearm at a dog, striking the dog. Additionally, 6th District Officer John Roussel reportedly received an injury during this incident, possibly from shrapnel. Officer Burmaster was sequestered on-scene; Officer Roussel was transported to the hospital, later learned to be Tulane Medical Center.*

*Upon receipt of this information, Sergeant Helou made the following notifications:*

*10:01 P.M – Sergeant Clinton Givens (PIB FIT Criminal Unit Supervisor) – Informed Sergeant Helou that PIB FIT Sergeant Debra Pruitt would be lead criminal investigator. Sergeant Givens advised at 10:12 P.M. that he would head to the scene to supervise the investigation. Sergeant Givens requested Sergeant Helou go to the hospital to check on Officer Roussel and perform any required investigative steps at the facility.*

*10:03 P.M. – PIB FIT Detective Shannon Jones-Brewer – Advised by Sergeant Helou (PIB Administrative Unit Supervisor) to head to the scene as the lead administrative investigator.*

*10:10 P.M. – PIB Deputy Chief Arlinda Westbrook – Notified of the incident.*

*10:11 P.M. – PIB Captain Sabrina Richardson – Notified of the incident.*

*10:20 P.M. – NOPD Command Desk – Sergeant Helou requested Crime Lab and a representative from the NOPD's range staff to the scene.*

*10:23 P.M. – Federal Consent Decree Monitor Jonathan Aronie – Notified via voicemail and later acknowledged notification at 11:26 P.M.*

*10:25 P.M. – Federal Consent Decree Monitor Chet Epperson – Notified of the incident.*

*10:30 P.M. – Independent Police Monitor Susan Hutson – Notified of the incident and advised would respond to the scene.*

*10:31 P.M. – Officer Demetrius Smith, assigned to the City Attorney's Office – Let voicemail message and later notified in further detail at 10:55 P.M.*

*While making these notifications, Sergeant Helou prepared to respond to Tulane Hospital. At 11:02 P.M., while en route to the hospital, Sergeant Helou received a telephone call from Assistant Superintendent John Thomas. Assistant Superintendent Thomas informed Sergeant Helou that he was currently at Tulane Hospital with Officer Roussel and would await the sergeant's arrival.*

*At around 11:09 P.M., Sergeant Helou arrived at Tulane Hospital, where he met with Assistant Superintendent Thomas and Officer Roussel inside a waiting room area. Officer Roussel was in the process of completing required (due to injury) substance abuse testing administered by a Toxicology and Drug Analysis Laboratory (TDAL) representative William Montgomery. Following the completion of these tests, Sergeant Helou asked Officer Roussel if he was ok. Officer Roussel advised he was ok and that he was awaiting some*

*bloodwork test results and would be discharged from the hospital shortly. Officer Roussel informed Sergeant Helou that he was treated on-scene by EMS for a graze wound to his right forearm.*

*An unknown EMS paramedic removed a small, suspected bullet fragment from his wound, but the paramedic dropped this fragment onto the ground and could not locate it. An EMS "Sprint" vehicle then transported Officer Roussel to Tulane Hospital. Officer Roussel advised he had not yet spoken with a supervisor regarding this incident, except for Assistant Superintendent Thomas.*

*At 11:35 P.M., Sergeant Helou obtained a Public Safety Statement (PSS0 from Officer Roussel inside the waiting room area. Officer Roussel recalled hearing three shots fired. No suspects were at large, and a dog sustained injury. Officer Roussel also sustained injury and didn't see any evidence regarding this incident. Sergeant Helou obtained a telephone number for Officer Roussel:* [redacted]

*Shortly after obtaining this statement, Officer Roussel was discharged from the hospital. Sergeant Helou relocated with Officer Roussel to the scene, arriving at 11:55 P.M. Officer Roussel was then sequestered inside his police vehicle.*

*On Sunday, April 11, 2021, at around 12:06 A.M., NOPD Range instructor Officer Steven Fox, unit 5791, began to inspect Officer Burmaster's department-issued firearm and remaining ammunition. Prior to beginning this process, Crime Lab Technician L. Robbins, unit 5132, photographed the officer and during the process, photographed the officer's firearm and remaining ammunition. Crime Lab supervisor T. Smith, unit 5130, supervised Technician Robbins' actions.*

*Sergeant Fox inspected Officer Burmaster's department-issued Glock 17 9mm semi-automatic handgun (Serial # NO2261PD). The firearm contained one live round in its chamber and its inserted magazine contained thirteen live rounds (14 total live rounds) – all ammunition was authorized. Sergeant Helou, based on the magazine's seventeen round capacity, believed Officer Burmaster fired three rounds during this incident. Officer Fox then inspected Officer Burmaster's two spare seventeen round capacity magazines; each magazine contained seventeen rounds of authorized ammunition.*

*During this inspection, Officer Burmaster admitted to Sergeant Helou that he was not wearing his soft body armor; the officer's body armor was currently located at his house. Sergeant Helou obtained Officer Burmaster's telephone number:* [redacted]

*On Sunday, April 11, 2021, at around 12:37 A.M., NOPD Range instructor Officer Steven Fox, unit 5791, began to inspect Officer Roussel's department-issued firearm and remaining ammunition. Prior to beginning this process, Crime Lab Technician L. Robbins, unit 5132, photographed the officer and during the process, photographed the officer's firearm and remaining ammunition. Crime Lab supervisor T. Smith, unit 5130, supervised Technician Robbins' actions.*

*Sergeant Fox inspected Officer Roussel's department-issued Glock 17 9mm semi-automatic handgun (Serial # NO2871PD). The firearm contained one live round in its chamber and its inserted magazine contained sixteen live rounds (17 total live rounds) – all ammunition was authorized. Sergeant Helou, based on the magazine's seventeen round capacity, determined Officer Roussel did not discharge his firearm during this incident. Officer Fox then inspected Officer Roussel's two spare seventeen round capacity magazines; each magazine contained seventeen rounds of authorized ammunition.*

*During this inspection, Sergeant Helou noted that Officer Roussel wore his soft body armor."*

---

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

*"On Saturday, April 10, 2021, at 10:03 pm, Detective Brewer was notified by Sergeant Helou of a Dog Shooting (Firearm Discharge) which occurred at 1400 Felicity Street. The involved Officer D. Burmaster was on scene. Sergeant Clarence Mitchell, Unit 620, was on scene. Officer Roussel had been transported to Tulane Hospital.*

*Detective Brewer arrived on scene at 10:51 pm and met with Sergeant C. Givens. Detective Brewer met with Sergeant C. Mitchell who informed Detective Brewer that Officer Burmaster was seated in the marked police Tahoe at the scene. Sergeant C. Mitchell advised he obtained a public safety statement from Officer Burmaster. Sergeant C. Mitchell advised Officer Burmaster badge number as #961 and Employee ID as #12743.*

*Detective Brewer met with Officer Burmaster to obtain information follow-up questions to the public safety statement, regarding where Officer Burmaster was standing during the time of the weapon discharge and which way was Officer Burmaster standing when he fired his weapon? Officer Burmaster responded he was standing in the center of the front yard attached to 1420 Felicity Street, near the bottom apartment. Officer Burmaster stated he was facing in the direction of 1422 Felicity Street when he fired his weapon.*

*At 11:14pm, Detective Brewer spoke with Lt. Cutno regarding the Academy personnel responding to the scene. Lt. Cutno advised Officer S. Fox would respond. Detective Brewer met with S. Hutson (IPM) to provide an update on the incident.*

*At 11:40pm, Detective Brewer was advised by Sergeant C. Mitchell that the resident at 1432 Felicity Street possibly heard shots, Detective Brewer relocated to the residence at 12:03 am, but received no response.*

*Detective Brewer contacted command desk specialist Haynes who informed the incident was dispatched at 21:30pm, as a signal 103 Disturbance. Unit 637 arrived on scene at 21:40. At 21:42 unit 647 advised on a firearm discharge."*

On Sunday, April 11, 2021, at about 8:59AM, Sergeant Pruitt was contacted by SPCA Supervisor, Beth Renfo. Sergeant Pruitt learned the SPCA were not properly notified by communications therefore not receiving the call for service. Sergeant Pruitt provided Beth of Apollo's location and was notified Canine Officer Kellen would be transporting the remains from Metairie Small Animal Hospital to the SPCA. Apollo was picked up by Canine Officer Kellen and transported to the SPCA at about 10:00AM the same day.

