UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and JULIA BARECKI-BROWN — CIVIL ACTION NO. 22-00847

VERSUS

DIVISION: 4

DERRICK BURMASTER, SHAUN FERGUSON, and the CITY OF NEW ORLEANS — SECTION: L

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE DEPOSITION OF:
SHANNON JONES BREWER,

TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA, CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTED AT:
NEW ORLEANS CITY HALL
1300 PERDIDO STREET, ROOM 5E03
NEW ORLEANS, LOUISIANA 70112

COMMENCING AT 10:03 A.M., ON MARCH 8, 2023.

EXHIBIT G



A P P E A R A N C E S

FOR THE PLAINTIFF:
JONES WALKER L.L.P.
(BY: TARAK ANADA, ESQ.)
201 ST. CHARLES AVENUE, 49TH FLOOR
NEW ORLEANS, LOUISIANA 70170
(504) 582-8322
tanada@joneswalker.com

FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:
NEW ORLEANS CITY ATTORNEY'S OFFICE
(BY: JAMES M. ROQUEMORE, ESQ.)
1300 PERDIDO STREET, SUITE 5E03
NEW ORLEANS, LOUISIANA 70112
(504) 658-9800
james.roquemore@nola.gov

FOR DERRICK BURMASTER:
GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
(BY: C. THEODORE ALPAUGH III, ESQ.)
639 LOYOLA AVENUE, SUITE 2130
NEW ORLEANS, LOUISIANA 70113
(504) 529-4141
cta@gustebarnett.com

ALSO PRESENT:
TAMMY HUPIN, VIDEOGRAPHER

REPORTED BY:

YOLANDA J. PENA
CCR NO. 2017002, RPR
STATE OF LOUISIANA





I N D E X

PAGE

STIPULATION....................................4

EXAMINATION BY:

MR. ANADA...............................6, 112

MR. ALPAUGH...................................92

MR. ROQUEMORE................................111

CERTIFICATE..................................115

LIST OF EXHIBITS

Exhibit No. 8..................................8
(Notice of 30(b)(6) Deposition & Request to Bring Documents, Information, or Objects)

Exhibit No. 9..................................7
(Photograph)

Exhibit No. 20.A..............................19
(Event Summary)

Exhibit No. 23.B..............................75
(Audio file, Interview of Officer Burmaster )

Exhibit No. 26................................24
(Use of Force Board minutes)

Exhibit No. 40................................29
(CITY DEFENDANTS 003646, Policy Tactics Training Recommendations)

Exhibit No. B-1...............................93
(Transcript of interview of Officer Burmaster, 6/15/21)





S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and among the parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure.

All formalities, excluding the reading and signing of the transcript by the witness, are hereby waived.

All objections, except as to the form of the question and responsiveness of the answer, are considered reserved until trial or other use of the deposition.





THE VIDEOGRAPHER: We are on the record. This is Media Unit 1 in the video deposition of Sergeant Shannon Jones Brewer in the matter of Derek Brown and Julia Barecki-Brown versus NOPD, et al., filed in the United States District Court, Eastern District of Louisiana.

Today is Wednesday March 8th, 2023, and the time is 10:03 a.m. This deposition is being taken at New Orleans City Attorney's Office at the request of Jones Walker.

The videographer is Tammy Hupin. The court reporter is Yolanda Pena. We are with Magna Legal Services.

At this time, would counsel please state their appearances and whom they represent.

MR. ANADA: Tarak Anada, representing the Brown family.

MR. ALPAUGH: Ted Alpaugh, representing Derrick Burmaster.

MR. ROQUEMORE: And James Roquemore, representing the City of New Orleans and the superintendent.

THE VIDEOGRAPHER: And at this time, would the court reporter please swear in the witness.





(Simultaneous speaking.)

THE REPORTER: Raise your right hand, please.

* * *

SHANNON JONES BREWER,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ANADA:

Q. Good morning, Sergeant Brewer.

A. Good morning.

Q. Thank you for your time today.

A. Thank you.

Q. Have you given a deposition before?

A. No.

Q. So a simple question-answer process. Only difference is you're under oath today, just like you would be in front of a judge or a jury.

A. All right.

Q. Let me know if any of my questions are -- are confusing or difficult to understand. Us lawyers have a tendency to -- to sometimes speak in a confusing manner. And I would appreciate it if you would say, "Hey, Tarak, I didn't quite understand that. Do you mind rephrasing it?" I'll -- I'll be happy to do so.





