David Duplantier                                    March 08, 2023

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   DEREK BROWN and JULIA        CIVIL ACTION NO.
     BARECKI-BROWN                22-00847
 5
     VERSUS
 6                                DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF    SECTION: L
     NEW ORLEANS
 8

 9

10

11   * * * * * * * * * * * * * * * * * * * * * * * * *

12            TRANSCRIPT OF THE DEPOSITION OF:

13                  DAVID DUPLANTIER,

14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

17   * * * * * * * * * * * * * * * * * * * * * * * * *

18

19          REPORTED AT:

20          NEW ORLEANS CITY HALL

21          1300 PERDIDO STREET, ROOM 5E03

22          NEW ORLEANS, LOUISIANA  70112

23

24

25          COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```

EXHIBIT H



David Duplantier                                           March 08, 2023
                                                                  Page 2

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4        JONES WALKER L.L.P.
          (BY:  TARAK ANADA, ESQ.)
 5        201 ST. CHARLES AVENUE, 49TH FLOOR
          NEW ORLEANS, LOUISIANA  70170
 6        (504) 582-8322
          tanada@joneswalker.com
 7

 8    FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9        NEW ORLEANS CITY ATTORNEY'S OFFICE
          (BY:  JAMES M. ROQUEMORE, ESQ.)
10        1300 PERDIDO STREET, SUITE 5E03
          NEW ORLEANS, LOUISIANA  70112
11        (504) 658-9800
          james.roquemore@nola.gov
12

13    FOR DERRICK BURMASTER:

14        GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
          (BY:  C. THEODORE ALPAUGH III, ESQ.)
15        639 LOYOLA AVENUE, SUITE 2130
          NEW ORLEANS, LOUISIANA  70113
16        (504) 529-4141
          cta@gustebarnett.com
17

18    ALSO PRESENT:

19        SOPHIA CEFOLIA

20
      REPORTED BY:
21
          YOLANDA J. PENA
22        CCR NO. 2017002, RPR
          STATE OF LOUISIANA
23

24

25
```



EXHIBIT H



David Duplantier

1                     I N D E X

2

3                                           PAGE

LIST OF EXHIBITS....................................4

4

STIPULATION.........................................5

5

EXAMINATION BY:

6

        MR. ANADA..............................6, 107, 145

7

        MR. ALPAUGH..........................86, 119, 144

8

        MR. ROQUEMORE..............................121

9

CERTIFICATE.......................................147

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25




EXHIBIT H

David Duplantier                                        March 08, 2023
                                                                Page 4

```
1                        LIST OF EXHIBITS

2
```

Exhibit No. 1...........................................7
     (Second Amended Complain)

Exhibit No. 8..........................................21
     (Notice of 30(b)(6) Deposition
     & Request to Bring Documents,
     Information, or Objects)

Exhibit No. 20.A......................................110
     (Event Summary)

Exhibit No. 22.........................................46
     (NOPD Operations Manual,
     Chapter 1.7.1, Conducted
     Energy Weapon)

Exhibit No. 23.........................................49
     (NOPD Operations Manual,
     Chapter 1.3, Use of Force)

Exhibit No. 40.........................................86
     (CITY DEFENDANTS 003646,
     Policy Tactics Training
     Recommendations)

City Exhibit No. 1....................................125
     (CITY DEFENDANTS 003651,
     PowerPoint, Responses to the
     Problem of Dog-related
     Encounters)





1                   S T I P U L A T I O N

2

3           IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6           All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9           All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25





EXHIBIT H

