David Duplantier                                    March 08, 2023

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4   DEREK BROWN and JULIA          CIVIL ACTION NO.
     BARECKI-BROWN                  22-00847
 5
     VERSUS
 6                                  DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF      SECTION: L
     NEW ORLEANS
 8

 9

10

11   * * * * * * * * * * * * * * * * * * * * * * * * *

12            TRANSCRIPT OF THE DEPOSITION OF:

13                  DAVID DUPLANTIER,

14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

17   * * * * * * * * * * * * * * * * * * * * * * * * *

18

19         REPORTED AT:

20         NEW ORLEANS CITY HALL

21         1300 PERDIDO STREET, ROOM 5E03

22         NEW ORLEANS, LOUISIANA  70112

23

24

25         COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```



```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         JONES WALKER L.L.P.
           (BY:  TARAK ANADA, ESQ.)
 5         201 ST. CHARLES AVENUE, 49TH FLOOR
           NEW ORLEANS, LOUISIANA  70170
 6         (504) 582-8322
           tanada@joneswalker.com
 7

 8    FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9         NEW ORLEANS CITY ATTORNEY'S OFFICE
           (BY:  JAMES M. ROQUEMORE, ESQ.)
10         1300 PERDIDO STREET, SUITE 5E03
           NEW ORLEANS, LOUISIANA  70112
11         (504) 658-9800
           james.roquemore@nola.gov
12

13    FOR DERRICK BURMASTER:

14         GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
           (BY:  C. THEODORE ALPAUGH III, ESQ.)
15         639 LOYOLA AVENUE, SUITE 2130
           NEW ORLEANS, LOUISIANA  70113
16         (504) 529-4141
           cta@gustebarnett.com
17

18    ALSO PRESENT:

19         SOPHIA CEFOLIA

20

21    REPORTED BY:

           YOLANDA J. PENA
22         CCR NO. 2017002, RPR
           STATE OF LOUISIANA
23

24

25
```



David Duplantier                                        March 08, 2023
                                                            Page 3

```
 1                        I N D E X

 2
                                                    PAGE
 3
    LIST OF EXHIBITS....................................4
 4
    STIPULATION.........................................5
 5
    EXAMINATION BY:
 6
         MR. ANADA..............................6, 107, 145
 7
         MR. ALPAUGH.........................86, 119, 144
 8
         MR. ROQUEMORE.................................121
 9
    CERTIFICATE.......................................147
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



David Duplantier

March 08, 2023
Page 4

1                        LIST OF EXHIBITS

2

3    Exhibit No. 1.......................................7
          (Second Amended Complain)
4
     Exhibit No. 8......................................21
5         (Notice of 30(b)(6) Deposition
           & Request to Bring Documents,
6          Information, or Objects)

7    Exhibit No. 20.A..................................110
          (Event Summary)
8
     Exhibit No. 22.....................................46
9         (NOPD Operations Manual,
           Chapter 1.7.1, Conducted
10         Energy Weapon)

11   Exhibit No. 23.....................................49
          (NOPD Operations Manual,
12         Chapter 1.3, Use of Force)

13   Exhibit No. 40.....................................86
          (CITY DEFENDANTS 003646,
14         Policy Tactics Training
           Recommendations)
15
     City Exhibit No. 1...............................125
16         (CITY DEFENDANTS 003651,
           PowerPoint, Responses to the
17         Problem of Dog-related
           Encounters)

18

19

20

21

22

23

24

25



1                    S T I P U L A T I O N

2

3           IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6           All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9           All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25

MAGNA
LEGAL SERVICES

David Duplantier                                    March 08, 2023
                                                          Page 6

```
 1                    DAVID DUPLANTIER,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                      EXAMINATION
 5   BY MR. ANADA:
 6        Q.   Good afternoon, Sergeant.
 7        A.   Good afternoon.
 8        Q.   My name is Tarak Anada.  I represent the Brown
 9   family.  Thank you for giving us your time today.  And
10   I apologize that the deposition was delayed a little
11   bit.
12        A.   No worries.
13        Q.   I value your time, and I'm going to do my best
14   to be quick and efficient.
15             Have you given a deposition before?
16        A.   It's been a while, but yes, I have.
17        Q.   How many times, do you think?
18        A.   Maybe once, twice.
19        Q.   Do you remember what the depositions were in
20   regard to?
21        A.   It's been a long -- it's been a while since
22   I've been on the streets, so it's been -- it's -- I
23   couldn't even tell.  It's probably been over ten years.
24        Q.   Oh, wow.  Okay.  Yeah.  I can't remember what
25   I did last week, so I don't blame you.
```



```
 1              MR. ANADA:  I'm going to mark a document
 2         entitled "Second Amended Complaint" as
 3         Exhibit 1.
 4      (Exhibit No. 1 was marked for identification.)
 5  BY MR. ANADA:
 6      Q.   Sergeant, did you have an occasion to skim or
 7  review this document?
 8      A.   The one that I just received?
 9      Q.   Yeah.
10      A.   Yes.  As we were on break, I started reading
11  through it.
12      Q.   Yeah, okay.  The reason I have it is I wanted
13  to show you -- because it gives you a little bit of
14  flavor of what the Brown family is alleging in this
15  matter.
16      A.   Okay.
17      Q.   Do you have a dog?
18      A.   Yes, I do.  I definitely have a dog.
19      Q.   Beautiful.
20      A.   It's my child, so.
21      Q.   He's beautiful.  I have two dogs, and I
22  consider them my children as well.
23      A.   I agree.
24      Q.   I consider them my children as my -- in the
25  same way as my friends who have human children consider
```



1  them their children.  Do you feel the same way about

2  your dog?

3       A.   Yes, sir, I do.

4       Q.   And I think from -- from reviewing this

5  document, can you tell that the Brown family also felt

6  that way?

7       A.   Yeah, I can.  As I read the document, I

8  glanced at the picture of the dog, but I didn't really

9  want to look at it because I understand -- not having

10 gone through it, but I can safely say I understand

11 probably how they feel.

12      Q.   You'd be devastated if somebody shot your dog,

13 right?

14      A.   Yes, sir.

15      Q.   I would be too.  For both.  For both your dog

16 and my dog, if anyone shot either of them.

17           Can you tell me a little bit about what your

18 progression of ranks and roles have been from when you

19 joined the NOPD until now, just generally?

20      A.   Started in NOPD in 1991.  Naturally, like

21 every other officer, patrol for three, four years.

22 They transferred me over to an undercover narcotics

23 unit I worked at for three years.  I think right after

24 narcotics, I went back to the district as a narcotics

25 detective, not working under -- undercover capacity.  I



1  did that for about a year.

2          I moved on to -- I earned a position on the

3  SWAT team.  I applied for the SWAT team.  I spent maybe

4  about 12, 13 years there.  And after the SWAT team,

5  they offered me to come teach, so I've been at the

6  academy, I would say -- as a supervisor, but at the

7  academy since maybe 2013.

8          But I also -- there was a break with my

9  SWAT -- my SWAT responsibilities.  They took me back as

10 an instructor there for a few years to teach from a

11 patrolman standpoint.  Went back to the SWAT team.

12 Went back to the -- so it's kind of been back and forth

13 between the SWAT team and the academy.

14         And I've been at the academy now, I would say,

15 consistently for the last maybe -- let's see.  I said

16 '13?  What?  Twelve years, maybe 13 years, somewhere in

17 that category.  My numbers might be off a little, but

18 it's been a while.

19    Q.    Understood, understood.  Thank you.

20         It sounds like you have experienced both

21 patrolling the streets and also training patrolmen and

22 SWAT team members.  Is that right?

23    A.    Yes, sir.

24    Q.    When you were patrolling the streets, have you

25 ever had the occasion to come upon a canine at any of



 1   the residence you investigated or entered?

 2        A.   Numerous times.

 3        Q.   Have you ever shot any of the dogs you've

 4   encountered?

 5        A.   I have never shot a dog.  I have been on scene

 6   where a dog was shot by a team member, but I haven't

 7   shot a dog personally.

 8        Q.   Are you able to estimate how many times you've

 9   encountered a dog in the line of duty?

10        A.   Oh, I -- I couldn't give you a number.  I

11   would -- I would be pulling something out the sky.

12        Q.   It would be like more than 50, right?

13        A.   I'm sure.  Thirty-two years, yeah.

14        Q.   Okay.  Have any of those dogs, to your memory,

15   ever acted aggressively towards you?

16        A.   A few of them, yes.  A few of them.

17        Q.   How did you deal with those instances?

18        A.   Well, as I stated, one -- we executed a

19   warrant on a house one time, and we were forced to

20   apply force against dog, which actually ended up

21   killing the dog.

22        Q.   That was a no-knock?

23        A.   Yes, it was a no-knock.  The -- just off the

24   top of my head, there was a dog we had to tase -- use a

25   taser against, and we were fortunate -- actually, not



David Duplantier

1  that long -- maybe a few years ago, we had a dog -- we

2  were fortunate to where we had enough time to -- to

3  kind of establish barriers and -- and pretty much work

4  it to where we kind of got the dog cornered and got him

5  into an isolated area where he couldn't get out to hurt

6  anybody.

7        Q.   Was that different than the dog that was

8  tased?

9        A.   Yes.

10       Q.   Okay.

11       A.   Yes.

12       Q.   Tell me about the dog -- the incident where

13  the dog was tased?

14       A.   The dog had actually attacked another officer.

15  And once again, we were on the SWAT team, so I don't

16  recall if it was a warrant.  I -- I'm not sure what it

17  was.  But I remember the dog went after another

18  officer.  And we hadn't had tasers, CEW, however you

19  want to refer to it, very long.  But -- as a matter of

20  fact, at the time, the only people carrying it were --

21  was the SWAT team.

22            But while the dog was attacking the officer,

23  another team member was able to get a deployment on the

24  dog and got him to not necessarily release because it

25  didn't cause any release right off the bat.  Once the



```
 1   cycle finished, the shock of it, the pain of it, I
 2   guess, caused the dog to -- to pull back off of the
 3   officer.
 4        Q.   It sounds to me that you observed the CEW in
 5   that situation to be a nonlethal tool that, in fact,
 6   mitigated the threat presented by that dog.  Is that
 7   accurate?
 8        A.   Yes.
 9        Q.   Okay.  You ever seen anyone use a baton to
10   mitigate a threat posed by a dog?
11        A.   Not -- I don't recall ever seeing a baton
12   used, per se, to -- to keep -- to ward off a threat
13   from an animal, so I would have to say no on that one.
14        Q.   Have you ever -- in your time patrolling the
15   streets, in your over 50 times encountering a dog in
16   the line of duty, have you ever seen any officer use
17   force on a dog that was four months old, stood less
18   than 18 inches and weighed just over 22 pounds?
19        A.   I've seen force applied to an animal roughly
20   that size, give or take a few pounds.  I don't know the
21   age of the animal, but I've seen some officers use --
22   apply force against a dog small -- I would say small in
23   stature.
24        Q.   And this is multiple times you've observed
25   this?
```



```
 1          A.    I would say a couple times in my career.
 2          Q.    Can you tell me about the couple times you
 3    remember?  Just to get a flavor of what happened.
 4          A.    God, it was -- it was years and years ago,
 5    still in patrol.
 6          Q.    Just whatever you remember.  I know it's hard
 7    to --
 8          A.    Checking an alarm on a house, the dog -- we
 9    didn't -- the officer didn't find out until afterwards,
10    the dog was actually chained, but you didn't see it
11    right off the bat.  It was dark.
12          Q.    Sure.
13          A.    As the officer was going down the alley to
14    check the rear of the house, we -- coming around, we
15    heard the officer screaming at the dog.  And the
16    officer was backing out of there, but the dog is making
17    a straight beeline for him, so he ended up firing at
18    the dog.
19                I do not recall -- I don't think it was a
20    lethal shot, but -- yeah, I don't think it was a lethal
21    shot on that one.  I do know force being applied to --
22    this dog was actually a puppy, but it had a decent size
23    to it.  And that was on -- that was on the warrant we
24    executed.
25                Upon entering the house, the dog popped up,
```



 1  ran towards the officer, and the officer fired.  I know

 2  that -- I know that was a nonlethal shot because we

 3  actually took the dog over to a med vet or some

 4  emergency animal hospital and -- and got it treated.

 5       Q.   That was a nice thing to do.

 6            On that occasion, did the officer fire one

 7  shot or more than one shot at the dog?

 8       A.   The -- the one where we took the dog to the --

 9  I think it was one shot fired, but we had -- we were

10  working in close proximity to each other.  I mean, like

11  within feet.  So when the dog popped up and ran towards

12  the one officer, I mean, we -- we hope -- we train for

13  it, to have some type muscle discipline on our

14  engagement.  So it was -- if I recall -- if I recall

15  correctly, it was one shot.  If it was two, maybe, but

16  no more than that.

17       Q.   Not three?

18       A.   I don't think it was that many shots.

19       Q.   Okay.  In your time being a trainer of SWAT

20  team and also patrol officers, have you given or -- or

21  witnessed any training about evaluating a potential

22  threat and, based on that evaluation, determining

23  whether to use lethal force or nonlethal force?

24       A.   Can you -- because I'm -- I'm not sure what

25  you're asking me.



1        Q.   Yeah.  It's kind of hard to -- has there ever

2   been any training on, like -- I guess I'm going to call

3   it threat assessment.  It could be -- I'm not talking

4   about dogs, necessarily.

5        A.   Just in general?

6        Q.   Yeah.  Like --

7        A.   Officers go through that with use of force.

8   I mean --

9        Q.   Okay.

10        A.   -- whenever -- whenever officers go through

11   use-of-force training, which is ongoing all the time.

12        Q.   Sure.

13        A.   And that -- that's applicable to animals,

14   people, what have you.  Naturally, the force has to be

15   reasonable.  So depending on the circumstances, the --

16   what you choose to resort to as an application of

17   force, the circumstances naturally will dictate.

18        Q.   Right.  Of course.

19        A.   So yeah.  They go through -- officers go

20   through that training on a regular.

21        Q.   Okay.  Is part of that training to help

22   officers correctly identify what is reasonably a threat

23   of serious bodily harm or death versus something that

24   is not a threat arising to that level?  Does the

25   training help officers determine whether it's a threat



```
 1  that justifies lethal force versus a threat that does
 2  not justify lethal force?
 3       A.   I'll say, yes, the training does cover that.
 4  It's -- it's hard to be because as I -- as I teach
 5  recruits, I say I can take this incident and take one
 6  small factor of it and change it slightly.
 7       Q.   Sure.
 8       A.   And it will dramatically -- or could
 9  dramatically change their response to it.  So once
10  again, I guess the biggest thing is, is the key word is
11  "reasonableness" --
12       Q.   Right.
13       A.   -- if the force -- force being used is
14  reasonable.  Does it fit -- as you're asking me, does
15  it fit the problem at hand.  And even then, we've had
16  situations where the force is justifiable -- would have
17  been justifiable, but there are other factors that fall
18  in -- i.e., who's around?  What's around?  What other
19  elements are present that may stop you from you
20  applying that force?  Which means you got to come up
21  with another quick plan or take what's coming to you.
22  I hate to say it that way, depending on what that
23  something is, you know.
24       Q.   Understood, understood.
25            Does NOPD train their officers on how to
```



```
 1    determine whether the use of lethal force is reasonable
 2    versus non-reasonable in any given scenario?  Or is
 3    that just totally left up to the officer?
 4         A.   When you -- well -- and -- and when we
 5    talk about reasonableness, yeah, we take into
 6    consideration -- when we're teaching use of force,
 7    we take into consideration the situation and the facts
 8    at hand.
 9              But at the same time -- using myself as an
10    example and not trying to just limit it to an animal.
11    My response to animal may be different from someone
12    else's, only because of my comfort level with the
13    animal, right.
14         Q.   Right.
15         A.   Or dealing with animals, I should say.  So
16    when we talk about reasonableness and threat levels, it
17    also falls to the mind of that officer, right.
18         Q.   It has some --
19         A.   And it does have to fall in parameters.  Even
20    through -- so what may frighten you may be more than
21    what frightens me.  It still has to fall in a that
22    parameter of will the average person look at it and
23    say, "Yeah, I may not have done it because I may feel
24    more comfortable with this situation."  But I can see
25    where someone did.  I can understand where those
```



 1  actions were taken, other -- where other people may

 2  have taken those same actions.

 3      Q.  Understood.  So there's some subjective

 4  component of --

 5      A.  Yes.

 6      Q.  -- this decision-making matrix?

 7      A.  Yes.

 8      Q.  Okay.  And is it correct that NOPD trains

 9  their officers that part of the use of force

10  decision-making process is based on that particular

11  officer's subjective thoughts, experience, comfort

12  level with animals, et cetera?

13      A.  For the most part, yes.

14      Q.  Okay.  Did you -- did you know

15  Officer Burmaster before -- before this incident?

16      A.  Yeah.  He's been on the job for a while.

17      Q.  Okay.  So you've trained him before, before

18  this incident?

19      A.  I mean, he's been in in-service.  Officers go

20  through annual in-service training, so I'm going to say

21  yes on that.  You know, they come in and out for

22  training every year or --

23      Q.  He probably did?

24      A.  Especially -- yes.  I've dealt with him in

25  some case outside of this particular incident.



1    Q.   You probably did, but you don't have a

2    specific recollection of --

3    A.   Right.  Correct.

4    Q.   Fair.  What were your -- what were your

5    thoughts about Burmaster as a police officer prior to

6    this incident?

7    A.   I mean, I guess if somebody asked me to

8    describe him, he's active.  You know, you have some

9    officers, they exist and you see them annually, and

10   you're like, I didn't even know he's still on the job.

11   And then there's some that -- you have officers that

12   act out in the field, and they're constantly getting

13   into stuff, you know.

14        We -- I don't want to use the word.  We call

15   them "crap magnets," right.  I was a crap magnet.  You

16   know, if I went out in the field, everything would be

17   great, and it would be my luck that something is going

18   to happen that I have to address.  So I would put him

19   in that category.

20   Q.   What about kind of crap do you remember that

21   Officer Burmaster has magneted to him?

22   A.   And -- and I don't really recall anything in

23   particular off --

24   Q.   Okay.

25   A.   I just -- you know.  Like I say, if



1    somebody -- some names will pop up.  You know, they're

2    going to always be involved in something, good, bad,

3    indifferent, who knows.  But they're going to --

4    something is going to happen.  They -- like I said, I

5    use myself as an example.  Say if you're riding with

6    him, we're going to get into something.  Something is

7    going to happen.

8        Q.   All right.  And you agree about that as to

9    Burmaster?

10       A.   Yeah.

11       Q.   And you don't -- you don't think all NOPD

12   officers are like this, just some.  Right?

13       A.   Like -- meaning?

14       Q.   Like, all NOPD officers are not crap magnets,

15   right?

16       A.   No.  Because, I mean, like anything in life,

17   there's some people that are more apt to want to go

18   work, and then you have some people that they'll do

19   just enough that they have to do and -- you know.

20       Q.   I got you.  Okay.  That makes sense.

21            Can you describe to me the training that --

22              MR. ANADA:  Oh, you know what I forgot

23            to do -- let me just rewind real quick.  I'm

24            going to mark as Exhibit 8 the notice of

25            30(b)(6) deposition of NOPD.  Let me find a



```
 1                    copy for the witness.
 2          (Exhibit No. 8 was marked for identification.)
 3                    MR. ANADA:  Here you go.
 4     BY MR. ANADA:
 5          Q.   Have you ever seen this document before?
 6          A.   Yes, I received this.  It has me listed on it
 7     to appear to give -- for this deposition.
 8          Q.   Okay.  What topic have you been designated to
 9     give testimony on?
10          A.   Let's see.  Just basically training on how
11     officers are to handle animals in the field, including
12     NOPD's development of that training.
13          Q.   Okay.  And you're prepared to talk about that
14     today?
15          A.   To the best of my ability.
16          Q.   Sure, okay.  Thanks.
17               And you understand that the responses you give
18     to questions on this specific topic are going to be
19     viewed as NOPD's official responses.  Right?
20          A.   Yes, sir.
21          Q.   Okay.  If you ever answer one of my
22     questions and you think that it's just your,
23     Sergeant Duplantier's --
24          A.   Opinion.
25          Q.   -- opinion or answer but not NOPD's, as an
```



```
 1   organization, will you tell me so I don't get confused
 2   about that?
 3        A.   Yes.
 4        Q.   Okay.
 5        A.   Yes.
 6             MR. ROQUEMORE:  I'm going to object to
 7             the extent that that's not a -- I mean,
 8             you-guys -- I'm going to object to the extent
 9             that it's unreasonable for him to always
10             qualify his answers.
11             I think if there's a question, you know,
12             I would suggest that we need to -- like, you
13             know, if there's a question on whether he's
14             testifying on the topic he's designated for,
15             that would be part of the questioner's
16             responsibility to make sure that, you know,
17             the scope of the answer and the applicability.
18             MR. ANADA:  Okay.
19             MR. ROQUEMORE:  So that's my objection.
20             MR. ANADA:  Yes, sir.  Objection is
21             noted for the record.
22             MR. ROQUEMORE:  Yes, sir.
23   BY MR. ANADA:
24        Q.   Do you ever remember Officer Burmaster telling
25   you he was afraid Apollo would bite him in the penis?
```



1        A.    I don't recall that.

2        Q.    Okay.  Let's go to the topic you're designated

3   about, Sergeant.  "NOPD trained on how officers are to

4   handle animals in the field."  Let's just stop there.

5              I think the most efficient way is can -- can I

6   just ask you this question, and you answer it to the

7   best of your ability?  What kind of training do NOPD

8   officers get about how to handle animals in the field?

9        A.    Between -- and I don't recall the exact time

10  frame.  But I know there was between -- sometimes

11  between early 2000 to 2000- and, maybe, -14, sometime

12  in there we had training and in-service on handling

13  animals, right.

14       Q.    This is post -- post-academy?  Like after --

15       A.    No.  This was actually -- so the in-service

16  training is annual training that officers go through

17  every year.  They'll come up with a curriculum

18  targeting certain areas that -- some things don't

19  change, other go through legal updates, but some things

20  are added and maybe deleted based off of the -- the job

21  trying to get information out --

22       Q.    Sure.

23       A.    So I know in -- like, I don't recall the exact

24  date, but we did -- at some point for that annual

25  in-service training for police officers, there was a



 1    class.  I don't recall the title of it, but it was
 2    dealing with animals, for the most part.
 3         Q.   Do you know if Burmaster took that class?
 4         A.   I'm sure he did because every officer has to
 5    go through in-service training.  If they don't go
 6    through in-service training, then that's -- there is
 7    some -- you can get suspended, written up, things of
 8    that nature.
 9         Q.   Okay.
10         A.   So we make sure every officer attends
11    in-service training, keep records of that.
12         Q.   Fair.
13         A.   So I'm going to go out and say yes on that.
14         Q.   Okay.  So in-service training, it's been
15    addressed one time?
16         A.   I don't recall how long they had that involved
17    with the in-service training because it started out
18    with -- the gentleman that was teaching it was with the
19    ASPCA.  When he left, I ended up actually teaching the
20    class for a while.  Like I said, in-service changes, so
21    I know, at some point, it was taken out of in-service
22    and replaced with some other course.
23         Q.   Sure.
24         A.   They did try to supplement the in-service
25    training class within an ASPCA class that they mandated



David Duplantier                                    March 08, 2023
                                                         Page 25

 1   officers to take, which was an online course.  And --
 2   and not that long ago -- I'll say a few years ago, they
 3   did -- we do what they refer to as DTB, daily training
 4   bulletins.
 5           So every month, they -- it's not through the
 6   academy.  It's through PSAB, Professional Standards and
 7   Accountability Bureau.  They develop training courses
 8   that officers have to take.  It's -- once again, it's
 9   like in-service; you have to go through it.  But they
10   put a training course online.  You read through it, go
11   through it, and at the end, you have to test out of it.
12      Q.   And that's the daily bulletins?
13      A.   Daily training bulletins.  So once a month,
14   they'll come up with a different daily training
15   bulletin.  So after the ASPCA online course, I know the
16   job came up with -- one of the DTBs dealt with, you
17   know, handling animals and being confronted by animals,
18   et cetera.
19      Q.   Did you write that DTB?
20      A.   No, no.  That goes -- that comes out of PSAB.
21   It doesn't come out of the academy.
22      Q.   Are there documents that you can get that can
23   show me what the DTB was or what they were told?
24      A.   PSAB -- PSAB should have a record of it.
25      Q.   Who's that?



 1       A.    PSAB, the -- that acronym, that Professional

 2  Standards and Accountability Bureau, it's just a

 3  division of the -- of the department.  They should have

 4  a record of it.

 5       Q.    Okay.  Has anyone ever asked you to gather

 6  those documents for this --

 7       A.    I -- yeah, I did a little research on it.  My

 8  problem I found was that the present captain over PSAB

 9  was not there when -- so his knowledge on it was

10  little, was not there when -- naturally when the DTB

11  was put in place.

12       Q.    Understood.

13       A.    I did reach out to someone who had been there

14  for a while, and they remember putting it together, but

15  they couldn't tell me exactly, off the top -- they

16  said, "I don't know who put it together."

17       Q.    Is there, like, a computer database, something

18  where we could just search for it and try to find it?

19       A.    I have no idea.  I have no idea on that one.

20       Q.    Do you know if anyone at NOPD ever looked into

21  that?

22       A.    I don't know.

23       Q.    Okay.  Do you know -- and I'm assuming you're

24  unfamiliar with the actual content of that DTB.  Right?

25       A.    Correct.  Other than myself having to take



David Duplantier                                    March 08, 2023
                                                    Page 27

```
 1  it -- and I don't recall what was asked or what was
 2  included in it.
 3      Q.   Okay.  Got it.  All right.  So we talked about
 4  DTBs.  Let's back up to the annual in-service
 5  trainings.
 6      A.   Yes, sir.
 7      Q.   All right.  So you recall one occasion that
 8  use of force against animals was covered in one of
 9  those?
10      A.   Yes, sir.
11      Q.   Do you recall a second occasion?
12      A.   Like I said, the -- the only in-face training
13  we had was for the in-service, which is some years ago.
14  They had their online training, which is established by
15  the ASPCA.  As a matter of fact, the recruits take
16  that.  They just took that recently in the academy.
17  And after that, it was the DTB.
18      Q.   Okay.
19      A.   Outside of that, I don't recall anything else.
20      Q.   All right.  So putting aside the DTB and
21  putting aside ASPCA training -- which we'll talk about
22  that.  In terms of the annual in-service trainings, you
23  only recall one occasion that dealt with encountering
24  animals in the line of duty?
25      A.   Yes.
```



1        Q.    All right.  Fair enough.

2              And you believe -- you assume, but you don't

3    know with a hundred percent certainty, that Burmaster

4    would have taken that annual in-service training and

5    also would have gone through the daily bulletin

6    training.  Right?

7        A.    The reason I'm leaning towards, yes, he took

8    it, because if he was out sick, injured, what have you,

9    that may have prevented him.  Before he could go back

10   to duty, he would have to take -- it's mandated to take

11   the courses.

12             We call it a -- at the end of the year,

13   officers that may have been out -- we have a list of

14   people that did not either complete or go through

15   in-service training.  They -- we set aside -- at the

16   end of the year before we go into the next year,

17   there's time these officers have to come in, and they

18   have to complete this training.

19       Q.    Have you ever seen Burmaster's name on one of

20   these lists of people that?

21       A.    I couldn't -- it's been so long, I couldn't

22   recall.  So I'd have -- they'd have to go back and

23   check records, to be honest with you.

24       Q.    I got you.  So we're making an educated

25   assumption that Burmaster attended those trainings, but



```
 1  we don't have -- you don't have personal knowledge
 2  whether he actually did or didn't?
 3       A.    No, sir.
 4       Q.    True?  Okay.
 5             All right.  Let's go to the ASPCA training.
 6  When did that start?  Or when did it end?  Like, what
 7  time frame was that?
 8       A.    I don't -- it's -- like I say, it's online
 9  training that they mandate.  We have so many classes we
10  have to take through online training that's mandated by
11  the department or the federal government.  We're still
12  going through that.  They still have to take the ASPCA
13  training.  I know the recruits do.  I cannot really
14  give you a time frame on when it was mandated via the
15  department for outside the academy.
16       Q.    Do you have any knowledge of whether Burmaster
17  took that online ASPCA training?
18       A.    No knowledge.
19       Q.    Okay.  Have you taken it?
20       A.    Yes, sir.
21       Q.    Do you remember what was covered?
22       A.    No, I don't.
23       Q.    Look, I don't blame you.  I don't blame you.
24             And you -- similarly, you don't recall what
25  was -- what specific -- what was specifically covered
```



