UNITED STATES DISTRICT COURT
EASTERN DISTRICT FOR THE STATE OF LOUISIANA

* * * * * * * * * * * * * * * * * * * * * * *

DEREK BROWN and
JULIA BARECKI-BROWN

VERSUS

DERRICK BURMASTER, SHAUN FERGUSON, and the
CITY OF NEW ORLEANS

* * * * * * * * * * * * * * * * * * * * * * *

CIVIL ACTION NO. 22-00847 DIVISION: 4

SECTION: L

The 30(b)(6) deposition of CHRIS GOODLY taken on Monday, March 7, 2023, starting at 1:45 p.m. at New Orleans City Hall, 1300 Perdido Street, Room 5E03, New Orleans, Louisiana 70112.

CARRIE A. HARTILL
CERTIFIED COURT REPORTER
STATE OF LOUISIANA



APPEARANCES:

FOR THE CITY OF NEW ORLEANS AND CITY DEFENDANTS:
JAMES M. ROQUEMORE, ESQ
CITY OF NEW ORLEANS
NEW ORLEANS, LOUISIANA
EMAIL: james.roquemore@nola.gov

FOR THE DEFENDANT, DERRICK BURMASTER:
C. THEODORE ALPAUGH, III, ESQ.
FRATERNAL ORDER OF POLICE LEGAL COUNSEL
639 LOYOLA AVENUE, SUITE 2130
NEW ORLEANS, LOUISIANA 70113
PHONE: (504) 529-4141
EMAIL: cta@gustebarnett.com

FOR THE PLAINTIFF DEREK BROWN AND JULIA BARECKI-BROWN:
TARAK ANADA, ESQ.
JONES WALKER LLP
201 ST. CHARLES AVENUE, SUITE 4900
NEW ORLEANS, LA 70170
PHONE: (504) 582-8322
EMAIL: tanada@joneswalker.com

ALSO REPRESENTING THE PLAINTIFFS:

WILLIAM BROCK MOST, ESQ.
MOST & ASSOCIATES
201 SAINT CHARLES AVENUE, SUITE 114
NEW ORLEANS, LA 70170
PHONE: (504) 509-5023
EMAIL: williammost@gmail.com



INDEX

PAGE

DIRECT EXAMINATION:

BY MR. MOST . . . . . . . . . . . . . . . . . . . . . . 6

CROSS-EXAMINATION:

BY MR. ALPAUGH . . . . . . . . . . . . . . . . . . . . 86

FOLLOW-UP:

BY MR. MOST . . . . . . . . . . . . . . . . . . . . . . 97

EXHIBITS

| | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT NO. 8 | NOD . . . . . . . . . . | 10 |
| EXHIBIT NO. 24 | NOPD OPERATIONS MANUEL . . . . . | 15 |
| EXHIBIT NO. 20 | NOPD ASI . . . . . . . . . . . . | 26 |
| EXHIBIT NO. 29 | USE OF FORCE BOARD minutes . . . | 30 |

Q. Yeah. I don't think -- I haven't seen where it's required, but are officers are allowed to do it like, if they choose to, could they wear a cup in the field?
A. Well, if it's not in policy, and they're wearing it discreetly, there's no policy against it. So it wouldn't be prohibited. It wouldn't be prohibiting them from, you know, utilizing that resource, if you will.
Q. So if an officer let's say there was an officer who had an unusual fear of animals biting his penis, one thing he could do to mitigate that would be to wear a cup that would be allowed, correct?
A. I'll say this, I don't think there's any policy against it.
Q. Okay. The reason why officers are required to wear body armor in the field is because if they don't, they're putting themselves at risk, correct?
A. The dynamics of the job. I mean, they're faced with sometimes volatile in daily encounters, you know, so that's a safety measure, it's a safety precaution.
And it was it's been implemented within the policy for years.
Q. So an officer who chooses not to wear body armor and leave their body armor at home, is violating policy and increasing their own risk of being harmed, correct?

Yes.
Q. Sure. So you didn't, in your experiences an NOPD officer see a consistent pattern of dogs attacking people in a consistent and serious basis?
A. Well, not in my capacity.
Q. Right.
A. I knew it was not uncommon, but it was not in my capacity to say it was a major thing. We were dealing with violent crime and that's where my attention was focused on, primarily.
Q. Did you ever hear of dogs biting officers' penises?
A. Not that characterization of the incident, no. That was -- I've never heard -- I've not -- I've not heard that before.
Q. You say you haven't heard that before. I mean, you're aware of that Burmaster said he was afraid of this dog biting his penis?
A. I mean, I've heard that in this case. I've heard that in this case. But most people when they describe they'll being attacked they would be like, "I thought it was going to bite me," but they, you know, unless you elaborate.
And Derrick, elaborated on where he would perceive to be bitten at.
Most people just say, "I just thought I was gonna



