1

2                    UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT FOR THE STATE OF LOUISIANA

4

5        * * * * * * * * * * * * * * * * * * * * * * * * * *

6

7                          DEREK BROWN and

8                        JULIA BARECKI-BROWN

9                             VERSUS

10         DERRICK BURMASTER, SHAUN FERGUSON, and the

11                       CITY OF NEW ORLEANS

12

13       * * * * * * * * * * * * * * * * * * * * * * * * * *

14       CIVIL ACTION NO. 22-00847            DIVISION: 4

15        SECTION: L

16

17              The deposition of JOHN ROUSSEL taken on

18         Tuesday, March 7, 2023, starting at 2:00 p.m. at

19       New Orleans City Hall, 1300 Perdido Street, Room 5E03,

20                New Orleans, Louisiana 70112.

21

22    CARRIE A. HARTILL

23    CERTIFIED COURT REPORTER

24    STATE OF LOUISIANA

25



EXHIBIT
B

1    A.   No.

2    Q.   I'm going to mark a photograph of the puppy

3    Apollo as Exhibit 9.   How would you describe what

4    you're looking at on Exhibit 9?

5    A.   Looks like a puppy.

6    Q.   Do you find the image on Exhibit 9

7    threatening in any way?

8    A.   No.

9    Q.   Would you feel threatened if the puppy

10   depicted on Exhibit 9 was running towards you, in your

11   direction?

12   A.   No.

13   Q.   Would the puppy depicted on Exhibit 9, if it

14   was running in your direction, would you be afraid of

15   receiving great bodily harm?

16   A.   No.

17   Q.   If the puppy depicted on Exhibit 9 was

18   running towards you would you be fearful that you

19   could die?

20   A.   No.

21   Q.   Did you see the body of the dog that Officer

22   Burmaster shot at my client's residence?

23   A.   Yes.

24   Q.   Okay.   Did it look consistent with what is

25   depicted on Exhibit 9?



1    A.   Yes.

2    Q.   If I were to represent to you that this is in

3    fact Apollo, the puppy that Officer Burmaster shot,

4    would you have any reason to disagree with that?

5    A.   No.

6    Q.   Okay.  Do you in fact recognize this dog as

7    the dog Burmaster shot?

8    A.   Yes.

9    Q.   Okay.  It doesn't look any, any difference

10   significantly in terms of the size of the dog?

11   A.   No.

12   Q.   If we were to present this photograph to the

13   jury, do you believe it would be a fair and accurate

14   representation of the dog that Burmaster shot in my

15   client's residence?

16   A.   Yes.

17   Q.   Thank you.  If this dog depicted on Exhibit

18   9, the puppy, was running towards you, would you be

19   fearful that your penis would be bitten?

20   A.   No.

21   Q.   If the dog depicted on Exhibit 9 was running

22   towards you, would you consider shooting it with your

23   firearm?

24   A.   No.

25   Q.   Would you consider shooting the dog depicted



 1   A.   A little bit.  They got a daily training

 2   bulletin about it.  They also train in the academy.

 3   Q.   Okay.  Can you tell me about both, one at a

 4   time?  Let's let's start with the training you

 5   received as it relates to dealing with animals in the

 6   line of duty that you received in the academy.

 7   A.   So we try to avoid them.  Make sure that no

 8   animal is in a certain area before you approach.

 9   If they have an animal, tell the owner to pick it up.

10   And it all depends on if you've seen -- it's really

11   kind of a case by case basis, really.

12   Q.   Okay.  Was there any training in the academy

13   that guides you -- guided you on when the use of

14   lethal force is appropriate on an animal versus when

15   a lesser means of non-lethal force should be tried?

16   A.   It all depends on the perception of the

17   officer, if he feels like he's going to receive great

18   bodily harm during an encounter.

19   Q.   Okay.  All right.  Tell me about the next

20   animal training you received?  Well, is there

21   anything more that you have to tell me about what you

22   received in the academy as it relates to animals?

23   A.   That's basically the same, so.

24   Q.   Same as humans, right?

25   A.   Right.  Well --



1  Q.  You can shoot an animal, if you can shoot a

2  human; that's what you've been trained, right?

3  A.  No.

4  Q.  Okay, well help me understand.

5  A.  So it's different because an animal by law is

6  considered property.

7  Q.  Right.

8  A.  A human's a human.  So there's difference,

9  like a person you can to talk to and deescalate the

10 situation, an animal it's not the same.

