1        UNITED STATES DISTRICT COURT
      EASTERN DISTRICT FOR THE STATE OF LOUISIANA

2

3    * * * * * * * * * * * * * * * * * * * * *

                DEREK BROWN and
4            JULIA BARECKI-BROWN

5                 VERSUS

6    DERRICK BURMASTER, SHAUN FERGUSON, and the
             CITY OF NEW ORLEANS

7

    * * * * * * * * * * * * * * * * * * * * *
8    CIVIL ACTION NO. 22-00847      DIVISION: 4

9    SECTION: L

10

11    The 30(b)(6) deposition of CHRIS GOODLY taken on

12       Monday, March 7, 2023, starting at 1:45 p.m. at

13    New Orleans City Hall, 1300 Perdido Street, Room 5E03,

14       New Orleans, Louisiana 70112.

15

16

17

18

19

20

21

22

23   CARRIE A. HARTILL

24   CERTIFIED COURT REPORTER

25   STATE OF LOUISIANA



MAGNA
LEGAL SERVICES

EXHIBIT
I

1   Q. And then you were elevated to a supervisory and

2   management role at some point, right?

3   A. Correct

4   Q. And in that role you had to counsel, train, educate

5   other officers, right?

6   A. Yeah, mentor.  I mean, a lot of stuff goes into

7   that supervisory capacity.  Yes.

8   Q. Were you ever a field training officer?

9   A. No.

10  Q. And then at some point, you had a supervisory

11  role at the academy, correct?

12  A. Well, I was the commander of the Academy, if

13  you will.  So, I mean, I oversaw the day-to-day

14  operation of the entire education training staff,

15  you know?

16      So a direct supervision of like, training

17  aspects, I would oversee that, but I wasn't

18  directly engaged in one-on-one scenario based

19  training.

20  Q. So you were the person at the top in charge

21  of the whole Academy?

22  A. Correct.

23  Q. Maybe analogous to the president of a college

24  or something?

25  A. Tomato tomato, but yeah, I guess you call it that.



1    I just called it the designee of the Academy, you

2    know?

3     Q. Sure.  And your role was part of the

4    administrative -- at certain times did issues

5    around curriculum and the content of training cross

6    your desk and involve you?

7     A. So we have a curriculum director.  So I won't say

8    the majority of the curriculum crosses my desk.

9    I did give some knowledge based as to what the

10   expectations were to the curriculum director.

11       As well as, give some insights as to what

12   works or what do we need in training, and

13   I would like to see that adopted.

14       So most of the stuff that the curriculum

15   director develop, it actually was in his

16   roles and responsibility.

17   And if I saw an issue with it, I would address it.

18    Q. Okay. So you were keeping track of what was being

19   trained so that you could provide guidance if

20   it needed to be changed or improved, things along

21   those lines?

22    A. That would be.

23    Q. And then, your final role at an NOPD was, you say

24   was Assistant Chief?

25    A. Yes, Chief Deputy Superintendent.  It's the Assistant



1    topics, agreed?

2     A. I would say that'd be fair, yes.

3     Q. And as a -- in your roles, one of your job functions

4    was to serve on the Use of Force Review Board; is

5    that correct?

6     A. Yes.

7     Q. And the Use of force Review Board is a body

8    within NOPD that reviews officers actions,

9    and will, at times, vote on whether the officer's

10   actions were justified or not justified, correct?

11    A. Yes, but on certain circumstances.

12   Meaning like, Uses of Force are broken down into

13   categories levels, if you will.

14       And the highest level would be a level four.  The

15   Use of Force Review Board was enacted to review each

16   Level 4 incident that the department had.

17       And render a decision on whether the use of

18   force used by the utilized by the officer or

19   officers was within policy or out of policy.

20   There was a little bit of dynamics had change

21   when I was leaving. We used to vote justified/

22   non-justified, they started getting into this

23   paradigm, they're saying like, well, one officer may

24   be justified and the other officer may not be justified

25   and want to break it down into that category. The



1  recommendation at the time that I left was that we

2  just say, is it within policy or not within policy.

3    But yes, at the time of this incident, it was

4  justified or not justified.

