

# NEW ORLEANS POLICE DEPARTMENT OPERATIONS MANUAL

# CHAPTER: 1.7.1

# TITLE:  CONDUCTED ENERGY WEAPON (CEW)

**EFFECTIVE: 12/06/15**
**REVISED: 04/01/18, 08/11/19, 11/15/19, 12/06/20**

**PURPOSE**

This policy, together with **Chapter 1.3 – Use of Force**, governs the issuance, carrying and use of conducted electrical weapons (CEW).

**POLICY STATEMENT**

1.      CEWs are intended to control a violent individual while minimizing the risk of serious injury to the individual, officers or third-parties.

2.      Officers shall use CEWs only when such force is necessary to protect the officer, the subject, or another party from physical harm, and other less intrusive means would be ineffective.

3.      <u>Mere flight from an officer is not sufficient cause for the use of a CEW.</u>  The use of a CEW on a fleeing subject when a possible risk to the safety of the officer, the subject, or others has not been established by articulable justification other than flight, is unreasonable.

4.      CEWs are authorized for use when:
   (a) A subject who may be lawfully detained or apprehended poses an imminent risk of harm to the officer(s), the subject, or others;
   (b) Attempts to subdue the subject with less intrusive means have been or will likely be ineffective; <u>AND</u>
   (c) There is an objectively reasonable expectation that it would be unsafe for officers to approach the suspect within contact range.

   **OR**

   (d) Situation in which there is probable cause to arrest or reasonable articulable suspicion to detain a subject for an offense involving infliction or threatened infliction of bodily harm;<u> AND</u>
   (e) Attempts to subdue the subject with less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the subject or another party."

5.      Officers should refrain from using their CEW against individuals who are being taken into protective civil custody unless those individuals meet the criteria as outlined herein. (paragraph 4 above).  Individuals undergoing a crisis must pose an imminent risk to the officers, themselves, or others, less intrusive means would likely be ineffective, and it would be unsafe for officers to approach within contact range.  Nothing in the policy prevents officers from taking reasonable steps to protect themselves or others when taking a person into protective civil custody, in accordance with Louisiana Revised Statute Title 28, Section 53(L)(3).

6.      Officers who have been issued a CEW may use the device consistent with this Chapter and **Chapter 1.3 - Use of Force**.

7.      Officers shall not carry a personally owned CEW.


**DEFINITIONS**

**Active Resistance**—Resistance exhibited by a suspect that is between passive resistance and aggressive resistance (e.g., attempts to leave the scene, flee, hide from detection, or pull away from the officer's grasp). Verbal statements, bracing, or tensing alone do not constitute active resistance.

**AFID / AFID Tags**—Small identifying cards expelled from a CEW cartridge when probes are discharged. Each AFID tag contains a serial number unique to the specific cartridge used. AFID tags are sometimes referred to as Anti-Felon Identification (AFID) tags.

**Aggressive Resistance**—Is a subject's attempt to attack or an actual attack of an officer. Exhibiting aggressive behavior (e.g., lunging toward the officer, striking the officer with hands, fists, kicks or any instrument that may be perceived as a weapon such as a knife or stick) are examples of aggressive resistance. Neither passive nor active resistance, including fleeing, pulling away, verbal statements, bracing, or tensing, constitute aggressive resistance.

**Application, Apply, or Applied**—The actual contact and delivery of electrical impulse to the subject via probe discharge or drive stun.

**Arcing**—Pulling the trigger to activate a CEW without discharging the probes. This is prohibited when done as a warning to the subject but allowed to test the CEW prior to deployment (also referred to as a spark test).

**Cartridge**—A replaceable vessel that generally contains compressed gas, probes, connecting wires, and AFID tags.

**Complete the Circuit or Complete the Incapacitation Circuit**—The ability of the CEW electrical pulse to travel between the probes.  This can be accomplished when the spread between the probes attached to a target subject is sufficient to incapacitate the subject. When the spread between the probes is insufficient, a probe misses or is dislodged, the CEW may be used in drive-stun mode (three-point contact) to complete the circuit and incapacitate the subject.

**Conducted Energy Weapon (CEW)**—A weapon designed primarily to discharge electrical impulses to a subject causing involuntary muscle contractions and overriding the subject's voluntary motor responses.

**Crime of Violence**—a felony involving the infliction or threatened infliction of serious bodily injury or death.

**Cycle**—The period during which electrical impulses are emitted from the CEW following

activation. In most models, a standard cycle is 5 seconds per activation. The duration of a cycle may be shortened by turning the CEW off, and may be extended in certain models by continuing to pull the trigger.

**Discharge**—Pulling the trigger of the CEW resulting in probe release or the use of the CEW in drive-stun mode.

**Display**—Drawing and exhibiting the CEW as part of a warning tactic, typically accompanied by appropriate verbalization.

**Drive-Stun Mode**—Pulling the trigger and placing the CEW in direct contact with the subject, causing the electric energy to enter the subject directly.  Drive-stun mode is possible whether or not the cartridge has been expended or removed from the CEW.  CEWs shall be used in drive-stun mode only to supplement the probe mode to complete the incapacitation circuit, or as a countermeasure to gain separation between the officer(s) and the subject, so that officers can consider another force option. **CEWs shall not be used in drive-stun mode as a pain compliance technique.**

**Duration**—The aggregate time that the CEW is activated on an individual subject.

**Exigent Circumstances**—A compelling urgency or true emergency that an officer can specifically describe not using vague terms or boilerplate language. Circumstances that cause a reasonable person to believe that prompt action is necessary to prevent injury to themselves or others.

**Firing**—Discharging CEW probes at an intended target.

**Laser Painting**—The act of unholstering and pointing a CEW at a subject and activating the CEW's laser to show the weapon is targeted on the subject.

**Less-Lethal Weapon**—Any apprehension or restraint tool that, when used as designed and intended, is less likely to cause death or serious physical injury than a conventional lethal weapon such as a firearm.

**Passive Resistance**—Behavior that is unresponsive to police verbal communication or direction (e.g., ignoring or disregarding police attempts at verbal communication or control; going limp; or failing to physically respond or move) and verbal resistance (e.g., verbally rejecting police verbal communication or direction; telling the officer that he or she will not comply with police direction, to leave alone, or not bother him or her). Bracing, tensing, linking arms, or verbally signaling an intention to avoid or prevent being taken into custody constitutes passive resistance. Passive resistance, including verbal statements, bracing, or tensing alone does not constitute active resistance

**Positional or Compression Asphyxia**—When a subject's body position interferes with breathing, either when the chest is restricted from expanding properly or when the position of the subject's head obstructs the airway. Death may occur from positional asphyxia.

**Probe Discharge**—Pulling the trigger of the CEW causing the release of the probes from the cartridge and allowing them to make contact with the subject and achieve neuromuscular incapacitation.

**Probes**—Projectiles with wires contained in a CEW cartridge. When the CEW is discharged, probes are expelled from the CEW, penetrate the subject's skin and allow application of the electrical impulse.

**Sensitive Area**—An area of the subject's body that may cause serious injury to the subject if struck by a CEW probe (e.g., head, neck, genitalia).

**Serious Physical Injury**—Physical injury that creates a substantial risk of death; causes death or serious and protracted disfigurement; or causes impairment of the function of any bodily organ or limb.

**Signal Performance Power Magazine (SPPM)**—A transmission device that will send a signal to all BWC within a 30-foot range of the transmitter for 30 seconds. BWCs receiving this signal will be activated to "recording mode." The officer must manually stop the BWC according to Chapter guidelines.

