**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| DEREK BROWN and | * Civil Action No. 22-00847 |
| JULIA BARECKI-BROWN | * |
| | * SECTION: L |
| VERSUS | * |
| | * HONORABLE ELDON E. FALLON |
| DERRICK BURMASTER, SHAUN | * |
| FERGUSON,  and the CITY OF | * DIVISION: 4 |
| NEW ORLEANS | * |
| | * HONORABLE KAREN WELLS ROBY |

**************************************************************************

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[1] Pursuant to this fundamental constitutional property right, a police officer's "use of force against a household pet is reasonable only if [1] the pet poses an immediate danger and [2] the use of force is unavoidable."[2]

Here, an NOPD officer shot and killed Plaintiffs' sixteen-week-old, twenty-two pound puppy when that puppy ran towards him. The puppy, Apollo, was so small that it only had two adult teeth. The officer, Defendant Derrick Burmaster, did not attempt any less-than-lethal means to deter the puppy. He was carrying a TASER, but did not try to use it. Nor did he try kicking the dog away, even though the dog was only a little bigger than a football. Nor did Burmaster try to use his NOPD-required baton, because he chose not to carry one that day in violation of policy.

---

[1] U.S. CONST. amend. IV.

[2] *Skinner v. Ard*, 517 F. Supp. 3d 586, 599 (M.D. La. 2021) (*quoting Robinson v. Pezzat*, 818 F.3d 1, 7-8, 422 U.S. App. D.C. 35 (D.C. Cir. 2016); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008)).

Thus, Burmaster's choice to shoot the dog fails both parts of the legal test for use of force. The puppy was not an immediate danger to Burmaster. And Burmaster's use of force was completely avoidable. Both these facts are confirmed by *Defendants' own experts*. Every single expert designated by Defendants has testified that they would not have used lethal force on Plaintiffs' puppy Apollo. Multiple Defendants' experts specifically found the shooting to be "not justified."

Officer Burmaster's use of lethal force on Apollo was avoidable, objectively unreasonable and violative of the Brown family's constitutional rights. Plaintiffs accordingly move the Court to grant partial summary judgment in their favor on liability as follows:

1. Granting partial summary judgment in Plaintiffs' favor on Plaintiffs' Section 1983 claim;

2. Granting partial summary judgment in Plaintiffs' favor dismissing Burmaster's qualified immunity defense;

3. Granting partial summary judgment in Plaintiffs' favor on Plaintiffs' state law claims.

## BACKGROUND

**A.     Apollo**

1.     In April of 2021, the Brown family had two dogs: Apollo, a small Catahoula puppy who was 16 weeks old and weighed approx. 22 lbs.,[3] and Bucho, a larger adult dog. The Browns loved their dogs dearly, and like most American families, considered them to be members of their family.

2.     This was Apollo:[4]

---

[3] Autopsy Report, attached as **Ex. A**, p. 2.

[4] https://www.nola.com/news/crime_police/puppy-named-apollo-shot-to-death-by-nopd-cop-in-lower-garden-district-just-a/article_ff3ab41e-9ad9-11eb-9e26-c35c62e96f23.html. This photograph of



**Puppy named Apollo shot to death by NOPD cop in Lower Garden District: 'Just a little nugget'**



Apollo was an 18-week-old rescue puppy shot dead by NOPD on Saturday, April 10 after they responded to reports of a disturbance at a home in the Lower Garden District.

3.     For additional reference, the following images depict Apollo next to (1) Bucho and the

Browns' adult daughter and (2) next to a food bowl:

 

**B.     The events of April 10, 2021**

4.     At approximately 9:15 p.m. on the evening of Saturday April 10, 2021, Plaintiffs Derek

Brown and Julia Barecki-Brown, husband and wife, got into a verbal argument. The

_____

Apollo was taken ten days before Apollo's death, and accurately depicts his size on the date of the incident. Deposition of Officer John Roussel, attached as **Ex. B**, pp. 8-9 and Ex. 9 thereto.

3

argument occurred at the Brown family's home located at 1420 Felicity Street in New Orleans. Julia's voice was loud enough that a neighbor called 911 to report the argument.[5]

5.    Officer Burmaster responded to investigate the complaint about the argument at the Brown family's home a few minutes before 9:39 p.m.[6] Burmaster was 5' 10.5" and weighed 230 lbs.,[7] and was over 10 times the weight of Apollo.

6.    Once he arrived at the scene, Burmaster waited near his car for his backup Officer John Roussel to arrive. Officer Roussel arrived at approximately 9:40 p.m.[8]

7.    Once Officer Roussel arrived on scene, the two officers walked toward the Brown family's home at 1420 Felicity Street. Officer Burmaster made "kissy sounds" in an attempt to determine whether any dogs were present on the Browns' fenced in private property. Officer Burmaster made these "kissy sounds" in front of the Browns' neighbor's house located at 1422 Felicity Street, instead of making them in front of (or at the gate of) the Brown family's house at 1420 Felicity Street.[9]

8.    The Brown family's dogs Apollo, the small puppy, and Bucho, the larger adult dog, were outside on the Browns' front porch, properly contained within their fenced in property, as the officers approached 1420 Felicity Street. **Ex. C**, pp. 49-51.

---

[5] Deposition of Derek Brown, attached as **Ex. C**, pp. 47-49. The Brown family's home at 1420 Felicity Street is a single family house with an attached downstairs apartment in which the Browns' personal friend was staying in at the time of the incident discussed herein. **Ex. C**, pp. 15-16.

