John Roussel                                    March 07, 2023

1

2                    UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT FOR THE STATE OF LOUISIANA

4

5        * * * * * * * * * * * * * * * * * * * * * * * * * *

6

7                           DEREK BROWN and

8                        JULIA BARECKI-BROWN

9                              VERSUS

10          DERRICK BURMASTER, SHAUN FERGUSON, and the

11                       CITY OF NEW ORLEANS

12

13       * * * * * * * * * * * * * * * * * * * * * * * * * *

14       CIVIL ACTION NO. 22-00847            DIVISION: 4

15         SECTION: L

16

17              The deposition of JOHN ROUSSEL taken on

18          Tuesday, March 7, 2023, starting at 2:00 p.m. at

19         New Orleans City Hall, 1300 Perdido Street, Room 5E03,

20               New Orleans, Louisiana 70112.

21

22    CARRIE A. HARTILL

23    CERTIFIED COURT REPORTER

24    STATE OF LOUISIANA

25



```
 1   APPEARANCES:

 2   FOR THE CITY OF NEW ORLEANS AND CITY DEFENDANTS:

 3    JAMES M. ROQUEMORE, ESQ

 4    CITY OF NEW ORLEANS

 5    NEW ORLEANS, LOUISIANA

 6    EMAIL: james.roquemore@nola.gov

 7

 8   FOR THE DEFENDANT, DERRICK BURMASTER:

 9    C. THEODORE ALPAUGH, III, ESQ.

10    FRATERNAL ORDER OF POLICE LEGAL COUNSEL

11    639 LOYOLA AVENUE, SUITE 2130

12    NEW ORLEANS, LOUISIANA 70113

13    PHONE: (504) 529-4141

14    EMAIL: cta@gustebarnett.com

15

16   FOR THE PLAINTIFF DEREK BROWN AND JULIA BARECKI-BROWN:

17    TARAK ANADA, ESQ.

18    JONES WALKER LLP

19    201 ST. CHARLES AVENUE, SUITE 4900

20    NEW ORLEANS, LA 70170

21    PHONE: (504) 582-8322

22    EMAIL: tanada@joneswalker.com

23

24

25
```



1    ALSO FOR THE PLAINTIFFS:

2    WILLIAM BROCK MOST, ESQ.

3    MOST & ASSOCIATES

4    201 SAINT CHARLES AVENUE, SUITE 114

5    NEW ORLEANS, LA 70170

6    PHONE: (504) 509-5023

7    EMAIL: williammost@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2                              INDEX

3                                               PAGE

4   DIRECT EXAMINATION:

5   BY MR. ANADA . . . . . . . . . . . . . . . . .    7

6   CROSS-EXAMINATION:

7   BY MR. ALPAUGH   . . . . . . . . . . . . . . .    76

8   BY MR. ROQUEMORE . . . . . . . . . . . . . .     89

9   FOLLOW-UP:

10  BY MR. ANADA . . . . . . . . . . . . . . . . .   95

11  BY MR. ALPAUGH . . . . . . . . . . . . . . .    109

12                           EXHIBITS

13                         DESCRIPTION          PAGE

14  EXHIBIT NO. 18      VIDEO BURMASTER BWC . . . . . .   6

15  EXHIBIT NO. 43      VIDEO ROUSSEL BWC  . . . . . . .  6

16  EXHIBIT NO. 44      VIDEO ROUSSEL STMT . . . . . . .  6

17     (withheld by counsel)

18  EXHIBIT NO.  9      PHOTO OF APOLLO  . . . . . . . .  8

19  EXHIBIT NO. 22   NOPD OPERATIONS MANUAL CH 1.7.1 . . 31

20  EXHIBIT NO. 23   NOPD OPERATIONS MANUAL CH 1.3 . . . 37

21  EXHIBIT NO. 37   NOPD PIB REPORT BY SGT. PRUITT . . . 42

22  EXHIBIT NO. 26   USE OF FORCE BOARD MINUTES . . . . . 54

23  EXHIBIT NO. 20   NOPD ASI . . . . . . . . . . . . . . 59

24

25



1

2                  S T I P U L A T I O N

3          It is stipulated and agreed by and

4        between counsel that the deposition of

5                    JOHN ROUSSEL,

6      is hereby being taken pursuant to the Rules

7      of Court, including applicable articles of

8      the Louisiana Code of Civil Procedure.

9          The formalities of sealing and

10      certification are hereby waived.  The

11      witness waives the right to read and sign

12      the deposition.  The party responsible for

13      the service of the discovery material shall

14      retain the original.

15          All objections are to be made in

16      accordance with the Rules of Court, including

17      applicable articles of the Louisiana Code of

18      Civil Procedure.

19                        * * *

20          Carrie A. Hartill, Certified Court

21      Reporter in and for the State of Louisiana,

22      officiated in administering the oath to the

23      witness.

24

25   Officer John Roussel,



```
 1   1300 Perdido Street,
 2   New Orleans, Louisiana 70112,
 3   after being duly sworn to tell
 4   the truth, the whole truth,
 5   and nothing but the truth,
 6   testified as follows:
 7           MR. ANADA:
 8               Just for the record, I'm just going to
 9           pre-mark some exhibits.  I'm going to mark
10           what I'll refer to as Burmaster Body Worn
11           Camera Video as Exhibit 18 to this
12           deposition.
13               I'm going to mark what I will
14           refer to as the Roussel Body Worn Camera as
15           Exhibit 43 to this deposition.  And I'm going
16           to mark the video that I'm going to refer to
17           as the Roussel 1340 Poydras Interview as
18           Exhibit 44 to this deposition.
19               Good afternoon, Officer Roussel.
20           THE WITNESS:
21               Hello, how are you?
22           MR. ANADA:
23               I'm doing well, thank you.  I appreciate
24           your time today.  My name is Tarak Anada.  I
25           represent the Brown family who I think you
```



```
 1          had some interaction with in 2021, you're
 2          familiar with the Browns?
 3          THE WITNESS:
 4              Yes.
 5          MR. ANADA:
 6              You're familiar that they -- you
 7          understand that they filed a civil rights
 8          lawsuit that deals with the shooting of their
 9          dog?
10          THE WITNESS:
11              Yes.
12          MR. ANADA:
13              You understand you have not been sued in that
14          lawsuit?
15          THE WITNESS:
16              Yes.
17          MR. ANADA:
18              Do you understand that Officer Burmaster has been
19          sued in that lawsuit?
20          THE WITNESS:
21              Yes.
22  EXAMINATION BY MR. ANADA:
23  Q.  I'm going to hand you an image and ask you
24  some questions about it.  Does this image frighten
25  you?
```



1   A.  No.

2   Q.  I'm going to mark a photograph of the puppy

3   Apollo as Exhibit 9.  How would you describe what

4   you're looking at on Exhibit 9?

5   A.  Looks like a puppy.

6   Q.  Do you find the image on Exhibit 9

7   threatening in any way?

8   A.  No.

9   Q.  Would you feel threatened if the puppy

10  depicted on Exhibit 9 was running towards you, in your

11  direction?

12  A.  No.

13  Q.  Would the puppy depicted on Exhibit 9, if it

14  was running in your direction, would you be afraid of

15  receiving great bodily harm?

16  A.  No.

17  Q.  If the puppy depicted on Exhibit 9 was

18  running towards you would you be fearful that you

19  could die?

20  A.  No.

21  Q.  Did you see the body of the dog that Officer

22  Burmaster shot at my client's residence?

23  A.  Yes.

24  Q.  Okay.  Did it look consistent with what is

25  depicted on Exhibit 9?



1  A.  Yes.

2  Q.  If I were to represent to you that this is in

3  fact Apollo, the puppy that Officer Burmaster shot,

4  would you have any reason to disagree with that?

5  A.  No.

6  Q.  Okay.  Do you in fact recognize this dog as

7  the dog Burmaster shot?

8  A.  Yes.

9  Q.  Okay.  It doesn't look any, any difference

10  significantly in terms of the size of the dog?

11  A.  No.

12  Q.  If we were to present this photograph to the

13  jury, do you believe it would be a fair and accurate

14  representation of the dog that Burmaster shot in my

15  client's residence?

16  A.  Yes.

17  Q.  Thank you.  If this dog depicted on Exhibit

18  9, the puppy, was running towards you, would you be

19  fearful that your penis would be bitten?

20  A.  No.

21  Q.  If the dog depicted on Exhibit 9 was running

22  towards you, would you consider shooting it with your

23  firearm?

24  A.  No.

25  Q.  Would you consider shooting the dog depicted



1   on Exhibit 9, with a firearm if it was running

2   towards you?  Would you personally consider that

3   unreasonable?

4           MR. ALPAUGH:

5               Object to the form.

6           MR. ANADA:

7               That's fine.  They're gonna object from

8           time to time and then unless they tell you --

9           unless he tells you not to answer, then you

10          can just get an answer after they're done

11          making their objection.

12  BY MR. ANADA:

13  A.  What was question?

14  Q.  If a police officer were to have shot the

15  dog, the puppy depicted on Exhibit 9 if it was

16  running in their direction -- if an officer would

17  have used lethal force by shooting the dog with their

18  firearm, would you personally consider that

19  unreasonable?

20          MR. ROQUEMORE:

21              Objection, objection to form.

22          MR. ALPAUGH:

23              Objection to form.

24          THE WITNESS:

25              Yes.



1   BY MR. ANADA

2   Q.  Okay.  Would you consider shooting the puppy

3   depicted on Exhibit 9, if it was running towards you

4   to be inconsistent with the training you've received

5   in -- by NOPD?

6           MR. ALPAUGH:

7               Object to the form.

8           THE WITNESS:

9               No.

10  BY MR. ANADA:

11  Q.  All right, let's start with some

12  background.  How long have you been with NOPD?

13  A.  Almost eight years.

14  Q.  Okay.  Am I right to refer to you as Officer

15  Roussel, or do you have a rank that I should say?

16  A.  Officer Roussel's fine.

17  Q.  Okay, all right, thanks.  Well, what

18  rank did you start at when you joined  the NOPD?  And how

19  did that evolve to your current rank or position?

20  A.  I started off as a police officer, now I'm a

21  senior police officer.

22  Q.  Okay.  All right.  Can you tell me a little

23  bit about the training that you've received?  If you

24  could just, I don't need a detailed answer, but if

25  you could just take me through kind of a high level,



1   the training you've received as a police officer or

2   in the process of becoming one.

3   A.   In the academy?

4   Q.   Whatever the first instance of training was,

5   I'd like you to start there, so if that's the

6   academy.

7   A.   It was six months long.  Each, week we'd

8   tackle a different portion like law, or policies and

9   procedures, and things like that.

10  Q.   Okay.  And that was the first instance of

11  police training you've received?

12  A.   Correct.

13  Q.   Okay.  After the academy.  What was the next

14  training that you received?

15  A.   FTO, which is field training.  So you're

16  partnered up to a FTO for four months, take you on

17  calls with them, and it kind of teaches you how to

18  operate in the field.

19  Q.   Okay.  All right.  What else?

20  A.   Then once a month, we have a daily training

21  bulletin, we have roll call training, and once a

22  year, we shoot, drive and I go to in-service.  Which

23  is a one week long refresher.

24  Q.   Got it.  Got it.  What type of training do have

25  in encountering animals in the line of duty?



```
 1   A.  A little bit.  They got a daily training
 2   bulletin about it.  They also train in the academy.
 3   Q.  Okay.  Can you tell me about both, one at a
 4   time?  Let's let's start with the training you
 5   received as it relates to dealing with animals in the
 6   line of duty that you received in the academy.
 7   A.  So we try to avoid them.  Make sure that no
 8   animal is in a certain area before you approach.
 9   If they have an animal, tell the owner to pick it up.
10   And it all depends on if you've seen -- it's really
11   kind of a case by case basis, really.
12   Q.  Okay.  Was there any training in the academy
13   that guides you -- guided you on when the use of
14   lethal force is appropriate on an animal versus when
15   a lesser means of non-lethal force should be tried?
16   A.  It all depends on the perception of the
17   officer, if he feels like he's going to receive great
18   bodily harm during an encounter.
19   Q.  Okay.  All right.  Tell me about the next
20   animal training you received?  Well, is there
21   anything more that you have to tell me about what you
22   received in the academy as it relates to animals?
23   A.  That's basically the same, so.
24   Q.  Same as humans, right?
25   A.  Right.  Well --
```



1    Q.  You can shoot an animal, if you can shoot a

2    human; that's what you've been trained, right?

3    A.  No.

4    Q.  Okay, well help me understand.

5    A.  So it's different because an animal by law is

6    considered property.

7    Q.  Right.

8    A.  A human's a human.  So there's difference,

9    like a person you can to talk to and deescalate the

10   situation, an animal it's not the same.

11   Q.  Okay.

12   A.  It depends on a case by case basis if an

13   animal is being aggressive or you know different

14   scenarios.  You have to dissect each

15   situation.

16   Q.  Have you ever been trained on methods of non-

17   lethal force that should be considered on an animal

18   before lethal force?

19   A.  Yes.

20   Q.  Okay.  Tell me about that.  Was that in the

21   academy, or where was that?

22   A.  In the academy.

23   Q.  Tell me about that part of your training.

24   A.  You have to use a taser or a baton.

25   Q.  Okay.  Would you consider both of those a



1  useful tool in mitigating the threat posed by an

2  animal that you may encounter in the line of duty?

3  A.  Yes.

4  Q.  Okay.  I'm a layperson, so forgive me if my

5  questions may seem a little bit silly.  What kind of

6  boots do you wear when you're in the line of duty?

7  A.  About medium, black boots that come up past my

8  ankle.

9  Q.  Steal toe?

10 A.  No.

11 Q.  Kevlar?

12 A.  Like, leather.

13 Q.  Okay.  They're the type of boots that

14 would not be penetrated by the dog.  The teeth of the

15 dog depicted in Exhibit 9, right?

16 A.  I don't think so.

17 Q.  You would be very surprised if this dog's teeth

18 could penetrate your service boots, right?

19 A.  Yes.

20 Q.  What about -- What about just if a dog's

21 running up to you, what about just like, kicking it;

22 is that a reasonable way to deal with the situation?

23 A.  It depends on the size of the dog.

24 Q.  Okay, so I'm talking about this dog.

25 A.  This dog.  Yeah.



1   Q.  You would think kicking this dog, if you perceived

2   it to be a threat, would be one way to mitigate the

3   threat, right?

4   A.  Yes.

5   Q.  You know, what kind of shoes Burmaster was

6   wearing at the time of the incident?

7   A.  I'm not sure.

8   Q.  Does NOPD govern what kind of footwear

9   officers wear, or is it up to them?

10  A.  It just has to be black, leather and past

11  your ankle.  It can't be steel toe.

12  Q.  Okay.  So it can't be like Converse Chucks?

13  Can't be steal toe?

14  A.  Right.

15  Q.  Can't be Converse Chucks, right?

16  A.  Right.

17  Q.  Okay.  It's got to be black leather.

18  A.  Black, has to have a leather toe, but it can

19  be suede on the side or -- it has to be a leather toe.

20  Q.  Okay.  All right.  So, it's got to be boots

21  similar to what you just described your boots to be?

22  A.  Correct.

23  Q.  Okay.  All right.  So assuming Burmaster was in

24  compliance with the footwear policy, he would have

25  been wearing boots similar to what you are wearing?



1    A.  Yes.

2    Q.  All right.  You said the baton, tell me about

3    how a baton could be a useful tool in mitigating any

4    threat posed by an animal such as the type depicted

5    in Exhibit 9.

6    A.  You just create distance or hit the animal to

7    make it run away.

8    Q.  What's -- so what's the policy on carrying

9    the baton?  Does -- Is it like, up to your discretion,

10   you can carry baton if you don't have other

11   sufficient tools?  Or do you have to even if you have

12   all kinds of other sufficient tools?

13   A.  You have to carry a baton while on duty.

14   Q.  Okay.  Burmaster was not carrying the baton

15   on the night that he shot the puppy depicted Exhibit

16   9, correct?

17   A.  I'm not sure.

18   Q.  Okay.  Fair.  If he was not carrying the baton on

19   the night in question -- and just for the record, that's

20   April 10, 2021.  If he was not carrying a baton he

21   would have been in direct violation of NOPD policy,

22   correct?

23          MR. ROQUEMORE:

24             Objection to form.

25          MR. ALPAUGH:



```
 1              Same objection.
 2          MR. ANADA:
 3              Can I hear the basis, please. I just want
 4          to.
 5          MR. ROQUEMORE:
 6              He's not an expert on what's a violation of
 7          the policy, the policy speaks for itself.
 8   EXAMINATION BY MR. ANADA:
 9   Q.  Okay.  You're familiar with NOPD's
10   policies, right?
11   A.  Yes.
12   Q.  Okay.  Based on you're familiar -- You've
13   read them, right?
14   A.  Yes.
15   Q.  Okay.  Based on your reading of them, you're
16   familiar with them.  Am I right that Burmaster would
17   have been in violation of the uniform policy if he
18   wasn't wearing a baton on April 10, 2021?
19   A.  Yes.
20   Q.  Okay.  Tell me about body armor, do police
21   officers wear body armor when they're patrolling the
22   streets?
23   A.  Yes.
24   Q.  Okay.  Can you tell me what that entails?
25   A.  You can have an outer vest, an inner vest.
```



1   The inner vest on and you wear it when you're on

2   duty.

3   Q.   What's the point of doing that?

4   A.   Protect you from gunfire.

5   Q.   Okay.  It's just on your chest?

6   A.   You've got a portion or your chest and on

7   your back.

8   Q.   Okay.  Nothing lower body?

9   A.   It stops like, right at your bellybutton.

10  Q.   Okay.  That kind of body armor would, you as

11  someone who's familiar with it and wears it, would

12  you think that that type of body armor would protect

13  the area of your body that was covered by the armor

14  from being bit by the dog depicted in Exhibit 9?

15  A.   Yes.

16  Q.   Okay.  Are you aware of whether or not

17  Officer Burmaster was wearing body armor on April 10,

18  2021?

19  A.   I'm not sure.

20  Q.   Okay.  Have you read the uniform policy that

21  mandates that officers wear body armor?

22  A.   Yes.

23  Q.   Okay.  Based on your reading of that policy

24  and your understanding of that policy, would you

25  agree that if Burmaster was not wearing body armor on



John Roussel                                          March 07, 2023
                                                           Page 20

 1  April 10, 2021, when he shot my clients puppy, he

 2  would have been in direct violation of NOPD'S uniform

 3  policy?

 4  A.  Yes.

 5  Q.  Okay.  Is there anything else required by the

 6  uniform policy?

 7  A.  As in?

 8  Q.  So we require a baton, require body armor; is there

 9  anything else that you can think of?

10  A.  Flashlight, radio, TASER, gun.

11  Q.  Do you know if Burmaster was carrying a

12  flashlight on April 10?

13  A.  I'm not sure.

14  Q.  Who's gonna bring it up?  Because couldn't a

15  flashlight be another, yet another potential non-

16  lethal way to mitigate any type of threat that could

17  be posed by the dog depicted in Exhibit 9?

18  A.  It depends on how the dog reacts.

19  Q.  Well, you could -- you agree with me that you

20  could kick the dog to mitigate threat.

21  A.  Right.

22  Q.  Couldn't you just smack it with your

23  flashlight?

