# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEREK BROWN and** | * | **CIVIL ACTION** |
| **JULIA BARECKI-BROWN** | * | |
| | * | **NO. 22-847** |
| **versus** | * | |
| | * | **SECTION "L"** |
| **DERRICK BURMASTER, SHAUN** | * | **JUDGE FALLON** |
| **FERGUSON, and the CITY OF NEW** | * | |
| **ORLEANS** | * | **MAGISTRATE DIVISION "4"** |
| | * | **MAGISTRATE JUDGE ROBY** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' FIRST MOTION IN LIMINE

**MAY IT PLEASE THE COURT:**

Defendant, Derrick Burmaster, submits the following in opposition to Plaintiffs' First Motion in Limine (Rec. Doc. 94), insofar as it applies to Burmaster.

Only two of the issues in the Motion pertain to Burmaster. They are the requests to bar any intimations of criminal conduct by plaintiffs and bar two "surprise" witnesses listed by Burmaster on his witness list that were never identified in initial disclosures. The rest of the issues solely pertain to the City and will not be addressed here.

First, with regard to the argument contained in part "C" of Plaintiffs' Memorandum in Support (Rec. Doc. 94-1), while there has been some testimony regarding alleged criminal conduct of plaintiffs with regard to their dogs, Burmaster does not intend to bring any of that up in this case. However, their request goes beyond that and seeks to also bar any reference to the reason for the officers' presence at the Plaintiff's home in the first place. This was a call relating to a domestic disturbance. That is the reason that the two officers were there. As Officer Burmaster testified:

33

16  Q.   You arrived by yourself in a one-man
17  car?
18      A.   Yes.  I was sitting in front of the
19  Brothers on St. Charles Avenue.  It was 9:30 at
20  night and I was ready to get off.  I did not
21  want to go to the Browns' house because I don't
22  like taking domestics passed 9 o'clock because
23  it makes you get off late, and I'm always
24  interested in getting off on time.  But, you
25  know, I was close.  I was like, Man, let me

34

1  see.  Let me go handle it, 'cuz it sounded like
2  it was a domestic even though it came out as a
3  fight.
4      So I got there way before Roussell
5  and I parked down the street.  I got out the
6  car and I started smoking a cigarette while I
7  was waiting for Roussell to pull up.  A man
8  from on the other side -- across the street, on
9  the other side of a fence, told me that he
10  could hear a woman yelling.  This is what he
11  tells me.  But he couldn't hear the male.  And
12  he heard things breaking.  So I -- I considered
13  that it was a domestic, you know, and then I
14  waited for Roussell.
15      And then when Roussell pulled up, I
16  broke -- Usually what I like to do is tell the
17  responding officers what information I've
18  learned before they arrived so that we could
19  all be prepared.  The man told me -- I believe
20  I also told Roussell that it was the bottom
21  apartment.  So that's where we were headed
22  at -- at the time when this happened.[1]

Derek Brown, one of the plaintiffs, admitted that he and his wife were having an argument

and that it was loud:

47

8      Q.   Tell me how, what the volume of your

---

[1]Exhibit "A", Deposition of Burmaster, p. 33, l. 16 - p. 34, l.22.

9  disagreement was?
10        MR. ANADA:  Object to form.  Go
11        ahead.
12     A.  It was probably loud.  I don't -- I'm not
13  the type to raise my voice.  Julia is more vocal
14  then me.  But, yes, I'm guessing it was loud enough
15  for someone to have called 911 and reported a noise
16  disturbance.  It must have been loud.
17     Q.   Right.  You understand that somebody did
18  call the police about the disturbance between you
19  and your wife on that night; is that right?
20     A.  Yes.[2]

This was confirmed by plaintiff Julia Barecki-Brown as well:

                    21
1     Q.   And, apparently, somebody heard the
2  argument in the neighborhood, right?
3     A.   Someone made a call.
4     Q.   So somebody heard something, right?
5     A.   Yes.
6     Q.   Do you know what they heard?
7     A.   Us arguing with each other.  I can be
8  pretty loud sometimes.
9     Q.   Where you loud that night?
10    A.   Yes.[3]

The Plaintiffs admitted that they were having a loud argument.  This was interpreted to be a domestic disturbance, which was the reason two officers were there and the reason why the nature of the call is relevant.

