## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEREK BROWN** and | * | **CIVIL ACTION** |
| **JULIA BARECKI-BROWN** | * | |
| | * | **NO. 22-847** |
| **versus** | * | |
| | * | **SECTION "L"** |
| **DERRICK BURMASTER, SHAUN** | * | **JUDGE FALLON** |
| **FERGUSON,** and the **CITY OF NEW** | * | |
| **ORLEANS** | * | **MAGISTRATE DIVISION "4"** |
| | * | **MAGISTRATE JUDGE ROBY** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

**MAY IT PLEASE THE COURT:**

Defendant, Derrick Burmaster (Burmaster"), respectfully submits his Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Liability. The Motion reads more like an Opposition to Burmaster's Motion for Summary Judgment (Rec. Doc. 105). Accordingly, rather than repeating all of the recitations and arguments therein, Burmaster incorporates by reference the said Motion, Memorandum in Support (Rec. Doc. 105-1) and all Exhibits thereto (Rec. Docs. 105-2 - 105-10). However, there are specific allegations in Plaintiffs' Motion for Summary Judgment that Burmaster will address herein, although in no particular order.

At the outset, Burmaster admits that he shot the dog. While he feels very sorry about it, he was in that moment fearful of bodily injury[1] and had only seconds to react. No more than five

---

[1] Plaintiffs' appear to focus on Burmaster's fear that he would be bitten in his penis, which was also a stated fear in a 2012 dog shooting. But it was not just that. It was his leg or anywhere else. Exhibit "1", Deposition of Burmaster, p. 91, l. 7 - p. 92, l. 19; p. 128, l. 23 - p. 130, l. 8.

seconds elapsed between Officer Burmaster becoming aware of the dogs and the last shot.[2] Nevertheless, Burmaster submits that the actions that he took were reasonable and justified under the circumstances.

## LAW AND ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]   A dispute is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.[4]   A fact issue is "material" if its resolution could affect the outcome of the action.[5]

"Although [qualified immunity is] nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised."[6]   This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."[7]   "[Q]uestions of immunity ordinarily should be decided by the court, not by the jury[8] because "[t]he entitlement is an immunity from suit rather than a mere defense

---

[2]Burmaster Body Worn Camera video, timestamp 21:41:25 - 21:41:30, Exhibit B (Rec. Doc. 105-3) to Burmaster's Motion for Summary Judgment.

[3]Fed. R. Civ. P. 56(a).

[4]*Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[5]*Id*.

[6]*Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[7]*Id*. (internal quotation marks omitted).

[8]*Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991).

to liability."[9]

"The plaintiff's burden is a formidable one." *Roy v. City of Monroe*, 950 F.3d 245 (5th Cir. 2020). A plaintiff bringing a constitutional violation claim has the ultimate burden to show that a defendant violated a constitutional right - - that is, the plaintiff must make this showing whether or not qualified immunity is involved. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319,330 (5th Cir. 2020) and *Morgan v. Swanson*, 659 F.3d 359,371 (5th Cir. 2011).

**B.     Qualified Immunity**

The standard for Qualified Immunity was discussed at length in Burmaster's Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 105-1) beginning at Section B on page 13. However, in the interest of brevity, salient portions will be repeated here.

The dispositive inquiry is whether it would have been clear to a reasonable officer in the situation faced by Burmaster that it was unlawful to shoot and kill a dog that was behaving aggressively towards him.

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.[10]   The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[11]

---

[9]*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

[10]*Thomas v. City of New Orleans*, 883 F. Supp. 669, 681 (E.D. La. 2012) (citing *Reichle v. Howards*, 566 U.S. 658, 663 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Loughlin v. Tweed*, No. CIV.A. 15-649, 2015 WL 3646777, at *6 (E.D. La. 2015).

[11]*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

As noted above, qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law."[12] The doctrine applies "regardless of whether the government official's error is a 'mistake of law, a mistake of fact or mistake based on mixed questions of law and fact.'"[13]

The purpose of qualified immunity is to shield public servants not only from liability, but also from defending a lawsuit. Once a defendant invokes the qualified immunity defense, the plaintiff carries the burden of demonstrating its inapplicability because of clearly established law.[14] "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear that every *reasonable official* would have understood that what he is doing violates that right.'"[15] Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not divest officials of qualified immunity.[16] Courts must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison.[17]

Under the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), this Court is not restricted with respect to the order in which it analyzes the "constitutional violation" prong and

---

[12]*Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).

[13] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[14]*Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

[15]*Ashcroft v. al-Kidd*, 563 U.S. 731, (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).

