UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| **DEREK BROWN and** | * | CIVIL ACTION |
| **JULIA BARECKI-BROWN** | * | |
| | * | NO: 22-00847 |
| **VERSUS** | * | |
| | * | SECTION: L |
| **DERRICK BURMASTER, SHAUN** | * | JUDGE FALLON |
| **FERGUSON, and the CITY OF** | * | |
| **NEW ORLEANS** | * | MAGISTRATE DIVISION: 4 |
| | * | MAGISTRATE JUDGE ROBY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DERRICK BURMASTER'S STATEMENT OF MATERIAL FACTS
THAT PRESENT A GENUINE ISSUE**

Derrick Burmaster ("Burmaster"), pursuant to Local Rule 56.2, submits the following Statement of Material Facts that Present a Genuine Issue. This statement is submitted solely for the purposes of Plaintiffs' Motion for Partial Summary Judgment on Liability [Doc. 110]. Any statement herein is not to be considered an admission as to any fact or admissibility at trial.

| # | Plaintiffs' Material Facts [Doc. 110-2 | Burmaster's Response |
|---|---|---|
| 1. | In April of 2021, the Brown family had two dogs: Apollo, a small Catahoula puppy who was 16 weeks old and weighed approx. 22 lbs., and Bucho, a larger adult dog. The Browns loved their dogs dearly, and like most American families, considered them to be members of their family. | Undisputed. |
| 2. | The was Apollo. [picture] | Undisputed. |
| Fn 2 | This photograph of Apollo was taken ten days before Apollo's death, and accurately depicts his size on the date of the incident. | Undisputed. |
| 3. | For additional reference, the following images depict Apollo next to (1) Bucho and the Browns' adult daughter and (2) next to a food bowl: [3 pictures] | Undisputed. |
| 4. | At approximately 9:15 p.m. on the evening of Saturday April 10, 2021, Plaintiffs Derek Brown and Julia Barecki-Brown, husband and wife, got into a verbal argument. The argument occurred at the Brown | Undisputed. |

1

| | | |
|---|---|---|
| | family's home located at 1420 Felicity Street in New Orleans. Julia's voice was loud enough that a neighbor called 911 to report the argument. | |
| 5. | Officer Burmaster responded to investigate the complaint about the argument at the Brown family's home a few minutes before 9:39 p.m. Burmaster was 5' 10.5" and weighed 230 lbs., and was over 10 times the weight of Apollo. | Undisputed. |
| Fn 3 | The Brown family's home at 1420 Felicity Street is a single family house with an attached downstairs apartment in which the Browns' personal friend was staying in at the time of the incident discussed herein. | Undisputed. |
| 6. | Once he arrived at the scene, Burmaster waited near his car for his backup Officer John Roussel to arrive. Officer Roussel arrived at approximately 9:40 p.m. | Undisputed. |
| 7. | Once Officer Roussel arrived on scene, the two officers walked toward the Brown family's home at 1420 Felicity Street. Officer Burmaster made "kissy sounds" in an attempt to determine whether any dogs were present on the Browns' fenced in private property. Officer Burmaster made these "kissy sounds" in front of the Browns' neighbor's house located at 1422 Felicity Street, instead of making them in front of (or at the gate of) the Brown family's house at 1420 Felicity Street. | Disputed. The BWC shows that Officer Burmaster made kissing sounds closer to the edge of Plaintiff's property line and not "in front of" the neighbor's house. |
| 8. | The Brown family's dogs Apollo, the small puppy, and Bucho, the larger adult dog, were outside on the Browns' front porch, properly contained within their fenced in property, as the officers approached 1420 Felicity Street. | Undisputed. |
| 9. | Because Burmaster made the "kissy sounds" in front of the wrong house (i.e., the Browns' neighbor's house), they were inaudible to the Browns' dogs, and therefore did not draw them out to make themselves known to the officers. | This is not a fact and is therefore disputed. |
| 10. | The Brown family's home contains a front courtyard that is enclosed (along with the house) by an iron fence | Undisputed. |
| 11. | As Burmaster arrived at the the [*sic*.] closed pedestrian gate entrance to the Browns' private courtyard, he was no longer making any kissing sounds, did not announce his presence whatsoever, and failed to observe (a) that the iron fence enclosing the property was reinforced at the bottom with a mesh screen to contain the Brown family's small puppy (Apollo was so small that he could fit between the iron fence posts) and (b) that, in addition to the unlocked pedestrian | Undisputed. |

