# In the Matter of:

*Derek Brown and Julia Barecki-Brown*

*vs.*

*Derrick Burmaster, Shawn Fergusan, and the City of New Orleans*

_____

## Officer Derrick Burmaster

March 10, 2023

_____

**EXHIBIT 1**

```
                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA




   DEREK BROWN and JULIA    Civil Action No.
   BARECKI-BROWN            22-847

   VERSUS                         SECTION: L

   DERRICK BURMASTER,        HONORABLE ELDON E.
   SHAWN FERGUSAN,           FALON
   and the CITY OF
   NEW ORLEANS     DIVISION:  4

                             HONORABLE KAREN WELLS
                             ROBY

   * * * * * * * * * * * * * * * * * * * * *


                    PUBLIC VERSION


        Videotaped deposition of OFFICER DERRICK
   P. BURMASTER, 505 North Sibley, Metairie,
   Louisiana 70003, taken at the CITY ATTORNEY'S
   OFFICE, located at 1300 Perdido Street, 5E03,
   New Orleans, Louisiana 70112, commencing at
   9:58 A.M., on Friday, the 10th day of March,
   2023.


   APPEARANCES:


      JONES WALKER
      (By:  Tarak Anada, Esquire)
      201 St. Charles Avenue
      51st Floor
      New Orleans, Louisiana  70170

             - AND -
```

```
 1   APPEARANCES (continued):

 2
     MOST & ASSOCIATES
 3   (By:  William Most, Esquire)
     201 St. Charles Avenue
 4   Suite 114 PMB 101
     New Orleans, Louisiana  70170
 5      (Attorneys for the Plaintiffs,
         Derek Brown and Julia Barecki-Brown)
 6

 7   GUSTE, BARNETT, SCHLESINGER, HENDERSON
     & ALPAUGH, L.L.P.
 8   (By:  C. Theodore Alpaugh, III, Esquire)
     639 Loyola Avenue
 9   Suite 2130
     New Orleans, Louisiana  70113
10      (Attorneys for the Defendant,
         Officer Derrick P. Burmaster)
11

12   CITY OF NEW ORLEANS
     (By:  James Roquemore, Esquire)
13   1300 Perdido Street
     5E03
14   New Orleans, Louisiana
        (Attorneys for the Defendants,
15       City of New Orleans and Shaun
         Ferguson)
16

17

18   ALSO PRESENT:

19
     Derek Brown
20
     Tammy Hupin, Videographer
21

22
     REPORTED BY:
23

24   KATHY ELLSWORTH SHAW, CCR, RPR
     Certified Court Reporter
25   (No. 049519)
```

```
 1              E X A M I N A T I O N   I N D E X
 2
 3                                                    PAGE
 4
 5    EXAMINATION BY MR. MOST.........................6
              RE-EXAMINATION.......................263
 6
 7    EXAMINATION BY MR. ROQUEMORE.................251
 8
 9                E X H I B I T   I N D E X
10
      EXHIBIT NO. 2................................197
11
      EXHIBIT NO. 3................................200
12
      EXHIBIT NO. 6................................201
13
      EXHIBIT NO. 7................................205
14
      EXHIBIT NO. 9................................114
15
      EXHIBIT NO. 19...............................192
16
      EXHIBIT NO. 23B..............................147
17
      EXHIBIT NO. 24................................28
18
      EXHIBIT NO. 28...............................117
19
      EXHIBIT NO. 30...............................221
20
      EXHIBIT NO. 47...............................182
21
22    HIGHLY SENSITIVE PROTECTED MATERIAL
23
      PAGE 236 LINE 14 THROUGH PAGE 238 LINE 16
24
25                  *      *      *      *      *
```

```
 1        Q.   When you say you thought about FedEx
 2   needs to get in there, is that something you
 3   thought about at the time?
 4        A.   I always think about that.  It --
 5   It -- It's my job to respond to calls for
 6   service.  So when I come upon a house that's
 7   surrounded by a fence or a gate, I try to
 8   summon the -- the caller to come out without
 9   having to go inside the gate, but this is a
10   call that I couldn't call the complainant, the
11   people that were arguing, because the caller is
12   across the street.  So we don't have a phone
13   number to anybody to call in there, so the
14   officer has to go into that fenced-in area.
15        Q.   Uh-huh (indicating affirmatively).
16        A.   And that door -- that gate was
17   unlocked.
18        Q.   Uh-huh (indicating affirmatively).
19             And so when you say you're always
20   thinking about not shooting a dog, you think
21   about the risk of shooting a dog on every call
22   for service?
23        A.   Yes.  Yes.  You have to as -- assess
24   every call --
25        Q.   Okay.
```

```
 1   yelling.
 2        A.   Yeah, me, too.
 3        Q.   So you heard the dogs barking, but
 4   you couldn't see them when --
 5        A.   Not at first, but I knew they
 6   were -- they -- I -- I -- I -- I immediately
 7   thought that they were upstairs on the porch.
 8   And I was hoping they -- they would have -- You
 9   know, briefly I was hoping that the dogs still
10   wouldn't come down or -- or anything like that,
11   but then they came down them steps fast, like a
12   bolt of lighting, so I had to make a quick
13   decision.  They -- They came out like a bolt of
14   lightning.
15        Q.   You pulled your gun out of your
16   holster before you saw the dogs; correct?
17        A.   Yeah, but I had a -- an
18   expectance -- I expected the dogs were going to
19   come after me.  So I'm going to wait till right
20   when he's going to bite me to have it out?
21        Q.   Why did you pull your gun out of
22   your holster rather than your taser?
23        A.   Taser would have been ineffective.
24        Q.   Why?
25        A.   Well, with a taser, you get --
```

```
 1    There's one cartridge.  Do you know how a taser
 2    works?  They supply us with two cartridges.
 3    One stays in the taser and the other one is on
 4    our belt.  The dog I expected to come after me
 5    quickly.  I would have only had one shot with
 6    the taser.  And plus, it would have also been
 7    ineffective because when I shoot a taser, the
 8    top prong shoots directly straight out.  The
 9    bottom prong comes down at a downward angle.
10    So I would have had to -- One prong would have
11    entered into the dog and other prong would have
12    hit the ground.  And all it would have done was
13    give the dog a -- a -- like a tingling
14    sensation instead of intramuscular
15    incapacitation.  It wouldn't -- It wouldn't
16    have been effective.
17            With a gun I have 17 opt -- 17
18    additional times.
19        Q.   And by "additional times," you mean
20    bullets?
21        A.   Yeah.  Well, 16 additional.  It was
22    17 bullets --
23        Q.   When you're talking about --
24        A.   -- in the gun, but I also have 34
25    extra ones on my belt.
```

