```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   DEREK BROWN and JULIA           CIVIL ACTION NO.
     BARECKI-BROWN                   22-00847
 5
     VERSUS
 6                                   DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF       SECTION: L
     NEW ORLEANS
 8

 9

10

11   * * * * * * * * * * * * * * * * * * * * * * * * *

12              TRANSCRIPT OF THE DEPOSITION OF:

13                     DAVID DUPLANTIER,

14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

17   * * * * * * * * * * * * * * * * * * * * * * * * *

18

19        REPORTED AT:

20        NEW ORLEANS CITY HALL

21        1300 PERDIDO STREET, ROOM 5E03

22        NEW ORLEANS, LOUISIANA  70112

23

24

25        COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```



```
 1                  A P P E A R A N C E S

 2


 3   FOR THE PLAINTIFF:

 4       JONES WALKER L.L.P.
         (BY:  TARAK ANADA, ESQ.)
 5       201 ST. CHARLES AVENUE, 49TH FLOOR
         NEW ORLEANS, LOUISIANA  70170
 6       (504) 582-8322
         tanada@joneswalker.com
 7


 8   FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9       NEW ORLEANS CITY ATTORNEY'S OFFICE
         (BY:  JAMES M. ROQUEMORE, ESQ.)
10       1300 PERDIDO STREET, SUITE 5E03
         NEW ORLEANS, LOUISIANA  70112
11       (504) 658-9800
         james.roquemore@nola.gov
12


13   FOR DERRICK BURMASTER:

14       GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
         (BY:  C. THEODORE ALPAUGH III, ESQ.)
15       639 LOYOLA AVENUE, SUITE 2130
         NEW ORLEANS, LOUISIANA  70113
16       (504) 529-4141
         cta@gustebarnett.com
17


18   ALSO PRESENT:

19       SOPHIA CEFOLIA


20

     REPORTED BY:
21
         YOLANDA J. PENA
22       CCR NO. 2017002, RPR
         STATE OF LOUISIANA
23


24


25
```



```
                              I N D E X

                                                              PAGE

LIST OF EXHIBITS.................................4

STIPULATION......................................5

EXAMINATION BY:

     MR. ANADA...............................6, 107, 145

     MR. ALPAUGH............................86, 119, 144

     MR. ROQUEMORE..................................121

CERTIFICATE....................................147
```



 1                         LIST OF EXHIBITS

 2

 3    Exhibit No. 1..........................................7
           (Second Amended Complain)
 4
      Exhibit No. 8.........................................21
 5         (Notice of 30(b)(6) Deposition
            & Request to Bring Documents,
 6          Information, or Objects)

 7    Exhibit No. 20.A....................................110
           (Event Summary)
 8
      Exhibit No. 22........................................46
 9         (NOPD Operations Manual,
            Chapter 1.7.1, Conducted
10          Energy Weapon)

11    Exhibit No. 23........................................49
           (NOPD Operations Manual,
12          Chapter 1.3, Use of Force)

13    Exhibit No. 40........................................86
           (CITY DEFENDANTS 003646,
14          Policy Tactics Training
            Recommendations)
15
      City Exhibit No. 1...................................125
16         (CITY DEFENDANTS 003651,
            PowerPoint, Responses to the
17          Problem of Dog-related
            Encounters)
18

19

20

21

22

23

24

25



```
 1                    S T I P U L A T I O N
 2
 3            IT IS STIPULATED AND AGREED by and among the
 4      parties that this deposition is hereby being taken
 5      pursuant to the Federal Rules of Civil Procedure.
 6            All formalities, excluding the reading and
 7      signing of the transcript by the witness, are hereby
 8      waived.
 9            All objections, except as to the form of the
10      question and responsiveness of the answer, are
11      considered reserved until trial or other use of the
12      deposition.
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1            more confusing.
 2        A.   Once again, I mean, I would have to actually
 3   go page by page with the one that we have present and
 4   the one that was in place at the time.
 5   BY MR. ANADA:
 6        Q.   Okay.
 7        A.   If there is a change, I can't see a dramatic
 8   one.
 9        Q.   Okay.  Fair enough.
10        A.   I can't see a dramatic change.
11        Q.   That works for me.  All right.  So we've now
12   talked about a few specific areas that were covered in
13   the in-service training that officers received about
14   encountering animals in the line of duty.
15             Is there anything else that was in that -- in
16   that training that we just haven't touched on today?
17        A.   No.  Based off of the reason of us being here,
18   the only other training, like I said, that goes hand in
19   hand with the CEW, use of force, all of it's one big
20   ball.  They -- they all -- the CEW, the use of -- the
21   use of the firearm, all that falls under it.  It's
22   going to -- it should fall directly under the overall
23   umbrella of use of force.
24        Q.   Got it.  Is there, like, a different -- a
25   difference in the standards of when an officer can use
```



1    lethal force against a human versus when an officer can
2    use lethal force against a dog?
3         A.   Yes.
4         Q.   Tell me the difference.
5         A.   Well, we -- actually, for -- going with a
6    human, we target -- our best target area naturally is
7    the back, largest muscle group, easiest area to hit.
8    You achieve what they refer to as to NMI, neuromuscular
9    incapacitation.  Okay.
10             You also want to get at least -- at least try
11   and get a seven-inch spread.  So that goes with the
12   distance you are from this person that you're going to
13   fire the weapon.  And if we're shooting or firing this
14   weapon at the front of the person, i.e. their torso,
15   the front torso -- we look to target -- we don't want
16   to target the heart.  That was a recent change of CEW.
17             We want to lower our target area, so we're
18   trying to get one dart below the belt line and the --
19   the top dart -- the bottom dart below the belt line,
20   the top dart at -- preferably right underneath the
21   heart area, right underneath that sternum area.  We
22   don't -- they don't want to give any direct shot to any
23   area where the heart is.
24        Q.   I got you.
25        A.   That in itself is a difficult shot, easier



David Duplantier                                                    March 08, 2023
                                                                         Page 54

