# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and            *    Civil Action No. 22-00847
JULIA BARECKI-BROWN     *
                            *    SECTION: L
VERSUS                    *
                            *    HONORABLE ELDON E. FALLON
DERRICK BURMASTER, SHAUN   *
FERGUSON, and the CITY OF     *    DIVISION: 4
NEW ORLEANS            *
                            *    HONORABLE KAREN WELLS ROBY

**************************************************************************

## MEMORANDUM IN OPPOSITION TO DEFENDANT BURMASTER'S MOTION FOR SUMMARY JUDGMENT

Defendant Burmaster has filed a Motion for Summary Judgment (R. Doc. 105) on the theory that no reasonable jury could find him liable for shooting a sixteen-week-old puppy, or alternatively that he is entitled to qualified immunity. But his motion ignores the abundant evidence that the shooting was avoidable, objectively unreasonable, and violative of the Brown family's clearly established constitutional rights. His motion misinterprets the Body-Worn Camera ("BWC") footage that captures the incident, and entirely writes-off the conclusions and testimony of his own partner Officer Roussel and the majority of the NOPD's designated experts, who all concluded that Burmaster's use of lethal force on this small puppy was unnecessary. His motion similarly disregards the numerous NOPD policies he was found to be in violation of by NOPD's Public Integrity Bureau ("PIB"), and discounts the NOPD Use of Force Review Board's unanimous ruling that his shooting of the puppy was "NOT JUSTIFIED."

These facts, which must be viewed "*in the light most favorable to the plaintiff* [in determining whether] the officer's alleged conduct violated a constitutional right,"[1] establish not only that Burmaster's motion should be denied, but also that Plaintiffs' Motion for Partial

---

[1] *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (emphasis added).

Summary Judgment on Liability should be granted.[2] Alternatively, in the event that the Court is not prepared to grant Plaintiffs' affirmative motion, Burmaster's motion should be denied in light of an abundance of fact issues that a rational juror could certainly determine in Plaintiffs' favor.

## I.    INTRODUCTION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[3] Pursuant to this fundamental constitutional property right, a police officer's "use of force against a household pet is reasonable only if [1] the pet poses an immediate danger and [2] the use of force is unavoidable."[4]

Here, an NOPD officer shot and killed Plaintiffs' 16 week old, 22 pound puppy when that puppy ran towards him. The puppy, Apollo, was so small that it only had two adult teeth. The officer, Defendant Derrick Burmaster, did not attempt any less-than-lethal means to deter the puppy. He was carrying a TASER, but did not try to use it. Nor did he try simply kicking the dog away, even though the dog was only a little bigger than a football (Burmaster's motion fails address this most obvious alternative to deadly force altogether). Nor did Burmaster try to use his NOPD-required baton, because he chose not to carry one that day in violation of policy.

Thus, Burmaster's choice to shoot the dog fails both parts of the legal test for use of force. The puppy was not an immediate danger to Burmaster. And Burmaster's use of force was completely avoidable. Both of these facts are confirmed by *NOPD's own designated experts*, who

---

[2] *See* Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment on Liability (R. Doc. 110-1), which Plaintiffs incorporate as if fully stated herein.

[3] U.S. CONST. amend. IV.

[4] *Skinner v. Ard*, 517 F. Supp. 3d 586, 599 (M.D. La. 2021) (*quoting Robinson v. Pezzat*, 818 F.3d 1, 7-8, 422 U.S. App. D.C. 35 (D.C. Cir. 2016); *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008)).

almost unanimously determined the shooting to be "NOT JUSTIFIED." In sum, Officer Burmaster's use of lethal force on Apollo was avoidable, objectively unreasonable and violative of the Brown family's clearly established constitutional rights.

## II.    BACKGROUND

### A.    Apollo

1.    In April of 2021, the Brown family had two dogs: Apollo, a small Catahoula puppy who was 16 weeks old and weighed approximately 22 pounds,[5] and Bucho, a larger adult dog. Apollo's tiny stature at the time of the incident is accurately depicted in the images contained in R. Doc. 110-1, p. 3, which Plaintiffs incorporate herein.

### B.    The events of April 10, 2021

2.    At approximately 9:15 p.m. on the evening of Saturday April 10, 2021, Plaintiffs Derek Brown and Julia Barecki-Brown got into a verbal argument at their home located at 1420 Felicity Street. Officer Burmaster responded to investigate the complaint about the argument at the Brown family's home a few minutes before 9:39 p.m.[6] Burmaster was 5' 10.5", weighed 230 pounds,[7] and was over 10 times the weight of Apollo, who he towered over.

3.    Once Burmaster's backup Officer Roussel arrived on scene, the two officers walked toward the Brown family's home. Officer Burmaster made "kissy sounds" in an attempt to determine whether any dogs were present on the Browns' fenced in private property.

---

[5] Autopsy Report, attached as **Ex. A**, p. 2.

[6] Body-Worn Camera ("BWC") footage of Burmaster, attached as **Ex. D** (file name "J1-18. (Clip_1.1)_1420_FELICITY_STREET-2 (Burmaster BWC).mp4"), at 00:01.

[7] Burmaster's Responses to Plaintiffs' Second Set of Interrogatories, attached as **Ex. E**, p. 3.

#101139167v1

Officer Burmaster made these "kissy sounds" in front of the Browns' neighbor's house located at 1422 Felicity Street, instead of making them in front of (or at the gate of) the Brown family's house at 1420 Felicity Street.[8]

4.  Both of the Brown family's dogs were outside on the Browns' front porch, properly contained within their fenced in property, as the officers approached 1420 Felicity Street. **Ex. C**, pp. 49-51.

