```
               UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and           *   CIVIL ACTION
JULIA BARECKI-BROWN       *
                          *   DOCKET NUMBER: 22-00847
VERSUS                    *
                          *   SECTION: L
DERRICK BURMASTER,        *
SHAUN FERGUSON, and       *   HONORABLE ELDON E. FALLON
the CITY OF NEW ORLEANS   *
                          *   DIVISION:  4
                          *
                          *   HONORABLE KAREN WELLS ROBY

****************************************************
```

Deposition of DEREK BROWN, taken via Zoom with the witness located in New Orleans, Louisiana, on Wednesday, the 19th day of December 2022, beginning at 9:00 a.m.

Reported by:

Jill Cox, CVR, CCR

NVRA CVR #7553

LA CCR #2019002

**New Orleans 504.522.2101**                    **North Shore 985.206.9303**
**Toll Free 800.526.8720**   SerpasCourtReporting.com   **Baton Rouge 225.332.3040**

EXHIBIT C

```
 1      A.   No.
 2      Q.   How about a misdemeanor crime?
 3      A.   I got a ticket for driving without a
 4  license a couple of years ago, nothing other than a
 5  few traffic violations.
 6      Q.   I know I asked you about being involved in
 7  depositions, have you ever had any other lawsuits
 8  that you have been involved in as a plaintiff or a
 9  defendant?
10      A.   No.
11      Q.   I'm going to ask you some questions about
12  your house on Felicity Street, okay?
13      A.   Okay.
14      Q.   So on April 10, 2021, your residence was
15  where?
16      A.   1420 Felicity Street, New Orleans.
17      Q.   And are you currently living at that same
18  house?
19      A.   Yes.
20      Q.   Okay.  How long had you, when did you move
21  into 1420 Felicity?
22      A.   Spring of 2005.
23      Q.   And the 1420 Felicity, is that something
24  that is a place you own or rent?
25      A.   Own.
```

```
 1      Q.   Okay.  Just in general terms give me a
 2  description of the house at 1420 Felicity, how many
 3  beds, how many baths?
 4      A.   It's an up-down double.  And our primary
 5  residence where we live is three bedroom, two bath.
 6  And there's an apartment on the ground floor with
 7  three bedrooms and one bath.
 8      Q.   Is the ground floor apartment something
 9  you rent out?
10      A.   It is, yes.
11      Q.   And on April 10th of 2021, was that
12  being rented out?
13      A.   Yeah.  We were -- I guess, technically, we
14  were renting, but it was a friend that had been
15  staying there for a month.
16      Q.   So somebody else was living on the ground
17  floor?
18      A.   Yes.
19      Q.   And from what I can tell or from what I
20  have seen in the pictures there is a wrought iron
21  fence in the front; is that right?
22      A.   Yes.
23      Q.   And it closes the front yard?
24      A.   Yes.
25      Q.   And there's a gate also that you have to
```

```
 1        Q.   Do you remember anything in particular
 2   that you said or that she said to each other?
 3        A.   I do not remember anything in particular.
 4   It was just a lot of husband-wife arguing about lack
 5   of communication, and of not being supportive.  I
 6   don't recall any specific words or sentences that we
 7   used that night.
 8        Q.   Tell me how, what the volume of your
 9   disagreement was?
10              MR. ANADA:  Object to form.  Go
11              ahead.
12        A.   It was probably loud.  I don't -- I'm not
13   the type to raise my voice.  Julia is more vocal
14   then me.  But, yes, I'm guessing it was loud enough
15   for someone to have called 911 and reported a noise
16   disturbance.  It must have been loud.
17        Q.   Right.  You understand that somebody did
18   call the police about the disturbance between you
19   and your wife on that night; is that right?
20        A.   Yes.
21        Q.   Okay.  And at some point, from what I
22   understand, at some point in time from what I
23   understand you were arguing out front, on your front
24   porch; is that right?
25        A.   Yes.
```

```
 1        Q.   Okay.  But you were also arguing inside
 2   your house; is that right?
 3        A.   Yes.
 4        Q.   Now, give me an idea of how long the
 5   argument, when your voices were raised, how long
 6   that lasted, how many minutes?
 7        A.   About 10 or 15 minutes.
 8        Q.   The loud voices began about when?
 9        A.   I am guessing 9:15.
10        Q.   And were you -- was the argument over by
11   the time the shooting occurred?
12        A.   No.  We were still arguing and then we
13   heard the gunshots.  And that's what stopped it the
14   argument.
15        Q.   All right.  So the argument, tell me how
16   that affected Bucho and Apollo?
17                 MR. ANADA:  Object to form.  Go
18                 ahead.
19        A.   Well, our dogs -- I don't really recall
20   them having any particular reaction to our argument.
21   I mean, I believe they were following us around and
22   looking at us.  That's typically what they always
23   do.  They just wanted treats.  I don't remember them
24   jumping or barking or anything like that.
25   BY MR. ROQUEMORE:
```

