Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DEREK BROWN and JULIA            CIVIL ACTION NO.

BARECKI-BROWN                    22-00847


VERSUS

                                 DIVISION: 4

DERRICK BURMASTER, SHAUN

FERGUSON, and the CITY OF        SECTION: L

NEW ORLEANS




*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

TRANSCRIPT OF THE DEPOSITION OF:

SHANNON JONES BREWER,

TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


        REPORTED AT:

        NEW ORLEANS CITY HALL

        1300 PERDIDO STREET, ROOM 5E03

        NEW ORLEANS, LOUISIANA  70112



        COMMENCING AT 10:03 A.M., ON MARCH 8, 2023.



EXHIBIT
H

1    deposition of the City of New Orleans.  We give the

2    City of New Orleans, through its attorney,

3    Mr. Roquemore, a list of topics that we would like to

4    ask the City in the deposition.  The City attorney

5    then, in turn, designates certain witnesses to speak

6    about certain enumerated topics.

7            And if you'll turn to page 2 of Exhibit 8, you

8    will see that you've been designated to give testimony

9    about topics 8 and 9, Topic 8 being the PIB's

10   investigation into and conclusions regarding the

11   shooting of Apollo and any other policy violations

12   related to that incident.

13           Do you -- do you see that?

14   A.   Yes.

15   Q.   Are you prepared to give testimony about that

16   topic today?

17   A.   Yes.

18   Q.   Okay.  And you understand what -- what is

19   meant by the -- the "incident," right?

20   A.   Are we speaking about -- well, can you explain

21   it to me?

22   Q.   Yeah, absolutely.  Absolutely.

23           The incident is Officer Burmaster's killing of

24   the Brown family's dog on April 10th, 2021.

25   A.   Yes.



Page 12

```
 1        A.    Are you asking about the initials PIB?
 2        Q.    No.  I -- I think it stands for Public
 3  Integrity Bureau --
 4        A.    That's correct.
 5        Q.    -- PIB?  Okay.  All right.
 6              And is that kind of like NOPD's internal
 7  affairs?
 8        A.    Yes.
 9        Q.    Okay.  And what -- what's your relationship to
10  the PIB?  Are you --
11        A.    At the time of this investigation, I was
12  assigned to the Public Integrity Bureau Force
13  Investigation Team -- at the time of this
14  investigation.  That is not my current assignment.
15        Q.    Okay.  And -- and how long were you assign- --
16  assigned to the Public Integrity Bureau's Force
17  Investigation Team?
18        A.    One year.
19        Q.    One year?  Okay.  And real quick, just some
20  background information.
21              When -- when did you start at NOPD?
22        A.    October 18th, 2004.
23        Q.    Okay.  And what -- what -- I don't need to
24  know every single detail.  But can you take me through
25  what type of training you've had?  I -- I assume it's,
```



Page 16

```
 1      Q.    Okay.
 2            MR. ROQUEMORE:  And that's not a
 3      problem.
 4            MR. ANADA:  Okay.
 5            MR. ROQUEMORE:  We'll -- we'll do that.
 6      We'll do that for all the officers.  You just
 7      let us know.
 8            MR. ANADA:  Thank you.  Former officers
 9      too?
10            MR. ROQUEMORE:  Not necessarily.
11            MR. ANADA:  Okay.  All right.
12            MR. ROQUEMORE:  Talk -- talk to me about
13      Goodly, and we will -- we'll see what we can
14      do.
15            MR. ANADA:  Okay.  Thank you.
16            MR. ROQUEMORE:  I don't foresee a
17      problem with Officer Goodly -- or former-chief
18      Goodly.  But before I commit to it, I need
19      to -- I -- I have to talk to him.
20            MR. ANADA:  Sure, not -- not a problem.
21      That sounds perfectly fine.
22   BY MR. ANADA:
23      Q.    You conducted an administrative investigation
24   into whether Derrick Burmaster's use of force on the
25   puppy that my clients owned was -- was justified or
```



Page 17

1    unjustified.  True?

2         A.   Yes.

3         Q.   Okay.  And what was Captain Preston Bax's role

4    in that investigation?

5              MR. ROQUEMORE:  I think it's

6              Precious Banks.

7              MR. ANADA:  Oh.

8              MR. ALPAUGH:  Precious Banks.

9              MR. ANADA:  It -- it says "Preston"

10             right here.  And that's what -- that's what

11             Burmaster was saying in his interview.

12             MR. ROQUEMORE:  Okay.  I'm sorry.  I

13             didn't mean -- you ask your question.

