# In the Matter of:

*Derek Brown and Julia Barecki-Brown*

*vs.*

*Derrick Burmaster, Shawn Fergusan, and the City of New Orleans*

## Officer Derrick Burmaster

March 10, 2023

EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and JULIA        Civil Action No.
BARECKI-BROWN               22-847

VERSUS                       SECTION: L

DERRICK BURMASTER,           HONORABLE ELDON E.
SHAWN FERGUSAN,              FALON
and the CITY OF
NEW ORLEANS      DIVISION:  4

                             HONORABLE KAREN WELLS
                             ROBY

* * * * * * * * * * * * * * * * * * * *

PUBLIC VERSION

    Videotaped deposition of OFFICER DERRICK P. BURMASTER, 505 North Sibley, Metairie, Louisiana 70003, taken at the CITY ATTORNEY'S OFFICE, located at 1300 Perdido Street, 5E03, New Orleans, Louisiana 70112, commencing at 9:58 A.M., on Friday, the 10th day of March, 2023.

APPEARANCES:

    JONES WALKER
    (By: Tarak Anada, Esquire)
    201 St. Charles Avenue
    51st Floor
    New Orleans, Louisiana 70170

        - AND -

```
 1   APPEARANCES (continued):
 2
     MOST & ASSOCIATES
 3   (By:  William Most, Esquire)
     201 St. Charles Avenue
 4   Suite 114 PMB 101
     New Orleans, Louisiana  70170
 5      (Attorneys for the Plaintiffs,
         Derek Brown and Julia Barecki-Brown)
 6
 7   GUSTE, BARNETT, SCHLESINGER, HENDERSON
     & ALPAUGH, L.L.P.
 8   (By:  C. Theodore Alpaugh, III, Esquire)
     639 Loyola Avenue
 9   Suite 2130
     New Orleans, Louisiana  70113
10      (Attorneys for the Defendant,
         Officer Derrick P. Burmaster)
11
12   CITY OF NEW ORLEANS
     (By:  James Roquemore, Esquire)
13   1300 Perdido Street
     5E03
14   New Orleans, Louisiana
        (Attorneys for the Defendants,
15       City of New Orleans and Shaun
         Ferguson)
16
17
18   ALSO PRESENT:
19
     Derek Brown
20
     Tammy Hupin, Videographer
21
22
     REPORTED BY:
23
24   KATHY ELLSWORTH SHAW, CCR, RPR
     Certified Court Reporter
25   (No. 049519)
```

```
 1              E X A M I N A T I O N   I N D E X
 2
 3                                                        PAGE
 4
 5     EXAMINATION BY MR. MOST.........................6
              RE-EXAMINATION.......................263
 6
 7     EXAMINATION BY MR. ROQUEMORE..................251
 8
 9                 E X H I B I T   I N D E X
10
       EXHIBIT NO. 2.................................197
11
       EXHIBIT NO. 3.................................200
12
       EXHIBIT NO. 6.................................201
13
       EXHIBIT NO. 7.................................205
14
       EXHIBIT NO. 9.................................114
15
       EXHIBIT NO. 19................................192
16
       EXHIBIT NO. 23B...............................147
17
       EXHIBIT NO. 24.................................28
18
       EXHIBIT NO. 28................................117
19
       EXHIBIT NO. 30................................221
20
       EXHIBIT NO. 47................................182
21
22     HIGHLY SENSITIVE PROTECTED MATERIAL
23
       PAGE 236 LINE 14 THROUGH PAGE 238 LINE 16
24
25                   *     *     *     *     *
```

```
 1              S T I P U L A T I O N
 2            It is stipulated and agreed by
 3    and among counsel for the parties hereto that
 4    the deposition of the aforementioned witness is
 5    hereby being taken under the Federal Rules of
 6    Civil Procedure, for all purposes, in
 7    accordance with law;
 8            That the formalities of reading and
 9    signing are specifically waived.
10            That the formalities of filing, sealing,
11    and certification are specifically waived;
12            That all objections, save those
13    as to the form of the question and the
14    responsiveness of the answer, are hereby
15    reserved until such time as this
16    deposition, or any part thereof, may be
17    used or sought to be used in evidence.
18            *     *     *     *     *
19            KATHY ELLSWORTH SHAW, certified
20    Court Reporter, State of Louisiana,
21    officiated in administering the oath to
22    the witness.
23
24
25
```

