```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3   DEREK BROWN and         *  CIVIL ACTION
     JULIA BARECKI-BROWN     *
 4                           *  DOCKET NUMBER: 22-00847
     VERSUS                  *
 5                           *  SECTION: L
     DERRICK BURMASTER,      *
 6   SHAUN FERGUSON, and     *  HONORABLE ELDON E. FALLON
     the CITY OF NEW ORLEANS *
 7                           *  DIVISION:  4
                             *
 8                           *  HONORABLE KAREN WELLS ROBY

 9   ****************************************************

10

11       Deposition of DEREK BROWN, taken via Zoom with

12    the witness located in New Orleans, Louisiana, on

13    Wednesday, the 19th day of December 2022, beginning

14                        at 9:00 a.m.

15

16

17

18

19

20

21   Reported by:

22   Jill Cox, CVR, CCR

23   NVRA CVR #7553

24   LA CCR #2019002

25
```

EXHIBIT B

### Page 2

```
 1          APPEARANCES:
 2  FOR THE PLAINTIFF (S):  DEREK BROWN and JULIA
 3  BARECKI-BROWN
 4       TARAK ANADA, ESQUIRE
 5       JONES WALKER, LLP
 6       201 ST. CHARLES AVENUE
 7       NEW ORLEANS, LOUISIANA 70170-5100
 8       PHONE:  (504) 582-8322
 9       EMAIL:  tanada@joneswalker.com
10  FOR THE DEFENDANT (S):  SHAUN FERGUSON and the CITY
11  OF NEW ORLEANS
12       JAMES M. ROQUEMORE, ESQUIRE
13       ASSISTANT CITY ATTORNEY
14       1300 PERDIDO STREET, SUITE 5E03
15       NEW ORLEANS, LOUISIANA 70112
16       PHONE:  504-658-9800
17       EMAIL:  james.roquemore@nola.gov
18  FOR THE DEFENDANT (S):  DERRICK BURMASTER
19       C. THEODORE ALPAUGH III, ESQUIRE
20       GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
21       639 LOYOLA AVE STE 2130
22       NEW ORLEANS, LA 70113-3157
23       PHONE:  (504) 529-4141
24       EMAIL:  cta@gustebarnett.com
25  ALSO PRESENT:  JULIA BARECKI-BROWN
```

### Page 3

```
 1              S T I P U L A T I O N
 2          It is hereby stipulated by and between
 3  counsel of record for the parties hereto that the
 4  oral deposition of DEREK BROWN, is hereby taken
 5  pursuant to notice and in accordance with the
 6  Louisiana Code of Civil Procedure, and for all uses
 7  and purposes thereby provided, via Zoom at New
 8  Orleans, Louisiana, on December 19, 2022, commencing
 9  at or about 9:29 a.m.
10          That all formalities in connection with the
11  taking of the deposition are hereby waived with the
12  exception of the swearing of the witness and
13  reduction of the questions and answers to typewritten
14  form, and the right of the witness to read and sign
15  the completed transcript of testimony was WAIVED;
16          That all objections, save those as to the
17  form of the questions and the responsiveness of the
18  answer, are hereby reserved until such time as this
19  deposition, or any part thereof, may be used or
20  sought to be used in evidence, such objections as
21  might have been made had the testimony been given in
22  open court.
23          That Jill Cox, CVR, CCR, officiated in
24  administering the oath to the above-named witness.
25
```

### Page 4

```
 1              INDEX
 2                                              PAGE
 3  Stipulations ....................................3
 4  Reporter's Page ................................71
 5  Reporter's Certificate .........................72
 6  EXAMINATIONS
 7  Examination By Mr. Roquemore ....................5
 8  Examination By Mr. Anada .......................68
 9  EXHIBITS (NOT PROVIDED TO COURT REPORTER)
10  Exhibit 1.  Notice of Deposition ................9
11  Exhibit 2.  Adoption form ......................30
12  Exhibit 3.  Photos .............................36
13  Exhibit 4.  Report of vet autopsy ..............40
14  Exhibit 5.  Psych evaluation ...................51
```

