

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | EASTERN DISTRICT OF LOUISIANA |
| 3 | |
| 4 | DEREK BROWN and JULIA          CIVIL ACTION NO.<br>BARECKI-BROWN                   22-00847 |
| 5 | |
| 6 | VERSUS                         DIVISION: 4 |
| 7 | DERRICK BURMASTER, SHAUN<br>FERGUSON, and the CITY OF      SECTION: L<br>NEW ORLEANS |
| 8 | |
| 9 | |
| 10 | |
| 11 | * * * * * * * * * * * * * * * * * * * * * * * * * |
| 12 | TRANSCRIPT OF THE DEPOSITION OF: |
| 13 | DAVID DUPLANTIER, |
| 14 | TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE |
| 15 | ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA, |
| 16 | CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA. |
| 17 | * * * * * * * * * * * * * * * * * * * * * * * * * |
| 18 | |
| 19 | REPORTED AT: |
| 20 | NEW ORLEANS CITY HALL |
| 21 | 1300 PERDIDO STREET, ROOM 5E03 |
| 22 | NEW ORLEANS, LOUISIANA  70112 |
| 23 | |
| 24 | |
| 25 | COMMENCING AT 1:53 P.M., ON MARCH 8, 2023. |





```
 1                   A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         JONES WALKER L.L.P.
           (BY:  TARAK ANADA, ESQ.)
 5         201 ST. CHARLES AVENUE, 49TH FLOOR
           NEW ORLEANS, LOUISIANA  70170
 6         (504) 582-8322
           tanada@joneswalker.com
 7

 8    FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9         NEW ORLEANS CITY ATTORNEY'S OFFICE
           (BY:  JAMES M. ROQUEMORE, ESQ.)
10         1300 PERDIDO STREET, SUITE 5E03
           NEW ORLEANS, LOUISIANA  70112
11         (504) 658-9800
           james.roquemore@nola.gov
12

13    FOR DERRICK BURMASTER:

14         GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
           (BY:  C. THEODORE ALPAUGH III, ESQ.)
15         639 LOYOLA AVENUE, SUITE 2130
           NEW ORLEANS, LOUISIANA  70113
16         (504) 529-4141
           cta@gustebarnett.com
17

18    ALSO PRESENT:

19         SOPHIA CEFOLIA

20

      REPORTED BY:
21
           YOLANDA J. PENA
22         CCR NO. 2017002, RPR
           STATE OF LOUISIANA
23

24

25
```



MAGNA
LEGAL SERVICES

David Duplantier

March 08, 2023
Page 3

1                    I N D E X

2                                              PAGE

3    LIST OF EXHIBITS....................................4

4    STIPULATION.........................................5

5    EXAMINATION BY:

6        MR. ANADA...........................6, 107, 145

7        MR. ALPAUGH.......................86, 119, 144

8        MR. ROQUEMORE..............................121

9    CERTIFICATE.......................................147

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                        LIST OF EXHIBITS

2

3    Exhibit No. 1.........................................7
          (Second Amended Complain)
4
     Exhibit No. 8........................................21
5         (Notice of 30(b)(6) Deposition
          & Request to Bring Documents,
6          Information, or Objects)

7    Exhibit No. 20.A...................................110
          (Event Summary)
8
     Exhibit No. 22......................................46
9         (NOPD Operations Manual,
           Chapter 1.7.1, Conducted
10         Energy Weapon)

11   Exhibit No. 23......................................49
          (NOPD Operations Manual,
12         Chapter 1.3, Use of Force)

13   Exhibit No. 40......................................86
          (CITY DEFENDANTS 003646,
14         Policy Tactics Training
           Recommendations)
15
     City Exhibit No. 1.................................125
16        (CITY DEFENDANTS 003651,
           PowerPoint, Responses to the
17         Problem of Dog-related
           Encounters)

18

19

20

21

22

23

24

25



1                    S T I P U L A T I O N

2

3           IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6           All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9           All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25



David Duplantier

1          more confusing.

2      A.    Once again, I mean, I would have to actually

3  go page by page with the one that we have present and

4  the one that was in place at the time.

5  BY MR. ANADA:

6      Q.    Okay.

7      A.    If there is a change, I can't see a dramatic

8  one.

9      Q.    Okay.  Fair enough.

10     A.    I can't see a dramatic change.

11     Q.    That works for me.  All right.  So we've now

12  talked about a few specific areas that were covered in

13  the in-service training that officers received about

14  encountering animals in the line of duty.

15          Is there anything else that was in that -- in

16  that training that we just haven't touched on today?

17     A.    No.  Based off of the reason of us being here,

18  the only other training, like I said, that goes hand in

19  hand with the CEW, use of force, all of it's one big

20  ball.  They -- they all -- the CEW, the use of -- the

21  use of the firearm, all that falls under it.  It's

22  going to -- it should fall directly under the overall

23  umbrella of use of force.

24     Q.    Got it.  Is there, like, a different -- a

25  difference in the standards of when an officer can use



1    lethal force against a human versus when an officer can

2    use lethal force against a dog?

3         A.    Yes.

4         Q.    Tell me the difference.

5         A.    Well, we -- actually, for -- going with a

6    human, we target -- our best target area naturally is

7    the back, largest muscle group, easiest area to hit.

8    You achieve what they refer to as to NMI, neuromuscular

9    incapacitation.  Okay.

10         You also want to get at least -- at least try

11   and get a seven-inch spread.  So that goes with the

12   distance you are from this person that you're going to

13   fire the weapon.  And if we're shooting or firing this

14   weapon at the front of the person, i.e. their torso,

15   the front torso -- we look to target -- we don't want

16   to target the heart.  That was a recent change of CEW.

17         We want to lower our target area, so we're

18   trying to get one dart below the belt line and the --

19   the top dart -- the bottom dart below the belt line,

20   the top dart at -- preferably right underneath the

21   heart area, right underneath that sternum area.  We

22   don't -- they don't want to give any direct shot to any

23   area where the heart is.

24         Q.    I got you.

25         A.    That in itself is a difficult shot, easier



David Duplantier

March 08, 2023
Page 54

 1   on the back.  Whereas with the animal, that's

 2   considered -- I'm sorry.  That's considered center mass

 3   on a person.

 4       Q.   Right.

 5       A.   Whereas with an animal, based on the way

 6   they're built, center mass is actually the side of the

 7   animal.

 8       Q.   Okay.

 9       A.   In order for us to effect a shot there, we

10   have to cant the weapon because the bottom dart drops

11   8 degrees when it's fired.  So the top dart is running

12   straight.  The bottom dart drops 8 degrees.  The

13   further are -- you are away, the further it tends to

14   drop.  If you get too far away, then naturally, the

15   dart will make the target area.

16            If you're too close, then you won't achieve

17   NMI, which is what you want.  You achieve basically

18   pain compliance, like a bee sting.  If you got a very

19   tight spread, the darts are only a few inches apart,

20   it'll hurt but it's not enough to maybe incapacitate

21   the person.

