**Firearm discharge**       **PIB Control Number: ASI # 2016-02**       **Received: Apr 09, 2016 01:33**

Item Number: D-09570-16

**Classification/Sub-classification: Weapon(s) Discharge / Animal - Hit**

**Involved citizen:**

   **Pitbull  Bruno**

**Officers / employees involved:**

   **SENIOR POLICE OFFICER Travis Stokes [00910/019718]**

      **Officer / employee current info:**

      Bureau:  MSB - Management Services Bureau
      District / Division:  ADD
      Division Assignment:  Limited Duty

      **Snapshot - Officer / employee information at time of incident:**

      Windows Username: 019718
      Bureau:  FOB - Field Operations Bureau
      District / Division:  First District
      Division Assignment:  3rd Platoon
      Unit Assignment:  Patrol
      Working Status:  Regular Working
      Shift Hours:  6:25 P.M. - 3:00 A.M.
      Rank/title: POLICE OFFICER 1
      Age: 51   Years of employment: 7   Years with unit: 2
      Off duty: No   Off duty employed: No

**Officer / employee witnesses:**

   **SENIOR POLICE OFFICER Nicholas Kozlowski [00511/025782]**

      **Officer / employee current info:**

      Bureau:  FOB - Field Operations Bureau
      District / Division:  1st District
      Division Assignment:  Day Watch

**Summary:**

      While checking the rear yard of a residence for the other party involved in a domestic disturbance
      at the location, Officer Stokes was suddenly charged at by an 8 year-old male pitbull canine
      named "Bruno." "Bruno," who weighed approximately 90 lbs, was not on a leash or chain and
      continued charging towards Officer Stokes as he attempted to back away from him.  Officer
      Stokes fired two rounds from his department-issued Glock 22 .40 caliber handgun, striking
      "Bruno" at least once in the head, ceasing its movement.  "Bruno" was transported from the
      scene by the SPCA to their facility, where he was later euthanized.

      Use of force deemed justified by a vote of 3-0 by UOFRB on 9/8/16.

**When/where:**

Date/time occurred: Apr 09 2016  01:33

Incident Location: ███████████████████████  Precinct: 1st District
     County:  Orleans Parish

**Linked files:**

ASI # 2016-02   (pdf)
entire criminal file   (pdf)

**Auto-linked incidents ( Linked through common Item Number)**

D-09570-16:     Use of force

**Status/assignment information:**

Status: Completed  Priority: ASI

Opened: 04/09/2016   Assigned:      Due: 04/14/2016        Completed: 06/21/2016

Disposition: Use Of Force Authorized

Unit assigned: PIB F.I.T.
Handled at field/unit level: No
Investigator assigned: POLICE LIEUTENANT John Helou
Supervisor assigned: POLICE SERGEANT Kevin Burns Jr.
Source of information: NOPD Employee
Extension Due Date:

**Organizational component(s):**

Bureau: FOB - Field Operations Bureau
District / Division: First District
Division Assignment: 3rd Platoon
Unit Assignment: Patrol
Working Status: Regular Working
Shift Hours: 6:25 P.M. - 3:00 A.M.

**Entered by:  POLICE LIEUTENANT John Helou on Jun 23, 2016 at 08:22**

# ADMINISTRATIVE SHOOTING INVESTIGATION

☒ INTENTIONAL
☐ ACCIDENTAL

PAGE **1** OF **29**

ASI NUMBER: **2016-02**

## EVENT

| SIGNAL | REASON FOR POLICE CONTACT | DATE/TIME OCCURRED | DIST/ZONE/SUB | STATUS | FATAL |
|---|---|---|---|---|---|
| 103D | Domestic Disturbance | 04-09-2016 1:34 PM | 1A01 | ☒ JUSTIFIED ☐ NOT JUSTIFIED ☐ POLICY VIOLATION ☒ TRAINING REC. ☐ TACTICAL DEFICIENCY | ☐ YES ☒ NO |

| LOCATION OF OCCURANCE | DATE/TIME ASI COMPLETED | LIGHTING |
|---|---|---|
| ▮▮▮▮▮▮ | 07-15-2016 1:00 PM | F |

## INVOLVED OFFICER 1

☒ INVOLVED OFFICER

| Stokes, Travis | RANK: P/O I | RACE: B | SEX: M | AGE: 50 | DUTY STATUS: On-Duty |
|---|---|---|---|---|---|

| PLACE OF ASSIGNMENT | ZIP CODE | HEIGHT | BUILD | SOBRIETY | INJURY | TREATED |
|---|---|---|---|---|---|---|
| 1st District | 70112 | 5' 10" | MEDIUM | S | N | |

| POLICY VIOLATION | FINDINGS | CURRENT FIREARMS | EMPLOYEE ID NUMBER | DOMINANT HAND |
|---|---|---|---|---|
| None | N/A | YES 07-01-15 | 19718 | RIGHT |

| WEAPON INFORMATION (MAKE MODEL SERIAL NUMBER AND CALIBER) | ROUNDS FIRED | RECOV'D. | QUAL. DATE | CANVASS | 360 PHOTOS |
|---|---|---|---|---|---|
| GLOCK 22   NO1300PD   .40 CALIBER | 2 | 2 | 07-01-15 | YES | YES |

| CEW INFORMATION | EFFECTIVE | SERIAL/CARTRIDGENUMBER | CURRENT QUAL. DATE | BWC | MVU | OTHER |
|---|---|---|---|---|---|---|
| X26P | X | X | YES 06-22-15 | YES | NO | NO |

| ATTIRE | DUTY BELT | EXPANDABLE | FLASH LIGHT | OTHER |
|---|---|---|---|---|
| Class "B" Officer | YES | YES | YES | RADIO |

## SUBJECT OFFORCE 1

☐ ARRESTED

| "Bruno" Pitbull Canine | DATE OF BIRTH OR AGE: 8 (Dog Years) | RACE: X | SEX: M | HEIGHT: X | WEIGHT: 90 lbs. |
|---|---|---|---|---|---|

| HOME ADDRESS | ZIP CODE | DATE/TIME OF FORCE | WEAPON | SOBRIETY | INJURY | TREATED |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | 70116 | 04-09-2016 1:34PM | NO | X | K | H |

| FORCE LOCATION | TYPE OF FORCE USED | ARREST HISTORY F/MT | BLANK | BLANK |
|---|---|---|---|---|
| ▮▮▮▮▮ | Growling, barking, charging | X | X | X |

| ALIAS/NICKNAME | DESCRIPTION OF INJURIES | BLANK | BLANK |
|---|---|---|---|
| X | GSW To Head | X | X |

| SUBJECT ARMED AT TIME OF UOF | LEVEL 4 TYPE | RESIDENT STATUS | JUVENILE |
|---|---|---|---|
| ☐ UNARMED ☐ SHOTGUN ☐ AUTOMATIC ☐ HANDGUN ☐ RIFLE ☐ SEMI-AUTOMATIC ☐ KNIFE ☐ OTHER WEAPON | ☐ DEADLY ☐ LETHAL ☐ EXHIBITED | ☐ ORLEANS RESIDENT ☒ NON-RESIDENT | ☐ YES ☒ NO |

| DETAILED DESCRIPTION OF INJURIES | RELATIONSHIP |
|---|---|
| "Bruno" was shot once in the head. The projectile remained in "Bruno's" head until removed by | S |
| Doctor Charles Jennings of Westbank Pet Emergency, 1152 Terry Parkway, Terrytown LA 70056 | |

## DESCRIPTION

| 01-BUILD | 02-ODDITIES | 03-SCARS | 04-TATTOOS | 05-APPAREL | 06-SPEECH |
|---|---|---|---|---|---|
| ☐ 01 SMALL/PETITE | ☐ 01 LIMP | ☐ 01 CHEEK, LEFT | ☐ 01 ARM, LEFT | ☐ 01 CLOTH OVER FACE | ☐ 01 SOFT/MUTLITE |
| ☐ 02 THIN | ☐ 02 CRIPPLED ARM | ☐ 02 CHEEK, RIGHT | ☐ 02 ARM, RIGHT | ☐ 02 STOCKING OVER FACE | ☐ 02 RASPY/DEEP |
| ☐ 03 MEDIUM | ☐ 03 MISSING ARM | ☐ 03 CHIN | ☐ 03 HAND, LEFT | ☐ 03 MASK | ☐ 03 RAPID |
| ☐ 04 MUSCULAR | ☐ 04 MISSING FINGER | ☐ 04 EAR, LEFT | ☐ 04 HAND, RIGHT | ☐ 04 EARRINGS | ☐ 04 SLOW |
| ☐ 05 HEAVY/STOCKY | ☐ 05 MISSING HAND | ☐ 05 EAR, RIGHT | ☐ 05 LEG, LEFT | ☐ 05 SUNGLASSES | ☐ 05 LOUD |
| ☐ 06 FLABBY | ☐ 06 MISSING FOOT | ☐ 06 EYEBROW, LEFT | ☐ 06 LEG, RIGHT | ☐ 06 RINGS | ☐ 06 MUMBLE |
| ☐ 07 STOOPED SHOULDERS | ☐ 07 MISSING LEG | ☐ 07 EYEBROW, RIGHT | ☐ 07 CHEST | ☐ 07 GLOVES | ☐ 07 STUTTERS/LISP |
| ☐ 08 NARROW SHOULDERS | ☐ 08 ABNORMAL GENITALS | ☐ 08 LIP UPPER | ☐ 08 NECK | ☐ 08 CAP/HAT | ☐ 08 MONOTONE |
| ☐ 09 BROAD SHOULDERS | ☐ 09 BODY ODOR | ☐ 09 LIP LOWER | ☐ 09 FACE | ☐ 09 MAN/FEMALE ATTIRE | ☐ 09 APOLOGETIC |
| ☐ 10 OVERHANDED? | ☐ 10 LEFT HANDED | ☐ 10 NECK | | ☐ 10 TENNIS SHOES | ☐ 10 EFFEMINATE |
| 07-ACCENT | 08-FACIAL ODDITIES | 09-EYES | 10-NOSE | 11-TEETH | 12-HAIR COLOR | 13-HAIR STYLE | 14-FACIAL HAIR | 15-COMPLEXION |
| ☐ 01 AFRO/AMERICAN | ☐ 01 BIRTHMARKS | ☐ 01 BLUE | ☐ 01 LARGE | ☐ 01 IRREGULAR | ☐ 01 BLONDE | ☐ 01 AFRO | ☐ 01 SIDEBURNS | ☐ 01 ALBINO |
| ☐ 02 SPANISH | ☐ 02 BLOTCHES | ☐ 02 BROWN | ☐ 02 SMALL | ☐ 02 GAPPED | ☐ 02 BLONDE | ☐ 02 BALD | ☐ 02 MUTTON CHOPS | ☐ 02 FAIR |
| ☐ 03 ORIENTAL | ☐ 03 FRECKLES | ☐ 03 GREY | ☐ 03 LONG | ☐ 03 PROTRUDING | ☐ 03 BROWN | ☐ 03 CURLY | ☐ 03 BEARD | ☐ 03 RUDDY |
| ☐ 04 FRENCH | ☐ 04 MOLE/WARTS | ☐ 04 GREEN | ☐ 04 THIN | ☐ 04 CAPS | ☐ 04 BLACK | ☐ 04 STRAIGHT | ☐ 04 GOATEE | ☐ 04 OLIVE |
| ☐ 05 ENGLISH | ☐ 05 PIMPLE/POCKS | ☐ 05 BLOODSHOT | ☐ 05 PUG | ☐ 05 MISSING | ☐ 05 GOLD/SILVER | ☐ 05 CREWCUT | ☐ 05 MUSTACHE | ☐ 05 LIGHT |
| ☐ 06 JAMAICAN | ☐ 06 WRINKLES | ☐ 06 BULGING | ☐ 06 POINTED | ☐ 06 CHIPPED | ☐ 06 SALT/PEPPER | ☐ 06 BALD | ☐ 06 FU MANCHU | ☐ 06 BROWN |
| ☐ 07 OTHER | ☐ 07 HIGH CHEEKS | ☐ 07 CROSSED | ☐ 07 BROAD | ☐ 07 GOLD | ☐ 07 MULTI-COLOR | ☐ 07 SHORT | ☐ 07 HAIR LINE, UP | ☐ 07 DARK |
| | ☐ 08 THICK LIPS | ☐ 08 MISSING/GLASS | ☐ 08 FLAT | ☐ 08 FLAT, BLONDE | ☐ 08 PLATINUM | ☐ 08 LONG | ☐ 08 UNSHAVEN | |
| | ☐ 09 DEFORMED EAR | ☐ 09 SQUINTS/BLINKS | ☐ 09 SCOUNTS? | ☐ 09 DIAMOND | ☐ 09 RED | ☐ 09 LONG | ☐ 09 BUSHY EYEBROWS | |
| | ☐ 10 MISSING EAR | ☐ 10 SLANTED/ORIENTAL | ☐ 10 RED | ☐ 10 BRACES | ☐ 10 GREY PATCHES | ☐ 10 FADE/DESIGN | ☐ 10 CLEAN SHAVEN | |

