**Firearm discharge**          **PIB Control Number: ASI # 2016-04**          **Received: Sep 01, 2016 13:44**

Item Number: G-32401-16

**Classification/Sub-classification: Weapon(s) Discharge / Intentional On-Duty - Hit**

**Involved citizen:**

**Pitbull  Dog**

Linked address(s):
· Home Address:  1427 Marais Street  New Orleans LA 70116
· Home Address:  2417 Jonquil Street  New Orleans LA 70122

**Officers / employees Involved:**

**POLICE SERGEANT Nigel Daggs [250/016100]**

**Officer / employee current info:**

Bureau:  FOB - Field Operations Bureau
District / Division:  7th District
Division Assignment:  Staff

**Snapshot - Officer / employee information at time of incident:**

Windows Username: 016100
Bureau:  FOB - Field Operations Bureau
District / Division:  Third District
Division Assignment:  A Platoon
Working Status:  Regular Working
Rank/title: POLICE OFFICER 4
Age: 40   Years of employment: 13   Years with unit: 7
Off duty: No   Off duty employed: No

**Officer / employee witnesses:**

**SENIOR POLICE OFFICER Arianne White [01940/017081]**

**Officer / employee current info:**

Bureau:  MSB - Management Services Bureau
District / Division:  ADD
Division Assignment:  Extended Sick

**Summary:**

On Saturday, July 30, 2016, at 8:03am, Officer Nigel Daggs, unit 321A of the Third District, was dispatched to a signal 21 (miscellaneous complaint), of a light tan vicious pitbull on the neighbor's porch barking at the neighbors.

Daggs BWC Summary

01:07 into the video; Officer Daggs advised the dispatcher he was on scene, but he was not acknowledged. Officer Daggs stopped his vehicle and a female voice could be heard saying, "I

CITY DEFENDANTS - 001853

live at 2421...I can't get in my house." The dog must be hungry or in heat because the dog repeatedly charged toward her mother's property. A male voice stated that he had called the SPCA and the officer advised that he had called them as well. The officer asked the citizens if anyone had a phone number on the dog's owner, which they did not. Officer Daggs requested a backup unit. Unit 325A and 327A advised they were enroute. Officer Daggs asked the dispatcher to try the SPCA again because the dog was trying to attack people again. Officer Daggs gave the dog commands to sit while he sat inside his vehicle. The officer repositioned his vehicle, facing the porch and driveway of ██████████ and advised the neighbor that the dog was inside a fence. Officer Daggs opened his driver's door and stood in the door jamb. Daggs asked the dispatcher if a canine officer could assist. Officer Daggs asked the male neighbor if he had been bitten to ascertain if emergency medical services were needed.

11:37 into the video; Officer White arrived on scene. Officer Daggs continued to give the dog orders to sit, which he complied. Officer Daggs advised if the dog moved further to the rear of the yard he would approach and secure the gate. Officer White observed a phone number written on the carport of the residence. Sergeant Anika Glover, unit 730A of the Seventh District advised that she was going to send an officer over to assist. Officer White advised that she was going to call the phone number listed on the house, when answered a male refused to cooperate. Officer Daggs observed another phone number and approached the house to obtain the phone number from a sale sign and the dog began to bark at him. Officer Daggs retreated and gave the dog orders to sit and lay down.

21:34 into the video; Officer White suggested that the next door neighbor had a better chance of securing the gate from his backyard, while Officer Daggs tried to draw the dog's attention. It was established that the dog could jump the gate. Therefore, Officer Daggs asked the neighbor to make noise in his backyard to draw the animal's attention and Officer Daggs would close the gate.

23:39 into the video, they implemented their plan. The neighbor could be heard saying "yah", while Officer Daggs approached the gate. The gate made a clanking noise as Officer Daggs closed it and immediately Officer Daggs ran backwards toward his vehicle. Officer Daggs removed his weapon with his left and immediately the dog could be seen within six feet of the officer. Officer Daggs fired two shots at the dog. The dog began to yelp, while Officer Daggs continued to give the dog commands to sit. Officer Daggs notified the dispatcher of the discharge and the animal retreated to its porch. Throughout the entire ordeal Officer Daggs repeatedly stated that he did not want to have to put the dog down.

Use of force deemed justified by a vote of 3-0 by UOFRB on 3/9/17.

**When/where:**

Date/time occurred: Jul 30 2016 08:29

Incident Location: ████████████████████   Precinct: 3rd District
   County: Orleans Parish

**Linked files:**

   ASI # 2016-04   (pdf)
   crim and asi rpts   (pdf)

**Auto-linked incidents ( Linked through common Item Number)**

   G-32401-16:   Use of force

**Status/assignment information:**

Status: Completed   Priority: ASI

CITY DEFENDANTS - 001854

Opened:  Assigned:     Due: 09/06/2016        Completed: 03/09/2017

Disposition: UOF Justified

Unit assigned: PIB F.I.T.
Handled at field/unit level: No
Investigator assigned: POLICE SERGEANT David Barnes
Supervisor assigned: POLICE SERGEANT Kevin Burns Jr.
Source of Information: NOPD Employee
Extension Due Date:


**Organizational component(s):**

Bureau: FOB - Field Operations Bureau
District / Division: Third District
Division Assignment: A Platoon
Unit Assignment: Patrol
Working Status: Regular Working
Shift Hours: Between 7am-3pm


**Entered by:  POLICE SERGEANT Christina Watson on Dec 05, 2016 at 02:44**

DEPARTMENT OF POLICE

INREROFFICE CORRESPONDENCE

| | | | |
|---|---|---|---|
| **TO:** | Deputy Chief Arlinda Westbrook | **DATE:** | 1/27/17 |
| | Public Integrity Bureau | | |
| **FROM:** | Sgt. David A. Barnes | | |
| | PIB / Force Investigation Team | | |
| **SUBJECT:** | A.S.I. # 2016-04 & Item G-32401-16 | | |
| | Re: P/O IV Nigel Daggs, Emp. #16100 | | |
| | Third District Day watch | | |

**Event Summary**

1.     On Saturday, July 30, 2016 at approximately 8:29 AM, Officer Nigel Daggs, badge number 1961, unit number 321(a) was involved in a level 4 use of force (canine shooting) in the 2400 block of Jonquil Street, in the Third police district.  Officer Daggs responded to a call for service (signal 21) concerning a complaint of a loose brown colored Pitbull in the area that was attacking neighbors.  Officer Daggs and an off duty Orleans Parish Sheriff's Office Deputy attempted to secure the Pitbull in the rear yard of ▮▮▮▮▮▮▮▮▮ when the Pitbull escaped the yard and charged towards Officer Daggs.  Officer Daggs attempted to retreat to his vehicle, but was unsuccessful as the Pitbull closed the distance to Officer Daggs too quickly.  Officer Daggs then produced his New Orleans Police Department issued Glock .40 caliber handgun and intentionally fired twice at the charging Pitbull.  The Pitbull was non-fatally struck once in the left front shoulder area.  No other injuries resulted from the discharge.

2.     The Force Investigation Team's investigation revealed no policy violations and no training deficiencies.  Officer Daggs properly took precautionary measures and resorted to his firearm only as a last resort to avoid the immediate threat of serious bodily injury.

**Investigators**

3.     The following Force Investigation team members arrived on scene to assist with the investigation:
     Lieutenant Kevin Burns – Unit 2140
     Sergeant Regina Williams – Unit 2141
     Sergeant Christina Watson – Unit 2142
     Sergeant Samuel Davis – Unit 2144
     Sergeant Travis Ward – Unit 2146
     Sergeant David Barnes – Unit 2147

CITY DEFENDANTS - 001856

4.        Sergeant Travis Ward was assigned to be the lead criminal investigator on the incident. Sergeant David Barnes was assigned to be the lead administrative investigator on the incident.

5.        While on scene, Sergeant Barnes and Ward were assisted by members of the Force Investigation Team, which were assigned the following tasks:

    a.  Sergeant Christina Watson assisted with procuring and downloading video footage from Officer Daggs and Officer Arianne White's body worn cameras, in car cameras, and gathered information to be documented in the Use of Force Report under FTN 2016-0387.

    b.  Sergeant David Barnes was assisted by Sergeant Regina Williams with locating evidence, securing the scene and canvassing the area for witnesses.

    c.  Lieutenant Kevin Burns assisted in supervising the scene and communicating with the Office of the Independent Police Monitor, the Office of the Federal Consent Decree Monitor, and NOPD command staff.

    d.  Sergeant Ward conducted interviews with witnesses on scene and assisted in supervising all aspects of the scene.

    e.  Sergeant Samuel Davis was also tasked with documenting the collection of evidence by the Scientific Criminal Investigative Section.

**Involved Officers**

6.        Officer Nigel Daggs, badge number 1961, unit number 321(A), employee identification number 16100, was the officer involved in the incident. Officer Nigel Daggs is a black male with a date of birth of August 26, 1976. Officer Daggs stands 6'2" tall and weighs approximately 270 pounds. At the time of the incident, Officer Daggs was 39 years of age and has been employed with the New Orleans Police Department for approximately 12 years and 10 months.

7.        Officer Daggs was on duty at the time of the incident, in his capacity as a patrol officer for the NOPD Third District Day watch (A Platoon), and was attired in an NOPD approved "class B" short-sleeve uniform shirt and pants. At the time of the incident, Officer Daggs was wearing his NOPD departmentally issued soft body armor and a full duty belt with the proper equipment.

8.        On Saturday, July 30, 2016, at approximately 9:51 AM, whole body, 360 degree, photographs of Officer Daggs were taken on scene by Sergeant Davis. At the time the photographs were taken of Officer Daggs, he appeared to be uninjured and his uniform appeared intact, with the all of the approved equipment on his duty rig. Sergeant Barnes also noted that Officer Daggs did not appear to be under the influence of any substances which would affect his judgment or capability as a police officer. Officer Daggs did not smell of alcohol, was not slurring his speech, or acting in any way which would lead the investigators to believe he was he was under the influence of any alcohol or drugs.

9.        On Saturday, July 30, 2016, during the incident, Officer Daggs was armed with, and used, his NOPD issued Glock Model 22, .40 caliber semi-automatic handgun, bearing serial number NO-0353-PD. The firearm was equipped with the departmentally approved "New

CITY DEFENDANTS - 001857

York" trigger and appeared to be in good working order. While on scene, Officer Desmond Rochon, unit 5733, a certified firearms instructor assigned to the NOPD Municipal Training Academy, inspected Officer Daggs's firearm and replaced two rounds of Winchester .40 caliber ammunition into Officer Daggs's magazine. Sergeant Barnes later learned that Officer Daggs was current on his firearms qualifications, having successfully qualified on September 30, 2015.

10. Officer Daggs did not suffer any injuries during the incident.

**Subject of force:**

11. The subject of the force in this incident was a six-year-old, male, brown, American Pitbull, named Frank. Frank the Pitbull was of a muscular build and was housed at ███ █████████ and belongs to a Mr. Raymond Egania, a black male, date of birth ███████ who resides at ███████████████ Prior to the police contact, Frank the Pitbull, was running loose through the neighborhood, barking loudly and aggressively charging at people who were outside. Frank the Pitbull has no documented history of aggressive behavior; however, witnesses stated that Frank the Pitbull has been loose and charged at people, barked loudly, and made residents fear for their safety on previous occasions.

