**Firearm discharge          PIB Control Number: ASI # 2018-03          Received: Aug 08, 2019**

Item Number: H-09174-18

**Classification/Sub-classification: Weapon(s) Discharge / Animal - Hit**

**Officers / employees involved:**

**SENIOR POLICE OFFICER Jerome D Newsome [00548/025727]**

**Officer / employee current info:**

Bureau:  FOB - Field Operations Bureau
District / Division:  3rd District
Division Assignment:  Night Watch

**Snapshot - Officer / employee information at time of incident:**

Windows Username: 025727
Bureau:  FOB - Field Operations Bureau
District / Division:  Third District
Division Assignment:  C Platoon
Unit Assignment:  Patrol
Working Status:  Unknown Working Status
Shift Hours:  Unknown Shift Hours
Rank/title: SENIOR POLICE OFFICER
Age: 29   Years of employment: 5   Years with unit: 4
Off duty: No   Off duty employed: No

**POLICE OFFICER 1 Emilio Aleman [1835/028946]**

**Officer / employee current info:**

Bureau:  FOB - Field Operations Bureau
District / Division:  Communications
Division Assignment:  FOB

**Snapshot - Officer / employee information at time of incident:**

Windows Username: 028946
Bureau:  FOB - Field Operations Bureau
District / Division:  Third District
Division Assignment:  C Platoon
Unit Assignment:  Patrol
Working Status:  Unknown Working Status
Shift Hours:  Unknown Shift Hours
Rank/title: POLICE OFFICER
Age: 42   Years of employment: 3   Years with unit: 3
Off duty: No   Off duty employed: No

**Officer / employee witnesses:**

**POLICE OFFICER 1 Arden A Taylor [1112/029604]**

**Officer / employee current info:**

Bureau:  FOB - Field Operations Bureau

CITY DEFENDANTS - 001891

District / Division:  SOD
Division Assignment:  Reassignment/LTD

**Summary:**

Officers Newsome, Aleman and Arden Taylor, Jr. responded to a call for service in the 5100 block of Touro Street involving three large German Shepherds chasing kids in the area.  As the officers approached the area where the dogs were located, the rear yard of an abandoned residence ▇▇▇▇▇▇▇▇▇▇▇the dogs ran towards the officers while barking.  Officer Newsome fired his department-issued firearm four times at the dogs, while Officer Aleman fired his department-issued firearm two times at the dogs.  Two dogs were injured; one was euthanised, while the other was in stable condition.  The third dog was not injured.  Officer Taylor used no reportable force during the inicdent.  No other injuries were reported.

Deemed justified by vote of 3-0 by UOFRB on 2/14/19.

**When/where:**

Date/time occurred: Aug 08 2018  06:56

Incident Location:  5100 Touro Street  New Orleans LA 70122  Precinct: 3rd District
        County:  Orleans Parish

**Linked files:**

        ASI 2018-03   (pdf)
        H-09174-18 - Supplemental Criminal Report   (pdf)

**Status/assignment information:**

Status: Completed  Priority: ASI

Opened:  Assigned:     Due: 08/13/2019         Completed: 08/06/2019

Disposition: UOF Justified

Unit assigned: PIB F.I.T.
Handled at field/unit level: No
Investigator assigned: POLICE SERGEANT David Barnes
Supervisor assigned: POLICE SERGEANT Kevin Burns Jr.
Source of Information: NOPD Employee
Extension Due Date:

**Organizational component(s):**

Bureau: FOB - Field Operations Bureau
District / Division: Third District
Division Assignment: C Platoon
Unit Assignment: Patrol
Working Status: Unknown Working Status
Shift Hours: Unknown Shift Hours

Entered by:  POLICE LIEUTENANT John Helou on Aug 06, 2019 at 13:33

CITY DEFENDANTS - 001893

# New Orleans Police Department
## Public Integrity Bureau
## Force Investigation Team
## Administrative Shooting Investigation

**TO:**      Commander Regina Williams                    **DATE:**  1-21-19
Public Integrity Bureau

**FROM:**    Sergeant David A. Barnes
Force Investigation Team

**SUBJECT:**  ASI # 2018-0003 / NOPD Item # H-09174-18
Critical Discharge of a Firearm by Officers Newsome and Aleman (Canine Hit)

## Event Summary

On Wednesday, August 8, 2018, at approximately 7:11 AM, Sergeant David Barnes was notified by Lieutenant Kevin Burns of a critical firearms discharge by NOPD Officers Jerome Newsome and Emilio Aleman in the 5100 Block of Touro Street, New Orleans, Louisiana, 70122. The incident was documented under Administrative Shooting Investigation (ASI) number 2018-03 and NOPD Item number H-09174-18.

Sergeant Barnes arrived at the location at approximately 8:43 AM and learned the officers had responded to a call concerning three dogs chasing children in the area. Shortly after arriving Officer Newsome spoke with the complainant, who stated the dogs were aggressive. Officer Newsome then radioed for Officers Emilio Aleman and Arden Taylor, Jr., unit 316C, to assist him with trying to secure the dogs in the rear yard of ███████████ an abandoned house.

When the officers arrived they approached the driveway of the abandoned house. When the dogs became aware of the officers' presence two of the dogs began running towards the officers while loudly barking. Once the two dogs passed the gate and continued towards the officers, Officer Newsome fired four shots at the two dogs. As the officers backed away from the dogs, one of the dogs turned and ran towards Officer Aleman. Officer Aleman responded by firing two shots at the dog. Both of the dogs that charged towards the officers were injured during the incident. The third dog then ran from the backyard towards Selma Street and the injured dogs quickly followed. The officers then tailed the dogs as they ran to Elysian Fields Avenue and then back to Robin Street. On Robin Street the dogs' owner arrived and took custody of the dogs. The dogs were relocated to Metairie Small Animal Hospital where one of the dogs was euthanized due to her wounds. The other injured dog was treated and will recover.

There were no injuries to the officers or any human beings as a result of the discharge. Officers Newsome and Aleman remained on full-duty status after the incident.

CITY DEFENDANTS - 001894

ASI Number: 2018-03

## Notifications

On Wednesday, August 8, 2018, Lieutenant Kevin Burns Jr., of the Force Investigation Team (FIT), was notified at approximately 7:07 AM of a critical firearms discharge in the NOPD's Third District. Lieutenant Burns learned two officers had discharged their weapons and struck a dog at the intersection of Touro and Timoleon streets. At approximately 7:13 AM, Lieutenant Burns contacted PIB Commander Regina Williams and advised her of the incident. At approximately 7:16 AM, Lieutenant Burns contacted Ms. Tonya McClary of the Office of the Independent Police Monitor (OIPM) and advised her of the incident. Lieutenant Burns then notified Sergeant David Barnes of FIT and advised Sergeant Barnes that he would be the lead administrative investigator assigned to the incident.

At approximately 7:17 AM, Lieutenant Burns notified Detective Michael McCleery of the incident and advised Detective McCleery he would be the lead criminal investigator assigned to the incident. Detective McCleery then contacted Sergeant John Helou of FIT and informed him of the incident.

At approximately 7:26 AM, Lieutenant Burns notified PIB Deputy Chief Arlinda Westbrook of the incident.

At approximately 7:27 AM, Lieutenant Burns notified Sergeant Melanie Dillon of the Criminal Investigations section of PIB and requested her assistance with the investigation.

On Wednesday, August 8, 2018, at approximately 8:42 AM, Lieutenant Burns sent an email notifying members of the Office of the Consent Decree Monitor (OCDM) Retired Chief Chet Epperson and Chief Mitchell Brown. The same notification email included Special Agent Ron Reed of the Federal Bureau of Investigation. The New Orleans City Attorney's office was later notified by Lieutenant Kevin Burns.

## Force Investigation Team Response

On Wednesday, August 8, 2018, Sergeant Dillon arrived on scene at approximately 7:55 AM and met with Sergeants James Young and Karla Baker, of the Third District. Sergeant Young informed Sergeant Dillon two dogs had been shot by officers. Sergeant Young provided Sergeant Dillon with the name of the owner of the dog, Katherine Johnson, with a date of birth of an address of ██████████ and phone numbers of ██████████ and ██████████ Sergeant Young also informed Sergeant Dillon that one of the dogs who had been injured were identified as Ellie Johnson, a black and tan female German Shephard with a date of birth of ██████████ The other dog was identified as Burrito Johnson, a red and tan female German Shephard with a date of birth of ██████████ Sergeant Young informed Sergeant Dillon there was a third dog who was uninjured. That dog was identified as Astor Johnson, a black and tan female German Shephard with a date of birth of ██████████ Sergeant Young also stated that the canine, Burrito, had to be euthanized due to her injuries.

CITY DEFENDANTS - 001895

ASI Number: 2018-03

Sergeant Young then conducted a walk-through of the scene with Sergeant Dillon to inform her of the location of the evidence. Sergeant Dillon observed four spent shell casings located in the street of the 5100 block of Touro Street. Sergeant Dillon also observed two patches of hair in the driveway of ███████████████ Sergeant Young advised Sergeant Dillon there was a trail of blood on Touro Street to Robin Street.

While Sergeant Young was informing Sergeant Dillon of this information, Sergeant John Helou and Detective McCleery arrived at the scene at approximately 8:00 AM. Sergeant Dillon informed Sergeant Helou and Detective McCleery of the information she had learned. Sergeant Helou learned Officers Newsome, Aleman, and Taylor were all separately sequestered inside police vehicles. Officer Newsome was sequestered in vehicle B15122, Officer Aleman was in B15040, and Officer Taylor was in B16008.

Sergeant Helou noted that the police vehicles were parked as to prevent vehicle traffic from entering the scene. However, it was noted that there was no crime scene tape properly securing either the 5100 block of Touro or the 2100 block of Robin Street. Sergeants Helou, Dillon, Young, and Detective McCleary then properly secured the primary scene in the 5100 block of Touro Street with crime scene tape.

The secondary scene was the location where the dogs were picked up by their owners. Sergeant Dillon noted there was a small amount of blood spatter on the curb, in front of the open lot, between 2151 and 2161 Robin Street. Sergeant Dillon also observed a large puddle of water on the sidewalk where it appeared the dogs' blood was recently washed away by the neighbors. The 2100 block of Robin Street was then properly secured with crime scene tape

The Scientific Criminal Investigations Section (SCIS) was notified. While they were enroute, Sergeant Helou attempted to contact New Orleans Police Department (NOPD) Range Commander Lieutenant Hudson Cutno at 8:32 AM via telephone to inquire if a firearm instructor was enroute to the scene. Although the lieutenant did not answer the phone, he sent a text message advising the sergeant that he was currently in a meeting. Sergeant Helou replied to this message with a request for a firearms instructor to meet him at the scene. Sergeant Helou followed this text message with a telephone call to NOPD Firearms Instructor Shelia Matthews. Instructor Matthews informed Sergeant Helou that NOPD Firearms Instructor Desmond Rochon was enroute to the scene.

At approximately 8:43 AM, Sergeant Barnes arrived on scene and met with members of FIT. Lieutenant Burns advised Sergeant Barnes he would be conducting the administrative investigation of the critical firearms discharge.

At around 8:45 AM, Sergeants Helou and Dillon met with IPM McClary and briefed her regarding what they had learned about the incident to that point.

### Lead Investigators

Sergeant Barnes was assigned to conduct the Administrative Shooting Investigation. Detective Michael McCleery was assigned to lead the criminal investigation into this incident.

3

ASI Number: 2018-03

**<u>Involved Officer(s)</u>**

1. **SPO Jerome Newsome**          **Badge # 548**

Duty Assignment:                FOB / 3rd District / C Platoon
Employee ID:                    25727
Personal:                       Race: Black
                                Gender: Male
                                Date of Birth:  10/9/1989
                                Age:  28 years old;

Uniform Status:                 Class B (Summer) uniform.
Appointed to NOPD:              August 31, 2014  3 year, 11 month, member
P.O.S.T. Firearm Certification: October 23, 2017 (prior to this incident)
Body Armor Equipped:            Yes.
BWC:                            Yes.
Previous Serious Uses of Force: No Previous serious uses of force
PIB Short Form:                 Officer Newsome has one previous sustained formal
                                disciplinary investigation for failing to take appropriate and
                                necessary police action from September 2015, under PIB
                                control number 2015-569-P.
Employee Assistance:            Officer Newsome was provided information regarding the
                                Officer Assistance Program and contact information for the
                                Department's Psychiatrist Dr. Bill McDermott.

Attorney Involvement:           Donovan Livaccari (FOP Representative)
Injuries:                       None
Photos Taken:                   Overall Photographs of the scene were taken as well as
                                360-degree photographs of Officer Newsome.
Public Safety Statement:        Sergeant Young obtained a public safety statement from
                                Officer Newsome after arriving on scene.  A second public
                                safety statement was later taken by Sergeant John Helou
                                during the on-scene investigation.
Duty Status following CFD:      Full-duty

    <u>Sergeant Barnes observed that Officer Newsome did not smell of alcohol and</u> did not
appear to be under the influence of any mind-altering substances at the time of the on-scene
investigation.

1. **SPO Emilio Aleman**          **Badge # 1835**

Duty Assignment:                FOB / 3rd District / C Platoon
Employee ID:                    28946

4

CITY DEFENDANTS - 001897

ASI Number: 2018-03

| | |
|---|---|
| Personal: | Race: Hispanic |
| | Gender: Male |
| | Date of Birth: ███████ |
| | Age:  41 years old; |

| | |
|---|---|
| Uniform Status: | Class B NOPD Uniform. |
| Appointed to NOPD: | July 12, 2016 2 year, 1 month member |
| P.O.S.T. Firearm Certification: | April 10, 2018 (prior to this incident) |
| Body Armor Equipped: | Yes. |
| BWC: | Yes. |
| Previous Serious Uses of Force: | No previous serious uses of force. |
| PIB Short Form: | Officer Aleman has a previously sustained violation for failing to properly document a domestic violence incident from October 2017, under PIB Control number 2017-569-R |
| Employee Assistance: | Officer Aleman was advised of the Officer Assistance Program, but there is no indication he sought out, or felt he needed the assistance at the time of the investigation. |
| Attorney Involvement: | Donovan Livaccari (FOP Representative) |
| Injuries: | None |
| Photos Taken: | Overall Photographs of the scene as well 360 degree photos of Officer Aleman were taken. |
| Public Safety Statement: | Sergeant David Barnes obtained a public safety statement from Officer Aleman while on scene. |
| Duty Status following CFD: | Full-duty |

Sergeant Barnes observed that Officer Newsome did not smell of alcohol and did not appear to be under the influence of any mind-altering substances at the time of the on-scene investigation.

## Public Safety Statements

*A public safety statement is a statement by an involved or witness officer that describes the type of force used, the direction and approximate number of shots fired by the involved officer(s) and the suspect, the location of any injured persons, the description of any outstanding suspects, and the direction of the suspect's fight.  The public safety statement may also include the amount of time elapsed since the suspect was last seen, whether the suspect is armed, any other information that could assist in the apprehension of outstanding suspects, descriptions of any victims or witnesses, and a description and location of any known evidence.  The public safety statement may also include any other information needed to ensure public safety.  It should be noted, public safety statements are not recorded.*

## Public Safety Statement of Officer Jerome Newsome

5

ASI Number: 2018-03

On Wednesday, August 8, 2018, at around 9:00 AM, Sergeant Helou obtained a Public Safety Statement from Officer Newsome inside his police vehicle (B15122). Sergeant Dillon and Ms. McClary monitored this statement.

Officer Newsome stated he fired two times at the dogs in a west-bound direction as the charged at him and Officers Aleman and Taylor. The officers pursued the dogs southbound on Touro Street, turning left onto Selma Street (eastbound), left onto Elysian Fields (Northbound) and left onto Robin Street (westbound) following the shooting and remained with the dogs until they were picked-up by their owners. There were no remaining dogs on the loose from this incident. The majority of the evidence was located in the driveway of ███████ and the street directly in front of this residence. Additional evidence was located in the 2100 block of Robin Street.

Officer Newsome spoke with a Caucasian Male with a low cut/bald head wearing a black shirt who called 911 regarding the dogs. Officer Newsome also spoke with an African-American female (approx. 40 years old) inside a white vehicle in front of her residence at 5123 Touro Street. The officer believed this woman may have witnessed the shooting. Sergeant Helou then ended the public safety statement. The public safety statement was not recorded.

**Public Safety Statement of Officer Emilio Aleman**

On Wednesday, August 8, 2018, at approximately 9:16 AM, Sergeant Barnes met with Officer Emilio Aleman, unit 316C, and obtained a public safety statement. Aleman advised Sergeant Barnes that he believed he fired twice towards a brick house. Officer Aleman stated that the dogs Charged at Officer Newsome and Officer Newsome fired his weapon, then as the dogs retreated, they turned towards him and he fired two rounds, standing in the street, downward in the direction of a brick house. The dogs then fled South on Touro. Sergeant Barnes then ended the public safety statement. The public safety statement was not recorded.

**Public Safety Statement of Officer Arden Taylor**

On Wednesday, August 8, 2018, at approximately 9:25 AM, Sergeant Barnes met with Officer Arden Taylor, Jr. and obtained a public safety statement. Officer Taylor informed Sergeant Barnes that the officers approached the dogs and the dogs charged as the officers were near the street in front of an abandoned brick house. Officer Taylor stated that when the dogs charged he believed Officer Newsome fired approximately three shots and Officer Aleman fired approximately three shots. Officer Taylor advised that he was positioned between the two officers and did not discharge his firearm. Officer Taylor advised Sergeant Barnes that the dogs then fled South and went to Elysian Fields. The officers were able to catch up to the dogs near a dominoes on Elysian fields and the finally cornered the dogs in the 2100 block of Robin Street. Sergeant Barnes then ended the public safety statement. The public safety statement was not recorded.

6

CITY DEFENDANTS - 001899

ASI Number: 2018-03

## Subjects of Force

The subjects of force were identified as two German Shephard dogs.  The dogs were identified as:

1. Ellie Johnson, a black and tan female German Shephard with a date of birth of August 8, 2017.

    And

2. Burrito Johnson, a red and tan female German Shephard with a date of birth of August 8, 2017.

A third dog was on scene during the incident and was not injured.  That dog was identified as Astor Johnson, a black and tan female German Shephard with a date of birth of February 12, 2016.

## Scene Description

The scene was in the 5100 block of Touro Street, located within the Saint Anthony neighborhood in the Third Police District within the City of New Orleans. The 5100 block of Touro Street was bounded by Robin Street to the north and Selma Street to the south. The area was mixed residential and commercial, mostly residential.

The initial crime scene was in the 5100 block of Touro Street, in front of 5124 Touro Street, an abandoned residence, was a red brick structure with an elevated porch, and an approximately four foot tall chain link fence which secured the driveway and rear yard of the residence, with the gate on the driveway open. There was a wooden stick on the sidewalk in front of the unoccupied residence. Spent .40 caliber casings were located in the street and edge of the driveway of 5124 Touro Street. Those casings were marked with evidence cones one, two, three, and four. In the driveway of 5123 Touro Street were possible blood drops and spatter. They were marked by evidence cones five and six. Evidence cones 11 and 12 marked two clumps of hair that were on the sidewalk in front of 5124 Touro Street. The wooden stick previously mentioned was marked by evidence cone 13. A secondary scene was located in the 2100 block of Robin Street, between 2151 and 2161 Robin Street. Some possible blood drops and spatter was found on the curb between 2151 and 2161 Robin Street. That was marked with evidence cone seven. A short distance away was more possible blood drops and spatter on the curb marked by evidence cone eight. In the grassy area between the sidewalk and street was some possible blood, marked by evidence cone nine. A large pool of water on the sidewalk that appeared to have some possible blood mixed in with it was marked by evidence cone 10.

