**Firearm discharge**      **PIB Control Number: FTN2020-0003**       **Received: May 14, 2020 10:00**

Item Number: A-02353-20

**Involved citizen:**

  **Animal**

**Officers / employees involved:**

  **SENIOR POLICE OFFICER Gregory C Rotton [02041/026104]**

   **Officer / employee current info:**

   Bureau:  FOB - Field Operations Bureau
   District / Division:  1st District
   Division Assignment: DIU Property

   **Snapshot - Officer / employee information at time of incident:**

   Windows Username: 026104
   Bureau:  FOB - Field Operations Bureau
   District / Division:  First District
   Division Assignment:  D.I.U.
   Unit Assignment:  Persons
   Working Status:  Unknown Working Status
   Shift Hours:  Unknown Shift Hours
   Rank/title: SENIOR POLICE OFFICER
   Age: 31   Years of employment: 5   Years with unit: 5
   Off duty:   Off duty employed:

**Summary:**

   This is not a use of force for reporting purposes.   The incident involved a discharge and shooting
   of a dog.  This will be presented to the UOFRB on 5-14-2020 and is documented under the
   attached ASI.

   The ASI will be attached after the UOFRB presentation

   Presented before the UOFRB on Thursday, May 14, 2020.

**When/where:**

Date/time occurred: Jan 03 2020

Incident location:      new orleans LA   Precinct: 3rd District
   County:  Orleans Parish

**Linked files:**

      OneDrive_1_7-7-2020   (zip)
      ASI # 2020-01   (pdf)

**Status/assignment information:**

CITY DEFENDANTS - 001950

Status: Completed

Opened:  Assigned:      Due: 01/08/2020      Completed: 05/14/2020

Disposition: UOF No Reportable Force Used by Officer

Unit assigned: PIB F.I.T.
Handled at field/unit level: No
Investigator assigned: POLICE SERGEANT David Barnes
Supervisor assigned: Un-assigned
Source of information:
Extension Due Date:


**Organizational component(s):**

Bureau: FOB - Field Operations Bureau
District / Division: First District
Division Assignment: D.I.U.
Unit Assignment: Persons
Working Status: Paid Detail
Shift Hours: Unknown Shift Hours


**Entered via BlueTeam by: POLICE SERGEANT Samuel Davis [00200/016415] on May 07, 2020 at 12:23**

CITY DEFENDANTS - 001951

## DEPARTMENT OF POLICE
## INTEROFFICE CORRESPONDENCE

TO: Captain Sabrina Richardson                                  DATE: 6-22-2021
Public Integrity Bureau

FROM: Sergeant John M. Helou
Public Integrity Bureau, Force Investigation Team

SUBJECT: ASI # 2020-01

While fulfilling a Public Records Request for this investigation, it was discovered the case file contained an unapproved copy of the investigative report. This investigation was presented before the Use of Force Review Board on Thursday, May 14, 2020. The purpose of this correspondence is to ensure the case file contains an approved copy of the attached investigative report.

Respectfully Submitted,

Concur / Does Not Concur

Date: July 7, 2021

Captain Sabrina Richardson
Public Integrity Bureau

# New Orleans Police Department
## Public Integrity Bureau
## Force Investigation Team
## Administrative Shooting Investigation

TO:       Captain Sabrina Richardson                 DATE:  5-4-2020
                Public Integrity Bureau

FROM:     Sergeant David A. Barnes
                Force Investigation Team

SUBJECT:  ASI # 2020-0001 / NOPD Item # L-30357-19 / A-02353-20
             Critical Discharge of a Firearm by Detective Gregory Rotton (Canine Hit)

## Event Summary

On Thursday, January 2, 2020, New Orleans Police Detective Greg Rotton was conducting a follow up investigation under New Orleans Police Item L-30357-19. The follow up investigation was on a Simple Burglary that occurred at ████████████ on Monday, December 23, 2019. Detective Rotton was canvassing the 2800 block of Onzaga Street for surveillance cameras at about 6:23 PM.

Detective Rotton walked river bound on the downtown side sidewalk of Onzaga Street towards North Dupre Street. When Detective Rotton arrived at the end of the block, Onzaga Street and North Dupre Street he encountered a large Dobermann-Pinscher dog in front of 2737 Onzaga Street. As Detective Rotton crossed the intersection, the dog, later learned to be "Hilo," barked at and charged towards Detective Rotton. Detective Rotton began backing away as the dog approached, before firing four shots at Hilo striking her, causing her to collapse in the street where she succumbed to her injuries.

The New Orleans Police Department's Force Investigation Team was notified of the firearms discharge and responded to the scene to investigate.

There were no injuries to the officers or any human beings as a result of the discharge. Detective Rotton remained on full-duty status after the incident.

## Notifications

The Force Investigation Team was notified at approximately 6:38 PM. Lieutenant Kevin Burns then made the following notifications:

NOPD Deputy Chief of PIB Arlinda Westbrook,
NOPD Captain of PIB Sabrina Richardson,

ASI Number: 2020-01

Officer of the Independent Police Monitor Representative Ms. Tonya McClary,
Federal Consent Decree Monitor Chet Epperson,
FBI Special Agent Ron Reed,
First Assistant District Attorney Mr. Graymond Martin,
and
New Orleans City Attorney's Office Representative Mrs. Isaka Williams.


### Lead Investigators

    Sergeant David Barnes was assigned to conduct the Administrative Shooting Investigation. Sergeant Debra Normand Pruitt was assigned to lead the criminal investigation into this incident.


### Involved Officer(s)


**1.  SPO Gregory Rotton**    **Badge # 2041**

| | |
|---|---|
| Duty Assignment: | FOB / 1st District / DIU |
| Employee ID: | 26104 |
| Personal: | Race: White |
| | Gender: Male |
| | Date of Birth: ████████ |
| | Age:  31 years of age |
| | |
| Uniform Status: | Plain Clothes DIU assignment (attired in NOPD Polo Shirt) |
| Appointed to NOPD: | March 15, 2015 – four (4) years, ten (10) months |
| P.O.S.T. Firearm Certification: | August 26, 2019 (prior to this incident) |
| Body Armor Equipped: | Yes. |
| BWC: | Not assigned. |
| Previous Serious Uses of Force: | No Previous serious uses of force |
| PIB Short Form: | Officer Rotton has a previous firearms discharge involving a patrol rifle documented under ASI 2016-05, NOPD Item number H-22654-16.  The incident involved an individual actively shooting at Law Enforcement Officers. |
| Employee Assistance: | Officer Rotton was provided information regarding the Officer Assistance Program and contact information for the Department's Psychiatrist Dr. Bill McDermott. |
| | |
| Attorney Involvement: | Donovan Livaccari (FOP Representative) |
| Injuries: | None |
| Photos Taken: | Overall Photographs of the scene were taken as well as 360-degree photographs of Officer Rotton |

2

ASI Number: 2020-01

Public Safety Statement:          Lieutenant Kevin Burns obtained a public safety statement
                                  from Officer Rotton on scene.
Duty Status following CFD:        Full duty

      Sergeant Barnes did not smell alcohol emanating from Detective Rotton and Detective Rotton did not appear to be under the influence of any mind-altering substances at the time of the on-scene investigation.   Sergeant Barnes requested the results of Officer Rotton's administrative drug testing from the City of New Orleans Civil Service Department and learned Officer Rotton's drug testing results were clear.

