**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| DEREK BROWN and | * | CIVIL ACTION |
| JULIA BARECKI-BROWN | * | |
| | * | DOCKET NUMBER: 22-00847 |
| VERSUS | * | |
| | * | SECTION: L |
| DERRICK BURMASTER, SHAUN | * | |
| FERGUSON, and the CITY OF | * | HONORABLE ELDON E. FALLON |
| NEW ORLEANS | * | |
| | * | DIVISION: 4 |
| | * | |
| | * | HONORABLE KAREN WELLS ROBY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

Defendant, the City of New Orleans (the "City") and Derrick Burmaster ("Defendants") submit this memorandum in support of its Motion for Partial Summary Judgment. The Defendants move for summary judgment on the following claims:

- <u>Second Cause of Action</u> – State Torts of Negligence and Negligent Infliction of Emotional Distress: the City and Officer Burmaster move for summary judgment on the claims asserted in paragraph 90 (claim for negligent infliction of emotional distress).

- <u>Third Cause of Action</u> – Negligent Hiring, Training, Retention, and Supervision: the City moves for summary judgment on all claims asserted in paragraphs 94 through 101.

- <u>Sixth Cause of Action</u> – *Monell* Liability; the City moves for summary judgment on all claims asserted in paragraphs 113 through 137.

<u>**PROCEDURAL POSTURE**</u>

Plaintiffs filed their original Complaint on March 31, 2022, filed a First Amended Complaint on October 28, 2022, and then filed a Second Amended Complaint on December 14,

2022.[1] On March 19, 2023, the City and co-defendant, Shaun Ferguson, filed their first Motion for Summary Judgment.[2] On March 29, 2023, this Court issued an order denying co-defendant Burmaster's motion for summary judgment, which was based on a defense of qualified immunity.[3] On the same day, Burmaster filed a Notice of Appeal of the denial of his motion for summary judgment.[4] On March 30, 2023, this Court issued an order staying and continuing the trial that was set for April 5, 2023, pending the ruling from the Fifth Circuit Court of Appeals.[5]

On January 17, 2025, the Fifth Circuit Court of Appeals denied Officer Burmaster's appeal on the question of qualified immunity, holding that there were material facts genuinely in dispute regarding whether Officer Burmaster reasonably believed that he was in imminent danger.[6] Thereafter, this Court reopened the case and, on January 29, 2025, issued a scheduling order which set a deadline of April 22, 2025, for all non-evidentiary pretrial motions to be filed.[7]

## STATEMENT OF FACTS NOT IN DISPUTE

1.    Derrick Burmaster was hired by the New Orleans Police Department ("NOPD") on August 13, 2000, to serve as a police officer recruit.[8]

2.    From 2000 to 2016, Officer Burmaster discharged a firearm three times.[9] In 2007 and 2009, Officer Burmaster discharged his firearm at a human.[10] In 2012, Officer Burmaster shot a dog.[11] Officer Burmaster was not charged with violation of any NOPD policy as a result of any

---

[1] R. Docs. 1, 36, 60.
[2] R. Doc. 109. Shaun Ferguson was dismissed on March 29, 2023. R. Doc. 163.
[3] R. Doc. 162.
[4] R. Doc. 164.
[5] R. Doc. 169.
[6] *Brown v. Burmaster*, 2025 WL 227785 (5th Cir. Jan. 17, 2025).
[7] R. Doc. 175.
[8] Exhibit 18, Officer Burmaster's Employee Summary Report, p. 1 (CITY DEFENDANTS 3806)). See Exhibit 2 (Helou Deposition), pp. 9:2-15; 16:16 – 20:20:15
[9] Exhibit 1 (Pruitt Affidavit), ¶ 8; Exhibit 19 (Officer Involved A.S.I. Report (CITY DEFENDANTS 2016)).
[10] *Id*.
[11] Exhibit 20 (2012 Report regarding Officer Burmaster's prior dog shooting).

of the incidents in 2007, 2009 or 2012 in which he discharged his firearm.[12] During the incident in which Officer Burmaster shot a dog in 2012, Officer Burmaster was charged by two dogs in an aggressive manner; Officer Burmaster instructed the dogs to "Get Back," and then discharged his firearm two times, killing one dog.[13]

3.      From 2000 to 2016, Officer Burmaster was investigated for an alleged violation of NOPD policy relating to use of force on seven occasions.[14] None of these incidents involved discharging a firearm.[15] Each of these incidents was investigated and resulted in a disposition of "not sustained" or "exonerated."[16]

4.      From January 1, 2016, to April 10, 2021, Officer Burmaster used force while acting as an NOPD police officer 13 times.[17] Each of Officer Burmaster's uses of force from 2016 to 2021 was reviewed by the NOPD and was determined by the NOPD to have been "justified" or "authorized"[18] Until April 10, 2021, none of Officer Burmaster's uses of force from 2016 to 2021 involved a discharge of a firearm and none involved using force against an animal.[19] From 2016 to April 10, 2021, Officer Burmaster was not charged with any violations of NOPD policy based on use of force.[20]

5.      Beginning in or around 2000, NOPD trained its officers, including Officer Burmaster, with respect to encounters with dangerous animals through annual "in service" training through the NOPD Academy, roll call training, daily training bulletins ("DTBs") provided by the NOPD's Professional Standards Accountability Bureau ("PSAB"), and by a mandated online

---

[12] Exhibit 1 (Pruitt Affidavit), ¶ 8.
[13] Exhibit 20 (2012 NOPD report).
[14] Exhibit 1 (Pruitt Affidavit), ¶ 9.
[15] *Id.*
[16] *Id.*
[17] *Id.*, ¶ 8.
[18] *Id.*, ¶ 9.
[19] Exhibit 18, pp. 9-10 (CITY DEFENDANTS 3814-15).
[20] *Id.*

course with the American Society for the Prevention of Cruelty to Animals ("ASPCA"), an animal-focused organization that, among other things, provides educational programs to law enforcement organizations.[21]

6.      In "once-a-year" in service training concerning animal encounters, NOPD trained its officers with a goal to "avoid either, A, having animals hurt us or, B, us having to hurt the animals."[22]

