# In the Matter of:

*Derek Brown and Julia Barecki-Brown*

*vs.*

*Derrick Burmaster, Shawn Fergusan, and the City of New Orleans*

## City of New Orleans through their designated representative, Lieutenant John Helou 30(b)(6) Deposition

March 10, 2023

5UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DEREK BROWN and JULIA BARECKI-BROWN | Civil Action No. 22-847 |
| VERSUS | SECTION: L |
| DERRICK BURMASTER, SHAWN FERGUSAN, and the CITY OF NEW ORLEANS | HONORABLE ELDON E. FALON |
| | DIVISION: 4 |
| | HONORABLE KAREN WELLS ROBY |

* * * * * * * * * * * * * * * * * * * *

    30 (B)(6) deposition of CITY OF NEW ORLEANS, through their designated representative, LIEUTENANT JOHN HELOU, 1340 Poydras Street, Suite 1900, New Orleans, Louisiana 70112, taken at the CITY ATTORNEY'S OFFICE, located at 1300 Perdido Street, 5E03, New Orleans, Louisiana 70112, commencing at 3:39 P.M., on Friday, the 10th day of March, 2023.

APPEARANCES:

  MOST & ASSOCIATES
  (By: William Most, Esquire)
  201 St. Charles Avenue
  Suite 114 PMB 101
  New Orleans, Louisiana 70170
    (Attorneys for the Plaintiffs,
     Derek Brown and Julia Barecki-Brown)

```
 1   APPEARANCES (continued):

 2

 3     GUSTE, BARNETT, SCHLESINGER, HENDERSON
       & ALPAUGH, L.L.P.
 4     (By:  C. Theodore Alpaugh, III, Esquire)
       639 Loyola Avenue
 5     Suite 2130
       New Orleans, Louisiana  70113
 6        (Attorneys for the Defendant,
           Officer Derrick P. Burmaster)
 7

 8     CITY OF NEW ORLEANS
       (By:  James Roquemore, Esquire)
 9     1300 Perdido Street
       5E03
10     New Orleans, Louisiana
          (Attorneys for the Defendants,
11         City of New Orleans and Shaun
           Ferguson)
12

13

14   ALSO PRESENT:

15
       Sofia Sophcefolia
16

17
     REPORTED BY:
18

19     KATHY ELLSWORTH SHAW, CCR, RPR
       Certified Court Reporter
20     (No. 049519)

21

22

23

24

25
```

```
 1                EXAMINATION INDEX
 2
 3                                              PAGE
 4
```

 5   EXAMINATION BY MR. MOST......................5
              RE-EXAMINATION.....................49
 6
     EXAMINATION BY MR. ALPAUGH..................39
 7
     EXAMINATION BY MR. ROQUEMORE................46
 8

```
 9
                  EXHIBIT INDEX
10
```

