David Duplantier                                            March 08, 2023

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   DEREK BROWN and JULIA          CIVIL ACTION NO.
     BARECKI-BROWN                  22-00847
 5
     VERSUS
 6                                  DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF      SECTION: L
     NEW ORLEANS
 8

 9

10

11   * * * * * * * * * * * * * * * * * * * * * * * *

12              TRANSCRIPT OF THE DEPOSITION OF:

13                   DAVID DUPLANTIER,

14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE

15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

17   * * * * * * * * * * * * * *.* * * * * * * * * * * *

18

19          REPORTED AT:

20          NEW ORLEANS CITY HALL

21          1300 PERDIDO STREET, ROOM 5E03

22          NEW ORLEANS, LOUISIANA  70112

23

24

25          COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```



```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4         JONES WALKER L.L.P.
           (BY:   TARAK ANADA, ESQ.)
 5         201 ST. CHARLES AVENUE, 49TH FLOOR
           NEW ORLEANS, LOUISIANA  70170
 6         (504) 582-8322
           tanada@joneswalker.com
 7

 8    FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9         NEW ORLEANS CITY ATTORNEY'S OFFICE
           (BY:   JAMES M. ROQUEMORE, ESQ.)
10         1300 PERDIDO STREET, SUITE 5E03
           NEW ORLEANS, LOUISIANA  70112
11         (504) 658-9800
           james.roquemore@nola.gov
12

13    FOR DERRICK BURMASTER:

14         GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
           (BY:   C. THEODORE ALPAUGH III, ESQ.)
15         639 LOYOLA AVENUE, SUITE 2130
           NEW ORLEANS, LOUISIANA  70113
16         (504) 529-4141
           cta@gustebarnett.com
17

18    ALSO PRESENT:

19         SOPHIA CEFOLIA

20

      REPORTED BY:
21
           YOLANDA J. PENA
22         CCR NO. 2017002, RPR
           STATE OF LOUISIANA
23

24

25
```



David Duplantier

March 08, 2023
Page 3

1                         I N D E X

2

3                                                  PAGE

LIST OF EXHIBITS.....................................4

4

STIPULATION.........................................5

5

EXAMINATION BY:

6

        MR. ANADA............................6, 107, 145

7

        MR. ALPAUGH.........................86, 119, 144

8

        MR. ROQUEMORE...............................121

9

CERTIFICATE.......................................147

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



David Duplantier                                        March 08, 2023
                                                             Page 4

1                        LIST OF EXHIBITS

2

3    Exhibit No. 1.........................................7
         (Second Amended Complain)
4
     Exhibit No. 8........................................21
5        (Notice of 30(b)(6) Deposition
          & Request to Bring Documents,
6         Information, or Objects)

7    Exhibit No. 20.A...................................110
         (Event Summary)
8
     Exhibit No. 22......................................46
9        (NOPD Operations Manual,
          Chapter 1.7.1, Conducted
10        Energy Weapon)

11   Exhibit No. 23......................................49
         (NOPD Operations Manual,
12        Chapter 1.3, Use of Force)

13   Exhibit No. 40......................................86
         (CITY DEFENDANTS 003646,
14        Policy Tactics Training
          Recommendations)
15
     City Exhibit No. 1.................................125
16       (CITY DEFENDANTS 003651,
          PowerPoint, Responses to the
17        Problem of Dog-related
          Encounters)

18

19

20

21

22

23

24

25



David Duplantier

March 08, 2023
Page 5

1          S T I P U L A T I O N

2

3          IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6          All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9          All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25



1    A.    I don't recall that.

2    Q.    Okay.  Let's go to the topic you're designated

3  about, Sergeant.  "NOPD trained on how officers are to

4  handle animals in the field."  Let's just stop there.

5         I think the most efficient way is can -- can I

6  just ask you this question, and you answer it to the

7  best of your ability?  What kind of training do NOPD

8  officers get about how to handle animals in the field?

9    A.    Between -- and I don't recall the exact time

10  frame.  But I know there was between -- sometimes

11  between early 2000 to 2000- and, maybe, -14, sometime

12  in there we had training and in-service on handling

13  animals, right.

14    Q.    This is post -- post-academy?  Like after --

15    A.    No.  This was actually -- so the in-service

16  training is annual training that officers go through

17  every year.  They'll come up with a curriculum

18  targeting certain areas that -- some things don't

19  change, other go through legal updates, but some things

20  are added and maybe deleted based off of the -- the job

21  trying to get information out --

22    Q.    Sure.

23    A.    So I know in -- like, I don't recall the exact

24  date, but we did -- at some point for that annual

25  in-service training for police officers, there was a



1    class.  I don't recall the title of it, but it was

2    dealing with animals, for the most part.

3         Q.   Do you know if Burmaster took that class?

4         A.   I'm sure he did because every officer has to

5    go through in-service training.  If they don't go

6    through in-service training, then that's -- there is

7    some -- you can get suspended, written up, things of

8    that nature.

9         Q.   Okay.

10        A.   So we make sure every officer attends

11   in-service training, keep records of that.

12        Q.   Fair.

13        A.   So I'm going to go out and say yes on that.

14        Q.   Okay.  So in-service training, it's been

15   addressed one time?

16        A.   I don't recall how long they had that involved

17   with the in-service training because it started out

18   with -- the gentleman that was teaching it was with the

19   ASPCA.  When he left, I ended up actually teaching the

20   class for a while.  Like I said, in-service changes, so

21   I know, at some point, it was taken out of in-service

22   and replaced with some other course.

23        Q.   Sure.

24        A.   They did try to supplement the in-service

25   training class within an ASPCA class that they mandated



1    officers to take, which was an online course.  And --

2    and not that long ago -- I'll say a few years ago, they

3    did -- we do what they refer to as DTB, daily training

4    bulletins.

5           So every month, they -- it's not through the

6    academy.  It's through PSAB, Professional Standards and

7    Accountability Bureau.  They develop training courses

8    that officers have to take.  It's -- once again, it's

9    like in-service; you have to go through it.  But they

10   put a training course online.  You read through it, go

11   through it, and at the end, you have to test out of it.

12   Q.    And that's the daily bulletins?

13   A.    Daily training bulletins.  So once a month,

14   they'll come up with a different daily training

15   bulletin.  So after the ASPCA online course, I know the

16   job came up with -- one of the DTBs dealt with, you

17   know, handling animals and being confronted by animals,

18   et cetera.

19   Q.    Did you write that DTB?

20   A.    No, no.  That goes -- that comes out of PSAB.

21   It doesn't come out of the academy.

22   Q.    Are there documents that you can get that can

23   show me what the DTB was or what they were told?

24   A.    PSAB -- PSAB should have a record of it.

25   Q.    Who's that?



1    it -- and I don't recall what was asked or what was

2    included in it.

3        Q.    Okay.  Got it.  All right.  So we talked about

4    DTBs.  Let's back up to the annual in-service

5    trainings.

