UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DEREK BROWN and JULIA                    CIVIL ACTION

BARECKI-BROWN                            NO. 22-00847

VERSUS                                   SECTION: L

                                         DIVISION: 4

DERRICK BURMASTER, SHAUN                 HON. ELDON FALLON

FERGUSON, and the CITY OF                HON. KAREN W.ROBY

NEW ORLEANS

            DEPOSITION OF SERGEANT DAVID A. BARNES,

individually, and as the 30(b)(6) representative of

the City of New Orleans, given in the above-

entitled cause, via Zoom videoconferencing,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter, in

and for the State of Louisiana on the 31st day of

March, 2025, commencing at 1:00 PM.

```
 1    APPEARANCES (Via Zoom):
 2    REPRESENTING THE PLAINTIFFS:
 3              MOST & ASSOCIATES
              BY: WILLIAM MOST,
 4            ATTORNEY AT LAW
              201 St. Charles Avenue
 5            Suite 2500, #9685
              New Orleans, Louisiana  70170
 6            Representing the Plaintiffs
              (williammost@gmail.com)
 7
              -and-
 8
              JONES, WALKER
 9            BY:  TARAK ANAND,
              ATTORNEY AT LAW
10            201 St. Charles Avenue
              New Orleans, Louisiana  70170-5100
11
12    REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON, and
      the CITY OF NEW ORLEANS:
13
              OFFICE OF THE CITY ATTORNEY
14            BY:  JAMES ROQUEMORE,
              ATTORNEY AT LAW
15            1300 Perdido Street
              Suite 5E03
16            New Orleans, Louisiana  70112
              (James.Roquemore@nola.gov)
17
      REPRESENTING DERRICK BURMASTER:
18
              GUSTE, BARNETT, SCHLESINGER & ALPAUGH
19            BY:  C. THEODORE ALPAUGH, III,
              ATTORNEY AT LAW
20            639 Loyola Avenue
              Suite 2130
21            New Orleans, Louisiana  70113
              Representing Derrick Burmaster
22            (cta@gustebarnett.com)
23    Reported By:
24            Sandra P. DiFebbo
              Certified Shorthand Reporter
25            State of Louisiana
26
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

```
 1
 2      E X A M I N A T I O N          I N D E X
 3
 4                                     Page
 5   BY MR. MOST:                      5, 96
 6   BY MR. ROQUEMORE:                 94
 7
 8
 9
10      E X H I B I T           I N D E X
11
12                       Page
13
14   Plaintiff's Exhibit 7              20
15   Plaintiff's Trial Exhibit 12       93
16   Plaintiff's Trial Exhibit 13       44
17   Deposition Exhibit 51              37
18   Deposition Exhibit 52              66
19   Deposition Exhibit 53              86
20   Deposition Exhibit 54              95
21   Deposition Exhibit 55              93
22   Plaintiff's Exhibit 68             59
23
24
25
```

```
 1              S T I P U L A T I O N

 2

 3              It is stipulated and agreed by and

 4    between Counsel for the parties hereto that the

 5    deposition of SERGEANT DAVID A. BARNES,

 6    individually and as the 30(b)(6) representative of

 7    the City of New Orleans, is hereby being taken

 8    pursuant to the Federal Rules of Civil Procedure

 9    for all purposes in accordance with law;

10              That the formalities of reading and

11    signing are specifically waived;

12              That the formalities of sealing,

13    certification, and filing are hereby specifically

14    waived.

15              That all objections, save those as to

16    the form of the question and responsiveness of the

17    answer are hereby reserved until such time as this

18    deposition or any part thereof is used or sought to

19    be used in evidence.

20                   *  *  *  *  *

21              Sandra P. DiFebbo, Certified Shorthand

22    Reporter, in and for the State of Louisiana,

23    officiated in administering the oath to the witness

24    remotely.

