**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| DEREK BROWN, ET AL | CIVIL ACTION |
| VERSUS | NO. 22-847 |
| DERRICK BURMASTER, ET AL | SECTION "L" (4) |

## Plaintiffs' Opposition to Motion for Summary Judgment

In R. Doc. 208, Defendants move for summary judgment on Plaintiff's state-law claims and *Monell* theories. The motion should be denied in its entirety.

First, Defendants' move for summary judgment on Plaintiffs' negligent infliction of emotional distress ("NIED") claim. But this Court already denied a motion for summary judgment on that claim,[1] and Defendants did not seek reconsideration. Furthermore, Defendants' NIED argument is that "Plaintiffs have failed to describe a severe emotional reaction to the shooting of their dog that can be said to be different from the 'worry or anxiety attendant to property damage." The evidence, however, shows the opposite. Plaintiffs' immediate emotional reaction to the shooting was recorded on video, and shows them wailing, sobbing, and saying, "oh my god, oh my god, no, no, no, no, no. . .  he was our baby. . .  you shot a puppy, this was the love of our life" while kneeling over Apollo's body. And Plaintiffs continued to suffer severe and debilitating physical and psychological symptoms, were subsequently diagnosed with post-traumatic stress disorder by a licensed clinical psychologist, and required ongoing therapy. Given all of this undisputed evidence, a reasonable jury could easily conclude Plaintiffs had an emotional reaction that was not simply distress over "property damage."

Defendants' argument on the other state-law claims is based on the "discretionary

---

[1] R. Doc. 162.

1

immunity" of R.S. § 9:2798.1. But Defendants do not articulate the four elements necessary to prove a discretionary immunity defense. Once articulated, it is clear that Defendants fail all four.

Regarding *Monell*, the Court already denied Defendants' *Monell* arguments at the motion to dismiss stage based on the allegations of the amended complaint. Now that Plaintiffs have evidence to support each of the allegations that this Court found sufficient to deny the Motion to Dismiss, the Court should deny the Motion for Summary Judgment as well. Defendants do not grapple with – or even acknowledge – this Court's prior ruling.

And finally, the Motion can also be denied because of disputed material facts. For example, three of Defendants' material facts rely on the idea that NOPD has been training its officers regarding animals "through annual 'in service' training." But when NOPD's 30(b)(6) witness went to look for the records of that training, he found such records <u>do not exist</u>.

For these reasons and as discussed further below, Defendants' Motion for Summary Judgment should be denied.

## I.    LEGAL STANDARD

"[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[2] Summary judgment is only appropriate when the moving party identifies material facts not in dispute, "and the nonmoving party fails to produce or identify in the record summary judgment evidence sufficient to sustain a finding in its favor respecting such of those facts as to which it bears the trial burden of proof."[3] In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible

---

[2] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).
[3] *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 521 (5th Cir. 1999).

inferences in favor of the non-moving party."[4]

## II.    ANALYSIS

**A.    The Court should deny Defendants' motion with regard to NIED because the video, witness testimony, and expert testimony show that Plaintiffs suffered emotional distress far more than just "worry or anxiety attendant to property damage."**

Previously in this case, Defendants moved for summary judgment on Plaintiffs' NIED claim.[5] The Court denied Burmaster's motion on the merits,[6] and denied the City's as moot.[7]

Defendants have now moved *again* for summary judgment on the NIED claim. They did not, however, file a motion for reconsideration of the Court's prior ruling. Nor does their motion even acknowledge that the Court has already ruled on this issue. Nor do they provide any explanation why the law of the case doctrine should not bar them from relitigating an already-decided issue,[8] or provide any explanation how this motion might be different than the prior one that was denied. Nor does Defendants' statement of material facts provide any facts related to the NIED claim, in violation of Local Rule 56.1. Defendants' motion should therefore be denied with regard to NIED given these procedural problems.

Defendants' motion regarding NIED should also be denied on the merits. Defendants argue that the NIED claim should fail because "Plaintiffs' have failed to describe a severe emotional reaction to the shooting of their dog that can be said to be different from the 'worry or anxiety

---

[4] *Total E & P USA Inc. v. Kerr—McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013).

[5] *See* R. Doc. 105-1 at 10 (Burmaster MSJ, arguing that "all claims against Burmaster under federal and state law must be dismissed"); R. Doc. 109-1 (City MSJ, arguing for dismissal of state law claims).

[6] R. Doc. 162 (denial of Burmaster's MSJ). Burmaster, who does not present any new or previously-unavailable facts or evidence, fails to explain why he should be permitted to file a second MSJ on Plaintiffs' NIED claim after his first MSJ on that same claim was denied on the merits.

[8] *See Loumar, Inc. v. Smith*, 698 F.2d 759 (5th Cir. 1983) ("The law of the case doctrsine is closely related to the principle of res judicata. The latter prevents collateral attack on the result of a completed lawsuit between the same parties; the former prevents collateral attacks against the court's rulings during the pendency of a lawsuit.")

attendant to property damage.'"[9] Such a contention—that Plaintiffs considered Apollo to be inanimate property such as a radiator—is insulting and erroneous.

Defendants' motion completely ignores the evidence of Plaintiffs' emotional trauma. First, the video of the shooting shows Plaintiffs' severe emotional reaction to the death of their beloved dog.[10] Ms. Brown wails and cries "what did you do, what did you do, no, no, no, no" as Mr. Brown screams "what the f*ck?" Ms. Brown sobs and says "that's a baby, what the f*ck is wrong with you?" As Officer Burmaster radios in that "it's just a dog" to try and defend his actions, Ms. Brown sobs "How could you shoot a puppy? How could you do this? He's a baby. . . Oh my god, oh my god, no, no, no, no, no. . . He was our baby. . . You shot a puppy, this was the love of our life." The video shows both Browns visibly crying over Apollo's dying body:[11]

 

Next, at their depositions, both Plaintiffs testified in detail to experiencing severe, ongoing psychological trauma as a direct result of the shooting. Mr. Brown testified:

- "I couldn't sleep for sure. Like, it certainly impacted my ability to get a good night's sleep.

