UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| DEREK BROWN, ET AL | CIVIL ACTION |
|---|---|
| VERSUS | NO. 22-847 |
| DERRICK BURMASTER, ET AL | SECTION "L" (4) |

**Plaintiffs' Response to Defendants Statement of Material Facts**

Plaintiffs note at the outset that, in violation of Local Rule 56.1, Defendants fail to list any allegedly uncontested facts relating to Plaintiffs' Negligent Infliction of Emotional Distress ("NIED") claim in their Statement of Uncontested Material Facts (R. Doc. 208-2). Defendants' motion should be denied on that basis alone as it relates to the NIED claim.

Plaintiffs' opposition memorandum details numerous material facts relevant to Plaintiffs' NIED claim. If Defendants contest these material facts, their motion should be denied as to the NIED claim. And if Defendants do not contest such material facts, their motion should also be denied as to the NIED claim.

| No. | Defendants' Material Fact | Plaintiffs' Response |
|---|---|---|
| 1 | Derrick Burmaster was hired by the New Orleans Police Department ("NOPD") on August 13, 2000, to serve as a police officer recruit. | Undisputed. |
| 2 | From 2000 to 2016, Officer Burmaster discharged a firearm three times. | Undisputed that this is what his records reflect. Obviously, he discharged a firearm far more times than that in the range, and he may have had unreported firearm discharged. |
| 3 | In 2007 and 2009, Officer Burmaster discharged his firearm at a human. | Undisputed. |
| 4 | In 2012, Officer Burmaster shot a dog. | Undisputed. |
| 5 | Officer Burmaster was not charged with violation of any NOPD policy as a result of any of the incidents in 2007, 2009 or 2012 in which he discharged his firearm. | Undisputed. |

| | | |
|---|---|---|
| 6 | During the incident in which Officer Burmaster shot a dog in 2012, Officer Burmaster was charged by two dogs in an aggressive manner; Officer Burmaster instructed the dogs to "Get Back," and then discharged his firearm two times, killing one dog. | **Disputed**. This characterization of the 2012 incident is derived only from Officer Burmaster's description. It has some of the same hallmarks (*e.g.*, a dog that he concluded would bite his penis) that led NOPD officers to deem "Officer Burmaster not to be credible." R. Doc. 110-9. |
| 7 | From 2000 to 2016, Officer Burmaster was investigated for possible violations of NOPD policy relating to use of force on seven occasions. | Undisputed. |
| 8 | None of the seven disciplinary actions brought against Officer Burmaster for use of force from 2000 to 2016 involved discharging a firearm. | Undisputed. |
| 9 | Each of the seven disciplinary actions brought against Officer Burmaster for use of force from 2000 to 2016 was investigated by the NOPD and resulted in a disposition of "not sustained" or "exonerated." | Undisputed. |
| 10 | From January 1, 2016, to April 10, 2021, Officer Burmaster used force while acting as an NOPD police officer 13 times. | Undisputed, but unclear why Defendants are limiting the time period to only those five years. |
| 12 | Until April 10, 2021, none of Officer Burmaster's uses of force from 2016 to 2021 involved a discharge of a firearm and none involved using force against an animal | Undisputed, but unclear why Defendants are limiting the time period to only those five years. For example, Burmaster shot and killed a dog in 2012. |
| 13 | From 2016 to April 10, 2021, Officer Burmaster was not charged with any violations of NOPD policy based on use of force. | Undisputed. |
| 14 | Beginning in or around 2000, NOPD trained its officers with respect to encounters with dangerous animals through annual "in service" training through the NOPD Academy, roll call training, daily training bulletins ("DTBs") provided by the NOPD's Professional Standards Accountability Bureau ("PSAB"), and by a mandated online course with the ASPCA, an animal focused organization that, among other things, provides educational programs to law enforcement organizations. | **Disputed.** There is no documentary evidence of annual "in service" training related animal encounters. NOPD's 30(b)(6) witness about training was asked:<br><br>Q. Prior to this year, has there been any inservice training other than the DTBs related to officer interaction with dogs?<br><br>A. To the best of my memory, I believe there was at one point, but I wasn't able to find any records indicating that it took place in inservice.<br><br>Ex. A at 15:1-6. |