SPCA Supervisor Beth Renfo advised Wednesday, April 14, 2021 would be the next available date a necropsy would be scheduled. The owner's information and brief synopsis of the incident was provided to the SPCA. The confirmation of Apollo's necropsy was pending scheduling with the SPCA.

On Sunday, April 11, 2021, at about 10:00AM, Sergeant Pruitt contacted New Orleans Police Department's Canine supervisor, Sergeant Jeff Giror. Sergeant Pruitt requested the assistance of a munitions dog to search for the third discharged casing. Sergeant Giror provided the assistance of Canine Officer Timothy Bender and Canine Paco.

On Sunday, April 11, 2021, Sergeant John Helou and Detective Shannon Brewer assisted in the canvass for the third casing as well as a canvass for witnesses and surveillance footage.

Sergeant John Helou provided the following notes:

*"On Sunday, April 11, 2021, at around 12:15 P.M., Sergeant Helou returned to the 1400 block of Felicity Street to assist Sergeant Pruitt with a canvass and search for additional ballistic evidence, specifically one of Officer Burmaster's three spent bullet casings. Sergeant Helou met K9 Officer Timothy Bender, unit 3658, and his munitions detection dog "Paco." Officer Bender and "Paco" began their search for the casing inside the courtyard of 1420 Felicity Street at 12:20 P.M. While speaking with the male resident of the house outside this courtyard, he informed Sergeant Helou that after the police left earlier that morning, someone cleaned up the area where the dog collapsed and expired after the shooting. Rocks and remnants of the dog were reportedly placed inside a plastic bag; the bag was then placed inside a nearby garbage can.*

*At 12:25 P.M., while continuing this conversation with the male resident, Sergeant Helou located the missing casing in the street, near the curb in front of the residence. Sergeant Helou notified Officer Bender that he located the casing and then requested Crime Lab to the location to process and collect the casing. Sergeant Helou kept watch over the casing as he waited for Crime Lab's arrival until around 2:22 P.M. the same afternoon when Sergeants Helou and Pruitt left the location to respond to an unrelated serious use of force incident. Detective Brewer remained on the Felicity Street scene and kept watch over the casing until Crime Lab arrived and processed, then recovered the casing."*

Detective Shannon Brewer's notes

*"On Sunday, April 11, 2021, Detective Brewer and Sergeant D. Pruitt canvased the area of 1400 Felicity Street for video surveillance and witnesses.*

*At 12:41 pm, Detective Brewer and Sergeant Pruitt met with the resident at [REDACTED] Mr. Waler Juarez H/M [REDACTED] Mr. Juarez stated he heard about 4-5 shots fired, he stayed inside his residence until he saw police vehicles.*

*At 12:49pm, Detective Brewer and Sergeant Pruitt met with Mrs. Wendy Lane [REDACTED] and Mr. Ashley Lane [REDACTED] at [REDACTED] owner of residence. [REDACTED] Mr. and Mrs. Lane stated they heard noises in the area but believed some furniture had fallen outside their residence. Mrs. Lane stated she asked her husband Mr. Lane if he heard anything. Mrs. Lane stated she spoke with her neighbor through a balcony area and was asked about gunshots. Mrs. Lane said she heard something but was not sure if it was gunshots. Mrs. Lane informed Detective Brewer and Sergeant Pruitt that the other residents at [REDACTED] were out of town.*

*At 12:55pm, Detective Brewer and Sergeant Pruitt met with the residents at, Mr. Bryan Perilloux [REDACTED] and Karen Brown [REDACTED] [REDACTED] Olga [REDACTED] [REDACTED] another resident who was at the location in the rear bedroom informed that she heard "3 pops" at around 9:41pm. Olga stated it heard like gunshots. Olga could hear a female crying but did not hear any dogs barking. Olga turned off the lights inside the residence and did not see anything outside.*

*At 1:07pm, Detective Brewer and Sergeant Pruitt checked 1422 Felicity Street. No Response*

*At 1424 Felicity Street, No Response*

*At 1430 Felicity Street, No Response*

---

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

*At 1:11 pm, Detective Brewer and Sergeant Pruitt met with the resident at [redacted] Mr. Michael Gottwald [redacted] Mr. Gottwald stated he came outside his residence and heard a female screaming. Mr. Gottwald walked down towards 1420 Felicity Street and heard a couple yelling loud. Mr. Gottwald observed a guy across the street from 1420 Felicity, near the apartments standing with a gun behind his back. Mr. Gottwald walked back to his residence. About 15 minutes later, Mr. Gottwald heard gunshots and a woman screaming at the officer.*

*Detective Brewer and Sergeant Pruitt met with the resident at [redacted] Nadine Haders [redacted] Ms. Haders was not home at the time of the incident, she arrived home at 10:30pm.*

*At 1436 Felicity Street, No Response*

*At 1800 Prytania Street, No Response*

*At 1780 Prytania Street, No Response*

*At 1443 Felicity Street, No Response*

*At [redacted] Detective Brewer and Sergeant Pruitt met with Mrs. Mary Warner [redacted] Ms. Warner heard "3 pops" then heard a woman crying. Ms. Warner went upstairs inside the residence and could see an officer being treated by EMS.*

*At 1429 Felicity Street, No Response*

*At 1425 Felicity Street, No Response*

*Detective Brewer and Sergeant Pruitt relocated to the Mayfair apartment. The apartment building is located at 1783 Coliseum Street. The right side of the building is directly located across the street from 1420 Felicity Street. Detective Brewer noted the number for building contact as [redacted]*

*Detective Brewer and Sergeant Pruitt checked the front door to the building and confirmed it was locked. Detective Brewer observed a surveillance camera located on the top of the front door facing Coliseum Street. Detective Brewer and Sergeant Pruitt checked the security system located near the front door and located PIN code for each resident.*

*PIN Code # 011, H. Torbert No Response*
*PIN code #016, D. Titus arrived home after the incident, when the street was block off. Mr. Titus disconnected.*
*PIN Code # 004, O. Smith, No Answer*
*PIN code # 013, No Response*

*Detective Brewer met with Ms. Melissa Puglia [redacted] Ms. Puglia stated at about 9:30pm, she was inside [redacted] watching television when she heard 3 shots, she looked out the window and could hear a female screaming, about 5-10 minutes later, she heard sirens. Ms. Puglia allowed Detective Brewer and Sergeant Pruitt access to the building.*

*Apartment A, No Response at the door.*

*Apartment G, No Response at the door.*

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

EXHIBIT F

*Apartment F, No Response at the door.*

*Apartment B, No Response at the door.*

*Apartment E, No Response at the door.*

*Apartment D, No Response at the door.*

*Apartment C, No Response at the door.*

*Apartment L, Detective Brewer met with Mr. Drew Lafontant [redacted] Mr. Lafontant was not home at the time of the incident.*