BY MR. ANADA:

Q. -- Exhibit 26. I'm sorry. The -- the use-of-force board.

A. Yes.

Q. If you'll just read to yourself the -- the information listed under voting conclusions and action items.

A. Action items? Uh-huh.

Q. Okay. Do you see under the subheading "Voting" --

A. Yes.

Q. -- that Chief Goodly, Chief Noel, and Chief Westbrook all unanimously ruled that the April 10th shooting by Officer Burmaster was, quote, "Not Justified," end quote?

A. That's correct.

Q. Okay. And based on your administrative investigation, do you have any disagreement with those conclusions?

A. No.

Q. Okay. Do you see where it says, "Action Items: Burmaster deescalation training"?

A. Yes.

Q. Do you -- do you understand that to mean that the use-of-force review board is recommending that



MAGNA LEGAL SERVICES

Q. Okay. So officers should factor that in to their decision-making --
A. That's --
Q. -- on whether or not to fire a bullet?
A. -- an important consideration, yes.
Q. Okay. I'm going to turn to page 15 under the subheading "Discrepancies, Clarifications, and Credibility Assessments." If you could just take a moment and -- it's just a one -- one-page --
MR. ALPAUGH: Page 15?
MR. ANADA: Page 15.
MR. ALPAUGH: Onto 16.
MR. ANADA: It starts and stops on page 15.
BY MR. ANADA:
Q. Do you want to take a second to familiarize yourself with this?
A. We can keep going.
Q. Okay. "Detective Brewer, after comparing the administrative statement provided by Officer Burmaster, with the evidence reviewed during this investigation, deemed Officer Burmaster not to be credible."
Is that -- is that a correct description of your assessment of Burmaster?
A. That's what I have in my statement, yes.





Q. Okay. And you stand by that today?
A. Yes.
Q. Okay. I'm going to read from the middle of the paragraph. "In Officer Burmaster's criminal statement, Officer Burmaster stated that he fired his first shot at the dog because the dogs ran up on him as they were barking and he thought the dogs were going to attack him.

"Officer Burmaster stated he fired the second and third shots because the dog continued towards him. However, in Officer Burmaster's administrative statement, he stated, when he fired his weapon three times at the dog, it was all a blur and Officer Burmaster could not recall the dog's actions."

Is that some of the reasons, the -- the -- the contradictory statements described there -- is that some of the reasons you found him not to be credible?
A. That would factor in, yes.
Q. "Officer Burmaster stated he was scared the dog would bite his genitals, causing a penetrating wound."

How did those statements of Burmaster factor into your ultimate conclusion?
A. Which one?
Q. "Officer Burmaster stated he was scared the





made the decision and made the determination based on what I observed.

Q. And am I correct that based on your -- what you observed and the analysis you conducted, Officer Burmaster did not make the right decision by shooting Apollo?

A. That is correct.

Q. And the last sentence of the second paragraph, under "Decision Point Analysis," you -- you reiterate yet again, quote, "The smaller dog did not attack or attempt to attack Officer Burmaster."

Is that -- is that right?

A. That's correct.

Q. At the end of that section, you state, "Officer Burmaster received disciplinary action related to these policy violations"?

A. That is correct.

Q. What -- what was the disciplinary action he received?

A. I do not believe that there has been a conclusion on that.

Q. That would have been your recommendation, right, though?

A. That would have been a part of the recommendation. That's correct.





Q. A part of your recommendation, right?
A. Uh-huh.
Q. Based on your -- your investigation, you believe that Officer Burmaster should receive some disciplinary action based on the policy violations. True?
A. That is correct.
Q. Turn to page 17. Under the subsection "Policy Violations," am I correct to understand this subsection is noting that Burmaster had actually violated NOPD's policies in -- in four different ways -- I'm sorry, five different ways?
MR. ROQUEMORE: Objection; form.
MR. ALPAUGH: Objection; form.
BY MR. ANADA:
Q. Am I -- am I correct to understand your statements, under "Policy Violations," to -- to mean that Burmaster had actually, in shooting Apollo, violated NOPD policy in five different ways?
MR. ALPAUGH: Same objection.
MR. ROQUEMORE: Objection; form.
A. Okay.
BY MR. ANADA:
Q. Am I -- am I correct to interpret your report as saying that?