```
 1                        DAVID DUPLANTIER,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                         EXAMINATION
 5   BY MR. ANADA:
 6        Q.   Good afternoon, Sergeant.
 7        A.   Good afternoon.
 8        Q.   My name is Tarak Anada.  I represent the Brown
 9   family.  Thank you for giving us your time today.  And
10   I apologize that the deposition was delayed a little
11   bit.
12        A.   No worries.
13        Q.   I value your time, and I'm going to do my best
14   to be quick and efficient.
15             Have you given a deposition before?
16        A.   It's been a while, but yes, I have.
17        Q.   How many times, do you think?
18        A.   Maybe once, twice.
19        Q.   Do you remember what the depositions were in
20   regard to?
21        A.   It's been a long -- it's been a while since
22   I've been on the streets, so it's been -- it's -- I
23   couldn't even tell.  It's probably been over ten years.
24        Q.   Oh, wow.  Okay.  Yeah.  I can't remember what
25   I did last week, so I don't blame you.
```



EXHIBIT H

David Duplantier
March 08, 2023
Page 21

```
 1              copy for the witness.
 2         (Exhibit No. 8 was marked for identification.)
 3                   MR. ANADA:  Here you go.
 4    BY MR. ANADA:
 5         Q.   Have you ever seen this document before?
 6         A.   Yes, I received this.  It has me listed on it
 7    to appear to give -- for this deposition.
 8         Q.   Okay.  What topic have you been designated to
 9    give testimony on?
10         A.   Let's see.  Just basically training on how
11    officers are to handle animals in the field, including
12    NOPD's development of that training.
13         Q.   Okay.  And you're prepared to talk about that
14    today?
15         A.   To the best of my ability.
16         Q.   Sure, okay.  Thanks.
17              And you understand that the responses you give
18    to questions on this specific topic are going to be
19    viewed as NOPD's official responses.  Right?
20         A.   Yes, sir.
21         Q.   Okay.  If you ever answer one of my
22    questions and you think that it's just your,
23    Sergeant Duplantier's --
24         A.   Opinion.
25         Q.   -- opinion or answer but not NOPD's, as an
```





EXHIBIT H

1  class.  I don't recall the title of it, but it was

2  dealing with animals, for the most part.

3      Q.   Do you know if Burmaster took that class?

4      A.   I'm sure he did because every officer has to

5  go through in-service training.  If they don't go

6  through in-service training, then that's -- there is

7  some -- you can get suspended, written up, things of

8  that nature.

9      Q.   Okay.

10     A.   So we make sure every officer attends

11 in-service training, keep records of that.

12     Q.   Fair.

13     A.   So I'm going to go out and say yes on that.

14     Q.   Okay.  So in-service training, it's been

15 addressed one time?

16     A.   I don't recall how long they had that involved

17 with the in-service training because it started out

18 with -- the gentleman that was teaching it was with the

19 ASPCA.  When he left, I ended up actually teaching the

20 class for a while.  Like I said, in-service changes, so

21 I know, at some point, it was taken out of in-service

22 and replaced with some other course.

23     Q.   Sure.

24     A.   They did try to supplement the in-service

25 training class within an ASPCA class that they mandated



EXHIBIT H

```
 1   officers to take, which was an online course.  And --

 2   and not that long ago -- I'll say a few years ago, they

 3   did -- we do what they refer to as DTB, daily training

 4   bulletins.

 5             So every month, they -- it's not through the

 6   academy.  It's through PSAB, Professional Standards and

 7   Accountability Bureau.  They develop training courses

 8   that officers have to take.  It's -- once again, it's

 9   like in-service; you have to go through it.  But they

10   put a training course online.  You read through it, go

11   through it, and at the end, you have to test out of it.

12       Q.   And that's the daily bulletins?

13       A.   Daily training bulletins.  So once a month,

14   they'll come up with a different daily training

15   bulletin.  So after the ASPCA online course, I know the

16   job came up with -- one of the DTBs dealt with, you

17   know, handling animals and being confronted by animals,

18   et cetera.

19       Q.   Did you write that DTB?

20       A.   No, no.  That goes -- that comes out of PSAB.

21   It doesn't come out of the academy.

22       Q.   Are there documents that you can get that can

23   show me what the DTB was or what they were told?