```
 1    in the --
 2         A.    The actual training?
 3         Q.    -- the once-a-year in-service?  You don't
 4    remember what was specifically covered about --
 5         A.    No.  And I will say this:  Most of -- most of
 6    it is -- it's -- I don't want to say redundant because
 7    it makes it sound like it's worthless.  But most of
 8    it is consistent -- that's a better word to use --
 9    where -- I mean, we're not -- they're not making us any
10    experts on the animals.  They're just trying to help us
11    avoid either, A, having animals hurt us or, B, us
12    having to hurt the animals.
13         Q.    Right.
14         A.    So most -- most of the information is pretty
15    consistent.  You know, you try to read the dog's body
16    language because they can't talk but they do give off
17    signals, right.
18         Q.    Sure, sure.
19         A.    So a lot of the -- the training talked about
20    that and what to look for and things of that nature.
21         Q.    Understood.  And we talked about three
22    potential different trainings about dogs, right?  The
23    ASPCA online course, the yearly training, and then --
24         A.    And the DTB.
25         Q.    Yeah.  And out of those three, the only one
```



 1    that you have any knowledge of the actual content of

 2    that training was the yearly one that --

 3         A.   Correct.

 4         Q.   -- that -- and you taught that?

 5         A.   Yeah, I taught that for a while.

 6         Q.   Okay.  How many years -- and that's just once

 7    a year, right?

 8         A.   Yes.

 9         Q.   How many times did you teach that?

10         A.   Oh, God.  I couldn't even tell you.  I mean,

11    it's -- in-service is every week.  So you get a

12    different group of officers every week until you --

13    until you cover the entire the department.

14         Q.   And -- and you specifically did the dog one,

15    right?

16         A.   Yeah -- well, it talked -- because -- mostly,

17    if you -- if you received a threat from an -- any

18    particular type animal.  A lot of the training talked

19    about dogs in particular.

20         Q.   Got you.  But it was really just use of force

21    on animals?

22         A.   Right.

23         Q.   Got you.  Got you.

24              And you remember teaching that course one

25    time, right?



1        A.   Well, no.  I've taught it several times.  It

2   was just -- it was like -- it's once a week I had to

3   teach it, for a year.

4        Q.   I see.  Okay.  And then, like, one group of

5   officers goes one week, another --

6        A.   Correct.

7        Q.   And everyone just goes once, right?

8        A.   Yes.

9        Q.   All right.  That makes sense.

10            Can you take us through the specific content

11   of that, if you remember?  I know --

12       A.   I -- I remember --

13       Q.   It's not a memory test.

14       A.   I remember we talked about the dog, the

15   position of the tail, the ears, right, that -- I always

16   stress to officers, the majority of the time, the dog

17   is not trying to get into a confrontation, but their

18   way of telling you, "I don't want to fight, but if you

19   come any closer, if you don't leave, I'm willing to do

20   it," is by them sitting there and their posture

21   changes.  You can see the hair on their body change,

22   and they start barking, which is a warning mechanism,

23   right.

24            So we talked about things of that nature.  We

25   talked about what to do prior to entering an enclosed



1    yard.  You know, don't just walk in; take a pause.  You

2    want to try and make a sound or do something, not so

3    loud as to alert a potential threat inside the

4    residence or inside this area, but dogs having keen

5    hearing --

6         Q.   Right.

7         A.   -- a potential -- you're trying to get them to

8    hear you.  All you're looking for is a sign to see if

9    there's an animal in the yard.

10        Q.   So like whistling, kissing sounds?  You don't

11   want to be too loud to tip off the target?

12        A.   Too loud to put yourself -- yeah, to put

13   yourself in harm's way --

14        Q.   Right.

15        A.   -- not from an animal but from a potential

16   threat.

17        Q.   Sure.

18        A.   But loud enough to where you may get the

19   animal's attention.

20        Q.   I got you.  I got you.

21             And this is prior to walking into a gated

22   yard?

23        A.   Yes.

24        Q.   So, like, where did you instruct officers you

25   trained on this topic to make that sound?  Like, at the




1   gate, right?

2        A.   Preferably outside.  Yeah, outside the gate.

3        Q.   Like, in front of the -- in front of the house

4   or property you're about to enter, right?

5        A.   I don't want to say in front because I don't

6   want to give -- we have this thing we refer to as a

7   "fatal funnel," right, where you put yourself into an

8   area where the likelihood or the probability for

9   someone to take a lethal act against, i.e. a gunshot,

10  put you directly -- we refer to -- so naturally, you

11  want it up close enough to the -- to the structure or

12  the location you're going to but not necessarily

13  directly in front of that entry and exit point.

14       Q.   So at the gate, not necessarily in front of

15  the house?

16       A.   Correct.

17       Q.   Okay.  Thanks.  That makes sense to me.

18            You mentioned interpreting the type of signs

19  that a dog could be giving to you to determine whether

20  it's a threat or not.  And you mentioned barking as one

21  sign?

22       A.   Correct.

23       Q.   In the -- you know, in the totality of the

24  circumstances, when an officer has to make a decision

25  about whether they're faced with -- they're being faced



1  with a threat of serious bodily harm or death by a dog,

2  one of the things to evaluate is, is the dog barking at

3  me or not?  Is that --

4       A.   And not all dogs -- I find that certain

5  breeds, they're not big barkers.  They're presence

6  alone and that eye contact they make with you is their

7  way of saying, "You might want to back up."

8       Q.   Yeah?

9       A.   Pit bulls are not big barkers all the time.

10 They -- Rottweilers not big barkers.  They -- you'll

11 get more of a stare from them, and they're waiting to

12 give -- see what you're going to do in response to

13 them.  So certain breeds -- not saying they won't bark,

14 but certain breeds, they're not big at barking.

15      Q.   I wish my pit bull mix was not a barker.

16      A.   Some of them -- some of them -- yeah.  I got a

17 bull -- my bulldog, he --

18      Q.   Anytime someone comes on the porch --

19      A.   He can't be quiet.  He's a nonstop bark -- he

20 barks at everything.

21      Q.   Mine too.  Mine too.  Okay.

22           So barking, in your training, would go towards

23 supporting that there is a credible threat posed by the

24 dog, right?

25      A.   Yes.



David Duplantier                                          March 08, 2023
                                                          Page 36

```
 1        Q.   Okay.  But not the breed of the dog?  Does
 2   that factor in?
 3        A.   Yeah.  I mean -- and once again, it goes to --
 4   I'm -- I'm going to say, for me, it would be a factor.
 5        Q.   Yeah.
 6        A.   But for some people, they don't -- they just
 7   see a dog.  They see an animal.  So some people's fear
 8   level when it comes to animals -- like people with
 9   horses; they won't get near them.  So for me, the breed
10   would be a factor.  For some people -- I can't say for
11   everyone -- that -- that's going to be taken into
12   consideration.
13        Q.   It's one of the subjective components of this,
14   right, based on your own personal experiences,
15   thoughts --
16        A.   Yes, sir.
17        Q.   -- beliefs, and that kind of stuff?
18             And you train the officers that it's fine to
19   factor in your subjective beliefs --
20        A.   Yes, sir.
21        Q.   -- into the overall decision-making rubric.
22   Right?
23        A.   Yes.
24        Q.   There's no reason that they shouldn't, right?
25        A.   No, there's no reason they shouldn't.
```



1      Q.   What about the size of the dog?

2      A.   And -- and I'm going to go back to my answer

3   on the first question.  For me, the size would take --

4   or play a big factor in it.  You know, I -- the last

5   thing I want to do is hurt any animal.  But if kicking

6   the dog would suffice, then I would kick the dog.  If

7   it -- if I thought it was a credible threat to me.  I

8   took it as a credible threat, a potential bite.

9      Q.   That would work really well for a small dog,

10  right --

11     A.   A small dog.

12     Q.   -- kicking?

13     A.   Like, a small.  But then again, like I said,

14  you -- a person's -- when we're going back to talking

15  about use of force and that person's interpretation to

16  the threat level, as long as it stays within reason --

17  so some people, even though it may be a small dog, it

18  still may be a very credible threat to them.

19     Q.   Based on their subjective viewpoint, right?

20     A.   Yes.

21     Q.   And I think I read somewhere -- I don't know.

22  Burmaster will tell you he'd been bitten by small dogs

23  before.  Does that sound familiar?

24     A.   I don't know.  I really don't know.

25     Q.   All right.  So if I'm an officer and I've been



```
1   bitten by small dogs, puppies before, then I'm allowed

2   to factor that in when I decide whether I use lethal

3   force or not.  Right?

4        A.   It -- it is a factor but not --

5        Q.   Yeah.  Not --

6        A.   -- the only -- not the only factor.  It is a

7   factor.

8        Q.   It's part of the equation?

9        A.   Yes, sir.

10       Q.   All right.

11       A.   Yes, sir.

12       Q.   If I have this strange ongoing fear for the

13  last ten years that small dogs are going to bite my

14  genitalia, am I allowed to consider that in the overall

15  analysis?

16       A.   I'm not quite sure how to answer.  I'm going

17  to say consider it in the overall analysis.

18       Q.   Well, yeah.  So I have this fear, this concern

19  that -- and I'm an officer you're training.  I have

20  this fear or concern that a small dog is going to bite

21  me in the genitalia.  I just feel that that's going to

22  happen one day.  I can consider that into my

23  decision-making, per the training you provide, right --

24  or per -- that NOPD provides?  Or do I have to set that

25  aside, and I can't think about that?
```



1        A.    I think that's something you have to set

2   aside.  I mean, you have a lot -- and I'm thinking as

3   we speak.  I know a lot of officers that are deathly

4   afraid of animals -- dogs, period.  They are deathly

5   afraid of dogs.

6             We hope that your observations and what you

7   take in on a call or going to a call or present on a

8   call plays a bigger factor than just your fear, right.

9   I know the fear exists.  I know your worry exists, but

10  there are so many other variables you got to take into

11  consideration.

12            So I -- that's why I said I wasn't quite sure

13  how to answer it.  But I think -- if I'm -- if I'm

14  getting what you're asking me correctly, based off of a

15  comment you just made --

16       Q.    Yeah.

17       A.    -- yes, it's a factor, but that's something

18  that's more on the back burner.  There's so much other

19  stuff that has to be put before it.

20       Q.    It's just one ingredient in the cake mix,

21  right?

22       A.    Yes, sir.

23       Q.    Okay.  So for the annual in-service trainings,

24  we've talked about how an officer is taught to evaluate

25  the threat of a canine in the line of duty.  We've



 1  talked about demeanor, whether or not it's barking,

 2  tail position, ear position, subjective experiences and

 3  beliefs about dogs, size of the dog, breed of the dog.

 4         What else is involved in this training that we

 5  haven't covered?

 6      A.   The demeanor of the officer as well.  Like, I

 7  explain to them -- I used to be really fast, but I'm

 8  not outrunning four legs.  My two will never beat the

 9  four.  Even though my fat bulldog -- he'll catch me in

10  a short distance.

11      Q.   Really?

12      A.   Yeah, he's -- he's a little piece.

13         But I remember -- I recall in the training

14  that some of the things we do can escalate the

15  situation, meaning the dog may be showing you

16  attention, not quite knowing or figuring out if they're

17  good with you or not yet.

18         But the average person, when they see the dog,

19  the first thing they want to do is reach down.  And it

20  may be a gesture of friendliness, but a dog can take

21  that as a threat.  You stand over him.  He doesn't know

22  you; she doesn't know you.  And you're reaching down

23  towards the face, generally.  They -- normally, most

24  people tell you pet from the side and not directly

25  from -- and most people want to do it because the dog



 1  is facing them.

 2      Q.   Right.

 3      A.   So we tell them don't -- even if the dog walks

 4  up to you, let him get a sniff but don't be so quick to

 5  reach out to it.

 6      Q.   You ever heard of people letting the dog sniff

 7  the back of their hand before they --

 8      A.   Yeah.  And I -- I tell them not even to extend

 9  it to them because the dog does -- may not know what

10  you're doing.

11      Q.   Sure.

12      A.   Probably won't.  So just let -- let the hands

13  sit there.  Let him get his smell.  Let him get his

14  feel.  Let him go about his business, and you handle

15  your situation.

16      Q.   I've read in some -- you ever looked at any of

17  the DOJ publicly available training about police

18  officers encountering animals in the line of a duty?

19      A.   I have read things, but I -- I would be

20  misinforming you if I knew it was from the DOJ.  I

21  don't recall.

22      Q.   Right.

23      A.   But I wouldn't be surprised if I did read

24  something regarding or in reference to the Department

25  of Justice.



1    Q.   You ever read any training bullet points or

2    training content, whether it's from the DOJ or not,

3    that says just because a dog is running in your

4    direction does not -- does not mean it's threatening

5    you, does not mean it's intending to cause you harm?

6    A.   Well, I don't recall necessarily reading that.

7    My knowledge base will tell me that.  But once again,

8    there are other factors you're taking into -- there are

9    a lot of other factors you're taking into

10   consideration.

11   Q.   You don't ever train officers to conclude

12   that, just because a dog is running in your direction,

13   it's a threat of serious bodily injury or harm, just

14   based on that.  Right?

15   A.   No, not that solely.  That -- that solely in

16   itself, no.

17   Q.   It's got to be that plus some other indicators

18   of aggression, right?

19   A.   Yes, sir.

20   Q.   Okay.  Like barking?

21   A.   Barking, right.  Body position, the speed that

22   he's coming at you, all of these things --

23   Q.   Maybe bearing his teeth?

24   A.   Yes, sir.

25   Q.   What else does the NOPD animal training, that



1   you are familiar with, cover that we haven't already

2   discussed?

3        A.   One of the things, which is one that never

4   changes, is we go through our CEW training, which is a

5   less lethal means.

6        Q.   Yeah.

7        A.   We talk about that with CEW training, when it

8   comes to animals.

9        Q.   You train officers to consider less lethal

10  means if it's a -- if they have the opportunity to do

11  that.  Right?

12       A.   Yes, sir.

13       Q.   They should consider those before they resort

14  to lethal force?

15       A.   Yes, sir.

16       Q.   And one of those is a CEW?

17       A.   Yes, sir.

18       Q.   Another one -- I think you stated just kicking

19  the dog, and that's, you know, especially effective for

20  a smaller dog.  Right?

21       A.   Yes.

22       Q.   And then the baton?

23       A.   A baton can be used.  The only problem with a

24  baton, the -- the shortcomings of using a baton or any

25  type of impact weapon is in order for you to use it,



David Duplantier                                    March 08, 2023
                                                    Page 44

 1    you have to get really, really close.

 2            Animals generally are a lot quicker than us,

 3    so that means you would have to discipline yourself

 4    enough to allow the dog to get within probably five

 5    feet of you in order for you to effect a strike.  And

 6    it's not guaranteed you'll get a good strike only

 7    because the way the animal is built.  They're not like

 8    people, upright.  So --

 9        Q.    Makes sense.

10        A.    So --

11        Q.    And this is the expandable baton, right?

12        A.    Yes, sir.

13        Q.    Okay.  And you train officers that they are

14    required to carry an expandable baton on them when

15    they're in the line of duty?

16        A.    Yes, sir.

17        Q.    Okay.  And the reason for that policy is so

18    they have another nonlethal tool that they can consider

19    using before shooting a person or an animal or whatever

20    they're shooting?

21        A.    Yeah.

22        Q.    Okay.  You believe that's an important rule?

23        A.    I think every tool that we train with is

24    important, to be honest with you, and should be used.

25        Q.    You've trained on the taser before, right?



1        A.   I'm a taser instructor, actually.

2        Q.   Is it -- is there like a difference in how

3    fast an officer can pull out his service weapon versus

4    how fast the officer can pull out the taser?

5        A.   Are you talking about speed of drawing the

6    weapon.

7        Q.   Yeah, yeah.

8        A.   I mean, I guess it varies from officer to

9    officer.  I mean, some of us move different than

10   others.  The usability of the weapon naturally is

11   different, the way we're able to -- to be effective

12   with a CEW.  So that -- that's really the big factor in

13   that case, not so much drawing it.  It's based off of

14   the -- the direct problem at hand.

15       Q.   The training you give is consistent with the

16   written policies of NOPD, right?

17       A.   Yes, sir.

18       Q.   Okay.  All right.

19                MR. ANADA:  Did we already mark the

20           taser training policy -- taser --

21                MR. ALPAUGH:  I have no idea.

22                MR. ANADA:  Let's see.  The operation

23           manual, 1.7.1?

24                MR. ROQUEMORE:  Twenty-two.

25                MR. ALPAUGH:  Here it is, 22.



```
 1                    MR. ANADA:  Okay.  Y'all have your copy?
 2                    MR. ALPAUGH:  Yep.
 3                    MR. ANADA:  I'm going to mark the
 4            following document as Exhibit 22.
 5        (Exhibit No. 22 was marked for identification.)
 6   BY MR. ANADA:
 7        Q.   You've seen this --
 8        A.   Yes.
 9        Q.   -- document before, right?
10        A.   Yes, sir.
11        Q.   Were you involved in drafting it?
12        A.   No, sir.
13        Q.   When you train officers, you train officers to
14   follow this, the policies contained in Exhibit 22?
15        A.   Yes, sir.
16        Q.   I'm going to ask you some questions about the
17   document.  Before I do, I want to make sure you have
18   the opportunity to review the document if you so
19   choose.  We can take a break, and you can read the
20   whole thing.  You can skim it.
21        A.   Yeah, we can.
22        Q.   Okay.  I assume you're just familiar with it
23   already.
24        A.   Yeah.
25        Q.   Okay.  All right.
```



```
 1              Is there anything -- are there any -- is there
 2    any content of this document that you disagree with?
 3         A.   That I disagree with?
 4         Q.   Yeah.
 5         A.   Nothing that comes to my recollection.
 6         Q.   Okay.  Why don't you just skim it real quick
 7    to make sure you have an opportunity to, you know, make
 8    sure that's...
 9         A.   Nothing that comes -- nothing that I see
10    offhand, that I would say I would change.
11         Q.   You agree with all the contents of Exhibit 22,
12    correct?
13         A.   That's a pretty extensive -- yes.
14              MR. ROQUEMORE:  Hold up.
15              MR. ANADA:  Make sure -- yeah.
16              MR. ROQUEMORE:  And I'm going to
17              interpose an objection.  These are the
18              official policies of the New Orleans Police
19              Department.
20              MR. ANADA:  Yeah.
21              MR. ROQUEMORE:  I know he's here as a
22              representative to talk about training and
23              whatnot, but, you know, he's not going to be
24              here to contradict the policies that are --
25              the official written policies.
```



```
 1              MR. ANADA:  I hear you.  And I'm asking
 2         about it in the context of him being a trainer
 3         and whether he trains consistent --
 4              MR. ROQUEMORE:  I just want to be
 5         careful --
 6              MR. ANADA:  Yeah, no.
 7              MR. ROQUEMORE:  -- and, you know, put
 8         that out there.
 9              MR. ANADA:  Yeah, no.  Absolutely.  I
10         appreciate that.  It's on the record.
11  BY MR. ANADA:
12      Q.   I guess what I'm just trying to mention is, as
13  you go through this -- it's the CEW policy, right?
14      A.   Yes, sir.
15      Q.   As you go through the CEW policy, is there
16  anything in here that you would not include in your
17  training of an NOPD officer because you disagree with
18  that portion?
19      A.   No.  We have to -- we don't get to piecemeal
20  it.  We -- we teach to the policy.
21      Q.   Okay.  Has Burmaster been trained on this
22  policy, the NOPD CEW policy?
23      A.   Everybody has.
24      Q.   Okay.
25      A.   Everybody has.  Starting at the -- at a
```



```
 1   recruit level.
 2        Q.   Okay.  You mind if I give that one to the
 3   court reporter?
 4        A.   Sure.
 5             MR. ANADA:  Let me make this more
 6        legible.  That was 22, right, guys?  CEW?
 7             MR. ALPAUGH:  I think so, yeah.  Yes.
 8             MR. ANADA:  I'm going to mark the
 9        following document as Exhibit 23.  This one I
10        do have copies of.  It's Chapter 1.3, entitled
11        "Use of Force."
12     (Exhibit No. 23 was marked for identification.)
13             MR. ANADA:  Oh, yeah.  I can give her
14        one, sure.  That's a great idea.
15             Here's a copy for you.
16             MS. CEFOLIA:  Thanks.
17             MR. ANADA:  You're welcome.
18   BY MR. ANADA:
19        Q.   Could you take a look at Exhibit 23 there,
20   this one?  You're obviously familiar with that
21   document, right?
22        A.   Yes, sir.
23        Q.   Okay.  I'm going ask you some questions about
24   it.  Feel free to read the whole thing before I ask or
25   just skim it or whatever you want to do.
```



David Duplantier                                          March 08, 2023
                                                          Page 50

```
 1        A.    It's a lot to skim, so we can go --
 2        Q.    You want me to just dive in?
 3        A.    Yeah.
 4        Q.    Okay.  Is there any -- are there any
 5   policies -- I'm basically just going to ask you the
 6   same questions about the CEW policy.
 7              You agree with all the policies set forth here
 8   in this document, right?
 9        A.    I'm sorry?
10        Q.    You agree with all the policies set forth in
11   Exhibit 23, right?
12        A.    "Agree" meaning?
13        Q.    You think these are good policies?
14        A.    It's our policy.
15        Q.    Right.  Okay.
16        A.    Yeah, I don't know how else to answer it.
17        Q.    You train in accordance with these policies?
18        A.    Yes, sir.
19        Q.    You -- you would never train inconsistent with
20   these policies, right?
21        A.    No, sir.
22        Q.    Okay.  Is there -- do you train --
23              MR. ANADA:  Jesus.  The phone thought I
24        was asking it a question.
25              MR. ROQUEMORE:  Can you hold on just
```



David Duplantier                                      March 08, 2023
                                                          Page 51

```
 1                for a second?  I'm going to -- I mean, I know
 2                that -- well, this Exhibit No. 23 is -- was
 3                revised in 10/22, October of '22.  This
 4                incident did happen in '21.  I'm not sure --
 5                you might want to ask if there's been any
 6                changes --
 7                      MR. ANADA:  Yeah.
 8      BY MR. ANADA:
 9           Q.   Do you know if this was in effect in April of
10      2021?
11           A.   This exact policy?
12           Q.   Yeah.
13           A.   I would have to look at the policies and go
14      through them page by page to determine what changes
15      were made, if any.
16           Q.   Okay.  Do you see anything in Exhibit 23 that
17      strikes you as -- that makes you believe -- is there
18      any content in Exhibit 23 that you have any reason to
19      believe was not in effect in 2021?
20                      MR. ROQUEMORE:  Objection; form.
21                      MR. ANADA:  I was trying to remember
22                what question I had pending.
23                      Can you read it back, please?
24                        (Record read.)
25                      MR. ANADA:  I think that just made it
```



David Duplantier                                    March 08, 2023
                                                    Page 52

```
 1              more confusing.
 2        A.    Once again, I mean, I would have to actually
 3   go page by page with the one that we have present and
 4   the one that was in place at the time.
 5   BY MR. ANADA:
 6        Q.    Okay.
 7        A.    If there is a change, I can't see a dramatic
 8   one.
 9        Q.    Okay.  Fair enough.
10        A.    I can't see a dramatic change.
11        Q.    That works for me.  All right.  So we've now
12   talked about a few specific areas that were covered in
13   the in-service training that officers received about
14   encountering animals in the line of duty.
15              Is there anything else that was in that -- in
16   that training that we just haven't touched on today?
17        A.    No.  Based off of the reason of us being here,
18   the only other training, like I said, that goes hand in
19   hand with the CEW, use of force, all of it's one big
20   ball.  They -- they all -- the CEW, the use of -- the
21   use of the firearm, all that falls under it.  It's
22   going to -- it should fall directly under the overall
23   umbrella of use of force.
24        Q.    Got it.  Is there, like, a different -- a
25   difference in the standards of when an officer can use
```



1 lethal force against a human versus when an officer can

2 use lethal force against a dog?

3      A.   Yes.

4      Q.   Tell me the difference.

5      A.   Well, we -- actually, for -- going with a

6 human, we target -- our best target area naturally is

7 the back, largest muscle group, easiest area to hit.

8 You achieve what they refer to as to NMI, neuromuscular

9 incapacitation.  Okay.

10           You also want to get at least -- at least try

11 and get a seven-inch spread.  So that goes with the

12 distance you are from this person that you're going to

13 fire the weapon.  And if we're shooting or firing this

14 weapon at the front of the person, i.e. their torso,

15 the front torso -- we look to target -- we don't want

16 to target the heart.  That was a recent change of CEW.

17           We want to lower our target area, so we're

18 trying to get one dart below the belt line and the --

19 the top dart -- the bottom dart below the belt line,

20 the top dart at -- preferably right underneath the

21 heart area, right underneath that sternum area.  We

22 don't -- they don't want to give any direct shot to any

23 area where the heart is.

24      Q.   I got you.

25      A.   That in itself is a difficult shot, easier



1   on the back.  Whereas with the animal, that's

2   considered -- I'm sorry.  That's considered center mass

3   on a person.

4        Q.   Right.

5        A.   Whereas with an animal, based on the way

6   they're built, center mass is actually the side of the

7   animal.

8        Q.   Okay.

9        A.    In order for us to effect a shot there, we

10  have to cant the weapon because the bottom dart drops

11  8 degrees when it's fired.  So the top dart is running

12  straight.  The bottom dart drops 8 degrees.  The

13  further are -- you are away, the further it tends to

14  drop.  If you get too far away, then naturally, the

15  dart will make the target area.

16           If you're too close, then you won't achieve

17  NMI, which is what you want.  You achieve basically

18  pain compliance, like a bee sting.  If you got a very

19  tight spread, the darts are only a few inches apart,

20  it'll hurt but it's not enough to maybe incapacitate

21  the person.

22       Q.   Understood.

23       A.   So --

24       Q.   Or the animal?

25       A.   Or the animal.  So referencing -- it makes it



1  much, much more difficult with an animal, speed, size.

2  So -- and most animals don't attack you by running

3  sideways.

4       Q.   Yeah.

5       A.   They can't.  So they're running dead-on, so in

6  order to effect a good shot with a CEW, i.e. a taser,

7  at an animal, you got to let the animal get right up on

8  you.  And then -- even then, your spread is going to be

9  so small to where you may not achieve what you want.

10      Q.   It can be done, but it's more difficult than

11  on a person?

12      A.   It's a thousand times more difficult than on a

13  person.  Your target area is so small and the speed is

14  so much more.

15      Q.   I got you.  You observed it done effectively

16  one time, at least, right?

17      A.   Yes, at least once.

18      Q.   Okay.  So, I mean, that makes sense to me.

19  It's much harder to do it on an animal than a human.

20           Some of the other NOPD officers we've spoken

21  with have referenced a field training, I think is what

22  it's called, when you -- when the officers actually

23  practice discharging their CEW at, like, a --

24      A.   A silhouette.

25      Q.   -- a silhouette of a -- like a --



```
 1        A.    Yeah.  They go through that every in-service.
 2        Q.    It's a silhouette of like a grown male,
 3   something like that?
 4        A.    Yeah.
 5        Q.    What is it?  Like, five-ten?  Six-one?
 6        A.    Probably.  I would say about maybe five-nine,
 7   five-ten.  Roughly -- roughly average height.
 8        Q.    Average height.  I got you.  Okay.
 9              And the reason they go through that is so they
10   can get some practice of hitting the target effectively
11   to achieve the NMI, right?
12        A.    Correct.
13        Q.    Okay.  NOPD never trains officers with that
14   kind of field training on a silhouette of a dog.  True?
15        A.    True.
16        Q.    And it's much harder to actually effectively
17   hit a dog with a CEW.  It can be done, but it's just
18   much more difficult --
19        A.    Right.
20        Q.    -- than a human?
21        A.    Right.  And you have to throw in the factor
22   that you have a potential of deescalating a person.  If
23   you're under attack from an animal, whether it be a dog
24   or any other kind of animal, you're not going to
25   deescalate the animal.  The animal moves off instinct.
```



 1          So there's -- you don't have that time factor.

 2    We teach with humans, you want to try and create some

 3    kind of distance, and you're trying to -- if you have

 4    that opportunity to try and get this situation that we

 5    don't have to apply force at all, that's -- that's

 6    hopefully your ultimate goal.

 7          One of the factors with an animal, you can't

 8    deescalate an animal, per se.  So that -- that's a big

 9    factor there.  So you don't have that time or that

10    opportunity with an animal to deescalate it.

11        Q.   So am I correct that your training is that you

12    shouldn't consider a CEW on an animal?

13        A.   I'm not going to say "shouldn't."  Using --

14    and just personal experience.

15        Q.   Sure.

16        A.   The shots that were effected with the CEW on

17    an animal was by -- not by the officer being attacked.

18    It was by a secondary officer who had a target area,

19    which was center mass on the side of the animal's body,

20    which also means even that officer has to get up a

21    little close in order to effect a good shot.

22          So I'm not going to say don't use it.  It's

23    just -- there's so many parameters that come into play

24    in order for you -- for you to get this device to work

25    properly on an animal.



David Duplantier                                      March 08, 2023
                                                         Page 58

 1      Q.   Right, right.  And I know you told me there's
 2   no -- there's never any training to practice firing a
 3   CEW at a silhouette of an animal.  Is there any
 4   training to -- officers get to physically practice
 5   shooting a target that's small?
 6      A.   Yes.  We -- when we -- when recruits go
 7   through training, when we go through training with
 8   officers, we take those targets and we'll cant it
 9   where -- simulating -- which is probably the closest
10   you're going to get to maybe firing at an animal.
11   Somebody is hiding under a house, right, based off of
12   the circumstances, right -- because it doesn't mean
13   it's automatic green light to -- to deploy a taser.
14           But we'll simulate someone hiding under a
15   house or in a small area where they may be on the side,
16   which is going to force you to cant that weapon.  And
17   then -- even then, we will change it to where,
18   depending on where this person's head is, you got to
19   know if the weapon is either going to be canted this
20   way [demonstrating].  Or if they're leaning their head
21   that way and I'm a right-handed officer, I got to cant
22   the weapon this way [demonstrating] because the bottom
23   dart drops 8 degrees.
24           So if I was to fire it this way
25   [demonstrating] and the person is laying down or the



1  dog is laying or whatever we want to use -- their head

2  is on this end, the bottom dart is more likely to drop

3  and possibly hit them in a vital area.  So all these

4  little factors come into play when you go to deploy

5  this weapon.

6       Q.   Makes sense.  Are officers given any real-life

7  field training on using their feet to kick a small

8  animal that's --

9       A.   No.

10      Q.   -- charging towards them?

11      A.   Officers go through defensive tactics.  So we

12  teach them strikes, front kicks.  We refer this --

13  refer to it -- in layman's terms, a soccer-style kick,

14  but nothing that's directly towards animals.  It's just

15  strikes that are shown to officers in training.

16      Q.   Okay.  Same question about use of batons on

17  animals.

18      A.   Same thing; nothing -- nothing directly

19  towards an animal.  Just there's -- there's strikes

20  that are acceptable and unacceptable, and we teach them

21  the acceptable strikes.

22      Q.   Okay.  So we've kind of gone topic by topic of

23  what is included in the training that NOPD gives to its

24  officers on the topic of dealing with animals in kind

25  of the line of duty.  You've very graciously given me a



1    very detailed summary of that, topic by topic.

2              Is there any more content of that training

3    that you can tell me about that we haven't already

4    discussed?

5         A.   Positioning, that -- that's one topic I don't

6    think we -- we actually mentioned.  I mentioned before

7    that the optimal shot is a back shot because it's a

8    large muscle group, not too many vital areas in that

9    part of the person's body that -- but not just with --

10   with that type of positioning.  We -- you know, we --

11   we teach our officers -- we refer to it as a

12   "Combat L."

13             So in other words, if two officers walk into a

14   room, we don't want them standing side by side at the

15   hip, right.  It makes them an easy target.  So we look

16   to achieve what we refer to as "Combat L."  The minute

17   you -- you make that approach, the minute you step into

18   a room, walk into a yard, a house, you're trying to at

19   least separate.  We try to break our normal -- the way

20   we've been brought up all our lives.  We feel better

21   close to each other.

22        Q.   You shouldn't go into --

23        A.   Hip to hip, bumper -- it just makes you one

24   target.

25        Q.   What about if you're just not hip to hip and