get bit." "Where you thought you was gonna get bit?" "I don't know, on the leg or in the face."
Q. So it sounds like Derrick Burmaster's the only officer you've heard specifically saying he was afraid of getting in the penis.
A. This is the only case that I recall that I heard an officer say that they feared that they would get bitten in the penis.
Q. Are you aware that Officer Burmaster shot another dog before Apollo?
A. Yes.
Q. Are you aware that he also said in that case, something about protecting his groin?
A. That might have been the description at the time? Yeah. I don't recall the exact area that he said he would be bitten in, in the last case.
Q. If he's was specifically afraid of being bitten in the groin, in both the times he's shot and killed dogs; those would be -- those two times would be the only two times you've heard an NOPD officer express that fear in your entire almost 26 years on the force?
A. That I recall, yep.
And I don't recall the last one. I mean, I

know he did discharge his weapon at an animal in 2012 and when I was working with him, but I don't know what area of the body that he was saying he was gonna perceive the threat as the bodily harm.

Q. Sure. And setting aside just fear of being bit in the groin or the penis, have you ever heard of an NOPD Officer actually being bit by a dog in the penis?

A. Not that I recall.

Q. Have you ever heard of any NOPD Officer being bit by any kind of animal in penis or testicles or groin in a way?

A. Any NOPD Officer? No, but I believe one of our canines did bite someone in the groin area. I don't know what timeframe, it's probably been in the excess of ten years, but I have heard it originate, yes.

Q. Okay. So and NOPD canine unit bit a non-NOPD member in the groin.

A. I think on one of the canine rolls I think somebody got bitten around the groin region. I don't want to say exactly the groin, but in the groin region.

Q. So I think we've covered Topic 10 which is

NOPD policy on the equipment Burmaster should have been carrying.

Moving on to Topic 11. Well, let me back up. In your opinion, was it reasonable for a Burmaster to feel -- to fear that this puppy was gonna bite him in the penis?

A. At the time he discharged his weapon, I did not feel that the perceived threat or the puppy Apollo -- the dog Apollo, the animal was in a proximity and/or situation where he was in great bodily harm to discharge his weapon.

Q. And so you didn't see anything that indicated to you that the dog was likely to bite Burmaster in the penis.

A. No, not during my review. No.

Q. Okay. So we're gonna move on to Topic 11, which is the Use of Force Review Board's investigation hearing and conclusions; are you prepared to testify about that?

A. To the best of my ability, let's do it.

Q. So at the Use of Force Review Board hearing, there were three voting members, yourself, Deputy Superintendent Paul Noel and Deputy Superintendent Linda Westbrook, correct?

A. Correct.

Chris Goodly March 07, 2023

of Force Review Board determined that Burmaster should receive some additional training to try and prevent this from happening again, right?

A. Yes.

Q. Specifically, de-escalation training, right?

A. Right.

Q. So that in the future, he would not, hopefully jump to the most serious use of force as a first impulse, correct?

A. Yeah, that's the part of the reason why the Academy of data assess it and see what's the training that we can offer -- that they can offer, have available to them to make the person better.

Q. Right. And that was premised on the idea that the training he had up until this point, clearly was not sufficient to prevent him from taking these actions, agreed?

A. I won't agree with that, I'm not saying that the training he received thus far was inadequate, but we always could use more training. I'm not gonna agree with that training that he received thus far could have, you know. I just don't -- I don't agree with he didn't receive enough training; I'm not gonna say that. We can always use more training. I always advocate for that.

But, you know, the training he received thus far up until



Chris Goodly March 07, 2023

the time of this incident, was it inadequate? No, I don't agree with that.

Q. Then why would more training help him?

A. Because it reinforces, you know, certain skill sets. It's always great to be abreast of your current craft.

Q. So if he had had this reinforced -- maybe he had received de-escalation training at one point, but if he had had it reinforced prior to this incident it might have helped avoid this incident?

MR. ALPAUGH:

Objection to the form of the question.

MR. ROQUEMORE:

Same objection.

THE WITNESS:

That's speculatory in my opinion.

EXAMINATION BY MR. MOST:

Q. Sure. But what's your opinion? Having it reinforced could have helped avoid this incident?

MR. ALPAUGH:

Same objection.

THE WITNESS:

I don't know about this type of training. I mean, de-escalation tactical consideration, more dog training; any one of those could have possibly changed the outcome.



Chris Goodly March 07, 2023

We don't know.

BY MR. MOST:

Q. But your hope, at least, was reinforcing this would prevent a reoccurrence of this incident, correct?

A. Correct.

Q. Yeah. So you're not saying that the training and reinforcement he received prior to this incident, you're not saying it definitely was adequate, all you're saying is you're not gonna say it was inadequate, agreed?

A. I'll take that, yeah. All right.

MR. NADA:

The answer was a "yes"?

THE WITNESS:

Yes.

Q. Okay, I think that's all the questions, we've got saving any additional questions prompted by these gentleman's question. Ted, do you want to ask anything?

MR. ALPAUGH:

Yeah, I don't have a whole lot, but I do have some.

CROSS-EXAMINATION BY MR. ALPAUGH:

Q. They asked about FTO's, do you know if Burmaster was an FTO at the time this happened?

A. At the time of this incident, looking at the actual