11 Q.  Okay.

12 A.  It depends on a case by case basis if an

13 animal is being aggressive or you know different

14 scenarios.  You have to dissect each

15 situation.

16 Q.  Have you ever been trained on methods of non-

17 lethal force that should be considered on an animal

18 before lethal force?

19 A.  Yes.

20 Q.  Okay.  Tell me about that.  Was that in the

21 academy, or where was that?

22 A.  In the academy.

23 Q.  Tell me about that part of your training.

24 A.  You have to use a taser or a baton.

25 Q.  Okay.  Would you consider both of those a



1  useful tool in mitigating the threat posed by an

2  animal that you may encounter in the line of duty?

3  A.  Yes.

4  Q.  Okay.  I'm a layperson, so forgive me if my

5  questions may seem a little bit silly.  What kind of

6  boots do you wear when you're in the line of duty?

7  A.  About medium, black boots that come up past my

8  ankle.

9  Q.  Steal toe?

10  A.  No.

11  Q.  Kevlar?

12  A.  Like, leather.

13  Q.  Okay.  They're the type of boots that

14  would not be penetrated by the dog.  The teeth of the

15  dog depicted in Exhibit 9, right?

16  A.  I don't think so.

17  Q.  You would be very surprised if this dog's teeth

18  could penetrate your service boots, right?

19  A.  Yes.

20  Q.  What about -- What about just if a dog's

21  running up to you, what about just like, kicking it;

22  is that a reasonable way to deal with the situation?

23  A.  It depends on the size of the dog.

24  Q.  Okay, so I'm talking about this dog.

25  A.  This dog.  Yeah.



1  Q.  You would think kicking this dog, if you perceived

2  it to be a threat, would be one way to mitigate the

3  threat, right?

4  A.  Yes.

5  Q.  You know, what kind of shoes Burmaster was

6  wearing at the time of the incident?

7  A.  I'm not sure.

8  Q.  Does NOPD govern what kind of footwear

9  officers wear, or is it up to them?

10  A.  It just has to be black, leather and past

11  your ankle.  It can't be steel toe.

12  Q.  Okay.  So it can't be like Converse Chucks?

13  Can't be steal toe?

14  A.  Right.

15  Q.  Can't be Converse Chucks, right?

16  A.  Right.

17  Q.  Okay.  It's got to be black leather.

18  A.  Black, has to have a leather toe, but it can

19  be suede on the side or -- it has to be a leather toe.

20  Q.  Okay.  All right.  So, it's got to be boots

21  similar to what you just described your boots to be?

22  A.  Correct.

23  Q.  Okay.  All right.  So assuming Burmaster was in

24  compliance with the footwear policy, he would have

25  been wearing boots similar to what you are wearing?



1   A.   Yes.

2   Q.   All right.  You said the baton, tell me about

3   how a baton could be a useful tool in mitigating any

4   threat posed by an animal such as the type depicted

5   in Exhibit 9.

6   A.   You just create distance or hit the animal to

7   make it run away.

8   Q.   What's -- so what's the policy on carrying

9   the baton?  Does -- Is it like, up to your discretion,

10   you can carry baton if you don't have other

11   sufficient tools?  Or do you have to even if you have

12   all kinds of other sufficient tools?

13   A.   You have to carry a baton while on duty.

14   Q.   Okay.  Burmaster was not carrying the baton

15   on the night that he shot the puppy depicted Exhibit

16   9, correct?

17   A.   I'm not sure.

18   Q.   Okay.  Fair.  If he was not carrying the baton on

19   the night in question -- and just for the record, that's

20   April 10, 2021.  If he was not carrying a baton he

21   would have been in direct violation of NOPD policy,

22   correct?

23        MR. ROQUEMORE:

24            Objection to form.

25        MR. ALPAUGH:



1  Q.  I see.  I see. Okay, okay.  So the uniform

2  policy doesn't mandate -- When I think of a cop's

3  flashlight, I think of a big old, yeah.  Do people

4  still use those?  Is that?

5  A.  Rarely.

6  Q.  Okay.  All right.  But a baton definitely

7  would be a useful tool to -- a useful non-lethal tool

8  to mitigate the threat of a small dog running towards

9  you, right?

10  A.  Yes.

11  Q.  Okay.  Have you ever had a dog run towards

12  you in the line of duty besides on April 10?