5   Q. And just ballpark, roughly, how many votes do

6  you think you participated in as a member of these --

7   A. Votes?  So the dynamics had changed,

8  because even when the use of force was created,

9  I was actually a non-voting member, meaning the

10  only people that were voting members were the

11  deputy chiefs or the Field Operations Bureau.

12  The Investigative Services Bureau and the Public

13  Integrity Bureau.

14    Unless the superintendent designated like

15  another one, just based on the circumstances

16  at hand.  But, even when I was at the Academy, the

17  non-voting members were participating in a use

18  of force review board because it's designed to

19  actually make the department better.  I mean,

20  correct inefficiencies and the training aspect is

21  key.  So that's where I might have sat on maybe

22  20 or 30.  Voted on 5, 10, maybe.

23   Q. And when you say you sat on maybe 20, often

24  at a Use of Force Review Board meeting

25  there will be multiple sort of critical incidents



1    that are reviewed at one meeting, right?

2     A. Yes, it can be more than one, correct.

3     Q. So you might have participated in discussion of

4    maybe 60 or 80 individual events?

5     A. No.  I'm giving you a cumulative.  I mean,

6    you know, one use of force could have had

7    one, it could have had five, and then just

8    on average, the normal one would maybe be

9    two or three, you know.

10        And I've sat on probably 20 of those.

11   So the average of those may be about 20 to 30,

12   if you will.

13    Q. Great.  Okay, so I'm gonna move on to our specific

14   topics.  So Topic No. 3 is an NOPD policy on handling

15   animals in the field; are you prepared to testify about

16   that topic?

17    A. To the best of my ability, yeah.

18    Q. And I've got available to us NOPD policies 1.3, and

19   Use of Force, and 1.7.1 use of CEW.

20   So we can refer to those as necessary.

21    A.  Okay.

22    Q.  But, you know, in a general sense, an off -- an

23   NOPD officer cannot shoot an animal, say a dog,

24   in the absence of an objectively legitimate an

25   imminent threat to himself or another,



```
 1   would you agree?
 2    A. Yes.  That's not just for an animal,
 3   though, but go ahead.
 4    Q. Sure.  Right.  And we're talking specifically here
 5   about an animal.  So I don't mean to limit it to that.
 6    A.  Yeah, I understood.
 7    Q.  Yeah.  Is the Use of Force standard similar for
 8   an officer shooting a person versus shooting an animal?
 9    A. You have to identify an active threat, and
10   it has to be an imminent danger.
11       And you believe that, that force word neutralize
12   that threat, so, yes.
13    Q. And it has to be an objectively --
14    A.  Reasonable.
15    Q.  -- Yeah, an objectively reasonable action.  So if
16   an officer had some crazy, subjective belief,
17   that can't be the basis for a legitimate use of
18   force, under a NOPD policy, would you agree?
19    A. I'm not sure, you're gonna have to --
20    Q. Sure.
21    A. -- repeat what you mean on that one.
22    Q. So let's say someone has a terrible phobia of
23   people with tattoos, right?  An officer can't just
24   shoot someone with a tattoo and say, I'm terrified
25   of people with phobias.
```



1        That would be unjustified, it requires some

2    objective danger for an officer to be justified

3    in firing their weapon, would you agree?

4     A. You have to articulate a reasonable

5    threat and that threat has to be agreed bodily

6    harm before you can use deadly force.

7     Q. Right.  So it has to be something that's

8    reasonable outside the officers head,

9    it has to be objectively reasonable, the

10   circumstances surrounding the officer, agreed?

11    A. Yes.  And that's up to the individual person.

12   He has to articulate within his perception,

13   perspective.

14   And clearly identify, you know, why he or she,

15   you know, made that decision to use that force.

16    Q. So I'm gonna mark as Exhibit 24.  Exhibit 24, do

17   you see that this is an NOPD Operations Manual

18   Chapter 1.3?

19    A. Correct.

20    Q. And the NOPD Operations Manual, that's the --

21   that represents the policies of the department,

22   correct?

23    A. Yes, this chapter represents the use of force

24   policy, correct.

25    Q. And so, The Operations Manual is; these are the



1  rules that officers are expected to

2  follow when they act as officers, agree?