**Support Side**—The position on the officer's gun belt opposite the primary duty firearm.

**GENERAL**

8.      A CEW is a conducted energy device. Taser products are currently in use by the NOPD. Axon Enterprises, Inc. manufactures the X2 or X26P handheld model CEWs that:
   (a) Use compressed nitrogen to project two probes a maximum of 35 ft. depending on the cartridge used. An electrical signal is then sent to the probes, via small wires, which disrupts the body's ability to communicate messages from the brain to the muscles and causes motor skill dysfunction.
   (b) Can also be used in a drive-stun mode when brought into immediate contact with a person's body.

9.      All personnel carrying an X26P CEW shall check the CID (central information display) prior to each tour of duty to ensure that the power supply registers three bars or above on the X26P battery icon.

10.     Taser cams must be recharged prior to dropping below 3 bars for the X26P. All personnel carrying an X2 or X26-P CEW shall check the CID prior to each tour of duty to ensure that the power supply registers at least three bars on the battery icon. Officers carrying a CEW shall check its power supply, perform a spark test, and check the proper function of the video camera prior to starting every shift.

11.     CEWs, CEW cameras, holsters, power supply packs, cartridges and their replacement needs shall be handled by the Education and Training Division.

12.     An inspection of the CEW, CEW camera, and CEW cartridge as well as a download of the use histories on each CEW will be conducted once a year. The Compliance Bureau - Performance Standards Section and the Education and Training Division shall perform this process, during scheduled annual recertification or on demand.  A log shall be kept by the Education and Training Division staff of this inspection indicating:
   (a) Each officer's name;
   (b) CEW serial number;
   (c) CEW camera serial number; and
   (d) CEW cartridge serial number inspected.

13.     Anytime a CEW is confiscated as evidence or as part of an internal investigation, the investigator will notify the Commander of the Education and Training Division by Departmental e-mail with the device's serial number(s).

**ISSUANCE AND CARRYING OF THE CONDUCTED ENERGY WEAPONS**

14.     Only officers who have successfully completed Department-approved training and are currently certified may be issued, carry and use a CEW (La. R.S. 40:2405.6)

15.    Officers shall use only the CEW cartridges issued by the Department.  If exigent circumstances exist where a cartridge is used by someone other than the assigned officer, the assigned officer, the deploying officer and the supervisor on the scene are subject to the reporting requirements pursuant to this Chapter.

16.    Officers shall ensure that they replace the unused cartridges to the CEW by the expiration date listed on the cartridge.

17.    Uniformed officers shall wear CEWs only in approved holsters on their support sides.

18.    Officers shall ensure their CEWs are properly maintained, according to the manufacturer's instructions and Departmental training, clean and in good working order.

19.    Officers **shall not** hold both a firearm and a CEW at the same time.

20.    The Education and Training Division shall maintain, in a database accessible to the Education and Training Division, the Compliance Bureau and the Public Integrity Bureau, a record of all:
      (a) CEW serial numbers on hand and issued;
      (b) The cartridge serial numbers issued;
      (c) The officer and district/division to which the CEW and cartridge(s) were issued; and
      (d) The officers' certification dates.

21.    Routine audits of the CEW database shall be conducted by authorized Education and Training Division, Public Integrity Bureau, and Compliance Bureau members. At a minimum, the audits/reviews shall compare the CEW Firing Log against the reported uses of force maintained by PIB. Appropriate action shall be taken to resolve any inconsistencies, including disciplinary action if required.

22.    The Education and Training Division shall issue all CEW units and all new and replacement cartridges.

23.    In the event that a CEW is returned for repairs or no longer remains the property of the New Orleans Police Department, the use history of that particular CEW will be downloaded by the Education and Training Division.  The use history will be maintained for a period of three years from the time the CEW was taken out of service or until the completed adjudication of any known pending criminal or civil litigation related to use of that CEW.

**SPARK TESTING**

24.    Officers shall conduct spark testing prior to the officer beginning his/her tour of duty in the following manner, in a safe location, out of the view of the public:
      (a) Remove the cartridge from the CEW;
      (b) Point the CEW in a safe direction;
      (c) Disengage the safety;
      (d) Observe battery power percentage;
      (e) Ensure the low intensity light (LIL) and laser beam are activated;
      (f) Pull the trigger and release, allowing the CEW to discharge for a five-second cycle;
      (g) Observe a visible spark between the electrodes during the cycle;
      (h) Observe video camera indicator for functionality;
          Re-engage the safety on the CEW;

> **Note:** The X26P uses the HD TASER CAM which displays the camera icon in the top left of the CID and the entire CID screen will flash yellow and black if the camera is blocked.

(i)  Re-insert the cartridge for field use; and
(j)  Holster the CEW.

## MALFUNCTIONS

25.   If the CEW malfunctions during the Education and Training Division's normal business hours, the officer shall bring the CEW to the Education and Training Division and relinquish it to Education and Training Division personnel. A receipt for the CEW and any attachments will be issued to the officer.

26.   If the device malfunctions when the Education and Training Division is closed, the officer shall remove the CEW and holster from his/her duty gun belt.  The officer shall not carry a malfunctioning CEW while working.

27.   The officer shall bring the CEW to the Education and Training Division as soon as possible after the malfunction is discovered.  If the officer is on extended leave, prior to the next open day of the Education and Training Division, he/she shall make arrangements to have the CEW delivered to the Education and Training Division by his/her supervisor on the next business day the Education and Training Division is open. A receipt for the CEW and any attachments will be issued to the supervisor.

## VERBAL AND VISUAL WARNINGS

28.   Unless prohibited by circumstances or officer safety concerns, a **<u>VERBAL WARNING</u>** of the intended use of a CEW should precede each CEW application. Where there is reason to believe that a subject may lack English proficiency, the officer, where practicable and if the officer is able, shall announce the warning in the language that the officer reasonably believes the subject speaks.

29.   Where feasible the officer will defer CEW application for a reasonable time to allow the subject to comply with the warning. The warning should provide the individual with a reasonable opportunity to voluntarily comply before CEW application and warn other officers and individuals that CEW deployment is imminent.  Any decision to apply multiple applications of a CEW must take into consideration whether a subject is capable of complying with the officer's commands, including consideration of apparent cognitive, intellectual, developmental, and physical disabilities.

30.   The officer may display the laser of a CEW in an attempt to gain compliance prior to the application of the CEW.  The officer shall:
(a)  Never intentionally direct the laser into the eyes of a person as it may permanently impair vision, and
(b)  Document all warnings, displays, or the lack thereof, as well as their underlying reasons in the related report. If compliance was gained by laser painting without discharge, it should also be specifically noted.

## USE OF A CONDUCTED ENERGY WEAPON

31.   The CEW is considered to be a less-lethal weapon, and:
(a)  If  <u>discharged,</u> is a **Level 2** use of force for reporting purposes under **Chapter 1.3.6 – Reporting Use of Force**.
(b)  If resulting in serious physical injury or hospitalization; if resulting in loss of consciousness; if applied more than twice, regardless of the mode or duration of

the application, and whether the applications are by the same of different officers, or if applied for 15 seconds or longer whether consecutive or continuous; or if applied against a handcuffed suspect, is a **Level 4** use of force for reporting purposes under **Chapter 1.3.6 – Reporting Use of Force**.

32.     The decision to utilize a CEW must be made based on the use of force factors outlined in **Chapter 1.3 – Use of Force**, and on the totality of the circumstances known to the officer at the time.

33.     CEWs shall be used only in accordance with NOPD training by a certified instructor and in accordance with NOPD regulations, local, state, and federal law.

34.     The CEW is not intended to be used as a substitute weapon in deadly force situations. The CEW shall not be used without a firearm backup in those situations when a substantial threat towards the officer or others is present.

35.     The CEW shall not be used in an indiscriminate manner in situations involving a large crowd (e.g. parade assignments, second lines or special events).

36.     Each application of the CEW is unique.  In each situation the officer's actions should be dictated by the circumstances and the training he/she has received prior to being authorized to carry and use the CEW. Officers must justify <u>each</u> application of a CEW. The officer's report(s) should:
        (a) Describe why less intrusive levels of force were not or would not have been effective; and
        (b) Describe the behavior of the subject that justified the use of the CEW in specific terms.