[6] Body-Worn Camera ("BWC") footage of Burmaster, attached as **Ex. D** (file name "J1-18. (Clip_1.1)_1420_FELICITY_STREET-2 (Burmaster BWC).mp4"), at 00:01.

[7] Burmaster's Responses to Plaintiffs' Second Set of Interrogatories, attached as **Ex. E**, p. 3.

[8] BWC footage of Roussel, attached as **Ex. F** (file name "J2-43. (Clip_1.1)_1420_Felicity_ Street.mp4"), at 00:01.

[9] **Ex. B**, pp. 58-61 ("Q. He was in front of the wrong house when he made [the "kissy sounds"], right? A. Correct."); **Ex. F**, at 00:20.

9.    Because Burmaster made the "kissy sounds" in front of the wrong house (i.e., the Browns'
      neighbor's house), they were inaudible to the Browns' dogs, and therefore did not draw
      them out to make themselves known to the officers. **Ex. B**, pp. 62-63.

10.   The Brown family's home contains a front courtyard that is enclosed (along with the house)
      by an iron fence.

11.   As Burmaster arrived at the the closed pedestrian gate entrance to the Browns' private
      courtyard, he was no longer making any kissing sounds, did not announce his presence
      whatsoever, and failed to observe (a) that the iron fence enclosing the property was
      reinforced at the bottom with a mesh screen to contain the Brown family's small puppy
      (Apollo was so small that he could fit between the iron fence posts) and (b) that, in addition
      to the unlocked pedestrian gate, there was a second even larger vehicle gate to the courtyard
      that was also unlocked.

12.   After the officers entered the Brown family's courtyard through the pedestrian gate, Bucho
      and Apollo, located on the Browns' front porch, alerted to the sound of the gate closing
      behind the officers, and Bucho—the larger adult dog—began to bark. At this moment,
      when Bucho first barked, but before Burmaster could even see the dogs, Burmaster drew
      his firearm.[10]

13.   Next, Bucho, followed by Apollo, began running down the stairs leading from the porch to
      the courtyard.[11]

_____

[10] NOPD PIB Force Investigation Team Administrative Shooting Investigation Report, attached as
**Ex. G**, p. 10.

[11] **Ex. D**, at 01:54; Ex. B, pp. 46-47.

14.     At this same moment, Officer Roussel, who was "standing right next to" Burmaster, tapped

        Burmaster on the shoulder for the purpose of communicating to him that they should retreat

        out of the pedestrian gate that they just walked in through in response to the barking. After

        doing so, Roussel exited the pedestrian gate leading back to the sidewalk and held it open

        for Burmaster to do the same because Burmaster was "close enough to also exit in time."[12]

15.     Burmaster chose not to exit the pedestrian gate with Roussel, and instead held his ground.

16.     A second even larger unlocked vehicle gate was also right behind Burmaster, and a

        courtyard table with chairs was in front of him.[13]

17.     Bucho, followed by Apollo, ran down the stairs leading from the porch to the courtyard.

        Upon descending the stairs and reaching the courtyard, Bucho ran in the opposite direction

        from Burmaster. The puppy Apollo, however, continued to run in Burmaster's direction

        As captured by Burmaster's BWC, *Apollo's tail was clearly and visibly wagging as he*

        *approached Burmaster*.[14]

18.     At this moment, Officer Burmaster was equipped with his non-lethal department issued

        Conducted Energy Weapon ("Taser"), but chose not use it on Apollo in violation of NOPD

        policy. A Taser would have been an effective non-lethal tool for Burmaster to have used

        on Apollo.[15]

---

[12] **Ex. B**, pp. 48-52.

[13] **Ex. D**, at 01:34; 01:52.

[14] **Ex. D,** at 1:56.

[15] Deposition of Sergeant Shannon Brewer, attached as **Ex. H**, pp. 55-56; Deposition of Chief Deputy Superintendent Christopher Goodly, attached as **Ex. I**, pp. 38-40; **Ex. B**, pp. 33, 38-41.

19.  Per NOPD's Conducted Energy Weapon (CEW) Policy (Ch. 1.7.1), "[a] CEW may … be deployed [on an animal if [] the animal poses an active threat to officers in their efforts to perform their duty; other conventional means to control the animal have been exhausted, may be unreasonable, or unavailable; and the officer reasonably believes that use of a CEW is necessary." "*The CEW has proven to be an effective tool against dangerous animals and may reduce the need for greater, more injurious force against such animals. The use of a CEW on an animal is a safer, more humane, and less traumatic conclusion to the incident.*" (emphasis added).[16]

20.  Burmaster was also required to carry a police baton, another non-lethal weapon that could have effectively been used on Apollo, but was not carrying it in violation of NOPD policy.[17] Burmaster was also not wearing his department issued body armor in violation of NOPD policy.[18]

21.  Burmaster was also wearing police boots, but chose not to simply kick Apollo to eliminate any threat. **Ex. B**, pp. 15-16, 38-41.

22.  Instead, Burmaster immediately resorted to firing his service weapon three times at Apollo, mortally wounding him. **Ex. G**, p. 11, 15-16.