24  A.  Some officers have tiny flashlight so it

25  depends on --



```
 1   Q.  I see.  I see. Okay, okay.  So the uniform
 2   policy doesn't mandate -- When I think of a cop's
 3   flashlight, I think of a big old, yeah.  Do people
 4   still use those?  Is that?
 5   A.  Rarely.
 6   Q.  Okay.  All right.  But a baton definitely
 7   would be a useful tool to -- a useful non-lethal tool
 8   to mitigate the threat of a small dog running towards
 9   you, right?
10   A.  Yes.
11   Q.  Okay.  Have you ever had a dog run towards
12   you in the line of duty besides on April 10?
13   A.  Yes.
14   Q.  How many times?
15   A.  Once.
16   Q.  Okay.  Tell me about it.
17   A.  I went into a courtyard kind of like
18   enclosed, like, kind of like in the building, a dog
19   maybe 20 pounds, 25 pounds ran towards me barking --
20   Q.  You said 25 pounds?
21   A.  Yes.  Yeah, and he bit me on the shin, and I
22   kicked him.  And the owner came out and got him
23   and brought him inside.
24   Q.  Okay.  Did you consider that bite serious
25   bodily harm?
```



```
1    A.  No.

2    Q.  What did you just go to the clinic?  Clinic

3    to get a -- did you even get any treatment for it?

4    A.  No, it was like an abrasion on my leg.

5    Q.  It didn't even puncture your skin?

6    A.  Slightly but not.

7    Q.  Okay.  What did you put some antiseptic on it

8    and call it a day?

9    A.  Yes.

10   Q.  Okay.  And what happened after you kicked it?

11   A.  The owner came out and got it.

12   He heard his dog barking.

13   Q.  When you kicked it, did the dog stop biting

14   you?

15   A.  Yes.

16   Q.  Did you consider shooting the dog with your

17   firearm?

18   A.  No.

19   Q.  Okay.  And am I correct, that the reason you

20   didn't is because you had numerous non-lethal ways to

21   handle the situation.

22   A.  Yes.

23   Q.  Okay.  All right.  Is that on body camera?

24   A.  That might have been like 2017.  It is, but I'm

25   not sure what the item number would be.
```



```
 1  Q.  I'm going to ask your lawyers to see if they
 2  can find it and produce it in this case.  I'm trying
 3  to decide how I should request it --
 4          MR. ROQUEMORE:
 5              Do a formal request, find out as much as
 6          you can, so that we can identify it.  And
 7          then we can do it. You could probably also
 8          make a public records request.
 9          MR. ANADA:
10              Yeah, but the trials coming up so fast.
11          Let me let me think about it.  I'll go
12          through the proper proper channels for sure.
13          Officer Roussel's 2017 BWC footage.
14          MR. ROQUEMORE:
15              We're gonna have to have some, a little
16          bit more information, I'd imagine, than just
17          the 2017 incident involving Roussel.
18          MR. ANADA:
19              Yeah, cause you've got tons of footage.
20          What else can you help us lawyers have to try
21          to find that?
22          THE WITNESS:
23              I know it was on Magazine Street.
24          MR. ANADA:
25              Regarding dog bit.  Should I say dog
```



John Roussel                                                March 07, 2023
                                                                 Page 24

 1   bite?  A dog encounter?

 2   THE WITNESS:

 3        A dog encounter if fine.

 4   MR. ROQUEMORE:

 5        Officer Roussel, did you even do an

 6   incident report for that?

 7   THE WITNESS:

 8        I don't believe so.  It was it

 9   was a disturbance.

10   MR. ANADA:

11        Okay, I understand it might be very

12   difficult, if not impossible to find, But we're

13   still going to give it a shot.

14   MR. ROQUEMORE:

15        Do you know about what types of things have

16   the body worn cameras stored?  Does every night of

17   using a body worn cam result in that being stored in

18   perpetuity?  Or is it just certain types of incidents

19   require --

20   THE WITNESS:

21        It is stored with a item number, the

22   challenge would be trying to find that item number to

23   find (indiscernible).

24   MR. ROQUEMORE:

25        The item number is usually linked up



```
 1              to an incident report. But in this case,
 2              there's no incident report, right?
 3         THE WITNESS:
 4              It'd be linked up to an incident report.
 5         So an item number is generated when we go on a call
 6         whether I write a report or not, and our body worn
 7         camera footage is recorded.
 8         MR. ROQUEMORE:
 9              Tarak, I can't guarantee being able to
10         find it based upon that and I'm not going
11         to commit to, you know, go on to Iron Mountain again
12         for another for another escapade of trying to find
13         stuff that's of marginal relevance.
14         Okay?  So if you can give us some more detail or
15         if Officer Roussel can do that --
16         MR. ANADA:
17              I'll agree that you cannot accomplish
18         something that's impossible.
19         MR. ROQUEMORE:
20              I agree to that, too.
21    BY MR. ANADA:
22    Q.  Magazine Uptown or Downtown?
23    A.  That would be Uptown.
24    Q.  Like, deep Uptown?
25    A.  Near around Felicity Street, around that area.
```



1   Q.  Sorry help me with my neighborhoods,

2   that's Garden District?

3   A.  Yes.

4   Q.  Lower?

5   A.  Yes.

6   Q.  Kind of in this area where.

7   A.  This same area, around there somewhere.

8   Q.  In a area in reasonable proximity to the area

9   of the incident in question in this lawsuit, true?

10  A.  Yes.

11  Q.  In fact, you -- the incident in this lawsuit

12  happened at 1420 Felicity Street in the Lower Garden

13  District and you believe that the incident in 2017 that

14  you're referring to occurred on Magazine, potentially,

15  near the intersection of Magazine and Felicity,

16  correct?

17  A.  Yes.

18  Q.  Have you ever watched the body camera footage

19  from that event?

20  A.  No.

21  Q.  Okay.  All right.  Let's go back to your your

22  training.  We've talked about the training you

23  receive in the academy as it relates to canine

24  encounters in line of duty.

25       Is there anything else that you remember about that



1  training that you haven't told me yet?

2  A.  No.

3  Q.  Okay.  And then I believe, you said there was

4  a second instance where you received some training

5  related to canine encounters in line of duty after

6  the academy, is that right?

7  A.  Yes.

8  Q.  Okay.  Tell me about that.

9  A.  So it was in a daily training bulletin.  And

10 what it is, it's 20 questions that you have to answer

11 about policy, and you have to get a 80 percent

12 correct rate in order to pass, or if you don't pass,

13 you have to retake it.

14 Q.  So it's a written, written exam?

15 A.  Yeah, a written exam.  It's a training bulletin.

16 Q.  So you do like ,study for it by reviewing the

17 policies?

18 A.  It comes up with 20 questions and you have

19 the link you can click for notes to study the

20 policy before taking it.  It's up to you if you

21 want to study your policy or not.  But you have to get

22 80 percent in order to pass for that month.

23     Each month you get another one on different topics.

24 Q.  Okay.  Any other training that you can think

25 of relates to dealing with animals in the line of



1  duty?

2  A.  Not that I can recall.

3  Q.  Do you know whether other police officers,

4  that, you know, I'm not going to ask you about police

5  officers before you joined the force, because you

6  probably don't know exactly what training they got.

7      But from at least the time you joined the force and

8  going forward, do you believe that you might have

9  received any different training than other officers

10  as it relates to animal encounters in the line of

11  duty?

12  A.  No.

13  Q.  All right.  What kind of training do you have

14  on tasers?

15  A.  We have the training Academy once a year to

16  during in-service we'll just have recertification

17  in TASER training?

18  Q.  Okay.  How much of this using like hands on,

19  I'm using the TASER and getting evaluated by an

20  instructor?  How much of that?  All of it?

21  A.  It's every year during in-service we have to shoot.

22  Q.  So none of the training you're referring to

23  is like written tests, multiple choice, essay or

24  anything like that, right?

25  A.  No.



1   Q.  It's all just, like --

2   A.  Hands-on training.

3   Q.  Hands on.  Okay.  Okay.  All right.  So, we

4   talked a little bit to some of the Officers we spoke

5   to yesterday about this training.  Is it is it true

6   that you would practice firing a TASER at a target

7   that was similar to like a human male?

8   A.  Yes.

9   Q.  Okay.  What was it?  A cardboard cutout?  Or

10  like a mannequin?  Or what?

11  A.  A cardboard cutout.

12  Q.  Okay.  And you're taught to shoot at center mass?

13  A.  Try to hit either in front, you got from the

14  stomach to the thigh and on the back try to get

15  the upper back to the butt area.  To try to get

16  the biggest muscle groups.

17  Q.  Okay.  I gotcha.  Was it -- was that easy to

18  pick up and get good at?  In your opinion?

19  A.  I got good at it.

20  Q.  Okay.  Is that, Is that so --  So this is

21  during the Academy, what we're talking about right

22  now, right?

23  A.  So in-service, that's when you do it with the

24  Academy, you do that as well, but you also have to be

25  tased.



1   Q.  Right?  How was that experience?

2   A. Terrible.

3   Q.  I can't even imagine.  I hope to never find

4   out.  Have you ever been trained to fire a TASER in a

5   downwards direction at an object, similar to the size

6   of a dog?

7   A.  Not that I recall.

8   Q.  Okay.  No, no training whatsoever on that, right?

9   Are you aware of any an NOPD officer ever

10  receiving training on the use of a TASER against a

11  dog?

12  A.  Not that I'm aware of.

13  Q.  Okay, but you are aware of NOPD policy on

14  how train -- how tasers can be useful to deal with a

15  dog, right?

16  A.  Yes.

17  Q.  Okay.  So am I correct that NOPD has issued a

18  policy stating tasers can be useful in mitigating the

19  threat of a dog, but at the same time NOPD has never

20  provided you or any other officers you know, any

21  training on the use of tasers on a dog.

22          MR. ROQUEMORE:

23              Objection form.

24  EXAMINATION BY MR. ANADA:

25  Q.  Right.  Am I right about that?



John Roussel                                          March 07, 2023
                                                         Page 31

```
 1   A.  Yes.
 2   Q.  Okay.  This is a silly question, but if you
 3   needed to use a TASER on a dog, in the line of duty,
 4   wouldn't you want to have had some training doing that
 5   before like, to make you better at it?
 6   A.  No, I mean, it's the same concept you just got to know
 7   how to line up your prongs.
 8   Q.  Okay.  Do they ever train you what part of
 9   the dog to aim the taser at?
10   A.  No.
11   Q.  Okay, so they never said center mass or
12   anywhere else.
13   A.  No.
14   Q.  Okay, so how would you know what part of the
15   dog to aim at if you had to use a taser against a
16   dog?
17   A.  You wouldn't.
18   Q.  You wouldn't know because there's was no
19   training, right?  On that.
20   A.  Correct.
21   Q.  Okay.  I'm going to mark as Exhibit 22 the NOPD
22   Conducted Energy Weapon Policy.  All right.  I'll
23   give this to the court reporter.
24   I'll tell you which page to turn to you.  All right,
25   could you turn to page 9 of Exhibit 22?  You are
```



1  familiar with the policy on CEW use on a dangerous

2  animal, right.

3  A.   Correct.

4  Q.   Okay, and CEW means TASER?

5  A.   Yes.

6  Q.   Like the TASER you have on your left-hand side,

7  the yellow?

8  A.   Yes.

9  Q.   Okay.  All right.  I'm just making sue we're talking

10  about the same thing.

11  I'm going to read from paragraph 57, "A CEW

12  may be deployed on a dangerous animal that is causing

13  a continuing public nuisance and needs to be

14  controlled for reasons of public peace and safety."

15  Do you disagree with that statement?

16  A.   No.

17  Q.   I'm going to read from 58, "A CEW may also be

18  deployed if the animal poses an active threat to

19  Officers in their efforts to perform their duty."  Do

20  you agree with that statement?

21  A.   Yes.

22  Q.   I'm going to read from 62.  "A CEW has proven

23  to be an effective tool against dangerous animals and

24  may reduce the need for greater, more injurious force

25  against such animals.



1      The use of a CEW on an animal is a safer,

2  and more humane and less traumatic conclusion to the

3  incident."  Do you agree with the two sentences I

4  just read from paragraph 62?

5  A.  Yes.

6  Q.  Have you ever discussed this shooting with

7  with Officer Burmaster after the shooting?

8  A.  No.

9  Q.  Have you been on calls with him since that?

10 A.  Yes.

11 Q.  Okay.  Have you ever been on a call with him

12 where an animal was encountered after April 10, '21?

13 A.  No.

14 Q.  On April 10, 2021, do you feel that the use

15 of a TASER could have been a safer, more humane, and

16 less traumatic use of force to mitigate any perceived

17 threat of Apollo?

18      MR. ALPAUGH:

19          Object to the form of the question.

20      THE WITNESS:

21          Yes.

22 EXAMINATION BY MR. ANADA:

23 Q.  Okay.  And am I correct that Officer Burmaster

24 did not attempt to use his taser on Apollo at

25 anytime?



1    A.  No.

2    Q.  Am I correct that Officer Burmaster did not

3    attempt to kick Apollo at anytime?

4    A.  I'm not sure.

5    Q.  You've never seen anything to indicate that

6    he has, right?

7    A.  No.

8    Q.  That he had tried to kick Apollo?  Okay.

9    You've watched the body cam footage from this

10   incident.

11   A.  I watched mine.

12   Q.  Okay.  And obviously Burmaster never

13   attempted to use his baton to mitigate the threat he

14   felt that Apollo posed because he didn't have a

15   baton, right.

16   A.  I'm not sure.

17   Q.  Okay.  But, okay.  You're not aware of any

18   evidence to suggest he did try to use a baton before

19   resorting to lethal force on Apollo, right.

20   A.  No.

21   Q.  Okay.  On Page 9 you see the subsection "CEW

22   Use on a Dangerous Animal"?

23   A.  Yes

24   Q.  You're not aware of any field training that

25   NOPD provides -- that it provides to its Officers that



1    relates to this subsection CEW Use On a Dangerous

2    animal, correct?

3    A.   No-hands on training, no.

4    Q.   What about other types of training?

5    A.   It's possible they've done a bulletin, but I

6    don't remember.

7    Q. Okay.  You're not aware of any bulletin, right?

8    A.   No.

9    Q.   Okay.  All right.

10            MR. ANADA:

11               I'm going to mark NOPD Policy titled

12          Use of Force as Exhibit 23.

13            MR. ALPAUGH:

14               It's already been marked.

15            MR. ANADA:

16               It probably has.  But if it has, it's at

17          least being remarked with the same number.

18            MR. ALPAUGH:

19               Same number?

20    EXAMINATION BY MR. ANADA:

21    Q.   Okay.  Officer Roussel, can you turn to the

22    last page. Page 11 of Exhibit 23.  I'm going to

23    direct you to the subsection entitled: Dangerous

24    Animals, paragraph 32; you're familiar with this

25    policy, right?



1   A.  Yes.

2   Q.  Okay.  I'm going to read from paragraph 32.

3   "Officers are authorized to use firearms to stop an

4   animal in circumstances which the animal reasonably

5   appears to pose an imminent threat to human safety.

6   And alternative methods are not reasonably available,

7   or likely be ineffective."

8   You've read that before when you've studied these

9   policies, right?

10  A.  Yes.

11  Q.  Okay.  All right.  I'm gonna ask you a lot of

12  questions.  And keep in mind, I'm not asking you to put

13  yourself in Officer Burmaster's head.  I understand his

14  perception is different than your perception.  We're

15  all -- we all have different perceptions, so so don't

16  mistake my question for for that.

17      I'm going to ask you these questions based on the

18  fact that you were you were there, you were

19  physically present at the scene.  I know that at some

20  point, your back had turned and you didn't see

21  everything Burmaster saw, but but you were at least --

22  you were at least able to observe Burmaster up until

23  the sound of the dog barking, right?

24  A.  Yes.

25  Q.  Okay.  All right.  And he ultimately did use



1   a firearm to to mitigate the threat he felt Apollo

2   posed to him, right?

3   A.  Yes.

4   Q.  Okay.  Based on your training as a police

5   officer, your experience as a police officer, and

6   your physically being present at the scene, do you

7   have any reason to believe an alternative method of

8   Burmaster kicking Apollo would not have been

9   effective.

10          MR. ALPAUGH:

11              Object to the form of the question?

12          MR. ROQUEMORE:

13              Same objection.

14          THE WITNESS:

15              Yes.

16  EXAMINATION BY MR. ANADA:

17  Q.  Tell me about that.

18  A.  We have a variable, we have a second large dog

19  in the same vicinity.

20  Q.  Okay.  I'm just talking about Apollo.

21  A.  Just Apollo?

22  Q.  Yeah, the large dog didn't -- he went after

23  you, right?

24  A.  Right.

25  Q.  Apollo the only dog that went after Burmaster,



1  in his direction was Apollo, right?

2  A.  Correct.

3  Q.  Okay.  All right.  Do you have any reason to

4  believe that that kicking Apollo would have been a

5  reasonably available alternative method to mitigate

6  the threat Burmaster felt by Apollo?

7          MR. ALPAUGH:

8              Object the form of the question.

9          MR. ROQUEMORE:

10             Same objection.

11         THE WITNESS:

12             Yes.

13 EXAMINATION BY MR. ANADA:

14 Q.  Okay.  Tell me about it.

15 A.  So, it would have been a reasonable way to

16 stop the dog?  Yes.  Because the size of the dog could

17 have deterred him from attempting to bite Burmaster.

18 Q.  The size of Apollo?

19 A.  Yes.

20 Q.  Okay.  I'm sorry.  I just think I'm not sure

21 we're understanding each other.

22 Are you saying it would have been reasonable for him

23 to kick Apollo?  Or are you saying it would not have

24 been?

25         MR. ALPAUGH:



1              Same objection.

2         THE WITNESS:

3              It would have been

4    EXAMINATION BY MR. ANADA:

5    Q.   It would have been.

6    A.   Yeah.

7    Q.   Okay.  You believe based on your training,

8    your experience as a police officer, and your

9    having been physically present at the scene that an

10   alternative method to using a firearm on Apollo could

11   have been kicking him and you have no reason to

12   believe that that would have been ineffective?

13        MR. ALPAUGH:

14             Same objection.

15        THE WITNESS:

16             Yes.

17   BY MR. ANADA:

18   Q. Okay.

19   Same question with a baton.

20        MR. ALPAUGH:

21             Same objection.

22        THE WITNESS:

23             Yes.

24   EXAMINATION BY MR. ANADA:

25   Q.   Okay.  Same question with a CEW taser.



```
 1              MR. ALPAUGH:
 2                   Same objection.
 3              THE WITNESS:
 4                   Yes.
 5   EXAMINATION BY MR. ANADA:
 6   Q.   Okay.  And your -- you answered all those
 7   questions based on your specialized training as a
 8   police officer, right?
 9   A.   Yes.
10   Q.   Okay.  You're not a layperson when it comes
11   to these things, right?
12   A.   What?
13   Q.   You're not a layperson, like me, when it
14   comes to these kinds of issues, right?
15   A.    Right.
16   Q.   Based on what you've just told me, is it your
17   belief that Burmaster complied with the directives of
18   paragraph 32?  On Exhibit 23?
19              MR. ALPAUGH:
20                   Object to form.
21              THE WITNESS:
22                   Yes.
23   EXAMINATION BY MR. ANADA:
24   Q.   You believe he did comply with it?
25   A.   Yes.
```



```
 1   Q.  I thought you just told me he had other
 2   reasonable available means to deal with the dog.  I'm
 3   just confused.
 4   A.  Apollo, solo, yes.  There's also the variable
 5   of the other dog being in the vicinity.
 6   Q.  I understand that, we're gonna get to the
 7   other dog, but do you feel that he complied with the
 8   policy as it respects to exhausting other reasonably
 9   available means before shooting Apollo?
10          MR. ALPAUGH:
11              Objection to form.
12          MR. ROQUEMORE:
13              Objection, asked and answered.
14          THE WITNESS:
15              No.
16   EXAMINATION BY MR. ANADA:
17   A.  No.
18   Q.  Okay.  In your opinion he did not follow
19   policy for Apollo?
20   A.  No.
21   Q.  You're agreeing with me that he did
22   not?  You said "no", all right.  Okay.  I get it.
23   I didn't want to belabor that I just want to make
24   sure, I'm thinking of how this is going to read later
25   and I'm making sure no one's going to be confused by
```



```
 1    it.  Sorry to belabor you and sorry to repeat the
 2    question.
 3         I'm going to mark as Exhibit 37.  I'll call this
 4    What should I call this?  Sergeant Pruitt's Report?  It's
 5    the one that you guys gave us.
 6              MR. ROQUEMORE:
 7                   It's a criminal investigation from the
 8              PIB.
 9              MR. ANADA:
10                   Okay, yeah.
11              MR. ROQUEMORE:
12                   Criminal PIB Investigation.
13              MR. ANADA:
14                   Yeah, so we're gonna mark this as Exhibit
15              37, Criminal PIB Investigation regarding
16              Derrick Burmaster.  Copy for you.  Copy for
17              you.
18    EXAMINATION BY MR. ANADA:
19    Q.  All right.  I assume you've never seen this
20    document before, Officer Roussel,
21    A.  No.
22    Q.  I'm not going to ask you to read this whole
23    thing, are you aware that a Criminal Investigation
24    occurred about Burmaster's conduct.
25    A.  Yes.
```



John Roussel                                                            March 07, 2023
                                                                          Page 43

```
 1            MR. ROQUEMORE:
 2                Objection form.
 3   BY MR. ANADA:
 4   Q.  On April 10?  All right.  If you can turn to page
 5   thee of this document.
 6            MR. ROQUEMORE:
 7                Tarak, if he wants to look at the
 8            document as a whole --
 9            MR. ANADA:
10                Yeah.
11            MR. ROQUEMORE:
12                I mean, I don't know if he wants to or
13            not --
14            MR. ANADA:
15                Yeah, absolutely.
16   BY MR. ANADA:
17   Q.  No, you certainly have the right if you want
18   to to read this document before I ask YOU any
19   questions.  What I would suggest is that --
20            MR. ROQUEMORE:
21                We can go off the record.  Give him
22            a moment.
23   EXAMINATION BY MR. ANADA:
24   Q.  Officer Roussel, you've had an opportunity during the
25   break to familiarize yourself with Exhibit 37?
```



1   A.   Yes.

2   Q.   You understand this to be a report prepared

3   by the New Orleans Police Department Public Integrity

4   Bureau relating to the incident at issue in this

5   lawsuit?