    With regard to the argument in part F of the memorandum regarding the alleged "surprise" witnesses, the first is Captain Precious Banks.  At the time of the incident she was a Lieutenant at the Training Academy of the NOPD.  She was the supervisor of Sgt. David Duplantier, who conducted

---

[2]Exhibit "B", Deposition of Derek Brown, p. 47, l. 8 - p. 47, l. 20.

[3]Exhibit "C", Deposition of Julia Barecki-Brown, p. 21, l. 1 - p. 21, l. 10.

the review of the shooting at the Training Academy at the request of the Use of Force Review Board.

Her name is signed just below Duplantier's as the approving supervisor on the Exhibit B7, New

Orleans Police Department, Education and Training Division, Training Action Plan (TAP), PTTR

# Item D-13802-21, date 10-12-2020, Bates Labeled "City Defendants 002711 – City Defendants

002714.[4]  Plaintiffs have had this document for some time and used it as an exhibit at the deposition

of Shannon Jones-Brewer, the PIB investigator assigned to the administrative investigation:

```
                         29
12            MR. ANADA:  Thank you.
13             Sorry.  My assistant marked, with the
14       exhibit sticker, my marked-up copy.  I'm just
15       going to put it on the clean copy.
16             I'm going to introduce the following
17       document as Exhibit 40.  It's titled "Policy
18       Tactics Training Recommendation."
19       (Exhibit No. 40 was marked for identification.)
20            MR. ANADA:  Forty.[5]
```

It was also used at the deposition of Sgt. David Duplantier:

```
                         86
2   BY MR. ALPAUGH:
3      Q.   Good afternoon, Sergeant.
4      A.   Good afternoon, sir.
5      Q.   And as I said at the beginning, I represent
6   Derrick Burmaster.  What has been handed to you is
7   Exhibit 40.
8      (Exhibit No. 40 was marked for identification.)
9   BY MR. ALPAUGH:
10      Q.   Can you take a look at that and -- a minute or
11   two and make sure you're familiar with that document?
12      A.   I'm very familiar with this one, sir.
13      Q.   Why are you very familiar with that document?
14      A.   I conducted the PTTR on this, the policy
```

---

[4]Exhibit "D".

[5]Exhibit "E", Deposition of Shannon Jones-Brewer, p. 29, l. 12 - p. 29, l. 20.

15   tactics training recommendation.
16       Q.   And that was the training that was as a result
17   of the use of force --
18       A.   Yes, sir.[6]

Her testimony is relevant regarding the report of Sgt. Duplantier and why she approved it on

behalf of NOPD.

With regard to the second "surprise" witness, Russell Green, his identity was not known until

the deposition of John Helou taken on March 8 of this year.  Helou identified him as one of the two

officers who shot a dog this year.  However, he will not be called as a witness and Plaintiffs have

been so informed.

Officer Burmaster respectfully requests that this Honorable Court deny Plaintiffs' Motion.

Respectfully submitted:

*/s/ C. Theodore Alpaugh, III*
**C. THEODORE ALPAUGH, III, T.A. (#02430)**
**CLAUDE A. SCHLESINGER (#15042)**
GUSTE, BARNETT, SCHLESINGER & ALPAUGH, L.L.P.
639 Loyola Avenue, Suite 2130
New Orleans, Louisiana 70113-7103
Telephone:      (504) 529-4141
Facsimile:      (504) 561-0326
Email:          cta@gustebarnett.com

**Attorneys for Defendant,**
**DERRICK BURMASTER**

---

[6]Exhibit "F", Deposition of David Duplantier, p. 86, l. 2 - p. 86, l. 18.

-5-