[16]*Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)

[17]*Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) (citing *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

-4-

the "clearly established law" prong of qualified immunity.

**C.     Burmaster did not violate the Fourth Amendment**.

Burmaster does not dispute that a dog is corporeal movable property under the Fourth Amendment.  However, this situation goes beyond shooting a pet dog.  As Plaintiffs contend, we must look at all of the facts and circumstances.  In this case the circumstances that must be considered is why the officers were there in the first place and what led up to the shooting.

The officers believed that there was a possible domestic disturbance, which is one of the most dangerous calls an officer can respond to.  As such, two officers were dispatched.   Then the two officers proceeded to the Plaintiffs' property.  The officers took reasonable steps to determine the presence of dogs however, as the call was domestic and they did not know what they would find.  As the complainant was not the source of the disturbance, they could not call to announce themselves.[18]

What is undisputed is that Officer Burmaster had no advance notice that he would encounter dogs on the Browns' property.  The evidence, which is undisputed and clear, both from Burmaster's and Roussel's BWCs and from their depositions, is that Burmaster made "kissy" sounds as he was approaching the Browns' property and while he was in clear view of their house, including the stairs leading up to the porch.  Both Burmaster and Roussel thought that no dogs were present and they were totally surprised by the presence of the dogs and their aggressive behavior.  When an incident is captured on video, the Fifth Circuit has held that the Court should look to the video:

> Nevertheless, because there is video and audio recording of the event, we are not required to accept factual allegations that are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Rather,

---

[18]Exhibit 1, p. 41, ll. 1 - 14.

we should "view[ ] the facts in the light depicted by the videotape." *Id.* at 381, 127
S.Ct. 1769.

*Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021), cert. denied sub nom *Tucker v. City of Shreveport, Louisiana*, 211 L. Ed. 2d 388, 142 S. Ct. 419 (2021).  The BWC videos, along with Burmaster's testimony as well as that of Sgt. Duplantier of the NOPD Training Academy established that, in the short time he had to react, Burmaster had no non-lethal options available to him.  The only alternative would have been to let the dog attack or bite Burmaster first, before he would be authorized to defend himself by using his weapon.

A similar situation presented itself in *Lane v. Rechfertig*, 2017 WL 5653870 (W.D. Tex. Jan. 25, 2017).  In that case an office responded to a residential alarm call.  When he got to the residence, he noted a sign on the front window that stated "Beware Rottweiler on Duty."  The officer announced his presence and then waited for backup.  Once backup arrived, they entered the residence and, while conducting a protective sweep, encountered a Rottweiler which they shot and killed. The owner of the dog filed a civil rights action against the officers and the City.  The officers claimed qualified immunity.  The Court dismissed the Fourth Amendment claim on that basis, observing as follows:

> Nevertheless, even assuming the scant and at times contradictory facts alleged in Lane's complaint are sufficient to state a claim for unreasonable seizure under the Fourth Amendment, they are insufficient to demonstrate a constitutional right was clearly established such that a reasonable officer in the Individual Defendants' situation would have understood their conduct violated that right. Officer Rechtfertig had *no advance notice of a dog on the property* when he responded to the residence alarm call. Even though Lane alleges the sign posted on the front window warned visitors of the presence of a Rottweiler, there were *no other visible signs of a dog, such as food bowls or toys*. Nor did Officer Rechtfertig *hear or see a dog after he announced his presence at the doorway* of the residence 5–10 times. Thus, the officers were *surprised when a large Rottweiler appeared*. Officers Rivera and Rechtfertig, who were conducting a sweep of a hallway and bedroom area, made a

-6-

*split-second decision to act in self-defense in a tense, uncertain, and rapidly evolving situation*. Qualified immunity *shields the Individual Defendants from liability for this decision*. See *Stephenson*[19], 632 Fed.Appx. at 185 (concluding the officer was entitled to qualified immunity where the officer shot a dog after being startled by a dog which was "showing its teeth"); *Grant*[20], 625 Fed.Appx. at 672 (granting qualified immunity where a surprised officer shot a dog when the dog showed its teeth and charged towards the officer's legs); Romero v. Bexar Cty., 993 F. Supp. 2d 658, 662 (W.D. Tex. 2014) ("It is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat."). Because Lane has failed to plead facts sufficient to defeat the Individual Defendants' qualified immunity defense, dismissal of his Fourth Amendment claim is warranted.[21]

The Fifth Circuit addressed qualified immunity in the context of killing a pet dog in the case of *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015).  That case involved an officer responding to a call of a man brandishing a gun.  When the officer got out of his car he drew his weapon as the man was not complying with his commands.  The following took place:

> As Officer Duncan approached Karlton, he was surprised by a large dog, which was later identified as the 50–pound, three-year-old boxer belonging to the Stephensons. Officer Duncan testified that the dog bared its teeth and jumped on him. Karlton claimed, however, that the dog did not jump and was "smiling." It is undisputed, however, that the dog was in the front yard without a leash and appeared suddenly as Officer Duncan reached Karlton. Officer Duncan fired one shot at the dog, testifying that he did so because he feared for his safety. Officer Duncan then proceeded to detain and search Karlton. The dog died later that day.