2

|  | | |
|---|---|---|
|  | gate, there was a second even larger vehicle gate to the courtyard that was also unlocked |  |
| 12 | After the officers entered the Brown family's courtyard through the pedestrian gate, Bucho and Apollo, located on the Browns' front porch, alerted to the sound of the gate closing behind the officers, and Bucho—the larger adult dog—began to bark. At this moment, when Bucho first barked, but before Burmaster could even see the dogs, Burmaster drew his firearm | The body-worn camera of Officer Burmaster is the best evidence of whether he drew his firearm before seeing the dogs. For the purpose of this motion, the statement is undisputed. |
| 13. | Next, Bucho, followed by Apollo, began running down the stairs leading from the porch to the courtyard. | Undisputed. |
| 14. | At this same moment, Officer Roussel, who was "standing right next to" Burmaster, tapped Burmaster on the shoulder for the purpose of communicating to him that they should retreat out of the pedestrian gate that they just walked in through in response to the barking. After doing so, Roussel exited the pedestrian gate leading back to the sidewalk and held it open for Burmaster to do the same because Burmaster was "close enough to also exit in time." | Disputed. The body-worn camera video accurately shows the events and does not support this characterization of the video. |
| 15. | Burmaster chose not to exit the pedestrian gate with Roussel, and instead held his ground. | It is undisputed that Officer held his ground, but Officer Burmaster's ability to choose is not supported by the body-worn camera evidence. |
| 16. | A second even larger unlocked vehicle gate was also right behind Burmaster, and a courtyard table with chairs was in front of him. | Undisputed. |
| 17. | Bucho, followed by Apollo, ran down the stairs leading from the porch to the courtyard. Upon descending the stairs and reaching the courtyard, Bucho ran in the opposite direction from Burmaster. The puppy Apollo, however, continued to run in Burmaster's direction As captured by Burmaster's BWC, Apollo's tail was clearly and visibly wagging as he approached Burmaster | Disputed. The body-worn camera video accurately shows the events and does not support this characterization of the video. |
| 18. | At this moment, Officer Burmaster was equipped with his non-lethal department issued Conducted Energy Weapon ("Taser"), but chose not use it on Apollo in violation of NOPD policy. A Taser would have been an effective non-lethal tool for Burmaster to have used on Apollo. | Disputed. NOPD policy states that officers "may" use a taser against an animal that "poses an active threat to officers in their |

3

|     |     |     |
| --- | --- | --- |
|     |     | efforts to perform their duty," but does not require such use.[1] |
| 19. | Per NOPD's Conducted Energy Weapon (CEW) Policy (Ch. 1.7.1), "[a] CEW may … be deployed [on an animal if [] the animal poses an active threat to officers in their efforts to perform their duty; other conventional means to control the animal have been exhausted, may be unreasonable, or unavailable; and the officer reasonably believes that use of a CEW is necessary." "The CEW has proven to be an effective tool against dangerous animals and may reduce the need for greater, more injurious force against such animals. The use of a CEW on an animal is a safer, more humane, and less traumatic conclusion to the incident." (emphasis added). | Undisputed. |
| 20 | Burmaster was also required to carry a police baton, another non-lethal weapon that could have effectively been used on Apollo, but was not carrying it in violation of NOPD policy. Burmaster was also not wearing his department issued body armor in violation of NOPD policy | It is disputed as to whether a baton would have been effective against Apollo.[2] |
| 21. | Burmaster was also wearing police boots, but chose not to simply kick Apollo to eliminate any threat. | Undisputed. |
| 22. | Instead, Burmaster immediately resorted to firing his service weapon three times at Apollo, mortally wounding him. | Disputed. The body-worn camera video accurately shows the events and does not support this characterization of the video. |
| 23 | At no time did Apollo bark, growl or vocalize in any way before Officer Burmaster shot him. At no time did Apollo jump, lunge or bear his teeth at Burmaster. Apollo was so young that he had not yet even developed the ability to bark.18 Except for two adult teeth, Apollo still had all of his puppy teeth. | Disputed. The body-worn camera video accurately shows the events and does not support this characterization of the video. |
| 24. | "Officer Burmaster stated that he was concerned the dog [Apollo] was going to bite his Penis." Notably, when Officer Burmaster previously fatally shot another citizen's dog in 2012, he was concerned that that dog would bite his penis as well | Undisputed. |