1  Q. And as part of that thought process,
2  you concluded, If a dog's coming at me, I'm
3  going to pull my gun rather than my taser;
4  right?
5  A. Well, it depends on the situation.
6  Say I have a bunch of dogs surrounding me, but
7  they're not actively coming at me. At that
8  moment, I would have the chance to aim the
9  taser correctly and make sure that in order --
10 the -- the leader of the group -- 'cuz if like
11 they're swarming around me and I think that I'm
12 going to get bit, which has happened before,
13 there's a option that I have time, you know,
14 to -- to try to get a good shot so that -- but
15 this was no time to -- to make a decision. You
16 had to shoot the dog or I would have been bit.
17 Q. Okay. And you talked in your
18 interview with PIB that you were certain the
19 dog was going to bite you?
20 A. Oh, yes. That dog was going to bite
21 me, no doubt.
22 Q. You're certain of that?
23 A. Yes.
24 Q. Why?
25 A. The dog was coming -- Watch the

```
 1   video.  The dog was coming at me, aggressive,
 2   barking.  I heard barking.  I thought that -- I
 3   was certain that dog was going to bite me.
 4        Q.   You were certain it was going to
 5   bite you because it was coming at you?
 6        A.   Yeah.
 7        Q.   Anything else besides --
 8        A.   It wasn't coming with its tail
 9   wagging, happy and jovial like.  It was coming
10   at me in a manner that made me think that he
11   was going to bite the -- bite my leg, bite --
12   bite me somewhere else.  The dog was very
13   agile.  It could reach from here down, you
14   know.  (Indicating.)
15        Q.   Okay.  So from the fact that the dog
16   was coming at you and not wagging its tail, you
17   were certain it was going to bite you?
18        A.   It was coming at me in -- in -- in a
19   threatening manner.
20        Q.   Right.  But I'm trying to figure out
21   what is a threatening manner.  What about the
22   dog indicated to you that you were certain it
23   was going to bite you?  So we have that it was
24   coming at you.
25        A.   I'm sorry.  I answered this multiple
```