```
 1   on the back.  Whereas with the animal, that's
 2   considered -- I'm sorry.  That's considered center mass
 3   on a person.
 4        Q.   Right.
 5        A.   Whereas with an animal, based on the way
 6   they're built, center mass is actually the side of the
 7   animal.
 8        Q.   Okay.
 9        A.   In order for us to effect a shot there, we
10   have to cant the weapon because the bottom dart drops
11   8 degrees when it's fired.  So the top dart is running
12   straight.  The bottom dart drops 8 degrees.  The
13   further are -- you are away, the further it tends to
14   drop.  If you get too far away, then naturally, the
15   dart will make the target area.
16             If you're too close, then you won't achieve
17   NMI, which is what you want.  You achieve basically
18   pain compliance, like a bee sting.  If you got a very
19   tight spread, the darts are only a few inches apart,
20   it'll hurt but it's not enough to maybe incapacitate
21   the person.
22        Q.   Understood.
23        A.   So --
24        Q.   Or the animal?
25        A.   Or the animal.  So referencing -- it makes it
```



```
 1   much, much more difficult with an animal, speed, size.
 2   So -- and most animals don't attack you by running
 3   sideways.
 4        Q.   Yeah.
 5        A.   They can't.  So they're running dead-on, so in
 6   order to effect a good shot with a CEW, i.e. a taser,
 7   at an animal, you got to let the animal get right up on
 8   you.  And then -- even then, your spread is going to be
 9   so small to where you may not achieve what you want.
10        Q.   It can be done, but it's more difficult than
11   on a person?
12        A.   It's a thousand times more difficult than on a
13   person.  Your target area is so small and the speed is
14   so much more.
15        Q.   I got you.  You observed it done effectively
16   one time, at least, right?
17        A.   Yes, at least once.
18        Q.   Okay.  So, I mean, that makes sense to me.
19   It's much harder to do it on an animal than a human.
20             Some of the other NOPD officers we've spoken
21   with have referenced a field training, I think is what
22   it's called, when you -- when the officers actually
23   practice discharging their CEW at, like, a --
24        A.   A silhouette.
25        Q.   -- a silhouette of a -- like a --
```