5.  Because Burmaster made the "kissy sounds" in front of the wrong house, they were inaudible to the Browns' dogs. **Ex. B**, pp. 62-63.

6.  The Brown family's home contains a front courtyard that is enclosed (along with the house) by an iron fence. As Burmaster arrived at the closed pedestrian gate entrance to the Browns' private courtyard, he was no longer making any kissing sounds, did not announce his presence whatsoever, and failed to observe (a) that the iron fence enclosing the property was reinforced at the bottom with a mesh screen to contain the Brown family's small puppy (Apollo was so small that he could fit between the iron fence posts) and (b) that, in addition to the unlocked pedestrian gate, there was a second even larger vehicle gate to the courtyard that was also unlocked.

7.  After the officers entered the Browns' courtyard through the pedestrian gate, Bucho and Apollo, located on the Browns' front porch, alerted to the sound of the gate closing behind the officers, and Bucho—the larger adult dog—began to bark. At this moment, when

---

[8] **Ex. B** (deposition of Officer Roussel), pp. 58-61 ("Q. He was in front of the wrong house when he made [the "kissy sounds"], right? A. Correct."); **Ex. F**, at 00:20.

#101139167v1

Bucho first barked, but before Burmaster could even see the dogs, Burmaster drew his firearm.[9]

8.    At this same moment, Officer Roussel, who was "standing right next to" Burmaster, tapped Burmaster on the shoulder for the purpose of communicating to him that they should retreat out of the pedestrian gate that they just walked in through in response to the barking. After doing so, Roussel exited the pedestrian gate leading back to the sidewalk and held it open for Burmaster to do the same because Burmaster was "close enough to also exit in time."[10] Burmaster chose not to exit the pedestrian gate with Roussel, and instead held his ground.

9.    A second even larger unlocked vehicle gate was also right behind Burmaster, and a courtyard table with chairs was in front of him. **Ex. D**, at 01:34; 01:52.

10.   Bucho, followed by Apollo, began running down the stairs leading from the porch to the courtyard. **Ex. D**, at 01:54; **Ex. B**, pp. 46-47. Upon descending the stairs and reaching the courtyard, Bucho ran in the opposite direction from Burmaster. The puppy Apollo, however, continued to run in Burmaster's direction. As captured by Burmaster's BWC, *Apollo's tail was visibly wagging as he approached Burmaster*. **Ex. D**, at 1:56.

11.   At this moment, Officer Burmaster was equipped with his non-lethal department issued Conducted Energy Weapon ("TASER" or "CEW"), but chose not use it on Apollo in violation of NOPD policy. A TASER would have been an effective non-lethal tool for Burmaster to have used on Apollo.[11]

---

[9] NOPD PIB Force Investigation Team Administrative Shooting Investigation Report, attached as **Ex. G**, p. 10.

[10] **Ex. B**, pp. 48-52.

[11] Deposition of Sergeant Shannon Brewer, attached as **Ex. H**, pp. 55-56; Deposition of Chief Deputy Superintendent Christopher Goodly, attached as **Ex. I**, pp. 38-40; **Ex. B**, pp. 33, 38-41.

12.   Per NOPD's Conducted Energy Weapon (CEW) Policy (Ch. 1.7.1), "[a] CEW may … be deployed [on an animal if []] the animal poses an active threat to officers in their efforts to perform their duty … *The CEW has proven to be an effective tool against dangerous animals and may reduce the need for greater, more injurious force against such animals. The use of a CEW on an animal is a safer, more humane, and less traumatic conclusion to the incident*." (emphasis added). NOPD's CEW Policy, attached as **Ex. J**, p. 9.

13.   Burmaster was also required to carry a police baton, another non-lethal weapon that could have effectively been used on Apollo, but was not carrying it in violation of NOPD policy.[12] Burmaster was also not wearing his department issued body armor in violation of NOPD policy.[13] Burmaster was also wearing police boots, but chose not to simply kick Apollo to eliminate any perceived threat. **Ex. B**, pp. 15-16, 38-41.

14.   Instead, Burmaster immediately resorted to firing his service weapon three times at Apollo, mortally wounding him. **Ex. G**, p. 11, 15-16.

15.   At no time did Apollo bark, growl, vocalize, jump, bear his teeth or lunge before Officer Burmaster shot him.[14] Apollo was so young that he had not yet even developed the ability to bark.[15] Apollo still had all of his puppy teeth other than two adult teeth. **Ex. A**, p. 2.

---

[12] **Ex. B**, pp. 14-15, 17-21, 41; **Ex. H**, pp. 56-58, 63; **Ex. G**, p. 15-16; NOPD's Uniform Specifications Policy, attached as **Ex. K**, p. 3.

[13] NOPD's Body Armor Policy, attached as **Ex. L**.

[14] **Ex. G**, pp. 8, 10-11; **Ex. B**, p. 46, 74-75; **Ex. D**, at 1:56; **Ex. H**, pp. 83-85.

[15] **Ex. C**, p. 69.

16.     "Officer Burmaster stated that he was concerned the dog [Apollo] was going to bite his Penis."[16] Notably, when Officer Burmaster previously fatally shot another citizen's dog in 2012, he was concerned that dog would bite his penis as well. **Ex. G**, pp. 3-4.