 1      Q.   So from what I understand your observation
 2   of the dogs while you were arguing with your wife
 3   was that the dogs were not affected, necessarily, in
 4   any way by your argument?
 5      A.   Not that I recall.  I mean, they are
 6   excitable dogs.  So I don't recall them getting wild
 7   or anything other than their normal behavior.  They
 8   may have followed us around.  Yeah, I don't really
 9   remember anything abnormal in their behavior.
10      Q.   And they were following you around, they
11   were inside the house at that time?
12      A.   They would follow us back and forth,
13   because as I recall we went outside and we came
14   inside, went outside and the dogs would always
15   follow us.  They would go out to pee or do their
16   business.  They would come back in and stare at us.
17      Q.   When the police officers arrived at your
18   property were you inside the house?
19      A.   Yes.
20      Q.   Your wife was inside the house?
21      A.   Yes.
22      Q.   And you were still arguing, right?
23      A.   Yes.
24      Q.   And the dogs were inside the house?
25      A.   No.  The dogs were outside.

```
 1      Q.   Okay.  How long had the dogs been outside
 2   at that time, when the police officers arrived?
 3              MR. ANADA:  Object to form.  Go
 4          ahead.
 5      A.   We rarely leave them outside unsupervised.
 6   So we usually make a point to bring them in if it's
 7   been more then a couple of minutes.  So I would say
 8   two or three minutes.
 9   BY MR. ROQUEMORE:
10      Q.   So why did you let the dogs outside at
11   that time?
12      A.   I think I was distracted.  You know, we
13   were arguing so I didn't -- I wasn't diligent like I
14   usually am about bringing them back inside.  So from
15   what I recall we were arguing in the hallway.  The
16   dogs were outside the window of our front door
17   looking in at us, like they often do when we leave
18   them outside for more any, more than a minute or
19   two.  They just come up to the front porch and stare
20   through the window looking at us until we let them
21   in.
22      Q.   Right.  But how did they get -- why did
23   they go outside in the first place?
24      A.   They had followed us out.
25      Q.   They followed you out when you went
```

```
 1   outside to argue, and then you came back in and you
 2   left the dogs outside?
 3        A.   Yes.
 4        Q.   And the reason why you left the dogs
 5   outside was what again?
 6        A.   I don't know why.  We would have left them
 7   outside maybe to do their business.  I don't know
 8   why we left them outside.
 9        Q.   Okay.  Do you remember talking to
10   Elizabeth Burke, a licensed clinical psychologist on
11   or about June 15, 2021?
12        A.   Yes.
13        Q.   And she was doing a psychological
14   evaluation of you with regard to the incident; is
15   that fair?
16             MR. ANADA:  Object to the form.
17        A.   Yes.
18   BY MR. ROQUEMORE:
19        Q.   I'm going to mark this, I'm going to show
20   you Exhibit No. 5.
21                      (Psych evaluation attached as
22                       Exhibit 5.)
23             This is a psychological evaluation, I
24   apologize for throwing it at you again.  This is
25   Exhibit No. 5 is the evaluation; is that right?
```

```
 1   the record.  You can do that now, what is the item
 2   of testimony that you wanted to clarify?
 3        A.   When I spoke with Dr. Burke in my
 4   psychiatric evaluation I don't recall having told
 5   her that both dogs barked.  I think she may have
 6   misinterpreted that.  While we were arguing I think
 7   I related to her it was just Bucho that barked, and
 8   it was mis-communicated that both dogs had barked.
 9   Because I don't recall Apollo having ever barked.
10   And that night, in particular, I would really recall
11   Bucho being the dog barking and I think maybe it was
12   misinterpreted in her report.
13        Q.   I'm going to read a sentence for you from
14   the second admitted complaint in this matter.
15   Paragraph five, Apollo was a catahoula and weighed
16   just wait over 22 pounds.  He stood less than
17   18 inches tall.  He was so young that he had not yet
18   developed the ability to bark.
19             Mr. Brown has the statement I just read to
20   you, are those statements true and correct to the
21   best of your knowledge?
22        A.   Yes.
23        Q.   Do y'all have any questions for Mr. Brown?
24             MR. ROQUEMORE:  No.
25             MR. ALPAUGH:  No.
```