14   BY MR. ANADA:

15        Q.   Is -- is there an officer or a member -- a

16   captain that you know named Preston Bax?

17        A.   Yes.

18        Q.   Okay.  How -- how do you pronounces his name?

19        A.   That -- That's correct.

20        Q.   Okay.  And was he involved in your

21   investigation at all?

22        A.   No.  Not in my role as an investigator, no.

23        Q.   Okay.  And am I correct that you were not

24   involved in the criminal investigation regarding

25   Derek Brown's actions on April 10th, 2021?



Page 20

1   hit pause, and you can read the whole thing if you'd

2   like.  You can take a little bit of time to skim it

3   and -- what -- whatever you would like to do to refresh

4   yourself about this document, we can do that, and then

5   I'm going to ask some questions to you about it.

6        A.   Uh-huh.

7        Q.   Do you want to pause and read the whole thing?

8   Or do you want to --

9        A.   No, you can move forward.

10       Q.   Okay.

11            MR. ANADA:  I think I might have given

12            you -- one of you-guys a copy of -- the one

13            with my notes on it.  Is that a possibility?

14            THE WITNESS:  No notes on it, no.

15            MR. ALPAUGH:  I don't see any notes on

16            this one.

17            MR. ANADA:  Okay.  Oh, here it is.

18            MR. ALPAUGH:  It's pretty easy to

19            recognize with all the flags on it.

20   BY MR. ANADA:

21       Q.   Is there any information in this document that

22   you believe to be incorrect or inaccurate?

23       A.   No.

24       Q.   Do you stand by the conclusions you drew, as

25   reflected in this document, as of today?



Page 21

```
 1        A.    Yes.

 2        Q.    Okay.  You haven't received any new

 3   information that would cause you to change your

 4   conclusions, as reflected on this document, correct?

 5        A.    No.

 6        Q.    Okay.  I'm going to start reading from page 1

 7   of this document.  In the first paragraph, there's a

 8   sentence that reads, "The complainant stated he

 9   observed a male and female arguing in front of 1420

10   Felicity Street."

11              How -- how did you come to learn that

12   information?  From Burmaster?

13        A.    No.  I believe this information was provided

14   from dispatch.

15        Q.    Okay.  Have you ever watched the body camera

16   footage of Officer Burmaster speaking with the

17   complainant in this matter?

18        A.    Yes.

19        Q.    Okay.  And what is -- what is -- what does

20   "complainant" mean, for the record?

21        A.    Just for clarification, I don't want to say

22   that I -- I know for a fact that that was the -- the

23   complainant or the person that called.  But there is --

24   on the body camera footage, Officer Burmaster speaking

25   with someone.
```



Page 55

1    threat to determine if lethal force is necessary or

2    unnecessary if they have not even seen the potential

3    threat?

4         A.   Yes.

5         Q.   Explain.

6         A.   He believed that there was a threat present,

7    and he removed his weapon.

8         Q.   Okay.  But he had not actually seen the

9    potential threat at the time he removed his weapon,

10   correct?

11        A.   That's correct.

12        Q.   Okay.

13        A.   That's what my statement is, yes.

14        Q.   I'm going to read from page 11.

15             [As read]:  "Officer Burmaster stated he did

16   not attempt to use any less lethal methods, such as

17   CEW, due to the CEW being a one shot.  And if you miss

18   the dog, he believed he would not have time to -- to

19   reload."

20             Do you believe the CEW could have been a

21   useful nonlethal tool at Burmaster's disposal to use to

22   mitigate whatever threat he thought my client's puppy

23   presented to him?

24        A.   Yes.

25        Q.   Okay.  And your conclusion was that he did not



Page 56

```
 1    attempt to use that nonlethal option --

 2         A.    That's correct.

 3         Q.    -- correct?  Okay.

 4               I'm going to continue reading from this page,

 5    the next paragraph.  "Officer Burmaster stated he was

 6    not wearing his NOPD-issued body armor at the time of

 7    this incident."

 8         A.    That's correct.

 9         Q.    In your mind, why -- why -- why is that

10    relevant to your investigation and conclusions?

11         A.    According to NOPD policy, the officer is

12    required to have it at that time, and he did not.

13         Q.    Okay.  And he was also required, by NOPD

14    policy, to carry with him a baton.  Correct?

15         A.    The NOPD policy allows for an officer to carry

16    a baton.  The NOPD policy -- if he is trained with the

17    CEW, to also have a CEW as well.

18         Q.    Okay.  I think I heard you say the NOPD policy

19    allows him to carry a baton?

20         A.    Uh-huh.

21         Q.    Does it require him to carry a baton?

22         A.    It's not a requirement.  I would have to go

23    back and make sure I check that line.

24         Q.    Okay.

25         A.    But it's not really that the baton is a
```



Page 57

1    requirement.