Officer Derrick Burmaster
March 10, 2023

Page 15

```
1        Q.   Okay.  Could you give us the very
2   short version of your educational and
3   professional background?
4        A.   I have a high school diploma.  I
5   have -- I'm -- I'm taking classes with LSU,
6   but I'm pausing right now.
7        Q.   Okay.  And how long have you been a
8   police officer?
9        A.   Twenty-three years.
10       Q.   Entirely with the New Orleans Police
11  Department?
12       A.   (Witness nods head affirmatively.)
13       Q.   And it will help for the record
14  if --
15       A.   Yes.
16       Q.   Yeah.  And this is a -- a question I
17  ask of all witnesses.  It's not specific to
18  you, but have you ever been arrested?
19       A.   Yes.
20       Q.   What were you arrested for?
21       A.   Simple battery, domestic.
22       Q.   And when was that?
23       A.   I would have to look that up.
24       Q.   Was it in the last two years?
25       A.   No.  It was many years ago.  My
```

```
 1    dog should always be the la -- option of last
 2    resort?
 3         A.    Yes.
 4         Q.    Okay.
 5         A.    Certainly.
 6         Q.    Do you recall the events of the
 7    night of the shooting?
 8         A.    Say that again.
 9         Q.    Do you recall the events of the
10    night of the shooting?
11         A.    Yes.
12         Q.    And my understanding is that on that
13    night, you were answering a -- a call for
14    service at the -- at the Browns' home?
15         A.    Yes.
16         Q.    You arrived by yourself in a one-man
17    car?
18         A.    Yes.  I was sitting in front of the
19    Brothers on St. Charles Avenue.  It was 9:30 at
20    night and I was ready to get off.  I did not
21    want to go to the Browns' house because I don't
22    like taking domestics passed 9 o'clock because
23    it makes you get off late, and I'm always
24    interested in getting off on time.  But, you
25    know, I was close.  I was like, Man, let me
```

1  see.  Let me go handle it, 'cuz it sounded like
2  it was a domestic even though it came out as a
3  fight.
4             So I got there way before Roussell
5  and I parked down the street.  I got out the
6  car and I started smoking a cigarette while I
7  was waiting for Roussell to pull up.  A man
8  from on the other side -- across the street, on
9  the other side of a fence, told me that he
10 could hear a woman yelling.  This is what he
11 tells me.  But he couldn't hear the male.  And
12 he heard things breaking.  So I -- I considered
13 that it was a domestic, you know, and then I
14 waited for Roussell.
15            And then when Roussell pulled up, I
16 broke -- Usually what I like to do is tell the
17 responding officers what information I've
18 learned before they arrived so that we could
19 all be prepared.  The man told me -- I believe
20 I also told Roussell that it was the bottom
21 apartment.  So that's where we were headed
22 at -- at the time when this happened.
23            I train all my recruits to -- to
24 avoid shooting dogs, to avoid coming in contact
25 with dogs.  And I tell them what to look for

1   when going to a -- a house that is surrounded
2   by a fence. You look for food and water bowls,
3   anything that would indicate that the -- a dog.
4   And what I did was, you know, I was approaching
5   the house, I went (indicating kissing noises),
6   to see if I could summon a dog to come out if
7   there was a dog behind the fence.
8           Also, things he had to consider is
9   this is -- looks like an apartment complex to
10  me. I don't know. Maybe it's a four-plex or
11  something. So I would -- I considered that at
12  the same time because why would somebody have a
13  loose animal on the other side of that fence if
14  other people had to live there and go there?
15  I didn't see any dog crap or anything like
16  that. Nothing indicated that there was a dog.
17          So with that, I decided to go into
18  the fence. I have to go there. They're
19  calling the police. It's a domestic. I had --
20  If I were to not go inside the fence, I'd get
21  written up for not doing my job. And I don't
22  know if, you know, he's dead because she was
23  the one that was told to be -- you know, that I
24  would consider to have been the aggressor, the
25  aggressive person because I can't -- I don't