### Page 5

```
 1                    DEREK BROWN,
 2      after having been first duly sworn by the
 3  Certified Court Reporter, was examined and did
 4  testify as follows:
 5                    EXAMINATION
 6  BY MR. ROQUEMORE:
 7      Q.  Mr. Brown, my name is James Roquemore. I
 8  am the attorney, I represent the City of New Orleans
 9  and Shaun Ferguson in this action that you have
10  filed in federal court.  We are here for your
11  deposition and we're going to go through some
12  preliminary advice and some information.  And then
13  we will get into the questions that I have for you.
14  Do you understand that?
15      A.  Yes.
16      Q.  Okay.  First of all, please state your
17  full name for the record?
18      A.  Derek Randall Brown.
19      Q.  Okay.  And Mr. Brown part of the
20  deposition, it is important that we do this
21  verbally.  So I'm going to ask you questions, try
22  not -- I'll try not to interrupt you while you are
23  answering, if you will try not to interrupt me when
24  I'm asking, that will allow the court reporter to
25  type everything down and make sure it's really clear
```

Page 46

1   Q.  Okay. Is it fair to say that after you
2   arrived home around 9:00, a disagreement arose
3   between you and your wife?
4   A.  Yes.
5   Q.  Tell me, describe that disagreement as
6   best you can?
7   A.  The disagreement was about our
8   communication, the disagreement was about our
9   communication or lack of it with each other. She
10  was -- Julia was at Courtyard Brewery with the group
11  and had left with, she got a ride home with a
12  friend, earlier half hour, 15 minutes, 20 minutes
13  earlier then me. And when she was home she was
14  calling me and I didn't answer the phone. I didn't
15  pick up. I believe there was something wrong with
16  one of our phones. She was wanting to know when I
17  was going to be back and I was responding. So I
18  came home and she was upset with me for not having
19  responded and that's what our argument was about.
20  Q.  And where were you when you were arguing,
21  were you inside?
22  A.  Yeah. We were inside the house. We had
23  stepped out onto the porch, and went back inside the
24  house. We were pacing some through the main floor
25  of our house.

Page 47

1   Q.  Do you remember anything in particular
2   that you said or that she said to each other?
3   A.  I do not remember anything in particular.
4   It was just a lot of husband-wife arguing about lack
5   of communication, and of not being supportive. I
6   don't recall any specific words or sentences that we
7   used that night.
8   Q.  Tell me how, what the volume of your
9   disagreement was?
10      MR. ANADA: Object to form. Go
11      ahead.
12  A.  It was probably loud. I don't -- I'm not
13  the type to raise my voice. Julia is more vocal
14  then me. But, yes, I'm guessing it was loud enough
15  for someone to have called 911 and reported a noise
16  disturbance. It must have been loud.
17  Q.  Right. You understand that somebody did
18  call the police about the disturbance between you
19  and your wife on that night; is that right?
20  A.  Yes.
21  Q.  Okay. And at some point, from what I
22  understand, at some point in time from what I
23  understand you were arguing out front, on your front
24  porch; is that right?
25  A.  Yes.

Page 48

1   Q.  Okay. But you were also arguing inside
2   your house; is that right?
3   A.  Yes.
4   Q.  Now, give me an idea of how long the
5   argument, when your voices were raised, how long
6   that lasted, how many minutes?
7   A.  About 10 or 15 minutes.
8   Q.  The loud voices began about when?
9   A.  I am guessing 9:15.
10  Q.  And were you -- was the argument over by
11  the time the shooting occurred?
12  A.  No. We were still arguing and then we
13  heard the gunshots. And that's what stopped it the
14  argument.
15  Q.  All right. So the argument, tell me how
16  that affected Bucho and Apollo?
17      MR. ANADA: Object to form. Go
18      ahead.
19  A.  Well, our dogs -- I don't really recall
20  them having any particular reaction to our argument.
21  I mean, I believe they were following us around and
22  looking at us. That's typically what they always
23  do. They just wanted treats. I don't remember them
24  jumping or barking or anything like that.
25  BY MR. ROQUEMORE:

Page 49

1   Q.  So from what I understand your observation
2   of the dogs while you were arguing with your wife
3   was that the dogs were not affected, necessarily, in
4   any way by your argument?
5   A.  Not that I recall. I mean, they are
6   excitable dogs. So I don't recall them getting wild
7   or anything other than their normal behavior. They
8   may have followed us around. Yeah, I don't really
9   remember anything abnormal in their behavior.
10  Q.  And they were following you around, they
11  were inside the house at that time?
12  A.  They would follow us back and forth,
13  because as I recall we went outside and we came
14  inside, went outside and the dogs would always
15  follow us. They would go out to pee or do their
16  business. They would come back in and stare at us.
17  Q.  When the police officers arrived at your
18  property were you inside the house?
19  A.  Yes.
20  Q.  Your wife was inside the house?
21  A.  Yes.
22  Q.  And you were still arguing, right?
23  A.  Yes.
24  Q.  And the dogs were inside the house?
25  A.  No. The dogs were outside.