22       Q.   Understood.

23       A.   So --

24       Q.   Or the animal?

25       A.   Or the animal.  So referencing -- it makes it



David Duplantier                                    March 08, 2023
                                                    Page 55

```
 1    much, much more difficult with an animal, speed, size.
 2    So -- and most animals don't attack you by running
 3    sideways.
 4         Q.    Yeah.
 5         A.    They can't.  So they're running dead-on, so in
 6    order to effect a good shot with a CEW, i.e. a taser,
 7    at an animal, you got to let the animal get right up on
 8    you.  And then -- even then, your spread is going to be
 9    so small to where you may not achieve what you want.
10         Q.    It can be done, but it's more difficult than
11    on a person?
12         A.    It's a thousand times more difficult than on a
13    person.  Your target area is so small and the speed is
14    so much more.
15         Q.    I got you.  You observed it done effectively
16    one time, at least, right?
17         A.    Yes, at least once.
18         Q.    Okay.  So, I mean, that makes sense to me.
19    It's much harder to do it on an animal than a human.
20              Some of the other NOPD officers we've spoken
21    with have referenced a field training, I think is what
22    it's called, when you -- when the officers actually
23    practice discharging their CEW at, like, a --
24         A.    A silhouette.
25         Q.    -- a silhouette of a -- like a --
```



1     A.   Yeah.  They go through that every in-service.

2     Q.   It's a silhouette of like a grown male,

3 something like that?

4     A.   Yeah.

5     Q.   What is it?  Like, five-ten?  Six-one?

6     A.   Probably.  I would say about maybe five-nine,

7 five-ten.  Roughly -- roughly average height.

8     Q.   Average height.  I got you.  Okay.

9         And the reason they go through that is so they

10 can get some practice of hitting the target effectively

11 to achieve the NMI, right?

12     A.   Correct.

13     Q.   Okay.  NOPD never trains officers with that

14 kind of field training on a silhouette of a dog.  True?

15     A.   True.

16     Q.   And it's much harder to actually effectively

17 hit a dog with a CEW.  It can be done, but it's just

18 much more difficult --

19     A.   Right.

20     Q.   -- than a human?

21     A.   Right.  And you have to throw in the factor

22 that you have a potential of deescalating a person.  If

23 you're under attack from an animal, whether it be a dog

24 or any other kind of animal, you're not going to

25 deescalate the animal.  The animal moves off instinct.



1   it from beginning to end, I disagreed with the findings

2   on the use of force.

3   BY MR. ALPAUGH:

4       Q.   And let's go through this a little bit on the

5   instructor findings/recommendations.  So can you just

6   go through this and read the first -- read this into

7   the record?

8               MR. ANADA:  Object to form; outside the

9               scope.  Go ahead.

10      A.   First paragraph or second?

11  BY MR. ALPAUGH:

12      Q.   Let's just -- first page.

13      A.   First page, okay.  It says, [As read]:

14           "Per the request of the Public Integrity

15  Bureau, academy instructor Sergeant David Duplantier

16  reviewed body-worn camera footage regarding an

17  officer-involved shooting incident under NOPD Item

18  D-13802 of 21.

19           "The incident involved Officer Derrick

20  Burmaster responding to a complaint of a possible

21  domestic fight.  Upon arriving on scene, Officer

22  Burmaster found himself being charged by two -- by one

23  of two dogs in front -- in the front yard of the

24  residence, which resulted in him firing his duty

25  weapon, killing the animal.



```
 1              "Through the body-worn camera review,
 2     Sergeant Duplantier learned that Officer Burmaster
 3     responded to a complaint of a" --
 4              THE REPORTER:  I'm sorry.  Can you slow
 5          down just a little bit, please?
 6              THE WITNESS:  I'm sorry?
 7              THE REPORTER:  Can you slow down a
 8          little bit, please?
 9              THE WITNESS:  Oh, yes, ma'am.  I
10          apologize.  I'm sorry.
11     A.    [As read]:  "Through the body-worn camera
12     review, Sergeant Duplantier learned that
13     Officer Burmaster responded to a complaint of a
14     possible domestic fight.  Officer Burmaster arrived on
15     scene and took a good position while waiting for his
16     backup.  Once the second officer arrived on scene,
17     Officer Burmaster verified the target location to the
18     second officer and provided him -- provided him with
19     vital information regarding the call for service.
20              "After communicating the information, the two
21     officers made their approach to the residence.  As
22     Officer Burmaster walked past the neighboring
23     residence, he whistled and made a 'kissing' noise,
24     attempting to identify if the target residence had
25     animals in the front fenced-in yard."
```



MAGNA
LEGAL SERVICES

1    BY MR. ALPAUGH:

2        Q.   Let me stop you there.  That last sentence

3    that you read.  As he was -- made a kissing noise as he

4    walked past the neighboring residence, is that in

5    accordance with training?

6        A.   Yes, sir.  We -- I actually teach that myself.

7        Q.   Okay.  All right.  Please continue.

8        A.   "Shortly after attempting to alert any animals

9    that may be inside the fenced area, the officers

10   entered the yard.  Within seconds of entering the yard,

11   the officers found themselves being charged by two

12   dogs.  The larger dog ran towards the second officer

13   while Officer Burmaster was faced with the medium-sized

14   dog running towards him.

15           "At the time, Officer Burmaster drew his duty

16   weapon and fired at the charging animal.  Subsequently,

17   the dog charging Officer Burmaster was killed while

18   the second dog fled back towards the residence.

19   Officer Burmaster fired his weapon at the dog.  The

20   owners existed the residence.

21           "Officer Burmaster tried to calm the two

22   individuals who appeared to be the owners of the

23   animals.  He attempted to explain what led to the use

24   of force while also making notification of the firearm

25   discharge via his police radio."



```
 1        Q.    And is the next paragraph your conclusions
 2   with regard to what happened?
 3                  MR. ANADA:  Object to form; outside the
 4             scope.  Go ahead.
 5                  MR. ALPAUGH:  He's going to say that
 6             every time.
 7                  MR. ANADA:  I didn't say it to the
 8             last --
 9                  MR. ALPAUGH:  Well, you did --
10                  MR. ANADA:  He was talking about what
11             NOPD's training was.  That's inside the scope.
12        A.    Yes.  That was -- that was my -- that was
13   basically my overall findings.
14   BY MR. ALPAUGH:
15        Q.    Could you read that into the record?
16        A.    Yes, sir.
17                  MR. ANADA:  Form.
18        A.    [As read]:  "Having reviewed the body-worn
19   camera footage of the incident, Sergeant Duplantier
20   determined that Officer Burmaster was faced with a
21   decision regarding imminent danger.  Officer Burmaster
22   attempted to verify if an animal was present before
23   entering the yard but still found himself faced with
24   the dog charging towards him in an enclosed area.
25                  "The only training recommendation identified
```



1  by Sergeant Duplantier pertained to the amount of time

2  allotted between Officer Burmaster attempting to alert

3  any animals and his decision to enter the yard.  The

4  moment of -- the moment of pause may allow a sleeping

5  animal and animals suffering with physical deficiencies

6  or an animal located a distance away time to expose

7  itself."

8  BY MR. ALPAUGH:

9      Q.   Is that something that's taught in the

10 training --

11     A.   Yes.

12     Q.   -- to wait a little bit?

13     A.   Yes, sir.

14     Q.   But waiting may depend on the circumstances?

15     A.   It depends on the circumstances.

16     Q.   All right.

17     A.   "Upon completion of the body-worn camera

18 review, Sergeant Duplantier contacted Sergeant John

19 Helou of the Public Integrity Bureau and scheduled the

20 tactical debrief with Officer Burmaster."