ADDITIONAL DESCRIPTION

## CODES

| RACE | DUTY STATUS | SOBRIETY | INJURY | TREATED | SUBJECT RELATIONSHIP TO INVOLVED OFFICER |
|---|---|---|---|---|---|
| W-WHITE | W-WORKING | S-SOBER | B-BROKEN BONES | R-REFUSED | A-SPOUSE |
| B-BLACK | O-OFF DUTY. | A-ALCOHOL | H-TREATED | T-TREATED | B-COMMON LAW |
| A-MERIND | D-DRUGS | D-DRUGS | L-LACERATIONS | H-HOSPITALIZED | C-PARENT |
| A-ASIAN | L-LIMITED | U-UNKNOWN | M-MINOR | S-REMAINED ON | D-OFFSPRING |
| U-UNKNOWN | R-REASSIGNED. | | M-OTHER MAJOR | SCENE | E-SIBLING |
| | | | N-NO INJURY | | F-GRANDPARENT |
| | | | K-KILLED | | |
| | | | | | G-GRANDCHILD | M-EX SPOUSE |
| | | | | | H-OTHER FAMILY | N-EMPLOYEE |
| | | | | | I-ACQUAINTANCE | O-EMPLOYER |
| | | | | | J-NEIGHBOR | P-HOMOSEXUAL |
| | | | | | K-BEING BABYSAT | S-STRANGER |
| | | | | | L-BOY/GIRL FRIEND | U-UNKNOWN |

## ADM

| CRIMINAL INVESTIGATOR | FDI INVESTIGATOR | OTHER | REPORTING CAR # |
|---|---|---|---|
| Sgt. Regina Williams | X | Elizabeth Renfro, LSPCA 1 | 2143 |

| ADMINISTRATIVE INVESTIGATOR | BADGE | USE OF FORCE INVESTIGATOR | FTN | SUPERVISOR | BADGE |
|---|---|---|---|---|---|
| Sgt. John Helou | 181 | Sgt. John Helou | 2016-0199 | _signature_ R. Buro3 | 125 |

New Orleans Police Department                                                    1
Force Investigation Team – Administrative Section
ASI # 2016-02

## Incident Summary

On Saturday, April 9, 2016, at approximately 1:34 AM, Officers Travis Stokes and Nicholas Kozlowski, unit 196 B, of the 1st Police District, responded to a call of a 103 D (Domestic Disturbance), at 1427 Marais Street, Apartment A, under item # D-09570-16. While investigating the disturbance, Officer Travis Stokes checked the rear yard of the residence and encountered a large pit-bull, later identified as "Bruno." "Bruno" was an eight year-old male Pitbull dog, who weighed approximately 90 lbs. "Bruno" began to growl and bark as he charged at Officer Stokes. Officer Stokes attempted to retreat, but before he could, "Bruno" lunged at him and Officer Stokes discharged his firearm twice at "Bruno." Officer Stokes struck "Bruno" at least one time in the head as a result of the firearm discharge, causing "Bruno" to immediately fall.

Louisiana SPCA Officer Elizabeth Renfro arrived on-scene and transported "Bruno" to their facility for treatment. "Bruno" was later euthanized due to his injuries.

## Notifications

On Saturday, April 9, 2016, at around 2:40 A.M., Sergeant Regina Williams, the on-call FIT supervisor / lead criminal investigator, began making notifications to the Office of the Consent Decree Monitor, the Independent Police Monitor and FBI Agent Steve Zeringue in order to provide them with information regarding the incident. Sergeant Williams was initially only able to successfully contact Agent Zeringue to brief him on the incident. Agent Zeringue advised he would not respond to the scene, but thanked Sergeant Williams for the notification. Sergeant Williams instructed Sergeant Helou, who had just arrived on-scene at 2:45 A.M., to update the Office of the Consent Decree Monitor and the Independent Police Monitor regarding the incident, which he agreed. Sergeant Helou's role on-scene was to assist Sergeant Williams with her criminal investigation, while he concurrently conducted his own administrative investigation and documented Officer Stokes' administrative use of force.

On Saturday, April 9, 2016, at 2:51 A.M., Sergeant Helou spoke with Deputy Police Monitor Ursula Price and advised her of the incident. Ms. Price stated she would be en-route to the location. At 2:52 A.M. on the same morning, Sergeant Helou contacted Federal Consent Decree Monitor Chet Epperson via telephone, but only received his voicemail. Sergeant Helou left Mr. Epperson a detailed message regarding the incident, which included his telephone number if he wished to call him back for further information. At 2:54 A.M. on the same morning, Sergeant Helou contacted Federal Consent Decree Monitor Dennis Nowicki via telephone, but only reached his voicemail. Sergeant Helou left Mr. Nowicki a detailed message regarding the incident, which included his telephone number if he wished to call him back for further information. At 2:57 A.M. on the same morning, Sergeant Helou received a text message from Ms. Price advising him she would be unable to make the scene, but would contact Sergeant Helou on Monday, April 11, 2016 for details regarding the incident. Sergeant Helou replied to and acknowledged this text message.

CITY DEFENDANTS - 001825

New Orleans Police Department                                                          2
Force Investigation Team – Administrative Section
ASI # 2016-02

### District Responsibilities

On Saturday, April 9, 2016, at 2:23 A.M., Sergeant Williams arrived on scene, where she met with Sergeant Stuart Smith, unit 130C. Sergeant Smith advised an officer with the SPCA just loaded the injured dog into their vehicle and was about to transport the dog to their facility. Sergeant Smith further advised the SPCA officer determined the dog was suffering and needed to be euthanized immediately.

On Saturday, April 9, 2016, at around 2:25 A.M., Sergeant Williams met with SPCA Officer Elizabeth Renfro, unit 1, prior to her departure with the dog to their facility. Agent Renfro advised Sergeant Williams she was called out to the scene by the New Orleans Police Department because a dog had been shot. Officer Renfro stated she immediately responded to the scene and relocated to the rear yard of ▇▇▇▇▇▇▇ where she encountered a large pit-bull dog that had been shot and was lying motionless next to a garbage can, but was still alive. The dog was not on a leash at the time. Renfro stated she picked the dog up and brought him to the LASPCA truck and placed him inside.

Officer Renfro stated she interviewed a subject by the name Nigel Tillman and he told her the dog was in good health and his owner was Jamal Woods, which was his cousin. The dog was the family's pet and had been for several years. Officer Renfro stated Tillman told her that the dog is normally on his leash and he believed the police took him off his leash after he shot him. The dog's name was "Bruno." Sergeant Williams and Officer Renfro exchanged information prior to her departure so that Sergeant Williams could track the status of "Bruno."

Prior to assuming control of the scene from Sergeant Smith, Sergeant Williams learned Officer Travis Stokes was the only involved officer and was sequestered in Stokes' police vehicle. Sergeant Smith advised Officer Stokes' partner, Officer Nicholas Kozlowski, did not witness the incident and was not sequestered due to the fact Sergeant Smith believed the incident was a level 3 use of force, specifically the destruction of an animal. Sergeant Williams explained to Sergeant Smith the incident was actually a level 4 use of force due to the firearm discharge by Officer Stokes and the fact the animal was not injured prior to the officers' arrival. Sergeant Williams further explained to Sergeant Smith the destruction of an animal commonly referred to an animal, who was seriously injured prior to the officer's arrival, being put out of its misery. Officer Kozlowski was subsequently sequestered inside Sergeant Smith's police vehicle and the scene was now properly preserved and protected according to both policy as well as the "District Responsibilities Regarding an Officer Involved Shooting."

Sergeants Williams and Helou observed the scene was appropriately protected with crime scene tape. A gate leading into the residence's completely fenced yard further secured the scene and created a natural barrier to unauthorized personnel entering the scene, potentially contaminating evidence. An inner and outer crime scene perimeter was established with the scribe, Recruit Eric Illarmo, documenting anyone entering the crime scene.

**FIT scene security**

Due to no observers from the Command Staff, FBI, Office of the Federal Consent Decree Monitor, Independent Police Monitor or Orleans Parish District Attorney being present on-scene, combined with the already well-protected crime scene (see above), FIT did not establish a mobile command post.

**FIT on scene investigation**

On Saturday, April 9, 2016, at 3:00 AM, Sergeant Helou met with Sergeant Williams in the 1400 block of Marais Street, where she advised him Officer Travis Stokes was the Involved Officer and was sequestered inside of his police vehicle. Sergeant Williams also advised Officer Nicholas Kozlowski, who was Officer Stokes' partner, was a Witness Officer and sequestered in a separate vehicle. Sergeant Williams also informed Sergeant Helou the dog was transported by the SPCA to their facility for medical treatment, but had to be euthanized. Sergeant Williams advised Crime Lab was already requested, but were working two separate unrelated shooting incidents, one of which involved several victims.

Sergeant Regina Williams, the lead FIT Criminal Investigator, and Sergeant John Helou, the lead FIT Administrative Investigator, completed the following duties while on-scene:

- Sergeant Williams obtained a Public Safety Statement from Officer Stokes.
- Sergeant Helou interviewed Mr. Nigel Tillman, the complainant on the original domestic disturbance call for service and co-owner of "Bruno." Mr. Tremone Woods, "Bruno's" other co-owner, along with Mr. Tillman's best friend, Mr. Dontra Henry, were also interviewed by Sergeant Helou.
- Sergeant Helou documented the overall conditions of Officers Stokes and Kozlowski and obtained $360^0$ photographs of each of them. Sergeant Helou, with the assistance of the on-scene Training Academy staff, inspected both officers' firearms and counted their remaining ammunition.
- Sergeants Regina Williams and John Helou conducted a thorough and complete canvass of the area for any witnesses to the incident, as well as any video (surveillance, cell phone, etc.) of the incident.
- Sergeant Helou completed the preliminary administrative use of force investigation regarding this incident. This preliminary investigation was documented in the Blue Team application under Force Tracking Number (FTN): 2016-0199. Sergeant Helou's **preliminary use of force determination** deemed Officer Stokes' use of force as appropriate, reasonable, within the policy of the New Orleans Police Department and was consistent with the applicable laws of the City of New Orleans, the State of Louisiana and Federal Law

New Orleans Police Department                                                                                      4
Force Investigation Team – Administrative Section
ASI # 2016-02

As mentioned above, Sergeant Williams obtained a Public Safety Statement from Officer Stokes.  A Public Safety Statement is defined as a statement made by an involved or witness officer that describes the type of force used, the direction and approximate number of shots fired by the involved officer(s) and the suspect(s), the location of the injured person(s), the description of any suspect(s) at-large and direction of flight, the elapsed time since these suspect(s) were last seen, whether the suspect(s) is armed, and another other information that could assist in the apprehension of outstanding suspect(s).  This could include, but would not be limited to, the description(s) of any victims or witnesses, description and location of any known evidence, and any other information to ensure officer and public safety.  In reviewing a summary of Officer Stokes' Public Safety Statement, Sergeant Helou determined Officer Stokes was not asked any questions nor did Officer Stokes provide any answers which were outside the scope of the components of the Public Safety Statement.