12. Frank the Pitbull suffered a gunshot wound to his left front shoulder area. The wound caused a broken shoulder bone and a deep flesh-wound to the Pitbull. Frank the Pitbull was transported to Metairie Small Animal Hospital to be treated for his injuries and his owner was not charged criminally.

**Notifications**

13. On Saturday, July 30, 2016, at 8:40 AM, Sergeant David Barnes was notified by Lieutenant Kevin Burns of a level 4 use of force in the 2400 block of Jonquil Street and was assigned the task of being the lead administrative investigator on the incident. On the same day Lieutenant Kevin Burns notified Sergeant Travis Ward, who would be assigned the task of being the lead criminal investigator on the incident. Lieutenant Burns also notified members of the Force Investigation Team, Sergeant Regina Williams, Sergeant Christina Watson, and Sergeant Samuel Davis, who all arrived on scene to assist with the investigation.

14. On Saturday, July 30, 2016, at approximately 8:39 AM, Officer Desmond Rochon, of the NOPD Municipal Training Academy, was notified and responded to the scene.

15. On Saturday, July 30, 2016, at approximately 8:41 AM, Ms. Susan Hutson, the New Orleans Independent Police Monitor, was notified and arrived on scene to conduct her independent assessment of the investigation.

16. On Saturday, July 30, 2016, at approximately 8:51 AM, Deputy Superintendent Arlinda P. Westbrook, Commander Gwen Nolan, the FBI Special Agent assigned to FIT, Steve Zeringue, as well as the City Attorney's office, and the Orleans Parish District Attorney's

CITY DEFENDANTS - 001858

Office, and the Officer of the Federal Consent Decree Monitor were notified of the incident by email.

**Incident Summary**

17. On Saturday, July 30, 2016 at approximately 8:29 AM, Officer Nigel Daggs, badge number 1961, unit number 321(a) was involved in a level 4 use of force (canine shooting) in the 2400 block of Jonquil Street, in the Third Police District. Officer Daggs responded to a call for service (signal 21) concerning a complaint of a loose brown colored Pitbull in the area that was attacking neighbors.

18. Officer Daggs arrived on scene at approximately 8:14 AM on Saturday, July 30, 2016. Upon arrival Officer Daggs was met by three complainants, an unknown female, later learned to be the daughter of Debra Lebeauf, residing at ███████████ Randy Stewart, and Sandra Stewart, both residing at ███████████ While meeting with the complainants, the unknown female informed Officer Daggs that the dog kept charging at her mom's property (███████████) and had kept her mom trapped inside of her residence.

19. Randy Stewart informed Officer Daggs that he was outside mowing his lawn when the Pitbull charged at him barking loudly. The complainants collectively informed Officer Daggs that the Pitbull had been roaming the neighborhood and made residents afraid to come outside. Officer Daggs then informed dispatch he would need additional units to assist in handling the incident.

20. Officer Arianne White, unit 327(A), arrived on scene shortly after Officer Daggs and assisted in corralling the Pitbull. Officer Daggs positioned his vehicle in the driveway of ███████████ and attempted to give the Pitbull commands. The Pitbull loitered around the yard area of ███████████ for the next several minutes as Officer Daggs and Officer White discussed possible solutions and tactics to secure the Pitbull in the rear yard of ███████████ ███████████

21. Approximately 14 minutes after arriving on scene, Officer Daggs was contacted on the radio by Seventh District Sergeant Anika Glover using unit number 730(A). Sergeant Glover informed Officer Daggs that she had a "dog lover" on her platoon who was willing to come assist in securing the Pitbull and did not have equipment to secure the Pitbull, but had "snacks" and "other things to get the dog."

22. Approximately 15 minutes after arriving on scene, Officer White attempted to call two different phone numbers affixed to the carport of ███████████ Officer White received an answer at one of the phone numbers; however, the subject who answered the phone refused to identify himself or provide any information.

23. Officer Daggs contacted unit 325(A), via the radio, Officer Patrick Smith, to assist with securing the dog in the rear yard of ███████████

CITY DEFENDANTS - 001859

24.     At approximately 23 minutes after arriving on scene, Officer Daggs spoke with Michael Ward, an off-duty Orleans Parish Sheriff's Office Deputy who was at ███████████████ Deputy Ward was trapped at the location of ███████████ because the Pitbull charged at the front door of the location and was keeping himself, and his sister, Debra Lebeauf, inside the location. Officer Daggs and Deputy Ward devised a plan for Deputy Ward to distract the Pitbull from across the fence in the rear yard of ██████████████ with Deputy Ward safely in the yard of ██████████████ while Officer Daggs closed and secured the front gate of ██████████.

25.     As Deputy Ward distracted the Pitbull, Officer Daggs attempted to secure the front gate of the location. Upon Officer Daggs closing the front gate of the location, the Pitbull began to charge towards Officer Daggs at the front gate of the location. Officer Daggs was unable to secure the front gate of the location before the Pitbull rapidly and aggressively charged at him. As Officer Daggs retreated the Pitbull continued to charge, quickly pushed through the front gate, and continued to charge, barking and growling, at Officer Daggs. Officer Daggs was attempting to retreat to his vehicle as the Pitbull quickly closed the distance between himself and the officer, barking loudly and bearing his teeth. Officer Daggs then drew his New Orleans Police Department issued Glock .40 Caliber handgun and intentionally fired twice at the charging Pitbull.

26.     The Pitbull was struck once, non-fatally, in the left front shoulder and ceased all aggression. Officer Daggs retreated towards the rear of his vehicle and continued to shout commands at the Pitbull to get down. The Pitbull then retreated to the front porch of ████ ██████████ and remained on the front porch until he was retrieved by Louisiana SPCA unit 41, James Carll.

27.     Immediately following the discharge, Officer Daggs informed the dispatcher that he needed a rank on scene and someone to treat the dog. Officer Daggs then informed dispatch that he had discharged his firearm and struck the Pitbull.

**District Responsibilities**

28.     On Saturday, July 30, 2016, at approximately 8:34 AM, Sergeant Sherman Mushatt, unit 320(A), arrived on scene to supervise and conduct a preliminary investigation into the incident.

29.     Crime scene tape was erected shortly after Sergeant Mushatt arrived on scene to secure the inner perimeter of the shooting scene itself. Sergeant Barnes's arrived on scene and observed an inner and outer perimeter had been established using crime scene tape. FIT investigators determined the outer perimeter had not been properly established so that the entirety of the scene could be secured. The outer perimeter was then established approximately 300 feet in either direction on Jonquil Street from the inner perimeter, which secured the additional portions of the scene, such as where the Pitbull had been treated by the SPCA before being transported.

CITY DEFENDANTS - 001860

30.    A review of the incident by Sergeant Barnes revealed that Officer Daggs was not immediately sequestered during the incident. On the Body Worn Camera footage, Officer Daggs assisted in securing the scene of the Officer Involved Shooting while other district units responded to a homicide which occurred at approximately the same time in the Third District. Officer Daggs also assisted SPCA unit 41, James Carll, with rendering aide to the Pitbull while on scene. Sergeant Barnes observed Officer Daggs briefly discuss the event with Sergeant Sherman Mushatt after Sergeant Mushatt arrived on scene, but did not observe Officer White or Officer Daggs discuss the specifics of the incident with anyone else prior to FIT's arrival.

**FIT scene security**

31.    Upon Sergeant Barnes's arrival on scene, it was observed the scene was properly secured by an inner perimeter. An outer perimeter was properly established by the Force Investigation Team, prior to the arrival of Sergeant Barnes, which ensured proper security of the entirety of the scene, and any evidence which was discovered outside of the inner perimeter.

32.    It was determined on scene, by Lieutenant Kevin Burns, that because of location of the incident, the lack of media on scene, the lack of pedestrian and vehicular traffic on scene, and the improbability of members of the command staff actually arriving on scene, a FIT mobile command post was not formally established. Lieutenant Burns located a shaded area on the Southern sidewalk, just beyond the inner perimeter, which would operate as a briefing location for members of FIT as well as any members of the Federal Monitoring Team, NOPD Command Staff, or the Office of the Independent Police Monitor who might arrive on scene.

33.    Immediately upon arrival, Lt. Kevin Burns ensured proper control of the scene had been established through the use of crime scene tape for an inner and outer perimeter, and that any and all evidence of the incident was properly preserved.

**FIT on scene investigation and follow up**

34.    On Saturday, July 30, 2016, at 8:40 AM, Sergeant David Barnes was notified by Lieutenant Kevin Burns of a level 4 use of force in the 2400 block of Jonquil Street and was assigned the task of being the lead administrative investigator on the incident. On the same day, at approximately 8:30 AM, Lieutenant Kevin Burns notified Sergeant Travis Ward, who would be assigned the task of being the lead criminal investigator on the incident. Lieutenant Burns also notified members of the Force Investigation Team, Sergeant Regina Williams, Sergeant Christina Watson, and Sergeant Samuel Davis, who all arrived on scene to assist with the investigation.

35.    Sergeant Barnes arrived on scene at approximately 9:29 AM on July 30, 2016. Sergeant Barnes learned from Sergeant Travis Ward that Sergeant Sherman Mushatt, Unit 320(A), advised Sergeant Ward that Officer Daggs fired two rounds from his service weapon towards the ground in front of ██████████████ As a result of the discharge, an aggressive Pitbull,

CITY DEFENDANTS - 001861

who was the intended target of the discharge, had been struck and there were no other animals or persons that were struck.

36.    Sergeant Ward met with Officer Nigel Daggs and obtained a public safety statement in accordance with NOPD Chapter 1.3.2  Chapter 1.3.2 defines a public safety statement as:

> "A statement by an involved or witness officer that describes the type of force used, the direction and approximate number of shots fired by the involved officer (or officers) and the suspect (or suspects), the location of an injured person, the description of outstanding suspect(s) and the direction of the suspect's flight, the time lapse since the suspect was last seen, whether the suspect is armed, any other information that could assist in the apprehension of outstanding suspects, description(s) of any victims or witnesses, description and location of any know evidence, and any other information to ensure officer and public safety." (NOPD Chapter 1.3.2)

The public safety statement obtained by Sergeant Ward consisted of asking Officer Daggs what direction he fired his weapon in, how many times he fired his weapon, and were there any bystanders in the direction that he fired his weapon.  Officer Daggs advised that he fired his weapon two times and the direction of his muzzle was towards the asphalt area in the roadway near a parked truck.  Officer Daggs advised that at the time he fired his weapon, there were no bystanders or pedestrians in the area.

37.    Sergeant Barnes observed the use of force scene was contained in the paved roadway in front of ███████████████. ████████ was observed to be a single story, wooden, structure that was green in color. Five concrete steps led to a concrete front porch area which was the width of the house itself.  The front of the residence consisted of a window positioned to the left of a wooden framed door with an iron gate.  The front door was positioned to the right side of the center of the residence.  The porch area was covered with two posts positioned along the outer left and right side of the porch that ran from the porch ceiling to the concrete porch floor.

38.    A pool of red blood was observed on the right side of the porch area.  Another large pool of blood was observed to the far left corner of the porch area, behind a green colored metal bench.