Information learned through investigation revealed after being shot, the dogs proceeded down Touro Street to Selma Street. The investigators found more possible blood drops and spatter in the 5100 block of Touro Street proceeding towards Selma Street. That was marked with evidence cone 14. Investigators found a possible blood trail proceeding down Selma Street and north on the West sidewalk of Elysian Fields Avenue. The possible blood trail continued

CITY DEFENDANTS - 001900

ASI Number: 2018-03

through a parking area of a strip mall in the 5200 block of Elysian Fields Avenue. Finally, in the driveway area of 2161 Robin Street, more possible blood drops and spatter were located, as well as blood drops and blood smeared on the passenger side of a gray Volvo C70 that was backed into the driveway.

According to the National Weather Service, the average temperature for Wednesday, August 8, 2018, was registered as 84 degrees, with an average humidity registered at 81 percent. Significant weather conditions noted were thunderstorms and fog, however, it was sunny, warm and dry during the time the investigation was conducted.

For exact measurements of the evidence recovered or for information concerning the crime scene, please refer to the crime scene report authored by Technician Lashay Robbins and the photographs of the scene taken by Technician Robbins.

### Involved Officer Statement(s)

### Statement of Officer Jerome Newsome

On Monday, August 13, 2018, at approximately 11:54 AM, Detective McCleery and Sergeant Barnes met with Officer Jerome Newsome (black male          ) at the PIB office, along with Officer Newsome's attorney, Donovan Livaccari, to provide a criminal statement. Detective McCleery advised Officer Newsome of his Constitutional Rights, per *Miranda*, from NOPD Form 153, which was titled "Miranda Rights." Officer Newsome acknowledged he understood those rights and signed the form, waiving his right against self-incrimination. Officer Newsome then provided the following information, in summary:

Officer Newsome stated he was working Wednesday, August 8, 2018 in the Third District on the night watch and had begun his shift at 10:25 PM on Tuesday, August 8, 2018 and was scheduled to finish his shift at 7:00 AM on Wednesday, August 8, 2018.  Sergeant Barnes asked Officer Newsome if he had a chance to review his BWC footage before the interview, which Officer Newsome stated he had not. Officer Newsome continued to state he was about go to the station when he received a "Code Two" call from the dispatcher of three German Shepherds in the area chasing children. Officer Newsome stated he arrived on the scene and was advised the complainant was located in front of 5124 Touro Street. Officer Newsome stated he went to 5124 Touro Street and found a white male in a black vehicle. The male informed Officer Newsome he had witnessed the dogs chase children in the area onto a school bus. Officer Newsome stated the male called the dogs "vicious" and the male was trying to close the gate of an abandoned house at 5124 Touro Street with his vehicle. Officer Newsome stated the male left at that point. Officer Newsome stated he didn't see the dogs at that point, but he called for additional units to assist him. Officers Aleman and Taylor arrived to assist Officer Newsome. Officer Newsome advised Officers Aleman and Taylor the dogs were in the back of the abandoned house. They then started to walk towards the gate when the dogs appeared in the rear corner of the yard. Once the dogs noticed the officers, they began to run at them and began to bark as they got closer, so the officers opened fire on the dogs.

8

CITY DEFENDANTS - 001901

Detective McCleery asked if they had formulated a plan prior to walking towards the gate. Officer Newsome stated the plan was to contain the dogs in the back yard. Detective McCleery asked if they were close to completing the plan. Officer Newsome stated they were unable to because the dogs ran after them. Detective McCleery asked Officer Newsome if he had ever received any training on dealing with dogs. Officer Newsome stated he hadn't. Detective McCleery then asked Officer Newsome if he recalled a Daily Training Bulletin (DTB) from May of 2017 that dealt with dogs. Officer Newsome stated he did not remember that. Detective McCleery asked Officer Newsome what occurred after he had fired his gun. Officer Newsome stated the dogs began to retreat, so he holstered his weapon and began to follow them in his car to make sure they were not attacking anyone else in the area. Officer Newsome stated they followed the dogs until the dogs' owner arrived on the scene.

Detective McCleery asked Officer Newsome if he had any interaction with the owner. Officer Newsome stated the owner was screaming, but he didn't really say anything to her. Detective McCleery asked if Officer Newsome recalled anything the owner may have said, with Officer Newsome recalling she said something like what happened and they didn't have to shoot the dogs. The owner also wanted someone to call her mother.

Sergeant Barnes then asked what information Officer Newsome had received from dispatch prior to arriving on the scene. Officer Newsome stated the information he received was there were three German Shepherds chasing kids in the area. Sergeant Barnes asked if they had gotten any other information. Officer Newsome stated the dispatcher advised them the LASPCA was notified. Officer Newsome stated he spoke with the complainant on the scene and the complainant had seen the dogs chase some kids onto a bus and that the dogs were vicious. Sergeant Barnes confirmed with Officer Newsome that he was told the LAPCA was notified, but he didn't recall if he did any follow up investigation on that matter. Sergeant Barnes asked Officer Newsome to describe what it was like when the officers first encountered the dogs. Officer Newsome stated they first encountered them as they were approaching the gate to lock it. The dogs were in a corner of the yard and when they turned and saw the officers the dogs began to run at them.

Detective McCleery advised Officer Newsome the Office of the Independent Police Monitor (OIPM) had a few questions they wanted addressed, but did not ask any questions from the OIPM at that time. Sergeant Barnes asked if Officer Newsome saw the dogs being vicious or aggressive towards anyone else. Officer Newsome stated there was no one else in the area so he didn't see them being aggressive towards anyone else. Sergeant Barnes had Officer Newsome draw a diagram where the dogs were originally and where the officers were when they began to run at the officers. Sergeant Barnes asked if the dogs ran at the officers or was it like the dogs were trying to get out of the yard. Officer Newsome stated the dogs ran at the officers while barking.

The investigators then stepped out of the interview room, leaving Officer Newsome and Mr. Livaccari in the room, to confer with the other members of FIT, as well as any representatives from the OIPM and the Office of Consent Decree Monitors (OCDM) members who were observing the interview from the observation room, to see if they had any questions

9

ASI Number: 2018-03

that weren't addressed to that point. Upon returning, Detective McCleery advised there were a few follow-up questions, with Officer Newsome stating the following, in summary:

Detective McCleery asked at what point did Officer Newsome notify his supervisor, as he sat in his vehicle for 10 minutes after receiving the information about the dogs. Officer Newsome stated he notified his supervisor after the officers had to take action on the dogs. Detective McCleery then asked Officer Newsome if he recalled checking on the status of the LASPCA, with Officer Newsome stating he didn't recall. Sergeant Barnes then asked Officer Newsome if he thought he did or didn't. Officer Newsome stated he didn't know.

Detective McCleery then asked why Officer Newsome made the comment that the dogs were going to have to be "taken out" before encountering the dogs. Officer Newsome stated he didn't recall making that comment before encountering the dogs. Sergeant Barnes asked Officer Newsome if he recalled making any comments about the possible outcomes of the situation. Officer Newsome stated that he made a comment about "taking out" the dogs, but didn't recall making that comment until after the incident when he told the Sergeant over the radio what had occurred. Sergeant Barnes asked if the officers had made a contingency plan prior to the incident in case they would have had to shoot the dogs. Officer Newsome stated he wasn't sure what Sergeant Barnes was asking him. Mr. Livaccari then clarified for Officer Newsome that Sergeant Barnes was asking if the officers had made a tactical plan before arriving on the scene. Officer Newsome stated the plan was to close the gate and try to contain the dogs. Sergeant Barnes asked if Officer Newsome thought there were any other viable options that could have been attempted. Officer Newsome stated he "don't really think about that and it's done." Sergeant Barnes then asked if Officer Newsome felt there was equipment that could have been used. Officer Newsome stated he hadn't been trained to use equipment for a dog. Sergeant Barnes then asked if there was some equipment Officer Newsome wished he had during the incident. Officer Newsome stated someone told him pepper spray would have helped. Sergeant Barnes asked if there was any training Officer Newsome could receive to help in a situation like this, but Officer Newsome couldn't think of any. Sergeant Barnes asked if Officer Newsome had ever encountered the dogs prior to the incident. Officer Newsome stated he hadn't. Sergeant Barnes asked Officer Newsome if he knew how the dogs had gotten out. Officer Newsome stated that after the fact, another officer told him the dogs had dug a hole and got out of the gate. Officer Newsome stated he didn't recall what officer told him that. Sergeant Barnes asked if Officer Newsome made any comments to the complainant, Mr. Damon Keller, about the possible outcomes. Officer Newsome stated he didn't recall what he told Keller, he just recalled what Keller told him. Sergeant Barnes asked if Officer Newsome felt a Conducted Electrical Weapon (CEW), or "Taser", would have been effective. Officer Newsome stated he didn't think they would have had a chance to "Taze" the dogs. He also added he hadn't been trained to use a CEW on a dog and with the spread of the wires from a CEW didn't seem like a viable option with the size of a dog's body. Sergeant Barnes commented that Officer Newsome kept referring to the officers as "us," following up with asking if the dogs were "charging" at Officer Newsome, specifically. Officer Newsome stated he didn't know exactly where the officers were, but they were all in the same general area and the dogs were running to the vicinity of where the officers were. Officer Newsome stated he felt that the dogs were coming towards where he was, though, as he was standing at the end of the driveway and the dogs were running towards the end of the driveway. Detective McCleery asked Officer Newsome how he would classify the demeanor of

10

ASI Number: 2018-03

the dogs. Officer Newsome stated the dogs were running towards him and barking and he felt they were being aggressive.

Detective McCleery asked Mr. Livaccari if he had any questions. Mr. Livaccari asked Officer Newsome if he recalled being asked earlier in the interview if he observed the dogs behaving viciously. Officer Newsome stated he recalled that. Mr. Livaccari stated Officer Newsome had answered no, with Officer Newsome stating the question was if he had observed the dogs acting viciously towards anyone else. Mr. Livaccari then clarified with Officer Newsome he was advised by the complainant (Keller) the dogs were acting viciously towards school children. Officer Newsome answered in the affirmative. Mr. Livaccari then commented that Officer Newsome felt the dogs were acting viciously towards him and the other officers. Officer Newsome stated he did feel that way because the dogs were "charging" at him and barking. Sergeant Barnes then confirmed Officer Newsome received information from Keller about the dogs acting aggressively towards school children and asked if Officer Newsome had received any information about the dogs' behavior from the dispatcher. Officer Newsome stated the dispatcher had advised him the dogs were chasing children in the area. Sergeant Barnes then asked if the dispatcher gave any information on the dogs acting viciously or aggressively chasing children. Officer Newsome stated the dispatcher advised him the dogs were chasing kids, so he took that to mean the dogs were being aggressive. Officer Newsome stated he didn't recall the dispatcher saying anything about the dogs being vicious, but the complainant (Keller) told him the dogs were vicious.

The interview was concluded at 12:19 PM and was audio and video recorded. The diagram drawn by Officer Newsome was placed into the case file.

### Statement of Officer Emilio Aleman

On Monday, August 13, at approximately 12:26 PM, Detective McCleery and Sergeant Barnes met with Officer Emilio Aleman (Hispanic male ▮▮▮▮▮▮) at the PIB office, along with Officer Aleman's attorney, Mr. Donovan Livaccari, to provide a criminal statment. Detective McCleery advised Officer Aleman of his Constitutional Rights, per *Miranda*, from NOPD Form 153, which was titled "Miranda Rights." Officer Aleman acknowledged he understood those rights and signed the form, waiving his right against self-incrimination. Officer Aleman then provided the following information, in summary:

Officer Aleman stated he was working on Wednesday, August 8, 2018 and he had received a call from Officer Newsome. Officer Newsome advised Officer Aleman he needed assistance to corral some dogs at about 6:50 AM. By the time Officer Aleman arrived on the scene, it was about 6:55 AM, Officer Aleman stated he parked near an abandoned house and, to the best of his recollection, he and his partner, Officer Arden Taylor Jr., got out of their vehicle and Officer Newsome got out of his. They then went to close a gate that was located to the right as you faced the front of the abandoned house. The house had a driveway that went straight back. Officer Aleman stated as they approached the gate, they didn't see any dogs. As they kept walking towards the gate, the dogs came out of the corner of the back yard and looked at the officers and started running towards them. Officer Aleman stated the dogs were three big German Shepherds. Officer Aleman stated the officers began to backpedal, but the dogs were

11

ASI Number: 2018-03

coming at the officers fast and aggressively. Officer Aleman stated the dogs were going towards Officer Newsome "showing some aggression and barking." Just before the dogs reached Officer Newsome, Officer Aleman stated Officer Newsome fired his weapon. At the sound of the weapon, Officer Aleman stated the dogs acted like they had been spooked and then began to "dart" in Officer Aleman's direction, like they were retreating, when one of the dogs did a "U-turn" and began to charge towards Officer Aleman. Officer Aleman stated he began to backpedal with his service weapon out. Officer Aleman felt that dog was right in front of Officer Aleman and getting ready to "pounce", so Officer Aleman stated he shot his weapon. Officer Aleman stated the dogs then darted away and the officers followed them until one of the dogs collapsed a street over, but Officer Aleman wasn't sure what the street name was, but he was pretty sure the abandoned house was located on Touro Street. Officer Aleman stated from what he remembered, Officer Newsome had responded to a call for service of dogs chasing kids.

Detective McCleery asked Officer Aleman if he had reviewed his BWC footage before the interview. Officer Aleman stated he hadn't. Detective McCleery asked if Officer Aleman had spoken with anyone on the scene besides the officers. Officer Aleman stated he didn't speak with anyone besides the officers on the scene. Detective McCleery then asked Officer Aleman that although he couldn't recall which street the dog collapsed on, if he could maybe recall any of the other streets the officers had followed the dogs on. Officer Aleman stated he didn't recall the names of the streets, but he could maybe look it up in Google Maps. Officer Aleman began to explain where the house was on Touro Street and where the officers were located. Sergeant Barnes asked Officer Aleman if he wanted to draw a diagram of where the dogs were originally and where the officers were when they began to run at the officers, which Officer Aleman stated he did. Officer Aleman explained the layout of the driveway at the abandoned house, where the dogs were originally located somewhere behind the house and how the officers approached the open gate to try and close it and how the dogs began to "dart" towards Officer Newsome. Officer Aleman also explained where Officer Newsome was when he shot his weapon. Officer Aleman further explained where he and Officer Taylor were located and how one of the dogs came at Officer Aleman, then did a double loop, so Officer Aleman fired his weapon at the dog. Officer Aleman explained where the dogs went after that until the dog collapsed and the owner showed up in a pickup truck. Officer Aleman stated that from what he remembered, the dogs walked in the shape of a "big block."

Detective McCleery asked if the owner was a male or female and Officer Aleman replied it was a female. Detective McCleery asked if the owner made any comments, but Officer Aleman stated he didn't remember her making any comments, but she was upset. Detective McCleery asked if there were any other civilian witnesses that Officer Aleman knew of. Officer Aleman stated when they first arrived on the scene, he only noticed Officer Newsome. He didn't recall any people during the incident because he was focused on the dogs. When the dog collapsed, Officer Aleman stated the owner pulled up in a truck by herself, with, possibly, her parents arriving on the scene with another male. They all left soon after to bring the dogs to an emergency animal clinic, Officer Aleman thought.

Sergeant Barnes asked Officer Aleman if he knew if the LASPCA was notified. Officer Aleman stated he remembered hearing it afterwards, but he was already on the way to the station when Officer Newsome contacted him, but he and Officer Taylor had already logged off the Mobile Digital Terminal (MDT). Sergeant Barnes asked if Officer Aleman had ever received any

CITY DEFENDANTS - 001905

ASI Number: 2018-03

training concerning dogs. Officer Aleman stated they had talked about it in the academy. Officer Aleman added that he was scared, and he was a dog lover and owner of two dogs, so he was the last person that wanted to be involved in this situation. Officer Aleman added he felt like he was going to get his "ass" chewed.

Sergeant Barnes asked Officer Aleman if the officer had developed a plan to deal with the dogs during their approach. Officer Aleman stated Officer Newsome had told him there were dogs in the back yard and a gate, so they would close the gate and wait for the LASPCA or the owners to arrive to take control of the dogs. Officer Aleman stated Officer Newsome knew the dogs were in the back yard because the caller had tried to close the gate themselves. The plan was to contain the dogs by closing the gate. However, the situation changed when the dogs "did the look" at the officers and "came at" them.

Detective McCleery asked if Officer Aleman knew how the dogs got out of the yard where they lived, with Officer Aleman stating he did not. Officer Aleman stated all he knew was that there were three ~~are~~ German Shepherds loose and chasing kids. Officer Aleman stated it was also around the time kids went to school. Sergeant Barnes asked Officer Aleman if he had ever encountered the dogs before, with Officer Aleman stating he hadn't. Sergeant Barnes then asked when the first time Officer Aleman had encountered the dogs. Officer Aleman stated it was when he saw them in the back yard with Officer Newsome. Sergeant Barnes asked if Officer Aleman had any information about the dogs before arriving on the scene or if Officer Newsome or the dispatcher notified him of anything concerning the dogs. Officer Aleman stated the only information he had was there were three dogs. He stated he didn't know what kind of dogs they were until they came from behind the house. Sergeant Barnes asked what Officer Aleman's "impression" of the three dogs. Officer Aleman stated his initial impression was that there were three dogs. His impression changed when the dogs looked and started towards the officers. Officer Aleman stated "like...they are coming at us." Sergeant Barnes asked Officer Aleman what his impression was then. Officer Aleman stated initially he was worried because the dogs were coming for the officers at a fast rate, then he felt scared, but he was more scared for Officer Newsome because the three dogs were going for him. Officer Aleman stated he didn't remember how many times Officer Newsome shot because of the "adrenalin and stuff." The dogs retreated, then one of the dogs made a U-turn and began to run at Officer Aleman. Officer Aleman stated he didn't want to pull the trigger, but he felt like the dog was "right there and getting ready to..." Officer Aleman then stated he felt like he and Officer Newsome were about to be bitten. Sergeant Barnes asked Officer Aleman if he thought there was anything else he thought could have been done while approaching the dogs. Officer Aleman stated it happened very fast and when you have three German Shepherds coming at you and the officers weren't close enough to close the gate, along with the LASPCA not there, Officer Aleman stated they couldn't just wait for the dogs to leave.

Sergeant Barnes asked if there was any equipment or training Officer Aleman felt could have helped in the situation. Officer Aleman stated he thought the officers did well, considering the situation. Sergeant Barnes stated he was concerned with improving training for the department and he wasn't second guessing Officer Aleman's or the other officers' actions. Officer Aleman then stated maybe if there was another officer there to draw attention away from the other officers, but the other officers on the shift had already gone back to the station and were about to get off work when the incident occurred. Sergeant Barnes and Mr. Livaccari clarified

13

CITY DEFENDANTS - 001906

ASI Number: 2018-03

Sergeant Barnes was asking if Officer Aleman could have any piece of equipment in that situation to avoid having to shoot the dogs, what would it be. Officer Aleman stated maybe a net to subdue the dogs without hurting them or, as Mr. Livaccari suggested, possibly a tranquilizer dart. Officer Aleman stated he thought more officers on the scene to draw the dogs' attention was good. As far as equipment, Officer Aleman thought something non-lethal would help. Officer Aleman stated that if you hit an animal with anything, they would "freak out", so a net to stop the dogs or a long pole to help close the gate would have helped. Sergeant Barnes asked if Officer Aleman observed the dogs exhibit any other vicious or threatening behavior towards anyone else other than the officers. Officer Aleman stated he didn't. Sergeant Barnes then asked if Officer Aleman spoke with anyone else besides the officers on the scene. Officer Aleman stated he didn't.