## Chronological Narrative Section

      On Thursday, January 2, 2020, NOPD's Force Investigation Team (FIT) responded to a critical firearms discharge in which NOPD Detective Gregory Rotton discharged his firearm, striking and killing a canine at the intersection of Onzaga Street and North Dupre Street. A more detailed account of the notification of FIT and the initial response can be found in this report under the "Notifications" and "Force Investigation Team Response" sections. This narrative will serve to detail pertinent steps taken during the on-scene and follow up investigation not already documented elsewhere in this report.

## On-Scene Investigation

      On Thursday, January 2, 2020, at approximately 6:38 PM, Sergeant David Barnes of the NOPD's Force Investigation Team (FIT), was notified of an officer involved shooting involving Detective Gregory Rotton shooting a canine at the intersection of Onzaga Street and North Dupre Street.

      Sergeant Barnes arrived on scene at approximately 7:16 PM and met with Lieutenant Kevin Burns and Sergeant Debra Pruitt, both of FIT. Sergeant Barnes was informed by Lieutenant Burns that he would be assigned the administrative shooting investigation while Sergeant Debra Norman Pruitt would be assigned to conduct the criminal investigation. Lieutenant Burns also informed Sergeant Barnes he had already obtained a public safety statement from Detective Rotton.

## Public Safety Statements

      *A public safety statement is a statement by an involved or witness officer that describes the type of force used, the direction and approximate number of shots fired by the involved officer(s) and the suspect, the location of any injured persons, the description of any outstanding suspects, and the direction of the suspect's flight. The public safety statement may also include the amount of time elapsed since the suspect was last seen, whether the suspect is armed, any other information that could assist in the apprehension of outstanding suspects, descriptions of any victims or witnesses, and a description and location of any known evidence. The public safety statement may also include any other information needed to ensure public safety. It should be noted, public safety statements are not recorded.*

## Public Safety Statement of Detective Gregory Rotton

3

ASI Number: 2020-01

On Thursday, January 2, 2020, at approximately 7:00 PM, Lieutenant Burns obtained a public safety statement from Detective Rotton. In that statement, Detective Rotton relayed he fired three or four shots at the dog, in a downward direction, and that he did not know of anyone who was hurt and did not suffer any injuries himself. Detective Rotton identified to Lieutenant Burns where the scene was contained and where in the intersection any evidence should be found.

## Investigation Continued

Sergeant Barnes noted the scene was cordoned with police tape across the 2700 and 2800 blocks of Onzaga Street as well as the 1600 blocks of North Dupre on both sides of Onzaga Street. Sergeant Barnes noted the 1600 block of North Dupre Street was a double block, with the addresses in the 1600s spanning two blocks, one block on either side of Onzaga Street. Sergeant Barnes observed a deceased female Dobermann-Pinscher at the northwest most corner of the intersection of Onzaga Street and North Dupre Street. The deceased Dobermann was laying on her right side with a large puddle of coagulated blood surrounding the head with a pile of formed feces nearest the anus. The dog's head was pointing in a southbound direction with her front legs extended. The left paw was bent back as the right paw remained straight. The rear legs were extended. The mouth was slightly open with her tongue extended out on the right side on the ground.

Sergeant Pruitt alerted Sergeant Barnes to apparent injuries in the following locations: top of the head, neck, and upper back near the shoulder blades. Investigators observed one spent bullet on the ground, near Hilo's neck, and one spent casing on the ground between Hilo's front and rear legs. Investigators noted Hilo did not have a collar or any other obvious identifying items. Sergeant Barnes observed two additional spent bullet casings were in proximity of each other nearest the northwest corner of the intersection

## Subject of Force

The subject of force was identified as a female Dobermann Pinscher identified as "Hilo". Hilo was approximately six years old and resided at ███████████ New Orleans, Louisiana, 70119.

## Scene Description

On Thursday, January 2, 2020, at about 7:12PM, the temperature was and average of 73 degrees Fahrenheit, the sky was cloudy, the ground was free of moisture and there was an occasional strong breeze.

The scene was contained near the intersection of North Dupre Street and Onzaga Street. North Dupre Street was a one-way street traveling in a downtown direction and Onzaga Street was a two-way street within a residential neighborhood. The intersection was bordered by the following: D'Abadie Street to the north, Lapeyrouse Street to the south, Paul Morphy Street to the east and Gentilly Boulevard to the west. The intersection was composed of a residence on

4

ASI Number: 2020-01

each corner. With 2737 Onzaga Street on the Northeast corner of the intersection (the downtown / riverside corner).

The scene was cordoned with police tape across the 2700 and 2800 block of Onzaga Street as well as the 1600 block of North Dupre on both sides of Onzaga Street. A deceased female Dobermann lay at the northwest most corner intersecting streets at Onzaga Street and North Dupre. The Dobermann, called "Hilo," was laying on her right side with a large puddle of coagulated blood surrounding the head with formed feces nearest the anus. Hilo's head was pointing in the southbound direction.

Investigators observed apparent injuries in the following locations: top of the head, neck, and upper back near the shoulder blades. There was one spent bullet on the ground, near Hilo's neck and one spent casing on the ground between Hilo's front and rear legs. Hilo was not attired in a collar or any other obvious identifying items. Two additional spent bullet casings were located in close proximity of each other nearest the northwest corner of the intersection.

Hilo lived with her owner, Clayton Crawford at ▮▮▮▮▮▮▮▮▮▮ The residence was on the northeast corner of the intersection, parallel to Hilo's final resting place. The residence was a raised double with siding and white trim. The doors to the residence were red. In the window of the rear door was a sign that read "Beware of the dog." The front and sides of the residence were not secured by a fence or other means. The rear yard appeared to once have a chain link fence due to the remaining poles and partial chain link fence. From the rear of the residence was a pole with chain link fence, a pole, then a chain link fence door, and another pole. After the last pole was a large opening then another pole, chain link fence to a corner pole.