7.      At the NOPD academy, officers were trained to contact the Louisiana Society for the Prevention of Cruelty to Animals (the "SPCA") by radio "if they have an issue with an animal" and if there is sufficient time to do so.[23]

8.      The NOPD in-service training "talked about the dog, the position of the tail, the ears, right, that -- I always stress to officers, the majority of the time, the dog is not trying to get into a confrontation, but their way of telling you, 'I don't want to fight, but if you come any closer, if you don't leave, I'm willing to do it,' is by them sitting there and their posture changes. You can see the hair on their body change, and they start barking, which is a warning mechanism, right."[24]

9.      The NOPD trained its officers, including Officer Burmaster, that a firearm should be used against an animal only in circumstances in which it reasonably appeared that the animal appeared to pose an imminent threat to human safety and alternative methods were not reasonably available or would likely not be effective.[25]

---

[21] Exhibit 4, Excerpts of transcript of Deposition of David Duplantier ("Duplantier Deposition"), pp. 23:2 – 25:21, 27:3 – 30:24; 48:15 – 49:1; 50:17 - 50:21; 121:10 – 124:21; 128:11 – 128:14; Exhibit 5, Excerpts of Deposition of Derrick Burmaster ("Burmaster Deposition"), pp. 180:25 – 181::24; Exhibit 6, Excerpts of transcript of Deposition of David Barnes ("Barnes Deposition"), pp. 50:25 51:14.
[22] Exhibit 4, Duplantier Deposition, p. 30:3-17.
[23] Exhibit 6 (Barnes Deposition), pp. 52:20 -53:7.
[24] Exhibit 4, Duplantier Deposition, p. 32:10-23.
[25] *Id*., pp. 23:2 – 25:21, 27:3 – 30:24; 30:3 -30:17; 32:9 – 42:24.42:25 – 45:17; 48:15 – 49:1; 121:10 – 124:21; 125:18 – 127:7; 128:11 – 128:14; 130:19 – 136:1. 78:23 – 81:7; Exhibit 5 (Burmaster Deposition), p. 250:9 – 250:12.

10.     The NOPD trained its officers to evaluate risks posed by each potential animal encounter faced by officers and not to consider every animal encountered to be a threat.[26]

11.     The NOPD trained its officers to consider alternative means to avoid use of force against animals.[27]

12.     NOPD Operations Manual, Chapter 1.3, entitled "Use of Force," became effective December 6, 2015, and was revised on April 1, 2018.[28]

13.     Chapter 1.3, paragraph 32, entitled "Dangerous Animals," provides:

> Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical.[29]

14.     In May 2017, as part of its monthly "Daily Training Bulletin" ("DTB") training program, NOPD, through its PSAB department, required all police officers to take an online course through the ASPCA.[30] The May 2017 DTB was entitled, "Officer Safety – Dog Bite Prevention," and contained training units entitled: "Recognizing Forms of Canine Aggression," "Basics of

---

[26] Exhibit 4 (Duplantier Deposition), pp. 30:3 -30:17, 32:10 – 42:24.
[27] *Id*, pp. 42:46:15; 130:19 – 133:4.
[28] Exhibit 3, New Orleans Police Department Operations Manual, Chapter 1.3, Use of Force, Rev. 2018 (BROWN_ 1210-1219).
[29] *Id*., Ch. 1.3, para. 32.
[30] Exhibit 6, Barnes Deposition, p. 10:1-20; 86:13-23. Exhibit 7, April 27, 2017, email and attachment sent by NOPD PolicyandPlanning to all NOPD employees, re: "May 2017 DTB Special Instructions." (the "May 2017 DTB") (CITY DEFENDANTS 5076-5081).

Canine Communications," and "Dog Bite Prevention."[31] Officer Burmaster attended the ASPCA course, completed the testing portion of the DTB on May 31, 2017.[32]

15.    In October 2019, the NOPD, through its PSAB, provided training to its police officers in the form of a DTB slide presentation entitled "The Problem of Dog-Related Incidents and Encounters."[33] The October 2019 DTB training quoted the complete paragraph of NOPD Policy Chapter 1.3., paragraph 32, (Dangerous Animals), and provided training information and techniques to officers to assist officers in discharging their duties while compiling with Chapter 1.3, paragraph 32.[34] On November 20, 2019, Officer Burmaster completed his October 2019 DTB training and passed the testing component of the training.[35]

16.    On April 10, 2021, Officer Burmaster responded to a domestic disturbance call at Plaintiff's residence and unfortunately shot Plaintiffs' dog.[36]

## LAW AND ARGUMENT

### I.    Legal Standard for Rule 56 Summary Judgment.

Granting summary judgment under Federal Rule of Civil Procedure 56 is proper if the pleadings and evidence in the case show that there is no genuine issue as to any material fact and

---

[31] Exhibit 7 (May 2017 DTB).
[32] Exhibit 8 (May 2017 DTB test) (CITY DEFENDANTS 5076-5081); Exhibit 9 (May 2017 DTB NOPD test confirmation (CITY DEFENDANTS 5287-5305), Officer Burmaster's confirmation is on page CITY DEFENDANTS 5290; Exhibit 1 (Pruitt Affidavit) ¶ 5 (Ex. A to the Pruitt Affidavit, Officer Burmaster's Employee Summary Report, p. 35 (CITY DEFENDANTS 3840 (showing credit awarded to Officer Burmaster for successful completion of 2017-05-MAY-DTB)).
[33] Exhibit 6 (Barnes Deposition), pp. 10:1-20; 44:21 – 50:2; 88:13 – 89:5; Exhibit 10, NOPD October 2019 DTB training material entitled "the Problem with Dog Related Encounters (the "October 2019 DTB") (CITY DEFENDANTS 5135-5146); Exhibit 11, testing component for the October 2019 DTB (CITY DEFENDANTS 5115-5117).
[34] Exhibit 10 (October 2019 DTB), p. CITY DEFENDANTS 5146.
[35] Exhibit 6, p. 95:12-17; Exhibit 12 (October 2019 DTB NOPD test confirmation) (CITY DEFENDANTS 5120-5132), Officer Burmaster's confirmation is on page CITY DEFENDANT 5315.
[36] Exhibit 13, October 27, 2023, letter from NOPD Sup. Anne Kirkpatrick to Officer Burmaster regarding final result of discipline charges relating to use of force (exoneration for charge of unlawful use of force) (CITY DEFENDANTS 5076-81)