11   EXHIBIT NO. 14..............................21
12   EXHIBIT NO. 31..............................12
13   EXHIBIT NO. 38..............................16
14   EXHIBIT NO. 42..............................26
15   EXHIBIT NO. 45..............................32
16   EXHIBIT NO. 46..............................16

```
17              *    *    *    *    *
18
19
20
21
22
23
24
25
```

```
 1               S T I P U L A T I O N
 2           It is stipulated and agreed by
 3   and among counsel for the parties hereto that
 4   the deposition of the aforementioned witness is
 5   hereby being taken under the Federal Rules of
 6   Civil Procedure, for all purposes, in
 7   accordance with law;
 8           That the formalities of reading and
 9   signing are specifically waived.
10           That the formalities of filing, sealing,
11   and certification are specifically waived;
12           That all objections, save those
13   as to the form of the question and the
14   responsiveness of the answer, are hereby
15   reserved until such time as this
16   deposition, or any part thereof, may be
17   used or sought to be used in evidence.
18           *       *       *       *       *
19           KATHY ELLSWORTH SHAW, certified
20   Court Reporter, State of Louisiana,
21   officiated in administering the oath to
22   the witness.
23
24
25
```

```
 1          A.   Maybe about a month ago.
 2          Q.   Okay.  And aside from talking to
 3   your lawyer, what did you do to prepare for the
 4   deposition in terms of who you talked to and
 5   what documents you looked at?
 6          A.   So I went into our professional
 7   standard software, which is IAPRO, looked at
 8   Burmaster's -- basically his file in IAPRO,
 9   which basically lists everything he's been
10   involved in with the -- since he's been hired
11   by the NOPD.  I believe I looked at Detective
12   Brewer's formal disciplinary investigation into
13   Officer Burmaster regarding that incident, the
14   dog shooting.  I believe I looked at Officer
15   Burmaster's Insight, Employee Summary Report,
16   and then I also looked at a document that was
17   forwarded by Mr. Roquemore from you, something
18   to do with a Fourth Circuit appeal.
19          Q.   Uh-huh (indicating affirmatively).
20          A.   Yeah.  I believe that's
21   everything -- Oh, and also -- I'm sorry.  I
22   also looked at the NOPD consent decree.
23          Q.   Okay.  When you say you looked the
24   IAPRO, for our court reporter, that's
25   I-A-P-R-O; right?
```

```
 1   whole career without firing their gun at a
 2   person or animal.  Agreed?
 3        A.   Yeah, I'd agree to that.
 4        Q.   Okay.  And we can look at a document
 5   about this if you're not sure, but Burmaster,
 6   however, has fired his gun at a person or
 7   animal at least four times; right?
 8        A.   Correct.
 9        Q.   We can look at a document if you're
10   not sure about this, but Burmaster is the only
11   officer in at least the last ten years to have
12   shot two animals; right?
13        A.   I might have to look at a document.
14        Q.   Sure.
15   MR. ALPAUGH:
16             What's that going to be?
17   MR. MOST:
18             Thirty-one.
19             (Tenders document to witness.)
20   EXAMINATION BY MR. MOST:
21        Q.   So do you see this document,
22   Lieutenant?
23        A.   I do.
24        Q.   And this was presented to us as a
25   list of firearm discharges involving animals by
```

```
 1   NOPD officers.  Is that what it appears to be
 2   to you?
 3         A.   Yes.  It looks like starting at 2012
 4   -- August 29, 2012, through January 3rd of
 5   2020.
 6         Q.   Okay.  And it looks like you
 7   generated this document?
 8         A.   Yes.
 9         Q.   And you generated it in July 2022?
10         A.   Yes.
11         Q.   And do you know whether there have
12   been subsequent animal shootings since July of
13   2022?
14         A.   Yes.
15         Q.   And has there been any?
16         A.   There's been two.
17         Q.   Do you know the officers involved in
18   those?
19         A.   I do.
20         Q.   Who are they?
21         A.   Officer Kaja Rhea.  I think it's
22   K-A-J-A is the first name.  R-H-E-A is the last
23   name.  And the second incident, I believe which
24   was January of this year, was Officer Russell
25   Green.
```

```
1        Q.   Okay.  So going back to at least
2   2012 to the present, based on this document and
3   what you know, Officer Burmaster is the only
4   officer in the NOPD to have shot two animals.
5   Agreed?
6        A.   Agreed.
7        Q.   And this was an interrogatory
8   response, but you may know the answer.
9   Burmaster has used force more than 30 times
10  while part of the NOPD.  Do you know if that's
11  right?
12       A.   I don't know the exact number, but I
13  know there's a number of them in his IAPRO
14  profile.
15       Q.   Okay.  And this is a question that I
16  will, if necessary, just show you the document
17  on my computer.  The question is that his Use
18  of Force file is more than 600 pages long.  Can
19  you answer that without referring to a
20  document?
21       A.   No, because I'm not sure what we're
22  referring to by 600 pages.
23       Q.   Yeah.
24       MR. ALPAUGH:
25            Do those have Bates number on them?
```

```
 1   reports, stuff like that.
 2       Q.   Right.  So it doesn't indicate he's
 3   used force 610 times, but the file itself is
 4   610 pages long; right?
 5       A.   Yes.
 6   MR. MOST:
 7            And we'll designate that as
 8       Exhibit 46.  We'll provide it
 9       electronically.  That's Bates 2730
10       through 3339.
11   MR. ALPAUGH:
12            That's the defendants'?  That's the
13       Defendants' 2730?
14   MR. MOST:
15            Yes.
16            Okay.  Next we designate Exhibit 38.
17   EXAMINATION BY MR. MOST:
18       Q.   You mentioned Insight.  That's a
19   software program?
20       A.   Yes, sir.
21       Q.   That's a -- That's a software
22   program that kind of generates a report about a
23   particular officer with a range of information,
24   discipline, use of force, sick days, all sorts
25   of stuff?
```

```
 1           A.   Yeah.  It's a -- It's basically --
 2   It's not a disciplinary program.  It's
 3   basically a management tool for supervisors,
 4   and it pulls data from different sources,
 5   different -- other software programs throughout
 6   the department.  And it just generates a
 7   summary report to assist the supervisor in
 8   spotting any types of patterns or anything
 9   negative that -- or positive that the
10   supervisor may need to take action on in order
11   to avoid something more serious down the line.
12   It's also supposed to alert the supervisor if
13   employee crosses a certain threshold in various
14   aspects to allow the supervisor to basically
15   proactively step in and see if there's
16   something that requires attention.
17           Q.   Is this the early warning system
18   that I've heard described?
19           A.   Yeah.  I think it -- I've heard
20   early warning system, early intervention
21   system.
22           Q.   And do you know what the thresholds
23   are for flagging officers in terms of use of
24   force or other things?
25           A.   I don't.  It is -- It's not a PIB
```