6        A.    Yes, sir.

7        Q.    All right.  So you recall one occasion that

8    use of force against animals was covered in one of

9    those?

10       A.    Yes, sir.

11       Q.    Do you recall a second occasion?

12       A.    Like I said, the -- the only in-face training

13   we had was for the in-service, which is some years ago.

14   They had their online training, which is established by

15   the ASPCA.  As a matter of fact, the recruits take

16   that.  They just took that recently in the academy.

17   And after that, it was the DTB.

18       Q.    Okay.

19       A.    Outside of that, I don't recall anything else.

20       Q.    All right.  So putting aside the DTB and

21   putting aside ASPCA training -- which we'll talk about

22   that.  In terms of the annual in-service trainings, you

23   only recall one occasion that dealt with encountering

24   animals in the line of duty?

25       A.    Yes.



1      Q.   All right.  Fair enough.

2           And you believe -- you assume, but you don't

3    know with a hundred percent certainty, that Burmaster

4    would have taken that annual in-service training and

5    also would have gone through the daily bulletin

6    training.  Right?

7      A.   The reason I'm leaning towards, yes, he took

8    it, because if he was out sick, injured, what have you,

9    that may have prevented him.  Before he could go back

10   to duty, he would have to take -- it's mandated to take

11   the courses.

12          We call it a -- at the end of the year,

13   officers that may have been out -- we have a list of

14   people that did not either complete or go through

15   in-service training.  They -- we set aside -- at the

16   end of the year before we go into the next year,

17   there's time these officers have to come in, and they

18   have to complete this training.

19     Q.   Have you ever seen Burmaster's name on one of

20   these lists of people that?

21     A.   I couldn't -- it's been so long, I couldn't

22   recall.  So I'd have -- they'd have to go back and

23   check records, to be honest with you.

24     Q.   I got you.  So we're making an educated

25   assumption that Burmaster attended those trainings, but



1    we don't have -- you don't have personal knowledge
2    whether he actually did or didn't?
3          A.   No, sir.
4          Q.   True?  Okay.
5               All right.  Let's go to the ASPCA training.
6    When did that start?  Or when did it end?  Like, what
7    time frame was that?
8          A.   I don't -- it's -- like I say, it's online
9    training that they mandate.  We have so many classes we
10   have to take through online training that's mandated by
11   the department or the federal government.  We're still
12   going through that.  They still have to take the ASPCA
13   training.  I know the recruits do.  I cannot really
14   give you a time frame on when it was mandated via the
15   department for outside the academy.
16         Q.   Do you have any knowledge of whether Burmaster
17   took that online ASPCA training?
18         A.   No knowledge.
19         Q.   Okay.  Have you taken it?
20         A.   Yes, sir.
21         Q.   Do you remember what was covered?
22         A.   No, I don't.
23         Q.   Look, I don't blame you.  I don't blame you.
24              And you -- similarly, you don't recall what
25   was -- what specific -- what was specifically covered



1    in the --

2        A.    The actual training?

3        Q.    -- the once-a-year in-service?  You don't

4    remember what was specifically covered about --

5        A.    No.  And I will say this:  Most of -- most of

6    it is -- it's -- I don't want to say redundant because

7    it makes it sound like it's worthless.  But most of

8    it is consistent -- that's a better word to use --

9    where -- I mean, we're not -- they're not making us any

10   experts on the animals.  They're just trying to help us

11   avoid either, A, having animals hurt us or, B, us

12   having to hurt the animals.

13       Q.    Right.

14       A.    So most -- most of the information is pretty

15   consistent.  You know, you try to read the dog's body

16   language because they can't talk but they do give off

17   signals, right.

18       Q.    Sure, sure.

19       A.    So a lot of the -- the training talked about

20   that and what to look for and things of that nature.

21       Q.    Understood.  And we talked about three

22   potential different trainings about dogs, right?  The

23   ASPCA online course, the yearly training, and then --

24       A.    And the DTB.

25       Q.    Yeah.  And out of those three, the only one



David Duplantier                                    March 08, 2023
                                                         Page 32

```
 1        A.   Well, no.  I've taught it several times.  It
 2   was just -- it was like -- it's once a week I had to
 3   teach it, for a year.
 4        Q.   I see.  Okay.  And then, like, one group of
 5   officers goes one week, another --
 6        A.   Correct.
 7        Q.   And everyone just goes once, right?
 8        A.   Yes.
 9        Q.   All right.  That makes sense.
10             Can you take us through the specific content
11   of that, if you remember?  I know --
12        A.   I -- I remember --
13        Q.   It's not a memory test.
14        A.   I remember we talked about the dog, the
15   position of the tail, the ears, right, that -- I always
16   stress to officers, the majority of the time, the dog
17   is not trying to get into a confrontation, but their
18   way of telling you, "I don't want to fight, but if you
19   come any closer, if you don't leave, I'm willing to do
20   it," is by them sitting there and their posture
21   changes.  You can see the hair on their body change,
22   and they start barking, which is a warning mechanism,
23   right.
24             So we talked about things of that nature.  We
25   talked about what to do prior to entering an enclosed
```



1  yard.  You know, don't just walk in; take a pause.  You

2  want to try and make a sound or do something, not so

3  loud as to alert a potential threat inside the

4  residence or inside this area, but dogs having keen

5  hearing --

6      Q.   Right.

7      A.   -- a potential -- you're trying to get them to

8  hear you.  All you're looking for is a sign to see if

9  there's an animal in the yard.

10     Q.   So like whistling, kissing sounds?  You don't

11 want to be too loud to tip off the target?

12     A.   Too loud to put yourself -- yeah, to put

13 yourself in harm's way --

14     Q.   Right.

15     A.   -- not from an animal but from a potential

16 threat.

17     Q.   Sure.

18     A.   But loud enough to where you may get the

19 animal's attention.

20     Q.   I got you.  I got you.

21          And this is prior to walking into a gated

22 yard?

23     A.   Yes.

24     Q.   So, like, where did you instruct officers you

25 trained on this topic to make that sound?  Like, at the



1  gate, right?

2      A.   Preferably outside.  Yeah, outside the gate.

3      Q.   Like, in front of the -- in front of the house

4  or property you're about to enter, right?

5      A.   I don't want to say in front because I don't

6  want to give -- we have this thing we refer to as a

7  "fatal funnel," right, where you put yourself into an

8  area where the likelihood or the probability for

9  someone to take a lethal act against, i.e. a gunshot,

10 put you directly -- we refer to -- so naturally, you

11 want it up close enough to the -- to the structure or

12 the location you're going to but not necessarily

13 directly in front of that entry and exit point.

14     Q.   So at the gate, not necessarily in front of

15 the house?

16     A.   Correct.

17     Q.   Okay.  Thanks.  That makes sense to me.

18          You mentioned interpreting the type of signs

19 that a dog could be giving to you to determine whether

20 it's a threat or not.  And you mentioned barking as one

21 sign?