25
```

1      Q.    Did you review -- so those would have

2  been e-mails that went out to officers about

3  updates to training?

4      A.    So the Daily Training Bulletins

5  themselves are usually a series of questions.

6  Generally, at the time, it was about 20 questions.

7  The officers had to log into a learning management

8  system and actually take a test and score at least

9  an 80 percent or above on it to get a passing score

10  to get credit for the training.  Those questions

11  would be based on either policy or like an online

12  video or training or something that they had to go

13  through, and then they were quizzed on that.

14      Q.    The Daily Training Bulletin you found was

15  the one from May of 2017 that referred to ASPCA

16  videos?

17      A.    I believe the 2017 -- the May of 2017

18  referred to ASPCA videos, and the October of 2019

19  referred to, as reference material, a PowerPoint

20  they would put together.

21      Q.    So in addition to those two Daily

22  Training Bulletins, did you find any -- did you

23  review any other documents?

24      A.    No.

25      Q.    And so those two documents comprised the

13

1              there is, obviously, also, the

2              PowerPoint.  So I reviewed that.  I

3              reviewed the e-mail that had been sent

4              out providing instructions for the May

5              2017 DTB and the two chapters.

6    BY MR. MOST:

7         Q.    Okay.  For the May 2017 DTB, did you

8    review the videos themselves?

9         A.    I did not.

10        Q.    So then is it fair to say that the

11   entirety of NOPD's training regarding interacting

12   with dogs in the field consists of the May 2017

13   e-mail DTB, the videos associated with that, the

14   test associated with that, and then May 2019 a

15   PowerPoint and then a test associated with the

16   PowerPoint; is that accurate?

17             MR. ROQUEMORE:

18                  Objection, form.

19             THE WITNESS:

20                  So I wouldn't say that's 100 percent

21                  accurate.  I would say the DTBs

22                  themselves are some of the training,

23                  but NOPD also puts all their recruits

24                  through training, actually, in-

25                  classroom training regarding responding

```
 1                  to animals and dealing with dogs on
 2                  scenes, things like that.
 3    BY MR. MOST:
 4         Q.    Would that be during the academy or
 5    during inservice training?
 6         A.    It's during the academy.
 7         Q.    Did you review what the training is
 8    during the academy?
 9         A.    I did not review exactly what the
10    training is during the academy.  I know it's
11    changed over the years.  It was taught specifically
12    by members of Louisiana SPCA for a time, and now
13    it's transitioned to an online module.
14         Q.    Do you know anything about the contents
15    of the academy training at any time for NOPD?
16         A.    I don't know the specifics of the
17    contents of the academy training, just that it is
18    the -- it is now a DOJ and COPS training through an
19    online training that they do that is, I think, five
20    modules.
21         Q.    Is there also inservice training about
22    interacting with dogs other than the DTBs?
23         A.    I do know that this year is, and it's
24    another set of online courses through the DOJ COPS
25    portal.
```

1    Q.    Prior to this year, has there been any
2    inservice training other than the DTBs related to
3    officer interaction with dogs?
4    A.    To the best of my memory, I believe there
5    was at one point, but I wasn't able to find any
6    records indicating that it took place in inservice.
7    Q.    So based on your investigation into
8    NOPD's training about officers interacting with
9    dogs, prior to 2025, that consisted of some academy
10   training, but you're not sure of the contents of
11   it, and then DTBs or associated documents and a
12   test in 2017 and 2019; is that correct?
13   A.    That's correct.
14   Q.    Have you brought any documents to today's
15   deposition?
16   A.    I have not.
17   Q.    Did you take any notes to prepare for
18   today's deposition?
19   A.    I did not.
20   Q.    What is your job title currently?
21   A.    Currently I'm a sergeant in charge of our
22   Legal Research and Planning Division, which
23   encompasses all of our Daily Training Bulletins.
24   Just to clarify, you'll hear me sometimes use the
25   term maybe, "Departmental Training," because it has