---

[9] R. Doc. 208-1 at 10.
[10] The Body-Worn Camera footage of Burmaster, was attached as Ex. D to R. Doc. 130 (Plaintiff's Opp. to Burmaster MSJ). The file name is J1-18.(Clip_1.1)_1420_FELICITY_STREET-2 (Burmaster BWC).mp4
[11] *Id.* at 00:04:30.

Being productive to feel healthy, physically, and emotionally."[12]

- "It created massive amounts of anxiety for me, massive amounts of depression. I had a lot of anger and rage over it. It has impacted my day-to-day life, my ability to do my job, my overall happiness."[13]

- "I sought out the services of a psychiatrist for a psychiatric evaluation and a friend of ours is a licensed clinical social worker."[14]

- A "[s]ocial or a licensed clinical social worker was referred to me by Doctor Elizabeth Burke. And I had an initial consultation with her, five months ago, maybe six months ago was the initial consultation and then had biweekly sessions with her … Every other week" for over "five or six months."[15]

Similarly, Ms. Barecki-Brown testified:

- "I feel anxious. I'm scared of the police. I was scared during Mardi Gras because of all the police presence. I can't believe it could even happen. It gives me nightmares. I have anxiety. Every time I have to talk about it, it opens it up again."[16]

- "It's made it hard for me to sleep. It makes me feel sick to my stomach. I feel sick to my stomach right now. I physically couldn't eat after that… Just an overwhelming sense of dread."[17]

- "I have consulted with some social workers and a physician."[18]

- "[I]t's pretty permanent that it happened. It's a very vivid horrible memory."[19]

- "After the other cruisers had gotten there … [Officer Burmaster] was high-fiving people. He was joking around with them. It just made it so much worse even."[20]

- "I keep pictures out of Apollo, and yes, every day I look at those pictures. Yes, it still is very painful."[21]

- "I have a job where I am in front of people all the time, and to constantly be reliving this

---

[12] R. Doc. 208-18 (Derek Brown Dep) at 63:5-7.
[13] *Id.* at 63:11-12
[14] *Id.* at 64:1-5.
[15] *Id.* at 64:16-23.
[16] Deposition of Julia Barecki-Brown, attached hereto as Ex. A, at 26:1-5.
[17] *Id.* at 26:9-12.
[18] *Id.* at 28:10-11.
[19] *Id.* at 30:7-9.
[20] *Id.* at 31:25-32:2.
[21] *Id.* at 34:7-9.

and be a mess I can't do my job if I'm like that."[22]

After the shooting, both Plaintiffs were evaluated by Dr. Elizabeth Berk, a licensed clinical psychologist (who is not merely a "counselor,"[23] as Defendants—who have her resume and have taken her deposition—intentionally mischaracterize). After conducting psychological testing and formal evaluations, Dr. Berk diagnosed Derek Brown with both Post-Traumatic Stress Disorder and Major Depressive Disorder, and diagnosed Julia Barecki-Brown with Post-Traumatic Stress Disorder.[24] With Ms. Barecki-Brown, Dr. Berk opined that "In my professional opinion it was directly caused by the death of the dog. She did not have any of these symptoms beforehand. She had never had symptoms of PTSD in her life and they started immediately following the loss of her dog."[25] Similarly, with Mr. Brown she opined that the "cause of Mr. Brown's symptoms and diagnoses" was the dog being shot. He didn't have any symptoms before that, as far as I could tell."[26]

But Defendants fail to acknowledge *any* of this evidence in their motion and instead represent to the Court that "Plaintiffs have failed to describe a severe emotional reaction to the shooting of their dog that can the said to be different from the worry or anxiety attendant of property damage."[27] Defendants' lack of candor to Court about the factual evidence in this case is troubling, to say the least.

As to Defendants' legal argument, they cite the wrong legal standard for NIED. Defendants erroneously premise their argument on La. Code Civ. Proc. 2315.6, the standard for *Lejeune*

---

[22] Id. at 34:19-22.
[23] R. Doc. 208-1, at 9.
[24] *See* Dep. of Dr. Berk, attached here as Ex. B, at 49:8-10, 71:9-13.
[25] *Id.* at 71:13-18.
[26] *Id.* at 74:13-20.
[27] R. Doc. 208-1, at 10.

damages.[28] But in doing so, Defendants fail to disclose that, as recently as 2023, the Louisiana Supreme Court "expressly reject[ed] the application of the standard set forth in *Lejeune*" in evaluating NIED claims.[29]

"In Louisiana, a claim for negligent infliction of emotional distress without physical injury is viable under La. Civ. Code art. 2315(A), which provides: 'Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it.' The general negligence duty-risk analysis is utilized in determining whether one may recover under La. Civ. Code art. 2315."[30] According to the Louisiana Supreme Court, the elements of NIED are: "(1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)."[31]

"[F]or negligent infliction of emotional distress claims absent physical damage/injury, a plaintiff must prove 'the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.'"[32] "The plaintiff's mental disturbance must be 'serious.'"[33] "Evidence of medical treatment is not required, nor is expert medical testimony; however, a plaintiff bears the burden of presenting sufficient

---

[28] R. Doc. 208-1, at 8, notes 47-49.

[29] *Kador ex rel. Willis v. Gautreaux*, 2025 U.S. Dist. LEXIS 61703, at *53 (M.D. La. Mar. 31, 2025) (quoting *Spencer v. Valero Refining Meraux, L.L.C.*, 2022-00469 (La. 1/27/23), 356 So.3d 936).

[30] *Id.* at *50-51.

[31] *Id.* at *51 (quoting *Spencer*, 356 So. 3d 936).

[32] *Id.* (quoting *Moresi v. State*, 567 So. 2d 1081, 1096 (La. 1990)).