#103848867v1

| 15 | In "once-a-year" in service training concerning animal encounters, NOPD trained its officers with a goal to "avoid either, A, having animals hurt us or, B, us having to hurt the animals." | **Disputed**. See # 14; there is no documentary evidence whatsoever of any in-service training concerning animal encounters. |
|---|---|---|
| 16 | At the NOPD academy, officers were trained to contact the Louisiana Society for the Prevention of Cruelty to Animals (the "SPCA") by radio "if they have an issue with an animal" and if there is sufficient time to do so. | **Disputed that this is material**, given that Burmaster testified he was "instructed to forget all training from that era."[1] |
| 17 | The NOPD in-service training "talked about the dog, the position of the tail, the ears, right, that -- I always stress to officers, the majority of the time, the dog is not trying to get into a confrontation, but their way of telling you, 'I don't want to fight, but if you come any closer, if you don't leave, I'm willing to do it,' is by them sitting there and their posture changes. You can see the hair on their body change, and they start barking, which is a warning mechanism, right." | **Disputed**. See # 14; there is no documentary evidence whatsoever of any in-service training concerning animal encounters. |
| 18 | The NOPD trained its officers that a firearm should be used against an animal only in circumstances in which it reasonably appeared that the animal appeared to pose an imminent threat to human safety and alternative methods were not reasonably available or would likely not be effective. | Undisputed. |
| 19 | The NOPD trained its officers to evaluate risks posed by each potential animal encounter faced by officers and not to consider every animal encountered to be a threat. | Undisputed. |
| 20 | The NOPD trained its officers to consider alternative means to avoid use of force against animals. | Undisputed. |
| 21 | NOPD Operations Manual, Chapter 1.3, entitled "Use of Force," became effective December 6, 2015, and was revised on April 1, 2018. | Undisputed that the description applies to the current Use of Force chapter. |

---

[1] R. Doc. 122-2 (Burmaster Dep.) at 182:6-11 ("Q. Do you recall the content of that training? A. From the academy? Q. Uh-huh (indicating affirmatively). A. Oh, we were instructed to forget all training from that era.")

#103848867v1

| | | |
|---|---|---|
| 22 | Chapter 1.3, paragraph 32, entitled "Dangerous Animals," provides: Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area. Under circumstances in which officers have sufficient advance notice that a potentially dangerous animal may be encountered, officers should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, CEW, animal control officer). Nothing in this Chapter shall prohibit any officer from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical. | Undisputed. |
| 23 | In May 2017, as part of its monthly "Daily Training Bulletin" ("DTB") training program, NOPD, through its PSAB department, required all police officers to take an online course through the American Society for the Prevention of Cruelty to Animals (the "ASPCA"). | **Disputed that this is material**, given that the City's 30(b)(6) witness conceded that the City does not "know anything about the contents of these videos."[2] |
| 24 | The May 2017 DTB was entitled, "Officer Safety – Dog Bite Prevention," and contained training units entitled: "Recognizing Forms of Canine Aggression," "Basics of Canine Communications," and "Dog Bite Prevention." | **Disputed that this is material**, given that the City's 30(b)(6) witness conceded that the City does not "know anything about the contents of these videos."[3] |
| 25 | Officer Burmaster attended the May 2017 ASPCA course and completed the testing portion of the DTB on May 31, 2017. | **Disputed that this is material**, given that the City's 30(b)(6) witness conceded that the City does not "know anything about the contents of these videos."[4] |
| 26 | In October 2019, the NOPD, through its PSAB, provided training to its police officers in the form of a DTB slide presentation entitled "The Problem of Dog-Related Incidents and Encounters." | Undisputed. |

---

[2] Ex. A (Barnes 30(b)(6) Dep) at 87:9-12 ("Q. So you don't know anything about the contents of these videos, right? A. That's correct. I don't know the specific content of the videos."). Plaintiffs subpoenaed videos from the ASPCA in 2023, but they are undated – so there is no way of knowing if they are the same ones used by NOPD in 2017.

[3] *Id*.

[4] *Id*

| 27 | The October 2019 DTB training quoted the complete paragraph of NOPD Policy Chapter 1.3., paragraph 32, (Dangerous Animals). | Undisputed. |
|---|---|---|
| 28 | The October 2019 DTB provided training information and techniques to officers to assist officers in discharging their duties while compiling with Chapter 1.3, paragraph 32. | Undisputed. |
| 29 | On November 20, 2019, Officer Burmaster completed his October 2019 DTB training and passed the testing component of the training. | Undisputed. |
| 30 | On April 10, 2021, Officer Burmaster responded to a domestic disturbance call at Plaintiff's residence and shot Plaintiffs' dog. | Undisputed. |

Respectfully Submitted:

*/s/ William Most*
WILLIAM MOST (La. Bar No. 36914)
HOPE PHELPS (La. Bar No. 37259)
DAVID LANSER (La. Bar No. 37764)
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, # 6825
New Orleans, LA 70170
Tel: 504.509-5023
Email: williammost@gmail.com

*/s/ Tarak Anada*
TARAK ANADA (#31598)
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8322
Facsimile: (504) 589-8322
E-Mail: tanada@joneswaker.com

#103848867v1