*Apartment I, No Response at the door.*

[redacted] *Christina Phan* [redacted] *Ms. Phan was not home at the time of the incident.*

*Apartment K, No Response at the door.*

*Apartment H, No Response at the door.*

*Apartment J, No Response at the door.*

*Apartment M, No Response at the door.*

*Apartment P, No Response at the door.*

*Apartment N, No Response at the door.*

*Apartment S, No Response at the door.*

[redacted] *Detective Brewer and Sergeant Pruitt met with Mr. Travis Hanson* [redacted] *Mr. Hanson advised he was the original 911 caller. Mr. Hanson stated he is employed with the* [redacted] *Mr. Hanson stated he heard screams coming from 1420 Felicity Street. Mr. Hanson notified the police. Mr. Hanson spoke with the office when they arrived at the location, Mr. Hanson relocated back inside his residence when he heard gunshots. Mr. Hanson heard the officer say something to the resident at 1420 Felicity Street possibly "I told you to put your dog's up". Mr. Hanson is not exactly sure if that is what the officer said.*

*At 2:48pm, Detective Brewer contacted channel 3 dispatch for the status on Crime Lab. Detective Brewer was informed by channel 3 dispatch that she was awaiting a line-up from the Crime Lab Rank. At 3:40pm, channel 3 dispatch informed that a crime lab unit was needed at 1420 Felicity Street under Item D-13802-21. At 4:10 pm, Crime Lab Unit 5125, C. Smith, arrived at the located. Smith photographed and processed the casing located near the curb directly in front of 1420 Felicity Street. Smith noted the casing was a WIN 9MM. The time of Collection was 4:19pm."*

---

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

On Sunday, April 11, 2021, at about while out on the canvass, Sergeant Pruitt met with Mr. Derek Brown with an update. Sergeant Pruitt notified Mr. Brown of the pending scheduled necropsy set for Wednesday, April 14, 2021 with the SPCA. Sergeant Pruitt notified Mr. Brown he and his wife would be scheduled to meet with the Chief of the Public Integrity Bureau, Arlinda Westbrook and Superintendent Shaun Ferguson with additional information in the near future.

Later the same day, Sergeant Pruitt was contacted by Attorney Tarak Anada of Jones Walker Law Firm, 504-782-8616, tanada@joneswalker.com. Mr. Anada stated he was representing the Brown Family regarding their family pet, Apollo.

On Monday, April 12, 2021, at about 2:00PM, Sergeant Pruitt relocated to the SPCA (1700 Mardi Gras Boulevard, New Orleans, Louisiana, 70114) and met with Supervisor Beth Renfo and Director of Operations Kathryn Destreza. As part of the SPCA's investigation, the available BWC footage was reviewed by the supervisor and director. Following the BWC review, the Director Destreza advised a radiograph would be completed in order to determine if and where any ballistic evidence was in the dog.

On Monday, April 12, 2021, Director of the LASPCA, Kathryn Destreza emailed Sergeant Pruitt the following information. A radiograph was taken of Apollo and foreign bodies were observed believed to be bullet fragments. The director was not able to say for certain until a necropsy was performed.

On Monday, April 12, 2021, at about 1:50PM, Sergeant Pruitt contacted Officer Derrick Burmaster via telephone and asked if he wanted to give a voluntary criminal statement. Officer Burmaster replied he wanted to give a voluntary criminal statement and Sergeant Pruitt set up his statement for Wednesday, April 14, 2021 at 2:00PM.

On Monday, April 12, 2021, at about 3:30PM, Sergeant Pruitt contacted Officer John Roussel via telephone and asked if he wanted to give a voluntary witness statement. Officer Roussel replied he wanted to give a voluntary witness statement and Sergeant Pruitt set up his statement for Wednesday, April 14, 2021 for 1:00PM.

On Wednesday, April 14, 2021, the necropsy was scheduled for the following day, Thursday, April 15, 2021. Sergeant Pruitt agreed to transport Apollo in an insulated cooler provided by the Brown family.

On Wednesday, April 14, 2021, at about 11:19AM, Sergeant Debra Pruitt conducted a video/audio interview with witness Officer John Roussel at 1340 Poydras Street, Suite 1900, PIB Conference Room. Present for the interview was Sergeant Debra Pruitt, Sergeant Clinton Givens, and Officer John Roussel.

**Synopsis of John Roussel's Witness Statement**

On Wednesday, April 14, 2021, at about 2:14PM, Sergeant Pruitt conducted a video/audio interview with Officer Derrick Burmaster at 1340 Poydras Street, Suite 1900, PIB Conference Room. Present for the interview was Sergeant Debra Pruitt, Sergeant Clinton Givens, Officer Derrick Burmaster and Donovan Liviccari. Officer Roussel verbally agreed to provide the Sergeants with a witness statement.

Officer Roussel stated on Saturday, April 10, 2021, he was assigned to the B-Platoon, worked as the early car from 1:25PM-10:00PM, and was attired in a class b uniform. Officer Roussel was wearing a functioning BWC, and his patrol car was outfitted with a functioning ICC.

Officer Roussel stated he and Officer Burmaster were dispatched to the 1400 block of Felicity Street about neighbors arguing inside the residence of 1420 Felicity Street. Upon arrival to the scene, Officer Roussel learned where the fight was, and the residence was secured with a gate. Officer Roussel described Officer Burmaster whistling prior to entering the gate checking for dogs. After there was no response, the officers entered the gate, the gate slammed shut behind them. The officers walked about halfway to the residence when dogs began barking.

Officer Roussel turned and ran to the gate as he observed two dogs running down the steps from the second-floor residence. One was described as a big dog the other was a small dog. Officer Roussel ran out of the gate, turned around and tried to keep the gate open for Officer Burmaster to come through and then heard gunshots. Officer Burmaster stated a piece of the projectile hit his arm. Officer Roussel stated he was trying to get out of the gate because he did not want to get bit. Officer Roussel further stated he did not see what the dogs were doing specifically because his back was turned as he was getting out of the gate. Officer Roussel did not witness the dog approach Officer Burmaster because his back was turned.

Officer Roussel stated he exited the yard, turned around to close the gate and control it to let Officer Burmaster through when he heard gunshots, was struck, and observed the little dog on the ground next to Officer Burmaster and the larger of the two dogs run back toward the house. Officer Roussel stated he first observed Officer Burmaster with his gun out after the shooting. Officer Roussel did not observe Officer Burmaster draw his weapon. Officer Roussel initially heard three shots, but after watching his BWC heard four.

Following the shooting, the owners came running down the stairs screaming, Officer Burmaster ran out of the yard identifying himself as a police officer and repeatedly told the owners he was sorry. Officer Roussel stated he requested a rank on scene over the radio.

Officer Roussel stated he sustained an injury as a result of the gunfire. After Officer Burmaster fired his weapon Officer Roussel immediately felt a burning sensation on his arm. Officer Roussel stated he believed Officer Burmaster was firing at the ground and the hollow point ammunition broke apart striking his arm. EMS personnel arrived on scene and pulled out a piece a bronze/silver piece of metal from his arm. The EMS mistakenly dropped the metal piece on the ground, and it was unable to be located.

Officer Roussel stated he fled the yard because he had the opportunity to do so before the dogs could get to him. Officer Roussel stated his first instinct was flight because he felt he could make it out the gate. Officer Roussel did not consider the taser or the firearm, as it did not cross his mind because he was confident, he would get out the gate in time. Officer Roussel described being about three feet from Officer Burmaster who was to his left side and the gate was to his right side, putting Officer Roussel closest to the gate.