EXHIBIT G



Q. But you expect --
A. -- Officer Burmaster's recollection.
BY MR. ALPAUGH:
Q. But you would expect someone's recollection right after an incident to be better than it was a couple months later?
MR. ANADA: Object to form.
A. I cannot say.
BY MR. ALPAUGH:
Q. Okay. So I understand it -- you said that those -- well, let me get back to -- I'm sorry. I'm trying to get back to credibility assessment.
You -- you have -- credibility assessment begin on page 15. And I think you said that you found Officer Burmaster not to be credible?
A. If that's what it says, yes.
Q. Yes. If you want to, please take a look at it. I mean, I'll represent to you that is what it says.
MR. ANADA: Object to form; asked and answered.
BY MR. ALPAUGH:
Q. Okay. So can you tell us -- I mean, this is a whole lot of things here. I presume the fact that he responded to call for service has no -- does not play

EXHIBIT G



into your determination he was not credible?

A. The fact that he responded to a call for service?

Q. Yes. Officer Burmaster's respond to call for service, did that play into your conclusion that he was not credible?

A. No.

Q. Okay. Let me ask a different way. In this -- in this -- in these -- these paragraphs, what in -- in these paragraphs on page 15 play into your conclusion that he was not credible?

A. Whatever is in the paragraph. It's all taken into consideration.

MR. ANADA: Object to form; asked and answered.

BY MR. ALPAUGH:

Q. Okay. So -- so I guess I'll go through sentence by sentence.

"Officer Burmaster stated before entering the front yard residence" --

THE REPORTER: I'm sorry. Can you slow down?

BY MR. ALPAUGH:

Q. "Officer Burmaster stated before entering the front yard of the residence, he checked the yard for





any signs of dogs."

Does that play into your credibility assessment?

A. With that particular statement?

Q. Yes.

A. No, not if that's what he said.

Q. Okay.

A. Or if that's what I observed from the video. If that's what I'm stating that I observed from the video or that's what he said, that's what typed.

Q. Yeah. And then the next sentence says, "Upon entering the yard and approaching the front door of the residence, Officer Bur- -- officers Burmaster and Roussel heard the sounds" --

THE REPORTER: I'm sorry. Can you please slow down?

MR. ALPAUGH: I'm sorry.

BY MR. ALPAUGH:

Q. "Upon entering the yard and approaching the" -- I've had that problem for years -- "approaching the front door of the residence, officers Burmaster and Roussel heard the sound of dog barking."

Did that play into your determination that he was not credible?

A. That -- if that's what I observed from the





video, that's what I typed.

BY MR. ALPAUGH:

Q. Okay. And we've already addressed the next couple of sentences. And then where it says, "Officer Burmaster stated he was scared the dog would bite his genitals causing a penetrating wound," did that bear into your credibility assessment?

A. I would say that that did, yes.

Q. How -- how so?

A. The dog was not in the proximity to do so.

Q. Based on your view of the body-worn camera?

A. Based on the view of the body-worn camera. And also based on the information Officer Burmaster provided.

Q. Okay. Rather than go through every line, is there anything else in here that you felt he was -- any statement he made in here, other than the one beginning "In Officer Burmaster's criminal statement" and ending with "cannot recall the dog's actions" -- other than that section, is there anything else in here -- and -- and also the scared of the dog biting genitals statement, is there anything else in here that you felt -- where you felt he was not credible?

MR. ANADA: Form.

A. I can only say what's in the statement. I





don't know specifically what -- only what I have listed here as --

BY MR. ALPAUGH:

Q. Well, everything in here is not -- is not something you found to not be credible. This -- this is simply a listing of what happened.

A. That's correct.

MR. ANADA: Form.

BY MR. ALPAUGH:

Q. Again, officers -- Officer Burmaster's actions at the time were based on his perc- -- his perception in that yard of -- of all the factors that -- that were happening around him. Correct?

MR. ANADA: Form.

A. I cannot say what it was based on.

BY MR. ALPAUGH:

Q. All right. You can't get into his head; no idea what he did?

A. I can't.

Q. You -- you can't know what he was considering other than what he may have told you in his statement?

A. I cannot.

Q. And the body-worn camera doesn't reveal what somebody is thinking?

A. That is correct.