24       A.   PSAB -- PSAB should have a record of it.

25       Q.   Who's that?
```




EXHIBIT H

1    it -- and I don't recall what was asked or what was

2    included in it.

3        Q.    Okay.  Got it.  All right.  So we talked about

4    DTBs.  Let's back up to the annual in-service

5    trainings.

6        A.    Yes, sir.

7        Q.    All right.  So you recall one occasion that

8    use of force against animals was covered in one of

9    those?

10       A.    Yes, sir.

11       Q.    Do you recall a second occasion?

12       A.    Like I said, the -- the only in-face training

13   we had was for the in-service, which is some years ago.

14   They had their online training, which is established by

15   the ASPCA.  As a matter of fact, the recruits take

16   that.  They just took that recently in the academy.

17   And after that, it was the DTB.

18       Q.    Okay.

19       A.    Outside of that, I don't recall anything else.

20       Q.    All right.  So putting aside the DTB and

21   putting aside ASPCA training -- which we'll talk about

22   that.  In terms of the annual in-service trainings, you

23   only recall one occasion that dealt with encountering

24   animals in the line of duty?

25       A.    Yes.




EXHIBIT H

David Duplantier                                March 08, 2023
                                                      Page 28

```
 1        Q.   All right.  Fair enough.
 2             And you believe -- you assume, but you don't
 3   know with a hundred percent certainty, that Burmaster
 4   would have taken that annual in-service training and
 5   also would have gone through the daily bulletin
 6   training.  Right?
 7        A.   The reason I'm leaning towards, yes, he took
 8   it, because if he was out sick, injured, what have you,
 9   that may have prevented him.  Before he could go back
10   to duty, he would have to take -- it's mandated to take
11   the courses.
12             We call it a -- at the end of the year,
13   officers that may have been out -- we have a list of
14   people that did not either complete or go through
15   in-service training.  They -- we set aside -- at the
16   end of the year before we go into the next year,
17   there's time these officers have to come in, and they
18   have to complete this training.
19        Q.   Have you ever seen Burmaster's name on one of
20   these lists of people that?
21        A.   I couldn't -- it's been so long, I couldn't
22   recall.  So I'd have -- they'd have to go back and
23   check records, to be honest with you.
24        Q.   I got you.  So we're making an educated
25   assumption that Burmaster attended those trainings, but
```



**EXHIBIT H**

1   we don't have -- you don't have personal knowledge

2   whether he actually did or didn't?

3        A.   No, sir.

4        Q.   True?  Okay.

5             All right.  Let's go to the ASPCA training.

6   When did that start?  Or when did it end?  Like, what

7   time frame was that?

8        A.   I don't -- it's -- like I say, it's online

9   training that they mandate.  We have so many classes we

10  have to take through online training that's mandated by

11  the department or the federal government.  We're still

12  going through that.  They still have to take the ASPCA

13  training.  I know the recruits do.  I cannot really

14  give you a time frame on when it was mandated via the

15  department for outside the academy.

16       Q.   Do you have any knowledge of whether Burmaster

17  took that online ASPCA training?

18       A.   No knowledge.

19       Q.   Okay.  Have you taken it?

20       A.   Yes, sir.

21       Q.   Do you remember what was covered?

22       A.   No, I don't.

23       Q.   Look, I don't blame you.  I don't blame you.

24            And you -- similarly, you don't recall what

25  was -- what specific -- what was specifically covered

**EXHIBIT H**



1   in the --

2          A.    The actual training?

3          Q.    -- the once-a-year in-service?  You don't

4   remember what was specifically covered about --

5          A.    No.  And I will say this:  Most of -- most of

6   it is -- it's -- I don't want to say redundant because

7   it makes it sound like it's worthless.  But most of

8   it is consistent -- that's a better word to use --

9   where -- I mean, we're not -- they're not making us any

10  experts on the animals.  They're just trying to help us

11  avoid either, A, having animals hurt us or, B, us

12  having to hurt the animals.

13         Q.    Right.

14         A.    So most -- most of the information is pretty

15  consistent.  You know, you try to read the dog's body

16  language because they can't talk but they do give off

17  signals, right.

18         Q.    Sure, sure.

19         A.    So a lot of the -- the training talked about

20  that and what to look for and things of that nature.

21         Q.    Understood.  And we talked about three

22  potential different trainings about dogs, right?  The

23  ASPCA online course, the yearly training, and then --

24         A.    And the DTB.

25         Q.    Yeah.  And out of those three, the only one

EXHIBIT H



David Duplantier                                        March 08, 2023
                                                            Page 96

1           Once he was inside, they actually achieved

2    a combat L.  The initial officer -- I don't recall

3    who went through the gate first, but I know

4    Officer Burmaster -- it's what we refer to as

5    "corner-fed" -- corner-fed entrance point, meaning the

6    entrance and exit point to the yard was shifted more to

7    one side than the other.  So it was closer to the --

8    facing the house, to the right side of the yard rather

9    than being directly in the center.

10          Q.   Okay.

11          A.   So when Officer Burmaster ended up going to

12   achieve this combat L, he went to the left.  The other

13   officer went to the right, which put him closer to the

14   gate, actually.  Officer Burmaster -- shortly after

15   getting in there, the dogs came charging out.  So by

16   the time, there was really nowhere else for him to go.

17   He wasn't going to jump the fence.  He's not going to

18   outrun the dog.

19          And my findings were, based on the response

20   of the dog -- and I'm going to say this for the record.

21   I feel bad about what happened, right.  But his

22   decision-making at that point -- I don't know what else

23   he could have done.  And I've even reached out, said,

24   "Well, okay.  If y'all found him to be wrong, give me

25   an alternative response," which I have not been able to



EXHIBIT H