```
 1  you're just next to each other?
 2       A.   You don't want that either.  If you can avoid
 3  that, you -- and -- and I told them, some Combat Ls
 4  will be better than others, right --
 5       Q.   Right.
 6       A.   -- depending on the size of the room, the
 7  terrain.  We may get no wider than this table that
 8  we're sitting at.
 9       Q.   I got you.
10       A.   But if you can achieve a wider one -- for
11  instance, the threat that you may be faced with, they
12  have to make a choice now.  Who am I going to go
13  after?  Which provides you an opportunity to respond,
14  whether it be lethal or less lethal.
15            But it gives you that opportunity because the
16  person now -- and it -- and it -- and also, we hope
17  that it -- because of what you have and because the
18  person realizes, "Well, if I go to my right, I got a
19  problem still on my left," or vice versa.
20       Q.   Sure.
21       A.   So we hope that the positioning alone, you're
22  already starting to hopefully deescalate your problem
23  because now the person has to decide, "Do I really want
24  to run this risk on trying to attack the officer or
25  hurt someone?"  Whatever -- however you want to
```



```
 1   describe it.  So that's why we look to see if we can
 2   get a good combat L.  Sometimes you don't -- you don't
 3   get it.  Sometimes you are forced where you're only
 4   maybe a couple of feet apart based off the size --
 5        Q.   You may be entering a very tight area where
 6   you have to be side by side?
 7        A.   Yes, yes.  But we try -- we -- I get at them
 8   personally.  Get away from each other.
 9        Q.   Yeah.
10        A.   Stop standing by -- side by side.
11        Q.   That makes a lot of sense to me, as a
12   layperson.  Thank you for that.
13             So if you and I were entering a gated private
14   property to conduct an investigation, we would be going
15   against the training that NOPD provides if we walk in
16   and stand right next to each other when there's plenty
17   of room to not do that.  Right?
18        A.   And it -- it's like playing an accordion,
19   almost.  You get different tones, right.  Depends on
20   how much you stretch it.  So at some point, you will be
21   with each other, side by side.  So entering a gate,
22   house, what have you, yes, you're going to end up being
23   tight.
24        Q.   Like -- right.  Well, when you're entering
25   it --
```



1    A.   Right.

2    Q.   -- because I mean, the gate is --

3    A.   But then we want you to spread out --

4    Q.   Okay.  So in terms --

5    A.   -- trying to achieve that.

6    Q.   If there was room to spread out and then you

7    and I didn't spread out and chose to just stay next to

8    each other, even after the -- you know, the tight

9    narrow gate, that would be going against NOPD's

10   training.  Right?

11   A.   Yeah.  I wouldn't say it -- it wouldn't be

12   against the policy.  I would just classify it as poor

13   tactics.

14   Q.   Yeah.

15   A.   Poor tactics.

16   Q.   Right.  It puts -- it puts --

17   A.   Puts you at unnecessary risk.

18   Q.   It puts -- yeah.  It puts you at more risk

19   than --

20   A.   Yeah.

21   Q.   -- you would be if you were further apart?

22   A.   Correct.

23   Q.   Right.  Okay.  All right.

24        Anything else about the training that NOPD

25   provides its officer the relate to encountering animals



```
 1    in the line of duty that we haven't talked about today,
 2    that you can think of?
 3         A.   No.  I think we -- we covered -- if I missed
 4    anything, it's not coming to my mind.
 5         Q.   Sure.
 6         A.   I think we covered -- we covered a lot, as far
 7    as for just handling animals, people even, so.
 8         Q.   Is there like a -- when you did these -- this
 9    in-service training, when was that?  What year was
10    that?
11         A.   Oh, God.  Like I say, it -- I'm really
12    stretching it.  Well, it was after Katrina, I know that
13    much.  It was after Katrina, and it had to be before
14    2015 because I think '14 or '15 was when we did -- and
15    I don't want to give you bad times.  It had to be after
16    Katrina, so I would say between -- what is that -- 2010
17    maybe and -- between 2010 and --
18         Q.   When was Katrina?  '05.
19                   MR. ALPAUGH:  2005.
20         A.   '5, yeah.  So I would say anywhere between --
21    I would go '07 to maybe -- between '07 and maybe '13 to
22    '15, somewhere in that category.  So I don't know
23    exactly what year it was.
24    BY MR. ANADA:
25         Q.   Okay.  Well, whenever it was, is there some
```



David Duplantier

March 08, 2023
Page 65

```
 1    kind of document or outline that we could read and say,

 2    "This is everything we covered"?

 3         A.    They should have a copy of the lesson plan

 4    somewhere.  I would have to try and have somebody do

 5    some digging, but there should be a copy of a lesson

 6    plan somewhere.  As a matter of fact, the lesson plan

 7    we used -- I think it actually really came from -- I

 8    don't know if it was ASPCA, but they had a big hand in

 9    the information that was in it.

10         Q.    Had anyone --

11         A.    It was about an -- it was about an hour-long

12    class.  I want to say it was an hour to two hours, no

13    more than that.

14         Q.    Was there video involved in the class?

15         A.    It was a PowerPoint.  I don't recall any -- I

16    don't recall if we had videos in a PowerPoint.  I don't

17    think we had any videos in the PowerPoint.

18               But they -- I do know that in that video, we

19    started talking about the demeanor of the dog, and

20    there were pictures involved, showing the different --

21    you know, what we were referencing when we talked about

22    positioning of the ears because -- you know, things of

23    that nature.

24         Q.    Has anyone ever asked you to try and locate

25    that PowerPoint?
```



 1      A.   No.

 2      Q.   And you said they should have it somewhere.

 3  Who is "they"?

 4      A.   The -- anything dealing with the DTBs or

 5  online -- mandated online -- well, I'm not going to say

 6  that.  Anything with DTBs is PSAB.  Online training

 7  could be either PSAB or the academy, depending on what

 8  it is.

 9           The academy will send out reminders saying,

10  look, you got -- everybody has to take this course

11  online by such and such date.  When it comes down to

12  anything with in-service and stuff, that's all strictly

13  through the academy.  So the class you're referencing,

14  that's going to be through the academy.

15      Q.   If I was trying to investigate what type of

16  training, in a complete fashion, like all of the

17  training that was given to -- that is given to NOPD

18  officers regarding use of force against animals, would

19  you agree that I can't do that in a complete and

20  thorough sense without being able to see this document?

21      A.   Yeah, I would say that.

22      Q.   Okay.

23      A.   I can say this much -- and I don't know -- you

24  know, the City went through a cyber attack, so a lot

25  was -- I don't --



```
 1            Q.   I heard about that.
 2            A.   Yeah.  I don't -- I'd have to -- I'd have to
 3   see what we could -- as far as for the class that was
 4   taught, what we're able to retrieve.
 5            Q.   Sure.  I'm sure a lot --
 6            A.   A lot of data -- a lot of data was lost.
 7            Q.   Okay.  All right.
 8                 Have you ever heard of a training entitled,
 9   quote, "The Problem of Dog-Related Incidents and
10   Encounters"?
11            A.   I can't say that I have.
12            Q.   That wasn't the title of what we were just
13   talking about, the in-service, right?
14            A.   No.
15            Q.   That's something different?
16            A.   It had a different title.
17            Q.   All right.  You ever heard of that training?
18            A.   I can't say that I have.
19            Q.   All right.  To your knowledge, has any
20   NOPD officer ever been trained on a slideshow or a
21   presentation or program entitled "The Problem of
22   Dog-Related Incidents and Encounters"?
23            A.   No idea.
24            Q.   You don't have any recollection of that,
25   right?
```



David Duplantier                                    March 08, 2023
                                                    Page 68

```
 1        A.    No.  Not offhand, no.
 2                   MR. ROQUEMORE:  And I'm going to object
 3             to the form.
 4                   MR. ANADA:  Sure.
 5   BY MR. ANADA:
 6        Q.    You still got Exhibit 1?
 7        A.    Exhibit 1 being?
 8        Q.    The -- that one.
 9        A.    Yes, yes.
10        Q.    The one with the picture of the dog.
11              All right.  If you go to paragraphs, like, 117
12   through, like, 135, do you mind just kind of reviewing
13   those paragraphs?  It's basically saying, like, what --
14   I'll let you read it.
15                   MR. ROQUEMORE:  And can we take a break?
16                   MR. ANADA:  Yeah, absolutely.
17                   (Recess taken.)
18   BY MR. ANADA:
19        Q.    Sergeant Duplantier, we're back to Exhibit 1.
20   I have in my outline some questions to ask you about
21   this training entitled "The Dog" -- "The Problem With
22   Dog-Related Incidents and Encounters."
23              From what I understand from your earlier
24   testimony, you're unfamiliar with that training.  You
25   haven't ever heard of it.  And you're not going to --
```



```
 1                  MR. ROQUEMORE:  I'm going to object.
 2                  MR. ANADA:  Okay.
 3                  MR. ROQUEMORE:  Form.  That's not what
 4          he testified to.
 5   BY MR. ANADA:
 6        Q.   Okay.  Are you aware of the training entitled
 7   "The Problem With Dog-Related Incidents and
 8   Encounters"?
 9        A.   No.
10        Q.   Are you familiar with that training?
11        A.   No, sir.
12        Q.   Have you ever read any materials that were
13   created in -- created in conjunction with that
14   training?
15        A.   I've read -- I don't know if I did or didn't.
16   I've read things, but I don't know if it was actually
17   in conjunction with this.
18        Q.   That name doesn't really ring a bell?
19        A.   The name doesn't -- the title doesn't ring a
20   bell.
21        Q.   Okay.  So one of the allegations the Brown
22   family is making is that this program was cut and
23   pasted from another program developed by the DOJ's COPS
24   program.  You ever heard of the DOJ's COPS program?
25        A.   Yes.
```



1        Q.   What is that?

2        A.   I've heard of it.  I couldn't sit up here and

3   break it down for you, explain -- I've just heard of

4   it.

5        Q.   Me and you both.  Okay.

6             So you don't have any knowledge of whether the

7   training entitled "The Problem of Dog-Related Incidents

8   and Encounters" was derived from the U.S. Department of

9   Justice's COPS program, also entitled "The Problem of

10  Dog-Related Incidents and Encounters."  Right?

11       A.   Correct.

12       Q.   You wouldn't be able to give me any

13  testimony about whether, in creating the NOPD training

14  entitled "The Problem With Dog-Related Incidents and

15  Encounters" -- in creating that, you wouldn't know if

16  NOPD based it on the COPS program.  Right?

17       A.   I'm sorry?

18       Q.   You wouldn't know if the NOPD based its

19  program with that title, "The Problem With Dog-Related

20  Incidents and Encounters" -- you wouldn't know if that

21  was based on a DOJ program, right?

22       A.   I wouldn't know.

23       Q.   And because you don't know about that, you

24  wouldn't know if the NOPD training with that title was

25  a complete cut and paste of the DOJ's program or just a



1    selective cut and paste of it?

2         A.   No idea.

3         Q.   You wouldn't know if any part of the DOJ's

4    COPS program was admitted -- was -- I'm sorry, was

5    omitted from the NOPD program "The Problem With

6    Dog-Related Incidents and Encounters"?

7         A.   No, sir.  I would not know.

8         Q.   All right.  What kind of training -- so you've

9    told me about the training an officer receives about

10   the things they should consider in the totality of the

11   circumstances when they decide whether lethal threat

12   is -- lethal force is appropriate or nonlethal force.

13   Right?

14        A.   Yes.

15        Q.   Do those factors still apply -- do you ever

16   provide training to officers -- are officers trained

17   about split-second decision-making?

18        A.   You -- you can't train to split-second

19   decision-make.  You can train to the parameters and the

20   factors involving use of force, things of that nature.

21   We talked about the dog, the training they've gotten

22   with dogs.  These factors, you take into consideration

23   when you're making the split-second decision.

24        Q.   Okay.  So it's the same --

25        A.   You really can't -- yeah.  You really can't



 1 | train to -- if it happens [mimics sounds] like that,
 2 | this is what you do.  So it -- there's no way to really
 3 | train to that.
 4 |     Q.   As far as deadly force versus --
 5 |     A.   Less lethal.
 6 |     Q.   -- nondeadly force, the factors are the same,
 7 | whether it's split-second decision-making or an
 8 | instance where you'd have more than just seconds to
 9 | make your decision, right?  Same factors?
10 |     A.   No, because we only -- we want to take in all
11 | the factors.  And that -- from that standpoint, yes,
12 | that's the same.  But when it's a split-second
13 | decision -- we're human.  We only read things so fast.
14 | You can only respond so quickly or take in so much
15 | information.  So when something is evolving so rapidly,
16 | it almost negates somethings that you may want to refer
17 | to or you may want -- say, "Well, can I do this?"  It
18 | takes those factors out of it because it's happened so
19 | quickly.
20 |     Q.   Right.  I understand.  It's more of a
21 | difficult situation?
22 |     A.   Yes, sir.
23 |     Q.   But the factors --
24 |     A.   The factors --
25 |     Q.   -- they stay the same?



1        A.    Yes, sir.

2        Q.    Okay.

3        A.    Yes, sir.

4        Q.    Does NOPD provide any -- in its conjunction

5    with training, does the NOPD provide any, like -- I

6    don't know what you call it -- modules or scenarios

7    where the officers have to make split-second decisions

8    in real time about whether something is worthy of

9    lethal force versus nonlethal?

10       A.    We go -- we have scenario-based training.

11   Officers go through scenario-based training.  They do

12   scenario-based training every year with in-service --

13   with the CEW, actually.  They go through deploying a

14   weapon.  Outside the classroom portion, the hands-on --

15   practical application, they go through deploying the

16   weapon.  We set up a scenario that they have to respond

17   to as partners, and we've done it -- like, the recruits

18   are about to go through it next week for the entire

19   week of it.  So we do -- we do do scenario-based

20   training.

21       Q.    That's a very important part of an officer's

22   training, right?

23       A.    Yes, sir.

24       Q.    Is this training designed to help them make

25   the right choice in split-second decision-making



1   regarding the use of force?

2       A.   Yes.

3       Q.   Okay.  Am I correct that none of these

4   scenarios or reenactments involve animals?

5       A.   No, sir.

6       Q.   When the NOPD trains one of its officers on

7   the use of force, does it train the officers that every

8   act of force needs to have its own justification and

9   its own evaluation of whether --

10      A.   Every application of force is separate in

11  itself.

12      Q.   Like every book, right?

13      A.   Right.

14      Q.   If I fire the first bullet, I have to conduct

15  some sort of evaluation of whether the circumstances

16  presented the need for lethal force in that -- in

17  firing that bullet.  Right?

18      A.   I'm sorry?  I'm --

19      Q.   If an officer fires one bullet, before they

20  fire it, they're required to --

21      A.   Assess it -- or reassess it --

22      Q.   -- assess whether the need for lethal force

23  exists or whether or not lethal force could be

24  sufficient, right?  They have to do that before they

25  fire the first bullet, right?



David Duplantier                                    March 08, 2023
                                                    Page 75

```
 1        A.   Before the -- yes.  You should assess -- I
 2   mean, you should know why you're resorting to lethal
 3   force.
 4        Q.   Right.
 5        A.   And even if there's a second shot fired --
 6        Q.   You got to do the analysis again, right?
 7        A.   Yes.  But we have to take into consideration,
 8   also, how rapid this is evolving.  So if the threat is
 9   continuing, we -- we teach recruits we don't shoot to
10   kill; we shoot to stop a threat.
11        Q.   Right.
12        A.   So even when someone -- if we're forced to
13   shoot a person, an animal, what have you, and its
14   continuing to advance on you, then it's not
15   unreasonable to believe that a second shot is going to
16   come rapid, possibly a third, until that -- until that
17   threat is stopped.
18        Q.   Am I correct that there is some analysis that
19   an officer needs to do before they fire each bullet?
20        A.   There is some analysis.
21        Q.   I understand that if things are --
22        A.   Yeah.  Because that -- that is -- actually,
23   that is part of that analysis, right.  If this person
24   is still coming, you're still seeing them come your
25   way, it's not like there was an immediate -- for the
```



1   officer -- if we go through scenario-based training, an

2   officer fires a lethal shot -- takes a lethal act,

3   fires the shot, and the person is laying there and then

4   all of a sudden I hear a second or a third shot, now we

5   have a problem.

6        Q.   Right.

7        A.   We have an issue with that.

8        Q.   Okay.

9        A.   If the person fires that first shot and

10  they're continuing to advance on you and they fire a

11  second or third shot before that -- before that threat

12  is stopped, then based off our evaluation, I'm like,

13  "Okay.  I understand why you did it.  I just want you

14  to tell me why you did it."

15       Q.   Right, right.  Okay.

16            Is there any training NOPD gives its

17  officers -- like real simulation training on that, on

18  whether one bullet is enough or whether there's a need

19  for more?  Do they ever get trained on that subject?

20       A.   Yeah.  We'll do scenario-based training.  When

21  we're going through scenario-based training, we

22  evaluate the officer's response to whatever the problem

23  is.

24       Q.   Okay.  And that's human scenario-based

25  training, involving humans.  Right?



1      A.    Yes.

2      Q.    Not animals?

3      A.    Right.

4      Q.    Am I correct that under NOPD training and

5  policy, officers can't have both their firearm and the

6  taser out at the same time?

7      A.    No.  That's -- that's --

8      Q.    Prohibited, right?

9      A.    Yes, that's prohibited.

10      Q.    So in a rapidly evolving scenario, if I choose

11  to pull out my firearm and it's a matter of -- you

12  know, it's a -- sort of like a matter of seconds that

13  I'll have to evaluate the use of lethal force versus

14  nonlethal, I'm pretty much stuck?  Once I pull out my

15  firearm, I'm pretty much stuck in a very short scenario

16  with the firearm, right?

17      A.    When you say "stuck," meaning --

18      Q.    Like --

19      A.    -- you don't change what you have?

20      Q.    Yeah.  Like, let's say there was a rapidly

21  evolving scenario where the officer had to make

22  split-second decision-making.  Just in this

23  hypothetical, the officer perceives a threat and then

24  has about five seconds.  And in that five seconds, they

25  have to decide whether the threat is -- justifies



```
 1   lethal force or nonlethal force.
 2            If I was in that scenario and I was an
 3   officer, if I pulled my firearm out, I'm pretty much
 4   stuck on that route, right?  Stuck on the --
 5       A.   No.  We tell -- we train for them to do -- we
 6   refer to them at transition drills.  So if I draw that
 7   weapon and that scenario shows me that this is not the
 8   answer for this problem, I may have thought the person
 9   was armed, right, with an edge weapon -- i.e. a knife,
10   box cutter, or handgun -- yeah, I want my handgun out.
11            But if it turns out that he turns around and
12   he has a cell phone in his hand, then you have to
13   quickly reholster your weapon and resort to something
14   else.  If that something else means that -- Do I go to
15   less lethal means?  Do I end up going with my hands?
16   Depending on what's happening.
17            So you -- we don't -- you're doing everything
18   you can to try and reholster the weapon because, I'll
19   say, just because you pulled it doesn't mean it's a
20   green light to say, "Well, initially, I thought this
21   was the answer, so I can just keep going with it."
22       Q.   That makes sense to me.
23            So even in a split-second decision-making
24   scenario, officer -- NOPD does train its officers to be
25   able to transition from the firearm to a nonlethal
```



1   means?

2        A.   Yes.

3        Q.   And that could be the taser, right?

4        A.   Yes.

5        Q.   It could be the baton?

6        A.   Yes.

7        Q.   Could be their feet kicking -- kicking?

8        A.   Yes, sir.

9        Q.   It could be -- oh, I forgot to ask you about

10  this.  Is another nonlethal means of dealing with a

11  threat retreat?

12       A.   Depends on the threat.

13       Q.   Okay.  Let's talk about a dog.

14       A.   And with us, with retreating -- and we train

15  never to turn your back because you cannot respond.

16  You can't see what's evolving, what's changing.  So

17  that tactical retreat, you're moving backwards, for the

18  most part, and you only want to go -- going to go back

19  so far because now you can't see what's behind you.

20       Q.   Yeah.  It's makes you vulnerable?

21       A.   Right.

22       Q.   What about if you could -- let's say I was a

23  police officer, and I was in a courtyard, and I was

24  near the gate that I just walked in through, the

25  pedestrian gate that I just walked through into the



 1   courtyard.  I then was presented with an animal that I

 2   perceived to be a threat, and I was able to -- because

 3   I was close enough to that gate, I was able to go back

 4   out the gate and close it, put a barrier between me and

 5   the animal.  Would that be a reasonable --

 6        A.   Yes.

 7        Q.   -- nonlethal method of mitigating the threat?

 8        A.   Responding?  Yes.

 9        Q.   Okay.  Are officers given any training about

10   doing that?

11        A.   I mean --

12        Q.   Specific to that?

13        A.   I mean, yeah.  We -- I'm going to say yes

14   because, I mean, that's not just with animals; that's

15   with people too.

16        Q.   Sure.  Yeah.

17        A.   Based off of your assessment of the threat in

18   front of you, it may be -- like I said, we refer to it

19   as a tactical retreat, not to continue to advance,

20   either to hold what you got, depending on what it is,

21   or to back out.  So it kind of depends on the threat

22   that you're facing.

23        Q.   Does NOPD train its officers to, before using

24   lethal force on an animal, first evaluate whether they

25   can safely evade the scenario?



David Duplantier                                        March 08, 2023
                                                            Page 81

 1        A.   Yeah.  I mean -- yeah, that -- and once again,
 2   that goes with use of force, period.
 3        Q.   Okay.
 4        A.   And not just with animals, with people as
 5   well.
 6        Q.   Okay.  So y'all train that?
 7        A.   Yes, sir.
 8        Q.   Okay.  Is there any requirement on what kind
 9   of boots an officer needs to wear in the line of duty?
10        A.   No, as long as their black.  There's no
11   particular brand or model.  They've -- they've loosened
12   some of the uniform policy, right, with hair, nails,
13   things of that nature.
14        Q.   Got you.
15        A.   So with the boots, there is no particular
16   brand of boot as long as they're black, you know.  And
17   they're not -- we -- even though -- or I should --
18   I'm -- I don't even want to quote on a tennis-style
19   boot or not because they -- like I said, they've
20   loosened the policy on the uniform.  But I can only go
21   off of what I -- with the academy because what the
22   recruits face is a little separate from the department.
23        Q.   Does NOPD want their officers to wear footwear
24   in the line of duty that -- footwear that would protect
25   their feet?



1        A.    I don't -- you know what, I'm not -- I want to

2   say no, because you have officers that wear their

3   patent leather shoes, their dress shoes when they're on

4   duty.  I couldn't do ti.  Doesn't provide protection to

5   your ankles.  It's not -- so like I said, I think -- as

6   far as for my knowledge, black.

7        Q.    Okay.

8        A.    Black.

9        Q.    Fair.  Do you know Sergeant Jones-Brewer?

10       A.    Yeah.  Shannon Jones-Brewer?

11       Q.    Yeah.

12       A.    Yes.

13       Q.    Do you know her?

14       A.    Yes.

15       Q.    You ever work with her before?

16       A.    Yes, I have.

17       Q.    What do you think about her?  Do you think

18  she's a competent member of the NOPD?

19       A.    I think she's competent.

20       Q.    You told her in a high regard?

21       A.    I respect her.

22       Q.    Have you ever heard her -- you know, she was

23  on -- she was, at one time, in charge of reviewing uses

24  of force.  You knew that, right?

25       A.    Yes, sir.



David Duplantier                                          March 08, 2023
                                                              Page 83

 1          Q.   Do you ever recall an instance where she made
 2    a conclusion in connection with her investigation of a
 3    use of force, and you heard it and you said, "Man, she
 4    was way off"?
 5          A.   Yes, sir.
 6          Q.   Okay.  One time?
 7          A.   Off the top of my head, twice.
 8          Q.   Okay.  Same question for Chief Goodly.
 9          A.   I respect him.  He was my commander for a
10    while.
11          Q.   Good commander?
12          A.   Yeah.
13          Q.   Competent?
14          A.   Yes, sir.
15          Q.   You ever heard him -- your understanding was
16    he was, at some time, on the use-of-force board?
17          A.   Yes, sir.
18          Q.   Have you ever come to hear of one of his
19    conclusions in his role on the use-of-force board that
20    you just totally disagree with?
21          A.   Yes, sir.
22          Q.   Okay.  Same question for Chief Noel.
23          A.   I worked with Chief Noel as a patrolman and
24    then -- other than just possibly working together
25    periodically on the streets.  I respect him.  I



```
 1   consider him a good officer.
 2        Q.   Does she have good judgment?
 3        A.   He?
 4        Q.   Oh, yeah, sorry.  He.
 5        A.   He -- yeah.  I think they have -- they have
 6   sound judgment.
 7        Q.   Has everyone I've mentioned -- Brewer-Jones
 8   [sic], Goodly, Noel -- all have good judgment, in your
 9   estimation?
10        A.   Yeah, I would consider them competent.
11        Q.   Same question for Chief Westbrook.
12        A.   I don't know Chief Westbrook very well.
13        Q.   I think she retired, didn't she?
14        A.   Yeah.  She has another position with the City
15   now.
16        Q.   You're not familiar with her?
17        A.   I know who she is.
18        Q.   Do you have any opinion about her judgment?
19        A.   She has been wrong, in my opinion, before.
20        Q.   Okay.  I should not interpret your testimony
21   as saying, in a split-second scenario, officers do not
22   need to evaluate the need for every bullet?
23        A.   No, no, no.
24        Q.   That would be incorrect?
25        A.   That's incorrect.
```



```
 1        Q.   Okay.
 2        A.   They do need to evaluate.  The same as
 3   evaluations --
 4        Q.   It's a little harder?
 5        A.   It's very hard.
 6        Q.   Right, yeah.
 7             MR. ANADA:  All right.  At this time,
 8        I'm going to turn the floor over to these
 9        gentlemen.  They're going to ask you some
10        questions.  I may or may not have a few
11        follow-up after them.
12             THE WITNESS:  Yes, sir.
13             MR. ANADA:  Thank you for your time and,
14        most importantly, your patience.
15             THE WITNESS:  No worries.
16             MR. ANADA:  Sorry for all the delays.
17             THE WITNESS:  No worries, no worries.
18             MR. ALPAUGH:  Tarak, do you have the
19        copies of Exhibit 4 that were given to the
20        previous witness?
21             MR. ANADA:  Yeah.  Which one is it?
22        Policy tactics?  Yeah, I'm sure I do.
23             MR. ALPAUGH:  So he can see one.
24             MR. ANADA:  Yeah, right here.
25             MR. ALPAUGH:  Okay.
```



```
 1                        EXAMINATION
 2   BY MR. ALPAUGH:
 3        Q.   Good afternoon, Sergeant.
 4        A.   Good afternoon, sir.
 5        Q.   And as I said at the beginning, I represent
 6   Derrick Burmaster.  What has been handed to you is
 7   Exhibit 40.
 8        (Exhibit No. 40 was marked for identification.)
 9   BY MR. ALPAUGH:
10        Q.   Can you take a look at that and -- a minute or
11   two and make sure you're familiar with that document?
12        A.   I'm very familiar with this one, sir.
13        Q.   Why are you very familiar with that document?
14        A.   I conducted the PTTR on this, the policy
15   tactics training recommendation.
16        Q.   And that was the training that was as a result
17   of the use of force --
18        A.   Yes, sir.
19        Q.   And looking at this document, can you tell us
20   what you were charged with doing?
21        A.   Initially, the initial form was sent to me
22   prior to the signatures on the bottom, and it's -- it
23   explains to me what they wanted me to -- to address,
24   i.e. in this case, it was use of force.
25             In addition to, they'll have me to review
```