13  A.  Yes.

14  Q.  How many times?

15  A.  Once.

16  Q.  Okay.  Tell me about it.

17  A.  I went into a courtyard kind of like

18  enclosed, like, kind of like in the building, a dog

19  maybe 20 pounds, 25 pounds ran towards me barking --

20  Q.  You said 25 pounds?

21  A.  Yes.  Yeah, and he bit me on the shin, and I

22  kicked him.  And the owner came out and got him

23  and brought him inside.

24  Q.  Okay.  Did you consider that bite serious

25  bodily harm?



1   A.   No.

2   Q.   What did you just go to the clinic?  Clinic

3   to get a -- did you even get any treatment for it?

4   A.   No, it was like an abrasion on my leg.

5   Q.   It didn't even puncture your skin?

6   A.   Slightly but not.

7   Q.   Okay.  What did you put some antiseptic on it

8   and call it a day?

9   A.   Yes.

10  Q.   Okay.  And what happened after you kicked it?

11  A.   The owner came out and got it.

12  He heard his dog barking.

13  Q.   When you kicked it, did the dog stop biting

14  you?

15  A.   Yes.

16  Q.   Did you consider shooting the dog with your

17  firearm?

18  A.   No.

19  Q.   Okay.  And am I correct, that the reason you

20  didn't is because you had numerous non-lethal ways to

21  handle the situation.

22  A.   Yes.

23  Q.   Okay.  All right.  Is that on body camera?

24  A.   That might have been like 2017.  It is, but I'm

25  not sure what the item number would be.



1      The use of a CEW on an animal is a safer,

2 and more humane and less traumatic conclusion to the

3 incident."  Do you agree with the two sentences I

4 just read from paragraph 62?

5 A.  Yes.

6 Q.  Have you ever discussed this shooting with

7 with Officer Burmaster after the shooting?

8 A.  No.

9 Q.  Have you been on calls with him since that?

10 A.  Yes.

11 Q.  Okay.  Have you ever been on a call with him

12 where an animal was encountered after April 10, '21?

13 A.  No.

14 Q.  On April 10, 2021, do you feel that the use

15 of a TASER could have been a safer, more humane, and

16 less traumatic use of force to mitigate any perceived

17 threat of Apollo?

18           MR. ALPAUGH:

19                Object to the form of the question.

20           THE WITNESS:

21                Yes.

22 EXAMINATION BY MR. ANADA:

23 Q.  Okay.  And am I correct that Officer Burmaster

24 did not attempt to use his taser on Apollo at

25 anytime?



1  in his direction was Apollo, right?

2  A.   Correct.

3  Q.   Okay.  All right.  Do you have any reason to

4  believe that that kicking Apollo would have been a

5  reasonably available alternative method to mitigate

6  the threat Burmaster felt by Apollo?

7          MR. ALPAUGH:

8              Object the form of the question.

9          MR. ROQUEMORE:

10             Same objection.

11         THE WITNESS:

12             Yes.

13  EXAMINATION BY MR. ANADA:

14  Q.   Okay.  Tell me about it.

15  A.   So, it would have been a reasonable way to

16  stop the dog?  Yes.  Because the size of the dog could

17  have deterred him from attempting to bite Burmaster.

18  Q.   The size of Apollo?

19  A.   Yes.

20  Q.   Okay.  I'm sorry.  I just think I'm not sure

21  we're understanding each other.

22  Are you saying it would have been reasonable for him

23  to kick Apollo?  Or are you saying it would not have

24  been?

25         MR. ALPAUGH:



1              Same objection.

2         THE WITNESS:

3              It would have been

4    EXAMINATION BY MR. ANADA:

5    Q.  It would have been.

6    A.  Yeah.

7    Q.  Okay.  You believe based on your training,

8    your experience as a police officer, and your

9    having been physically present at the scene that an

10   alternative method to using a firearm on Apollo could

11   have been kicking him and you have no reason to

12   believe that that would have been ineffective?