3   A. Yes.

4   Q. These aren't suggestions, these are mandatory

5  on officers, agreed?

6   A. I will concur. Yes.

7   Q. So if you will go to paragraph 24, which is on

8  page 10 of chapter 1.3.  I'm sorry, paragraph 32,

9  which is on page 11.

10   A. Dangerous animals?

11   Q. Yeah.  Are you familiar with this?  This

12  paragraph 32, dangerous animals?

13   A. I've seen it before, yes.

14        MR. ROQUEMORE:

15            William, just before we get further,

16        this is a revised: 10/2/22.  I just want to make

17        sure that Mr. Goodly is aware that this

18        is a later revision than what happened --

19        THE WITNESS:

20            Yeah.  And that's what I wanted to bring

21        up, because I did note the date that it was

22        revised happened after the incident

23        occurred too.

24  BY MR. MOST:

25   Q. Right.  So that was actually going to be my next



1   question, as written here, was this section revised

2   or was this section applicable to?

3        A.   This section looks to be applicable that in

4   it did not change as a result of this case.

5   I do not know, I can't confirm that without

6   consulting with like, the Professional Standards

7   and Accountability Bureau.

8        Who actually revises all NOPD policies, but it

9   appears to be the same or similar in nature.

10   Q. So as far as you know, this, this text here is

11   what would have applied to Officer Burmaster

12   at the time he shot the dog, in --

13   A. I believe so.

14   Q. Okay.  And when we talk, when I talked about

15   the dog, unless I speak otherwise, I'm talking about

16   the shooting of the dog name of Apollo in 2021, will

17   you understand that?

18   A. Yes.

19   Q. Okay.  So this -- I just want to go through

20   this paragraph here.  So the first sentence says,

21   (reading) "Officers are authorized to use firearms

22   to stop an animal in circumstances in which the animal

23   reasonably appears to pose an imminent threat to human

24   safety.  And alternative methods are not reasonably

25   available, or would likely be ineffective."



1   Do you see that sentence?

2   A. Yes.

3   Q. So for an officer to fire his or her weapon at an

4   animal, two things have to be true: there has to be --

5   It has to reasonably appear that the animal poses

6   an imminent threat to human safety; that's one thing, right?

7   A. Yes, according to the policy.  Yes.

8   Q. And the other thing that has to be true is that

9   alternative methods are not reasonably available

10  or would likely be ineffective, correct?

11  A. That's in the policy, yes.

12  Q. And if either of those two things are not met,

13  then the officer should not be firing his weapon

14  at the animal, agreed?

15  A. That would be a violation of the policy.

16  Q. Right.  And also something the officer should

17  not do, agreed?

18  A. Yes.

19  Q. Another thing is that, "The officer must be

20  cognizant of the surroundings when shooting at an

21  animal and ensure that there is no risk to people

22  in the area;" do you see that sentence?

23  A. Correct.  Yes, I do.

24  Q. So even if those first two criteria are met in

25  the first sentence, the officer also has to ensure



1   that said, "The dog fatally wounded by

2   Officer Burmaster did not present an imminent

3   threat towards Officer Burmaster;" do you see

4   that part?

5    A. I recall that being said, yes.  I recall

6   that actually at the Use of Force Review

7   Board, as well.

8    Q. And do you agree with that statement?

9    A. At the time we voted non justified, and

10   I did concur with those findings, yes.

11    Q. So you voted that the shooting was not

12   justified because, in your opinion, the dog

13   Burmaster shot did not present an

14   imminent threat towards him, agreed?

15    A. At the time, the smaller dog did not

16   pose an imminent threat to himself or another

17   at the time he fired those shots.

18    Q. So that dog did not pose a threat of

19   serious bodily harm to Burmaster, or another

20   human, agreed?

21    A. At the time he fired the shot, I did

22   conclude that, yes.