37.     A CEW should be used only when its operator can safely approach the subject within the operational range of the CEW. Officers should be aware that a CEW may not achieve the intended results and be prepared with other tactical options.

**APPLICATION OF A CONDUCTED ENERGY WEAPON**

38.     Close quarters deployment (a range of closer than seven (7) feet) may not provide adequate probe spread (the distance between probes) to allow the CEW to function to its full effectiveness.

39.     The officer shall hold the CEW in such a manner as to ensure the CEW video camera lens is not obstructed (e.g. avoid a two-handed grip of the device and ensure the lens is not covered by fingers or hands).

40.     The officer should attempt to utilize the CEW video camera to record as much of an incident as possible by keeping the CEW pointed at the target subject.

41.     The CEW **shall not** be used to torment, elicit statements from, or to punish any individual.

42.     Prior to deploying a CEW, an officer shall visually and physically confirm that it is, in fact, a CEW and not a firearm.

43.     CEWs shall be used in drive-stun mode only to <u>supplement</u> the probe mode to complete the incapacitation circuit if necessary, or as a countermeasure to gain separation (distance) between officers and the subject, so that officers can consider other force

options.

44.  CEWs shall not be used in drive-stun mode as a pain-compliance technique.

45.  Officers shall not intentionally activate more than one CEW at a time against a subject.

**SPECIAL DEPLOYMENT CONSIDERATIONS**

46.  Officers shall determine the reasonableness of CEW use based on all facts or circumstances known to the officer at the time, including the subject's age, size, physical condition, and the feasibility of lesser force options.

47.  Except when lethal force would be permitted or when the officer has reasonable cause to believe that there is an imminent risk of serious physical injury, officers shall not use CEWs against:
     (a)  Visibly pregnant women;
     (b)  Elderly persons;
     (c)  Visibly frail persons;
     (d)  Young children;
     (e)  Individuals with obviously low body mass; and
     (f)  Individuals who are handcuffed or restrained, unless use is necessary to prevent them from causing serious physical injury to themselves or others, and lesser attempts at control have been ineffective.

48.  Except when lethal force would be permitted, CEWs shall not be used when deployment may cause serious physical injury or death from situational hazards. This may include falling, drowning, losing control of a moving vehicle, or igniting a potentially explosive or flammable material or substance.

49.  Personnel should be cognizant of the risk of positional asphyxia following a CEW application and avoid using a restraint technique or position that would impair a subject's respiration. Once controlled and while in police custody, the subject should be continually monitored for any signs of distress.

**TARGETING CONSIDERATIONS**

50.  The deploying officer shall adhere to the following guidelines when targeting a person with a CEW:
     (a)  The recommended target areas when firing the CEW are the lower chest/abdomen area if facing the front of the target subject or the center mass of the back if facing the back of the target subject, as clothing tends to be tighter on these parts of the body.
     (b)  An officer is permitted to target the central area of the chest if necessary and the increased risk of injury is legally justified.
     (c)  Where a target subject is wearing heavy or loose clothing on the upper body, the officer should consider targeting the legs.

51.  CEWs may not be applied to a subject's head, neck, or genitalia, except when lethal force would be permitted, or when the officer has reasonable cause to believe there is an imminent risk of serious physical injury to the officer.

52.  If circumstances do not permit the officer to limit the application of the CEW probes to recommended target areas, officers shall take prompt and ongoing care to monitor the condition of the subject if one or more probes strikes the head, neck, chest or groin until

the subject is examined by paramedics or other medical personnel.

**MULTIPLE APPLICATIONS OF THE CONDUCTED ENERGY WEAPON**

53.    After one standard CEW cycle (5 seconds), the officer shall evaluate the situation to
       determine if subsequent cycles are necessary.

54.    Multiple applications of the CEW and/or exposure to the CEW for 15 seconds or longer
       whether due to multiple applications or continuous cycling, against a single individual,
       may increase the risk of death or serious injury.

55.    If the first application of the CEW appears to be ineffective, the officer should consider
       certain factors before additional applications, including:
       (a) Whether the probes are making proper contact (e.g. loose or bulky clothing);
       (b) Whether the individual has the ability, and has been given a reasonable
           opportunity, to comply with the officer's commands; and
       (c) Whether verbal commands, other options or tactics may be more effective.

56.    Officers shall independently justify each cycle used against a subject in their written
       Force Statements.

**CEW USE ON A DANGEROUS ANIMAL**

57.    A CEW may be deployed on a dangerous animal that is causing a continuing public
       nuisance and needs to be controlled for reasons of public peace and safety.

58.    A CEW may also be deployed if: the animal poses an active threat to officers in their
       efforts to perform their duty; other conventional means to control the animal have been
       exhausted, may be unreasonable, or unavailable; and the officer reasonably believes
       that use of a CEW is necessary.

59.    Officers should target the center mass of the animal and should not target the head or
       other sensitive areas on the animal if possible. Deployment against vicious animals may
       be very dynamic in nature and the probes may impact unintentional areas. Officers
       should exercise care when removing probes from the animal.

60.    As long as the officer acted appropriately, the owner of the animal will be responsible for
       any medical attention needed by the animal.

61.    The deployment of a CEW on an animal temporarily disables the animal.  Officers
       should be prepared to act quickly with control devices or restraints, if available.  Because
       of differences in their nervous systems, animals have shown the ability to recover quickly
       from CEW effects.  If available, conventional means of controlling the animal (e.g.,
       control sticks, collars, cages) should be on hand at the scene prior to the use of the
       CEW.

62.    The CEW has proven to be an effective tool against dangerous animals and may reduce
       the need for greater, more injurious force against such animals. The use of a CEW on an
       animal is a safer, more humane, and less traumatic conclusion to the incident.

63.    A CEW may be deployed against a potentially dangerous animal, such as a dog, when
       alternative methods are not reasonably available or likely to be effective and the animal:
       (a) Appears to pose an imminent threat to the safety of a human, another animal, or
       (b) Has attacked a human or another animal.

64.   The deployment of a CEW on an animal requires the same reporting, downloading and documentation as similar actions on a person.

**CEW CAMERA**

65.   The CEW is equipped with an audio-video recording device integrated into the power supply. This device is activated any time the safety is in the off position. The safety should not be in the off position unless the officer intends to use the CEW. The device's memory is limited. The video and audio data shall be downloaded after each reportable use and retained as required by the Department's records retention schedule (see **Chapter 82.1.3 – Records Retention Schedule**).

**OFF-DUTY CONSIDERATIONS**

66.   Officers are authorized to carry departmentally owned CEWs while engaged in approved police secondary employment but not authorized to carry Department-owned CEWs while off duty.

67.   Officers shall ensure that all Department-owned CEWs are secured while they are off duty to keep them inaccessible to others.

**DOCUMENTATION**

68.   Notification of the use of a CEW by an officer shall be made to the officer's supervisor as soon as possible after use.

69.   Officers who have an SPPM must tag the triggered video prior to reporting to the Education & Training Division with the CEW, expended cartridge and approved forms. The E&TD staff member assigned will then locate and view the BWC video on Evidence.com instead of downloading and viewing the CEW Cam video.

70.   Other than routine testing or training, the following shall be documented in the related NOPD incident report and the CEW **Form 213**:
      (a) All CEW discharges, intentional or accidental; and

      (b) Laser activation/painting.

71.   Officers do not need to document the pointing of a CEW at a person in a Form 213, without discharge or laser activation/painting. Officers do not need to report to the Education & Training Division after pointing a CEW at a person, without discharge or laser activation/painting.  But officers must record the activate targeting, alone, on their EPR or other report for the incident.