23.  At no time did Apollo bark, growl or vocalize in any way before Officer Burmaster shot him. At no time did Apollo jump, lunge or bear his teeth at Burmaster.[19] Apollo was so

---

[16] NOPD's Conducted Energy Weapon (CEW) Policy, attached as **Ex. J**, p. 9.

[17] **Ex. B**, pp. 14-15, 17-21, 41; **Ex. H**, pp. 56-58, 63; **Ex. G**, p. 15-16; NOPD's Uniform Specifications Policy, attached as **Ex. K**, p. 3.

[18] NOPD's Body Armor Policy, attached as **Ex. L**.

[19] **Ex. G**, pp. 8, 10-11; **Ex. B**, p. 46, 74-75; **Ex. D**, at 1:56; **Ex. H**, pp. 83-85.

7

young that he had not yet even developed the ability to bark.[20] Except for two adult teeth, Apollo still had all of his puppy teeth. **Ex. A**, p. 2.

24. "Officer Burmaster stated that he was concerned the dog [Apollo] going to bite his Penis."[21] Notably, when Officer Burmaster previously fatally shot another citizen's dog in 2012, he was concerned that that dog would bite his penis as well. **Ex. G**, pp. 3-4.

25. Burmaster did not evaluate the need for each of the three shots he fired at Apollo. He did not even know how many shots he fired at Apollo,[22] and further stated that "when he fired his weapon three times at the dog, it was all a blur and Officer Burmaster could not recall the dog's actions." Apollo did not continue to advance towards Burmaster after the first shot.[23]

26. Ricochet shrapnel from Burmaster's bullet struck Roussel's forearm, requiring Roussel to obtain medical treatment.[24]

27. After hearing the gunshots, Derek and Julia Brown ran out of their house into the courtyard to find that Apollo had been shot. Burmaster decided not to request aid for Apollo because the Browns were upset and were already "hugging on" Apollo.[25] Apollo ultimately died in Derek's arms. The Browns were ultimately diagnosed with Post Traumatic Stress Disorder.

28. The incident was captured on both Officer Burmaster's and Officer Roussel's BWCs.

---

[20] **Ex. C**, p. 69.

[21] **Ex. G**, p. 9.

[22] **Ex. G**, p. 5.

[23] **Ex. G**, p. 15; **Ex. H**, pp. 83-84.

[24] **Ex. G**, p. 2; **Ex. B**, p. 69.

[25] Deposition of Officer Burmaster, attached as **Ex. M**, pp. 71.

**C.      The Conclusions of Defendants' Designated Experts**

29.   After the incident, Burmaster was taken off of patrol duty by NOPD and put on desk duty pending an investigation of Burmaster's use of deadly force on Apollo. **Ex. G**, p. 1.

30.   The investigation was referred to two separate NOPD internal investigative bodies: the NOPD Public Integrity Bureau ("PIB")[26] Force Investigation Team and the Use of Force Review Board.

31.   NOPD Detective Shannon Brewer, who led the PIB Force Investigative Team's Administrative Shooting Investigation of Burmaster, concluded that "Officer Burmaster's discharge occurred due to Officer Burmaster observing the dogs and firing his weapon out of fear *and not because the dog presented a threat of serious bodily injury or death* to Officer Burmaster."[27] Detective Brewer's conclusion in this regard is particularly instructive given that the City of New Orleans has formally designated her as an expert witness in this matter. *See* Defendants' Expert Designations, attached as **Ex. N**.

32.   During her interview of Burmaster conducted in the course of the PIB Force Investigative Team's Administrative Shooting Investigation, Detective Brewer concluded that Burmaster's use of lethal force on Apollo was "unjustified."[28] In rendering her decision, Detective Brewer found that "[t]he dog fatally wounded by Officer Burmaster did not present an imminent threat toward Officer Burmaster and upon recognizing the dog did not present a threat of serious bodily harm, Officer Burmaster should have holstered his weapon." **Ex. G**, p. 15.

---

[26] PIB is NOPD's internal affairs department. **Ex. H**, p. 12.

[27] **Ex. G**, p. 17.

[28] **Ex. H**, pp. 72-73.

#101094921v1

33.     Detective Brewer further determined that, in shooting Apollo, Officer Burmaster committed five separate NOPD use of force policy violations.[29]

34.     Detective Brewer determined that Burmaster violated these policies because: "[t]he [smaller] dog did not harm or attempt to harm Officer Burmaster," "[t]he smaller dog did not attack or attempt to attack Officer Burmaster," and "Officer Burmaster fired his weapon out of fear and not due to an attack or attempted attack by the dog. Detective Brewer determined the dog did not present a threat of serious bodily injury to Officer Burmaster. Officer Burmaster was not equipped with a PR 24/Expandable Baton or ASP at the time of this incident. Officer Burmaster did not attempt any other less lethal options including exiting the front yard." **Ex. G**, p. 16.

35.     Detective Brewer certified that "Officer Burmaster received disciplinary action related to these policy violations," and further noted that she "deemed Officer Burmaster not to be credible" based on his statements made to the PIB Force Investigative Team compared to the actual evidence. **Ex. G**, pp. 15-16.

36.     The other two members of the NOPD's PIB Force Investigative Team, Sergeant John Helou and Captain Sabrina Richardson, unanimously concurred with the conclusions of Detective Brewer.[30]

37.     The NOPD's Use of Force Review Board also independently investigated Burmaster's shooting of Apollo. Similar to the PIB Force Investigative Team, the Use of Force Review

---

[29] **Ex. G**, p. 17. Each of these use of force policy violations are detailed in the attached Statement of Uncontested Material Facts.