6   A.   Yes.

7   Q.   I'm going to ask you go to page 3, and I'm

8   just going to read from the second paragraph, third

9   sentence,  "The fence had two secured openings, one

10  being the pedestrian entryway, and the other being a

11  vehicle entryway."  You both entered through the

12  pedestrian entryway, right?

13  A.   Correct.

14  Q.   Do you have any knowledge as to whether

15  Officer Burmaster considered retreating through the

16  vehicle entryway before he shot Apollo?

17  A.   No.

18  Q.   You never observed him trying to use that

19  vehicle entryway to escape, right?

20  A.   No.

21  Q.   Okay.  All right.  Do you have a pet dog?

22  A.   I do not.

23  Q.   Does Burmaster?

24  A.   Yes.

25  Q.   Just one?



John Roussel                                           March 07, 2023
                                                           Page 45

```
 1    A.   One that I know of.

 2    Q.   Little small dog, right?  Have you seen it?

 3    A.   I've seen pictures of it --

 4    Q.   Yeah.

 5    A.   -- it's small.

 6    Q.   It's kind of like Apollo's size right?

 7    A.   Smaller.

 8    Q.   Smaller.  I'm gonna go to Page 10.  I'm going to read

 9    from the timestamp 7:06, "As Officer Roussel quickly

10    turned to his left and fled, Officer Burmaster

11    remained in the same position.  Before the dogs came

12    down the step, Officer Burmaster already released his

13    firearm from the holster and held it pointing up

14    towards the staircase."  Do you see that?

15    A.   Yes.

16    Q.   Okay.  Does your -- based on what you

17    remember and what you've seen on your body camera

18    video, like have you seen anything that contradicts

19    that?

20    A.   No.

21    Q.   Okay.  Do you believe that to be the truth?

22    A.   Yes.

23    Q.   Okay.  You couldn't see the dogs before they

24    started coming down the steps, right?

25    A.   No.
```



1  Q.  If I interpret the body camera video

2  correctly, you heard like, the big dog make a big, loud

3  dog kind of growl, bark type of sound?

4  A.  Yes.

5  Q.  And then like, after that, they came down the

6  steps, am I right?

7  A.  Yes.

8  Q.  You couldn't see them until they started

9  making their way down the steps.

10  A.  Correct.

11  Q.  Okay.  I'll show you Burmaster's body cam

12  footage, but I know you can't tell me what he saw

13  and what he didn't see, but do you have any reason to

14  believe that his vision of when the dogs first became

15  visible would be different than yours like, did he

16  have any obstructions or anything that you're aware

17  of?

18  A.  No.

19  Q.  Okay.  So am I correct in interpreting this

20  that Burmaster had already chosen to use lethal force

21  despite all of the other reasonable methods, non-lethal

22  methods, that we've we've already discussed before he

23  even saw what the potential threat was?

24        MR. ALPAUGH:

25            Object to the form of the question.



1            MR. ROQUEMORE:

2                 Same objection.

3            THE WITNESS:

4                 Yes.

5    EXAMINATION BY MR. ANADA:

6    Q.  That's the conclusion you would come to

7    from from reading what it says in this report and

8    watching the body camera footage, right?

9    A.  Yes.

10   Q.  How many shots did Burmaster fire?  I've

11   heard three, I've heard four.  It's it's a little

12   unclear from the video.  What do you remember?

13   A.  I don't recall, it's around that number but I

14   don't know the exact number.  I don't remember.

15   Q.  Okay.  We're gonna watch the interview a

16   little bit later.  I think he said -- I thought it

17   was three and then I watched it again it was four.  I

18   can't, I can't figure it out either.  That's why I'm

19   asking.

20        I'm going to turn to Page 24.  I want to go to like,

21   the third to last paragraph, it ends in the words

22   "without firing his weapon."  Do you see that paragraph?

23   I think your finger was just on it.  It ends in "without

24   firing his weapon."

25   A.  Okay.  That's how it begins.



John Roussel                                           March 07, 2023
                                                           Page 48

1   Q.   I'm gonna read this statement from this PIB

2   report, PIB is like internal affairs, right?

3   A.   Correct.

4   Q.   "Officer Roussel stated," and this is in

5   regards to your interview conducted by Detective

6   Pruitt, you remember that interview?

7   A.   Yes.

8   Q.   It was Pruitt and who was the other guy that

9   was there?

10  A.   I don't recall his name.

11  Q.   Okay, we'll get to it, we have the videos in Exhibit.

12  "Officer Roussel stated when he exited the gate.  He

13  held it open for Officer Burmaster to exit quickly

14  because Officer Roussel believed he was close enough

15  to also exit in time."  Is that an accurate depiction

16  of what you said?

17  A.   Yeah

18  Q.   You stand by that today?

19  A.   Yes.

20  Q.   Okay.  She didn't mis-transcribe your

21  testimony then, right?

22  A.   No.

23  Q.   Okay.  I'm going to go down to the next paragraph.

24    "Officer Roussel stated he would not have

25  taken his gun out in that situation."  Is that, correct?



1   Is that what you told the investigators?

2   A.   Yes.

3   Q.   Okay, you stand by that today?

4   A.   Yes.

5   Q.   Feel free to tell me that you want to watch

6   your body -- your PWC before we answer this question,

7   but I'll just ask it, if you -- I can definitely play

8   the PWC to give you some context and refresh your

9   recollection to ask you if you prefer.

10       But, I seem to recall that you retreated when you

11   heard the sound of the dogs; does that seem right?

12   A.   Yes.

13   Q.   And I understand you were positioned closer

14   to the pedestrian gate?

15   A.   Yes.

16   Q.   And I understand that Burmaster was next to

17   you, but technically, a little bit further from the

18   pedestrian gate.

19   A.   Yes.

20   Q.   Okay.  I saw this in your body camera footage

21   and then I heard you say it during your interview.

22   I'm having to play all this stuff.  But when you

23   had decided to retreat, you actually like, reached

24   out and touched Burmaster, right (indicating)?

25   He was that -- he was that close to you.



1    A.  Yes.

2    Q.  Okay.  So like, it seemed to me in the video,

3    correct me if I'm wrong and tell me if you want to

4    wait to answer till we watch it, but it didn't even

5    seem like you were like going like that to touch him

6    (indicating) he was just like, you were right next

7    him going come on let's go.  I assume you

8    touched him to be like let's get out here?  Right?

9        So he was like right next to you, right?

10   A.  Yes.

11   Q.  Okay.  All right.  Do you know of any reason

12   he would have been unable to safely retreat through

13   the pedestrian exit at the time you decided to do

14   that?

15           MR. ALPAUGH:

16               Object to the form.

17           THE WITNESS:

18               Possibly a large dog.

19   EXAMINATION BY MR. ANADA:

20   Q.   But you were able to get out before the larger

21   dog even made it down the stairs, right?

22   A.  Correct.

23   Q.  Okay.  And he was standing right next to you,

24   right?

25   A.  Correct.



1   Q.  I know you said "possibly the larger dog"; what

2   did you mean by that?

3   A.  Because I was unaware how close behind me it

4   was as I was running out the gate.

5   Q.  Okay.  Can you give me any other reasons that based

6   on your review of the body camera footage Burmaster

7   would have been unable to retreat the way that you

8   did?

9           MR. ALPAUGH:

10              Object to the form of the question

11  EXAMINATION BY MR. ANADA:

12  Q.  I'm not asking yourself I'm not asking you to

13  put yourself in his mind, but I'm just saying based on

14  what you've seen based on what you've read.  Can you

15  think of any other reason -- I said, you said maybe the

16  position of the dog might have prevented him; am I

17  correct in interpreting that is one reason?

18  A.  Correct.

19          MR. ALPAUGH:

20              Same objection.

21  BY MR. ANADA:

22  Q. Other than that reason, can you think of any other

23  reasons based on what you've watched and read of as

24  to why Burmaster could not have retreated through the

25  same gate you retreated out of?



```
 1           MR. ALPAUGH:
 2                Same objection.
 3           THE WITNESS:
 4                No.
 5  EXAMINATION BY MR. ANADA:
 6  Q. Okay.  That's why you held the gate open
 7  right?  Because he was right next to you.  You thought
 8  he was close enough to also come out.
 9  A.  Correct.
10  Q.  Okay.  All right.  Sorry.  I'm just looking for
11  one more thing in this.  Okay.
12  Let's just go to the body camera footage.  We're
13  getting pretty close to the end, if you were wondering.
14  I just want to knock out all the other things to make
15  sure and we'll do the body cam last.  I want to
16  make sure there's no other documents I need to
17  ask you about.
18      You were aware of a criminal investigation of
19  Burmaster relating to this incident, right?
20           MR. ROQUEMORE:
21                Object to form.
22           THE WITNESS:
23                Yes.
24  EXAMINATION BY MR. ANADA:
25  Q.  Okay.  Were you also aware that there was an
```



1  administrative investigation.

2  A.  Yes.

3  Q.  Okay.  Did anyone ever advise you what the

4  outcome of that administrative investigation was?

5  A.  No.

6  Q.  Has Burmaster ever discussed with you -- has

7  Burmaster ever discussed either of the two

8  investigations I've just mentioned with you after the

9  incident?

10  A.  No.

11  Q.  Okay.  There were no Pit bulls at the Brown's

12  house on April 10, right?

13  A.  Not that I'm aware of.

14  Q.  Okay.  You know what a Pit bull looks like,

15  right?

16  A.  Yes.

17  Q.  Would it surprise you if any NOPD officer did

18  not know what a Pit bull looked like?  Like, a field

19  officer?  Like, someone who goes out and doesn't have a

20  desk job and goes out and actually patrols the

21  streets.

22       MR. ALPAUGH:

23       Object to form.

24        THE WITNESS:

25            No.



1   BY MR. ANADA:

2   Q.   Okay.  I'm going to mark as Exhibit 26 the

3   documents entitled The Use of Force Board.  Are you

4   familiar with the Use of Force Review Board?

5   A.   Yes.

6   Q.   What is that?

7   A.   The board talks about using forces that you've

8   committed.

9        COURT REPORTER:

10            I'm not sure of what you just said.

11  A.   The board you go in front when you do a Level 4

12  use of force.

13  Q.   What's a Level 4 use of force?

14  A.   That'd be shooting somebody, obstruction of animals,

15  things of that nature that have serious, bodily harm [sic].

16  Q.   What's the purpose of the -- what do they do?

17  What's this board do?

18  A.   They investigate complaints for use of force that

19  are at that level.

20  Q.   And they ultimately come to some kind of

21  conclusion about whether the force was justified or

22  not justified.

23  A.   Yes.

24  Q.   We can turn to page three of Exhibit 26.

25  You see the three officers listed under "Voting"?



John Roussel                                          March 07, 2023
                                                      Page 55

 1  A.  Yes.

 2  Q.  Do you know any of these individuals: Chief

 3  Goodly?  Chief Noel?  Chief Westbrook?

 4  A.  I've heard of them, yes.

 5  Q.  Are they like, higher up in the department

 6  folks?

 7  A.  Yes.

 8  Q.  You see, you see how all three of them

 9  unanimously came to the conclusion that the use of

10  force employed by Burmaster on April 10, 2021, was

11  not justified.  You see that?

12          MR. ALPAUGH:

13              Objection to form of the question.

14          MR. ROQUEMORE:

15              Objection to form.

16          THE WITNESS:

17              Yes.

18  BY MR. ANADA:

19  Q.  Does this document indicate to you that Chief

20  Goodly, Chief Noel, and Chief Westbrook all

21  unanimously voted and came to the conclusion that

22  Burmaster's use of force on Apollo was unjustified.

23          MR. ROQUEMORE:

24              Objection to form.

25          MR. ALPAUGH:



```
 1              Object to the form.
 2         THE WITNESS:
 3              Yes.
 4    BY MR. ANADA:
 5    Q.  And they weren't even there.  They just took
 6    statements and watched the video, but you were
 7    actually there.
 8    A.   Correct.
 9    Q.   Okay.  And then you've also watched some
10    video after the fact, right?
11    A.  Yes.
12    Q.  Your body cam footage.  Okay.  Based on your
13    physically having been present, your personal
14    knowledge of the situation, your training as a police
15    officer, and your understanding of NOPD's policies
16    and procedures, do you disagree with the conclusions
17    of Chief Goodly, Chief Noel and Chief Westbrook?
18         MR. ALPAUGH:
19              Object to the forum.
20         THE WITNESS:
21              No.
22    BY MR. ANADA:
23    Q.  All right.  I can see the light at the
24    end of the tunnel.
25         MR. ANADA:
```



1          Yeah, so do you want to go off the record

2       while we reposition?  Yeah.

3   (Off the record)

4   EXAMINATION BY MR. ANADA:

5   Q.  I'm going to play the video we've marked as

6   Exhibit 18.  This is Officer Burmaster's body worn

7   camera footage from the evening of the incident.

8       MR. ANADA:

9          Okay, sorry, this is not Burmaster's

10      that's Roussel's.

11      Okay, this is the right one.

12  EXAMINATION BY MR. ANADA:

13  Q. (VIDEO BEING PLAYED) I'm going to represent

14  you that the Brown's house was 1420 Felicity Street;

15  is that right?

16  The Brown's house was 1420 Felicity Street, okay?

17  A.  Okay.

18  Q.  I'm gonna represent to you that the house

19  immediately preceding the Brown's house that

20  you and Burmaster passed on your right-hand side when you are

21  approaching the Brown's house was 1422 Felicity;

22  that's for the purposes of the questions I'm gonna

23  ask you next.  You see this white house illuminated

24  white?

25  A.  Yes.



1   Q.   That is not the Brown's house, correct?

2   A.   Correct.

3   Q.   That's the house immediately preceding the

4   Brown's house, correct?

5   A.   Correct.

6   Q.   Okay.  I'll represent to you that this white

7   illuminated house is 1422 Felicity.

8   A.   Okay.

9   Q.   You heard him making those kissing noises?

10  A.   Yes.

11  Q.   He's in front of 1422 Felicity when he

12  made them, right?

13  A.   Correct.

14  Q.   1420 Felicity is like, I mean, I think that's

15  the entrance to the gate?

16  A.   Yes.

17  Q.   Alright, so he made the kissy noises about

18  let's let's get the exact timestamp. (playing) Here's

19  1422 right?  Here, 1:29, 1:30, approximately, is when he

20  made these kissing sounds.

21  A.   Okay.

22  Q.   He was in front of the wrong house when he

23  made them, right?

24  A.   Correct.

25  Q.   Okay. (video played)  Okay, ten seconds later is when you



1  all get to the gate to the Brown's property, right?

2  A.  Correct.

3  Q.  Which is 1420.  So am I correct that based on

4  this video I've just showed you, Burmaster was ten

5  seconds walking distance away from the gate to the

6  Brown's house and was in fact in front of the Brown's

7  neighbor's house located at 1422 Felicity when he

8  made kissing sounds?

9       MR. ROQUEMORE:

10           Object to the form

11      MR. ALPAUGH:

12           Same objection.

13      MR. ANADA:

14           Do you agree with that?

15      THE WITNESS:

16           Yes.

17  EXAMINATION BY MR. ANADA:

18  Q.  I'm going to mark as Exhibit 20, -- All right

19  Exhibit 20 is an Administrative Shooting

20  Investigation Report from the public Integrity Bureau

21  specifically, from Detective Shannon Brewer on the

22  force investigation team; do you know detective

23  Brewer?

24  A.  I do not.

25  Q.  I'm just going to replay that clip again.  Was



1  that -- you heard that kissing noise?

2  A.  Yes.

3  Q.  Was that in your opinion, would you characterize that

4  noise as loud?

5  A.  Kind of medium.

6  Q.  Medium.  To me it sounded like it was about

7  same volume as like, the footsteps you hear on the

8  right before he made the sounds; was that you

9  perception, as well?

10          MR. ROQUEMORE:

11              Objection to form.

12          MR. ALPAUGH:

13              Object to form.

14          THE WITNESS:

15              Yes.

16  EXAMINATION BY MR. ANADA:

17  Q.  You can turn to page 8 of Exhibit 20.  We

18  agree that he made the kissing sounds in front of the

19  neighbor's house 1422 Felicity, right?

20  A.  Correct.

21          MR. ALPAUGH:

22              Object to form.

23  BY MR. ANADA:

24  Q.  And we agree that was about a ten seconds of a

25  walk before he made it to the Brown's gate, correct?



```
 1  A.  Yes.
 2  Q.  All right.  I'm gonna read to you from the
 3  middle paragraph and the same thing applies here, if
 4  you want to read this page, go ahead.  If you want to
 5  read the whole document, go ahead.  Whatever you want
 6  to do, I don't think you need to base on the
 7  questions I'm going to ask you but you have that
 8  right.
 9  I'm going to read from the middle paragraph, last
10  sentence.
11  A.  That's all right.
12  Q.  "Officer Burmaster stated that his noises -- kissing
13  noises were loud and was at the gate when he made
14  them."
15      Assuming that at the gate means: at the Brown's
16  gate; that's not a true statement, is it?
17          MR. ROQUEMORE:
18              Object to the form of the question
19          MR. ALPAUGH:
20              Objection to form.
21          THE WITNESS:
22              No.
23  EXAMINATION BY MR. ANADA:
24  Q.  Can you repeat your answer, she couldn't hear
25  you.
```



1   A.  No.

2   Q.  And he says no further kissing noises were

3   made; do you see that?

4   A.  Yes.

5   Q.  I'm going to go to the third to last

6   paragraph, it's this one.  "Officer Burmaster stated one

7   dog looked to be a Pit bull."  You didn't say any dog's

8   looked to be a Pit bull at the scene, did you?

9   A.  No.

10  Q.  Would you agree that Officer Burmaster's

11  kissing noises were made at such a distance from the

12  Brown's residence that no animal would have possibly

13  heard them?