*Stephenson v. McClelland*, 632 F. App'x 177, 180 (5th Cir. 2015).  The parents of the man filed suit alleging, among other claims, a Fourth Amendment claim for the unreasonable seizure (death) of their dog.  In upholding the District Courts dismissal of the Fourth Amendment claim, the Fifth Circuit stated:

---

[19]*Stephenson v. McClelland*, 632 Fed.Appx. 177 (5th Cir. 2015).

[20]*Grant v. City of Hous.*, 625 Fed.Appx. 670, 674 (5th Cir. 2015).

[21]*Lane v. Rechtfertig*, 2017 WL 5653870, at *4 (W.D. Tex. Jan. 25, 2017), emphasis added.

This court has held that the killing of a dog can constitute a seizure within the meaning of the Fourth Amendment. See *Grant v. City of Houston*, No. 14–20653, 625 Fed.Appx. 670, 674 (5th Cir.2015). The Fourth Amendment requires that a seizure be objectively reasonable. In making such a determination, we look to the totality of the circumstances, balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "We analyze this question from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]' " and " 'allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Plumhoff v. Rickard*, ––– U.S. ––––, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) (second alteration in original) (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865).[22]

The Court then went on to state:

Viewing the facts in the light most favorable to the nonmovants, we conclude that Plaintiffs have not produced sufficient evidence to demonstrate that a constitutional right was clearly established such that a reasonable officer in Officer Duncan's situation would have understood that his conduct violated that right. *Officer Duncan did not know there would be a dog present during his encounter with Karlton and was surprised by its presence*. While Karlton knew his family pet to be friendly and nonaggressive, *Officer Duncan did not*. Officer Duncan was startled by a large dog that was showing its teeth (whether baring them aggressively or "smiling"). *Officer Duncan was forced to make a split-second judgment in a tense situation and he acted to protect himself*. See *Grant*, 625 Fed.Appx. at 672 (granting qualified immunity where an officer shot a dog after being surprised when the dog showed its teeth and charged towards the officer's legs); cf. *Kincheloe v. Caudle*, No. A–09–CA–010 LY, 2009 WL 3381047, at *8 (W.D.Tex. Oct. 16, 2009) (fact issues precluded summary judgment where a plaintiff testified that a police officer fired two shots, killing a pit bull who was merely walking toward bushes in the front yard); *Romero v. Bexar Cty.*, 993 F.Supp.2d 658, 662 (W.D.Tex.2014) ("It is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." (citing *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir.2003))). Accordingly, we conclude that Officer Duncan is entitled to qualified immunity on these claims.[23]

Another Fifth Circuit case cited by the Courts in *Lane* and *Stephenson* is *Grant v. City of*

---

[22]*Stephenson v. McClelland*, 632 F. App'x 177, 184 (5th Cir. 2015)

[23]*Stephenson v. McClelland*, 632 F. App'x 177, 185 (5th Cir. 2015), emphasis added.

*Hous.*, 625 Fed.Appx. 670, 674 (5th Cir. 2015).  In *Grant* a dog owner brought § 1983 action against the city and police officers alleging the illegal search of her residence, seizure of her money, and the killing of her dog.  The relevant facts are that a number of Houston Police Department officers were dispatched to execute an arrest warrant for the brother of the plaintiff who was at her residence. While searching the premises, the officers heard barking which turned out to be the plaintiff's dog, which had been secured in a bathroom.  One of the officers was an experienced dog handler and in order to remove the dog from the immediate search area took it downstairs and placed him in the garage.  Later two officers went downstairs to search bottom floor, including the garage. When they arrived at the garage they noticed a pit bull in a kennel situated against the garage wall.  One of the officers, Simpson, started searching the contents.  The following then took place:

> As Simpson bent down to inspect the luggage, he "heard the loud, sharp sound of aggressive barking and snarling coming from behind [him]." Thinking that the pit bull might have escaped from its kennel, Simpson turned around and saw Buster, "a medium-sized, yellow, mixed-breed dog, with its ears folded back along the top of its head, its teeth showing, its head lowered, and standing in an aggressive stance." As Simpson turned to face Buster, the dog charged towards the officer's legs, "snapping its teeth and turning its head sideways so that it could bite [his] leg." Simpson kicked Buster twice, but the dog continued its aggressive approach. After retreating to a corner, Simpson drew his pistol and fired at Buster. Simpson's first shot caused Buster to collapse onto the floor, but the dog quickly recovered and continued to charge at Simpson. Simpson's second shot penetrated Buster's neck, instantly killing the dog.[24]

In upholding the grant of qualified immunity, the Fifth Circuit stated:

> Here, the officers had no advance notice that a dog was present on the premises to be searched. Moreover, Officer Fisher, an experienced dog handler, took reasonable precautions to isolate Buster while the house was being searched. Finally, while Buster's killing doubtlessly presents a grave intrusion on Grant's property rights, in

---

[24]*Grant v. City of Houston*, 625 F. App'x 670, 672 (5th Cir. 2015) .

this case, unlike in *Hells Angels*[25], the governmental interest of safety provides a sound justification. The evidence in the record indicates that Simpson was genuinely surprised by Buster's presence and aggression, and Grant has marshalled only a scintilla of evidence to dispute the expert and eyewitness testimony indicating that Simpson exhausted all non-lethal options prior to using lethal force against the dog. Naquin, Bocanegra, Gracia, Russell, and Cromier could not have foreseen that Simpson would be forced to resort to such force in the course of searching the garage.[26]

The Plaintiffs also contend that Burmaster's belief that the dog would cause him serious bodily harm was objectively unreasonable. This ignores how little time Burmaster had to react, how he perceived the dog (as a small pit bull) and, importantly, the conclusions of Burmaster's designated expert, Sgt. David Duplantier of the NOPD Training Academy. In his report and testimony, he testified that it was his opinion that Officer Burmaster acted properly as he was trained to do and that Officer Burmaster's response fell within reason[27]:

> It is the opinion of Sgt. Duplantier that the incident was tragic and unfortunate; however, Officer Burmaster acted properly. He attempted to identify a potential threat but found himself faced with a quick difficult decision. Outside of the animal in question, Officer Burmaster placed no one else in harm's way. As police officers, our decisions to use force and the amount of force used must be based on reasonableness. That reasonableness is considered when determining if a situation is considered an imminent threat to ourselves or others. Though there may be officers that may have addressed the charging animal in a different fashion, Officer Burmaster's decision to use lethal force towards the dog falls within reason.[28]

---

[25]*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir.2005).

[26]*Grant v. City of Houston*, 625 F. App'x 670, 676 (5th Cir. 2015).

[27]Sgt. Duplantier's expertise and the discussion of Sgt. Duplantier's opinion is contained in Burmaster's Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 105-1), pp. 7-11. The relevant deposition excerpts are in Exhibit "H" (Rec. Doc. 105-9) and his report is Exhibit "I" (Rec. Doc. 105-10)

[28]Rec. Doc. 105-9, Exhibit "H", p. 5.

Sgt. Debra Pruitt was assigned to the Public Integrity Bureau Force Investigation Team ("FIT").[29] She was charged with conducting a criminal investigation of the incident which happens whenever there is any shooting involved.[30] As part of her investigation she took a statement of Officer Burmaster. When questioned about her interview of Officer Burmaster, she testified that he related what he experienced.[31] Sgt. Pruitt prepared a report as a result of her investigation.[32] As a result of her investigation, she determined that there was no criminal conduct by Officer Burmaster and that he was justified in his actions.[33]Pruitt also came to the conclusion that Officer Burmaster's actions were reasonable:

> 36
> 20  Q.  Okay.  And after you interviewed him did you
> 21  believe that his assessment of that threat was
> 22  reasonable?  Objectively.
> 23  A.  Right.  I mean, he felt the dog was going to
> 24  attack him and bite him and cause him to go to the
> 25  hospital.[34]
>                    *   *   *
>                37
> 14  Q.  I understand that was his perception, but the
> 15  question I'm asking is a little bit different.  Did you
> 16  believe after interviewing him that his perception of
> 17  the threat was appropriate?  Objectively.
> 18  A.  I mean, the only way I can answer that, is that
> 19  he experienced that.  And that he made those choices

---

[29]Rec. Doc. 105-6, Exhibit "E", Deposition of Debra Pruitt, p. 12, l. 9 - p. 13, l. 5.