---

[1] Ex. A, Excerpts of Deposition Transcript of 30(b)(6) witness David Duplantier (Duplantier Deposition), pp. 52::25 – 56:57:25; 97:17 – 98:15 ("The taser – the probability of the taser being effective, slim to probably none"); Exhibit 22, NOPD Operations Manual Ch. 1.7.1 (Conducted Energy Weapon (CEW)), p. 9 (Dangerous Animal), Exhibit 23 NOPD Operations Manual Ch. 1.3 (Use of Force), paragraph 32.

[2] Ex. A, pp. 97:23 – 98:11 ("the baton . . . you got to let the dog get up on you. So it basically almost effect[s] a bite or damn ner effect a bite before you could – and even then, you lose leverage because no the dog is on top of you.")

4

| | | |
|---|---|---|
| 25. | Burmaster did not evaluate the need for each of the three shots he fired at Apollo. He did not even know how many shots he fired at Apollo, and further stated that "when he fired his weapon three times at the dog, it was all a blur and Officer Burmaster could not recall the dog's actions." Apollo did not continue to advance towards Burmaster after the first shot. | Disputed. Burmaster testified that he shot until the threat was neutralized. |
| 26. | Ricochet shrapnel from Burmaster's bullet struck Roussel's forearm, requiring Roussel to obtain medical treatment. | Undisputed. |
| 27. | After hearing the gunshots, Derek and Julia Brown ran out of their house into the courtyard to find that Apollo had been shot. Burmaster decided not to request aid for Apollo because the Browns were upset and were already "hugging on" Apollo. Apollo ultimately died in Derek's arms. The Browns were ultimately diagnosed with Post Traumatic Stress Disorder | Undisputed. |
| 28. | The incident was captured on both Officer Burmaster's and Officer Roussel's BWCs. | Undisputed. |
| 29. | After the incident, Burmaster was taken off of patrol duty by NOPD and put on desk duty pending an investigation of Burmaster's use of deadly force on Apollo. | Undisputed. |
| 30. | The investigation was referred to two separate NOPD internal investigative bodies: the NOPD Public Integrity Bureau ("PIB") Force Investigation Team and the Use of Force Review Board. | Undisputed. |
| 31. | NOPD Detective Shannon Brewer, who led the PIB Force Investigative Team's Administrative Shooting Investigation of Burmaster, concluded that "Officer Burmaster's discharge occurred due to Officer Burmaster observing the dogs and firing his weapon out of fear and not because the dog presented a threat of serious bodily injury or death to Officer Burmaster." Detective Brewer's conclusion in this regard is particularly instructive given that the City of New Orleans has formally designated her as an expert witness in this matter. | According to the City, Shannon Brewer has been designated an expert witness so that she can provide her opinion as to matters in within her expertise and responsibilities with NOPD, which include the PIB investigation process, the Civil Service appeal process, and matters relating the NOPD's discipline of officers for policy and rule violations. She is not designated as an expert on use of force and will not be called to provide an opinion as to the reasonableness of Officer Burmaster's actions. The remainder of this statement is undisputed. |