1     A.   I walked him outside with -- with a
2  leash on.
3     Q.   You never came home and Roman ran to
4  the door?
5     A.   In a playful manner.
6     Q.   Uh-huh (indicating affirmatively).
7     A.   Shaking his butt, you know.
8     Q.   Okay.  Did Miss Mae ever run towards
9  you?
10    A.   I've had Miss Mae since she was a --
11 six weeks old.  So playfully, in a playful
12 manner, she would run up to me.
13    Q.   And what about Miss Mae's body
14 language indicated to you that it was a playful
15 manner?
16    A.   Playfully wagging his tail -- her --
17 her tail.  Miss Mae was a girl.  I don't know.
18    Q.   Did you have to -- ever have to use
19 force --
20    A.   No.
21    Q.   -- with Roman or Miss Mae?
22    A.   No.
23    Q.   Okay.  And earlier in this
24 deposition, you said you were afraid that
25 Apollo might have bitten your leg; right?

```
 1        A.   Or another sensitive area.
 2        Q.   Yeah.  So we don't have to use
 3   euphemisms here.  You were specifically afraid
 4   that Apollo was going to bite your penis;
 5   correct?
 6        A.   Yeah.
 7        Q.   Okay.
 8        A.   That dog came at me fast and he's
 9   definitely agile enough to jump high.
10        Q.   Right.  And -- And you were
11   specifically worried about the threat of that
12   dog biting your penis; correct?
13        A.   Or my leg or anywhere else, just
14   getting bit.
15        Q.   Right.  But you were specifically
16   afraid of the dog biting your penis; correct?
17        A.   No, anywhere.
18        Q.   Well, you spe -- you told PIB that
19   you were worried about it biting your penis;
20   right?
21        A.   Yeah, of course.
22        Q.   Right.
23        A.   Because the dog -- That dog was
24   coming at me and it -- it looked agile enough
25   to be able to do that.
```

1      Q.   Right.  So one specific part of your
2  body that you were afraid that the dog would
3  bite was your penis; correct?
4      A.   Yeah.  One -- That was one of the
5  specific things that I named, but he could have
6  got me anywhere.
7      Q.   Okay.
8      A.   Legs.
9      Q.   Have you ever told someone that you
10 were worried that Cha-Cha, Roman, Miss Mae, or
11 another dog was going to bite you in your
12 penis?
13     A.   No.
14     Q.   Okay.  Well, the one exception
15 besides Apollo is the dog you shot in 2012.
16 You indicated that you were afraid that dog
17 might bite -- bite your penis; right?
18     A.   I don't recall if I said that.  That
19 was a very long time ago.
20     Q.   Do you recall telling investigators
21 that you were protecting your crotch from the
22 dog that you killed in 2012?
23     A.   No.
24     Q.   You -- You don't recall saying that?
25     A.   I don't recall.