```
 1          A.    Yeah.  They go through that every in-service.
 2          Q.    It's a silhouette of like a grown male,
 3    something like that?
 4          A.    Yeah.
 5          Q.    What is it?  Like, five-ten?  Six-one?
 6          A.    Probably.  I would say about maybe five-nine,
 7    five-ten.  Roughly -- roughly average height.
 8          Q.    Average height.  I got you.  Okay.
 9                And the reason they go through that is so they
10    can get some practice of hitting the target effectively
11    to achieve the NMI, right?
12          A.    Correct.
13          Q.    Okay.  NOPD never trains officers with that
14    kind of field training on a silhouette of a dog.  True?
15          A.    True.
16          Q.    And it's much harder to actually effectively
17    hit a dog with a CEW.  It can be done, but it's just
18    much more difficult --
19          A.    Right.
20          Q.    -- than a human?
21          A.    Right.  And you have to throw in the factor
22    that you have a potential of deescalating a person.  If
23    you're under attack from an animal, whether it be a dog
24    or any other kind of animal, you're not going to
25    deescalate the animal.  The animal moves off instinct.
```



David Duplantier                                           March 08, 2023
                                                                  Page 57

1                So there's -- you don't have that time factor.
2    We teach with humans, you want to try and create some
3    kind of distance, and you're trying to -- if you have
4    that opportunity to try and get this situation that we
5    don't have to apply force at all, that's -- that's
6    hopefully your ultimate goal.
7                One of the factors with an animal, you can't
8    deescalate an animal, per se.  So that -- that's a big
9    factor there.  So you don't have that time or that
10   opportunity with an animal to deescalate it.
11       Q.   So am I correct that your training is that you
12   shouldn't consider a CEW on an animal?
13       A.   I'm not going to say "shouldn't."  Using --
14   and just personal experience.
15       Q.   Sure.
16       A.   The shots that were effected with the CEW on
17   an animal was by -- not by the officer being attacked.
18   It was by a secondary officer who had a target area,
19   which was center mass on the side of the animal's body,
20   which also means even that officer has to get up a
21   little close in order to effect a good shot.
22               So I'm not going to say don't use it.  It's
23   just -- there's so many parameters that come into play
24   in order for you -- for you to get this device to work
25   properly on an animal.



1  get.
2       Q.   When you say you reached out, you reached out
3  to who?
4       A.   To -- I spoke with PIB.  I spoke with --
5            MR. ANADA:  Form.
6       A.   I think it was Sergeant Helou in PIB,
7  referencing that.  I never spoke with Officer -- I'm
8  sorry, Sergeant Brewer firsthand with it.  But I did
9  speak with Sergeant Helou since he was the one that
10 sent me the PTTR.
11           But for the most part -- I mean -- and I
12 didn't -- as we went through it, like I said, the only
13 thing I could tell him was, "Look, maybe if you paused
14 a few seconds, you might have gotten alerted by the
15 dog."  But he did make an attempt to try and alert any
16 animal inside curtilage of the residence.
17           The fact that he got jammed into the corner
18 was a big factor, and the dog's response.  The dog is
19 just being a dog.  It's his house, his domain, so I get
20 it.  But unfortunately, the dog being a dog put the
21 officer in a situation where he had to do something.
22           The taser -- the probability of the taser
23 being effective, slim to probably none.  The fact --
24 if you wanted to go to an impact weapon, i.e. baton,
25 that -- like I said, you got to let the dog get up on



David Duplantier                                        March 08, 2023
                                                              Page 98

1   you.  So it basically almost effect a bite or damn near
2   effect a bite before you could -- and even then, you
3   lose leverage because now the dog is on top of you.
4   You really don't have leverage to swig the impact
5   weapon.
6            So unfortunately, to the behest of everybody
7   else, I didn't find anything wrong with his actions.
8   Once again, I said I'm open minded.  If somebody can
9   show me a better tactical response, I'm willing to
10  listen, but I didn't -- I didn't see another
11  alternative method.
12  BY MR. ALPAUGH:
13       Q.   So you felt, in the circumstances, he acted
14  properly?
15       A.   Yes, sir.
16            MR. ANADA:  Object to form; outside the
17       scope.
18  BY MR. ALPAUGH:
19       Q.   And also -- there are also a lot of factors.
20  There was another dog there, correct?
21       A.   Yes.  That -- that's a big factor.  There were
22  two dogs there.
23            MR. ANADA:  Form; outside the scope.
24            Sorry.
25       A.   There were two dogs present.



```
 1   included in this hypothetical NOPD training, right?
 2        A.   Yeah.
 3        Q.   Okay.  All right.  131.  Would it have been a
 4   good idea to omit the following DOJ language:  Quote,
 5   "When encountering a dog, officers should stop all
 6   forward movement and turn their bodies to the side.
 7   Officers should drop their eyes and watch the dog using
 8   peripheral vision"?
 9        A.   No.  I wouldn't teach our -- I wouldn't
10   recommend teaching our officers to that.  I think if it
11   was -- if you were only dealing with an animal, yeah.
12   But I don't -- I wouldn't train our officers to that
13   response.  It puts us in other situations, so...
14             MR. ANADA:  That's it.  That's all I've
15        got.
16             MR. ALPAUGH:  Just maybe one or two.
17                    RE-EXAMINATION
18   BY MR. ALPAUGH:
19        Q.   A couple times in here, you see the -- you see
20   the phrase, "A dog who feels threatened will usually
21   try to keep his distance."  Right?  You see that in
22   there?
23        A.   Yes.
24        Q.   And that a dog approaching you is almost
25   always friendly.  In this situation we had in this case
```



```
 1   here, given what you saw on the body-worn camera, did
 2   you think that those dogs were friendly?
 3        A.   Once again, I started off saying it was
 4   tragic, being a dog person.  But even I looked at it,
 5   and I thought the dogs were in a mindset where they may
 6   harm an officer.
 7        Q.   Right.  They weren't feeling threatened; they
 8   were protecting their --
 9        A.   I looked at -- I took it as they were
10   protecting their territory, doing what a dog is
11   supposed to do.
12                 MR. ALPAUGH:  Yeah.  Okay.  Thank you.
13                 MR. ANADA:  I got one.
14                       RE-EXAMINATION
15   BY MR. ANADA:
16        Q.   You would have shot that 22-pound puppy in
17   that situation?
18        A.   Honestly, I'm going to give you an answer
19   that's for you and against you.  I don't know.  I may
20   have.  I'm more likely, having dealt with dogs all my
21   life -- more likely to maybe try and kick at the dog.
22   However, there were two dogs present, so it really,
23   really murks up the water on decision-making.
24        Q.   Fair, fair.
25                 MR. ANADA:  Thank you so much.
```