17.     Burmaster did not evaluate the need for each of the three shots he fired at Apollo. He did not even know how many shots he fired at Apollo (**Ex. G**, p. 5.), and further stated that "when he fired his weapon three times at the dog, it was all a blur and Officer Burmaster could not recall the dog's actions." Apollo did not continue to advance towards Burmaster after the first shot. **Ex. G**, p. 15; **Ex. H**, pp. 83-84.

18.     Ricochet shrapnel from Burmaster's bullet struck Roussel's forearm, requiring Roussel to obtain immediate medical treatment. **Ex. G**, p. 2; **Ex. B**, p. 69.

19.     After hearing the gunshots, Derek and Julia Brown ran out of their house into the courtyard to find that Apollo had been shot. Burmaster decided not to request aid for Apollo because the Browns were upset and were already "hugging on" Apollo.[17] Apollo ultimately died in Derek's arms. The Browns were traumatized.

20.     The incident was captured on both Officer Burmaster's and Officer Roussel's BWCs.

**C.      The Conclusions of NOPD's Designated Experts**

21.     After the incident, Burmaster was put on desk duty. **Ex. G**, p. 1.

22.     An investigation of the shooting was referred to two separate NOPD internal investigative bodies: the NOPD Public Integrity Bureau ("PIB")[18] Force Investigation Team and the Use of Force Review Board.

---

[16] **Ex. G**, p. 9.

[17] Deposition of Officer Burmaster, attached as **Ex. M**, pp. 71.

[18] PIB is NOPD's internal affairs department. **Ex. H**, p. 12.

7

23.  NOPD Detective Brewer, who led the PIB Force Investigative Team's Administrative Shooting Investigation of Burmaster, concluded that "Officer Burmaster's discharge occurred due to Officer Burmaster observing the dogs and firing his weapon out of fear *and not because the dog presented a threat of serious bodily injury or death* to Officer Burmaster."[19] Detective Brewer's conclusion in this regard is particularly instructive given that NOPD has formally designated her as an expert witness in this matter. *See* Defendants' Expert Designations, attached as **Ex. N**.

24.  During her interview of Burmaster conducted in the course of the PIB Force Investigative Team's Administrative Shooting Investigation, Detective Brewer concluded that Burmaster's use of lethal force on Apollo was "unjustified."[20] In rendering her decision, Detective Brewer found that "[t]he dog fatally wounded by Officer Burmaster did not present an imminent threat toward Officer Burmaster and upon recognizing the dog did not present a threat of serious bodily harm, Officer Burmaster should have holstered his weapon." **Ex. G**, p. 15.

25.  Detective Brewer further determined that, in shooting Apollo, Officer Burmaster committed five separate NOPD use of force policy violations,[21] including:

    a.  Violation of NOPD's Use of Force Policy (Ch. 1.3) part 11 which mandates that "[o]fficers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create an objectively reasonable belief that a situation may escalate to the point at which lethal force would be authorized. Once an officer determines that the use of deadly force is no longer likely, the officer shall re-holster the weapon."

---

[19] **Ex. G**, p. 17.

[20] **Ex. H**, pp. 72-73.

[21] **Ex. G**, p. 17.

#101139167v1

b. Violation of NOPD's Use of Force Policy (Ch. 1.3) part 13(a) which mandates that "Deadly/Lethal force shall be used only when … There is an imminent danger of death or serious physical injury to the officer or another person."

c. Violation of NOPD's Use of Force Policy (Ch. 1.3) part 32 which mandates that "Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical."

d. Violation of NOPD's Uniform Specifications Policy (Chs. 41.10 part 29 and 41-11 part 8(c)) which mandate that officers must carry on them in the line of duty a "PR 24 police baton and ring holder or expandable baton with authorized carrying case," and must wear body armor.

e. Detective Brewer further concluded that Burmaster would have also been in violation of NOPD's Moral Conduct Policy (Rule 2, Paragraph 6: Unauthorized Force), but technically could not be due to the verbiage written in the rule which limits its applicability to unauthorized force against a person. Detective Brewer recommended that this policy be reflected to also apply to unauthorized force against animals going forward.

26. Detective Brewer determined that Burmaster violated these policies because: "[t]he [smaller] dog did not harm or attempt to harm Officer Burmaster," "[t]he smaller dog did not attack or attempt to attack Officer Burmaster," and "Officer Burmaster fired his weapon out of fear and not due to an attack or attempted attack by the dog. Detective Brewer determined the dog did not present a threat of serious bodily injury to Officer Burmaster. Officer Burmaster was not equipped with a PR 24/Expandable Baton or ASP at the time of this incident. Officer Burmaster did not attempt any other less lethal options including exiting the front yard." **Ex. G**, p. 16.

27. Detective Brewer certified that "Officer Burmaster received disciplinary action related to these policy violations," and further noted that she "deemed Officer Burmaster not to be

9

credible" based on his statements made to the PIB Force Investigative Team compared to the actual evidence. **Ex. G**, pp. 15-16.

28.     The other two members of the NOPD's PIB Force Investigative Team, Sergeant Helou and Captain Richardson, unanimously concurred with the conclusions of Detective Brewer.[22]

29.     The NOPD's Use of Force Review Board also independently investigated Burmaster's shooting of Apollo. Similar to the PIB Force Investigative Team, the Use of Force Review Board, comprised of Deputy Superintendent Goodly,[23] Deputy Superintendent Noel, and Deputy Superintendent Westbrook, all unanimously ruled that Burmaster's shooting of Apollo was "NOT JUSTIFIED."[24]

30.     In issuing its ruling, the Use of Force Review Board found that Burmaster (1) "had a false perception of a threat that was not there," (2) "did not articulate any threat towards him," (3) was not faced with any "attack," and (4) "the smaller dog posed no threat." The Use of Force Review Board further recommended that Burmaster receive "De-escalation training" "ASAP." **Ex. O**, p. 3.