2         Q.   Okay.  It's your understanding that the baton

3    is not required under NOPD's uniform policy?

4         A.   I would have to go back and check --

5         Q.   Okay.

6         A.   -- (indiscernible).  I'm not sure.

7         Q.   So sitting here, you -- you just don't know

8    one way or another?

9         A.   I'm not sure about the baton.

10        Q.   Okay.

11        A.   I do know --

12        Q.   Fair, fair.

13        A.   -- about a CEW, if he's trained.

14        Q.   Okay.  You -- you investigated whether he

15   attempted to use less -- less lethal methods before he

16   resorted to lethal force, correct?

17        A.   Ask me that one more time.

18        Q.   Part of your investigation was to determine

19   whether Burmaster used any less lethal methods before

20   he resorted to deadly force, correct?

21        A.   Correct.

22        Q.   If he had been carrying a baton, that could

23   have been a useful nonlethal method to mitigate any

24   threat that Burmaster perceived by the Browns' puppy.

25   Correct?



Page 58

1              MR. ALPAUGH:  Object to the form.

2        A.   It could have been.

3   BY MR. ANADA:

4        Q.   And it's your understanding, based on your

5   investigation, he did not attempt it use a baton before

6   resorting to lethal force on Apollo.  True?

7        A.   I would have to check to see if he was

8   carrying his baton, but he did not attempt.  That's

9   correct on the statement.

10       Q.   Okay.  I'm going to read from page 12 of your

11  report.  I'm just going to read two of the sentences

12  contained in this report.

13              Is it your understanding that the target

14  residence in this case was 1420 Felicity Street, the

15  Browns' residence?

16       A.   I believe so.

17       Q.   Okay.

18       A.   I believe they were 1420, yes.

19       Q.   Yeah.  And then is it your understanding that

20  1422 was a separate residence from the Browns'

21  residence?

22       A.   I believe so.

23       Q.   Okay.  You wrote in this report, quote, "At

24  the 2:21 time stamp, Officer Burmaster made a kissing

25  sound while passing the 1422 residence," end quote.



Page 61

```
1       Q.    Okay.  So officers should factor that in to
2  their decision-making --
3       A.    That's --
4       Q.    -- on whether or not to fire a bullet?
5       A.    -- an important consideration, yes.
6       Q.    Okay.  I'm going to turn to page 15 under the
7  subheading "Discrepancies, Clarifications, and
8  Credibility Assessments."  If you could just take a
9  moment and -- it's just a one -- one-page --
10                  MR. ALPAUGH:  Page 15?
11                  MR. ANADA:  Page 15.
12                  MR. ALPAUGH:  Onto 16.
13                  MR. ANADA:  It starts and stops on
14           page 15.
15  BY MR. ANADA:
16       Q.    Do you want to take a second to familiarize
17  yourself with this?
18       A.    We can keep going.
19       Q.    Okay.  "Detective Brewer, after comparing the
20  administrative statement provided by Officer Burmaster,
21  with the evidence reviewed during this investigation,
22  deemed Officer Burmaster not to be credible."
23            Is that -- is that a correct description of
24  your assessment of Burmaster?
25       A.    That's what I have in my statement, yes.
```



Page 62

```
 1          Q.   Okay.  And you stand by that today?

 2          A.   Yes.

 3          Q.   Okay.  I'm going to read from the middle of

 4   the paragraph.  "In Officer Burmaster's criminal

 5   statement, Officer Burmaster stated that he fired his

 6   first shot at the dog because the dogs ran up on him as

 7   they were barking and he thought the dogs were going to

 8   attack him.

 9              "Officer Burmaster stated he fired the second

10   and third shots because the dog continued towards him.

11   However, in Officer Burmaster's administrative

12   statement, he stated, when he fired his weapon three

13   times at the dog, it was all a blur and

14   Officer Burmaster could not recall the dog's actions."

15              Is that some of the reasons, the -- the -- the

16   contradictory statements described there -- is that

17   some of the reasons you found him not to be credible?

18          A.   That would factor in, yes.

19          Q.   "Officer Burmaster stated he was scared the

20   dog would bite his genitals, causing a penetrating

21   wound."

22              How did those statements of Burmaster factor

23   into your ultimate conclusion?

24          A.   Which one?

25          Q.   "Officer Burmaster stated he was scared the
```



Page 63

1   dog would bite his genitals, causing a penetrating

2   wound."