1  hear any domestic violence noises going on
2  right now.
3          So what if -- what if he -- I have
4  to go check.  You see what I'm saying?  I have
5  to be there.  I didn't want to.  Like I said,
6  make me get off late from work when I get off
7  at -- it's 9:30 at night and then I get off at
8  11.  I -- I'm a big fan of getting off on time.
9  So usually around 10 o'clock, you want to shut
10 down, but this is a call that I can't -- I
11 have -- You have to take the call.  Domestic
12 violence, you know.  So I went in -- inside the
13 fence.  And there's video of it, so --
14         Q.   Okay.  So you described the -- the
15 female as the aggressor?
16         A.   Well, the man across the street said
17 he could hear a woman's voice yelling and items
18 breaking.  So I -- I -- I took that information
19 and considered that the woman may possibly be
20 the aggressor because he said he couldn't hear
21 the -- the man.
22         Q.   Uh-huh (indicating affirmatively).
23              So as you're approaching the house,
24 you -- you had concluded that the -- the female
25 was the likely aggressor?

1    A.   Well, I was going to learn, but in
2  my mind, I'm thinking that the female was the
3  possible aggressor and that they lived at the
4  bottom.  But I -- you know, I still have to do
5  an investigation.  So regardless of how I think
6  or what I think at this point, I still -- I'm
7  going to find out.
8    Q.   And why did you think they lived at
9  the bottom?
10   A.   I believe the man pointed to the
11 bottom left apartment, if I can remember
12 correctly, but it's on -- like I had body-worn
13 camera activated.
14   Q.   You captured the discussion with
15 the -- the caller on your body-worn camera?
16   A.   Yes.
17   Q.   Okay.
18   A.   We had to turn our body-worn cameras
19 on when we arrive.
20   Q.   And so you said that although
21 dispatch described it as a fight, you
22 interpreted it as a domestic violence?
23   A.   Because when I got there, like I
24 said, the man said it was a woman screaming
25 and -- and items could be heard breaking.

1      Q.   Uh-huh (indicating affirmatively).
2      A.   So I -- I considered that it could
3 possibly be a domestic violence.
4      Q.   But I think you said that when you
5 got the call at -- at Brothers, it was called
6 in as a fight, but you concluded at that time
7 that it might be domestic violence?
8      A.   I -- I -- I got to recall what the
9 comments were of the call because if she's --
10 she might put it out as a fight, but in the
11 comments, it will say male and female fighting
12 at the location.  So then although it came out
13 as a fight, maybe I -- I don't know what was on
14 my mind at that point, but I would have to read
15 what the comments of the call were --
16     Q.   Uh-huh (indicating affirmatively).
17     A.   -- to -- to -- to know exactly
18 how -- what spot my -- my head was in.
19     Q.   It sounds to me like you have a -- a
20 very precise recollection of that night.  You
21 described exactly where you were and when it
22 was that you got the call.  Is -- Is it true
23 that you have a precise recollection of the
24 events that night?
25     A.   Yes.

```
 1   present, you're thinking about that.  If
 2   there's no dogs, you're thinking about the
 3   absence of dogs?  Would you agree?
 4        A.   Uh-huh (indicating affirmatively).
 5        Q.   Is that a yes?
 6        A.   Yeah.
 7        Q.   The only reason I say yes is because
 8   "uh-huh" sometimes doesn't show up well on the
 9   transcript.
10        A.   Okay.
11        Q.   And then once you were inside the
12   gate, you heard barking; correct?
13        A.   Yes, after I was well inside the
14   gate.
15        Q.   Did you hear the barking of one dog
16   or more than one dog?
17        A.   More than -- I don't recall.  I
18   heard barking.  I can't say.
19        Q.   Well, you started to say more and
20   then you said you don't recall.  Which is it?
21        A.   I mean, I don't -- I don't remember
22   how many dogs I heard -- I heard barking.  I
23   heard barking.
24        Q.   Uh-huh (indicating affirmatively).
25        A.   And it put -- It got me scared and
```