Page 50

1  Q. Okay. How long had the dogs been outside
2  at that time, when the police officers arrived?
3        MR. ANADA: Object to form. Go
4     ahead.
5  A. We rarely leave them outside unsupervised.
6  So we usually make a point to bring them in if it's
7  been more then a couple of minutes. So I would say
8  two or three minutes.
9  BY MR. ROQUEMORE:
10  Q. So why did you let the dogs outside at
11  that time?
12  A. I think I was distracted. You know, we
13  were arguing so I didn't -- I wasn't diligent like I
14  usually am about bringing them back inside. So from
15  what I recall we were arguing in the hallway. The
16  dogs were outside the window of our front door
17  looking in at us, like they often do when we leave
18  them outside for more any, more than a minute or
19  two. They just come up to the front porch and stare
20  through the window looking at us until we let them
21  in.
22  Q. Right. But how did they get -- why did
23  they go outside in the first place?
24  A. They had followed us out.
25  Q. They followed you out when you went

Page 51

1  outside to argue, and then you came back in and you
2  left the dogs outside?
3  A. Yes.
4  Q. And the reason why you left the dogs
5  outside was what again?
6  A. I don't know why. We would have left them
7  outside maybe to do their business. I don't know
8  why we left them outside.
9  Q. Okay. Do you remember talking to
10  Elizabeth Burke, a licensed clinical psychologist on
11  or about June 15, 2021?
12  A. Yes.
13  Q. And she was doing a psychological
14  evaluation of you with regard to the incident; is
15  that fair?
16        MR. ANADA: Object to the form.
17  A. Yes.
18  BY MR. ROQUEMORE:
19  Q. I'm going to mark this, I'm going to show
20  you Exhibit No. 5.
21        (Psych evaluation attached as
22        Exhibit 5.)
23        This is a psychological evaluation, I
24  apologize for throwing it at you again. This is
25  Exhibit No. 5 is the evaluation; is that right?

Page 52

1  A. Yes.
2  Q. And you remember talking to her and that
3  she was doing background information, and she was
4  asked you -- well, you told her about the incident;
5  is that right, do you remember that?
6  A. Yes.
7  Q. I just want to point you to page 2, the
8  first incomplete paragraph, three lines down. It
9  reads, when we got home they got into an argument.
10  She notes two dogs, one adult dog and one 16 week
11  old puppy named Apollo bark. So they put them
12  outside at about 9:30.
13        Do you remember telling Dr. Burke that?
14  A. I remember having the conversation, but I
15  don't remember like the exact words that I used when
16  I told her that.
17  Q. Is that statement accurate?
18  A. Which part of that statement?
19  Q. Is it accurate that when you got home you
20  got in an argument with your wife that made your
21  dogs bark, so they put -- so you put them out about
22  9:30 p.m.?
23  A. When we got home we got in to an argument,
24  yes. Which made the two dogs bark, I very well may
25  have told her that, yes.

Page 53

1  Q. Is that accurate?
2  A. Honestly, I can't recall, because
3  Doctor -- this was a couple of months after, and now
4  we're a year. So, yeah, I may have told her that.
5  But when we put the dogs out, we made the two dogs
6  bark so we would put them outside. Yes, I'm sure I
7  said something to that effect to the doctor.
8  Q. And just so I'm clear, after you put the
9  dogs out or after the dogs were let out, how long
10  after that was Apollo shot?
11  A. I would say it was a matter of minutes.
12  Like I said, it was two to three minutes. So around
13  two or three, a few minutes.
14  Q. Before April 10, 2021, had you ever had a
15  New Orleans Police Department officer come to your
16  house?
17  A. Only when we had reported crimes. I had
18  some stuff stolen from a car at a previous resident.
19  And then our -- we had a couple of cars stolen that
20  we reported. Then crimes on the street, we had NOPD
21  come to our house, but not to residence. We did
22  have an incident with tenants in 2009, and they had
23  a dog that we weren't comfortable with. So we
24  called the police because they were supposed to have
25  moved out and they didn't. The dog had killed one