21     Q.   So when did that happen?

22     A.   The debrief?

23     Q.   Yes.

24          MR. ANADA:  Form.

25     A.   It started on October 7th, and it was



1    completed the same day.

2    BY MR. ALPAUGH:

3        Q.    Okay.  Why don't you tell us about that.

4        A.    Naturally, he comes in.  I take the time to

5    sit down and explain to him why he's here, though he

6    already knows.  And the first thing we do is -- before

7    I do anything, we sit down and we look at the BWC

8    together, the body-worn camera footage together.

9            You'd be surprised how many officers really

10   haven't seen their body-worn camera footage in some of

11   these incidents, so it may be the first time they saw

12   it.  I don't recall if it was his first time or not.

13           He talked about everything leading up to it,

14   to the encounter with the animals.  As we went through

15   it, we talked about it, frame by frame almost.  I said,

16   "It was good that you did that.  The only thing I can

17   tell you is, is maybe give yourself a second longer, a

18   couple seconds longer before entering the yard."

19           However, I didn't know the extent of the

20   domestic call.  I didn't know the particulars on it.  I

21   know they got a domestic call, so that plays a factor

22   into things as well, not only for response but exposure

23   as well.  Domestic call is very dangerous.  It's

24   already a heated situation.  So if it was a true

25   domestic call, we take that into consideration.



1              Once he was inside, they actually achieved

2    a combat L.  The initial officer -- I don't recall

3    who went through the gate first, but I know

4    Officer Burmaster -- it's what we refer to as

5    "corner-fed" -- corner-fed entrance point, meaning the

6    entrance and exit point to the yard was shifted more to

7    one side than the other.  So it was closer to the --

8    facing the house, to the right side of the yard rather

9    than being directly in the center.

10        Q.   Okay.

11        A.   So when Officer Burmaster ended up going to

12   achieve this combat L, he went to the left.  The other

13   officer went to the right, which put him closer to the

14   gate, actually.  Officer Burmaster -- shortly after

15   getting in there, the dogs came charging out.  So by

16   the time, there was really nowhere else for him to go.

17   He wasn't going to jump the fence.  He's not going to

18   outrun the dog.

19             And my findings were, based on the response

20   of the dog -- and I'm going to say this for the record.

21   I feel bad about what happened, right.  But his

22   decision-making at that point -- I don't know what else

23   he could have done.  And I've even reached out, said,

24   "Well, okay.  If y'all found him to be wrong, give me

25   an alternative response," which I have not been able to



1    get.

2         Q.    When you say you reached out, you reached out

3    to who?

4         A.    To -- I spoke with PIB.  I spoke with --

5               MR. ANADA:  Form.

6         A.    I think it was Sergeant Helou in PIB,

7    referencing that.  I never spoke with Officer -- I'm

8    sorry, Sergeant Brewer firsthand with it.  But I did

9    speak with Sergeant Helou since he was the one that

10   sent me the PTTR.

11             But for the most part -- I mean -- and I

12   didn't -- as we went through it, like I said, the only

13   thing I could tell him was, "Look, maybe if you paused

14   a few seconds, you might have gotten alerted by the

15   dog."  But he did make an attempt to try and alert any

16   animal inside curtilage of the residence.

17             The fact that he got jammed into the corner

18   was a big factor, and the dog's response.  The dog is

19   just being a dog.  It's his house, his domain, so I get

20   it.  But unfortunately, the dog being a dog put the

21   officer in a situation where he had to do something.

22             The taser -- the probability of the taser

23   being effective, slim to probably none.  The fact --

24   if you wanted to go to an impact weapon, i.e. baton,

25   that -- like I said, you got to let the dog get up on



David Duplantier

1    you.  So it basically almost effect a bite or damn near

2    effect a bite before you could -- and even then, you

3    lose leverage because now the dog is on top of you.

4    You really don't have leverage to swig the impact

5    weapon.

6            So unfortunately, to the behest of everybody

7    else, I didn't find anything wrong with his actions.

8    Once again, I said I'm open minded.  If somebody can

9    show me a better tactical response, I'm willing to

10   listen, but I didn't -- I didn't see another

11   alternative method.

12   BY MR. ALPAUGH:

13       Q.  So you felt, in the circumstances, he acted

14   properly?

15       A.  Yes, sir.

16               MR. ANADA:  Object to form; outside the

17               scope.

18   BY MR. ALPAUGH:

19       Q.  And also -- there are also a lot of factors.

20   There was another dog there, correct?

21       A.  Yes.  That -- that's a big factor.  There were

22   two dogs there.

23               MR. ANADA:  Form; outside the scope.

24               Sorry.

25       A.  There were two dogs present.



```
 1              MR. ALPAUGH:  You want to make it
 2         continuing?
 3              MR. ANADA:  You know, I've tried to do
 4         that before, and then some -- I've tried to do
 5         that before, and then some lawyer like put in
 6         a brief that you can't do that.
 7              MR. ALPAUGH:  Okay.  That's fine.
 8              MR. ANADA:  But I would like to.
 9              THE WITNESS:  But -- I'm sorry.  The
10         question was?
11              MR. ALPAUGH:  Can you read that back,
12         ma'am?
13                   (Record read.)
14              MR. ANADA:  Form; scope.  Go ahead.
15    A.    The fact that -- the fact that there were two
16   dogs -- neither dog really took a position that I would
17   consider -- or I think the average person would
18   consider that it was a warning, right.  They were
19   barking, but they were coming towards him.  They were
20   charging towards him.  I didn't find it unreasonable
21   for him to believe that the dog was attacking him.
22   BY MR. ALPAUGH:
23    Q.    Would it be unreasonable to believe that also
24   there's a potential the other dog would attack him as
25   well?
```



David Duplantier

1     A.    Dogs are pack animals, so it's not

2  unreasonable to believe that it.  Is it guaranteed the

3  second dog would have done it?  Don't know.  But dogs

4  are pack animals, so it's possible that factor -- that

5  factor loomed as well.

6     Q.    Would you describe what "pack animals" means?

7     A.    Meaning they work together.  There's

8  generally -- one is over the other.  One is a leader;

9  one is the follower.  If the bigger dog was the leader,

10  then it's possible that the other dog would followed or

11  vice versa.

12          So they do hang together.  Dogs hunt together.

13  They tend to eat together.  They are individuals, but

14  they function and they feel more comfortable when

15  they're in a group.  As long as they been -- let me say

16  this.  They don't -- like people, they don't all get

17  along.  But generally, if they do have some type bond

18  between them, they will follow each other.

19     Q.    Officer Burmaster told you he felt he and the

20  other officer were both in imminent danger at the time

21  this happened.  Correct?