For the purposes of this investigation, Sergeant Helou will refer to the front of the residence located at ███████████ as the A side, the west side of the residence as the B side, the rear yard of the residence as the C side and the east side of the residence as the D side.

Sergeant Williams was escorted to the scene by Sergeant Smith to the rear of ███████ Street, where she observed it was pitch dark with no lights from the residence that would illuminate the yard. Sergeant Williams used a flash light to see the blood that was on the ground near a garbage can in the rear yard on the opposite side from ███████████. Sergeant Williams documented the immediate scene as follows:

The scene was located at 1427 Marais Street, which is located in the 1st Police District. ███████ ███████ is situated on the north side of the street. The residence is made up of white wood and is decorated with green shutters and doors. If one would stand in front of the residence and faced the residence the right side is municipally marked ███ and the left side is marked ███ The residence is a four plex and the apartment in question is apartment B, which is located on the east side of the residence in the rear. The door to apartment B is on the east side rear of the residence instead in the rear yard.

There was an alley that measured approximately 120 feet from the front of the residence to the rear of the residence. Just outside apartment B's door was a tan sofa with no cushion or pillows. The sofa was dirty and had been in the climate for some time. In the rear yard of the residence, on the ███████████ side, (B/C side), was a garbage can with a large amount of blood next to it. The dog had been removed by the LASPCA. The lighting was very poor, the temperature was 61 degrees and the winds were blowing from the south. On the side of ███ ███████████ in the rear side yard was a dog house and a chain that was hooked to a fence just outside a dog's house.

The chain was approximately 8 feet long and approximately 12 feet away from the garbage can where the dog's blood was found. Due to the length of the chain in relation to the location of the dog's blood, one could confirm the dog was not on the chain when it was shot. This was due to the severity of the dog's wound, which caused it to immediately fall at the point of impact with the bullet from the officer's gun.

There were several different types of casings in the rear yard that did not belong to the officer.

CITY DEFENDANTS - 001828

The officer's casings, which were 40 caliber Win S&W, was located near the blood where the
dog fell. There were two black benches that was lined up along the rear wall of the residence in
the rear yard. There were also two black benches with a black iron table on the ██████████
Street side of the residence closer to the east side gate. In the middle of the yard were four
individual black chairs with red seats that faced the rear of the residence. The chairs were side by
side. There was nothing else of evidentiary value located in the rear yard. All casings located in
the rear yard were collected and will be submitted to the crime lab for comparison. One could
conclude the 9mm's, .380 calibers and the 86 caliber casings did not come from the officer's
gun. New Orleans police officers carry 40 caliber handguns while on duty. Furthermore, it
would be physically impossible for the officers' .40 caliber handguns to fire the 86 and .380
caliber rounds, as well as the 9mm rounds found in the rear yard.

The results of the crime lab's ballistics analysis of these casings are located below in the
"Evidence" section.

### Summary of Mr. Nigel Tillman's Statement

On Saturday, April 9, 2016, at 3:03 A.M., Sergeant Helou introduced himself to Mr. Tillman
and noted he was distraught and upset. Sergeant Helou offered his condolences to Mr. Tillman,
and obtained from him a digitally-recorded audio statement, which is summarized as follows:

*"Mr. Tillman stated he was out with some friends. When he and his friends returned home,
they observed his ex-girlfriend, later identified as Queneka Collins (B/F ██████████), sitting on
a couch outside the side door (D side) leading to his apartment. Mr. Tillman stated he didn't
acknowledge Ms. Collins' presence, but one of his friends told her that she needed to leave. Mr.
Tillman further stated Ms. Collins got up from the couch and began pleading with him for them
to get back together.*

*Mr. Tillman advised he entered his home with his friends and told Ms. Collins she needed to
leave or he would call the police. Ms. Collins then pushed her way into the apartment, which
caused Mr. Tillman to call 911, but she tried to take the phone from him. Mr. Tillman called
911, but before the police arrived, one of his friends asked him to step out of the apartment so
they could speak about why Ms. Collins was acting that way. Once Mr. Tillman and his friend
stepped out of the apartment, Ms. Collins locked herself inside the apartment and refused to
open the door.*

*Once the police arrived, Mr. Tillman stated the officers tried for two hours to talk her out of
the house, but couldn't make contact with her. The officers then tried searching for other entry
points into the house, but never fully made it all the way around to the other side of the house.
They made it about halfway into the rear year, then the officers came back out to ask more
questions. Mr. Tillman stated the officers then went back in again, but he noticed the officers
were now "ready," but he didn't believe the officers were "ready" for an animal. Mr. Tillman
stated it was very dark on the sides and rear of the house because Ms. Collins turned the lights
off, so he understood the officers being "ready," as they didn't know what to expect. Mr.
Tillman stated as the officers went around the corner, he heard approximately four gunshots.
Mr. Tillman believed Ms. Collins tried to run out of the house and the officers fired at her. Mr.*

*Tillman stated he and his friends learned the officers shot Bruno, his eight year-old male pit-bull.*

*Mr. Tillman stated he and his friends were distraught and they kept asking each other questions, since Bruno is usually on a leash in the back yard, but sometimes would get off the leash and would simply go underneath the house to keep warm. Mr. Tillman stated Bruno's leash is pretty long; he could freely roam the rear yard, but couldn't get out of the yard. Mr. Tillman added people have tried to hop the other gate which led to the rear yard as he motioned to the other side of the house (C Side), but when they heard Bruno barking, would leave.*

*Mr. Tillman stated he was baffled as to why the officers didn't come to the other side of the house where there was a "Beware of Dog" sign posted on that particular gate. The officers could have then asked someone if a dog was back there. Mr. Tillman stated he didn't know police protocol when checking a yard, but he knew if someone goes into a yard, they're supposed to ask if there is a dog back there, so the dog could be secured.*

*Mr. Tillman stated he felt the force used by the officers was excessive. Tillman felt questions could have been asked by the officers before using that type of force. Mr. Tillman stated he believed the officers didn't know it was a dog, but also didn't know it was a person they were shooting at. After the shooting, his friends gave him their condolences and about an hour later, Ms. Collins came out in handcuffs and everyone who was around dispersed. Mr. Tillman apologized for not recounting everything, but he was upset as he lost a member of his family.*

*During follow-up questioning by Sergeant Helou, Mr. Tillman stated the incident with Ms. Collins occurred at around 12:41 AM and clarified the couch she sat on was outside the house. According to Mr. Tillman, he and Ms. Collins dated for around 10 months before they broke up. According to Mr. Tillman, he tried to talk Ms. Collins out of the house for about 10 minutes before he called the police and once he called the police, it took them 15 minutes to arrive once he made the call. Mr. Tillman added Bruno never bit anyone; he was all bark and no bite and has been attacked before by other dogs. Mr. Tillman also stated people from the neighborhood would come by and feed him boiled eggs to ensure he grew big and strong. Mr. Tillman also stated Bruno was up to date on his vaccinations.*

*Sergeant Helou noted the rear yard was extremely dark and asked Mr. Tillman if the lighting in the yard was the same as when the officers arrived, to which he replied "yes." Mr. Tillman added Ms. Collins broke the lights with a bat on a prior occasion and the yard was pitch black. Mr. Tillman stated when they walked back to the yard, prior to the shooting, each officer held a flashlight in one hand and their other hand on their gun.*

*According to Mr. Tillman, his best friend, Dontra Henry, were outside, along with his cousins, Jay Woods and Donnie Woods, were also outside in front of the house when the shooting occurred in the rear yard, but only Dontra was still on-scene. Mr. Tillman did not have telephone numbers on either Jay Woods or Donnie Woods, as his phone's battery was dead."*

**END OF STATEMENT**

**Summary of Mr. Dontra Henry's Statement**

CITY DEFENDANTS - 001830

On Saturday, April 9, 2016, at 3:18 A.M., Sergeant Helou introduced himself to Mr. Dontra Henry (B/M ███████, residing at ███████ telephone # ███████), where he obtained from him a digitally-recorded audio statement, which is summarized as follows:

*"Mr. Henry stated "there was an unruly woman, who came out willingly, and the dog got shot."*

*During follow-up questioning by Sergeant Helou, Mr. Henry stated when the incident happened, Nigel was in the street in front of his home and paced up and down the block while he spoke with his girlfriend on the phone. Mr. Henry stated the incident happened after midnight after he and his friends returned from the Kobe Bryant party. Mr. Henry stated although he didn't see anything, he didn't believe the officer meant to shoot the dog; he didn't sense any "ill will." Mr. Henry stated other than Nigel's girlfriend; he didn't see any other criminal violations. According to Mr. Henry, he and Nigel are best friends and there was a prior incident with Nigel's girlfriend where she damaged his vehicle. When his group arrived at the home, his girlfriend was already there; she refused to leave, but no one touched her. Mr. Henry felt Nigel and the officers handled the entire situation well."*

**END OF STATEMENT**

### Summary of Mr. Tremone Woods' Statement

On Saturday, April 9, 2016, at 3:58 AM, an irate African American male approached the scene and began making loud remarks about the police shooting his dog. Sergeant Helou approached this male and introduced himself to him. Sergeant Helou noted this male, identified as Mr. Tremone Woods (B/M ███████, residing at ███████, telephone # ███████), was belligerent and had an odor of alcohol emanating from his breath. Sergeant Helou then obtained from Mr. Woods a digitally-recorded audio statement, which is summarized below:

*"Mr. Woods stated he didn't know what was going on. He received a telephone call from his father informing him his dog had been shot by the police and rushed home. Mr. Woods stated his dog had been at the residence since he was a puppy. According to Mr. Woods, he stated his dog hears arguing, he gets aggressive and tries to be protective, but he's never bit anyone, never fought with any other animals and was up to date on his vaccinations. Mr. Woods stated Mr. Nigel Tillman was his cousin."*

**END OF STATEMENT**

### Area Canvass

A complete and thorough canvass of the area was immediately done by Sergeants Helou and Williams, which began on Saturday, April 9, 2016, at 3:54 A.M. This canvass included checking nearby business' and residences for any civilians or surveillance cameras, which would have been in a position to witness any portion of the incident. Sergeant Williams

New Orleans Police Department                                                                         8
Force Investigation Team – Administrative Section
ASI # 2016-02

canvassed the even side of Marais Street and Sergeant Helou canvassed the odd side of Marais Street. The result of Sergeant Williams' canvass are as follows:

On Saturday, April 9, 2016, at 3:55 AM, Sergeant Williams knocked at 1440 Marais Street, but she received no answer.