39.    The left side of the residence was inaccessible due to a large, green, leafy, bush.  An upside down medium sized wooden picnic table was observed partially positioned into the large green leafy bush and partially positioned into the front yard.

40.    On the right side of the residence, there was a small, black iron gate affixed to a standard chain link fence, approximately four feet tall.  The right side of the chain link gate was observed to be partially ajar and opened towards the street.  FIT investigators observed and took note of the fact that the chain link fence gate was missing the typical latch that would be utilized to secure and or close the gate.  Investigators also noted that there was a metal chain near the top right corner of the left gate door.  This chain had a locked Master lock

CITY DEFENDANTS - 001862

connecting the two ends of the chain together. It was observed to be without a key positioned into the locking mechanism. The metal chain was observed to only be affixed to the left gate door, not the right gate door. It was apparent to FIT investigators that the gate, without any working latching mechanism, was insufficient to keep a canine properly secured.

41. A divided concrete driveway, with grass observed to be growing between the tire paths, extended from the street to the gate of the chain link fence.

42. The yard behind the chain link fence, to the right of the residence, appeared to be cluttered with assorted debris, including wood debris, metal debris, and other junk-like materials, such as tools, tool parts, and vehicle parts. The yard appeared unkempt and cluttered.

43. A blood trail was observed along the divided concrete driveway towards the street.

44. A white For F-150 was parked on the curb in front of ███████████ The vehicle bore a Wisconsin license plate ████████. Parked perpendicular to the white F-150, behind the white F-150, facing ████████ was a fully marked NOPD Ford Explorer, bearing vehicle number 15056. The NOPD vehicle was parked facing the divided driveway of ████████████

45. Two spent shell casings were observed positioned in the roadway near the rear, left side, of the marked police vehicle.

46. Sergeant Barnes observed several drops of blood leading from ████████████ to the Southern sidewalk of Jonquil Street, where the Pitbull had been treated and removed from the scene by SPCA Unit 41, James Carll.

47. For a more complete and accurate description of the scene, please refer to the crime scene sketch compiled by the scientific criminal investigation division, a copy of which has been placed into the criminal case file.

48. After observing and securing the scene, Sergeant Barnes began to canvass the 2400 block of Jonquil Street for witnesses to the incident.

### Canvass

49. On Saturday, July 30, 2016 at 9:47 AM Sergeant Barnes met with the resident of ████ identified as Debra Lebeauf, a black female with a date of birth of ████████████ and obtained a recorded statement.

50. On Saturday, July 30, 2016 at approximately 10:04 AM Sergeant Barnes knocked on the door at ████████████ and met with Residents Randy Stewart (B/M ████████ ) and Sandra Stewart (B/F ████████ .

CITY DEFENDANTS - 001863

51.     On Saturday, July 30, 2016, at 10:00 AM, Sergeant Regina Williams assisted with a canvass of an officer involved shooting that occurred in the 2400 block of Jonquil Street. The results of the canvas are as follows:

52.     At 3831 Clematis Street, at 10:00 AM, Sergeant Williams observed this was Skinny's Tavern. No one was at the business. There were no visible surveillance cameras on the business. The business had posted hours of Monday through Saturday 4:00 PM until.

53.     At 2428 Jonquil Street, 10:03 AM, Sergeant Williams observed a pad lock on the outside gate to the property and there was no other access to the residence.

54.     At ██████████, 10:04 AM, Sergeant Williams spoke to Floyd Tribble, a black male with a date of birth of ██████████. Mr. Tribble stated he did not see or hear anything because he was sleep.

55.     At 2432 Jonquil Street, 10:06 AM, there was no answer and there were no cameras.

56.     At ████████ 10:07 AM, Sergeant Williams spoke to Nassera Ducre, a black female who refused to provide a date of birth, with phone number ████████ Ms. Ducre stated the dog was very aggressive towards the neighbor that lived next to the dog's residence. The dog would not let the neighbor get to her vehicle to go to work. Ms. Ducre was not sure if the dog bit anyone before, and stated she never had any experiences with the dog.  Ms. Ducre stated she did not witness the shooting, but she heard at least 2 gunshots.

57.     At ████████ 10:10 AM, Sergeant Williams spoke to Mr. Robert Butler, a black male who refused to provide a date of birth. Mr. Butler stated he heard two shots, but did not witness the shooting.

58.  At 2440 Jonquil Street, 10:12 AM, Sergeant Williams knocked at the residence and she received no answer.

59.     At 2442 Jonquil Street, 10:13 AM, Sergeant Williams observed the residence was locked and secured with a padlock on the outside gate that led to the front door of the residence. Sergeant Williams did not notice any vehicles at the residence that would have indicated someone was home.

60.     At ████████ 10:14 AM, Sergeant Williams spoke to Joycelyn Owens, a black female who refused to provide a date of birth, and she stated she was asleep at the time of the shooting and she has not had any interaction with the dog in the past.

61.     At 2458 Jonquil Street, 10:19 AM, Sergeant Williams knocked at the residence, but she noticed there was a padlock on the door with a keypad for a real estate agency. No one answered the door.

62.     During her canvass, Sergeant Williams did not observe any video surveillance on any of the above residences.

CITY DEFENDANTS - 001864

63.    Beginning at 10:00 a.m. Sergeant Davis participated in an area canvass for witnesses on the odd side of Jonquil Street. The results of that canvass were as follows:

64.    At ▆▆▆, on the right side apartment, at 10:02 AM, Mr. John Thomas, heard two (2) shots and provided a recorded statement.

65.    At 2411, on the left side apartment, at 10:04 AM, there was no answer.

66.    At 2417, at 10:06 AM, there was no answer.

67.    At 2427, at 10:07 AM, investigators determined the location was unoccupied.

68.    At 2433, at 10:10 AM, there was no answer.

69.    At ▆▆▆ at 10:10 AM, Sergeant Davis met with Judy Maclauchlan. Ms. Maclauchlan stated she observed the dog loose and stated the dog had a history of aggression. Ms. Maclauchlan provided a recorded statement.

70.    At ▆▆▆ at 10:16 AM, Sergeant Davis met with Katrice Eugene. Ms. Eugene stated she heard two shots, but did not witness the incident.

71.    At 2445, at 10:17 AM, there was no answer.

72.    At ▆▆▆ at 10:18 AM, Sergeant Davis met with Ms. Zenia Diaz. Ms. Diaz stated she heard two shots, but did not witness the incident.

73.    At 2449, at 10:24 AM, there was no answer.

74.    At 2451, at 10:25 AM, there was no answer.

75.    At ▆▆▆ at 10:27 AM, Sergeant Davis met with Ms. Annette Taylor. Ms. Taylor stated she heard two shots, but did not witness anything.

76.    At 2459, at 10:29 AM, there was no answer.

77.    At 2461, at 10:30 AM, there was no answer.

78.    At 2463, at 10:30 AM, there was no answer.

79.    Lieutenant Kevin Burns assigned Sergeant Davis to document the collection of evidence by arriving Crime Lab technician Brittany Thomas, unit 5111, which began at 11:28 a.m. The items collected are as follows:

80.    On Saturday, July 30, 2016, at 11:28 a.m. Crime Lab Technician B. Thomas took photographs of ▆▆▆▆▆▆ from multiple angles. Technician Thomas also

CITY DEFENDANTS - 001865

photographed a Ford F-150 pickup truck, bearing Wisconsin License plate ████, which was parked in front of the residence.

81. At 11:34 AM, Technician Thomas took overall photographs of the scene.

82. At 11:38 AM, photographs of two spent .40 caliber casings were taken.

83. At 11:39 AM, photographs of blood on scene were taken.

84. At 11:41 AM, whole body, 360 degree, photographs of Officer Nigel Daggs were taken.

85. At 11:43 AM, photographs of Officer Daggs C.E.W and C.E.W display were taken.

86. At 11:43 AM, photographs of one unused C.E.W. cartridge were taken.

87. At 11:45 AM, photographs of Glock model 22 .40 Caliber firearm, serial Number NO-0353-PD, were taken.

88. At 11:45 AM, photographs of Glock model 22 magazine were taken. It should be noted that the magazine had been recharged by Officer Desmond Rochon of the Training academy prior to it being photographed.

89. At 11:52 AM, photographs of overall scene from an elevated position.

90. At 11:54 AM, photographs of a trash can, on the even side of Jonquil Street, containing a dog collar with what appeared to be blood on it.

91. At 11:57 AM, Crime Lab Technician Monesha Bell, unit 5113, rendered a sketch of the scene.

92. At 12:09 PM, Crime Lab Technician Brittany Thomas began to collect the following pieces of evidence from the scene:

93. At 12:09 PM, Technician Thomas collected a brown dog collar with blood on it from the trash can on the even side of Jonquil Street.

94. At 12:10 PM, Technician Thomas collected one spent Winchester Smith and Wesson .40 caliber shell casing, marked by evidence marker 1.

95. At 12:10 PM, Technician Thomas collected one spent Winchester Smith and Wesson .40 caliber shell casing, marked by evidence marker 2.

96. Upon collection of all evidence by crime lab, Sergeant Davis and members of the Force Investigation Team removed all crime scene tape and secured from the scene. Upon securing from the scene, Sergeant Davis transferred all photographs taken, using his department issued cell phone, and provided the photographs to Sergeant Travis Ward.

CITY DEFENDANTS - 001866

Sergeant Davis also provided the recorded statements provided by Mr. John Thomas and Ms. Judy Maclauchlan to Sergeant Ward.

97.    On Saturday, July 30, 2016 at 8:41 AM, Sergeant Christina Watson, unit ███ of the Public Integrity Bureau's Force Investigation Team, was notified by Lieutenant Kevin Burns, unit ███ of the same unit, of a level 4 use of force that occurred in the 2400 block of Jonquil Street.

98.    At 9:19 AM, Sergeant Watson arrived in the 2400 block of Jonquil Street. Sergeant Watson conferred with Lieutenant Burns and learned he wanted her to secure the officers body worn cameras (BWC).

99.    At 9:30 AM, Sergeant Watson relocated to NOPD marked police Ford Explorer Interceptor #15056. Vehicle #15056 was parked front first into the driveway between ███ and ████████ Sergeant Watson learned the vehicle was assigned to Officer Nigel Daggs, as he was seated in the driver's seat. Sergeant Watson advised Officer Daggs to deactivate both his BWC and the In Car Camera system. Officer Daggs relinquished possession of his BWC over to Sergeant Watson. Sergeant Watson advised Officer Daggs that he would need to complete a force statement and he could contact a legal representative, if he wished to do so. Sergeant Watson instructed Officer Daggs to meet her at the Third District Station when he was allowed to leave the scene.

100.    At 9:33 AM, Sergeant Watson turned around to NOPD marked police Ford Explorer Interceptor #16008, which was parked perpendicular to the rear of vehicle #15056. Sergeant Watson learned the vehicle was assigned to Officer Arianne White, as she was seated in the driver' seat. Sergeant Watson advised Officer White to deactivate both her BWC and the In Car Camera system. Officer White relinquished possession of her BWC over to Sergeant Watson. Sergeant Watson advised Officer White that she would need to complete a force statement, which she could begin writing while on scene.  Sergeant Watson instructed Officer White to meet her at the Third District Station when she was allowed to leave the scene.