The investigators then stepped out of the interview room, leaving Officer Aleman and Mr. Livaccari in the room, to confer with the other members of FIT, as well as any IPM and OCDM members who were observing the interview from the observation room, to see if they had any questions that weren't addressed to that point.

Upon returning to the interview room, Detective McCleery advised there weren't any follow-up questions and concluded the interview at 12:45 PM. The interview was audio and video recorded. The diagram drawn by Officer Aleman was placed into the case file.

### Witness Officer Statements

### Statement of Officer Arden Taylor, Jr.

On Monday, August 20, 2018, at approximately 12:30 PM, Detective McCleery and Sergeant Barnes met with Officer Arden Taylor (black male             ) at the PIB office. Officer Taylor then provided the following information, in summary:

Officer Taylor stated he was working on the day in question and between 6:50 AM and 7:00 AM he and Officer Aleman were about to go back to the station. Officer Taylor stated Officer Newsome called and said he needed some help on a call concerning dogs, so the officers went to go backup Officer Newsome. When they met with Officer Newsome, he informed them there were some dogs chasing children around and he believed they were in a certain yard. Officer Taylor stated they parked the vehicle away from the yard where the dogs were supposed to be, walked up and saw three German Shepherds. Officer Taylor stated when the dogs saw them, they immediately began going towards the officers. One of the dogs growled, so Officer Taylor took out his CEW ("Taser"). One of the dogs went toward Officer Newsome, who was to Officer Taylor's right, while the other dog went towards Officer Taylor's partner, Officer Aleman, who was to Officer Taylor's left. Officers Newsome and Aleman opened fire, so Officer Taylor holstered his CEW and took out his weapon. Officer Taylor stated no dogs charged at him, so he did not fire.

Detective McCleery asked Officer Taylor if he recalled anyone saying anything regarding the incident as they approached where the dogs were. Officer Taylor stated Officer Newsome had spoken with someone before they arrived, but no one told Officers Taylor and Aleman anything. Detective McCleery asked Officer Taylor if he heard Officer Newsome say anything to

14

ASI Number: 2018-03

the effect the officers were going to have to "take them out", referring to the dogs. Officer Taylor stated when he and Officer Aleman pulled up, Officer Taylor already had his CEW out. Officer Taylor stated Officer Newsome told him the CEW might not work, but Taylor never deployed his CEW because none of the dogs ever charged at him, but the dogs did go towards Officer Newsome and Aleman. Detective McCleery asked Officer Taylor what he did after the other officers fired their weapons. Officer Newsome stated he holstered his CEW and drew his weapon, just in case, but did not have to use it, so he holstered his weapon. The dogs went to Elysian Fields Avenue and began to walk lake-bound on Elysian Fields Avenue. Officer Taylor stated he and Officers Aleman and Newsome got in their vehicles and followed the dogs, eventually cornering them in a driveway. Detective McCleery asked if Officer Taylor ever spoke with the owner of the dog. Officer Taylor stated he did. Officer Taylor stated the owner pulled up after seeing the units parked in the street. Officer Taylor stated he was telling the dogs to sit and to stay when the owner pulled up and saw two of the dogs had been shot. Officer Taylor stated the owner asked Officer Taylor to call her mother to help her control the dogs. One of the dogs jumped into her car and Officer Taylor stated he told the owner to roll the window up so the dog wouldn't get out again. Officer Taylor stated he got the number for the owner's mother from the owner and called the owner's mother. Officer Taylor then told the mother where they were located so the mother could come help with the dogs.

Detective McCleery asked what the dogs' behavior was when the officers first approached them. Officer Taylor stated at least one of the dogs growled as they approached the officers, with the other two following the dog that growled. Officer Taylor believed the dog that growled was the dog that went after Officer Newsome. Detective McCleery asked Officer Taylor how he would describe the dogs' behavior. Officer Taylor stated the lead dog was aggressive and aggressively approaching the officers with the tail being up, with the other two dogs following the lead dog.

Detective McCleery asked how long Officer Taylor had been employed by the NOPD. Officer Taylor stated he began in December of 2016. Detective McCleery asked Officer Taylor if he recalled a Daily Training Bulletin (DTB) on how to handle aggressive dogs, with Sergeant Barnes asking Officer Taylor when he graduated from the Municipal Training Academy (MTA). Officer Taylor stated he graduated in July of 2017. Sergeant Barnes then asked if Officer Taylor completed DTBs while as a recruit in the MTA. Officer Taylor stated the recruits did not complete DTBs while in training at the MTA. Sergeant Barnes then confirmed that Officer Taylor did not complete a DTB in May of 2017. Sergeant Barnes then asked if Officer Taylor was made to go back to complete any DTBs that were posted prior to his graduation. Officer Taylor stated he was not responsible for those. Sergeant Barnes confirmed Officer Taylor had his BWC on and activated during the incident, then asked Officer Taylor if he reviewed it. Officer Taylor stated he hadn't reviewed the footage. Sergeant Barnes then confirmed with Officer Taylor that any information Officer Taylor was giving during the interview was from memory. Detective McCleery asked Officer Taylor if he reviewed footage from his CEW. Officer Taylor stated he had because he had to download the footage and added the footage was one second long and all you could hear was the dog screaming or yelping. Detective McCleery asked if Officer Taylor could see anything on the CEW footage, with Officer Taylor stating his finger was blocking the camera so there was nothing to see.

15

ASI Number: 2018-03

Sergeant Barnes asked when the last time Officer Taylor received CEW training. Officer Taylor stated he had received CEW training during his in-service training, which was approximately two months prior to the incident.

The investigators then stepped out of the interview room, leaving Officer Taylor in the room, to confer with the other members of FIT, as well as any OIPM and OCDM members who were observing the interview from the observation room, to see if they had any questions that weren't addressed to that point. Upon returning, Detective McCleery advised there were a few follow-up questions, with Officer Taylor stating the following, in summary:

Detective McCleery asked what steps were taken to preserve the scene after the shooting. Officer Taylor stated once they began to chase after the dogs, no one remained to preserve the scene, so the casings may have been run over. Detective McCleery asked if when the ranking officers arrived, they told the officers to preserve the scene in any way. Officer Taylor stated "no...not necessarily." Detective McCleery asked if Officer Taylor gave a public safety statement and, if so, to whom. Officer Taylor stated he did and he gave it to Sergeant Barnes. Sergeant Barnes then asked Officer Taylor if he had given a public safety statement prior to the one he gave to Sergeant Barnes. Officer Taylor stated he hadn't.

Detective McCleery asked if there was any sort of initial plan to approach the dogs. Officer Taylor stated Officer Newsome had the idea to close the gate because Officer Newsome thought the dogs were in the back of the house and wouldn't see them closing the gate. Detective McCleery asked if Officer Taylor had reviewed his in-car camera (ICC) footage. Officer Taylor stated he hadn't. Sergeant Barnes then confirmed with Officer Taylor that the ICC was activated at the time of the incident. Sergeant Barnes asked if Officer Taylor heard Officer Newsome make any statements during the incident. Officer Taylor stated he heard Officer Newsome say the officers possibly would have to "put" the dogs "down", but added Officer Newsome was "stressed out" and "anxious." Sergeant Barnes asked why Officer Taylor thought Officer Newsome was stressed out and anxious. Officer Taylor stating it was because Officer Newsome had just fired his weapon. Sergeant Barnes asked if that comment was made prior to or after Officer Newsome fired his weapon. Officer Taylor stated Officer Newsome made the comment after firing his weapon. Detective McCleery asked Officer Taylor if he heard Officer Newsome make any comments prior to firing his weapon. Officer Taylor clarified if Detective McCleery was asking if he overheard Officer Newsome make a comment about "taking out" the dogs prior to the shooting he didn't. Officer Taylor stated he just heard Officer Newsome comment that the CEW Officer Taylor had probably wouldn't work.

The interview was concluded at 12:43 PM and was audio and video recorded.

### Emergency Veterinary Personnel Statement(s)

On Wednesday, August 8, 2018, both canines were examined at the Metairie Small Animal Hospital by Dr. Megan Mayer and Chris Fabacher. "Burrito", a one-year old female German Shepard, sustained a wound to the neck, with the bullet proceeding to enter the arm and shatter the right humerus bone. The bullet broke into several small pieces. Burrito also sustained a gunshot wound to the left mandible, with the bullet proceeding through the tongue and ventral tongue macerated. "Burrito" was euthanized as a result of her wounds.

16

CITY DEFENDANTS - 001909

ASI Number: 2018-03

"Ellie", a one-year old female German Shepard, sustained a gunshot wound to the left hock. That was a through-and-through wound. She also sustained a graze wound to the right abdomen area. "Ellie" was walking on her own and, according to Dr. Mayer, was expected to make a full recovery at the time of the investigation.

Investigators spoke with Dr. Reid Rabalais at Metairie Small Animal Clinic, who informed them of the injuries and statuses of both canines. The entirety of the conversation with Dr. Rabalais is documented in the narrative portion of this report.

### Involved Witness Statement(s)

On Tuesday, August 14, 2018, at 8:43 AM, Detective McCleery and Sergeant Barnes met with Katherine Johnson (black female ███████████), at the PIB office, along with Johnson's attorney, Rachel Yazbeck. Johnson stated the following, in summary:

Ms. Johnson stated around 6:35 or 6:40 AM on Wednesday, August 8, 2018, a neighbor that lived on Timoleon Street rang the doorbell of where Ms. Johnson lived and let her know her dogs had gotten out of the yard. Detective McCleery asked Johnson if she knew the neighbor's name and where she lived. Johnson stated she only knew the neighbor had a first name of April and lived in a green colored house with a red door. She didn't know the exact address, but knew April lived on Timoleon Street. Johnson stated she grabbed three dog leashes and went out the back door to find them because April had told her the dogs were on the street in back of where Johnson lived, and Johnson could probably get them quickly. Johnson stated when she went out the back door, she noticed a hole in the fence that one of the dogs had created. Johnson stated she had let the dogs out at about 3:00 AM that morning, so one of the dogs must have bit a hole in the fence sometime between 3:00 AM and 6:40 AM. Johnson stated she went out the back gate and walked up and down Timoleon Street and didn't see them.

While on the way back to her house, Johnson stated another neighbor saw her and asked what was wrong. Johnson stated she told the neighbor her dogs got out, so the neighbor told Johnson she would get in her car and search for them as well, as the neighbor knew the dogs. Johnson went back to her house, got in her father's truck, and went looking for the dogs. Johnson stated she forgot to grab her phone when she left. Johnson drove around for about five to ten minutes when the neighbor, who was helping her look for the dogs, pulled in front of her and advised her the police had shot Johnson's dogs. The neighbor advised Johnson she would take Johnson to where the dogs were. Detective McCleery asked for the name of that neighbor, with Johnson stating she didn't remember the name of the neighbor and knew her by face, but added the neighbor lived at the corner of Pauger and Timoleon Streets in an "orangy-brownish" house. Johnson followed the neighbor to where the dogs were, and Johnson parked the truck.

Johnson stated she saw four officers parked across Touro Street, standing back and looking towards a house. Johnson stated she parked the truck in front of the house, which had an empty lot next to it, and got out. A tall black officer, she didn't know the names of the officers, told Johnson to get back. Johnson stated she told the officer she thought the dogs were hers and when she said that, the oldest dog of the three, Asta, ran in Johnson's line of vision. Johnson

17

ASI Number: 2018-03

stated she called Asta's name and Asta came running towards her. When that happened, the other two dogs, Burrito and Ellie, heard Johnson's voice and also came running. At that point, Johnson noticed Burrito and Ellie had been shot. Johnson stated she hadn't closed the door when she got out and Asta jumped into the truck. Johnson stated the other two dogs collapsed at her feet. While she was holding their collars when a white police officer, who was heavyset, started yelling that Johnson needed to do a better job of watching her dogs or keeping them penned up, or something to that effect.

Johnson, wondering why her dogs had been shot, stated she looked at her dogs and asked what happened, with the tall black officer saying the dogs charged at him. Johnson stated she didn't know if he said anything after that. Johnson stated she took a minute to compose herself and the officers started shouting at Johnson she needed to put the dogs on leashes and close the door so Asta didn't get out again. Johnson stated she was incoherent at first but reached up and slammed the door shut. Johnson stated the white police officer yelled at her that she needed to put the windows up. Johnson stated she began to cry for a minute, then told the officers that in order for her to put the windows up, she would need to let Burrito and Ellie go, so the white officer told her not to worry about it. Johnson stated she then told the police she needed someone to call her parents because she didn't have her phone. Johnson stated she said it a couple of times. Someone then commented the LASPCA or something was called, with Johnson repeating that someone needed to call her parents because she needed help while yelling her parents' names and phone numbers. Johnson stated someone eventually called her mother. Johnson stated she didn't know it at the time, but her parents were also riding around, looking for the dogs.

Johnson stated when her parents pulled up, her father approached her and began to hold the dog with Johnson, while Johnson's mother got a towel. Johnson stated Burrito was bleeding the most, but they were unable to find out where she was bleeding from, so they were unable to put pressure on it. About this time a tall, white male police officer arrived and asked Johnson where the dog was shot. Johnson stated she yelled that she didn't know and couldn't find where Burrito was shot. Someone commented they needed to get the dogs to a hospital. Another neighbor from across the street then arrived on the scene, making a comment he was a veterinarian technician and would help get the dogs into the truck, but stressed Johnson needed to get the dogs to a hospital right away.

Johnson said one of the police officers possibly called Metairie Small Animal Hospital (MSAH) and let them know they were on the way because when Johnson arrived at MSAH there was a black female police officer there already. The dogs were brought in MSAH. Johnson stated the doctors weighed and began to x-ray the dogs, starting with Burrito because she was the one that was severely injured. Johnson stated she observed that Burrito had bitten a hole in her tongue.
At that point, Johnson began to get emotional during the interview. Detective McCleery retrieved some tissue and the investigators stopped the interview until Johnson was composed enough to continue.

Johnson continued, saying the veterinarian that was taking care of Burrito told her they were taking x-rays of the dogs and the first concern was to stabilize them because both dogs were in shock. Johnson added that Asta was unhurt. The veterinarian told Johnson they were

18

CITY DEFENDANTS - 001911

ASI Number: 2018-03

putting fluids into the dogs and would be back with an update, then went into the back of the MSAH. Johnson stated the female officer got her and her father's personal information. Johnson stated after that, she went out to move the truck from where it was, which she described as a loading area.

When Johnson got back inside, the veterinarian told her Burrito's humerus bone had been shattered and her leg would probably be amputated because it would be unable to be repaired. The veterinarian also advised Burrito's jaw had been shattered, as well, so they would have to put a plate in it. The veterinarian stated Elle was ok, other than a superficial wound to her torso and being shot in the foot, but x-rays were still being taken. The injury to the foot did not strike any bones or ligaments, however. Johnson and her father stepped outside for her father to have a cigarette. Johnson stated the veterinarian approached them outside and told them they had been unable to stabilize Burrito because Burrito was losing too much blood, so they were probably going to have to euthanize her. They put Burrito to sleep eventually. Johnson stated that at the time of the interview Ellie was home and recovering.

Ms. Yazbeck then added Asta and another dog named Gumbo were the parents of Ellie and Burrito and Johnson still lived with her parents. Detective McCleery asked how old Asta was, with Johnson stating she was about two and a half years old, being born on February 12, 2016. Ellie and Burrito were born on August 9, 2017. Detective McCleery confirmed with Johnson the dogs were all pure-bred German Shepherds. Detective McCleery asked Johnson if she meant the dogs had bitten a hole in the fence at 3:00 AM that morning. Johnson stated it happened between 3:00 AM and 6:40 AM that morning and felt it was probably closer to 6:40 AM. Detective McCleery asked if she knew what specific dog chewed the hole in the fence. Johnson stated Asta would be frightened by thunder, so Johnson wasn't aware if maybe Asta heard something and was frightened. Again, Johnson wasn't sure it was Asta, but considering how frightened she can get, she guessed it was her. Johnson was asked by Detective McCleery if she had let all four dogs out, with Johnson stating it was just the three female dogs. Attorney Yazbeck asked if that was a common thing for her to do. Johnson stated it was. Johnson stated there was a dog gate inside of the house and when she would hear the dogs pushing on the gate, she would get up and let them out. Detective McCleery asked where the hole had been bitten into the fence was located. Johnson stated the house was located on a corner and if one were looking at the house, there was an iron gate in front of the driveway. Next to the gate was the wooden fence, which faced the street, and had the hole in it. Johnson stated the hole had been sealed up after the incident. Detective McCleery asked Johnson if she had ever seen any of the dogs being aggressive before. Johnson stated she hadn't.

Ms. Yazbeck asked Johnson if the dogs had been around people and were socialized. Johnson stated they were and had previously been around kids and other dogs all the time. Johnson added some of her relatives took the puppies from the same litter that Ellie and Burrito were born from and the relatives brought over those dogs almost every Sunday as well so Burrito and Ellie would play with the other dogs. Detective McCleery confirmed Gumbo and Asta were the parents of Ellie and Burrito and Johnson adding Gumbo was nine years old.

Ms. Yazbeck asked Johnson how long she was on the scene until she was able to leave with the dogs. Johnson stated she wasn't sure but guessed around 10 to 15 minutes. Johnson

19

CITY DEFENDANTS - 001912

ASI Number: 2018-03

continued she left the house initially at 6:40 AM, with her mom telling her later she had gotten the call from the NOPD officer at 7:05 AM, so she had time to walk around looking for the dogs then go back home to get the truck and drive around looking for the dogs, then find the dogs and wait for her parents to arrive before leaving the scene. Johnson then stated it was around 20 to 30 minutes, approximately. Detective McCleery then asked Johnson if she spoke with anyone else besides the neighbors and the officers. Johnson stated she didn't recall speaking with anyone besides the veterinary technician. Detective McCleery then asked Johnson if she would be able provide copies of the veterinary paperwork for his file. Johnson stated she would provide the paperwork.

Sergeant Barnes asked Johnson if, while she was on the scene, if any officers stopped her from leaving or detained her. Johnson stated not directly, she didn't think, mostly it was because she needed to get in contact with her parents and she kept telling the officers she didn't have a way to contact them and she needed someone to call them. Johnson stated they left shortly after her parents got to the scene. Ms. Yazbeck asked Johnson if any of the officers told her what had occurred. Johnson stated other than one of the officers telling her the dogs had charged at him, they didn't. Johnson stated her mom went back to the scene because she didn't remember what hospital the dogs had been taken to and asked what happened and an unknown officer told Johnson's mom that the dogs had charged at children.

The investigators then stepped out of the interview room, leaving Johnson and Ms. Yazbeck in the room, to confer with the other members of FIT, as well as any OIPM and OCDM members who were observing the interview from the observation room, to see if they had any questions that weren't addressed to that point. Upon returning, Detective McCleery advised there weren't any follow-up questions. Ms. Yazbeck asked if there was BWC footage. Sergeant Barnes answered that there was and Johnson would be contacted before it was released to the media, if it was released to the media. The interview was concluded at 9:12 AM and was audio and video recorded.

**Civilian Witness Statement(s)**

**Statement of Damon Keller**

On Wednesday, August 8, 2018, at approximately 8:50 AM, Detective McCleery was approached by male who identified himself as Damon Keller (white male ▮▮▮▮▮▮▮▮) at Robin and Touro Streets. Keller advised he was the person that had called in the complaint of the dogs. He advised he went for a walk every morning and saw a male on a bicycle being chased by three German Shepard dogs that were acting "mean." The dogs then broke away from the male on the bicycle, so Keller stated he went to his car, got in, and began to search for the dogs. He eventually found them on Timoleon Street. Keller advised he tried to corral the dogs into the backyard of 5124 Touro Street. Eventually a police officer pulled up to 5124 Touro Street, so Keller stated he left. Detective McCleery advised he would contact Keller at a later date and arrange to have Keller give a recorded statement.