## Involved Witness Statement(s)

### Statement of Mr. Clayton Crawford

On Thursday, January 2, 2020, Investigators learned the owner of the involved Dobermann was Mr. Clayton Crawford, a white male with a date of birth of ▮▮▮▮▮▮▮▮▮ who resided at ▮▮▮▮▮▮▮▮ On Thursday, January 2, 2020, at approximately 7:24 PM, Sergeant Pruitt obtained and audio recorded statement from Mr. Crawford. In that statement, Mr. Crawford provided the following information, in summary:

Mr. Crawford stated he resided at ▮▮▮▮▮▮▮ and the owner of Hilo, six-year-old, female, Dobermann. Mr. Crawford stated he let his dogs out from the rear door of his residence. The smaller dog ran back inside the residence, because it was windy, and the Dobermann, named Hilo, remained outside. After Mr. Crawford tended to the smaller dog, he relocated out his back door. Mr. Crawford state he walks to the dogs near the side of his house regularly, sometimes on a leash and sometimes off a leash. Mr. Crawford stated the dog was a very well-behaved dog and would normally never step out of her yard, but someone "walking down the street in the middle of the night," would raise her suspicion. Mr. Crawford then stated, "you know, she is a guard dog . . . she went out of the yard and she barked at him." Mr. Crawford then added that the dog did not bite the officer.

5

ASI Number: 2020-01

When asked where the dog and the officer were, Mr. Crawford stated she was right in front of the officer, maybe a foot or so, and stated that as soon as she got within range of him the officer shot her. Mr. Crawford stated the dog barked at the officer for sure and added that it wasn't the officer's fault, and that she was an intimidating dog. Mr. Crawford, when asked, stated he believed the dog did a kind of "bursting" run at the officer.

Mr. Crawford stated the officer was alone and didn't even look like an officer, he just looked like a guy with a gun. Mr. Crawford then stated the officer was a good man and that the officer was sorry. Mr. Crawford again stated it wasn't the officer's fault. Mr. Crawford stated it seemed rash, and was worried what would happen if it was a child who had scared the officer, and stated that he felt like officers should be trained to handle that kind of situation without firing a weapon. Mr. Crawford stated he felt like the officer shouldn't be allowed to fire a weapon in such close proximity to everyone around because a dog is barking at him. Mr. Crawford expressed concern that he didn't know what an officer was doing walking in the neighborhood with a loaded gun.

Mr. Crawford stated after the dog was shot, he walked up to the officer and stated, "you shot her. Why did you shoot her?" and the Officer stated he thought the dog was going to attack him. Mr. Crawford stated the officer was genuinely sorry. When asked Mr. Crawford stated the dog died over the course of approximately 10 to 15 minutes.

Sergeant Pruitt concluded the interview at approximately 7:33 PM. The audio statement was reviewed and retained within the case file.

Sergeant Pruitt explained to Mr. Crawford she was lead investigator on the case. Mr. Crawford was concerned about Hilo remaining on the ground. Sergeant Pruitt ensured Mr. Crawford that in order to do a thorough investigation, Hilo had to remain on scene. Sergeant Pruitt further informed Mr. Crawford the Crime Lab Unit would photograph and document the scene as it was, prior to collecting all of the evidence.

### Civilian Witness Statement(s)

On Thursday, January 2, 2020, while on scene, Sergeant Barnes spoke with the following nearby residents from the following addresses:

 – Sharon Swan (W/F ▮▮▮▮▮▮▮▮ and Killean Holley (B/M ▮▮▮▮ ).

Both subjects informed Sergeant Barnes they were inside of the residence at the time and heard gunshots but did not see what happened. The subjects did not immediately come outside after the gunshots.

 – Garmanne Mack (B/F ▮▮▮▮▮▮▮▮ ) and Derrick Mack (B/M ▮▮▮▮

6

ASI Number: 2020-01

Mrs. Garmanne Mack informed Sergeant Barnes she was inside of her residence, located at the Southwest corner of Onzaga and N. Dupre Streets, when she heard four (4) gunshots and then heard the detective apologizing to the owner of the canine. Mrs. Mack stated she came outside and saw the officer telling the owner of the canine, "I'm sorry man."

Mr. Derrick Mack informed Sergeant Barnes he was inside the back of the residence at the time of the incident and didn't hear anything and didn't know what was going on.

It should be noted the following interviewed individuals were all located on or near the porch of 1640 N. Dupre while being interviewed and shared similar stories and similar concerns that the canine had been shot. All of the individuals agreed that the dog had never shown signs of aggression in their previous encounters with the dog and appeared extremely upset that the incident occurred, saying that incidents like this don't happen in their neighborhood and questioned why the officer would be conducting an investigation in the evening because it was disruptive to the neighborhood. After a brief exercise in community policing, the residents seemed to understand that a thorough investigation was being conducted into the incident and that their concerns were noted. The interaction and interviews were conducted in the presence of Ms. Tonya McClary of the OIPM.

 Rachelle Turner (W/F ) and Scott Turner (W/M ).

Mrs. Rachelle Turner informed Sergeant Barnes she was inside with the doors open and heard four shots. She did not immediately come outside and did not witness the event.

Mr. Scott Turner, when approached, was very upset and confrontational that it took investigators an hour to speak with him because he was sitting on the porch watching the scene and taking pictures of the aftermath. Mr. Turner later informed Sergeant Barnes he was "useless" to the investigation because he was in the shower at the time of the incident.

 Ms. Anya Canache (W/F )

Ms. Canache informed Sergeant Barnes she was inside and heard four (4) shots and believed it was someone banging on her door. Ms. Canache stated she later exited her residence and observed the dead animal and her neighbor crying near the animal.

 – Ms. Emily Neustrom (W/F ).

Ms. Neustrom stated she was inside when she heard the gunshots and also thought it was someone banging on her door. Ms. Neustrom informed Sergeant Barnes she did not immediately come out of her residence.

## Physical Evidence Section

On January 2, 2020, at about 8:17 PM Exhibits #1 - #2 were collected by Crime Scene Technician Jerome Haynes at the intersection of Onzaga Street and North Dupre Street and placed on as evidence at NOPD's Central Property and Evidence Room:

7

ASI Number: 2020-01

### Exhibit 1:
Four fired .40 S&W spent casings from scene. (North Dupre and Onzaga Street)
The spent casings were compared to Detective Greg Rotton's firearm. The spent casings were
found to be fired from Detective Rotton's firearm.