6

that the moving party is entitled to judgment as a matter of law.[37]  Although the court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial.[38]  A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant.[39]  Put another way, genuine issues of fact "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[40]

As to issues which the nonmoving party has the burden of proof at trial, the moving party may satisfy its burden by demonstrating the absence of evidence supporting the nonmoving party's claim.[41]  Once the movant makes this showing, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial.[42]  The nonmovant must go beyond the pleadings and use evidence to establish a genuine issue.[43]  Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment.[44]  To survive summary judgment by a defendant, a plaintiff must demonstrate a genuine issue of fact for *each element* of their cause of action or claim.[45]

---

[37] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[38] *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F. 3d 532, 536 (5th Cir. 1998).

[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[41] *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

[42] *Rivera v. Houston Indep. Sch. Dist.*, 349 F. 3d 244, 247 (5th Cir. 2003).

[43] *Id.*

[44] *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

[45] *Malacara v. Garber*, 353 F. 3d 393, 404 (5th Cir. 2003) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F. 3d 343, 349 (5th Cir. 2001)).

## II.    Plaintiff's claim for Negligent Infliction of Emotional Distress fails because Plaintiffs' cannot demonstrate psychic trauma.

Plaintiffs, in their Second Cause of Action, claim damages based on state law for emotional distress based on the allege negligent killing of their dog."[46] Louisiana Civil Code article 2315.6 provides that a persons "who view an event causing injury to another person, or who come upon the scene of the event soon thereafter" may be entitled to damages for mental anguish or emotional distress, even though they were not physically impacted.[47] However, only family members are allowed to recover damages under this statute.[48] A dog is neither a person nor a family member; therefore injury to a dog is not authorized by this statute.[49]

The standard for the recovery of negligent infliction of emotional distress absent physical injury is that the plaintiff must show an "especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious."[50] Louisiana courts recognize that plaintiffs, without regard to physical injury, may recover for emotional distress and inconvenience resulting from damage to their property, but only in four categories of cases: (1) when the property was damaged by an intentional or illegal act; (2) when the property was damaged by acts giving rise to strict or absolute liability; (3) when the property was damaged by activities amounting to a continuous nuisance; and (4) under circumstances where the owner was present or nearby at the time the damage occurred and suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the incident

---

[46] *Id.*, ¶ 90.

[47] This statute codified *Lejune v. Rayne Branch Hosp.*, 556 So. 2d 559, 570 (La. 1990), in which the Louisiana Supreme Court recognized that parties can recover mental pain and anguish claims arising out of an injury to a third party.

[48] La. Civil Code art. 2315.6(A) (limiting coverage to spouse, children, parents, siblings, and grandparents).

[49] See *Skinner v. Ard*, 2020 WL 620790, *10 (W.W. La. February 10, 2020) (unpublished) ("As a dog is not a person, Plaintiff are not entitled to recover *Lejune* damages in this case.").

[50] *Doerr v. Mobil Oil Corp.*, 04–1789, pp. 8–9 (La. App. 4 Cir. 6/14/06), 935 So.2d 231, 237, writ denied, 06–1760 (La.11/3/06), 940 So.2d 664 (quoting *Moresi v. State Through Dep't of Wildlife and Fisheries*, 567 So.2d 1081, 1096 (La.1990) and *Bonnette v. Conoco, Inc.*, 2001–2767 (La.1/28/03), 837 So.2d 1219).

itself.[51] The jurisprudence, has limited such recovery for by requiring that "the emotional distress be severe and not merely the result of the usual worry or anxiety attendant to property damage."[52]

Plaintiff must prove that they "suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the incident itself," as required to recover mental anguish damages; the mental anguish which gives rise to a claim for damages must be real mental injury.[53] Factors such as whether they sought medical, psychiatric, or psychological treatment following the accident, or whether any prescription drugs or medication was prescribed, are important.[54]

In the instant case, immediately after the dog shooting in this case, Plaintiffs retained their present lawyer, and Plaintiffs' lawyer referred them to a counsellor, Dr. Elizabeth Berk, for an evaluation.[55] The counsellor was retained in this case to provide opinion testimony and to make treatment recommendations.[56] Dr. Berk had a single encounter with each Plaintiff two months after the shooting, made recommendations for additional counselling, but did not provide counseling to either plaintiff.[57] After meeting with the Plaintiffs in June 2021, the counsellor had no other contact with the Plaintiffs.[58]

Ms. Barecki-Brown, in her deposition, admitted that she has not undergone any formal counselling or taken any medications after the incident in this case.[59] Mr. Brown, according to the

---

[51] *Doerr v. Mobil Oil Corp.*, 935 So.2d at 237 (footnote omitted, citing Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 7.02[6] (2nd ed.2004)).

[52] *Id.*, (citing *Farr v. Johnson*, 308 So.2d 884 (La. App. 2d Cir.1975).

[53] See *Barrios v. Safeway Ins. Co*., 2011-1028, (La. App. 4 Cir. March 21, 2012), 97 So.3d 1019, 1025 (affirming damage award of $10,000 for killing of a pet dog) (concurrence by Justice Ledet, citing *Heard v. Affordable Movers, Inc*., 40,432, pp. 5–8 (La. App. 2 Cir. 12/14/05), 917 So.2d 722, 726–27).

[54] See *id*., 1025-26 (commenting in concurrence that plaintiffs failed to prove "psychic trauma" where there was no evidence that plaintiffs sought medical, psychiatric, or psychological treatment following the accident).

[55] Exhibit 14, Excerpts of Deposition Transcript of Elizabeth Berk ("Berk Deposition"), pp. 21:16 - 22:5; 26:5-12; 28:4-8; 44:23 – 45:1. See R. Doc. 100 (Plaintiffs' Exhibit and Witness List), p. 7 (identifying Dr. Berk as potential witness to testify about "the emotional distress experienced by the Browns[.]").