1   system.  It's, I believe -- I'm not sure if
2   it's MSB that manages it, but there is a early
3   intervention unit within headquarters that
4   actually sets those thresholds.
5        Q.   Does PIB get notified when officers
6   hit certain thresholds in Insight?
7        A.   Only if it's involving people that
8   we supervise.  We don't -- We don't have access
9   to Insight past our -- or people under our
10  chain of command.
11       Q.   Do you know if there's a document or
12  a memo or something that lays out what those
13  thresholds are?
14       MR. ROQUEMORE:
15            I'm going to object.  This is beyond
16       the scope.
17       MR. MOST:
18            Okay.
19  EXAMINATION BY MR. MOST:
20       Q.   And just so you know, the lawyers
21  that are here may make objections, but unless
22  Jim instructs you not to answer, you can just
23  go ahead and answer.  They've made their
24  objections for the record.
25            So do you know if there's like a

```
 1   memo or document or something that lays out
 2   what the thresholds are?
 3        A.   Yeah, I believe there is.
 4        Q.   Okay.  Do you know what that's
 5   called?
 6        A.   No. It may be -- I think there's
 7   a -- There's an NOPD policy on Insight.  It may
 8   be at the end of the policy possibly because I
 9   may have seen it in training or something like
10   that before.
11        Q.   Okay.  So if you look at pages nine
12   to ten of this Exhibit 38, the Insight
13   document.
14        A.   I have nine of 42.
15        Q.   Yeah.  So look at nine and ten of
16   42.
17        A.   Okay.  Gotcha.
18             (Witness examines document.)
19        Q.   And so this reflects use of force
20   information; right?
21        A.   Yes.  It looks like from January 1st
22   of 2016.
23        Q.   Right.  And it only goes back to
24   2016 because NOPD started using Insight in
25   2016?
```

City of New Orleans through their designated representative, Lieutenant John Helou
March 10, 2023

Page 20

```
 1         A.   Yeah, I believe that's right.
 2   Somewhere around then, yes.
 3         Q.   Okay.  So -- And you can check my
 4   counting here, but Burmaster has used force at
 5   least reflected here, at least 13 times since
 6   2016; correct?
 7         A.   Thirteen.
 8         Q.   And this actually doesn't include
 9   the Apollo shooting in 2021; correct?
10         A.   No.
11         Q.   So at least 13.  And we know it's
12   more than 13, but we don't know how many since
13   2016; right?
14         A.   Not -- I mean, not from this report,
15   no.
16         Q.   Right.  And NOPD chose to retain
17   Burmaster on the force despite these uses of
18   force.  Agreed?
19         A.   Yeah.  He's still on the job.
20         Q.   Do you know whether Burmaster's FTO
21   role has been removed from him?
22         A.   I don't know that --
23         Q.   Okay.
24         A.   -- off the top of my head.  I know
25   he's changed districts.
```

```
 1    allegation driven.  So it doesn't take much to
 2    lodge an excessive force complaint against --
 3    against somebody.
 4         Q.   Uh-huh (indicating affirmatively).
 5         A.   So I just kind of wanted to put that
 6    on the record.
 7         Q.   Sure.  But at least the way I
 8    phrased it, it was a true statement; right?
 9         A.   Can you repeat it one more time?
10         Q.   Sure.  So to sum up from the
11    documents we've looked at, these documents show
12    that Burmaster has had at least 30 uses of
13    force, at least 20 sustained policy violations,
14    at least five complaints of use of force;
15    correct?
16         A.   Correct.  Excessive force or use of
17    force?
18         Q.   Excessive force.
19         A.   Yes.
20         Q.   And NOPD has chosen to retain him in
21    the department.  Agreed?
22         A.   Agreed.
23         Q.   So then there was a Fourth Circuit
24    opinion you looked at in preparing for this?
25         A.   That's correct.
```

```
 1        MR. ALPAUGH:
 2             Yeah.  John, I've got a couple for
 3        you.  Let's get back to the beginning.
 4   EXAMINATION BY MR. ALPAUGH:
 5        Q.   You were asked whether -- about
 6   Officer Burmaster allegedly using force 13
 7   times since 2016.  Do you remember that?
 8        A.   Yes, sir.
 9        Q.   Is that an unusual amount of use of
10   force for an officer in that time frame that's
11   being a proactive police officer?
12        A.   What was the time frame again?  I'm
13   sorry.
14        Q.   I believe the question is since
15   2016?
16        A.   No.  I wouldn't say it's unusual.
17        Q.   Okay.  Now, on his short form, which
18   is Exhibit 14 -- Do you have it in front of
19   you?
20        A.   Yes.
21        Q.   All right.  You were asked if there
22   were 22 different rule violations on there;
23   correct?
24        A.   Sustained allegations?
25        Q.   Sustained allegations, yeah.
```