22     A.   Correct.

23     Q.   In the -- you know, in the totality of the

24 circumstances, when an officer has to make a decision

25 about whether they're faced with -- they're being faced



1  with a threat of serious bodily harm or death by a dog,

2  one of the things to evaluate is, is the dog barking at

3  me or not?  Is that --

4      A.    And not all dogs -- I find that certain

5  breeds, they're not big barkers.  They're presence

6  alone and that eye contact they make with you is their

7  way of saying, "You might want to back up."

8      Q.    Yeah?

9      A.    Pit bulls are not big barkers all the time.

10  They -- Rottweilers not big barkers.  They -- you'll

11  get more of a stare from them, and they're waiting to

12  give -- see what you're going to do in response to

13  them.  So certain breeds -- not saying they won't bark,

14  but certain breeds, they're not big at barking.

15      Q.    I wish my pit bull mix was not a barker.

16      A.    Some of them -- some of them -- yeah.  I got a

17  bull -- my bulldog, he --

18      Q.    Anytime someone comes on the porch --

19      A.    He can't be quiet.  He's a nonstop bark -- he

20  barks at everything.

21      Q.    Mine too.  Mine too.  Okay.

22          So barking, in your training, would go towards

23  supporting that there is a credible threat posed by the

24  dog, right?

25      A.    Yes.



1      Q.    Okay.  But not the breed of the dog?  Does
2  that factor in?
3      A.    Yeah.  I mean -- and once again, it goes to --
4  I'm -- I'm going to say, for me, it would be a factor.
5      Q.    Yeah.
6      A.    But for some people, they don't -- they just
7  see a dog.  They see an animal.  So some people's fear
8  level when it comes to animals -- like people with
9  horses; they won't get near them.  So for me, the breed
10  would be a factor.  For some people -- I can't say for
11  everyone -- that -- that's going to be taken into
12  consideration.
13      Q.    It's one of the subjective components of this,
14  right, based on your own personal experiences,
15  thoughts --
16      A.    Yes, sir.
17      Q.    -- beliefs, and that kind of stuff?
18            And you train the officers that it's fine to
19  factor in your subjective beliefs --
20      A.    Yes, sir.
21      Q.    -- into the overall decision-making rubric.
22  Right?
23      A.    Yes.
24      Q.    There's no reason that they shouldn't, right?
25      A.    No, there's no reason they shouldn't.



David Duplantier                                    March 08, 2023
                                                         Page 37

1        Q.    What about the size of the dog?

2        A.    And -- and I'm going to go back to my answer

3    on the first question.  For me, the size would take --

4    or play a big factor in it.  You know, I -- the last

5    thing I want to do is hurt any animal.  But if kicking

6    the dog would suffice, then I would kick the dog.  If

7    it -- if I thought it was a credible threat to me.  I

8    took it as a credible threat, a potential bite.

9        Q.    That would work really well for a small dog,

10   right --

11       A.    A small dog.

12       Q.    -- kicking?

13       A.    Like, a small.  But then again, like I said,

14   you -- a person's -- when we're going back to talking

15   about use of force and that person's interpretation to

16   the threat level, as long as it stays within reason --

17   so some people, even though it may be a small dog, it

18   still may be a very credible threat to them.

19       Q.    Based on their subjective viewpoint, right?

20       A.    Yes.

21       Q.    And I think I read somewhere -- I don't know.

22   Burmaster will tell you he'd been bitten by small dogs

23   before.  Does that sound familiar?

24       A.    I don't know.  I really don't know.

25       Q.    All right.  So if I'm an officer and I've been



1    bitten by small dogs, puppies before, then I'm allowed

2    to factor that in when I decide whether I use lethal

3    force or not.  Right?

4         A.   It -- it is a factor but not --

5         Q.   Yeah.  Not --

6         A.   -- the only -- not the only factor.  It is a

7    factor.

8         Q.   It's part of the equation?

9         A.   Yes, sir.

10        Q.   All right.

11        A.   Yes, sir.

12        Q.   If I have this strange ongoing fear for the

13   last ten years that small dogs are going to bite my

14   genitalia, am I allowed to consider that in the overall

15   analysis?

16        A.   I'm not quite sure how to answer.  I'm going

17   to say consider it in the overall analysis.

18        Q.   Well, yeah.  So I have this fear, this concern

19   that -- and I'm an officer you're training.  I have

20   this fear or concern that a small dog is going to bite

21   me in the genitalia.  I just feel that that's going to

22   happen one day.  I can consider that into my

23   decision-making, per the training you provide, right --

24   or per -- that NOPD provides?  Or do I have to set that

25   aside, and I can't think about that?



1      A.    I think that's something you have to set

2    aside.  I mean, you have a lot -- and I'm thinking as

3    we speak.  I know a lot of officers that are deathly

4    afraid of animals -- dogs, period.  They are deathly

5    afraid of dogs.

6          We hope that your observations and what you

7    take in on a call or going to a call or present on a

8    call plays a bigger factor than just your fear, right.

9    I know the fear exists.  I know your worry exists, but

10   there are so many other variables you got to take into

11   consideration.

12         So I -- that's why I said I wasn't quite sure

13   how to answer it.  But I think -- if I'm -- if I'm

14   getting what you're asking me correctly, based off of a

15   comment you just made --

16     Q.    Yeah.

17     A.    -- yes, it's a factor, but that's something

18   that's more on the back burner.  There's so much other

19   stuff that has to be put before it.

20     Q.    It's just one ingredient in the cake mix,

21   right?

22     A.    Yes, sir.

23     Q.    Okay.  So for the annual in-service trainings,

24   we've talked about how an officer is taught to evaluate

25   the threat of a canine in the line of duty.  We've



David Duplantier                                      March 08, 2023
                                                      Page 40

1    talked about demeanor, whether or not it's barking,

2    tail position, ear position, subjective experiences and

3    beliefs about dogs, size of the dog, breed of the dog.

4            What else is involved in this training that we

5    haven't covered?

6        A.    The demeanor of the officer as well.  Like, I

7    explain to them -- I used to be really fast, but I'm

8    not outrunning four legs.  My two will never beat the

9    four.  Even though my fat bulldog -- he'll catch me in

10   a short distance.

11       Q.    Really?

12       A.    Yeah, he's -- he's a little piece.

13           But I remember -- I recall in the training

14   that some of the things we do can escalate the

15   situation, meaning the dog may be showing you

16   attention, not quite knowing or figuring out if they're

17   good with you or not yet.

18           But the average person, when they see the dog,

19   the first thing they want to do is reach down.  And it

20   may be a gesture of friendliness, but a dog can take

21   that as a threat.  You stand over him.  He doesn't know

22   you; she doesn't know you.  And you're reaching down

23   towards the face, generally.  They -- normally, most

24   people tell you pet from the side and not directly

25   from -- and most people want to do it because the dog



1    is facing them.