```
 1   you see that?
 2        A.   I do.
 3        Q.   You see that it says this law was clearly
 4   established as of the facts of this case?  As of
 5   the time of the facts of this case?
 6        A.   I see that, yes.
 7        Q.   Do you see that the facts of this case
 8   occurred in 2016?
 9        A.   Yes.  I see that.
10        Q.   Has NOPD changed its training or policies
11   in any way to respond to Ramirez versus Killian?
12             MR. ROQUEMORE:
13                  Objection, form.
14             THE WITNESS:
15                  So what we train, especially through
16                  the DTBs, is consistent with really
17                  shooting a dog should be done as a last
18                  resort, which I think you can pull it
19                  into the same kind of context as they
20                  have to pose an immediate danger, and
21                  the use of force is unavoidable, right.
22   BY MR. MOST:
23        Q.   So when you say a last resort, meaning an
24   officer should not shoot a dog if there is other
25   plausible, nonlethal mechanisms for deterring the
```

39

1    dog, agreed?

2         A.    If they had the opportunity, and in that

3    split-second decisionmaking of the officer, it

4    would be reasonable.

5         Q.    So if there is a dog that an officer can

6    plausibly deter by kicking it, then the officer

7    shouldn't jump straight to shooting it, agreed?

8              MR. ROQUEMORE:

9                   Objection, form.

10             THE WITNESS:

11                  So if there is another reasonable

12                step that the officer would be able to

13                take at the moment in time, we would

14                certainly want the officer to take that

15                other option, right.  Whether that's

16                kicking it, whether it's using a baton

17                or anything like that.  As long as

18                there is time to be able to make that

19                transition or take that action, right.

20   BY MR. MOST:

21        Q.    It takes about as long to decide to shoot

22   a gun as it does to decide to kick, agreed?

23             MR. ROQUEMORE:

24                  Objection, form.

25             THE WITNESS:

1    Standards in Training, which is POST council

2    required, and as a result of several other programs

3    that have come through, including, obviously, the

4    consent decree.  The academy has expanded to be

5    approximately 25 to 26 weeks of training at this

6    point.  It's over 900 hours of in-seat time.

7        Q.    But I am specifically talking about

8    officers' interaction with dogs, training about

9    that.  Do you know anything about that in between

10   when you took it in 2006 to 2007 and the present?

11       A.    I don't know any of the specifics other

12   than at some point it transitioned from the SPCA to

13   the online DOJ COPS training.

14       Q.    Does NOPD have a copy of the content of

15   the SPCA training?

16       A.    Again, that's something that the academy

17   would have.  I imagine if there was a lesson plan

18   on it, they may have a copy of that lesson plan.

19   If it was the ASPCA training, then it would have

20   been found from the ASPCA.

21       Q.    Do you see this, which is Plaintiff's

22   Trial Exhibit 13, a printout of a PowerPoint

23   entitled, "The Problem with Dog-Related Incidents

24   and Encounters?"

25       A.    I see that.

1      Q.    So is this the content of the May 2019

2    DTB?

3              MR. ROQUEMORE:

4                   Objection to form.  This is a

5              Plaintiff's Bates numbered exhibit.  If

6              I could show him the defendant's

7              exhibit to compare, perhaps.  Maybe he

8              could give an answer to that.

9              MR. MOST:

10                  Sure.  What is the Bates on the

11             defendant's --

12             MR. ROQUEMORE:

13                  But you can answer, if you can.

14             THE WITNESS:

15                  Without reviewing it in its

16             entirety, from the face of it, it looks

17             like it was not the May 2019 but the

18             October of 2019 reference material.

19    BY MR. MOST:

20      Q.    So there was an e-mail that went out in

21    October of 2019 that was the DTB?

22      A.    So there would have been an e-mail

23    notification for officers to review this and take

24    an online like test module that was 20 questions.

25      Q.    So officers were to review this 12-page

1    PowerPoint and then take a test?

2         A.    Yes.

3         Q.    So there was no verbal instruction or

4    audio or video -- nothing other than this

5    PowerPoint in terms of content, correct?

6         A.    Not that I'm aware.

7         Q.    So there was no one teaching this

8    content.    It was a PowerPoint attached to an e-mail

9    that went out to all officers saying read this and

10   take a test, correct?

11        A.    Correct.    DTBs are generally done more as

12   an independent study where they provide you

13   reference material, and then you have to answer a

14   series of questions based on the reference

15   material.    So an e-mail would have gone out with

16   the reference material.    The reference material may

17   have also been uploaded to our learning management

18   software, which I believe at the time that this

19   occurred was Power DMS, and all of those records

20   get even more complicated when you throw in the

21   fact that in December of 2019, we had a cyber

22   attack that wiped out half the city's systems,

23   right, and so that would have been e-mailed out for

24   the officers to review, and then they would have

25   had to have logged in to complete the quiz in Power

1   DMS.  It is based on the material that they

2   received in the e-mail.

3             MR. MOST:

4                  Jim, did you want to show Sergeant

5             Barnes the defendant's Bates stamped

6             version of something similar?

7             MR. ROQUEMORE:

8                  I am going to show him at this time

9             City Defendant's 51 --

10            THE WITNESS:

11                 Jim says his Zoom just went down.

12            He is frozen.  All right.

13            MR. ROQUEMORE:

14                 Mr. Most, you asked me about what I

15            wanted to show him, so I have City

16            Defendant's 5135 to 5146.  It's

17            probably the same document that you

18            were showing him, which it starts at

19            Plaintiff's 59.  I'll just ask

20            Mr. Barnes if he could, Sergeant

21            Barnes, to take a look and perhaps

22            compare those to -- if you want to like

23            give him a side by side.

24            MR. MOST:

25                 Sure.

1    BY MR. MOST:

2         Q.    Here is Page 2.  Here is Page 3.  It says

3    SARA.

4         A.    They are the same.

5         Q.    Page 4?

6         A.    And Page 3 is the same.  Page 2 is also

7    the same.

8         Q.    Page 4?

9         A.    Yes.  That's the same.

10        Q.    Page 5?

11        A.    Yep.

12        Q.    Page 6?

13        A.    Yes. Page 7 is the same.

14        Q.    Page 8?

15        A.    Yep.

16        Q.    Page 9?

17        A.    Yep.

18        Q.    Page 10?

19        A.    Yes.  It's the same.

20        Q.    Eleven and 12?

21        A.    Yep.

22        Q.    Okay.  So this document, Plaintiff's

23    Trial Exhibit 13, is the content of that October

24    2019 DTB, correct?

25        A.    Correct.