[33] *Id.* at *52 (quoting *Moresi*, 567 So. 2d at 1096).

evidence of the nature and extent of the mental anguish suffered that was caused by the defendant's conduct. Whether the mental distress is 'serious' is a matter of proof."[34]

"The existence of a special, direct duty owed by the defendant is not required. We also decline to impose a requirement of outrageous conduct on the part of a defendant. A claim for negligent infliction of emotional distress is a claim that, by definition, requires a plaintiff to prove negligence. Further, we expressly reject application of the standard set forth in *Lejeune*, 556 So.2d 559. The emotional distress suffered by a plaintiff need not be 'reasonably foreseeable,' nor 'severe and debilitating.'"[35]

As to the negligence/liability elements of Plaintiffs' NIED claim, the Fifth Circuit has already ruled in this case that "a reasonable jury could conclude that Burmaster did not reasonably believe that [Apollo], a small puppy who was wagging his tail shortly before the shooting, posed a threat. A reasonable jury could further conclude that Burmaster did not reasonably believe he was in imminent danger, based on [Apollo]'s size, Burmaster's ability to exit the yard, and the availability of non-lethal tools like the taser and police boots. And, … a reasonable jury could ultimately find that Burmaster "seized" [Apollo] in violation of clearly established law." *Brown v. Burmaster*, 2025 U.S. App. LEXIS 1129, at *8 (5th Cir. Jan. 17, 2025).

And regarding causation and damages, given the video of the Browns' contemporaneous reactions, their deposition testimony, and the diagnoses of Dr. Berk, a reasonable jury could conclude that Plaintiffs' emotional reaction elicited by Apollo's death was more than just "worry or anxiety attendant to property damage." Defendants' motion should be denied.

---

[34] *Id.* at *51-52 (quoting *Spencer*, 356 So. 3d 936).
[35] *Id.* at *52-53.

**B.    The Court should deny the City's motion with regard to discretionary immunity because the City fails all four steps of the R.S. § 9:2798.1 analysis.**

Next, the City argues it should be immune from state-law claims due to the "discretionary immunity" of R.S. § 9:2798.1. But the City does not cite or meaningfully engage with the multi-step analysis that courts have set out for assessing a R.S. § 9:2798.1 defense.

R.S. 9:2798.1 bars liability for "policymaking or discretionary acts." The statute does not protect actions at "the operational level, but only confers immunity for policy decisions; *i.e.* decisions based on social, economic, or political concerns."[36] Thus, it protects "from liability only at the policy making or ministerial level, not at the operational level."[37] As such, there is a multi-part test for determining whether immunity applies. That test includes at least four steps:

1. A court should first determine whether the entity's actions or omissions were at the "operational level" or at the "policy making or ministerial level."[38]

2. Next, a court should determine whether the official "violated a statute, regulation, or policy specifically prescribing a mandatory course of action".[39]

3. If no mandatory duty was violated, "then the court must next determine whether the discretionary act was related to public policy considerations."[40]

4. If the first three steps are cleared, a court must then assess whether entity's acts or omissions "constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct."[41]

Here, Defendants' argument fails on all four steps. First, the failures of training and oversight that Plaintiffs allege in this case are entirely at the operational level, rather than the

---

[36] *Saine v. City of Scott*, 819 So.2d 496 (La. App. 3 Cir.2002) (*citing Chaney v. Nat. R.R. Passenger Corp.*, 583 So.2d 926, 929 (La. App. 1 Cir.1991)).
[37] *Fowler v. Roberts*, 556 So.2d 1, 15 (La.1989).
[38] *Id.*
[39] *Lockett v. New Orleans City*, 639 F.Supp.2d 710 (E.D. La., 2009), citing *Fowler v. Roberts*, 556 So.2d 1 (La.1989); *Watters v. Department of Social Services*, 15 So.3d 1128, 2009 WL 1709582 (La. App., 2009).
[40] *Id.*
[41] R.S. 9:2798.1(C)(2); *see McNeal v. LeBlanc*, 18-cv-736, R. Doc. 165 at *42 (M.D. La., Jan 30, 2025) (denying 9:2798.1 immunity when "a reasonable jury could find that [defendant official] acted recklessly").

policymaking level. There is no dispute that the City chose to provide *some* training and supervision to Burmaster – the dispute is about whether the City failed operationally in how it carried out that training and supervision. Thus, the City fails step one.

Second, it is not "discretionary" whether a government entity complies with the state and federal constitutions. That is a mandatory duty: not something the City has discretion over. The City is also bound by state law requirements regarding training. In a 2022 opinion, a section of this Court denied R.S. 9:2798.1 immunity to the Orleans Parish Sheriff on a failure to train claim because of mandatory training obligations:

> Plaintiff specifically alleges in her operative complaint that the Sheriff had a mandatory duty to train and supervise deputies in accordance with certain officer training requirements described in La. Rev. Stat. §§ 40:2404.2 and 40:2405.8 . . .
>
> The Court notes that, on their face, these statutes indeed mandate officer training requirements; for example, one provision requires officers to be trained for a certain number of hours. La. Rev. Stat. § 40:2404.2. The negligent failure of the Sheriff to abide but such a mandatory policy would thus deprive the Sheriff of a discretionary immunity defense. Taking as true Plaintiff's allegation that the Sheriff's actions regarding training and supervision were thus prescribed by statute, then the Sheriff's conduct was not "discretionary."[42]

So too here. NOPD is bound by the same training statutes as the Sheriff's Office. NOPD is similarly required by the constitution and state law to ensure that its officers do not violate citizens' basic civil rights. And NOPD – unlike the Sheriff's Office – is additionally subject to a court-ordered federal consent decree, which specifically addresses requirements for NOPD's use-of-force training.[43] Thus, the City fails step two.