Officer Roussel stated when he exited the gate, he held it open for Officer Burmaster to exit quickly because Officer Roussel believed he was close enough to also exit in time. Officer Roussel was unable to say whether or not Officer Burmaster would or would not have made it out without firing his weapon.

Sergeant Pruitt asked Officer Roussel if there was anything he wanted to add. Officer Roussel stated he went over the BWC he noticed he touched Officer Burmaster and as he's running to the gate, he noticed Officer Burmaster go for his gun. Officer Roussel stated his natural instinct was to flee and Officer Burmaster's instinct was to stand his ground. Officer Roussel stated he would not have taken his gun out in that situation.

From Officer Roussel's memory, he observed two dogs coming down the stairs and heard the sound of a deep bark. Officer Roussel believed the larger of the two dogs was the one barking and did not hear the smaller

dog barking. Officer Roussel did not know which dog was chasing him because he was running out of the gate. When Officer Roussel exited the gate, there were no dogs at the gate. Officer Roussel stated he was more worried about the big dog.

Sergeant Pruitt asked Officer Roussel to stand and observed the injured right arm. The injury was on the back of the officer's right arm. Officer Roussel was asked if he ever witnessed Officer Burmaster over-react on a call. Officer Roussel stated he never observed Officer Burmaster pull his weapon out but has seen him unnecessarily argue with people.

**End of Interview**

On Wednesday, April 14, 2021, at about 2:14PM, Sergeant Debra Pruitt conducted a video/audio interview with involved Officer Derrick Burmaster at 1340 Poydras Street, Suite 1900, PIB Conference Room. Present for the interview was Sergeant Debra Pruitt, Sergeant Clinton Givens, Officer Derrick Burmaster, and his representative Donovan Liviccari.

**Synopsis of Derrick Burmaster's Criminal Statement**

The beginning of the interview captured Officer Burmaster explaining he wanted to read his force statement. Sergeant Pruitt interjected by introducing all members present for the Criminal Statement. Sergeant Pruitt advised Officer Burmaster of his Miranda Rights via form 230. Officer Burmaster affirmed he understood his rights and answered, yes and no when asked if he was willing to talk to Sergeant Pruitt. Officer Burmaster followed up by stating he was willing to talk to Sergeant Pruitt. Officer Burmaster signed form 230 affirming he was advised of his rights. Before beginning the interview, Sergeant Givens and Representative Liviccari stepped out of the interview and returned a short time later.

Officer Burmaster stated on Saturday, April 10, 2021 he was assigned to the New Orleans Police Department's Sixth District, B-Platoon (2:25PM-11:00PM) and was attired in a class B uniform. Officer Burmaster was outfitted with a functioning BWC and his vehicle was outfitted with a functioning front ICC (rear camera not functioning).

Officer Burmaster stated he and Officer John Roussel were dispatched to the 1400 block of Felicity Street to address a fight. The dispatcher's information stated there was an argument at the location. Upon arrival, Officer Burmaster spoke to a witness, suspected 911 caller. The witness stated there was a woman screaming across the street and there were items being broken. The man suspected the incident he witnessed was domestic and pointed to the residence at 1420 Felicity Street, bottom left corner residence.

Sergeant Pruitt asked Officer Burmaster to explain what happened next. Officer Burmaster opened his phone and began reading from the phone. As Officer Burmaster read from his phone, Sergeant Clinton Givens stopped Officer Burmaster and noted he would be able to read his statement but directed Officer Burmaster to answer the specific questions asked by Sergeant Pruitt. Officer Burmaster then stated he declined to answer any further questions as both Officer Burmaster and Representative Livicarri stood from their seats. Officer Burmaster continued to say he prepared the document and spent a lot of time on the document commenting the investigators did not want to hear it.

Sergeant Givens advised Officer Burmaster he was not in control of the interview and needed to follow the format provided by the investigator. Sergeant Pruitt asked Representative Liviccari and Officer Burmaster to continue if that is what they wanted to do. As Officer Burmaster continued to read his statement, Captain

Sabrina Richardson and Sergeant Sam Davis interjected. Captain Richardson advised he could not read his force statement for the Criminal Investigation because it was part of the Administrative Investigation. Captain Richardson asked Officer Burmaster if he was reading his force statement. Officer Burmaster affirmed he was reading his force statement and felt comfortable doing so.

Representative Liviccari stated if Officer Burmaster chose to read his force statement for the Criminal Interview, that was his choice. Captain Richardson wanted to make it clear for the record Officer Burmaster willingly read his force statement as part of his Criminal Statement.

Sergeant Pruitt and Sergeant Givens returned to the conference room and it was made part of the record they understood the force statement was reserved for the administrative investigation and wished to enter the information into the criminal investigation.

Sergeant Pruitt asked Officer Burmaster to explain what happened in his own words. Officer Burmaster stated the residence he was going to was described as an apartment surrounded by a gate. Officer Burmaster stated whenever he approaches a residence with a gate, he checks for dogs. One method used is to make kissing noises which was heard on the BWC. Officer Burmaster stated there was no response to the kissing noises and verbally stated on BWC, no dog.

Noting the residence was an apartment complex, if there were any dogs it would have to be an even-tempered dog that would get along with others. Officer Burmaster stated the apartment complex should not have had any vicious animals. The officer described a vicious animal as a dog that would attack without provocation. Officer Burmaster described the two dogs as vicious and noted the City of New Orleans required a vicious animals to be confined to a cage. The officer stated the owners were guilty of failure to confine a vicious animal, because they possessed a dog that would attack without provocation inside the common area of an apartment complex. Officer Burmaster stated there was no beware of dog sign, no food or water bowls and no response to the kissing noises.

After speaking to the witness of the disturbance, Officer Burmaster stated he was compelled to go beyond the fence. If he did not investigate, he would have been a coward and it would have been neglect of duty as per responding to calls for service. Officer Burmaster stated as he was inside the fence, he heard large dogs aggressively barking. The dogs came from the upstairs residence, down the stairs towards the officer. Officer Burmaster stated he could not jump over the fence because there were spikes on top and would have hurt himself. Officer Burmaster stood up from his seat and stated he had the right to come to work and not get bit by a dog. Sergeant Pruitt instructed Officer Burmaster to have a seat.

Officer Burmaster stated Officer Roussel ran and was able to elude the dogs because he was closer to the gate. Officer Burmaster stated Officer Roussel was a few feet from him but was really close to the gate opening. Sergeant Givens asked Officer Burmaster to describe the attack. Officer Burmaster stated the dogs ran up on him as they were barking and thought the dogs were going to bite him. Officer Burmaster stated there were two dogs and stated the dogs ran up to both he and Officer Roussel. The larger of the two dogs ran toward Officer Roussel and the smaller of the two ran up to him. The large dog ran from the staircase straight to the gate opening toward Officer Roussel. Officer Burmaster stated he was afraid the larger of the two dogs was going to attack since Officer Roussel made it out of the gate.

Sergeant Givens asked Officer Burmaster to describe the attack, opposed to what he thought was going to happen. Officer Burmaster stated the dogs were barking while running toward him. Sergeant Pruitt followed up by asking when the officer first heard the dogs. Officer Burmaster stated several seconds after entering the yard

he heard he dogs. Upon first entering the yard, Officer Burmaster stated he thought how nice it was there were no dogs. Sergeant Pruitt asked why he would think how nice it was that there were no dogs.