```
 1   get.
 2        Q.    When you say you reached out, you reached out
 3   to who?
 4        A.    To -- I spoke with PIB.  I spoke with --
 5                   MR. ANADA:   Form.
 6        A.    I think it was Sergeant Helou in PIB,
 7   referencing that.  I never spoke with Officer -- I'm
 8   sorry, Sergeant Brewer firsthand with it.  But I did
 9   speak with Sergeant Helou since he was the one that
10   sent me the PTTR.
11             But for the most part -- I mean -- and I
12   didn't -- as we went through it, like I said, the only
13   thing I could tell him was, "Look, maybe if you paused
14   a few seconds, you might have gotten alerted by the
15   dog."  But he did make an attempt to try and alert any
16   animal inside curtilage of the residence.
17             The fact that he got jammed into the corner
18   was a big factor, and the dog's response.  The dog is
19   just being a dog.  It's his house, his domain, so I get
20   it.  But unfortunately, the dog being a dog put the
21   officer in a situation where he had to do something.
22             The taser -- the probability of the taser
23   being effective, slim to probably none.  The fact --
24   if you wanted to go to an impact weapon, i.e. baton,
25   that -- like I said, you got to let the dog get up on
```



**EXHIBIT H**

David Duplantier                                    March 08, 2023
                                                    Page 99