```
 1   whatever documentation, video footage that may come
 2   with it that they provided me.  And they'll ask me my
 3   opinion, if there was anything else I saw that may need
 4   to be addressed from a tactical standpoint or possibly
 5   a policy violation standpoint.
 6              MR. ANADA:  Can we just take one breath
 7         for a second?  Does anyone have a copy of the
 8         30(b)(6) notice handy that I can look at real
 9         quick?  I just can't remember the exact scope
10         of his designation.  I just need to reference
11         that to understand if I need to make an
12         objection or not.
13              Is that it?  Is that it?  Oh, yeah.
14         Okay.  Thanks.  Sorry about this.  Okay.  I'm
15         sorry.  Sorry for the delay.  Please proceed.
16   BY MR. ALPAUGH:
17       Q.   Anyway, so on the first page where it says,
18   "Justification for recommendation," in the middle, do
19   you see that there?
20       A.   I'm sorry?
21       Q.   Where it says "Justification for
22   recommendation"?
23       A.   Yes, sir.
24       Q.   And that's the reason, written in there, as to
25   why he was sent to you?
```



David Duplantier                                    March 08, 2023
                                                         Page 88

```
 1        A.   Yes, sir.
 2        Q.   Okay.  And so you developed a training plan
 3   after that?
 4        A.   After reviewing everything, I -- once I review
 5   it, I send them a response as to what -- what my
 6   findings were, what have you, and then I use that to
 7   schedule -- to help schedule.
 8        Q.   So what did you review?
 9        A.   I reviewed the body-worn camera footage from
10   the officers.  I do not recall if I reviewed the
11   use-of-force statement.  I may have.  But I remember
12   going through the body-worn camera footage.
13        Q.   Okay.  And does this document contain a
14   summary of your findings?
15        A.   Yes, sir.
16        Q.   And that's on, what, the third page, I
17   believe?
18        A.   It picks up on the third page and concludes on
19   the fourth page.
20        Q.   And that's the instructor
21   findings/recommendations?
22        A.   Yes, sir.
23             MR. ANADA:  I'm going to object to form.
24        Outside of the scope of the 30(b)(6) notice.
25             Go ahead.
```



```
 1                    MR. ALPAUGH:  That may be but -- anyway.
 2                    MR. ANADA:  He can certainly give you
 3           his personal answers.
 4                    MR. ALPAUGH:  He's a fact witness, so --
 5           and an expert in training.
 6  BY MR. ALPAUGH:
 7      Q.   So anyway, can you tell us what the -- what
 8  your initial -- your findings were?
 9                    MR. ANADA:  Object to form; outside the
10           scope of 30(b)(6) topic.  Go ahead.
11                    Sorry.  It's just an objection I have to
12           make for the record.
13                    MR. ALPAUGH:  If he objects or I object,
14           you don't have to stop.  It's only if this man
15           objects that you have to -- that you may have
16           to stop.
17                    THE WITNESS:  Roger that.  I'm sorry,
18           sir.  I apologize.  Could you ask me --
19  BY MR. ALPAUGH:
20      Q.   Sure.  Can you tell me what -- please
21  summarize your findings in this case.
22                    MR. ANADA:  I object to form.  Outside
23           the scope.  Go ahead.
24      A.   Having reviewed the body-worn camera
25  footage -- so basically, put in a nutshell, looking at
```



```
 1  it from beginning to end, I disagreed with the findings
 2  on the use of force.
 3  BY MR. ALPAUGH:
 4       Q.   And let's go through this a little bit on the
 5  instructor findings/recommendations.  So can you just
 6  go through this and read the first -- read this into
 7  the record?
 8                 MR. ANADA:  Object to form; outside the
 9            scope.  Go ahead.
10       A.   First paragraph or second?
11  BY MR. ALPAUGH:
12       Q.   Let's just -- first page.
13       A.   First page, okay.  It says, [As read]:
14            "Per the request of the Public Integrity
15  Bureau, academy instructor Sergeant David Duplantier
16  reviewed body-worn camera footage regarding an
17  officer-involved shooting incident under NOPD Item
18  D-13802 of 21.
19            "The incident involved Officer Derrick
20  Burmaster responding to a complaint of a possible
21  domestic fight.  Upon arriving on scene, Officer
22  Burmaster found himself being charged by two -- by one
23  of two dogs in front -- in the front yard of the
24  residence, which resulted in him firing his duty
25  weapon, killing the animal.
```



David Duplantier                                        March 08, 2023
                                                           Page 91

```
 1                "Through the body-worn camera review,
 2    Sergeant Duplantier learned that Officer Burmaster
 3    responded to a complaint of a" --
 4                THE REPORTER:  I'm sorry.  Can you slow
 5          down just a little bit, please?
 6                THE WITNESS:  I'm sorry?
 7                THE REPORTER:  Can you slow down a
 8          little bit, please?
 9                THE WITNESS:  Oh, yes, ma'am.  I
10          apologize.  I'm sorry.
11    A.    [As read]:  "Through the body-worn camera
12    review, Sergeant Duplantier learned that
13    Officer Burmaster responded to a complaint of a
14    possible domestic fight.  Officer Burmaster arrived on
15    scene and took a good position while waiting for his
16    backup.  Once the second officer arrived on scene,
17    Officer Burmaster verified the target location to the
18    second officer and provided him -- provided him with
19    vital information regarding the call for service.
20                "After communicating the information, the two
21    officers made their approach to the residence.  As
22    Officer Burmaster walked past the neighboring
23    residence, he whistled and made a 'kissing' noise,
24    attempting to identify if the target residence had
25    animals in the front fenced-in yard."
```



1    BY MR. ALPAUGH:

2        Q.    Let me stop you there.  That last sentence

3    that you read.  As he was -- made a kissing noise as he

4    walked past the neighboring residence, is that in

5    accordance with training?

6        A.    Yes, sir.  We -- I actually teach that myself.

7        Q.    Okay.  All right.  Please continue.

8        A.    "Shortly after attempting to alert any animals

9    that may be inside the fenced area, the officers

10   entered the yard.  Within seconds of entering the yard,

11   the officers found themselves being charged by two

12   dogs.  The larger dog ran towards the second officer

13   while Officer Burmaster was faced with the medium-sized

14   dog running towards him.

15          "At the time, Officer Burmaster drew his duty

16   weapon and fired at the charging animal.  Subsequently,

17   the dog charging Officer Burmaster was killed while

18   the second dog fled back towards the residence.

19   Officer Burmaster fired his weapon at the dog.  The

20   owners existed the residence.

21          "Officer Burmaster tried to calm the two

22   individuals who appeared to be the owners of the

23   animals.  He attempted to explain what led to the use

24   of force while also making notification of the firearm

25   discharge via his police radio."



David Duplantier                                    March 08, 2023
                                                    Page 93

```
 1        Q.   And is the next paragraph your conclusions
 2   with regard to what happened?
 3                  MR. ANADA:   Object to form; outside the
 4            scope.  Go ahead.
 5                  MR. ALPAUGH:   He's going to say that
 6            every time.
 7                  MR. ANADA:   I didn't say it to the
 8            last --
 9                  MR. ALPAUGH:   Well, you did --
10                  MR. ANADA:   He was talking about what
11            NOPD's training was.  That's inside the scope.
12        A.   Yes.  That was -- that was my -- that was
13   basically my overall findings.
14   BY MR. ALPAUGH:
15        Q.   Could you read that into the record?
16        A.   Yes, sir.
17                  MR. ANADA:   Form.
18        A.   [As read]:  "Having reviewed the body-worn
19   camera footage of the incident, Sergeant Duplantier
20   determined that Officer Burmaster was faced with a
21   decision regarding imminent danger.  Officer Burmaster
22   attempted to verify if an animal was present before
23   entering the yard but still found himself faced with
24   the dog charging towards him in an enclosed area.
25                  "The only training recommendation identified
```



David Duplantier                                    March 08, 2023
                                                         Page 94

1   by Sergeant Duplantier pertained to the amount of time

2   allotted between Officer Burmaster attempting to alert

3   any animals and his decision to enter the yard.  The

4   moment of -- the moment of pause may allow a sleeping

5   animal and animals suffering with physical deficiencies

6   or an animal located a distance away time to expose

7   itself."

8   BY MR. ALPAUGH:

9       Q.   Is that something that's taught in the

10  training --

11      A.   Yes.

12      Q.   -- to wait a little bit?

13      A.   Yes, sir.

14      Q.   But waiting may depend on the circumstances?

15      A.   It depends on the circumstances.

16      Q.   All right.

17      A.   "Upon completion of the body-worn camera

18  review, Sergeant Duplantier contacted Sergeant John

19  Helou of the Public Integrity Bureau and scheduled the

20  tactical debrief with Officer Burmaster."

21      Q.   So when did that happen?

22      A.   The debrief?

23      Q.   Yes.

24              MR. ANADA:  Form.

25      A.   It started on October 7th, and it was



1 completed the same day.

2 BY MR. ALPAUGH:

3     Q.    Okay.  Why don't you tell us about that.

4     A.    Naturally, he comes in.  I take the time to

5 sit down and explain to him why he's here, though he

6 already knows.  And the first thing we do is -- before

7 I do anything, we sit down and we look at the BWC

8 together, the body-worn camera footage together.

9     You'd be surprised how many officers really

10 haven't seen their body-worn camera footage in some of

11 these incidents, so it may be the first time they saw

12 it.  I don't recall if it was his first time or not.

13     He talked about everything leading up to it,

14 to the encounter with the animals.  As we went through

15 it, we talked about it, frame by frame almost.  I said.

16 "It was good that you did that.  The only thing I can

17 tell you is, is maybe give yourself a second longer, a

18 couple seconds longer before entering the yard."

19     However, I didn't know the extent of the

20 domestic call.  I didn't know the particulars on it.  I

21 know they got a domestic call, so that plays a factor

22 into things as well, not only for response but exposure

23 as well.  Domestic call is very dangerous.  It's

24 already a heated situation.  So if it was a true

25 domestic call, we take that into consideration.



1              Once he was inside, they actually achieved

2    a combat L.  The initial officer -- I don't recall

3    who went through the gate first, but I know

4    Officer Burmaster -- it's what we refer to as

5    "corner-fed" -- corner-fed entrance point, meaning the

6    entrance and exit point to the yard was shifted more to

7    one side than the other.  So it was closer to the --

8    facing the house, to the right side of the yard rather

9    than being directly in the center.

10        Q.    Okay.

11        A.    So when Officer Burmaster ended up going to

12   achieve this combat L, he went to the left.  The other

13   officer went to the right, which put him closer to the

14   gate, actually.  Officer Burmaster -- shortly after

15   getting in there, the dogs came charging out.  So by

16   the time, there was really nowhere else for him to go.

17   He wasn't going to jump the fence.  He's not going to

18   outrun the dog.

19              And my findings were, based on the response

20   of the dog -- and I'm going to say this for the record.

21   I feel bad about what happened, right.  But his

22   decision-making at that point -- I don't know what else

23   he could have done.  And I've even reached out, said,

24   "Well, okay.  If y'all found him to be wrong, give me

25   an alternative response," which I have not been able to



 1   get.

 2       Q.    When you say you reached out, you reached out

 3   to who?

 4       A.    To -- I spoke with PIB.  I spoke with --

 5             MR. ANADA:  Form.

 6       A.    I think it was Sergeant Helou in PIB,

 7   referencing that.  I never spoke with Officer -- I'm

 8   sorry, Sergeant Brewer firsthand with it.  But I did

 9   speak with Sergeant Helou since he was the one that

10   sent me the PTTR.

11             But for the most part -- I mean -- and I

12   didn't -- as we went through it, like I said, the only

13   thing I could tell him was, "Look, maybe if you paused

14   a few seconds, you might have gotten alerted by the

15   dog."  But he did make an attempt to try and alert any

16   animal inside curtilage of the residence.

17             The fact that he got jammed into the corner

18   was a big factor, and the dog's response.  The dog is

19   just being a dog.  It's his house, his domain, so I get

20   it.  But unfortunately, the dog being a dog put the

21   officer in a situation where he had to do something.

22             The taser -- the probability of the taser

23   being effective, slim to probably none.  The fact --

24   if you wanted to go to an impact weapon, i.e. baton,

25   that -- like I said, you got to let the dog get up on



David Duplantier                                    March 08, 2023
                                                        Page 98

1   you.  So it basically almost effect a bite or damn near

2   effect a bite before you could -- and even then, you

3   lose leverage because now the dog is on top of you.

4   You really don't have leverage to swig the impact

5   weapon.

6           So unfortunately, to the behest of everybody

7   else, I didn't find anything wrong with his actions.

8   Once again, I said I'm open minded.  If somebody can

9   show me a better tactical response, I'm willing to

10  listen, but I didn't -- I didn't see another

11  alternative method.

12  BY MR. ALPAUGH:

13      Q.  So you felt, in the circumstances, he acted

14  properly?

15      A.  Yes, sir.

16              MR. ANADA:  Object to form; outside the

17          scope.

18  BY MR. ALPAUGH:

19      Q.  And also -- there are also a lot of factors.

20  There was another dog there, correct?

21      A.  Yes.  That -- that's a big factor.  There were

22  two dogs there.

23              MR. ANADA:  Form; outside the scope.

24              Sorry.

25      A.  There were two dogs present.



```
 1              MR. ALPAUGH:  You want to make it
 2         continuing?
 3              MR. ANADA:  You know, I've tried to do
 4         that before, and then some -- I've tried to do
 5         that before, and then some lawyer like put in
 6         a brief that you can't do that.
 7              MR. ALPAUGH:  Okay.  That's fine.
 8              MR. ANADA:  But I would like to.
 9              THE WITNESS:  But -- I'm sorry.  The
10         question was?
11              MR. ALPAUGH:  Can you read that back,
12         ma'am?
13                   (Record read.)
14              MR. ANADA:  Form; scope.  Go ahead.
15    A.   The fact that -- the fact that there were two
16    dogs -- neither dog really took a position that I would
17    consider -- or I think the average person would
18    consider that it was a warning, right.  They were
19    barking, but they were coming towards him.  They were
20    charging towards him.  I didn't find it unreasonable
21    for him to believe that the dog was attacking him.
22    BY MR. ALPAUGH:
23    Q.   Would it be unreasonable to believe that also
24    there's a potential the other dog would attack him as
25    well?
```



```
 1        A.   Dogs are pack animals, so it's not
 2   unreasonable to believe that it.  Is it guaranteed the
 3   second dog would have done it?  Don't know.  But dogs
 4   are pack animals, so it's possible that factor -- that
 5   factor loomed as well.
 6        Q.   Would you describe what "pack animals" means?
 7        A.   Meaning they work together.  There's
 8   generally -- one is over the other.  One is a leader;
 9   one is the follower.  If the bigger dog was the leader,
10   then it's possible that the other dog would followed or
11   vice versa.
12             So they do hang together.  Dogs hunt together.
13   They tend to eat together.  They are individuals, but
14   they function and they feel more comfortable when
15   they're in a group.  As long as they been -- let me say
16   this.  They don't -- like people, they don't all get
17   along.  But generally, if they do have some type bond
18   between them, they will follow each other.
19        Q.   Officer Burmaster told you he felt he and the
20   other officer were both in imminent danger at the time
21   this happened.  Correct?
22             MR. ANADA:  Form; scope.
23        A.   Yes, sir.
24   BY MR. ALPAUGH:
25        Q.   And (inaudible) officer remorseful about
```



 1   shooting the dog?

 2                  MR. ANADA:  Form; scope.

 3        A.   Yes, actually he was.  He -- I remember him

 4   mentioning he didn't want that to happen.

 5   BY MR. ALPAUGH:

 6        Q.   In fact, he has pets himself?

 7        A.   Pardon?

 8        Q.   In fact, he told you he had pets himself?

 9        A.   Yes.

10                  MR. ANADA:  Form; scope.

11                  (Off-record discussion.)

12   BY MR. ALPAUGH:

13        Q.   But even -- so taking all this into account,

14   it was your determination that this was a reasonable

15   use of force?

16                  MR. ANADA:  Object to form; outside the

17           scope.

18        A.   Yes, sir.

19   BY MR. ALPAUGH:

20        Q.   And you didn't see anything wrong with what he

21   did?

22                  MR. ANADA:  Object to form; outside the

23           scope.

24        A.   No, sir.

25   BY MR. ALPAUGH:



1       Q.   On the last page, those are your

2    recommendations there?

3       A.   Under the comment section?

4       Q.   I guess.

5       A.   It's under -- do you need me to read this into

6    record?

7       Q.   This part right here?

8       A.   Oh, this part right here.

9       Q.   It says comments --

10      A.   The recommended -- in the end, when I say

11   exhibited proficiency, he understood he was able to

12   explain his actions and what led to his actions.

13   Therefore, I found no reason to hold him back.  It

14   wasn't -- if he showed lack of remorse or if he

15   didn't -- excuse me, but give a shit, then yeah, that

16   -- I would have -- I would have an issue with that, and

17   I would definitely pass that information on.

18                MR. ANADA:  Form; scope.

19   BY MR. ALPAUGH:

20      Q.   Let me go back just a little bit.  I was

21   looking at your comments.  I guess I would like you to

22   read your comments into the record.

23      A.   My comments:  "Officer Derrick" --

24                MR. ANADA:  Form; scope.  Go ahead.

25      A.   "Officer Derrick Burmaster received a tactical



```
 1   debrief with a positive attitude.  Officer Burmaster
 2   acknowledged regret for having to shoot the animal and
 3   felt he did what he could to determine if an animal was
 4   present.
 5              "It is the opinion of Sergeant Duplantier that
 6   the incident was tragic and unfortunate; however,
 7   Officer Burmaster acted properly.  He attempted to
 8   identify a potential threat but found himself phased
 9   with a quick difficult decision.  Outside of the animal
10   in question, Officer Burmaster placed no one else in
11   harm's way.
12              "As police officers, our decisions to use
13   force and the amount of force used must be based on
14   reasonableness.  That reasonableness is considered when
15   determining if a situation is considered an imminent
16   threat to ourselves or others.  Though there may be
17   officers that may have addressed the charging animal in
18   a different fashion, Officer Burmaster's decision to
19   use lethal force towards the dog falls within reason."
20   BY MR. ALPAUGH:
21      Q.   All right.  And those comments are still your
22   opinion today?
23              MR. ANADA:  Object to form; scope.
24      A.   Yes, sir.
25   BY MR. ALPAUGH:
```



David Duplantier                                    March 08, 2023
                                                    Page 104

```
 1        Q.    So on the next page, you checked off exhibit
 2   proficiency -- "Exhibited Proficiency/Successfully
 3   Passed Training"?
 4        A.    Yes, sir.
 5        Q.    And that's your signature down there?
 6        A.    Yes, sir.
 7        Q.    And down near the bottom is Precious --
 8   Lieutenant Banks?
 9        A.    Yes, at the time.
10        Q.    Captain Banks?
11        A.    Yes, sir.  Now Captain Banks.  At the time,
12   Lieutenant Banks.
13        Q.    And you've been teaching use of force for how
14   many years?
15        A.    Our use of force -- our use of force,
16   quote/unquote, "expert" or our subject matter expert is
17   Lieutenant Hudson Cutno.  So I don't teach use of
18   force.  However, when it comes to this, as far as for
19   use of force and tactics and what have you, I have been
20   put in charge of that just based on my career --
21        Q.    Okay.
22        A.    -- training with the SWAT team, teaching
23   recruits.
24        Q.    So this is what you do?
25        A.    Yes, sir.
```



MAGNA ▶
LEGAL SERVICES

David Duplantier                                        March 08, 2023
                                                        Page 105

```
 1        Q.   Okay.  With all due respect to
 2   former-chief Goodly, that's not what he did?
 3        A.   No, sir.
 4             MR. ANADA:  Form.
 5   BY MR. ALPAUGH:
 6        Q.   And with all due respect to former-Deputy
 7   Chief Paul Noel, that's not what he did?
 8             MR. ANADA:  Form; scope.
 9        A.   No, sir.
10   BY MR. ALPAUGH:
11        Q.   With all due respect to Arlinda Westbrook,
12   that's not what she did?
13             MR. ANADA:  Form; scope.
14        A.   Definitely not.
15   BY MR. ALPAUGH:
16        Q.   All right.  And with regard to
17   Sergeant Brewer, is that what she did?
18             MR. ANADA:  Form; scope.
19        A.   No, sir.
20   BY MR. ALPAUGH:
21        Q.   So of these people -- all those people, you're
22   the only one qualified to evaluate this?
23             MR. ANADA:  Object to form; scope.
24        A.   I find myself to have a deeper working
25   knowledge than they do.
```



```
 1                 MR. ALPAUGH:  Okay.  Thank you,
 2           Sergeant.  No further questions.
 3                 MR. ANADA:  Jim, I have questions that
 4           just directly piggyback on what he just
 5           stated.  I believe it will be more burdensome
 6           if we move to another topic.  Can I ask him
 7           three follow-up questions and --
 8                 MR. ALPAUGH:  Excuse me.  I have a son
 9           that's been calling me incessantly.
10                 MR. ANADA:  Okay.
11                 MR. ROQUEMORE:  Let's go on break.
12                      (Recess taken.)
13    BY MR. ALPAUGH:
14        Q.   Just one thing I wanted to bring up.  When
15    Mr. Anada was asking you questions earlier on, you
16    talked about officers -- you referred to them, I think,
17    as a "crap magnet."  Is that another word for proactive
18    police officer?
19        A.   Yeah.  I think that's pretty much synonymous
20    with proactive police --
21        Q.   So it wasn't supposed to be derogatory; it was
22    just talking about somebody --
23        A.   No, it's just -- yeah.
24        Q.   -- looking for things he has to take care of?
25        A.   Right, yeah.  The officers will go out,
```



 1  self-initiate things.  You know, I hate to put it that

 2  way, but you got some officers that they duck calls,

 3  whether it be due to fear or whatever.  So when I say

 4  "crap magnet," that mean just -- if you're going to go

 5  out there and do police work, you're going to get

 6  involved in stuff.

 7        Q.   And by the nature of that, you may get more

 8  complaints than the officers that don't do anything?

 9        A.   Yeah, definitely.

10                  MR. ALPAUGH:  All right.  Thanks.

11                       RE-EXAMINATION

12  BY MR. ANADA:

13        Q.   All right.  Sergeant Duplantier, I just want

14  to follow-up on a couple questions that Mr. Alpaugh

15  asked you.

16                  MR. ANADA:  Can we share -- Exhibit 40,

17        was it?

18                  MR. ALPAUGH:  Forty.

19  BY MR. ANADA:

20        Q.   All right.  I'm going to put aside page 1, and

21  I'm going to ask you to look at page 2.  In this

22  exhibit, starting on page 2, you've expressed in this

23  report lots of opinions about whether Burmaster's

24  actions were correct, justified, or not justified.

25  Right?



1      A.   Yes, sir.

2      Q.   Those are just your personal opinions and not

3 the official position of the NOPD, right?

4      A.   I'm not quite sure how to answer that because

5 it ended up going to two different areas of the

6 department.  Initially, the first being the

7 use-of-force panel and their findings on it.  And we

8 discussed some of the variables that come into play

9 with it, experience and knowledge and what have you.

10          So I'm going to say it's not my opinion.  It's

11 really -- if you -- when you look at policy and our use

12 of force and things of that nature, that falls into our

13 training.  Now, my opinion will fall into play when

14 they ask me, "Do you feel he" -- whether it be

15 remorseful, understanding, did he come in there with a

16 good attitude, then yeah, that would be my opinion.

17      Q.   Okay.

18      A.   The -- my comments and my findings, I base

19 that not on my opinion.  I base that on our policy and

20 use of force.  And -- and that's why I said, if they

21 had an alternative answer to it, I'm open-minded, tell

22 me.  Maybe it's something I missed, right.  Nobody is

23 perfect.

24      Q.   Sure.

25      A.   So that part of it, I'm going off of, no,



1    that's -- that's the department.  It's just that you

2    had two different areas of the department that were at

3    odds.

4         Q.   I got you.  Okay.  So your opinions about

5    whether or not Burmaster violated policies are NOPD's

6    opinions, right?

7         A.   Yes, sir.

8         Q.   Okay.  Their official position, right?

9         A.   Pardon?

10        Q.   NOPD's official position is what your

11   conclusions are about Burmaster's --

12             MR. ROQUEMORE:  I'm going to object.

13             This is beyond the scope of the 30(b)(6).

14             He's not here as to -- to provide the official

15             position with regard to what you're asking

16             about.  He's here to talk about the training

17             aspect.

18             MR. ANADA:  Okay.

19             MR. ROQUEMORE:  So he's -- you know,

20             this is the official position of NOPD with

21             regard to training but not necessarily

22             justification for use of force --

23             MR. ANADA:  Okay.

24             MR. ROQUEMORE:  -- or violation of

25             policy.



1             MR. ANADA:  You're objection is on the

2        record.

3  BY MR. ANADA:

4       Q.   Your determinations of whether or not

5  Burmaster violated policy contained in Exhibit 40 is

6  NOPD's official position on that subject, right?

7       A.   From the training academy standpoint, yes.  As

8  the trainers and training academy, yes.

9       Q.   It's not just your opinion?

10      A.   No.  That's why the signature of the

11 lieutenant -- my supervisor at the time, she -- she

12 reviewed it and approved it.

13      Q.   Okay.  And NOPD's conclusions on that topic

14 are inconsistent and at odds with the conclusions

15 reached on Exhibit 26.  Right?

16      A.   Yes.

17            MR. ROQUEMORE:  Objection; form.

18            MR. ANADA:  Thank you.  I got another

19       one here.

20   (Exhibit No. 20.A was marked for identification.)

21 BY MR. ANADA:

22      Q.   NOPD's official conclusions about whether

23 Burmaster did or did not violate policy and training of

24 the NOPD are at odds and inconsistent with the document

25 reflected -- the conclusions in Exhibit 20.A, correct?



```
 1                    MR. ROQUEMORE:  Objection; form.
 2                    You can answer if you want -- or if you
 3           can.
 4   BY MR. ANADA:
 5       Q.   Yeah.  The conclusions are kind of at the end,
 6   but go ahead and read the whole thing.  My notes are on
 7   there, just don't worry about it.  I don't care if you
 8   read my notes.  It's Brewer's.
 9       A.   So your question is, is my -- is the training
10   academy inconsistent with the findings of Officer --
11   Sergeant Brewer?  I'm sorry.
12                    MR. ALPAUGH:  Tarak, that's the
13           administrative shooting investigation?
14                    MR. ANADA:  Yes, sir.
15                    MR. ALPAUGH:  Okay.
16   BY MR. ANADA:
17       Q.   So let me just see this document for a second.
18   All right.  I'm going to direct you to page 17 of
19   Exhibit 20.A.
20       A.   Yes, sir.  Highlighted portion or the
21   entire --
22       Q.   The whole page.  So at the top of the -- the
23   first half of the page contains several conclusions
24   that Burmaster violated a whole bunch of different
25   portions of the NOPD policy, right?
```



David Duplantier

March 08, 2023
Page 112

1    A.    They have him for Rule 4, performance of duty,

2  neglect of duty, one is failing to comply with the

3  instructions or the written -- regarding use of force.

4         So they've broken it down to the paragraphs.

5  I'd have to read the paragraph in that policy to see.

6  But according to -- based off of what you've given me

7  from the Public Integrity Bureau of Sergeant Shannon

8  Jones-Brewer, she found him in violation of one, two,

9  three, four -- five different policies.

10   Q.    Okay.

11   A.    All falling under Rule 4, though, performance

12 of duty.

13   Q.    Okay.  And you found him in violation of zero

14 policies, right?

15   A.    I found him in violation of nothing.

16   Q.    Okay.  So NOPD's official conclusions about

17 Burmaster's policy violations contained in Exhibit 40,

18 would you agree that they're inconsistent and at odds

19 with the conclusions reached about policy violations in

20 Exhibit 20.A by the -- in the administrative shooting

21 investigation report?

22         MR. ROQUEMORE:  Objection; form.

23 BY MR. ANADA:

24   Q.    Those two contradict each other, right?

25         MR. ROQUEMORE:  Objection; form.



1          You can answer if you --

2      A.   Yes, they contradict.

3  BY MR. ANADA:

4      Q.   They contradict each other, right?

5      A.   Yes, they do contradict each other.

6      Q.   Could you read the summary and conclusion of

7  the administrative review --

8      A.   The conclusion -- and this is from, I think,

9  Sergeant Jones-Brewer.

10         [As read]:  "Detective Brewer investigation

11  revealed Officer Burmaster's discharge occurred --

12  occurred due to Officer Burmaster observing the dog and

13  firing his weapon out of fear and not because the dog

14  presented a threat of serious bodily injury or death to

15  Officer Burmaster."  Final recommendation section --

16     Q.   That's it.  You concluded the opposite, right?

17     A.   Yes, sir.

18     Q.   Okay.  So the official positions of NOPD about

19  whether or not the shooting was justified, as reflected

20  in Exhibit 40, which you've told me is NOPD's position,

21  that is at odds and contradicts the summary and

22  conclusion in the administrative shooting investigation

23  report marked as Exhibit 20.A, correct?

24     A.   Yes, sir.

25     Q.   Okay.  Part of NOPD's official position, as



1   you've shared with Mr. Alpaugh, is that at the time

2   Burmaster recognized the threat of the dogs, he was --

3   what's that word?  When you achieve a what?

4        A.   We refer to it as a Combat L.

5        Q.   Can you remind me what the definition of that

6   is?

7        A.   It's --

8        Q.   Spaced apart?

9        A.   Basically, we want officers to separate,

10  separate themselves, not stand directly next to each

11  other if avoidable.

12       Q.   All right.  So the official position of NOPD,

13  as you stated to Mr. Alpaugh, was at the time Burmaster

14  first heard the threat, the barking, he had achieved a

15  spacing apart from Officer Roussel, and they were not

16  standing right next to each other?

17       A.   They weren't standing --

18            MR. ROQUEMORE:  Objection; form.

19  BY MR. ANADA:

20       Q.   The official conclusion is that they were not

21  standing next to each other, right?

22            MR. ROQUEMORE:  Objection; form.

23  BY MR. ANADA:

24       Q.   Go ahead.  You can answer.

25       A.   Yes.  They weren't standing --



1        Q.   At the time the --

2        A.   At the time engagement occurred, the dogs came

3   out.

4        Q.   At the time the dogs were barking -- the dogs

5   were first heard in the audio?

6        A.   Correct.

7        Q.   Okay.  And NOPD would disagree with any

8   statement that Officer Roussel and Officer Burmaster

9   were actually standing right next to each other at the

10  time of the dogs barking?

11            MR. ROQUEMORE:  Objection; form, outside

12       the scope.

13       A.   Yes.

14  BY MR. ANADA:

15       Q.   Okay.  I heard you trained -- let me go back

16  to this document.  Man, so many documents flying

17  around.  I'm going to go back to Exhibit 40 for just a

18  second.  All right.  I heard you say it's -- NOPD

19  trains their officers to do what Burmaster did -- oh,

20  sorry about that.

21            I wrote this down in my notes.  You told

22  Mr. Alpaugh that NOPD trains its officers to do what

23  Burmaster did.  And I'll read from your report.

24            [As read]:  "Officer Burmaster walked past the

25  neighboring resident -- residence.  He whistled and



```
 1   made a 'kissing' noise attempting to identify if the

 2   target residence had animals in front -- in the front

 3   fenced-in yard."