13        MR. ALPAUGH:

14             Same objection.

15        THE WITNESS:

16             Yes.

17   BY MR. ANADA:

18   Q. Okay.

19   Same question with a baton.

20        MR. ALPAUGH:

21             Same objection.

22        THE WITNESS:

23             Yes.

24   EXAMINATION BY MR. ANADA:

25   Q.  Okay.  Same question with a CEW taser.



```
 1          MR. ALPAUGH:
 2               Same objection.
 3          THE WITNESS:
 4               Yes.
 5  EXAMINATION BY MR. ANADA:
 6  Q.  Okay.  And your -- you answered all those
 7  questions based on your specialized training as a
 8  police officer, right?
 9  A.  Yes.
10  Q.  Okay.  You're not a layperson when it comes
11  to these things, right?
12  A.  What?
13  Q.  You're not a layperson, like me, when it
14  comes to these kinds of issues, right?
15  A.   Right.
16  Q.  Based on what you've just told me, is it your
17  belief that Burmaster complied with the directives of
18  paragraph 32?  On Exhibit 23?
19          MR. ALPAUGH:
20               Object to form.
21          THE WITNESS:
22               Yes.
23  EXAMINATION BY MR. ANADA:
24  Q.  You believe he did comply with it?
25  A.  Yes.
```



1  Q.  I thought you just told me he had other

2  reasonable available means to deal with the dog.  I'm

3  just confused.

4  A.  Apollo, solo, yes.  There's also the variable

5  of the other dog being in the vicinity.

6  Q.  I understand that, we're gonna get to the

7  other dog, but do you feel that he complied with the

8  policy as it respects to exhausting other reasonably

9  available means before shooting Apollo?

10         MR. ALPAUGH:

11              Objection to form.

12         MR. ROQUEMORE:

13              Objection, asked and answered.

14         THE WITNESS:

15              No.

16  EXAMINATION BY MR. ANADA:

17  A.  No.

18  Q.  Okay.  In your opinion he did not follow

19  policy for Apollo?

20  A.  No.

21  Q.  You're agreeing with me that he did

22  not?  You said "no", all right.  Okay.  I get it.

23  I didn't want to belabor that I just want to make

24  sure, I'm thinking of how this is going to read later

25  and I'm making sure no one's going to be confused by



1    Q.  If I interpret the body camera video

2    correctly, you heard like, the big dog make a big, loud

3    dog kind of growl, bark type of sound?

4    A.  Yes.

5    Q.  And then like, after that, they came down the

6    steps, am I right?

7    A.  Yes.

8    Q.  You couldn't see them until they started

9    making their way down the steps.

10   A.  Correct.

11   Q.  Okay.  I'll show you Burmaster's body cam

12   footage, but I know you can't tell me what he saw

13   and what he didn't see, but do you have any reason to

14   believe that his vision of when the dogs first became

15   visible would be different than yours like, did he

16   have any obstructions or anything that you're aware

17   of?

18   A.  No.

19   Q.  Okay.  So am I correct in interpreting this

20   that Burmaster had already chosen to use lethal force

21   despite all of the other reasonable methods, non-lethal

22   methods, that we've we've already discussed before he

23   even saw what the potential threat was?

24          MR. ALPAUGH:

25               Object to the form of the question.



1              MR. ROQUEMORE:

2                   Same objection.

3              THE WITNESS:

4                   Yes.

5     EXAMINATION BY MR. ANADA:

6     Q.  That's the conclusion you would come to

7     from from reading what it says in this report and

8     watching the body camera footage, right?

9     A.  Yes.

10    Q.  How many shots did Burmaster fire?  I've

11    heard three, I've heard four.  It's it's a little

12    unclear from the video.  What do you remember?

13    A.  I don't recall, it's around that number but I

14    don't know the exact number.  I don't remember.

15    Q.  Okay.  We're gonna watch the interview a

16    little bit later.  I think he said -- I thought it

17    was three and then I watched it again it was four.  I

18    can't, I can't figure it out either.  That's why I'm

19    asking.

20         I'm going to turn to Page 24.  I want to go to like,

21    the third to last paragraph, it ends in the words

22    "without firing his weapon."  Do you see that paragraph?

23    I think your finger was just on it.  It ends in "without

24    firing his weapon."

25    A.  Okay.  That's how it begins.



1  Q.  I'm gonna read this statement from this PIB

2  report, PIB is like internal affairs, right?

3  A.  Correct.

4  Q.  "Officer Roussel stated," and this is in

5  regards to your interview conducted by Detective

6  Pruitt, you remember that interview?

7  A.  Yes.

8  Q.  It was Pruitt and who was the other guy that

9  was there?

10  A.  I don't recall his name.

11  Q.  Okay, we'll get to it, we have the videos in Exhibit.

12  "Officer Roussel stated when he exited the gate.  He

13  held it open for Officer Burmaster to exit quickly

14  because Officer Roussel believed he was close enough

15  to also exit in time."  Is that an accurate depiction

16  of what you said?