23    Q. And you're saying that both as in your

24   opinion, and also as as speaking for the City

25   of Baton Rouge -- I'm sorry, New Orleans, agreed?



```
1    the taser either for to fire prongs for
2    neuromuscular incapacitation, or in drive
3    stun mode to defend himself, correct?
4     A. So if it was reasonable and practical, and he
5    had that available as a means, he should have at
6    least tried to use those considerations.
7     Q. Did you see anything that led you to believe
8    that use of the TASER would not be
9    reasonable?
10    A. No.
11    Q. Did you see anything that led you to believe
12   the TASER was not available to him?
13    A. Let's see on that one.  I don't think he had his --
14   Did he have his TASER?  I have to refresh my memory.
15   I don't recall.
16    Q. If he had a TASER on him, it would have
17   been available to him, correct?
18    A. So at the time that he would have to
19   articulate, you know, even at the time, he
20   fired his TASER, just like his weapon, articulated
21   why he felt it was necessary to neutralize that
22   portion at the time.
23        There was a variety of considerations
24   that were reviewed and he just went to the
25   very last one on a force continuum, if you will.
```



 1  He went to drawing his weapon.

 2      So there was a variety of tactics that --

 3  he could have flared his arm to see if the

 4  dog would have retreated.  He could have

 5  used verbal dialogues.  Started screaming at the

 6  dog.  Call out to the owners, if it was

 7  practical.

 8      But, at the very nature that he fired his

 9  weapon, I didn't, and it's just my opinion, I

10  didn't feel like he reached the level of fearing

11  for great bodily harm when he fired the shot.

12  Q. Sure.  So the Use of Force Continuum, I

13  think is helpful.  So the Use of Force

14  Continuum; that's something that's described

15  in police practices.  It's also described in NOPD's

16  Operations Manual, right?

17  A.  Yes.

18  Q.  And the Use of Force Continuum is sort

19  of a range of options that are available to

20  police in terms of escalating severity, correct?

21  A. Yes.

22  Q. So at the lower end is, yeah, verbal statements,

23  and at the very top end is firing your gun, correct?

24  A. Deadly force, correct.

25  Q. Right.  And so you're saying that Burmaster



```
1   skipped all the lower things and went straight
2   to deadly force with a gun, correct?
3    A. In that situation, yes.
4    Q. So lower level things he could have used
5   we've covered: he could have used a TASER
6   if he had one, right?
7    A. Yes.  It was an option.
8    Q. It was an option.
9    A. An option.
10   Q. Either to fire the prongs, or to use defensively
11  in drive stun mode, correct?
12   A. Well, drive stun mode, if he was in drive
13  stun in my review, it would have been a
14  deadly force situation in order to drive stun
15  an animal like that, you know.
16      If the animal's close enough where he can
17  drive stun then he probably would have had
18  other options, as well.  That's just how I
19  look at it.  I assessed it.  I put myself  in
20  those shoes and give an honest opinion as to what
21  I would have done and then what could we
22  have done differently.
23   Q. Sure.
24   A. So in my review, if he was in drive stun mode,
25  then that was a deadly force encounter in his perception.
```



1   Q. Right.  So that would be a very serious use of

2   force, but it would be less serious than firing

3   his gun, correct?

4   A. Well, according to the policy.

5   Q. Right.  How long does it take approximately,

6   to pull a TASER and put it into drive

7   stun mode?

8   A. That's debatable.  And put it into drive stun mode?

9   Q.  Uh-huh (affirmative).

10  A.  You would have to actually take the cartridge off of

11  it and still fire the weapon, turn it on.

12      So, it can be done probably in under two, three seconds.

13  But that's still two or three seconds that could be lost,

14  if you will.

15  Q. Sure.  Okay.  So other less serious things on the Use

16  of Force Continuum that would have been available to

17  Burmaster would be using his fists or his feet to deter a

18  dog, correct?

19  A. Could have kicked at the dog, shooed the dog, yes.

20  Q. Did you see anything that made you think that

21  using his fists or his feet was unavailable or

22  unreasonable for him to use?

23  A. Wait up, repeat that again?

24  Q. Sure.  So from what you saw of the incident,

25  did you see anything or hear anything that led you



1   to believe that Burmaster's fists or feet would

2   be an unreasonable tactic with regard to the dog?

3    A. It would have been a consideration that he

4   could have at least attempted to implore.