72.   The Commander of the Education & Training Division should analyze the CEW **Form 213** reports annually to identify trends, including deterrence and effectiveness.  A summary of these findings should be sent to the Deputy Superintendent of PIB and the Compliance Bureau.  The Compliance Bureau – Audit Section should also conduct random and directed audits, at least annually, of CEW data downloads and reconcile CEW report forms with recorded activations and compliance with Departmental regulations.  These audits should compare the downloaded data to the officers' force statements.

73.   CEW information and statistics, with identifying information removed, should be made available to the public by sending the information to the Deputy Superintendent of PIB

for inclusion in its annual report.

**ACTIONS FOLLOWING DEPLOYMENT**

74.   Following deployment, the deploying officer shall take immediate action to secure the subject, provide necessary medical care for any injuries sustained, and protect the scene.

75.   Deploying officers, assisting officers and on-scene supervisors shall be responsible for monitoring any person who has received a CEW application while in NOPD custody.

76.   Except in exigent circumstances, when an officer is forced to act alone in taking custody of an immediate threat, a CEW shall not be left unattended. Officers should holster the CEW when not in use.

77.   A supervisor shall respond to the scene of a CEW use to investigate and complete a Use of Force Report whenever a CEW is discharged, whether a hit or a miss.

78.   Medical personnel shall be summoned to the scene after a CEW application for injuries other than probe deployment. Medical care shall not be denied to anyone who requests it.

79.   In the event of serious physical injury or death involving a subject who has been exposed to a CEW discharge, the on-scene supervisor shall notify PIB and request the Scientific Criminal Investigations Section (Crime Lab) for the processing and the collection of evidence.  Supervisors shall ensure photographs shall be taken of any injuries to the subject, impact sites, location of fallen probes or wires and the area of AFID deployment. All CEW probes, AFID tags (also referred to as Anti-Felon Identification (AFID) tags), cartridges, wires, and photographs shall be placed into evidence.  All attempts shall be made to keep cartridge wires intact for possible testing.

80.   As soon as practicable, the officer shall notify a Communications Dispatcher of the CEW discharge and request that a supervisor respond to the scene. Supervisors should ensure that NOPD members or evidence technicians photograph any injury to the subject, location of fallen probes or wires, and area of AFID deployment.

81.   The cartridge serial number should be noted and documented on **Form 213** and by all reporting persons.  All probes should be treated as a biohazard if the probes penetrated the subject's skin, and probes, wires, AFID tags, or any other related evidence should be collected and processed by the Scientific Criminal Investigations Section (Crime Lab).

82.   Supervisors should attempt to locate and identify witnesses to the incident.

83.   Officers should refrain from discussing the incident until the arrival of a supervisor. Officers shall brief the supervisor of the circumstances surrounding the incident and what actions were taken.

**MEDICAL TREATMENT**

84.   Officers shall ensure first aid is available if necessary following the removal of the probes. Officers should inspect the probes after removal to ensure the entire barb or the probe has been removed. In the event that a probe or barb has broken off and remains embedded in a subject's skin, the subject must be provided medical attention at a medical facility for the probe's or barb's removal.

85.     The probes shall be placed point down into the expended cartridge bores and secured with tape before preservation as evidence.  Officers shall not dispose of the plastic cartridge housing when disposing of probes.  The officer is required to bring the plastic cartridge housing to the Education and Training Division to obtain a replacement cartridge.

86.     Probes that are embedded in a subject's skin should be removed by only medical or authorized, specially trained NOPD personnel, except that probes that are embedded in a subject's head, throat, groin, or other sensitive area should be removed by medical personnel only. Probes should be treated as a bio-hazard. Officers shall not bring probes to the Education & Training Division.

87.     Used CEW probes shall be considered a sharp biohazard, similar to a used hypodermic needle.

88.     All persons who have been struck by CEW probes or who have been subjected to the electric discharge of the CEW shall be transported to a hospital for medical evaluation or attention prior to booking.

89.     Any individual who received CEW application shall be monitored while in police custody. The transporting officer shall inform any person providing medical care or subsequently receiving custody, that the individual has been subjected to the application of a CEW.

**SUPERVISOR RESPONSIBILITIES**

90.     Supervisors should respond to calls when they believe there is a likelihood of the use of a CEW. A supervisor shall respond to all incidents in which a CEW was activated.

91.     A supervisor shall review each CEW activation. Unless the CEW has been confiscated as part of an investigation, the discharging officer must bring the CEW to the Education and Training Division on Monday through Friday, between the hours of 7:30 a.m. and 3:30 p.m., and within 72 hours of the incident, exclusive of holidays. If the CEW does not have a SPPM, the onboard CEW memory shall be downloaded and stored by the designated Education and Training Division staff at that time.  Probe impact sites shall be documented on **Form 213** and in all related reports.

92.     An on-scene supervisor shall notify the Public Integrity Bureau and the District/Division Commander, and he/she shall request a crime lab response if any serious physical injury has resulted due to the use of force involving a CEW.

**EDUCATION AND TRAINING DIVISION**

93.     Officers shall bring their CEWs to the Education and Training Division pursuant to Education and Training Division procedures, if malfunctions occur.

**TRAINING**

94.     All officers shall be certified in the use of the CEW by the Education and Training Division.

95.     All officers must successfully complete the NOPD's CEW certification program, to include written test and practical skills, prior to carrying or using a CEW.  Officers shall timely maintain CEW recertification at all times when carrying or using a CEW.

96.     Officers shall be trained in the increased risks that CEWs may present to vulnerable
        individuals (see **Chapter 1.7.1** under Special Deployment Considerations).

97.     Officers shall be trained in, and adhere to, protocols on their responsibilities following
        CEW use, including:
        (a) The appropriate removal of CEW probes;
        (b) The risk of positional asphyxia, and the training of officers in the use of restraint
            techniques that do not impair the subject's respiration following an CEW
            application;
        (c) The transportation to a hospital for treatment and evaluation of all subjects on
            whom a CEW has been used; and
        (d) The monitoring of all subjects who have received CEW application while in police
            custody.

98.     Officers shall receive annual CEW recertification which consists of:
        (a) physical competency;
        (b) weapon retention;
        (c) NOPD policy, including any policy changes;
        (d) technology changes; and
        (e) scenario-based training by Education and Training Division instructors.

99.     A reassessment of an officer's knowledge and/or practical skill may be required at any
        time deemed appropriate by the officer's supervisor or the Commander of the Education
        and Training Division. All training and proficiency for CEWs shall be documented in the
        officer's training file.

100.    Command staff, supervisors and investigators shall receive CEW training as appropriate
        for the investigations they conduct and review.

101.    Officers who do not carry a CEW shall receive training sufficient to familiarize them with
        the CEW and working with officers who use the CEW.

102.    The Commander of Education and Training shall ensure that all officers who carry a
        CEW have received initial and annual proficiency training. Periodic audits shall be used
        for verification.

103.    Application of a CEW during training is optional for certification. The Commander of
        Education and Training shall ensure that all training includes:
        (a) A review of this policy;
        (b) A review of the Use of Force policy in **Chapter 1.3**;
        (c) Performing support side-hand draws or cross-draws to reduce the possibility of
            accidentally drawing and firing a firearm;
        (d) Target area considerations, including techniques or options reducing the
            intentional application of probes to the head, neck, chest and groin;
        (e) Handcuffing a subject during the application of a CEW and transitioning to other
            force options;
        (f) Restraint techniques that do not impair respiration following the application of a
            CEW; and
        (g) De-escalation techniques.