[30] **Ex. G**, p. 19. Sergeant John Helou has also been designated by the City of New Orleans as an expert witness in this matter. **Ex. N.** Sergeant Helou testified that shooting Apollo was unjustified because Apollo posed no "sign of aggression or imminent attack" towards Burmaster. Deposition of Sergeant Helou, attached as **Ex. Q**, p. 37.

Board, comprised of Deputy Superintendent Christopher Goodly,[31] Deputy Superintendent Paul Noel, and Deputy Superintendent Arlinda Westbrook, all unanimously ruled that Burmaster's shooting of Apollo was "NOT JUSTIFIED."[32]

38.     In issuing its ruling, the Use of Force Review Board found that Burmaster (1) "had a false perception of a threat that was not there," (2) "did not articulate any threat towards him," (3) was not faced with any "attack," and (4) "the smaller dog posed no threat." The Use of Force Review Board further recommended that Burmaster receive "De-escalation training" "ASAP." **Ex. O**, p. 3.

## LAW AND ARGUMENT

**A.     Qualified Immunity**

To assess qualified immunity, courts "first ask the threshold 'constitutional violation question' of whether … the officer's alleged conduct violated a constitutional right. If … the alleged conduct amounts to a constitutional violation, then we ask the 'qualified immunity question' of whether the right was clearly established at the time of the conduct." *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 410 (5th Cir. 2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established … constitutional rights of which a reasonable person would have known.'" *Morales v. City of New Orleans*, No. 21-1992, 2022 U.S. Dist. LEXIS 111104, at *11 (E.D. La. June 23, 2022) (Fallon, J.) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "If we answer both the

---

[31] Deputy Superintendent Christopher Goodly has been cross-designated as an expert witness by the City of New Orleans and Plaintiffs. **Ex. N**.

[32] Report of Use of Force Review Board, attached as **Ex. O**, p. 3.

#101094921v1

constitutional violation and qualified immunity questions affirmatively, the officer is not entitled to qualified immunity." *Lytle*, 560 F.3d at 410 (internal citations omitted).

Thus, to evaluate Burmaster's qualified immunity claim, the Court faces two questions: (1) whether Burmaster's conduct violated the Brown family's constitutional rights, and if so, (2) whether those rights were clearly established at the time of the shooting. But the City of New Orleans is a public entity, and therefore not entitled to the defense of qualified immunity. For the City, the Court only need assess the first question.

**B.     The Fourth Amendment prohibits unreasonable seizures.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "A 'seizure' of property occurs when an officer meaningfully interferes 'with an individual's possessory interests in that property.'" *Grant v. City of Hous.*, 625 F. App'x 670, 675 (5th Cir. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). "The destruction of property constitutes a meaningful interference with an individual's possessory interests." *Id.*

Under Louisiana law, a dog is considered to be its owner's corporeal movable property. *Sonnier v. Ackal*, No. 16-00621, 2017 U.S. Dist. LEXIS 112386, at *9 (W.D. La. June 27, 2017). "'It is beyond dispute' that the killing of an individual's pet dog by an officer constitutes a 'seizure' 'within the meaning of the Fourth Amendment.'" *Skinner v. Ard*, 517 F. Supp. 3d 586, 597 (M.D. La. 2021) (quoting *Grant*, 625 Fed. App'x at 675); *see also Jones v. Lopez*, 689 Fed. Appx. 337, at *2 (5th Cir. May 15, 2017); *Stephenson v. McClelland*, 632 Fed. App'x 177, 184 (5th Cir. 2015); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005).

"The Fourth Amendment requires that a seizure be objectively reasonable." *Stephenson*, 632 Fed. App'x at 184. "To determine whether a seizure was reasonable, we look to the totality of

the circumstances, balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Grant,* 625 F. App'x at 675 (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)); *see also Stephenson,* 632 Fed. App'x at 184 ("The Fourth Amendment requires that a seizure be objectively reasonable. In making such a determination, we look to the totality of the circumstances….").

"*[T]he key question is reasonableness based on the totality of the circumstances." Skinner,* 517 F. Supp. 3d at 598 (emphasis added); *see also Lytle,* 560 F.3d at 417 (analyzing the "totality of the circumstances" in determining Fourth Amendment unreasonable seizure claim). Importantly, in conducting the reasonableness analysis based on the totality of the circumstances in this case, "we must look at *all of the facts and circumstances* relevant to the reasonableness of [the officer's] conduct, [and would be] *mistaken to focus entirely on the threat of harm." Id.* at 412 (emphasis added). Qualified immunity is not appropriate when the officer "unreasonably created" the encounter that ostensibly permitted the use of deadly force to protect him. *Edmond v. City of New Orleans,* No. 93-3602, 1994 U.S. App. LEXIS 42156, at *5 (5th Cir. 1994) (citing *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir. 1993)).[33]

In assessing reasonableness under the totality of circumstances, courts focus on two primary requirements: "[1] if the pet poses an immediate danger and [2] the use of force is

---

[33] Notably, the legal analysis for use of force on property like a pet is distinct from the analysis for use of force on a person. For the use of force against persons, the Fifth Circuit provides that "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." *Harris v. Serpas,* 745 F.3d 767, 772 (5th Cir. 2014). But for use of force on property, the Fifth Circuit applies a broader totality of the circumstances reasonableness inquiry that includes analysis of issues like whether the officer took reasonable precautions leading up to the seizure and whether the officer exhausted non-lethal options before firing his weapon. *See Grant,* 625 F. App'x at 675 (court's reasoning relies on totality of the circumstances reasonableness test, not just the moment of perceived threat); *Stephenson,* 632 Fed. App'x at 184 (same); *Skinner,* 517 F. Supp. 3d at 600 (same) (citing *Grant,* 625 F. App'x at 675).