14          MR. ROQUEMORE:

15              Object to the form.

16          MR. ALPAUGH:

17              Objection form.

18          THE WITNESS:

19              It's possible.

20  EXAMINATION BY MR. ANADA:

21  Q.  Would it have been more reasonable in your

22  opinion as a police officer, based on your training,

23  your job experience, your understanding of the NOPD's

24  policies and procedures, would it have been more

25  prudent to make the kissing noises in front of the



```
 1    Brown's residence rather than in front of their
 2    neighbor's residence?
 3            MR. ALPAUGH:
 4                Object to form.
 5            THE WITNESS:
 6                Yes.
 7    BY MR. ANADA:
 8    Q.  Do you have any understanding why he made the
 9    kissing noises in front of 1422 and not in front of
10    the Brown's residence?
11    A.  No.
12    Q.  (VIDEO PLAYED)  Around this timestamp, am I
13    correct, that this timestamp 1:53 was when the first
14    audible dog sound was heard?
15    A.  Yes.
16    Q.  Okay.  At this time, this was the time that
17    you decided to retreat, right?
18    A.  Yes.
19    Q.  Okay.  And at that time, Officer Burmaster
20    was standing so close to you that you literally just
21    reached out and touched him to try and prompt him to
22    also evade the scene with you?
23    A.  Correct.
24    Q.  Okay.  Let's go to your body camera.
25    We're about to watch, we're going to watch now
```



```
 1    Officer Roussel's body worn camera marked as
 2    Exhibit 43.
 3              MR. ALPAUGH:
 4                  Excuse me, if I may say?
 5              MR. ANADA:
 6                  Sure.
 7              MR. ALPAUGH:
 8                  There are multiple versions of these
 9              exhibits.  So like for instance the one
10              you're using for Burmaster is not the same
11              one that Detective Pruitt used in doing
12              her review.
13              The timestamp are not going to match up
14              because you're not putting in there exactly
15              which one you're using.
16                  The actual name of it is on the NOPD Website
17              -- the NOPD produced documents; that's the problem I
18              have.
19              There are at least two maybe three different
20              clips out there.
21              They all start at different times, and they
22              all have different timestamps on them based when
23              they start on the clip, not on per the video itself.
24                  That's the problem I have with this.
25              MR. ANADA:
```



John Roussel                                      March 07, 2023
                                                  Page 65

```
 1        I also want to avoid any confusion.  I'm
 2   only attaching three clips to this deposition.
 3   So, the timestamps will all match the only three
 4   clips attached to this deposition.
 5   MR. ALPAUGH:
 6        I understand that.
 7   MR. ANADA:
 8        So in my mind that resolves any confusion.
 9   Am I missing something?
10   MR. ALPAUGH:
11        No.  We've already had testimony about other
12   clips, that weren't shown, by the way --
13   of what the timestamps were, from the depositions
14   we took from Sergeant Pruitt and from Chief Goodly.
15   So unless the exact same clips are shown, it's
16   not going to match; that's all I'm saying.
17   MR. ANADA:
18        Yeah.  I understand.  I don't really
19   have any solution to yesterday's issues that
20   I can think of right now.  I'm sure they can
21   be worked out.  I don't think there will be
22   any confusion for today's deposition knowing
23   the timestamps pertaining to which videos.
24        Because there's only going to be these three
25   videos attached.
```



1           But I understand your concern, I think we can
2           figure out a way to avoid confusion there.
3    EXAMINATION BY MR. ANADA:
4    Q.  (VIDEO PLAYED)  Do you see that big tree on the corner
5    of their fence?
6    A.  Yes.
7    Q.  Would you agree that that's approximately
8    where the Brown's property line starts, this tree?
9    A.  Yes.
10   Q.  Okay.  Did you agree he made the kissy
11   sounds before that tree, right?
12   A.  Correct.
13   Q.  That was you touching Burmaster, right?
14   A.  Yes.
15        MR. ALPAUGH:
16            What timestamp?
17        MR. ANADA:
18            Let me play it one more time to to get
19            the exact.  Around, 42 to 43.
20   Q.  It appears to me, from your body camera footage,
21   that you were just right next to him at that time?
22   Would you agree?
23   A.  Yes.
24   Q.  (VIDEO PLAYED)  How many calls have you been
25   on with Burmaster?



1  A.  Quite a few.

2  Q.  More than 100?

3  A.  I'd say more than 100.

4  Q.  How many times have you heard him apologize

5  to a citizen during the course of these approximate

6  100 calls?

7  A.  A couple.

8  Q.  Do you remember why he apologized.  We're

9  gonna talk about why he apologized.  Can you remember

10  any other instances where he apologized?

11  A.  Not particularly, no.  Usually, it's just of his

12  demeanor during a call he apologizes.

13  Q.  Have you observed him to be hot tempered on

14  your calls you've been on him with?

15  A.  On occasion.

16  Q.  Do you remember any instances?

17  A.  One.

18  Q.  Tell me about it, besides this one.

19  A.  Besides this one?

20  Q.  Yeah.

21  A.  It was a hit and run that kind of got

22  escalated, and I just took it over for him and

23  handled it.

24  Q.  So what did he do that made you believe he

25  was hot tempered?



John Roussel                                          March 07, 2023
                                                      Page 68

1   A.   Raised his voice.

2   Q.   All right.  Last but not least, I'm gonna

3   play this is this is video marked as Exhibit 44.

4   It's Officer Roussel's interview with the Public

5   Integrity Bureau.  Interviewed by Sergeant Pruitt.

6   (VIDEO PLAYED)

7   All right.  Do you see the date and time at the top,

8   right-hand corner?

9   A.   Yes.

10  Q.   It says, April 14, 2021?

11  A.   That's correct.

12  Q.   That was four days after the -- three, four

13  days after the incident?

14  A.   Yes.

15  Q.   Incident being April 10, 2021.  (VIDEO PLAYED)

16  Real quick putting this video aside, have you

17  ever observed other NOPD officers working in

18  the line of duty without carrying a baton?

19  A.   On occasion.

20  Q.   Okay.  How many times would you estimate?

21  A.   I don't know.

22  Q.   Would you agree that it's more than 10 times?

23  A.   Yes.

24  Q.   It's not uncommon for an NOPD officer to be

25  in the line of duty without a baton, correct?



1   A.   Correct.

2   Q.   Have you ever been specific -- I understand

3   there's a written policy that says NOPD officers have

4   to have a baton as part of their their uniform but

5   other than that written policy; is there any training

6   about carrying a baton?

7   A.   We had training during in-service last year

8   about different defense tactics with the baton.

9   Q.   Okay.  Did that training reiterate to

10  the officers that all officers should be carrying

11  a baton in the line of duty?

12  A.   Yes.

13  Q.   (VIDEO PLAYED)  Do you remember giving this

14  interview?

15  A.   Yes.

16  Q.   Oh, real quick.  A piece of shrapnel hit your

17  forearm when -- from Burmaster's hollow-point bullet?

18  A.   Yes.

19  Q.   Isn't there a NOPD policy that says before

20  you fire you should make sure it's -- firing is not

21  dangerous to people in the vicinity of where you're

22  firing?

23          MR. ROQUEMORE:

24              Objection to form.

25          MR. ALPAUGH:



```
 1              Same objection.
 2          THE WITNESS:
 3              Yes.
 4   BY MR. ANADA:
 5   Q.   Okay.  what's your understanding of that
 6   policy?
 7   A.   You have to make sure it's safe to do so.
 8   You don't want to shoot in a direction where there's
 9   innocent bystanders.
10   Q.   It seems to me that, let me know if you
11   disagree, but it seems to me that Burmaster firing in
12   the way that he did put put you in danger of physical
13   harm; do you agree with that?
14          MR. ROQUEMORE:
15              Object to form.
16          MR. ALPAUGH:
17              Object to form.
18          THE WITNESS:
19              No.
20   EXAMINATION BY MR. ANADA
21   Q.   It could have hit your eye, right?
22   A.   It could of, he was aiming towards the
23   ground.
24   Q.   Are NOPD officers in your experience trained
25   about bullet fragments and ricochet?
```



1    A.   Yes.

2    Q.   What kind of training would you -- Do you

3    remember about those topics?

4    A.   Just tell us about it.  Like, how it can

5    ricochet off surfaces and take a different path.

6    Q.   So did they -- was there -- has there ever

7    been any NOPD training that you're aware of about how

8    to account for those possibilities when firing a

9    shot?

10   A.   Not that I recall.

11   Q.   Same thing with this video, you

12   have a right it's perfectly within your rights to

13   watch the entire thing if you want to.  I'm trying to

14   do us all a favor here, but if you want to take a

15   break and watch the whole thing, I encourage you to

16   do so. (VIDEO PLAYED)

17   A.   I'm good.

18   Q.   I'm gonna start from about 17:48.  You heard what

19   you just testified to you?

20   A.   Yes.

21   Q.   You believe that he was close enough to exit

22   the pedestrian gate with you.

23   A.   Correct.

24   Q.   Okay.  That's true.  That's a correct

25   statement, right?



1  A.  Correct.

2        MR. ROQUEMORE:

3             And I'll just clarify, he wasn't testifying

4        there, he was giving a statement.

5        You said yeah, you said "testify".

6        MR. ANADA:

7             You are right.

8  EXAMINATION BY MR. ANADA:

9  Q.  I go back in time and modify that word to

10 "statement".

11     Was this your first time being interviewed

12 by the PIB?

13 A.  No.

14 Q.  How many times have you been interviewed by

15 the PIB?

16 A.  This would be my second time.

17 Q.  What was the first time about?

18 A.  Flight.

19 Q.  It didn't involve Burmaster?

20 A.  No.

21 Q   It didn't involve use of force?

22 A.  No.

23 Q.  Okay.  Do you remember when they took a break

24 and left you by yourself for a little bit and then

25 came back?



1    A.  Yes.

2    Q.  Okay.  I'm going to start the video at 22:31

3    where they're coming back in the room after their

4    break.  (VIDEO PLAYED)

5    Q.  You heard your -- that portion of your

6    statement?

7    A.  Yes.

8    Q.  Am I correct to -- Did I accurately hear you

9    say, "I would not have taken my gun out in that

10   situation"?

11   A.  Yes.

12   Q.  And your comments led me to believe that you

13   were surprised that Officer Burmaster took his gun

14   out, right?

15   A.  Yes.

16   Q.  In fact, you -- for a second you thought it

17   was maybe his TASER that he had used?

18   A.  Correct

19   Q.  Am I correct that the reason you wouldn't

20   have taken your gun out in that situation is because

21   that would not be consistent with the training and

22   policies of the NOPD.

23          MR. ALPAUGH:

24              Object to form of the question.

25          THE WITNESS:



1           Correct.

2    EXAMINATION BY MR. ANADA:

3    Q. (VIDEO PLAYED)  This Officer asked you

4    which dog was the threat and you answered the big

5    dog, right?

6    A.  Correct.

7    Q.  All right.  I can't remember where on the

8    video this is.  I can sift through it and find it.  But

9    do you remember telling these investigators that the

10   growl or bark sound you heard was the sound of a

11   big dog barking and not a small dog barking?

12   A.  Yes.

13   Q.  Do you remember saying that to them?

14   A.  Yes.

15   Q.  Okay, so so that's my question: Based on what

16   you heard, you believe that the bigger dog was

17   barking and not Apollo, right?

18   A.  Correct.

19   Q.  Have you ever seen any video or any evidence

20   to to suggest that Apollo made a single sound other

21   than writhing in pain when he was dying?

22           MR. ROQUEMORE:

23               Object to the form.

24           THE WITNESS:

25               No.



```
 1   EXAMINATION BY MR. ANADA:
 2   Q.  Okay.  And what I mean "sound" I mean, like,
 3   he didn't vocalize at any time based on what you've
 4   seen, other than immediately after he was shot?
 5   A.  Correct.
 6   Q.  Okay.  All right.
 7           MR. ANADA:
 8               That's all I got for you. Thank you very
 9           much.  Ted's gonna have some questions for
10           you.  And your attorney may have some
11           questions for you too.
12           I'll be your videographer.  You just tell me
13           what you want.
14           MR. ALPAUGH:
15               Pull up Burmaster's video. Exhibit,
16           what was it?
17           MR. ANADA:
18               It is 18.
19           MR. ALPAUGH:
20               Eighteen.
21           MR. ANADA:
22               Can everyone see my screen okay?
23           MR. ALPAUGH:
24               I can see it better now, actually.
25           Exhibit 18.
```



```
 1            MR. ANADA:
 2                 All right.  Just let me know --
 3            MR. ALPAUGH:
 4                 Just stop just one second.
 5   CROSS-EXAMINATION BY MR. ALPAUGH:
 6   Q.  Now, do you remember when Mr. Anada asked you
 7   a question, what about Burmaster making a kissing
 8   noises in front of the house next door?
 9   A.  Yes. (VIDEO PLAYED)
10   Q.  I want you to listen.  I want you to
11   listen from the time you hear the first
12   kissing noise to the time you get to the
13   gate, okay?
14   A.  All right.
15   Q.  I want you to concentrate on that.  Stop
16   it right there.  Stop right there.
17       What's the timestamp on there?
18            MR. ANADA:
19                 It's 1:45, but I stopped it after the
20            kissing sounds.  Do you want me to find the
21            exact?
22            MR. ALPAUGH:
23                 No, that's okay.
24   BY MR. ALPAUGH:
25   Q.  Did you hear the kissing sounds -- you hear
```



1   them when he started making them, right?

2   A.   Yes.

3   Q.   Was he still making them when he passed

4   the tree that marked the boundary line of the

5   property?

6   A.   Yes.

7   Q.   So now he's in front of their house, of

8   the Brown's house, correct?

9   A.   Correct.

10        MR. ANADA:

11             Object to the form, asked and answered.

12  BY MR. ALPAUGH:

13  Q.   Now, when y'all got to the Brown's house --

14  Of course when the kissing noises were made, no dogs

15  came down, correct?

16  A.   That is correct.

17  Q.   Did you see any evidence of dogs in the yard?

18  A.   No.

19  Q.   No dog toys?

20  A.   No.

21  Q.   No bowls of food?

22  A.   No.

23  Q.   No water bottles?

24  A.   No.

25  Q.   No feces?



```
 1    A.  No.
 2    Q.  Nothing like that, okay.  So, when y'all went in
 3    the gate -- would you have gone in the gate, either one
 4    of you if you, had you known there were dogs in the
 5    yard?
 6    A.  No.
 7    Q.  So when you went in the gate, as far as you
 8    were concerned, you were satisfied that there were
 9    no dogs in the yard?
10    A.  Correct.
11    Q.  Keep going.  Go ahead.  (VIDEO PLAYED)
12    Stop right there.  Okay.
13    When the gate -- you close the gate when you
14    came in, correct?
15    A.  Correct.
16    Q.  That was pretty loud when you came in.
17    A.  It slammed, yeah
18    Q.  And so then you hear the dogs bark, we've
19    already got the timestamp as when that happens on
20    your video.  Did you immediately turn to leave?
21    A.  Turned?
22    Q.  When you heard the barking sound, what did
23    you do?
24    A.  Turn to leave.
25    Q.  You went to go out the gate?
```



1   A.   Yes.

2   Q.   You say you tapped Burmaster on the shoulder.

3   A.   Yes.

4   Q.   Now when you perceived there were dogs you

5   said -- you were asked a number of questions about

6   the one dog Apollo being a threat, but there were two

7   dogs in there --

8   A.   Correct.

9   Q.   And the larger dog was probably a threat as

10  well, correct?

11  A.   Correct.

12  Q.   Okay.  So that dog once you went out the gate

13  could easily have gone and attacked Officer

14  Burmaster.

15  A.   Correct.

16  Q.   So we're not talking about one dog, we're

17  talking about two.

18  A.   Correct.

19  Q.   You will agree with regard to body worn

20  cameras is what the camera captures and what your

21  eyes are looking at are two different things,

22  correct?

23  A.   That's correct.

24  Q.   The camera looks straight ahead, it doesn't

25  swivel like your head does.



1    A.   Correct.

2    Q.   It doesn't move like your eyes do.

3    A.   Correct.

4    Q.   So that what we're seeing on body worn camera

5    is were your chest is pointing.

6    A.   That's correct.

7    Q.   Not where your head's turned?

8    A.   That's correct.

9    Q.   And that'd be the same with Officer

10   Burmaster's body worn camera, correct?

11          MR. ANADA:

12              Object to form.

13          THE WITNESS:

14          `       Correct.

15   BY MR. ALPAUGH:

16   Q.   They all work the same, correct?

17   A.   That's correct.

18   Q.   In other words, when you turn your head the

19   body worn camera doesn't move, correct?

20   A.   That is correct.

21          MR. ANADA:

22              Object to form.

23   BY MR. ANADA:

24   Q.   You were asked whether you thought that

25   Officer Burmaster had enough time to exit when you



1   were going out the gate, correct?

2   A.  Correct.

3   Q.  And you testified you thought he did.

4   A.  Yes.

5   Q.  But you don't know what he was thinking.

6   A.  I do not.

7   Q.  You have no idea what he perceiving at that

8   time?

9   A.  I do not.

10  Q.  And there's no way you can cause you weren't

11  there?

12          MR. ANADA:

13              Object to form.

14  BY MR. ALPAUGH:

15  Q.  You weren't in his head, were you?

16  A.  I was not.

17  Q.  And you had your back to him when the shooting

18  occurred, correct?

19  A.  Correct.

20  Q.  I think you were asked questions regarding

21  the vehicle gate -- there were two gates there,

22  right?  A pedestrian gate and a vehicle gate?

23  A.  That's correct.

24  Q.  Do you know if the vehicle gate was able to

25  be opened?



1   A.   Unaware.

2   Q.   Okay.  Was there enough time to even determine

3   whether that gate was going to be able to be opened?

4          MR. ANADA:

5              Objection to form.

6          THE WITNESS:

7              No.

8   BY MR. ALPAUGH:

9   Q.   You were there, you know how much time you had to

10  get out of the yard.

11  A.   Very little.

12  Q.   A matter of seconds, actually, wasn't it?

13  A.   Yes.

14  Q.   And you testified that you would not have

15  taken your gun out in this in this situation, correct?

16  A.   Correct.

17  Q.   But again, you don't know what was going

18  through Officer Burmaster's head at the time and how

19  we perceived the situation.

20  A.   I do not.

21  Q.   You were asked questions about Exhibit 9

22  a photograph of Apollo.  That's a picture of Apollo

23  sitting down, looking up at somebody from the floor,

24  correct?