[30]Rec. Doc. 105-6, Exhibit "E", p. 34, l. 6 - p. 35, l. 7.

[31]Rec. Doc. 105-6, Exhibit "E", p. 35, l. 8 - p. 37, l. 12.

[32]Rec. Doc. 105-7, Exhibit "F", Report of Debra Pruitt, Exhibit 37 to Exhibit "E".

[33]Rec. Doc. 105-6, Exhibit "E", p. 78, ll. 5-18; Exhibit "F", p. 37.

[34]Exhibit "2", Excerpts from deposition of Debra Pruitt, p. 36, l.20 - p. 36, l. 25.

20   based on what he was going through.[35]

The Plaintiffs' also conflate the City's experts with Burmaster's experts and say that all experts agree that the shooting was not justified. They lump all of them together under "Defendants' Designated Experts"[36] when clearly such is not the case. The City has designated Sgt. Debra Pruitt, former Deputy Chief Chris Goodly, Sgt. Shannon Brewer, Sgt. David Duplantier and Lt. John Helou.[37] However, Burmaster did not designate all of these officers, but rather designated simply Sgt. Debra Pruitt and Sgt. David Duplantier.[38] Interestingly, the testimony and findings of neither of these officers were discussed by Plaintiffs. Why? Because they go against the narrative that everyone agrees that the use of force herein was unjustified.

Again, their findings and testimony are addressed at length in Burmaster's Memorandum in Support of Motion for Summary Judgment (Rec. Doc. Rec. Doc. 105-1, pp. 5-6, pp. 7-11) which is incorporated by reference into this Memorandum. Suffice it to say, however, that as stated above, both Sgts. Pruitt and Duplantier believed in their opinion that the shooting was justified and that Burmaster did *not* violate policy.

Plaintiffs also contend that Burmaster's use of deadly force was unreasonable as he had other non-lethal options. However, according to the testimony from Burmaster and Sgt. Duplantier, he had no other options. Officer Burmaster testified that a Taser would not have worked:

---

[35]Exhibit "2", p. 37, l. 14 - p. 37, l. 20.

[36]Plaintiffs' Memorandum, p. 9, Heading C. Plaintiffs do, however, attach Burmaster's designation of experts as Exhibit "N" (Rec. Doc. 110-16) to their Memorandum.

[37]City designation, Exhibit "3".

[38]Burmaster Designation, Exhibit "4".

61
21      Q.   Why did you pull your gun out of
22   your holster rather than your taser?
23      A.   Taser would have been ineffective.
24      Q.   Why?
25      A.   Well, with a taser, you get --

62
1    There's one cartridge.  Do you know how a taser
2    works?  They supply us with two cartridges.
3    One stays in the taser and the other one is on
4    our belt.  The dog I expected to come after me
5    quickly.  I would have only had one shot with
6    the taser.  And plus, it would have also been
7    ineffective because when I shoot a taser, the
8    top prong shoots directly straight out.  The
9    bottom prong comes down at a downward angle.
10   So I would have had to -- One prong would have
11   entered into the dog and other prong would have
12   hit the ground.  And all it would have done was
13   give the dog a -- a -- like a tingling
14   sensation instead of intramuscular
15   incapacitation.  It wouldn't -- It wouldn't
16   have been effective. [39]

Sgt. Duplantier agreed:

54
16        If you're too close, then you won't achieve
17   NMI, which is what you want.  You achieve basically
18   pain compliance, like a bee sting.  If you got a very
19   tight spread, the darts are only a few inches apart,
20   it'll hurt but it's not enough to maybe incapacitate
21   the person.
22      Q.   Understood.
23      A.   So --
24      Q.   Or the animal?
25      A.   Or the animal.  So referencing -- it makes it
55
1    much, much more difficult with an animal, speed, size.
2    So -- and most animals don't attack you by running
3    sideways.

_____

[39]Exhibit "1", p. 61, l. 21  62, l. 16.

4   Q.  Yeah.
5   A.  They can't.  So they're running dead-on, so in
6  order to effect a good shot with a CEW, i.e. a taser,
7  at an animal, you got to let the animal get right up on
8  you.  And then -- even then, your spread is going to be
9  so small to where you may not achieve what you want.
10   Q.  It can be done, but it's more difficult than
11  on a person?
12   A.  It's a thousand times more difficult than on a
13  person.  Your target area is so small and the speed is
14  so much more.[40]

Sgt. Duplantier has seen a Taser used effectively on a dog only once, and that is by a second

officer, not the one being attacked, and the shot was from the side and not head on.[41]

He also testified that a baton would not be useful and that he did not see any alternative

method:

97
17    The fact that he got jammed into the corner
18  was a big factor, and the dog's response.  The dog is
19  just being a dog.  It's his house, his domain, so I get
20  it.  But unfortunately, the dog being a dog put the
21  officer in a situation where he had to do something.
22    The taser -- the probability of the taser
23  being effective, slim to probably none.  The fact --
24  if you wanted to go to an impact weapon, i.e. baton,
25  that -- like I said, you got to let the dog get up on
98
1  you.  So it basically almost effect a bite or damn near
2  effect a bite before you could -- and even then, you
3  lose leverage because now the dog is on top of you.
4  You really don't have leverage to swig the impact
5  weapon.
6    So unfortunately, to the behest of everybody
7  else, I didn't find anything wrong with his actions.

---

[40]Exhibit "5", Deposition of David Duplantier, p. 54, l. 16 - p. 55, l. 14.  A complete discussion of Tasers and dogs versus humans is contained in Exhibit 1, p. 52,l. 24 - p. 55, l. 14.

[41]Exhibit 3, p. 56,l. 16 - p. 57, l. 25.

8  Once again, I said I'm open minded.  If somebody can
9  show me a better tactical response, I'm willing to
10  listen, but I didn't -- I didn't see another
11  alternative method.
12  BY MR. ALPAUGH:
13     Q.  So you felt, in the circumstances, he acted
14  properly?
15     A.  Yes, sir.[42]

Further whether a kick would have been successful is muddied by the fact that there were two

dogs present.[43]  Regardless, based on what he saw the dogs were in a mindset to harm a person as

they were protecting their territory:

                    144
18  BY MR. ALPAUGH:
19     Q.  A couple times in here, you see the -- you see
20  the phrase, "A dog who feels threatened will usually
21  try to keep his distance."  Right?  You see that in
22  there?
23     A.  Yes.
24     Q.  And that a dog approaching you is almost
25  always friendly.  In this situation we had in this case
                    145
1  here, given what you saw on the body-worn camera, did
2  you think that those dogs were friendly?
3     A.  Once again, I started off saying it was
4  tragic, being a dog person.  But even I looked at it,
5  and I thought the dogs were in a mindset where they may
6  harm an officer.
7     Q.  Right.  They weren't feeling threatened; they
8  were protecting their --
9     A.  I looked at -- I took it as they were
10  protecting their territory, doing what a dog is
11  supposed to do.[44]

---

[42]Exhibit "5", p. 97, l. 17 - p. 98, l. 15.

[43]Exhibit "5", p. 145, ll. 15-23.

[44]Exhibit "5", p. 144, l. 18 - p. 145, l. 11.

Plaintiffs also rely on what they contend are policy violations to establish liability.  Ignoring for the moment the fact that the disciplinary process involving Officer Burmaster has not been completed, he has had no *Loudermill* hearing which is his Constitutional Right[45] and no final finding by the Superintendent of any violation whatsoever, that contention has been addressed in this Circuit and answered in the negative. First, with regard to negligence itself, the Court has stated:

> The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest. There is no question about the fundamental interest in a person's own life, but it does not follow that a negligent taking of life is a constitutional deprivation. The government has the right to employ deadly force under some circumstances, and there are interests to be balanced in deciding the reach of constitutional demand.  See *Tennessee v. Garner*, 471 U.S. at ——, 105 S.Ct. at 1700, 85 L.Ed.2d at 8–9.[46]

Second, with regard to a claim of negligence due to alleged failure to follow police procedures, this holding in *Young* was applied in the case of *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992) where the Court stated:

> Our holding in *Young v. City of Killeen* is instructive. In that case a police officer observed a drug transaction between Young and another person. The officer approached the suspects in his car with the light flashing. Young attempted to flee in his car, but the officer blocked Young's path. The officer left his car and told Young to get out of his. When Young reached under his seat for what appeared to be a weapon, the officer shot and killed him. Under those facts, the court found that the actions of the officer were not excessive to the need. In so holding, the court stated that if Young's action gave the officer cause to believe that he was under a threat of serious harm, then the officer's use of deadly force was not a constitutional violation. Young is pertinent to the instant case for another reason. The Plaintiffs have charged that the force Lowery employed was excessive, at least in part *because Lowery may not have followed established police procedures in displaying his badge and identifying himself while in plain clothes*. The implication is that Lowery thereby *manufactured the circumstances* that gave rise to the fatal shooting. *We rejected a*

---

[45] *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

[46] *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985)