5

| 32. | During her interview of Burmaster conducted in the course of the PIB Force Investigative Team's Administrative Shooting Investigation, Detective Brewer concluded that Burmaster's use of lethal force on Apollo was "unjustified." In rendering her decision, Detective Brewer found that "[t]he dog fatally wounded by Officer Burmaster did not present an imminent threat toward Officer Burmaster and upon recognizing the dog did not present a threat of serious bodily harm, Officer Burmaster should have holstered his weapon." | Disputed. As written, the statement implies that Brewer provided a statement as to the reasonableness of Officer Burmaster's actions. She was not doing this. Rather, she was making a determination as to whether NOPD policy was violated. |
|---|---|---|
| 33. | Detective Brewer further determined that, in shooting Apollo, Officer Burmaster committed five separate NOPD use of force policy violations, including: a. Violation of NOPD's Use of Force Policy (Ch. 1.3) part 11 which mandates that "[o]fficers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create an objectively reasonable belief that a situation may escalate to the point at which lethal force would be authorized. Once an officer determines that the use of deadly force is no longer likely, the officer shall re-holster the weapon." b. Violation of NOPD's Use of Force Policy (Ch. 1.3) part 13(a) which mandates that "Deadly/Lethal force shall be used only when … There is an imminent danger of death or serious physical injury to the officer or another person." c. Violation of NOPD's Use of Force Policy (Ch. 1.3) part 32 which mandates that "Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical." d. Violation of NOPD's Uniform Specifications Policy (Chs. 41.10 part 29 and 41-11 part 8(c)) which | Undisputed. |

6

| | | |
|---|---|---|
| | mandate that officers must carry on them in the line of duty a "PR 24 police baton and ring holder or expandable baton with authorized carrying case," and must wear body armor. e. Detective Brewer further concluded that Burmaster would have also been in violation of NOPD's Moral Conduct Policy (Rule 2, Paragraph 6: Unauthorized Force), but technically could not be due to the verbiage written in the rule which limits its applicability to unauthorized force against a person. Detective Brewer recommended that this policy be reflected to also apply to unauthorized force against animals going forward | |
| 34. | Detective Brewer determined that Burmaster violated these policies because: "[t]he [smaller] dog did not harm or attempt to harm Officer Burmaster," "[t]he smaller dog did not attack or attempt to attack Officer Burmaster," and "Officer Burmaster fired his weapon out of fear and not due to an attack or attempted attack by the dog. Detective Brewer determined the dog did not present a threat of serious bodily injury to Officer Burmaster. Officer Burmaster was not equipped with a PR 24/Expandable Baton or ASP at the time of this incident. Officer Burmaster did not attempt any other less lethal options including exiting the front yard." | Undisputed. |
| 35. | Detective Brewer certified that "Officer Burmaster received disciplinary action related to these policy violations," and further noted that she "deemed Officer Burmaster not to be credible" based on his statements made to the PIB Force Investigative Team compared to the actual evidence. | Undisputed that she said this in her report. However, there has been no due process disciplinary *Loudermill* hearing nor has the Superintendent imposed discipline. |
| 36. | The other two members of the NOPD's PIB Force Investigative Team, Sergeant John Helou and Captain Sabrina Richardson, unanimously concurred with the conclusions of Detective Brewer. | Undisputed. |
| 37. | The NOPD's Use of Force Review Board also independently investigated Burmaster's shooting of Apollo. Similar to the PIB Force Investigative Team, the Use of Force Review Board, comprised of Deputy Superintendent Christopher Goodly, Deputy Superintendent Paul Noel, and Deputy Superintendent Arlinda Westbrook, all unanimously ruled that Burmaster's shooting of Apollo was "NOT JUSTIFIED." | Disputed. As written, the statement implies that the Use of Force Review Board provided a statement as to the reasonableness of Officer Burmaster's actions. It was not doing this. Rather, it was making a determination as to whether NOPD policy was violated. |
| 38 | In issuing its ruling, the Use of Force Review Board found that Burmaster (1) "had a false perception of a | Undisputed. |

7

| | |
|---|---|
| threat that was not there," (2) "did not articulate any threat towards him," (3) was not faced with any "attack," and (4) "the smaller dog posed no threat." The Use of Force Review Board further recommended that Burmaster receive "De-escalation training" "ASAP." | |

Respectfully submitted:

<u>/s/ C. Theodore Alpaugh, III</u>
**C. THEODORE ALPAUGH, III (#02430)**
**CLAUDE A. SCHLESINGER (#15042)**
Guste, Barnett, Schlesinger & Alpaugh, L.L.P.
639 Loyola Avenue, Suite 2130
New Orleans, Louisiana 70113
Tel:   (504) 529-4141
Fax:   (504) 561-0326
Email: cta@gustebarnett.com

**Attorneys for Defendant,**
**DERRICK BURMASTER**