## III.    LAW AND ARGUMENT

## A.    Summary Judgment Standard

When analyzing a "constitutional violation question" on summary judgment, the Court must view "the facts *in the light most favorable to the plaintiff* [in determining whether] the

---

[22] **Ex. G**, p. 19. Sergeant John Helou has also been designated by the NOPD as an expert witness in this matter. **Ex. N.** Sergeant Helou testified that shooting Apollo was unjustified because Apollo posed no "sign of aggression or imminent attack" towards Burmaster. Deposition of Sergeant Helou, attached as **Ex. Q**, p. 37.

[23] Deputy Superintendent Christopher Goodly has been cross-designated as an expert witness by the NOPD and Plaintiffs. **Ex. N**.

[24] Report of Use of Force Review Board, attached as **Ex. O**, p. 3.

officer's alleged conduct violated a constitutional right." *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (emphasis added). Only "when facts are undisputed <u>and</u> *no rational factfinder could conclude that the officer acted unreasonably,* [can a Court] hold that an officer acted reasonably as a matter of law." *Id.*

**B.      Qualified Immunity**

"A court required to rule upon the qualified immunity issue must consider this threshold question: Taken *in the light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right?" *Reyes v. Sazan*, No. 97-0133, 2002 U.S. Dist. LEXIS 9154, at *4 (E.D. La. May 9, 2002) (Fallon, J.) (emphasis added) (citing *Banton v. City of Dallas,* 272 F.3d 730, 744 (5th Cir. 2001); *Saucier v. Katz,* 533 U.S. 194, 121 S. Ct. 2151 (2001)); *see also Reneau v. City of New Orleans*, No. 03-1410, 2004 U.S. Dist. LEXIS 12415, at *9 (E.D. La. July 2, 2004) (Fallon, J.) (same).

To assess qualified immunity, courts "first ask the threshold 'constitutional violation question' of whether … the officer's alleged conduct violated a constitutional right. If … the alleged conduct amounts to a constitutional violation, then we ask the 'qualified immunity question' of whether the right was clearly established at the time of the conduct." *Lytle*, 560 F.3d at 410. "Under the doctrine of qualified immunity, [officers are] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established … constitutional rights of which a reasonable person would have known.'" *Morales v. City of New Orleans*, No. 21-1992, 2022 U.S. Dist. LEXIS 111104, at *11 (E.D. La. June 23, 2022) (Fallon, J.) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "If we answer both the constitutional violation and qualified immunity questions affirmatively, the officer is not entitled to qualified immunity." *Lytle*, 560 F.3d at 410 (internal citations omitted).

11

Thus, to evaluate Burmaster's qualified immunity claim, the Court faces two questions: (1) whether Burmaster's conduct violated the Brown family's constitutional rights, and if so, (2) whether those rights were clearly established at the time of the shooting.

**C.     The Fourth Amendment prohibits unreasonable seizures.**

"The Fourth Amendment requires that a seizure be objectively reasonable." *Stephenson v. McClelland*, 632 Fed. App'x 177, 184. "[T]he key question is reasonableness based on the totality of the circumstances." *Skinner*, 517 F. Supp. 3d at 598 (emphasis added). Importantly, in conducting this analysis, "we must look at all of the facts and circumstances relevant to the reasonableness of [the officer's] conduct, [and would be] mistaken to focus entirely on the threat of harm." *Id*. at 412 (emphasis added). Qualified immunity is not appropriate when the officer "unreasonably created" the encounter that ostensibly permitted the use of deadly force to protect him. *Edmond v. City of New Orleans*, No. 93-3602, 1994 U.S. App. LEXIS 42156, at *5 (5th Cir. 1994).

**D.     Burmaster's factual arguments are incorrect and contradicted by the evidence.**

The factual positions that Burmaster takes in his motion are contradicted by the actual evidence. First, Burmaster claims that Apollo was behaving aggressively, and "[i]t wasn't coming with its tail wagging." R. Doc. 105-1, p. 4. This is incorrect. As captured by Burmaster's BWC, Apollo's tail was visibly wagging as he approached Burmaster, and he was not barking, growling, bearing his teeth or lunging. **Ex. D,** at 1:56

Burmaster next takes the position that, at the time he first heard the dogs, "he was well into the yard and well away from the gate," but this is directly contradicted by Officer Roussel's testimony that Burmaster was "right next to him" and "close enough to also exit in time."[25]

---

[25] **Ex. B**, pp. 48-52. There was also a second unlocked vehicle gate right behind him.