3       A.   That was his statement.  That didn't factor in

4   much into the credibility.

5       Q.   Okay.  "Officer Burmaster stated he was not

6   equipped with his PR-24 expandable baton or ASP at the

7   time of this incident and did not attempt any less

8   lethal options."

9            Does that refresh your memory, that Burmaster

10  was, in fact, not equipped with his baton at the time

11  of the incident?

12      A.   Yes.

13      Q.   Okay.  I'm going to read from the third

14  paragraph.  "Officer Burmaster determined, due to

15  Officer Roussel running out the front gate, the dogs

16  presented a threat.  Therefore, Officer Burmaster fired

17  his weapon, fatally wounding the dog."

18           Is that a correct recitation of your -- your

19  conclusion based on your investigation?

20      A.   If that's what he said, that's what I typed.

21      Q.   The reason he considered the dog a threat is

22  because Roussel ran out the front gate, right?

23      A.   If that's what he said.  That would have been

24  on the recording.

25      Q.   "Officer Burmaster fired his weapon out of



Page 64

1   fear and not because the animal presented an imminent

2   threat of serious bodily injury to Officer Burmaster."

3           Does that accurately state your conclusion in

4   this matter?

5       A.   If that's what he said.

6       Q.   Okay.  Do -- do you stand by that conclusion

7   today?

8       A.   Yes.

9       Q.   All right.  Can you give me some of the

10  reasons that you concluded that the animal Apollo did

11  not present an imminent threat of serious bodily injury

12  to Officer Burmaster?

13      A.   The animal, based on the video, did not come

14  within close proximity enough to Officer Burmaster at

15  the time when he initially began firing his weapon.

16  The officer -- sorry, the animal never made any

17  attempts to attack the officer.

18      Q.   Any -- any other reasons that you can think

19  of?

20      A.   That's kind of like a summary of it, based on

21  it.

22      Q.   What -- what about the -- the -- the small

23  size of this -- I think it was a four-week-old puppy?

24      A.   I really can't say.  I don't know much about

25  dogs, so I cannot make that determination just based on



Page 65

```
 1    size.  I can only tell you about the actions.
 2         Q.   Okay.  And then your -- your conclusion that
 3    the -- the dog did not present an imminent threat of
 4    serious bodily injury was important enough for you to
 5    actually restate it.  I'm going to read from the bottom
 6    of paragraph 15.
 7              "Detective Brewer determined Officer Burmaster
 8    was scared and fired his weapon.  The dog fatally
 9    wounded by Officer Burmaster did not present an
10    imminent threat towards Officer Burmaster.  And upon
11    recognizing the dog did not present a threat of serious
12    bodily harm, Officer Burmaster should have holstered
13    his weapon."
14         A.   That's correct.
15         Q.   And you -- you stand by those statements and
16    conclusions today?
17         A.   Yes.
18         Q.   What I just read to you is a very important
19    conclusion in your investigation, correct?
20         A.   Yes.
21         Q.   And -- and in fact, I -- the reason I think
22    it's very important is I've seen -- seen it restated
23    several times and reiterated.  On page 16, you again
24    reiterate, quote, "...the dog did not harm
25    Officer Burmaster and did not attempt to harm
```



Page 66

1    Officer Burmaster."

2                    MR. ROQUEMORE:  Objection; form.

3                    MR. ALPAUGH:  Same objection.

4    BY MR. ANADA:

5        Q.   I just read -- all right.  Let me read the

6    full sentence so -- so I can help cure the objection.

7                    On page 15, under "Decision Point Analysis,"

8    "Upon observing the dogs, Officer Burmaster fired his

9    weapon.  Officer Burmaster stated he fired his weapon

10   on the dog closest to him.  However, the dog did not

11   harm Officer Burmaster and did not attempt to harm

12   Officer Burmaster."

13                   That's you again reiterating that the --

14   the -- that Apollo did not attempt to harm or present

15   any threat to Burmaster, correct?