Officer Derrick Burmaster
March 10, 2023

Page 52

```
 1   it even got -- well, Roussell got scared, too.
 2   So from the point of view of two different
 3   officers, this was a bad situation to be in.
 4   And I don't like getting bit by dogs and that
 5   would have been a penetrating wound.
 6        Q.   And when you heard the barking, you
 7   thought, Oh, my Lord, I'm going to get
 8   attacked?
 9        A.   Yes.
10        Q.   And you thought that when you heard
11   the barking but before you saw the dogs?
12        A.   The moment I heard barking.
13        Q.   Could you see the --
14        A.   I was like -- 'Cuz I'm now in a
15   confined space with two -- with one or more
16   dogs and I can't escape.  They had no platform
17   or anything for me to jump on top of.  I'll
18   jump on top of a police car if a police car was
19   there.  They had noth -- no platform.  I
20   couldn't jump over the fence.  'Cuz of the way
21   the fence is, I'd have got injured jumping over
22   that fence even though it was short, but it's
23   got those decorative whatever on top of them.
24   It's a steel iron fence.
25        Q.   Uh-huh (indicating affirmatively).
```

Officer Derrick Burmaster
March 10, 2023

```
 1        A.    And Roussell could escape out, but I
 2   don't have any options.
 3        Q.    Right, because Roussell was --
 4        A.    Roussell was close to the -- to the
 5   entrance.  I was far -- deeper in.
 6        Q.    Uh-huh (indicating affirmatively).
 7        A.    I was making my way to this, what I
 8   perceived was the bottom left apartment to try
 9   to see what was going on with the -- the people
10   that were occupying that place.
11        Q.    Right.  So Roussell was close to the
12   gate and you were much further into the --
13        A.    Yes.  So I couldn't get out.
14        Q.    When you say you were much
15   further --
16        A.    And plus, if I -- from where I was,
17   if I would have starting running towards that
18   gate, that would have been running towards the
19   dog.  I would have had to run by both of the
20   dogs.
21        Q.    Uh-huh (indicating affirmatively).
22              So --
23        A.    Trust me.  I was -- I hated that --
24   that this happened.  Absolutely hated.  And
25   what hurt even more was these two come out
```

Officer Derrick Burmaster
March 10, 2023

Page 54

```
1    yelling and I'm like, Damn.  Their fucking dog
2    is gone.  Fuck!  And that's what I was
3    thinking.  And my first -- I said, "I'm sorry,"
4    like I was trying to deescalate 'cuz they were
5    so -- Man, it was a bad situation to be in.
6    And I hate it.  I wish I'd have never gone on
7    that call, man.  But I had to.
8         Q.   Why did you have to go on that call?
9         A.   Because I was nearby and it's my
10   job.  And I'm -- I'm -- I'm -- I'm -- I'm --
11   I'm good at handling disturbances.  I'm a
12   crisis officer as well.
13        Q.   So you -- you've taken crisis
14   intervention training?
15        A.   Yes.  I'm a -- I'm a CIT officer.
16        Q.   Okay.
17        A.   So when I said, "I'm sorry," I --
18   I -- I was trying to deescalate, you know.
19        Q.   Right, because you weren't actually
20   sorry, but you said that to deescalate it?
21        A.   And also I announced, "Police,"
22   because I didn't want any -- You know, after I
23   shot the dog, I announced that I was police
24   because I didn't want whoever was inside the
25   house to come out shooting thinking it's some
```