22                MR. ANADA:  Form; scope.

23     A.    Yes, sir.

24  BY MR. ALPAUGH:

25     Q.    And (inaudible) officer remorseful about



```
 1   shooting the dog?
 2                 MR. ANADA:  Form; scope.
 3        A.   Yes, actually he was.  He -- I remember him
 4   mentioning he didn't want that to happen.
 5   BY MR. ALPAUGH:
 6        Q.   In fact, he has pets himself?
 7        A.   Pardon?
 8        Q.   In fact, he told you he had pets himself?
 9        A.   Yes.
10                 MR. ANADA:  Form; scope.
11                 (Off-record discussion.)
12   BY MR. ALPAUGH:
13        Q.   But even -- so taking all this into account,
14   it was your determination that this was a reasonable
15   use of force?
16                 MR. ANADA:  Object to form; outside the
17          scope.
18        A.   Yes, sir.
19   BY MR. ALPAUGH:
20        Q.   And you didn't see anything wrong with what he
21   did?
22                 MR. ANADA:  Object to form; outside the
23          scope.
24        A.   No, sir.
25   BY MR. ALPAUGH:
```



David Duplantier

March 08, 2023
Page 102

1      Q.   On the last page, those are your

2   recommendations there?

3      A.   Under the comment section?

4      Q.   I guess.

5      A.   It's under -- do you need me to read this into

6   record?

7      Q.   This part right here?

8      A.   Oh, this part right here.

9      Q.   It says comments --

10      A.   The recommended -- in the end, when I say

11   exhibited proficiency, he understood he was able to

12   explain his actions and what led to his actions.

13   Therefore, I found no reason to hold him back.  It

14   wasn't -- if he showed lack of remorse or if he

15   didn't -- excuse me, but give a shit, then yeah, that

16   -- I would have -- I would have an issue with that, and

17   I would definitely pass that information on.

18                  MR. ANADA:  Form; scope.

19   BY MR. ALPAUGH:

20      Q.   Let me go back just a little bit.  I was

21   looking at your comments.  I guess I would like you to

22   read your comments into the record.

23      A.   My comments:  "Officer Derrick" --

24                  MR. ANADA:  Form; scope.  Go ahead.

25      A.   "Officer Derrick Burmaster received a tactical



David Duplantier

```
 1    debrief with a positive attitude.  Officer Burmaster
 2    acknowledged regret for having to shoot the animal and
 3    felt he did what he could to determine if an animal was
 4    present.
 5            "It is the opinion of Sergeant Duplantier that
 6    the incident was tragic and unfortunate; however,
 7    Officer Burmaster acted properly.  He attempted to
 8    identify a potential threat but found himself phased
 9    with a quick difficult decision.  Outside of the animal
10    in question, Officer Burmaster placed no one else in
11    harm's way.
12            "As police officers, our decisions to use
13    force and the amount of force used must be based on
14    reasonableness.  That reasonableness is considered when
15    determining if a situation is considered an imminent
16    threat to ourselves or others.  Though there may be
17    officers that may have addressed the charging animal in
18    a different fashion, Officer Burmaster's decision to
19    use lethal force towards the dog falls within reason."
20    BY MR. ALPAUGH:
21        Q.   All right.  And those comments are still your
22    opinion today?
23               MR. ANADA:  Object to form; scope.
24        A.   Yes, sir.
25    BY MR. ALPAUGH:
```





# NEW ORLEANS POLICE DEPARTMENT
# OPERATIONS MANUAL

# CHAPTER: 1.7.1

# TITLE: CONDUCTED ENERGY WEAPON (CEW)

**EFFECTIVE: 12/06/15**
**REVISED: 04/01/18, 08/11/19, 11/15/19, 12/06/20**

## PURPOSE

This policy, together with **Chapter 1.3 – Use of Force**, governs the issuance, carrying and use of conducted electrical weapons (CEW).

## POLICY STATEMENT

1.  CEWs are intended to control a violent individual while minimizing the risk of serious injury to the individual, officers or third-parties.

2.  Officers shall use CEWs only when such force is necessary to protect the officer, the subject, or another party from physical harm, and other less intrusive means would be ineffective.

3.  <u>Mere flight from an officer is not sufficient cause for the use of a CEW</u>.  The use of a CEW on a fleeing subject when a possible risk to the safety of the officer, the subject, or others has not been established by articulable justification other than flight, is unreasonable.

4.  CEWs are authorized for use when:
    (a) A subject who may be lawfully detained or apprehended poses an imminent risk of harm to the officer(s), the subject, or others;
    (b) Attempts to subdue the subject with less intrusive means have been or will likely be ineffective; <u>AND</u>
    (c) There is an objectively reasonable expectation that it would be unsafe for officers to approach the suspect within contact range.

    **OR**

    (d) Situation in which there is probable cause to arrest or reasonable articulable suspicion to detain a subject for an offense involving infliction or threatened infliction of bodily harm; <u>AND</u>
    (e) Attempts to subdue the subject with less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the subject or another party."

the subject is examined by paramedics or other medical personnel.

**MULTIPLE APPLICATIONS OF THE CONDUCTED ENERGY WEAPON**

53.　After one standard CEW cycle (5 seconds), the officer shall evaluate the situation to determine if subsequent cycles are necessary.

54.　Multiple applications of the CEW and/or exposure to the CEW for 15 seconds or longer whether due to multiple applications or continuous cycling, against a single individual, may increase the risk of death or serious injury.

55.　If the first application of the CEW appears to be ineffective, the officer should consider certain factors before additional applications, including:
　　　(a) Whether the probes are making proper contact (e.g. loose or bulky clothing);
　　　(b) Whether the individual has the ability, and has been given a reasonable opportunity, to comply with the officer's commands; and
　　　(c) Whether verbal commands, other options or tactics may be more effective.

56.　Officers shall independently justify each cycle used against a subject in their written Force Statements.

**CEW USE ON A DANGEROUS ANIMAL**

57.　A CEW may be deployed on a dangerous animal that is causing a continuing public nuisance and needs to be controlled for reasons of public peace and safety.

58.　A CEW may also be deployed if: the animal poses an active threat to officers in their efforts to perform their duty; other conventional means to control the animal have been exhausted, may be unreasonable, or unavailable; and the officer reasonably believes that use of a CEW is necessary.

59.　Officers should target the center mass of the animal and should not target the head or other sensitive areas on the animal if possible. Deployment against vicious animals may be very dynamic in nature and the probes may impact unintentional areas. Officers should exercise care when removing probes from the animal.

60.　As long as the officer acted appropriately, the owner of the animal will be responsible for any medical attention needed by the animal.

61.　The deployment of a CEW on an animal temporarily disables the animal. Officers should be prepared to act quickly with control devices or restraints, if available. Because of differences in their nervous systems, animals have shown the ability to recover quickly from CEW effects. If available, conventional means of controlling the animal (e.g., control sticks, collars, cages) should be on hand at the scene prior to the use of the CEW.

62.　The CEW has proven to be an effective tool against dangerous animals and may reduce the need for greater, more injurious force against such animals. The use of a CEW on an animal is a safer, more humane, and less traumatic conclusion to the incident.

63.　A CEW may be deployed against a potentially dangerous animal, such as a dog, when alternative methods are not reasonably available or likely to be effective and the animal:
　　　(a) Appears to pose an imminent threat to the safety of a human, another animal, or
　　　(b) Has attacked a human or another animal.

64.     The deployment of a CEW on an animal requires the same reporting, downloading and documentation as similar actions on a person.