On Saturday, April 9, 2016, at 3:55 AM, Sergeant Williams knocked at 1438 Marais Street, but she received no answer.

On Saturday, April 9, 2016, at 3:56 AM, Sergeant Regina Williams came to a residence next to 1438 Marais Street, but it had no municipal numbers on the residence. Sergeant Williams noticed the residence was under renovation and no one lived at the residence. The above houses were the only houses on the even side of Marais Street.

There was a yard that sat on Marais Street that had a camera on the rear of the residence. The front of the residence was situated on Esplanade Street. Sergeant Williams relocated to the front of the residence and noted the municipals were 1261 Esplanade Street. Sergeant Williams knocked at the door, but she received no answer. Sergeant Williams would follow up with the surveillance camera later in the morning.

The results of Sergeant Helou's canvass of the odd side of Marais Street are as follows:

On Saturday, April 9, 2016, at 3:55 AM, Sergeant Helou began a canvass of the lake side (odd-numbered side) of the 1400 block of Marais Street for potential witnesses to the incident or surveillance cameras which may have recorded the incident. Sergeant Helou began his canvass at 1439/1437 Marais Street. Sergeant Helou noted this residence was unoccupied and under renovation, with a large scaffolding in the front yard. The property was also surrounded by an iron fence. Used appliances were observed in this residence's driveway. No cameras were observed on this residence.

On Saturday, April 9, 2016, at 3:56 AM, Sergeant Helou proceeded to 1431 Marais Street, where he observed this residence also to be abandoned, under renovation and surrounded by a chain link fence. A dumpster was observed in this residence's driveway. No cameras were observed on this residence.

On Saturday, April 9, 2016, at 4:05 AM, Sergeant Helou checked the residence of 1423/1421 Marais Street, where he observed a "For Rent' sign on the porch of this residence. Sergeant Helou knocked on the front doors of these residences, but received no answer from either. Sergeant Helou noted no surveillance cameras on this residence.

On Saturday, April 9, 2016, at 4:08 AM, Sergeant Helou checked the residence of 1419/1417 Marais Street. Sergeant Helou noted a surveillance camera on the porch of this residence, but also noted because of its location, would not have captured any portion of the incident. Sergeant Helou knocked on the front doors of these residences, but received no answer from either.

On Saturday, April 9, 2016, at approximately 11:00 AM, Sergeant Regina Williams reached out to Sergeant Samuel Davis Jr., of the Force Investigation Team and asked him could he follow up with a residence at 1261 Esplanade Avenue that may have surveillance footage of the activity that went on in front of Marais Street. Sergeant Williams knew that the camera would not catch

the shooting, but it would at least give an idea of what happened after the shooting. The results of Sergeant Samuel Davis Jr., investigation is as follows:

On Saturday April 9, 2016 at 2:45 PM, Sergeant Samuel Davis Jr., unit 2144, assigned to the Public Integrity Bureau Force Investigation Team, met with Mrs. Barbra Locklear. Mrs. Locklear is the owner of the Storyville Hotel located at ███████████████████ Mrs. Locklear resided at the location and could be contacted at █████████████████.

Mrs. Locklear's business (The Storyville Hotel) was situated on Esplanade Avenue; however, the parking lot for the business was located at the rear of the business. There are security cameras which face ████████████████ Sergeant Davis learned from Mrs. Locklear that the camera at the rear parking lot was operational and that it records and stores video for a three (3) week period. Sergeant Davis further learned the camera was active and recording on Saturday April 9, 2016 between the hours of 12-3am. Mrs. Locklear informed Sergeant Davis the security camera was in fact recording during the hours in question and that she could provide a copy of any video captured. It was agreed Mrs. Locklear would contact her security company and provide a copy of the recorded video to Sergeant Davis at her earliest convenience.

On Tuesday April 12, 2016 at 4:05 PM, Sergeant Davis met with Mrs. Barbra Locklear at 1261 Esplanade Ave. Mrs. Locklear provided a flash drive containing video footage from her security camera, which she stated covered from 12-3 AM on Saturday April 9, 2016.

On Wednesday, April 13, 2016, at about 10:00 AM, Sergeant Davis relocated to New Orleans Police Headquarters and met with Detective Eddie Williams of the Digital Forensics Unit, for conversion of the security camera video. Detective Williams converted the files into a viewable AVI version. Two disks were provided, 1 disk contained the entire video segments provided to Sergeant Davis by Mrs. Locklear and the other disk contained only the converted portion of the videos, beginning with the police arrival at 2:15 AM. The gaps in the timing were due to the camera only being activated by a motion sensor. Both converted disks were given to Sergeant Regina Williams. The original flash drive was returned to Mrs. Barbra Locklear.

The surveillance video provided by Ms. Locklear only assisted in confirming the response of the responding unit following the shooting's aftermath.

## Body-Worn Camera (BWC) Footage Review

Officer Stokes' BWC footage of this incident is summarized as follows:

*"The video began at 1:14 A.M. on Saturday, April 9, 2016, with Officers Stokes and Kozlowski en-route to the scene. Upon arrival at 1:15 P.M., the officers met with Mr. Nigel Tillman, who exited the D side alley way and informed them he called the police about his ex-girlfriend, Ms. Collins, who locked herself inside the residence and was refusing to come out. According to Mr. Tillman, Ms. Collins recently committed herself at a mental hospital but was released. Mr. Tillman then led the officers down the alley to his apartment's door. Sergeant Helou noted no "Beware of the Dog" sign displayed on the D-side iron gate as they walked through it. Sergeant Helou also noted the entire rear yard was extremely dark and both officers needed to use their flashlights to see.*

*Officer Stokes passed the apartment door (also on the D side), then briefly scanned the rear*

New Orleans Police Department                                                                    10
Force Investigation Team – Administrative Section
ASI # 2016-02

yard (C side) before returning to the door, advising his partner, he could hear Ms. Collins was
still inside. Officer Stokes banged on the door's security door, announced themselves and
demanded that she open the door. While waiting for the door to open, Officer Stokes asked Mr.
Tillman if Ms. Collins had mental problems, but he stated no, she wasn't diagnosed with
anything, but they had to strap her down at the hospital and later released her. Mr. Tillman
added Ms. Collins didn't do drugs and he didn't believe she was suicidal.

After knocking on the security door several times with no response, Officer Stokes advised
Officer Kozlowski to contact the rank regarding the situation. Officer Stokes then attempted to
look inside the window next to the door, but was unable to see anything, as the blinds were down
and closed. While awaiting for a response from a rank, Mr. Tillman showed Officer Stokes
another window in the rear yard (C side) leading to the apartment, where Officer Stokes was
able to see Ms. Collins seated on a sofa. As Officer Kozlowski conferred with the rank, he asked
Mr. Tillman if anyone else had keys to the residence, to which he replied his mother. Officer
Kozlowski asked Mr. Tillman to call his mother for the keys. While Officer Kozlowski continued
to speak with the rank, Officer Stokes advised Ms. Collins turned off the lights inside the
residence.

Officer Kozlowski advised Officer Stokes the rank would be en-route as soon as he wrapped
up the call he was currently on. Both officers then returned to the apartment's door where Mr.
Tillman was asked if he was ok with the officers forcing entry into the residence, to which he
replied he wasn't. Mr. Tillman advised he made contact with his mother, who was elderly and
lived uptown off Louisiana Avenue; his mother advised she couldn't make it right now. Officer
Stokes asked Mr. Tillman if one of his friends could bring him to get the keys from his mother, to
which he replied yes. Mr. Tillman and the officers returned to the front of the home to arrange
the ride to his mother's home, when he received a call at 1:31 A.M. from Ms. Collins, who
advised she left the residence. No one exited from the alleyway and Officer Stokes shined his
flashlight down the alleyway, but found no one there.

As Mr. Tillman continued to speak with Ms. Collins, he asked Officers Stokes and Kozlowski
to see if she actually exited the residence (Mr. Tillman remained at the front of the residence on
the phone). Officer Stokes went back towards the apartment's door first, followed by Officer
Kozlowski as they both utilized their flashlights. When the officers observed the door to the
apartment still closed, Officer Kozlowski remained at the door, while Officer Stokes checked the
rear yard (C side) of the residence for Ms. Collins. As Officer Stokes passed the second window
shown to him earlier by Mr. Tillman, he went around the corner to the B side of the residence, he
shined his light towards another closed exterior door and then down the B side's alley, finding
no one. Sergeant Helou noted the "igloo type" doghouse visible at this point, but no dog present
at this time. At 1:33 A.M., as Officer Stokes turned to head back to the C side yard, he was
startled by a barking dog. Officer Stokes turned back around and began retreating towards the
yard, but the barking dog, who was not secured with a leash, continued to pursue him. Officer
Stokes then fired his firearm twice at the dog at 1:33 A.M., striking it in the head and ceased its
movement next to the garbage can. Immediately after the discharge, Officer Kozlowski called in
a signal 108 over the radio, but as Officer Stokes returned to Officer Kozlowski's location at the
apartment's door at the D side, he advised him there was no 108; he shot a dog. Officer
Kozlowski clarified there was no 108, but they had to shoot a dog and shots were fired; Unit 120
advised over the radio to carry him to the location. Officer Kozlowski also asked Officer Stokes

New Orleans Police Department                                                    11
Force Investigation Team – Administrative Section
ASI # 2016-02

*if he was good, to which he replied "I'm good." Officer Stokes continued to shine his light on the dog, who still lay on the ground next to the garbage can. At this time, citizens at the front of the house are heard expressing their concern for Bruno. The officers then exited from the rear yard via the alley on the D side to the front of the residence. As they did, Officer Kozlowski again asked Officer Stokes is he was alright; he again replied he was good. Officer Stokes also told Officer Kozlowski that he started to run from the dog, but he couldn't run. Kozlowski told Stokes he heard him barking.*

*Once the Officers returned to the front of the residence, Mr. Tillman, Mr. Henry and several family members expressed their distraught for the shooting of Bruno, all while stating she (Ms. Collins) now had to go to jail. Officer Stokes asked who the dog was for, to which someone in the group replied the dog was for his cousin. Officer Stokes tried to explain the dog to the group that the dog wasn't on a leash and came at him, at which time Officer Stokes was informed by someone in the group that the dog never went past the wall. Officers Stokes went back to his vehicle, while Officer Kozlowski remained with the group and spoke with them. Officer Kozlowski then approached Officer Stokes and again asked if he was alright, to which he replied no and sighed. Officer Kozlowski informed Officer Stokes he heard the dog, holstered his firearm and pulled his Taser (while he was still near the apartment door), but when he heard "pop, pop", he dropped his flashlight.*

*On Saturday, April 15, 2016, at 1:37 A.M., Officer Jacquelynne Fontenot arrived on scene. Officer Kozlowski advised her to stick around because the family was upset.*

*On Saturday, April 9, 2016, at 1:38 A.M., Sergeant Stuart Smith, Unit 130C, arrived with Recruit Eric Illarmo, Unit 132C, and took command of the scene. Sergeant Smith offered his condolences to the dog owner's family and then walked the scene with Officers Stokes and Kozlowski while Sergeant Smith asked Stokes questions relative to the Public Safety Statement. Sergeant Smith notified SPCA to render aid to the dog and Command Desk, then FIT regarding the firearms discharge. Sergeant Smith also advised the Special Operations Division regarding the still-barricaded subject (Ms. Collins).*

*On Saturday, April 9, 2016, at 2:09 A.M., Ms. Collins exited the residence on her own accord and was taken into police custody. Ms. Collins was transported to University Medical Center for a psychiatric evaluation."*

## END OF VIDEO SUMMARY (Officer Stokes)

Sergeant Helou determined through the timestamps on Officer Stokes' body-worn camera footage, he (and Officer Kozlowski) spent approximately 17 minutes on the C and D side of the residence before "Bruno" appeared and charged at Officer Stokes.