101.    Sergeant Watson opted to review the officer's BWCs on scene, which would give the investigating sergeants a clearer picture of the events that occurred. Sergeant Watson instructed Officer White to have a seat in Sergeant Watson's loaner police vehicle. Officer Daggs had five (5) BWC videos, while Officer White had four (4) videos. Sergeant Watson labeled and PIB restricted both officers BWC videos.

102.    At 1:20 PM, both Officer Daggs and White emailed Sergeant Watson their force statements prior to ETOD.

103.    At 1:30 PM, Sergeant Watson provided Officer Daggs with the phone number to departmental psychologist Dr. William McDermott.

104.    On Monday, August 1, 2016, at 1:14 PM, Sergeant Watson placed the five (Daggs-3; White-2) In Car Camera videos associated with the incident on a disc.

CITY DEFENDANTS - 001867

105. On Wednesday, August 3, 2016, at 7:41 PM, Sergeant Watson placed Officer Daggs (5) and White's (4) BWC videos on a disc.

**Academy**

106. On Saturday, July 30, 2016, at approximately 9:53 AM, Officer Desmond Rochon, unit 5733, a firearms instructor assigned to the Municipal Training Academy, unloaded Officer Daggs's departmentally issued firearm in the presence of Sergeant Samuel Davis and Sergeant Regina Williams. Officer Rochon removed the magazine, which contained 12 live rounds, and unloaded one live round from the chamber prior to inspecting Officer Daggs's firearm. Investigators observed Officer Daggs's firearm was a NOPD issued Glock Model 22, .40 caliber semi-automatic handgun, bearing serial number NO-0353-PD. The firearm was equipped with the departmentally approved "New York" trigger, loaded with departmentally approved Winchester .40 caliber ammunition, and appeared to be in good working order. At 9:55 AM Officer Rochon replaced two rounds of Winchester .40 caliber ammunition into Officer Daggs's magazine and instructed Officer Daggs to load and holster his weapon.

107. On Monday, August 1, 2016, Sergeant Barnes received an electronic copy of Officer Daggs's most recent Louisiana Post Firearm Qualification records. According to the document, Officer Daggs successfully qualified on September 30, 2015, and was current in his qualification at the time of the shooting. The record was accompanied by Officer Desmond Rochon's documentation of the shooting incident. The report from Officer Rochon provided Officer Daggs's firearm was in proper working order, and the ammunition used in that firearm was compliant with NOPD policy chapter 1.4.1.

**Evidence**

108. On Saturday, July 30, 2016, at approximately 11:28 AM, Scientific Criminal Investigations Section Technician Brittany Thomas photographed the scene and evidence. The items collected are as follows:
    a. At 11:28 AM, Technician Thomas took photographs of ███████████ from multiple angles, and photographed the Ford F-150 pickup truck, bearing Louisiana license plate 573-YGL, which was parked in front of the residence.
    b. At 11:34 AM, Technician Thomas took overall scene photographs.
    c. At 11:38 AM, Technician Thomas took photographs of the 2 spent .40 caliber casings.
    d. At 11:39 AM, Technician Thomas took photographs of blood on scene in front of 2417 Jonquil Street.
    e. At 11:41 AM, Technician Thomas took whole body, 360 degree, photographs of Officer Nigel Daggs.
    f. At 11:43 AM, Technician Thomas took photograph of Officer Daggs's C.E.W. and C.E.W. display.
    g. At 11:43 AM, Technician Thomas took photographs of one (1) unused C.E.W. cartridge.

CITY DEFENDANTS - 001868

      h. At 11:45 AM, Technician Thomas took photographs of a Glock, model 22, .40 caliber firearm, bearing serial number NO-0353-PD;

      i. At 11:45 AM, Technician Thomas took photographs of a Glock, model 22, .40 caliber magazine.  (It should be noted the magazine had been recharged by Officer Desmond Rochon prior to the photographs being taken).

      j. At 11:52 AM, Technician Thomas took photographs of the overall scene from an elevated position.

      k. At 11:54 AM, Technician Thomas took photographs of a trash can on the even side of Jonquil Street which contained a dog collar, with what appeared to be blood on it.

109. At 11:57 AM, SCIS Technician Monique Bell, unit 5113, rendered a sketch of the scene.

110. At 12:09 PM, Technician Brittany Thomas began to collect the evidence from the scene.  The following pieces of evidence were collected:

      a. At 12:09 PM, a brown dog collar with blood on it was collected from the trash can on the even side of Jonquil Street, directly across from ▮▮▮▮▮▮▮

      b. At 12:10 PM, one (1) spent .40 caliber Winchester Smith and Wesson shell casing (evidence marker 1).

      c. At 12:10 PM, one (1) spent .40 caliber Winchester Smith and Wesson shell casing (evidence marker 2).

111. After the listed evidence was photographed and collected, members of the Force Investigation Team removed all crime scene tape and secured the scene.

112. On Monday, August 1, 2016, at 12:43pm, Sergeant Watson telephoned the Louisiana Society for the Prevention of Cruelty to Animals (LASPCA) at (504) 368-5191. Sergeant Watson spoke with Dobbins in Enforcement about photographs of the dog. Dobbins advised there was one photograph of the dog, but she had to get permission from her supervisor before releasing it.

113. On Tuesday, August 9, 2016, at 4:36pm, Sergeant Watson received four photographs of the dog via email from LASPCA/James Carll.

114. On Tuesday, August 2, 2016, at approximately 12:56 PM, Officer Nigel Daggs relocated to the Scientific Criminal Investigations Section at 2219 Lakeshore Drive, and met with NOPD's Firearms and Tool Mark Examiner Sean McElrath.  Examiner McElrath conducted a test fire of Officer Daggs's departmentally issued weapon for comparison to the spent shell casings on the scene.

115. On Tuesday, August 9, 2016, Sergeant Ward received a scientific analysis report from Examiner McElrath which indicated that the spent shell casings collected on the scene matched the reference shell casing that was fired from Officer Daggs's weapon.

CITY DEFENDANTS - 001869

116.   While on scene, Sergeant Barnes was informed by LASPCA Officer James Carll that he believe the bullet had fragmented against the Pitbull's shoulder, shattering the bone. Sergeant Barnes contacted the Metairie Small Animal Hospital and spoke with a Ms. Shondelle. Sergeant Barnes was informed that if the veterinarians who operated on the Pitbull had recovered a bullet it was discarded, and she was unable to locate a record for the Pitbull.

**Statements and Video Footage**

### Statement of Mrs. Debra Lebeauf

117.   On Saturday, July 30, 2016, at 9:47 AM, Sergeant Barnes met with the resident of ███ identified as Debra Lebeauf, a black female with a date of birth of ███ and obtained a recorded statement. In her statement, Ms. Lebeauf informed Sergeant Barnes she woke up in the morning at approximately 5:00 AM and heard a dog constantly barking. She opened her door to investigate and observed the dog on her front porch. Mrs. Lebeauf stated the dog eventually left, but continued to bark. At approximately 6:00 AM she called her daughter to tell her about the dog and contacted the SPCA. After receiving no response from the SPCA she contacted the NOPD non-emergency line (821-2222) and was informed there no units available at the time. She then attempted to contact the SPCA again and left a message. The dog continued to bark and roam the neighborhood acting viciously.

118.   At approximately 7:00 AM Mrs. Lebeauf received a call from her son-in-law, a sheriff's deputy with the Orleans Parish Sheriff's Office, who stated he was coming over. Mrs. Lebeauf stated that when her son-in-law, Michael Ward, arrived she observed him fighting the dog off the front porch with a chair. She then stated her son-in-law then called the police and informed them they needed to have a unit respond as soon as possible because the dog was being aggressive. Mrs. Lebeauf then informed Sergeant Barnes that prior to her son-in-law arriving, she observed an unknown man walking his dog in the 2400 block of Jonquil Street when the aggressive canine began to attack and attempt to "hump" the other dog while it was being walked on a leash. Sergeant Barnes, upon researching canine behavior, discovered an article authored by Pat Miller, an "International Institute for Applied Companion Animal Behavior" endorsed dog trainer, and Training Editor for the *Whole Dog Journal*. The Article, entitled, "Dog Mounting and Dog Dominance Behavior," establishes that, "Nonsexual mounting of other dogs is generally a dominance, control, or challenge behavior..." Sergeant Barnes believes that the "humping" actions of the Pitbull were actually the Pitbull displaying dominance, control, or challenge behavior.

119.   Mrs. Lebeauf informed Sergeant Barnes that the aggressive dog belonged to the tenant of the property a ███ who she knew as Raymond Egana. She stated she attempted to contact Mr. Egana at a number she previously had for him and was unsuccessful. Mrs. Lebeauf further informed Sergeant Barnes that there were neighbors living down the street who also saw the aggressiveness of the dog. Sergeant Barnes learned from Mrs. Lebeauf that her daughter arrived at the location and was unable to get into the house and went to a neighbor's house down the street until the dog was no longer a threat.

CITY DEFENDANTS - 001870

120.    Mrs. Lebeauf informed Sergeant Barnes that when the New Orleans Police Officer arrived, he spoke to a neighbor down the street and observed the dog roaming the neighborhood. She stated a second officer arrived to assist. Mrs. Lebeauf then stated the first officer observed the dog went back into the yard at ███████████ and asked her son-in-law if he could help distract the dog while he secured the gate.

121.    Mrs. Lebeauf stated the dog "kept coming" at the officer, was barking and was vicious, and she believed the officer was "in fearful of his life" and he shot. She stated the dog then limped away and went back onto the porch of ██████████ Mrs. Lebeauf provided Sergeant Barnes with a contact number of ███████ This concluded the recorded statement with Mrs. Lebeauf.

### Statement of Mr. Randy Stewart

122.    On Saturday, July 30, 2016, at approximately 10:04 AM, Sergeant Barnes knocked on the door at ████████████ and met with residents Randy Stewart (B/M ███████) and Sandra Stewart (B/F ████████ Mr. Stewart provided Sergeant Barnes with a contact number of ██████████ and Mrs. Stewart provided Sergeant Barnes with a contact number of ██████████

123.    Mr. Stewart, in an audio recorded statement taken on Saturday, July 30, 2016, at 12:11 PM, informed Sergeant Barnes that at about 7:30 AM, on Saturday, July 30, 2016, he was mowing his lawn when an aggressive dog charged him from behind and head-butted his right leg so hard he was almost knocked to the ground. Mr. Stewart said he ran inside to escape the dog and retrieved his firearm. Once Mr. Stewart observed the dog had relocated down the street near ██████████████ he continued to mow his lawn, keeping his gun with him in case the dog returned. Mr. Stewart informed Sergeant Barnes that if the dog had come back to his residence at ████████████, he was going to shoot the dog. This concluded the statement given by Mr. Stewart.

### Statement of Mrs. Sandra Stewart

124.    On Saturday, July 30, 2016, at approximately 10:10 PM, Sergeant Barnes spoke with Mrs. Sandra Stewart at ████████████ Mrs. Stewart informed Sergeant Barnes that when she learned of the aggressive dog she called the police. Mrs. Stewart then stepped onto her front porch to get a description of the dog to provide to the police call operator and observed the dog on the porch of ██████████ barking. Mrs. Stewart then observed Mrs. Lebeauf's daughter arrive at the location and relocate to a neighbor's residence until it was safe to go to ██████████ Sergeant Barnes did not obtain a recorded statement from Mrs. Stewart because she had a prior engagement to attend to and left the location.