On Tuesday, August 14, 2018 at approximately 10:15 AM, Detective McCleery and Sergeant Barnes met with Damon Keller (white male ▮▮▮▮▮▮▮▮), at the PIB office in an interview room. Keller stated the following, in summary:

CITY DEFENDANTS - 001913

ASI Number: 2018-03

Keller stated he went walking every morning and usually walked down Western Street to Filmore Street, over to Elysian Fields Avenue and then to Selma Street. Keller stated he usually walked that route three to four times a day. Keller stated as he was approaching Selma Street, about to turn, he saw a guy on a bicycle riding down Elysian Fields Avenue. Keller stated he saw three dogs come across Elysian Fields Avenue to attack the male on the bicycle. The dogs approached the male on the bicycle, with Keller and the male yelling at the dogs loudly. The dogs then went back across Elysian Fields Avenue, with the male starting to yell at Keller because he thought the dogs belonged to him. Keller stated he told the male the dogs were not his and Keller was trying to help the male. The male then told Keller the dogs were going to hurt someone and Keller agreed with the male. As the male on the bicycle left, Keller began to resume his walk and the dogs crossed back over the street again and were going towards Keller. Keller stated the male on the bicycle turned his bicycle around and rode up to the dogs, with the male on the bicycle and Keller again yelling at the dogs. Keller stated the dogs were very mean and aggressive. Keller stated the dogs then "took off" again. The male on the bicycle told Keller he didn't have a phone on him and didn't know how close Keller lived, with Keller saying he lived close. The male told Keller when he got home to call the police, which Keller did.

Keller stated he also got into his wife's vehicle and was following the dogs while he stayed on the phone with the 911 operator until the dogs went into the back of an abandoned house. At that point, an NOPD officer arrived and Keller stated he didn't want to get out of his car because he didn't trust the three dogs. He was trying to pen them into the back yard and close the gate. The officer told Keller he would handle it, so Keller left. Out of curiosity, Keller stated he went back about an hour and a half to two hours later to see what happened and encountered Detective McCleery.

Detective McCleery asked Keller if he knew the male on the bicycle. Keller stated he did not know him. Keller stated he even walked up and down Elysian Fields Avenue twice to try and find him, but did not see him. Keller could only describe the male as a "big blonde headed guy on a bike."

Detective McCleery asked Keller what he meant when he said the dogs were acting "mean and aggressive." Keller explained the dogs "came at" them growling and "teeth wide open." Detective McCleery asked Keller if he had seen the dogs before, with Keller stating he had never seen the dogs before in his life. Keller then added he told the 911 operator the dogs were beautiful and had tags, but "they were mean." Detective McCleery then asked if Keller saw the dogs chasing anyone else. Keller stated he didn't, he just saw them chase the male on the bicycle and himself.

Detective McCleery then asked if Keller made the comment that the dogs were chasing children. Keller stated he made the comment that there were kids going back to school and the dogs might go after children. Keller added that was the day school was starting, and right after the dogs took off, a female walked her child up Selma Street to Elysian Fields Avenue and waited for a bus. Keller asked rhetorically, what if he and the male on the bicycle hadn't come in contact with the dogs and the dogs had "bum rushed" them (meaning the children). Keller added he had grandchildren and it made him nervous to think that if a little kid had started

21

ASI Number: 2018-03

running away from the dogs he didn't know what could have happened to the little kid. Detective McCleery then asked about the tags on the dogs and if they looked like they had been taken care of and kept up. Keller stated they had tags and collars and that whoever owned the dogs had them trained.

Sergeant Barnes asked when the officer arrived on the scene on Touro Street, if there was any conversation between Keller and the officer. Keller stated he told the officer the dogs were in the back yard and to be careful and the officer told Keller they had it handled from that point. Detective McCleery asked what the officer looked like and Keller stated he was a bald headed black male.

The investigators then stepped out of the interview room, leaving Keller in the room, to confer with the other members of FIT, as well as any OIPM and OCDM members who were observing the interview from the observation room, to see if they had any questions that weren't addressed at that point. Upon returning, Detective McCleery asked if there was anything that wasn't covered Keller felt was important. Keller stated he wasn't normally scared of dogs, but his wife made a comment to him that for him to get into a car and follow the dogs and call 911 was unusual.

The interview was concluded at 10:23 AM and was audio and video recorded.

## Statement of Zack Delerno

On Wednesday, August 8, 2018, as Detective McCleery met with Sergeant Barnes and Lieutenant Burns at Selma and Touro Streets, a male was observed leaving ███████. The male, identified as Zack Delerno (white male ████████, advised he did not see anything, but he did hear some small "pops" around 6:50 AM and overheard neighbors saying something about a dog.  The brief statement was not recorded.

## Statement of Chanel Ward

Sergeant Barnes was approached by Chanel Ward (black female ████████) in the 5100 block of Touro Street. Ward asked Sergeant Barnes if there were problems with the house next door to her, implying that there had been in the past.  Sergeant Barnes informed Ward he was investigating a critical firearms discharge by an officer during an incident involving some dogs in the neighborhood. Ward stated that she heard gunshots at approximately 6:57 AM and then heard a dog whining.  Ward also stated that she regularly sees school children walk past in the morning and has never seen dogs out in the neighborhood. The brief statement was not recorded.

## Statement of Jonathan Gonzalez

On Wednesday, August 8, 2018, at approximately 10:46 AM, Sergeant Helou observed a black male leaving a house at ████████ Sergeants Helou and Dillon, along with Ms. McClary, went to speak with the male, later identified as Jonathan Gonzalez (black male ████ ████ Gonzalez advised his mother, Monica Jacques, lived there as well, but had left for work

22

ASI Number: 2018-03

around the time of the shooting. Gonzalez stated he witnessed the OIS and agreed to provide a recorded interview. Gonzalez stated the following, in summary:

Gonzales stated his mother left their residence to bring his little brother to school. As this occurred Mr. Gonzales observed a police vehicle parked in front of the abandoned residence directly across from their residence. The officer inside this police vehicle asked his mother if she observed any German Shepherds. Gonzales stated his mother informed the officer she did not. Gonzales himself added he was outside moments before his mother left with his little brother and did not see the dogs.

Gonzales stated after his mother left, she called to warn him about the three loose German Shepherds. Gonzalez then looked out his residence's window and observed two or three police vehicles arrived in the area. Gonzalez observed three police officers looking in the abandoned residence's driveway. After turning his head for a second, Gonzales stated he exited his residence and observed the German Shepherds, along with the officers shooting them. Following the shooting, the dogs ran around the corner with the officers in pursuit.

Gonzales stated he did not feel the officers needed to shoot the dogs and the officers could have handled the situation in a different manner. Gonzales stated prior to the shooting, he observed the dogs approaching the officers in the abandoned residence's driveway. Gonzales believed all the dogs were from the neighborhood, but only two of the dogs were actually shot. Gonzalez did not recall the dogs being hostile or aggressive towards anyone in the past. Gonzales did not observe what happened to the dogs following the shooting but observed a large amount of blood / blood trail leading from the abandoned residence through the block.

Gonzales stated he heard either five or six gunshots around 6:46 AM. Following the gunshots, Gonzales called his mother to inform her about the officers shooting the dogs. Gonzales stated his mother was previously a veterinarian and returned to the area after this notification to assist the dogs. Gonzales stated he did not hear the dogs barking when he saw the officers but heard the dogs whimpering and crying following the shooting. Gonzales did not hear the officers say or yell anything prior to the shooting and did not believe the officers observed him looking out the window.

Gonzales added by the time his mother returned to the area, the dogs' owners were already on-scene. Gonzales confirmed his residence was not equipped with surveillance cameras and he did not record the incident with his cell phone.

Gonzalez did not notice anyone else outside at the time of the shooting. Gonzalez stated the residence at 5124 Touro Street has been abandoned since his family moved here seven or eight years ago.

Gonzales checked his phone's call log and stated his mother called to warn him about the German Shepherds at 6:55 AM and at 7:09 AM, the phone log indicated Gonzalez called his mother at 7:09 AM to inform her about the shooting. According to Gonzalez, he placed this call approximately two minutes after the shooting. Gonzales stated he loved animals and from his view, didn't believe the dogs were trying to hurt or kill the officers. Gonzales believed the dogs

23

ASI Number: 2018-03

were just scared and the officers should have contacted the SPCA or another animal protection agency to retrieve the animals.

## Statement of an Unknown Black Male

On Wednesday, August 8, 2018, at about 11:00 AM, Sergeant Barnes spoke with a black male on the porch of ████████████████ The black male was approximately 50 years old, approximately five foot 10 inches tall with short salt and pepper hair and a medium build. The male refused to identify himself, answer questions, say if he witnessed the event or not or if he even lived at that address. The black male kept repeating "They fucked over them dogs. I ain't saying nothing else." Sergeant Barnes tried several times to interview the black male but met with negative results.

## Statement of Kimberly Jones

On Wednesday, August 8, 2018, while investigating the location at ████████ ████████████ Sergeants Helou and Dillon were approached by black female, who identified herself as Kimberly Jones (black female ████████ . Jones' advised she witnessed the encounter between the officers and the dogs. Jones agreed to provide the supervisors with a recorded statement. Sergeant Helou conducted the recorded statement inside of his unmarked police unit at the corner of Mirabeau Avenue and Pauger Street. Jones stated the following, in summary:

Jones stated the incident began around 6:45 AM on the morning of Wednesday, August 8, 2018, when she encountered the daughter of the dogs' owners. Jones observed this person walking in the neighborhood while looking for her dogs, because they somehow escaped from their fenced yard. The daughter had leashes in her hands and Jones agreed to drive around and help look for her dogs. Jones stated the daughter initially began her search on foot, but later drove her family's Chevrolet Silverado to assist in the search.

Once Jones reached the area of Filmore Avenue and Vermillion Street, she observed several police vehicles stopped in the area and waited in her vehicle nearby as she believed this had something to do with the loose dogs. Jones observed two or three officers, at least one with their firearm drawn and one with their CEW drawn. Within minutes of seeing these officers, Jones heard five gunshots, backed her vehicle out of the area and returned to 2045 Mirabeau Avenue. Jones knocked on the door and informed a female named Rosalyn their dogs were shot and were running towards Elysian Fields Avenue. Ms. Jones informed Rosalyn one of the dog's paws appeared broken with his tongue hanging out filled with blood; she didn't know the condition of the other dogs. Rosalyn informed Ms. Jones she was going to call her husband.

While returning to her residence, Ms. Jones saw the daughter and told her she believed her dogs were shot and did not know their condition. Jones agreed to take the daughter to the dogs' location. During this time, Jones observed three individuals standing outside in the neighborhood expressing outrage for the shooting. One of these individuals was also driving around and provided Jones and the owners' daughter with an updated location on the dogs. Upon relocating to this location, Jones observed the owners' daughter trying to place the dogs inside

24

ASI Number: 2018-03

the family's truck. Jones heard one of the officers tell the owners' daughter to get the dogs in the vehicle and roll up the windows. Jones left the area due to the traumatic nature of the situation, combined with how frantic the dogs were and the daughter crying. Jones believed the dogs' owners were enroute to this location.

It should be noted at the beginning of Sergeant Helou's follow-up questions, his digital recorder stopped recording due to its memory being full. Upon conclusion of these questions, Sergeants Helou and Dillon followed Jones in her vehicle to the intersection of Frenchmen Street and Selma Street. This, according to Ms. Jones, was where she witnessed the officers shoot the dogs. It was while the sergeants followed Jones that Sergeant Helou realized his recorder stopped recording.

Upon returning to the PIB Office, Sergeant Helou obtained another digital audio recorder and contacted Kimberly Jones via telephone to document the follow-up questions on the record. Jones stated the following, in summary:

During follow-up questioning, Jones stated she observed (right before the shooting) officers approaching the gate of the residence where the dogs were located. Although it was difficult for Jones to see, based on her position, what specifically the dogs did prior to the shooting, Jones believed the dogs were running out of the gate. Jones informed Sergeant Helou she was a dog owner, loved dogs, and the incident was very horrific. Jones believed the dogs were doing what they were trained to do and were running in the officers' direction. Jones added, in the officers' defense, if three large dogs were running at her, she was not sure what she would do in that situation.

Jones believed all three dogs were German Shepherds; two of the dogs were large in size, with the other being medium in size. The dog who was injured the most seemed to be the youngest of the three. Jones recalled one incident around three years ago where these same dogs escaped into the neighborhood. Jonson was not sure about the dogs' demeanor towards other people during their prior escape. Finally, Sergeant Helou asked Jones for the location of the shooting where he followed her. Jones stated the location was Vermillion Boulevard and Robin Street.

## Statement of Mr. Ron Ward

On Friday, August 10, 2018, during follow-up on-scene investigation, shortly after 9:00 AM, Sergeant Helou was approached by Ron Ward (black male ███████ who advised Sergeant Helou he had witnessed the incident. Sergeant Helou took a recorded statement from Ward, who advised the following, in summary:

Mr. Ward stated that on Wednesday, August 8, 2018, at around 6:55 AM, he was seated inside his residence's living room when he heard a siren chirp, presumably from a police vehicle. Upon looking out the window, Mr. Ward observed three police vehicles with one officer already out of his vehicle; the other officers were in the process of exiting their vehicles. One officer drew his conducted electrical weapon (CEW); the other two officers did not have their weapons drawn. The officers moved towards the driveway of 5124 Touro Street as if something was

25

ASI Number: 2018-03

wrong. Mr. Ward then observed the two officers who originally didn't have their weapons drawn now drew their weapons and took a defensive position.

Immediately following these observations, Mr. Ward heard dogs barking, the officers begin firing their weapons and the dogs yelped and ran down the street towards Mirabeau Avenue. Following these observations, Mr. Ward stopped looking out the window. Mr. Ward recalled hearing around five or six gunshots. Mr. Ward described the barks preceding the gunshots as consistent with that of vicious, large dogs. Mr. Ward recalled one of the dogs was a healthy, fully-grown German Shepherd and he had not seen any of these dogs before. Mr. Ward moved to his residence in 2013. Mr. Ward reiterated the dogs were big, sounded vicious and ran.

## Statements taken during witness canvass on Friday, August 10, 2018

The statements of the following individuals are documented under the follow-up canvassing section in the chronological narrative portion of this report.



Mr. Adrian Darby (black male⬛⬛⬛⬛⬛⬛,
Mrs. Sharon Turk (black female⬛⬛⬛⬛⬛⬛⬛
Mr. Daniel Chartian (black male⬛⬛⬛⬛⬛⬛
Unknown Female at⬛⬛⬛⬛⬛
Mr. Robert Walters (black male⬛⬛⬛⬛⬛),⬛⬛⬛⬛⬛

## Statement of Major Winfield

On Monday, August 13, 2018, at approximately 9:50 AM, Detective McCleery met with Major Kevin Winfield (black male⬛⬛⬛⬛⬛⬛) at the PIB office. Major Winfield provided the following information, in summary:

Major Winfield stated on the morning of the incident he was driving to work. While driving down Pasteur Boulevard, he noticed some police vehicles parked in the street at Robin Street. Major Winfield stated he had stopped to back up and drive down Robin Street when he noticed three officers coming from around their car with their guns drawn. Major Winfield stated it appeared they were looking in an alley or yard, but Major Winfield stated he couldn't see that "much of it." Major Winfield stated as the officers had their guns drawn, he saw three dogs running towards the officers. Major Winfield stated the officers fired a few rounds, with one of the dogs being hit in front of Major Winfield's vehicle. All three of the dogs ran down Touro Street. Major Winfield stated he backed up because the officers got in their units to turn down Robin Street.

Detective McCleery then confirmed Major Winfield saw police vehicles parked in the street and officers come around the vehicles with their weapons drawn, looking down a yard. Detective McCleery then confirmed that Major Winfield saw some dogs running towards the officers, with the officers shooting "off a few rounds." Detective McCleery asked Major Winfield how he felt the dogs were acting. Major Winfield stated the dogs "looked pretty aggressive to me." Major Winfield stated the dogs were running towards the officers fast. He

26

also added he didn't know why the dogs were running towards the officers if they wanted to play. Detective McCleery then confirmed with Major Winfield he felt the dogs were acting aggressive.

Detective McCleery asked if he was required to wear a BWC or have an ICC with the OPSO. Major Winfield stated he wasn't required to have either. Major Winfield stated the last he saw of the officers was when they turned onto Robin Street. Major Winfield stated he never exited his vehicle, never spoke with the officers and didn't hear anything they said. Detective McCleery asked if Major Winfield noticed anyone else in the block.  Major Winfield stated his focus was on what was happening in front of him, so he didn't.

Detective McCleery then stepped out of the interview room, leaving the Major Winfield in the room to confer with anyone observing the interview from the observation room and see if they had any questions that weren't addressed to that point. Detective McCleery re-entered the interview room and asked a few follow-up questions, with Major Winfield stating the following, in summary:

Detective McCleery asked Major Winfield if he had ever seen the dogs before. Major Winfield stated he hadn't. Detective McCleery then asked Major Winfield if he noticed anything on his vehicle after the incident, like a casing or blood. Major Winfield stated he didn't notice anything.

The interview was audio and video recorded for posterity beginning at 9:50 AM and concluding at 9:56 AM.

## Physical Evidence Section

On Wednesday, August 8, 2018, beginning at 10:21 AM the following evidence was collected from the 5100 block of Touro Street by Technician Lashay Robbins of the Scientific Criminal Investigation Section and submitted to Police Technician Specialist Veronica Manuel of Central Property and Evidence:

### Exhibit One
One (1) sealed envelope containing One (1) "Win" .40 S&W spent casing

### Exhibit Two
One (1) sealed envelope containing One (1) "Win" .40 S&W spent casing

### Exhibit Three
One (1) sealed envelope containing Two (2) "Win" .40 S&W spent casing

### Exhibit Four
One (1) sealed envelope containing One (1) possible blood sample

### Exhibit Five
One (1) sealed envelope containing One (1) possible blood sample

27

CITY DEFENDANTS - 001920

ASI Number: 2018-03

On Wednesday, August 8, 2018, beginning at 10:35 AM the following evidence was collected from the 2100 block of Robin Street by Technician Lashay Robbins of the Scientific Criminal Investigation Section and submitted to Police Technical Specialist Veronica Manuel of Central Property and Evidence:

<u>Exhibit Six</u>
One (1) sealed envelope containing One (1) possible blood sample

On Friday, August 10, 2018, beginning at 10:09 AM the following evidence was collected from the 5100 block of Touro Street by Police Technician Specialist Courtney Carr of the Scientific Criminal Investigation Section and submitted to Police Technical Specialist Veronica Manuel of Central Property and Evidence:

<u>Exhibit Seven</u>
One (1) sealed envelope containing One (1) "Win" .40 S&W spent casing

*Evidence & Firearms Recovered/ Processed:*

**Rounds Fired:**          (6)
**Rounds Taking Effect:**  (4)
**Bullets Recovered:**     None
**Shell Casings Recovered:**   Five casings in total were recovered. Forensic examination determined three of the casings were fired by the firearm assigned to Officer Newsome and two of the casings were fired by the firearm used by Officer Aleman.

**Weapons Inspected:**        3

1. Glock Model: 22
   Serial # NO1637PD
   Caliber: .40 Caliber

The firearm was issued to and used by Officer Newsome. The firearm was found to be loaded with 11 live "Winchester" rounds. Forensic examination determined three of the casings recovered were fired from this firearm. Those casings were recovered in the grassy area near the driveway of 5124 Touro Street and street and grass near 5132 Touro Street.