### Exhibit 2:
One spent bullet from scene (below Hilo's chin) The spent bullet was consistent with .40 caliber
class ammunition, however; did not possess sufficient individual markings for any further
conclusions to be made.

On Friday, January 3, 2020, at about 4:11PM, Exhibits #3-#4 were collected by Sergeant
Debra Pruitt from 1700 Mardi Gras Boulevard, directly after Hilo's necropsy and placed on as
evidence at NOPD's Central Property and Evidence Room:

### Exhibit 3:
One unknown caliber copper jacketed projectile (removed at necropsy) The projectile had similar
rifling characteristics to the test fired material; however, no further conclusions were made.

### Exhibit 4:
One unknown caliber copper jacketed projectile (removed at necropsy) The projectile had similar
rifling characteristics to the test fired material; however, no further conclusions were made.

*Evidence & Firearms Recovered/ Processed:*

| | |
|---|---|
| **Rounds Fired:** | (4) |
| **Rounds Taking Effect:** | (4) |
| **Bullets Recovered:** | (3) |
| **Shell Casings Recovered:** | Forensic examination determined the casings were fired by |

the firearm assigned to Officer Rotton.

**Weapons Inspected:**     3

1.  Glock Model: 22
    Serial # NO-0873-PD
    Caliber: .40 Caliber

The firearm was issued to and used by Detective Rotton. The firearm was found to be
loaded with 11 live .40 caliber rounds. Forensic examination determined all the casings
recovered were fired from this firearm.

### Academy Examination of Firearm

On Thursday, January 2, 2020, at approximately 7:28 PM, Officer Stephen Fox, Unit 5791
of the NOPD Firearms Training Staff, examined the firearm used by Detective Rotton during the
incident. Officer Fox observed the firearm was an NOPD issued Glock model 22 .40 caliber

8

CITY DEFENDANTS - 001960

ASI Number: 2020-01

handgun, bearing serial number NO-0873-PD. Officer Fox determined the firearm had one (1) live round in the chamber and ten (10) live rounds in the magazine. Officer Fox determined Detective Rotton fired four (4) shots and provided him with four additional replacement rounds. All the ammunition was consistent with NOPD issued duty ammunition.

Sergeant Barnes met with Officer Stephen Fox at the NOPD Municipal Training Academy location in New Orleans East and obtained a copy of the firearm examination report and Detective Rotton's most recent firearm qualification paperwork.

### SPCA Personnel and Response

On Thursday, January 2, 2020, New Orleans SPCA Unit #4, manned by Shaun Loose (badge number 29) arrived on scene at about 7:15PM along with New Orleans Police Crime Lab, unit 5122, manned by Jerome Haynes.

At approximately 7:50 PM, Detective Rotton was briefly interviewed by SPCA Officer Shaun Loose. During the interview, Detective Rotton provided the same information which had previously been provided to investigators during the public safety statement.

After the on-scene investigation was completed, SPCA Officer Loose, with assistance from Mr. Crawford, placed the remains of Hilo into a large plastic bag and placed the remains in a holding area inside of Officer Loose's vehicle to be transported to the New Orleans SPCA facility at 1700 Mardi Gras Boulevard, New Orleans, Louisiana, 70114. A necropsy was scheduled for Friday, January 3, 2020, at 3:25 PM with Doctor Kerry Backsen.

### Investigation Continued

Sergeant Barnes and Sergeant Debra Pruitt then accompanied Detective Rotton as he walked them through where he was positioned and where the dog was positioned during the incident. This helped investigators to ensure they did not leave any evidence behind on scene.

After ensuring the on-scene investigation had been completed that night and the evidence had been accounted for, investigators contacted NOFD to ensure any blood, fluids, or other possible contamination that was not able to be collected was cleaned from the street.

### Follow-up canvassing of scene

On Saturday, January 4, 2020, at approximately 11:00 AM, Sergeant Barnes, accompanied by Sergeants Debra Normand Pruitt and Samuel Davis, along with Lieutenant Kevin Burns, all of the Force Investigation Team, relocated the scene near the intersection of Onzaga Street and North Dupre Street.

Sergeant Debra Pruitt accompanied by Sergeant Samuel Davis canvassed the nearby residences and met with the following individuals:

9

ASI Number: 2020-01

████████████████ - Mr. Ben Johnson (W/M ██████████) stated he did not hear or observe any of the incident. There were surveillance cameras on the residence, however; the cameras did not reach the area of the incident.

████████████████ - Mr. Joseph Bland (B/M, no phone number provided) stated he heard four gunshots, looked out of a window and observed a dog on the ground in the street.

## Statement of Mrs. Connie Labat

During the canvas, Sergeant Barnes met with Mrs. Connie Labat (B/F ████████ at ████ ████████ who provided a contact number of ████████ Mrs. Labat informed Sergeant Barnes she was inside of her residence with her son and husband when she heard what sounded like gunshots. Mrs. Labat peeked out of her side door to see a dog lying in the street. Mrs. Labat stated her husband exited the house and asked what had happened. Mrs. Labat stated the officer stated, "He was coming at me," to her husband. Mrs. Labat stated she heard a sound of excitement directly after the shots were fired which she described as "Oh." Mrs. Labat identified her son as Julian Labat (B/M ████████ and her husband as Christian Labat (B/M ████████

Lieutenant Kevin Burns provided the following notes from his canvass:

1658 North Dupre Street -- surveillance only captures driveway.

1680 North Dupre Street and 1678 North Dupre Street both have cameras, but they are pointed in the opposite direction from where incident occurred.

1673 North Dupre Street — front facing camera, pointed in the opposite direction from where incident occurred.

1669 North Dupre Street-- camera focused on porch.

1659 North Dupre Street — camera focused on driveway

1655 North Dupre Street-- cameras pointed in the area of incident. Lt. Burns contacted Ms. Vicki Clark. Ms. Clark observed a man out with his dog and then heard shots fired. The owner of the dog ran to the corner and asked the man why he shot his dog. The officer started crying stating the dog was trying to attack him. Ms. Clark did not hear growling, scrambling, or screaming before she heard the shots. Ms. Clark did not observe the shooting and further stated her surveillance cameras were broken.