[56] *Id.*.

[57] *Id.*, pp. 44:23 – 45:1; 55:18:55:11; 70:4-12.

[58] *Id*. p. 55:3 – 11.

[59] Exhibit 16, Excerpts of Deposition Transcript of Julia Barecki-Brown ("Barecki-Brown Deposition"), pp. 28:1 – 29:20).

counselor retained by Plaintiffs' lawyer, "was drinking more" after the shooting.[60] Mr. Brown, at his deposition stated that received "services . . . over the phone" with a licensed clinical social worker that was referred to [him] by Doctor Elizabeth [Berk]."[61] However, Dr. Berk denied having any knowledge of any such counseling.[62] Mr. Brown described his additional counselling as "[p]rimarily me talking or listening and then coming up with tools and strategies to deal with PTSD. We talk about what's working what's not."[63] However, Plaintiffs' have not identified the counselor that supposedly provided services to Mr. Brown after he was evaluated by Dr. Berk as a witness; nor have Plaintiffs identified any document from that counselor as a potential exhibit at trial.[64]

Under these circumstances, Plaintiffs cannot demonstrate that they "suffered psychic trauma in the nature of or similar to a physical injury as a direct result of the incident itself" as required by Louisiana caselaw.[65] Plaintiffs' have failed to describe a severe emotional reaction to the shooting of their dog that can be said to be different from the "worry or anxiety attendant to property damage," which in this case is a pet dog. Ms. Barecki-Brown sought no treatment and required no medication for her to deal with the sadness of her pet's death. Mr. Brown, although he claims to have received some sort of counselling, fails to provide any documentation of this counseling sufficient to determine whether he suffered sufficiently severe mental trauma. Given this lack of proof, summary judgment is warranted on Plaintiffs' claim of negligent infliction of emotional distress.

---

[60] Exhibit 14 (Berk Deposition), 38:23 - 45:5.
[61] Exhibit 15, Excerpt of Transcript of Deposition of Derek Brown ("Mr. Brown Deposition"), pp. 63:24 – 64:12.
[62] Exhibit 14 (Berk Deposition), p. 53:20-25.
[63] Exhibit 15, p. 65:8-16.
[64] See R. Docs. 100, 197.
[65] *Doerr v. Mobil Oil Corp.*, 935 So.2d at 237.

**III.**    **The City is protected from Plaintiffs' state law claims by discretionary immunity because Plaintiffs' claims are based on the City's policy decisions**.

The City is immune from such claims based on Louisiana Revised Statute § 9:2798.1. This statute provides, "Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties."[66]

Plaintiffs allege, in their "*Monell*" claim,[67] that the City "was deliberately indifferent to Plaintiffs' constitutional rights by failing to adequately train, supervise and discipline Burmaster[.]"[68] It is axiomatic that, under the Supreme Court case of *Monell v. New York City Dept. of Social Services*,[69] a local government may not be sued under 42 U.S.C. § 1983 "for an injury inflicted solely by its employees or agents."[70] "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[71] Because Plaintiffs are clearly alleging liability for alleged Constitutional violations based on policy decisions in supervising, retaining and disciplining Officer Burmaster, the City is entitled to immunity from Plaintiffs' state law claims based on these decisions.

Courts regularly grant immunity to local government agencies for claims that allege fault in training, retaining and supervising law enforcement officers. For example, in *Hoffpauir v.*

---

[66] Louisiana Revised Statute § 9:2798.1(B).
[67] R. Doc. 60, p. 14 ("Sixth Cause of Action – Monell Liability").
[68] *Id.*, ¶ 114.
[69] 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978).
[70] *Id.*, 436 U.S. at 694.
[71] *Id.*

*Columbia Casualty Company*,[72] a plaintiff brought claims of negligent hiring, training, retention, and supervision against a sheriff's department. The court granted summary judgment for the sheriff's department on the claims of negligent hiring, training, retention, and supervision, holding that hiring, training, retention and supervision of officers were discretionary acts and that Louisiana Revised Statute § 9:2798.1 provided the sheriff's department immunity. The court in *Hoffpauir* reviewed a case with relevant facts[73] which involved allegations of improper hiring and retention of a rapist deputy, and held:

> Similarly, the hiring, training and supervision policy of the Livingston Parish Sheriff's Department is a discretionary function. Like in *Smith*, the plaintiffs have failed to point to a Louisiana statute mandating a particular policy or procedure for hiring, training, supervising or screening officers; and the court's review has also failed to uncover any relevant statute mandating a policy or procedure. Accordingly, the Sheriff's Department's hiring, training, retention and supervision policy are discretionary functions, for which Louisiana Revised Statutes § 9:2798.1 grants the officers and the department immunity.[74]

In addition, in *Allemang v. State of Louisiana*,[75] plaintiffs asserted that a state trooper was negligently trained. Even though the plaintiff's expert provided an opinion that the trooper improperly conducted a test of a suspect and that the State Police department was unable or unwilling to adequately train and supervise troopers, the district court held that the claims for negligent training were barred by Louisiana Revised Statute § 9:2798.1.

The City's actions in the hiring, training, retaining, and supervising Officer Burmaster are discretionary functions for which immunity is provided by statute. Accordingly, all claims and causes of action for negligent training, hiring, retention and supervision made under state law should also be dismissed.

---

[72] 2013 WL 5934699 (M.D. La. 11/5/2013) (unreported).
[73] *Smith v. Lafayette Parish Sheriff's Department*, 874 So.2d 863 La. App. 3 Cir. (2004),
[74] *Hoffpauir*, at *9.
[75] 2021 WL 2383934 (W.D. La. 06/10/2021).