2        Q.    Right.

3        A.    So we tell them don't -- even if the dog walks

4    up to you, let him get a sniff but don't be so quick to

5    reach out to it.

6        Q.    You ever heard of people letting the dog sniff

7    the back of their hand before they --

8        A.    Yeah.  And I -- I tell them not even to extend

9    it to them because the dog does -- may not know what

10   you're doing.

11       Q.    Sure.

12       A.    Probably won't.  So just let -- let the hands

13   sit there.  Let him get his smell.  Let him get his

14   feel.  Let him go about his business, and you handle

15   your situation.

16       Q.    I've read in some -- you ever looked at any of

17   the DOJ publicly available training about police

18   officers encountering animals in the line of a duty?

19       A.    I have read things, but I -- I would be

20   misinforming you if I knew it was from the DOJ.  I

21   don't recall.

22       Q.    Right.

23       A.    But I wouldn't be surprised if I did read

24   something regarding or in reference to the Department

25   of Justice.



1    Q.    You ever read any training bullet points or

2    training content, whether it's from the DOJ or not,

3    that says just because a dog is running in your

4    direction does not -- does not mean it's threatening

5    you, does not mean it's intending to cause you harm?

6    A.    Well, I don't recall necessarily reading that.

7    My knowledge base will tell me that.  But once again,

8    there are other factors you're taking into -- there are

9    a lot of other factors you're taking into

10   consideration.

11   Q.    You don't ever train officers to conclude

12   that, just because a dog is running in your direction,

13   it's a threat of serious bodily injury or harm, just

14   based on that.  Right?

15   A.    No, not that solely.  That -- that solely in

16   itself, no.

17   Q.    It's got to be that plus some other indicators

18   of aggression, right?

19   A.    Yes, sir.

20   Q.    Okay.  Like barking?

21   A.    Barking, right.  Body position, the speed that

22   he's coming at you, all of these things --

23   Q.    Maybe bearing his teeth?

24   A.    Yes, sir.

25   Q.    What else does the NOPD animal training, that



David Duplantier

1    you are familiar with, cover that we haven't already

2    discussed?

3        A.    One of the things, which is one that never

4    changes, is we go through our CEW training, which is a

5    less lethal means.

6        Q.    Yeah.

7        A.    We talk about that with CEW training, when it

8    comes to animals.

9        Q.    You train officers to consider less lethal

10   means if it's a -- if they have the opportunity to do

11   that.  Right?

12       A.    Yes, sir.

13       Q.    They should consider those before they resort

14   to lethal force?

15       A.    Yes, sir.

16       Q.    And one of those is a CEW?

17       A.    Yes, sir.

18       Q.    Another one -- I think you stated just kicking

19   the dog, and that's, you know, especially effective for

20   a smaller dog.  Right?

21       A.    Yes.

22       Q.    And then the baton?

23       A.    A baton can be used.  The only problem with a

24   baton, the -- the shortcomings of using a baton or any

25   type of impact weapon is in order for you to use it,



```
 1   you have to get really, really close.
 2           Animals generally are a lot quicker than us,
 3   so that means you would have to discipline yourself
 4   enough to allow the dog to get within probably five
 5   feet of you in order for you to effect a strike.  And
 6   it's not guaranteed you'll get a good strike only
 7   because the way the animal is built.  They're not like
 8   people, upright.  So --
 9       Q.   Makes sense.
10       A.   So --
11       Q.   And this is the expandable baton, right?
12       A.   Yes, sir.
13       Q.   Okay.  And you train officers that they are
14   required to carry an expandable baton on them when
15   they're in the line of duty?
16       A.   Yes, sir.
17       Q.   Okay.  And the reason for that policy is so
18   they have another nonlethal tool that they can consider
19   using before shooting a person or an animal or whatever
20   they're shooting?
21       A.   Yeah.
22       Q.   Okay.  You believe that's an important rule?
23       A.   I think every tool that we train with is
24   important, to be honest with you, and should be used.
25       Q.   You've trained on the taser before, right?
```



David Duplantier                                          March 08, 2023
                                                                Page 45

```
 1        A.    I'm a taser instructor, actually.
 2        Q.    Is it -- is there like a difference in how
 3   fast an officer can pull out his service weapon versus
 4   how fast the officer can pull out the taser?
 5        A.    Are you talking about speed of drawing the
 6   weapon.
 7        Q.    Yeah, yeah.
 8        A.    I mean, I guess it varies from officer to
 9   officer.  I mean, some of us move different than
10   others.  The usability of the weapon naturally is
11   different, the way we're able to -- to be effective
12   with a CEW.  So that -- that's really the big factor in
13   that case, not so much drawing it.  It's based off of
14   the -- the direct problem at hand.
15        Q.    The training you give is consistent with the
16   written policies of NOPD, right?
17        A.    Yes, sir.
18        Q.    Okay.  All right.
19                   MR. ANADA:  Did we already mark the
20              taser training policy -- taser --
21                   MR. ALPAUGH:  I have no idea.
22                   MR. ANADA:  Let's see.  The operation
23              manual, 1.7.1?
24                   MR. ROQUEMORE:  Twenty-two.
25                   MR. ALPAUGH:  Here it is, 22.
```



David Duplantier                                    March 08, 2023
                                                          Page 48

```
 1                    MR. ANADA:  I hear you.  And I'm asking
 2              about it in the context of him being a trainer
 3              and whether he trains consistent --
 4                    MR. ROQUEMORE:  I just want to be
 5              careful --
 6                    MR. ANADA:  Yeah, no.
 7                    MR. ROQUEMORE:  -- and, you know, put
 8              that out there.
 9                    MR. ANADA:  Yeah, no.  Absolutely.  I
10              appreciate that.  It's on the record.
11    BY MR. ANADA:
12         Q.   I guess what I'm just trying to mention is, as
13    you go through this -- it's the CEW policy, right?
14         A.   Yes, sir.
15         Q.   As you go through the CEW policy, is there
16    anything in here that you would not include in your
17    training of an NOPD officer because you disagree with
18    that portion?
19         A.   No.  We have to -- we don't get to piecemeal
20    it.  We -- we teach to the policy.
21         Q.   Okay.  Has Burmaster been trained on this
22    policy, the NOPD CEW policy?
23         A.   Everybody has.
24         Q.   Okay.
25         A.   Everybody has.  Starting at the -- at a
```



```
 1   recruit level.
 2        Q.   Okay.  You mind if I give that one to the
 3   court reporter?
 4        A.   Sure.
 5             MR. ANADA:  Let me make this more
 6        legible.  That was 22, right, guys?  CEW?
 7             MR. ALPAUGH:  I think so, yeah.  Yes.
 8             MR. ANADA:  I'm going to mark the
 9        following document as Exhibit 23.  This one I
10        do have copies of.  It's Chapter 1.3, entitled
11        "Use of Force."
12   (Exhibit No. 23 was marked for identification.)
13             MR. ANADA:  Oh, yeah.  I can give her
14        one, sure.  That's a great idea.
15             Here's a copy for you.
16             MS. CEFOLIA:  Thanks.
17             MR. ANADA:  You're welcome.
18   BY MR. ANADA:
19        Q.   Could you take a look at Exhibit 23 there,
20   this one?  You're obviously familiar with that
21   document, right?
22        A.   Yes, sir.
23        Q.   Okay.  I'm going ask you some questions about
24   it.  Feel free to read the whole thing before I ask or
25   just skim it or whatever you want to do.
```