```
 1            MR. ROQUEMORE:
 2                 I'm going to pose an objection to
 3                 that last question in that I think it's
 4                 incomplete as to the content.
 5            MR. MOST:
 6                 Okay.  When I say content, I mean
 7                 the training module.
 8    BY MR. MOST:
 9        Q.    There was some text in the e-mail that
10    was a test, but this twelve-point PowerPoint
11    reflects the training content of the October 2019
12    DTB, correct?
13        A.    So my understanding is that this
14    PowerPoint with the e-mail is the reference
15    material for the training content, right.  So it is
16    where the officers would review and look to find
17    the information that they are tested on, but then
18    the test is also part of the training.
19        Q.    Does the test have any content that is
20    not in this PowerPoint?
21        A.    Not specifically that I'm aware of.  I
22    believe the test that DTB -- the training was not
23    just on dogs, but it was also on the SARA model
24    aspect, S-A-R-A, model aspects of community
25    engagement, but there may have been a couple of
```

1   questions on it that were not directly related to

2   responses to dog-related encounters, right.

3        Q.   So Page 2 of this, which is Plaintiff's

4   60, says that basic and inservice training should

5   include a number of things, right?

6        A.   Correct.

7        Q.   One of the things it says is training on

8   dog behavior by qualified professionals, right?

9        A.   Correct.

10       Q.   Does that mean professionals who are

11  professionals in dog behavior?

12       A.   So I would imagine it would be training

13  consistent with like out of the DOJ COPS training

14  that was put together or the SPCA training that was

15  put together by what I would have hoped were

16  qualified professionals that put that training

17  together.

18       Q.   So basic training means like training in

19  the academy, right?

20       A.   Correct.

21       Q.   Inservice training means supplemental

22  training, not DTBs, but supplemental training over

23  the years of an officer's experience, right?

24       A.   Correct.

25       Q.   And DTBs are not included in inservice

1   training?  That is a different thing, right?

2       A.    So DTBs are a type of form of inservice

3   training, right.  Now, we talked about the core

4   inservice training, which is generally our

5   classroom training each year for officers, right.

6   And so officers, supervisors, certain specialized

7   units, have to go through their own inservice

8   training that we speak of, for our purposes, as

9   inservice, but, realistically, all of the training

10  that takes place after the academy is considered

11  inservice training or some form of it.  We also do

12  roll call trainings.  The academy will put out and

13  have supervisors make sure their officers are up to

14  date mostly on our policies and things like that.

15      Q.    Prior to this year, the only inservice

16  training Officer Burmaster received about

17  interactions with dogs were the two DTBs, correct?

18      A.    So I can't say with 100 percent

19  certainty.  As you remember, earlier I discussed I

20  believe there was another classroom inservice

21  training, but I was unable to find any other record

22  of it, so the only training I have records of are

23  the two DTBs.

24      Q.    Do either of those two DTBs include

25  information on local resources?

52

1        A.    So I don't know.  I don't believe either

2    of the two DTBs specifically include information on

3    local resources.  That is captured in our chapter,

4    in Chapter 41.34, which it specifically tells them

5    to reach out to the SPCA.  Now, in all of the basic

6    training, when they have the ability to or they

7    know they're going to a call that involves a canine

8    or an animal of some type, we instruct them to sort

9    of plan ahead and organize that, because they can

10    contact SPCA through our communications, through

11    the Orleans Parish communication system.

12        Q.    So NOPD's training says NOPD inservice

13    training should include information on local

14    resources, but you don't see any evidence that

15    Officer Burmaster received any inservice training

16    that included information on local resources,

17    correct?

18        A.    Other than what was learned in the

19    academy, correct.

20        Q.    But NOPD's policy says that should be an

21    inservice training, but it wasn't, right?

22        A.    Well, the policy doesn't say that.  This

23    training says basic and inservice training should

24    include information on local resources.  Now,

25    realistically, it's very common for officers to