---

[42] *Pierre v. Wellpath, LLC*, 21-cv-1043 (E.D. La. June 23, 2022) (sheriff's "mandatory duty to train and supervise deputies" defeated 9:2798.1 immunity), *citing Williams v. City of Monroe*, 27,065 (La. App. 2 Cir. 7/3/95), 658 So. 2d 820, 828 (holding that the Department of Transportation and Development, a public entity, was not entitled to discretionary immunity when it failed to act in accordance with mandatory statutory requirements).

[43] *See United States v. City of New Orleans*, 12-cv-01924-SM-JCW, R. Doc. 565 at ¶¶ 109 et seq. (E.D. La., Oct. 2, 2018) (Amended and Restated Consent Decree).

Third, Defendants offer nothing whatsoever to suggest that their training choices were "related to public policy considerations," which courts have described as "decisions based on social, economic, or political concerns."[44] When a defendant does "not articulate[] any social, economic or political considerations surrounding" their actions, R.S. § 9:2798.1 immunity is denied.[45] Thus, the City fails step three.

And fourth, a reasonable jury could conclude that it would be reckless for a police agency to take a DOJ training document, copy verbatim from it, but omit almost everything that might mitigate the need for the use of force on dogs. This too would eliminate discretionary immunity. Thus, the City fails step four.

Because the City fails all four steps of the R.S. § 9:2798.1 analysis, its motion should be denied.

**C.    This Court should deny the City's motion with regarding to the training *Monell* claim because NOPD's training is insufficient judged by its own criteria, because it cherry-picks one-sided material from a DOJ training, and for a range of other reasons.**

The City argues for dismissal of Plaintiff's training *Monell* claim on the theory that its training was adequate. It points to three items of training over Burmaster's twenty-five years on the force: Burmaster's NOPD academy training around the year 2000, a daily training bulletin in 2017, and a daily training bulletin in 2019. (Daily training bulletins are short training exercises in

---

[44] *Chavis v. Lawrence*, 23-cv-1129, R. Doc. 36 at *24 (M.D. La., Jan. 21, 2024), *citing Lockett v. City of New Orleans*, 639 F. Supp. 2d 710, 745 (E.D. La. 2009) (*quoting Saine v. City of Scott,* 2002- 265 (La. App. 3 Cir. 6/12/02); 819 So. 2d 496), aff'd, 607 F.3d 992, (5th Cir. 2010); *see also Randle v. Tregre*, 147 F. Supp. 3d 581, 593 (E.D. La. 2015), aff'd, 670 F. App'x 285 (5th Cir. 2016).

[45] *Misuraca v. City of Kenner*, 802 So. 2d 784, 789 (La. App. 5th Cir. 2001) ("Kenner has not articulated any social, economic or political considerations surrounding the police officer's actions in handling the immediate investigation or securing the accident scene. Thus, Kenner is not immune from liability under La. R.S. 9:2798.1")

which an officer reads some material or watches a video and then answers some questions.[46])

First, all of this training is plainly inadequate for the simple reason that <u>almost no officer can remember anything about any of it</u>. Burmaster's only recollection about any of his training about interacting with animals was two words: "be safe."[47] Sgt. David Barnes – one of the City's 30(b)(6) witnesses about training – could not recall anything about the content of the academy training at any time before the present.[48] Officer John Roussel recalled only one of the two daily training bulletins; he did not recall the other one at all.[49] Sgt. David Duplantier – another 30(b)(6) witness on training – could not recall anything about the content of the 2017 daily training bulletin[50] and had not even heard of the 2019 DTB.[51] Drawing all permissible inferences in favor of Plaintiffs, it cannot be said that NOPD's training on animal encounters is legally sufficient if the officers can barely remember that it happened, much less the content.

Furthermore, each of the three proffered training items (the academy training, the 2017 DTB, and the 2019 DTB) is insufficient.

First, Burmaster's academy training from when he became an officer in 2000 was apparently so insufficient that Burmaster testified he was "<u>instructed to forget all training from</u>

---

[46] Ex. C (Barnes 30(b)(6) Dep)  at 10:4-13 ("So the Daily Training Bulletins themselves are usually a series of questions. . . . Those questions would be based on either policy or like an online video or training or something that they had to go through, and then they were quizzed on that")

[47] R. Doc. 122-2 (Burmaster Dep.) at 182:12-15 ("Q. Okay. And you -- What other training have you received since that era about interacting with animals on the job? A. Be safe.")

[48] Ex. C (Barnes 30(b)(6) Dep) at 14:14-20 ("Q. Do you know anything about the contents of the academy training at any time for NOPD? A. I don't know the specifics of the contents of the academy training, just that it is the -- it is now a DOJ and COPS training through an online training that they do that is, I think, five modules."); 15:9-10 ("some academy training, but you're not sure of the contents of it . . .  That's correct.")

[49] R. Doc. 122-8 (Roussel Dep.) at 27:3:28-2.

[50] R. Doc. 122-5 (Duplantier Dep.) at 29:16-22 ("Q. Do you have any knowledge of whether Burmaster took that online ASPCA training? A. No knowledge. Q. Okay. Have you taken it? A. Yes, sir. Q. Do you remember what was covered? A. No, I don't.")

[51] R. Doc. 122-5 at 67 ("Have you ever heard of a training entitled quote, "The Problem of Dog-Related Incidents and Encounters"? A. I can't say that I have.")

that era."[52] That is to say, the City instructed Burmaster to forget his training about interacting with animals, and then City did not provide any *new* training on the topic – for 17 years.