Officer Burmaster stated he when trains officers or when he responds to calls like that, he tells them the same thing. Be aware of dogs and about the dangers of animals when responding to calls. Sergeant Pruitt asked Officer Burmaster where he was when he made kissing noises, he responded a couple feet from the house. Officer Burmaster stated the dogs should have heard him as they came from the second-floor balcony. Sergeant Pruitt advised the kissing noises were made outside of the gate before entering the perimeter of the property and asked if he thought his noises were premature. Officer Burmaster stated his noises were loud and was at the gate when he made them. No further kissing noises were made.

Officer Burmaster stated he thought the dogs were inside and let out by the owners. Had the dogs been on the porch they would have immediately come down. Officer Burmaster continued to say the dog's owners were irresponsible and should be the ones being questioned. Sergeant Pruitt continued with her prepared questions.

Officer Burmaster stated he did not notice if anyone was outside upon their arrival into the yard nor was anyone from 1420 Felicity Street expecting the officers. The officer made kissing noises and no other announcements as they entered the yard. Officer Burmaster and Officer Roussel walked toward the bottom left apartment and stopped halfway from the gate to the door. Officer Burmaster stated he stopped because he heard the dogs coming and he was scared he was going to get attacked. Officer Burmaster further stated he was not interested in getting attacked, bit, and going to the hospital.

Officer Burmaster stated he heard the dogs barking and thought, "oh my lord, I'm about to get attacked." The dogs came running down the steps, running toward him. Officer Burmaster was scared he was going to get bit and have to go to the hospital. Officer Roussel was able to get out of the yard. Officer Burmaster noted there was no car or anything for him to jump on. Officer Burmaster stated it would have been fruitless to try exiting the yard because the dogs were already coming at him. Officer Burmaster stated the dogs were heard barking as they were heard on the second-floor balcony. As he heard the dogs from the second floor Officer Burmaster's response the thought of not being able to get out of the situation. Officer Burmaster stated he would not have been able to move quick enough, could not get over the fence, and there was no car to jump on top of and the yard was paved in such a way running could have caused him to twist his ankle.

Officer Burmaster the only way to avoid getting bit, going to the hospital, and catching rabies from the unknown dogs was to take his gun out. Officer Burmaster stated one dog looked to be a pit bull and the second dog was a small unknown breed.

Captain Richardson advised Officer Burmaster to answer the questions asked by the Sergeant.

Officer Burmaster stated the dog that attacked him, was running at a quick pace and the officer believed the dog was going to bite him. He further stated the dogs were barking but was not sure which or if both the dogs were barking. Officer Burmaster stated the dog did not make physical contact with him but would have if he didn't shoot it. The dog was a couple feet away when he deployed his weapon. Officer Burmaster stated he gave the verbal command of "get back" but later thought it was dumb because dogs don't speak English.

Officer Burmaster stated he was concerned the dog was going to bite his penis. Once the officer shot the small dog, the larger dog retreated. Officer Burmaster stated he perceived the large dog to be a threat as well. When the large dog retreated, Officer Burmaster was able to exit the yard and let the dispatcher know he fired

his weapon. As to the visibility of the yard, Officer Burmaster described it as poor because it was dimly lit. Officer Burmaster found the scene safe to deploy his firearm as it was the two officers and the two dogs.

Officer Burmaster stated when he fired his weapon, he fired three times at the smaller of the two dogs. The smaller dog was the dog closest to Officer Burmaster and did not fire at the larger dog because it immediate retreated. Officer Burmaster stated after firing three times, the dog was laid out. The dog continued in a forward motion toward Officer Burmaster after the first and second shots. Following the shooting, the Officer Burmaster encountered the owners were upset and asked why the officer shot their dog.

Sergeant Pruitt asked if an investigation was completed for the domestic incident they responded to. Officer Burmaster stated he was told to stay away from the residence and thought the FIT was going to investigate the call for service. Officer Burmaster stated he did not know of any investigation into the original incident.

Officer Burmaster listed the following equipment carried on his person: handgun, taser, handcuffs, Narcan. Sergeant Pruitt asked about the officer's baton. Officer Burmaster stated he was not carrying a baton because he carried the aforementioned items. Sergeant Pruitt mentioned hands and feet as part of what may be used during a force incident. Officer Burmaster disagreed that the hands or feet would have been effective because he would have been bit. Officer Burmaster stated he did not use any other tools because he would have been bit.

Officer Burmaster stated he received training on encounters with dogs. Officer Burmaster stated that was why he made the kissing noises, checked for food, beware of dog signs, and water bowls. Officer Burmaster stated as it related to dog behavior, he learned dogs were territorial and would protect their space. Officer Burmaster stated his objective in shooting the dog was to stop the threat of a battery from the dog.

**End of interview**

**Necropsy:**

On Thursday, April 15, 2021, at about 6:00 AM, Sergeant Debra Pruitt relocated to 1700 Mardi Gras Boulevard, Louisiana SPCA and met with Apollo's owner, Mr. Derek Brown and SPCA supervisor Beth Renfo. Mr. Brown provided an insulated cooler and ice for Apollo's transport.

Sergeant Pruitt turned on a BWC provided by PIB and used it to memorialize the collection of Apollo for transport. Sergeant Pruitt entered the rear of building at 1700 Mardi Gras Boulevard with supervisor Beth Renfo and followed her to a room containing a refrigerator. Beth Renfo removed a bag from the refrigerator labeled with Apollo's name and placed it into the insulated cooler.

Sergeant Pruitt asked for the original bags used to transport Apollo from the scene to Metairie Small Animal Hospital. Beth Renfo relocated to another room where a walk-in cooler was located. Beth Renfo entered the cooler and removed the bags. The bags were moved to the bottom of the insulated cooler between the bag of ice and Apollo's remains.

Sergeant Pruitt exited the building with Beth Renfo and prepared for the drive to LSU's Veterinary School in Baton Rouge where Mr. Brown would be accompanying. Sergeant Pruitt turned off the BWC after the insulated cooler was placed on the rear seat of the police unit.

On Thursday, April 15, 2021 at about 8: 20AM, Sergeant Pruitt and Mr. Brown arrived at LSU's Veterinary School in Baton Rouge where Mr. Brown registered Apollo. At about 8:44AM, Apollo was taken from Sergeant Pruitt and sent to radiology. Apollo was finished with radiology at about 9:12AM and was brought over to the



building where the necropsy would take place by radiology. At 9:16AM, Sergeant Pruitt and Mr. Brown relocated to the necropsy building. At 9:31AM, Sergeant Pruitt and Mr. Brown signed in. Mr. Brown paid for the elected necropsy by the school. Both Sergeant Pruitt and Mr. Brown waited for Mr. Brown's hired expert, Mr. Jim Crosby to arrive for the procedure to begin.

On Thursday, April 15, 2021 at about 11:00AM, Sergeant Pruitt met Mr. Jim Crosby and Attorney Tarak Anada's legal team, Cecilia Ortiz and Terry Bartholomew. At about 11:19AM the procedure began as Mr. Crosby accompanied Dr. Daniel Paulsen in the necropsy room. Sergeant Pruitt, Cecilia Ortiz, Terry Bartholomew, and Mr. Brown remained in the viewing room. At about 11:23AM, Mr. Brown was asked to identify the remains ensuring it was the correct animal. Mr. Brown confirmed the remains was of Apollo and elected to remain in the room until the procedure was completed.