```
 1              MR. ALPAUGH:  You want to make it
 2        continuing?
 3              MR. ANADA:  You know, I've tried to do
 4        that before, and then some -- I've tried to do
 5        that before, and then some lawyer like put in
 6        a brief that you can't do that.
 7              MR. ALPAUGH:  Okay.  That's fine.
 8              MR. ANADA:  But I would like to.
 9              THE WITNESS:  But -- I'm sorry.  The
10        question was?
11              MR. ALPAUGH:  Can you read that back,
12        ma'am?
13                   (Record read.)
14              MR. ANADA:  Form; scope.  Go ahead.
15        A.   The fact that -- the fact that there were two
16   dogs -- neither dog really took a position that I would
17   consider -- or I think the average person would
18   consider that it was a warning, right.  They were
19   barking, but they were coming towards him.  They were
20   charging towards him.  I didn't find it unreasonable
21   for him to believe that the dog was attacking him.
22   BY MR. ALPAUGH:
23        Q.   Would it be unreasonable to believe that also
24   there's a potential the other dog would attack him as
25   well?
```



EXHIBIT H

1    A.   Dogs are pack animals, so it's not

2   unreasonable to believe that it.  Is it guaranteed the

3   second dog would have done it?  Don't know.  But dogs

4   are pack animals, so it's possible that factor -- that

5   factor loomed as well.

6    Q.   Would you describe what "pack animals" means?

7    A.   Meaning they work together.  There's

8   generally -- one is over the other.  One is a leader;

9   one is the follower.  If the bigger dog was the leader,

10   then it's possible that the other dog would followed or

11   vice versa.

12          So they do hang together.  Dogs hunt together.

13   They tend to eat together.  They are individuals, but

14   they function and they feel more comfortable when

15   they're in a group.  As long as they been -- let me say

16   this.  They don't -- like people, they don't all get

17   along.  But generally, if they do have some type bond

18   between them, they will follow each other.

19    Q.   Officer Burmaster told you he felt he and the

20   other officer were both in imminent danger at the time

21   this happened.  Correct?

22          MR. ANADA:  Form; scope.

23    A.   Yes, sir.

24   BY MR. ALPAUGH:

25    Q.   And (inaudible) officer remorseful about





EXHIBIT H

```
 1   shooting the dog?
 2              MR. ANADA:  Form; scope.
 3        A.   Yes, actually he was.  He -- I remember him
 4   mentioning he didn't want that to happen.
 5   BY MR. ALPAUGH:
 6        Q.   In fact, he has pets himself?
 7        A.   Pardon?
 8        Q.   In fact, he told you he had pets himself?
 9        A.   Yes.
10              MR. ANADA:  Form; scope.
11              (Off-record discussion.)
12   BY MR. ALPAUGH:
13        Q.   But even -- so taking all this into account,
14   it was your determination that this was a reasonable
15   use of force?
16              MR. ANADA:  Object to form; outside the
17         scope.
18        A.   Yes, sir.
19   BY MR. ALPAUGH:
20        Q.   And you didn't see anything wrong with what he
21   did?
22              MR. ANADA:  Object to form; outside the
23         scope.
24        A.   No, sir.
25   BY MR. ALPAUGH:
```

**EXHIBIT H**



```
 1        Q.   So on the next page, you checked off exhibit
 2   proficiency -- "Exhibited Proficiency/Successfully
 3   Passed Training"?
 4        A.   Yes, sir.
 5        Q.   And that's your signature down there?
 6        A.   Yes, sir.
 7        Q.   And down near the bottom is Precious --
 8   Lieutenant Banks?
 9        A.   Yes, at the time.
10        Q.   Captain Banks?
11        A.   Yes, sir.  Now Captain Banks.  At the time,
12   Lieutenant Banks.
13        Q.   And you've been teaching use of force for how
14   many years?
15        A.   Our use of force -- our use of force,
16   quote/unquote, "expert" or our subject matter expert is
17   Lieutenant Hudson Cutno.  So I don't teach use of
18   force.  However, when it comes to this, as far as for
19   use of force and tactics and what have you, I have been
20   put in charge of that just based on my career --
21        Q.   Okay.
22        A.   -- training with the SWAT team, teaching
23   recruits.
24        Q.   So this is what you do?
25        A.   Yes, sir.
```

EXHIBIT H

MAGNA
LEGAL SERVICES

David Duplantier                                    March 08, 2023
                                                    Page 105