 4          You told Alpaugh that that is exactly what

 5   NOPD trains officers to do, right?

 6      A.   That's -- at the academy, that's what we --

 7   that's what we instruct officers to do.

 8      Q.   Exactly what I just read?

 9      A.   The -- to attempt to alert the animal?

10      Q.   Yeah.

11      A.   Yes.

12      Q.   As I just read, right?

13             MR. ROQUEMORE:  Objection; form.

14   BY MR. ANADA:

15      Q.   Like, as I -- as I just read from this

16   document, that's what y'all train, right?  That's how

17   NOPD -- that is what NOPD trains its officers to do,

18   exactly what I read from Exhibit 40?

19             MR. ROQUEMORE:  Objection.  I think

20             you're -- it's becoming misleading.  If you

21             want to reread that and ask him if he agrees

22             to it, but I do believe it's been asked and

23             answered.

24   BY MR. ANADA:

25      Q.   Do you need to me to reread it, or can you
```



```
 1   answer it?
 2        A.   Could you?  Because I'm trying to understand
 3   what it is you're asking.
 4        Q.   I wrote down in my notes that you told
 5   Mr. Alpaugh that Burmaster did exactly what NOPD trains
 6   its officers to do as reflected in this sentence from
 7   your report.  "As Officer Burmaster walked past the
 8   neighboring residence, he whistled and made a 'kissing'
 9   noise attempting to identify if the target residence
10   had animals in the front, fenced-in yard."
11        A.   Yes.
12        Q.   That's exactly what NOPD trains its officer to
13   do to determine whether an animal is present --
14        A.   To alert if there's an animal present.  If
15   you're referencing the position he was in, according to
16   the video, from what I recall, it says neighboring
17   yard.  And it was not like he was a house down; he was
18   right at the target location when he made that attempt.
19        Q.   At the gate, right?
20        A.   Yes, yes.
21        Q.   Okay.  NOPD's official position is -- when he
22   made the kissing noise, is he was at the gate?
23                  MR. ROQUEMORE:  Objection to form.
24                  MR. ALPAUGH:  Object to form.
25        A.   To my recollection, he was right at his target
```



1  location.  Once again, you don't want to do it once

2  your inside gate --

3  BY MR. ANADA:

4       Q.   Right.

5       A.   -- and trying to stand --

6       Q.   You got to do it at the gate, and then you

7  wait a long time?

8       A.   Within close proximity.

9       Q.   And you concluded he did that in coming up

10  with your conclusions that are reflected in Exhibit 40,

11  right?

12       A.   Yes.

13       Q.   And those are NOPD's conclusions, right?

14       A.   That's the academy's conclusions.  And I'm not

15  trying to combat -- when you say "NOPD," it's their --

16  obviously, there are a couple of different branches

17  here, so I'm going to speak on behalf of the academy,

18  which falls under NOPD.  But the people that found --

19  their findings were opposite of mine, that's NOPD too.

20       Q.   Right.  NOPD's --

21       A.   So you're going to be saying it's the academy

22  stand -- training academy standpoint.

23       Q.   NOPD has taken contradictory positions on some

24  facets of this --

25       A.   Yes, sir.



```
 1                   MR. ROQUEMORE:  Objection; form.
 2    BY MR. ANADA:
 3         Q.   Multiple facets, actually?
 4                   MR. ROQUEMORE:  Objection; form.
 5    BY MR. ANADA:
 6         Q.   Right?
 7                   MR. ROQUEMORE:  You can --
 8         A.   They've taken opposite positions --
 9    BY MR. ANADA:
10         Q.   On multiple facets?
11         A.   Right.
12         Q.   Of this dispute?
13         A.   Yes.
14         Q.   About the facts of this dispute?
15         A.   Yes.
16                   MR. ANADA:  Okay.  I'm going to turn it
17              over to your attorney.
18                   MR. ALPAUGH:  You want me to finish one
19              thing?
20                   MR. ROQUEMORE:  Go ahead.  That's fine.
21                        RE-EXAMINATION
22    BY MR. ALPAUGH:
23         Q.   Sergeant?
24         A.   Yes, sir.
25         Q.   That sentence that was read to you, it starts
```



```
 1   out "As Officer Burmaster walked past the neighboring
 2   residence," isn't -- didn't he make kissing noises as
 3   he was walking past the neighboring residence and not
 4   when he got to the gate?
 5                MR. ANADA:  Object to form; asked and
 6           answered.
 7                MR. ALPAUGH:  No, that's not.  That's
 8           not because you asked him, sir, whether the
 9           kissing noises began at the gate --
10                MR. ANADA:  I said -- I asked him
11           whether he was making kissing noises at the
12           gate.
13                MR. ALPAUGH:  Let me clarify.
14                MR. ANADA:  Object to form; asked and
15           answered.
16                You can answer his question.
17   BY MR. ALPAUGH:
18       Q.   It started while he was walking past the
19   neighbor's residence, correct?
20                MR. ANADA:  Object to form.
21       A.   Which was -- and when you say neighboring
22   residence, it's a neighboring residence.  I mean right
23   up on it.  So I didn't see where his position was so
24   far off to where it wasn't -- it wouldn't have been
25   effective.  That's why I said, in the end, the only
```



1    thing it would have done was maybe pause a few more

2    seconds to see what kind of response you got.

3              MR. ALPAUGH:  Thank you, sir.

4                    EXAMINATION

5    BY MR. ROQUEMORE:

6        Q.    If you would take out the amended complaint --

7    second amended complaint --

8              MR. ANADA:  Exhibit 1.

9    BY MR. ROQUEMORE:

10       Q.    -- Exhibit No. 1.  I think it's -- it should

11   be right in front of you.  Let's go to paragraph 117.

12   The plaintiffs allege in 117, "In terms of training,

13   either Burmaster received no training regarding animals

14   at all...."  Is that a true statement?

15       A.    I don't believe that's a true statement at

16   all, and I'm saying that because of the amount of time

17   he's been on the job.  I know we've had trainings that

18   is mandated to be taken by all police officers.

19       Q.    The mandated training that's --

20       A.    I would find it hard to believe he didn't take

21   any dog-related training.

22       Q.    In fact, there was an in-service -- is it true

23   that there was in-service training regarding dealing

24   with animals and dogs?

25       A.    Yes, sir.



1            MR. ANADA:  Form.

2    BY MR. ROQUEMORE:

3        Q.   And how many -- what percentage of the police

4    officers are required to do police or in-service

5    training?

6        A.   All police officers.  That includes academy

7    staff as well, unless you're an instructor in that

8    area, then naturally you're not going to teach

9    yourself.

10       Q.   And in addition to the -- to the in-service

11   training -- which is through the academy, right?

12       A.   Yes, sir.

13       Q.   There was -- you mentioned that there was

14   directed training bulletins, DTBs, also.

15       A.   Yes, sir.

16       Q.   Is that right?

17       A.   Yes, sir.  And that went through PSAB.

18       Q.   PSAB stands for -- for what?

19       A.   Professional Standards and Accountability

20   Bureau.

21       Q.   And what's the purpose of the DTBs?  How is

22   that -- why is it -- how is it different from what the

23   academy does?

24       A.    It's just additional training, for the most

25   part.  I mean, we only have so much time to train for



1   in-service because officers are taken off the street.

2   They go through a week-long training.

3            In addition to that, they have firearms, they

4   have driving.  So the things that aren't hands-on

5   training per se, some of that training and that

6   information can be disseminated via electronics, so

7   they will have them do online training.

8        Q.   Okay.  That's online --

9        A.   Yes.  And you have to test out of it.

10       Q.   So the DTBs are online?

11       A.   Yes.

12       Q.   And then you mentioned ASPCA also?

13       A.   There was a period where they mandated because

14  they took the -- they took the -- and I apologize.  I

15  don't recall the actual title of the course.  But the

16  course dealing with animals and dogs from in-service,

17  they followed it up saying they still saw a need to

18  disseminate this information, so they mandated that

19  they took the ASPCA training online.

20       Q.   And ASPCA is what?

21       A.   That's -- that's the -- forgive me.  I

22  can't -- they deal with animals.  That's the group that

23  deals with --

24       Q.   And the products that they gave to the NOPD

25  are class -- online classes and things along those



 1   lines?

 2        A.   Yeah.  And it's not just for NOPD.  It's an

 3   actual --

 4               MR. ANADA:  Form; leading.  Go ahead.

 5        A.   It's not just NOPD.  It's -- I mean, it's not

 6   limited to NOPD, let me say that.  The course is a

 7   course for -- anybody can log in and basically go

 8   through this course with animals.

 9   BY MR. ROQUEMORE:

10        Q.   And to your knowledge, what was the animal

11   and/or dog-related course or courses that were provided

12   to NOPD through the ASPCA?

13        A.   When you say what was --

14        Q.   What courses were made available to NOPD

15   through the --

16        A.   It was -- it was -- it's just --

17               MR. ANADA:  Form.

18        A.   It's just listed as the ASPCA interaction with

19   animals -- I don't recall the title of it.  We just did

20   it with the recruits, but I don't recall the actual

21   title of it.

22   BY MR. ROQUEMORE:

23        Q.   Okay.  Now, Mr. Anada also asked you if

24   you were familiar with an NOPD training entitled

25   "The Problem of Dog-Related Incidents and Encounters."



1              Do you remember --

2      A.    Yes.

3      Q.    You remember that question?

4      A.    Yes.

5      Q.    I'm going to show you what's been marked as --

6                  MR. ANADA:  Did you already give us

7             copies?

8                  MR. ROQUEMORE:  Not yet.

9                  City Exhibit No. 1.  And it's a slide

10            presentation.  It's titled "Responses to

11            Problem of Dog-Related Encounters."

12    (City Exhibit No. 1 was marked for identification.)

13    BY MR. ROQUEMORE:

14     Q.    If you can, just flip through -- flip through

15    it and particularly note the last page.  And then I'll

16    ask you questions about this.

17     A.    Okay.

18     Q.    And after looking at it, if I asked you have

19    you ever seen this before, what would you say?

20                 MR. ANADA:  Form; asked and answered.

21                 Go ahead.

22     A.    The title of it doesn't -- doesn't ring a

23    bell, but the information in it -- like I said, when we

24    talked about the classes earlier, a lot of it is

25    consistent.



1    BY MR. ROQUEMORE:

2        Q.    Okay.  What is -- what about the information

3    is notable to you?

4        A.    Once again, it talked about the use of force.

5    That's a blanket.  That's our blanket right there,

6    whether it be animals, people, what have you, even

7    though other factors come into play.

8            They talk about shooting an animal is a last

9    resort, taking into consideration bystanders and people

10   around in the area.  If you're forced to resort -- if

11   you have the grounds to use lethal force -- but it

12   doesn't necessarily mean that you may have a green

13   light to use it.

14           If -- for instance, in this case, if the dogs

15   were out, the homeowners were standing behind the dog

16   in that line of fire, then yes.  If the dog is

17   attacking, you're -- it's a bad -- it's a day for you,

18   but you don't want to fire at the animals if there's

19   somebody in your line of fire, naturally.  And that's

20   with people as well.

21       Q.    Is this material in this slide presentation

22   consistent with the training that the NOPD provides to

23   its officers regarding dog encounters?

24                   MR. ANADA:  Form.

25                   You can answer.



 1      A.   Yes.  They even go into body posture.  They

 2   talk a little bit about facial expressions.  Dogs read

 3   your body language, like I talked about earlier.  So

 4   yes.

 5   BY MR. ROQUEMORE:

 6      Q.   Is there anything in the slide presentation

 7   that is inconsistent with NOPD training?

 8      A.   Nothing that --

 9           MR. ANADA:  Form.

10      A.   -- I see.

11           THE WITNESS:  I'm sorry.

12      A.   Nothing that I see in here.

13   BY MR. ROQUEMORE:

14      Q.   The last page.

15      A.   Yes, sir.

16      Q.   It's entitled "Dangerous Animals" and then in

17   parentheses, "Chapter 1.2 UoF."

18      A.   That's 1.3, use of force.

19      Q.   Okay.  So this looks to be a quote of the NOPD

20   policy regarding a use of force for dangerous animals.

21   Is that right?

22      A.   Yes.

23      Q.   Is that fair?

24      A.   Yes, sir.

25      Q.   And is this the format that a DTB would be



David Duplantier                                    March 08, 2023
                                                    Page 128

 1  created?

 2              MR. ANADA:  Object to form.

 3      A.   Yes, sir.

 4  BY MR. ROQUEMORE:

 5      Q.   Does this look to be a DTB training that

 6  was -- that would be provided to its officer --

 7              MR. ANADA:  Object to form.

 8  BY MR. ROQUEMORE:

 9      Q.   -- to NOPD officers?

10      A.   It appears to be, yes.

11      Q.   Is there any reason for you to doubt this is,

12  in fact, a DTB that was provided to NOPD officers?

13              MR. ANADA:  Object to form.

14      A.   No, no reason for me to doubt it.

15  BY MR. ROQUEMORE:

16      Q.   And as we're sitting here today -- well, let

17  me ask you this.  So you said the DTBs come from --

18      A.   PSAB.

19      Q.   -- PSAB.  And that's separate from the

20  academy, right?

21      A.   Yes.  It's another bureau.

22      Q.   Okay.  It's not something that you have

23  hands-on personal --

24      A.   No.

25      Q.   -- close familiarity with?



```
 1          A.    No, nothing that --
 2          Q.    Okay.  That would be Hargrove -- Hargrave,
 3    right?
 4          A.    Captain Hargrove, yes.
 5          Q.    Hargrove.  And -- but as you're sitting here
 6    today, the -- you, as the representative to the City,
 7    other than the fact that it is designed as a teaching
 8    tool for the policy, you -- you don't have any
 9    information about how this particular slideshow was
10    developed?
11          A.    No, sir.
12                    MR. ANADA:  Form.
13          A.    No, sir.
14    BY MR. ROQUEMORE:
15          Q.    Do you have any information as to how this
16    slideshow was developed?
17          A.    No, sir.
18          Q.    And that's speaking as a City of New Orleans
19    representative; is that right?
20          A.    Yes, sir.
21                    MR. ANADA:  Form.
22    BY MR. ROQUEMORE:
23          Q.    So with regard to the second amended
24    complaint, there's a -- paragraph 120, where the
25    plaintiffs believe -- they state, [As read]:  "That --
```



1  that is because NOPD training was derived by copying

2  from a training curriculum developed by the U.S.

3  Department of Justice COPS program."

4          The City has no information with regard to

5  that allegation; is that right?

6      A.   I'm sorry, sir.  You lost me.

7      Q.   You don't -- the City has no information about

8  whether it was copied from a U.S. Department of Justice

9  COPS program; is that right?

10     A.   None to my knowledge.

11     Q.   And are the City representative providing

12  testimony for the City --

13     A.   Yes, sir.

14     Q.   -- regarding training?

15     A.   Yes, sir.

16     Q.   And your statement is that there is no

17  information; is that right?

18     A.   None to my knowledge.

19     Q.   On the next page, paragraph 122.  At the top

20  of page 16, there's an allegation that the NOPD omitted

21  or removed all training about how an approaching dog is

22  almost always friendly.

23          Is that concept about how an approaching dog

24  is almost always friendly -- is that something that

25  NOPD believes is untrue, necessarily?



David Duplantier                                    March 08, 2023
                                                       Page 131

```
 1                    MR. ANADA:   Form.
 2         A.    I don't want to say they believe it's untrue.
 3                    MR. ANADA:   I withdraw the objection.
 4         A.    I think they go into the fact that -- I think
 5    they go into the fact more if that -- you assess --
 6    you're assessing this animal the same way you would
 7    your first encounter -- second or third encounter with
 8    an individual.  I shouldn't say first encounter.  Your
 9    encounter with an individual.
10              We assume most people are friendly, but you're
11    assessing them and assessing the situation to see if my
12    assumption is correct or if my assumption was correct
13    and it changes.  So our -- our -- I guess maybe to
14    better answer your question is yeah, we go in thinking
15    the dogs are friendly, but we're constantly assessing
16    to see if that doesn't hold true.
17    BY MR. ROQUEMORE:
18         Q.    Is that how the NOPD trains its officers?
19         A.    Yes.
20         Q.    To always assess --
21         A.    Yes, yes.
22         Q.    Not assume --
23         A.    Always.
24         Q.    Not assume they're --
25         A.    Automatically bad.
```



1      Q.   Okay.  And what about the -- what is the NOPD

2  training with regard to the quote on 123?  Quote,

3  "Serious dog bites are relatively rare."  Is there any

4  training that NOPD provides regarding that comment --

5  or that quote?

6      A.   I mean, serious dog bites are relatively rare.

7  We -- in my teachings and through the ASPCA, most of

8  the time, we -- we teach to where most of the time, the

9  dogs, they don't want a confrontation, like people.  So

10  we're like, yeah, you know.  The chance of a dog

11  attacking you are slim to none.

12          However, going back to assessing and reading

13  the dog, that's what we want you to do.  So yeah, we

14  look at it as that likelihood the dog wants to attack

15  you may be slim.  However, based off your readings and

16  your findings, that could always be the wrong -- wrong

17  impression.

18      Q.   Okay.  And there's an allegation that -- a

19  suggestion that NOPD purposefully removed a video or

20  training with regard to use of taser upon dogs as a --

21  as an alternative approach to encountering dogs and

22  dangerous situations.

23          What is your understanding of what the

24  training that NOPD does with regard to that concept?

25               MR. ANADA:  Form.



David Duplantier

1       A.   I would find that hard to believe.  I mean,
2   we -- out of all departments, this is one department
3   that every stance we take is to try -- the word
4   embedded in our sole is "deescalation."
5            So for us to take away something in training
6   that may help the officer to use the minimal amount of
7   force or no force, I find that hard to believe we would
8   remove that.  This department, I don't -- I would
9   really find that hard to believe.
10  BY MR. ROQUEMORE:
11      Q.   Okay.  On page -- or on paragraph 130, there's
12  a criticism of the NOPD with regard to failing to
13  follow through with regard to partnering with animal
14  control and other animal services and information on
15  local resources.  What -- what is trained with regard
16  to that in the NOPD?
17      A.   When it comes down to training with working
18  with outside agencies -- I want to make sure I'm
19  reading this correctly.
20           All right.  Earlier on in this deposition, I
21  mentioned a few incidents we were involved in, one not
22  that long ago where you had to corral the dog that had
23  actually viciously attacked its owners.  It was
24  terrible scene.
25           The animal control that came out, it took us



David Duplantier                                                        March 08, 2023
                                                                           Page 134

1   forever to get them out.  And so the partnering bit, it

2   sounds nice on paper, but in actuality, your resources

3   are limited.  So in that case, we were the ones that

4   helped to corral the dog.  The young lady that -- she

5   was some -- she looked like a little girl.  And this

6   was a pit bull that just attacked.  So we were helping

7   her with it.

8               So when it comes down to partnering and stuff,

9   I mean, all of that sounds great, but show me the

10  resources where we had the resources and the personnel

11  to say, "Well, I got a bunch of people at ASPCA.  I got

12  a bunch of people at NOPD that work on this."

13              That would be great, but -- so I don't know --

14  really know -- I don't think we're avoiding partnering

15  with anybody.  I think we're trying to deal with the

16  problem with what we have, and basically, that's us,

17  for the most part.  You can't get an ASPCA truck out at

18  night.

19      Q.   Okay.  And what about having information on

20  local resources?  I know that you -- you're -- you kind

21  of -- you just said that --

22      A.   Yeah, we --

23      Q.   -- local resources are limited.  But --

24      A.   And, look --

25      Q.   -- just having information on that --



1      A.   Yeah.  We have -- officers have information on

2 it.  If the situation allots the time -- allots the

3 time to call for these resources, we will.  But most of

4 the time -- and that's from firsthand knowledge.  Most

5 of the time, it's hard to get those resources out

6 there, but they are aware of those resources.

7      Q.   All right.  In your experience as a -- in the

8 academy and the NOPD, can you say whether or not, in

9 your opinion, the NOPD adequately trains its officers

10 with regard to encountering potentially dangerous dog

11 encounters?

12            MR. ANADA:  Form.  Go ahead.

13      A.   I think we do.  I think we do.  And I keep

14 referring back to use of force.  I know people,

15 animals, and different variables.  But use of force

16 falls in line in both categories, and I think that

17 combined with what knowledge is shared, I think -- I

18 think we do okay with at least educating our officers

19 with dealing with animals.

20            You're not going to make them an animal

21 expert, right.  That's a separate job in itself.  But I

22 think we educate our officers pretty well, and as long

23 as they stick with the use-of-force situation, right,

24 our -- our guidelines and use of force, that coupled

25 with information we share with them, I think we do okay



```
 1   with what we do.
 2                 MR. ROQUEMORE:  All right.  Very good.
 3         Thank you, sir.
 4                 MR. ANADA:  Just very few minor
 5         follow-up questions.
 6                 THE WITNESS:  Yes, sir.
 7                       RE-EXAMINATION
 8   BY MR. ANADA:
 9        Q.   Okay.  Going back to this exhibit --
10                 MR. ANADA:  What was it?  C-1?
11                 MR. ALPAUGH:  City 1.
12                 MR. ANADA:  City 1, okay.
13   BY MR. ANADA:
14        Q.   Going back to City 1, as the 30(b)(6) designee
15   by the City on the topic of NOPD training on how
16   officers are to handle animals in the field, you have
17   never seen this document -- this particular document
18   before today, right?
19        A.   No.
20        Q.   Okay.  You can't tell the judge or the jury,
21   under oath, that you -- that this particular
22   presentation or training was given to NOPD officers,
23   right?
24        A.   That's correct.
25        Q.   You can't say whether or not it was given to
```



1   Burmaster, right?

2        A.   That is correct.

3        Q.   Okay.  All right.  Let's just put that aside.

4   Let's pretend that -- let's go into a hypothetical

5   situation.  Let's assume that this was actually -- this

6   training, this slideshow, presentation, whatever it's

7   called, was actually given to NOPD officers in this

8   hypothetical.  I know in reality, we don't know.

9             But -- and let's also assume that this

10  training was derived from a training presentation from

11  the DOJ with the exact same title, "Response to the

12  Problem of Dog-Related Encounters," and that whoever

13  with NOPD that created this, derived the content from

14  the DOJ document.

15            You still with me in this --

16       A.   Yes, sir.

17       Q.   -- hypothetical?  Okay.

18            Go back to the amended complaint.  It's

19  Exhibit 1.  And check out paragraph 122.

20       A.   Okay.

21       Q.   If, in fact, the creator of this document, the

22  City Exhibit 1, derived this material from the DOJ

23  document, would it have been a poor decision to

24  exclude the DOJ's comments, quote, "almost always

25  friendly" -- I'm sorry, "An approaching dog is almost



1    always friendly"?

2         A.   Would it be wrong to exclude that in training?

3         Q.   Yeah.  Would it be wrong to copy some of the

4    DOJ's material in here but exclude that language?

5         A.   I think that would be wrong.  I think that's

6    pertinent information.

7         Q.   Yeah, okay.  It would -- as the 30(b)(6)

8    designee on training regarding animal interactions, you

9    think that would be a poor decision?

10        A.   Yes.

11        Q.   Okay.  All right.  What about omitting

12   language -- the DOJ language that "Officers should not

13   always view a dog running towards them as a threat"?

14   Would it be a poor decision to specifically omit that

15   DOJ language from the NOPD presentation?

16        A.   To view a dog running toward them as a threat

17   or should not view a dog running towards them as a

18   threat?  That -- once again, that's pertinent

19   information.

20        Q.   You would, as the 30(b)(6) designee, feel

21   that -- if this was going to be given to NOPD, that

22   statement should have been in here; it shouldn't have

23   been omitted.  Right?

24        A.   It's pertinent information.  Yeah.

25        Q.   All right.  Going to paragraph 123.  Would it



 1   have been a good decision to omit from the DOJ's

 2   statement that, quote, "Serious dog bites are

 3   relatively rare"?

 4        A.   I'll be honest with you.  I -- yeah, that's

 5   information but --

 6        Q.   You're okay with that one being omitted?

 7        A.   I'm okay -- yeah, because I'm not thinking

 8   along those lines.  I'm assessing what my threat is and

 9   I'm not thinking, well, this dog bite might not be too

10   bad.

11        Q.   That's fair.  So you're good with that one

12   being omitted?

13        A.   Yeah.

14        Q.   In this hypothetical scenario?

15        A.   Yes.

16        Q.   All right.  What about omitting the DOJ's

17   language, "The overwhelming majority of dog bites are

18   minor, causing either no injuries at all or injuries so

19   minor no that no medical care is required"?

20        A.   Once again, it's good information, but I

21   don't -- I don't find that to be so pertinent to be

22   shared.  I mean, I don't think -- I don't think the

23   average person is thinking along those lines --

24        Q.   Okay.

25        A.   -- (inaudible) police.



1        Q.   Fair.  What about the DOJ's language, quote,

2   "Fewer than 2 percent of the individuals visiting an

3   emergency room complaining of a dog bite require

4   hospitalization"?

5        A.   I don't see where that's something that really

6   carries any serious weight.

7        Q.   What about this:  "Even as the canine

8   population has steadily increased over the past three

9   decades, the number of reported dog bites has

10  drastically decreased."  You wouldn't --

11       A.   Once again, I'm -- I'm -- no, I'm not -- I

12  don't find where, if that was omitted, that would be

13  that big of a deal.

14       Q.   Yeah.  You're okay with --

15       A.   There are so many other things that we're

16  basing our decision-making on when assessing --

17       Q.   You're okay if that one was omitted?

18       A.   (Witness nods head.)

19       Q.   What about the language of the DOJ, quote,

20  "Dogs are seldom dangerous," end quote?  Would you have

21  liked to see that one included?

22       A.   I can go with that, yeah.  Because it goes to

23  help trying to --

24       Q.   It would have been prudent then --

25       A.   It goes to helping to establish a mindset



1  where not every animal is a bad animal.

2      Q.   It would have been prudent for NOPD to include

3  that language in its presentation, right?

4      A.   Yes, sir.

5      Q.   All right.  What if the DOJ materials included

6  a video of a real-time example of a safe, effective use

7  of the taser on a dog?  Would it have been prudent to

8  include that video in NOPD's presentation?  Or are

9  you --

10      A.   Now, I will say this.  There has been a video

11  of a taser being effectively used on a dog.  I just

12  don't recall if it was a taser or if it was -- but I do

13  remember there was an officer being attacked -- it

14  wasn't here, somewhere else -- and another officer, a

15  secondary officer got a shot from the side.  As a

16  matter of fact, I think it was a charging Rottweiler.

17  But I don't recall where it fell at.

18      Q.   Fair.  That's good important information an

19  officer should see as part of their training, right,

20  videos like this?

21      A.   Yeah.

22      Q.   Would you have liked to see that video

23  included in NOPD's presentation?  Or omitted?

24      A.   I don't see -- I'm looking at a need and a

25  nice.  It's nice to see it, but necessarily not a need,