17  A.  Yeah

18  Q.  You stand by that today?

19  A.  Yes.

20  Q.  Okay.  She didn't mis-transcribe your

21  testimony then, right?

22  A.  No.

23  Q.  Okay.  I'm going to go down to the next paragraph.

24   "Officer Roussel stated he would not have

25  taken his gun out in that situation."  Is that, correct?



1   Is that what you told the investigators?

2   A.  Yes.

3   Q.  Okay, you stand by that today?

4   A.  Yes.

5   Q.  Feel free to tell me that you want to watch

6   your body -- your PWC before we answer this question,

7   but I'll just ask it, if you -- I can definitely play

8   the PWC to give you some context and refresh your

9   recollection to ask you if you prefer.

10      But, I seem to recall that you retreated when you

11  heard the sound of the dogs; does that seem right?

12  A.  Yes.

13  Q.  And I understand you were positioned closer

14  to the pedestrian gate?

15  A.  Yes.

16  Q.  And I understand that Burmaster was next to

17  you, but technically, a little bit further from the

18  pedestrian gate.

19  A.  Yes.

20  Q.  Okay.  I saw this in your body camera footage

21  and then I heard you say it during your interview.

22  I'm having to play all this stuff.  But when you

23  had decided to retreat, you actually like, reached

24  out and touched Burmaster, right (indicating)?

25  He was that -- he was that close to you.



 1   A.   Yes.

 2   Q.   Okay.  So like, it seemed to me in the video,

 3   correct me if I'm wrong and tell me if you want to

 4   wait to answer till we watch it, but it didn't even

 5   seem like you were like going like that to touch him

 6   (indicating) he was just like, you were right next

 7   him going come on let's go.  I assume you

 8   touched him to be like let's get out here?  Right?

 9        So he was like right next to you, right?

10   A.   Yes.

11   Q.   Okay.  All right.  Do you know of any reason

12   he would have been unable to safely retreat through

13   the pedestrian exit at the time you decided to do

14   that?

15          MR. ALPAUGH:

16             Object to the form.

17          THE WITNESS:

18             Possibly a large dog.

19   EXAMINATION BY MR. ANADA:

20   Q.   But you were able to get out before the larger

21   dog even made it down the stairs, right?

22   A.   Correct.

23   Q.   Okay.  And he was standing right next to you,

24   right?

25   A.   Correct.



```
 1            MR. ALPAUGH:

 2                 Same objection.

 3            THE WITNESS:

 4                 No.

 5   EXAMINATION BY MR. ANADA:

 6   Q. Okay.  That's why you held the gate open

 7   right?  Because he was right next to you.  You thought

 8   he was close enough to also come out.

 9   A.  Correct.

10   Q.  Okay.  All right.  Sorry.  I'm just looking for

11   one more thing in this.  Okay.

12   Let's just go to the body camera footage.  We're

13   getting pretty close to the end, if you were wondering.

14   I just want to knock out all the other things to make

15   sure and we'll do the body cam last.  I want to

16   make sure there's no other documents I need to

17   ask you about.

18        You were aware of a criminal investigation of

19   Burmaster relating to this incident, right?

20            MR. ROQUEMORE:

21                 Object to form.

22            THE WITNESS:

23                 Yes.

24   EXAMINATION BY MR. ANADA:

25   Q.  Okay.  Were you also aware that there was an
```



1          Object to the form.

2      THE WITNESS:

3          Yes.

4  BY MR. ANADA:

5  Q. And they weren't even there.  They just took

6  statements and watched the video, but you were

7  actually there.

8  A.    Correct.

9  Q.    Okay.  And then you've also watched some

10 video after the fact, right?

11 A.    Yes.

12 Q.    Your body cam footage.  Okay.  Based on your

13 physically having been present, your personal

14 knowledge of the situation, your training as a police

15 officer, and your understanding of NOPD's policies

16 and procedures, do you disagree with the conclusions

17 of Chief Goodly, Chief Noel and Chief Westbrook?

18      MR. ALPAUGH:

19          Object to the forum.

20      THE WITNESS:

21          No.

22 BY MR. ANADA:

23 Q.    All right.  I can see the light at the

24 end of the tunnel.

25      MR. ANADA:



1   Q.  That is not the Brown's house, correct?

2   A.  Correct.

3   Q.  That's the house immediately preceding the

4   Brown's house, correct?

5   A.  Correct.

6   Q.  Okay.  I'll represent to you that this white

7   illuminated house is 1422 Felicity.