5    Q. Sure.  Generally, officers are supposed to go

6   up the Use of Force Continuum if lower level

7   things don't work, right?

8    A. If practical and reasonably objective, correct.

9    Q. Any reason it'd be impractical or unreasonable for

10  Burmaster to try his fists or his feet first?

11   A.  I don't know that if it was a dynamic situation

12  like that-- I, just giving you my opinion,

13  I would have tried other means before I resorted

14  to that against that weight of dog, that type of dog,

15  if you will.

16      I just didn't see it to be reasonable at that point.

17   Q. Right.  It was a little dog.

18   A. Yes.

19   Q. He could have maybe kicked it away.

20   A. And the perception of not just a little dog, but

21  the totality of the circumstances, that's what

22  was weighed.

23      Because we're forgetting there was two dogs

24  on there. One was a bigger dog, and appeared

25  to be a little bit more aggressive.  The other one,



1    not to say it wasn't a feisty puppy, you know,

2    but the nature of the dynamic of the incident,

3    it appeared that the officer was focused on the larger dog,

4    but when the smaller dog came at him, that's what startled,

5    in my view, his perception to fire on the smaller dog.

6        Because the reaction time to look at the larger dog

7    did not come into play.  I would have been much more

8    comfortable, just my review, of him saying that I

9    thought the larger dog was about to attack me and

10   I wanted to focus my attention on the larger dog.

11       Now the smaller dog did not articulate,

12   in my humblest opinion, a imminent threat that would create

13   serious bodily harm on me -- on him, I should say.

14    Q. And as you pointed out, officers have to consider

15   the totality of the circumstances when assessing

16   whether to use force, right?

17    A. Correct.

18    Q. And so in your opinion, given the totality of the

19   circumstances, it was unreasonable for Officer Burmaster

20   to shoot the dog, the smaller dog, agreed?

21    A. At that time, correct.

22    Q. Are the are the shoes that officers wear, are they

23   have a steel toed?

24    A. There's regulations.  Proper footwear, I think that's

25   in the uniform policy, but you know, they don't have



1   to have steel toed shoes to be on this profession; that's an

2   option.

3    Q. Yep.  So another option that could be available

4   to an officer dealing with an animal coming towards

5   them would be to use a baton, if if the officer was

6   carrying one, correct?

7    A. If it was reasonable and practical, yes, that

8   would be an option for them.

9    Q. Right.  And a baton could be -- might be an

10   effective way of deterring a small animal, agreed?

11    A. Yes.

12    Q. And an Officer -- another option for an Officer

13   with a small animal coming towards

14   them is to retreat, correct?

15    A. If that's reasonable and practical, yes.

16    Q. Did you see any indication that it was unreasonable

17   or impractical for Burmaster to retreat from the dog?

18    A. By looking at the dynamics that he was

19   faced, it was highly unlikely that he could have

20   retreated in a fashion that his partner did.

21      Just based on, you know, his movement in

22   the actual area that they were in versus his

23   partner.  You know, his partner was readily

24   accessible.  And I think close, if you will. to retreat.

25   As where as his stance was a little bit, you know,



1    Q. Would you have even pulled your gun out of

2    the holster?

3    A. I mean, it's a dynamic situation.  So I don't

4    know, you know, if the thought process is,

5    you know, the animal, what's to follow the animal?

6    I may have, I don't know, you know,

7    the animal could be a precursor to something even

8    more, you know, what if the owners were

9    volatile, you know?

10   Q. Okay, so you might have pulled your gun out of

11   the holster, but you wouldn't have fired.

12   A. At the time he discharged, I would not have

13   fired.  I would not have shot my weapon.

14   Q. So part of NOPD officers -- Well, let me

15   just before we move on.  And that was the all the

16   members of the use of force review board unanimously

17   agreed with you that it was unjustified.

18   A. Yeah, the voting members, we all agreed at the

19   time that it was not justified.

20   Q. And you were both head of the Field Operations

21   Bureau at one time and also in charge of the academy

22   at another time, right?

23   A. Yes.

24   Q. And so.  And so you know, that officers are

25   required by policy to carry certain equipment



1    Q.  Yeah.  I don't think -- I haven't seen where it's

2    required, but are officers are allowed to do it like,

3    if they choose to, could they wear a cup in

4    the field?