**CEW DISCHARGE REPORTING PROCEDURES**

**OFFICER'S RESPONSIBILITIES**

**APPLICATION/DISCHARGE**

104.   After a CEW is discharged for any reason other than spark testing or training (i.e., drive stun or probe deployment), the officer who deployed the CEW shall:
       (a) Complete a CEW Discharge/Use Report (Form #213);
       (b) Request that the on-scene supervisor review and sign the CEW Discharge/Use Report; and
       (c) Deliver the following to the Education and Training Division, Monday through Friday, between the hours of 7:30 a.m. and 3:30 p.m., and within 72 hours of the incident, exclusive of holidays:
            i.   The CEW;
            ii.  The spent cartridge; and
            iii. A completed and supervisor approved CEW Discharge/Use Report.

105.   Officers shall report all CEW discharges (except for spark testing and training discharges) and laser painting to their supervisors and communications as soon as possible.

**ACCIDENTAL DISCHARGE**

106.   Accidental discharges involving a CEW shall require the officer to:
       (a) Complete a CEW Discharge/Use Report;
       (b) Request that the on-scene supervisor review and sign the CEW Discharge/Use Report; and;
       (c) Complete a **Form 105**, via his/her chain of command, to the Commander of the Education and Training Division describing the circumstances of the discharge; and
       (d) Deliver the following to the Education and Training Division Monday through Friday, between the hours of 8:00 a.m. - 3:35 p.m.; within 72 hours of the incident, exclusive of holidays:
            i.   The CEW;
            ii.  The spent cartridge;
            iii. A completed and supervisor approved CEW Discharge/Use Report; and
            iv.  A **Form 105** on the circumstances surrounding the accidental discharge.

**SUPERVISOR'S RESPONSIBILITIES**

107.   In addition to Use of Force reporting requirements for CEW discharges the reporting supervisor shall:
       (a) Ensure proper care is given to the injured officers and/or citizens;
       (b) Ensure proper notifications of the Department command staff (commanders and above) are made as soon as possible by notifying the Command Desk of the CEW deployment;
       (c) Ensure all responsibilities of the officer have been carried out regarding care for the injured, apprehension of the subjects, photographing of injuries and AFID placement, and protection of the scene; and
       (d) Deliver all CEW Discharge/Use Reports and all other written reports, CEWs and cartridges associated with the incident to the Education and Training Division by the officer as directed.

**EDUCATION AND TRAINING DIVISION RESPONSIBILITIES**

108.   The Education and Training Division personnel shall review the CEW Discharge/Use Report (**Form 213**) and complete a CEW Discharge Interview Form (**Form 171**). The

Education and Training Division staff will then download the audio/video and issue another cartridge if needed. If the Education and Training Division is not open within the 72 hour period, the officer is responsible for bringing the above listed items to the Education and Training Division the morning of the first business day.

109.   The Education and Training Division shall be responsible for identifying training issues and conduct any follow-up training. If an officer has more than three accidental discharges in one year, the officer must complete another CEW training class to be scheduled at the discretion of the Commander of the Education and Training Division.

110.   The Education and Training Division is responsible for notifying the Public Integrity Bureau of all accidental CEW discharges.

## CEW DISCHARGES OUTSIDE ORLEANS PARISH

## OFFICER'S RESPONSIBILITIES

111.   An officer involved in an accidental, non-contact CEW discharge that occurs outside of Orleans Parish shall:
(a) As soon as practical, notify his/her immediate supervisor or an on-duty supervisor from within his/her chain of command;
(b) Complete a CEW Discharge/Use Report;
(c) Complete a 105 to the Commander of the Education and Training Division describing the circumstances of the discharge; and
(d) Follow the "Accidental Discharge" procedure listed herein.

112.   An officer involved in an accidental or intentional contact CEW discharge that occurs outside of Orleans Parish shall:
(a) Immediately notify the Police/Sheriff's Department within the jurisdiction where deployment occurred and have a local police report completed;
(b) Obtain the police report item number;
(c) Contact his/her immediate NOPD supervisor or an on-duty supervisor from within chain of command; and
(d) Follow appropriate reporting procedures listed herein.

## SUPERVISOR'S RESPONSIBILITIES

113.   Upon notification of an accidental or intentional discharge outside Orleans Parish, the supervisor shall:
(a) Notify the Communication Services of CEW discharge;
(b) Ensure the officer completes an CEW Discharge/Use Report;
(c) Review and sign the report;
(d) Ensure the officer completes a Form 105 to the Commander of the Education and Training Division within 72 hours, or no later than close of business the first business day should the incident occur on a weekend or holiday.

## PUBLIC INTEGRITY BUREAU RESPONSIBILITIES

114.   The Public Integrity Bureau shall respond to all CEW deployment scenes involving serious physical injury as defined by **Chapter 1.3 – Use of Force** and handle in accordance with Force Investigation Team protocols.

115.   An officer of the Public Integrity Bureau will perform an administrative review of all CEW uses.

116.    After the administrative review of a CEW use, PIB shall review the report and determine whether the report is complete and any violation of Department policy or procedure has occurred.  The investigator shall determine whether an administrative or internal disciplinary investigation shall be initiated.

117.    If the investigator from the Public Integrity Bureau secures a CEW from an officer as part of his/her investigation, the Commander of the Public Integrity Bureau or his/her designee shall send a Form 105 to the Commander of the Education and Training Division listing the involved officer's name, the CEW serial number, the CEW Video Camera serial number and any CEW Cartridge serial numbers.

118.    Once it is determined that the CEW is no longer needed for the investigation or will not be needed as evidence, it shall be returned to the Education and Training Division.

119.    PIB shall ensure the number of CEW uses is included in IAPro for inclusion into the Early Warning System (EWS).

120.    MSB shall maintain the number of CEW in operation for inclusion into the EWS.

121.    Analysis of this data shall include a determination of whether CEWs result in an increase in the use of force and of whether officer and subject injuries are affected by the rate of CEW use.

122.    The analysis shall include a breakdown of deployments involving the use of laser painting techniques to measure the prevention or deterrent effectiveness associated with the use of CEWs.

123.    CEW data and analysis shall be included in PIB's Use of Force Annual Report.



# NEW ORLEANS POLICE DEPARTMENT OPERATIONS MANUAL

# CHAPTER: 1.3

# TITLE:  USE OF FORCE

**EFFECTIVE:  12/06/15**
   **REVISED: 04/01/2018, 10/02/2022**

**PURPOSE**

This Chapter governs the use of force by NOPD police officers.  The Use of Force Chapter applies to all commissioned members of the NOPD.

**DEFINITIONS**

**Active Resistance**—Resistance exhibited by a suspect that is between passive resistance and aggressive resistance (e.g., attempts to leave the scene, flee, hide from detection, or pull away from the officer's grasp). Verbal statements, bracing, or tensing alone do not constitute active resistance.

**Aggravated Resistance**—When a subject's actions create an objectively reasonable perception on the part of the officer that the officer or another person is subject to imminent death or serious physical injury as a result of the circumstances and/or nature of an attack. Aggravated resistance represents the least encountered but most serious threat to the safety of law enforcement personnel or another person.

**Aggressive Resistance**—Is a subject's attempt to attack or an actual attack of an officer. Exhibiting aggressive behavior (e.g., lunging toward the officer, striking the officer with hands, fists, kicks) are examples of aggressive resistance. Neither passive nor active resistance, including fleeing, pulling away, verbal statements, bracing, or tensing, constitute aggressive resistance.

**Anatomical Compliance Technique / Pressure Point Compliance Technique**—The act of applying pressure to vulnerable areas, weak points or pressure points of the body. This technique is used to cause immediate compliance by a subject who poses a threat.

**Apprehension**—The arrest, capture or taking into custody of a person.

**Arrest**—The taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him. (La. C.Cr. P. Art. 201).

**Canine Apprehension**—Where articulated facts demonstrate that a canine played a clear role in the capture of a person. The mere presence of a canine at the scene of an arrest shall not

count as a canine apprehension.