#101094921v1

unavoidable." *Skinner*, 517 F. Supp. at 599 (*quoting Robinson*, 818 F.3d at 7-8; *Viilo*, 547 F.3d at 710).

**C.   Burmaster's use of lethal force on Apollo was objectively unreasonable under the totality of the circumstances.**

"[T]he use of force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Id*. For this reason, a police officer can only constitutionally destroy a pet "when there is reason to believe the pet poses an imminent danger." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001).

Courts "must consider all of the circumstances leading up to that moment [of the alleged Fourth Amendment violation], because they inform the reasonableness of [the officer's] decision making." *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016). An analysis of the totality of the circumstances of the events of April 10, 2021 confirms that Burmaster's use of lethal force on Apollo was unnecessary, avoidable and objectively unreasonable:

*1.   No Reasonable Steps to Announce Police Presence or Determine the Presence of Pet Dogs*

Officer Burmaster claims to have taken sufficient and reasonable steps to determine whether any household pets were present inside the Browns' gated private property he was about to enter. Specifically, he made "kissy sounds" in an attempt to draw out any potential dogs to make themselves known. As shown in the BWC footage, however, Burmaster made these sounds in front of the wrong house. Because he made these sounds in front of the Brown family's neighbor's house—and not in front of the Browns' house—they were inaudible to the dogs located on the Browns' front porch. Moreover, Burmaster did not verbally announce his presence at all when entering the Browns' gate. Doing so would have given the Browns a chance to bring their dogs inside. These facts weigh against a finding reasonableness.

14

2.    *Burmaster's belief that Apollo would cause him serious bodily harm was objectively unreasonable.*

A police officer's "use of deadly force is objectively reasonable only where an officer has a *reasonable belief* that he or the public was in imminent danger … of death or serious bodily harm." *Crane v. City of Arlington*, 50 F.4th 453, 467 (5th Cir. 2022) (emphasis added). "This standard is an objective standard, meaning, the Court must decide if the officer's *belief* (that the individual against whom the officer is using deadly force places the officer or others in imminent danger of death or serious bodily harm) was *'objectively reasonable'* in light of the facts and circumstances confronting the officer. *Estate of Cau Bich Tran v. City of San Jose*, No. C 03-04997 JW, 2005 U.S. Dist. LEXIS 61437, at *14 (N.D. Cal. Sep. 30, 2005) (emphasis added) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Burmaster takes the position that "when an officer believes that [he is] in imminent danger of death or great bodily harm, the officer can reasonably exercise the use of deadly force.[34] *This is simply incorrect*, because the officer's belief that he's in danger *must be reasonable*." *Pena v. Leombruni*, 200 F.3d 1031, 1035 (7th Cir. 1999) (emphasis added) (citing *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985); *Deering v. Reich,* 183 F.3d 645, 650 (7th Cir. 1999); *Palmquist v. Selvik*, 111 F.3d 1332, 1343 (7th Cir. 1997); *Jaffee v. Redmond,* 51 F.3d 1346, 1353 (7th Cir. 1995); *Abraham v. Raso,* 183 F.3d 279, 289 (3d Cir. 1999); *Nelson v. County of Wright,* 162 F.3d 986, 990 (8th Cir. 1998); *Sigman v. Town of Chapel Hill,* 161 F.3d 782, 786-87 (4th Cir. 1998)).

Here, Burmaster's belief that Apollo would cause him serious bodily harm was objectively unreasonable. Apollo was a 22 lb. puppy. Burmaster is a 5' 10.5" 230 lb. police officer who is over

---

[34] *See* R. Doc. 105-1, p. 3.

ten-times the weight of Apollo. The BWC footage confirms that Apollo never barked, growled, vocalized, jumped, lunged or bared his teeth at Burmaster, but was instead wagging his tail. Burmaster justified his immediate use of deadly force on Apollo based on his bizarre subjective belief that Apollo would bite his penis. Burmaster had this same concern the last time he used deadly force against a dog in the line of duty in 2012. However, the City's designated expert Superintendent Goodly established that no NOPD officer has ever been bitten in the genital area by a dog during his decades-long tenure.[35]

In sum, while Burmaster has articulated a belief that Apollo would have caused him serious bodily harm, such a belief was neither objectively reasonable nor credible. Indeed, *Defendants' own designated experts have come to this same conclusion*: designated expert and 30(b)(6) representative Detective Shannon Brewer, who led the PIB Force Investigative Team's Administrative Shooting Investigation of Burmaster, concluded that "Officer Burmaster's discharge occurred due to Officer Burmaster observing the dogs and firing his weapon out of fear and *not because the dog presented a threat of serious bodily injury or death* to Officer Burmaster."[36] Moreover, the City's designated expert Sergeant John Helou concurred with Detective Brewer's conclusions. Finally, the City's designated expert Deputy Superintendent Christopher Goodly, who was on NOPD's Use of Force Review Board assigned to investigate this incident, concluded that Burmaster (1) "had a false perception of a threat that was not there," (2) "did not articulate any threat towards him," (3) was not faced with any "attack," and (4) "the smaller dog posed no threat."