25  A.   Correct.



```
 1   Q.  In the situation you had, where you had two

 2   dogs running down the stairs one was a big dog, one

 3   was a little dog; could that change your perception

 4   of that possibly being a threat?

 5            MR. ANADA:

 6                 Objection to form.

 7            THE WITNESS:

 8                 Yes.

 9   BY MR. ALPAUGH:

10   Q. Are you familiar with dogs acting together

11   and how they work?

12            MR. ANADA:

13                 Object to form.

14            THE WITNESS:

15                 Yes.

16   BY MR. ALPAUGH:

17   Q.  And based on your experience as a

18   police officer, you're familiar with that?

19            MR. ANADA:

20                 Object to form.

21            THE WITNESS:

22                 Correct.

23   BY MR. ALPAUGH:

24   Q.  What happens when you have dogs acting

25   together?
```



```
1            MR. ANADA:
2                 Object to form.
3            THE WITNESS:
4                 They react how the other ones react.  So they'll
5            be together.
6    BY MR. ALPAUGH:
7    Q. Would it be fair to call it a pack mentality?
8            MR. ANADA:
9                 Object to form.
10           THE WITNESS:
11                Yes.
12   BY MR. ALPAUGH:
13   Q.  You've seen this behavior before, have you not?
14           MR. ANADA:
15                Object to form.
16           THE WITNESS:
17                Yes, I have.
18   Q.  You've experienced it before?
19           MR. ANADA:
20                Form.
21           THE WITNESS:
22                Yes.
23   BY MR. ALPAUGH.
24   Q.  So it'd be reasonable to assume that when two
25   dogs come downstairs that there will be a heightened
```



```
 1   reason to be afraid?  To be concerned?
 2            MR. ANADA:
 3                 `Objection to form.
 4            THE WITNESS:
 5                 Yes.
 6   BY MR. ALPAUGH:
 7   Q.  You were asked a question could Officer
 8   Burmaster have kicked the dog, Apollo, correct?
 9   A.  Correct.
10   Q.  If he had kicked the dog Apollo, then what
11   would have prevented the other larger dog from coming
12   after him?
13   A.  Nothing.
14   Q.  And how much time would have would have had
15   to react to that?
16            MR. ANADA:
17                 Object to form.
18            THE WITNESS:
19                 A second or two.
20   BY MR. ALPAUGH:
21   Q.  And I guess, the same thing would apply if
22   you -- if Officer Burmaster had used his TASER and it
23   hadn't worked?
24            MR. ANADA:
25                 Object to form.
```



```
 1            THE WITNESS:
 2                 Yes.
 3   BY MR. ALPAUGH:
 4   Q.  And that does happen sometimes, does it not?
 5   A.  Yes.
 6   Q.  Because you have to have both probes hit the
 7   animal.
 8   A.  That is correct.
 9   Q.  And again the animal is much smaller than a human.
10   A.  That's correct.
11   Q.  And they have fur, which humans don't have fur,
12   correct?
13   A.  That is correct.
14   Q.  And that could deflect TASER prongs, correct?
15   A.  Yes.
16   Q.  And with regard to the baton, again if he swings it
17   then hits the dog, does that prevent the other larger
18   dog from going after him?
19            MR. ANADA:
20                 Objective form.
21            THE WITNESS:
22                 No.
23   MR. ALPAUGH:
24   Q. Again, that would be a matter of seconds.
25            MR. ANADA:
```



```
 1                    Object to form.
 2               THE WITNESS:
 3                    Yes.
 4    BY MR. ALPAUGH:
 5    Q.  Because you were outside, the gate was closed, the
 6    dog couldn't come after you.
 7    A.  Correct.
 8    Q.  At the time I believe Officer Burmaster was an FTO,
 9    was he ever your FTO?
10    A.  No.
11    Q.  Just for the record, he was an FTO.
12    A.  Yes.
13    Q.  What is an FTO?  For the record, what is that?
14    A.  Field Training Officer.
15    Q.  And their purpose is, you talked about about
16    field training earlier, you underwent four months of
17    field training you would have a field training
18    officer go with you on your first four months out
19    of the car --
20    A.  That's correct.
21    Q.  -- As an officer.  But it wasn't Burmaster.
22    A.  No.
23    Q.  In regard to body armor, it's only going
24    to protect the area from your waist up to your upper
25    chest, correct?  And upper back, correct?
```



```
 1   A.  That is correct.
 2   Q.  It's not gonna protect your legs?
 3   A.  No.
 4   Q.  It's not gonna protect your arms?
 5   A.  No.
 6   Q.  Or any other part of the body that's not
 7   actually covered by the armor?
 8   A.  That's correct.
 9   Q.  Give me a second, please.  Just so I'm clear,
10   when you and Officer Burmaster went into this yard,
11   you had no advance notice that there were any animals
12   there, correct?
13   A.  Correct.
14   Q.  So, believing there were no animals there,
15   there was no reason to develop any contingency plan
16   for dealing with animals, was there?
17   A.  No.
18   Q.  Again, had you known there were animals in
19   there, you wouldn't have gone in the yard, would you?
20   A.  No.
21   Q.  I might be finished, give me minute or two.
22         MR. ALPAUGH:
23             Thank you, Officer Roussel.  I have no
24         further questions at this time.
25         MR. ROQUEMORE:
```



John Roussel                                    March 07, 2023
                                                Page 89

```
 1              I do have some questions.
 2              Officer Roussel, I'm Jim Roquemore, I am the
 3              assistant City attorney.  And I'm
 4              representing the City in this case, I just
 5              have a couple of questions.
 6   CROSS EXAMINATION BY MR. ROQUEMORE:
 7   Q.  You mentioned about training, you mentioned
 8   that you have received training with regard to use of
 9   force; is that right?
10   A.  That's correct.
11   Q.  And you receive that training, both in your
12   initial training through the academy, right?
13   A.  Correct.
14   Q.  And continuing as a police officer in as
15   you're out of the academy, you'll also receive
16   training; is that correct?
17   A.  Correct.
18   Q.  Okay.  And that training as a as a field
19   officer is both through the academy and through daily
20   training bulletins, is that right?
21   A.  That is correct.
22   Q.  Okay.  And there's the daily training
23   bulletins are focused on making sure that officers
24   understand and comply with the policies; is that a
25   fair statement?
```



1    A.   That's correct.

2    Q.   Okay.  And in your in your experience as a an

3    officer, we've mentioned -- Mr. Anada brought forth

4    of couple of policies that he believes are relevant.

5         The Conducted Energy Weapon chapter 1.7.1 in

6    specifically the section paragraphs 57;64,

7    which deal with CEW use on the dangerous animal; we

8    discussed that, and you're familiar with these?

9    A.   Yes.

10   Q.   And in your experience -- Is it your

11   experience that the NOPD effectively trains with

12   regard to this policy?  So the officers follow

13   the policy?

14        MR. ANADA:

15            Object to form asked and answered.

16        THE WITNESS:

17            Yes.

18   BY MR. ROQUEMORE:

19   Q.   And, in your experience, there is no other

20   unwritten policy dealing with CEW use with animals?

21   No unwritten policy, right?

22   A.   No.

23   Q.   Okay.  And you're also -- we also discussed

24   the chapter 1.3 Use of Force, specifically, paragraph

25   32 dealing with dangerous animals and you're -- you



```
 1   were trained on this policy also; is that right?
 2           MR. ANADA:
 3               Object to the form, asked and answered.
 4           THE WITNESS:
 5               That is correct.
 6   BY MR. ROQUEMORE:
 7   Q.   Yes?  And it's your experience that the
 8   training that you received as an officer, effectively
 9   trains for this policy; is that right?
10           MR. ANADA:
11               Objective form asked and answered.
12           THE WITNESS:
13               Yes.
14   BY MR. ROQUEMORE:
15   Q.   And is there any reason that you have to
16   believe that the actual policy of the New Orleans
17   Police Department is any different than that stated
18   in paragraph 32?
19   A.   No.
20   Q.   Now, what -- the -- with regard to the
21   Academy and after you became a police officer, do you
22   have encounters with the Academy from time to time?
23   A.   Yes, once a year.
24   Q.   Once a year; that's for training, right?
25   A.   That's correct.
```



1   Q.   Okay.  Are you familiar with Sergeant David
2   Duplantier?
3   A.   Yes.
4   Q.   Okay.  And he's an Academy trainer; is that
5   right?
6   A.   That's correct.
7   Q.   And do you hold him in high regard?
8   A.   Yes.
9   Q.   And it's your -- what?  He trains for use of
10  force; is that fair?
11  A.   Yes.
12  Q.   And have you received particular training
13  from him?
14  A.   Yes.
15  Q.   And what training did you receive from
16  Sergeant Duplantier?
17  A.   Just bulletins and talking about different
18  scenarios; things like that, and the levels of force.
19  Q.   Okay.  Would you consider him to be an expert
20  on the policy, the Use of Force for the NOPD?
21  A.   Yes.
22  Q.   And as between your opinions and his
23  opinions, which one would you give greater weight?
24          MR. ANADA:
25              Object to form.



```
 1            THE WITNESS:
 2                 Sergeant Duplantier?  Yes, Sergeant
 3            Duplantier.
 4   BY MR. ROQUEMORE:
 5   Q.  Okay.  If they -- you mentioned that there
 6   was a difference in use of force between humans and
 7   dogs.
 8   A.  Yes.
 9   Q.  And you mentioned that one of the one of the
10   issues has to do with humans, you can talk to?
11   A.  That's correct.
12   Q.  And for dogs you can't talk to?
13   A.  That's correct.
14   Q.  Okay.  And that's -- you explained from your
15   experience how the use of force differs from humans
16   versus dogs -- or the acceptable use of force.
17   A.  Well, humans you can talk and if the situation's
18   escalating you can deescalate the situation, try and
19   use a lower form of force by communication.
20        Animals, you can't do that.  You don't know what to
21   expect from an animal that you don't know.
22            MR. ANADA:
23                 Object to form, asked and answered.
24   BY MR. ROQUEMORE:
25   Q.  Is specifically using, making kissing noises
```



1   part of the training that you've received through

2   the training with the NOPD?

3           MR. ANADA:

4               Object to form.

5           THE WITNESS:

6               Yes, sir.  They encourage you to make a

7           noise to see if there's any.

8   BY MR. ROQUEMORE:

9   Q.  Is there any training that you've had, in your

10  experience, from the NOPD, that teaches that all dogs

11  should be treated as threats?

12  A.  No.

13  Q.  In managing and supervising officers, are you

14  familiar with the Insight System?

15  A.  I'm familiar with the Insight System.

16  Q.  Is that a "yes"?

17  A.  Yes.

18  Q.  Okay. And tell me what what the Insight

19  System does.

20  A. It keep track of multiple things throughout

21  your career.  It also can alert in different aspects

22  of your career.  Say if you've had too many complaints,

23  or anything, pretty much, you know too much of

24  something, it'll alert.

25  Q.  Okay.  So it'll, it provides a database



1   and a way to collect information regarding

2   disciplinary complaints, right?

3   A.   That is correct.

4   Q.   Excessive force, if there's uses of force by

5   a by an officer?

6   A.   That's correct.

7   Q.   And other things like, time and attendance and

8   times that they've been -- an

9   Officer has been received unformal --  informal

10  discipline is that also fair?

11          MR. ANADA:

12              Form, leading.

13          THE WITNESS:

14              Correct.

15          MR. ROQUEMORE:

16              I don't have any other questions.

17          MR. ANADA:

18              I have a couple, unfortunately.  Can we

19          go off the record for one second?

20  (Brief Break)

21  BY MR. ANADA:

22  Q.   Officer Roussel, just a couple follow-up

23  questions, in the line of the questions you

24  were asked by the other attorneys.

25      I'm going to refer you back to Exhibit 43,



John Roussel                                          March 07, 2023
                                                      Page 96

```
 1   which is your body worn camera footage.
 2   Which you've looked at somewhat.
 3        Do you remember Mr. Alpaugh asked you some
 4   questions about whether Burmaster was making
 5   kissing sounds after he crossed the tree that
 6   marked the Brown's property line?
 7   A.  Yes.
 8   Q. Can you tell me, I want you to watch
 9   it very closely, what timestamp reflects
10   Officer Burmaster making kissing sounds after
11   he passes the tree, and which is the demarcation
12   line of my client's property.
13             MR. ALPAUGH:
14                  Object to the form of the question.
15   BY MR. ANADA:
16   Q.  So again just to remind you, I want you to
17   tell me what timestamp proves that he was making the
18   sounds after he crosses the tree, okay?
19             MR. ALPAUGH:
20                  Object to the form of the question,
21             you're using a different video.
22             (VIDEO PLAYED)
23             I thought you said you were using
24             Roussel's body worn camera video,
25             this is Burmaster's
```



```
 1          MR. ANADA:
 2               You're right.  Thank you.
 3          MR. ALPAUGH:
 4               I have no objection using Burmaster's for
 5          that question, but --
 6          MR. ANADA:
 7               No, I intended to use Roussel's.
 8  (VIDEO PLAYED)
 9  BY MR. ANADA:
10  Q.  So this is Exhibit 43 that we're
11  watching, Officer Roussel's body worn camera.
12  Do you see the tree that marks the property
13  line.
14  A.  Yes.  I see the tree.
15  Q.  Do you agree that that is where the
16  neighbor's property, 1422, ends and on the
17  other side of the tree is where the Brown's
18  property, 1420, starts?
19  A.  Yes.
20  Q.  Okay.  So my question is, help me understand,
21  at what timestamp Burmaster's making kissing noises
22  after he crosses past the tree.  (VIDEO PLAYED)
23       The reason I asked is I just don't see that,
24  and I'm just wondering if you and I are seeing
25  different things.  Let me play it again for you.
```



```
 1              MR. ALPAUGH:
 2                   Object to the question because you're
 3              using a different video than was he was
 4              questioned on.
 5              MR. ANADA:
 6                   Wait, this is still the wrong video?
 7              MR. ALPAUGH:
 8                   No, I was wrong with the previous --
 9              I said that was Burmaster's, that was
10              the one he was questioned on.
11                   I thought you intended to show this one,
12              I said the one you showed before was not the
13              one you said you intended to show.
14              MR. ANADA:
15                   Got it, understood.
16              MR. ALPAUGH:
17                   But that's not the one he was questioned
18              about where you hear the noises and where he
19              -- what he testified about.
20                   So you're using two different videos and I
21              object to that.
22              MR. ANADA:
23                   Got it, an objection.
24         BY MR. ANADA:
25         Q.  Okay.  Again, my question is: Do you hear him
```



1   making kissing noises after he crosses past that tree?

2   A.  It looks like he makes a kissing noise at the

3   tree.

4   Q.  At tree?

5   A.  Yes.

6   Q.  Okay.  He never makes one when he is in front

7   of the Brown's house, right?

8   A.  Not that I can hear.

9   Q.  He never makes one when he's at the gate of

10  the Brown's house, right?

11  A.  No.

12  Q.  All right.  That's all I have for Exhibit 43.

13  And then just to address Mr. Alpaugh's objection, I'm

14  going to play Exhibit 18-- Burmaster's body worn

15  camera and I'm just asking you the same question.

16  (VIDEO PLAYED)  Same answer?  At the tree?

17  A.  Yes.

18  Q.  Same answer, not in front of the Brown's

19  residence?

20  A.  It'd be at the beginning and end, like.

21  Q.  Okay.  But it wasn't in front of their house,

22  right?

23  A.  Not in front of their residence.

24  Q.  Was it at or -- was it at the gate?

25  A.  No.



1  Q.  The gate, the pedestrian gate to the Brown's

2  house, he did not make kissing noises as he -- at

3  that location, right?

4  A.  No.

5  Q.  That's all I have on that.  Okay.  Mr. Alpaugh

6  asked you about the threat that the bigger

7  dog might have posed, do you remember those

8  questions?

9  A.  Yes.

10  Q.  Okay.  Let's say that me and Mr. Alpaugh are

11  threats that are moving towards you.  Let's say that

12  I present a threat of great bodily harm or death to,

13  but Mr. Alpaugh does not.

14     Based on your understanding of NOPD's policy and your

15  training, can you shoot Mr. Alpaugh who is not

16  presenting a threat to you based on me presenting a

17  threat to you?

18          MR. ALPAUGH:

19              Object to the form of the question.

20          MR. ROQUEMORE:

21              Objection to the form.

22          THE WITNESS:

23              No.

24  BY MR. ANADA:

25  Q.  Okay.  You can shoot me if I'm presenting a



1  threat of great bodily harm or death, right?  To you?

2  A.  Correct.

3  Q.  But not the person who's not.

4  A.  Correct.

5  Q.  Okay.  So would your answer be different in

6  my hypothetical if in my hypothetical, me and Mr.

7  Alpaugh were dogs?

8  A.  Well, dogs are different than humans.

9  Q.  I understand that.  Can you shoot a non-

10  threatening dog because there is also a threatening

11  dog on the premises?

12  A.  No.

13  Q.  Okay.  All right.  I'm going to -- Do you

14  live in a neighborhood where there's a lot of fenced

15  in yards?

16  A.  Yes.

17  Q.  Okay.  Are you familiar with any of the --

18  any of your neighbors that have fenced in yards?

19  A.  Yes.

20  Q.  Do any of them have a fence one purpose being

21  to contain their dogs?

22  A.  Yes.

23  Q.  Okay.  Does that -- do you know anyone who

24  lets their dog run freely within their fenced in

25  property?



1   A.  Yes.

2   Q.  Do you know anyone who lets their dog freely

3   roam on their front yard, or front patio that does not

4   have a fenced in property?

5   A.  Yes.

6   Q.  You do?

7   A.  I do.

8   Q.  How many?

9   A.  One.

10  Q.  Okay, just one.  Anecdotal.

11  A.  It's my neighbor's dog, he runs around every

12  once in a while.

13  Q.  Okay.  All right.  Other than the one

14  everyone else you know who let their dog run free

15  in their fenced in property -- on their property has

16  a fence, right?

17  A.  Yes.

18  Q.  Could a fence be indicative -- Could a fence

19  surrounding a house be indicative of that household

20  having a pet dog?

21  A.  Most houses have fences.  You could have a dog in

22  the back, could not.  There's no possibly of knowing

23  when most residence do come with fenced in yards.

24  Q.  Based on your experience, it would be more

25  likely to a cat or a dog when you're entering a



1  fenced in residence versus when you're entering a

2  residence that has no fence?

3  A.  Yes.

4  Q.  Okay.  If I was an NOPD Officer and I had

5  this, this fear going back all the way to 2012 that

6  dogs are going to be biting me in the penis.  Sorry.

7  Am I violating policy, because of this fear, if I

8  include in my body armor a cup?

9          MR. ROQUEMORE:

10              Object to the form.

11          MR. ALPAUGH:

12              Object to the form of the question.

13          THE WITNESS:

14              I'm not sure.

15  EXAMINATION BY MR. ANADA:

16  Q.  You've ever heard or read anything that

17  reflects a policy of NOPD that prohibits wearing a

18  cup, right?

19          MR. ALPAUGH:

20              Object to the form.

21          THE WITNESS:

22              I haven't heard of any policy regarding a

23          cup.

24  EXAMINATION BY MR. ANADA:

25  Q. Okay.  So for -- to your knowledge, NOPD



1   permits a cup.

2          MR. ALPAUGH:

3              Object to the form.

4          THE WITNESS:

5              As far as I know.

6   BY MR. ALPAUGH:

7   Q.  Okay.  As far as you know, NOPD permits the

8   wearing of a cup by an officer in the line of duty?

9          MR. ALPAUGH:

10             Same objection.

11         THE WITNESS:

12             Yes.

13  EXAMINATION BY MR. ANADA:

14  Q.  Okay. You got any plans to go on any

15  vacations in April?

16  A.  No.

17  Q.  Okay.  You're not gonna be out of the country

18  or anything?

19  A.  No.

20  Q.  What about the week of April 3?  Are you

21  going to be in New Orleans?

22  A.  Yes.

23  Q.  Okay.  Do you have any any specific plans for

24  that week?

25  A.  No.



1  Q.  I ask, because that's the date of the trial

2  in this matter.  And most of the witnesses we're

3  going to have to issue a subpoena to to have them be

4  required to appear at the trial.

5           MR. ROQUEMORE:

6                And again, Tarak, just send that to me

7           and I have your number, we'll arrange for.

8           MR. ANADA:

9                Okay, so I can serve his subpoena on you?

10          MR. ROQUEMORE:

11               Is that okay with you?

12          THE WITNESS:

13               That's fine.

14          MR. ROQUEMORE:

15               For him

16          MR. ANADA:

17               Yeah.  Right.  Like, you don't need me to

18          like --

19          MR. ROQUEMORE:

20               You don't have to hire the sheriff to

21          come out and like chase him down.

22          MR. ANADA:

23               Right.  Right.  And more importantly, I

24          do not ever ask police officers for their

25          home address during depositions.  I think



1    that's a bad idea.

2    MR. ALPAUGH:

3         It's also prohibited by state law.

4    MR. ANADA:

5         Right.  That's why it's a bad idea.  So I

6    don't need your home address because you're

7    authorizing your attorney to accept Service

8    of a trial subpoena on your behalf, right?

9    THE WITNESS:

10        Yes.

11   MR. ROQUEMORE:

12        But are you saying that you are going to

13   subpoena him?

14   MR. ANADA:

15        Yeah, oh, yeah.

16   MR. ROQUEMORE:

17        Okay.  So mark that -- those days, mark

18   that week off.

19   MR. ANADA:

20        And that's just the case if it goes to

21   trial. Of course, it may not go to trial.  I

22   want to put Exhibit 20 back in front of you

23   real quick.  Do you have your copy of 20?