*similar argument in Young.* There, the district court found that the officer had acted negligently and contrary to good police procedure. On appeal, we noted that "[t]he sense in which [the district court] finds excessive force is that the force would have been avoided if [the policeman] had approached Young as required by proper police procedures." We found to the contrary, however, that regardless of what had transpired up until the shooting itself, Young's movements gave the officer reason to believe, at that moment, that there was a threat of physical harm. We said: *The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest.* There is no question about the fundamental interest in a person's own life, but it *does not follow that a negligent taking of life is a constitutional deprivation*. We do not mean to imply that we in any way find Lowery's actions leading up to the shooting to be negligent. We merely explain that *even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections*.[47]

Officer Burmaster acted properly and in accordance with procedure. His shooting of the Browns' dog was justified and does not constitute a Constitutional violation.

Plaintiffs also contend that Officer Burmaster used unreasonable force as he allegedly could not justify each of his shots and refers to his administrative statement to PIB. However, what he was not asked in that statement was why he fired three times. The simple answer is that he fired until he felt the threat was neutralized:

> 97
> 2     Q.  So after each shot you fired, you
> 3  evaluated whether it was sufficient to stop the
> 4  threat.  It wasn't and so you continued firing
> 5  until the third shot?
> 6     A.  Yes.
> 7     Q.  Is that accurate?
> 8     A.  (Witness nods head affirmatively.)
> 9     Q.  Yes?
> 10     A.  I was a -- I was not able to get out
> 11  of there until the three -- until I was
> 12  finished firing the last round.
> 13     Q.  My question was --
> 14     A.  And then I looked at the other dog,

---

[47] *Fraire v. City of Arlington*, 957 F.2d 1268, 1275–76 (5th Cir. 1992), emphasis added.

15  but I determined that that dog seemed like it
16  was -- it was going to leave me alone.  So I
17  decided at that point I didn't have to shoot
18  that dog, so I ran out the fence.  I was able
19  to get out the fence.[48]

The Plaintiffs also contend that the conclusions of what they call the "Defendants' own

Experts" agree with their expert and so since they all agree Plaintiffs should be entitled to summary

judgment in their favor on that basis alone.[49]  However, as discussed above, they do not take into

account Burmaster's experts, Pruitt and Duplantier, who believe that the shooting was justified.

Accordingly, as there is no unanimity of views of the experts, this argument falls.

**D.    Burmaster did not violate the Browns' Constitutional Rights.**

Contrary to Plaintiffs' assertions, they cannot show a violation of clearly established law.[50]

 "A government official's conduct violates clearly established law when, at the time of the

challenged conduct, '[t]he contours of [a] right [are] sufficiently clear that every reasonable official

would have understood that what he is doing violates that right.'"[51] Officer Burmaster does not

dispute that the Fourth Amendment right to be free from unreasonable search and seizure is clearly

established.  However, the United States Supreme Court has repeatedly instructed that clearly

established law should not be defined at a high level of generality.[52]  "The general proposition, for

---

[48]Exhibit "1", p. 97, l. 2 - p. 97, l. 19.

[49]Plaintiffs' Memorandum (Rec. Doc. 111-1), p. 20, section 6.

[50]This issue is discussed at length in Burmaster's Memorandum in Support of Motion for Summary Judgment (Rec. Doc. 105-1) and in Section C above.

[51]*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added).

[52]Ashcroft, 563 U.S. at 742 (2011).

example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."[53]  Rather, the question must be "frame[d] . . . with specificity and granularity."[54]

With the more specific inquiry the Supreme Court requires, "the question becomes whether there is either 'directly controlling authority . . . establishing the illegality of such conduct' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'"[55]  Although the Supreme Court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[56]  In *White*[57], the Court reminded lower courts that clearly established law must be "particularized" to the facts of the case.  The judgment of the appellate court was vacated because it relied on general constitutional principles that did not identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ..." U.S. Const. amend. IV. To prove a violation of the Fourth Amendment, the person must show that she had a subjective

---

[53]*Id.*

[54]*Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)).

[55]*Gonzalez v. Huerta,* 826 F.3d 854, 858 (5th Cir. 2016) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

[56] *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citing *White v. Pauly*, 137 S.Ct. 548, 551 (2017),

[57]*White v. Pauly*, *supra*.

expectation of privacy in the object of the challenged search and that her expectation is one that society would view as reasonable. *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 1656 (1984) (footnote omitted). The applicability of the Fourth Amendment thus depends on "whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted).