Burmaster further claims that "he did not have time to escape out of the gate as Officer Roussel did nor was he able to find cover." R. Doc. 105-1, p. 4. This is also contradicted by the evidence. Officer Roussel, who was "standing right next to" Burmaster, and tapped Burmaster on the shoulder for the purpose of communicating to him that they should retreat out of the pedestrian gate that they just entered in response to the barking. After doing so, Roussel exited the pedestrian gate leading back to the sidewalk and held it open for Burmaster to do the same because Burmaster was "close enough to also exit in time."[26] Moreover, there was a table with chairs right in front of Burmaster that he could have used to create a barrier between himself and Apollo. And a second even larger unlocked vehicle gate was also right behind Burmaster that he could have escaped through.[27]

Burmaster next claims that "Officer Roussel testified that Burmaster started making 'kissing' noise before he got to the Brown's house and stopped when he was in front of the Brown's house." *Id.* p. 5. Incorrect. Roussel testified that Burmaster stopped making the kissing noises *before* the Brown's house, not *in front of* the Brown's house.  Roussel testified:

Q.    …He never makes one when he is in front of the Brown's house, right?
A.    Not that I can hear.
Q.    He never makes one when he's at the gate of the Brown's house?
A.    No.[28]

He further testified:

Q.    …"[B]ased on your training, your job experience, your understanding of the NOPD's policies and procedures, would it have been more prudent to make the kissing noises in front of the Brown's residence than in front of their neighbor's residence?
    MR. ALPAUGH: Object to form.

---

[26] **Ex. B**, pp. 48-52.

[27] **Ex. D**, at 01:34; 01:52.

[28] **Ex. B**, p. 99.

13

A.     Yes.[29]

Burmaster next claims that Detective Pruitt, who oversaw a separate criminal investigation of Burmaster's actions, opined that Burmaster "was justified in his actions." What Burmaster fails to mention to the Court is that Pruitt clearly stated that her opinion in this regard was *strictly limited to whether or not Burmaster had committed a crime*. Her conclusion in this regard has no bearing on whether Burmaster's actions were justified in a civil context, reasonable, within NOPD policy, or constitutional:

> Q.     Okay, you're speaking this sentence, he just asked you, "Sergeant Pruitt found Officer Burmaster to be justified in his action." You're only saying that in the context of a criminal investigation, right?
> A.     Yes.
> Q.     You're not talking about whether he violated any NOPD policies, whether he was liable in the administrative proceeding, whether he was constitutionally liable; *this statement is strictly limited to whether or not he committed a crime, right*?
> A.     *Correct.*[30]

Whether or not Burmaster committed a crime is irrelevant to this civil proceeding. All that needs to be determined in this case is whether Burmaster's use of force was objectively reasonable, which is a completely different standard.[31]

Next, Burmaster misrepresents the testimony of Detective Shannon Brewer.[32] She is the Detective who found Burmaster's shooting to be unjustified and violative of NOPD's policies, and

---

[29] **Ex. B**, pp. 62-63.

[30] Burmaster omits this page from his submitted excerpt of Pruitt's deposition. Plaintiffs attach it hereto as **Ex. R**, pp. 78-79 (emphasis added). Pruitt went on to state that, based on experience as an officer, a puppy running towards her would be an insufficient threat to justify lethal force; there would have to be some other indication of a threat, *Id.* p. 38, and that she would not have even taken her gun out in the situation Burmaster faced. *Id.* p. 70.

[31] *See* further discussion of this topic in Plaintiffs' Motion in *Limine* to Exclude Criminal Finding of Sargent Pruitt.

[32] The City's designated expert and designated 30(b)(6) witness.

#101139167v1

that Burmaster's stated justification to use lethal force was "not credible." Burmaster claims that at her deposition, when asked about her assessment of Burmaster's credibility, she could not articulate any legitimate basis for it. R. Doc. 105-1, p. 6.  But this is the opposite of what happened. When Burmaster's counsel asked her for the basis of her credibility assessment, she testified that it was based on the facts that (1) Burmaster stated he was justified in using lethal force because "he was scared the dog would bite his genitals" was not credible because "[t]he dog was not in proximity to do so."[33] Burmaster also claims that Sgt. Brewer testified that Burmaster has not received any disciplinary action for the incident, but she in fact stated the opposite: "Officer Burmaster *received* disciplinary action related to these policy violations.[34] Indeed, even Burmaster himself admitted that he was disciplined after the incident by being pulled off of the streets and put on desk duty for several months "because of the shooting." **Ex. M, p. 19**.

Finally, in his recitation of Sergeant Duplantier's findings and testimony (R. Doc. 105-1, p. 8), Burmaster represents that "Sgt. Duplantier testified that Officer Burmaster had no viable alternative [to shooting Apollo]." R. Doc. 105-1, p. 8. This is a misrepresentation of Duplantier's deposition testimony. Rather, when asked whether he would have shot Apollo in the same situation, Duplantier testified that he was "more likely to … try and kick at the dog."[35] Therefore, contrary to Burmaster's representation in his motion, *Burmaster's designated expert* and the NOPD's 30(b)(6) designee on training admitted that a "viable alternative" would have been to simply kick Apollo. And all of the other designated experts in this case, as well as Burmaster's partner Officer Roussel, agree with this.

---

[33] **Ex. H**, pp. 104, 113.

[34] **Ex. H**, p. 67 (emphasis added).

[35] Deposition of Sergeant Duplantier, attached as **Ex. S**, p. 145.

#101139167v1

E.     **Burmaster's legal arguments on qualified immunity should be denied.**

   *1.     The Browns' constitutional rights were clearly established.*

"At [this] step[36] of the qualified immunity inquiry, we ask whether the violated constitutional right was clearly established at the time of the violation." *Lytle*, 560 F.3d at 417. "When conducting this inquiry, '[t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004); *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

"'[T]he very action in question [need not have] previously been held unlawful' for a public official to have reasonable notice of the illegality of some action." *Skinner*, 517 F. Supp. 3d at 602 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This analysis does not "require a case directly on point" prohibiting the official's specific actions. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). A plaintiff need not establish that the "very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[D]efining a right too narrowly risks making recovery against a public official virtually impossible because only those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar would abrogate qualified immunity." *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (internal quotations omitted).