16       A.   Yes.

17       Q.   And -- and you had this under sub- --

18   subheading "Decision Point Analysis."  And am I correct

19   that your statements here are -- are criticisms of

20   Officer Burmaster's decision point analysis?

21       A.   An assessment would be -- be -- I would say

22   the correct term, an assessment.

23       Q.   Okay.  And you assessed that his decision

24   point analysis was not up to par, correct?

25       A.   So under the decision point analysis is how I



Page 67

1   made the decision and made the determination based on

2   what I observed.

3       Q.   And am I correct that based on your -- what

4   you observed and the analysis you conducted,

5   Officer Burmaster did not make the right decision by

6   shooting Apollo?

7       A.   That is correct.

8       Q.   And the last sentence of the second paragraph,

9   under "Decision Point Analysis," you -- you reiterate

10  yet again, quote, "The smaller dog did not attack or

11  attempt to attack Officer Burmaster."

12          Is that -- is that right?

13      A.   That's correct.

14      Q.   At the end of that section, you state,

15  "Officer Burmaster received disciplinary action related

16  to these policy violations"?

17      A.   That is correct.

18      Q.   What -- what was the disciplinary action he

19  received?

20      A.   I do not believe that there has been a

21  conclusion on that.

22      Q.   That would have been your recommendation,

23  right, though?

24      A.   That would have been a part of the

25  recommendation.  That's correct.



Page 68

1          Q.    A part of your recommendation, right?

2          A.    Uh-huh.

3          Q.    Based on your -- your investigation, you

4    believe that Officer Burmaster should receive some

5    disciplinary action based on the policy violations.

6    True?

7          A.    That is correct.

8          Q.    Turn to page 17.  Under the subsection "Policy

9    Violations," am I correct to understand this subsection

10   is noting that Burmaster had actually violated NOPD's

11   policies in -- in four different ways -- I'm sorry,

12   five different ways?

13                    MR. ROQUEMORE:  Objection; form.

14                    MR. ALPAUGH:  Objection; form.

15   BY MR. ANADA:

16        Q.    Am I -- am I correct to understand your

17   statements, under "Policy Violations," to -- to mean

18   that Burmaster had actually, in shooting Apollo,

19   violated NOPD policy in five different ways?

20                    MR. ALPAUGH:  Same objection.

21                    MR. ROQUEMORE:  Objection; form.

22        A.    Okay.

23   BY MR. ANADA:

24        Q.    Am I -- am I correct to interpret your report

25   as saying that?



Page 69

```
 1                    MR. ALPAUGH:  Same objection.
 2                    MR. ROQUEMORE:  Same objection.
 3         A.   Okay.
 4    BY MR. ANADA:
 5         Q.   You list five different policy violations
 6    under subheading "Policy and Violations."  True?
 7         A.    That is correct.
 8         Q.   Okay.  And each one of those is a -- a
 9    different way that -- or a different policy that he
10    violated.  True?
11         A.    Individual section of the policy.
12         Q.   Okay.  You -- you stand by those conclusions
13    today?
14         A.    Yes.
15         Q.   Okay.  And then I want to -- I want to ask
16    about the note that you write under policy and
17    violations.  Under "Note," it says, "Officer Burmaster
18    cannot be found in violation of Rule 2, Moral Conduct,
19    Paragraph 6, Unauthorized Force, due to the verbiage
20    written in the rule, which states unauthorized force
21    must be against a person."
22              The way that I read that is you communicating
23    that if this policy -- if this rule did not limit
24    itself to force against a person and if it also
25    included animals, he would have also violated that rule
```



Page 70

1    as well.  Right?

2              MR. ALPAUGH:  Object to the form.

3              MR. ROQUEMORE:  Objection; form.

4    BY MR. ANADA:

5        Q.   It's your conclusion that the only reason you

6    can't find him violation -- in violation of Rule 2,

7    Moral Conduct, Paragraph 6, Unauthorized force -- the

8    only reason you didn't find him in violation of that

9    rule is because the rule in itself says it only applies

10   to humans, right?