## CEW CAMERA

65.     The CEW is equipped with an audio-video recording device integrated into the power supply. This device is activated any time the safety is in the off position. The safety should not be in the off position unless the officer intends to use the CEW. The device's memory is limited. The video and audio data shall be downloaded after each reportable use and retained as required by the Department's records retention schedule (see **Chapter 82.1.3 – Records Retention Schedule**).

## OFF-DUTY CONSIDERATIONS

66.     Officers are authorized to carry departmentally owned CEWs while engaged in approved police secondary employment but not authorized to carry Department-owned CEWs while off duty.

67.     Officers shall ensure that all Department-owned CEWs are secured while they are off duty to keep them inaccessible to others.

## DOCUMENTATION

68.     Notification of the use of a CEW by an officer shall be made to the officer's supervisor as soon as possible after use.

69.     Officers who have an SPPM must tag the triggered video prior to reporting to the Education & Training Division with the CEW, expended cartridge and approved forms. The E&TD staff member assigned will then locate and view the BWC video on Evidence.com instead of downloading and viewing the CEW Cam video.

70.     Other than routine testing or training, the following shall be documented in the related NOPD incident report and the CEW **Form 213**:
        (a) All CEW discharges, intentional or accidental; and

        (b) Laser activation/painting.

71.     Officers do not need to document the pointing of a CEW at a person in a Form 213, without discharge or laser activation/painting. Officers do not need to report to the Education & Training Division after pointing a CEW at a person, without discharge or laser activation/painting. But officers must record the activate targeting, alone, on their EPR or other report for the incident.

72.     The Commander of the Education & Training Division should analyze the CEW **Form 213** reports annually to identify trends, including deterrence and effectiveness. A summary of these findings should be sent to the Deputy Superintendent of PIB and the Compliance Bureau. The Compliance Bureau – Audit Section should also conduct random and directed audits, at least annually, of CEW data downloads and reconcile CEW report forms with recorded activations and compliance with Departmental regulations. These audits should compare the downloaded data to the officers' force statements.

73.     CEW information and statistics, with identifying information removed, should be made available to the public by sending the information to the Deputy Superintendent of PIB



# NEW ORLEANS POLICE DEPARTMENT OPERATIONS MANUAL

# CHAPTER: 1.3

# TITLE: USE OF FORCE

**EFFECTIVE: 12/06/15**
       **REVISED: 04/01/2018, 10/02/2022**

## PURPOSE

This Chapter governs the use of force by NOPD police officers. The Use of Force Chapter applies to all commissioned members of the NOPD.

## DEFINITIONS

**Active Resistance**—Resistance exhibited by a suspect that is between passive resistance and aggressive resistance (e.g., attempts to leave the scene, flee, hide from detection, or pull away from the officer's grasp). Verbal statements, bracing, or tensing alone do not constitute active resistance.

**Aggravated Resistance**—When a subject's actions create an objectively reasonable perception on the part of the officer that the officer or another person is subject to imminent death or serious physical injury as a result of the circumstances and/or nature of an attack. Aggravated resistance represents the least encountered but most serious threat to the safety of law enforcement personnel or another person.

**Aggressive Resistance**—Is a subject's attempt to attack or an actual attack of an officer. Exhibiting aggressive behavior (e.g., lunging toward the officer, striking the officer with hands, fists, kicks) are examples of aggressive resistance. Neither passive nor active resistance, including fleeing, pulling away, verbal statements, bracing, or tensing, constitute aggressive resistance.

**Anatomical Compliance Technique / Pressure Point Compliance Technique**—The act of applying pressure to vulnerable areas, weak points or pressure points of the body. This technique is used to cause immediate compliance by a subject who poses a threat.

**Apprehension**—The arrest, capture or taking into custody of a person.

**Arrest**—The taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him. (La. C.Cr. P. Art. 201).

**Canine Apprehension**—Where articulated facts demonstrate that a canine played a clear role in the capture of a person. The mere presence of a canine at the scene of an arrest shall not

Exhibit 23

count as a canine apprehension.

**Canine Deployment**—Any situation, except one involving an on-leash article search only, in which a canine is brought to the scene and used in an attempt to locate or apprehend a suspect, whether or not a suspect actually is located or apprehended. This includes all instances in which a canine is removed from the police car; or when a suspect gives up immediately after an announcement is made that if they do not surrender, the canine will be released; or when a canine search is conducted in an effort to apprehend a suspect.

**Civil Disturbance**—
Any incident which disrupts a community where law enforcement intervention is required to maintain public safety. Civil disturbances may consist of riots, demonstrations, strikes, sit-ins, or mass acts of criminal damage or violence.

**Compliant**—Cooperative obedience in response to lawful requests or directions from law enforcement personnel.

**Critical Firearm Discharge**—A discharge of a firearm by an NOPD officer, including discharges when no person or animal is struck. Range and training firings, humane destruction of animals, and off-duty hunting discharges when no person is struck are not critical firearms discharges.

**Conducted Energy Weapon (CEW)**—A weapon designed primarily to discharge electrical impulses into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses.

**CEW Application**—The contact and delivery of electrical impulse to a subject with a CEW.

**Deadly Force/Lethal Force**—Any force likely to cause death or serious physical injury. The use of a firearm (discharge) is considered deadly force. Neck holds and strikes to the head, neck or throat with a hard object are considered lethal force.

**Elbow strike**—A strike to a person with the point of an officer's elbow.

**Firearm**—A pistol, revolver, shotgun, carbine, or machine gun. Any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive. (Gun Control Act of 1960, Title 18, US, chapter 44, Title1)

**Force Statement**—A written statement required as part of the departmental Use of Force Report (in Blue Team application and Form #114). The Force Statement is completed by an involved officer or witness officer documenting a use of force. A Force Statement is not considered a compelled statement under *Garrity* v. *New Jersey* or under analogous State law. The statement can be considered compelled only when the officer is ordered to provide a statement after refusing to do so on the grounds that the officer has a reasonable, good faith belief that such statement may incriminate himself/herself.

**Force Tracking Number**—A unique number assigned by FIT to each reportable use of force event to facilitate awareness event and tracking of a use of force investigation. The number includes the letters "FTN" for Force Tracking Number, followed by the year the force event occurred followed by a three-digit sequential number starting with 001 for the first recorded allegation of the year. FTN 2014-001 indicates the first reportable use of force event in 2014.

**Force Transition**—Force transition is the movement, escalation/de-escalation, from the application of one force type to another in conjunction with the "objectively reasonable" standard.

**Force Investigation Team (FIT)**—The NOPD unit tasked with conducting investigations of serious uses of force; uses of force indicating apparent criminal conduct by an officer; uses of force by NOPD personnel of a rank higher than sergeant; and uses of force reassigned to FIT by the Superintendent, the Superintendent's designee, or PIB. FIT also shall investigate all instances in which an individual has died while in, or as an apparent result of being in, the custody of NOPD.

**Imminent Threat**—An immediately impending danger that must be instantly met.

**Impact Weapon**—Any solid or semi-solid object used by an officer as a method of gaining control of a subject. Absent exigent circumstances, officers shall not use non-traditional weapons/hard objects, such as firearms or radios, as impact weapons.

**In-Custody Death**—An incident in which an individual died while in, or as an apparent result of being in, the custody of NOPD.