Officer Kozlowski's BWC footage of this incident is summarized as follows:

*"Officer Kozlowski's Body-Worn Camera footage of the incident was largely identical to Officer Stokes' body worn camera footage, except it captured the incident from his perspective. Sergeant Helou learned Officer Kozlowski initially notified Sergeant Eric Geisler, Unit 120C, of the situation. Sergeant Geisler informed Officer Kozlowski that he did not have a vehicle and*

New Orleans Police Department                                                    12
Force Investigation Team – Administrative Section
ASI # 2016-02

*couldn't make it to their location. Sergeant Geisler, after hearing a gist of the incident from Officer Kozlowski, advised him to have the complainant attempt to obtain keys for the residence and to notify Sergeant Smith, as he is currently on the street. Officer Kozlowski then notified Sergeant Smith of the incident, who advised he was currently on the scene of an unrelated domestic disturbance, but stated he would be en-route shortly. Officer Kozlowski's video confirmed he did not witness Officer Stokes shoot the dog, as he was around the corner on the D side near the apartment's door. The video also confirmed Officer Kozlowski advised Officer Stokes to stand by the car when he observed the family becoming more upset as Officer Stokes tried to explain the situation to them."*

**END OF VIDEO SUMMARY (Officer Kozlowski)**


**Officers' Condition / Demeanor**

On Saturday, April 9, 2016 at 4:15 A.M., Sergeant Helou took $360^0$ photographs of Officer Stokes, noting that he appeared calm, but serious and his uniform was neat and free of any dirt or debris. There was no smell of alcohol emanating from Officer Stokes' body nor were his eyes bloodshot. Sergeant Helou had no reason to suspect Officer Stokes was intoxicated or under the influence of any drug.

On Saturday, April 9, 2016, at 4:25 A.M., Sergeant Helou took $360^0$ photographs of Officer Kozlowski, noting that he appeared calm and his uniform was neat and free of any dirt or debris. There was no smell of alcohol emanating from Officer Kozlowski's body nor were his eyes bloodshot. Sergeant Helou had no reason to suspect Officer Kozlowski was intoxicated or under the influence of any drug.

On Saturday, April 9, 2016, at 4:31 AM, Sergeants Williams and Helou performed a walk-through with Officer Stokes. Once the walk-through was completed, Sergeants Williams and Helou instructed Officers Stokes and Kozlowski to complete their respective force statements and email them to Sergeant Helou. Sergeant Helou provided both Officers Stokes and Kozlowski with his business card containing his contact information. On the reverse side of these cards was information regarding psychological and counseling service providers. Both officers were instructed by Sergeant Helou to utilize these resources if needed.

Sergeant Williams advised Officers Stokes and Kozlowski she would contact them to record a formal statement relative to the criminal investigation portion of this incident. It was mutually agreed by Officers Stokes and Kozlowski these statements would take place on Wednesday, April 13, 2016, at 7:00 PM. Officers Stokes and Kozlowski were then released from the scene.

**Evidence**

On Saturday, April 9, 2016, at 6:06 A.M., Sergeant Helou was notified via the Channel 1 dispatcher a crime lab unit was en-route to their location. On Saturday, April 9, 2016, at 6:30 A.M., Crime Lab Unit 5119, manned by Technician S. Mills arrived to process the scene, which included the taking of several photographs. These photographs included a "Beware of Dog" sign

CITY DEFENDANTS - 001836

New Orleans Police Department                                                13
Force Investigation Team – Administrative Section
ASI # 2016-02

posted on an iron gate leading to the B side of the residence. Crime Lab also photographed the
lack of a similar sign on the iron gate leading to the D side of the residence. Crime Lab Unit
5115, manned by Technician S. Mohammad, arrived at 6:54 A.M. the same morning to assist
Technician Mills with the completion of the crime scene sketch and later, with the collection of
the evidence. With the greatly enhanced visibility provided by the daylight, Sergeant Helou
observed areas of the yard with small areas of blood, which were also photographed by
Technician Mills. Once Technician Mills photographed the chain as it was, Technician
Mohammad stretched the chain out and took an exact measurement of the chain. This
measurement was made part of the sketch. Sergeant Helou noted the sketch indicated when the
chain was fully stretched out, it could not reach the area where the garbage can and blood pool
were located.

On Saturday, April 9, 2016, at 7:25 A.M., Technician Mills began collection of the evidence
recovered from the scene. Technician Mills used a new set of gloves for each item of evidence
to avoid cross contamination. Each item of evidence was also placed in its own separate
envelope and are listed below:

*Exhibit Number: 001- Win 40 S&W spent casing*

Collected at 7:25 A.M. by Technician Mills

*Exhibit Number: 002- \*-\* 9mm+p spent casing*

Collected at 7:26 A.M. by Technician Mills

*Exhibit Number: 003- Hornaday .380 Auto live round*

Collected at 7:26 A.M. by Technician Mills

*Exhibit Number: 004- CCI 9mm Luger spent casing*

Collected at 7:27 A.M. by Technician Mills

*Exhibit Number: 005- Speer .380 Auto spent casing*

Collected at 7:28 A.M. by Technician Mills

*Exhibit Number: 006- Hornaday .380 Auto spent casing*

Collected at 7:28 A.M. by Technician Mills

*Exhibit Number: 007- CCI 9mm Luger spent casing*

Collected at 7:29 A.M. by Technician Mills

*Exhibit Number: 008- R-P 40 S&W spent casing*

Collected at 7:30 A.M. by Technician Mills

New Orleans Police Department                                                            14
Force Investigation Team – Administrative Section
ASI # 2016-02

Beginning at 7:31 A.M., Sergeant Helou, along with Technicians Mills and Mohammad, conducted another search of the rear yard in an attempt to locate the second Win 40 S&W spent casing ejected from Officer Stokes' firearm. The results of this additional search are listed below:

*Exhibit Number: U/M 1- S\*B 40 S&W spent casing*

Discovered at 7:31 A.M. by Technician Mills/Collected at 7:32 A.M. by Technician Mills

*Exhibit Number: U/M 2- R-P 40 S&W spent casing*

Discovered at 7:43 A.M. by Technician Mohammad/Collected at 7:43 A.M. by Technician Mills

*Exhibit Number: U/M 3- S\*B 40 S&W spent casing*

Discovered at 7:43 A.M. by Technician Mohammad/Collected at 7:43 A.M. by Technician Mills

*Exhibit Number: U/M 4- WCC 86 Live Round*

Discovered at 7:47 A.M. by Technician Mohammad/Collected at 7:48 A.M. by Technician Mills

*Exhibit Number: U/M 5- Win 40 S&W spent casing*

Discovered at 7:47 A.M. by Technician Mohammad/Collected at 7:49 A.M. by Technician Mills

On Tuesday, April, 26, 2016, at 2:00 PM, Sergeant Regina Williams received a bullet from Elizabeth Renfro of the LASPCA. The bullet was recovered from "Bruno," the dog that was shot by Officer Travis Stokes. The Necropsy was performed by Doctor Charles Jennings of the Westbank Pet Emergency, located at 1152 Terry Parkway, Terrytown Louisiana 70056 phone number 504-392-1932. The bullet has been entered into Central Evidence and Property under the above item number and was assigned Exhibit number 003.

Officer Travis Stokes scheduled a test fire of his department-issued Glock 22 for Wednesday, April 27, 2016, at 10:00 AM. Once the test fire was completed, a request was sent to crime lab to have the bullet compared to Officer Travis Stokes' gun and casings found at the scene

On Wednesday, April 27, 2016, at approximately 9:00 AM, Officer Travis Stokes went to the crime lab and had his weapon test fired by crime lab ballistic specialist Officer Sean McElrath.

On Monday, May 9, 2016, at approximately 3:50 PM, Sergeant Regina Williams followed up with Sean McElrath of the ballistic section to find out if he had did any comparison with Officer Stokes handgun, the casings at the scene and the bullet recovered from the necropsy of the dog. McElrath's results are as follows:

Officer McElrath was able to finish the case. He stated whatever fluid the doctors placed the projectile from the dog into totally corroded the projectile. Officer McElrath surmised the fluid

New Orleans Police Department                                                    15
Force Investigation Team – Administrative Section
ASI # 2016-02

was a different solution than the coroner's office used for autopsies. McElrath could tell that the projectile was .40 caliber class (.40 S&W) but that's all. McElrath could not tell if the rifling was cut or polygonal (indicative of a Glock). Both .380 casings found on the scene were fired by the same weapon.

All 9mm casings found at the scene were fired in the same weapon. The .40 caliber casings were fired in 3 different weapons. Two of the .40 caliber casings were fired from the officer's gun. The rest were fired in two other .40 caliber guns.

Based on the above ballistics analysis, Sergeant Helou confirmed the other casings and rounds recovered from the scene had no relation to this case.


## Academy

Lieutenant Hudson Cutno (Unit 5710) and Officer Desmond Rochon (Unit 5733), both of whom were assigned to the Training Academy, arrived on Saturday, April 9, 2016, at around 4:11 A.M to inspect the firearms of Officers Stokes and Kozlowski, beginning with the Involved Officer Stokes.

On Saturday, April 9, 2016, at 4:17 A.M., Officer Rochon inspected Officer Stokes' department-issued Glock 22 .40 caliber semi-automatic handgun (serial # NO1300PD), finding it was in good working order with no unauthorized modifications. Officer Rochon noted the weapon was equipped with the proper "New York Trigger." The weapon's chamber contained one live "Win 40 S&W" round and its fifteen round magazine was charged with twelve live "Win 40 S&W" rounds. Sergeant Helou also confirmed this ammunition count by counting and then photographing Officer Stokes' weapon and remaining ammunition. Officer Rochon issued Officer Stokes two live replacement "Win 40 S&W" replacement rounds.

Sergeant Helou was able to confirm through the ammunition count of Officer Stokes' firearm and by reviewing his Force Statement and body-worn camera footage that Officer Stokes discharged his firearm twice during this incident.

On Saturday, April 9, 2016, at 4:17 A.M., Officer Rochon inspected Officer Kozlowski's department-issued Glock 22 .40 caliber semi-automatic handgun (serial # NO1857PD), finding it was in good working order with no unauthorized modifications. Officer Rochon noted the weapon was equipped with the proper "New York Trigger." The weapon's chamber contained one live "Win 40 S&W" round and its fifteen round magazine was charged with fourteen live "Win 40 S&W" rounds. Sergeant Helou also confirmed this ammunition count by counting and then photographing Officer Kozlowski's weapon and ammunition.

Sergeant Helou was able to confirm through the ammunition count of Officer Kozlowski's firearm and by reviewing his Force Statement and body-worn camera footage that Officer Kozlowski did not discharge his firearm during this incident.

CITY DEFENDANTS - 001839

New Orleans Police Department                                                                          16
Force Investigation Team – Administrative Section
ASI # 2016-02
**Communications**

On Monday, April 11, 2016 at 11:33 A.M., Sergeant Helou requested the recorded 911 calls and Channel 1 radio communications for the incident.  Sergeant Helou requested and received from the Command Desk the incident recall report for the incident.