### Statement of Deputy Michael Ward

CITY DEFENDANTS - 001871

125.     On Saturday, July 30, 2016, at or about 9:50 AM, Sergeant Travis Ward met with and attempted to obtain an audio recorded statement from Deputy Michael Ward, a black male with a date of birth of ██████████.

126.     Deputy Ward advised that he was called to his mother-in-law's house at ██████████ Street after she advised him that there was a dog running loose in the street. Deputy Ward advised that once he arrived, he was immediately approached by the dog in an aggressive manner. Deputy Ward grabbed a metal chair that was on the porch area of ██████████ Street and fought the dog off by pushing it away with the chair. Deputy Ward was then able to relocate inside of the residence. Deputy Ward stated he then called 911 and advised there was a Pitbull dog on the loose and that the police were needed. Deputy Ward then advised that he observed the marked police vehicle arrive into the block and he exited the porch area. He then advised that he and the officer then devised a plan in which he would relocate to the rear yard of ██████████ nd make noise by banging on the chain link fence in order to distract the dog long enough for the officer to close the gate and secure the dog in the rear yard area of ██████████ Deputy Ward then stated that he began to make noise on the fence and observed the Pitbull relocate to the rear yard of ██████████ Street. It was at this time that the officer closed the gate to the rear yard area and attempted to latch it, but the dog turned around and charged towards the front of the house. Deputy Ward stated that he observed the dog jump up and hit the gate with his front two paws, which opened the gate. Deputy Ward then stated that he heard the officer yelling commands at the dog and then heard two quick gunshots followed by the sound of the dog crying.

127.     Sergeant Travis Ward then concluded the statement by Deputy Ward. It was later learned there was a malfunction with the digital audio recorded statement by Deputy Ward and the statement was not captured or saved. Sergeant Travis Ward's recorder was replaced after the incident.

### Statement of John Thomas

128.     On Saturday, July 30, 2016, at approximately 10:03 AM, Sergeant Samuel Davis met with and obtained an audio recorded statement from Mr. John Thomas, who resides at ██████████

129.     Mr. Thomas informed Sergeant Davis that he heard two shots, came outside and saw the dog on the porch of ██████████ Mr. Thomas also informed Sergeant Davis that he has seen the dog be aggressive before, but the dog usually stays in the yard because it acts like a guard dog.

130.     Sergeant Samuel Davis then concluded the interview with Mr. Thomas.

### Statement of Judy Maclauchlin

131.     On Saturday, July 30, 2016, at approximately 10:12 AM, Sergeant Samuel Davis met with and obtained an audio recorded statement from Ms. Judy Maclauchlin, who resides at ██████████

CITY DEFENDANTS - 001872

132. Ms. Maclauchlin informed Sergeant Davis that she observed the dog loose on the porch, blocking her inside and keeping her neighbor from going to work. Ms. Maclauchlin also stated that the dog was keeping another neighbor from getting to the house. Ms. Maclauchlin stated she saw the police arrive and later heard three (3) shots. Ms. Maclauchlin then stated that her neighbor "Sandy" came over and told her that the dog was lunging at the police and they had to shoot it. Sergeant Davis asked her to describe what she meant by "loose on the porch." Ms. Maclauchlin then informed Sergeant Davis that she meant on Mrs. Debra's porch. Ms. Machlauchlin stated the people in the neighborhood were trying to get the dog off of the porch because the dog has a history of aggression. Ms. Maclauchlin stated that the dog chased her friend down the street one time and she believes people have been bitten before by the dog.

133. Ms. Maclauchlin informed Sergeant Davis that she observed the dog on Mrs. Debra's porch and observed that whenever Mrs. Debra attempted to get out the dog would lunge at her. Ms. Maclauchlin also stated she heard the police officer yelling prior to hearing the shots, and after hearing the shots. Ms. Maclauchlin also stated that she believes the dog is left alone and mistreated by the owners.

134. Sergeant Davis then concluded the interview with Ms. Maclauchlin.

### Statement of Mr. Raymond Egana (owner of the canine)

135. On Saturday, July 30, 2016, at approximately 11:45 AM, Mr. Raymond Egana, a black male with a date of birth of ███████████, who resides at ███████████ with a phone number of ███████████ arrived on the scene and requested to speak with Sergeant Ward. Sergeant Ward relocated to the outer perimeter (outer tape barrier) and introduced himself and advised that he was the lead investigator for the incident. The interview with Mr. Egana was audio recorded. The following is a summation of the interview with Mr. Egana:

136. Mr. Egana advised that he was the owner of the canine, and that the canine was a six year old pit bull named "Frank." Mr. Egana stated that he tied Frank up in the front part of the rear yard at about 9:30 PM the night before. He stated that he stayed out all night and had not been home since. Mr. Egana was surprised to learn that Frank got out, but did mention that he has had trouble with "kids" coming into his yard and taking Frank to fight other pit bulls. Mr. Egana stated adamantly that he does not fight his dogs and does not allow other people to use his dog for fighting.

137. Mr. Egana stated that Frank was wearing a collar and metal chains. Sergeant Ward asked Mr. Egana to describe Frank's mannerisms. Mr. Egana stated that Frank was, "a beautiful dog, he don't bother nobody," and, "he loves children." Sergeant Ward then asked Mr. Egana if Frank has been on any medication. Mr. Egana stated that Frank wasn't on any medication. Sergeant Ward then asked Mr. Egana when the last time he fed Frank was. Mr. Egana stated that he fed Frank the day before at about 4:30 PM. Sergeant Ward asked if Frank has been subjected to animal fights. Mr. Egana stated, "No." Sergeant Ward asked if there was a reason known to Mr. Egana why Frank would act aggressively.

CITY DEFENDANTS - 001873

Mr. Egana stated, "He don't like lawnmowers." Mr. Egana continued to say he believed that the people he got Frank from may have antagonized the dog with lawnmowers and bikes. He stated that Frank doesn't like anything loud. When asked, Mr. Egana stated that Frank would try and grab lawnmowers when they would crank on and that he would also try to grab a weed eater, or a drill, or any type of machine.

138. Sergeant Barnes then asked Mr. Egana where exactly Frank was tied up. Mr. Egana stated that he was tied up behind the second gate, towards the rear of the yard.

139. Sergeant Ward then concluded the interview with Mr. Egana.

### Statement of Officer Arianne White

140. On Wednesday, August 3, 2016, at approximately 2:00 PM, Officer Arianne White provided a voluntary witness statement at the Public Integrity Bureau Office, in interview room one. Those present for the taking of the statement were Sergeant Travis Ward and Sergeant Regina Williams, of the Force Investigation Team, Officer Arianne White of the Third District, and Mr. Donovan Livaccari, the attorney for Officer White. The witness officer statement began at approximately 2:01 pm and was audio recorded.

141. The following information is a summation of Officer Whites' witness officer statement. For a complete record of the statement, please refer to the audio recording that has been made a permanent part of the case file.

142. Sergeant Ward asked Officer White to describe what she knew about the incident. Officer White stated that unit 321 requested assistance concerning an aggressive dog. When she arrived she learned from a neighbor that the dog was being aggressive and harassing everybody. Officer White stated that she observed some phone numbers on the overhang near the driveway. Officer White tried the phone numbers, but received no response. She stated that she attempted to get SPCA to come out, but was advised by NOPD dispatch that they (SPCA) were notified. She then stated that they came up with an idea to have the dog distracted while Officer Daggs closed the gate, but it wasn't executed properly because in her opinion the neighbor didn't make enough noise to distract the dog while Officer Daggs closed the gate. She stated that the dog did go into the rear of the yard but once Officer Daggs attempted to close the gate, the dog saw him and "shot out" towards him (Daggs). She stated that Officer Daggs attempted to retreat at which point the dog hit the gate and was on him (Daggs). She stated that Officer Daggs took out his service weapon and discharged. She stated that she was able to get back into her vehicle while this was going on.

143. Sergeant Williams then asked Officer White who was unit 321. Officer White stated "Daggs."

144. Sergeant Ward then asked what information she had about the incident prior to arrival. She stated "none." Sergeant Ward asked if she had ever been to that location before. She stated "no."

CITY DEFENDANTS - 001874

145. Sergeant Ward asked her if she had a good line of sight to the gate from where she was positioned. She stated that she did. Sergeant Ward then asked if she observed anything located on the gate that could have been used to secure it. She stated that she saw a length of chain that she thought Officer Daggs could have used to wrap around the gate and secure it. Sergeant Williams then asked if Officer Daggs used it to secure the gate. Officer White stated that he didn't have enough time to use it, the dog heard him and came for him.

146. Sergeant Williams asked what Officer Daggs was doing when she got to the scene. She stated that he was keeping eye an on the dog and standing by his vehicle, and that he had just requested SPCA to the scene. She stated that she also requested for the SPCA to make the scene.

147. Sergeant Williams asked her if there were any other people out at the scene. She stated the neighbor was coming in and out of his residence. She then stated that a subject who lived to the left of the house where the dog was located came out. She stated that they asked him to go back into his house and he responded with "Fuck yall, I'm gone." Sergeant Williams then asked to clarify about the other neighbor, the sheriff's deputy. Sergeant Williams asked Officer White if she observed him have any interaction with the dog. She stated that she didn't see that.

148. Sergeant Williams then asked to clarify about the phone numbers that she called. She asked where those numbers were located. Officer White stated that the numbers were located on the overhang near the car port area. Sergeant Williams then asked if she was able to speak to anyone from the numbers that she called. Officer White stated that she did get in touch with one person; however, he was questioning why she was calling him. She advised that she was trying to notify the owner of the dog that he was loose, but the person was uncooperative.

149. Sergeant Ward asked if she observed any signs on the property that warned of the dog. She stated that she saw a sign on the open gate that warned "beware of dog."

150. Sergeant Williams asked Officer White if she saw where Officer Daggs fired his weapon. She stated "yes." Sergeant Williams then asked if Officer Daggs' weapon was pointed in a way that someone could have been struck. Officer White stated "No, we were in a very confined area, I was back inside my vehicle, Daggs was to my right, the dog was to my left, it was just us in a triangle, we were very confined, no one could have been hit or struck."

151. Sergeant Williams then asked Officer White if she believed that deadly force was necessary in this incident. Officer White stated "yes I do." Sergeant Williams then asked if a Taser or an ASP could have been used to stop this dog. Officer White stated "No, it would have just made him angry."

152. Sergeant Ward asked Officer White if she was able to determine the type of dog in the short amount of time that she saw it. She stated that she wasn't a big dog person, but believed it was a Pit Bull.

CITY DEFENDANTS - 001875

153.   Sergeant Williams then asked what happened after the dog was shot. Officer White stated that dispatch was notified and that she activated her emergency button on her radio. She stated they called for the rank and asked dispatch to notify SPCA again. Sergeant Williams asked what the dog did after being shot. She stated that he stopped in his tracks, whimpered a little bit and then relocated back to the porch area. She then stated that she was notified by the Seventh District that they were going to send over their desk officer to assist with getting the dog because she was good with dogs. Officer White stated that she didn't think that was a good idea due to the fact that the dog was so aggressive. Sergeant Williams asked if this was before or after Officer Daggs shot. She stated that this was before, but the officer never made it to the scene.