2. Glock Model: 22
   Serial # NO1366PD
   Caliber: .40 Caliber

The firearm was issued to and used by Officer Aleman. The firearm was found to be loaded with 13 live "Winchester" rounds. Forensic examination determined two of the casings recovered were fired from this firearm. Those casings were recovered from the street near 5123 Touro Street.

3. Glock Model: 22
   Serial # NO0955PD
   Caliber: .40 Caliber

28

CITY DEFENDANTS - 001921

ASI Number: 2018-03

The firearm was issued and carried by Officer Arden Taylor. The firearm was found to contain 15 live "Winchester" rounds. Inspection by Officer Desmond Rochon of the NOPD Municipal Training Academy determined the firearm had not been discharged.

<u>**Vehicles Involved**</u>

No vehicles were involved in this incident. The in-car camera equipped in the vehicle use by Officer Newsome captured portions of the event from the vantage point of the camera, a review of Officer Newsome's ICC footage is found later in this report. The ICC of Officers Aleman and Taylor was obscured during the shooting, as it was parked behind Officer Newsome's vehicle.

<u>**Police Academy**</u>

On Wednesday, August 8, 2018, at approximately 9:10 AM, NOPD Firearms Instructor Officer Desmond Rochon arrived on the scene. At 9:23 AM, SCIS Technician Lashay Robbins took 360 degree photographs of Officer Newsome. Immediately following these photographs, Officer Rochon inspected Officer Newsome's department issued Glock 22 .40 caliber semi-automatic handgun, bearing serial number NO1637PD. Officer Rochon found the weapon to be in proper working order. Officer Rochon removed the 15 round capacity magazine from the weapon and found it charged with 10 rounds of WIN .40 S+W ammunition. One round of WIN .40 S+W ammunition was removed from the weapon's chamber for a total of 11 remaining rounds of ammunition. Based on the remaining ammunition remaining in this weapon, Sergeant Helou noted the possibility existed that Officer Newsome likely fired four rounds during this incident.

Officer Rochon issued Officer Newsome four rounds of replacement duty ammunition. Sergeant Dillon and Ms. McClary monitored this entire process.

On Wednesday, August 8, 2018, at 9:36 AM, Technician Robbins took 360 degree photos of Officer Aleman. Immediately following these photographs, Officer Rochon inspected Officer Aleman's department issued Glock 22 .40 caliber semi-automatic handgun, bearing serial number NO1366PD. Officer Rochon found the weapon to be in proper working order. Officer Rochon removed the 15 round capacity magazine from the weapon and found it charged with 12 rounds of WIN .40 S+W ammunition. One round of WIN .40 S+W ammunition was removed from the weapon's chamber for a total of 13 remaining rounds of ammunition. Based on the ammunition remaining in this weapon, it was noted the possibility existed that Officer Aleman likely fired two rounds during the incident.

Officer Rochon issued Officer Newsome two rounds of replacement duty ammunition. Sergeant Dillon and IPM McClary again monitored this entire process.

On Wednesday, August 8, 2018, at 9:48 AM, Technician L. Robbins took 360 degree photos of Officer Taylor. Immediately following these photographs, Officer Rochon inspected Officer Taylor's department issued Glock 22 .40 caliber semi-automatic handgun, bearing serial number NO0975PD. Officer Rochon found the weapon to be in proper working order. Officer Rochon removed the 15 round capacity magazine from the weapon and found it charged with 14 rounds

29

ASI Number: 2018-03

of WIN .40 S+W ammunition. One round of WIN .40 S+W ammunition was removed from the weapon's chamber for a total of 15 remaining rounds of ammunition. Based on the ammunition remaining in this weapon, it was noted the possibility existed that Officer Taylor did not discharge the weapon during the incident. Sergeant Dillon and IPM McClary also monitored this entire process.

## Electronic Transmissions

Sergeant Barnes reviewed the recorded communications associated with the incident, documented under NOPD item number H-09174-18.

Sergeant Barnes reviewed the 911 call made by Mr. Keller to NOPD dispatch operator 202 and discovered Mr. Keller, in the 911 call stated that he was at the corner of Timoleon and Touro Streets and there were three big German Shepherds who were on Elysian Fields and were "very aggressive" and "chasing kids and everything." Mr. Keller then stated, "they're mean." Mr. Keller again stated that the dogs were chasing kids. Mr. Keller stated that he was going to keep following the dogs for a minute and did not want anyone to get hurt by the dogs. Mr. Keller stated that he saw tags on all of the dogs' necks, but they were "very aggressive towards people." Mr. Keller then gave an update that the dogs had arrived in the rear yard of a house at 5124 Touro Street. The operator advised Mr. Keller to call back if there were any more updates and then the operator and Mr. Keller then ended the call.  The call operator then contacted NOPD dispatch and provided the information.

Sergeant Barnes then reviewed the recordings of the radio dispatch channel 3 associated with NOPD item number H-09174-18. Just after four minutes into the recording Unit 305, Officer Newsome, is heard telling dispatch she can send him the call holding about the dogs. At approximately 5:30 into the recording Officer Newsome advises dispatch that he has arrived on scene. Dispatch them provided him with complainant information and advised him the SPCA had been notified. At approximately 7:55 into the recording 316, Officers Aleman and Taylor can be heard carrying themselves to the station for the end of their tour of duty.   At approximately 8:35 into the recording Officer Newsome calls Officers Taylor and Aleman over the radio and asks them to go to channel "D2," an unrecorded talk channel.   Then at approximately 9:30 into the recording Unit 316 contacts dispatch on channel 3 and advises that they are going to assist Unit 305, Officer Newsome. Approximately 13:50 into the recording Officer Newsome, breathing heavily, advises dispatch that the dogs charged at him and they fired shots.   Officer Newsome also advised that the dogs were then running "up the block." Approximately 16:50 into the recording Officer Newsome can be heard on the radio saying that he has them by the convenience store were the dominos is at.

Officer Newsome then contacted dispatch to ensure his rank had been notified. At that moment unit 320, Sergeant James Young, contacts Officer Newsome over the radio and asks him to go to the unrecorded radio channel, D3. Communications then begins calling for any third district rank. Unit 330, Sergeant Baker then responded, and dispatch advised that they are receiving calls about gunshots in the area of Touro Street and dispatch believes it is the officers' shots that are being reported. At approximately 19:30 into the recording, Sergeant Baker advised dispatch to notify the SPCA again, because they have dogs that were injured. Sergeant Baker

30

then gives dispatch permission to make the shots fired item a duplicate of the item Officer Newsome is working. At approximately 20:40 into the recording, Sergeant Baker asks dispatch to notify someone from MTA. At approximately 20:55 into the recording, Officer Newsome advises Sergeant Baker that the owner of the dogs has arrived. At approximately 21:15 into the recording, Unit 303A can be heard carrying herself to the scene of the incident.

At approximately 21:49 into the recording the Sergeant Baker contacts the dispatcher to make sure FIT is notified. Unit 303A then contacts Officer Newsome over the radio and asks for a point of entry to the scene. The recording the ends at 22:42 minutes.

Sergeant Barnes determined from the radio recordings that during the incident Officer Newsome immediately notified his rank and dispatch that shots had been fired and communicated with them concerning the incident. Within minutes of the incident Sergeant Baker ensured the academy and FIT were both notified.

Sergeant Banes also determined that the initial call received by the 911 operator relayed information that there were three large, aggressive, German Shepherds, roaming in the area and had been chasing children.

Sergeant Barnes reviewed the Incident Details report for item number H-09174-18 and discovered the comments stated the animals were dangerous. Sergeant Barnes noted LASPCA was notified prior to Officer Newsome Arriving on scene.

### Discrepancies, Clarifications, & Credibility Assessments

In reviewing the statements of the officers and comparing them to the body worn camera footage, Sergeant Barnes determined there were not issues concerning materially false statements on the part of the officers. Officer Newsome stated he did not recall making any statements about having the put the dogs down prior to the incident.

Officer Newsome made several statements on scene in reference to putting the dogs down, and several statements concerning Ms. Johnson not controlling her dogs. Though the statements regarding Ms. Johnson not controlling her dogs are not technically untrue, the manner in which they were stated is unbecoming of a professional New Orleans Police Officer and demonstrate a lack of retention of training on the part of Officer Newsome. It is recommended that Officer Newsome undergo refresher training on use of force decision making.

Despite the fact that body worn camera confirmed Officer Newsome made these statements, Ms. Johnson told investigators a white male officer had made the comments. Ms. Johnson, however, was obviously in a state of distress at the time, crying hysterically and unable to keep her composure. The body worn camera also showed that at the time of the incident Ms. Johnson asked Sergeant Young why he had shot the dogs, apparently believing Sergeant Young was one of the officers that had been there when she arrived.

Sergeant Barnes found no materially false statements made by the officers or the witnesses, with only minor discrepancies. For example, Mr. Gonzalez, in his statement, stated

31

ASI Number: 2018-03

the dogs were not aggressive and they were not barking when the officers shot them. The body worn camera clearly shows this not to be the case.

It should also be noted that Sergeant Helou reviewed and informed Sergeant Barnes that Officers Newsome and Aleman both scored 100% on the Daily Training Bulletin from May 2017 regarding dog bite prevention. Officer Taylor did not complete the DTB while he was in the academy.

## Consultation with the Coroner & District Attorney

On Tuesday, November 27, 2018 at approximately 10:15 AM, Detective McCleery submitted his completed criminal investigation and related materials to the Orleans Parish District Attorney's Office for review. The criminal investigation found there were no criminal violations on the part of Officer Newsome or Officer Aleman. Detective McCleery then spoke with Assistant District Attorney Paige Cline and learned the District Attorney's Office would not be pursuing charges against the officers in this incident.

## Tactical Analysis

On December 19, 2018, Sergeant Barnes contacted Lieutenant Hudson Cutno, the NOPD Municipal Training Academy's supervisory instructor in the area of use of force decision making. On January 9, 2019, Sergeant Barnes received a critique of the officers' actions during the incident.

Lieutenant Cutno stated that after reviewing Officer Newsome's BWC Lieutenant Cutno believes Officer Newsome clearly chose to use force on animals he knew were possibly dangerous. Lieutenant Cutno partially based this conclusion on Officer Newsome stating, "gonna have to put 'em down" several times. This statement was present in his conversation with Mr. Keller prior to his contact with the animals, Newsome mentioned it again as he advised Officer Taylor that the taser was not going to work, and then mentioned it again to his rank.

Officer Newsome stated to assisting officers that he was going to try and close the gate. Lieutenant Cutno believes this action would have been a viable solution if done tactically with the coordination of the assisting officers on scene. However, viewing the actions on the video closing the gate was never attempted, none of the officer's ever attempted to move towards the gate to shut it or to move out of the view of the animals. No plan was discussed a plan that would have be reasonable to avoid the attack.

Lieutenant Cutno determined that based on the distance of the animals upon first view and the time it took the animals to recognize the officers and charge, they could have retreated and devised a plan to possibly seek cover from the animals or to close the gate.

Officer Newsome stood in clear view of the animals who were positioned at the very rear of the yard, drawing their attention. After the animals charged towards him, he had no alternative but to defend himself. It is my belief this could have been avoided if the officers would have created a plan to close the gate out of view of the animals.

CITY DEFENDANTS - 001925

ASI Number: 2018-03

After viewing Officer Aleman's BWC, Lieutenant Cutno stated it shows Officer Aleman reacted based on his position at the time the dogs were charging. Officer Alleman observed the dogs chagrining towards him and he tried to create distance to avoid being attacked; however, one of the animals charged directly towards him.

Sergeant Barnes and Lieutenant Cutno also discussed the possibility of Officer Newsome using his vehicle to approach the driveway and observe the dogs to formulate a plan instead of approaching on foot. Approaching in the vehicle would have shielded the officers from the canines and diminished the possibility of the officers having to use force based on the canines charging at them.

Lieutenant Cutno informed Sergeant Barnes that he feels the officers on scene had several options available and chose to engage the canines without a clear objective or plan to contain the animals. A quick situational analysis could have alerted the officers to the risk of standing in the open with only an open gate between them and the charging animals. A decision which would require them to use deadly force.

## Decision Point Analysis

During this incident Officer Newsome, accompanied by Officer Taylor and Aleman, made the decision to approach the front gate of 5124 Touro Street on foot, without the use or cover of their vehicles. The officers stated they planned to close the gate to secure the canines in the rear yard until the LASPCA or the owner arrived to take control of the canines. Upon observing the canines, the officers hesitated and remained in the driveway area for approximately 10 seconds before the canines began to charge at the officers, appearing aggressive. The officers all backed up as Officers Aleman and Newsome kept their firearms pointed at the dogs, while Officer Taylor pointed his CEW. Within three seconds of the dogs beginning to rapidly approach the officers they had almost reached the officers and Officer Newsome made the decision to fire four shots, striking two of the canines. The canines appeared to yelp and scatter after Officer Newsome fired. One of the canines turned around and jumped directly towards Officer Aleman, who fired two shots, striking the canine again.

The officers did not attempt to approach the driveway in their vehicles or park their vehicles closer to the driveway in the event they would need to be used for protection. This tactic mentioned by Officer Taylor after the incident when he makes the comment to Sergeant Baker that they were not close enough to their vehicles.

At the time the Officer Newsome discharged his weapon the canines presented a serious threat to the officers and appeared to be aggressively approaching the officers. However, Officer Newsome did not place himself in a position to plan and make available any other options. Officer Newsome could have used his CEW or allowed Officer Taylor to use his CEW. Though the shooting of the canines itself, at the point in time when Officer Newsome discharged, is consistent with law and NOPD policy, it demonstrated Officer Newsome did not utilize common sense tactics or planning to approach the situation. Tactics the complainant, Mr. Keller, had already demonstrated in his approach to the situation by using his vehicle. Officer Aleman and Taylor, upon arriving at the location, followed Officer Newsome's lead as the officer who had already been on scene and appeared to be aware of what was happening.

33

CITY DEFENDANTS - 001926

ASI Number: 2018-03

After the discharge by Officer Newsome, the canines scattered, and the scene rapidly devolved into a chaotic attempt to avoid the frantic canines. At that point, one canine rapidly approached Officer Aleman, still barking, and appeared to lunge at Officer Aleman. As the canine lunged, Officer Aleman reacted in self-defense, firing two shots towards the canine. The shots appeared to strike the canine and the canine fled.

From that point on, following and corralling the canines to ensure public safety became the primary focus of the officers.

## Training

On Wednesday, January 9, 2019, Lieutenant Cutno informed Sergeant Barnes the Municipal Training Academy does not have a dedicated training class designed to deal with dangerous animals. However, there is a class taught by Lieutenant Cutno about decision making when it comes to using force. Lieutenant Cutno Suggested Officer Newsome take a use of force and decision-making class refresher.

During the investigation, Sergeant Barnes determined the department does not train to deal with canines. This is a deficiency on the part of the department. Sergeant Barnes recommends the Municipal Training Academy, in both the new recruit training and in-service training, implement a brief course on dealing with loose, potentially aggressive, animals. The class should be taught by, or in partnership with the LASPCA, so that officers will understand the potential options when dealing with canines, and what to do in the event the LASPCA is unavailable or does not respond in a timely fashion.

## Equipment

Sergeant Barnes determined that during the investigation all the equipment available to the involved officers functioned properly.

Sergeant Barnes would recommend that each district be equipped with the proper tools to effectively deal with incidents of loose, potentially aggressive, canines. Sergeant Barnes researched some available options for humanely capturing canines and determined a viable option for the department would be the Animal Care Equipment and Services Rescue Tech Kit. The Kits retail for $169.60 to 193.70 depending upon the length of the animal dual release pole used to snare the canines. The poles range from 4 feet to 5 feet with an extension. The kits also include an extra cable lead, a pack of 25 slip leads (leashes), seven (7) color coded muzzles, and ID bands. Purchasing one four-foot pole kit for each district would cost a total of $1,356.80, or $4,070.40 to purchase a kit for each watch, in each district. The kits with proper training by SPCA members on the use of the kits would help prevent future incidents on calls concerning canines and would help to eliminate the need to wait for SPCA in the event there is no animal control officer to respond. The kits are available for retail at http://www.animal-care.com.

34

CITY DEFENDANTS - 001927

ASI Number: 2018-03

Another option proposed would be the availability of pepper spray, or another repellent equally as effective, specifically designated for calls involving animals, and would be kept secured by an authorized user and maintained solely for that purpose.

<u>**Policy Violations**</u>

Sergeant Barnes found no policies that were violated during this incident.

<u>**Chronological Narrative Section**</u>

On Wednesday, August 8, 2019, the NOPD's Force Investigation Team (FIT) responded to a critical firearms discharge in which NOPD officers discharged their firearms, striking two canines in the 5100 block of Touro Street. A more detailed account of the notification of FIT and the initial response can be found in this report under the "Notifications" and "Force Investigation Team Response" sections. This narrative will serve to detail pertinent steps taken during the on scene and follow up investigation not already documented elsewhere in this report.

<u>**FIT On-Scene Investigation**</u>

On Wednesday, August 8, 2018, after investigators briefed Ms. Tonya McClary of the OIPM, at approximately 8:50 AM, Detective McCleery was approached by male who identified himself as Damon Keller (white male ▇▇▇▇▇▇▇ at Robin and Touro Streets. Keller advised he was the person that had called in the complaint of the dogs. He advised he went for a walk every morning and saw a male on a bicycle being chased by three German Shepard dogs that were acting "mean." The dogs then broke away from the male on the bicycle, so Keller stated he went to his car, got in, and began to search for the dogs. He eventually found them on Timoleon Street. Keller advised he tried to corral the dogs into the backyard of 5124 Touro Street. Eventually a police officer pulled up to ▇▇▇▇▇▇▇ so Keller stated he left. Detective McCleery advised he would contact Keller at a later date and arrange to have Keller give a recorded statement. This interaction and the formal statement of Keller is documented under the "civilian witnesses" section of this report.

Detective McCleery then met with Sergeant Barnes and Lieutenant Burns at Selma and Touro Streets. As they were talking, a male was observed leaving ▇▇▇▇▇▇▇ The male, identified as Zack Delerno (white male ▇▇▇▇▇▇▇ advised he did not see anything, but he did hear some small "pops" around 6:50 AM and overheard neighbors saying something about a dog. This statement is also memorialized earlier in this report.

While the above was happening, SCIS Police Technician Supervisor Aven Cooper and Police Technician Specialist Lashay Robbins arrived on scene. Shortly after arriving, they marked evidence cones near the possible blood drops and spatter in the 2100 block of Robin Street.

As Sergeant Barnes relocated to conduct the public safety statements with Officers Aleman and Taylor, he was approached by Chanel Ward (black female ▇▇▇▇▇▇▇ in the 5100 block of Touro Street. Ms. Ward asked Sergeant Barnes if there were problems with the house next door to her, implying that there had been in the past. Sergeant Barnes informed Ward

35

ASI Number: 2018-03

he was investigating a critical firearms discharge by an officer during an incident involving some dogs in the neighborhood. Ward stated that she heard gunshots at approximately 6:57 AM and then heard a dog whining. Ward also stated that she regularly sees school children walk past in the morning and has never seen dogs out in the neighborhood. The brief statement was not recorded and is memorialized earlier in this report.

Around 9:00 AM, Sergeant Helou began to conduct the public safety statement (PSS), per New Orleans Police Operations Manuel Chapter 1.3.2, of the involved officer, Officer Newsome, inside his police vehicle. The PSS is documented under the public safety statement section of this report.

Following this statement, Sergeant Helou learned from the mobile data terminal (MDT) inside Officer Newsome's vehicle that a "Damon" called about the loose dogs from telephone number 504-259-6973.