**End of Canvass**

**Involved Officer Statement(s)**

**Force Statement of Detective Gregory Rotton**

10

ASI Number: 2020-01

During the investigation, the incident was initially classified as a use of force and force tracking number (FTN) 2020-003 was generated. As part of the investigation, Detective Rotton provided Sergeant Barnes with a written administrative force statement prior to the incident being reclassified as not a use of force. In the initial force statement written by Detective Rotton, the following information was provided:

"On Thursday, January 2, 2020, at or about 18:00 hours (poorly lit, after sunset) I, Detective Gregory C. Rotton, Unit 1127 of the First District Investigative Unit, self-initiated a follow-up investigation of item L-30357-19, a simple burglary (signal 62) item that was reported from 2521 Onzaga Street. On the listed date, I was attired in a plain black polo-style shirt, khaki pants, and black boots. I wore my bronze-colored New Orleans Police Department badge (engraved "Detective 2041") on my belt, approximately three inches from my buckle toward my right side. As I was acting in the capacity of my duties in the District Investigative Unit, I was neither assigned nor wearing a body-worn camera. I was equipped only with my Glock model 22 service handgun equipped with a fifteen-round magazine, one spare fifteen round magazine, and a police radio; I was not equipped with a Taser C.E.W. or baton.

I drove to the intersection of Gentilly and Onzaga (approximately 2800 Onzaga) after overestimating my destination and opted to begin a canvass for surveillance related to L-30357-19 at the Seahorse Saloon (1648 Gentilly) as I knew the location to have operational surveillance that may prove useful. I briefly spoke with a bartender whose name I did not collect at the time (white male, approximately fifty years old, portly, mostly bald with grey hair and a full grey beard) about said surveillance, and agreed to meet with him later after he was able to provide me with a point of contact for their surveillance system. From here, I continued walking river bound (southeast) on Onzaga from the 2800 block toward the 2500 block, using my flashlight to locate possible surveillance hosts along the way.

I walked along the odd-numbered side of the 2800 block of Onzaga until I neared the intersection of Onzaga and North Dupre, at which time I observed a large, black quadruped animal of some sort enter my line of site from my left (on the far side of the intersection, odd-numbered side of 2700 Onzaga). I shined my flashlight on said animal and identified it as a large brown or black dog; I was not immediately alarmed as the dog appeared to be sniffing in the bushes of the first house in the odd-numbered side of the 2700 block of Onzaga, and thus keeping to itself. I further noted that there were no people in the area, which is to say, said dog appeared to be unattended.

I do not, at this time, recall exactly how I maneuvered, but my intent was to continue on my path into the 2500 block of Onzaga for my surveillance canvass. Around this time, the above-mentioned dog, twenty or so yards from me, turned and observed me. At this time, the dog began to bark and rush toward me at a high speed with its head held low. Having grown up with large dogs and having

11

ASI Number: 2020-01

encountered large dogs in the course of my duty before, I had grown accustomed to observing "friendly" body language, such as the wagging of the tail and/or hind quarters, ears forward, and head held at a relaxed height (at or above the animal's shoulders); the dog which I now refer to displayed absolutely no benign body language. Based on the previously stated facts, being the bark, the fast-paced approach toward me, and the absence of "friendly" dog body language, I felt that I was now in imminent danger of being mauled by the aforementioned dog, which would result in my own grievous bodily injury and possibly death. I realized that I would not likely be able to outrun the dog and I was without a Taser or baton as an intermediate way to deter the dog from attacking me. As I paced backwards for an unknown number of steps to maintain a defensive gap, I drew my Glock model 22 service weapon and fired a short volley of three to four shots until I observed that the dog fell to the ground and was no longer a threat to my safety or life. As I began to gather my composure from the rapid rush of adrenaline to my bloodstream, I re-holstered my weapon and called for assistance via radio.

During this time, a man whom I will refer to as the dog's owner (name unknown to me, white male, mid-thirties, thin in build) emerged from a side yard at or about fifty yards farther down North Dupre toward Saint Bernard Avenue. I apologized profusely before responding First District Officers arrived. Sergeant Joseph Davis of the First District General Assignment Unit requested that I remove myself from the immediate scene and wait for the Force Investigation Team in my vehicle (unmarked 2018 Ford Taurus, dark blue, number A18003, no in-car camera) at the intersection of Gentilly and Onzaga."

Sergeant Barnes noted the force statement was typed on a departmental memo addressed to Sergeant Barnes and bore a typed signature line of Detective Rotton. Sergeant Barnes also noted due to the recent cyber-attack affecting the City of New Orleans, the standard form 114B (used for officer's force statements) was unavailable.

### Statement of Detective Gregory Rotton

On Monday, January 6, 2020, at about 1:44PM, Sergeant Debra Pruitt met with Detective Gregory Rotton at 1340 Poydras Street, Suite 1900, PIB Office for an interview. Sergeant Pruitt advised Detective Rotton his Miranda Rights via NOPD form 153 on her Surface computer. Detective Rotton signed his name onto form 153. The form was reviewed and retained within the case file.

Detective Rotton stated he was canvassing for surveillance cameras for a shed burglary that occurred approximately ten days prior. Detective Rotton overestimated the location, going too far and ending up at Onzaga and Gentilly Boulevard. He parked his unmarked police unit across from the Seahorse Salon at Gentilly Boulevard located across from the Fairgrounds Racetrack. Detective Rotton was familiar with the business and had previously received surveillance from the location.

CITY DEFENDANTS - 001964

ASI Number: 2020-01

Detective Rotton began canvassing on foot with his flashlight and realized he was about three blocks from where the burglary took place. Although he was three blocks away, he continued to canvass for video footage while on foot, walking river bound on Onzaga towards the location of the burglary for about one block and came to the intersection of Onzaga Street and North Dupre Street.

Detective Rotton observed a large black animal moving around on the far side of the intersection. Detective Rotton stated he used his flashlight to distinguish what he saw, and observed it was a dog. Detective Rotton stated the dog did not think the dog seemed to care if he was there, so he continued forward into the intersection. The dog turned in Detective Rotton's direction and began to bark and run towards Detective Rotton. Detective Rotton stated he then thought it was a bad situation and clarified that he grew up with large dogs and knew what a Doberman looked like. Detective Rotton stated there was usually some body language that comes with dogs approaching, such as the head would be up and the hind quarters would walk, showing a friendly gesture. Detective Rotton stated this was not a friendly gesture and that the dog went straight into a very rapid approach. Detective Rotton stated he began backing up, trying to keep space because he knew he couldn't outrun the dog. Detective Rotton stated, being in plain clothes, all he had at that point was a pistol and a pocketknife, so he drew his service weapon and fired until he observed the dog stopped moving. Detective Rotton then observed the owner of the dog running to him from 50-60 yards off to his left.