**IV.** **Plaintiff cannot establish a *Monell* claim based on training, supervising or retaining Officer Burmaster.**

To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must "show that '(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'"[76] "An unofficial policy or custom, such as the decision of a government's law-makers, the acts of its policymaking officials, and practices, can suffice for purposes of showing the existence of an official policy—but only if it is so persistent and widespread to practically have the force of law."[77]

**A.** **Training.**

The elements of a *Monell* claim for failure to train are: (1) that the municipality's training policies or practices were inadequate, (2) that the municipality was deliberately indifferent in adopting these deficient policies, and (3) that the inadequate training policies directly caused the violations in question.[78] Deliberate indifference is a stringent standard of fault and requires proof that the NOPD disregarded a known or obvious consequence of its actions.[79] There are two ways to prove deliberate indifference: (1) proof by pattern; and (2) a single incident.[80] Proof by pattern requires that a plaintiff show that municipal employees violated constitutional rights "so often" that the factfinder could infer from the pattern of violations that "the need for further training must have been plainly obvious to the . . . policymakers."[81]

---

[76] *Verastique v. City of Dallas, Texas*, 106 F.4th 427, 432 (5th Cir. 2024) (quoting *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023) (quoting *Pena v. City of Rio Grande City*, 879 F.3d 613, 618 (5th Cir. 2018)). See *Monell v. New York City Dept of Social Services*, 436 U.S. at 690; *Piotrowski v. City of Houston*, 237 F. 3d 567, 579 (5th Cir. 2001) (municipal liability claim based on a pattern of unconstitutional activity of employees must show the activity was a customary practice that amounted to an unofficial municipal policy).

[77] *Id.* (punctuation omitted).

[78] *Hankins v. Wheeler*, No. 21-1129, 2022 WL 2208848, at *7 (E.D. La. June 21, 2022) (Fallon, J.) (citing *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020).

[79] *Board of Court Commissioners of Bryan County v. Brown*, 520 U.S. 397, 410 (1997).

[80] *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d at 624 (citing *Canton*).

[81] *Valdez*, 852 Fed. Appx. at 135 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and quoting *Canton*, 489 U.S. at 390 n.10)).

### i. **Adequacy of Training**.

The indisputable facts show that NOPD enacted a facially constitutional policy regarding use of force, including use of force against animal.[82] The NOPD's policy regarding animals, NOPD policy Ch. 1.3, paragraph 32, provides that firearms may be used against animals only when "the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective."[83] In addition, "[t]he officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area."[84] In October 2019, the NOPD provided training to officers specifically with regard to this policy (the October 2019 DTB).[85]

Nevertheless, Plaintiffs claim that "Burmaster received no training regarding animals[.]"[86] This assertion is demonstrably false.[87] In the alternative, Plaintiffs argue that NOPD's training is limited to a single monthly training slide show that was provided to officers in October 2019.[88] However, Sgt. David Duplantier, the NOPD's Academy trainer regarding use of force, testified that: (1) without exception, all NOPD officers, including Officer Burmaster, underwent in-service training through the NOPD Academy (the training division of the NOPD) regarding animal encounters and use of force; (2) the NOPD Professional Standards and Accountability Bureau (PSAB) provided a directed training bulletin ("DTB") to officers specific to dangerous dog encounters; and (3) the NOPD mandated that officers participate in online training through the ASPCA regarding animal encounters.[89] Included in the evidence are documents relating to the

---

[82] Exhibit 6 (Barnes Deposition), pp. 72:25 – 73:25.
[83] Exhibit 3, Ch. 1.3, para. 32.
[84] *Id.*
[85] Exhibit 10 (October 2019 DTB) (CITY DEFENDANTS 5135-5146).
[86] Doc. 60, ¶ 117.
[87] See, *e.g.*, Exhibits 4, 7 – 12.
[88] R. Doc. 60, ¶ 119.
[89] Exhibit 4, Duplantier Deposition, pp. 23:2 – 25:21, 27:3 – 30:24; 48:15 – 49:1; 121:10 – 124:21; 128:11 – 128:14.

May 2017 DTB, which was provided online through the ASPCA, and the October 2019 DTB, which incorporated material from a white paper published by the Department of Justice's "COPS" program.[90] Sgt. Duplantier made it clear that the October 2019 DTB was not the only training provided to officers regarding encounters with animals.[91] Plaintiffs' contention that the NOPD's training is limited to the October 2019 DTB is also false.

Plaintiffs' final fallback argument is to criticize the content of the October 2019 DTB (and presumably the other training provided by the NOPD).[92] Plaintiffs allege that NOPD training omits the concept that "a dog running at an officer is 'almost always friendly,'" that dog bites are rarely lethal, and fails to list community resources for officers to contact when faced with animal encounters.[93] However, the October 2019 DTB contains instruction on the need to assess the environment, pay attention to the behavior of the dogs, and look for escape routes.[94] The DTB contains a slide entitled "Assessing the Dog's Behavior: Warning Signals versus Friendliness" which discusses how dogs "respond to us by communicating through their own body postures, facial expressions, and vocalizations."[95] The DTB emphasizes the need for "making careful assessments when first encountering a dog."[96] And the DTB explicitly states, "Shooting the dog: Shooting a dog should always be the option of last resort."[97]

Moreover, the NOPD provided additional instructions to officers over and beyond the training contained in the October 2019 DTB. As explained by NODP witnesses, the NOPD trained

---

[90] Exhibits 7, 8, 10, and 11.
[91] Exhibit 4, pp. 124:23 – 133:9.
[92] See R. Doc. 60, ¶ 117.
[93] *Id.*, ¶
[94] Exhibit 10 (October 2019 DTB), p. CITY DEFENDANTS 5137-41.
[95] *Id.*, CITY DEFENDANTS 5142.
[96] *Id.*, p. CITY DEFENDANTS 5138.
[97] *Id.*, p. CITY DEFENDANTS 5145.

its officers regarding animal encounters in NOPD academy and PSAB.[98] This training teaches officers to evaluate animals on a case-by-case basis and to only use lethal force as a last resort.[99] Further, as Sgt. Barnes explained, officers are taught to contact the Louisiana SPCA when appropriate.[100] Sgt. Duplantier testified that the NOPD trains its officers to not to assume all dogs are dangerous.[101] The NOPD also trains its officers that shooting a dog is a last resort, and that non-lethal uses of force should be used if reasonably possible.[102]

A municipality's responsibility for a deprivation of rights is at its "most tenuous" with respect to a claim of failure to train.[103] The instant case is certainly not a case where no training was provided.[104] To the contrary, this is a case where the NOPD has provided robust training to its officers as to the parameters of constitutional uses of force against animals, and provided tools to officers to evaluate animals and to proactively create contingency plans to avoid unnecessary uses of force. Plaintiffs' criticism of isolated aspects NOPD's training is nothing more than a semantic quibble and fails to demonstrate that NOPD's training of its officers, including Officer Burmaster, was inadequate.