David Duplantier

March 08, 2023
Page 50

```
 1        A.    It's a lot to skim, so we can go --

 2        Q.    You want me to just dive in?

 3        A.    Yeah.

 4        Q.    Okay.  Is there any -- are there any

 5   policies -- I'm basically just going to ask you the

 6   same questions about the CEW policy.

 7              You agree with all the policies set forth here

 8   in this document, right?

 9        A.    I'm sorry?

10        Q.    You agree with all the policies set forth in

11   Exhibit 23, right?

12        A.    "Agree" meaning?

13        Q.    You think these are good policies?

14        A.    It's our policy.

15        Q.    Right.  Okay.

16        A.    Yeah, I don't know how else to answer it.

17        Q.    You train in accordance with these policies?

18        A.    Yes, sir.

19        Q.    You -- you would never train inconsistent with

20   these policies, right?

21        A.    No, sir.

22        Q.    Okay.  Is there -- do you train --

23              MR. ANADA:  Jesus.  The phone thought I

24         was asking it a question.

25              MR. ROQUEMORE:  Can you hold on just
```



```
 1            more confusing.
 2       A.    Once again, I mean, I would have to actually
 3   go page by page with the one that we have present and
 4   the one that was in place at the time.
 5   BY MR. ANADA:
 6       Q.    Okay.
 7       A.    If there is a change, I can't see a dramatic
 8   one.
 9       Q.    Okay.  Fair enough.
10       A.    I can't see a dramatic change.
11       Q.    That works for me.  All right.  So we've now
12   talked about a few specific areas that were covered in
13   the in-service training that officers received about
14   encountering animals in the line of duty.
15            Is there anything else that was in that -- in
16   that training that we just haven't touched on today?
17       A.    No.  Based off of the reason of us being here,
18   the only other training, like I said, that goes hand in
19   hand with the CEW, use of force, all of it's one big
20   ball.  They -- they all -- the CEW, the use of -- the
21   use of the firearm, all that falls under it.  It's
22   going to -- it should fall directly under the overall
23   umbrella of use of force.
24       Q.    Got it.  Is there, like, a different -- a
25   difference in the standards of when an officer can use
```



David Duplantier

March 08, 2023
Page 53

1  lethal force against a human versus when an officer can
2  use lethal force against a dog?
3      A.   Yes.
4      Q.   Tell me the difference.
5      A.   Well, we -- actually, for -- going with a
6  human, we target -- our best target area naturally is
7  the back, largest muscle group, easiest area to hit.
8  You achieve what they refer to as to NMI, neuromuscular
9  incapacitation.  Okay.
10          You also want to get at least -- at least try
11  and get a seven-inch spread.  So that goes with the
12  distance you are from this person that you're going to
13  fire the weapon.  And if we're shooting or firing this
14  weapon at the front of the person, i.e. their torso,
15  the front torso -- we look to target -- we don't want
16  to target the heart.  That was a recent change of CEW.
17          We want to lower our target area, so we're
18  trying to get one dart below the belt line and the --
19  the top dart -- the bottom dart below the belt line,
20  the top dart at -- preferably right underneath the
21  heart area, right underneath that sternum area.  We
22  don't -- they don't want to give any direct shot to any
23  area where the heart is.
24      Q.   I got you.
25      A.   That in itself is a difficult shot, easier



1    on the back.  Whereas with the animal, that's

2    considered -- I'm sorry.  That's considered center mass

3    on a person.

4          Q.    Right.

5          A.    Whereas with an animal, based on the way

6    they're built, center mass is actually the side of the

7    animal.

8          Q.    Okay.

9          A.    In order for us to effect a shot there, we

10   have to cant the weapon because the bottom dart drops

11   8 degrees when it's fired.  So the top dart is running

12   straight.  The bottom dart drops 8 degrees.  The

13   further are -- you are away, the further it tends to

14   drop.  If you get too far away, then naturally, the

15   dart will make the target area.

16          If you're too close, then you won't achieve

17   NMI, which is what you want.  You achieve basically

18   pain compliance, like a bee sting.  If you got a very

19   tight spread, the darts are only a few inches apart,

20   it'll hurt but it's not enough to maybe incapacitate

21   the person.

22          Q.    Understood.

23          A.    So --

24          Q.    Or the animal?

25          A.    Or the animal.  So referencing -- it makes it



1  much, much more difficult with an animal, speed, size.

2  So -- and most animals don't attack you by running

3  sideways.

4        Q.    Yeah.

5        A.    They can't.  So they're running dead-on, so in

6  order to effect a good shot with a CEW, i.e. a taser,

7  at an animal, you got to let the animal get right up on

8  you.  And then -- even then, your spread is going to be

9  so small to where you may not achieve what you want.

10       Q.    It can be done, but it's more difficult than

11 on a person?

12       A.    It's a thousand times more difficult than on a

13 person.  Your target area is so small and the speed is

14 so much more.

15       Q.    I got you.  You observed it done effectively

16 one time, at least, right?

17       A.    Yes, at least once.

18       Q.    Okay.  So, I mean, that makes sense to me.

19 It's much harder to do it on an animal than a human.

20             Some of the other NOPD officers we've spoken

21 with have referenced a field training, I think is what

22 it's called, when you -- when the officers actually

23 practice discharging their CEW at, like, a --

24       A.    A silhouette.

25       Q.    -- a silhouette of a -- like a --



1      A.    Yeah.  They go through that every in-service.

2      Q.    It's a silhouette of like a grown male,

3   something like that?

4      A.    Yeah.

5      Q.    What is it?  Like, five-ten?  Six-one?

6      A.    Probably.  I would say about maybe five-nine,

7   five-ten.  Roughly -- roughly average height.

8      Q.    Average height.  I got you.  Okay.

9            And the reason they go through that is so they

10  can get some practice of hitting the target effectively

11  to achieve the NMI, right?

12     A.    Correct.

13     Q.    Okay.  NOPD never trains officers with that

14  kind of field training on a silhouette of a dog.  True?