```
 1    contact the SPCA if they have an issue with an
 2    animal through a radio, which is how we contact
 3    SPCA and how we train our officers in the academy
 4    to contact SPCA.  So if there is time to contact
 5    SPCA, then that's how they would do it, and that's
 6    what is taught at the academy on the information on
 7    local resources.
 8         Q.   I understand, but in at least one way
 9    NOPD's training does not comply with its own
10    training, right, because it says inservice training
11    should include information on local resources, but
12    NOPD doesn't do that, right?
13              MR. ROQUEMORE:
14                   Objection, form.
15              THE WITNESS:
16                   Again, I'm not -- I have to go in
17                   and review to make sure that there is
18                   no question on that specifically.  In
19                   the training for the DTBs, I know that
20                   the training in 2017 did include -- I
21                   mean, it was SPCA training, so it
22                   included local resources, as in the
23                   SPCA.
24    BY MR. MOST:
25         Q.   How do you know that?  You didn't review
```

1  scenario, was it reasonable that those individuals

2  facing the scenario feared serious bodily injury or

3  death.

4        Q.   Right, but severity of injury, risk the

5  severity of potential injury to the officer, is a

6  core part of the use of force analysis, right?

7             MR. ROQUEMORE:

8                  Object to form.

9             THE WITNESS:

10                 It can be, but, again, it is based

11             on the perception.  So to give the

12             example of if someone points an empty

13             gun at someone, is the perception still

14             that they might get shot even though

15             they are not going to, right?  So the

16             severity of an empty gun is slim, you

17             know, like no one is getting shot with

18             an empty gun, right, but the perception

19             of that incident incident isn't I know

20             the gun is empty.  It is someone is

21             pointing a gun at me, so that's what

22             comes into the reasonableness, like the

23             review of it.

24  BY MR. MOST:

25        Q.   Right.  So a core important part of

1    NOPD's training should be to help officers
2    accurately understand the severity of risks that a
3    dog poses to them so that they can make intelligent
4    decisions about when and whether to use force,
5    correct?
6                MR. ROQUEMORE:
7                    Objection, form.
8                THE WITNESS:
9                    So when or whether to use force is
10                   often based on, you know, a
11                   reasonableness standard, right.  We
12                   talk about like Graham v. Connor.  You
13                   are looking at a reasonable objective
14                   standard for whether or not an officer
15                   in that situation would feel that they
16                   were either subject to serious bodily
17                   injury or death in the case of like
18                   lethal force, right.  And so with that
19                   being said, yes, to the extent that
20                   it's a case-by-case basis, right,
21                   whereas, if you have someone pointing a
22                   gun that's empty, is the actual threat
23                   of serious bodily injury there versus
24                   is the perception of the threat of
25                   serious bodily injury there.

1          A.    I'll have to double-check, but I think
2     it's in a taser PowerPoint.  The original taser
3     PowerPoint or the initial taser PowerPoint when you
4     first go through the training.  I think it is -- if
5     it's in that, then it will likely be in the form of
6     a lesson plan.
7          Q.    Let's move on to the -- we don't have a
8     ton left. We are getting close to the end.
9               MR. MOST:
10                   Jim, I think Lieutenant Helou will
11                be much shorter, I would expect.
12    BY MR. MOST:
13         Q.    Turning to the other inservice training
14    provided to officers, which was the May 2017 one,
15    the May 2017 DTB.  You are familiar with that?
16         A.    Yes.  I'm familiar with that.
17         Q.    We're looking at Deposition Exhibit 53
18    here.  It looks like an e-mail.  I guess it was
19    actually an e-mail that went out in April, and it
20    says May 2017 DTB.  It told officers to go to a
21    certain website and watch three videos, right, and
22    then take the test?
23         A.    That's correct.
24         Q.    The officers were asked to do this one
25    time in 2017, not each year or anything like that,

88

1   have gone through, yeah.

2        Q.   Do you have any recollection of the

3   contents of these videos?

4        A.   Not specifically, other than just

5   responding to dog bites, right, and responding to

6   calls where there may be a dog on scene.

7        Q.   Do you remember if they were animated or

8   live videos or -- not live video, but whether they

9   were animated or videos of a real person, anything

10  like that?

11       A.   No.  I don't recall any of the specific

12  content of those videos.

13       Q.   So, Sergeant Barnes, talking about --

14  going back to the DOJ document and the NOPD's

15  training, you would agree with me that there was a

16  large amount of content in the DOJ document about

17  the dangerousness of dogs, specifically that they

18  are not that dangerous, that was omitted from

19  NOPD's training, right?

20            MR. ROQUEMORE:

21                 Objection, form.

22            THE WITNESS:

23                 So there was -- obviously, the NOPD

24            training in 2019 was condensed to the

25            Departmental Training Bulletin, so