Next, the 2017 DTB consisted of a few online ASPCA videos officers were supposed to watch and then take a short test.[53] But because no one from NOPD "downloaded or captured any of those videos," the City's 30(b)(6) witness conceded that the City does not "know anything about the contents of these videos."[54] If the City does not know anything about the content of the training, it can hardly use it to defend itself from an inadequate-training claim. (And in any case, Burmaster did not recall taking this DTB.[55])

Finally, the 2019 DTB was a set of slides entitled "The Problem of Dog-Related Incidents and Encounters." It was insufficient in several ways. First, it was deficient on its own terms. On page 2, it says that "[b]asic and in-service training should include . . . Partnering with animal control and other animal services . . . [and] Information on local resources."[56] But NOPD's curriculum does not actually suggest any partnering with other services, and does not include any information on local resources.[57] It therefore fails to meet its own explicit standard for sufficiency.[58]

Second, NOPD's training appears to be largely copied-and-pasted from the U.S. Department

---

[52] R. Doc. 122-2 (Burmaster Dep.) at 182:6-11 ("Q. Do you recall the content of that training? A. From the academy? Q. Uh-huh (indicating affirmatively). A. Oh, we were instructed to forget all training from that era.")

[53] Ex. C (Barnes Dep.) at 87:4-9.

[54] *Id.* at 87:9-12 ("Q. So you don't know anything about the contents of these videos, right? A. That's correct. I don't know the specific content of the videos."). Plaintiffs subpoenaed videos from the ASPCA in 2023, but they are undated – so there is no way of knowing if they are the same ones used by NOPD in 2017.

[55] R. Doc. 122-2 at 183:11-184:4 ("Q. Do you recall receiving an in-service training -- in-service training using this curriculum in 2019 or so? . . . The Witness: This looks familiar. . . . .Q. Do you recall receiving any training besides the training that you received using this document? A. No.")

[56] R. Doc. 45-1 (NOPD Training) at 2.

[57] R. Doc. 45-1 (NOPD Training).

[58] *Id.*

of Justice's COPS curriculum with the same title.[59] But NOPD's training omits or removes key elements that are part of the COPS training. For example, NOPD omits the fact that "serious [dog] bites are relatively rare" and that the "overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required."[60] The COPS training notes that "[f]ewer than 2 percent of the individuals visiting an emergency room complaining of a dog bite require hospitalization," and compares that to 5.7 percent for people assaulted by a human.[61] And that "even as the canine population has steadily increased over the past three decades, the number of reported dog bites has drastically decreased."[62] COPS concludes that "dogs are seldom dangerous."[63] NOPD copied and pasted other content – but omitted all of this.

The COPS training also includes – and NOPD omits – a video of "a real-time example of a safe, effective use of the Taser®—which ensures the safety of the officers, bystanders, and dogs."[64]

And directly on point to the case here, the COPS training notes that a factor contributing to dog-related incidents is "Insufficiently Trained Police Officers" who "view a dog running toward them as a threat (the dog could be friendly and merely greeting the officer)."[65] The COPS training specifically noted that:

> An approaching dog: Most dogs happily greet a new human. Some will be so enthusiastic about greeting that they will do this at a full run and then launch themselves at the officer. Absent any of the warning signals described below, **an approaching dog is almost always friendly**. A dog who feels threatened will usually try to keep his distance.[66]

---

[59] *Compare* R. Doc. 45-1 (NOPD Training) *with* R. Doc. 45-2 (DOJ Training). For example, slide 2 of NOPD's training is copied verbatim from page 21 of the COPS training. R. Doc. 60 at ¶ 121; *compare* R. Doc. 45-1 at 2 *with* 45-2 at 21. Same with slide 2 of NOPD's training and page 26 of the COPS training. (For the COPS training, page numbers refer to the page of the PDF.) *Id.*

[60] R. Doc. 60 at ¶ 123. R. Doc. 45-2 (COPS Training) at 11.

[61] *Id.*

[62] *Id.* at 12.

[63] *Id.* at 13.

[64] *Id.* at 16.

[65] *Id.* at 15.

[66] *Id.* at 25 (emphasis added).

But NOPD omitted all that. Accordingly, Burmaster was not trained by NOPD that an approaching dog is almost always friendly – a fact that could have saved Apollo's life, and prevented Burmaster from wounding Officer Roussel with the volley of gunfire.

The COPS training also includes specific tactics that NOPD omits. For example, the COPS training notes that "when encountering a dog, officers should stop all forward movement and turn their bodies to the side. Officers should drop their eyes and watch the dog using peripheral vision."[67] The NOPD training also omits or removes the fact that <u>all</u> dogs hit with TASER darts but not immobilized "fled the scene and did not attack."[68]

Notably, the City does not mention in its Motion for Summary Judgment that the Court has already opined on this training. In denying a Motion to Dismiss regarding the training *Monell* claim, the Court wrote that "Plaintiffs provide significant detail about the specific pieces of information from the COPS program training that the NOPD left out of its training" and on that basis denied the motion[69] Plaintiff's expert James Crosby agrees: he opines that the City's cherry-picking indicated that the "New Orleans Police Department failed to meet recognized best practices regarding police-dog encounter training."[70]

And finally, there are indications that the City <u>itself</u> thought Burmaster's training was inadequate. After the NOPD Use of Force Review Board assessed the shooting of Apollo, the board members ordered that Burmaster receive "De-escalation training . . . ASAP."[71] If the City's own leaders thought Burmaster needed further training "ASAP," it is hard to see how the City can prevail on summary judgment on training.

---

[67] R. Doc. 60 at ¶ 131. R. Doc. 45-2 (COPS Training) at 34.
[68] R. Doc. 60 at ¶ 131. R. Doc. 45-2 (COPS Training) at 37.
[69] R. Doc. 115 at 6.
[70] R. Doc. 209-3 at 21.
[71] R. Doc. 110-17 at 3.

There is also plausibility of causation. Burmaster has said he shot the puppy because he thought the dog was "going to bite [his] penis."[72] But if he had been trained – as the US DOJ says officers should be trained – that a dog running at an officer is "almost always friendly," Burmaster would not have felt the need to shoot and kill multiple dogs, including a foot-and-a-half-tall, eighteen-week-old puppy running toward him. Plaintiff's expert, James Crosby, opined that the City's omission of "crucial material" from its training "likely contributed to Burmaster's incorrect perception of Apollo as a threat."[73]

To sum up: NOPD can only document that it has offered three items of dog-related training. Item # 1, the academy training, was so problematic that Burmaster was "instructed to forget" it. Item # 2 was the 2017 ASPCA DTB – but the City doesn't know anything about the content of that training. And Item # 3 was the 2019 DTB that consisted of the one-sided cherry-picking from the DOJ training, which this Court already indicated could support a *Monell* claim.