On Thursday, April 15, 2021, at about 1:33PM, the necropsy was complete. Dr. Paulsen stated the gunshot entrance was at the top of the neck. The projectile traveled under the scapula into the chest, broke two ribs, lacerated a lung and exited out of the left side of the chest. Dr. Paulsen estimated Apollo was shot in no less than three feet away. Dr. Paulsen would provide a detailed report of the necropsy located below.

**End of necropsy documentation**

On Thursday, April 22, 2021 at about 12:30PM, Sergeant Pruitt met with Chief Westbrook, Mr. Derek Brown, Mrs. Julie Bareki-Brown, Attorney William Most, and Attorney Tarak Arneda. The BWC footage was shown to the family and the attorneys as well as any questions were answered.

## Firearms Report:

On Wednesday, April 28, 2021, the Firearms Analysis was completed, and the results were as follows. Officer Burmaster's Glock model 17, Gen 5, 9mm was test fired and the fired cartridges were retained as reference and compared to the following collected evidence.

Three fired 9mm caliber cartridge casings were collected from the scene and were found to have been fired from Officer Burmaster's firearm. Three unknown caliber copper jacket fragments, fifteen unknown caliber lead fragments, and one unknown fragment were collected from Apollo's necropsy. No information could be obtained from the fragments collected in the necropsy.

The Firearm Analysis Report was reviewed and retained within the case file.

## Necropsy Report:

On Wednesday, May 5, 2021, Sergeant Debra Pruitt received the final necropsy report documented by Dr. Daniel Paulsen of Louisiana State University's, Louisiana Animal Disease Diagnostic Laboratory.

LSU | LADDL
Louisiana Animal Disease Diagnostic Laboratory
Louisiana State University
River Road, Room 1043
Baton Rouge LA 70803
Phone: (225) 578-9777 Fax: (225) 578-9784

Report Date: 5/5/2021

Final Report

Date Received: 4/15/2021 Case Coordinator: Dr. Daniel B. Paulsen Accession No: L2106009

NEW ORLEANS POLICE DEPT.
SGT. DEBRA PRUITT
LA

Phone: (504) 931-6506
Email: dnormand@nola.gov

Associated Parties

| | | |
|---|---|---|
| Other | Jones Walker Attorneys Tarek Anada | LA |
| LSU Internal | Dr. Kristin Vylinal | Louisiana State University River Road Baton Rouge, LA 70803 |
| Owner | Derek Brown | 1420 Felicity St. New Orleans, LA 70130 [redacted] |
| Other | New Orleans Police Dept. Sgt. Debra Pruitt | LA (504) 931-6506 |
| Veterinarian | LADDL Asst. Director Dr. Maria S. Mitchell | Louisiana State University River Road, Room 1043 Baton Rouge, LA 70803 |

Reference Data
Resident: J Lee

Animal Information

| Name | Taxonomy | Sex |
|---|---|---|
| Apollo | Dog (Domestic) - Catahoula Leopard Dog | Male |

Diagnosis
Trauma due to multiple gunshot wounds

Penetrating trauma:
1. Through and through wound, entrance dorsal midline, mid cervical region passing between scapula and thorax with thoracic penetration at rib 5, pulmonary laceration, exit of thorax at rib 7, and skin exit over left caudolateral thorax
2. Multiple lacerations of left and right forelimbs and right hindlimb containing metal fragments with slab fracture of medial malleolus of right tibia, 4th and 5th phalanges of right forelimb and distal radius of left forelimb

Clinical Data
Samples submitted to the police:



Louisiana Animal Disease Diagnostic Laboratory
Louisiana State University
River Road, Room 1043
Baton Rouge LA 70803
Phone: (225) 578-9777 Fax: (225) 578-9784

- Right forelimb 1: metal fragment from medial aspect of the right carpus
- Right forelimb 2: metal fragment from the subcutaneous tissue over the 2nd metacarpal-phalanx joint
- Right forelimb - 4th digit P1
- Right forelimb - skin over 5th digit P3
- Left forelimb (~12): metal fragment from left radius
- Debris with package
- Right hindlimb - piece of jacket
- Left ear (4): metal fragment from the fur

**Preliminary Gross Findings**
Gunshot wounds

Dorsoventral through and through gunshot wound with fracture of 2 ribs and pulmonary laceration
Partial fractures of both forelimbs and right rear limb with embedded metallic fragments (jacket and core bullet fragments)

Putative bullet fragments transferred to Sgt. Deborah Pruitt, NOPD
Tissues saved in -80C freezer.

Pending: histopathology

**Gross Findings**
Submitted for postmortem examination is a 10.1 kg, juvenile, intact male Catahoula dog, in good body condition, with marked postmortem autolysis. The dog is submitted in a black plastic bag labeled with a yellow tag reading "Animal name: APOLLO/Animal I.D. #:A47518149/SPCA Vet: /Reason: HLE CASE/NOPD/Breed: CATAHOULA X/Age: 4 mo/Owner: JULIE BAREKI/DEREK BROWN/Date: 4/12/21". A separate black bag containing a brown paper bag, a light blue towel stained with blood, and minimal debris is also submitted. Identifying marks include a white and merle haircoat. Crown to rump length is 68 cm, height is 45 cm, and the body thickness is 17 cm. The nose to crown length is 20 cm, and the width of the head is 10 cm. Permanent teeth 101 and 201 are present, 102 is breaking through the gum line, and the space for 202 is empty; all other teeth are deciduous. Both nostrils and the oral cavity contain a small amount of blood. Soft light brown stool is adhered to the anus, perineum, and ventral tail.

On and around the left ear, four 1-3 mm metal pieces are embedded in the hair.

At the dorsal midline between the scapulae, 22 cm caudal to the crown, there is a circular skin defect (A) with sharp edges, measuring 8 mm in diameter, associated with abundant hemorrhage. At the left thorax, 36 cm caudal to the crown and 16 cm ventral to the dorsum, there is a ragged circular skin defect (B) with sharp edges, measuring 1.7 x 1.8 cm. Subjacent to A, involving the subcutis and skeletal muscles and undermining the dorsal part of the left scapula, there is a 10.5 cm-diameter cavity containing abundant clotted blood. Located at the lower caudal margin of the cavity, the left 5th rib has a complete fracture (C), 1 cm ventral to the vertebra. The left 7th rib has a complete fracture (D) at the costochondral junction associated with a 1.2 x 1.7 cm circular defect at the thoracic wall and hemorrhage. B overlies D. The thoracic cavity has no negative pressure and contains approximately 30 ml of clotted blood. The left caudal lung lobe has a 4.0 cm-long dorsoventrally linear laceration near the hilus, which is associated with abundant pulmonary hemorrhage. An embedded 1.6 cm-long bone fragment; a 2.7 cm long dorsoventrally linear laceration at the ventral edge of the left caudal lobe is also present. The pleura of the lung lobe is trapped at fracture margins of D. The trachea and the primary bronchus for the left caudal lung lobe contain minimal blood.

The wounds of the right hindlimb and both forelimbs have associated mild hemorrhage:

At the craniomedial aspect of the right hock, there is a 1.5 cm skin laceration with a 1.6 x 0.7 cm, curved piece of metal jacket partially embedded in the soft tissue; this is associated with a thin, 1 cm long slab fracture of the medial malleolus of the tibia.