```
 1        Q.   Okay.  With all due respect to
 2   former-chief Goodly, that's not what he did?
 3        A.   No, sir.
 4                  MR. ANADA:  Form.
 5   BY MR. ALPAUGH:
 6        Q.   And with all due respect to former-Deputy
 7   Chief Paul Noel, that's not what he did?
 8                  MR. ANADA:  Form; scope.
 9        A.   No, sir.
10   BY MR. ALPAUGH:
11        Q.   With all due respect to Arlinda Westbrook,
12   that's not what she did?
13                  MR. ANADA:  Form; scope.
14        A.   Definitely not.
15   BY MR. ALPAUGH:
16        Q.   All right.  And with regard to
17   Sergeant Brewer, is that what she did?
18                  MR. ANADA:  Form; scope.
19        A.   No, sir.
20   BY MR. ALPAUGH:
21        Q.   So of these people -- all those people, you're
22   the only one qualified to evaluate this?
23                  MR. ANADA:  Object to form; scope.
24        A.   I find myself to have a deeper working
25   knowledge than they do.
```

EXHIBIT H



MAGNA ▶

LEGAL SERVICES

David Duplantier                              March 08, 2023
                                              Page 108

 1        A.    Yes, sir.

 2        Q.    Those are just your personal opinions and not

 3   the official position of the NOPD, right?

 4        A.    I'm not quite sure how to answer that because

 5   it ended up going to two different areas of the

 6   department.  Initially, the first being the

 7   use-of-force panel and their findings on it.  And we

 8   discussed some of the variables that come into play

 9   with it, experience and knowledge and what have you.

10             So I'm going to say it's not my opinion.  It's

11   really -- if you -- when you look at policy and our use

12   of force and things of that nature, that falls into our

13   training.  Now, my opinion will fall into play when

14   they ask me, "Do you feel he" -- whether it be

15   remorseful, understanding, did he come in there with a

16   good attitude, then yeah, that would be my opinion.

17        Q.    Okay.

18        A.    The -- my comments and my findings, I base

19   that not on my opinion.  I base that on our policy and

20   use of force.  And -- and that's why I said, if they

21   had an alternative answer to it, I'm open-minded, tell

22   me.  Maybe it's something I missed, right.  Nobody is

23   perfect.

24        Q.    Sure.

25        A.    So that part of it, I'm going off of, no,

EXHIBIT H



 1    that's -- that's the department.  It's just that you

 2    had two different areas of the department that were at

 3    odds.

 4         Q.   I got you.  Okay.  So your opinions about

 5    whether or not Burmaster violated policies are NOPD's

 6    opinions, right?

 7         A.   Yes, sir.

 8         Q.   Okay.  Their official position, right?

 9         A.   Pardon?

10         Q.   NOPD's official position is what your

11    conclusions are about Burmaster's --

12                   MR. ROQUEMORE:  I'm going to object.

13                   This is beyond the scope of the 30(b)(6).

14                   He's not here as to -- to provide the official

15                   position with regard to what you're asking

16                   about.  He's here to talk about the training

17                   aspect.

18                   MR. ANADA:  Okay.

19                   MR. ROQUEMORE:  So he's -- you know,

20                   this is the official position of NOPD with

21                   regard to training but not necessarily

22                   justification for use of force --

23                   MR. ANADA:  Okay.

24                   MR. ROQUEMORE:  -- or violation of

25                   policy.




EXHIBIT H

David Duplantier                                     March 08, 2023
                                                         Page 110

```
 1            MR. ANADA:  You're objection is on the
 2       record.
 3  BY MR. ANADA:
 4       Q.   Your determinations of whether or not
 5  Burmaster violated policy contained in Exhibit 40 is
 6  NOPD's official position on that subject, right?
 7       A.   From the training academy standpoint, yes.  As
 8  the trainers and training academy, yes.
 9       Q.   It's not just your opinion?
10       A.   No.  That's why the signature of the
11  lieutenant -- my supervisor at the time, she -- she
12  reviewed it and approved it.
13       Q.   Okay.  And NOPD's conclusions on that topic
14  are inconsistent and at odds with the conclusions
15  reached on Exhibit 26.  Right?
16       A.   Yes.
17            MR. ROQUEMORE:  Objection; form.
18            MR. ANADA:  Thank you.  I got another
19       one here.
20   (Exhibit No. 20.A was marked for identification.)
21  BY MR. ANADA:
22       Q.   NOPD's official conclusions about whether
23  Burmaster did or did not violate policy and training of
24  the NOPD are at odds and inconsistent with the document
25  reflected -- the conclusions in Exhibit 20.A, correct?
```




EXHIBIT H