```
 1   if that -- if I'm kind of making sense on that one.
 2        Q.   All right.  Going to paragraph 128.  Would it
 3   have been a good idea for NOPD to include the DOJ's
 4   language that -- I'll paraphrase -- a dog running
 5   towards an officer is not necessarily a threat; the dog
 6   could be friendly and merely greeting the officer?
 7                  MR. ROQUEMORE:  Objection; form.
 8                  You can answer.
 9        A.   You're saying --
10   BY MR. ANADA:
11        Q.   Let me rephrase it.
12        A.   Okay.
13        Q.   Read paragraph 128, if you don't mind, just to
14   yourself.
15        A.   Okay.
16        Q.   Would it have been prudent to -- that NOPD not
17   exclude but actually include that language in its
18   presentation?
19        A.   It wouldn't hurt to add it, but at the same
20   time, I know there's other information that -- that
21   touches upon that with training.
22        Q.   Okay.  All right.
23             (Brief interruption.  Recess taken.)
24   BY MR. ANADA:
25        Q.   I'm now on paragraph 129.  Would it have
```



1    been -- was it prudent -- would it have been prudent if

2    NOPD omitted from its presentation the following DOJ

3    language:  "An approaching dog:  Most dogs happily

4    greet a new human.  Some will be enthusiastic about

5    greeting that they will do this in a full run and

6    launch themselves at the officers.  Absent any warning

7    signals described below, an approaching dog is almost

8    always friendly.  A dog who feels threatened will

9    usually try and keep his distance"?

10          Do you think it was a good decision or a bad

11   decision to omit that language?

12        A.    I think in the words of --

13        Q.    You can say some of it would be --

14        A.    Yeah, I think some of it is a little redundant

15   with some of the other stuff.  So when it talked about

16   almost always friendly, that I think --

17        Q.    Should have been in there?

18        A.    Yeah, right.  But this -- I mean, from there,

19   like I said, we started elaborating on assessing the

20   dogs.  I think that might have been a little overkill,

21   maybe not quite necessary.  But whereas the other stuff

22   that we talked about earlier, yes, I think something

23   like that is important, sure.

24        Q.    Portions of -- multiple portions of the

25   language I just read to you would -- should have been



1    included in this hypothetical NOPD training, right?

2         A.   Yeah.

3         Q.   Okay.  All right.  131.  Would it have been a

4    good idea to omit the following DOJ language:  Quote,

5    "When encountering a dog, officers should stop all

6    forward movement and turn their bodies to the side.

7    Officers should drop their eyes and watch the dog using

8    peripheral vision"?

9         A.   No.  I wouldn't teach our -- I wouldn't

10   recommend teaching our officers to that.  I think if it

11   was -- if you were only dealing with an animal, yeah.

12   But I don't -- I wouldn't train our officers to that

13   response.  It puts us in other situations, so...

14                  MR. ANADA:  That's it.  That's all I've

15             got.

16                  MR. ALPAUGH:  Just maybe one or two.

17                       RE-EXAMINATION

18   BY MR. ALPAUGH:

19        Q.   A couple times in here, you see the -- you see

20   the phrase, "A dog who feels threatened will usually

21   try to keep his distance."  Right?  You see that in

22   there?

23        A.   Yes.

24        Q.   And that a dog approaching you is almost

25   always friendly.  In this situation we had in this case



1  here, given what you saw on the body-worn camera, did

2  you think that those dogs were friendly?

3       A.   Once again, I started off saying it was

4  tragic, being a dog person.  But even I looked at it,

5  and I thought the dogs were in a mindset where they may

6  harm an officer.

7       Q.   Right.  They weren't feeling threatened; they

8  were protecting their --

9       A.   I looked at -- I took it as they were

10 protecting their territory, doing what a dog is

11 supposed to do.

12            MR. ALPAUGH:  Yeah.  Okay.  Thank you.

13            MR. ANADA:  I got one.

14                 RE-EXAMINATION

15 BY MR. ANADA:

16      Q.   You would have shot that 22-pound puppy in

17 that situation?

18      A.   Honestly, I'm going to give you an answer

19 that's for you and against you.  I don't know.  I may

20 have.  I'm more likely, having dealt with dogs all my

21 life -- more likely to maybe try and kick at the dog.

22 However, there were two dogs present, so it really,

23 really murks up the water on decision-making.

24      Q.   Fair, fair.

25            MR. ANADA:  Thank you so much.



David Duplantier                                    March 08, 2023
                                                    Page 146

```
 1                    Jim, are you --
 2                    MR. ROQUEMORE:  No, I'm good.  Thank
 3           you.
 4                    MR. ANADA:  Thank you so much for your
 5           time.
 6   (This proceeding was concluded at 4:57 p.m. on
 7   March 8, 2023.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



David Duplantier                                    March 08, 2023
                                                    Page 147

```
 1                    REPORTER'S CERTIFICATE

 2        I, YOLANDA J. PENA, Certified Court Reporter in
    and for the State of Louisiana, Registered
 3  Professional Reporter, and as the officer before whom
    this testimony was taken, do hereby certify that DAVID
 4  DUPLANTIER, after having been duly sworn by me upon
    authority of R.S. 37:2554, did testify as set forth in
 5  the foregoing 146 pages.
          I further certify that said testimony was reported
 6  by me in the Stenotype reporting method, was prepared
    and transcribed by me or under my direction and
 7  supervision, and is a true and correct transcript to
    the best of my ability and understanding.
 8        I further certify that the transcript has been
    prepared in compliance with transcript format
 9  guidelines required by statute or by rules of the
    board and that I have been informed about the complete
10  arrangement, financial or otherwise, with the person
    or entity making arrangements for deposition services.
11        I further certify that I have acted in compliance
    with the prohibition on contractual relationships, as
12  defined by Louisiana Code of Civil Procedure Article
    1434, and in rules and advisory opinions of the board.
13        I further certify that I am not an attorney or
    counsel for any of the parties, that I am neither
14  related to nor employed by any attorney or counsel
    connected with this action, and that I have no
15  financial interest in the outcome of this matter.
          This certificate is valid only for this
16  transcript, accompanied by my original signature and
    original raised seal on this page.
17
          Prairieville, Louisiana, this 10th day of March,
18  2023.

19

20

21

22                    _____
                      YOLANDA J. PENA, CCR, RPR
23                    CCR NO. 2017002, RPR NO. 907346

24

25
```



David Duplantier

**-**

**-14** 23:11

**0**

**05** 64:18

**07** 64:21

**1**

**1** 7:3,4 68:6,7,19 107:20 121:8,10
125:9,12 136:11,12,14 137:19,22

**1.2** 127:17

**1.3** 49:10 127:18

**1.7.1** 45:23

**10/22** 51:3

**117** 68:11 121:11,12

**12** 9:4

**120** 129:24

**122** 130:19 137:19

**123** 132:2 138:25

**128** 142:2,13

**129** 142:25

**13** 9:4,16 64:21

**130** 133:11

**131** 144:3

**135** 68:12

**14** 64:14

**15** 64:14,22

**16** 130:20

**17** 111:18

**18** 12:18

**1991** 8:20

**2**

**2** 107:21,22 140:2

**20.A** 110:20,25 111:19 112:20

113:23

**2000** 23:11

**2000-** 23:11

**2005** 64:19

**2010** 64:16,17

**2013** 9:7

**2015** 64:14

**2021** 51:10,19

**2023** 146:7

**21** 51:4 90:18

**22** 12:18 45:25 46:4,5,14 47:11
49:6 51:3

**22-pound** 145:16

**23** 49:9,12,19 50:11 51:2,16,18

**26** 110:15

**3**

**30(b)(6)** 20:25 87:8 88:24 89:10
109:13 136:14 138:7,20

**4**

**4** 85:19 112:1,11

**40** 86:7,8 107:16 110:5 112:17
113:20 115:17 116:18 118:10

**4:57** 146:6

**5**

**5** 64:20

**50** 10:12 12:15

**7**

**7th** 94:25

**8**

**8** 20:24 21:2 54:11,12 58:23 146:7

**A**

**ability** 21:15 23:7

**Absent** 143:6

**absolutely** 48:9 68:16

**academy** 9:6,7,13,14 25:6,21
27:16 29:15 66:7,9,13,14 81:21
90:15 110:7,8 111:10 116:6
118:17,21,22 122:6,11,23 128:20
135:8

**academy's** 118:14

**acceptable** 59:20,21

**accordance** 50:17 92:5

**accordion** 62:18

**account** 101:13

**Accountability** 25:7 26:2 122:19

**accurate** 12:7

**achieve** 53:8 54:16,17 55:9 56:11
60:16 61:10 63:5 96:12 114:3

**achieved** 96:1 114:14

**acknowledged** 103:2

**acronym** 26:1

**act** 19:12 34:9 74:8 76:2

**acted** 10:15 98:13 103:7

**actions** 18:1,2 98:7 102:12 107:24

**active** 19:8

**actual** 26:24 30:2 31:1 123:15
124:3,20

**actuality** 134:2

**add** 142:19

**added** 23:20

**addition** 86:25 122:10 123:3

**additional** 122:24

**address** 19:18 86:23

**addressed** 24:15 87:4 103:17

**adequately** 135:9

**administrative** 111:13 112:20
113:7,22



David Duplantier

**admitted** 71:4

**advance** 75:14 76:10 80:19

**afraid** 22:25 39:4,5

**afternoon** 6:6,7 86:3,4

**age** 12:21

**agencies** 133:18

**aggression** 42:18

**aggressively** 10:15

**agree** 7:23 20:8 47:11 50:7,10,12 66:19 112:18

**agrees** 116:21

**ahead** 88:25 89:10,23 90:9 93:4 99:14 102:24 111:6 114:24 119:20 124:4 125:21 135:12

**alarm** 13:8

**alert** 33:3 92:8 94:2 97:15 116:9 117:14

**alerted** 97:14

**allegation** 130:5,20 132:18

**allegations** 69:21

**allege** 121:12

**alleging** 7:14

**alley** 13:13

**allots** 135:2

**allotted** 94:2

**allowed** 38:1,14

**Alpaugh** 45:21,25 46:2 49:7 64:19 85:18,23,25 86:2,9 87:16 89:1,4,6, 13,19 90:3,11 92:1 93:5,9,14 94:8 95:2 98:12,18 99:1,7,11,22 100:24 101:5,12,19,25 102:19 103:20,25 105:5,10,15,20 106:1,8,13 107:10, 14,18 111:12,15 114:1,13 115:22 116:4 117:5,24 119:18,22 120:7, 13,17 121:3 136:11 144:16,18 145:12

**alternative** 96:25 98:11 108:21 132:21

**amended** 7:2 121:6,7 129:23 137:18

**amount** 94:1 103:13 121:16 133:6

**Anada** 6:5,8 7:1,5 20:22 21:3,4 22:18,20,23 45:19,22 46:1,3,6 47:15,20 48:1,6,9,11 49:5,8,13,17, 18 50:23 51:7,8,21,25 52:5 64:24 68:4,5,16,18 69:2,5 85:7,13,16,21, 24 87:6 88:23 89:2,9,22 90:8 93:3, 7,10,17 94:24 97:5 98:16,23 99:3, 8,14 100:22 101:2,10,16,22 102:18,24 103:23 105:4,8,13,18,23 106:3,10,15 107:12,16,19 109:18, 23 110:1,3,18,21 111:4,14,16 112:23 113:3 114:19,23 115:14 116:14,24 118:3 119:2,5,9,16 120:5,10,14,20 121:8 122:1 124:4, 17,23 125:6,20 126:24 127:9 128:2,7,13 129:12,21 131:1,3 132:25 135:12 136:4,8,10,12,13 142:10,24 144:14 145:13,15,25 146:4

**analysis** 38:15,17 75:6,18,20,23

**and/or** 124:11

**animal** 12:13,19,21 14:4 17:10,11, 13 31:18 33:9,15 36:7 37:5 42:25 44:7,19 54:1,5,7,24,25 55:1,7,19 56:23,24,25 57:7,8,10,12,17,25 58:3,10 59:8,19 75:13 80:1,5,24 90:25 92:16 93:22 94:5,6 97:16 103:2,3,9,17 116:9 117:13,14 124:10 126:8 131:6 133:13,14,25 135:20 138:8 141:1 144:11

**animal's** 33:19 57:19

**animals** 15:13 17:15 18:12 21:11 23:4,8,13 24:2 25:17 27:8,24 30:10,11,12 31:21 36:8 39:4 41:18 43:8 44:2 52:14 55:2 59:14,17,24 63:25 64:7 66:18 74:4 77:2 80:14 81:4 91:25 92:8,23 94:3,5 95:14 100:1,4,6 116:2 117:10 121:13,24 123:16,22 124:8,19 126:6,18 127:16,20 135:15,19 136:16

**ankles** 82:5

**annual** 18:20 23:16,24 27:4,22 28:4 39:23

**annually** 19:9

**answers** 22:10 89:3

**Anytime** 35:18

**Apollo** 22:25

**apologize** 6:10 89:18 91:10 123:14

**appeared** 92:22

**appears** 128:10

**applicability** 22:17

**applicable** 15:13

**application** 15:16 73:15 74:10

**applied** 9:3 12:19 13:21

**apply** 10:20 12:22 57:5 71:15

**applying** 16:20

**approach** 60:17 91:21 132:21

**approaching** 130:21,23 137:25 143:3,7 144:24

**approved** 110:12

**April** 51:9

**apt** 20:17

**area** 11:5 33:4 34:8 53:6,7,17,21, 23 54:15 55:13 57:18 58:15 59:3 62:5 92:9 93:24 122:8 126:10

**areas** 23:18 52:12 60:8 108:5 109:2

**arising** 15:24

**Arlinda** 105:11

**armed** 78:9

**arrived** 91:14,16

**arriving** 90:21

**ASPCA** 24:19,25 25:15 27:15,21 29:5,12,17 30:23 65:8 123:12,19, 20 124:12,18 132:7 134:11,17

**aspect** 109:17

**assess** 74:21,22 75:1 131:5,20

**assessing** 131:6,11,15 132:12 139:8 140:16 143:19

**assessment** 15:3 80:17

**assume** 28:2 46:22 131:10,22,24 137:5,9

**assuming** 26:23

**assumption** 28:25 131:12

**attack** 55:2 56:23 61:24 66:24 99:24 132:14

**attacked** 11:14 57:17 133:23 134:6 141:13



David Duplantier

**attacking** 11:22 99:21 126:17 132:11

**attempt** 97:15 116:9 117:18

**attempted** 92:23 93:22 103:7

**attempting** 91:24 92:8 94:2 116:1 117:9

**attended** 28:25

**attends** 24:10

**attention** 33:19 40:16

**attitude** 103:1 108:16

**attorney** 119:17

**audio** 115:5

**automatic** 58:13

**Automatically** 131:25

**average** 17:22 40:18 56:7,8 99:17 139:23

**avoid** 30:11 61:2

**avoidable** 114:11

**avoiding** 134:14

**aware** 69:6 135:6

---

**B**

---

**back** 8:24 9:9,11,12 12:2 27:4 28:9,22 35:7 37:2,14 39:18 41:7 51:23 53:7 54:1 60:7 68:19 79:15, 18 80:3,21 92:18 99:11 102:13,20 115:15,17 132:12 135:14 136:9,14 137:18

**backing** 13:16

**backup** 91:16

**backwards** 79:17

**bad** 20:2 64:15 96:21 126:17 131:25 139:10 141:1 143:10

**ball** 52:20

**Banks** 104:8,10,11,12

**bark** 35:13,19

**barker** 35:15

**barkers** 35:5,9,10

**barking** 32:22 34:20 35:2,14,22 40:1 42:20,21 99:19 114:14 115:4, 10

**barks** 35:20

**barrier** 80:4

**barriers** 11:3

**base** 42:7 108:18,19

**based** 14:22 18:10 23:20 36:14 37:19 39:14 42:14 45:13 52:17 54:5 58:11 62:4 70:16,18,21 76:12 80:17 96:19 103:13 104:20 112:6 132:15

**basically** 21:10 50:5 54:17 68:13 89:25 93:13 98:1 114:9 124:7 134:16

**basing** 140:16

**bat** 11:25 13:11

**baton** 12:9,11 43:22,23,24 44:11, 14 79:5 97:24

**batons** 59:16

**bearing** 42:23

**beat** 40:8

**beautiful** 7:19,21

**bee** 54:18

**beeline** 13:17

**began** 120:9

**beginning** 86:5 90:1

**behalf** 118:17

**behest** 98:6

**beliefs** 36:17,19 40:3

**believes** 130:25

**bell** 69:18,20 125:23

**belt** 53:18,19

**big** 35:5,9,10,14 37:4 45:12 52:19 57:8 65:8 97:18 98:21 140:13

**bigger** 39:8 100:9

**biggest** 16:10

**bit** 6:11 7:13 8:17 90:4 91:5,8 94:12 102:20 127:2 134:1

**bite** 22:25 37:8 38:13,20 98:1,2 139:9 140:3

**bites** 132:3,6 139:2,17 140:9

**bitten** 37:22 38:1

**black** 81:10,16 82:6,8

**blame** 6:25 29:23

**blanket** 126:5

**board** 83:16,19

**bodies** 144:6

**bodily** 15:23 35:1 42:13 113:14

**body** 30:15 32:21 42:21 57:19 60:9 127:1,3

**body-worn** 88:9,12 89:24 90:16 91:1,11 93:18 94:17 95:8,10 145:1

**bond** 100:17

**book** 74:12

**boot** 81:16,19

**boots** 81:9,15

**bottom** 53:19 54:10,12 58:22 59:2 86:22 104:7

**box** 78:10

**branches** 118:16

**brand** 81:11,16

**break** 7:10 9:8 46:19 60:19 68:15 70:3 106:11

**breath** 87:6

**breed** 36:1,9 40:3

**breeds** 35:5,13,14

**Brewer** 97:8 105:17 111:11 113:10

**Brewer's** 111:8

**Brewer-jones** 84:7

**bring** 106:14

**broken** 112:4

**brought** 60:20

**Brown** 6:8 7:14 8:5 69:21

**built** 44:7 54:6

**bull** 35:15,17 134:6

**bulldog** 35:17 40:9

**bullet** 42:1 74:14,17,19,25 75:19 76:18 84:22



David Duplantier

March 08, 2023
Index: bulletin..computer

**bulletin** 25:15 28:5

**bulletins** 25:4,12,13 122:14

**bulls** 35:9

**bumper** 60:23

**bunch** 111:24 134:11,12

**burdensome** 106:5

**bureau** 25:7 26:2 90:15 94:19 112:7 122:20 128:21

**Burmaster** 18:15 19:5,21 20:9 22:24 24:3 28:3,25 29:16 37:22 48:21 86:6 90:20,22 91:2,13,14,17, 22 92:13,15,17,19,21 93:20,21 94:2,20 96:4,11,14 100:19 102:25 103:1,7,10 109:5 110:5,23 111:24 113:12,15 114:2,13 115:8,19,23,24 117:5,7 120:1 121:13 137:1

**Burmaster's** 28:19 103:18 107:23 109:11 112:17 113:11

**burner** 39:18

**business** 41:14

**BWC** 95:7

**bystanders** 126:9

───────────────

**C**

**C-1** 136:10

**cake** 39:20

**call** 15:2 19:14 28:12 39:7,8 73:6 91:19 95:20,21,23,25 135:3

**called** 55:22 137:7

**calling** 106:9

**calls** 107:2

**calm** 92:21

**camera** 88:9,12 89:24 90:16 91:1, 11 93:19 94:17 95:8,10 145:1

**canine** 9:25 39:25 140:7

**canted** 58:19

**capacity** 8:25

**captain** 26:8 104:10,11 129:4

**care** 106:24 111:7 139:19

**career** 13:1 104:20

**careful** 48:5

**carries** 140:6

**carry** 44:14

**carrying** 11:20

**case** 18:25 45:13 86:24 89:21 126:14 134:3 144:25

**catch** 40:9

**categories** 135:16

**category** 9:17 19:19 64:22

**caused** 12:2

**causing** 139:18

**CEFOLIA** 49:16

**cell** 78:12

**center** 54:2,6 57:19 96:9

**certainty** 28:3

**cetera** 18:12 25:18

**CEW** 11:18 12:4 43:4,7,16 45:12 48:13,15,22 49:6 50:6 52:19,20 53:16 55:6,23 56:17 57:12,16 58:3 73:13

**chained** 13:10

**chance** 132:10

**change** 16:6,9 23:19 32:21 47:10 52:7,10 53:16 58:17 77:19

**changing** 79:16

**Chapter** 49:10 127:17

**charge** 82:23 104:20

**charged** 86:20 90:22 92:11

**charging** 59:10 92:16,17 93:24 96:15 99:20 103:17 141:16

**check** 13:14 28:23 137:19

**checked** 104:1

**Checking** 13:8

**Chief** 83:8,22,23 84:11,12 105:7

**child** 7:20

**children** 7:22,24,25 8:1

**choice** 61:12 73:25

**choose** 15:16 46:19 77:10

**chose** 63:7

**circumstances** 15:15,17 34:24 58:12 71:11 74:15 94:14,15 98:13

**city** 66:24 84:14 125:9,12 129:6,18 130:4,7,11,12 136:11,12,14,15 137:22

**clarify** 120:13

**class** 24:1,3,20,25 65:12,14 66:13 67:3 123:25

**classes** 29:9 123:25 125:24

**classify** 63:12

**classroom** 73:14

**close** 14:10 34:11 44:1 54:16 57:21 60:21 80:3,4 118:8 128:25

**closer** 32:19 96:7,13

**closest** 58:9

**combat** 60:12,16 61:3 62:2 96:2, 12 114:4 118:15

**combined** 135:17

**comfort** 17:12 18:11

**comfortable** 17:24 100:14

**commander** 83:9,11

**comment** 39:15 102:3 132:4

**comments** 102:9,21,22,23 103:21 108:18 137:24

**communicating** 91:20

**competent** 82:18,19 83:13 84:10

**complaining** 140:3

**complaint** 7:2 90:20 91:3,13 121:6,7 129:24 137:18

**complaints** 107:8

**complete** 28:14,18 66:16,19 70:25

**completed** 95:1

**completion** 94:17

**compliance** 54:18

**comply** 112:2

**component** 18:4

**components** 36:13

**computer** 26:17



MAGNA
LEGAL SERVICES

David Duplantier

**concept** 130:23 132:24

**concern** 38:18,20

**conclude** 42:11

**concluded** 113:16 118:9 146:6

**concludes** 88:18

**conclusion** 83:2 113:6,8,22 114:20

**conclusions** 83:19 93:1 109:11 110:13,14,22,25 111:5,23 112:16, 19 118:10,13,14

**conduct** 62:14 74:14

**conducted** 86:14

**confrontation** 32:17 132:9

**confronted** 25:17

**confused** 22:1

**confusing** 52:1

**conjunction** 69:13,17 73:4

**connection** 83:2

**consideration** 17:6,7 36:12 39:11 42:10 71:22 75:7 95:25 126:9

**considered** 54:2 103:14,15

**consistent** 30:8,15 45:15 48:3 125:25 126:22

**consistently** 9:15

**constantly** 19:12 131:15

**contact** 35:6

**contacted** 94:18

**contained** 46:14 110:5 112:17

**content** 26:24 31:1 32:10 42:2 47:2 51:18 60:2 137:13

**contents** 47:11

**context** 48:2

**continue** 80:19 92:7

**continuing** 75:9,14 76:10 99:2

**contradict** 47:24 112:24 113:2,4,5

**contradictory** 118:23

**contradicts** 113:21

**control** 133:14,25

**copied** 130:8

**copies** 49:10 85:19 125:7

**COPS** 69:23,24 70:9,16 71:4 130:3,9

**copy** 21:1 46:1 49:15 65:3,5 87:7 138:3

**copying** 130:1

**corner** 97:17

**corner-fed** 96:5

**cornered** 11:4

**corral** 133:22 134:4

**correct** 18:8 19:3 26:25 31:3 32:6 34:16,22 47:12 56:12 57:11 63:22 70:11 74:3 75:18 77:4 98:20 100:21 107:24 110:25 113:23 115:6 120:19 131:12 136:24 137:2

**correctly** 14:15 15:22 39:14 133:19

**couple** 13:1,2 62:4 95:18 107:14 118:16 144:19

**coupled** 135:24

**courses** 25:7 28:11 124:11,14

**court** 49:3

**courtyard** 79:23 80:1

**cover** 16:3 31:13 43:1

**covered** 27:8 29:21,25 30:4 40:5 52:12 64:3,6 65:2

**crap** 19:15,20 20:14 106:17 107:4

**create** 57:2

**created** 69:13 128:1 137:13

**creating** 70:13,15

**creator** 137:21

**credible** 35:23 37:7,8,18

**criticism** 133:12

**curriculum** 23:17 130:2

**curtilage** 97:16

**cut** 69:22 70:25 71:1

**Cutno** 104:17

**cutter** 78:10

**cyber** 66:24

**cycle** 12:1

**D**

**D-13802** 90:18

**daily** 25:3,12,13,14 28:5

**damn** 98:1

**danger** 93:21 100:20

**dangerous** 95:23 127:16,20 132:22 135:10 140:20

**dark** 13:11

**dart** 53:18,19,20 54:10,11,12,15 58:23 59:2

**darts** 54:19

**data** 67:6

**database** 26:17

**date** 23:24 66:11

**David** 6:1 90:15

**day** 38:22 95:1 126:17

**dead-on** 55:5

**deadly** 72:4

**deal** 10:17 123:22 134:15 140:13

**dealing** 17:15 24:2 59:24 66:4 79:10 121:23 123:16 135:19 144:11

**deals** 123:23

**dealt** 18:24 25:16 27:23 145:20

**death** 15:23 35:1 113:14

**deathly** 39:3,4

**debrief** 94:20,22 103:1

**decades** 140:9

**decent** 13:22

**decide** 38:2 61:23 71:11 77:25

**decision** 34:24 71:23 72:9,13 93:21 94:3 103:9,18 137:23 138:9, 14 139:1 143:10,11

**decision-make** 71:19

**decision-making** 18:6,10 36:21 38:23 71:17 72:7 73:25 77:22



David Duplantier

78:23 96:22 140:16 145:23

**decisions** 73:7 103:12

**decreased** 140:10

**deeper** 105:24

**deescalate** 56:25 57:8,10 61:22

**deescalating** 56:22

**deescalation** 133:4

**defensive** 59:11

**deficiencies** 94:5

**definition** 114:5

**degrees** 54:11,12 58:23

**delay** 87:15

**delayed** 6:10

**delays** 85:16

**deleted** 23:20

**demeanor** 40:1,6 65:19

**demonstrating** 58:20,22,25

**department** 26:3 29:11,15 31:13 41:24 47:19 70:8 81:22 108:6 109:1,2 130:3,8 133:2,8

**departments** 133:2

**depend** 94:14

**depending** 15:15 16:22 58:18 61:6 66:7 78:16 80:20

**depends** 62:19 79:12 80:21 94:15

**deploy** 58:13 59:4

**deploying** 73:13,15

**deployment** 11:23

**deposition** 6:10,15 20:25 21:7 133:20

**depositions** 6:19

**derived** 70:8 130:1 137:10,13,22

**derogatory** 106:21

**Derrick** 86:6 90:19 102:23,25

**describe** 19:8 20:21 62:1 100:6

**designated** 21:8 22:14 23:2

**designation** 87:10

**designed** 73:24 129:7

**designee** 136:14 138:8,20

**detailed** 60:1

**detective** 8:25 113:10

**determination** 101:14

**determinations** 110:4

**determine** 15:25 17:1 34:19 51:14 103:3 117:13

**determined** 93:20

**determining** 14:22 103:15

**devastated** 8:12

**develop** 25:7

**developed** 69:23 88:2 129:10,16 130:2

**development** 21:12

**device** 57:24

**dictate** 15:17

**difference** 45:2 52:25 53:4

**difficult** 53:25 55:1,10,12 56:18 72:21 103:9

**digging** 65:5

**direct** 45:14 53:22 111:18

**directed** 122:14

**direction** 42:4,12

**directly** 34:10,13 40:24 52:22 59:14,18 96:9 106:4 114:10

**disagree** 47:2,3 48:17 83:20 115:7

**disagreed** 90:1

**discharge** 92:25 113:11

**discharging** 55:23

**discipline** 14:13 44:3

**discussed** 43:2 60:4 108:8

**discussion** 101:11

**dispute** 119:12,14

**disseminate** 123:18

**disseminated** 123:6

**distance** 40:10 53:12 57:3 94:6 143:9 144:21

**district** 8:24

**dive** 50:2

**division** 26:3

**document** 7:1,7 8:5,7 21:5 46:4,9, 17,18 47:2 49:9,21 50:8 65:1 66:20 86:11,13,19 88:13 110:24 111:17 115:16 116:16 136:17 137:14,21, 23

**documentation** 87:1

**documents** 25:22 26:6 115:16

**dog** 7:17,18 8:2,8,12,15,16 10:5,6, 7,9,20,21,24 11:1,4,7,12,13,14,17, 22,24 12:2,6,10,15,17,22 13:8,10, 15,16,18,22,25 14:3,7,8,11 31:14 32:14,16 34:19 35:1,2,24 36:1,7 37:1,6,9,11,17 38:20 40:3,15,18, 20,25 41:3,6,9 42:3,12 43:19,20 44:4 53:2 56:14,17,23 59:1 65:19 68:10,21 71:21 79:13 92:12,14,17, 18,19 93:24 96:18,20 97:15,18,19, 20,25 98:3,20 99:16,21,24 100:3,9, 10 101:1 103:19 113:12,13 126:15, 16,23 130:21,23 132:3,6,10,13,14 133:22 134:4 135:10 137:25 138:13,16,17 139:2,9,17 140:3,9 141:7,11 142:4,5 143:3,7,8 144:5, 7,20,24 145:4,10,21

**dog's** 30:15 97:18

**dog-related** 67:9,22 68:22 69:7 70:7,10,14,19 71:6 121:21 124:11, 25 125:11 137:12

**dogs** 7:21 10:3,14 15:4 30:22 31:19 33:4 35:4 37:22 38:1,13 39:4,5 40:3 71:22 90:23 92:12 96:15 98:22,25 99:16 100:1,3,12 114:2 115:2,4,10 121:24 123:16 126:14 127:2 131:15 132:9,20,21 140:20 143:3,20 145:2,5,20,22