8   A.  Okay.

9   Q.  You heard him making those kissing noises?

10  A.  Yes.

11  Q.  He's in front of 1422 Felicity when he

12  made them, right?

13  A.  Correct.

14  Q.  1420 Felicity is like, I mean, I think that's

15  the entrance to the gate?

16  A.  Yes.

17  Q.  Alright, so he made the kissy noises about

18  let's let's get the exact timestamp. (playing) Here's

19  1422 right?  Here, 1:29, 1:30, approximately, is when he

20  made these kissing sounds.

21  A.  Okay.

22  Q.  He was in front of the wrong house when he

23  made them, right?

24  A.  Correct.

25  Q.  Okay. (video played)  Okay, ten seconds later is when you



1  all get to the gate to the Brown's property, right?

2  A.  Correct.

3  Q.  Which is 1420.  So am I correct that based on

4  this video I've just showed you, Burmaster was ten

5  seconds walking distance away from the gate to the

6  Brown's house and was in fact in front of the Brown's

7  neighbor's house located at 1422 Felicity when he

8  made kissing sounds?

9           MR. ROQUEMORE:

10               Object to the form

11          MR. ALPAUGH:

12               Same objection.

13          MR. ANADA:

14               Do you agree with that?

15          THE WITNESS:

16               Yes.

17  EXAMINATION BY MR. ANADA:

18  Q.  I'm going to mark as Exhibit 20, -- All right

19  Exhibit 20 is an Administrative Shooting

20  Investigation Report from the public Integrity Bureau

21  specifically, from Detective Shannon Brewer on the

22  force investigation team; do you know detective

23  Brewer?

24  A.  I do not.

25  Q.  I'm just going to replay that clip again.  Was



1  that -- you heard that kissing noise?

2  A.  Yes.

3  Q.  Was that in your opinion, would you characterize that

4  noise as loud?

5  A.  Kind of medium.

6  Q.  Medium.  To me it sounded like it was about

7  same volume as like, the footsteps you hear on the

8  right before he made the sounds; was that you

9  perception, as well?

10         MR. ROQUEMORE:

11             Objection to form.

12         MR. ALPAUGH:

13             Object to form.

14         THE WITNESS:

15             Yes.

16  EXAMINATION BY MR. ANADA:

17  Q.  You can turn to page 8 of Exhibit 20.  We

18  agree that he made the kissing sounds in front of the

19  neighbor's house 1422 Felicity, right?

20  A.  Correct.

21         MR. ALPAUGH:

22             Object to form.

23  BY MR. ANADA:

24  Q.  And we agree that was about a ten seconds of a

25  walk before he made it to the Brown's gate, correct?



MAGNA
LEGAL SERVICES

 1  A.  Yes.

 2  Q.  All right.  I'm gonna read to you from the

 3  middle paragraph and the same thing applies here, if

 4  you want to read this page, go ahead.  If you want to

 5  read the whole document, go ahead.  Whatever you want

 6  to do, I don't think you need to base on the

 7  questions I'm going to ask you but you have that

 8  right.

 9  I'm going to read from the middle paragraph, last

10  sentence.

11  A.  That's all right.

12  Q.  "Officer Burmaster stated that his noises -- kissing

13  noises were loud and was at the gate when he made

14  them."

15      Assuming that at the gate means: at the Brown's

16  gate; that's not a true statement, is it?

17          MR. ROQUEMORE:

18              Object to the form of the question

19          MR. ALPAUGH:

20              Objection to form.

21          THE WITNESS:

22              No.

23  EXAMINATION BY MR. ANADA:

24  Q.  Can you repeat your answer, she couldn't hear

25  you.



1    A.   No.

2    Q.   And he says no further kissing noises were

3    made; do you see that?

4    A.   Yes.

5    Q.   I'm going to go to the third to last

6    paragraph, it's this one.  "Officer Burmaster stated one

7    dog looked to be a Pit bull."  You didn't say any dog's

8    looked to be a Pit bull at the scene, did you?

9    A.   No.

10   Q.   Would you agree that Officer Burmaster's

11   kissing noises were made at such a distance from the

12   Brown's residence that no animal would have possibly

13   heard them?