5    A. Well, if it's not in policy, and they're wearing

6    it discreetly, there's no policy against it. So it wouldn't

7    be prohibited.  It wouldn't be prohibiting them from,

8    you know, utilizing that resource, if you will.

9    Q. So if an officer let's say there was an officer who

10   had an unusual fear of animals biting his penis, one

11   thing he could do to mitigate that would be to wear

12   a cup that would be allowed, correct?

13   A. I'll say this, I don't think there's any

14   policy against it.

15   Q. Okay.  The reason why officers are required to

16   wear body armor in the field is because if they

17   don't, they're putting themselves at risk, correct?

18   A. The dynamics of the job.  I mean, they're faced

19   with sometimes volatile in daily encounters, you know,

20   so that's a safety measure, it's a safety precaution.

21       And it was it's been implemented within the policy

22   for years.

23   Q. So an officer who chooses not to wear body armor and

24   leave their body armor at home, is violating policy

25   and increasing their own risk of being harmed, correct?



1   assignment that goes into that.

2        So not that the department or any one that has

3   the autonomy to make those decision are saying,

4   albeit, I agree or disagree, I'm gonna keep

5   this person in the same position.

6        I mean, there's a lot of factors that go into

7   that decision making process of whether they keep

8   somebody or remove somebody.

9        So on the surface it's within the best interests

10  of the department versus the needs of the employee.

11  So I won't say that there's more to Burmaster

12  being an FTO or not, it's a stamp of approval for the

13  department, no, I won't say that.

14   Q. Okay.  But he's at least someone -- if he was

15  an FTO. He's at least someone that department

16  chose and selected to be a role model for other

17  officers, correct.

18   A. He's held to a higher standard so I mean,

19  role model, yeah, I mean, you want

20  somebody that's in field training capacity that

21  has the knowledge, you know, a keen knowledge

22  of, you know, the streets and a few other dynamic

23  but because of an allegation that's not gonna,

24  you know, substantiate or negate the fact that

25  he or she stayed in a certain position or remains



1    Yes.

2     Q. Sure.  So you didn't, in your experiences an NOPD

3    officer see a consistent pattern of dogs attacking people

4    in a consistent and serious basis?

5     A. Well, not in my capacity.

6     Q. Right.

7     A. I knew it was not uncommon, but it was not in

8    my capacity to say it was a major thing.  We

9    were dealing with violent crime and that's where

10   my attention was focused on, primarily.

11    Q. Did you ever hear of dogs biting officers' penises?

12    A. Not that characterization of the incident, no.

13   That was -- I've never heard -- I've not --

14   I've not heard that before.

15    Q.  You say you haven't heard that before.

16   I mean, you're aware of that Burmaster

17   said he was afraid of this dog biting his penis?

18    A.  I mean, I've heard that in this case.  I've

19   heard that in this case. But most people when

20   they describe they'll being attacked they would

21   be like, "I thought it was going to bite me,"

22   but they, you know, unless you elaborate.

23       And Derrick, elaborated on where he would

24   perceive to be bitten at.

25   Most people just say, "I just thought I was gonna



1  get bit."  "Where you thought you was gonna get bit?"

2  "I don't know, on the leg or in the face."

3   Q. So it sounds like Derrick Burmaster's the

4  only officer you've heard specifically saying

5  he was afraid of getting in the penis.

6   A. This is the only case that I recall that

7  I heard an officer say that they feared

8  that they would get bitten in the penis.

9   Q. Are you aware that Officer Burmaster shot

10  another dog before Apollo?

11   A.  Yes.

12   Q.  Are you aware that he also said in that

13  case, something about protecting his groin?

14   A. That might have been the description at the

15  time?  Yeah.  I don't recall the exact

16  area that he said he would be bitten in,

17  in the last case.

18   Q. If he's was specifically afraid of being

19  bitten in the groin, in both the times

20  he's shot and killed dogs; those would be --

21  those two times would be the only two times

22  you've heard an NOPD officer express that

23  fear in your entire almost 26 years on the force?