**Canine Deployment**—Any situation, except one involving an on-leash article search only, in which a canine is brought to the scene and used in an attempt to locate or apprehend a suspect, whether or not a suspect actually is located or apprehended. This includes all instances in which a canine is removed from the police car; or when a suspect gives up immediately after an announcement is made that if they do not surrender, the canine will be released; or when a canine search is conducted in an effort to apprehend a suspect.

**Civil Disturbance**—
Any incident which disrupts a community where law enforcement intervention is required to maintain public safety. Civil disturbances may consist of riots, demonstrations, strikes, sit-ins, or mass acts of criminal damage or violence.

**Compliant**—Cooperative obedience in response to lawful requests or directions from law enforcement personnel.

**Critical Firearm Discharge**—A discharge of a firearm by an NOPD officer, including discharges when no person or animal is struck. Range and training firings, humane destruction of animals, and off-duty hunting discharges when no person is struck are not critical firearms discharges.

**Conducted Energy Weapon (CEW)**—A weapon designed primarily to discharge electrical impulses into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses.

**CEW Application**—The contact and delivery of electrical impulse to a subject with a CEW.

**Deadly Force/Lethal Force**—Any force likely to cause death or serious physical injury. The use of a firearm (discharge) is considered deadly force. Neck holds and strikes to the head, neck or throat with a hard object are considered lethal force.

**Elbow strike**—A strike to a person with the point of an officer's elbow.

**Firearm**—A pistol, revolver, shotgun, carbine, or machine gun. Any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive. (Gun Control Act of 1960, Title 18, US, chapter 44, Title1)

**Force Statement**—A written statement required as part of the departmental Use of Force Report (in Blue Team application and Form #114). The Force Statement is completed by an involved officer or witness officer documenting a use of force. A Force Statement is not considered a compelled statement under *Garrity* v. *New Jersey* or under analogous State law. The statement can be considered compelled only when the officer is ordered to provide a statement after refusing to do so on the grounds that the officer has a reasonable, good faith belief that such statement may incriminate himself/herself.

**Force Tracking Number**—A unique number assigned by FIT to each reportable use of force event to facilitate awareness event and tracking of a use of force investigation. The number includes the letters "FTN" for Force Tracking Number, followed by the year the force event occurred followed by a three-digit sequential number starting with 001 for the first recorded allegation of the year. FTN 2014-001 indicates the first reportable use of force event in 2014.

**Force Transition**—Force transition is the movement, escalation/de-escalation, from the application of one force type to another in conjunction with the "objectively reasonable" standard.

**Force Investigation Team (FIT**)—The NOPD unit tasked with conducting investigations of serious uses of force; uses of force indicating apparent criminal conduct by an officer; uses of force by NOPD personnel of a rank higher than sergeant; and uses of force reassigned to FIT by the Superintendent, the Superintendent's designee, or PIB. FIT also shall investigate all instances in which an individual has died while in, or as an apparent result of being in, the custody of NOPD.

**Imminent Threat**—An immediately impending danger that must be instantly met.

**Impact Weapon**—Any solid or semi-solid object used by an officer as a method of gaining control of a subject. Absent exigent circumstances, officers shall not use non-traditional weapons/hard objects, such as firearms or radios, as impact weapons.

**In-Custody Death**—An incident in which an individual died while in, or as an apparent result of being in, the custody of NOPD.

**Kick**—To forcibly strike a person with any part of an officer's leg.

**Leg sweep**—To trip a person and/or cause one or both legs of a person to collapse and the person to fall to the ground.

**Less-Lethal Force**—Force employed that is neither likely nor intended to cause death or serious injury.

**Less-Lethal Weapon**—An apprehension or restraint tool that, when used as designed and intended, is less likely to cause death or serious injury than a conventional lethal weapon such as a firearm.

**Neck Hold**—One of the following types of holds: (1) arm-bar control hold, a hold that inhibits breathing by compression of the airway in the neck; (2) carotid restraint hold, a hold that inhibits blood flow by compression of the blood vessels in the neck; (3) lateral vascular neck constraint; or (4) a hold with a knee or other object to the back of a prone subject's neck; (5) any actions with the hands and fingers of an officer, which restricts the airflow of an individual.  A neck hold is considered lethal force.

**Passive Resistance**—Behavior that is unresponsive to police verbal communication or direction (e.g., ignoring or disregarding police attempts at verbal communication or control; going limp; or failing to physically respond or move) and verbal resistance (e.g., verbally rejecting police verbal communication or direction; telling the officer that he or she will not comply with police direction, to leave alone, or not bother him or her). Bracing, tensing, linking arms, or verbally signaling an intention to avoid or prevent being taken into custody constitutes passive resistance. Passive resistance, including verbal statements, bracing, or tensing alone does not constitute active resistance

**Probable Cause**—The facts and circumstances, known to the officer at the time, which would justify a reasonable person in believing that the suspect committed or was committing an offense.

**Reasonable Force**—Force that is objectively reasonable under the circumstances. The minimum amount of force necessary to effect an arrest or protect the officer or other person.

**Reasonably Necessary**—Force is reasonably necessary when the facts and circumstances, including the reasonable inferences drawn therefrom, known to an officer at the time he or she uses force, would cause an objectively reasonable officer to believe that force is appropriate.

**Reportable Use of Force**—Any force above hand control or escort techniques applied for the purposes of handcuffing, or escort techniques that are not used as pressure-point compliance techniques, do not result in injury or complaint of injury, and are not used to overcome resistance. The pointing of a firearm at a subject is a reportable use of force.

**Seizure (or Detention)**—Occurs when an officer's words, actions, or control would convey to a reasonable person that he or she is not free to leave.

**Serious Physical Injury**—Physical injury that creates a substantial risk of death; causes death or serious and protracted disfigurement; or causes impairment of the function of any bodily organ or limb.

**Serious Use of Force**—Includes the following:
   (a) All uses of lethal force by an NOPD officer;
   (b) All critical firearm discharges by an NOPD officer;
   (c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization;
   (d) All neck holds;
   (e) All uses of force by an NOPD officer resulting in a loss of consciousness;
   (f) All canine bites
   (g) More than two applications of an CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive; and
   (h) Any strike, blow, kick, CEW application or similar use of force against a handcuffed subject.

**Specialized Weapons** - weapons which require specialized training, certification and authorization prior to use, such as chemical agents, 40mm launchers, stinger rounds and grenades, flashbangs, LRAD systems, etc. (see: **Chapter 46.2.3 – CRU SWAT Equipment and Storage**.)

**Specialty Impact Munitions -** Refers to extended range impact munitions. These munitions may include impact rounds containing chemical agents.

**Supervisor**—A sworn NOPD employee at the rank of sergeant or above and non-sworn NOPD members with oversight responsibility for officers.

**Takedown**—A person is thrown, pushed, tackled, or shoved to the ground or against a wall, car, or other surface by an officer.  The key element to a takedown is the degree of force used. The use of a compliance technique off-balancing the subject against a wall, car, or surface (**other than ground**) alone is **not** a takedown.  A shove or push does not maintain contact, but rather creates distance between the officer and the subject, and is not a takedown unless a fall to the ground results.

**Use of Force**—Physical effort to compel compliance by an unwilling subject above unresisted handcuffing, including pointing a firearm at a person.

**Use of Force Indicating Apparent Criminal Conduct by an Officer**—Force that a reasonable and trained supervisor would conclude could result in criminal charges due to the apparent circumstances of the use of force. The level of the force used as compared to the resistance encountered, discrepancies in the use of force as described by the officer and the use of force as evidenced by any resulting injuries, witness statements, or other evidence are examples.

**Use of Force Levels**—For reporting and investigative purposes, the New Orleans Police

Department categorizes use of force by its members into four (4) primary force levels:

**LEVEL 1**
Level-1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques that are not reasonably expected to cause injury; takedowns that do not result in actual injury or complaint of injury; and use of an impact weapon for non-striking purposes (e.g., prying limbs, moving, or controlling a person) that does not result in actual injury or complaint of injury.  It does not include escorting, touching, or handcuffing a person with minimal or no resistance.