---

[35] **Ex. I**, pp. 59-61.

[36] **Ex. G**, p. 17.

In sum, Burmaster did not have an objectively reasonable belief that he was in imminent danger of death or serious bodily harm. This fact weighs against a finding of reasonableness. *See also Guajardo v. Rapelje*, No. 2:14-CV-10260, 2015 U.S. Dist. LEXIS 40993, at *10 (E.D. Mich. Mar. 31, 2015) ("Additionally, although defendant testified that he feared for his life, there was no evidence that defendant had a reasonable and honest belief that the use of deadly force was necessary to prevent imminent death or great bodily harm.").

3.      *No Attempt at Non-Lethal Force before Resorting to Deadly Force*

In evaluating the reasonableness of an officer's use of deadly force, if the officer had an effective non-lethal option at his disposal, the Court must evaluate "whether the police [officer] acted unreasonably in failing to recognize or to pursue it." *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)). In *Grant v. City of Houston*, 625 F. App'x 670, 676 (5th Cir. 2015), the Fifth Circuit evaluated whether an officer's use of lethal force against a pet dog was objectively reasonable. In *Grant*, a dog charged an officer "snapping its teeth and turning its head sideways so that it could bite [his] leg." *Id.* The officer kicked the dog twice, but the dog continued its aggressive approach. *Id.* The officer also attempted to retreat, but was unsuccessful. *Id.* He then fatally shot the dog. In determining that the officer's actions were reasonable under the totality of the circumstances, the Fifth Circuit specifically noted that there was sufficient evidence that he "exhausted all non-lethal options prior to using lethal force against the dog." *Id.*[37]

Here, Officer Burmaster had numerous effective non-lethal options readily available to him at the time he shot Apollo, but acted unreasonably in failing to pursue any of them. Burmaster

---

[37] *See also* NOPD Use of Force Policy (Ch. 1.3) included in **Ex. J,** p. 11 (requiring officers to use non-lethal force on animals if "reasonably available."

could have effectively used his Taser (also called a "CEW") on Apollo. NOPD policy clearly states that "[t]he CEW has proven to be an effective tool against dangerous animals and may reduce the need for greater, more injurious force against such animals. The use of a CEW on an animal is a safer, more humane, and less traumatic conclusion to the incident." Defendants' own designated experts have testified that a Taser would have been an effective non-lethal tool that Burmaster could have used in this situation. Burmaster's partner Officer Roussel who was present on the scene with Burmaster also confirmed that a Taser would have been effective.[38]

The City's designated experts and Officer Roussel further confirmed that Burmaster's NOPD-issued baton would have also been an effective non-lethal tool to use on Apollo.[39] But this option was unavailable to Burmaster because he chose not to carry his baton with him on the date of the incident in express violation of NOPD's mandatory policy. The City's experts and Burmaster's partner have also confirmed that Burmaster could have evaded Apollo by exiting the pedestrian gate along with Officer Roussel or otherwise creating distance between himself and Apollo.[40]

Finally, and most obviously, Burmaster could have simply used his police boots to kick this 22 lb. puppy to neutralize any alleged threat that it posed. The City's designated experts and Officer Roussel have all confirmed this to have been an effective alternative to lethal force. Burmaster's failure to pursue any of these effective non-lethal options weighs against a finding of reasonableness.

4.     *Burmaster's Numerous Violations of NOPD's Use of Force Policies*

---

[38] **Ex. H**, pp. 55-56; **Ex. I**, pp. 38-40; **Ex. B**, pp. 33, 38-41.

[39] **Ex. B**, pp. 14-15, 17-21, 41; **Ex. H**, pp. 56-58, 63; **Ex. G**, p. 15-16.

[40] *See* citations to **Exhs. B** and **H**, *supra* and **Ex. I**, p. 46

In evaluating the reasonableness of an officer's use of force, "a policy violation can serve as evidence that an act was objectively unreasonable." *Dawes v. City of Dall.*, No. 17-1424, 2021 U.S. Dist. LEXIS 260494, at *7-8 (N.D. Tex. Sep. 24, 2021) (citing *Anthony v. Morton*, No. 05-0027, 2007 U.S. Dist. LEXIS 101798, 2007 WL 628750, *7 (W.D. Tex. Jan. 31, 2007) (holding that officer's violation of police baton policy "is *certainly probative in determining if [officer] acted in an objectively reasonable manner*.") (emphasis added); *Hope v. Pelzer*, 536 U.S. 730, 743-44, (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct."). "Relatedly, a policy violation may show that a reasonable, alternative course of action was available to the officer." *Dawes*, 2021 U.S. Dist. LEXIS 260494, at *8.

As detailed above, the City's designated experts, who were also members of the PIB Force Investigative Team and the Use of Force Review Board assigned to investigate this incident, unanimously concluded that Burmaster's shooting of Apollo was "not justified." In rendering their decisions, these experts concluded that Burmaster violated five separate NOPD policies relating to the use of deadly force. The fact that Burmaster's shooting of Apollo violated numerous NOPD policies weighs against a finding of reasonableness.