24   It's this document.

25        There it is, that's.



```
 1              Alright, can you go to page 17, please.
 2   BY MR. ANADA:
 3   Q.  If you go to page 17, Exhibit 20.
 4              MR. ALPAUGH:
 5                  Page 17?
 6              MR. ANADA:
 7                  Yeah, page 17 of Exhibit 20.
 8   BY MR. ANADA:
 9   Q.  At this point you've seen videos, multiple
10   videos, reflecting this incident.  You've watched
11   your own interview with the Public Integrity Bureau
12   where you discuss the incident.  You've been
13   discussing the incident with me and the other
14   lawyers for over two hours -- over three hours maybe.
15       You've seen documents about the incident.  You feel
16   that you're pretty familiar with the incident at this
17   point?
18   A.  Yes.
19   Q.  Okay.  I'm going to read a sentence from page
20   17 on Exhibit 20.  And my question is going to be: Do
21   you have any reason to disagree with the statement
22   I'm going to read you, (reading)
23   "Officer Burmaster's discharge occurred due to Officer
24   Burmaster observing the dogs and firing his weapon out of
25   fear and not because the dog presented a serious bodily
```



```
 1   injury or death threat to Officer Burmaster."
 2           MR. ALPAUGH:
 3               Object to form.
 4           MR. ANADA:
 5               Is it because I read the words wrong?
 6           MR. ALPAUGH:
 7               Multiple reasons.
 8           MR. ANADA:
 9               Okay.
10           MR. ALPAUGH:
11               I would have objected to it if you'd read
12           them right.
13   FOLLOW-UP BY MR. ANADA:
14   Q.  Okay, okay.  I'm gonna re-read the portion
15   that I miss --  I transposed some words.
16   "And not because the dog," referring to Apollo,
17   "presented a threat of serious bodily injury or death
18   to Officer Burmaster."
19           MR. ALPAUGH:
20               Same objection.
21   BY MR. ANADA:
22   Q.  Based on what you've watched, what you've seen
23   what, you've heard, what you've read; do you have any
24   reason to disagree with that conclusion of Detective
25   Brewer?
```



```
 1            MR. ALPAUGH:

 2                 Same objection.

 3            THE WITNESS:

 4                 No.

 5            MR. ANADA:

 6                 Okay.  That's all I got for you.

 7            MR. ALPAUGH:

 8                 I only have a couple.

 9   FOLLOW-UP BY MR. ALPAUGH:

10   Q.  You were asked a question about fences,

11   that neighborhood, 1420, where the incident

12   occurred, Is that at a fairly old neighborhood in New

13   Orleans?

14   A.  Yes.

15   Q.  And the fences that you saw, were they new

16   fences or old fences?

17            MR. ANADA:

18                 Object to form.

19            MR. ALPAUGH:

20                 In your opinion.

21            THE WITNESS:

22                 Old.

23   BY MR. ALPAUGH:

24   Q.  Old?

25   A.  In my opinion, old fences.
```



1  Q.  And you saw the two dogs that were involved; were

2  those dogs fairly old dogs or young dogs, do think?

3  A.  They're young dogs.

4  Q.  Would your opinion be the fences were there before the

5  dogs were?

6          MR. ANADA:

7              Object to form.

8          THE WITNESS:

9              Yes.

10 BY MR. ALPAUGH:

11 Q.  Now, when you -- I'm not going to have you

12 watching the video, but I'm going to ask you a

13 question about it.  When you were walking

14 down and Officer Burmaster starts making the kissing

15 noises in front of the house next door, up to the tree

16 at the boundary, correct?

17 A.  Yes.

18 Q.  Is there a solid wall between the first house

19 where he first started making the kissing noises and

20 the house the Brown's were in?

21         MR. ANADA:

22             Object to form.

23         THE WITNESS:

24             No.

25 BY MR. ALPAUGH:



John Roussel                                            March 07, 2023
                                                        Page 111

1    Q.   In fact, it's a low fence, is it not?

2    A.   Correct.

3    Q.   And as you're walking down there, you can see

4    the Brown's house, can't you?

5    A.   That is correct.

6            MR. ALPAUGH:

7                I have no further questions.  Thank you.

8            MR. ANADA:

9                I'm done.  I'm good.  Thank you very much for

10           your time. I did not anticipate it to go this

11           long, but I appreciate your patience.

12   (The deposition was concluded at  4:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



1              R E P O R T E R ' S   P A G E

2

3       I, CARRIE A. HARTILL, Certified Court Reporter in and for

4   the State of Louisiana, the officer before whom this sworn

5   testimony was taken, do hereby state;

6       That due to the spontaneous discourse of this proceeding,

7   where necessary, dashes (--) have been used to indicate pauses,

8   changes in thought, and/or talkovers; that same is the proper

9   method for a Court Reporter's transcription of a proceeding, and

10  that dashes (--) do not indicate that words or phrases have been

11  left out of this transcript;

12      That any words and/or names which could not be verified

13  through reference material has been denoted with the phrase

14  "(phonetically spelled)."

15

16

17

18

19

20

21                          _____

22                          Carrie A. Hartill, BA-CCR

23                          Certified Court Reporter

24                          Louisiana License #2018009

25



```
 1              C E R T I F I C A T I O N

 2        This certification is valid only for a transcript

 3   accompanied by my original signature and original required seal

 4   on this page.

 5        I, Carrie Hartill, Certified Court Reporter, in and for the

 6   State of Louisiana, as the officer before whom this testimony was

 7   taken, do hereby certify that Officer John Roussel, to whom the oath

 8   was administered, after having been duly sworn by me upon

 9   authority of R.S. 37:2554, did testify as hereinbefore set forth

10   in the foregoing 111 pages;

11        That this testimony was reported by me in the Stenomask

12   reporting method, was prepared and transcribed by me or under my

13   personal direction and supervision, and is a true and correct

14   transcript to the best of my ability and understanding;

15        That the transcript has been prepared in compliance with

16   transcript format guidelines required by statute or by rules of

17   the board, that I am informed about the complete arrangement,

18   financial or otherwise, with the person or entity making

19   arrangements for deposition services; that I have acted in

20   compliance with the prohibition on contractual relationships, as

21   defined by Louisiana Code of Civil Procedure Article 1434 and in

22   rules and advisory opinions of the board; that I have no actual

23   knowledge of any prohibited employment or contractual

24   relationship, direct or indirect, between a court reporting firm

25   and any party litigant in this matter nor is there any such
```



John Roussel

1  relationship between myself and a party litigant in this matter.

2  I am not related to counsel or to the parties herein, nor am I

3  otherwise interested in the outcome of this matter.

4

5

6

7

8

9                                    _____

10                                   Carrie A. Hartill, BA-CCR

11                                   Certified Court Reporter

12                                   Louisiana License #2018009

13

14

15

16

17

18

19

20

21

22

23

24

25



John Roussel

March 07, 2023
Index: 1.3..Alpaugh

**1**

**1.3** 90:24

**1.7.1** 90:5

**10** 17:20 18:18 19:17 20:1,12 21:12 33:12,14 43:4 45:8 53:12 55:10 68:15,22

**100** 67:2,3,6

**11** 35:22

**1300** 6:1

**1340** 6:17

**14** 68:10

**1420** 26:12 57:14,16 58:14 59:3 97:18

**1422** 57:21 58:7,11,19 59:7 60:19 63:9 97:16

**17** 107:1,3,5,7,20

**17:48** 71:18

**18** 6:11 57:6 75:18,25

**18--** 99:14

**1:29** 58:19

**1:30** 58:19

**1:45** 76:19

**1:53** 63:13

**2**

**20** 21:19 27:10,18 59:18,19 60:17 106:22,23 107:3,7,20

**2012** 103:5

**2017** 22:24 23:13,17 26:13

**2021** 7:1 17:20 18:18 19:18 20:1 33:14 55:10 68:10,15

**21** 33:12

**22** 31:21,25

**22:31** 73:2

**23** 35:12,22 40:18

**24** 47:20

**25** 21:19,20

**26** 54:2,24

**3**

**3** 44:7 104:20

**32** 35:24 36:2 40:18 90:25 91:18

**37** 42:3,15 43:25

**4**

**4** 54:11,13

**42** 66:19

**43** 6:15 64:2 66:19 95:25 97:10 99:12

**44** 6:18 68:3

**5**

**57** 32:11

**57;64** 90:6

**58** 32:17

**6**

**62** 32:22 33:4

**7**

**70112** 6:2

**7:06** 45:9

**8**

**8** 60:17

**80** 27:11,22

**9**

**9** 8:3,4,6,10,13,17,25 9:18,21 10:1, 15 11:3 15:15 17:5,16 19:14 20:17 31:25 34:21 82:21

**A**

**abrasion** 22:4

**absolutely** 43:15

**academy** 12:3,6,13 13:2,6,12,22 14:21,22 26:23 27:6 28:15 29:21, 24 89:12,15,19 91:21,22 92:4

**accept** 106:7

**acceptable** 93:16

**accomplish** 25:17

**account** 71:8

**accurate** 9:13 48:15

**accurately** 73:8

**acting** 83:10,24

**active** 32:18

**actual** 64:16 91:16

**address** 99:13 105:25 106:6

**administrative** 53:1,4 59:19

**advance** 88:11

**advise** 53:3

**affairs** 48:2

**afraid** 8:14 85:1

**afternoon** 6:19

**aggressive** 14:13

**agree** 19:25 20:19 25:17,20 32:20 33:3 59:14 60:18,24 62:10 66:7,10, 22 68:22 70:13 79:19 97:15

**agreeing** 41:21

**ahead** 61:4,5 78:11 79:24

**aim** 31:9,15

**aiming** 70:22

**alert** 94:21,24

**Alpaugh** 10:4,22 11:6 17:25 33:18 35:13,18 37:10 38:7,25 39:13,20 40:1,19 41:10 46:24 50:15 51:9,19 52:1 53:22 55:12,25 56:18 59:11 60:12,21 61:19 62:16 63:3 64:3,7 65:5,10 66:15 69:25 70:16 73:23 75:14,19,23 76:3,5,22,24 77:12 80:15 81:14 82:8 83:9,16,23 84:6,



John Roussel

March 07, 2023
Index: Alpaugh's..body

12,23 85:6,20 86:3,23 87:4 88:22
96:3,13,19 97:3 98:1,7,16 100:5,
10,13,15,18 101:7 103:11,19
104:2,6,9 106:2 107:4 108:2,6,10,
19

**Alpaugh's** 99:13

**Alright** 58:17 107:1

**alternative** 36:6 37:7 38:5 39:10

**Anada** 6:7,22,24 7:5,12,17,22
10:6,12 11:1,10 18:2,8 23:9,18,24
24:10 25:16,21 30:24 33:22 35:10,
15,20 37:16 38:13 39:4,17,24 40:5,
23 41:16 42:9,13,18 43:3,9,14,16,
23 47:5 50:19 51:11,21 52:5,24
54:1 55:18 56:4,22,25 57:4,8,12
59:13,17 60:16,23 61:23 62:20
63:7 64:5,25 65:7,17 66:3,17 70:4,
20 72:6,8 74:2 75:1,7,17,21 76:1,6,
18 77:10 80:11,21,23 81:12 82:4
83:5,12,19 84:1,8,14,19 85:2,16,24
86:19,25 90:3,14 91:2,10 92:24
93:22 94:3 95:11,17,21 96:15 97:1,
6,9 98:5,14,22,24 100:24 103:15,
24 104:13 105:8,16,22 106:4,14,19
107:2,6,8 108:4,8,13,21

**Anecdotal** 102:10

**animal** 13:8,9,14,20 14:1,5,10,13,
17 15:2 17:4,6 28:10 32:2,12,18
33:1,12 34:22 35:2 36:4 62:12
86:7,9 90:7 93:21

**animals** 12:25 13:5,22 27:25
32:23,25 35:24 54:14 88:11,14,16,
18 90:20,25 93:20

**ankle** 15:8 16:11

**antiseptic** 22:7

**anytime** 33:25 34:3

**Apollo** 8:3 9:3 33:17,24 34:3,8,14,
19 37:1,8,20,21,25 38:1,4,6,18,23
39:10 41:4,9,19 44:16 55:22 74:17,
20 79:6 82:22 85:8,10 108:16

**Apollo's** 45:6

**apologize** 67:4

**apologized** 67:8,9,10

**apologizes** 67:12

**appears** 36:5 66:20

**applies** 61:3

**apply** 85:21

**approach** 13:8

**approaching** 57:21

**approximate** 67:5

**approximately** 58:19 66:7

**April** 17:20 18:18 19:17 20:1,12
21:12 33:12,14 43:4 53:12 55:10
68:10,15 104:15,20

**area** 13:8 19:13 25:25 26:6,7,8
29:15 87:24

**armor** 18:20,21 19:10,12,13,17,21,
25 20:8 87:23 88:7 103:8

**arms** 88:4

**arrange** 105:7

**aspects** 94:21

**assistant** 89:3

**assume** 42:19 50:7 84:24

**assuming** 16:23 61:15

**attached** 65:4,25

**attaching** 65:2

**attacked** 79:13

**attempt** 33:24 34:3

**attempted** 34:13

**attempting** 38:17

**attendance** 95:7

**attorney** 75:10 89:3 106:7

**attorneys** 95:24

**audible** 63:14

**authorized** 36:3

**authorizing** 106:7

**avoid** 13:7 65:1 66:2

**aware** 19:16 30:9,12,13 34:17,24
35:7 42:23 46:16 52:18,25 53:13
71:7

---

## B

**back** 19:7 26:21 29:14,15 36:20
72:9,25 73:3 81:17 87:25 95:25
102:22 103:5 106:22

**background** 11:12

**bad** 106:1,5

**bark** 46:3 74:10 78:18

**barking** 21:19 22:12 36:23 74:11,
17 78:22

**base** 61:6

**based** 18:12,15 19:23 25:10 36:17
37:4 39:7 40:7,16 45:16 51:5,13,
14,23 56:12 59:3 62:22 64:22
74:15 75:3 83:17 100:14,16 102:24
108:22

**basically** 13:23

**basis** 13:11 14:12 18:3

**baton** 14:24 17:2,3,9,10,13,14,18,
20 18:18 20:8 21:6 34:13,15,18
39:19 68:18,25 69:4,6,8,11 86:16

**beginning** 99:20

**begins** 47:25

**behalf** 106:8

**behavior** 84:13

**belabor** 41:23 42:1

**belief** 40:17

**believed** 48:14

**believes** 90:4

**believing** 88:14

**bellybutton** 19:9

**big** 21:3 46:2 66:4 74:4,11 83:2

**bigger** 74:16 100:6

**biggest** 29:16

**bit** 11:23 13:1 15:5 19:14 21:21
23:16,25 29:4 47:16 49:17 72:24

**bite** 21:24 24:1 38:17

**biting** 22:13 103:6

**bitten** 9:19

**black** 15:7 16:10,17,18

**board** 54:3,4,7,11,17

**bodily** 8:15 13:18 21:25 54:15
100:12 101:1 107:25 108:17

**body** 6:10,14 8:21 18:20,21 19:8,
10,12,13,17,21,25 20:8 22:23



24:16,17 25:6 26:18 34:9 45:17
46:1,11 47:8 49:6,20 51:6 52:12,15
56:12 57:6 63:24 64:1 66:20 79:19
80:4,10,19 87:23 88:6 96:1,24
97:11 99:14 103:8

**boots**  15:6,7,13,18 16:20,21,25

**bottles**  77:23

**boundary**  77:4

**bowls**  77:21

**break**  43:25 71:15 72:23 73:4
95:20

**Brewer**  59:21,23 108:25

**bring**  20:14

**brought**  21:23 90:3

**Brown**  6:25

**Brown's**  53:11 57:14,16,19,21
58:1,4 59:1,6 60:25 61:15 62:12
63:1,10 66:8 77:8,13 96:6 97:17
99:7,10,18 100:1

**Browns**  7:2

**building**  21:18

**bull**  53:14,18 62:7,8

**bullet**  69:17 70:25

**bulletin**  12:21 13:2 27:9,15 35:5,7

**bulletins**  89:20,23 92:17

**bulls**  53:11

**Bureau**  44:4 59:20 68:5 107:11

**Burmaster**  6:10 7:18 8:22 9:3,7,
14 16:5,23 17:14 18:16 19:17,25
20:11 33:7,23 34:2,12 36:21,22
37:8,25 38:6,17 40:17 42:16 44:15,
23 45:10,12 46:20 47:10 48:13
49:16,24 51:6,24 52:19 53:6,7
55:10 57:20 59:4 61:12 62:6 63:19
64:10 66:13,25 70:11 72:19 73:13
76:7 79:2,14 80:25 85:8,22 87:8,21
88:10 96:4,10 107:24 108:1,18

**Burmaster's**  36:13 42:24 46:11
55:22 57:6,9 62:10 69:17 75:15
80:10 82:18 96:25 97:4,21 98:9
99:14 107:23

**butt**  29:15

**BWC**  23:13

**bystanders**  70:9

## C

**call**  12:21 22:8 25:5 33:11 42:3,4
67:12 84:7

**calls**  12:17 33:9 66:24 67:6,14

**cam**  24:17 34:9 46:11 52:15 56:12

**camera**  6:11,14 22:23 25:7 26:18
45:17 46:1 47:8 49:20 51:6 52:12
57:7 63:24 64:1 66:20 79:20,24
80:4,10,19 96:1,24 97:11 99:15

**cameras**  24:16 79:20

**canine**  26:23 27:5

**captures**  79:20

**car**  87:19

**cardboard**  29:9,11

**career**  94:21,22

**carry**  17:10,13

**carrying**  17:8,14,18,20 20:11
68:18 69:6,10

**case**  13:11 14:12 23:2 25:1 89:4
106:20

**cat**  102:25

**causing**  32:12

**center**  29:12 31:11

**CEW**  32:1,4,11,17,22 33:1 34:21
35:1 39:25 90:7,20

**challenge**  24:22

**change**  83:3

**channels**  23:12

**chapter**  90:5,24

**characterize**  60:3

**chase**  105:21

**chest**  19:5,6 80:5 87:25

**Chief**  55:2,3,19,20 56:17 65:14

**choice**  28:23

**chosen**  46:20

**Chucks**  16:12,15

**circumstances**  36:4

**citizen**  67:5

**City**  89:3,4

**civil**  7:7

**clarify**  72:3

**clear**  88:9

**click**  27:19

**client's**  8:22 9:15 96:12

**clients**  20:1

**clinic**  22:2

**clip**  59:25 64:23

**clips**  64:20 65:2,4,12,15

**close**  48:14 49:25 51:3 52:8,13
63:20 71:21 78:13

**closed**  87:5

**closely**  96:9

**closer**  49:13

**collect**  95:1

**comments**  73:12

**commit**  25:11

**committed**  54:8

**communication**  93:19

**complaints**  54:18 94:22 95:2

**compliance**  16:24

**complied**  40:17 41:7

**comply**  40:24 89:24

**concentrate**  76:15

**concept**  31:6

**concern**  66:1

**concerned**  78:8 85:1

**conclusion**  33:2 47:6 54:21 55:9,
21 108:24

**conclusions**  56:16

**conduct**  42:24

**conducted**  31:22 48:5 90:5

**confused**  41:3,25

**confusion**  65:1,8,22 66:2



John Roussel

considered 14:6,17 44:15

consistent 8:24 73:21

context 49:8

contingency 88:15

continuing 32:13 89:14

contradicts 45:18

controlled 32:14

Converse 16:12,15

cop's 21:2

copy 42:16 106:23

corner 66:4 68:8

correct 12:12 16:22 17:16,22
22:19 26:16 27:12 30:17 31:20
32:3 33:23 34:2 35:2 38:2 44:13
46:10,19 48:3,25 50:3,22,25 51:17,
18 52:9 56:8 58:1,2,4,5,13,24 59:2,
3 60:20,25 63:13,23 66:12 68:11,
25 69:1 71:23,24 72:1 73:8,18,19
74:1,6,18 75:5 77:8,9,15,16 78:10,
14,15 79:8,10,11,15,18,22,23 80:1,
3,6,8,10,14,16,17,19,20 81:1,2,18,
19,23 82:15,16,24,25 83:22 85:8,9
86:8,10,12,13,14 87:7,20,25 88:1,
8,12,13 89:10,13,16,17,21 90:1
91:5,25 92:6 93:11,13 95:3,6,14
101:2,4

correctly 46:2

country 104:17

couple 67:7 89:5 90:4 95:18,22

court 31:23 54:9

courtyard 21:17

covered 19:13 88:7

create 17:6

criminal 42:7,12,15,23 52:18

CROSS 89:6

CROSS-EXAMINATION 76:5

crossed 96:5

crosses 96:18 97:22 99:1

cup 103:8,18,23 104:1,8

current 11:19

cutout 29:9,11

                    D

daily 12:20 13:1 27:9 89:19,22

danger 70:12

dangerous 32:1,12,23 34:22 35:1,
23 69:21 90:7,25

database 94:25

date 68:7 105:1

David 92:1

day 22:8

days 68:12,13 106:17

deal 15:22 30:14 41:2 90:7

dealing 13:5 27:25 88:16 90:20,25

deals 7:8

death 100:12 101:1 108:1,17

decide 23:3

decided 49:23 50:13 63:17

deep 25:24

deescalate 14:9 93:18

defense 69:8

deflect 86:14

demarcation 96:11

demeanor 67:12

department 44:3 55:5 91:17

depends 13:10,16 14:12 15:23
20:18,25

depicted 8:10,13,17,25 9:17,21,25
10:15 11:3 15:15 17:4,15 19:14
20:17

depiction 48:15

deployed 32:12,18

deposition 6:12,15,18 65:2,4,22

depositions 65:13 105:25

Derrick 42:16

describe 8:3

desk 53:20

detail 25:14

detailed 11:24

detective 48:5 59:21,22 64:11
108:24

determine 82:2

deterred 38:17

develop 88:15

die 8:19

difference 9:9 14:8 93:6

differs 93:15

difficult 24:12

direct 17:21 20:2 35:23

direction 8:11,14 10:16 30:5 38:1
70:8

directives 40:17

disagree 9:4 32:15 56:16 70:11
107:21 108:24

discharge 107:23

disciplinary 95:2

discipline 95:10

discretion 17:9

discuss 107:12

discussed 33:6 46:22 53:6,7 90:8,
23

discussing 107:13

dissect 14:14

distance 17:6 59:5 62:11

District 26:2,13

disturbance 24:9

document 42:20 43:5,8,18 55:19
61:5 106:24

documents 52:16 54:3 64:17
107:15

dog 7:9 8:21 9:6,7,10,14,17,21,25
10:15,17 15:14,15,23,24,25 16:1
19:14 20:17,18,20 21:8,11,18
22:12,13,16 23:25 24:1,3 30:6,11,
15,19,21 31:3,9,15,16 36:23 37:18,
22,25 38:16 41:2,5,7 44:21 45:2
46:2,3 50:18,21 51:1,16 62:7 63:14
74:4,5,11,16 77:19 79:6,9,12,16
83:2,3 85:8,10,11 86:17,18 87:6