The plaintiff cites a number of cases regarding killing of pet dogs. However, none of those cases involve a shooting of a dog who was in the midst of attacking a police officer who felt he was in imminent danger.[58] For instance, plaintiffs cite the case of *Maldonado v. Fontanes*, 917 F.3d 296 (1st Cir. 2009), 367 for the proposition that killing of a pet dog is an unlawful seizure. However, that case involved police raids in Puerto Rico of two public housing projects where the police seized and violently destroyed a host of pet animals.

*Skinner v. Ard,* 517 F.Supp. 586 (M.D. La. 2021) involved an officer who, while serving a summons, was given a "nip" by a dog who was not barking or aggressive. The deputy shot him. In *Grant*, *supra*, the officer perceived a threat and shot and killed a pet dog. The officer was granted qualified immunity which was upheld by the Fifth Circuit. *Sonner v. Ackal*, 2017 WL 3080023 (W.D. La. 2017), involved law enforcement officers killing a pet dog used for breeding. However, the Court stated that it did not reach the issue of qualified immunity nor the ultimate issue of whether

---

[58]Plaintiffs' contend that Burmaster's Body Worn Camera shows the dog wagging its tail. No one who has viewed that video has said that to date. In fact, that contention was belied by the testimony of Sgt. Duplantier on page 15 *infra*.

the officer's violated the Fourth Amendment because they were not raised in the defendants' motion for summary judgment. *Sonnier v. Ackal*, 2017 WL 3080023, at *6 . *Viilo v. Eyre*, 547 F.3d 707 (7h Cir. 2008) involved the killing of a dog who was not any threat to the officers and qualified immunity was denied. *Robinson v. Pezzat*, 818 F. 3d. 1 (D.C. Cir. 2016) involved the shooting of a dog which was put in the bathroom. The grant of summary judgment in favor of the officer was reversed as the appellate court determined that a reasonable jury could find that the officer acted unreasonably in shooting a pet that posed no threat. Qualified immunity, however, was not at issue.

*Brown v. Battle Creek Police Dep't*, 844 f.3d. 556 (6th Cir. 2016) involved the shooting and killing of two pit bulls. The Court upheld the grant of qualified immunity to the officers despite its holding that "there is a constitutional right under the Fourth Amendment to not have one's dog unreasonably seized." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). *Mayfield v. Bethards*, 826 F. 3d 1352 (10th Cir. 2016) involved two officers who, without provocation, shot and killed two dogs in plaintiffs' yard. In that case, qualified immunity was denied. *Carroll v. County of Monroe*, 712 F.3d 649 (2nd Cir. 2013) involved the execution of a "no-knock" warrant and an attack by a dog that was in the house, resulting in its death. The jury ruled in favor of the officer and Court upheld verdict, holding that there was sufficient evidence for the jury to find that the officer reasonably feared for his safety. Finally, *Anderson v. City of Chicago*, 2018 WL 2142337 (N.D. Ill. 2018) involved the killing of a dog during the execution of a search warrant. The opinion involves the denial of a Motion for Summary Judgment on qualified immunity as the court found that there was a question of fact as to whether the officers' actions were reasonable.

The examination of the foregoing cases established that while there is consensus that

shooting a pet dog is a Fourth Amendment seizure, whether that seizure is unlawful and violative of the Constitution depends on the facts of each case.  The result in the foregoing cases were consistent only in that if they found that the action in shooting the dog were reasonable then they found for the officer and if not they found against the officer.

It is not as simple, as plaintiffs' contend, that an officer shooting a pet dog has, *ipso facto*, committed a Constitutional violation. Rather, the whole issue boils down to whether it was reasonable.

## CONCLUSION

The Browns cannot carry their burden to negate Burmaster's right to qualified immunity. Burmaster reasonably believed that his conduct was not barred by existing law and that current precedent does not place the constitutional question beyond debate.

Accordingly, Plaintiffs' Motion must be denied.

Respectfully submitted:

*/s/ C. Theodore Alpaugh, III*
**C. THEODORE ALPAUGH, III, T.A. (#02430)**
**CLAUDE A. SCHLESINGER (#15042)**
GUSTE, BARNETT, SCHLESINGER & ALPAUGH, L.L.P.
639 Loyola Avenue, Suite 2130
New Orleans, Louisiana 70113-7103
Telephone:    (504) 529-4141
Facsimile:    (504) 561-0326
Email:        cta@gustebarnett.com

**Attorneys for Defendant,**
**DERRICK BURMASTER**

D:\GBSA, L.L.P\CTAData - Documents\CTA CORP CLIENTS\FOP.Burmaster, Derrick\Pleadings\MSJ Opposition\MMO.opp.summary.judgment.CTA.03232023.wpd