Additionally, when the constitutional right in question is "self-evident," the absence of case law specifically establishing the existence of the right is not dispositive. *Reyes*, 2002 U.S. Dist.

---

[36] The Court has discretion to consider this issue after determining whether a constitutional right has been violated.

#101139167v1

LEXIS 9154, at *6 (Fallon, J.) ("[W]e are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government. Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right, but that does not mean that there is no such right."). Indeed, as explained by the Fifth Circuit and the Supreme Court, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Tyson v. Cty. of Sabine*, 42 F.4th 508, 519 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)); *see also Brosseau v. Haugen,* 543 U.S. 194, 199 (2004) (per curiam) ("Of course, in an *obvious case*, [general] standards can 'clearly establish' the answer, even without a body of relevant case law.") (emphasis added). Indeed, "[i]t may be true … that 'even if there is no closely analogous case law, a *right can be clearly established on the basis of 'common sense.'*" *Lester v. Prator*, No. 15-2008, 2017 U.S. Dist. LEXIS 169259, at *24-25 (W.D. La. Oct. 12, 2017) (emphasis added) (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001)).

Moreover, as the Supreme Court has explained, "qualified immunity is lost when plaintiffs point either to 'cases of controlling authority in their jurisdiction at the time of the incident' <u>*or*</u> to '*a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful*.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 746 (2011) (emphasis added) (quoting *Wilson* v. *Layne*, 526 U.S. 603, 617 (1999)). "These standards ensure the officer has 'fair and clear warning' of what the Constitution requires." *Id.* (quoting *United States* v. *Lanier*, 520 U.S. 259, 271 (1997)). Even "the decisions of courts in other circuits" may contribute to this consensus of persuasive authority. *Flores v. Rivas*, No. 18-297, 2020 U.S. Dist.

17

LEXIS 22047, at *22 (W.D. Tex. Jan. 31, 2020) (citing *Morrow v. Meachum*, 917 F.3d 870, 879-80 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

As the First Circuit has explained in *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009):

> The killing of a person's pet dog or cat by the government without the person's consent is also a seizure within the meaning of the Fourth Amendment. Three other circuits had announced this conclusion well before the violations alleged here. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds*; *Lesher v. Reed*, 12 F.3d 148, 150-51 (8th Cir. 1994). Since then, the Seventh Circuit has also held that the killing of a companion dog is a Fourth Amendment seizure. *See Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). No circuit court has held otherwise.
>
> *We reject the Mayor's argument that this law was not clearly established because this court had not earlier addressed the questions of effects and seizure.* Against the *widespread acceptance of these points in the federal circuit courts*, the Mayor's argument fails. These are principles of law, and the law was sufficiently recognized by courts to be clearly established. *See Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (holding that a constitutional right is clearly established if "a consensus of persuasive authority" exists "such that a reasonable officer could not have believed that his actions were lawful")

Here, the unconstitutionality of using lethal force on a household pet that is not posing a legitimate and imminent danger when non-lethal options are readily available is "self-evident" from case law prohibiting unreasonable seizures, and therefore clearly established. It is also "clearly established on the basis of common sense."

Nonetheless, a widespread consensus of authority from within the Fifth Circuit and beyond gives "reasonable warning" that an officer's destruction of a citizen's pet is objectively unreasonable unless the pet poses legitimate imminent danger and the use of lethal force is unavoidable. There are far too many decisions that give such fair warning to fit in this brief. Here are some of them:

18

In *Grant v. City of Houston*, 625 F. App'x 670 (5th Cir. 2015) (unpublished), the Fifth Circuit evaluated whether an officer's use of lethal force against a pet dog was objectively reasonable. In *Grant*, a dog charged an officer "snapping its teeth and turning its head sideways so that it could bite [his] leg." *Id.* at 673. The officer "*kicked the [dog twice]*, but the dog continued its aggressive approach." *Id.* The officer also attempted to retreat, but was unsuccessful. *Id.* He was then forced shoot the dog. In determining that the officer's actions were reasonable under the totality of the circumstances, the Fifth Circuit specifically premised its ruling on the fact that the officer "exhausted all non-lethal options prior to using lethal force against the dog." *Id.* at 676.[37] This case gave Officer Burmaster reasonable notice that not even attempting to first use non-lethal force, such as simply kicking Apollo, would render his shooting objectively unreasonable and violative of the Fourth Amendment.

In *Jones v. Lopez*, 689 F. App'x 337 (5th Cir. 2017) (unpublished), the court reviewed a situation where an officer shot a citizen's eight-year-old boxer when responding to a 911 call. The plaintiff and the officer had opposing accounts of whether the dog acted aggressively toward the officer. The Fifth Circuit, citing *Grant*, "agree[d] with the legal ruling that the killing of the plaintiffs' pet dog raise[d] a Fourth Amendment claim" where plaintiffs claimed that "[t]hey never saw him threaten to attack the officers, heard him growl, or otherwise pose the threat identified by the officers." *Id.* at 341. Burmaster was therefore given reasonable notice that shooting a dog in the absence of these circumstances would be unconstitutional.