11             MR. ALPAUGH:  Object to the form.

12       A.   Okay.

13   BY MR. ANADA:

14       Q.   Is -- is that right?

15       A.   I'm -- I'm just -- I was just waiting for...

16       Q.   Okay.  I'll just ask one more time.

17       A.   Okay.

18       Q.   Is it correct that the only reason you

19   concluded that Burmaster was not in violation of

20   Rule 2, Moral Conduct, Paragraph 6, Unauthorized Force,

21   is because the verbiage in that rule itself limits

22   it's -- limits it's applicability to persons?

23       A.   That's correct.

24             MR. ALPAUGH:  Object to the form.

25   BY MR. ANADA:



Page 71

1       Q.    Your answer was "That's correct"?

2       A.    That is correct.

3       Q.    Okay.  Under "Summary and Conclusion," you

4   reiterate, yet again, that -- that the dog Apollo did

5   not present a threat of serious bodily harm or injury

6   or death to Burmaster.  True?

7       A.    That is correct.

8       Q.    And then I want to ask you about your final

9   recommendation.  You recommended that the NOPD policy

10  which relates to unauthorized force be revised to

11  include animals.  True?

12      A.    That is correct.

13      Q.    Do you know if your recommendation was ever

14  implemented?

15      A.    I don't know.

16      Q.    Do you believe that, based on

17  Officer Burmaster's actions on April 10th -- I know you

18  concluded that you would have -- you recommended

19  disciplinary action.  But do you think it's a good idea

20  for him to remain a field training officer based on

21  what -- what happened on April 10th?

22              MR. ALPAUGH:  Object to the form of the

23          question.

24              MR. ROQUEMORE:  Objection; form.

25      A.    I can't answer that.



1    BY MR. ANADA:

2         Q.   And -- and why -- why can't you?

3              MR. ALPAUGH:   Same objection.

4         A.   I'm just waiting.

5    BY MR. ANADA:

6         Q.   Do -- do you have any thoughts on whether

7    it would be wise for NOPD to continue letting

8    Officer Burmaster be a field training officer based on

9    his unjustified use of force against Apollo?

10             MR. ALPAUGH:   Same objection.

11             MR. ROQUEMORE:   Objection.   This goes

12             beyond the 30(b)(6) topics.   So if you're

13             asking her her personal opinion --

14             MR. ANADA:   Yeah, I'm -- I'm asking her

15             personal opinion.

16             MR. ALPAUGH:   Same objection.

17        A.   I can't give my personal opinion on that.

18   BY MR. ANADA:

19        Q.   Why not?

20        A.   I don't have an assessment of

21   Officer Burmaster's history as a field training

22   officer.

23        Q.   Okay.   All right.   So I'm looking at the last

24   page.   You concluded that the shooting was unjustified

25   of Apollo.   Truc?



Page 73

1          A.    That's correct.

2          Q.    And am I correct that this -- page 19 of this

3    exhibit we marked as Exhibit 20.A.  am I correct that

4    Sergeant John Helou concurred with your conclusions?

5          A.    That's what it says.

6          Q.    That means he agreed with your conclusions.

7    Right?

8          A.    That he -- that would mean he concurred.

9          Q.    Okay.

10         A.    I cannot tell you.  You would have to speak

11   with John Helou.

12         Q.    And am I correct that, in addition to

13   John Helou, Captain Sabrina Richardson also

14   independently concurred with -- with your conclusions?

15         A.    That is what is --

16         Q.    So that's --

17         A.    -- on the document.

18         Q.    That's -- that's three members of the Force

19   Investigation Team and/or Public -- Public Integrity

20   Bureau that all concluded that Burmaster shooting of

21   Apollo was unjustified.  True?

22         A.    I would say that they -- the signature here

23   would say that they concurred with this investigation.

24         Q.    Okay.

25         A.    Yes.



Page 81

1          A.   I think you're still asking the same question

2     that you asked previously.

3          Q.   And your answer was "correct"?

4          A.   I can't make that decision.  No, my answer was

5     not "correct."  My answer was, no, I can't say that for

6     certain.

7                    MR. ANADA:  This is playing from time

8                    stamp 28:53.

9                    (Audio recording played.)

10    BY MR. ANADA:

11         Q.   You heard him say that it was all a jumble

12    from the first shot he fired to the third shot he

13    fired?