**Kick**—To forcibly strike a person with any part of an officer's leg.

**Leg sweep**—To trip a person and/or cause one or both legs of a person to collapse and the person to fall to the ground.

**Less-Lethal Force**—Force employed that is neither likely nor intended to cause death or serious injury.

**Less-Lethal Weapon**—An apprehension or restraint tool that, when used as designed and intended, is less likely to cause death or serious injury than a conventional lethal weapon such as a firearm.

**Neck Hold**—One of the following types of holds: (1) arm-bar control hold, a hold that inhibits breathing by compression of the airway in the neck; (2) carotid restraint hold, a hold that inhibits blood flow by compression of the blood vessels in the neck; (3) lateral vascular neck constraint; or (4) a hold with a knee or other object to the back of a prone subject's neck; (5) any actions with the hands and fingers of an officer, which restricts the airflow of an individual.  A neck hold is considered lethal force.

**Passive Resistance**—Behavior that is unresponsive to police verbal communication or direction (e.g., ignoring or disregarding police attempts at verbal communication or control; going limp; or failing to physically respond or move) and verbal resistance (e.g., verbally rejecting police verbal communication or direction; telling the officer that he or she will not comply with police direction, to leave alone, or not bother him or her). Bracing, tensing, linking arms, or verbally signaling an intention to avoid or prevent being taken into custody constitutes passive resistance. Passive resistance, including verbal statements, bracing, or tensing alone does not constitute active resistance

**Probable Cause**—The facts and circumstances, known to the officer at the time, which would justify a reasonable person in believing that the suspect committed or was committing an offense.

**Reasonable Force**—Force that is objectively reasonable under the circumstances. The minimum amount of force necessary to effect an arrest or protect the officer or other person.

**Reasonably Necessary**—Force is reasonably necessary when the facts and circumstances, including the reasonable inferences drawn therefrom, known to an officer at the time he or she uses force, would cause an objectively reasonable officer to believe that force is appropriate.

**Reportable Use of Force**—Any force above hand control or escort techniques applied for the purposes of handcuffing, or escort techniques that are not used as pressure-point compliance techniques, do not result in injury or complaint of injury, and are not used to overcome resistance. The pointing of a firearm at a subject is a reportable use of force.

**Seizure (or Detention)**—Occurs when an officer's words, actions, or control would convey to a reasonable person that he or she is not free to leave.

**Serious Physical Injury**—Physical injury that creates a substantial risk of death; causes death or serious and protracted disfigurement; or causes impairment of the function of any bodily organ or limb.

**Serious Use of Force**—Includes the following:
(a) All uses of lethal force by an NOPD officer;
(b) All critical firearm discharges by an NOPD officer;
(c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization;
(d) All neck holds;
(e) All uses of force by an NOPD officer resulting in a loss of consciousness;
(f) All canine bites
(g) More than two applications of an CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive; and
(h) Any strike, blow, kick, CEW application or similar use of force against a handcuffed subject.

**Specialized Weapons** - weapons which require specialized training, certification and authorization prior to use, such as chemical agents, 40mm launchers, stinger rounds and grenades, flashbangs, LRAD systems, etc. (see: **Chapter 46.2.3 – CRU SWAT Equipment and Storage**.)

**Specialty Impact Munitions** - Refers to extended range impact munitions. These munitions may include impact rounds containing chemical agents.

**Supervisor**—A sworn NOPD employee at the rank of sergeant or above and non-sworn NOPD members with oversight responsibility for officers.

**Takedown**—A person is thrown, pushed, tackled, or shoved to the ground or against a wall, car, or other surface by an officer.  The key element to a takedown is the degree of force used. The use of a compliance technique off-balancing the subject against a wall, car, or surface (**other than ground**) alone is **not** a takedown.  A shove or push does not maintain contact, but rather creates distance between the officer and the subject, and is not a takedown unless a fall to the ground results.

**Use of Force**—Physical effort to compel compliance by an unwilling subject above unresisted handcuffing, including pointing a firearm at a person.

**Use of Force Indicating Apparent Criminal Conduct by an Officer**—Force that a reasonable and trained supervisor would conclude could result in criminal charges due to the apparent circumstances of the use of force. The level of the force used as compared to the resistance encountered, discrepancies in the use of force as described by the officer and the use of force as evidenced by any resulting injuries, witness statements, or other evidence are examples.

**Use of Force Levels**—For reporting and investigative purposes, the New Orleans Police

Department categorizes use of force by its members into four (4) primary force levels:

**LEVEL 1**
Level-1 uses of force include pointing a firearm at a person and hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) applied as pressure point compliance techniques that are not reasonably expected to cause injury; takedowns that do not result in actual injury or complaint of injury; and use of an impact weapon for non-striking purposes (e.g., prying limbs, moving, or controlling a person) that does not result in actual injury or complaint of injury.  It does not include escorting, touching, or handcuffing a person with minimal or no resistance.

**LEVEL 2**
Level-2 uses of force include use of a CEW (including where a CEW is fired at a person but misses); the use of "flash bangs" and "aerial flash bangs" to compel compliance from an unwilling subject; a canine deployment resulting in an apprehension without contact and force that causes or could reasonably be expected to cause an injury greater than transitory pain but does not rise to a Level 3 use of force.

**LEVEL 3**
Level-3 uses of force include any strike to the head (except for a strike with an impact weapon); use of impact weapons when contact is made (except to the head), regardless of injury; a canine deployment resulting in an apprehension contact that is not a bite or the destruction of an animal.

**LEVEL 4**
Level-4 uses of force include all 'serious uses of force' as listed below:
- (a) All uses of lethal force by an NOPD officer;
- (b) All critical firearm discharges by an NOPD officer;
- (c) All uses of force by an NOPD officer resulting in serious physical injury or requiring hospitalization;
- (d) All neck holds;
- (e) All uses of force by an NOPD officer resulting in a loss of consciousness;
- (f) All canine bites;
- (g) More than two applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or CEW application for 15 seconds or longer, whether continuous or consecutive;
- (h) Any strike, blow, kick, CEW application, or similar use of force against a handcuffed subject; and
- (i) Any vehicle pursuit resulting in death, serious physical injury, or injuries requiring hospitalization.
- (j) Any use of specialized weapons, such as gas dispersants, the use of "flash bangs" and "aerial flash bangs" or impact rounds for the purposes of crowd control (See **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and Civil Disturbances**), including the munitions listed in **Appendix E** of Chapter 46.2.1).

**Use of Force Report**—A written report documenting a supervisor's investigation of a use of force (in Blue Team application and Form #114).

## USE OF FORCE POLICY STATEMENT

1.    The policy of the New Orleans Police Department is to value and preserve human life when using lawful authority to use force. Therefore, officers of the New Orleans Police

Department shall use the minimum amount of force that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control, while protecting the lives of the member or others. Members are advised that the Department places restrictions on officer use of force that go beyond the restrictions set forth under the Constitution or state law.

2. Officers shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through the use of poor tactical decisions.

3. When feasible based on the circumstances, officers will use de-escalation techniques, disengagement; area containment; surveillance; waiting out a subject; summoning reinforcements; and/or calling in specialized units such as mental health and crisis resources, in order to reduce the need for force, and increase officer and civilian safety. Moreover, the officers shall de-escalate the amount of force used as the resistance decreases.