Sergeant Helou reviewed the two recorded calls to 911 for this incident and learned the following:

On Saturday, April 9, 2016, at 1:08 A.M., the Communications Division received a call from Mr. Tillman who advised New Orleans Police Complaint Operator # 128 that his ex-girlfriend, Ms. Queneka Collins, locked him inside his residence at ███████████ and refused to let him leave.  Mr. Tillman advised the operator that Ms. Collins didn't need to go to jail, "a crisis unit just needed to pick her up."  Mr. Tillman advised Ms. Collins didn't have any weapons and did not have any mental illnesses, although he informed the complaint operator Ms. Collins was in the hospital for one day, but "they" let her go.  Sergeant Helou noted sounds and dialogue between Mr. Tillman and an unknown person(s) heard throughout this entire call were those commonly heard during a domestic disturbance.  For example, Mr. Tillman told someone during this call, presumed to be Ms. Collins, to stop touching him.  Mr. Tillman also told this same person he was going to tell the police to take her to the hospital instead of jail.  Sergeant Helou further noted Mr. Tillman's emotions / attitude throughout this three minute, twenty-one second conversation with the complaint operator ranged from irate to calm and rapidly changed from moment to moment.  The complaint operator advised Mr. Tillman the police would be en-route to the location before the call ended.

On Saturday, April 9, 2016, at 1:14 A.M., an irate Mr. Tillman called 911 again and advised New Orleans Police Complaint Operator (unknown #) his ex-girlfriend, Ms. Queneka Collins, locked herself inside his house and "went crazy."  Mr. Tillman went on to say "I don't want y'all to kick in my fucking door; if they kick in my fucking door, you're gonna pay for my fucking door, get the fuck out of my house!"  Mr. Tillman also expressed frustration and anger over the police not yet arriving on-scene.  Mr. Tillman again advised the operator that Mr. Collins "went crazy" and the fact Mr. Tillman filed a prior police report against Ms. Collins, due to the fact she slashed his vehicle's tires and keyed his vehicle. Mr. Tillman advised the complaint operator that Ms. Collins was an African-American female wearing a gray hooded sweatshirt and black pants.  Mr. Tillman advised the operator he didn't know what she was doing, but she went "fucking pecan."  Mr. Tillman also advised the complaint operator no weapons were involved in this incident and there were no children on premises.  Prior to the conclusion of this call, the complaint operator asked Mr. Tillman if Ms. Collins had any mental illnesses.  Mr. Collins replied "they had her in the hospital the other day, but let her go because there was nothing wrong with her although she was "strapped down" that night.  This three-minute, twenty second call was concluded when Mr. Tillman advised the police had arrived on-scene.

Sergeant Helou reviewed the PremierOne Report Incident Details for item # D-09570-16, where he learned on Saturday, April 9, 2016, at 1:08 A.M., New Orleans Police Complaint Operator # 128 classified the original 911 call as a signal 103 D (Domestic Disturbance) and noted the following in the incident's comments: Ex-Girlfriend, Queneka Collins, African-American female was irate and refused to leave the location.  The complainant and subject were

New Orleans Police Department                                                                    17
Force Investigation Team – Administrative Section
ASI # 2016-02

arguing in the background and no weapons were involved. At 1:09 A.M. the same morning, the complaint operator sent the call for service to the Channel One Police Dispatcher, who noted in the comments the call was broadcast, but no units were available to respond. At 1:10 A.M. the same morning, unit 196B manned by Officers Travis Stokes and Nicholas Kozlowski, responded to the call.

The PremierOne Report Incident Details for item # D-09570-16 also listed the additional comments added to the incident on Saturday, April 9, 2016, at 1:14 A.M., based on the second 911 call by Mr. Tillman. These comments were: Ex-girlfriend, Queneka Collins, African-American female wearing a gray hoodie and black pants, locked herself inside complainant's house and is refusing to leave. There was a history of domestic violence, but no weapons were involved.

Sergeant Helou further noted the comments section of the PremierOne Report Incident Details for item # D-09570-16 listed the following additional comments deemed pertinent by Sergeant Helou to this investigation:

- On Saturday, April 9, 2016, at 1:34 A.M., unit 196B, Officers Stokes and Kozlowski, advised they shot a dog at the location.
- On Saturday, April 9, 2016, at 1:41 A.M., unit 130C, Sergeant Stuart Smith, requested SPCA to the location.
- On Saturday, April 9, 2016, at 1:55 A.M., unit 130C, Sergeant Stuart Smith, advised Sergeant Williams of FIT was notified.
- On Saturday, April 9, 2016, at 2:02 A.M., unit 130C, Sergeant Stuart Smith, requested notifications to SWAT and advised a female was barricaded inside the location.
- On Saturday, April 9, 2016, at 2:02 A.M., unit 130C, Sergeant Stuart Smith, requested notifications to SWAT and advised a female was barricaded inside the location. Captain James Scott, assigned to the Special Operations Division was notified of the incident at 2:05 A.M.
- On Saturday, April 9, 2016, at 2:09 A.M., unit 120C, Sergeant Eric Geisler, advised the female subject was apprehended.

Sergeant Helou reviewed the recorded Dispatch Channel One radio transmissions for the incident and learned on the morning of Saturday, April 9, 2016, three districts (1, 5 & 8) were assigned to the Channel One dispatcher. Sergeant Helou noted at the time of this incident, there were no periods of time where no one spoke over the air, as Sergeant Helou heard these three districts each handle numerous unrelated calls for service, along with their related radio transmissions. Sergeant Helou further noted the following information pertinent to this investigation during his review of these radio transmissions:

- On Saturday, April 9, 2016, at around 1:07 A.M., Officers Stokes and Kozlowski (unit 196B) responded to an unrelated domestic disturbance at 313 North Rocheblave Street. Other units, which included Sergeant Stuart Smith (130C) who rode in the same police vehicle as Recruit Eric Illarmo (unit 132C), also responded to this incident. Sergeant Helou noted the dispatcher advised the responding units in great detail regarding the call's comments.

New Orleans Police Department                                              18
Force Investigation Team – Administrative Section
ASI # 2016-02

- On Saturday, April 9, 2016, at 1:09 A.M., as soon as the dispatcher broadcasted the domestic disturbance at ███████████ Sergeant Smith instructed the dispatcher to clear unit 196B from 313 North Rocheblave Street and re-direct them to ████ Street. The dispatcher advised unit 196B she was sending them to ██████████ which the unit acknowledged. However, the dispatcher did not advise unit 196B of any comments obtained by the complaint operators and contained in the item either from the first or second 911 call.
- On Saturday, April 9, 2016, at around 1:17 A.M., Officer Kozlowski requested to speak with Sergeant Smith.
- On Saturday, April 9, 2016, at around 1:32 A.M., Sergeant Smith advised he and Recruit Illarmo were clearing from 313 North Rocheblave Street and they were now headed to ████████████ to assist unit 196B.
- On Saturday, April 9, 2016, at around 1:34 A.M., Officer Kozlowski advised the dispatcher of a signal "108" - **Officer needs assistance, life in danger,** but immediately clarified there was no "108." Officer Kozlowski stated they had to shoot a dog and shots were fired. Sergeant Smith again advised the dispatcher he's en-route to 196B's location. Sergeant Eric Geisler, unit 120B, also advised he was en-route to 196B's location.
- On Saturday, April 9, 2016, at 1:37 A.M., Sergeant Smith and Recruit Illarmo arrived on-scene.
- On Saturday, April 9, 2016, at 1:40 A.M., Sergeant Smith requested SPCA to the location and advised the dog was wounded, but alive at the moment.
- At 1:41 A.M., Sergeant Smith requested someone from FIT contact him regarding the firearm discharge, to which the dispatcher advised Sergeant Smith to contact the Command Desk. The dispatcher also notified Sergeant Smith a message was left with the SPCA regarding the incident.

Sergeant Helou concluded from reviewing these **radio transmissions** that immediately after Officer Kozlowski advised the dispatcher of his partner's firearm discharge, and the dog being shot, his supervisors, Sergeants Eric Geisler (unit 120C) and Stuart Smith (unit 130C), each advised the dispatcher they were en-route to the location. Sergeant Smith, who was already en-route to the officers' location, arrived within three minutes of the notification of the firearms discharge; Sergeant Geisler arrived shortly after Sergeant Smith. Upon Sergeant Smith's arrival, he immediately requested both the SPCA to assist with the wounded dog and FIT to assist with the firearm discharge. Sergeant Helou concluded the actions of both Sergeants Smith and Geisler demonstrated close and effective supervision of their subordinate officers.

Sergeant Helou concluded from the **PremierOne Report Incident Details** for item # D-09570-16 and the associated 911 calls and recorded radio transmissions the Channel One Police Dispatcher did not notify unit 196B of the comments listed in the incident. These comments were provided by the complainant to two New Orleans Police Department Complaint Operators in two separate 911 calls. Furthermore, although Mr. Tillman denied several times when asked directly by these complaint operators if Ms. Collins was mentally-ill, Mr. Tillman made several references that she was crazy and had been hospitalized before. This information should have been notated in the incident's comments and then relayed to unit 196B and anyone else responding to the incident. Sergeant Helou also noted this was a missed opportunity to utilize

New Orleans Police Department                                    19
Force Investigation Team – Administrative Section
ASI # 2016-02

the expertise and training of a Crisis Intervention Team (CIT) Officer to possibly negotiate a peaceful surrender of Ms. Collins.

Sergeant Helou further concluded from the **PremierOne Report Incident Details** for item D-09570-16 and the associated 911 calls and recorded radio transmissions immediately after Officer Kozlowski advised the dispatcher of his partner's firearm discharge, and the dog being shot, his supervisors, Sergeants Eric Geisler (unit 120C) and Stuart Smith (unit 130C), each advised the dispatcher they were en-route to the location. Sergeant Smith, who was already en-route to the officers' location, arrived within three minutes of the notification of the firearms discharge; Sergeant Geisler arrived shortly after Sergeant Smith. Upon Sergeant Smith's arrival, he immediately requested both the SPCA to assist with the wounded dog and a member of FIT (Sergeant Williams) to contact him regarding the firearm discharge. Sergeant Helou concluded the actions of both Sergeants Smith and Geisler demonstrated close and effective supervision of their subordinate officers. Sergeant Helou further concluded Sergeant Williams properly classified the incident according to policy as a Level 4 use of force, as FIT would not have responded to Level 3 use of force incident.

Sergeant Helou was also able to conclude from the PremierOne Report Incident Details for item # D-09570-16 and the associated 911 calls and recorded radio transmissions the Channel One Police Dispatcher, once notified of the firearms discharge, made notifications to the Command Desk. The Command Desk then made the proper notifications to the Public Integrity Bureau, FIT, the Command Staff, the Federal Monitors, the Independent Police Monitor, the SPCA, Coroner's Office and Crime Lab.

Finally, Sergeant Helou was also able to conclude from reviewing the PremierOne Report Incident Details for item # D-09570-16, the associated 911 calls, recorded radio transmissions and body-worn camera videos, Officers Stokes and Kozlowski arrived on-scene at 1:15 P.M., seven minutes after Mr. Tillman's initial call to 911. This seven-minute response time met the previously-established goal by Superintendent Michael Harrison for responses to calls for service classified as code 2 priority responses.