154.   Sergeant Williams then asked what happened after the shot on the scene. She stated that they notified Sergeant Mushatt and then erected crime scene tape to secure the scene.

155.   Sergeant Williams asked her if she observed the SPCA officer arrive and what happened. She stated that she had moved her vehicle down the street a little but observed SPCA arrive and take control of the dog with the rope pole and relocate towards the SPCA vehicle.

156.   Sergeant Williams then asked if there was any communication about the incident between herself and Officer Daggs. She stated they named the dog "sunshine" because they had sympathy for the dog. She stated "He really didn't want to shoot the dog, I didn't want to see the dog shot, but I didn't want to see any of us getting bit either."

157.   It was learned that Officer Whites' Body Worn Camera and Mobile Video Unit were activated during this incident and that she was wearing her ballistic vest.

158.   Sergeant Ward then asked Officer White if there were any tools or training that she could think of that could have been useful in this incident. Officer White stated that the SPCA needs to be more readily available and have an emergency phone number provided.

159.   Sergeant Williams asked Officer White if there were any tools that could be available to officers to assist in these types of incidents in the future. Officer White stated she wasn't sure what type of tools could be used, but felt that since this is what the SPCA is trained to do, they should be more readily available.

160.   Sergeants Ward and Williams then exited the room to confer with their fellow members. Upon their return, Sergeant Ward ended the witness officer statement at approximately 2:16 pm.

### Statement of Officer Nigel Daggs

161.   On Wednesday August 3, 2016 at approximately 1:15 pm, Officer Daggs arrived at the offices of the Public Integrity Bureau to provide a voluntary criminal statement. He was accompanied by his attorney Mr. Donovan Livacarri.

CITY DEFENDANTS - 001876

162.     The statement began at approximately 1:21 pm, and was audio recorded with a digital audio recorder and video recorded with a video surveillance system.

163.     Sergeant Ward began by advising Officer Daggs of his rights against self-incrimination from a rights of arrestee form number 257154. At the completion of advising Officer Daggs of his rights, Officer Daggs indicated that he understood his rights by stating "yes." Officer Daggs then marked the Yes box located on the rights of arrestee form indicating that he understood his rights. Sergeant Ward then asked Officer Daggs if he wished to make a statement at this time. Officer Daggs responded with an audible "Yes." Officer Daggs then signed his name in the space provided and checked off the box that stated he signed and would waive his rights.

164.     Sergeant Ward then began to conduct the statement with Officer Daggs. Those present for the statement were Sergeant Travis Ward of the Force Investigation Team, Sergeant Regina Williams, also of the Force Investigation Team, Officer Nigel Daggs of the Third District and Mr. Donovan Livacarri, the attorney for Officer Daggs. The statement began at approximately 1:22 pm.

165.     The following is a summation of the statement from Officer Daggs. For a complete review of the voluntary criminal statement with Officer Daggs, please refer to the audio recorded statement that has been made a permanent part of the case file.

166.     Sergeant Ward asked Officer Daggs to describe what he could recall concerning this incident.

167.     Officer Daggs stated at about 8:00 am, he received a code 2 dispatch to investigate a call of a dog in the 2400 block of Jonquil that was attempting to bite several of the residents. When he arrived in the area, he was stopped by one of the complainants who advised that he was cutting his grass when the dog lunged at him and attempted to bite him on his face. Officer Daggs advised that the complainant indicated to him that he feared for his life. The complainant then directed Officer Daggs to where the dog was located. Officer Daggs then relocated approximately three houses down the street where he observed the dog on a porch. He then spoke with a complainant who resided next to where the dog was located. Officer Daggs then advised that the neighbor advised him the dog had attempted to bite him and he had to pick up a chair to fight the dog off. (It should be noted that this information confirms what Deputy Michael Ward stated during his interview on the scene, concerning having to use a chair to defend himself from the dog)

168.     Officer Daggs then stated he instructed everyone outside not to agitate the dog. Officer Daggs observed the dog exit his porch and begin to walk towards the rear yard area. Officer Daggs then observed the dog lunge at the neighbor while the two were talking.

169.     Officer Daggs stated the dog would walk around the area a little bit and then go back onto the porch area. Officer Daggs then stated that he requested NOPD dispatch to contact the SPCA to come to the scene. Officer Daggs even requested NOPD Canine to relocate to the scene and attempt to corral the dog (Sergeant Barnes later reviewed the incident details

CITY DEFENDANTS - 001877

and noted there was no response from NOPD Canine prior to the use of force occurring). He stated that he requested two additional times for the SPCA to arrive on the scene. Officer Daggs stated that he was advised by NOPD dispatch that they were not getting a response from the SPCA and all calls went to voice message.

170. Officer Daggs then stated he observed the dog walk back into rear yard area and lay down next to a bag of dog food. Officer Daggs stated he and the neighbor, who he observed was an Orleans Criminal Sheriff's Office Deputy, began to talk about different ways to attempt to secure the dog. Officer Daggs and Deputy Ward devised a plan where Deputy Ward would relocate to his rear yard on his raised porch and attempt to distract the dog. Deputy Ward was able to get the attention of the dog and caused it to relocate to its rear yard area. Officer Daggs believed that he could secure the dog in the back-yard area by closing the gate. Officer Daggs was successful in closing the gate, but at that time the dog noticed that he was there. The dog then charged towards Officer Daggs who at this point was in the process of tactically retreating towards his vehicle while keeping an eye on the dog. Officer Daggs observed the dog burst through the gate and continue to pursue Officer Daggs.

171. Officer Daggs then removed his firearm and pointed it at the dog in hopes that it would cause the dog to stop charging towards him. However, the dog kept closing the distance between them. Officer Daggs then felt that his safety was in jeopardy. Officer Daggs then discharged his weapon twice and believed the dog was struck once in the front leg. Officer Daggs then advised that this caused the dog to stop his aggressive demeanor. The dog then relocated to the porch area.

172. Officer Daggs then advised that SPCA made the scene where he assisted the SPCA Officer in placing the dog into the SPCA vehicle for transport to a veterinarian.

173. Officer Daggs then stated that he advised dispatch that he had a discharge and requested his rank to the scene.

174. Sergeant Williams then asked Officer Daggs to clarify what happened during the incident where he and the deputy were talking and the dog came out and lunged at him (Deputy). Officer Daggs stated that the deputy was able to quickly get back inside his residence at that time before being bitten. Sergeant Williams then asked where Officer Daggs was located at this point. Officer Daggs stated that he believed he was standing outside the door of his vehicle at that time.

175. Sergeant Williams then brought Officer Daggs' attention to the point of the incident where the dog was in the back yard and he was attempting to secure the gate. Sergeant Williams asked Officer Daggs if he felt that the gate was secured at that point. Officer Daggs then stated that the gate was not secured at all due to the fact that there was no latch or hinge to secure the gate. Officer Daggs then advised that there was a large chain that was wrapped around the gate but he was unable to lock or secure the gate. (This information was confirmed through the initial investigation at the scene that the chain was locked together by a pad lock at both ends.)

CITY DEFENDANTS - 001878

176. Sergeant Ward asked Officer Daggs if he had ever been to that location prior to this call for service. Officer Daggs stated that he hadn't been there before and had no calls for service at that location. Sergeant Ward asked Officer Daggs what information was provided to him prior to his arrival at the scene concerning the dog. Officer Daggs stated that the only information he had from NOPD dispatch was that dog was being very aggressive. He stated that one of the complainants on the scene advised him that the dog has gotten out before and was aggressive at that time.

177. Sergeant Ward asked Officer Daggs what his level of personal experience was with dogs. Officer Daggs stated that he did not own any dogs. Sergeant Ward then asked if he had any phobias or fears about dogs. Officer Daggs stated that he did not.

178. Sergeant Ward asked if any other NOPD officers were present during the discharge of the weapon. Officer Daggs stated that Officer Arianne White was present. Sergeant Ward then asked if there were any other bystanders who were in any danger of being struck by Officer Daggs' bullets. Officer Daggs stated that he had previously instructed everyone to go inside their house.

179. Sergeant Ward asked Officer Daggs what was going through his mind when the dog charged towards him. Officer Daggs stated that he believed that the dog was going to be very aggressive and that he could have been severely harmed by the dog.

180. Sergeant Ward asked if there were any other force options available to him at that time. Officer Daggs stated "No." Sergeant Ward then asked if he felt if a less than lethal option would have been as effective during this incident. Officer Daggs stated "No."

181. It was learned that Officer Daggs was wearing his ballistic vest during the incident and that his Body Worn Camera and Mobile Video Unit in this vehicle were both turned on and recording during the incident. Officer Daggs then stated that he did deactivate his BWC for a brief moment after he felt the scene was safe while he spoke with his supervisor Sergeant Sherman Mushatt, but was instructed to reengage his BWC by his Sergeant Mushatt.

182. Sergeant Ward asked Officer Daggs if he was under the influence of alcohol or any controlled dangerous substances during this incident. Officer Daggs stated "No."

183. Sergeant Williams then asked Officer Daggs if he arrived to the scene prior to Officer White. Officer Daggs stated that he arrived first. Sergeant Williams asked if Officer White was his back up unit. Officer Daggs stated "Yes." Sergeant Williams then asked in what manner Officer White assisted. Officer Daggs stated that Officer White stayed back by the cars in a cover position, while he attempted to close the gate.

184. Sergeant Ward then asked Officer Daggs if there was any training or tools that he could have had that could have assisted him in this incident. Officer Daggs stated that he hasn't received any training on how to handle this type of situation. Officer Daggs stated that the availability of the SPCA to come out and assist would have been beneficial.

CITY DEFENDANTS - 001879

185.    Sergeant Ward then asked if there was anything that the NOPD could do better in order to help train its officers to handle this type of incident. Officer Daggs stated that maybe if a dog catching pole was available, then he may have not had to use his weapon in this incident.

186.    Sergeants Ward and Williams then stepped out of the interview room to confer with their fellow detectives. Upon reentering the room, Sergeant Ward concluded the statement at 1:44 pm.

### Body Worn Camera Footage

187.    On Monday, August 1, 2016, Sergeant Barnes reviewed the body worn camera footage captured by Officer Daggs body worn camera.

188.    Officer Daggs's footage began as he arrived in the area of the 2400 block of Jonquil Street. Officer Daggs was overheard speaking with a complainant who advised that she lived at ███████████ and couldn't get into her house. Officer Daggs asked her what the dog was doing. She replied that the dog kept charging at her mom's property and that her mom wasn't able to leave the house. She then advised that her brother in law was a sheriff's deputy named Michael Ward. While Officer Daggs was speaking to the female, a male voice, later identified as Randy Stewart, was overheard stating that he was cutting his grass and the dog came after him. Officer Daggs then requested back up units to his location. Officer Daggs then instructed the complainants to "Watch out," that the dog was back out. At that point in the footage, a dog could be overheard barking. Officer Daggs then yelled, "Sit, Sit," and traveled down the street in his vehicle towards ███████ Street. Officer Daggs positioned his vehicle facing the driveway of ██████████████ and partially opened the driver's door and it appeared he begin looking for the dog. Officer Daggs was overheard stating to someone outside that the dog was inside the fence area. Officer Daggs then requested dispatch to contact the NOPD Canine unit to see if they had some type of pole to assist in retrieving the dog. Sergeant Barnes did not hear a response from dispatch regarding the request from the NOPD Canine unit.