On Wednesday, August 8, 2018 at 9:10 AM, NOPD Firearms Instructor Rochon of the Municipal Training Academy (MTA) arrived on the scene and assisted in the investigation. His assistance is also documented under the "Police Academy" section of this report.

On Wednesday, August 8, 2018, at 9:16 AM, Sergeant Barnes began to conduct the PSS, per New Orleans Police Operations Manuel Chapter 1.3.2, of one of the involved officers, Officer Aleman. The PSS is documented under the public safety statement section of this report.

At 9:25 AM, Sergeant Barnes conducted the PSS of Officer Taylor. The PSS is documented under the public safety statement section of this report.

At 9:36 AM, Technician L. Robbins took 360-degree photos of Officer Aleman. Immediately following these photographs, Officer Rochon inspected Officer Aleman's department issued Glock 22 .40 caliber semi-automatic handgun, bearing serial number NO1366PD. Officer Rochon found the weapon to be in proper working order. Officer Rochon removed the 15 round capacity magazine from the weapon and found it charged with 12 rounds of WIN .40 S+W ammunition. One round of WIN .40 S+W ammunition was removed from the weapon's chamber for a total of 13 remaining rounds of ammunition.

At 9:48 AM, Technician L. Robbins took 360-degree photos of Officer Taylor. Immediately following these photographs, Officer Rochon inspected Officer Taylor's department issued Glock 22 .40 caliber semi-automatic handgun, bearing serial number NO0975PD. Officer Rochon found the weapon to be in proper working order. Officer Rochon removed the 15 round capacity magazine from the weapon and found it charged with 14 rounds of WIN .40 S+W ammunition. One round of WIN .40 S+W ammunition was removed from the weapon's chamber for a total of 15 remaining rounds of ammunition. Sergeant Dillon and IPM McClary also monitored this entire process.

When investigators realized Officer, Newsome fired his weapon four times and Officer Aleman fired his weapon two times, but only found four spent casings, it was decided to contact Officer Timothy Bender and his canine, Paco. The Canine, Paco, is trained to find explosives and

36

ASI Number: 2018-03

munitions.  Investigators enlisted the assistance of Paco in an attempt to find the spent casings that had not been located.

On Wednesday, August 8, 2018, at approximately 10:06 AM, Officer Newsome performed a walkthrough of the incident with Lieutenant Burns, Sergeants Barnes, Helou and Dillon, Detective McCleery and IPM McClary.

At 10:11 AM, Officer Aleman performed a walkthrough of the incident with Lieutenant Burns, Sergeants Barnes, Helou and Dillon, Detective McCleery and IPM McClary.

At 10:21 AM, Technician Robbins began to collect the evidence in the 5100 block of Touro Street. The clumps of hair photographed were not collected.  Technician Robbins also took two possible blood samples from the driveway of 5123 Touro Street. Technician Robbins also took a possible blood sample from the curb in the 2100 block of Robin Street.

While Technician Robbins was collecting evidence, Officer Bender and Paco arrived on scene. Detective McCleery briefed Officer Bender as to what they were looking for and the area they needed searched at approximately 10:30 AM. The search began at 10:40 AM. At 10:53 the search was concluded, and Paco was unsuccessful in locating any other evidence.

On Wednesday, August 8, 2018, at approximately 10:46 AM, Sergeant Helou observed a black male leaving a house at 5123 Touro Street. Sergeants Helou and Dillon, along with Ms. McClary, went to speak with the male, later identified as Jonathan Gonzalez (black male August 3, 1998). Gonzalez advised his mother, Monica Jacques, lived there as well, but had left for work around the time of the shooting. Gonzalez stated he witnessed the OIS and agreed to provide a recorded interview. The interview is documented in detail earlier in this report.

On Wednesday, August 8, 2018, at about 11:00 AM, Sergeant Barnes spoke with a black male on the porch of 2104 Robin Street. The black male was approximately 50 years old, approximately five foot 10 inches tall with short salt and pepper hair and a medium build. The male refused to identify himself, answer questions, say if he witnessed the event or not or if he even lived at that address. The black male keep repeating "They fucked over them dogs. I ain't saying nothing else." Sergeant Barnes tried several times to interview the black male but met with negative results. The unknown male's statement is also documented in the civilian witness section of this report.

Sergeant Barnes and Detective McCleery then began to follow the possible blood drops around the block. At 11:05 AM, Detective McCleery was met by a female in a white vehicle in the 5100 block of Touro Street. She identified herself as Elizabeth Stets. She advised she had seen police officers with their weapons drawn and dogs running away, but did not see the shooting. Stets also advised she had heard a female scream "why are they killing those German Shepherds?" Detective McCleery obtained Stets' contact information.

Sergeant Barnes and Detective McCleery asked Technician Robbins and her Supervisor, Aven Cooper, to follow them and take photographs of the possible blood trial as it led down Selma Street, then north on Elysian Fields Avenue and continued up Elysian Fields Avenue to a

37

ASI Number: 2018-03

parking area of a strip mall in the 5200 block of Elysian Fields Avenue. They walked to the 2100 block of Robin Street to where the dogs had been found, finding more possible blood drops and trails in the driveway of ██████████████ There was also possible blood drops and possible blood smeared on the passenger side of a gray Volvo C70 bearing Louisiana license plate ██████ █████ at was backed into the driveway. The resident of ████████████ Stan Griffith (black male ██████████████), advised the investigators the vehicle had been parked with the front towards the house, but had left at some point. When they returned, they had backed the vehicle into the driveway and noticed the possible blood.

As Sergeant Barnes and Detective McCleery were following and documenting the possible blood trail, Sergeants Helou and Dillon relocated to a residence at ████████████ in an attempt to retrieve surveillance video from this location. The sergeants met with Nick Inman (white male ██████████████ who advised his cameras captured video and audio of the incident. Inman placed this footage on a flash drive provided by Sergeant Helou, which was later provided to Detective McCleery.

Before departing the scene, members of FIT and Sergeant Dillon met and agreed to contact Special Agent (SA) Kathy Scanlan of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and her canine, Ting to try and find the spent casings that were not located. Ting is a canine trained to find explosives and munitions. Investigators arranged to search the scene with Ting and Special Agent Scanlan on Friday, August 10, 2018, as well as conduct a canvass of the area.

As Sergeants Helou and Dillon were departing the scene, Detective McCleery requested Sergeant Dillon relocate to 2045 Mirabeau Street and take photographs of the gates, which secured the dogs' owner's home. Detective McCleery also asked Sergeant Dillon to take a statement from the homeowners if they were home. At approximately 11:30 AM, Sergeant Dillon arrived at 2045 Mirabeau Street and took five photographs of the exterior fence of the residence. Sergeant Dillon and Sergeant Helou knocked on the door of residence and did not receive an answer.

While investigating the location at 2045 Mirabeau Street, Sergeants Helou and Dillon were approached by black female, who identified herself as Kimberly Jones (black female August 29, 1966). Jones' advised she witnessed the encounter between the officers and the dogs. Jones agreed to provide the supervisors with a recorded statement. Sergeant Helou conducted the recorded statement inside of his unmarked police unit at the corner of Mirabeau Avenue and Pauger Street. During the statement, Sergeant Helous' recorder ceased recording. Once Sergeant Helou returned to the PIB Office he contacted Mrs. Jones by telephone and asked a few follow up questions. The entirety of the interview is documented earlier in this report in the civilian witness section.

Detective McCleery, Sergeant Barnes and Technician Robbins relocated to the Metairie Small Animal Hospital (MSAH), located at 101 Metairie Road, Metairie, La. arriving at approximately 11:49 AM. After arriving at MSAH Sergeant Barnes and Detective McCleery met with Doctor Reed Rabalais, DVM who informed the investigators Burrito had sustained a wound to the neck, with the bullet proceeding to enter the arm and shatter the right humerus bone. The

bullet broke into several small pieces. Burrito also sustained a gunshot wound to the left mandible, with the bullet proceeding through the tongue and ventral tongue macerated. Dr. Rabalais stated Ellie sustained a gunshot wound to the left hock that was a through-and-through wound. She also sustained a graze wound to the right abdomen area. Doctor Rabalais advised Burrito had already been euthanized and had been picked up to be cremated. Ellie had been through surgery and was recovering. He provided copies of x-rays from both Burrito and Ellie. He then brought them to where Ellie was healing. The investigators were assisted by Dr. Megan Mayer in examining Ellie. Technician Robbins took photographs of Ellie's wounds.

Upon returning to the PIB office, at 1:07 PM, Detective McCleery called Ms. Katherine Johnson's phone and left a voicemail for her to call back.

SCIS Technician Robbins relocated to Central Property and Evidence (C.P.&E.) and submitted the spent casings and possible blood samples with C.P.&E. Police Technical Specialist Veronica Manuel.

## Review of Body Worn Camera Footage

Sergeant Barnes then downloaded and viewed the body worn camera footage (BWC) of Officers Taylor, Aleman, and Newsome.

## BWC Footage from Officer Newsome

Sergeant Barnes reviewed the body worn camera footage captured by Officer Jerome Newsome's BWC. The footage began with Officer Newsome driving to the scene. At 00:38, the dispatcher is heard advising Officer Newsome the dogs were in the back of 5124 Touro Street and that the SPCA had been notified. At 01:29, Officer Newsome was observed rolling down the window of his vehicle and speaking with Mr. Keller. Officer Newsome commented he would keep an eye on them and confirmed where the dogs were located. At 01:51, Officer Newsome made the comment to Mr. Keller that if the dogs posed any danger, he would have to "take 'em out." At 04:03, Officer Newsome is heard asking Officer Aleman and Taylor to come to his location to help him out. At 07:30, Officer Newsome gets out of his car and asks a female in a white vehicle if they knew anyone on the block that owned three German Shepherds. The female advised she didn't and she had just walked her son to the bus stop. At 08:13 on the video, Officer Newsome is heard telling Officer Aleman and Taylor about where the dogs were supposed to be located. They then walk to the driveway of 5124 Touro Street, with Officer Newsome stating he didn't know if the gate closed or not, but he wanted to at least close the dogs in the yard. At 08:33, Officer Newsome is heard saying "there they go, right there" as the dogs can be seen at the rear of the driveway, near the rear fence of the yard. Officer Taylor slowly walks past Officer Newsome towards the gate with his CEW in his left hand. Officer Newsome then tells Officer Taylor his CEW wouldn't work against the dogs. Officer Newsome again stated, "We gonna have to take them things out." The dogs began barking at 08:42 and can be seen running out of the back yard at the officers. Officers Aleman and Newsome could be heard saying "get back." At 8:45 on the video, Officer Newsome discharged his weapon at the dogs, firing four shots. The dogs began to cry and scatter. At 08:52, the two shots fired by Officer Aleman could be heard. Officer Newsome notifies the dispatcher of the OIS at 09:01. At 9:12 on the video

CITY DEFENDANTS - 001932

ASI Number: 2018-03

Officer Newsome tells the other officers, "C'mon, we gotta go get them before they attack someone." Officer Newsome is shown going after the dogs in his vehicle. At 09:51, Officer Newsome is overheard mumbling something to himself and stating aloud, "I had to put 'em..." At 10:24, Officer Newsome was heard saying "fuck." Officer Newsome stops his vehicle and gets out, then turns and says to the other officers, with a different tone of voice, at 10:35 "we gotta put 'em down." At 10:39, Officer Newsome tells Officer Aleman "I said we gonna have to put 'em down." The officers attempt to catch up to the dogs on foot and then turn around to get back in their vehicles and follow the dogs to the 5200 block of Elysian Fields Avenue. As the officers return to their vehicles Officer Taylor says they are going to have to split up and box the dogs in. Throughout the incident Officer Newsome can be heard sighing to himself several times. Officer Newsome exits his vehicle again near the convenience store where a Domino's pizza is in the 5200 block of Elysian Fields Avenue. Officer Newsome radios the dogs' location to the other officers. Officer Newsome then contacts Sergeant Young and tells him the dogs kind of "boxed in" at the moment but were running around and says the officers can't really stop them and may have to put the dogs down. Sergeant Young then asked what the dogs were doing. Officer Newsome also explained the situation to Sergeant Young and explained that he believed all the dogs were hit at least once. Sergeant Young then asked for Officer Newsome's location and stated he was on coming to the scene.

Officer Newsome is then seen driving to the 2100 block of Robin Street. As Officer Newsome exits his vehicle in the 2100 block of Robin Street, Katherine Johnson arrives on scene in a tan and black truck. As the door opens on the truck Officer Aleman can be heard saying, "stay in your car, Stay in your car." Ms. Johnson can be heard saying, "These are my dogs." in the background of Officer Newsome's BWC footage. Officer Newsome says, at 14:41, "oh, they been shot" and is seen notifying Sergeant Young the owner was on the scene. Officer Newsome then says quietly, at 14:56, "you better control your dogs...they been chasing people" as Johnson was heard becoming emotionally distraught in the background. Ms. Johnson then screams to the officers, "Can somebody please call my parents!" Officer Taylor attempts to console Ms. Johnson, saying, "we got people coming." Officer Taylor then retrieves his phone from the vehicle to call Ms. Johnson's parents as she tells the officers the number. Officer Aleman can be heard at 15:26 asking Ms. Johnson to close the door so the dogs won't come back out. At 15:29, Officer Newsome is heard quietly saying "sorry...that's what happens when you don't control your dog." Those comments appeared to have been made by Officer Newsome to himself and did not appear to be directed at Johnson. Officer Taylor then tells Ms. Johnson to roll her windows up, in an attempt to contain the canine in the car. Officer Newsome stops Officer Taylor and says, "let her calm down, just let her calm down." At 16:03 on the video Officer Newsome advises Sergeant Baker that they have the owner of the dogs on scene. Ms. Johnson can be heard emotional in the background and appears to be asking why the officers shot her dogs. At 16:23, Officer Newsome addresses Ms. Johnson and states, "it's all on camera, ma'am...I'll show you that they charged at us." At 16:37 on the video Officer Aleman asks Ms. Johnson to please not let go of the dogs. At 16:43 Officer Taylor could be heard getting the phone number from Ms. Johnson and calling her parents as Ms. Johnson could be heard crying in the background. At 17:12 on the video Officer Newsome tells Officer Aleman that he is, "not about to get attacked by a dog." Officer Newsome is then contacted by unit 303A and asked what the point of entry is to the scene. Officer Newsome then laughs about the questions as Officer Taylor tells him the scene is on Touro where they discharged. Officer Newsome then tells unit

40

ASI Number: 2018-03

303A that they do not have a scene at the location because they aren't where they discharged. Unit 303A tells him that his scene is where they discharged and asks where it is so she can go secure it. Officer Newsome then attempts to remember where the scene was and is reminded by Officer Taylor that the scene is near Touro and Timoleon Streets. Officer Newsome then returns to his vehicle to find the exact address to provide to 303A. Unit 303A asks Officer Newsome where he was when he discharged because she wants to make sure no one runs over his casings. Officer Newsome then enters his car at 19:22 on the video and advises he is relocating to Touro Street.

At 19:25, Officer Newsome leaves the 2100 block of Robin Street and relocates to the 5100 block of Touro Street to secure the scene, pulling into the middle of the block. Unit 303A, Officer Nahlisha Smith, can be seen positioning her vehicle near the intersection of Touro and Timoleon Streets to secure the block. Officer Newsome then called to Officer Nahlisha Smith and advised her where the scene is. Officer Newsome tells Officer Smith that they tried to find the owner, and that the owner is "cutting up," and states that they can't have three German Shepherds running wild, Officer Newsome then nervously laughs, and says, "or running after people and charging at police men." At approximately 22:58 on the video Officer Smith is contacted by Sergeant Young and instructed to relocate with the owners to the animal hospital. Officer Smith ask's Officer Newsome if he's got the scene and Officer Newsome responds that he doesn't see anything. Officer Smith then tells Officer Newsome to look in the grass and Officer Newsome locates a casing. Officer Newsome then says that he shot about twice, and that Officers Aleman and Taylor shot a couple of times too. As Officer Newsome makes that statement, Sergeant Young tells Officer Smith over the radio to follow the pickup truck that has the "guy in the back." Sergeant Young tells Officer Smith that they are headed to Metairie Small Animal Hospital and that he needs her to follow them because he must stay on scene.

At approximately 25:29 on the video, Lieutenant Gervais Allison arrives on scene and drives into the 5100 block of Touro Street, in front of 5124 Touro Street. Lieutenant Allison was accompanied by Lieutenant Jimmie Turner. Officer Newsome then met with Lieutenant Gervais Allison and explained what had occurred. Officer Newsome stated that he only found one casing so far but he knew he shot two or three times and that Officers Aleman and Taylor shot once or twice too. As Officer Newsome talks to Lieutenant Allison, Lieutenant Allison surveys the scene and finds two more casings as well as a blood trail on the street. Officer Newsome says, "oh yeah, we hit 'em." Officer Newsome then explains that he knew he hit them because they retreated when they got hit.

At approximately 30:05 on the video Sergeant Young arrived on the scene by Officer Newsome and obtained a public safety statement from Officer Newsome.

At 32:25 on the video Sergeant Baker informs Officer Newsome he is being sequestered and Officer Newsome shuts off his BWC at 32:27.

### BWC Footage from Officer Taylor

Sergeant Barnes then reviewed the footage captured by Officer Taylor's BWC. The footage opened with Officer Taylor seated in the passenger seat of the police vehicle proceeding

41

ASI Number: 2018-03

to the scene. At 01:11 on the video, Officer Taylor says something to himself about two dogs and an open gate. At 01:14, the vehicle stops and Officer Taylor get out of the vehicle. At 01:20, Officer Newsome, in the distance, tells Officer Aleman there are three dogs in the backyard as he points towards 5124 Touro Street. Officer Taylor takes out his CEW and the three officers walk towards 5124 Touro Street and approach the driveway area. As the officers approach, Officer Taylor walks past Officers Aleman and Newsome while asking, "where are they supposed to be? In the yard already?" One of the officers answer inaudibly as the dogs come into view and Officer Taylor says, "oh." At approximately 01:43, the three German Shepherds are seen at the end of the back of the driveway, with the gate open. By 1:50 in the video the dogs began to bark loudly and aggressively while running towards the officers. Officer Taylor said, "get back" and began backing up as Officer Newsome could be heard saying "get back" and then Officer Taylor says it again.   At 01:53, the first gunshot was heard from Officer Newsome. Three other gunshots follow and the dogs that had been hit cry loudly and start to scatter. Officer Taylor continued to back up nearly across the street as the white grand marquis, driven by Major Kevin Winfield, could be seen in the street.  Officer Taylor then transitioned from his CEW to his handgun and brought it to his chest, obscuring the view of the BWC. At 02:00, there were an additional two gunshots heard on the BWC. Officer Taylor pointed his weapon at one of the dogs as it ran by him as all three dogs ran down Touro Street towards Selma Street. Officer Taylor and Officer Aleman then get back in their vehicle to try and find the canines. At 02:31, Officer Aleman can be heard saying "goddamn it," with Officer Taylor attempting to calm him down saying, "hey man, it's all cool, it's all good, that's justified." After driving around for a bit, the vehicle stopped at 03:08 and Officer Taylor got out of the vehicle. Another marked unit was parked in the street with its overhead lights on. Two German Shepherds were seen standing in the middle of Selma Street near the front of the other marked unit. As Officer Taylor approached the dogs, they ran off down the street. Officer Taylor got back in the car and the car continued in the direction of where the dogs ran. The vehicle stopped at Selma Street and Elysian Fields Avenue where the officers began to track the dogs on foot. The same events captured on Officer Newsome's body worn camera are captured by Officer Taylor's with the exception that Officer Newsome could not be heard making any statements.  Officer Taylor also commented that they didn't have anything to catch the dogs with.  All three officers get back in the car and drive to try and get the dogs stopped.