Detective Rotton stated he weighed his options and was worried that the dog biting him might injure him severely and the only option he had at the time was lethal force.

Detective Rotton stated he didn't recall seeing any human witnesses in the area at all.

Detective Rotton stated that after the last shot the dog was laying prone on its right side with the head still facing Detective Rotton. Detective Rotton stated at that point he believed the dog may have been gasping for air. Detective Rotton clarified that the dog did not move after the last shot. Detective Rotton could not recall exactly how long the dog gasped for air after it was shot.

Detective Rotton, when asked, stated the dog did not make any contact with him, but came within feet of him, and when the dog approached the dog's head was down and it was in a straight line towards him. Detective Rotton stated in the situation, as the dog approached, he knew something bad was about to happen and he was worried about "grievous bodily injury" and even death and stated it was a no-win situation for him and his only option was to do what he did.

Sergeant Pruitt then left the room to consult with those who were observing the interview, including representatives from FIT, the OIPM, and the FCDM.

Sergeant Pruitt returned to the room to ask several follow up questions, such as, "did you give the dog any verbal commands?" Detective Rotton stated that if he did, he didn't have any memory of it. Detective Rotton stated there was no equipment he had any confidence in to assist him in the situation.

13

CITY DEFENDANTS - 001965

ASI Number: 2020-01

During the interview, Detective Rotton relayed that he felt extremely upset over the entire incident and felt like he took a member of someone's family over trying to find surveillance of the theft of a lawnmower.

Sergeant Pruitt concluded the interview at approximately 2:09 PM.   The interview was audio and video recorded, reviewed and retained as part of the permanent case file.

### Public Commentary / Media

On Thursday, January 2, 2020, Nola.com published an article which stated the canine bit the officer.   The information provided to Nola.com was not provided by any investigators or individuals who were on scene at the time of the incident and was incorrect.

The following day, January 3, 2020, Sergeant Barnes was alerted to a public Facebook post by an individual identified on Facebook as Scott M.X. Turner.   Sergeant Barnes observed the profile pictured of the account were the individual interviewed on scene who was combative and did not witness any of the incident, Mr. Scott Turner.   The Facebook post provided the following:
> "Last night, at 6:30 pm, an NOPD plainclothes cop fired four shots at our neighbor's Doberman.   The pooch was killed.

> He was a quiet, almost timid dog, out for his dinnertime pee.   His person was watching him from the porch a few feet away.

> The cop lied to the investigation team, claiming he'd been bitten by the dog.   The investigating cops were laughing and yukking it as they stood about the crime scene (until a commanding officer told them to rope it in).   The incident is run through with many questions and contradictions.

> Simple to say, I hope the cop loses his job.   Sadly, it's equally simple to say he won't.   The simplest, of course, is that our neighbor lost his friend.   #nopd, #copitchytriggerfinger"

The post included several photographs of the scene, none of which documented any of the claims the post made.

On Monday, January 6, 2020, Sergeant Debra Pruitt met with Chief Arlinda Westbrook, IPM Tonya McClary, Mr. Clayton Crawford, and Mr. Scott Turner. Chief Westbrook addressed the press release that mentioned the officer was bit. Chief Westbrook advised Mr. Crawford the officer did not report getting bit and it was a miscommunication within the department's public information office. During the meeting, Sergeant Pruitt learned from Mr. Crawford, that Hilo was a registered service dog, Mr. Crawford's neighbor, Mr. Turner had several questions about the placement of the evidence on scene. Sergeant Pruitt answered questions by Mr. Crawford and Mr. Turner. Following the meeting, Sergeant Pruitt found Hilo's registration with usservicedogregistry.org.

14

ASI Number: 2020-01

## Electronic Transmissions

On Monday, January 6, 2020, Sergeant David Barnes requested channel one transmissions from the incident. Sergeant Barnes reviewed the recorded communications associated with the incident, documented under NOPD item numbers L-30357-20 and A-02353-20.

Sergeant Barnes reviewed the Incident Details report for NOPD item number A-02353-20 and discovered the comments in the incident recall provided the unit advised he was bit by the dog and discharged his firearm.

Sergeant Barnes reviewed the recordings of the radio transmissions documented under NOPD item number A-02353-20 and discovered Detective Rotton advised he was attacked by the dog and that he was okay and did not need EMS. Detective Rotton advised he had a firearms discharge. Sergeant Barnes noted that nowhere on the recording did Detective Rotton, or anyone else advised dispatch that Detective Rotton had been bitten by the dog.

Sergeant Barnes reviewed the recording in its' entirety and did not discover any other information pertinent to the use of force investigation.

Sergeant Barnes contacted the NOPD's liaison to the Orleans Parish Communications District (OPCD), Sergeant Mark McCourt, and informed him of the discrepancy between the information relayed by the officers on scene and what was documented in the incident recall. Sergeant Barnes requested training and or counseling be completed and documented regarding the documentation of the information. Sergeant Barnes received notification from Sergeant McCourt that the request had been brought to the attention of the OPCD's department of compliance and training for action.

## Initial Burglary Report

On Friday, January 3, 2020, investigators reviewed the original documented Simple Burglary report under NOPD item L-30357-20. The incident occurred at 2521 Onzaga Street. The report described a push lawn mower and various tools were stolen out of a shed from the above address. There was a note at the end of the report "*Seahorse owner – 1641 Gentilly Boulevard." The report was reviewed and retained within the case file.

## Consultation with the SPCA - Necropsy

On Friday, January 3, 2020, at about 3:00PM, Sergeant Debra Pruitt and Sergeant David Barnes attended the necropsy of Hilo performed by Veterinarian Kerry Backsen of Louisiana SPCA. Doctor Backsen radiographed Hilo in search of obvious ballistic evidence. The photographs were included with the report.

On Friday, January 3, 2020, at about 3:26PM, Doctor Backsen performed the necropsy and made the following notes:

15

ASI Number: 2020-01

Wound 1: circular wound at the tail of the skull. The entrance wound extended down into the cervical vertebral spine with notable fractures to the spine. The spent projectile was located from the external thoracic muscle at the tail of the left humerus.

Wound 2: wound with smooth edges, mid spine.

Wound 3: circular wound with smooth edges, below wound #2 spine. This wound was an entrance would with a spent projectile retrieved from the left elbow.

Wound 4: circular wound with irregular wound margins, underside of cervical wound #1.