### ii. Deliberate indifference.

In addition, Plaintiffs cannot prove deliberate indifference on the part of the NOPD in its training by either proof by pattern or a single incident. Here, there is no pattern of dog shootings that would have made NOPD aware that its training or supervision was inadequate.

---

[98] Exhibit 4 (Duplantier Deposition), pp. 121:10 – 124:21; Exhibit 6 (Barnes Deposition), pp. 13:10 – 15:13; 49:9 - 53:7
[99] Exhibit 6 (Barnes Deposition), pp. 38:10 – 39:19.
[100] *Id*., pp. 51:24 - 52:11.
[101] Exhibit 4, pp. 30:3 -30:17; 32:9 – 42:24.42:25 – 45:17.
[102] *Id*., pp. 125:18 – 127:7; 130:19 – 136:1.
[103] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985)).
[104] See *Pena v. City of Rio Grande City*, 879 F.3d at 624 (limiting single incident exception to cases where no training is provided).

Prior to the date that Plaintiffs' dog was shot, Officer Burmaster had only one other instance – ten years prior – in which he fired a gun at a dog.[105] The general rule, which is applicable here, is that the existence of a constitutionally deficient policy, practice, or custom cannot be inferred from a single wrongful act, when the policy, practice, or custom relied upon is not, itself, unconstitutional.[106] Officer Burmaster's single dog shooting in his 21 years of service as a NOPD officer, which occurred nine years previous, is insufficient to demonstrate a pattern that might put the City on notice that he might (allegedly) unlawfully shoot Plaintiffs' dog.

In addition, as for the entire NOPD police force from 2012 to 2021, there were only ten animal shootings prior to the shooting of Plaintiffs' dog.[107] Plaintiff cannot provide any evidence to suggest that any of these prior incidents involved unlawful force against animals. This low number of previous lawful animal shooting incidents (one a year) does not demonstrate a pattern sufficient to put the NOPD on notice that its policies with respect to training, supervision or retention were inadequate.[108] Because there is no pattern of dog shootings by NOPD officers, it cannot be said that the City was deliberately indifferent to the effect of its policies in training, supervising and retaining its officers with respect dog shootings.

### iii. **Exception to the rule requiring proof of a pattern.**

Proof of deliberate indifference by a single incident is the exception to general rule requiring a pattern; it requires a showing that "a municipality has failed to train its employees to

---

[105] Exhibit 2, Excerpts of transcript of deposition of John Helou ("Helou Deposition"), p. 14:1-6, Exhibit 1 (Pruitt Affidavit), ¶ 15 and Exhibit B to Pruitt Affidavit (ASI shootings).
[106] *Thompkins v. Belt*, 828 F. 2d 298, 304 (5th Cir. 1987).
[107] Exhibit 2 (Helou Deposition), pp. 12:4 – 13:10; Exhibit 17 (Exhibit 31 to the Helou Deposition) (Report of NOPD animal shootings form 2012 to 2022).
[108] See *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002), (eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry); *Peterson v. City of Fort Worth, Texas*, 588 F.3d 836, 850-851 (5th Cir. 2009) (twenty-seven excessive force complaints over a four-year period did not establish a pattern of excessive force).

handle recurring situations presenting an obvious potential for such a violation[.]"[109] This "single-incident exception" exists only where the "risk of constitutional violations" was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy."[110] The single incident exception "is generally reserved for those cases in which the government actor was provided no training whatsoever."[111] This case is not such a case.

For example, in *Brown v. Bryan County*,[112] a county sheriff failed to provide any training or supervision for a new officer who had a demonstrated history of forcing three or four individuals "to the ground" out of twelve arrests, which an expert testified was excessive.[113] The Court held that the total lack of training or supervision, together with the high frequency of forceable arrests, demonstrated the sheriff's deliberate indifference to the unconstitutional forceable take-down arrest of the plaintiff which resulted in injures to the plaintiff.[114]

In contrast, in *Pena*, supra, a *Monell* claim was asserted against a city based on a failure-to-train theory based on alleged inadequacies in the city's taser-training program.[115] The Court noted that the plaintiffs acknowledged that there was some training provided to officers for tasers. Because there was some training, rather than no training, the Court held that the plaintiffs could not satisfy "the exacting test for the narrow single-incident exception" for municipal liability.[116]

Here, unlike *Bryan County* and *Littell*, it is clear that NOPD provided regular training as to appropriate use of force for animals. Further, unlike in the untrained officer in *Bryan County*, prior

---

[109] *Valdez*, 852 Fed. Appx. at 136 (citing *Bd. of the City Comm'rs v. Brown*, 520 U.S. 397, 409 (1997), and citing *Canton*, 489 U.S. at 390, 109 S. Ct. 1197).

[110] *Id*. (quoting *Littell*, 894 F.3d at 624).

[111] See *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) (citations omitted).

[112] 219 F.3d 450 (5th Cir. 2000).

[113] 219 F.3d at 462.

[114] *Id*. at 462-463. See also *Littell*, 894 F.3d at 627 (allegation that school district provided "no training whatsoever" as to how to conduct a lawful search was actionable as a *Monell* claim).

[115] 879 F.3d at 623.

[116] *Id*. at 624,

uses of force by Officer Burmaster are almost entirely unrelated to shooting a dog.[117] *Monell* liability depends on a finding that "this officer was highly likely to inflict the particular injury suffered by the plaintiff."[118] On this record, the City cannot be deemed deliberately indifferent as to its training of Defendant Burmaster.