15     A.    True.

16     Q.    And it's much harder to actually effectively

17  hit a dog with a CEW.  It can be done, but it's just

18  much more difficult --

19     A.    Right.

20     Q.    -- than a human?

21     A.    Right.  And you have to throw in the factor

22  that you have a potential of deescalating a person.  If

23  you're under attack from an animal, whether it be a dog

24  or any other kind of animal, you're not going to

25  deescalate the animal.  The animal moves off instinct.



David Duplantier

1             So there's -- you don't have that time factor.
2    We teach with humans, you want to try and create some
3    kind of distance, and you're trying to -- if you have
4    that opportunity to try and get this situation that we
5    don't have to apply force at all, that's -- that's
6    hopefully your ultimate goal.
7             One of the factors with an animal, you can't
8    deescalate an animal, per se.  So that -- that's a big
9    factor there.  So you don't have that time or that
10   opportunity with an animal to deescalate it.
11       Q.   So am I correct that your training is that you
12   shouldn't consider a CEW on an animal?
13       A.   I'm not going to say "shouldn't."  Using --
14   and just personal experience.
15       Q.   Sure.
16       A.   The shots that were effected with the CEW on
17   an animal was by -- not by the officer being attacked.
18   It was by a secondary officer who had a target area,
19   which was center mass on the side of the animal's body,
20   which also means even that officer has to get up a
21   little close in order to effect a good shot.
22             So I'm not going to say don't use it.  It's
23   just -- there's so many parameters that come into play
24   in order for you -- for you to get this device to work
25   properly on an animal.



```
1              MR. ALPAUGH:  You want to make it
2         continuing?
3              MR. ANADA:  You know, I've tried to do
4         that before, and then some -- I've tried to do
5         that before, and then some lawyer like put in
6         a brief that you can't do that.
7              MR. ALPAUGH:  Okay.  That's fine.
8              MR. ANADA:  But I would like to.
9              THE WITNESS:  But -- I'm sorry.  The
10        question was?
11             MR. ALPAUGH:  Can you read that back,
12        ma'am?
13                  (Record read.)
14             MR. ANADA:  Form; scope.  Go ahead.
15    A.    The fact that -- the fact that there were two
16 dogs -- neither dog really took a position that I would
17 consider -- or I think the average person would
18 consider that it was a warning, right.  They were
19 barking, but they were coming towards him.  They were
20 charging towards him.  I didn't find it unreasonable
21 for him to believe that the dog was attacking him.
22 BY MR. ALPAUGH:
23    Q.    Would it be unreasonable to believe that also
24 there's a potential the other dog would attack him as
25 well?
```



David Duplantier

1      A.   Dogs are pack animals, so it's not

2 unreasonable to believe that it.  Is it guaranteed the

3 second dog would have done it?  Don't know.  But dogs

4 are pack animals, so it's possible that factor -- that

5 factor loomed as well.

6      Q.   Would you describe what "pack animals" means?

7      A.   Meaning they work together.  There's

8 generally -- one is over the other.  One is a leader;

9 one is the follower.  If the bigger dog was the leader,

10 then it's possible that the other dog would followed or

11 vice versa.

12           So they do hang together.  Dogs hunt together.

13 They tend to eat together.  They are individuals, but

14 they function and they feel more comfortable when

15 they're in a group.  As long as they been -- let me say

16 this.  They don't -- like people, they don't all get

17 along.  But generally, if they do have some type bond

18 between them, they will follow each other.

19      Q.   Officer Burmaster told you he felt he and the

20 other officer were both in imminent danger at the time

21 this happened.  Correct?

22                MR. ANADA:  Form; scope.

23      A.   Yes, sir.

24 BY MR. ALPAUGH:

25      Q.   And (inaudible) officer remorseful about



1    thing it would have done was maybe pause a few more

2    seconds to see what kind of response you got.

3              MR. ALPAUGH:  Thank you, sir.

4                        EXAMINATION

5    BY MR. ROQUEMORE:

6        Q.   If you would take out the amended complaint --

7    second amended complaint --

8              MR. ANADA:  Exhibit 1.

9    BY MR. ROQUEMORE:

10       Q.   -- Exhibit No. 1.  I think it's -- it should

11   be right in front of you.  Let's go to paragraph 117.

12   The plaintiffs allege in 117, "In terms of training,

13   either Burmaster received no training regarding animals

14   at all...."  Is that a true statement?

15       A.   I don't believe that's a true statement at

16   all, and I'm saying that because of the amount of time

17   he's been on the job.  I know we've had trainings that

18   is mandated to be taken by all police officers.

19       Q.   The mandated training that's --

20       A.   I would find it hard to believe he didn't take

21   any dog-related training.

22       Q.   In fact, there was an in-service -- is it true

23   that there was in-service training regarding dealing

24   with animals and dogs?

25       A.   Yes, sir.



1                    MR. ANADA:   Form.

2    BY MR. ROQUEMORE:

3         Q.   And how many -- what percentage of the police

4    officers are required to do police or in-service

5    training?

6         A.   All police officers.  That includes academy

7    staff as well, unless you're an instructor in that

8    area, then naturally you're not going to teach

9    yourself.

10        Q.   And in addition to the -- to the in-service

11   training -- which is through the academy, right?

12        A.   Yes, sir.

13        Q.   There was -- you mentioned that there was

14   directed training bulletins, DTBs, also. .

15        A.   Yes, sir.

16        Q.   Is that right?

17        A.   Yes, sir.  And that went through PSAB.

18        Q.   PSAB stands for -- for what?

19        A.   Professional Standards and Accountability

20   Bureau.

21        Q.   And what's the purpose of the DTBs?  How is

22   that -- why is it -- how is it different from what the

23   academy does?

24        A.   It's just additional training, for the most

25   part.  I mean, we only have so much time to train for



```
 1    in-service because officers are taken off the street.
 2    They go through a week-long training.
 3              In addition to that, they have firearms, they
 4    have driving.  So the things that aren't hands-on
 5    training per se, some of that training and that
 6    information can be disseminated via electronics, so
 7    they will have them do online training.
 8         Q.   Okay.  That's online --
 9         A.   Yes.  And you have to test out of it.
10         Q.   So the DTBs are online?
11         A.   Yes.
12         Q.   And then you mentioned ASPCA also?
13         A.   There was a period where they mandated because
14    they took the -- they took the -- and I apologize.  I
15    don't recall the actual title of the course.  But the
16    course dealing with animals and dogs from in-service,
17    they followed it up saying they still saw a need to
18    disseminate this information, so they mandated that
19    they took the ASPCA training online.
20         Q.   And ASPCA is what?
21         A.   That's -- that's the -- forgive me.  I
22    can't -- they deal with animals.  That's the group that
23    deals with --
24         Q.   And the products that they gave to the NOPD
25    are class -- online classes and things along those
```