```
 1                  there was, I'm sure, a large amount of
 2                  information and detailed specifics from
 3                  the DOJ report that were omitted from
 4                  the condensed PowerPoint that was put
 5                  together for the NOPD training.
 6     BY MR. MOST:
 7          Q.   Have you read the DOJ document?
 8          A.   I have not read the entirety of the DOJ
 9     document.
10          Q.   From what we saw, you saw that a
11     recurrent theme within that document was that dogs
12     are probably not as dangerous as a lot of officers
13     think, correct?
14                  MR. ROQUEMORE:
15                       Objection, form.
16                  THE WITNESS:
17                       So I don't know that I can speak to
18                  any kind of current theme in the
19                  document just because I have not really
20                  reviewed the document in-depth like
21                  that.  It certainly was mentioned in at
22                  least two places.
23     BY MR. MOST:
24          Q.   We saw it talking about how an
25     approaching dog is almost always friendly, right?
```

1    what you looked at?

2        A.    So for both the 2017 and -- so right

3    there, that he had actually taken it and passed it

4    with a score of 100 percent.

5              MR. ROQUEMORE:

6                  William, is that one of your

7              exhibits?

8              MR. MOST:

9                  Yeah.  This is Deposition Exhibit

10             54.

11   BY MR. ROQUEMORE:

12       Q.    Same question for the 2019 DTB.  Did you

13   look at the records to see whether or not Officer

14   Burmaster, in fact, received that training?

15       A.    I did.  I pulled up -- our records have a

16   similar spreadsheet, and he also took and passed

17   the October 2019 DTB.

18       Q.    Based on your research, what percentage

19   of NOPD officers received the 2017 DTB training

20   relating to dog bite prevention?

21       A.    So all of our DTB training goes out to

22   100 percent of our commissioned officers.  So any

23   officer who is POST certified is required to go in

24   and do the Departmental Training Bulletins.  So by

25   2017 and 2019, it would have been 100 percent of