Furthermore, Officer Burmaster (1) met the DOJ training's description of a "Insufficiently Trained Police Officer," (2) the Use of Force Review Board concluded that Burmaster needed further training "ASAP," and (3) Dr. Crosby testified that NOPD's training "failed to meet recognized best practices." All this put together gives a reasonable jury more than enough to conclude that the City's training was sufficiently inadequate to support a *Monell* claim. The motion should be denied.

**D.    This Court should deny the City's motion with regarding to the supervision *Monell* claim because the allegations that led the Court to deny a motion to dismiss have now been supported by evidence.**

The City argues that Plaintiff's supervision *Monell* claim should be dismissed because

---

[72] R. Doc. 122-2 (Burmaster Dep.) at 129:2-6 ("Q. Yeah. So we don't have to use euphemisms here. You were specifically afraid that Apollo was going to bite your penis; correct? A. Yeah.")
[73] R. Doc. 209-3 at 20.

"Officer Burmaster's supervisory and disciplinary history does not indicate a patten that should have put NOPD on notice of a potential constitutional violation."[74]

The City's motion, however, does not even acknowledge that the Court has already weighed in on this issue. In its January 2023 Motion to Dismiss, the City argued that Plaintiffs' allegations failed to meet the legal threshold for alleging inadequate training or supervision, and that "Plaintiffs fail to show a plausible direct causal link between Defendant Burmaster's employment history and the shooting of Plaintiffs' dog."[75]

On March 21, 2023, this Court denied the Motion to Dismiss in its entirety. The Court held that "the complaint includes numerous factual allegations about Burmaster's use of force complaints and disciplinary record, which, if true, could raise significant questions about whether or not the NOPD showed 'deliberate indifference' to Plaintiffs' constitutional rights by continuing to employ him on the force."[76]

Accordingly, the Court should consider how the City's Motion for Summary Judgment intersects with the Court's ruling on the Motion to Dismiss.[77] A motion to dismiss deals with allegations, and a motion for summary judgment deals with evidence. But the City's arguments in its Motion for Summary Judgment and its (denied) Motion to Dismiss are the same. For that reason, the question now is this: do Plaintiffs have evidence to support the allegations that this Court found sufficient to deny the Motion to Dismiss, when read in the light most favorable to Plaintiffs?

The answer is yes. These are the allegations that led the Court to deny the Motion to dismiss, along with record evidence to support each allegation:

---

[74] R. Doc. 208-1 at 21.
[75] R. Doc. 68-1 at 14.
[76] R. Doc. 115 at 7.
[77] *See St. Paul Fire & Marine Ins. Co. v. Bd. of Comm'rs of the Port of New Orleans*, 07-3053 (E.D. La., Apr. 2, 2012) (when MSJ and MTD made overlapping arguments, the "Court converts the Motion to Dismiss into a summary judgment motion and addresses the two motions concurrently.")

| Allegation relevant to denial of Motion to Dismiss | Record evidence supporting allegation |
|---|---|
| "Burmaster is a 'frequent user of force,' who has used force at least 30 times since 2011." R. Doc. 115 at 2. | R. Doc. 122-4 at pgs. 3-4 (admitting RFA that "Officer Burmaster reported use of force thirty or more times at NOPD"). |
| Burmaster's use of force includes "an incident in 2012 when he shot and killed a dog while investigating a property damage complaint." *Id.* | R. Doc. 122-2 at 191:3-8 (Burmaster admitting he killed a dog while on the job in 2012). |
| "Burmaster's use of force has been the subject of multiple complaints'" *Id.* | R. Doc. 122-4 at 3 (admitting that there have been five complaints about Burmaster's use of force); R. Doc. 122-3 (30(b)(6) Dep.) (admitting "least five complaints of use of force"). |
| "NOPD has sustained at least twenty other rule violations against Burmaster." *Id.* | R. Doc. 122-3 (30(b)(6) Dep.) at 25:11-20 ("Q. So at least PIB has approved 22 rule violations by Burmaster? . . . A. Yeah. I'd agree to that based on the document.") |
| Burmaster's rule violations involved "'verbal intimidation, moral conduct, professionalism, performance of duty, neglect of duty, [and] failure to comply with instructions." *Id.* | R. Doc. 122-3 at 26: ("PIB has sustained 22 rule violations by Burmaster, including violations regarding verbal intimidation, moral conduct, professionalism, performance of duty, and neglect of duty. Agreed? . . . The Witness: Yes.") |
| Burmaster posted an Instagram post about an ethics test. *Id.* at 7. | R. Doc. 122-2 at 201:20-25 (Burmaster admitting he posted the item to Instagram). |

The above allegations were sufficient to deny the Motion to Dismiss. Now that they are not just allegations – they are facts with evidentiary support – they should be sufficient to deny the Motion for Summary Judgment as well. Defendants provide no argument to the contrary.