CONFIDENTIAL

NEW ORLEANS POLICE DEPARMENT Item: D-13802-21 Page 32 of 37

Louisiana Animal Disease Diagnostic Laboratory
Louisiana State University
River Road, Room 1043
Baton Rouge LA 70803
Phone: (225) 578-9777 Fax: (225) 578-9784

At the medial aspect of the right carpus, there is a 4 x 6 mm skin laceration associated with a 2.5 mm metal fragment embedded in the underlying subcutaneous tissue. A 3 x 2.5 mm metal fragment is embedded in the subcutaneous tissue over the 2nd metacarpal-phalanx joint, associated with a small laceration in the overlying skin. The proximal phalanx (P1) of right front 4th digit has a complete open fracture of the diaphysis associated with a 4 x 3 mm metal fragment. The proximal phalanx (P1) of right front 5th digit has a comminuted open fracture. The skin over the distal phalanx (P3) of the 5th digit contains a 1 mm metal fragment.

At the medial aspect of the left carpus, there are three lacerations measuring 2.3 cm, 1.6 cm, and 1.7 cm, respectively. The left radius has a partial open fracture 1.7 cm proximal to the carpal joint, associated with twelve variably sized metal fragments measuring up to 1.7 x 0.8 cm.

The heart weighs 74.15 g, which is 0.73% of body weight (Reference interval=0.43-0.99%). The right ventricular wall (RV) is 0.4 cm thick, the left ventricular wall (LV) is 1.0 cm thick, and the interventricular septum is 0.9 cm thick. The RV:LV ratio is 1:2.5 (Reference interval=1:2-3). The stomach and the small intestine contain tan liquid. The large intestine contains light brown soft formed feces.

No other significant lesions are noted.

## Histopathology

Marked postmortem autolysis with widespread postmortem bacterial growth in all organs interferes with optimal histologic interpretation.

Soft tissue at the cavity underneath the entrance wound: There is extensive severe hemorrhage in the subcutaneous adipose tissue dissecting along the fascial planes. Multiple embedded fragments of hair shafts, fragments of necrotic skeletal muscle fibers, and other debris are present. Regionally, the skeletal muscle bundles are hypereosinophilic with loss of sarcoplasmic cross-striation and nuclei (necrosis). The adjacent skeletal muscles haves multifocal necrosis of individual myofibers and interstitial edema.

Lung: In the left caudal lung lobe, there is a localized blunt laceration through the pulmonary parenchyma with irregular margins. More than 90% of the alveoli in this and adjacent sections are filled with peracute hemorrhage. A section from the right lung lobe has diffuse atelectasis.

Left thoracic wall: The skeletal muscle bundles are multifocally torn and individual myofibers are fragmented; this is associated with extensive, peracute hemorrhage within the muscle bundles and adjacent adipose tissue.

Skin, exit wound at left thorax: For 3 mm from the wound margin, the epidermis and dermis is denuded with coagulative necrosis of the adnexa (hair follicles and sebaceous glands) and superficial dermis.

Skin, left medial forelimb: At the margin, there is a narrow zone of coagulation along with embedded hair fragments, bone fragment and other debris.

Kidney, liver, spleen, pancreas, heart, skeletal muscle from the right thigh, stomach, small intestine, large intestine, adrenal glands, presumed thyroid, thymus, brain (cerebrum, cerebellum, brainstem): No significant lesions are noted.

## Comments

The cause of death is a single, through and through gunshot wound entering at the dorsal midline of the mid cervical region and exiting the caudolateral left thorax. The projectile passed into the thorax at left rib 5, lacerated the right lung causing extensive hemorrhage and pneumothorax, and exited the thorax at left rib 7. Wounds in the 3 limbs were cause by smaller fragments of metal that were consistent with bullet fragments and were likely indirect hits. No pre-existing disease was detected.

Complete photographs of the gross necropsy are retained and available, as are limited fixed and unfixed tissues.

Accession Number: L2108009 Final (5/5/2021) Page 3 of 4

Detective Assigned: Sergeant Debra N. Pruitt Supervision: Captain Sabrina Richardson

EXHIBIT F
CITY DEFENDANTS - 002184

CONFIDENTIAL

NEW ORLEANS POLICE DEPARMENT Item: D-13802-21 Page 33 of 37

LSU | LADDL
Louisiana Animal Disease Diagnostic Laboratory
Louisiana State University
River Road, Room 1043
Baton Rouge LA 70803
Phone: (225) 578-9777 Fax: (225) 578-9784

Client Report History

| Report Type | Delivery Method | Sent To | Date Sent |
|---|---|---|---|
| Preliminary | Email | dnormand@nola.gov | 4/15/2021 3:09 PM |
| Final | Email | dnormand@nola.gov | 5/5/2021 1:41 PM |

Accession Number: L2106009 Final (5/5/2021) Page 4 of 4

Detective Assigned: Sergeant Debra N. Pruitt Supervision: Captain Sabrina Richardson

EXHIBIT F
CITY DEFENDANTS - 002185

Following a review of the necropsy report, Sergeant Pruitt made the following conclusions:

Apollo's cause of death was a single, through and through gunshot wound that lacerated the right lung causing hemorrhaging and a collapse of the lung.
The report was reviewed and retained within the case file.

On Friday, May 7, 2021Sergeant Pruitt received LASPCA's Report from Director of Operations, Kathryn Destreza. Sergeant Pruitt reviewed the following report:

Investigative Report

| NOHLR CASE #: 06426005 | REPORT COMPLETED BY: K. Destreza | DATE OF REPORT: 4/14/2021 |
|---|---|---|
| LEAD AGENCY: New Orleans Police Department/ Public Integrity Bureau | | AGENCY CASE #: N/A |
| ADDRESS: 1340 Poydras St. Suite 1900 | CITY: New Orleans | COUNTY: Orleans |
| STATE: LA | ZIP: 70112 | INTENTIONALLY LEFT BLANK |
| AGENCY CONTACT: Sgt. Debra Pruitt | | POSITION/TITLE: Sergeant |
| OFC PH: 504-658-6800 | CELL: [redacted] | FAX: 504-658-6809 |
| EMAIL: dnormand@nola.gov | | INTENTIONALLY LEFT BLANK |

SUBJECT INFORMATION

| NAME: N/A | SEX: N/A | ALIAS: N/A | | |
|---|---|---|---|---|
| ADDRESS: N/A | CITY: N/A | COUNTY: N/A | | |
| STATE: N/A | ZIP: N/A | PH: N/A | CELL: N/A | INTENTIONALLY LEFT BLANK |
| DL#: N/A | DL State: N/A | EMAIL: N/A | | |
| *IF A BUSINESS OR ORGANIZATION IS ASSOCIATED TO THE SUBJECT PLEASE LIST INFORMATION BELOW:* | | | | |
| SUBJECT AGENCY: N/A | AGENCY WEBSITE: N/A | | | |
| ADDRESS: N/A | CITY: N/A | COUNTY: N/A | | |
| STATE: N/A | ZIP: N/A | PH: N/A | CELL: N/A | EIN#: N/A |

INCIDENT INFORMATION

| ADDRESS: 1420 Felicity St | CITY: New Orleans | COUNTY: Orleans |
|---|---|---|
| STATE: LA | ZIP: 70130 | OTHER: |

COMPLAINANT INFORMATION

| NAME: N/A | PH: N/A | CELL: N/A | |
|---|---|---|---|
| ADDRESS: N/A | CITY: N/A | COUNTY: N/A | |
| STATE: N/A | ZIP: N/A | EMAIL: N/A | INTENTIONALLY LEFT BLANK |
| COMPLAINT SUMMARY: | | | |

SUMMARY/LIST OF CHARGE(S)

| CHARGE TITLE | CHARGE CATEGORY | COUNT(S) |
|---|---|---|
| N/A | N/A | N/A |
| | | |
| | | |
| | | |
| | | |

*BEGIN REPORT NARRATIVE ON NEXT PAGE*

1 | Investigative Report

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

Investigative Report

**REPORT NARRATIVE**

On April 10, 2021 New Orleans Police Department (NOPD) Sergeant D. Pruitt with the Public Integrity Bureau (PIB) requested assistance with a NOPD Officer involved shooting of an owned dog. The dog was identified as Apollo, a male Catahoula/mix breed approximately 5 months old.