**DOJ** 41:17,20 42:2 70:21 137:11, 14,22 138:12,15 140:19 141:5 143:2 144:4

**DOJ's** 69:23,24 70:25 71:3 137:24 138:4 139:1,16 140:1 142:3

**domain** 97:19

**domestic** 90:21 91:14 95:20,21, 23,25

**doubt** 128:11,14



David Duplantier

**drafting** 46:11

**dramatic** 52:7,10

**dramatically** 16:8,9

**drastically** 140:10

**draw** 78:6

**drawing** 45:5,13

**dress** 82:3

**drew** 92:15

**drills** 78:6

**driving** 123:4

**drop** 54:14 59:2 144:7

**drops** 54:10,12 58:23

**DTB** 25:3,19,23 26:10,24 27:17,20 30:24 127:25 128:5,12

**DTBS** 25:16 27:4 66:4,6 122:14,21 123:10 128:17

**duck** 107:2

**due** 105:1,6,11 107:3 113:12

**duly** 6:2

**Duplantier** 6:1 68:19 90:15 91:2, 12 93:19 94:1,18 103:5 107:13

**Duplantier's** 21:23

**duty** 10:9 12:16 27:24 28:10 39:25 41:18 44:15 52:14 59:25 64:1 81:9, 24 82:4 90:24 92:15 112:1,2,12

———————————

**E**

———————————

**ear** 40:2

**earlier** 68:23 106:15 125:24 127:3 133:20 143:22

**early** 23:11

**earned** 9:2

**ears** 32:15 65:22

**easier** 53:25

**easiest** 53:7

**easy** 60:15

**eat** 100:13

**edge** 78:9

**educate** 135:22

**educated** 28:24

**educating** 135:18

**effect** 44:5 51:9,19 54:9 55:6 57:21 98:1,2

**effected** 57:16

**effective** 43:19 45:11 97:23 120:25 141:6

**effectively** 55:15 56:10,16 141:11

**efficient** 6:14 23:5

**elaborating** 143:19

**electronics** 123:6

**elements** 16:19

**else's** 17:12

**embedded** 133:4

**emergency** 14:4 140:3

**enclosed** 32:25 93:24

**encounter** 95:14 131:7,8,9

**encountered** 10:4,9

**encountering** 12:15 27:23 41:18 52:14 63:25 132:21 135:10 144:5

**encounters** 67:10,22 68:22 69:8 70:8,10,15,20 71:6 124:25 125:11 126:23 135:11 137:12

**end** 25:11 28:12,16 29:6 59:2 62:22 78:15 90:1 102:10 111:5 120:25 140:20

**ended** 10:20 13:17 24:19 96:11 108:5

**engagement** 14:14 115:2

**enter** 34:4 94:3

**entered** 10:1 92:10

**entering** 13:25 32:25 62:5,13,21, 24 92:10 93:23 95:18

**enthusiastic** 143:4

**entire** 31:13 73:18 111:21

**entitled** 7:2 49:10 67:8,21 68:21 69:6 70:7,9,14 124:24 127:16

**entrance** 96:5,6

**entry** 34:13

**equation** 38:8

**escalate** 40:14

**establish** 11:3 140:25

**established** 27:14

**estimate** 10:8

**estimation** 84:9

**evade** 80:25

**evaluate** 35:2 39:24 76:22 77:13 80:24 84:22 85:2 105:22

**evaluating** 14:21

**evaluation** 14:22 74:9,15 76:12

**evaluations** 85:3

**evolving** 72:15 75:8 77:10,21 79:16

**exact** 23:9,23 51:11 87:9 137:11

**EXAMINATION** 6:4 86:1 121:4

**examined** 6:2

**exclude** 137:24 138:2,4 142:17

**excuse** 102:15 106:8

**executed** 10:18 13:24

**exhibit** 7:3,4 20:24 21:2 46:4,5,14 47:11 49:9,12,19 50:11 51:2,16,18 68:6,7,19 85:19 86:7,8 104:1 107:16,22 110:5,15,20,25 111:19 112:17,20 113:20,23 115:17 116:18 118:10 121:8,10 125:9,12 136:9 137:19,22

**exhibited** 102:11 104:2

**exist** 19:9

**existed** 92:20

**exists** 39:9 74:23

**exit** 34:13 96:6

**expandable** 44:11,14

**experience** 18:11 57:14 108:9 135:7

**experienced** 9:20

**experiences** 36:14 40:2

**expert** 89:5 104:16 135:21



David Duplantier

**experts** 30:10

**explain** 40:7 70:3 92:23 95:5 102:12

**explains** 86:23

**expose** 94:6

**exposure** 95:22

**expressed** 107:22

**expressions** 127:2

**extend** 41:8

**extensive** 47:13

**extent** 22:7,8 95:19

**eye** 35:6

**eyes** 144:7

---

**F**

---

**face** 40:23 81:22

**faced** 34:25 61:11 92:13 93:20,23

**facets** 118:24 119:3,10

**facial** 127:2

**facing** 41:1 80:22 96:8

**fact** 11:20 12:5 27:15 65:6 89:4 97:17,23 99:15 101:6,8 121:22 128:12 129:7 131:4,5 137:21 141:16

**factor** 16:6 36:2,4,10,19 37:4 38:2, 4,6,7 39:8,17 45:12 56:21 57:1,9 95:21 97:18 98:21 100:4,5

**factors** 16:17 42:8,9 57:7 59:4 71:15,20,22 72:6,9,11,18,23,24 98:19 126:7

**facts** 17:7 119:14

**failing** 112:2 133:12

**fair** 19:4 24:12 28:1 52:9 82:9 127:23 139:11 140:1 141:18 145:24

**fall** 16:17 17:19,21 52:22 108:13

**falling** 112:11

**falls** 17:17 52:21 103:19 108:12 118:18 135:16

**familiar** 37:23 43:1 46:22 49:20

69:10 84:16 86:11,12,13 124:24

**familiarity** 128:25

**family** 6:9 7:14 8:5 69:22

**fashion** 66:16 103:18

**fast** 40:7 45:3,4 72:13

**fat** 40:9

**fatal** 34:7

**fear** 36:7 38:12,18,20 39:8,9 107:3 113:13

**federal** 29:11

**feel** 8:1,11 17:23 38:21 41:14 49:24 60:20 96:21 100:14 108:14 138:20

**feeling** 145:7

**feels** 143:8 144:20

**feet** 14:11 44:5 59:7 62:4 79:7 81:25

**fell** 141:17

**felt** 8:5 98:13 100:19 103:3

**fence** 96:17

**fenced** 92:9

**fenced-in** 91:25 116:3 117:10

**Fewer** 140:2

**field** 19:12,16 21:11 23:4,8 55:21 56:14 59:7 136:16

**fight** 32:18 90:21 91:14

**figuring** 40:16

**Final** 113:15

**find** 13:9 20:25 26:18 35:4 98:7 99:20 105:24 121:20 133:1,7,9 139:21 140:12

**findings** 88:6,14 89:8,21 90:1 93:13 96:19 108:7,18 111:10 118:19 132:16

**findings/recommendations** 88:21 90:5

**fine** 36:18 99:7 119:20

**finish** 119:18

**finished** 12:1

**fire** 14:6 53:13 58:24 74:14,20,25 75:19 76:10 126:16,18,19

**firearm** 52:21 77:5,11,15,16 78:3, 25 92:24

**firearms** 123:3

**fired** 14:1,9 54:11 75:5 92:16,19

**fires** 74:19 76:2,3,9

**firing** 13:17 53:13 58:2,10 74:17 90:24 113:13

**firsthand** 97:8 135:4

**fit** 16:14,15

**five-nine** 56:6

**five-ten** 56:5,7

**flavor** 7:14 13:3

**fled** 92:18

**flip** 125:14

**floor** 85:8

**flying** 115:16

**follow** 46:14 100:18 133:13

**follow-up** 85:11 106:7 107:14 136:5

**follower** 100:9

**footage** 87:1 88:9,12 89:25 90:16 93:19 95:8,10

**footwear** 81:23,24

**force** 10:20 12:17,19,22 13:21 14:23 15:7,14,17 16:1,2,13,16,20 17:1,6 18:9 27:8 31:20 37:15 38:3 43:14 49:11 52:19,23 53:1,2 57:5 58:16 66:18 71:12,20 72:4,6 73:9 74:1,7,8,10,16,22,23 75:3 77:13 78:1 80:24 81:2 82:24 83:3 86:17, 24 90:2 92:24 101:15 103:13,19 104:13,15,18,19 108:12,20 109:22 112:3 126:4,11 127:18,20 133:7 135:14,15,24

**forced** 10:19 62:3 75:12 126:10

**forever** 134:1

**forgive** 123:21

**forgot** 20:22 79:9

**form** 51:20 68:3 69:3 86:21 88:23 89:9,22 90:8 93:3,17 94:24 97:5



David Duplantier

98:16,23 99:14 100:22 101:2,10,
16,22 102:18,24 103:23 105:4,8,
13,18,23 110:17 111:1 112:22,25
114:18,22 115:11 116:13 117:23,
24 119:1,4 120:5,14,20 122:1
124:4,17 125:20 126:24 127:9
128:2,7,13 129:12,21 131:1 132:25
135:12 142:7

**format** 127:25

**former-chief** 105:2

**former-deputy** 105:6

**fortunate** 10:25 11:2

**Forty** 107:18

**forward** 144:6

**found** 26:8 90:22 92:11 93:23
96:24 102:13 103:8 112:8,13,15
118:18

**fourth** 88:19

**frame** 23:10 29:7,14 95:15

**free** 49:24

**friendliness** 40:20

**friendly** 130:22,24 131:10,15
137:25 138:1 142:6 143:8,16
144:25 145:2

**friends** 7:25

**frighten** 17:20

**frightens** 17:21

**front** 34:3,5,13,14 53:14,15 59:12
80:18 90:23 91:25 116:2 117:10
121:11

**full** 143:5

**function** 100:14

**funnel** 34:7

---

**G**

---

**gate** 34:1,2,14 62:21 63:2,9 79:24,
25 80:3,4 96:3,14 117:19,22 118:2,
6 120:4,9,12

**gated** 33:21 62:13

**gather** 26:5

**gave** 123:24

---

**general** 15:5

**generally** 8:19 40:23 44:2 100:8,
17

**genitalia** 38:14,21

**gentleman** 24:18

**gentlemen** 85:9

**gesture** 40:20

**girl** 134:5

**give** 10:10 12:20 21:7,9,17 29:14
30:16 34:6 35:12 45:15 49:2,13
53:22 64:15 70:12 89:2 95:17
96:24 102:15 125:6 145:18

**giving** 6:9 34:19

**glanced** 8:8

**goal** 57:6

**God** 13:4 31:10 64:11

**good** 6:6,7 20:2 40:17 44:6 50:13
55:6 57:21 62:2 83:11 84:1,2,8
86:3,4 91:15 95:16 108:16 136:2
139:1,11,20 141:18 142:3 143:10
144:4 146:2

**Goodly** 83:8 84:8 105:2

**government** 29:11

**graciously** 59:25

**great** 19:17 49:14 134:9,13

**green** 58:13 78:20 126:12

**greet** 143:4

**greeting** 142:6 143:5

**grounds** 126:11

**group** 31:12 32:4 53:7 60:8 100:15
123:22

**grown** 56:2

**guaranteed** 44:6 100:2

**guess** 12:2 15:2 16:10 19:7 45:8
48:12 102:4,21 131:13

**guidelines** 135:24

**gunshot** 34:9

**guys** 49:6

---

**H**

---

**hair** 32:21 81:12

**half** 111:23

**hand** 16:15 17:8 41:7 45:14 52:18,
19 65:8 78:12

**handed** 86:6

**handgun** 78:10

**handle** 21:11 23:4,8 41:14 136:16

**handling** 23:12 25:17 64:7

**hands** 41:12 78:15

**hands-on** 73:14 123:4 128:23

**handy** 87:8

**hang** 100:12

**happen** 19:18 20:4,7 38:22 51:4
94:21 101:4

**happened** 13:3 72:18 93:2 96:21
100:21

**happening** 78:16

**happily** 143:3

**hard** 13:6 15:1 16:4 85:5 121:20
133:1,7,9 135:5

**harder** 55:19 56:16 85:4

**Hargrave** 129:2

**Hargrove** 129:2,4,5

**harm** 15:23 35:1 42:5,13 145:6

**harm's** 33:13 103:11

**hate** 16:22 107:1

**he'll** 40:9

**head** 10:24 58:18,20 59:1 83:7
140:18

**hear** 33:8 48:1 76:4 83:18

**heard** 13:15 41:6 67:1,8,17 68:25
69:24 70:2,3 82:22 83:3,15 114:14
115:5,15,18

**hearing** 33:5

**heart** 53:16,21,23

**heated** 95:24

---



David Duplantier

**height** 56:7,8

**Helou** 94:19 97:6,9

**helped** 134:4

**helping** 134:6 140:25

**hiding** 58:11,14

**high** 82:20

**Highlighted** 111:20

**hip** 60:15,23,25

**hit** 53:7 56:17 59:3

**hitting** 56:10

**hold** 47:14 50:25 80:20 102:13
131:16

**homeowners** 126:15

**honest** 28:23 44:24 139:4

**Honestly** 145:18

**hope** 14:12 39:6 61:16,21

**horses** 36:9

**hospital** 14:4

**hospitalization** 140:4

**hour** 65:12

**hour-long** 65:11

**hours** 65:12

**house** 10:19 13:8,14,25 34:3,15
58:11,15 60:18 62:22 96:8 97:19
117:17

**Hudson** 104:17

**human** 7:25 53:1,6 55:19 56:20
72:13 76:24 143:4

**humans** 57:2 76:25

**hundred** 28:3

**hunt** 100:12

**hurt** 11:5 30:11,12 37:5 54:20
61:25 142:19

**hypothetical** 77:23 137:4,8,17
139:14 144:1

━━━━━━━━━━━━━━━━━━━━
                    I
━━━━━━━━━━━━━━━━━━━━

**i.e.** 16:18 34:9 53:14 55:6 78:9
86:24 97:24

**idea** 26:19 45:21 49:14 67:23 71:2
142:3 144:4

**identification** 7:4 21:2 46:5 49:12
86:8 110:20 125:12

**identified** 93:25

**identify** 15:22 91:24 103:8 116:1
117:9

**imminent** 93:21 100:20 103:15

**impact** 43:25 97:24 98:4

**important** 44:22,24 73:21 141:18
143:23

**importantly** 85:14

**impression** 132:17

**in-face** 27:12

**in-service** 18:19,20 23:12,15,25
24:5,6,11,14,17,20,21,24 25:9
27:4,13,22 28:4,15 30:3 31:11
39:23 52:13 56:1 64:9 66:12 67:13
73:12 121:22,23 122:4,10 123:1,16

**inaudible** 100:25 139:25

**incapacitate** 54:20

**incapacitation** 53:9

**incessantly** 106:9

**inches** 12:18 54:19

**incident** 11:12 16:5 18:15,18,25
19:6 51:4 90:17,19 93:19 103:6

**incidents** 67:9,22 68:22 69:7 70:7,
10,14,20 71:6 95:11 124:25 133:21

**include** 48:16 141:2,8 142:3,17

**included** 27:2 59:23 140:21 141:5,
23 144:1

**includes** 122:6

**including** 21:11

**inconsistent** 50:19 110:14,24
111:10 112:18 127:7

**incorrect** 84:24,25

**increased** 140:8

**indicators** 42:17

**indifferent** 20:3

**individual** 131:8,9

**individuals** 92:22 100:13 140:2

**information** 23:21 30:14 65:9
72:15 91:19,20 102:17 123:6,18
125:23 126:2 129:9,15 130:4,7,17
133:14 134:19,25 135:1,25 138:6,
19,24 139:5,20 141:18 142:20

**ingredient** 39:20

**initial** 86:21 89:8 96:2

**initially** 78:20 86:21 108:6

**injured** 28:8

**injuries** 139:18

**injury** 42:13 113:14

**inside** 33:3,4 92:9 93:11 96:1
97:16 118:2

**instance** 61:11 72:8 83:1 126:14

**instances** 10:17

**instinct** 56:25

**instruct** 33:24 116:7

**instructions** 112:3

**instructor** 9:10 45:1 88:20 90:5,15
122:7

**Integrity** 90:14 94:19 112:7

**intending** 42:5

**interaction** 124:18

**interactions** 138:8

**interpose** 47:17

**interpret** 84:20

**interpretation** 37:15

**interpreting** 34:18

**interruption** 142:23

**investigate** 66:15

**investigated** 10:1

**investigation** 62:14 83:2 111:13
112:21 113:10,22

**involve** 74:4

**involved** 20:2 24:16 40:4 46:11
65:14,20 90:19 107:6 133:21

**involving** 71:20 76:25

**isolated** 11:5



David Duplantier

March 08, 2023
Index: issue..loud

**issue**  76:7 102:16

**Item**  90:17

___

**J**

**jammed**  97:17

**Jesus**  50:23

**Jim**  106:3 146:1

**job**  18:16 19:10 23:20 25:16
121:17 135:21

**John**  94:18

**joined**  8:19

**Jones-brewer**  82:9,10 112:8
113:9

**judge**  136:20

**judgment**  84:2,6,8,18

**jump**  96:17

**jury**  136:20

**Justice**  41:25 130:3,8

**Justice's**  70:9

**justifiable**  16:16,17

**justification**  74:8 87:18,21 109:22

**justified**  107:24 113:19

**justifies**  16:1 77:25

**justify**  16:2

___

**K**

**Katrina**  64:12,13,16,18

**keen**  33:4

**key**  16:10

**kick**  37:6 59:7,13 145:21

**kicking**  37:5,12 43:18 79:7

**kicks**  59:12

**kill**  75:10

**killed**  92:17

**killing**  10:21 90:25

**kind**  9:12 11:3,4 15:1 19:20 23:7
36:17 56:14,24 57:3 59:22,24 65:1

**knew**  41:20 82:24

**knife**  78:9

**knowing**  40:16

**knowledge**  26:9 29:1,16,18 31:1
42:7 67:19 70:6 82:6 105:25 108:9
124:10 130:10,18 135:4,17

**knife**  78:9

**knife**  78:9

68:12 71:8 80:21 81:8 111:5 121:2
134:20 142:1

**kissing**  33:10 91:23 92:3 116:1
117:8,22 120:2,9,11

___

**L**

**lack**  102:14

**lady**  134:4

**language**  30:16 127:3 138:4,12,15
139:17 140:1,19 141:3 142:4,17
143:3,11,25 144:4

**large**  60:8

**larger**  92:12

**largest**  53:7

**launch**  143:6

**lawyer**  99:5

**laying**  58:25 59:1 76:3

**layman's**  59:13

**layperson**  62:12

**leader**  100:8,9

**leading**  95:13 124:4

**leaning**  28:7 58:20

**learned**  91:2,12

**leather**  82:3

**leave**  32:19

**led**  92:23 102:12

**left**  17:3 24:19 61:19 96:12

**legal**  23:19

**legible**  49:6

**legs**  40:8

**lesson**  65:3,5,6

**lethal**  13:20 14:23 16:1,2 17:1 34:9
38:2 43:5,9,14 53:1,2 61:14 71:11,

12 72:5 73:9 74:16,22,23 75:2 76:2
77:13 78:1,15 80:24 103:19 126:11

**letting**  41:6

**level**  15:24 17:12 18:12 36:8 37:16
49:1

**levels**  17:16

**leverage**  98:3,4

**lieutenant**  104:8,12,17 110:11

**life**  20:16 145:21

**light**  58:13 78:20 126:13

**likelihood**  34:8 132:14

**limit**  17:10

**limited**  124:6 134:3,23

**lines**  124:1 139:8,23

**list**  28:13

**listed**  21:6 124:18

**listen**  98:10

**lists**  28:20

**lives**  60:20

**local**  133:15 134:20,23

**locate**  65:24

**located**  94:6

**location**  34:12 91:17 117:18 118:1

**log**  124:7

**long**  6:21 11:1,19 24:16 25:2 28:21
37:16 81:10,16 100:15 118:7
133:22 135:22

**longer**  95:17,18

**looked**  26:20 41:16 134:5 145:4,9

**loomed**  100:5

**loosened**  81:11,20

**lose**  98:3

**lost**  67:6 130:6

**lot**  30:19 31:18 39:2,3 42:9 44:2
50:1 62:11 64:6 66:24 67:5,6 98:19
125:24

**lots**  107:23

**loud**  33:3,11,12,18



David Duplantier

**lower** 53:17

**Ls** 61:3

**luck** 19:17

---

**M**

**made** 39:15 51:15,25 83:1 91:21,
23 92:3 116:1 117:8,18,22 124:14

**magnet** 19:15 106:17 107:4

**magneted** 19:21

**magnets** 19:15 20:14

**majority** 32:16 139:17

**make** 22:16 24:10 33:2,25 34:24
35:6 46:17 47:7,15 49:5 54:15
60:17 61:12 72:9 73:7,24 77:21
86:11 87:11 89:12 97:15 99:1
120:2 133:18 135:20

**makes** 20:20 30:7 32:9 34:17 44:9
51:17 54:25 55:18 59:6 60:15,23
62:11 78:22 79:20

**making** 13:16 28:24 30:9 69:22
71:23 92:24 120:11 142:1

**male** 56:2

**man** 83:3 89:14 115:16

**mandate** 29:9

**mandated** 24:25 28:10 29:10,14
66:5 121:18,19 123:13,18

**manual** 45:23

**March** 146:7

**mark** 7:1 20:24 45:19 46:3 49:8

**marked** 7:4 21:2 46:5 49:12 86:8
110:20 113:23 125:5,12

**mass** 54:2,6 57:19

**material** 126:21 137:22 138:4

**materials** 69:12 141:5

**matrix** 18:6

**matter** 7:15 11:19 27:15 65:6
77:11,12 104:16 141:16

**meaning** 20:13 40:15 50:12 77:17
96:5 100:7

**means** 16:20 43:5,10 44:3 57:20
78:14,15 79:1,10 100:6

**mechanism** 32:22

**med** 14:3

**medical** 139:19

**medium-sized** 92:13

**member** 10:6 11:23 82:18

**members** 9:22

**memory** 10:14 32:13

**mention** 48:12

**mentioned** 34:18,20 60:6 84:7
122:13 123:12 133:21

**mentioning** 101:4

**method** 80:7 98:11

**middle** 87:18

**mimics** 72:1

**mind** 17:17 49:2 64:4 68:12 142:13

**minded** 98:8

**mindset** 140:25 145:5

**mine** 35:21 118:19

**minimal** 133:6

**minor** 136:4 139:18,19

**minute** 60:16,17 86:10

**misinforming** 41:20

**misleading** 116:20

**missed** 64:3 108:22

**mitigate** 12:10

**mitigated** 12:6

**mitigating** 80:7

**mix** 35:15 39:20

**model** 81:11

**modules** 73:6

**moment** 94:4

**month** 25:5,13

**months** 12:17

**move** 45:9 106:6

**moved** 9:2

**movement** 144:6

**moves** 56:25

**moving** 79:17

**multiple** 12:24 119:3,10 143:24

**murks** 145:23

**muscle** 14:13 53:7 60:8

---

**N**

**nails** 81:12

**names** 20:1

**narcotics** 8:22,24

**narrow** 63:9

**naturally** 8:20 15:14,17 26:10
34:10 45:10 53:6 54:14 95:4 122:8
126:19

**nature** 24:8 30:20 32:24 65:23
71:20 81:13 107:7 108:12

**necessarily** 11:24 15:4 34:12,14
42:6 109:21 126:12 130:25 141:25
142:5

**negates** 72:16

**neglect** 112:2

**neighbor's** 120:19

**neighboring** 91:22 92:4 115:25
117:8,16 120:1,3,21,22

**neuromuscular** 53:8

**nice** 14:5 134:2 141:25

**night** 134:18

**NMI** 53:8 54:17 56:11

**no-knock** 10:22,23

**nods** 140:18

**Noel** 83:22,23 84:8 105:7

**noise** 91:23 92:3 116:1 117:9,22

**noises** 120:2,9,11

**non-reasonable** 17:2

**nondeadly** 72:6

**nonlethal** 12:5 14:2,23 44:18
71:12 73:9 77:14 78:1,25 79:10
80:7

**nonstop** 35:19



David Duplantier

**NOPD** 8:19,20 16:25 18:8 20:11,
14,25 23:3,7 26:20 38:24 42:25
45:16 48:17,22 55:20 56:13 59:23
62:15 63:24 66:17 67:20 70:13,16,
18,24 71:5 73:4,5 74:6 76:16 77:4
78:24 80:23 81:23 82:18 90:17
108:3 109:20 110:24 111:25
113:18 114:12 115:7,18,22 116:5,
17 117:5,12 118:15,18,19,23
123:24 124:2,5,6,12,14,24 126:22
127:7,19 128:9,12 130:1,20,25
131:18 132:1,4,19,24 133:12,16
134:12 135:8,9 136:15,22 137:7,13
138:15,21 141:2 142:3,16 143:2
144:1

**NOPD's** 21:12,19,25 63:9 93:11
109:5,10 110:6,13,22 112:16
113:20,25 117:21 118:13,20 141:8,
23

**normal** 60:19

**notable** 126:3

**note** 125:15

**noted** 22:21

**notes** 111:6,8 115:21 117:4

**notice** 20:24 87:8 88:24

**notification** 92:24

**number** 10:10 140:9

**numbers** 9:17

**Numerous** 10:2

**nutshell** 89:25

---

**O**

**oath** 136:21

**object** 22:6,8 68:2 69:1 88:23 89:9,
13,22 90:8 93:3 98:16 101:16,22
103:23 105:23 109:12 117:24
120:5,14,20 128:2,7,13

**objection** 22:19,20 47:17 51:20
87:12 89:11 110:1,17 111:1
112:22,25 114:18,22 115:11
116:13,19 117:23 119:1,4 131:3
142:7

**objects** 89:13,15

**observations** 39:6

**observed** 12:4,24 55:15

**observing** 113:12

**occasion** 7:6 9:25 14:6 27:7,11,23

**occurred** 113:11,12 115:2

**October** 51:3 94:25

**odds** 109:3 110:14,24 112:18
113:21

**off-record** 101:11

**offered** 9:5

**offhand** 47:10 68:1

**officer** 8:21 11:14,18,22 12:3,16
13:9,13,15,16 14:1,6,12 17:3,17
18:15 19:5,21 22:24 24:4,10 34:24
37:25 38:19 39:24 40:6 45:3,4,8,9
48:17 52:25 53:1 57:17,18,20
58:21 61:24 63:25 67:20 71:9
74:19 75:19 76:1,2 77:21,23 78:3,
24 79:23 81:9 84:1 90:19,21 91:2,
13,14,16,17,18,22 92:12,13,15,17,
19,21 93:20,21 94:2,20 96:2,4,11,
13,14 97:7,21 100:19,20,25
102:23,25 103:1,7,10,18 106:18
111:10 113:11,12,15 114:15 115:8,
24 117:7,12 120:1 128:6 133:6
141:13,14,15,19 142:5,6 145:6

**officer's** 18:11 73:21 76:22

**officer-involved** 90:17

**officers** 12:21 14:20 15:7,10,19,
22,25 16:25 18:9,19 19:9,11 20:12,
14 21:11 23:3,8,16,25 25:1,8
28:13,17 31:12 32:5,16 33:24
36:18 39:3 41:18 42:11 43:9 44:13
46:13 52:13 55:20,22 56:13 58:4,8
59:6,11,15,24 60:11,13 66:18
71:16 73:7,11 74:6,7 76:17 77:5
78:24 80:9,23 81:23 82:2 84:21
88:10 91:21 92:9,11 95:9 103:12,
17 106:16,25 107:2,8 114:9
115:19,22 116:5,7,17 117:6 121:18
122:4,6 123:1 126:23 128:9,12
131:18 135:1,9,18,22 136:16,22
137:7 138:12 143:6 144:5,7,10,12

**official** 21:19 47:18,25 108:3
109:8,10,14,20 110:6,22 112:16
113:18,25 114:12,20 117:21

**omit** 138:14 139:1 143:11 144:4

**omitted** 71:5 130:20 138:23 139:6,

12 140:12,17 141:23 143:2

**omitting** 138:11 139:16

**once-a-year** 30:3

**ongoing** 15:11 38:12

**online** 25:1,10,15 27:14 29:8,10,17
30:23 66:5,6,11 123:7,8,10,19,25

**open** 98:8

**open-minded** 108:21

**operation** 45:22

**opinion** 21:24,25 84:18,19 87:3
103:5,22 108:10,13,16,19 110:9
135:9

**opinions** 107:23 108:2 109:4,6

**opportunity** 43:10 46:18 47:7
57:4,10 61:13,15

**opposite** 113:16 118:19 119:8

**optimal** 60:7

**order** 43:25 44:5 54:9 55:6 57:21,
24

**organization** 22:1

**Orleans** 47:18 129:18

**outline** 65:1 68:20

**outrun** 96:18

**outrunning** 40:8

**overkill** 143:20

**overwhelming** 139:17

**owners** 92:20,22 133:23

---

**P**

**p.m.** 146:6

**pack** 100:1,4,6

**pain** 12:1 54:18

**panel** 108:7

**paper** 134:2

**paragraph** 90:10 93:1 112:5
121:11 129:24 130:19 133:11
137:19 138:25 142:2,13,25

**paragraphs** 68:11,13 112:4



David Duplantier

**parameter** 17:22

**parameters** 17:19 57:23 71:19

**paraphrase** 142:4

**Pardon** 101:7 109:9

**parentheses** 127:17

**part** 15:21 18:9,13 22:15 24:2 38:8 60:9 71:3 73:21 75:23 79:18 97:11 102:7,8 108:25 113:25 122:25 134:17 141:19

**particulars** 95:20

**partnering** 133:13 134:1,8,14

**partners** 73:17

**pass** 102:17

**Passed** 104:3

**past** 91:22 92:4 115:24 117:7 120:1,3,18 140:8

**paste** 70:25 71:1

**pasted** 69:23

**patent** 82:3

**patience** 85:14

**patrol** 8:21 13:5 14:20

**patrolling** 9:21,24 12:14

**patrolman** 9:11 83:23

**patrolmen** 9:21

**Paul** 105:7

**pause** 33:1 94:4 121:1

**paused** 97:13

**pedestrian** 79:25

**pending** 51:22

**penis** 22:25

**people** 11:20 15:14 18:1 20:17,18 28:14,20 36:6,8,10 37:17 40:24,25 41:6 44:8 64:7 80:15 81:4 100:16 105:21 118:18 126:6,9,20 131:10 132:9 134:11,12 135:14