14            MR. ROQUEMORE:

15                Object to the form.

16            MR. ALPAUGH:

17                Objection form.

18            THE WITNESS:

19                It's possible.

20   EXAMINATION BY MR. ANADA:

21   Q.   Would it have been more reasonable in your

22   opinion as a police officer, based on your training,

23   your job experience, your understanding of the NOPD's

24   policies and procedures, would it have been more

25   prudent to make the kissing noises in front of the



```
1    Brown's residence rather than in front of their

2    neighbor's residence?

3            MR. ALPAUGH:

4                Object to form.

5            THE WITNESS:

6                Yes.

7    BY MR. ANADA:

8    Q.  Do you have any understanding why he made the

9    kissing noises in front of 1422 and not in front of

10   the Brown's residence?

11   A.  No.

12   Q.  (VIDEO PLAYED)  Around this timestamp, am I

13   correct, that this timestamp 1:53 was when the first

14   audible dog sound was heard?

15   A.  Yes.

16   Q.  Okay.  At this time, this was the time that

17   you decided to retreat, right?

18   A.  Yes.

19   Q.  Okay.  And at that time, Officer Burmaster

20   was standing so close to you that you literally just

21   reached out and touched him to try and prompt him to

22   also evade the scene with you?

23   A.  Correct.

24   Q.  Okay.  Let's go to your body camera.

25   We're about to watch, we're going to watch now
```



1   A.   Correct.

2   Q.   Have you ever been specific -- I understand

3   there's a written policy that says NOPD officers have

4   to have a baton as part of their their uniform but

5   other than that written policy; is there any training

6   about carrying a baton?

7   A.   We had training during in-service last year

8   about different defense tactics with the baton.

9   Q.   Okay.  Did that training reiterate to

10  the officers that all officers should be carrying

11  a baton in the line of duty?

12  A.   Yes.

13  Q.   (VIDEO PLAYED)  Do you remember giving this

14  interview?

15  A.   Yes.

16  Q.   Oh, real quick.  A piece of shrapnel hit your

17  forearm when -- from Burmaster's hollow-point bullet?

18  A.   Yes.

19  Q.   Isn't there a NOPD policy that says before

20  you fire you should make sure it's -- firing is not

21  dangerous to people in the vicinity of where you're

22  firing?

23          MR. ROQUEMORE:

24              Objection to form.

25          MR. ALPAUGH:



1  A.  Yes.

2  Q.  What kind of training would you -- Do you

3  remember about those topics?

4  A.  Just tell us about it.  Like, how it can

5  ricochet off surfaces and take a different path.

6  Q.  So did they -- was there -- has there ever

7  been any NOPD training that you're aware of about how

8  to account for those possibilities when firing a

9  shot?

10 A.  Not that I recall.

11 Q.  Same thing with this video, you

12 have a right it's perfectly within your rights to

13 watch the entire thing if you want to.  I'm trying to

14 do us all a favor here, but if you want to take a

15 break and watch the whole thing, I encourage you to

16 do so. (VIDEO PLAYED)

17 A.  I'm good.

18 Q.  I'm gonna start from about 17:48.  You heard what

19 you just testified to you?

20 A.  Yes.

21 Q.  You believe that he was close enough to exit

22 the pedestrian gate with you.

23 A.  Correct.

24 Q.  Okay.  That's true.  That's a correct

25 statement, right?



1    A.   Yes.

2    Q.   Okay.  I'm going to start the video at 22:31

3    where they're coming back in the room after their

4    break.  (VIDEO PLAYED)

5    Q.   You heard your -- that portion of your

6    statement?

7    A.   Yes.

8    Q.   Am I correct to -- Did I accurately hear you

9    say, "I would not have taken my gun out in that

10   situation"?

11   A.   Yes.

12   Q.   And your comments led me to believe that you

13   were surprised that Officer Burmaster took his gun

14   out, right?

15   A.   Yes.

16   Q.   In fact, you -- for a second you thought it

17   was maybe his TASER that he had used?

18   A.   Correct

19   Q.   Am I correct that the reason you wouldn't

20   have taken your gun out in that situation is because

21   that would not be consistent with the training and

22   policies of the NOPD.

23        MR. ALPAUGH:

24             Object to form of the question.

25        THE WITNESS:



1           Correct.

2    EXAMINATION BY MR. ANADA:

3    Q. (VIDEO PLAYED)  This Officer asked you

4    which dog was the threat and you answered the big

5    dog, right?

6    A.  Correct.

7    Q.  All right.  I can't remember where on the

8    video this is.  I can sift through it and find it.  But

9    do you remember telling these investigators that the

10   growl or bark sound you heard was the sound of a

11   big dog barking and not a small dog barking?