24   A. That I recall, yep.

25       And I don't recall the last one. I mean, I



1   know he did discharge his weapon at an animal

2   in 2012 and when I was working with him,

3   but I don't know what area of the body that he

4   was saying he was gonna perceive the threat as

5   the bodily harm.

6    Q. Sure.  And setting aside just fear of being

7   bit in the groin or the penis, have you ever

8   heard of an NOPD Officer actually being

9   bit by a dog in the penis?

10   A. Not that I recall.

11   Q. Have you ever heard of any NOPD Officer

12  being bit by any kind of animal in penis

13  or testicles or groin in a way?

14   A. Any NOPD Officer?  No, but I believe

15  one of our canines did bite someone in the

16  groin area.  I don't know what timeframe,

17  it's probably been in the excess of ten years,

18  but I have heard it originate, yes.

19   Q. Okay.  So and NOPD canine unit bit a

20  non-NOPD member in the groin.

21   A.  I think on one of the canine rolls

22  I think somebody got bitten around the groin region.

23  I don't want to say exactly the groin, but

24  in the groin region.

25   Q. So I think we've covered Topic 10 which is



1   NOPD policy on the equipment Burmaster should

2   have been carrying.

3       Moving on to Topic 11.  Well, let me back up.

4   In your opinion, was it reasonable for a Burmaster

5   to feel -- to fear that this puppy was gonna bite him in

6   the penis?

7    A. At the time he discharged his weapon, I did

8   not feel that the perceived threat or the puppy

9   Apollo -- the dog Apollo, the animal was in

10  a proximity and/or situation where he was in

11  great bodily harm to discharge his weapon.

12   Q. And so you didn't see anything that indicated

13  to you that the dog was likely to bite

14  Burmaster in the penis.

15   A. No, not during my review.  No.

16   Q. Okay.  So we're gonna move on to Topic 11,

17  which is the Use of Force Review Board's

18  investigation hearing and conclusions;

19  are you prepared to testify about that?

20   A. To the best of my ability, let's do it.

21   Q. So at the Use of Force Review Board hearing,

22  there were three voting members, yourself,

23  Deputy Superintendent Paul Noel and

24  Deputy Superintendent Linda Westbrook, correct?

25   A.  Correct.



1   Q.  And all three of you unanimously agreed

2   that Burmaster's shooting of the dog Apollo was

3   unjustified, agreed?

4   A. Yes.

5   Q. And prior to your vote, there had been an

6   administrative investigation by the Public

7   Integrity Bureau, correct?

8   A. Yes.

9   Q. The Public Integrity Bureau is NOPD's

10  internal affairs department, correct?

11  A. Correct.

12  Q. And a team of the Public Integrity Bureau

13  did an administrative investigation to

14  determine whether or not the shooting was

15  justified, correct?

16  A. Yes.

17        MR. ROQUEMORE:

18            I'm going to object.  That kind of

19        miss characterizes the purpose of the

20        investigation.

21        MR. MOST:

22            Okay, thank you.

23  EXAMINATION BY MR. MOST:

24  Q. And the -- at the Public Integrity Bureau

25  level: Detective Brewer, Sergeant Helou and



1         MR. ROQUEMORE:

2             Objection to form.

3         MR. MOST:

4             You can answer it.

5         THE WITNESS:

6             So the investigator prepared a

7         recommendation.  And you just read it

8         into the record.

9         And yes, the people that you indicated

10        concur with the conclusion of the investigator:

11        Sergeant Helou, Captain Sabrina Richardson,

12        and as a result of that presentation

13        presented by the use of force review board,

14        all of those voting members, myself, Deputy Chief

15        Westbrook, at the time, and Deputy Chief Paul Noel

16        all at the time rendered the decision that the

17        shooting was not justified.

18    BY MR. MOST:

19    Q. Okay, so Brewer, Helou, Richardson, Noel, Westbrook,

20    and Goodly all agreed it was unjustified, agreed?

21    A. Yes.

22    Q. Are you aware of anyone who voted that it was justified

23    anywhere in the Chain of Command?

24    A. Chain of Command?  Not that I'm aware of.

25    Q. And of course we're setting aside for the moment