**LEVEL 2**
Level-2 uses of force include use of a CEW (including where a CEW is fired at a person but misses); the use of "flash bangs" and "aerial flash bangs" to compel compliance from an unwilling subject; a canine deployment resulting in an apprehension without contact and force that causes or could reasonably be expected to cause an injury greater than transitory pain but does not rise to a Level 3 use of force.

**LEVEL 3**
Level-3 uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons when contact is made (except to the head), regardless of injury; a canine deployment resulting in an apprehension contact that is not a bite or the destruction of an animal.

**LEVEL 4**
Level-4 uses of force include all 'serious uses of force' as listed below:
  (a) All uses of lethal force by an NOPD officer;
  (b) All critical firearm discharges by an NOPD officer;
  (c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization;
  (d) All neck holds;
  (e) All uses of force by an NOPD officer resulting in a loss of consciousness;
  (f) All canine bites;
  (g) More than two applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive;
  (h) Any strike, blow, kick, CEW application, or similar use of force against a handcuffed subject; and
  (i) Any vehicle pursuit resulting in death, serious physical injury, or injuries requiring hospitalization.
  (j) Any use of specialized weapons, such as gas dispersants, the use of "flash bangs" and "aerial flash bangs" or impact rounds for the purposes of crowd control (See **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and Civil Disturbances**), including the munitions listed in **Appendix E** of Chapter 46.2.1).

**Use of Force Report**—A written report documenting a supervisor's investigation of a use of force (in Blue Team application and Form #114).

**USE OF FORCE POLICY STATEMENT**

1.     The policy of the New Orleans Police Department is to value and preserve human life when using lawful authority to use force. Therefore, officers of the New Orleans Police

Department shall use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the member or others. Members are advised that the Department places restrictions on officer use of force that go beyond the restrictions set forth under the Constitution or state law.

2.      Officers shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through the use of poor tactical decisions.

3.      When feasible based on the circumstances, officers will use de-escalation techniques, disengagement; area containment; surveillance; waiting out a subject; summoning reinforcements; and/or calling in specialized units such as mental health and crisis resources, in order to reduce the need for force, and increase officer and civilian safety. Moreover, the officers shall de-escalate the amount of force used as the resistance decreases.

4.      Any evaluation of reasonableness must allow for the fact that officers must sometimes make split-second decisions about the amount of force that is necessary in a particular situation with limited information and in circumstances that are tense, uncertain and rapidly evolving.

5.      While the ultimate objective of every law enforcement encounter is to protect the public, nothing in this Chapter requires an officer to retreat or be exposed to possible physical injury before applying reasonable force. Nevertheless, officers should strive, where practicable, to first try to de-escalate a situation prior to using force.

**USE OF FORCE PRINCIPLES**

6.      NOPD officers, regardless of the type of force or weapon used, shall abide by the following requirements:
        (a) Officers shall use verbal advisements, warnings, and persuasion, when possible, before resorting to force.
        (b) Officers are expected to use sound judgment when making a subjective and independent decision regarding the need and appropriateness of the force to be used.
        (c) Under no circumstances will an officer use force solely because another officer is using force.
        (d) Officers will use disengagement; area containment; surveillance; waiting out a subject; summoning reinforcements; and/or calling in specialized units such as mental health professionals or a CIT Officer, when feasible, in order to reduce the need for force and increase officer and civilian safety.
        (e) When possible, officers shall allow individuals time to submit to arrest before force is used.

**MEDICAL ATTENTION**

7.      Immediately following a use of force, officers and supervisors shall inspect and observe subjects for injury or complaints of pain. Officers shall obtain medical assistance for any person who exhibits signs of physical distress, has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. This may require officers to render emergency first aid within the limits of their individual skills, training and available equipment until professional medical care providers arrive on the scene. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored by the officer involved in the incident or an on-scene assisting officer until medical personnel can assess the individual. NOPD officers shall request

medical assistance without delay when a subject has visible injuries or the subject complains of injury.

**AUTHORITY TO USE REASONABLE FORCE (Louisiana R.S. 14:20 and R.S. 14:22)**

8.      Officers may use only necessary and reasonable force:
      (a) To protect themselves from injury;
      (b) To protect others from injury;
      (c) To effect a lawful detention;
      (d) To effect a lawful arrest; or
      (e) To conduct a lawful search.

9.      A use of force is "necessary" when it is reasonably required, considering the totality of facts and circumstances, to carry out one of the above listed law enforcement objectives.

10.     When practicable, officers will identify themselves as peace officers before using force. If it is not already known by the subject to be detained, arrested, or searched, officers should, if reasonable, make clear their intent to detain, arrest or search the subject.
11.     Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create an objectively reasonable belief that a situation may escalate to the point at which lethal force would be authorized. Once an officer determines that the use of deadly force is no longer likely, the officer shall re-holster the weapon.

12.     Officers shall not use force to attempt to effect compliance with a command that is unlawful. Any use of force by an officer to subdue an individual resisting arrest or detention is unreasonable when the initial arrest or detention of the individual was unlawful. **(See La. C. Cr. P. 220)**

**DEADLY FORCE**

13.     **Deadly/Lethal force shall be used only when:**
      (a) There is an imminent danger of death or serious physical injury to the officer or another person; or
      (b) To prevent the escape of a fleeing subject if there is probable cause to believe:
            i.   The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death; and
            ii.  The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person.

14.     Officers are not authorized to fire their firearms in order to subdue an escaping suspect who presents no imminent threat of death or serious injury. **(Tennessee v. Garner, 471 U.S. 1 (1985).**

15.     Deadly Force may never be used for the protection of property.

**DETERMINING THE REASONABLENESS OF FORCE**

16.     When determining whether to use force **(see: Graham v. Connor, 490 U.S. 386 (1989))** and in evaluating whether an officer has used reasonable force, the facts and circumstances, when they are known or reasonably should be known by the officer, that should be considered include, but are not limited to:
      (a) The seriousness of the suspected offense or reason for contact with the individual;
      (b) Whether the subject poses a threat of injury to himself, officers or others, and the immediacy and severity of the threat;

(c) The conduct of the individual being confronted as reasonably perceived by the officer at the time;
(d) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, and the number of officers versus subjects);
(e) The effects of drugs or alcohol;
(f) The subject's mental state or capacity;
(g) Proximity to weapons or dangerous improvised weapons/devices;
(h) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained;
(i) The availability of other options and their possible effectiveness;
(j) The training and experience of the officer;
(k) The environment wherein the event is occurring;
(l) Whether the person appears to be resisting in an active, aggressive, or aggravated manner;
(m) The risk of escape;
(n) The apparent need for immediate control of the subject for a prompt resolution of the situation versus the ability to step back, regroup and develop an alternative approach and the time available to the officer to make a decision;
(o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others; and
(p) Any other exigent and articulable circumstances.

## DE-ESCALATION

17.    When it is consistent with protecting the safety of the officer, the subject, or the public, officers shall use de-escalation techniques to avoid or reduce the need for the use of force. These techniques include gathering information about the incident, assessing the risks, assembling resources, attempting to slow momentum, and communicating and coordinating a response. In their interaction with subjects, officers should use advisements, warnings, verbal persuasion, and other tactics and alternatives to higher levels of force. Officers should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance in order to consider or deploy a greater variety of force options.

## SUPERVISORY RESPONSE TO FORCE INCIDENTS

18.    The prospect of a favorable outcome is often enhanced when supervisors become involved in the management of an overall response to potential violent encounters by coordinating resources and officers' tactical actions. Whenever possible, supervisors shall acknowledge and respond in a timely manner to in-progress incidents in which there is a higher potential for officers to use force.