5.    *No Evaluation of the Need for Multiple Shots*

"[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle*, 560 F.3d at 413. "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Id.* As such, when an officer decides to fire his service weapon to mitigate a perceived threat of death or serious bodily harm, he must evaluate the need for each

subsequent shot he fires. *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 278 (5th Cir. 2015).

Here, Officer Burmaster fired three shots at Apollo, but has admitted that he did not evaluate the need for the second or third shots. He specifically admitted in his administrative statement provided to PIB that "when he fired his weapon three times at the dog [Apollo], it was all a blur and Officer Burmaster could not recall the dog's actions." In sum, Officer Burmaster fired two subsequent shots at Apollo without conducting any evaluation of the need to do so. This fact weighs against a finding of reasonableness.

Moreover, Burmaster's volley of gunfire caused his partner officer Roussel to be injured from shrapnel. An officer's firing of "shots [that] might strike an unintended target" "weighs against a conclusion of reasonableness." *Lytle*, 560 F.3d at 413.

6.   *The Conclusions of the Defendants' own Experts*

The City's own designated experts have concluded that Burmaster's use of deadly force on Apollo was unjustified, unnecessary and outside of NOPD policy. This fact alone warrants the entry of partial summary judgment in Plaintiffs' favor on the issue of liability. *Buckley v. Cty. of Suffolk*, No. 10-1110, 2013 U.S. Dist. LEXIS 3509, at *15 (E.D.N.Y. Jan. 9, 2013) (granting partial summary judgment in plaintiff's favor on liability in light of defendant's own expert's conclusion that defendant's boat was unsafe and dangerous);  *SEC v. Keener*, 580 F. Supp. 3d 1272, 1286 (S.D. Fla. 2022) (granting summary judgment in plaintiff's favor in light of defendant's own expert's conclusion that defendant operated as "dealer" within the meaning of the Securities Exchange Act); *Digene Corp. v. Third Wave Techs., Inc.*, 536 F. Supp. 2d 996, 1006 (W.D. Wis.

#101094921v1

2008) (dismissing defendant's monopolization counterclaim brought pursuant to Section 2 of the Sherman Act on summary judgment based on defendant's own expert's conclusions).[41]

## D.      Burmaster violated the Brown Family's Clearly Established Constitutional Rights

"At the second step of the qualified immunity inquiry, we ask whether the violated constitutional right was clearly established at the time of the violation." *Lytle*, 560 F.3d at 417. "When conducting this inquiry, '[t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004); *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

"'[T]he very action in question [need not have] previously been held unlawful' for a public official to have reasonable notice of the illegality of some action." *Skinner*, 517 F. Supp. 3d at 602 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This analysis does not "require a case directly on point" prohibiting the official's specific actions. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). A plaintiff need not establish that the "very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[D]efining a right too narrowly risks making recovery against a public official virtually impossible because only those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar would

---

[41] Plaintiffs' use of force against animals expert Dr. James Crosby—a former Officer, Sergeant and Lieutenant of the Jacksonville Sherriff's Office for twenty-two years and former Animal Control Division Manager—has concurred with Burmaster's experts that Burmaster's use of lethal force against Apollo was unjustified, unnecessary and outside of policy. *See* Report of Corsby, attached as **Ex. P**. This further warrants the entry of partial summary judgment in Plaintiffs' favor. *See Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 381 (5th Cir. 1981) (basing its ruling on the fact that both parties' experts agreed that the inadequacy of welds was the primary cause of a building collapse).

abrogate qualified immunity." *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (internal quotations omitted).

Additionally, when the constitutional right in question is "self-evident," the absence of case law specifically establishing the existence of the right is not dispositive. *Reyes*, 2002 U.S. Dist. LEXIS 9154, at *6 (Fallon, J.) ("[W]e are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right."). Indeed, as explained by the Fifth Circuit and the Supreme Court, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Tyson v. Cty. of Sabine*, 42 F.4th 508, 519 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)); *see also Brosseau v. Haugen,* 543 U.S. 194, 199 (2004) (per curiam) ("Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."). Indeed, "[i]t may be true … that 'even if there is no closely analogous case law, a right can be clearly established on the basis of 'common sense.'" *Lester v. Prator*, No. 15-2008, 2017 U.S. Dist. LEXIS 169259, at *24-25 (W.D. La. Oct. 12, 2017) (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001)).

Nonetheless, as the Middle District of Louisiana has already recognized, the Fifth Circuit's 2015 decision in *Grant* was sufficient to put police officers on notice that "'[i]t is beyond dispute that the killing of an individual's pet dog by an officer constitutes a 'seizure' within the meaning of the Fourth Amendment' and that '[s]eizures by law-enforcement officials violate the Fourth

Amendment … if they are unreasonable.'" *Skinner*, 517 F. Supp. 3d at 602-603 (quoting *Grant*, 625 F. App'x at 675). *See also Jones v. Lopez*, 689 F. App'x 337, 341 (5th Cir. 2017) (recognizing *Grant* as the decision that provides the standard for whether an officer's shooting of a dog is reasonable and therefore constitutional). *See also Brown*, 269 F.3d 205, 211 (3d Cir. 2001) (holding that "a reasonable officer ... could not have … concluded that he could lawfully destroy a pet who posed no imminent danger" in light of the Supreme Court's 1984 decision in *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Moreover, as the Supreme Court has explained, "qualified immunity is lost when plaintiffs point either to 'cases of controlling authority in their jurisdiction at the time of the incident' *or* to '*a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful*.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011) (emphasis added) (quoting *Wilson* v. *Layne*, 526 U.S. 603, 617 (1999)). "These standards ensure the officer has 'fair and clear warning' of what the Constitution requires." *Id.* (quoting *United States* v. *Lanier*, 520 U.S. 259, 271 (1997)). Even "the decisions of courts in other circuits" may contribute to this consensus of persuasive authority. *Flores v. Rivas*, No. 18-297, 2020 U.S. Dist. LEXIS 22047, at *22 (W.D. Tex. Jan. 31, 2020) (citing *Morrow v. Meachum*, 917 F.3d 870, 879-80 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