100:7 101:10,11,24 102:2,11,14,
20,21,25 107:25 108:16

**dog's** 15:17,20 62:7

**dogs** 45:11,23 46:14 49:11 77:14,
17 78:4,9,18 79:4,7 83:2,10,24
84:25 93:7,12,16 94:10 101:7,8,21
103:6 107:24

**door** 76:8

**downstairs** 84:25

**Downtown** 25:22

**drive** 12:22

**due** 107:23

**duly** 6:3

**Duplantier** 92:2,16 93:2,3

**duty** 12:25 13:6 15:2,6 17:13 19:2
21:12 26:24 27:5 28:1,11 31:3
32:19 68:18,25 69:11 104:8

**dying** 74:21

E

**earlier** 87:16

**easily** 79:13

**easy** 29:17

**effective** 32:23 37:9

**effectively** 90:11 91:8

**efforts** 32:19

**Eighteen** 75:20

**employed** 55:10

**enclosed** 21:18

**encounter** 13:18 15:2 24:1,3

**encountered** 33:12

**encountering** 12:25

**encounters** 26:24 27:5 28:10
91:22

**encourage** 71:15 94:6

**end** 52:13 56:24 99:20

**ends** 47:21,23 97:16

**Energy** 31:22 90:5

**entails** 18:24

**entered** 44:11

**entering** 102:25 103:1

**entire** 71:13

**entitled** 35:23 54:3

**entrance** 58:15

**entryway** 44:10,11,12,16,19

**escalated** 67:22

**escalating** 93:18

**escapade** 25:12

**escape** 44:19

**essay** 28:23

**estimate** 68:20

**evade** 63:22

**evaluated** 28:19

**evening** 57:7

**event** 26:19

**evidence** 34:18 74:19 77:17

**evolve** 11:19

**exact** 47:14 58:18 65:15 66:19
76:21

**exam** 27:14,15

**EXAMINATION** 7:22 18:8 30:24
33:22 35:20 37:16 38:13 39:4,24
40:5,23 41:16 42:18 43:23 47:5
50:19 51:11 52:5,24 57:4,12 59:17
60:16 61:23 62:20 66:3 70:20 72:8
74:2 75:1 89:6 103:15,24 104:13

**Excessive** 95:4

**Excuse** 64:4

**exhausting** 41:8

**Exhibit** 6:11,15,18 8:3,4,6,10,13,
17,25 9:17,21 10:1,15 11:3 15:15
17:5,15 19:14 20:17 31:21,25
35:12,22 40:18 42:3,14 43:25
48:11 54:2,24 57:6 59:18,19 60:17
64:2 68:3 75:15,25 82:21 95:25
97:10 99:12,14 106:22 107:3,7,20

**exhibits** 6:9 64:9

**exit** 48:13,15 50:13 71:21 80:25

**exited** 48:12

**expect** 93:21

**experience** 30:1 37:5 39:8 62:23
70:24 83:17 90:2,10,11,19 91:7
93:15 94:10 102:24

**experienced** 84:18

**expert** 18:6 92:19

**explained** 93:14

**eye** 70:21

**eyes** 79:21 80:2

F

**fact** 9:3,6 26:11 36:18 56:10 59:6
73:16

**fair** 9:13 17:18 84:7 89:25 92:10
95:10

**familiar** 7:2,6 18:9,12,16 19:11
32:1 35:24 54:4 83:10,18 90:8 92:1
94:14,15 101:17 107:16

**familiarize** 43:25

**family** 6:25

**fast** 23:10

**favor** 71:14

**fear** 103:5,7 107:25

**fearful** 8:18 9:19

**feces** 77:25

**feel** 8:9 33:14 41:7 49:5 107:15

**feels** 13:17

**Felicity** 25:25 26:12,15 57:14,16,
21 58:7,11,14 59:7 60:19

**felt** 34:14 37:1 38:6

**fence** 44:9 66:5 101:20 102:16,18
103:2

**fenced** 101:14,18,24 102:4,15,23
103:1

**fences** 102:21

**field** 12:15,18 34:24 53:18 87:14,
16,17 89:18

**figure** 47:18 66:2



John Roussel

**filed** 7:7

**find** 8:6 23:2,5,21 24:12,22,23 25:10,12 30:3 74:8 76:20

**fine** 10:7 11:16 24:3 105:13

**finger** 47:23

**finished** 88:21

**fire** 30:4 47:10 69:20

**firearm** 9:23 10:1,18 22:17 37:1 39:10 45:13

**firearms** 36:3

**firing** 29:6 47:22,24 69:20,22 70:11 71:8 107:24

**flashlight** 20:10,12,15,23,24 21:3

**fled** 45:10

**Flight** 72:18

**floor** 82:23

**focused** 89:23

**folks** 55:6

**follow** 41:18 90:12

**follow-up** 95:22 108:13

**food** 77:21

**footage** 23:13,19 25:7 26:18 34:9 46:12 47:8 49:20 51:6 52:12 56:12 57:7 66:20 96:1

**footsteps** 60:7

**footwear** 16:8,24

**force** 10:17 13:14,15 14:17,18 28:5,7 32:24 33:16 34:19 35:12 46:20 54:3,4,12,13,18,21 55:10,22 59:22 72:21 89:9 90:24 92:10,18, 20 93:6,15,16,19 95:4

**forces** 54:7

**forearm** 69:17

**forgive** 15:4

**form** 10:5,21,23 11:7 17:24 30:23 33:19 37:11 38:8 40:20 41:11 43:2 46:25 50:16 51:10 52:21 53:23 55:13,15,24 56:1 59:10 60:11,13, 22 61:18,20 62:15,17 63:4 69:24 70:15,17 73:24 74:23 77:11 80:12, 22 81:13 82:5 83:6,13,20 84:2,9, 15,20 85:3,17,25 86:20 87:1 90:15

91:3,11 92:25 93:19,23 94:4 95:12 96:14,20 100:19,21 103:10,12,20 104:3 108:3

**formal** 23:5

**forum** 56:19

**forward** 28:8

**fragments** 70:25

**free** 49:5 102:14

**freely** 101:24 102:2

**frighten** 7:24

**front** 29:13 54:11 58:11,22 59:6 60:18 62:25 63:1,9 76:8 77:7 99:6, 18,21,23 102:3 106:22

**FTO** 12:15,16 87:8,9,11,13

**fur** 86:11

---

### G

**Garden** 26:2,12

**gate** 48:12 49:14,18 51:4,25 52:6 58:15 59:1,5 60:25 61:13,15,16 71:22 76:13 78:3,7,13,25 79:12 81:1,21,22,24 82:3 87:5 99:9,24 100:1

**gates** 81:21

**gave** 42:5

**generated** 25:5

**give** 24:13 25:14 31:23 43:21 49:8 51:5 88:9,21 92:23

**giving** 69:13 72:4

**good** 6:19 29:18,19 71:17

**Goodly** 55:3,20 56:17 65:14

**gotcha** 29:17

**govern** 16:8

**great** 8:15 13:17 100:12 101:1

**greater** 32:24 92:23

**ground** 70:23

**groups** 29:16

**growl** 46:3 74:10

**guarantee** 25:9

**guess** 85:21

**guided** 13:13

**guides** 13:13

**gun** 20:10 48:25 73:9,13,20 82:15

**gunfire** 19:4

**guy** 48:8

**guys** 42:5

---

### H

**hand** 7:23

**handle** 22:21

**handled** 67:23

**hands** 28:18 29:3

**Hands-on** 29:2

**happen** 86:4

**happened** 22:10 26:12

**harm** 8:15 13:18 21:25 54:15 70:13 100:12 101:1

**head** 36:13 79:25 80:18 81:15 82:18

**head's** 80:7

**hear** 18:3 60:7 61:24 73:8 76:11,25 78:18 98:18,25 99:8

**heard** 22:12 46:2 47:11 49:11,21 55:4 58:9 60:1 62:13 63:14 67:4 71:18 73:5 74:10,16 78:22 103:16, 22 108:23

**heightened** 84:25

**held** 45:13 48:13 52:6

**high** 11:25 92:7

**higher** 55:5

**hire** 105:20

**hit** 17:6 29:13 67:21 69:16 70:21 86:6

**hits** 86:17

**hold** 92:7

**hollow-point** 69:17

**holster** 45:13



John Roussel

**home**  105:25 106:6

**hope**  30:3

**hot**  67:13,25

**hours**  107:14

**house**  53:12 57:14,16,18,19,21,23
58:1,3,4,7,22 59:6,7 60:19 76:8
77:7,8,13 99:7,10,21 100:2 102:19

**household**  102:19

**houses**  102:21

**human**  14:2,8 29:7 36:5 86:9

**human's**  14:8

**humane**  33:2,15

**humans**  13:24 86:11 93:6,10,15,
17 101:8

**hypothetical**  101:6

**I**

**idea**  81:7 106:1,5

**identify**  23:6

**illuminated**  57:23 58:7

**image**  7:23,24 8:6

**imagine**  23:16 30:3

**immediately**  57:19 58:3 75:4
78:20

**imminent**  36:5

**importantly**  105:23

**impossible**  24:12 25:18

**in-service**  12:22 28:16,21 29:23
69:7

**incident**  16:6 23:17 24:6 25:1,2,4
26:9,11,13 33:3 34:10 44:4 52:19
53:9 57:7 68:13,15 107:10,12,13,
15,16

**incidents**  24:18

**include**  103:8

**inconsistent**  11:4

**indicating**  49:24 50:6

**indicative**  102:18,19

**indiscernible**  24:23

**individuals**  55:2

**ineffective**  36:7 39:12

**informal**  95:9

**information**  23:16 95:1

**initial**  89:12

**injurious**  32:24

**injury**  108:1,17

**innocent**  70:9

**inside**  21:23

**Insight**  94:14,15,18

**instance**  12:4,10 27:4 64:9

**instances**  67:10,16

**instructor**  28:20

**Integrity**  44:3 59:20 68:5 107:11

**intended**  97:7 98:11,13

**interaction**  7:1

**internal**  48:2

**interpret**  46:1

**interpreting**  46:19 51:17

**intersection**  26:15

**interview**  6:17 47:15 48:5,6 49:21
68:4 69:14 107:11

**interviewed**  68:5 72:11,14

**investigate**  54:18

**investigation**  42:7,12,15,23 52:18
53:1,4 59:20,22

**investigations**  53:8

**investigators**  49:1 74:9

**involve**  72:19,21

**involving**  23:17

**Iron**  25:11

**issue**  44:4 105:3

**issued**  30:17

**issues**  40:14 65:19 93:10

**item**  22:25 24:21,22,25 25:5

**J**

**Jim**  89:2

**job**  53:20 62:23

**joined**  11:18 28:5,7

**jury**  9:13

**justified**  54:21,22 55:11

**K**

**Kevlar**  15:11

**kick**  20:20 34:3,8 38:23

**kicked**  21:22 22:10,13 85:8,10

**kicking**  15:21 16:1 37:8 38:4 39:11

**kind**  11:25 12:17 13:11 15:5 16:5,8
19:10 21:17,18 26:6 28:13 45:6
46:3 54:20 60:5 67:21 71:2

**kinds**  17:12 40:14

**kissing**  58:9,20 59:8 60:1,18 61:12
62:2,11,25 63:9 76:7,12,20,25
77:14 93:25 96:5,10 97:21 99:1,2
100:2

**kissy**  58:17 66:10

**knock**  52:14

**knowing**  65:22 102:22

**knowledge**  44:14 56:14 103:25

**L**

**large**  37:18,22 50:18

**larger**  50:20 51:1 79:9 85:11 86:17

**law**  12:8 14:5 106:3

**lawsuit**  7:8,14,19 26:9,11 44:5

**lawyers**  23:1,20 107:14

**layperson**  15:4 40:10,13

**leading**  95:12

**leather**  15:12 16:10,17,18,19

**leave**  78:20,24

**led**  73:12



John Roussel

March 07, 2023
Index: left..object

**left** 45:10 72:24

**left-hand** 32:6

**leg** 22:4

**legs** 88:2

**lesser** 13:15

**lethal** 10:17 13:14 14:17,18 20:16 34:19 46:20

**lets** 101:24 102:2

**level** 11:25 54:11,13,19

**levels** 92:18

**light** 56:23

**link** 27:19

**linked** 24:25 25:4

**listed** 54:25

**listen** 76:10,11

**literally** 63:20

**live** 101:14

**located** 59:7

**location** 100:3

**long** 11:12 12:7,23

**looked** 53:18 62:7,8 96:2

**lot** 36:11 101:14

**loud** 46:2 60:4 61:13 78:16

**Louisiana** 6:2

**lower** 19:8 26:4,12 93:19

**M**

**made** 50:21 58:12,17,20,23 59:8 60:8,18,25 61:13 62:3,11 63:8 66:10 67:24 74:20 77:14

**Magazine** 23:23 25:22 26:14,15

**make** 13:7 17:7 23:8 31:5 41:23 46:2 52:14,16 62:25 69:20 70:7 94:6 100:2

**makes** 99:2,6,9

**making** 10:11 32:9 41:25 46:9 58:9 76:7 77:1,3 89:23 93:25 96:4, 10,17 97:21 99:1

**male** 29:7

**managing** 94:13

**mandate** 21:2

**mandates** 19:21

**mannequin** 29:10

**marginal** 25:13

**mark** 6:9,13,16 8:2 31:21 35:11 42:3,14 54:2 59:18 106:17

**marked** 35:14 57:5 64:1 68:3 77:4 96:6

**marks** 97:12

**mass** 29:12 31:11

**match** 64:13 65:3,16

**matter** 82:12 86:24 105:2

**means** 13:15 32:4 41:2,9 61:15

**medium** 15:7 60:5,6

**mentality** 84:7

**mentioned** 53:8 89:7 90:3 93:5,9

**method** 37:7 38:5 39:10

**methods** 14:16 36:6 46:21,22

**middle** 61:3,9

**mind** 36:12 51:13 65:8

**mine** 34:11

**minute** 88:21

**mis-transcribe** 48:20

**missing** 65:9

**mistake** 36:16

**mitigate** 16:2 20:16,20 21:8 33:16 34:13 37:1 38:5

**mitigating** 15:1 17:3 30:18

**modify** 72:9

**moment** 43:22

**month** 12:20 27:22,23

**months** 12:7,16 87:16,18

**Mountain** 25:11

**move** 80:2,19

**moving** 100:11

**multiple** 28:23 64:8 94:20 107:9 108:7

**muscle** 29:16

**N**

**nature** 54:15

**needed** 31:3

**neighbor's** 59:7 60:19 63:2 97:16 102:11

**neighborhood** 101:14

**neighborhoods** 26:1

**neighbors** 101:18

**night** 17:15,19 24:16

**No-hands** 35:3

**Noel** 55:3,20 56:17

**noise** 60:1,4 76:12 94:7 99:2

**noises** 58:9,17 61:12,13 62:2,11, 25 63:9 76:8 77:14 93:25 97:21 98:18 99:1 100:2

**non-** 14:16 20:15 101:9

**non-lethal** 13:15 21:7 22:20 46:21

**NOPD** 11:5,12,18 16:8 17:21 30:9, 13,17,19 31:21 34:25 35:11 53:17 64:16,17 68:17,24 69:3,19 70:24 71:7 73:22 90:11 92:20 94:2,10 103:4,17,25 104:7

**NOPD's** 18:9 20:2 56:15 62:23 100:14

**notes** 27:19

**notice** 88:11

**nuisance** 32:13

**number** 22:25 24:21,22,25 25:5 35:17,19 47:13,14 79:5 105:7

**numerous** 22:20

**O**

**object** 10:5,7 11:7 30:5 33:19 37:11 38:8 40:20 46:25 50:16 51:10 52:21 53:23 56:1,19 59:10 60:13,22 61:18 62:15 63:4 70:15, 17 73:24 74:23 77:11 80:12,22



81:13 83:13,20 84:2,9,15 85:17,25
87:1 90:15 91:3 92:25 93:23 94:4
96:14,20 98:2,21 100:19 103:10,
12,20 104:3 108:3

**objected** 108:11

**objection** 10:11,21,23 17:24 18:1
30:23 37:13 38:10 39:1,14,21 40:2
41:11,13 43:2 47:2 51:20 52:2
55:13,15,24 59:12 60:11 61:20
62:17 69:24 70:1 82:5 83:6 85:3
97:4 98:23 99:13 100:21 104:10
108:20

**Objective** 86:20 91:11

**observe** 36:22

**observed** 44:18 67:13 68:17

**observing** 107:24

**obstruction** 54:14

**obstructions** 46:16

**occasion** 67:15 68:19

**occurred** 26:14 42:24 81:18
107:23

**officer** 6:19 7:18 8:21 9:3 10:14,16
11:14,16,20,21 12:1 13:17 19:17
23:13 24:5 25:15 30:9 33:7,23 34:2
35:21 36:13 37:5 39:8 40:8 42:20
43:24 44:15 45:9,10,12 48:4,12,13,
14,24 53:17,19 56:15 57:6 61:12
62:6,10,22 63:19 64:1 68:4,24
73:13 74:3 79:13 80:9,25 82:18
83:18 85:7,22 87:8,14,18,21 88:10,
23 89:2,14,19 90:3 91:8,21 95:5,9,
22 96:10 97:11 103:4 104:8 107:23
108:1,18

**officers** 16:9 18:21 19:21 20:24
28:3,5,9 29:4 30:20 32:19 34:25
36:3 54:25 68:17 69:3,10 70:24
89:23 90:12 94:13 105:24