In *Skinner v. Ard*, 517 F. Supp. 3d 586, 591 (M.D. La. Feb 3, 2021), Judge deGravelles denied qualified immunity to an officer who (1) did not "attempt to use any non-lethal methods to

---

[37] *See also* NOPD Use of Force Policy (Ch. 1.3) included in **Ex. J**, p. 11 (requiring officers to use non-lethal force on animals if "reasonably available.")

restrain a citizen's dog, instead resorting to the most dangerous weapon he possessed — his personally owned gun — to shoot at the dog" and (2) "was not '*imminently* in danger of being bitten by [the dog] *at the time [the officer] discharged his weapon*.'" (emphasis in original) (quoting *Grant*, 625 F. App'x at 675-78). Citing to *Grant, Jones*, and the robust consensus of authority outside of the Fifth Circuit discussed immediately below, Judge deGravelles concluded that "all reasonable officers" would have "fair notice" that "the use of force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Id.* at 590, 599, 603. *See also Kincheloe v. Caudle*, No. A-09-CA-010 LY, 2009 U.S. Dist. LEXIS 96371, at *22 (W.D. Tex. Oct. 16, 2009) (denying motion to dismiss because "[the dog] did not pose an immediate danger to the public or Chief Caudle when Chief Caudle decided to draw his weapon and shoot and kill [the dog]").

In *Robinson v. Pezzat*, 422 U.S. App. D.C. 35, 37, 818 F.3d 1, 3 (2016), the Court of Appeals for the D.C. Circuit concluded that "[e]very circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment … [and] have invariably concluded that 'the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.'" In *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008), the Seventh Circuit held that the decisions of multiple circuit courts were "enough to give police officers reasonable notice that unnecessarily killing a person's pet offends the Fourth Amendment," and that an officer cannot constitutionally destroy a pet "when it poses no immediate danger."  "Common sense … counsel[s] that the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable."

In *Andrews v. City of W. Branch*, 454 F.3d 914, 918-19 (8th Cir. 2006), the Eighth Circuit reversed a district court's grant of qualified immunity on the grounds that "an officer commits an unreasonable, warrantless seizure of property, in violation of the Constitution, when he shoots and kills an individual's family pet when that pet presented no danger and when non-lethal methods of capture would have been successful." In this case, the Court premised its ruling on the fact that the dog was not "growling, acting fiercely, or harassing anyone at the time [the officer] killed him."

In *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210 (3d Cir. 2001), the Third Circuit reversed a district court's granting of qualified immunity to an officer who unnecessarily shot a dog that was not posing any legitimate threat to the officer. In so holding, the court articulated that an officer may not, "consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger."

In *Fuller v. Vines*, 36 F.3d 65, 66, 68 (9th Cir. 1994), *overruled on other grounds, by Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002), the Ninth Circuit held that a plaintiff's allegations that an officer shot his dog on his property despite the dog not posing an imminent threat stated a valid claim for an unlawful seizure violative of the Fourth Amendment. *See also Bletz v. Corrie*, 974 F.3d 306, 310 (3d Cir. 2020) (holding that the use of deadly force against a household pet is reasonable only "if the pet poses an imminent threat to the law enforcement officer's safety, viewed from the perspective of an objectively reasonable officer."); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) (holding that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment only when "viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety."); *Brown*, 269 F.3d 205, 211 (3d Cir. 2001) (holding that "a reasonable officer ... could not

#101139167v1

have … concluded that he could lawfully destroy a pet who posed no imminent danger" in light of the Supreme Court's 1984 decision in *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

In light of this widespread consensus of authority, it "it would have been apparent to a reasonable officer that shooting [the Browns' 22 lb. puppy] would be unlawful." *Brown*, 269 F.3d at 211-12 ("[I]t would have been apparent to a reasonable officer that shooting [the dog] Immi would be unlawful. Accordingly, Officer Eberly has not established that he is entitled to qualified immunity."). Moreover, the unlawfulness of such action would have been "self-evident," "obvious" and "common sense" from general constitutional rules already identified in the decisional law. *Tyson*, 42 F.4th at 519; *Lester*, 2017 U.S. Dist. LEXIS 169259, at *24-25.

   2.   *Burmaster's use of deadly force on Apollo was objectively unreasonable under the totality of the circumstances.*

Under the applicable case law, Burmaster's action in shooting a small puppy who was running towards him with its tail wagging, and not barking, lunging, showing its teeth, or growling, was objectively unreasonable, especially because he could have simply kicked, tased or used his baton (if he had be carrying one as mandated by policy) on the puppy. In the interest of not burdening the Court with an excess of duplicative pages, Plaintiffs refer the Court to Section C, pages 14-21, of their Memorandum in Support of their Motion for Partial Summary Judgment (R. Doc. 110-1), which Plaintiffs fully incorporate herein. The jurisprudence cited therein makes it clear that Burmaster's use of lethal force against Apollo was objectively unreasonable under a totality of the circumstances. And the cases cited by Burmaster do not show otherwise.

Burmaster's reliance on *Grant*, 625 F. App'x 670 is misplaced. There, as discussed above the Fifth Circuit only granted qualified immunity to an officer when a dog charged him "snapping its teeth and turning its head sideways so that it could bite" because he first attempted to kick the dog twice and also retreat before he resorted to lethal force. *Grant* actually shows that Burrmaster's

22

use of lethal force was unreasonable because he did not first attempt any non-lethal measures before shooting Apollo.