14         A.   That's correct.

15         Q.   He did not evaluate the need for each

16    individual shot, correct --

17                    MR. ALPAUGH:  Object to the form.

18    BY MR. ANADA:

19         Q.   -- based on your investigation?

20                    MR. ALPAUGH:  Object to the form.

21         A.   Based on what he said, it was all a blur, from

22    the first to the third.

23    BY MR. ANADA:

24         Q.   Okay.  So he did not, based on what he told

25    you, specifically consider the necessity of the first



Page 83

1      A.   I believe that's what she said.  Yes, I think
2  so.
3      Q.   And in response to that question, he didn't
4  say "yes," that we -- that we heard.  Right?
5      A.   I believe he gave the same answer that he did
6  when I asked the question.
7      Q.   It was all jumbled together?
8      A.   Uh-huh.
9      Q.   So he -- he did not -- in response to the
10  specific question, after the first short, was Apollo
11  still moving towards him, he did not answer that
12  question with a yes.  True?
13      A.   He did not.
14      Q.   Okay.
15           MR. ANADA:  It's time stamp 32:10.
16           (Audio recording played.)
17  BY MR. ANADA:
18      Q.   Was that you questioning him, or was that
19  Sergeant Preston?
20      A.   Unfortunately, I can't tell.
21      Q.   Okay.  You -- you heard the question posed to
22  him?
23      A.   I did.  I did hear the question, yes.
24      Q.   Okay.  He said -- the -- the question was --
25  am I -- am I right that the question was, "Was the dog


MAGNA ▶
LEGAL SERVICES

Page 84

1    that advanced towards you" -- which we know to be

2    Apollo, the small dog.  "Was the dog advancing towards

3    you barking?"  Is that how you understood the question?

4        A.    Yes.

5        Q.    Okay.  And in response to that question, he

6    did not say "yes."  True?

7        A.    He did not.

8        Q.    Okay.  If you were to now tell the jury, yes,

9    that dog was, in fact, barking at him -- Apollo was, in

10   fact, barking at him when it was running in his

11   direction, that would be -- that would contradict what

12   we just heard in the recorded audio.  True?

13                MR. ALPAUGH:  Object to the form.

14       A.    Why -- why would I say that?

15   BY MR. ANADA:

16       Q.    He didn't tell you that the dog advancing

17   towards him was barking.  True?

18                MR. ALPAUGH:  Object to the form.

19       A.    What is your question again?

20   BY MR. ANADA:

21       Q.    He did not tell you the dog advancing towards

22   him, Apollo, was barking, right?

23                MR. ALPAUGH:  Object to the form.

24       A.    What he said was one or more.

25   BY MR. ANADA:



Page 85

1        Q.    Right.

2        A.    I cannot say.

3        Q.    Okay.  He didn't say the small dog was

4   barking?

5              MR. ALPAUGH:  Object to the form.

6        A.    He did not say that.

7   BY MR. ANADA:

8        Q.    Okay.  If he now tells the jury, "I

9   specifically recall the small dog barking," that would

10  be inconsistent with what he told you.  Right?

11             MR. ALPAUGH:  Object to the form.

12       A.    It wouldn't be the same response.

13  BY MR. ANADA:

14       Q.    Okay.  It would be a different answer, right?

15             MR. ALPAUGH:  Object to the form.

16       A.    It would not be the same response as what you

17  hear on the recording.

18  BY MR. ANADA:

19       Q.    Okay.

20             (Audio recording played.)

21             MR. ALPAUGH:  Where did you start that

22             one?

23             MR. ANADA:  Oh, I apologize.  I started

24             it at 33:30.

25  BY MR. ANADA:



Page 89

```
 1                    MR. ANADA:  Yeah.  The starting point
 2             was 33:30.  I -- I don't have the ending
 3             point.
 4                    MR. ALPAUGH:  Okay.
 5                    MR. ANADA:  You want me to try and
 6             re- -- recreate it.
 7                    MR. ALPAUGH:  That's okay.
 8   BY MR. ANADA:
 9        Q.   When you investigated this incident, you
10   didn't consider it a laughing matter.  True?
11        A.   No.
12        Q.   Okay.  Is it true that Burmaster began
13   laughing several times during your interview with him?
14        A.   I can't recall that.
15                    MR. ANADA:  I'm going to start from time
16             stamp 56:00.
17                    (Audio recording played.)
18   BY MR. ANADA:
19        Q.   That was -- that was one little laugh right
20   there, a little chuckle, right?
21        A.   It sounded like a laugh.
22        Q.   Okay.
23        A.   I don't know.
24        Q.   All right.  So we have one laugh so far.
25                    (Audio recording played.)
```