4. Any evaluation of reasonableness must allow for the fact that officers must sometimes make split-second decisions about the amount of force that is necessary in a particular situation with limited information and in circumstances that are tense, uncertain and rapidly evolving.

5. While the ultimate objective of every law enforcement encounter is to protect the public, nothing in this Chapter requires an officer to retreat or be exposed to possible physical injury before applying reasonable force. Nevertheless, officers should strive, where practicable, to first try to de-escalate a situation prior to using force.

## USE OF FORCE PRINCIPLES

6. NOPD officers, regardless of the type of force or weapon used, shall abide by the following requirements:
   (a) Officers shall use verbal advisements, warnings, and persuasion, when possible, before resorting to force.
   (b) Officers are expected to use sound judgment when making a subjective and independent decision regarding the need and appropriateness of the force to be used.
   (c) Under no circumstances will an officer use force solely because another officer is using force.
   (d) Officers will use disengagement; area containment; surveillance; waiting out a subject; summoning reinforcements; and/or calling in specialized units such as mental health professionals or a CIT Officer, when feasible, in order to reduce the need for force and increase officer and civilian safety.
   (e) When possible, officers shall allow individuals time to submit to arrest before force is used.

## MEDICAL ATTENTION

7. Immediately following a use of force, officers and supervisors shall inspect and observe subjects for injury or complaints of pain. Officers shall obtain medical assistance for any person who exhibits signs of physical distress, has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. This may require officers to render emergency first aid within the limits of their individual skills, training and available equipment until professional medical care providers arrive on the scene. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored by the officer involved in the incident or an on-scene assisting officer until medical personnel can assess the individual. NOPD officers shall request

medical assistance without delay when a subject has visible injuries or the subject complains of injury.

## AUTHORITY TO USE REASONABLE FORCE (Louisiana R.S. 14:20 and R.S. 14:22)

8.    Officers may use only necessary and reasonable force:
        (a) To protect themselves from injury;
        (b) To protect others from injury;
        (c) To effect a lawful detention;
        (d) To effect a lawful arrest; or
        (e) To conduct a lawful search.

9.    A use of force is "necessary" when it is reasonably required, considering the totality of facts and circumstances, to carry out one of the above listed law enforcement objectives.

10.    When practicable, officers will identify themselves as peace officers before using force. If it is not already known by the subject to be detained, arrested, or searched, officers should, if reasonable, make clear their intent to detain, arrest or search the subject.
11.    Officers shall not draw or exhibit a firearm unless the circumstances surrounding the incident create an objectively reasonable belief that a situation may escalate to the point at which lethal force would be authorized. Once an officer determines that the use of deadly force is no longer likely, the officer shall re-holster the weapon.

12.    Officers shall not use force to attempt to effect compliance with a command that is unlawful. Any use of force by an officer to subdue an individual resisting arrest or detention is unreasonable when the initial arrest or detention of the individual was unlawful. (See La. C. Cr. P. 220)

## DEADLY FORCE

13.    **Deadly/Lethal force shall be used only when:**
        (a) There is an imminent danger of death or serious physical injury to the officer or another person; or
        (b) To prevent the escape of a fleeing subject if there is probable cause to believe:
            i.    The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death; and
            ii.    The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person.

14.    Officers are not authorized to fire their firearms in order to subdue an escaping suspect who presents no imminent threat of death or serious injury. **(Tennessee v. Garner, 471 U.S. 1 (1985).**

15.    Deadly Force may never be used for the protection of property.

## DETERMINING THE REASONABLENESS OF FORCE

16.    When determining whether to use force **(see: Graham v. Connor, 490 U.S. 386 (1989))** and in evaluating whether an officer has used reasonable force, the facts and circumstances, when they are known or reasonably should be known by the officer, that should be considered include, but are not limited to:
        (a) The seriousness of the suspected offense or reason for contact with the individual;
        (b) Whether the subject poses a threat of injury to himself, officers or others, and the immediacy and severity of the threat;

(c) The conduct of the individual being confronted as reasonably perceived by the officer at the time;
(d) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, and the number of officers versus subjects);
(e) The effects of drugs or alcohol;
(f) The subject's mental state or capacity;
(g) Proximity to weapons or dangerous improvised weapons/devices;
(h) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained;
(i) The availability of other options and their possible effectiveness;
(j) The training and experience of the officer;
(k) The environment wherein the event is occurring;
(l) Whether the person appears to be resisting in an active, aggressive, or aggravated manner;
(m) The risk of escape;
(n) The apparent need for immediate control of the subject for a prompt resolution of the situation versus the ability to step back, regroup and develop an alternative approach and the time available to the officer to make a decision;
(o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others; and
(p) Any other exigent and articulable circumstances.

## DE-ESCALATION

17.    When it is consistent with protecting the safety of the officer, the subject, or the public, officers shall use de-escalation techniques to avoid or reduce the need for the use of force. These techniques include gathering information about the incident, assessing the risks, assembling resources, attempting to slow momentum, and communicating and coordinating a response. In their interaction with subjects, officers should use advisements, warnings, verbal persuasion, and other tactics and alternatives to higher levels of force. Officers should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance in order to consider or deploy a greater variety of force options.

## SUPERVISORY RESPONSE TO FORCE INCIDENTS

18.    The prospect of a favorable outcome is often enhanced when supervisors become involved in the management of an overall response to potential violent encounters by coordinating resources and officers' tactical actions. Whenever possible, supervisors shall acknowledge and respond in a timely manner to in-progress incidents in which there is a higher potential for officers to use force.

## FORCE LEVELS

19.    When use of force is needed, officers will assess each incident to determine, based on policy, training and experience, which use of force option is believed to be appropriate for the situation and bring it under control in a safe and prudent manner.

**LEVELS OF RESISTANCE**
(a) **Passive Resistance,**
(b) **Active Resistance,**
(c) **Aggressive Resistance, and**
(d) **Aggravated Resistance.**

## LEVELS OF CONTROL

20.     There are a variety of controls officers can use to stop the unlawful actions of a subject(s) or to protect a subject(s) from injuring himself/herself/themselves or others. The type of control officers use may vary based upon the facts and circumstances confronting them. Officers shall assess all contacts to determine the appropriate level of control. When possible, officers shall attempt to gain control of subjects by using verbal commands/directives first.

21.     If verbal commands/directives are ineffective or not feasible, officers may utilize other control methods. If force is necessary, officers shall determine which control technique(s), tactics or authorized defensive equipment would best de-escalate the incident and bring it under control in the safest manner. When it is objectively reasonable, officers may utilize the following skills and techniques as follows:

   (a) **Professional Presence**—This includes all symbols of police authority, such as badge, uniform, marked police vehicle, etc., and applies to all levels of control.

   (b) **Verbal Commands**—This level includes fundamental verbal skills and strategies that are available to the trained officer. The mere presence of the officer can be included in this category.

   (c) **Contact Controls**—When confronted with a subject demonstrating minimal resistant behavior, the officer may use low-level anatomical compliance techniques or physical tactics to gain control and cooperation. These tactics can be psychologically manipulative as well as physical, and include additional verbal persuasion skills, anatomical applications, and escort positions.