On Tuesday, June 28, 2016, at around 11:20 A.M., Sergeant Helou met with Assistant Police Communications Supervisor Annie Lockett at the Orleans Parish Communications District. Ms. Lockett identified the complaint operators who answered Mr. Tillman's first and second calls to 911 as Ms. Arrionne Gray and Ms. Tekisha Mellion. Ms. Lockett also identified the Channel One Police Dispatcher at the time Officers Stokes and Kozlowski were dispatched to Mr. Tillman's residence as Ms. Andrea Taylor. Ms. Lockett further advised Ms. Taylor was an Assistant Police Communications Supervisor and according to the personnel lineup for the evening of Friday, April 8, 2016, she relieved the normal Channel One Police Dispatcher for that shift while the normal dispatcher was at lunch. Ms. Lockett explained that during this period, Ms. Taylor monitored Dispatch Channel One, which covered districts 1, 5 and 8, in addition to monitoring the Command Desk and supervising the other dispatchers and complaint operators working that shift. Ms. Lockett added according to the lineup, the Communications Division's personnel staffing was extremely short this particular shift and Ms. Taylor's additional role as a relief person was the only way the normal dispatchers and complaint operators could receive their lunch or relief breaks.

New Orleans Police Department                                                           20
Force Investigation Team – Administrative Section
ASI # 2016-02

Ms. Lockett explained the Orleans Parish Communications District is currently in a consolidation period where dispatchers and complaint operators for the police, fire and ems departments, who were previously separate entities, would eventually be combined into one entity. This consolidation, which was approved by the City of New Orleans on Monday, March 14, 2016, requires training current personnel to handle calls for all three agencies to improve call-answering time and bring New Orleans in line with national standards. Employees will also be trained to use new call-taking software, which will ensure call-taker compliance to National Academies of Emergency Dispatch Protocols. This new software, Pro QA (Propriety Dispatch / Quality Assurance), is an automated system which evaluates incoming information according to logical roles built on emergency knowledge. Pro QA guides the complaint operator and dispatcher through the process of collecting vital information from the caller and choosing an appropriate dispatch level. Ms. Lockett added complaint operators and dispatchers are required to be trained and certified prior to using the Pro QA software and the Orleans Parish Communications District began sending its personnel to Pro QA training sessions beginning in February 2016. Finally, Ms. Lockett added these training sessions are approximately one-month long in duration and referred Sergeant Helou to the Training Coordinator for the Orleans Parish Communications District, Ms. Shinar Haynes, for more information.

On Tuesday, June 28, 2016, at around 11:40 A.M., Sergeant Helou met with Ms. Shinar Haynes, who serves as the Training Coordinator for the Orleans Parish Communications District. Ms. Haynes confirmed as of today, Ms. Taylor, Ms. Gray and Ms. Mellion have not yet attended a Pro QA training session. Ms. Haynes informed Sergeant Helou the Orleans Parish Communications District is staggering the number of personnel from each agency (police, fire and ems) sent to each training session to staffing concerns within each agency. Ms. Haynes advised Sergeant Helou the next Pro QA training session is currently scheduled for August 2016.

**PIB history**

A review of Officer Stokes' PIB history indicated no firearms discharges prior to this incident since his hire date of Sunday, December 28, 2008. Prior to this incident, Officer Stokes has been involved in five other use of force incidents. One of these use of force incidents, which occurred on Sunday, May 15, 2011, resulted in a citizen complaint alleging unauthorized force. This citizen complaint was investigated as a DI-1 under PIB Complaint Tracking # 2011-0532-C and ultimately exonerated Officer Stokes.

**Statements**

### Summary of Officer Travis Stokes' Statement

On Wednesday, April 13, 2016, at 7:26 P.M., Officer Travis Stokes appeared at PIB with his attorney, Mr. Donovan Livaccari, where they met with Lieutenant Kevin Burns and Sergeant John Helou inside interview room # 1. After Lieutenant Burns advised Officer Stokes his giving of a statement regarding this incident was voluntary. Officer Stokes agreed to provide a

New Orleans Police Department                                    21
Force Investigation Team – Administrative Section
ASI # 2016-02

statement, which was audio and video recorded, and stated the following:

"*Officer Stokes stated on Saturday, April 9, 2016, at around 1:08 A.M., he and his partner Nicholas Kozlowski responded to a signal 103D on Marais Street. Upon arrival, they met with the complainant, who advised them his ex-girlfriend had gained entry to his residence and barricaded himself inside. The officers relocated to the complainant's residence, but couldn't get her to exit the residence. The officers notified their rank, who was going to call SWAT, but the complainant advised his mother had keys to the residence, but she was located uptown. The officers, along with the complainant, had walked back to the front of the residence when he received a telephone call from his ex-girlfriend, who told him she had left the residence.*

*Officer Stokes stated he and his partner went back to the residence to check it. Officer Stokes stated since he didn't know if the female was armed, he had his firearm out as he checked the residence. Officer Stokes stated the apartment door was still closed and as he made his way to the rear of the residence, he observed none of the windows were open. As Officer Stokes made his way to the right side of the residence, he found another door, which was also closed. As Officer Stokes moved his flashlight to the right, a large dog (didn't know what breed it was at that time) began barking, then charged at him. Officer Stokes retreated, believing the dog was on a chain, but discovered it wasn't and the dog continued charging at him. The dog came within one to two feet in front of him and continued approaching. Officer Stokes discharged his firearm twice, striking the dog.*

*Officer Stokes stated he was attired in a "Class B" uniform that day and he had his body-worn camera on and activated. Officer Stokes wasn't sure if his vehicle's MVU was activated. Officer Stokes stated he did not know there was a dog at the location prior to his arrival, nor had he been to that location in the past. Officer Stokes stated he did not know the complainant or his ex-girlfriend and added the complainant never advised him or his partner of the dog, even after the complainant accompanied him into the rear yard. Officer Stokes stated the dog may have come from the doghouse, but he knew the dog charged at him when he was the light from his flashlight.*

*Officer Stokes described the dog's behavior as "very aggressive" and charging at him. Officer Stokes clarified he could gauge the aggressiveness of the dog by the manner in which he barked. Officer Stokes added the dog was doing its job in protecting its residence as it believed he was an intruder. Once he shot the dog, Officer Stokes stated the dog fell in front of him and his partner called-in a 108 as he couldn't see him and didn't know what was going on. Officer Stokes walked over to his partner, told him what was going on and the two walked back to the front of the residence and awaited the rank's arrival. Once the rank arrived, he and his partner brought the rank back to the scene of the shooting and the dog was still there. It was at that time Officer Stokes recognized the dog's breed as being a large pit bull weighing from 85-90 lbs. Officer Stokes stated he's never been bitten by a dog before and also that he was 5'10" tall and weighed 145 lbs. Officer Stokes did not touch the dog at any point, nor did he unhook the dog from any type of leash, nor did he see any other officers unhook the dog from any type of lease. Officer Stokes did not see any type of leash or collar on the dog. Officer Stokes stated he never saw the dog move anywhere else inside the yard once it had been shot because he rank told him to sit in his car. However, Officer Stokes heard that once SPCA arrived, the dog stood and walked away from where he fell.*

CITY DEFENDANTS - 001845

New Orleans Police Department                                                                22
Force Investigation Team – Administrative Section
ASI # 2016-02

*Officer Stokes stated he was sequestered alone in the vehicle in which he sat and his partner made the notifications over the radio regarding the discharge. Officer Stokes stated he was a little shaken-up after the shooting, but after a while he calmed down. Officer Stokes stated he currently owns a Pit Bull and confirmed he fired his weapon twice. Officer Stokes described the lighting inside the yard as poor and clarified he wouldn't have been able to see anything in the yard without his flashlight. Officer Stokes stated he fired his weapon downward and there was no possibility of anyone, other than the dog, being struck. Officer Stokes stated no one indicated to him a dog was in the rear yard, nor did he see any signs which indicated a dog was present. This included when he was in the yard with the complainant. Officer Stokes didn't see anything in the yard upon their initial entry which would have indicated to him a dog was present. Officer Stokes stated he wasn't able to confirm who the dog's owner was, but added that when the ex-girlfriend finally exited the complainant's residence and was in the police car, the complainant stated "get that fucking bitch outta here, she got my dog killed!" Officer Stokes stated Officer Jacquelynne Fontenot, Unit 105C, transported the ex-girlfriend."*

**END OF STATEMENT**

### Summary of Officer Nicholas Kozlowski's Statement

On Wednesday, April 13, 2016, at 7:38 P.M., Officer Nicholas Kozlowski appeared at PIB with his attorney, Mr. Donovan Livaccari, where they met with Lieutenant Kevin Burns and Sergeant John Helou inside interview room # 1. After Lieutenant Burns advised Officer Kozlowski his giving of a statement regarding this incident was voluntary, Officer Kozlowski agreed to provide a statement, which was audio and video recorded, and stated the following:

*"Officer Kozlowski stated on Saturday, April 9, 2016, at around 1:08 A.M., he and his partner received a call of a domestic disturbance at ▮▮▮▮▮▮▮▮▮▮ Upon arrival, they were greeted by the complainant, Nigel Tillman, who informed them his ex-girlfriend had locked herself inside the house. The officers attempted to make contact with her, but were unable to do so. The officers notified their rank, Sergeants Eric Geisler and Stuart Smith; Sergeant Geisler advised he didn't currently have a vehicle, while Sergeant Smith advised he would be en-route as soon as he finished the call he was currently on to determine if it was a barricaded subject situation. Once the complainant was asked if it was ok to damage the door to gain entry, it was determined the complainant would get a spare set of keys from his mother. Officer Kozlowski clarified this conversation occurred at the side of the house, which was a double shotgun and the door was in the middle of the house down a dark alley.*

*Officer Kozlowski stated he and his partner, along with the complainant, relocated back to the front of the residence, where it was better lit, so he could call his mother for the keys. It was at this time the complainant received a telephone call from his ex-girlfriend, who informed him she was no longer in the house. The officers knew the yard was completely fenced in and didn't see her exit through the front, so they returned to the yard to see if she was there or somewhere still on the property. Officer Kozlowski proceeded back down the alley way with Officer Stokes in front of him. Officer Kozlowski covered the door, while Officer Stokes checked the yard to search for the subject. Officer Kozlowski heard a dog barking, followed by two discharges of a firearm. Officer Kozlowski stated he didn't know what was going on, so he called in a 108. Officer Stokes came back around and told him it wasn't a 108; he had to shoot a dog. The*

*officers then notified their rank and FIT arrived.*

*Officer Kozlowski clarified he and Officer Stokes were partners riding together in the same vehicle and his vehicle's MVU was not activated. Officer Kozlowski stated he and his partner did not respond to the call with their vehicle' lights and siren activated. Officer Kozlowski stated he was attired in a "Class B" uniform and there was no lighting on the side of the residence; they couldn't see more than two feet in front of them without a flashlight. Officer Kozlowski added in the rear yard, the lighting was even worse. When Officer Kozlowski heard the shots, he was covering the door on the side of the house and could not see Officer Stokes, but heard the dog moving in addition to the barking in, what sounded to him, an aggressive manner. Officer Kozlowski couldn't hear if the dog was on a chain or leash and only saw the dog after he was shot. Officer Kozlowski observed the dog to be a large, muscular breed and assumed it to be a Pitbull, which was later confirmed by SPCA. Officer Kozlowski stated he was bit by a dog when he was young and that it was very painful.*

*Officer Kozlowski described Officer Stokes' demeanor following the shooting as pale and distraught; Officer Kozlowski asked him several times if he was alright. Officer Kozlowski has been Officer Stokes' partner for a while and described him as an avid dog lover who talked about his dog all the time. Officer Stokes had a previous dog, who passed away some time ago, and to this date, he still spoke of that dog. Officer Kozlowski confirmed he made the notifications after the firearms discharge; initially he thought they were under attack and broadcast a 108, but after his partner clarified what actually happened, he cancelled the 108 and advised of the firearms discharge. Once he communicated this over the air, Sergeant Smith immediately carried himself to their location.*