189.    Officer Daggs continued to give several orders to the dog to "sit," and to "get back into your yard." Officer Daggs was then overheard speaking with Deputy Ward, who was located in the house at ██████████████ speaking through the screen door. Officer Daggs then advised dispatch that the dog was located in the yard, but he felt that if he approached the dog would attack. Officer Daggs stated that he was trying not to use any force. Officer Daggs requested SPCA to the location again.

190.    Approximately 13:35 minutes after arriving on scene Officer Daggs and Officer White could be heard discussing how to restrain the dog in the yard. Officer Daggs stated, "I'm trying not to put this dog down."

191.    Approximately 14 minutes into the footage, Officer Daggs was contacted by Sergeant Anika Glover, unit 730A, who advised that she could send a member of her platoon who was

CITY DEFENDANTS - 001880

a "dog lover," out to try and retrieve the dog. Officer Daggs advised that the dog was aggressive and asked if the responding officer had the proper equipment. Unit 730 then advised that they did not have any equipment, but had, "snacks" and "other things to get dogs."

192.  Approximately 15 minutes into the footage, Officer White attempted to call two different phone numbers affixed to the carport of ██████████████ Officer White received an answer at one of the phone numbers; however, the subject who answered the phone refused to identify himself or provide any information.

193.  After waiting several more minutes, Officer Daggs was overheard formulating a plan with Deputy Ward, in which Deputy Ward would make noise in his rear yard to distract the dog while Officer Daggs attempted to secure the gate.

194.  At the 23:47 mark in the footage, Officer Daggs approached the open gate and began to close it. As Officer Daggs closed the gate, it made a loud noise which alerted the dog to his presence. Officer Daggs then retreated back towards his vehicle as the dog ran toward him. At the 23:59 mark in the footage, Officer Daggs was seen pointing his weapon at the approaching dog, which was steadily closing the distance to Officer Daggs. Once the dog was located between the front of Officer Daggs's police vehicle and the rear of the parked F-150, only a few feet from Officer Daggs, Officer Daggs fired his weapon twice. The dog was struck by the gunfire and began to screech. Officer Daggs then ordered the dog to get down by yelling "down" multiple times. The dog then turned away from Officer Daggs and relocated to the porch of ██████████████ Officer Daggs and Officer White were then heard advising dispatch of the shooting.

195.  No further use of force or information pertinent to the use of force was observed on the body worn camera footage of Officer Daggs.

196.  Sergeant Barnes then reviewed the body worn camera footage of Officer Arianne White. In that footage, Sergeant Barnes observed Officer White arrived on scene to assist Officer Daggs with the call for service. On the footage, Officer White was seated in the driver's seat of her vehicle speaking to Officer Daggs about their potential options regarding the dog. Officer White then attempted to call two different phone numbers affixed to the carport of ██████████████ Officer White received an answer at one of the phone numbers; however, the subject who answered the phone refused to identify himself or provide any information.

197.  The body worn camera footage from Officer White's camera did not catch the shooting itself; however, at the time of the shooting the footage captured audio of the incident. Officer Daggs can be heard formulating a plan with Deputy Michael Ward and can be heard yelling commands at the Pitbull. Just prior to the shots, Officer White screamed to alert Officer Daggs of the impending danger of the Pitbull. Two shots were heard and Officer Daggs gave commands to the Pitbull.

CITY DEFENDANTS - 001881

198.     No other force or information pertinent to the decision to use force was observed on the body worn camera footage of Officer White.

## In-Car Camera Footage (MVU)

199.     Sergeant Barnes then reviewed the in-car camera (mobile video unit referred to as MVU) footage from unit B15056, the unit assigned to Officer Daggs on July 30, 2016. Sergeant Barnes observed the MVU footage showed Officer Daggs arrived near 2431 Jonquil Street at approximately 8:07:25 AM. On the footage, three people can be seen flagging down Officer Daggs and pointing in the direction of ▇▇▇▇▇▇▇▇ where the Pitbull was located. Officer Daggs stopped his vehicle and spoke with the subjects about what the Pitbull was doing, who the owner was, and if the owner could be contacted. One of the individuals, later identified as Randy Stewart, advised Officer Daggs that he was attacked by the Pitbull and retrieved his firearm in case he had to shoot the dog. Officer Daggs instructed Mr. Stewart to put his gun away. Officer Daggs then contacted dispatch to ask for backup units to assist him with the call. Officer Daggs listened to the concerns of the citizens until approximately 8:10:47 AM, when he told the citizens to watch out because the dog was back out.

200.     Officer Daggs then drove his vehicle towards ▇▇▇▇▇▇▇▇ and radioed dispatch to ask for an SPCA unit to assist. On the footage the Pitbull can be heard barking loudly as Officer Daggs yelled commands for the dog to "sit" as he approached 2417 Jonquil Street in his vehicle. The footage then shows Officer Daggs drove the vehicle to the end of the driveway of ▇▇▇▇▇▇▇▇ with the vehicle facing the front porch area of the residence, the dog was heard continuing to bark loudly off camera.

201.     At approximately 8:14:15 AM Officer Daggs asked dispatch if the NOPD Canine unit would be available to assist, or had any equipment, to restrain the dog. At approximately 8:17:00 AM Officer Daggs informs Deputy Michael Ward, who is in the doorway of ▇▇▇▇ ▇▇▇▇▇▇▇▇ that they're trying to get someone out to help so they won't have to put the dog down. At 8:18:26 AM Officer Daggs informed dispatch that the dog is in the yard and that he is worried if he tries to close the gate at that point (while the dog is in the front portion of the back yard) the dog may attack him, and that he's trying to avoid using force against the dog.

202.     At approximately 8:18:54 AM, Officer Daggs is contacted by 730(A) about the member of her platoon who will be coming to help restrain the dog. The video continues to corroborate and capture the same actions of Officer Daggs and Officer White as the body worn camera footage of the officers. For the next several minutes Officer Daggs, Officer White, and Deputy Michael Ward, attempt to contact the owner of the dog, and discuss what possible options to take to secure the dog.

203.     At approximately 8:26:24 AM, Officer Daggs, moved his camera to face the side yard of ▇▇▇▇▇▇▇▇ and zoomed in on a for sale sign mounted on the chain-link gate in an attempt to read the phone number on the sign, however, the camera was unable to capture the numbers clearly so that Officer Daggs can read them.

CITY DEFENDANTS - 001882

204.    At approximately 8:28:17 AM, approximately 21 minutes after Officer Daggs arrived on scene, Officer Daggs developed a plan and communicated to Deputy Ward to make noise to district the dog from his backyard, so the dog will be distracted towards the rear of the yard, so that Officer Daggs could close the front gate.  At approximately 8:29:20 AM, the dog can be heard barking at Deputy Ward in the rear yard as Officer Daggs approached the front gate of ████████████ to secure it, with the dog safely inside of the yard.

205.    At 8:29:33 AM, Officer Daggs was seen retreating from the chain link gate.  He stepped hastily backwards to keep an eye on the Pitbull.  At 8:29:35 AM the Pitbull was seen charging towards Officer Daggs, ramming the chain link gate open, and continuing towards Officer Daggs quickly, barking loudly and bearing his teeth.  As the dog reached the front left side of Officer Dagg's vehicle, just at the street curb, Officer Daggs fired two shots.  The dog, just off camera, was heard screeching as Officer Daggs screamed commands at the dog to get down.  At 8:30:08 AM, the dog relocated to the front porch of ████████████ Officers Daggs and Officer White then notified dispatch of the discharge and asked for a supervisor.

206.    No further force is captured on the in-car camera footage.

### Policy Review

207.    Sergeant Barnes reviewed NOPD Chapter 1.3 regarding use of force.  The chapter states, "Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective."  Sergeant Barnes determined that the incident under investigation involved an animal which reasonably appeared to pose an imminent threat to Officer Daggs and others in the area.  Given those circumstances, Officer Daggs was authorized to use his firearm to stop the Pitbull.

208.    Sergeant Barnes also observed that chapter 1.3 states, "Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer)."  Sergeant Barnes's investigation revealed that Officer Daggs did develop a reasonable contingency plan to deal with the animal when he attempted to secure the animal in the yard of ████████████ with the assistance of Deputy Michael Ward.

209.    According to chapter 1.3, when the reasonable contingency plan was implemented and failed, Officer Daggs would not have been prohibited from shooting the Pitbull, a dangerous animal.  Chapter 1.3 states, "Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical."

### Credibility Assessment

CITY DEFENDANTS - 001883

210.    Based on the investigation, the involved officers and witnesses, with the exception of Mr. Egana, appear to be credible. Each of the statements is supported by evidence and there are no discrepancies in the statements that need clarification.

211.    Sergeants Barnes and Ward did attempt to verify Mr. Egana's statement, in which he stated the Pitbull was properly tied up in the rear yard of ███████████████ The investigators relocated to the yard and were unable to locate any evidence of a chain, leash, or tie, which the dog would have been secured by according to Mr. Egana's statement. Therefore, Sergeant Barnes does not believe Mr. Egana's statement is entirely credible.

**Communications**

212.    On Saturday, July 30, 2016, at approximately 6:18:32 AM, communications created an incident under item number G-32358-16. The comments on the incident recall indicate that a female relayed there is a brown dog loose in the block of 2400 Jonquil Street. The complainant stated that the dog was aggressive and the operator could hear the dog barking in the background. At 6:22:17 AM the female relayed the dog was at her front door and she was unable to get out of the location.

213.    At 6:54:44 AM, a female caller, under the same item number, relayed information that the dog was still loose and aggressive, and that neighbors on the block were afraid to leave their homes.

214.    At 7:42:33 AM, a call was received under item G-32358-16, from Lenzie Lebeauf, who stated a neighbor was cutting grass and was attacked by an aggressive, grayish, pit bull that was loose in the area. She was unsure if the neighbor needed EMS and believed he went inside of his house.

215.    At 7:58:44 AM, a call was received, under the same item number, from a male caller who stated he was attacked by the pit bull. The comments further relayed that the male was threatening to shoot the dog.

216.    On Saturday, July 30, 2016, at approximately 8:00:37 AM, item G-32401-16, for the same incident as G-32358-16, was created. The comments documented on the incident recall for item G-32401-16 relayed that there were at least two parties on scene, there was a lost, stray, or unwanted animal on scene, the animal was dangerous, the animal was not confined, and that the incident was in progress. The incident under item number G-32401-16 was classified as a code 2 priority call, while the incident under G-32358-16 was classified as a code 1A priority call. Even after the caller under G-32358-16 relayed that the pit bull had attacked a person and it was unknown if EMS was needed, the call was not upgraded to a code two. Eventually, after the use of force, G-32358-16 was marked up as a duplicate of G-32401-16.

217.    The above listed information, documented under item G-32401-16, was documented in in the comments on the computer assisted dispatch system (CAD), and would have been available for Officer Daggs to read.