At approximately 6:10 on the video, all three officers are out of their vehicles near the convenience store as the dogs leave the parking area and return South on Elysian Fields Avenue towards Robin Street. Officer Taylor then turns back to the other officers and says they can just get in the car and trail them.  At 06:35, someone could be heard on the radio say that the dogs were alive, but some were limping and there was blood, with the officer guessing all the dogs had been hit by gunfire. The officers found the dogs in the 2100 block of Robin Street and got out of the car and approached the dogs. At 07:38, Officer Taylor is heard telling the dogs to sit, with Officer Aleman telling someone off frame to stay in their car at 07:44. A female voice can be heard saying that the dogs were hers. At 07:58, the female can be heard crying and asking "what did you do? What did you do?" The female then asks someone to call her parents, with Officer Taylor advising there were people coming to the scene to help. Officer Taylor also tells the female the dogs were chasing people. At 08:55, the female says that the dogs ate a hole in the fence that she didn't know about until this incident.  Ms. Johnson then provides Officer Taylor with a phone number to contact her parents.  Officer Taylor, at 9:25, walks back to his vehicle to

42

ASI Number: 2018-03

retrieve his phone and states to Officer Newsome that he is going to call her parents for her. As Officer Taylor returns to speak to Ms. Johnson (from a distance) Ms. Johnson is questioning why the officers shot her dogs. The officers tell Ms. Johnson that her dogs charged at them. Officer Taylor then calls Ms. Johnson's mother and informs her that they have had a situation involving Ms. Johnson and her dogs and requests her mother to come assist her daughter at 2161 Robin Street.

At approximately 11:09 on the video Ms. Johnson's mother arrives. Officer Taylor approaches Ms. Johnson's mother and informs her what happened and asks her to help roll a window up so they can keep the dogs contained. The Mother approaches Ms. Johnson, who is crying hysterically, and attempts to calm her down. Officer Taylor also asks Ms. Johnson's father, who arrived on scene at the same time, to help his daughter. Ms. Johnson's father then takes control of the dogs from Ms. Johnson and tells her repeatedly to calm down. At 11:56 on the footage, Officer Newsome asks Officer Taylor what scene they were at and Officer Taylor responds they were at Timoleon and Touro. Ms. Johnson's mother could be heard telling the officers in the background that the dogs were just puppies as Ms. Johnson asks Officer Taylor if he called the SPCA. Officer Taylor responds yes and returns to his vehicle, standing in the passenger side doorway. At 12:42 on the footage, Officer Newsome leaves the scene in the direction of 5100 Touro Street. At 12:50 on the footage, Officer Aleman asks Officer Newsome, "This is a four, right?" and clarifies he means a level four use of force. Officer Taylor responds, "yeah, definitely."

Officer Taylor can be seen looking up the number for SPCA on his phone at that time and asks Officer Aleman if they have anyone on the way from SPCA. Officer Aleman responds that he doesn't know, but he doesn't think so.

Officer Taylor then attempts to call LASPCA from his phone as Sergeant Baker arrives at 13:17. Officer Taylor then relays the facts of the incident to Sergeant Baker, stating, "They charged at us and we were too far away from the vehicles, we (both) had to open fire." Officer Taylor says that two of the dogs were hit. Sergeant Baker asked if all three officers fired and Officer Taylor informs her that he did not fire. Sergeant Baker then looks at Officer Aleman and asks if he shot. Officer Aleman responds affirmatively and then states, "I tried not to . . . he was right on me." Sergeant Baker then instructs Officers Aleman and Taylor to go sit down as she approaches Ms. Johnson and the canines. Officer Taylor and Aleman stand in the passenger and driver's side doorways of their vehicle, respectively, for the next several minutes without conversing at all.

Approximately 16:25 into the video, the pickup truck with the dogs, Ms. Johnson, and Ms. Johnson's father, leaves the location. As the truck passes Officer Aleman and writes the license plate number as Officer Taylor calls the plate out to him. Sergeants Baker and Young walk back towards the vehicle as Sergeant Young calls out the truck information for Officer Smith. At the same time, Ms. Johnson's mother could be seen leaving the scene. At approximately 16:56 in the video an unknown black female is seen walking towards Touro Street on Robin, from Elysian Fields, passing the officers. As she passes, she says, "I was scared, walking my babies to school, I was so scared."

CITY DEFENDANTS - 001936

ASI Number: 2018-03

Sergeant Baker then asks Officer Taylor about the other scene, Officer Taylor informs her that that's where the shooting occurred, and he thinks only two of the dogs were hit. Sergeant Baker, at approximately 17:43 on the video, appears to adjust Officer Taylor's nameplate, as Officer Taylor tells her, "yeah, it's in there somewhere, it does that every time."

Approximately 19:00 minutes into the video, Sergeant Young tells Sergeant Baker he doesn't know where anyone went. Sergeant Baker responds, "Metairie Small Animal Hospital." At, 19:15 in the video, Sergeant Baker turns to Officer Taylor and asks, "did you end up getting anybody's name or anything?" Officer Taylor responds that he didn't.

At approximately 20:45 on the video, Lieutenant Burns, of FIT, could be heard on the radio telling Sergeant Young to ensure Officers Aleman and Newsome were sequestered and to tape the scene off and protect all evidence. Sergeant Baker then points to Officer Aleman and says, "Have a seat, you're sequestered." Sergeant Young asks the officers if they know where the owner came from. The officers state they weren't sure. Sergeant Young then asks the officers where the shell casings are, and the officers inform him that they are all on Touro Street. Sergeant Young then asks if there is any evidence on Robin Street. The officers respond that there is no evidence on Robin Street. Sergeant Young then says, "Well, besides the blood." Officer Taylor responds affirmatively. Sergeant Young then tells the officers not to talk to each other and instructs them to sequester themselves. Sergeant Young also states he is going to the scene on Touro Street.

At approximately 22:15 into the video, the officers and sergeants all leave the scene on Robin Street to return to the scene on Touro Street after Officer Taylor notes the address of 2163 Robin Street. After entering the car Officer Aleman could be heard saying, "man, we were almost home." Officer Taylor responds to him stating, "hey, we're still hot," in what appears to be a reference to the body cameras recording. Once they arrive in the 5100 block of Touro Street, Officer Taylor exits the vehicle that Officer Aleman is driving and leans against another police vehicle parked nearby. Securing the North end of the 5100 block of Touro Street.

Sergeant Baker then engages Officer Taylor in conversation about the emotional toll of shooting a dog. Sergeant Baker then points out that it must be hard on Officer Aleman because he is a dog lover. Sergeant Baker then walks to the primary scene and Officer Taylor sits in silence for the next several minutes. At approximately 30:35 in the video Sergeant Baker walks towards Officer Taylor and states, "it seems you two are leading in 108's on the watch." Officer Taylor responds to Sergeant Baker saying, "yeah, it seems to follow us." Sergeant Baker then tells Officer Taylor he can turn his camera off, and Officer Taylor does so. No other information is captured on Officer Taylor's BWC.

**BWC Footage from Officer Aleman**

Sergeant Barnes then reviewed the footage captured by Officer Aleman's BWC. The footage began with Officer Aleman driving to the scene. At 01:12, Officer Aleman was heard asking "They big dogs?" As he approaches Officer Newsome, Officer Newsome is heard saying the dogs were supposedly German Shepherds that were in the back yard and he thought he had seen something move as they approached 5124 Touro Street. Officer Newsome says he didn't

44

CITY DEFENDANTS - 001937

ASI Number: 2018-03

know if the gate closed or not. At 01:36, Officer Newsome was overheard telling Officer Taylor that his CEW wouldn't work against the dogs and that they would have to "take them things out." At 01:41, Officer Aleman could be heard saying "ohhh shit," as the dogs notice and begin to move towards the officers. At 01:44, the dogs began barking and running faster at the officers as the officers began to back up. At 01:47, Officer Newsome was seen on Officer Aleman's BWC discharging his weapon four times, with the dogs crying loudly. One dog runs up Touro Street towards Robin Street, while one of the other dogs runs in circles in front of 5124 Touro Street. At 01:53, the dog that was seen running in circles began running right at Officer Aleman. The third dog ran down Touro Street towards Selma Street. At 01:54, Officer Aleman discharged his weapon twice. That German Shephard then ran down Touro Street towards Selma Street. Officer Aleman says "fuck" and "goddamn it" and Officer Newsome can be seen calling in the incident on the radio. Officer Aleman says "goddamn it" as they all get into their vehicles to find the dogs. The footage from that point is corroborated by the footage from Officer Newsome's and Officer Taylor's BWCs. No new information is obtained from reviewing the next several minutes of the BWC.

At 7:26 on the video, Officer Aleman exits his vehicle in the 2100 block of Robin Street and Ms. Johnson can be seen pulling up in her truck. Officer Taylor can be heard telling the dogs to sit, while Officer Aleman tells Officer Taylor to be careful. At 07:38, Officer Aleman can be heard telling Ms. Johnson to stay in her car, while Ms. Johnson can be heard saying the dogs belonged to her and calling for Asta, one of the German Shepherds. Ms. Johnson can then be heard asking "what did you do?" and becoming emotional. At 08:00, Johnson is heard asking for someone to call her parents. Ms. Johnson and Officers Aleman and Taylor have an exchange, with Officer Taylor telling Ms. Johnson her dogs were chasing people. At 08:22, Officer Taylor receives Johnson's parents phone number from her and walks off-frame, presumably to call Ms. Johnson's parents. At 08:31, Officer Aleman asks Ms. Johnson to close the door of her truck and to roll up her windows so the dogs don't get back out. At 08:48, Ms. Johnson tells the officers the dogs had bitten a hole in the fence and she just realized it had happened. Ms. Johnson gives her parents phone number again and asks the officers "why was this necessary?" at 09:18. Officer Aleman tells Ms. Johnson her dogs "charged" and Officer Taylor states, "the dogs came at us." Ms. Johnson makes the comment when her mother arrived on the scene, she would roll up the windows, but she couldn't let go of the dogs. Officer Aleman then asks her to not let go of her dogs.

At 09:50, Officer Taylor is seen calling Ms. Johnson's parents.

At 11:12, the parents of Ms. Johnson are observed walking to her and the dogs. Officer Taylor asks if the Louisiana Society for the Prevention of Cruelty to Animals (LASPCA) was en-route and Officer Aleman commented he didn't know but didn't think they were.

At 13:14, Sergeant Young is seen on Officer Aleman's BWC footage, with Officer Aleman heard telling Sergeant Young the dogs had charged at them. Sergeant Young is then heard saying the dogs need to get to a veterinarian.

At 16:47, the same unknown black female observed on Officer Taylor's BWC is seen walking down the street, past Sergeant Baker, who had arrived previously. The female is heard

45

saying she was scared and was walking her child to school. It was unclear exactly what the female was commenting about. At 17:11. Sergeant Baker asked where Officer Newsome was, with Officer Aleman telling her he had gone to secure the other scene.

At 20:34, Lieutenant Burns was heard on the radio telling Sergeant Young to sequester the officers and treat the scenes as they would if a person had been shot. Officers Aleman and Taylor then secure the scene on Touro Street.

Just after 23 minutes into the video Officer Aleman parks the car in the 5100 block of Touro Street, at the intersection with Robin Street, and Officer Taylor exits the vehicle. For the remainder of the video Officer Aleman remains seated in the driver's seat of the vehicle sequestered. The video ends at 30:38 after Officer Taylor can be heard in the background relaying Sergeant Baker's message that they can turn off their cameras.

### BWC Footage of Sergeant Young

On Sunday, August 12, 2018, Sergeant Barnes reviewed the BWC footage captured by Sergeant James Young. The footage opened with Sergeant Young driving to the scene of the incident. Sergeant Young arrives on scene approximately 36 seconds into the video and exits his vehicle, walking towards Officer Aleman in who is at the driver's side door of his own vehicle. 52 seconds into the video, Sergeant Young asks, "what we got?" Officer Aleman turns and says to Sergeant Young, "The dogs charged me." Sergeant Young then asks who is taking the dogs to the vet and instructs the officers to get their names.

Sergeant Young then walks to Ms. Johnson's vehicle as a subject who identifies himself as a veterinarian technician approaches and informs Sergeant Young the best place to bring the dogs is to Metairie Small Animal Hospital. Sergeant Young then clarifies that is the quickest place as the subject provides instructions to get on the interstate and get off at the City Park exit to get there. Sergeant Young then asks Ms. Johnson and her family who can drive. Ms. Johnson's father states that he can drive, and he knows where MSAH is located.

At approximately 1:43 into the video the veterinarian technician says they need to apply a lot of pressure. Ms. Johnson responds, crying, that she doesn't know where the dog is shot and asks Sergeant Young where he shot her. Sergeant Young informs Ms. Johnson that he just arrived, and he is the supervisor. Sergeant Baker stands watch with as Sergeant Young talks to the family as the technician and Ms. Johnson's father attempt to locate the wound on one of the dogs. Ms. Johnsons father says he is going to put the dog in the back of the truck and ride with her. As he does so his glasses fall and Sergeant Young retrieves the glasses and places them in Ms. Johnson's father's front left pocket, at his request. Ms. Johnson and her father then place the second injured dog in the rear of the truck.

Sergeant Young tells Sergeant Baker that someone needs to follow the family to the veterinarian. Sergeant Baker responds, almost perplexed, pointing at Officers Taylor and Aleman as if to say they can't go. The veterinarian technician, as soon as the dogs were loaded into the rear of the vehicle, leaves the scene. Ms. Johnson then gets into the driver's seat of the vehicle as her father sits in the bed of the truck with the dogs. Sergeant Young then tells

46

ASI Number: 2018-03

Sergeant Baker to get Nahlisha Smith to the scene to follow them. Sergeant Young then contacts Officer Smith over the radio and relays the same information obtained from the other body worn camera footage.

Sergeant Young then walks to the intersection of Robin Street and Elysian Fields Avenue to watch which way the vehicle left so that he can relay it to Officer Smith. Sergeant Young then contacts Lieutenant Burns over the radio and the conversation captured on Officer Taylor's BWC could be heard. Sergeant Young then speaks to Officers Taylor and Aleman and informs them they are sequestered and asks them questions about where the evidence is located. During the questioning Sergeant Young does not go into any specifics of where evidence is located on the primary scene in the 5100 block of Touro Street.

At approximately 9:30 into the video, Sergeant Young states that all the officers can return to the primary scene in the 5100 block of Touro Street. At approximately 10:25 into the video Sergeant Young arrives on scene in the 5100 block of Touro Street and exits his vehicle. Sergeant Young then obtains a public safety statement from Officer Newsome attempting to locate any witnesses and evidence. Sergeant Young the walks to the rear of the driveway of 5124 and examines the area for any evidence. Sergeant Young then turns his BWC off at 14:39 into the video after it appears Lieutenant Turner motions that he can. No other information is captured on the BWC.

## BWC Footage of Sergeant Baker

On Sunday, August 12, 2018, Sergeant Barnes reviewed the BWC footage captured by Sergeant Baker. The footage begins as Sergeant Baker rides in the passenger seat of a police vehicle on her way to the scene. Sergeant Baker arrives on scene approximately 18 seconds into the video, exits her vehicle, and approaches Officer Taylor and turns on her body worn camera as Officer Taylor begins to tell her what occurred. On the footage, Officer Taylor's nameplate can be seen hanging from his shirt. Sergeant Baker then asks Officer Taylor if her BWC is on. Officer Taylor inspects the BWC visually and says it's on. Officer Taylor then tells Sergeant Baker there were three German Shepherds behind an open gate that had been chasing people and when they came the dogs charged at them. Officer Taylor then says they were, "too far away from the vehicles and we had to open fire." Officer Taylor explained that two of the dogs were hit and that he did not fire. Sergeant Baker then asked Officer Aleman if he fired and Officer Aleman responded affirmatively. Sergeant Baker then tells Officer Aleman to go sit down and she walks towards Ms. Johnson and the dogs.

Sergeant Baker stands on the opposite side of Sergeant Young near Ms. Johnson, her family, and the dogs. Sergeant Barnes observed the same information was captured on Sergeant Baker's BWC that was already documented on Sergeant Young's BWC. At approximately 2:35 on the video, Sergeant Baker asks with "we" have their (Ms. Johnson's) number so that they can contact them. Sergeant Young then states that they are going to have to get someone to follow them to the Vet. Sergeant Baker asks who and states, "they can't go," motioning to Officers Aleman and Taylor. After the dogs are loaded in the back of the pickup truck Sergeant Baker reminds Ms. Johnson to be careful because her father is in the bed of the truck.

47

ASI Number: 2018-03

Sergeant Baker then walks back to the vehicle where Officer Aleman and Taylor are and asks them where Jerome is (referring to Officer Jerome Newsome). Officer Taylor informs her that he is at the other scene on Touro Street. Officer Taylor informs her that the other scene is where the shots were fired, and the dogs started running. Sergeant Baker then points out Officer Taylor's nameplate is dislodged at approximately 4:50 on the video. At approximately 5:21 into the video, Sergeant Baker asks Officer Aleman if he is alright and pats him on the arm. Officer Aleman nods and says something that sounds like, "you know how I feel." Sergeant Baker responds, "oh yeah." At approximately 5:50 into the video an unknown, older male, appears on the lakeside sidewalk of Robin Street and asks the Officers if they need help. Sergeant Baker responds, "we're good" and thanks the man for checking.

The events captured on Sergeant Baker's BWC are documented on the BWCs already reviewed. No new information is obtained from the review of Sergeant Baker's BWC. While Sergeant Baker speaks with Lieutenant Turner in the 5100 block of Touro Street, Lieutenant Turner tells her she can turn off her BWC. Sergeant Baker then turns her BWC off at approximately 12:30 into the video. No other information is captured on Sergeant Baker's BWC.

<u>End of BWC Review</u>

On Thursday, August 9, 2018, at approximately 3:39 PM, investigators received an email from Sergeant Helou. The email contained copies of Officer Aleman's, Officer Newsome's and Officer Taylor's range qualifications from Officer Stephen Fox of the MTA. The document showed that Officers Aleman and Taylor were current at the time of the OIS. Officer Aleman last qualified on Tuesday, April 10, 2018. He achieved a passing score of 118 out of a possible 120. The document also showed he qualified with departmentally issued Glock model 22, serial number NO1366PD, the same weapon discharged on Wednesday, August 8, 2018.

Officer Taylor last qualified on Tuesday, January 23, 2018. Officer Newsome was not set to re-qualify with his weapon until October of 2018.

Officer Newsome last qualified on Monday, October 23, 2017. He achieved a passing score of 115 out of a possible 120. The document also showed he qualified with departmentally issued Glock model 22, serial number NO1637PD, the same weapon discharged on Wednesday, August 8, 2018, as well as a personally owned Glock model 27, serial number YEH682.

On Thursday, August 9, 2018, Sergeant Barnes received a compact disc (CD) from Sergeant Helou containing In Car Camera (ICC) footage from Officers Aleman's and Taylor's vehicle, as well as Officer Newsome's vehicle. The CD also contained the surveillance footage from 2111 Robin Street and recorded statements from Jones and Gonzalez.

Sergeant Barnes viewed the surveillance footage from 2111 Robin Street, which showed the corner of Robin and Touro Streets. A tree partially obscured the view of 5124 Touro Street and partially obscured the view of 5132 Touro Street. The time and date on the footage was "2018 08 08 06:56:17." Movement could be seen in the upper center right area of the frame. At 06:56:20, an Orleans Parish Sheriff's Office (OPSO) vehicle was observed entering the frame

48

CITY DEFENDANTS - 001941

from the right side and pulling up to where the movement was observed in front of 5124 Touro Street. At 06:56:56, the OPSO vehicle was observed backing up, with two NOPD vehicles driving up Touro Street and turning onto Robin Street. The OPSO vehicle proceeded down Touro Street towards Selma Street and off frame.