Wound 5: Graze wound on the right lateral side.

Wound 2 and 4 communicate, it was presumed an entrance and exit. No spent projectile was located to correspond to this wound at the necropsy. (Note: the spent projectile from wound #4 was on scene below the injury and collected as evidence. Two spent bullet projectiles were collected from Hilo's body, one spent projectile was collected below Hilo's neck on scene and one spent bullet was unaccounted for. The fourth bullet grazed Hilo's back. Sergeant Pruitt planned to return on scene to search for the fourth spent bullet and to canvass any additional witnesses and video surveillance.

Doctor Backsen verbally advised the cause of Hilo's death would either be from blood loss or damage to the cervical chord.

## BWC Review of Responding Officer

### BWC of Officer Samantha Barker

Sergeant Barnes reviewed the BWC footage of Officer Samantha Barker, the first responding officer on the scene. On the footage, Officer Barker arrives on scene and approaches Detective Rotton, who is kneeling next to the shot dog with Mr. Crawford.

Officer Barker immediately asks Detective Rotton where he is bit. Detective Rotton responds that he came close to being bit but was not bit. Officer Barker then verified that a supervisor had been notified. Detective Rotton stands and is visibly shaken. Officer Barker asks if he is ok and tells him to take a breath. Mr. Crawford stands as well and is also visibly shaken and crying.

Officer Rotton approaches Mr. Crawford and offers his hand and apologizes to Mr. Crawford. Mr. Crawford says it's alright and tells Officer Rotton it's not his fault, saying, "She's a terrifying dog, I understand." Mr. Crawford then continues to say, "She's the sweetest dog though, she's just protective, she wouldn't have bit. She just rushed you man." Mr. Crawford breaks up the end of his sentence as he starts to cry.

Officer Barker then speaks to Mr. Crawford, attempting to console him, and asks what she can do to help. Mr. Crawford replies that he isn't sure and asks the officers what is going to

16

ASI Number: 2020-01

happen now, and if SPCA is going to take her. Mr. Crawford states, "She's going to die right here."

Officer Barker kneels next to Hilo, the canine, as Hilo is laying on the ground, and she pets Hilo and his shoulder area, as if consoling the canine. Hilo can be seen opening and closing her jaw as Officer Barker pets the animal calmly. Mr. Crawford then says they should "finish the job at least," and states the animal is not going to live, suggesting that they should put Hilo out of her misery.

As other officers arrive, Officer Barker asks them to move their vehicle onto the other side of the scene to stop traffic from coming onto North Dupre Street. Officer Barker then retrieves crime scene tape from the rear of her unit and begins to cordon off the scene.

Sergeant Barnes noted on the footage Mrs. Garmanne Mack and Mr. Derrick Mack had come outside and stood on the sidewalk near her residence as the officers erected crime scene tape. Mrs. Mack then questioned Officer Barker wondering if they were going to take the officer's gun and where the officer was coming from and why he was there. Officer Barker informed Mrs. Mack she didn't know the answers to her questions, and she wasn't sure if they were taking the officer's firearm. Officer Barker informed Mrs. Mack a supervisor would be investigating the incident. At the same time, Sergeant Joseph Davis was arriving on scene and sequestered Detective Rotton. Mrs. Mack watched as Detective Rotton was walking away from the scene and asked, "Where's the police officer going, I mean c'mon. I mean where the hell was he coming from." Then Mrs. Rachelle Turner arrived on the scene and asked Mrs. Mack if everything was ok. Mrs. Mack stated, "I'm fine, they shot that man's dog." Mrs. Mack informed Mrs. Turner the police had shot the dog. Mrs. Turner stated, "Why?! That dog was so nice!" Mrs. Mack then says, "Thank you. He says that dog *attacked* him." (emphasis added) Officer Barker is provided a bottle of water from Mr. Derrick Mack to give to Mr. Crawford and walks away from where Mrs. Mack and Mrs. Turner have gathered.

Officer Barker then provides the bottle of water to Mr. Crawford as Mr. Crawford cries over Hilo and states, "She was the best dog in the fucking world."

Officer Barker then approaches Sergeant Davis and says she wants to move the tape back more because a small crowd is gathering near the scene. Officer Barker then coordinates with the other officers to expand the cordoned off area of the scene. As Officer Barker passes Mrs. Turner, the neighbors ask Mrs. Turner why the officer shot the dog. Mrs. Turner stated something to the effect of "Because he's got a gun, why else would you shoot a dog." The neighbor then asks what the dog was doing. Mrs. Turner responded, "really?" then is heard telling the neighbors that she doesn't know the whole story, but explains the dog was never mean and the officer just walked up and shot the dog. As Officer Barker passes Mrs. Mack, Mrs. Mack tells Mr. Derrick Mack that the officers must be trying to cover something up for the police officer. Officer Barker then walks away from the civilians, back to the scene.

Sergeant Barnes noted that into the video, at the direction of Sergeant Davis, Officer Barker dropped a blue glove near one of the spent casings that was not near the canine's body to mark the location of where it was (Sergeant Davis was verbally counseled for the training issue

17

ASI Number: 2020-01

while on scene and during the investigation of a formal disciplinary investigation by Lieutenant Burns).

At approximately 26 minutes into the footage, Lieutenant Burns arrived and took control of the scene.   Sergeant Barnes did not observe any other information pertinent to the use of force.

## Scientific Analysis of Ballistic Evidence

On Saturday, March 7, 2020, Firearms Examiner Sean McElrath performed the analysis of the ballistic evidence from this case. The four .40 caliber casings collected from the scene were compared to Detective Rotton's test fired casing. The four casings were found to have been fired from Detective Rotton's firearm. The spent projectile collected from the scene was consistent with a .40 caliber ammunition, but no other individual markings were found an no further conclusions could be made. The two spent projectiles removed from Hilo's body were consistent with .40 caliber ammunition, but no other individual markings were found, and no further conclusions could be made. The Scientific Analysis Report was reviewed and retained within the case file.

## Discrepancies, Clarifications, & Credibility Assessments

Statement of Garmanne Mack:
The initial statement of Mrs. Garmanne Mack may be credible in that it does not elaborate on the incident any more than providing the basic facts which are corroborated by the BWC of Officer Barker.  However, any statements regarding the incident, what happened, or how the use of force happened cannot be found credible as Mrs. Mack was not in a position to see the incident and, as shown on the BWC of Officer Barker, displayed a confirmation bias in that she was predisposed to believe the police officer was in the wrong.