### iv.  Causation.

A *Monell* claim requires a direct causal link between a policy and the alleged constitutional deprivation.[119] Here, Plaintiffs cannot establish a direct causal link between the City's training and the shooting of Plaintiffs' dog. The October 2019 DTB and the other training provided by NOPD, including training at the academy, in-service training, roll-call training, a May 2017 DTB provided through the ASPCA, all train officers to anticipate and plan for potential dog encounters, to assess each dog in each new circumstance, and to not use lethal force unless the dog reasonably appears to pose an imminent threat to human safety. These concepts encompass the training components advocated by Plaintiffs. Given the training provided to NOPD officers, including Officer Burmaster, it cannot be said that any aspect of the training (or, as Plaintiffs allege, the omission of a sentence here or there from a particular training course) directly caused Officer Burmaster to shoot Plaintiffs' dog.

### B.  Supervision and Discipline.

To survive a motion for summary judgment on *Monell* claims relating to discipline and supervision, Plaintiffs must present competent evidence to demonstrate (1) that the City's failure to discipline and supervise amounted to deliberate indifference and (2) a causal link between the

---

[117] See *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 412, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997) ("[t]he connection between the background of the particular [defendant] and the specific constitutional violation alleged must be strong.").
[118] *Brown*, 520 U.S. at 412 (emphasis in original).
[119] See *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dept of Soc. Servs*., 436 U.S. at 694)

failure to discipline and supervise and the violation of their rights.[120] Plaintiffs must present "sufficiently numerous prior incidents, each of which includes specific facts that are sufficiently similar" to those alleged in the instant case.[121] "Isolated violations" do not constitute a pattern or custom that can create municipal liability.[122] The Fifth Circuit has consistently held that a plaintiff must show numerous similar instances specific to plaintiff's own constitutional deprivations to demonstrate a pattern or custom as a matter of law.[123]

### i. Persistent and Widespread Practice.

Plaintiffs cannot point to sufficiently numerous prior similar incidents involving Officer Burmaster to demonstrate a pattern or custom.[124] Plaintiffs claim that Officer Burmaster used force more than 30 times in his work as a NOPD police officer. However, Officer Burmaster only fired his gun at a dog once, which was nine years earlier, in 2012.[125] In addition, Officer Burmaster fired

---

[120] *Verastique*, 106 F.4th at 432.

[121] *Id.* See *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 1989) (pattern requires "similarity and specificity" and "sufficiently numerous prior incidents").

[122] *Piotrowski v. City of Houston*, 237 F. 3d 567, 581 (5th Cir. 2001) (quoting *Bennett v. City of Slidell*, 728 F. 2d 762, 768 n.3 (5th Cir. 1984)).

[123] *See Davidson v. City of Stafford, Texas*, 848 F. 3d 384, 396 (5th Cir. 2017), as revised (Mar. 31, 2017) (holding three cases over a three year period as legally "insufficient to establish a pattern of constitutional violations"); *see also Peterson v. City of Fort Worth*, 588 F. 3d 838, 851–52 (5th Cir. 2009) (finding twenty-seven (27) internal affairs complaints insufficient to establish a police custom of excessive force); *Castro v. McCord*, 259 Fed. App'x. 664, 669 (5th Cir. 2007) (evidence of three shooting deaths in five years prior to trial insufficient to establish a "persistent, widespread practice" of shootings by county officers); *Roberts v. City of Shreveport*, 397 F. 3d 287, 294 (5th Cir. 2005) ("[P]laintiffs fall short in attempting to demonstrate a pattern of unconstitutional conduct. . . . Their proffered evidence of pattern requires an excessively high level of generality, as it consists of a handful of tangentially related incidents . . . ."); *Pineda v. City of Houston*, 291 F. 3d 325, 329 (5th Cir. 2002) (overturning lower court's finding that eleven (11) incidents of unconstitutional searches constituted a custom); *Allen v. City of Galveston, TX*, No. G-06-467, 2008 WL 905905, at *5–6 (S.D. Tex. 2008) (holding that evidence of the failure to reprimand or discipline, evidence of subsequent events involving officer, evidence of 106 complaints alleging various infractions against police department's officers for a three year period prior to the incident failed to create a genuine issue of material fact from which a reasonable jury could conclude that such an unofficial policy of a "code of silence" existed).

[124] Plaintiffs do not try to demonstrate that dog shootings by other NOPD officers could demonstrate a pattern. See Exhibit 17 (which shows that from 2012 to 2022 there were 10 animal shootings by NOPD officers prior to the shooting in this case).

[125] Exhibit 1, Pruitt Affidavit, ¶ 8.

a gun on two other occasions, in 2007 and 2009; but these weapon discharges were against humans.[126]

None of Officer Burmaster's other 27 reported uses of force involved use of a firearm.[127] Plaintiff makes no effort to present evidence to explain the facts of any of these 27 uses of force, because none are in any way similar to the incident in this case. For example, from January 1, 2016, to April 10, 2021, Officer Burmaster uses of force included such things as exhibiting a firearm (4 times), use of hands (3 times), causing a take down (4 times), and exhibiting a CEW Exhibit/Laser (2 times).[128] Each of Officer Burmaster's uses of force from 2016 to 2021 was reviewed by the NOPD and was determined by the NOPD to have been "justified" or "authorized"[129]

Further, of the 30 uses of force relied upon by Plaintiffs, only seven instances resulted in a disciplinary charges; each of which occurred between 2000 and 2016; each resulted in a disposition of "not sustained" or "exonerated.".[130] Notably, Officer Burmaster was not charged with any disciplinary violations based on use of force from 2016 to 2021.[131] Officer Burmaster's other disciplinary charges are even more dissimilar to the incident alleged in this case.