David Duplantier                                    March 08, 2023
                                                    Page 124

```
 1  lines?
 2       A.   Yeah.  And it's not just for NOPD.  It's an
 3  actual --
 4            MR. ANADA:  Form; leading.  Go ahead.
 5       A.   It's not just NOPD.  It's -- I mean, it's not
 6  limited to NOPD, let me say that.  The course is a
 7  course for -- anybody can log in and basically go
 8  through this course with animals.
 9  BY MR. ROQUEMORE:
10       Q.   And to your knowledge, what was the animal
11  and/or dog-related course or courses that were provided
12  to NOPD through the ASPCA?
13       A.   When you say what was --
14       Q.   What courses were made available to NOPD
15  through the --
16       A.   It was -- it was -- it's just --
17            MR. ANADA:  Form.
18       A.   It's just listed as the ASPCA interaction with
19  animals -- I don't recall the title of it.  We just did
20  it with the recruits, but I don't recall the actual
21  title of it.
22  BY MR. ROQUEMORE:
23       Q.   Okay.  Now, Mr. Anada also asked you if
24  you were familiar with an NOPD training entitled
25  "The Problem of Dog-Related Incidents and Encounters."
```



David Duplantier

```
 1              Do you remember --
 2      A.    Yes.
 3      Q.    You remember that question?
 4      A.    Yes.
 5      Q.    I'm going to show you what's been marked as --
 6              MR. ANADA:  Did you already give us
 7           copies?
 8              MR. ROQUEMORE:  Not yet.
 9              City Exhibit No. 1.  And it's a slide
10           presentation.  It's titled "Responses to
11           Problem of Dog-Related Encounters."
12    (City Exhibit No. 1 was marked for identification.)
13  BY MR. ROQUEMORE:
14      Q.    If you can, just flip through -- flip through
15  it and particularly note the last page.  And then I'll
16  ask you questions about this.
17      A.    Okay.
18      Q.    And after looking at it, if I asked you have
19  you ever seen this before, what would you say?
20              MR. ANADA:  Form; asked and answered.
21              Go ahead.
22      A.    The title of it doesn't -- doesn't ring a
23  bell, but the information in it -- like I said, when we
24  talked about the classes earlier, a lot of it is
25  consistent.
```



David Duplantier

March 08, 2023
Page 126

```
1    BY MR. ROQUEMORE:
2        Q.    Okay.   What is -- what about the information
3    is notable to you?
4        A.    Once again, it talked about the use of force.
5    That's a blanket.   That's our blanket right there,
6    whether it be animals, people, what have you, even
7    though other factors come into play.
8              They talk about shooting an animal is a last
9    resort, taking into consideration bystanders and people
10   around in the area.   If you're forced to resort -- if
11   you have the grounds to use lethal force -- but it
12   doesn't necessarily mean that you may have a green
13   light to use it.
14             If -- for instance, in this case, if the dogs
15   were out, the homeowners were standing behind the dog
16   in that line of fire, then yes.   If the dog is
17   attacking, you're -- it's a bad -- it's a day for you,
18   but you don't want to fire at the animals if there's
19   somebody in your line of fire, naturally.   And that's
20   with people as well.
21       Q.    Is this material in this slide presentation
22   consistent with the training that the NOPD provides to
23   its officers regarding dog encounters?
24                   MR. ANADA:   Form.
25                   You can answer.
```



```
 1        A.    Yes.   They even go into body posture.   They
 2   talk a little bit about facial expressions.   Dogs read
 3   your body language, like I talked about earlier.   So
 4   yes.
 5   BY MR. ROQUEMORE:
 6        Q.    Is there anything in the slide presentation
 7   that is inconsistent with NOPD training?
 8        A.    Nothing that --
 9              MR. ANADA:   Form.
10        A.    -- I see.
11              THE WITNESS:   I'm sorry.
12        A.    Nothing that I see in here.
13   BY MR. ROQUEMORE:
14        Q.    The last page.
15        A.    Yes, sir.
16        Q.    It's entitled "Dangerous Animals" and then in
17   parentheses, "Chapter 1.2 UoF."
18        A.    That's 1.3, use of force.
19        Q.    Okay.  So this looks to be a quote of the NOPD
20   policy regarding a use of force for dangerous animals.
21   Is that right?
22        A.    Yes.
23        Q.    Is that fair?
24        A.    Yes, sir.
25        Q.    And is this the format that a DTB would be
```



```
 1   created?
 2                   MR. ANADA:   Object to form.
 3        A.    Yes, sir.
 4   BY MR. ROQUEMORE:
 5        Q.    Does this look to be a DTB training that
 6   was -- that would be provided to its officer --
 7                   MR. ANADA:   Object to form.
 8   BY MR. ROQUEMORE:
 9        Q.    -- to NOPD officers?
10        A.    It appears to be, yes.
11        Q.    Is there any reason for you to doubt this is,
12   in fact, a DTB that was provided to NOPD officers?
13                   MR. ANADA:   Object to form.
14        A.    No, no reason for me to doubt it.
15   BY MR. ROQUEMORE:
16        Q.    And as we're sitting here today -- well, let
17   me ask you this.  So you said the DTBs come from --
18        A.    PSAB.
19        Q.    -- PSAB.  And that's separate from the
20   academy, right?
21        A.    Yes.  It's another bureau.
22        Q.    Okay.  It's not something that you have
23   hands-on personal --
24        A.    No.
25        Q.    -- close familiarity with?
```



MAGNA
LEGAL SERVICES

```
 1          A.   No, nothing that --
 2          Q.   Okay.   That would be Hargrove -- Hargrave,
 3     right?
 4          A.   Captain Hargrove, yes.
 5          Q.   Hargrove.   And -- but as you're sitting here
 6     today, the -- you, as the representative to the City,
 7     other than the fact that it is designed as a teaching
 8     tool for the policy, you -- you don't have any
 9     information about how this particular slideshow was
10     developed?
11          A.   No, sir.
12                    MR. ANADA:   Form.
13          A.   No, sir.
14     BY MR. ROQUEMORE:
15          Q.   Do you have any information as to how this
16     slideshow was developed?
17          A.   No, sir.
18          Q.   And that's speaking as a City of New Orleans
19     representative; is that right?
20          A.   Yes, sir.
21                    MR. ANADA:   Form.
22     BY MR. ROQUEMORE:
23          Q.   So with regard to the second amended
24     complaint, there's a -- paragraph 120, where the
25     plaintiffs believe -- they state, [As read]:   "That --
```



1    that is because NOPD training was derived by copying

2    from a training curriculum developed by the U.S.

3    Department of Justice COPS program."

4              The City has no information with regard to

5    that allegation; is that right?

6         A.   I'm sorry, sir.  You lost me.

7         Q.   You don't -- the City has no information about

8    whether it was copied from a U.S. Department of Justice

9    COPS program; is that right?

10        A.   None to my knowledge.

11        Q.   And are the City representative providing

12   testimony for the City --

13        A.   Yes, sir.

14        Q.   -- regarding training?

15        A.   Yes, sir.

16        Q.   And your statement is that there is no

17   information; is that right?