And Plaintiffs now have additional relevant facts on top of what was alleged in the Complaint. For example:

- According to Defendants' 30(b)(6) witness, "most officers go their whole career without firing their gun at a person or animal."[78] But Burmaster has fired his gun at

---

[78] R. Doc. 122-3 at 11:25-12:3.

a person or animal at least four times.[79]

- Going back to at least 2012 to the present, Officer Burmaster is the only officer in the NOPD to have shot two animals.[80]

- Burmaster's use of force file is more than 600 pages long.[81]

- A state criminal district court and the state Fourth Circuit "upheld that determination that Burmaster engaged in an unconstitutional search" – but that finding that Burmaster had violated the constitution appears nowhere "HR, personnel, or PIB files."[82]

- Expert Jim Crosby opined that "the disciplinary history of Officer Burmaster documents his poor decision making, lack of professional conduct, and should have, in my experience, resulted in his termination from service. Thus, it appears that the New Orleans Police Department wrongly retained Burmaster prior to this shooting, and wrongfully retained him again in the aftermath of this incident."[83]

- The City of New Orleans didn't just tolerate Burmaster on the force. It selected him to be a Field Training Officer – one of the less than 10% of officers that are used as "good examples of policing to train new recruits."[84]

It is particularly telling that NOPD found Burmaster to have violated their rules almost two dozen times and did not even keep track of <u>judicial decisions</u> finding that Burmaster violated the U.S. Constitution, but specially selected him to be an exemplar of good policing for new recruits.

These facts, in addition to the ones assessed in the Court's Order on the City's Motion to Dismiss could lead a reasonable jury to find that the City failed in its training, oversight, or retention of Burmaster. *See* R. Doc. 115 at 8 (concluding that "drawing all reasonable inferences in favor of the Plaintiff, if this Court accepts as true Plaintiffs' allegations about Burmaster's past use of force incidents and other rule violations, the complaint does raise factual questions about

---

[79] R. Doc. 122-3 at 12:4-8.
[80] R. Doc. 122-3 (30(b)(6) Dep.) at 14:1-6 ("Q. Okay. So going back to at least 2012 to the present, based on this document and what you know, Officer Burmaster is the only officer in the NOPD to have shot two animals. Agreed? A. Agreed.")
[81] *Id*. at 16:16-18.
[82] *Id*. at 34:13-35:9.
[83] R. Doc. 110-18 at ¶ 17.
[84] R. Doc. 94-7 (30(b)(6) Dep. at 54:21-24.

'the inappropriateness of NOPD's choice to continue having Burmaster on the force.'")

The City also argues that the *Monell* claim should be dismissed because dogs "are considered property; there are different considerations for uses of force against property than for humans."[85] This Court, however, has already held that it "rejects" that argument[86] - and the City did not seek reconsideration.

Because Plaintiffs have evidentiary support for the relevant allegations that was sufficient to state a claim, and have substantial additional material as well, this Court should deny the City's motion.

**E.    This Court should deny the City's motion with regard to *Monell* because NOPD's "EXONERATED" finding could support a jury determination of ratification.**

In 2022, Plaintiffs indicated to the Court and Defendants that if the Chief of Police determined that Burmaster's actions were within policy, one of Plaintiffs' *Monell* theories would be ratification.[87]

The legal background is that when an authorized policymaker approves a subordinate's decision and the basis for it, such ratification can be chargeable to the government entity.[88] *Monell* liability through ratification is generally limited to when "the subordinate's actions are sufficiently extreme,"[89] and cannot be proved by simple failure to investigate[90] or good faith statements made

---

[85] R. Doc. 208-1 at 22.
[86] R. Doc. 115 at 7-8 ("The Court also rejects Movants' argument here that '[t]here is nothing 'obvious' about Defendant Burmaster's unspecified use of force against humans that would necessarily lead to Defendant Burmaster's shooting of Plaintiffs' dog.'")
[87] R. Doc. 56 at 3 (discussing ratification, and contending that "the *Monell* question is premature. It cannot be resolved until the City conducts the Chief's Hearing, finalizes its position on the shooting, and thus informs the Court as to whether it ratifies the shooting or not.")
[88] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
[89] *World Wide Street Preachers v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009)
[90] *Praprotnik, supra,* at 131 ("the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority. . . .")

in defending complaints.[91]

Here, we have extreme conduct by a subordinate – Officer Burmaster chose to aim, shoot, and kill the *smaller* of two dogs on residential property. The dog was an eighteen-week-old puppy that weighed just over 22 pounds and was less than a foot and a half tall. It was approximately one-tenth of Burmaster's weight. Burmaster used a gun even though NOPD policy specifically authorizes the use of TASERs on animals. Burmaster fired his gun in the direction of a residential home he knew to be occupied (because it was the one he was responding to a call for service to), and wounded another officer with shrapnel. The Fifth Circuit affirmed that this conduct was extreme that the "district court did not err in not dismissing the Plaintiffs' claims for punitive damages."[92]

The question then is whether the City ratified Burmaster's actions. NOPD's Public Integrity Bureau and Use of Force Review Board investigated and found the shooting to be unjustified. But at the initial status conference in this matter, NOPD's counsel informed the Court that it was the City's then-position that Burmaster's shooting was justified.[93] After the status conference, Plaintiff's counsel asked how the City's position could be contrary to its own findings. The City's counsel explained that the City's position about the shooting was tentative – its final position will be developed after Burmaster's disciplinary Chief's Hearing.

In a previous pleading, the City confirmed that "[a]mong the possible outcomes of the Chief's Hearing are: (1) a decision may be made by that Defendant Burmaster violated NOPD policies and procedures; (2) a decision may be made that Defendant Burmaster did not violate

---

[91] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010) ("Good faith statements made in defending complaints against municipal employees do not demonstrate ratification.").

[92] *Brown v. Burmaster*, 2025 U.S. App. LEXIS 1129, at fn. 3 (5th Cir. Jan. 17, 2025).

[93] *See* R. Doc. 19 (setting initial status conference).

NOPD policies and procedures . . . "[94]

Here, the Chief's Hearing was held on June 15, 2023.[95] The Chief's Hearing committee recommended to Chief Kirkpatrick that Burmaster be found "EXONERATED" of the use of force violation.[96] ("Exonerated" means that the "alleged conduct did occur but did not violate NOPD policies, procedures, or training."[97])

Chief Kirkpatrick adopted that recommendation, and sustained only the uniform and body armor rule violations by Burmaster.[98] Because "exoneration" suggests that the conduct was consistent with agency policies, procedures, and training, some courts have found similar fact patterns – investigations concluding in "exoneration" – to be sufficient to deny summary judgment on a *Monell* ratification theory.[99] (The ratification theory is also strengthened by the fact that City of New Orleans didn't just tolerate Burmaster on the force; it selected him to be a Field Training

---

[94] R. Doc. 62-1 at fn. 1.