Apollo had died on scene and was relocated by Sgt. Pruitt to Metairie Small Animal Hospital, 5040 W. Esplanade Ave, Metairie LA. 70006 to preserve the body until we could retrieve the dog.

On April 11, 2021 New Orleans Humane Law & Rescue Officer K. Villars retrieved Apollo from Metairie Small Animal and transported Apollo to the Louisiana SPCA located at 1700 Mardi Gras Blvd. New Orleans, LA 70114 to be radiographed to identify if there were bullets within the body of Apollo. The radiographed were scheduled for Monday, April 12, 2021 as the earliest time a veterinarian would be on campus.

On April 12, 2021 I, Kathryn Destreza, Director of Operations with the Louisiana SPCA was briefed on the case by New Orleans Humane Law & Rescue (NOHLR) Supervisor Beth Renfro. Officer Renfro explained that on the night of April 10, 2021, 2 NOPD officers were responding to a disturbance complaint at 1420 Felicity St. That the officers had entered the gated property and were surprised by 2 dogs, and one of the officers shot the younger dog. Officer Renfro had been in contact with Sgt. Pruitt who was investigating the shooting and that Sgt. Pruitt would be in this day to meet with us.

Sgt. Pruitt arrived shortly after and asked us to review the body cam footage of the 2 officers on the scene. We reviewed the footage, which showed 2 NOPD officers approaching the residence and on approach began to make sounds which appeared to be an attempt to discern if dogs were on the property. After a pause at the gate, the 2 officers entered the property and began to approach the door on the ground level.

As they were approaching this door, I heard a buzzing noise, which I thought was a cell phone vibration, and immediately could hear a deep bark from somewhere close by. At that time, one of the officers made a comment and began to run back to the gate but the other officer immediately placed his hand on his weapon and turned toward the sound. It appeared the officer that ran made it out of the gate just as a large, brown dog reach the gate. Simultaneous to this, a smaller dog was approaching the officer in the yard. This officer shot 3 times at the approaching dog, who made a sound and stopped moving. As the shots were fired, I viewed the large brown dog run back to the stair to the porch.

Apollo was radiographed and showed foreign bodies located in his body. These radiographs were sent to Sgt. Pruitt and are contained in the case file.

It was arranged with the owner's legal representation and NOPD PIB that Louisiana State University (LSU) Pathology Laboratory would perform the necropsy to confirm cause of death and retrieve the any bullets for the investigation. Apollo was transported from Louisiana SPCA to LSU by Sgt. Pruitt.

Supplemental report to follow as needed.

Kathryn Destreza
Director of Operations
Louisiana SPCA

Investigative Report

LASPCA's report was reviewed and retained within the case file.

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

**Conclusion:**

Following a review of the scene investigation, BWC and ICC, statements, and necropsy of the deceased dog (Apollo), Sergeant Pruitt's findings were as follows:

On Saturday April 10, 2021, Officer Derrick Burmaster and Officer John Roussel were dispatched to the 1400 block of Felicity Street on a reported disturbance by Mr. Travis Hanson. The dispatcher's comments read the neighbors across the street were fighting. Officer Burmaster arrived first and met with Mr. Travis Hanson. Mr. Hanson stated he heard a woman screaming at 1420 Felicity Street and assumed it was a domestic disturbance. Mr. Hanson returned to his residence after speaking with Officer Burmaster.

Officer John Roussel arrived on scene and met with Officer Burmaster who stated screams were heard from 1420 Felicity Street. The officers walked to the residence on the sidewalk. As they approached the property line, Officer Burmaster made kissing noises with his mouth and commented there were no dogs after there was no response in the yard. The residence was a two-story house with an exterior staircase to the front. On the first floor there was a door with a lit porch, on the second floor there was the same. The house was set back in the yard further than neighboring houses. The yard was secured with an iron fence and had two openings, a pedestrian entrance and a vehicle entrance.

The officers walked through the pedestrian entrance through the yard toward the two-story house. The officers walked to a lit entrance on the first floor. As they were more than halfway into the yard near the staircase, one of the officer's BWC made two noises, used to alert the officer the camera was recording. Following the noise from the BWC, a low, deep bark from a dog was heard. As Officer Burmaster said, "shit!" and immediately went for his firearm as Officer Roussel turn and ran for the pedestrian gate.

A large brown dog exited the exterior staircase at the front of the residence and ran forward to Officer Roussel as he was exiting the gate. As the large dog ran to Officer Roussel, Officer Burmaster screamed, "get back, get back!" A second dog exited the staircase and ran toward Officer Burmaster who fired his gun three times at the dog causing him collapse and die. The larger dog ran back to the staircase unharmed.

The deceased dog, Apollo, was approximately a five-month-old Catahoula Leopard Dog. Apollo succumbed to his injuries of a through and through gunshot wound to the back of his neck that broke ribs and lacerated his lung causing hemorrhaging and collapsed lung.

The owners of the dog, Mr. Derek Brown and Mrs. Julie Bereki had a verbal altercation at their home, 1420 Felicity Street. Neither of the two called for the police, therefore were not expecting them. The couple stated the door to their residence was open as they allowed the dogs to enter and exit as needed to relieve themselves in their yard. As stated before, the yard was secured with an iron fence preventing the dogs from exiting the yard. The couple used their home as an Airbnb meaning various individuals rented the lower portion of their home and would come into contact with the couple's dogs at any time. The investigators met with one of the renters at the time of the incident who did not have a problem with any of the couple's dogs during their stay.

As Officer Burmaster approached the property with Officer Roussel, Officer Burmaster assessed the yard by making kissing noises with his mouth as if he were trying to call an animal. There was no response from inside the yard and Officer Burmaster verbally stated, no dogs and continued into the yard. When the officers heard the dog, Officer Burmaster elected to remain in the yard as he did not believe he would make it out before the dogs got to him. Officer Burmaster remained where he was in the yard, he did not see any objects to retreat onto that would get him out of the way of the dogs.

---

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson    

Officer Burmaster was focused on the first dog to come down, the larger of the two as it proceeded behind Officer Roussel and Officer Burmaster yelled, "Get back! Get back!" Soon after, a second, smaller dog ran from the staircase directly to Officer Burmaster. Officer Burmaster fired three rounds at the dog running at him, causing the dog to collapse and die. The larger of the two dogs ran back to the staircase following the gunshots.

Sergeant Pruitt found the owners properly secured their yard to prevent the dogs from escaping. Sergeant Pruitt found Officer Burmaster had a legal right to be at the location, he checked for animals in the yard by making noises. Officer Burmaster did not fire his weapon until an animal was running in his direction. Officer Burmaster only had seconds to see the animal coming in his direction and made the decision to shoot it to prevent any harm from the animal.

Sergeant Pruitt did **not** find Officer Burmaster violated R.S. 14:102- Relative to Cruelty to Animals; simple and aggravated or any other municipal or state violation. Sergeant Pruitt found Officer Burmaster justified in his actions.

Any additional information will be added in a supplemental report.

**Detective Assigned:** Sergeant Debra N. Pruitt **Supervision:** Captain Sabrina Richardson

EXHIBIT F