**people's** 36:7

**perceived** 80:2

**perceives** 77:23

**percent** 28:3 140:2

**percentage** 122:3

**perfect** 108:23

**performance** 112:1,11

**period** 39:4 81:2 123:13

**periodically** 83:25

**peripheral** 144:8

**person** 17:22 40:18 44:19 53:12, 14 54:3,21 55:11,13 56:22 58:25 61:16,18,23 75:13,23 76:3,9 78:8 99:17 139:23 145:4

**person's** 37:14,15 58:18 60:9

**personal** 29:1 36:14 57:14 89:3 108:2 128:23

**personally** 10:7 62:8

**personnel** 134:10

**pertained** 94:1

**pertinent** 138:6,18,24 139:21

**pet** 40:24

**pets** 101:6,8

**phased** 103:8

**phone** 50:23 78:12

**phrase** 144:20

**physical** 94:5

**physically** 58:4

**PIB** 97:4,6

**picks** 88:18

**picture** 8:8 68:10

**pictures** 65:20

**piece** 40:12

**piecemeal** 48:19

**piggyback** 106:4

**pit** 35:9,15 134:6

**place** 26:11 52:4

**plaintiffs** 121:12 129:25

**plan** 16:21 65:3,6 88:2

**play** 37:4 57:23 59:4 108:8,13 126:7

**playing** 62:18

**plays** 39:8 95:21

**plenty** 62:16

**point** 23:24 24:21 34:13 62:20 96:5,6,22

**points** 42:1

**police** 19:5 23:25 41:17 47:18 79:23 92:25 103:12 106:18,20 107:5 121:18 122:3,4,6 139:25

**policies** 45:16 46:14 47:18,24,25 50:5,7,10,13,17,20 51:13 109:5 112:9,14

**policy** 44:17 45:20 48:13,15,20,22 50:6,14 51:11 63:12 77:5 81:12,20 85:22 86:14 87:5 108:11,19 109:25 110:5,23 111:25 112:5,17,19 127:20 129:8

**poor** 63:12,15 137:23 138:9,14

**pop** 20:1

**popped** 13:25 14:11

**population** 140:8

**porch** 35:18

**portion** 48:18 73:14 111:20

**portions** 111:25 143:24

**posed** 12:10 35:23

**position** 9:2 32:15 40:2 42:21 84:14 91:15 99:16 108:3 109:8,10, 15,20 110:6 113:20,25 114:12 117:15,21 120:23

**positioning** 60:5,10 61:21 65:22

**positions** 113:18 118:23 119:8

**positive** 103:1

**possibly** 59:3 75:16 83:24 87:4

**post** 23:14

**post-academy** 23:14

**posture** 32:20 127:1

**potential** 14:21 30:22 33:3,7,15 37:8 56:22 99:24 103:8

**potentially** 135:10

**pounds** 12:18,20

**Powerpoint** 65:15,16,17,25



David Duplantier

**practical** 73:15

**practice** 55:23 56:10 58:2,4

**Precious** 104:7

**preferably** 34:2 53:20

**prepared** 21:13

**presence** 35:5

**present** 16:19 26:8 39:7 52:3 93:22 98:25 103:4 117:13,14 145:22

**presentation** 67:21 125:10 126:21 127:6 136:22 137:6,10 138:15 141:3,8,23 142:18 143:2

**presented** 12:6 74:16 80:1 113:14

**pretend** 137:4

**pretty** 11:3 30:14 47:13 77:14,15 78:3 106:19 135:22

**prevented** 28:9

**previous** 85:20

**prior** 19:5 32:25 33:21 86:22

**private** 62:13

**proactive** 106:17,20

**probability** 34:8 97:22

**problem** 16:15 26:8 43:23 45:14 61:19,22 67:9,21 68:21 69:7 70:7, 9,14,19 71:5 76:5,22 78:8 124:25 125:11 134:16 137:12

**proceed** 87:15

**proceeding** 146:6

**process** 18:10

**products** 123:24

**Professional** 25:6 26:1 122:19

**proficiency** 102:11 104:2

**Proficiency/successfully** 104:2

**program** 67:21 69:22,23,24 70:9, 16,19,21,25 71:4,5 130:3,9

**progression** 8:18

**prohibited** 77:8,9

**properly** 57:25 98:14 103:7

**property** 34:4 62:14

**protect** 81:24

**protecting** 145:8,10

**protection** 82:4

**provide** 38:23 71:16 73:4,5 82:4 109:14

**provided** 87:2 91:18 124:11 128:6, 12

**providing** 130:11

**proximity** 14:10 118:8

**prudent** 140:24 141:2,7 142:16 143:1

**PSAB** 25:6,20,24 26:1,8 66:6,7 122:17,18 128:18,19

**PTTR** 86:14 97:10

**Public** 90:14 94:19 112:7

**publicly** 41:17

**pull** 12:2 45:3,4 77:11,14

**pulled** 78:3,19

**pulling** 10:11

**puppies** 38:1

**puppy** 13:22 145:16

**purpose** 122:21

**purposefully** 132:19

**put** 19:18 25:10 26:11,16 33:12 34:7,10 39:19 48:7 80:4 89:25 96:13 97:20 99:5 104:20 107:1,20 137:3

**puts** 63:16,17,18 144:13

**putting** 26:14 27:20,21

**Q**

**qualified** 105:22

**qualify** 22:10

**question** 22:11,13 23:6 37:3 50:24 51:22 59:16 83:8,22 84:11 99:10 103:10 111:9 120:16 125:3 131:14

**questioner's** 22:15

**questions** 21:18,22 46:16 49:23 50:6 68:20 85:10 106:2,3,7,15 107:14 125:16 136:5

**quick** 6:14 16:21 20:23 41:4 47:6 87:9 103:9

**quicker** 44:2

**quickly** 72:14,19 78:13

**quiet** 35:19

**quote** 67:9 81:18 127:19 132:2,5 137:24 139:2 140:1,19,20 144:4

**quote/unquote** 104:16

**R**

**radio** 92:25

**ran** 14:1,11 92:12

**ranks** 8:18

**rapid** 75:8,16

**rapidly** 72:15 77:10,20

**rare** 132:3,6 139:3

**RE-EXAMINATION** 107:11 119:21 136:7 144:17 145:14

**reach** 26:13 40:19 41:5

**reached** 96:23 97:2 110:15 112:19

**reaching** 40:22

**read** 8:7 25:10 30:15 37:21 41:16, 19,23 42:1 46:19 49:24 51:23,24 65:1 68:14 69:12,15,16 72:13 90:6, 13 91:11 92:3 93:15,18 99:11,13 102:5,22 111:6,8 112:5 113:6,10 115:23,24 116:8,12,15,18 119:25 127:2 129:25 142:13 143:25

**reading** 7:10 42:6 132:12 133:19

**readings** 132:15

**real** 20:23 47:6 73:8 76:17 87:8

**real-life** 59:6

**real-time** 141:6

**reality** 137:8

**realizes** 61:18

**rear** 13:14

**reason** 7:12 28:7 36:24,25 37:16 44:17 51:18 52:17 56:9 87:24 102:13 103:19 128:11,14

**reasonable** 15:15 16:14 17:1 80:5



MAGNA
LEGAL SERVICES

David Duplantier

March 08, 2023
Index: reasonableness..room

101:14

**reasonableness** 16:11 17:5,16
103:14

**reassess** 74:21

**recall** 11:16 12:11 13:19 14:14
19:22 23:1,9,23 24:1,16 27:1,7,11,
19,23 28:22 29:24 40:13 41:21
42:6 65:15,16 83:1 88:10 95:12
96:2 117:16 123:15 124:19,20
141:12,17

**received** 7:8 21:6 31:17 52:13
102:25 121:13

**receives** 71:9

**recent** 53:16

**recently** 27:16

**recess** 68:17 106:12 142:23

**recognized** 114:2

**recollection** 19:2 47:5 67:24
117:25

**recommend** 144:10

**recommendation** 86:15 87:18,22
93:25 113:15

**recommendations** 102:2

**recommended** 102:10

**record** 22:21 25:24 26:4 48:10
51:24 89:12 90:7 93:15 96:20
99:13 102:6,22 110:2

**records** 24:11 28:23

**recruit** 49:1

**recruits** 16:5 27:15 29:13 58:6
73:17 75:9 81:22 104:23 124:20

**redundant** 30:6 143:14

**reenactments** 74:4

**refer** 11:19 25:3 34:6,10 53:8
59:12,13 60:11,16 72:16 78:6
80:18 96:4 114:4

**reference** 41:24 87:10

**referenced** 55:21

**referencing** 54:25 65:21 66:13
97:7 117:15

**referred** 106:16

**referring** 135:14

**reflected** 110:25 113:19 117:6
118:10

**regard** 6:20 82:20 93:2 105:16
109:15,21 129:23 130:4 132:2,20,
24 133:12,13,15 135:10

**regret** 103:2

**regular** 15:20

**reholster** 78:13,18

**relate** 63:25

**release** 11:24,25

**remember** 6:19,24 11:17 13:3,6
19:20 22:24 26:14 29:21 30:4
31:24 32:11,12,14 40:13 51:21
87:9 88:11 101:3 125:1,3 141:13

**remind** 114:5

**reminders** 66:9

**remorse** 102:14

**remorseful** 100:25 108:15

**remove** 133:8

**removed** 130:21 132:19

**rephrase** 142:11

**replaced** 24:22

**report** 107:23 112:21 113:23
115:23 117:7

**reported** 140:9

**reporter** 49:3 91:4,7

**represent** 6:8 86:5

**representative** 47:22 129:6,19
130:11

**request** 90:14

**require** 140:3

**required** 44:14 74:20 122:4
139:19

**requirement** 81:8

**reread** 116:21,25

**research** 26:7

**residence** 10:1 33:4 90:24 91:21,
23,24 92:4,18,20 97:16 115:25
116:2 117:8,9 120:2,3,19,22

**resident** 115:25

**resort** 15:16 43:13 78:13 126:9,10

**resorting** 75:2

**resources** 133:15 134:2,10,20,23
135:3,5,6

**respect** 82:21 83:9,25 105:1,6,11

**respond** 61:13 72:14 73:16 79:15

**responded** 91:3,13

**responding** 80:8 90:20

**response** 16:9 17:11 35:12 76:22
88:5 95:22 96:19,25 97:18 98:9
121:2 137:11 144:13

**responses** 21:17,19 125:10

**responsibilities** 9:9

**responsibility** 22:16

**result** 86:16

**resulted** 90:24

**retired** 84:13

**retreat** 79:11,17 80:19

**retreating** 79:14

**retrieve** 67:4

**revealed** 113:11

**review** 7:7 46:18 86:25 88:4,8
91:1,12 94:18 113:7

**reviewed** 88:9,10 89:24 90:16
93:18 110:12

**reviewing** 8:4 68:12 82:23 88:4

**revised** 51:3

**rewind** 20:23

**riding** 20:5

**right-handed** 58:21

**ring** 69:18,19 125:22

**risk** 61:24 63:17,18

**Roger** 89:17

**role** 83:19

**roles** 8:18

**room** 60:14,18 61:6 62:17 63:6
140:3



David Duplantier

**ROQUEMORE** 22:6,19,22 45:24
47:14,16,21 48:4,7 50:25 51:20
68:2,15 69:1,3 106:11 109:12,19,
24 110:17 111:1 112:22,25 114:18,
22 115:11 116:13,19 117:23 119:1,
4,7,20 121:5,9 122:2 124:9,22
125:8,13 126:1 127:5,13 128:4,8,
15 129:14,22 131:17 133:10 136:2
142:7 146:2

**Rottweiler** 141:16

**Rottweilers** 35:10

**roughly** 12:19 56:7

**Roussel** 114:15 115:8

**route** 78:4

**rubric** 36:21

**rule** 44:22 112:1,11

**run** 61:24 143:5

**running** 42:3,12 54:11 55:2,5
92:14 138:13,16,17 142:4

---

**S**

**safe** 141:6

**safely** 8:10 80:25

**scenario** 17:2 73:16 77:10,15,21
78:2,7,24 80:25 84:21 139:14

**scenario-based** 73:10,11,12,19
76:1,20,21,24

**scenarios** 73:6 74:4

**scene** 10:5 90:21 91:15,16 133:24

**schedule** 88:7

**scheduled** 94:19

**scope** 22:17 87:9 88:24 89:10,23
90:9 93:4,11 98:17,23 99:14
100:22 101:2,10,17,23 102:18,24
103:23 105:8,13,18,23 109:13
115:12

**screaming** 13:15

**search** 26:18

**secondary** 57:18 141:15

**seconds** 72:8 77:12,24 92:10
95:18 97:14 121:2

**section** 102:3 113:15

**seldom** 140:20

**selective** 71:1

**self-initiate** 107:1

**send** 66:9 88:5

**sense** 20:20 32:9 34:17 44:9 55:18
59:6 62:11 66:20 78:22 142:1

**sentence** 92:2 117:6 119:25

**separate** 60:19 74:10 81:22 114:9,
10 128:19 135:21

**Sergeant** 6:6 7:6 21:23 23:3 68:19
82:9 86:3 90:15 91:2,12 93:19
94:1,18 97:6,8,9 103:5 105:17
106:2 107:13 111:11 112:7 113:9
119:23

**service** 45:3 91:19

**services** 133:14

**set** 28:15 38:24 39:1 50:7,10 73:16

**seven-inch** 53:11

**Shannon** 82:10 112:7

**share** 107:16 135:25

**shared** 114:1 135:17 139:22

**shifted** 96:6

**shit** 102:15

**shock** 12:1

**shoes** 82:3

**shoot** 75:9,10,13 103:2

**shooting** 44:19,20 53:13 58:5
90:17 101:1 111:13 112:20 113:19,
22 126:8

**short** 40:10 77:15

**shortcomings** 43:24

**shortly** 92:8 96:14

**shot** 8:12,16 10:3,5,6,7 13:20,21
14:2,7,9,15 53:22,25 54:9 55:6
57:21 60:7 75:5,15 76:2,3,4,9,11
141:15 145:16

**shots** 14:18 57:16

**show** 7:13 25:23 98:9 125:5 134:9

**showed** 102:14

**showing** 40:15 65:20

**shown** 59:15

**shows** 78:7

**sic** 84:8

**sick** 28:8

**side** 40:24 54:6 57:19 58:15 60:14
62:6,10,21 96:7,8 141:15 144:6

**sideways** 55:3

**sign** 33:8 34:21

**signals** 30:17 143:7

**signature** 104:5 110:10

**signatures** 86:22

**signs** 34:18

**silhouette** 55:24,25 56:2,14 58:3

**similarly** 29:24

**simulate** 58:14

**simulating** 58:9

**simulation** 76:17

**sir** 8:3,14 9:23 21:20 22:20,22
27:6,10 29:3,20 36:16,20 38:9,11
39:22 42:19,24 43:12,15,17 44:12,
16 45:17 46:10,12,15 48:14 49:22
50:18,21 69:11 71:7 72:22 73:1,3,
23 74:5 79:8 81:7 82:25 83:5,14,
17,21 85:12 86:4,12,18 87:23 88:1,
15,22 89:18 92:6 93:16 94:13
98:15 100:23 101:18,24 103:24
104:4,6,11,25 105:3,9,19 108:1
109:7 111:14,20 113:17,24 118:25
119:24 120:8 121:3,25 122:12,15,
17 127:15,24 128:3 129:11,13,17,
20 130:6,13,15 136:3,6 137:16
141:4

**sit** 41:13 70:2 95:5,7

**sitting** 32:20 61:8 128:16 129:5

**situation** 12:5 17:7,24 40:15 41:1
57:4 72:21 95:24 97:21 103:15
131:11 135:2,23 137:5 144:25
145:17

**situations** 16:16 132:22 144:13

**Six-one** 56:5

**size** 12:20 13:22 37:1,3 40:3 55:1
61:6 62:4



David Duplantier

March 08, 2023
Index: skim..takes

**skim** 7:6 46:20 47:6 49:25 50:1

**sky** 10:11

**sleeping** 94:4

**slide** 125:9 126:21 127:6

**slideshow** 67:20 129:9,16 137:6

**slightly** 16:6

**slim** 97:23 132:11,15

**slow** 91:4,7

**small** 12:22 16:6 37:9,11,13,17,22 38:1,13,20 55:9,13 58:5,15 59:7

**smaller** 43:20

**smell** 41:13

**sniff** 41:4,6

**soccer-style** 59:13

**sole** 133:4

**solely** 42:15

**somethings** 72:16

**son** 106:8

**sort** 74:15 77:12

**sound** 30:7 33:2,25 37:23 84:6

**sounds** 9:20 12:4 33:10 72:1 134:2,9

**Spaced** 114:8

**spacing** 114:15

**speak** 39:3 97:9 118:17

**speaking** 129:18

**specific** 19:2 21:18 29:25 32:10 52:12 80:12

**specifically** 29:25 30:4 31:14 138:14

**speed** 42:21 45:5 55:1,13

**spent** 9:3

**split-second** 71:17,18,23 72:7,12 73:7,25 77:22 78:23 84:21

**spoke** 97:4,7

**spoken** 55:20

**spread** 53:11 54:19 55:8 63:3,6,7

**staff** 122:7

**stance** 133:3

**stand** 40:21 62:16 114:10 118:5,22

**standards** 25:6 26:2 52:25 122:19

**standing** 60:14 62:10 114:16,17, 21,25 115:9 126:15

**standpoint** 9:11 72:11 87:4,5 110:7 118:22

**stands** 122:18

**stare** 35:11

**start** 29:6 32:22

**started** 7:10 8:20 24:17 65:19 94:25 120:18 143:19 145:3

**starting** 48:25 61:22 107:22

**starts** 119:25

**state** 129:25

**stated** 10:18 43:18 106:5 114:13

**statement** 88:11 115:8 121:14,15 130:16 138:22 139:2

**stature** 12:23

**stay** 63:7 72:25

**stays** 37:16

**steadily** 140:8

**step** 60:17

**sternum** 53:21

**stick** 135:23

**sting** 54:18

**stood** 12:17

**stop** 16:19 23:4 62:10 75:10 89:14, 16 92:2 144:5

**stopped** 75:17 76:12

**straight** 13:17 54:12

**strange** 38:12

**street** 123:1

**streets** 6:22 9:21,24 12:15 83:25

**stress** 32:16

**stretch** 62:20

**stretching** 64:12

**strictly** 66:12

**strike** 44:5,6

**strikes** 51:17 59:12,15,19,21

**structure** 34:11

**stuck** 77:14,15,17 78:4

**stuff** 19:13 36:17 39:19 66:12 107:6 134:8 143:15,21

**subject** 76:19 104:16 110:6

**subjective** 18:3,11 36:13,19 37:19 40:2

**Subsequently** 92:16

**sudden** 76:4

**suffering** 94:5

**suffice** 37:6

**sufficient** 74:24

**suggest** 22:12

**suggestion** 132:19

**summarize** 89:21

**summary** 60:1 88:14 113:6,21

**supervisor** 9:6 110:11

**supplement** 24:24

**supporting** 35:23

**supposed** 106:21 145:11

**surprised** 41:23 95:9

**suspended** 24:7

**SWAT** 9:3,4,9,11,13,22 11:15,21 14:19 104:22

**swig** 98:4

**sworn** 6:2

**synonymous** 106:19

**T**

**table** 61:7

**tactical** 79:17 80:19 87:4 94:20 98:9 102:25

**tactics** 59:11 63:13,15 85:22 86:15 104:19

**tail** 32:15 40:2

**takes** 72:18 76:2



**taking** 42:8,9 101:13 126:9

**talk** 17:5,16 21:13 27:21 30:16 43:7 47:22 79:13 109:16 126:8 127:2

**talked** 27:3 30:19,21 31:16,18 32:14,24,25 39:24 40:1 52:12 64:1 65:21 71:21 95:13,15 106:16 125:24 126:4 127:3 143:15,22

**talking** 15:3 37:14 45:5 65:19 67:13 93:10 106:22

**Tarak** 6:8 85:18 111:12

**target** 33:11 53:6,15,16,17 54:15 55:13 56:10 57:18 58:5 60:15,24 91:17,24 116:2 117:9,18,25

**targeting** 23:18

**targets** 58:8

**tase** 10:24

**tased** 11:8,13

**taser** 10:25 44:25 45:1,4,20 55:6 58:13 77:6 79:3 97:22 132:20 141:7,11,12

**tasers** 11:18

**taught** 31:4,5 32:1 39:24 67:4 94:9

**teach** 9:5,10 16:4 31:9 32:3 48:20 57:2 59:12,20 60:11 75:9 92:6 104:17 122:8 132:8 144:9

**teaching** 17:6 24:18,19 31:24 104:13,22 129:7 144:10

**teachings** 132:7

**team** 9:3,4,11,13,22 10:6 11:15,21, 23 14:20 104:22

**teeth** 42:23

**telling** 22:24 32:18

**ten** 6:23 38:13

**tend** 100:13

**tennis-style** 81:18

**terms** 27:22 59:13 63:4 121:12

**terrain** 61:7

**terrible** 133:24

**territory** 145:10

**test** 25:11 32:13 123:9

**testified** 6:3 69:4

**testifying** 22:14

**testimony** 21:9 68:24 70:13 84:20 130:12

**thing** 14:5 16:10 34:6 37:5 40:19 46:20 49:24 59:18 95:6,16 97:13 106:14 111:6 119:19 121:1

**things** 23:18,19 24:7 30:20 32:24 35:2 40:14 41:19 42:22 43:3 65:22 69:16 71:10,20 72:13 75:21 81:13 95:22 106:24 107:1 108:12 123:4, 25 140:15

**thinking** 39:2 131:14 139:7,9,23

**Thirty-two** 10:13

**thought** 37:7 50:23 78:8,20 145:5

**thoughts** 18:11 19:5 36:15

**thousand** 55:12

**threat** 12:6,10,12 14:22 15:3,22, 24,25 16:1 17:16 31:17 33:3,16 34:20 35:1,23 37:7,8,16,18 39:25 40:21 42:13 61:11 71:11 75:8,10, 17 76:11 77:23,25 79:11,12 80:2,7, 17,21 103:8,16 113:14 114:2,14 138:13,16,18 139:8 142:5

**threatened** 143:8 144:20 145:7

**threatening** 42:4

**throw** 56:21

**ti** 82:4

**tight** 54:19 62:5,23 63:8

**time** 6:9,13 10:19 11:2,20 12:14 14:19 15:11 17:9 23:9 24:15 28:17 29:7,14 31:25 32:16 35:9 52:4 55:16 57:1,9 73:8 77:6 82:23 83:6, 16 85:7,13 92:15 93:6 94:1,6 95:4, 11,12 96:16 100:20 104:9,11 110:11 114:1,13 115:1,2,4,10 118:7 121:16 122:25 132:8 135:2, 3,4,5 142:20 146:5

**times** 6:17 10:2,8 12:15,24 13:1,2 31:9 32:1 55:12 64:15 144:19

**tip** 33:11

**title** 24:1 67:12,16 69:19 70:19,24 123:15 124:19,21 125:22 137:11

**titled** 125:10

**today** 6:9 21:14 52:16 64:1 103:22 128:16 129:6 136:18

**told** 25:23 58:1 61:3 71:9 82:20 100:19 101:8 113:20 115:21 116:4 117:4

**tones** 62:19

**tool** 12:5 44:18,23 129:8

**top** 10:24 26:15 53:19,20 54:11 83:7 98:3 111:22 130:19

**topic** 21:8,18 22:14 23:2 33:25 59:22,24 60:1,5 89:10 106:6 110:13 136:15

**torso** 53:14,15

**totality** 34:23 71:10

**totally** 17:3 83:20

**touched** 52:16

**touches** 142:21

**tragic** 103:6 145:4

**train** 14:12 16:25 36:18 42:11 43:9 44:13,23 46:13 50:17,19,22 71:18, 19 72:1,3 74:7 78:5,24 79:14 80:23 81:6 116:16 122:25 144:12

**trained** 18:17 23:3 33:25 44:25 48:21 67:20 71:16 76:19 115:15 133:15

**trainer** 14:19 48:2

**trainers** 110:8

**training** 9:21 14:21 15:2,11,20,21, 25 16:3 18:20,22 20:21 21:10,12 23:7,12,16,25 24:5,6,11,14,17,25 25:3,7,10,13,14 27:12,14,21 28:4, 6,15,18 29:5,9,10,13,17 30:2,19,23 31:2,18 35:22 38:19,23 40:4,13 41:17 42:1,2,25 43:4,7 45:15,20 47:22 48:17 52:13,16,18 55:21 56:14 57:11 58:2,4,7 59:7,15,23 60:2 62:15 63:10,24 64:9 66:6,16, 17 67:8,17 68:21,24 69:6,10,14 70:7,13,24 71:8,9,16,21 73:5,10, 11,12,20,22,24 76:1,16,17,20,21, 25 77:4 80:9 86:15,16 88:2 89:5 92:5 93:11,25 94:10 104:3,22 108:13 109:16,21 110:7,8,23 111:9 118:22 121:12,13,19,21,23 122:5, 11,14,24 123:2,5,7,19 124:24 126:22 127:7 128:5 130:1,2,14,21 132:2,4,20,24 133:5,17 136:15,22



David Duplantier

March 08, 2023
Index: trainings..worked

137:6,10 138:2,8 141:19 142:21
144:1

**trainings**  27:5,22 28:25 30:22
39:23 121:17

**trains**  18:8 48:3 56:13 74:6
115:19,22 116:5,17 117:5,12
131:18 135:9

**transferred**  8:22

**transition**  78:6,25

**treated**  14:4

**truck**  134:17

**true**  29:4 56:14,15 95:24 121:14,
15,22 131:16

**turn**  79:15 85:8 119:16 144:6

**turns**  78:11

**Twelve**  9:16

**Twenty-two**  45:24

**type**  14:13 31:18 34:18 43:25
60:10 66:15 100:17

U

**U.S.**  70:8 130:2,8

**ultimate**  57:6

**umbrella**  52:23

**unacceptable**  59:20

**undercover**  8:22,25

**underneath**  53:20,21

**understand**  8:9,10 17:25 21:17
68:23 72:20 75:21 76:13 87:11
117:2

**understanding**  83:15 108:15
132:23

**understood**  9:19 16:24 18:3
26:12 30:21 54:22 102:11

**unfamiliar**  26:24 68:24

**unfortunate**  103:6

**uniform**  81:12,20

**unit**  8:23

**unnecessary**  63:17

**unreasonable**  22:9 75:15 99:20,
23 100:2

**untrue**  130:25 131:2

**Uof**  127:17

**updates**  23:19

**upright**  44:8

**usability**  45:10

**use-of-force**  15:11 83:16,19
88:11 108:7 135:23

V

**variables**  39:10 108:8 135:15

**varies**  45:8

**verified**  91:17

**verify**  93:22

**versa**  61:19 100:11

**versus**  15:23 16:1 17:2 45:3 53:1
72:4 73:9 77:13

**vet**  14:3

**vice**  61:19 100:11

**viciously**  133:23

**video**  65:14,18 87:1 117:16 132:19
141:6,8,10,22

**videos**  65:16,17 141:20

**view**  138:13,16,17

**viewed**  21:19

**viewpoint**  37:19

**violate**  110:23

**violated**  109:5 110:5 111:24

**violation**  87:5 109:24 112:8,13,15

**violations**  112:17,19

**vision**  144:8

**visiting**  140:2

**vital**  59:3 60:8 91:19

**vulnerable**  79:20

W

**wait**  94:12 118:7

**waiting**  35:11 91:15 94:14

**walk**  33:1 60:13,18 62:15

**walked**  79:24,25 91:22 92:4
115:24 117:7 120:1

**walking**  33:21 120:3,18

**walks**  41:3

**wanted**  7:12 86:23 97:24 106:14

**ward**  12:12

**warning**  32:22 99:18 143:6

**warrant**  10:19 11:16 13:23

**watch**  144:7

**water**  145:23

**weapon**  43:25 45:3,6,10 53:13,14
54:10 58:16,19,22 59:5 73:14,16
78:7,9,13,18 90:25 92:16,19 97:24
98:5 113:13

**wear**  81:9,23 82:2

**week**  6:25 31:11,12 32:2,5 73:18,
19

**week-long**  123:2

**weighed**  12:18

**weight**  140:6

**Westbrook**  84:11,12 105:11

**whatnot**  47:23

**whistled**  91:23 115:25 117:8

**whistling**  33:10

**wider**  61:7,10

**withdraw**  131:3

**witnessed**  14:21

**word**  16:10 19:14 30:8 106:17
114:3 133:3

**words**  60:13 143:12

**work**  11:3 20:18 37:9 57:24 82:15
100:7 107:5 134:12

**worked**  8:23 83:23



MAGNA
LEGAL SERVICES

David Duplantier

**working**  8:25 14:10 83:24 105:24
133:17

**works**  52:11

**worries**  6:12 85:15,17

**worry**  39:9 111:7

**worthless**  30:7

**worthy**  73:8

**wow**  6:24

**write**  25:19

**written**  24:7 45:16 47:25 87:24
112:3

**wrong**  84:19 96:24 98:7 101:20
132:16 138:2,3,5

**wrote**  115:21 117:4

---

**Y**

---

**y'all**  46:1 81:6 96:24 116:16

**yard**  33:1,9,22 60:18 90:23 91:25
92:10 93:23 94:3 95:18 96:6,8
116:3 117:10,17

**year**  9:1 18:22 23:17 28:12,16 31:7
32:3 64:9,23 73:12

**yearly**  30:23 31:2

**years**  6:23 8:21,23 9:4,10,16 10:13
11:1 13:4 25:2 27:13 31:6 38:13
104:14

**you-guys**  22:8

**young**  134:4