12   A.  Yes.

13   Q.  Do you remember saying that to them?

14   A.  Yes.

15   Q.  Okay, so so that's my question: Based on what

16   you heard, you believe that the bigger dog was

17   barking and not Apollo, right?

18   A.  Correct.

19   Q.  Have you ever seen any video or any evidence

20   to to suggest that Apollo made a single sound other

21   than writhing in pain when he was dying?

22           MR. ROQUEMORE:

23               Object to the form.

24           THE WITNESS:

25               No.



1  EXAMINATION BY MR. ANADA:

2  Q.  Okay.  And what I mean "sound" I mean, like,

3  he didn't vocalize at any time based on what you've

4  seen, other than immediately after he was shot?

5  A.  Correct.

6  Q.  Okay.  All right.

7          MR. ANADA:

8              That's all I got for you. Thank you very

9          much.  Ted's gonna have some questions for

10         you.  And your attorney may have some

11         questions for you too.

12         I'll be your videographer.  You just tell me

13         what you want.

14         MR. ALPAUGH:

15             Pull up Burmaster's video. Exhibit,

16         what was it?

17         MR. ANADA:

18             It is 18.

19         MR. ALPAUGH:

20             Eighteen.

21         MR. ANADA:

22             Can everyone see my screen okay?

23         MR. ALPAUGH:

24             I can see it better now, actually.

25         Exhibit 18.



```
 1   making kissing noises after he crosses past that tree?
 2   A.  It looks like he makes a kissing noise at the
 3   tree.
 4   Q.  At tree?
 5   A.  Yes.
 6   Q.  Okay.  He never makes one when he is in front
 7   of the Brown's house, right?
 8   A.  Not that I can hear.
 9   Q.  He never makes one when he's at the gate of
10   the Brown's house, right?
11   A.  No.
12   Q.  All right.  That's all I have for Exhibit 43.
13   And then just to address Mr. Alpaugh's objection, I'm
14   going to play Exhibit 18-- Burmaster's body worn
15   camera and I'm just asking you the same question.
16   (VIDEO PLAYED)  Same answer?  At the tree?
17   A.  Yes.
18   Q.  Same answer, not in front of the Brown's
19   residence?
20   A.  It'd be at the beginning and end, like.
21   Q.  Okay.  But it wasn't in front of their house,
22   right?
23   A.  Not in front of their residence.
24   Q.  Was it at or -- was it at the gate?
25   A.  No.
```



1    Q.  The gate, the pedestrian gate to the Brown's

2    house, he did not make kissing noises as he -- at

3    that location, right?

4    A.  No.

5    Q.  That's all I have on that.  Okay.  Mr. Alpaugh

6    asked you about the threat that the bigger

7    dog might have posed, do you remember those

8    questions?

9    A.  Yes.

10   Q.  Okay.  Let's say that me and Mr. Alpaugh are

11   threats that are moving towards you.  Let's say that

12   I present a threat of great bodily harm or death to,

13   but Mr. Alpaugh does not.

14       Based on your understanding of NOPD's policy and your

15   training, can you shoot Mr. Alpaugh who is not

16   presenting a threat to you based on me presenting a

17   threat to you?

18           MR. ALPAUGH:

19               Object to the form of the question.

20           MR. ROQUEMORE:

21               Objection to the form.

22           THE WITNESS:

23               No.

24   BY MR. ANADA:

25   Q.  Okay.  You can shoot me if I'm presenting a



1   threat of great bodily harm or death, right?  To you?

2   A.  Correct.

3   Q.  But not the person who's not.

4   A.  Correct.

5   Q.  Okay.  So would your answer be different in

6   my hypothetical if in my hypothetical, me and Mr.

7   Alpaugh were dogs?

8   A.  Well, dogs are different than humans.

9   Q.  I understand that.  Can you shoot a non-

10  threatening dog because there is also a threatening

11  dog on the premises?

12  A.  No.

13  Q.  Okay.  All right.  I'm going to -- Do you

14  live in a neighborhood where there's a lot of fenced

15  in yards?

16  A.  Yes.

17  Q.  Okay.  Are you familiar with any of the --

18  any of your neighbors that have fenced in yards?

19  A.  Yes.

20  Q.  Do any of them have a fence one purpose being

21  to contain their dogs?

22  A.  Yes.

23  Q.  Okay.  Does that -- do you know anyone who

24  lets their dog run freely within their fenced in

25  property?



EXHIBIT

9