## FORCE LEVELS

19.    When use of force is needed, officers will assess each incident to determine, based on policy, training and experience, which use of force option is believed to be appropriate for the situation and bring it under control in a safe and prudent manner.

   **LEVELS OF RESISTANCE**
      (a) **Passive Resistance,**
      (b) **Active Resistance,**
      (c) **Aggressive Resistance, and**
      (d) **Aggravated Resistance.**

**LEVELS OF CONTROL**

20.   There are a variety of controls officers can use to stop the unlawful actions of a subject(s) or to protect a subject(s) from injuring himself/herself/themselves or others. The type of control officers use may vary based upon the facts and circumstances confronting them. Officers shall assess all contacts to determine the appropriate level of control. When possible, officers shall attempt to gain control of subjects by using verbal commands/directives first.

21.   If verbal commands/directives are ineffective or not feasible, officers may utilize other control methods. If force is necessary, officers shall determine which control technique(s), tactics or authorized defensive equipment would best de-escalate the incident and bring it under control in the safest manner. When it is objectively reasonable, officers may utilize the following skills and techniques as follows:

   (a) **Professional Presence**—This includes all symbols of police authority, such as badge, uniform, marked police vehicle, etc., and applies to all levels of control.

   (b) **Verbal Commands**—This level includes fundamental verbal skills and strategies that are available to the trained officer. The mere presence of the officer can be included in this category.

   (c) **Contact Controls**—When confronted with a subject demonstrating minimal resistant behavior, the officer may use low-level anatomical compliance techniques or physical tactics to gain control and cooperation. These tactics can be psychologically manipulative as well as physical, and include additional verbal persuasion skills, anatomical applications, and escort positions.

   (d) **Compliance Techniques**—When a subject becomes resistant (active resistance), the officer may use anatomical compliance techniques or physical control tactics to overcome the level of resistance and remain vigilant for more aggressive behavior from the subject.

   (e) **Conducted Energy Weapon**—The CEW is used in:  (1) situations in which a subject who may be lawfully detained or apprehended poses an imminent risk of harm to the officer(s), the subject, or others; attempts to subdue the subject with less intrusive means have been or will likely be ineffective; and there is an objectively reasonable expectation that it would be unsafe for officers to approach the suspect within contact range; OR (2) situations in which a suspect for whom an officer has probable cause to arrest is actively fleeing from arrest for a serious offense; and attempts to subdue the subject with less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the subject or another party.  **Officers are reminded that mere flight shall not be the sole justification for using a CEW against a suspect**. Members should consider the severity of the offense, the suspect's threat level to others, and the risk of serious injury to the subject before deciding to use a CEW on a fleeing suspect.

   (f) **Defensive Tactics**—When a subject attempts to assault the officer or another person (aggressive resistance or aggravated resistance), the officer is justified in taking appropriate physical action to immediately stop the aggressive action and to gain control of the subject. This may include the use of hands, fists and feet.

   (g) **Authorized Impact Weapons**—Those less-than-lethal weapons such as the PR-24 and expandable batons, which, when authorized by the NOPD and utilized in accordance with training, may be used to overcome aggressive and aggravated resistance.

   (h) **Deadly or Lethal Force**—Deadly/Lethal force shall be used only when:
      i.   There is an imminent danger of death or serious physical injury to the officer or another person; or
      ii.  To prevent the escape of a fleeing subject if there is probable cause to believe:

- The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death; and
- The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person.

**DUTY TO INTERCEDE**

22.   Officers have a duty to intercede to prevent the use of unreasonable force if the officer has reason to know that unreasonable force is being used and there is a realistic opportunity to intervene to prevent harm. The action required by the officer will depend on the circumstances of the incident. Appropriate action may include, but is not limited to:
      (a) Verbal or physical intervention;
      (b) Immediate notification to a supervisor; and
      (c) A direct order by a supervisor to cease the use of unreasonable force.

**PROHIBITED ACTIONS**

23.   **Neck Holds**—Officers shall not use neck holds, except when lethal force is authorized.

24.   **Head, Neck, Throat, Heart, Kidney, and Groin Strikes with Impact Weapons**—The head, neck, throat, spine, heart, kidneys and groin shall not be intentionally targeted with impact weapons except when deadly force is authorized. Head strikes with impact weapons are prohibited except when lethal force is authorized.

25.   **Shooting at or from moving vehicles**—Officers shall not discharge a firearm from or at a moving vehicle unless the occupants of the vehicle are using deadly force other than the vehicle itself against the officer or another person, and such action is necessary for self-defense or to protect another person. Discharging a firearm in this circumstance is never authorized when it is reasonable to believe that the vehicle may contain an innocent passenger or it is reasonably apparent that the vehicle may careen out of control and injure an innocent bystander.

      Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle. Where possible the officer shall attempt to move out of the path of a moving vehicle rather than discharge their weapon to stop the vehicle. Officers shall not shoot at any part of a vehicle in an attempt to disable the vehicle.

26.   **Shooting through a door or window** when the target is not clearly in view.

27.   **Warning shots** or shots fired for the purpose of summoning aid are prohibited.

28.   **Using firearm as impact weapon**—Officers should never use a firearm as an impact weapon, i.e. "pistol whip" a subject or using the firearm as a club, except in situations where deadly force would be authorized.

29.   **Force against persons in handcuffs**—Officers shall not use force against persons in handcuffs, except to prevent imminent bodily harm to the officer, or another person, or to physically move the subject who has become passively resistant.

30.   **Force to overcome passive resistance**—Officers shall not use force to overcome passive resistance, except that physically moving a subject is permitted when it is necessary and objectively reasonable.

**OLEORISIN CAPSICUM SPRAY (OC Spray)–PROHIBITED**

31.     Oleoresin capsicum spray is **not** authorized for general use by the New Orleans Police Department. Officers shall not use or possess OC Spray while on duty, including officers working secondary employment. Exception to the general prohibition is made for SOD/SWAT use only, under highly specific circumstances such as civil disturbances when a command level decision has been made to deploy OC spray. (See **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and Civil Disturbances**).

**DANGEROUS ANIMALS**

32.     Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical.

**SPECIALIZED UNITS AND WEAPONS**

33.     Not every member of the NOPD is trained on all available weapons or skills. Specialized weapons are **RESTRICTED** to members of designated units (i.e., SOD), who have been trained in their use, and for use during special events or incidents (see: **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and Civil Disturbances**). The general guidelines for the appropriate levels of force categories follow the guidelines of this Chapter, such as:
        a. If the weapon is used or deployed as an impact round, it's a Level 3 UOF (like an impact weapon), unless it meets the requirements for an impact round to be a level 4 such as a strike to the head or sensitive area, loss of consciousness, serious physical injury, or hospitalization. OR if the weapons are used or deployed in a crowd control setting, they are considered a Level 4 UOF.
        b. Any of the gas dispersants or agents, including aerial, would be a Level 2 UOF (in line with OC spray) **unless** used in a civil disturbance / crowd control setting, then they would be considered a Level 4 UOF.
        c. Aerial flash bangs are distraction devices and considered a Level 2 UOF, unless they cause injury or strike/impact someone. The same applies to a flash bang. **unless** used in a crowd control / civil disturbance setting, then they would be considered a Level 4 UOF.
        d. Any weapon or munition used in a civil disturbance setting is considered a Level 4 UOF.

34.     Specialized units (i.e. SOD) and members who have been trained on the weapons and skills covered in **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and Civil Disturbances (Appendix – E)** shall have their individual training documented, along with the required certification and re-certification in their individual Departmental training records and in INSIGHT (personnel jacket). Any use of specialized weapons by a member who has not achieved and/or maintained required certification shall be investigated as a Level 4 UOF and appropriate corrective action taken.