As the First Circuit has explained in *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009):

> The killing of a person's pet dog or cat by the government without the person's consent is also a seizure within the meaning of the Fourth Amendment. Three other circuits had announced this conclusion well before the violations alleged here. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*; *Lesher v. Reed*, 12 F.3d 148, 150-51 (8th Cir. 1994). Since then, the Seventh Circuit has also held that the killing of a companion dog is a Fourth

23

Amendment seizure. *See Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). No circuit court has held otherwise.

We reject the Mayor's argument that this law was not clearly established because *this* court had not earlier addressed the questions of effects and seizure. Against the widespread acceptance of these points in the federal circuit courts, the Mayor's argument fails. These are principles of law, and the law was sufficiently recognized by courts to be clearly established. *See Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (holding that a constitutional right is clearly established if "a consensus of persuasive authority" exists "such that a reasonable officer could not have believed that his actions were lawful")

Here, the Plaintiffs have indeed pointed to a robust consensus of persuasive authority, within the Fifth Circuit and other circuits, setting forth a clear framework for determining whether an officer's shooting of a pet is objectively unreasonable such that it constitutes an unconstitutional seizure. *See Grant v. City of Hous.*, 625 F. App'x 670 (5th Cir. 2015); *Sonnier v. Ackal,* No. 6:16-cv-00621, 2017 U.S. Dist. LEXIS 112386, at *9 (W.D. La. June 27, 2017) (holding that an officer's killing of a dog violates the Fourth Amendment if it is objectively unreasonable under the totality of the circumstances); *Viilo v. Eyre,* 547 F.3d 707, 710 (7th Cir. 2008) ("[T]he use of deadly force against a household pet is reasonable only if the pet poses an [imminent] danger *and the use of force is unavoidable*.") (emphasis added); *Robinson v. Pezzat,* 818 F.3d 1, 7-8, 422 U.S. App. D.C. 35 (D.C. Cir. 2016) (same); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016) (same); *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016) (holding that it is clearly established that unreasonably destroying a pet violates the constitution); *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (holding that the unreasonable killing of a companion animal constitutes an unconstitutional seizure of personal property under the Fourth Amendment); *Anderson v. City of Chi.*, No. 16-cv-00726, 2018 U.S. Dist. LEXIS 88865, at *8 (N.D. Ill. May 29, 2018) ("By no later than 2008, it was clearly established … that the killing of a companion dog

24

constitutes a 'seizure' within the meaning of the Fourth Amendment.") (citing *Viilo*, 547 F.3d at 710).

In light of this robust consensus of authority, it "it would have been apparent to a reasonable officer that shooting [the Browns' 22 lb. puppy] would be unlawful." *Brown*, 269 F.3d at 211-12 ("[I]t would have been apparent to a reasonable officer that shooting [the dog] Immi would be unlawful. Accordingly, Officer Eberly has not established that he is entitled to qualified immunity."). Moreover, the unlawfulness of such action would have been "self-evident," "obvious" and "common sense" from general constitutional rules already identified in the decisional law. *Tyson*, 42 F.4th at 519; *Lester*, 2017 U.S. Dist. LEXIS 169259, at *24-25.

## CONCLUSION

The Court should grant partial summary judgment on liability in Plaintiffs' favor (1) granting Plaintiffs' Section 1983 claim and (2) dismissing Burmaster's qualified immunity defense. The Court should also summarily grant Plaintiffs' state law claims brought herein based on the same evidence submitted herewith.[42]

Respectfully submitted,

| | |
|---|---|
| */s/Tarak Anada* | */s/William Most* |
| TARAK ANADA (La. Bar No. 31598) | WILLIAM MOST (La. Bar No. 36914) |
| JONES WALKER LLP | DAVID LANSER (La Bar No. 37764) |
| 201 St. Charles Avenue, Ste. 4900 | MOST & ASSOCIATES |
| New Orleans, LA 70170 | 201 Saint Charles Ave., Ste. 114 #101 |
| Telephone: (504) 582-8322 | New Orleans, LA 70170 |
| Facsimile: (504) 589-8322 | Tel: (504) 509-5023 |
| Email: tanada@joneswalker.com | Email: williammost@gmail.com |

***Counsel for Plaintiffs Derek Brown and Julia Barecki-Brown***

---

[42] *See* necessary legal elements for Plaintiffs' state law claims against all Defendants (Conversion, Negligence, Negligent Infliction of Emotional Distress, Vicarious Liability, and Indemnity, detailed in R. Doc. 60, pp. 10-11, 13-14, 18, which Plaintiffs fully incorporate herein). The elements of these causes of action are fulfilled based on the uncontested evidence submitted herewith.

#101094921v1