**one's** 41:25

**open** 48:13 52:6

**opened** 81:25 82:3

**openings** 44:9

**operate** 12:18

**opinion** 29:18 41:18 60:3 62:22

**opinions** 92:22,23

**opportunity** 43:24

**order** 27:12,22

**Orleans** 6:2 44:3 91:16 104:21

**outcome** 53:4

**outer** 18:25

**owner** 13:9 21:22 22:11

---

**P**

**pack** 84:7

**pain** 74:21

**paragraph** 32:11 33:4 35:24 36:2
40:18 44:8 47:21,22 48:23 61:3,9
62:6 90:24 91:18

**paragraphs** 90:6

**part** 14:23 31:8,14 69:4 88:6 94:1

**partnered** 12:16

**pass** 27:12,22

**passed** 57:20 77:3

**passes** 96:11

**past** 15:7 16:10 97:22 99:1

**path** 71:5

**patio** 102:3

**patrolling** 18:21

**patrols** 53:20

**peace** 32:14

**pedestrian** 44:10,12 49:14,18
50:13 71:22 81:22 100:1

**penetrate** 15:18

**penetrated** 15:14

**penis** 9:19 103:6

**people** 21:3 69:21

**perceived** 16:1 33:16 79:4 82:19

**perceiving** 81:7

**percent** 27:11,22

**perception** 13:16 36:14 60:9 83:3

**perceptions** 36:15

**Perdido** 6:1

**perfectly** 71:12

**perform** 32:19

**permits** 104:1,7

**perpetuity** 24:18

**person** 14:9 101:3

**personal** 56:13

**personally** 10:2,18

**pertaining** 65:23

**pet** 44:21 102:20

**photograph** 8:2 9:12 82:22

**physical** 70:12

**physically** 36:19 37:6 39:9 56:13

**PIB** 42:8,12,15 48:1,2 72:12,15

**pick** 13:9 29:18

**picture** 82:22

**pictures** 45:3

**piece** 69:16

**Pit** 53:11,14,18 62:7,8

**plan** 88:15

**plans** 104:14,23

**play** 49:7,22 57:5 66:18 68:3 97:25
99:14

**played** 57:13 58:25 63:12 66:4,24
68:6,15 69:13 71:16 73:4 74:3 76:9
78:11 96:22 97:8,22 99:16

**playing** 58:18

**point** 19:3 36:20 107:9,17

**pointing** 45:13 80:5

**police** 10:14 11:20,21 12:1,11
18:20 28:3,4 37:4,5 39:8 40:8 44:3
56:14 62:22 83:18 89:14 91:17,21
105:24

**policies** 12:8 18:10 27:17 36:9
56:15 62:24 73:22 89:24 90:4

**policy** 16:24 17:8,21 18:7,17
19:20,23,24 20:3,6 21:2 27:11,20,
21 30:13,18 31:22 32:1 35:11,25
41:8,19 69:3,5,19 70:6 90:12,13,
20,21 91:1,9,16 92:20 100:14
103:7,17,22



John Roussel

**portion** 12:8 19:6 73:5 108:14

**pose** 36:5

**posed** 15:1 17:4 20:17 34:14 37:2 100:7

**poses** 32:18

**position** 11:19 45:11 51:16

**positioned** 49:13

**possibilities** 71:8

**possibly** 50:18 51:1 62:12 83:4 102:22

**potential** 20:15 46:23

**potentially** 26:14

**pounds** 21:19,20

**Poydras** 6:17

**practice** 29:6

**pre-mark** 6:9

**preceding** 57:19 58:3

**prefer** 49:9

**premises** 101:11

**prepared** 44:2

**present** 9:12 36:19 37:6 39:9 56:13 100:12

**presented** 107:25 108:17

**presenting** 100:16,25

**pretty** 52:13 78:16 94:23 107:16

**prevent** 86:17

**prevented** 51:16 85:11

**previous** 98:8

**probes** 86:6

**problem** 64:17,24

**procedures** 12:9 56:16 62:24

**process** 12:2

**produce** 23:2

**produced** 64:17

**prohibited** 106:3

**prohibits** 103:17

**prompt** 63:21

**prongs** 31:7 86:14

**proper** 23:12

**property** 14:6 59:1 66:8 77:5 96:6, 12 97:12,16,18 101:25 102:4,15

**protect** 19:4,12 87:24 88:2,4

**proven** 32:22

**proves** 96:17

**provided** 30:20

**proximity** 26:8

**prudent** 62:25

**Pruitt** 48:6,8 64:11 65:14 68:5

**Pruitt's** 42:4

**public** 23:8 32:13,14 44:3 59:20 68:4 107:11

**Pull** 75:15

**puncture** 22:5

**puppy** 8:2,5,9,13,17 9:3,18 10:15 11:2 17:15 20:1

**purpose** 54:16 87:15 101:20

**purposes** 57:22

**put** 22:7 36:12 51:13 70:12 106:22

**putting** 64:14 68:16

**PWC** 49:6,8

---

## Q

**question** 10:13 17:19 26:9 31:2 33:19 36:16 37:11 38:8 39:19,25 42:2 46:25 49:6 51:10 55:13 61:18 73:24 74:15 76:7 85:7 96:14,20 97:5,20 98:2,25 99:15 100:19 103:12 107:20

**questioned** 98:4,10,17

**questions** 7:24 15:5 27:10,18 36:12,17 40:7 43:19 57:22 61:7 75:9,11 79:5 81:20 82:21 88:24 89:1,5 95:16,23 96:4 100:8

**quick** 68:16 69:16 106:23

**quickly** 45:9 48:13

---

## R

**radio** 20:10

**Raised** 68:1

**ran** 21:19

**rank** 11:15,18,19

**Rarely** 21:5

**rate** 27:12

**re-read** 108:14

**reached** 49:23 63:21

**react** 84:4 85:15

**reacts** 20:18

**read** 18:13 19:20 32:11,17,22 33:4 36:2,8 41:24 42:22 43:18 44:8 45:8 48:1 51:14,23 61:2,4,5,9 103:16 107:19,22 108:5,11,23

**reading** 18:15 19:23 47:7 107:22

**real** 68:16 69:16 106:23

**reason** 9:4 22:19 37:7 38:3 39:11 46:13 50:11 51:15,17,22 73:19 85:1 88:15 91:15 97:23 107:21 108:24

**reasonable** 15:22 26:8 38:15,22 41:2 46:21 62:21 84:24

**reasons** 32:14 51:5,23 108:7

**recall** 28:2 30:7 47:13 48:10 49:10 71:10

**receive** 13:17 26:23 89:11,15 92:15

**received** 11:4,23 12:1,11,14 13:5, 6,20,22 27:4 28:9 89:8 91:8 92:12 94:1 95:9

**receiving** 8:15 30:10

**recertification** 28:16

**recognize** 9:6

**recollection** 49:9

**record** 6:8 17:19 43:21 57:1,3 87:11,13 95:19

**recorded** 25:7

**records** 23:8



**reduce**  32:24

**refer**  6:10,14,16 11:14 95:25

**referring**  26:14 28:22 108:16

**reflecting**  107:10

**reflects**  96:9 103:17

**refresh**  49:8

**refresher**  12:23

**regard**  79:19 86:16 87:23 89:8
90:12 91:20 92:7

**reiterate**  69:9

**related**  27:5

**relates**  13:5,22 26:23 27:25 28:10
35:1

**relating**  44:4 52:19

**released**  45:12

**relevance**  25:13

**relevant**  90:4

**remained**  45:11

**remarked**  35:17

**remember**  26:25 35:6 45:17
47:12,14 48:6 67:8,9,16 69:13 71:3
72:23 74:7,9,13 76:6 96:3 100:7

**remind**  96:16

**repeat**  42:1 61:24

**replay**  59:25

**report**  24:6 25:1,2,4,6 42:4 44:2
47:7 48:2 59:20

**reporter**  31:23 54:9

**reposition**  57:2

**represent**  6:25 9:2 57:13,18 58:6

**representation**  9:14

**representing**  89:4

**request**  23:3,5,8

**require**  20:8 24:19

**required**  20:5 105:4

**residence**  8:22 9:15 62:12 63:1,2,
10 99:19,23 102:23 103:1,2

**resolves**  65:8

**resorting**  34:19

**respects**  41:8

**result**  24:17

**retake**  27:13

**retreat**  49:23 50:12 51:7 63:17

**retreated**  49:10 51:24,25

**retreating**  44:15

**review**  51:6 54:4 64:12

**reviewing**  27:16

**ricochet**  70:25 71:5

**right-hand**  57:20 68:8

**rights**  7:7 71:12

**roam**  102:3

**roll**  12:21

**room**  73:3

**Roquemore**  10:20 17:23 18:5
23:4,14 24:4,14,24 25:8,19 30:22
37:12 38:9 41:12 42:6,11 43:1,6,
11,20 47:1 52:20 55:14,23 59:9
60:10 61:17 62:14 69:23 70:14
72:2 74:22 88:25 89:2,6 90:18
91:6,14 93:4,24 94:8 95:15 100:20
103:9 105:5,10,14,19 106:11,16

**Roussel**  6:14,17,19 11:15 23:17
24:5 25:15 35:21 42:20 43:24 45:9
48:4,12,14,24 88:23 89:2 95:22

**Roussel's**  11:16 23:13 57:10 64:1
68:4 96:24 97:7,11

**run**  17:7 21:11 67:21 101:24
102:14

**running**  8:10,14,18 9:18,21 10:1,
16 11:3 15:21 21:8 51:4 83:2

**runs**  102:11

---

### S

**safe**  70:7

**safely**  50:12

**safer**  33:1,15

**safety**  32:14 36:5

**satisfied**  78:8

**scenarios**  14:14 92:18

**scene**  36:19 37:6 39:9 62:8 63:22

**screen**  75:22

**seconds**  58:25 59:5 60:24 82:12
86:24

**section**  90:6

**secured**  44:9

**send**  105:6

**senior**  11:21

**sentence**  44:9 61:10 107:19

**sentences**  33:3

**Sergeant**  42:4 65:14 68:5 92:1,16
93:2

**serve**  105:9

**service**  15:18 106:7

**Shannon**  59:21

**sheriff**  105:20

**shin**  21:21

**shoes**  16:5

**shoot**  12:22 14:1 28:21 29:12 70:8
100:15,25 101:9

**shooting**  7:8 9:22,25 10:17 11:2
22:16 33:6,7 41:9 54:14 59:19
81:17

**shot**  8:22 9:3,7,14 10:14 17:15
20:1 24:13 44:16 71:9 75:4

**shots**  47:10

**shoulder**  79:2

**show**  46:11 98:11,13

**showed**  59:4 98:12

**shown**  65:12,15

**shrapnel**  69:16

**sic**  54:15

**side**  16:19 32:6 57:20 97:17

**sift**  74:8

**significantly**  9:10

**silly**  15:5 31:2

**similar**  16:21,25 29:7 30:5



**single** 74:20

**sir** 94:6

**sitting** 82:23

**situation** 14:10,15 15:22 22:21
48:25 56:14 73:10,20 82:15,19
83:1 93:18

**situation's** 93:17

**size** 9:10 15:23 30:5 38:16,18 45:6

**skin** 22:5

**slammed** 78:17

**Slightly** 22:6

**smack** 20:22

**small** 21:8 45:2,5 74:11

**smaller** 45:7,8 86:9

**solo** 41:4

**solution** 65:19

**sound** 36:23 46:3 49:11 63:14
74:10,20 75:2 78:22

**sounded** 60:6

**sounds** 58:20 59:8 60:8,18 66:11
76:20,25 96:5,10,18

**speaks** 18:7

**specialized** 40:7

**specific** 69:2 104:23

**specifically** 59:21 90:6,24 93:25

**spoke** 29:4

**staircase** 45:14

**stairs** 50:21 83:2

**stand** 48:18 49:3

**standing** 50:23 63:20

**start** 11:11,18 12:5 13:4 64:21,23
71:18 73:2

**started** 11:20 45:24 46:8 77:1

**starts** 66:8 97:18

**state** 106:3

**stated** 48:4,12,24 61:12 62:6 91:17

**statement** 32:15,20 48:1 61:16
71:25 72:4,10 73:6 89:25 107:21

**statements** 56:6

**stating** 30:18

**steal** 15:9 16:13

**steel** 16:11

**step** 45:12

**steps** 45:24 46:6,9

**stomach** 29:14

**stop** 22:13 36:3 38:16 76:4,15,16
78:12

**stopped** 76:19

**stops** 19:9

**stored** 24:16,17,21

**straight** 79:24

**Street** 6:1 23:23 25:25 26:12
57:14,16

**streets** 18:22 53:21

**studied** 36:8

**study** 27:16,19,21

**stuff** 25:13 49:22

**subpoena** 105:3,9 106:8,13

**subsection** 34:21 35:1,23

**sue** 32:9

**sued** 7:13,19

**suede** 16:19

**sufficient** 17:11,12

**suggest** 34:18 43:19 74:20

**supervising** 94:13

**surfaces** 71:5

**surprise** 53:17

**surprised** 15:17 73:13

**surrounding** 102:19

**swings** 86:16

**swivel** 79:25

**sworn** 6:3

**System** 94:14,15,19

---

**T**

**tackle** 12:8

**tactics** 69:8

**taking** 27:20

**talk** 14:9 67:9 93:10,12,17

**talked** 26:22 29:4 87:15

**talking** 15:24 29:21 32:9 37:20
79:16,17 92:17

**talks** 54:7

**tapped** 79:2

**Tarak** 6:24 25:9 43:7 105:6

**target** 29:6

**tased** 29:25

**taser** 14:24 20:10 28:17,19 29:6
30:4,10 31:3,9,15 32:4,6 33:15,24
39:25 73:17 85:22 86:14

**tasers** 28:14 30:14,18,21

**taught** 29:12

**teaches** 12:17 94:10

**team** 59:22

**technically** 49:17

**Ted's** 75:9

**teeth** 15:14,17

**telling** 74:9

**tells** 10:9

**tempered** 67:13,25

**ten** 58:25 59:4 60:24

**terms** 9:10

**Terrible** 30:2

**testified** 6:6 71:19 81:3 82:14
98:19

**testify** 72:5

**testifying** 72:3

**testimony** 48:21 65:11

**tests** 28:23

**that'd** 54:14 80:9



John Roussel

**thee** 43:5

**thigh** 29:14

**thing** 32:10 42:23 52:11 61:3 71:11,13,15 85:21

**things** 12:9 24:15 40:11 52:14 54:15 79:21 92:18 94:20 95:7 97:25

**thinking** 41:24 81:5

**thought** 41:1 47:16 52:7 73:16 80:24 81:3 96:23 98:11

**threat** 15:1 16:2,3 17:4 20:16,20 21:8 30:19 32:18 33:17 34:13 36:5 37:1 38:6 46:23 74:4 79:6,9 83:4 100:6,12,16,17 101:1 108:1,17

**threatened** 8:9

**threatening** 8:7 101:10

**threats** 94:11 100:11

**till** 50:4

**time** 6:24 10:8 13:4 16:6 28:7 30:19 48:15 50:13 63:16,19 66:18, 21 68:7 72:9,11,16,17 75:3 76:11, 12 80:25 81:8 82:2,9,18 85:14 87:8 88:24 91:22 95:7

**times** 21:14 64:21 67:4 68:20,22 72:14 95:8

**timestamp** 45:9 58:18 63:12,13 64:13 66:11 76:17 78:19 96:9,17 97:21

**timestamps** 64:22 65:3,13,23

**tiny** 20:24

**titled** 35:11

**today** 6:24 48:18 49:3

**today's** 65:22

**toe** 15:9 16:11,13,18,19

**told** 27:1 40:16 41:1 49:1

**tons** 23:19

**tool** 15:1 17:3 21:7 32:23

**tools** 17:11,12

**top** 68:7

**topics** 27:23 71:3

**touch** 50:5

**touched** 49:24 50:8 63:21

**touching** 66:13

**toys** 77:19

**track** 94:20

**train** 13:2 30:14 31:8

**trained** 14:2,16 30:4 70:24 91:1

**trainer** 92:4

**training** 11:4,23 12:1,4,11,14,15, 20,21,24 13:1,4,12,20 14:23 26:22 27:1,4,9,15,24 28:6,9,13,15,17,22 29:2,5 30:8,10,21 31:4,19 34:24 35:3,4 37:4 39:7 40:7 56:14 62:22 69:5,7,9 71:2,7 73:21 87:14,16,17 89:7,8,11,12,16,18,20,22 91:8,24 92:12,15 94:1,2,9 100:15

**trains** 90:11 91:9 92:9

**transposed** 108:15

**traumatic** 33:2,16

**treated** 94:11

**treatment** 22:3

**tree** 66:4,8,11 77:4 96:5,11,18 97:12,14,17,22 99:1,3,4,16

**trial** 105:1,4 106:8,21

**trials** 23:10

**true** 26:9 29:5 61:16 71:24

**truth** 6:4,5 45:21

**tunnel** 56:24

**turn** 31:24,25 35:21 43:4 47:20 54:24 60:17 78:20,24 80:18

**turned** 36:20 45:10 78:21 80:7

**type** 12:24 15:13 17:4 19:12 20:16 46:3

**types** 24:15,18 35:4

---

**U**

**ultimately** 36:25 54:20

**unable** 50:12 51:7

**unanimously** 55:9,21

**unaware** 51:3 82:1

**unclear** 47:12

**uncommon** 68:24

**understand** 7:7,13,18 14:4 24:11 36:13 41:6 44:2 49:13,16 65:6,18 66:1 69:2 89:24 97:20 101:9

**understanding** 19:24 38:21 56:15 62:23 63:8 70:5 100:14

**understood** 98:15

**underwent** 87:16

**unformal** 95:9

**uniform** 18:17 19:20 20:2,6 21:1 69:4

**unjustified** 55:22

**unreasonable** 10:3,19

**unwritten** 90:20,21

**upper** 29:15 87:24,25

**Uptown** 25:22,23,24

---

**V**

**vacations** 104:15

**variable** 37:18 41:4

**vehicle** 44:11,16,19 81:21,22,24

**versions** 64:8

**versus** 13:14 93:16 103:1

**vest** 18:25 19:1

**vicinity** 37:19 41:5 69:21

**video** 6:11,16 45:18 46:1 47:12 50:2 56:6,10 57:5,13 58:25 59:4 63:12 64:23 66:4,23 68:3,6,15,16 69:13 71:11,16 73:2,4 74:3,8,19 75:15 76:9 78:11,20 96:21,22,24 97:8,22 98:3,6 99:16

**videos** 48:11 65:23,25 98:20 107:9,10

**violating** 103:7

**violation** 17:21 18:6,17 20:2

**visible** 46:15

**vision** 46:14

**vocalize** 75:3



MAGNA
LEGAL SERVICES

John Roussel

**voice** 68:1

**volume** 60:7

**voted** 55:21

**Voting** 54:25

---

**W**

---

**waist** 87:24

**wait** 50:4 98:6

**walk** 60:25

**walking** 59:5

**watch** 47:15 49:5 50:4 63:25 71:13,15 96:8

**watched** 26:18 34:9,11 47:17 51:23 56:6,9 107:10 108:22

**watching** 47:8 97:11

**water** 77:23

**ways** 22:20

**weapon** 31:22 47:22,24 90:5 107:24

**wear** 15:6 16:9 18:21 19:1,21

**wearing** 16:6,25 18:18 19:17,25 103:17 104:8

**wears** 19:11

**Website** 64:16

**week** 12:7,23 104:20,24 106:18

**weight** 92:23

**Westbrook** 55:3,20 56:17

**whatsoever** 30:8

**white** 57:23,24 58:6

**witnesses** 105:2

**wondering** 52:13 97:24

**word** 72:9

**words** 47:21 80:18 108:5,15

**work** 80:16 83:11

**worked** 65:21 85:23

**working** 68:17

**worn** 6:10,14 24:16,17 25:6 57:6 64:1 79:19 80:4,10,19 96:1,24

97:11 99:14

**write** 25:6

**writhing** 74:21

**written** 27:14,15 28:23 69:3,5

**wrong** 50:3 58:22 98:6,8 108:5

---

**Y**

---

**y'all** 77:13 78:2

**yard** 77:17 78:5,9 82:10 88:10,19 102:3

**yards** 101:15,18 102:23

**year** 12:22 28:15,21 69:7 91:23,24

**years** 11:13

**yellow** 32:7

**yesterday** 29:5

**yesterday's** 65:19