Burmaster's reliance on *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015) is similarly misplaced. There, an officer approached a suspect reported to be brandishing a gun, and was startled to meet a large 50 pound boxer "that was showing its teeth." *Id.* at 185. Then, "the dog jumped on him and bared its teeth, at which point Officer Duncan discharged his weapon." *Id.* In light of the size of the dog, and the fact that it bared its teeth and jumped on the officer, the court held that the officer was entitled to qualified immunity. *Id.* Here, it is undisputed that Apollo was a small 22 pound puppy (not a large Boxer), and it is further undisputed that that Apollo never bared his teeth at or jumped on Burmaster.

*Lane v. Rechfertig,* No. 16-473, 2017 WL 5653870 (W.D. Tex. Jan. 25, 2017) is also clearly distinguishable. There, the court granted qualified immunity to an officer that shot a "large Rottweiler" based on undisputed testimony that the Rottweiler was charging an officer while "growling and barking in an aggressive posture." *Id.* at *4. The Plaintiffs do not dispute that an officer can constitutionally shoot a large Rottweiler that is charging him while aggressively growling and barking. The Plaintiffs only argue here that an officer cannot constitutionally shoot a tiny puppy not much bigger than a football when it is running towards him, wagging its tail, and neither growling, lunging, bearing its teeth nor barking.

Next, Burmaster misunderstands the relevance of the numerous NOPD policies he was found to be in violation of when he shot Apollo. Plaintiffs are not arguing that Burmaster's "negligent failure to follow NOPD procedures" resulted in the Fourth Amendment violation at issue. Rather, Plaintiffs' argument is that, in evaluating the reasonableness of an officer's use of force, "a policy violation can serve as evidence that an act was objectively unreasonable." *Dawes*

*v. City of Dall.*, No. 17-1424, 2021 U.S. Dist. LEXIS 260494, at *7-8 (N.D. Tex. Sep. 24, 2021) (citing *Anthony v. Morton*, No. 05-0027, 2007 U.S. Dist. LEXIS 101798, 2007 WL 628750, *7 (W.D. Tex. Jan. 31, 2007) (holding that officer's violation of police baton policy "is *certainly probative in determining if [officer] acted in an objectively reasonable manner*.") (emphasis added); *Hope v. Pelzer*, 536 U.S. 730, 743-44, (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct."). "Relatedly, a policy violation may show that a reasonable, alternative course of action was available to the officer." *Dawes*, 2021 U.S. Dist. LEXIS 260494, at *8.

Finally, in his motion and throughout his defense of the case, Burmaster's suggestion has been that it was reasonable for him to shoot the small non-threatening puppy Apollo because the larger dog Bucho, who ran away from Burmaster and in the opposite direction towards Officer Roussel, may have posed a legitimate threat of danger. There is no judicial decision in existence that suggests an officer can use lethal force on a person or animal that *does not* pose a threat merely because *another* person or animal that may pose a threat is also on the scene. Such an argument fails on the basis of common sense.

**F.      This Court should not dismiss Plaintiffs' claim for Punitive Damages.**

A defendant in a Section 1983 case can be liable for punitive damages when their conduct "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Burmaster makes no specific argument for dismissing punitive damages, other than the conclusory statement that "Plaintiff cannot, and has not, established that Burmaster's alleged behavior" meets the standard. However, that a reasonable jury could conclude that Burmaster's actions reflected a reckless indifference to the Browns' rights. Burmaster could

24

have avoided killing the Brown's dog by extremely simple means: kick, evade, Taser, baton, etc. And he was fully aware of the wrongful nature of his conduct because he violated numerous NOPD policies. *Hope*, 536 U.S. 730, 743-44, (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct.").

The evidence further shows that Burmaster exhibited and continues to exhibit callous disregard for the Browns' constitutional rights: (1) in the aftermath of the shooting, Burmaster was "joking around with" and "high-fiving" other officers. He then (2) started laughing on three separate occasions during his PIB interview with Detective Brewer, (3) wore a "joke shirt" to his deposition that read "Not Today Satan" (to imply that the Browns and/or their counsel were Satan), and perhaps most offensively, (4) planned to sue the Brows for letting their puppy scare him and only didn't because he "thought they were poor."[38]

Burmaster may be correct that he was not motivated by "evil intent," but evil intent is not required for punitive damages. Reckless or callous indifference is sufficient, and a reasonable jury could conclude that Burmaster met that standard.

## IV.    CONCLUSION

Summary judgment on liability should be granted in Plaintiffs' favor. But if it is not, it is clear that a rational juror could review the evidence in this case and conclude that Burmaster's actions were unreasonable. For these reasons, Burmaster's motion should be denied.

Respectfully submitted,

---

[38] Deposition of Julia Brown, attached as **Ex. T**, pp. 31-32; **Ex. H**, pp. 89-91, **Ex. M**, pp. 10, 111, 194-97.

#101139167v1

| | |
|---|---|
| */s/Tarak Anada*_____ | */s/William Most*_____ |
| TARAK ANADA (La. Bar No. 31598) | WILLIAM MOST (La. Bar No. 36914) |
| JONES WALKER LLP | DAVID LANSER (La Bar No. 37764) |
| 201 St. Charles Avenue, Ste. 4900 | MOST & ASSOCIATES |
| New Orleans, LA 70170 | 201 Saint Charles Ave., Ste. 114 #101 |
| Telephone: (504) 582-8322 | New Orleans, LA 70170 |
| Facsimile: (504) 589-8322 | Tel: (504) 509-5023 |
| Email: tanada@joneswalker.com | Email: williammost@gmail.com |

***Counsel for Plaintiffs Derek Brown and Julia Barecki-Brown***

#101139167v1