Page 90

```
 1    BY MR. ANADA:
 2         Q.   It's the second -- second time he was laughing
 3    during the interview?
 4         A.   Sounded like a laugh.
 5         Q.   Okay.
 6         A.   Honestly, I don't remember that part.
 7         Q.   Do you remember that y'all took a short break
 8    during the interview?
 9         A.   I don't.
10                    (Audio recording played.)
11                    MR. ANADA:  Bear with me for one minute.
12                    (Audio recording played.)
13                    MR. ANADA:  Could we go off the record?
14                    THE VIDEOGRAPHER:  We're off the record.
15              The time is 12:08 p.m.
16                         (Recess taken.)
17                    THE VIDEOGRAPHER:  We're back on the
18              record.  The time is 12:09 p.m.
19                    MR. ANADA:  Let's start from time stamp
20              42:53.
21                    (Audio recording played.)
22                    MR. ALPAUGH:  Can you stop just for a
23              second there?
24                    MR. ANADA:  Sure.
25                    MR. ALPAUGH:  But that recording is a
```



Page 91

```
 1              confidential attorney-client communication.
 2              And you're playing that for the record.
 3              That's him talking to his attorney --
 4                   MR. ANADA:  I think he's talking on the
 5              phone with someone else about a check being in
 6              the mail.
 7                   MR. ALPAUGH:  I don't know about that.
 8              But I mean, his attorney is present when
 9              nobody else is there.  So I -- I haven't heard
10              this part of -- of the statement, and so to
11              the extent that it reflects any confidential
12              attorney-client communications, I'm going to
13              object to it.
14                   MR. ANADA:  Okay.  Your objection is
15              noted for the record.
16                   (Audio recording played.)
17                   MR. ANADA:  The reason I think he's
18              talking on the phone is he's talking and then
19              there's no response.
20                   (Audio recording played.)
21 BY MR. ANADA:
22      Q.   This is a third time we've heard Burmaster
23 laugh during this audio clip -- during -- during this
24 audio.  Correct?
25      A.   It -- again, it sounds like a laugh.
```



Page 104

1   video, that's what I typed.

2   BY MR. ALPAUGH:

3       Q.   Okay.  And we've already addressed the next

4   couple of sentences.  And then where it says,

5   "Officer Burmaster stated he was scared the dog would

6   bite his genitals causing a penetrating wound," did

7   that bear into your credibility assessment?

8       A.   I would say that that did, yes.

9       Q.   How -- how so?

10      A.   The dog was not in the proximity to do so.

11      Q.   Based on your view of the body-worn camera?

12      A.   Based on the view of the body-worn camera.

13  And also based on the information Officer Burmaster

14  provided.

15      Q.   Okay.  Rather than go through every line,

16  is there anything else in here that you felt he was --

17  any statement he made in here, other than the one

18  beginning "In Officer Burmaster's criminal statement"

19  and ending with "cannot recall the dog's actions" --

20  other than that section, is there anything else in

21  here -- and -- and also the scared of the dog biting

22  genitals statement, is there anything else in here that

23  you felt -- where you felt he was not credible?

24              MR. ANADA:  Form.

25      A.   I can only say what's in the statement.  I



Page 113

1      Q.    The other one did not have -- did not involve

2  the shooting of an animal.   True?

3      A.    Correct.

4      Q.    Did you -- in -- in that other one, did you

5  conclude that the shot was justified or unjustified?

6      A.    Justified.

7      Q.    Okay.   You -- you just call them like you see

8  them, right?   You're not biased towards justified or

9  unjustified, right?

10      A.    No, sir.

11      Q.    Okay.  Last -- last question.  I just want to

12  close the loop on this and make sure I -- I understand.

13            I think you've articulated to us a few reasons

14  why you did not -- why you found Burmaster to not be

15  credible.   I think one of them was the contradictory

16  statements he made in the criminal interview versus the

17  administrative interview.   That was one reason?

18      A.    That factored in, yes.

19      Q.    And then another reason I think you told

20  Mr. Alpaugh was that the -- the -- the evidence you

21  saw, you concluded that the dog was actually not in the

22  proximity where it could have bitten Officer Burmaster.

23  Right?

24      A.    That is correct.

25      Q.    Is there any other reasons that you can tell