   (d) **Compliance Techniques**—When a subject becomes resistant (active resistance), the officer may use anatomical compliance techniques or physical control tactics to overcome the level of resistance and remain vigilant for more aggressive behavior from the subject.

   (e) **Conducted Energy Weapon**—The CEW is used in: (1) situations in which a subject who may be lawfully detained or apprehended poses an imminent risk of harm to the officer(s), the subject, or others; attempts to subdue the subject with less intrusive means have been or will likely be ineffective; and there is an objectively reasonable expectation that it would be unsafe for officers to approach the suspect within contact range; OR (2) situations in which a suspect for whom an officer has probable cause to arrest is actively fleeing from arrest for a serious offense; and attempts to subdue the subject with less intrusive means have been or will likely be ineffective or increase the likelihood of greater harm to the officer, the subject or another party. **Officers are reminded that mere flight shall not be the sole justification for using a CEW against a suspect.** Members should consider the severity of the offense, the suspect's threat level to others, and the risk of serious injury to the subject before deciding to use a CEW on a fleeing suspect.

   (f) **Defensive Tactics**—When a subject attempts to assault the officer or another person (aggressive resistance or aggravated resistance), the officer is justified in taking appropriate physical action to immediately stop the aggressive action and to gain control of the subject. This may include the use of hands, fists and feet.

   (g) **Authorized Impact Weapons**—Those less-than-lethal weapons such as the PR-24 and expandable batons, which, when authorized by the NOPD and utilized in accordance with training, may be used to overcome aggressive and aggravated resistance.

   (h) **Deadly or Lethal Force**—Deadly/Lethal force shall be used only when:

      i.    There is an imminent danger of death or serious physical injury to the officer or another person; or

      ii.   To prevent the escape of a fleeing subject if there is probable cause to believe:

- The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death; and
- The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer or to another person.

## DUTY TO INTERCEDE

22.    Officers have a duty to intercede to prevent the use of unreasonable force if the officer has reason to know that unreasonable force is being used and there is a realistic opportunity to intervene to prevent harm. The action required by the officer will depend on the circumstances of the incident. Appropriate action may include, but is not limited to:

    (a) Verbal or physical intervention;
    (b) Immediate notification to a supervisor; and
    (c) A direct order by a supervisor to cease the use of unreasonable force.

## PROHIBITED ACTIONS

23.    **Neck Holds**—Officers shall not use neck holds, except when lethal force is authorized.

24.    **Head, Neck, Throat, Heart, Kidney, and Groin Strikes with Impact Weapons**—The head, neck, throat, spine, heart, kidneys and groin shall not be intentionally targeted with impact weapons except when deadly force is authorized. Head strikes with impact weapons are prohibited except when lethal force is authorized.

25.    **Shooting at or from moving vehicles**—Officers shall not discharge a firearm from or at a moving vehicle unless the occupants of the vehicle are using deadly force other than the vehicle itself against the officer or another person, and such action is necessary for self-defense or to protect another person. Discharging a firearm in this circumstance is never authorized when it is reasonable to believe that the vehicle may contain an innocent passenger or it is reasonably apparent that the vehicle may careen out of control and injure an innocent bystander.

Officers shall not intentionally place themselves in the path of, or reach inside, a moving vehicle. Where possible the officer shall attempt to move out of the path of a moving vehicle rather than discharge their weapon to stop the vehicle. Officers shall not shoot at any part of a vehicle in an attempt to disable the vehicle.

26.    **Shooting through a door or window** when the target is not clearly in view.

27.    **Warning shots** or shots fired for the purpose of summoning aid are prohibited.

28.    **Using firearm as impact weapon**—Officers should never use a firearm as an impact weapon, i.e. "pistol whip" a subject or using the firearm as a club, except in situations where deadly force would be authorized.

29.    **Force against persons in handcuffs**—Officers shall not use force against persons in handcuffs, except to prevent imminent bodily harm to the officer, or another person, or to physically move the subject who has become passively resistant.

30.    **Force to overcome passive resistance**—Officers shall not use force to overcome passive resistance, except that physically moving a subject is permitted when it is necessary and objectively reasonable.

**OLEORISIN CAPSICUM SPRAY (OC Spray)–PROHIBITED**

31.     Oleoresin capsicum spray is **not** authorized for general use by the New Orleans Police
        Department. Officers shall not use or possess OC Spray while on duty, including officers
        working secondary employment. Exception to the general prohibition is made for
        SOD/SWAT use only, under highly specific circumstances such as civil disturbances
        when a command level decision has been made to deploy OC spray. (See **Chapter
        46.2.1 – Response to First Amendment Assemblies, Mass Demonstrations, and
        Civil Disturbances**).

**DANGEROUS ANIMALS**

32.     Officers are authorized to use firearms to stop an animal in circumstances in which the
        animal reasonably appears to pose an imminent threat to human safety and alternative
        methods are not reasonably available or would likely be ineffective. The officer must be
        cognizant of the surroundings when shooting at an animal and ensure there is no risk to
        people in the area. Under circumstances in which officers have sufficient advance notice
        that a potentially dangerous animal may be encountered, officers should develop
        reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW,
        animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a
        dangerous animal if circumstances reasonably dictate that a contingency plan has failed
        or becomes impractical.

**SPECIALIZED UNITS AND WEAPONS**

33.     Not every member of the NOPD is trained on all available weapons or skills. Specialized
        weapons are **RESTRICTED** to members of designated units (i.e., SOD), who have been
        trained in their use, and for use during special events or incidents (see: **Chapter 46.2.1
        – Response to First Amendment Assemblies, Mass Demonstrations, and Civil
        Disturbances**). The general guidelines for the appropriate levels of force categories
        follow the guidelines of this Chapter, such as:
        a.  If the weapon is used or deployed as an impact round, it's a Level 3 UOF (like an
            impact weapon), unless it meets the requirements for an impact round to be a
            level 4 such as a strike to the head or sensitive area, loss of consciousness,
            serious physical injury, or hospitalization. OR if the weapons are used or
            deployed in a crowd control setting, they are considered a Level 4 UOF.
        b.  Any of the gas dispersants or agents, including aerial, would be a Level 2 UOF
            (in line with OC spray) **unless** used in a civil disturbance / crowd control setting,
            then they would be considered a Level 4 UOF.
        c.  Aerial flash bangs are distraction devices and considered a Level 2 UOF, unless
            they cause injury or strike/impact someone. The same applies to a flash bang.
            **unless** used in a crowd control / civil disturbance setting, then they would be
            considered a Level 4 UOF.
        d.  Any weapon or munition used in a civil disturbance setting is considered a Level
            4 UOF.

34.     Specialized units (i.e. SOD) and members who have been trained on the weapons and
        skills covered in **Chapter 46.2.1 – Response to First Amendment Assemblies, Mass
        Demonstrations, and Civil Disturbances (Appendix – E)** shall have their individual
        training documented, along with the required certification and re-certification in their
        individual Departmental training records and in INSIGHT (personnel jacket). Any use of
        specialized weapons by a member who has not achieved and/or maintained required
        certification shall be investigated as a Level 4 UOF and appropriate corrective action
        taken.