*Officer Kozlowski confirmed he was with Officer Stokes the entire time until he went into the yard to search for the female subject. Officer Kozlowski also confirmed this close proximity would have allowed him to hear anything said to his partner. Officer Kozlowski stated at no time did anyone alert either him or Officer Stokes to a dog in the yard. However, Officer Kozlowski was on a prior, unrelated call in the same block with Officer Jacquelynne Fontenot in which an aggressive dog was trying to make it over a fence while they were there. Officer Kozlowski couldn't recall if the dog was at that particular house or the one to its left, but after seeing the dog, noted that it looked similar to the one he saw on the prior occasion. Officer Kozlowski also confirmed prior to the discharge, he did not see any type of posted sign alerting them to the presence of a dog. Following the discharge, Officer Kozlowski did observe a "Beware of Dog" sign on the gate located at the other side of the residence as Mr. Tremone Woods approached Sergeant Helou, but stated they did not observe this sign initially as they did not enter from this side.*

*Officer Kozlowski had no knowledge of anyone other than the dog being injured or killed as a result of Officer Stokes' discharge. After the discharge, he and Officer Stokes relocated back to the front of the house, where observed the group of people there upset and believed they had come to the conclusion Officer Stokes was the one who shot the dog. Fearing for Officer Stokes' safety, Officer Kozlowski directed Officer Stokes to stand by their vehicle (about 30 feet away) while he stood between him and the group to create a protective buffer between them. Officer Kozlowski didn't wasn't Officer Stokes inside the vehicle in case the situation escalated and he needed his assistance, but clarified he and his partner weren't working on the domestic*

*disturbance investigation at this point, but that he did keep an eye on the house in the event the female exited the residence. Officer Kozlowski believed the only comment Officer Stokes made to him following the discharge was that he believed the dog was going to hurt him and he was frightened for his life. Officer Kozlowski stated once Sergeant Williams arrived on-scene, she instructed him to stay away from Officer Stokes. Officer Kozlowski stated at no point did he or Officer Stokes discuss what they would say to the investigators and the footage recorded by their body-worn cameras would corroborate this as they were activated the entire time.*

*When asked by Lieutenant Burns what Officer Kozlowski felt he and Officer Stokes could have improved-on tactically regarding this incident, he replied other than asking more questions about the presence of a dog. Officer Kozlowski clarified every time he's been on any call where a dog has been present, they were immediately notified by the homeowner. Officer Kozlowski stated he and his partner were one the side and in the rear yard of the residence twice before the discharge occurred for an extended period of time and each of them made enough noise where if a dog was present, he felt it would have made its presence known. Officer Kozlowski stated he and his partner had no reason to believe there was a dog in the rear yard."*

**END OF STATEMENT**


**Decision Point Analysis**

Based on the evidence gathered from the scene, a review of the applicable body-worn camera footage and the statements of the citizens, involved officer and witness officer, Sergeant Helou concluded at the time Officer Stokes used deadly force on "Bruno," he was not aware of a dog on the B side of the residence's rear yard. The officers were met by Mr. Tillman on the A side of the residence, where he explained the situation, then led the officers through the D side gate, where there was no "Beware of Dog" sign down to the D and C side of the residence, never alerting the officers to the presence of a dog. Inside the rear yard, there were no signs which alerted Officer Stokes to the presence of a dog, with the exception of the dog house Officer Stokes saw seconds before "Bruno" appeared. As Officer Stokes returned from the B side of the residence to the C side of the residence after searching for Mr. Tillman's ex-girlfriend, "Bruno" suddenly appeared and charged at him while barking and growling. Officer Stokes, believing "Bruno" may have been on a leash or chain, attempted to quickly retreat from "Bruno," but since "Bruno" was not on a leash or chain, he continued to charge at Officer Stokes. Officer Stokes discharged his firearm at "Bruno" only when the distance between himself and "Bruno" was closing.

After Officer Stokes discharged his firearm and "Bruno" fell, he immediately notified his partner, Officer Kozlowski, he was ok. Officer Kozlowski, after making notifications to the dispatcher regarding the firearm discharge, accompanied Officer Stokes to the front of the residence where he attempted to explain his actions to Mr. Tillman and his friends.

Sergeant Helou consulted Chapter 42.4 of the New Orleans Police Department's Operational manual, titled "Domestic Violence," specifically the section titled "Officer Response." Paragraph 10 of this section states: *"All domestic violence calls assigned a code 2*

New Orleans Police Department                                                                          25
Force Investigation Team – Administrative Section
ASI # 2016-02
*priority response will be answered with two officers and, whenever possible, a supervisor.*
*Domestic violence calls assigned a code 1A priority response may be answered by one officer.*
*Refer to Policy/PR 316, Officer Response to Calls."* Based on this information, Sergeant
Helou determined Officers Stokes' and Kozlowski's response to this call for service, which
was assigned a code 2 priority response, was within this policy.

## Tactical Analysis

On Tuesday, June 21, 2016, at around 10:00 A.M., Sergeant Helou consulted with Sergeant
Samuel Davis, Jr., who previously served as an instructor at the New Orleans Police
Department's Training Academy, regarding the tactics employed by Officer Stokes during this
incident. Sergeant Davis, after viewing the body-worn camera footage of the incident, found
Officer Stokes' tactics were consistent with NOPD policies and training. Sergeant Davis added
that based on the situation, no lesser force alternatives were available to Officer Stokes.

## Training Analysis

On Wednesday, April 13, 2016, at 12:59 P.M., Sergeant Helou received, from Academy
Instructor Officer Sheila Matthews, Officer Travis Stokes' most-recent firearms qualifications
record. The record indicated Officer Stokes successfully re-qualified with his Glock 22 .40
caliber firearm on Wednesday, July 1, 2015. Officer Stokes scored a score of 101 points out of a
possible 120 points.

## Equipment

All technology and equipment used during this incident functioned properly. This included
both officers' body-worn cameras, flashlights, communications equipment and Officer Stokes'
firearm. Both Officers Stokes and Kozlowski wore their duty rigs, which housed all of their
equipment, with the exception of their body-worn cameras, which were properly-mounted
center-mass in accordance with policy.

The investigation confirmed the in car camera of Officers Stokes and Kozlowski's vehicle
was not activated. In the event the in car camera system were activated, it would not have
captured the firearm discharge. This was due to fact the officers' vehicle was parked in the
1400 block of Marais Street, facing eastbound and the firearm discharge occurred in the rear
yard of ███████████████████.

CITY DEFENDANTS - 001849

New Orleans Police Department                                                    26
Force Investigation Team – Administrative Section
ASI # 2016-02
  Policy Violations

     Sergeant Helou found no policy violations associated with this incident.  Chapter 1.3 of the
New Orleans Police Department's Operations Manual, titled "Use of Force" authorizes
Officers to use firearms to stop an animal in circumstances in which the animal reasonably
appears to pose an imminent threat to human safety and alternative methods are not reasonably
available or would likely be ineffective.


# RECOMENDATIONS


Justified__X__   Not Justified____  Within Policy__X__  Violated Policy_____

Training Consideration__X__  Policy Consideration__X___  Equipment
Consideration_____   Commendation____

**Use of force:** Justified.  Officer Travis Stokes discharged his firearms at "Bruno," an 8 year-old
Pitbull weighing approximately 90 lbs., only after he aggressively barked, growled and charged
at Officer Carter while on the B side of the residence.  Officer Stokes attempted to retreat, but
"Bruno" was not on a leash and continued to rapidly advance towards Officer Stokes.  Officer
Stokes was in a position to receive great bodily harm and fired in defense of his own life.

**Policy Violations:** None.   Chapter 1.3 of the New Orleans Police Department's Operations
Manual, titled "Use of Force" authorizes Officers to use firearms to stop an animal in
circumstances in which the animal reasonably appears to pose an imminent threat to human
safety and alternative methods are not reasonably available or would likely be ineffective.

**Policy Consideration:**  Sergeant Helou recommended a policy limiting the number of districts a
dispatcher can monitor to only (2) two districts.  Although Mr. Tillman never mentioned to the
complaint operator on either of his two calls to 911 regarding the presence of a dog on the
premises, he did provide a large amount of information to these complaint operators.  In listening
to the recorded Dispatch Channel One radio transmissions for the incident, Sergeant Helou noted
none of the information provided by Mr. Tillman (details regarding incident, his ex-girlfriend's
mental state, etc.) was relayed by the dispatcher over the air to Officers Stokes and Kozlowski,
their supervisors or any other units which may have responded to assist with the call for service
given the information provided by Mr. Tillman.

     Sergeant Helou further learned on the morning of Saturday, April 9, 2016, three districts (1, 5
& 8) were assigned to the Channel one dispatcher.  Sergeant Helou noted at the time of this
incident, there were no periods of time where no one spoke over the air, as Sergeant Helou heard
these three districts each handle numerous unrelated calls for service, along with their related
radio transmissions.  The dispatcher may have been overwhelmed with the extreme amount of
radio traffic at the time she dispatched Officers Stokes and Kozlowski to the call for service.


CITY DEFENDANTS - 001850

New Orleans Police Department                                                  27
Force Investigation Team – Administrative Section
ASI # 2016-02

Sergeant Helou believed the Channel One dispatcher could have dispatched more efficiently if she would have only monitored two districts at once.

**Equipment:**  Sergeant Helou noted all technology and equipment used during this incident functioned properly.  This included Officer both officers' body-worn cameras, flashlights, communications equipment and Officer Stokes' firearm.  Both Officers Stokes and Kozlowski wore their duty rigs, which housed all of their equipment, with the exception of their body-worn cameras, which were properly-mounted center-mass in accordance with policy.

**Tactics:**  Former Training Academy Instructor Sergeant Samuel Davis, Jr., after viewing the body-worn camera footage of the incident, found Officer Stokes' tactics were consistent with NOPD policies and training.  Sergeant Davis added that based on the situation, no lesser force alternatives were available to Officer Stokes.

**Training Consideration:** Sergeant Helou recommended Sergeant Stuart Smith receive additional training in Chapter 1.3, "Use of Force," specifically the differences between a Level 3 and Level 4 use of force.

Sergeant Helou also recommended Complaint Operators Ms. Arrionne Gray and Ms. Tekisha Mellion, as well as Assistant Police Communications Supervisor Andrea Taylor attend Pro QA training as soon as possible, as staffing needs permit.

**Commendation:**  None

New Orleans Police Department                                              28
Force Investigation Team – Administrative Section
ASI # 2016-02

Respectfully Submitted,

Date: 7-15-16

Sergeant John M. Helou
**Force Investigation Team**
**Public Integrity Bureau**

CONCUR / DOES NOT CONCUR

Date: 7-18-16

Lieutenant Kevin Burns
**Force Investigation Team**
**Public Integrity Bureau**

CONCUR / DOES NOT CONCUR

Date: 7-19-16

Commander Gwen Nolan
**Public Integrity Bureau**

CONCUR / DOES NOT CONCUR

Date: 7-26-16

Deputy Chief Arlinda P. Westbrook
**Public Integrity Bureau**

**EXHIBITS**

**EXHIBIT A:  Scene Sketch (4 Pages)**
**EXHIBIT B: PTTR Forms (4 Pages)**

CITY DEFENDANTS - 001852