CITY DEFENDANTS - 001884

218. On Monday, August 8, 2016, Sergeant Barnes reviewed the 911 call audio for items G-32358-16 and G-32401-16. On the 911 call audio for items G-32358-16 a female caller is heard calmly informing the call operator that there is a loose pit bull in the neighborhood, and asks for assistance. The operator informs her that the SPCA will be notified. The call then ends. The same caller calls back shortly after and informs the call operator that the dog is at her front door and won't leave her porch and she can't get out of her house.

219. Shortly afterwards, another female caller calls and informs the call operator that the dog has her mother trapped inside the house because he won't leave the porch. The caller informs the call operator that they have called and left two messages with the SPCA and no one has responded. Shortly after the same caller again calls and says that the dog is now trying to get in the front door of her mother's house at ███████████ The caller also informs the call operator that she believes the dog attacked one of her neighbors.

220. A male caller, identified as Deputy Ward, calls and informs the call operator that he needs a unit immediately. Deputy Ward informs the call operator that the pit bull is rabid and just attacked him. Deputy Ward insists that an officer is needed immediately, and states that he should have "shot his ass." Deputy Ward then informs the call operator that he has his weapon and that the dog is very aggressive. The call operator tells Deputy Ward that they will get someone out to the location. Deputy Ward responds by saying, "I'm gonna shoot him if you don't."

221. A female caller, identifying herself as "Lenzie," calls back to ask the status of the call. She states that her husband, a sheriff's deputy was just attacked by the dog.

222. There were no other 911 calls documented under item G-32358-16.

223. Sergeant Barnes then reviewed the 911 call audio for item G-32401-16. A female, later identified as Sandra Stewart, calls and informs the call operator that the dog attacked her husband at 2431 Jonquil Street, and the dog is now on the porch of her neighbor's house, named Debra Lebeauf. The Caller informed the call operator that the dog grabbed her husband's pants leg. The operator instructs the caller to stay inside and that she's going to send the call to the dispatcher and get an officer to them as soon as possible.

224. On Wednesday, August 3, 2016, Sergeant Barnes requested permission to monitor the taped transmissions on NOPD dispatch channel three (3), which pertained to item number G-32401-16. Upon reviewing the transmissions, Sergeant Barnes did not find that any pertinent information concerning the incident was withheld from Officer Daggs. Further, because of the nature of the call, Sergeant Barnes determined that when Officer Daggs arrived on scene, any updated information was relayed to him by the complainants that met him at his vehicle upon arrival.

225. Sergeant Barnes identified a few deficiencies in the communications section's handing of the incident. Sergeant Barnes was unsure as to why the first call, documented under G-32358-16, was not upgraded to a code 2 priority call after the information that someone had been attacked by the dog was received. Sergeant Barnes is also unsure as to why incident

CITY DEFENDANTS - 001885

documented under G-32401-16, was not determined, prior to dispatch, to be a duplicate of G-32358-16. The information was readily available to dispatch that the incidents were likely related at the time the second incident was created. Sergeant Barnes believes the first incident should have been upgraded to a code 2 priority call at 7:42 AM, when the information was received concerning the Pitbull attacking someone, and the possibility of EMS being needed. That information was received 18 minutes before the incident documented under G-32401-16 was received. Based on that information, the call could have been dispatched as a code 2 priority call approximately 18 minutes before Officer Daggs was dispatched. While this information may not have changed the outcome of the incident, it would have allowed for a more rapid response, and possibly could have provided a different opportunity for responding officers to resolve the incident.

**PIB history**

226.   Sergeant Barnes reviewed the PIB short form of Officer Daggs, as well as Officer Daggs's previous use of force incidents. Sergeant Barnes was unable to locate any uses of force similar in nature to the incident under investigation. Sergeant Barnes also found no prior disciplinary history associated with a use of force incident.

**Decision Point Analysis**

227.   At the time Officer Daggs made the decision to use force he was attempting to retreat from a pit bull who was aggressively charging at him, was capable of causing serious bodily injury, and posed a direct and imminent threat to Officer Daggs.

228.   During the investigation, prior to the use of force, Officer Daggs obtained information from several complainants that an aggressive pit bull was loose in the block and was attacking people. Officer Daggs waited for assistance for approximately 22 minutes prior to attempting to secure the pit bull in the rear yard of ▮▮▮▮▮▮▮▮▮▮ Prior to making the decision to attempt to secure the pit bull, Officer Daggs formulated a plan with Deputy Michael Ward which would allow Officer Daggs an opportunity to secure the chain link gate of 2417 Jonquil Street while the dog was being distracted in the rear yard.

229.   What Officer Daggs was unaware of upon executing the plan was that the latch on the chain link gate was inoperable. Upon reaching the gate and attempting to latch the broken gate, the pit bull charged aggressively charged him, and Officer Daggs resorted to deadly for to stop the threat of serious bodily injury or death.

**Tactical Analysis**

230.   Officer Daggs's tactics during the incident were consistent with NOPD policy and training.

231.   Officer Daggs may have been able to resort to his C.E.W. in an attempt to stop the pit bull from causing serious bodily injury; however, at the speed the canine was charging and

CITY DEFENDANTS - 001886

the angle at which Officer Daggs was to the canine, the C.E.W. likely would not have made contact and would have been less effective than his firearm at stopping the threat.

**Training Analysis**

232.　　The department does not train to deal with canines, this is a deficiency on the part of the department, at no fault of Officer Daggs. Sergeant Barnes recommends the Municipal Training Academy, in both the new recruit training and in-service training, implement a brief course on dealing with loose, potentially aggressive, animals. The class should be taught by, or in partnership with the LASPCA, so that officers will understand the potential options when dealing with canines, and what to do in the event the LASPCA is unavailable.

**Equipment**

233.　　Sergeant Barnes determined that during the investigation all of the equipment available to the involved officers functioned properly and was used in the manner intended. Sergeant Barnes did identify that Sergeant Travis Ward's recorded did not function properly during the on-scene investigation. Sergeant Ward's recorder was replaced after the incident.

234.　　Sergeant Barnes would recommend that each district be equipped with the proper tools to effectively deal with incidents of loose, potentially aggressive, canines. Sergeant Barnes researched some available options for humanely capturing canines and determined a viable option for the department would be the Animal Care Equipment and Services Rescue Tech Kit. The Kits retail for $169.60 to 193.70 depending upon the length of the animal dual release pole used to snare the canines. The poles range from 4 feet to 5 feet with an extension. The kits also include an extra cable lead, a pack of 25 slip leads (leashes), seven (7) color coded muzzles, and ID bands. Purchasing one four foot pole kit for each district would cost a total of $1,356.80, or $4,070.40 to purchase a kit for each watch, in each district. The kits with proper training by SPCA members on the use of the kits would help prevent future incidents on calls concerning canines and would help to eliminate the need to wait for SPCA in the event there is no animal control officer to respond. The kits are available for retail at http://www.animal-care.com.

**Policy Violations**

235.　　A review of NOPD Chapter 1.3, regarding use of force, revealed there were no policy violation resulting from the use of force.

**Summary of Investigation (findings)**

236.　　On Saturday, July 30, 2016, Sergeant Barnes and members of the Force Investigation Team investigated a critical discharge of a firearm by Officer Nigel Daggs. The incident involved an aggressive pit bull which charged at Officer Daggs and Officer Daggs shot and wounded the pit bull.

CITY DEFENDANTS - 001887

237.    The investigation of Sergeant Barnes determined that Officer Daggs was facing an imminent threat of serious bodily injury or death from an aggressive pit bull and fired his weapon at the pit bull in self-defense to stop the imminent threat.

238.    During the investigation Sergeant Barnes discovered Officer Daggs was not in violation of any departmental policies; however, he had not been properly trained or equipped on handling incidents involving loose, or aggressive, animals. This is not a deficiency on the part of Officer Daggs, however, it highlights a deficiency on the part of the department. Sergeant Barnes determine that the New Orleans Police Department failed to provide proper training to officers regarding the handling of situation involving loose, stray, unwanted, potentially aggressive animals, and failed to properly equip officers to handle such situations. The department, in light of the lack of training, also failed to establish a memorandum of understanding with the LASPCA which would provide for animal control officers to be available, when needed, for incident such as this.

239.    Sergeant Barnes determined the call initially was received at 6:18 AM, and was pending until approximately 8:03 AM. If an understanding had been established with the LASPCA, an animal control officer should have been available to assist long before Officer Daggs was placed in a position where he had to use force against the pit bull.

240.    Sergeant Barnes did determine that Officer Daggs did a commendable job in responding to the call when he received it, and ensuring the safety of the citizens in the area by placing himself in the line of danger. Officer Daggs waited approximately 22 minutes before taking any action against the dog, after attempting to contact the owner, SPCA, and other units who would be able to assist in the scenario. Officer Daggs then developed a plan which would place only himself in the line of danger in order to secure the dog in the rear yard of ████████. Officer Daggs patience in dealing with the situation and his willingness to place himself in danger to bring the situation to a safe and peaceful resolution for the citizens of New Orleans and the aggressive pit bull, deserve the praise and support of the New Orleans Police Department and the citizens of New Orleans.

**Recommendations**

241.    During the investigation Sergeant Barnes identified a deficiency in NOPD's arrangement with the LASPCA as to how they will handle calls for service concerning loose, potentially dangerous, canines. This is an area of policy which should be addressed.

242.    There were no tactical considerations which Sergeant Barnes identified as deficient during the incident.

243.    Sergeant Barnes identified training issues during the incident as it relates to how NOPD officers are trained to handle calls for service dealing with animals. Another training issue

244.    Sergeant Barnes identified an equipment consideration as a result of this incident that could help officers deal with canines in similar situations. Sergeant Barnes believes the

CITY DEFENDANTS - 001888

purchase of equipment, such as leashes, poles, and muzzles, to help control loose canines, would diminish the possibility of officers resorting to force when attempting to secure loose, potentially dangerous, canines.

245.     Sergeant Barnes did determine that Officer Daggs did a commendable job in responding to the call when he received it, and ensuring the safety of the citizens in the area by placing himself in the line of danger. Officer Daggs waited approximately 22 minutes before taking any action against the dog, after attempting to contact the owner, SPCA, and other units who would be able to assist in the scenario. Officer Daggs then developed a plan which would place only himself in the line of danger in order to secure the dog in the rear yard of ▮▮▮▮▮▮▮▮▮▮▮ Officer Daggs patience in dealing with the situation and his willingness to place himself in danger to bring the situation to a safe and peaceful resolution for the citizens of New Orleans and the aggressive pit bull, deserve the praise and support of the New Orleans Police Department and the citizens of New Orleans.

246.     Based on his investigation, and a review of NOPD chapter 1.3, Sergeant Barnes determined the force used in this incident was justifiable and was consistent with NOPD policy.

Respectfully Submitted,

Sergeant David A. Barnes
Force Investigation Team
Public Integrity Bureau

CONCUR / DOES NOT CONCUR

Date: 1-29-17

Lieutenant Kevin Burns
Force Investigation Team
Public Integrity Bureau

CONCUR / DOES NOT CONCUR

Date: 2/28/17

Commander Gwen Nolan
Public Integrity Bureau

CONCUR / DOES NOT CONCUR

Date: 3-39-17

Deputy Chief Arlinda P. Westbrook
Public Integrity Bureau

CITY DEFENDANTS - 001889

**Attachments**
Short form
**BWC Videos**
**Other Videos**
Sketch
**Scene photos**

CITY DEFENDANTS - 001890