## Review of In-Car Camera Footage

### ICC Footage from Officer Newsome's vehicle

Sergeant Barnes reviewed the ICC footage captured by Officer Newsome's vehicle. The video started with Officer Newsome driving to the scene. After pulling up to the scene, Officer Newsome can be heard speaking with someone for a bit, with Officer Newsome overheard saying that if the dogs posed a danger, he would have to take them out. Officer Newsome is then heard contacting unit 316, Officer Aleman and Taylor, and asking for assistance. There is no activity on the camera until 06:54:37 when a white vehicle is seen backing out of a driveway. Officer Newsome spoke with the driver of the vehicle about the dogs and asks if the driver knows if anyone on the block owned the dogs. The driver said she didn't know and that she had just dropped one of her children off at the bus stop. Officer Newsome is then seen trying to see if he could see where the dogs were, on foot. The other officers arrive and then all the officers walk to the driveway area. At 06:55:46, the OPSO vehicle can be seen driving up to the scene. At 06:55:49, the dogs can be heard barking, with one of the officers is heard telling the dogs to get back as Officer Newsome is seen drawing his weapon and backing up, along with Officers Aleman and Taylor. The first shots were fired at 06:55:53, with a dog seen running at or near Officer Newsome. At 06:55:59, one of the dogs is seen running towards Selma Street, with the third dog running right at Officer Aleman, who fires twice and the dog running towards Selma Street. The dog that ran at or near Officer Newsome is then seen turning and running towards Selma Street.

Officer Newsome is seen calling in the incident on the radio and entering his vehicle, driving up Touro Street and turning on Robin Street. He then turns on Frenchman Street. At 06:56:43, the dogs could be seen running down Selma Street towards Elysian Fields Avenue. Officer Newsome turned onto Selma Street and began following the dogs. Officer Newsome pulled over to the side of the street and got out of the vehicle. The dogs can then be seen running by his vehicle to Elysian Fields Avenue and going up Elysian Fiends Avenue. Officer Newsome then drives to Selma Street and Elysian Fields Avenue and stops. Officer Newsome is heard making the comment they were going to have to put the dogs down. Officer Newsome is seen driving up Elysian Fields Avenue. Officer Newsome turns towards the strip mall in the 5200 block of Elysian Fields Avenue, with the first dog seen at 06:58:43. Officer Newsome parks his vehicle facing the strip mall. Officer Newsome contacted Sergeant Young and advised him of the situation. Officer Newsome then drives to the 2100 block of Robin Street. The ICC didn't offer any new information or differ from what the BWC footage offered, except for a wider view of the scene.

At 07:06:40, Officer Newsome is seen driving to the 5100 block of Touro Street to help secure it. At 07:12:22, Lieutenants Allison and Turner are seen pulling up to the scene and Officer Newsome explained to them what had occurred. Sergeant Young then arrived and

CITY DEFENDANTS - 001942

Officer Newsome explained the situation to him. Sergeant Baker also arrived at advised Officer Newsome he could turn off his ICC at that point.

## ICC Footage from Officer Aleman and Taylor's vehicle

Sergeant Barnes then reviewed the ICC of Officers Aleman and Taylor. The footage started as they were driving to the scene, parking behind Officer Newsome and walking to the driveway area of 5124 Touro Street. At 06:55:51, the officers were observed backing up, with a dog seen running at the officers and then muffled sounds that sounded like gunshots starting at 06:55:52. Another dog was seen running towards the officers at 06:55:57 and more muffled sounds that sounded like gunshots at 06:55:58. The dogs were then seen running on Touro Street towards Selma Street. The officers then got in their vehicle and followed Officer Newsome. Once they arrived on Selma Street, the officers stopped, with the dogs approaching and standing near Officer Newsome's vehicle. Officer Taylor got out of his and Officer Aleman's vehicle and began to approach the dogs, but they then ran towards Elysian Fields Avenue. They followed Officer Newsome to the corner of Elysian Fields Avenue and Selma Street, where Officer Newsome was seen getting out of his vehicle, along with Officer Taylor. The officers both got back into their vehicles and Officers Aleman and Taylor followed Officer Newsome until he turned in the 5200 block of Elysian Fields Avenue, with Officers Aleman and Taylor continuing up Elysian Fields Avenue and turning onto Filmore Avenue, turning around and going back to the strip mall in the 5200 block of Elysian Fields Avenue.

The officers then went to the 2100 block of Robin Street. The ICC footage had a wider view of the scene, but Detective McCleery did not see anything much different from what had already been outlined in the previous BWC and ICC footage. At 07:07:06, a green vehicle is seen turning onto Robin Street and a person gets out in what appears to be scrubs, approaching the Johnsons. The person appeared to help load the dogs into Johnson's truck, which left at 07:10:15. Officers Aleman and Taylor stayed in the 2100 block of Robin Street until 07:16:22, when they followed another police vehicle to the scene. The vehicle was parked at the corner of Robin and Touro Streets, but nothing of consequence was seen after. The footage ended at 07:24:50.

### End of ICC Review

On Thursday, August 9, 2018, at 12:54 PM, Detective McCleery received a phone call from Katherine Johnson. She agreed to meet with Detective McCleery at the PIB office for an interview at 1:00 PM the following day.

On Thursday, August 9, 2018, at 1:26 PM, Detective McCleery received an email from Lieutenant Burns advising SA Scanlan and Ting would be in the 5100 block of Touro Street at 9:00 AM on Friday, August 10, 2018, to search for the remaining casings.

On Friday, August 10, 2018, Detective McCleery met with Lieutenant Burns and Sergeants Barnes, Helou and Dillon before SA Scanlan arrived. Sergeant Helou was approached by Ron Ward (black male November 1, 1967) who advised Sergeant Helou he had witnessed the incident. Sergeant Helou took a recorded statement from Mr. Ward. The details of that statement are documented earlier in this report under the civilian witness section.

CITY DEFENDANTS - 001943

ASI Number: 2018-03

Special Agent Scanlan arrived and began a search of the area around 5124 Touro Street for the missing spent casings at 9:03 AM. At 9:14 AM, Ting located a single spent .40 caliber casing in the grassy area between the sidewalk and street near the driveway of 5124 Touro Street. Ting then "flipped" the casing up and moved it from its' original location. SA Scanlan marked the original location of the casing with a yellow flag, as well as where the casing ended up with an orange flag. The other casing was not located. SCIS was notified and Technician Courtney Carr was assigned.

<u>Follow-up canvassing of scene</u>

While waiting for Technician Carr, Sergeant Barnes and Detective McCleery decided to finish canvassing the area for possible witnesses and/or cameras. They started by going to 2102 Robin Street. They did not receive an answer and did not observe any surveillance cameras.

Next, the investigators went to ███████████ meeting with Adrian Darby (black male █████████. Darby stated the following, in summary, beginning at 9:26 AM:

Darby stated he was sleeping and heard five to six gunshots, which woke him up. He stated he looked out of the window and heard some dogs "scream" and run to his right, away from the gunshots. Detective McCleery asked Darby if he saw who was holding the weapons that caused the gunshots. Darby stated no at first, then said it was possibly a white police officer, who was running behind the dogs with his weapon out. Darby stated he wasn't sure if the officer shot the weapon. Detective McCleery asked Darby if he saw where the dogs ran to. Darby stated they ran to his right, towards the next block down from Robin and Touro Streets, pointing towards Selma Street. Detective McCleery asked if anyone else was home at the time of the incident. Darby stated his wife was, but she was sleeping at the time of the incident and by the time she got up, there were only a bunch of police officers on the scene. Detective McCleery then asked Darby if he had a surveillance camera on his house and he stated he did not.

The investigators then went to ███████████ and spoke with Sharon Turk (black female ██████████. Mrs. Turk stated the following, in summary, beginning at 9:36 AM:

Mrs. Turk stated she was home when she woke up when she heard a dog barking. She then heard four gunshots and a dog yelping. Mrs. Turk stated she thought she heard four more gunshots. Mrs. Turk stated she got up and looked out all her windows but did not see anything. Mrs. Turk stated she thought she may have been dreaming because of some sleeping medication she had been taking, so she got back in bed and went back to sleep.

Detective McCleery then confirmed with Mrs. Turk they had spoken briefly before recording the interview and that during that unrecorded interaction, she had classified the barking she heard as aggressive. Mrs. Turk agreed with Detective McCleery. Mrs. Turk stated "I would say aggressive, yea. When the dog is on the...ummm...you know when the dog is attacking, you know...we're a dog family...it's a different bark then when a dog is just barking and when a dog is growling. I heard a growl. Almost like this dog barked next door when he ran over here to attack my daughter...that kind of a...that kind of a bark...you could tell he was barking or he

51

CITY DEFENDANTS - 001944

was after somebody…you know…it was definitely a…ummm…that's the best word I could use to describe it…aggressive…it was a growl, it wasn't a bark…it's that rrrrrrr…like I'm…yea."

Sergeant Barnes then clarified with Mrs. Turk the incident involving her daughter was a separate incident that had occurred with a different dog.

Mrs. Turk stated she heard on the news it was Shepherds, saying they didn't see stray dogs in that area, especially not Shepherds and definitely not three Shepherds. Turk stated they didn't even hear dogs barking in the area, except for the dog next door. Turk asked if the investigators knew where the dogs came from and if they were someone's pets. The investigators let Turk know they knew where from but couldn't answer her question about the dogs being someone's pets. Turk then stated she was surprised and frightened because it could have been her or her husband or her daughter. She then stated she looked out of her windows in the opposite direction of where the incident occurred initially.

Turk then stated she was glad the incident was on the news so she could verify it for her husband and daughter and not have them think she was having a dream. Turk then spoke about another incident concerning the dog next door that had nothing to do with the current incident.

At the conclusion of the interview, Detective McCleery received a phone call from Katherine Johnson. Ms. Johnson advised she would have to reschedule her interview for Tuesday, August 14, 2018 due to work conflicts.

The investigators then went to █████████ and spoke with Daniel Chartian (black male █████████. Mr. Chartian advised he was not home at the time of the incident.

Next, the investigators went to █████████ and spoke with an Unknown Female. The female refused to open her screen door, which was dark enough the investigators couldn't see the female. She also refused to identify herself. The investigators asked if she had seen or heard anything, with the female advising she didn't see or hear anything and didn't go outside.

Lastly, the investigators spoke with Robert Walters (black male █████████ at █████████ Mr. Walters advised he heard three to four gunshots but did not see anything. He added on Tuesday, August 7, 2018, he was on his porch and saw a slim black male walking down Touro Street saying he was looking for his German Shepard. He did not know the male.

**End of Canvass**

SCIS Technician Carr then arrived on the scene and collected the spent casing. She then relocated to C.P. and E and submitted the casing with C.P.&E. Police Technician Veronica Manuel.

Detective McCleery then contacted OPSO Agent Robert Lear about the OPSO vehicle seen in the ICC footage. Agent Lear advised he would research it.

CITY DEFENDANTS - 001945

ASI Number: 2018-03

Later that day, Agent Lear contacted Detective McCleery and advised he could not locate information on who the deputy was. Agent Lear requested a picture of the vehicle be emailed to him. At 12:06 PM on Friday, August 8, 2018, Detective McCleery did so.

On Friday, August 10, 2018, at approximately 12:37 PM, Agent Lear contacted Detective McCleery and advised the driver of the vehicle in question was Major Kevin Winfield. Agent Lear also provided a contact number for Major Winfield. Detective McCleery contacted Major Winfield and arranged to meet with him on Monday, August 13, 2018.

Detective McCleery then arranged to meet Officers Aleman and Newsome on Monday, August 13, 2018, as well.

On Friday, August 10, Detective McCleery received an email from NOPD Firearms Examiner Kenneth Leary at 12:55 PM. Examiner Leary advised he had examined the spent casings from Touro Street. Examiner Leary was wondering if the involved officers would be test firing their weapons, as well. Detective McCleery advised that the officers would be interviewed Monday and he would advise them to make arrangements to test fire their weapons.

On Tuesday, August 14, 2018, at 12:05 PM, Sergeant Barnes downloaded and emailed Detective McCleery the footage from Officer Taylor's CEW. Sergeant Barnes and Detective McCleery reviewed the footage. The footage was very brief and lasted approximately one (1) second. The view from the camera was obscured, presumably by Officer Taylor's hand. Detective McCleery could hear the dogs yelping in the background.

On Wednesday, August 15, 2018, at 8:11 AM, Detective McCleery emailed Officers Newsome and Aleman and advised them to contact Kenneth Leary or Sean McElrath in the Firearms section to have their weapons test fired.

At 9:29 AM, Detective McCleery received an email from Sergeant Dillon containing pictures of 2045 Mirabeau Street, Johnson's home. The pictures did not show the location of the hole in the fence.

At 10:49 AM, Detective McCleery received an email from Ms. Johnson with the medical records for Ellie and Burrito attached.

Detective McCleery also received a text message from Ms. Johnson advising April may be living at 2131 or 2133 Timoleon Street.

At 4:34 PM, Detective McCleery received an email from Officer Newsome advising he was trying to set up his firearms test.

At 10:07 PM, Detective McCleery and Officer Taylor agreed to meet the following Monday, August 20, 2018 at 12:00 PM. Detective McCleery then notified Sergeant Barnes of the interview.

CITY DEFENDANTS - 001946

ASI Number: 2018-03

On Wednesday, August 22, 2018, at 11:39 AM, Detective McCleery received a report from Firearms Examiner Sean McElrath which revealed that three of the five casings recovered from the scene were fired from the firearm used by Officer Newsome during the incident. The report also relayed that the remaining two casings recovered from the scene had been fired from the firearm used by Officer Aleman during the incident.

On Wednesday, August 22, 2018, at 1:09 PM, Detective McCleery and Sergeant Barnes went to 2131 Timoleon Street and met with an unknown black female. The female advised April was her aunt and did not get home from work until after 6:00 PM. Detective McCleery gave the female his contact number and asked her to have April call him.

On Friday, August 24, 2018, Detective McCleery received a call from April Thompson (black female ██████████████) at 10:59 AM. Ms. Thompson agreed to be recorded so Detective McCleery telephonically interviewed Thompson, in the presence of Sergeant Travis Ward of FIT, with Ms. Thompson stating the following, in summary:

Ms. Thompson stated she had taken her dog out to go to the bathroom, then brought her dog back in. Ms. Thompson was in the kitchen and heard her dog barking. Normally when her dog barked, someone was at the front door or something was distracting her dog. Ms. Thompson stated she didn't hear anyone knocking on the door, so she looked through the peep hole and did not see anyone. Ms. Thompson stated she then opened the door and saw three German Shepherds in the middle of the block. Ms. Thompson said somebody's dogs were out and closed the door. Ms. Thompson stated she went back to doing what she was doing before and was trying to remember where she had seen the German Shepherds before. Ms. Thompson stated she texted her neighbor not to bring her dogs outside. After about 10-15 minutes, Ms. Thompson realized where she knew the dogs from. Ms. Thompson stated she looked out again and saw the dogs going towards Elysian Fields Avenue. Ms. Thompson stated she then got in her car and knocked on the door of the house where she had seen the dogs before and told the owner her dogs were out. Ms. Thompson stated she went back to her house and about 15 minutes later she looked out again and saw the owner in her truck looking for the dogs. Ms. Thompson stated the owner turned the corner, with Ms. Thompson asking if she had found her dogs yet and the owner saying she hadn't. Ms. Thompson then commented to the owner that the dogs should be around somewhere.

Detective McCleery asked Thompson how she would describe the behavior of the dogs when she saw them. Ms. Thompson stated the three dogs were walking together close, maybe trying to find their way home. Ms. Thompson stated the dogs may have been a little frightened, but she didn't know for sure. Ms. Thompson confirmed they were walking in the middle of the block towards Saint Anthony Street the first time she saw them. The second time she saw the dogs, they were at Elysian Fields Avenue and Timoleon Street. Detective McCleery asked Ms. Thompson if she had spoken with the owner of the dogs before. Ms. Thompson stated she hadn't seen the owner before but knew the house where the German Shepherds were from because she walked her dog in the neighborhood before. Detective McCleery asked Ms. Thompson if she heard anything else that morning, but Ms. Thompson stated she didn't and learned of the incident from other people and/or the news.

54

CITY DEFENDANTS - 001947

ASI Number: 2018-03

The interview was concluded at 11:07 AM and was audio recorded.

On Thursday, September 20, 2018, Detective McCleery received the tactical deployment report from Officer Bender regarding the deployment of his canine, Paco.

Sergeant Barnes learned at the conclusion of the criminal investigation, there were no violations of criminal law identified on the part of Officers Jerome Newsome or Emilio Aleman.

## Summary & Conclusions

During his investigation, Sergeant Barnes learned Officer Newsome responded to a call concerning three aggressive dogs who were chasing children in the area and were in the rear of ▮▮▮▮▮▮▮▮▮▮▮ an abandoned house.  Officers Aleman and Taylor arrived on scene to provide backup for Officer Newsome, at his request.  Once Officer Aleman and Taylor arrived on scene, Officer Newsome let the officers to the driveway of ▮▮▮▮▮▮▮▮ where they encountered three large German Shepherds in the rear driveway, behind an open gate, who charged aggressively at the officers.  The officers were far enough from the gate when they were spotted by the dogs that they did not appear to have time to shut the gate.  The officers were also far enough from their cars that they were unable to retreat to their vehicles for cover.  Less than ten seconds elapsed from the time the officers observed the dogs to the dogs observing and then charging aggressively at the officers.  Once the dogs began charging it took less than three seconds for the dogs to close the distance, creating a dangerous situation in which one or more of the officers could have suffered serious injury.  In those three seconds, Officer Newsome made the decision to fire his weapon four times, striking two of the dogs.  One of the dogs, still approaching, was shot at another two times by Officer Aleman.

The entire incident from the time the officers initially observed the dogs until the time the first shot was fire took approximately 12 seconds.  The time from Officer Newsome firing his first shot to Officer Aleman firing his last shot took approximately 8 seconds with approximately 6 seconds between Officer Newsome's last shot and Officer Aleman's first shot.  The entirety of the shooting incident, from the time the Officer first encountered the dogs until the last shot was fired took approximately 20 seconds.

During the investigation, Sergeant Barnes determined the discharge appeared consistent with state, federal, and municipal laws, as well as NOPD policy.  Sergeant Barnes also determined the officers are not properly trained on how to approach on calls concerning aggressive animals.  Sergeant Barnes does believe that a safer approach, such as in a vehicle, or an approach that provided the officers with better cover from an attacking canine, would appear to be a common-sense tactic.  However, common-sense is not a standard that individuals can be held to, nor is it often adhered to.

## Final Recommendation Section

Sergeant Barnes, as a result of the investigation, recommends Officer Newsome undergo a refresher course on use of force decision making, especially one that emphasizes the impacts an initial approach to an incident may have on whether force results.  Sergeant Barnes would also

55

ASI Number: 2018-03

Sergeant Barnes also recommends the critical firearms discharge in this incident be classified as within policy.  The investigation of Sergeant Barnes determined the officers involved did not violate any Municipal, State, or Federal Laws, and did not violate NOPD Policy.

**Signatures**

Respectfully Submitted

Date: ___1/21/2018___
Sgt. David A. Barnes
New Orleans Police Department
Force Investigation Team

Concur/Does Not Concur

Date: 2-3-19
Lieutenant Kevin Burns
Public Integrity Bureau
Force Investigation Team

Concur/Does Not Concur

Cmdr. _____ Date: 2-4-19
Commander Regina Williams
Public Integrity Bureau

56

CITY DEFENDANTS - 001949