Statements of Mr. Scott Turner:
Mr. Scott Turner's statements cannot be found to be credible. Mr. Turner displayed a bias towards the officers and the investigation from the investigator's first contact with him, made public statements which were misleading and blatantly false, and admitted to investigators he was not in a position to know of have seen what was going on.  Mr. Turner accused Detective Rotton of lying to investigators and to Mr. Crawford, all statements which were disproven during the investigation and rebuked by body worn camera footage.  Mr. Turner also made statements about the responding officers' demeanor, which were disproven by body worn camera.

Statement of Mr. Clayton Crawford:
Sergeant Barnes found no credibility issues with Mr. Crawford's statement.  Mr. Crawford provided the truth, corroborated by evidence and body worn camera footage.  Mr. Crawford showed no bias during the investigation.

Statement of Detective Gregory Rotton:

18

ASI Number: 2020-01

Sergeant Barnes found no credibility issues with Detective Gregory Rotton.  During the investigation, Detective Rotton provided more than one statement, which was corroborated by the evidence, Mr. Crawford, and body worn camera footage of the aftermath of the incident.

## Tactical Analysis

There is limited tactical analysis of this incident, as Detective Rotton was not conducting any enforcement action.  On the contrary, Detective Rotton was merely walking down the street at the time of the incident.  Had a civilian unfamiliar to the canine, a postman, or a child playing in the area encountered the same situation, without the ability to defend themselves, the canine could have caused serious injury or even death to that person.

Sergeant Barnes noted Detective Rotton could have attempted to use a CEW against the individual, however, Detective Rotton was not equipped with his CEW at the time of the incident and was not required to be equipped with his CEW.

## Decision Point Analysis

During this incident Detective Rotton was confronted with a large Dobermann-Pinscher rapidly approaching him in an aggressive manner as he walked through a neighborhood.  Detective Rotton, upon being confronted, had no where to run for cover from the canine, and believed he only had the effective option of shooting the canine in order to stop its' advance.  In this split-second decision, Detective Rotton, fearing serious injury or even death, fired four shots at a downward angle striking the canine and killing it.

## Training

Sergeant Barnes did not identify any additional training that would assist NOPD officers with their decision-making abilities during the circumstances presented by this incident.

During the incident, Sergeant Barnes identified Sergeant Davis took steps to have some of the evidence on scene marked by officers in a manner inconsistent with SCIS standards.  Sergeant Davis was verbally counseled on scene regarding marking evidence on scene and why it should not be done.  The verbal counseling was conducted by Lieutenant Kevin Burns on scene.

## Equipment

Sergeant Barnes determined that during the investigation all the equipment available to the involved officers functioned properly.

## Policy Violations

Sergeant Barnes found no policies that were violated during this incident.

19

ASI Number: 2020-01

Sergeant Barnes noted a complaint was later filed with the NOPD's Public Integrity Bureau regarding the NOPD's response and investigation into the incident. The complaint alleged the following violations:

Officer Gregory Rotton was alleged to have violated Rule 4: Performance of Duty; Paragraph 4; Neglect of Duty C6 Failing to comply with instructions, oral or written, from any authoritative source to wit Chapter 1.3, Use of Force, paragraph 32. Paragraph 32 reads:

> "32.   Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical."

The formal disciplinary investigation exonerated Detective Rotton of this allegation.

Sergeant Joseph Davis was alleged to be in violation of Rule 3: Professional Conduct, Paragraph 1 Professionalism, if he laughed at the death of the complainant's dog, made comparison of the dog to a poodle, did not provide steps of the investigation and released inaccurate information stating the dog bit the detective. The formal disciplinary investigation found this allegation to be unfounded.

Sgt. Davis did none of what is outlined in the allegation; however, a potential infraction similar in nature was identified and resolved through counseling with Lt. Burns.

Lieutenant Kevin Burns Jr. was alleged to be in violation of Rule 3: Professional Conduct, Paragraph 1 Professionalism, if he laughed at the death of the complainant's dog, made comparison of the dog to a poodle, did not provide steps of the investigation and released inaccurate information stating the dog bit the detective. The formal disciplinary investigation found this allegation to be unfounded.

Lt. Burns did none of what is outlined in the allegation; however, a potential infraction similar in nature was identified and resolved through counseling by Captain Richardson.

### Findings of the Criminal Case

Upon review of the facts of the case, Sergeant Debra Pruitt did not find probable cause to prosecute Officer Greg Rotton for destruction of an animal. Sergeant Pruitt did find Mr. Clayton Crawford violated the following New Orleans code of Ordinance: Section 18-14 (Cats and dogs confined, Exceptions), which states: dogs which are properly licensed and vaccinated may be

CITY DEFENDANTS - 001972

ASI Number: 2020-01

allowed outside of an enclosure if under a secure leash and accompanied by their owner or keeper but are not to be allowed to trespass upon any public property, if so prohibited by ordinance, or upon private property. Although Mr. Crawford was in violation of the ordinance, the State has declined to prosecute.

### Summary & Conclusions

As a result of the investigation, Sergeant Barnes discovered Officer Gregory Rotton was conducting a follow up investigation under New Orleans Police Item L-30357-19 and was canvassing the area of the 2800 block of Onzaga Street The follow up investigation was on a Simple Burglary that occurred at 2521 Onzaga Street on for surveillance cameras.

Detective Rotton reached the intersection of Onzaga Street and North Dupre Street when he encountered a large Dobermann-Pinscher in front of ▮▮▮▮▮▮ As Detective Rotton crossed the intersection, the dog, later learned to be "Hilo," barked at and charged towards Detective Rotton. Detective Rotton began backing away as the dog approached, before firing four shots at Hilo striking and killing her.

Detective Rotton discussed possible force options which were either not feasible or not available to him at the time of the incident. The account of the canine charging at Detective Rotton was corroborated by the dog's owner, who repeatedly told Detective Rotton the incident was not his fault and that he knew the dog presented as terrifying.

### Final Recommendation Section

Sergeant Barnes, as a result of the investigation, believes the actions taken by Detective Rotton are consistent with Federal, State, and Municipal law. The actions of Detective Rotton are also consistent with departmental policy.

### Signatures

Respectfully Submitted

Date: 5/4/2020
Sgt. David A. Barnes
New Orleans Police Department
Force Investigation Team

*Concur/ Does Not Concur*

_____Date:
Lieutenant Kevin Burns
Public Integrity Bureau
Force Investigation Team

21

ASI Number: 2020-01

*Concur/ Does Not Concur*

_____Date:
Captain Sabrina Richardson
Public Integrity Bureau

22