Officer Burmaster's supervisory and disciplinary history does not indicate a patten that should have put NOPD on notice of a potential constitutional violation. This case is like *Verastique*, in which protesters sought money damages for alleged constitutional violations.[132] The Fifth Circuit affirmed the dismissal of the plaintiff's *Monell* failure-to-discipline claim because, although the plaintiff cited nineteen disciplinary incidents against one officer, the incidents were

---

[126] *Id.*
[127] *Id.*, ¶ 10; Exhibit 19.
[128] Exhibit 18 (Employee Summary Report) (CITY DEFENDANTS 3814-15).
[129] *Id.*.
[130] Exhibit 1, ¶ 10.
[131] Exhibit 18 (Employee Summary Report) (CITY DEFENDANTS 3814-15).
[132] 106 F.4th 427.

too vaguely described and not sufficiently similar to the incident giving rise to the lawsuit to create a pattern. Like the Plaintiffs here, the plaintiffs in *Verastique* relied on a "hodge-podge of unrelated allegations" which were dissimilar to the incident giving rise to the lawsuit.[133] Here, Plaintiffs cite a variety of disciplinary incidents against Officer Burmaster that have no relationship to using force against an animal. Courts recognize that there are different standards for use of force for humans versus animals.[134] Dogs are considered property; there are different considerations for uses of force against property than for humans.[135] Plaintiffs have therefore failed to demonstrate a pattern of sufficiently similar or numerous incidents to meet their burden for their Monell claim based on training or supervision.[136]

### ii. Deliberate Indifference.

"To show deliberate indifference, the connection between the background of the individual and the specific violation alleged must be strong, as the plaintiff 'must show that the hired officer was highly likely to inflict the particular type of injury [he] suffered.'"[137] Here, as in *Verastique*, there is no evidence in the record to suggest that it was "obvious that the highly predictable consequence" of not supervising Officer Burmaster would be that he "would apply force in such a way that the Fourth Amendment rights of [the Plaintiffs] were at risk.'"[138] In *Verastiquie*, the

---

[133] *Id.*

[134] Exhibit 4 (Duplantier Deposition), p. 52:25 – 53:3 ("Q. Is there, like, a different – a difference in the standards of when an officer can use lethal force against a human versus when an officer can use lethal force against a dog? A. Yes."); 53:4 – 56:18 (differences in use of tasers for dogs and humans); 56:20 – 57:10 (differences in de-escalation options between humans and dogs); 99:23 – 100:18 (considerations regarding dogs as pack animals).

[135] *Gomez v. Galman*, 18 F.4th 769 (officer's previous use of force to damage property was different in kind from the use of force in the physical assault upon the plaintiff).

[136] See *Estate of Davis ex rel. McCully*, *supra*, 406 F.3d at 384 (deputy's improper exposure of himself in photography, history of demonstrated lack of judgment, crudity, and "perhaps illegalities," and reports of acting like a "rogue" cop during a traffic stop, did not demonstrate a relevant pattern for with respect to "using deadly force during a traffic stop").

[137] *Gomez v. Galman*, 18 F.4th 769, 778 (5th Cir. 2021) (quoting *Gros v. City of Grand Prairie*, 209 F.3d 431, 433–34 (5th Cir. 2000)).

[138] *Id.*, at 433 (quoting *Peterson v. City of Fort Worth*, 588 F.3d at 85) (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 461 (5th Cir. 2000).

plaintiffs alleged that the officer in question was investigated for discipline violations nineteen times in twenty-three years, and five of those resulted in disciplinary actions. According to the Court, this number of disciplinary incidents "includes insufficiently numerous incidents to create a pattern capable of providing constructive notice"[139]

In comparison, Officer Burmaster had approximately 20 disciplinary rule violations during the approximately 19 years he was on the force before the incident involving Plaintiff's dog.[140] This shows that Officer Burmaster averaged a little more than one rule violation per year, which is very close to the .826 incident rate that *Verastique* determined was too low "to support any inference of a department-wide pattern of illegality."[141]

In addition, *Verastique* noted that the plaintiffs failed to identify factors, such as department size and number of arrests, which "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice."[142] Context is necessary to support a claim that a pattern exists as to disciplinary violations as well as use of force. In *Peterson v. City of Fort Worth, Tex.*, the Court held that twenty-seven complaints of use of excessive force did not support a pattern "so common and well-settled as to constitute a custom that fairly represents municipal policy" where the plaintiff failed to provide context, including the size of the police department or how many arrests were made.[143] And in *Saenz*, the Court held that twenty-one previous incidents in which a police officer killed people failed to establish a pattern absent "further context surrounding the circumstances" of the of the prior shootings.[144]

---

[139] *Id.*, at 433.
[140] Exhibit 2, 31:10-19.
[141] See 106 F.4th at 434.
[142] *Id.*
[143] 588 F.3d at 851 (quoting *Piotrowski v. City of Houston*, 237 F.3d at 579).
[144] 637 F. App'x at 832. See also *Weiland v. Palm Beach City Sheriff's Office*, 792 F.3d 1313, 1328 n. 21 (11th Cir. 2015) (allegations of "thousands of contacts" with mentally ill people and "numerous police shootings" of mentally ill did not put sheriff's office on notice that training was inadequate where "factual enhancement" was missing to show similarity of constitutional violations).

Here, Plaintiffs cannot provide any context sufficient to create a question of fact as to whether the number of Officer Burmaster's previous uses of force were unusually large in comparison to other officers employed by NOPD. To the contrary, Lt. John Helou of NOPD's Force Integrity Team was asked whether the number of uses of force by Officer Burmaster since 2016, which was 13 uses of force, was "an unusual amount of use of force for an officer in that time frame that's being a proactive police officer?"[145] Lt. Helou answered, "No. I wouldn't say it's unusual."[146]

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants pray that the Court grant this Motion for Partial Summary Judgment.

Respectfully submitted:

*/s/ James M. Roquemore*_____
**JAMES M. ROQUEMORE, LSB #40035**
ASSISTANT CITY ATTORNEY
**CORWIN ST. RAYMOND, LSB #31330**
CHIEF DEPUTY CITY ATTORNEY
**DONESIA D. TURNER, LSB #23338**
CITY ATTORNEY
1300 PERDIDO STREET, SUITE 5E03
NEW ORLEANS, LOUISIANA 70112
TEL: (504) 658-9800
FACSIMILE: (504) 658-9868
James.Roquemore@nola.gov
*Counsel for Derrick Burmaster and the City*
*of New Orleans*

---

[145] Exhibit 2 (Helou Deposition), p. 39:9-11.
[146] *Id.*, p. 39:16.