18        A.   None to my knowledge.

19        Q.   On the next page, paragraph 122.  At the top

20   of page 16, there's an allegation that the NOPD omitted

21   or removed all training about how an approaching dog is

22   almost always friendly.

23              Is that concept about how an approaching dog

24   is almost always friendly -- is that something that

25   NOPD believes is untrue, necessarily?



```
 1                MR. ANADA:  Form.
 2        A.   I don't want to say they believe it's untrue.
 3                MR. ANADA:  I withdraw the objection.
 4        A.   I think they go into the fact that -- I think
 5   they go into the fact more if that -- you assess --
 6   you're assessing this animal the same way you would
 7   your first encounter -- second or third encounter with
 8   an individual.  I shouldn't say first encounter.  Your
 9   encounter with an individual.
10           We assume most people are friendly, but you're
11   assessing them and assessing the situation to see if my
12   assumption is correct or if my assumption was correct
13   and it changes.  So our -- our -- I guess maybe to
14   better answer your question is yeah, we go in thinking
15   the dogs are friendly, but we're constantly assessing
16   to see if that doesn't hold true.
17   BY MR. ROQUEMORE:
18        Q.   Is that how the NOPD trains its officers?
19        A.   Yes.
20        Q.   To always assess --
21        A.   Yes, yes.
22        Q.   Not assume --
23        A.   Always.
24        Q.   Not assume they're --
25        A.   Automatically bad.
```



1      Q.    Okay.  And what about the -- what is the NOPD

2  training with regard to the quote on 123?  Quote,

3  "Serious dog bites are relatively rare."  Is there any

4  training that NOPD provides regarding that comment --

5  or that quote?

6      A.    I mean, serious dog bites are relatively rare.

7  We -- in my teachings and through the ASPCA, most of

8  the time, we -- we teach to where most of the time, the

9  dogs, they don't want a confrontation, like people.  So

10 we're like, yeah, you know.  The chance of a dog

11 attacking you are slim to none.

12         However, going back to assessing and reading

13 the dog, that's what we want you to do.  So yeah, we

14 look at it as that likelihood the dog wants to attack

15 you may be slim.  However, based off your readings and

16 your findings, that could always be the wrong -- wrong

17 impression.

18     Q.    Okay.  And there's an allegation that -- a

19 suggestion that NOPD purposefully removed a video or

20 training with regard to use of taser upon dogs as a --

21 as an alternative approach to encountering dogs and

22 dangerous situations.

23         What is your understanding of what the

24 training that NOPD does with regard to that concept?

25                 MR. ANADA:  Form.



1    A.   I would find that hard to believe.  I mean,

2  we -- out of all departments, this is one department

3  that every stance we take is to try -- the word

4  embedded in our sole is "deescalation."

5         So for us to take away something in training

6  that may help the officer to use the minimal amount of

7  force or no force, I find that hard to believe we would

8  remove that.  This department, I don't -- I would

9  really find that hard to believe.

10 BY MR. ROQUEMORE:

11   Q.   Okay.  On page -- or on paragraph 130, there's

12 a criticism of the NOPD with regard to failing to

13 follow through with regard to partnering with animal

14 control and other animal services and information on

15 local resources.  What -- what is trained with regard

16 to that in the NOPD?

17   A.   When it comes down to training with working

18 with outside agencies -- I want to make sure I'm

19 reading this correctly.

20        All right.  Earlier on in this deposition, I

21 mentioned a few incidents we were involved in, one not

22 that long ago where you had to corral the dog that had

23 actually viciously attacked its owners.  It was

24 terrible scene.

25        The animal control that came out, it took us



```
 1   forever to get them out.  And so the partnering bit, it
 2   sounds nice on paper, but in actuality, your resources
 3   are limited.  So in that case, we were the ones that
 4   helped to corral the dog.  The young lady that -- she
 5   was some -- she looked like a little girl.  And this
 6   was a pit bull that just attacked.  So we were helping
 7   her with it.
 8           So when it comes down to partnering and stuff,
 9   I mean, all of that sounds great, but show me the
10   resources where we had the resources and the personnel
11   to say, "Well, I got a bunch of people at ASPCA.  I got
12   a bunch of people at NOPD that work on this."
13           That would be great, but -- so I don't know --
14   really know -- I don't think we're avoiding partnering
15   with anybody.  I think we're trying to deal with the
16   problem with what we have, and basically, that's us,
17   for the most part.  You can't get an ASPCA truck out at
18   night.
19       Q.   Okay.  And what about having information on
20   local resources?  I know that you -- you're -- you kind
21   of -- you just said that --
22       A.   Yeah, we --
23       Q.   -- local resources are limited.  But --
24       A.   And, look --
25       Q.   -- just having information on that --
```



1      A.    Yeah.  We have -- officers have information on

2  it.  If the situation allots the time -- allots the

3  time to call for these resources, we will.  But most of

4  the time -- and that's from firsthand knowledge.  Most

5  of the time, it's hard to get those resources out

6  there, but they are aware of those resources.

7      Q.    All right.  In your experience as a -- in the

8  academy and the NOPD, can you say whether or not, in

9  your opinion, the NOPD adequately trains its officers

10 with regard to encountering potentially dangerous dog

11 encounters?

12          MR. ANADA:  Form.  Go ahead.

13     A.    I think we do.  I think we do.  And I keep

14 referring back to use of force.  I know people,

15 animals, and different variables.  But use of force

16 falls in line in both categories, and I think that

17 combined with what knowledge is shared, I think -- I

18 think we do okay with at least educating our officers

19 with dealing with animals.

20          You're not going to make them an animal

21 expert, right.  That's a separate job in itself.  But I

22 think we educate our officers pretty well, and as long

23 as they stick with the use-of-force situation, right,

24 our -- our guidelines and use of force, that coupled

25 with information we share with them, I think we do okay



```
 1   with what we do.
 2                  MR. ROQUEMORE:  All right.  Very good.
 3          Thank you, sir.
 4                  MR. ANADA:  Just very few minor
 5          follow-up questions.
 6                  THE WITNESS:  Yes, sir.
 7                     RE-EXAMINATION
 8   BY MR. ANADA:
 9      Q.   Okay.  Going back to this exhibit --
10                  MR. ANADA:  What was it?  C-1?
11                  MR. ALPAUGH:  City 1.
12                  MR. ANADA:  City 1, okay.
13   BY MR. ANADA:
14      Q.   Going back to City 1, as the 30(b)(6) designee
15   by the City on the topic of NOPD training on how
16   officers are to handle animals in the field, you have
17   never seen this document -- this particular document
18   before today, right?
19      A.   No.
20      Q.   Okay.  You can't tell the judge or the jury,
21   under oath, that you -- that this particular
22   presentation or training was given to NOPD officers,
23   right?
24      A.   That's correct.
25      Q.   You can't say whether or not it was given to
```