[95] R. Doc. 194-1 at 2.

[96] *Id.* at 3.

[97] *United States v. New Orleans*, 12-cv-01924-SM-DPC, R. Doc. 778 (Consent Decree) at ¶ 415(d) (E.D. La., Apr. 18, 2024).

[98] *Id.* at 5-6.

[99] *Larez v. City of Los Angeles*, 946 F.2d 630, 646-48 (9th Cir. 1991) (finding that police chief ratified an inadequate investigation into allegations of excessive use of force when he signed a letter stating that none of the plaintiff's complaints would be sustained); *AGG v. City of Hayward*, No. 19-cv-00697-DMR, 2020 U.S. Dist. LEXIS 189516, at *43-44 (N.D. Cal. Oct. 13, 2020) ("The parties do not appear to dispute either that Chaplin had the final decision with respect to disciplinary action against Wooley or that Wooley was ultimately exonerated from wrongdoing. In light of the facts above, a reasonable jury could determine that Chaplin knew of Wooley's "line in the sand" decision because of the investigatory board's findings and recommendations and could infer that Chaplin ratified that decision by exonerating Wooley."); *Smith v. City of Stockton*, No. 2:15-cv-00363-KJM-AC, 2018 U.S. Dist. LEXIS 136656, at *38 (E.D. Cal. Aug. 10, 2018) (referring to exonerating investigation, and holding that this "concession leaves open the possibility a juror could draw a reasonable inference that Chief Jones, the top police department policymaker, made a "conscious, affirmative choice" to approve the investigation and ratify Perez's and Harrison's unreasonable use of deadly force. . . Plaintiff's ratification theories survive summary judgment.") (reversed on other grounds); *Tubar v. Clift*, No. C05-1154-JCC, 2008 U.S. Dist. LEXIS 101130, at *18-19 (W.D. Wash. Dec. 4, 2008) ("Chief Crawford's review of the internal investigation and official exoneration of Officer Clift constituted 'affirmative or deliberative conduct' sufficient to create a triable issue as to municipal liability by ratification."). Some courts, however, have gone the other way. *See, e.g., Sheehan v. BART*, No. 14-cv-03156-LB, 2016 U.S. Dist. LEXIS 25501, at *3 (N.D. Cal. Feb. 29, 2016) ("BART and the OPD cannot be held liable on a *Monell* ratification theory merely because their post-incident investigations exonerated Officers Pianta and Stolzman.")

Officer, i.e., to be used as "good examples of policing to train new recruits.").[100] So too here; this Court should deny Defendant's motion regarding *Monell.*

**F.    Defendants' motion should be denied due to disputed material facts.**

Summary judgment can only be granted if "if the movant shows that there is no genuine dispute as to any material fact."[101] Here, Defendants' motion relies on material facts that even the City's own personnel do not agree about.

For example, three of Defendants' material facts (numbers 14, 15, and 17) rely on the idea that NOPD has been training "its officers with respect to encounters with dangerous animals through annual 'in service' training."[102] This is based solely on the testimony of NOPD officer David Duplantier, who also said they "keep records" of such training.[103] But when NOPD's 30(b)(6) witness went to look for such records, he found they did not exist:

> Q.    Prior to this year, has there been any inservice training other than the DTBs related to officer interaction with dogs?

> A.    To the best of my memory, I believe there was at one point, but I wasn't able to find any records indicating that it took place in inservice.[104]

In another material fact, Defendants rely on the academy training that Burmaster would have received as a trainee around the year 2000.[105] But as noted above, Burmaster testified he was "instructed to forget all training from that era."[106] The 2000-era training cannot be material to the

---

[100] R. Doc. 94-7 (30(b)(6) Dep. at 54:21-24.
[101] *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).
[102] R. Doc. 208-2.
[103] R. Doc. 122-5 (Duplantier Dep.) at 24:10-11 ("So we make sure every officer attends in-service training, keep records of that.")
[104] Ex. C (Barnes 30(b)(6) dep) at 15:1-6.
[105] R. Doc. 208-2 at # 16.
[106] R. Doc. 122-2 (Burmaster Dep.) at 182:6-11 ("Q. Do you recall the content of that training? A. From the academy? Q. Uh-huh (indicating affirmatively). A. Oh, we were instructed to forget all training from that era.")

motion if Burmaster is correct that he was instructed to forget it.

Similarly, in several other material facts, the City tries to take credit for a 2017 training using ASPCA videos. But the City's 30(b)(6) witness conceded that the City does not "know anything about the contents of these videos."[107] The 2017 training cannot be material if the City doesn't know what it was. Given that the City's own employees dispute the accuracy and materiality of its proffered facts, the Motion should be denied.

### III.    CONCLUSION

For the reasons above, this Court should deny Defendants' Motion for Summary Judgment.

Respectfully Submitted:

| | |
|---|---|
| */s/ William Most* | */s/ Tarak Anada* |
| WILLIAM MOST (La. Bar No. 36914) | TARAK ANADA (#31598) |
| HOPE PHELPS (La. Bar No. 37259) | JONES WALKER LLP |
| DAVID LANSER (La. Bar No. 37764) | 201 St. Charles Avenue |
| MOST & ASSOCIATES | New Orleans, Louisiana 70170-5100 |
| 201 St. Charles Ave., Ste. 2500, # 6825 | Telephone: (504) 582-8322 |
| New Orleans, LA 70170 | Facsimile: (504) 589-8322 |
| Tel: 504.509-5023 | E-Mail: tanada@joneswaker.com |
| Email: williammost@gmail.com | |

---

[107] *Id.*