UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DEREK BROWN and JULIA | CIVIL ACTION |
| BARECKI-BROWN | NO. 22-00847 |
| VERSUS | SECTION: L |
| | DIVISION: 4 |
| DERRICK BURMASTER, SHAUN | HON. ELDON FALLON |
| FERGUSON, and the CITY OF | HON. KAREN W.ROBY |
| NEW ORLEANS | |

DEPOSITION OF SERGEANT DAVID A. BARNES, individually, and as the 30(b)(6) representative of the City of New Orleans, given in the above-entitled cause, via Zoom videoconferencing, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana on the 31st day of March, 2025, commencing at 1:00 PM.

EXHIBIT C

```
 1   APPEARANCES (Via Zoom):
 2   REPRESENTING THE PLAINTIFFS:
 3           MOST & ASSOCIATES
             BY: WILLIAM MOST,
 4           ATTORNEY AT LAW
             201 St. Charles Avenue
 5           Suite 2500, #9685
             New Orleans, Louisiana  70170
 6           Representing the Plaintiffs
             (williammost@gmail.com)
 7
             -and-
 8
             JONES, WALKER
 9           BY:  TARAK ANAND,
             ATTORNEY AT LAW
10           201 St. Charles Avenue
             New Orleans, Louisiana  70170-5100
11
12   REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON, and
     the CITY OF NEW ORLEANS:
13
             OFFICE OF THE CITY ATTORNEY
14           BY:  JAMES ROQUEMORE,
             ATTORNEY AT LAW
15           1300 Perdido Street
             Suite 5E03
16           New Orleans, Louisiana  70112
             (James.Roquemore@nola.gov)
17
     REPRESENTING DERRICK BURMASTER:
18
             GUSTE, BARNETT, SCHLESINGER & ALPAUGH
19           BY:  C. THEODORE ALPAUGH, III,
             ATTORNEY AT LAW
20           639 Loyola Avenue
             Suite 2130
21           New Orleans, Louisiana  70113
             Representing Derrick Burmaster
22           (cta@gustebarnett.com)
23   Reported By:
24           Sandra P. DiFebbo
             Certified Shorthand Reporter
25           State of Louisiana
26
```

1

2     E X A M I N A T I O N          I N D E X

3

4                                         Page

5   BY MR. MOST:                          5, 96

6   BY MR. ROQUEMORE:                     94

7

8

9

10    E X H I B I T          I N D E X

11

12                        Page

13

14   Plaintiff's Exhibit 7              20

15   Plaintiff's Trial Exhibit 12      93

16   Plaintiff's Trial Exhibit 13      44

17   Deposition Exhibit 51             37

18   Deposition Exhibit 52             66

19   Deposition Exhibit 53             86

20   Deposition Exhibit 54             95

21   Deposition Exhibit 55             93

22   Plaintiff's Exhibit 68            59

23

24

25

1                S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of SERGEANT DAVID A. BARNES,

6    individually and as the 30(b)(6) representative of

7    the City of New Orleans, is hereby being taken

8    pursuant to the Federal Rules of Civil Procedure

9    for all purposes in accordance with law;

10              That the formalities of reading and

11   signing are specifically waived;

12              That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15              That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20                   * * * * *

21              Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the witness

24   remotely.

25

```
 1              SERGEANT DAVID A. BARNES, 1615 Poydras
 2         Street, Suite 1851, New Orleans, Louisiana
 3         70112, having been first duly sworn, was
 4         examined and testified on his oath as follows:
 5    EXAMINATION BY MR. MOST:
 6         Q.   Good afternoon, Sergeant Barnes.  How are
 7    you?
 8         A.   I'm good.  How are you? Good afternoon.
 9         Q.   And your rank is Sergeant?
10         A.   Yes.
11         Q.   Sergeant, could you give us your full
12    name and business address for the record?
13         A.   I'm Sergeant David Barnes.  That is
14    D-A-V-I-D.  Middle initial is A, for Alan, and
15    Barnes, B-A-R-N-E-S.
16              THE WITNESS:
17                   I'm not sure if you had an objection
18                or something.
19              MR. ROQUEMORE:
20                   I just wanted to make a note for
21                this deposition.  David Barnes,
22                Sergeant Barnes, is also being offered
23                as a supplemental 30(b)(6) witness on
24                the issue of training.  Thank you.
25                That's all I needed to say.
```

1           THE WITNESS:

2                And my business address is 1615

3                Poydras Street.  That's New Orleans,

4                Louisiana.  It's Suite 1851.  I believe

5                the Zip code is 70112.

6    BY MR. MOST:

7           Q.   Sergeant Barnes, you understand that

8    today you are speaking as a representative on

9    behalf of the city itself?

10          A.   I do.

11          Q.   So you understand that because of that,

12   normally, "I don't know" is a perfectly acceptable

13   response in a deposition, but that may not be true

14   when you are speaking on behalf of the city itself,

15   correct?

16          A.   Correct.

17          Q.   And the topic that you are prepared to

18   speak on behalf of the city is about the city's

19   training with regards to NOPD officers interacting

20   with dogs?

21          A.   That's correct.

22          Q.   Sergeant Barnes, you've given a number of

23   depositions in the past, correct?

24          A.   I have.

25          Q.   So you understand that you're under oath

1  today?

2      A.    I do.

3      Q.    And that your answers here today have the

4  same force as if we were in a courtroom with a

5  judge and jury?

6      A.    Yes, sir.

7      Q.    Is there anything, whether it's

8  medication, fatigue, substances, illness, anything

9  else that will prevent you from understanding my

10 questions and answering them truthfully and

11 completely?

12     A.    No, sir.

13     Q.    Obviously, as you know, we can take a

14 break at any time; although, I will tell you now

15 that I will ask you after any break who you talked

16 to and what you reviewed.  So I'll tell you that in

17 advance.  All right?

18     A.    Yes, sir.

19     Q.    And if I ask you a question that you

20 don't understand -- if I ask you a question that

21 you don't understand or is not clear, would you

22 agree now to tell me that's the case rather than

23 just trying to answer it?

24     A.    Yes, sir.

25     Q.    And because this is a Zoom deposition, I

1  may not be able to see everything that happens in

2  your room.  So who is currently in the room with

3  you?

4       A.   So currently in the room is myself and

5  Mr. James Roquemore.

6       Q.   Will you agree now to tell me whether

7  Mr. Roquemore or anybody else tries to communicate

8  with you other than verbally so that we can hear

9  it, whether it's by hand signals, physical signals,

10  a note, or anything else along those lines?

11       A.   Yes, sir.

12       Q.   And what is your understanding of the

13  case that you are here to testify about today?

14       A.   So my understanding is this is an

15  incident that involved a NOPD officer, specifically

16  Derrick Burmaster, using force in shooting an

17  animal, a canine, a dog, that belonged to Derek and

18  Julie Brown.

19       Q.   When did you start, roughly, preparing

20  for this deposition?

21       A.   Sometime in the last week or so.

22       Q.   Roughly, how much time total did you

23  spend preparing for this deposition?

24       A.   Probably somewhere in between two and six

25  hours or so.

1      Q.    What did you do to prepare for this

2  deposition?

3      A.    I reviewed our Daily Training Bulletins,

4  the records of our Daily Training Bulletins from, I

5  believe, May of 2017 and October of 2019, and the

6  training that was instructed for officers to take.

7  It was, I guess, a reference material for those

8  questions and those tests.  I also consulted with

9  members of our academy just to see if there was any

10  other additional training that the academy had put

11  on regarding officers' encounters with dogs.

12      Q.    Who did you consult with at the academy?

13      A.    I spoke briefly with Chief Dwayne

14  Johnson.

15      Q.    Anybody else?

16      A.    So I called Sergeant Palmer to find out

17  who I should talk to about the training that took

18  place in 2016 or '17, around the time, or who would

19  have an idea, and she pointed me to Chief Johnson.

20      Q.    Anybody else?

21      A.    No.

22      Q.    So in terms of records that you reviewed,

23  you reviewed records about Daily Training

24  Bulletins?

25      A.    I did.

1      Q.    Did you review -- so those would have

2    been e-mails that went out to officers about

3    updates to training?

4      A.    So the Daily Training Bulletins

5    themselves are usually a series of questions.

6    Generally, at the time, it was about 20 questions.

7    The officers had to log into a learning management

8    system and actually take a test and score at least

9    an 80 percent or above on it to get a passing score

10   to get credit for the training.  Those questions

11   would be based on either policy or like an online

12   video or training or something that they had to go

13   through, and then they were quizzed on that.

14     Q.    The Daily Training Bulletin you found was

15   the one from May of 2017 that referred to ASPCA

16   videos?

17     A.    I believe the 2017 -- the May of 2017

18   referred to ASPCA videos, and the October of 2019

19   referred to, as reference material, a PowerPoint

20   they would put together.

21     Q.    So in addition to those two Daily

22   Training Bulletins, did you find any -- did you

23   review any other documents?

24     A.    No.

25     Q.    And so those two documents comprised the

```
1    entirety of --
2         A.   Oh, I did -- I'll take that back.  I did
3    review our Chapter 1.3, our Use of Force Policy,
4    and I believe Chapter 41.34, which is a policy
5    regarding responding to calls about animals
6    specifically.
7         Q.   Any other documents you reviewed?
8         A.   No.
9         Q.   Did you review any documents related to
10   the facts of this case?
11        A.   So I was involved sitting on as a policy
12   input member for the Use of Force Review Board when
13   this case was originally heard by the Use of Force
14   Review Board, but other than that, no.
15        Q.   So you have a recollection of some of the
16   facts of the case from the Use of Force Review
17   Board, but you didn't review any other documents to
18   prepare for this deposition?
19        A.   Correct.
20        Q.   Were you also present at the chiefs'
21   hearing?
22             MR. ROQUEMORE:
23                  Objection, form.
24             THE WITNESS:
25                  So I have to go back and look.  I
```

```
 1              don't know if I was.  When you talk
 2              about the chief's hearing, you mean the
 3              disciplinary hearing?
 4          MR. MOST:
 5              Yes.
 6          THE WITNESS:
 7              I don't remember if I was present at
 8              the chief's hearing.  I'm usually
 9              present at several chief's hearings,
10              but I don't have the occasion to attend
11              them all.
12  BY MR. MOST:
13      Q.   So in terms of the universe of documents
14  that you reviewed to prepare for this deposition,
15  it's the two training documents, one from 2017, one
16  from 2019, and then two sections of NOPD's policy
17  video, correct?
18          MR. ROQUEMORE:
19              Objection, form.
20          THE WITNESS:
21              So there is -- in the May 2017 and
22              the October there is more than a single
23              document for each one.  There is actual
24              like tests itself, the questions and
25              the results.  And then in the 2019
```

1              there is, obviously, also, the

2              PowerPoint.  So I reviewed that.  I

3              reviewed the e-mail that had been sent

4              out providing instructions for the May

5              2017 DTB and the two chapters.

6    BY MR. MOST:

7         Q.   Okay.  For the May 2017 DTB, did you

8    review the videos themselves?

9         A.   I did not.

10        Q.   So then is it fair to say that the

11   entirety of NOPD's training regarding interacting

12   with dogs in the field consists of the May 2017

13   e-mail DTB, the videos associated with that, the

14   test associated with that, and then May 2019 a

15   PowerPoint and then a test associated with the

16   PowerPoint; is that accurate?

17             MR. ROQUEMORE:

18                  Objection, form.

19             THE WITNESS:

20                  So I wouldn't say that's 100 percent

21             accurate.  I would say the DTBs

22             themselves are some of the training,

23             but NOPD also puts all their recruits

24             through training, actually, in-

25             classroom training regarding responding

```
 1              to animals and dealing with dogs on

 2              scenes, things like that.

 3   BY MR. MOST:

 4      Q.    Would that be during the academy or

 5   during inservice training?

 6      A.    It's during the academy.

 7      Q.    Did you review what the training is

 8   during the academy?

 9      A.    I did not review exactly what the

10   training is during the academy.  I know it's

11   changed over the years.  It was taught specifically

12   by members of Louisiana SPCA for a time, and now

13   it's transitioned to an online module.

14      Q.    Do you know anything about the contents

15   of the academy training at any time for NOPD?

16      A.    I don't know the specifics of the

17   contents of the academy training, just that it is

18   the -- it is now a DOJ and COPS training through an

19   online training that they do that is, I think, five

20   modules.

21      Q.    Is there also inservice training about

22   interacting with dogs other than the DTBs?

23      A.    I do know that this year is, and it's

24   another set of online courses through the DOJ COPS

25   portal.
```

1    Q.   Prior to this year, has there been any
2  inservice training other than the DTBs related to
3  officer interaction with dogs?
4    A.   To the best of my memory, I believe there
5  was at one point, but I wasn't able to find any
6  records indicating that it took place in inservice.
7    Q.   So based on your investigation into
8  NOPD's training about officers interacting with
9  dogs, prior to 2025, that consisted of some academy
10  training, but you're not sure of the contents of
11  it, and then DTBs or associated documents and a
12  test in 2017 and 2019; is that correct?
13    A.   That's correct.
14    Q.   Have you brought any documents to today's
15  deposition?
16    A.   I have not.
17    Q.   Did you take any notes to prepare for
18  today's deposition?
19    A.   I did not.
20    Q.   What is your job title currently?
21    A.   Currently I'm a sergeant in charge of our
22  Legal Research and Planning Division, which
23  encompasses all of our Daily Training Bulletins.
24  Just to clarify, you'll hear me sometimes use the
25  term maybe, "Departmental Training," because it has

1    transitioned at one point from being Daily Training
2    Bulletins to Departmental Training Bulletins, but
3    they are DTBs.  When I say that, it's the same
4    thing. Our legal instruction.  So I receive the
5    legal instruction to deal with a lot of our
6    emergency planning, specifically our natural
7    disaster stuff and our EOC A-line and am in charge
8    of all of our policy and procedures.
9          Q.    Sergeant, you are a licensed attorney?
10         A.    I am.
11         Q.    In terms of your interaction with the
12   facts of this case, you were not a direct witness
13   to the shooting, correct?
14         A.    No.  I learned about the shooting after
15   the fact but was not involved in the investigation
16   or ever went on the scene.
17         Q.    Are you familiar with Sergeant
18   Duplantier?
19         A.    I am.
20         Q.    Are you aware that he, also, earlier in
21   this case, testified about NOPD's training
22   regarding dogs?
23         A.    I am aware that he was subpoenaed to
24   testify.  I don't know what the contents of his
25   deposition was or his testimony.

1      Q.    Do you know if he is generally more

2    knowledgeable about NOPD's training than you are or

3    if you are more knowledgeable than he is?

4      A.    Well, it depends on the areas.  For

5    example, the DTBs are actually run out of my unit,

6    and so they're created and pushed out to the

7    department through -- well, it was at the time

8    Policy and Planning and is now Legal Research and

9    Planning, whereas, the actual recruit training he

10   would be more familiar with as a -- he is a recruit

11   commander and has been at our academy.  As a matter

12   of fact, he has been assigned to our academy for a

13   large number of years.  So when it comes to the

14   actual training that takes place at the academy,

15   specifically with the recruits, he would have a lot

16   of knowledge on that aspect of it, whereas, I

17   wouldn't expect him to have much knowledge, if much

18   at all, of the workings of the Departmental

19   Training Bulletins, the DTBs.

20     Q.    When you attended -- so you were not a

21   witness to the shooting.  You attended the Use of

22   Force Review Board hearing where information about

23   the shooting was presented to the Use of Force

24   Review Board, correct?

25     A.    That's correct.

1          Q.    So you've seen the video, the body camera

2     video, of the shooting?

3          A.    I have.

4          Q.    Did you review at that time the PIB and

5     ASI investigation report?

6          A.    I believe I reviewed the ASI at the time

7     that they had the Use of Force Review Board or in

8     the days leading up to it.

9          Q.    You understand that the dog that

10    Burmaster shot was a puppy?

11              MR. ROQUEMORE:

12                   Objection, form.

13              THE WITNESS:

14                   So I understand that the dog that

15              Burmaster shot was approximately, I

16              believe, four months old around then.

17    BY MR. MOST:

18         Q.    Would you characterize a four-month-old

19    dog as a puppy?

20         A.    I would.  I mean, I tend to think of most

21    dogs as puppies.  I believe they're still in that

22    puppy stage at four months old.

23         Q.    So Burmaster shot a dog that, in your

24    characterization, would be a puppy?

25         A.    Well, it would be a young dog for sure.

1       Q.   A puppy?

2       A.   I mean, a four-month-old dog would be a

3   puppy then, yes.

4       Q.   In your understanding, your use of the

5   word "puppy," a four-month-old dog is a puppy,

6   right?

7               MR. ROQUEMORE:

8                    Objection.  He already answered.

9                 Asked and answered.

10              THE WITNESS:

11                   So I would characterize a four-

12               month-old dog as being juvenile in the

13               fact that they are a puppy, yes.

14   BY MR. MOST:

15      Q.   This puppy was about 18 inches tall and

16   about 22 pounds.  Does that match your

17   recollection?

18      A.   I don't know the specifics of the size of

19   the dog.

20      Q.   Do you recall that the dog was about the

21   size of a large cat?

22      A.   Again, I don't know the specifics of the

23   size of the dog, and just characterizing it as

24   being a puppy, with the different types of dog

25   breeds, I don't know.  You know, there is a very

1    big difference between a four-month-old Chihuahua

2    and a four-month-old Mastiff, right, as far as size

3    goes.  Specifically on this dog, I don't know the

4    exact size of the dog or have any indication of how

5    big the dog was exactly.

6         Q.   Okay.  I'd like to show you a photo of

7    the dog.  I think the best photo that shows sort of

8    the size of it at the time of its death is a photo

9    taken after its death.  There is some blood in the

10   photo.  Will it bother you if I show you that

11   photo?

12        A.   No.

13        Q.   I'm pulling up what is Plaintiff's

14   Exhibit 7 for trial exhibits.  Do you see that this

15   is a photo of the dog, and there is flagstones and

16   a human foot for scale?

17        A.   You broke up on the last part.  You said

18   a photo of what?

19        Q.   Sorry.  A photo of the dog with

20   flagstones and a human foot for scale.

21        A.   I see that, yes.

22        Q.   Would you agree that this dog is about

23   the size of a large cat?

24        A.   So without making comparisons, you can

25   see that it is not the largest of dogs, right, in

1  this photo, compared to the human foot.  Just

2  looking at the size of the head of the dog, it

3  looks like the head would be about the size of half

4  of the foot, so that -- I mean, if you compare it

5  to a large cat, I still don't know the exact size

6  of it, but I would say it is safe to compare to a

7  similarly situated animal in size.  Whether that's

8  a large cat or another style dog, I think that

9  would be a reasonable comparison to make.

10     Q.  The officer could use their taser to

11  repel a dog like the one we see in this picture,

12  correct?

13     A.  So certainly an officer has the option to

14  be able to use the taser, but it's not always

15  effective.

16           MR. MOST:

17                We lost Jim.  One second.

18           THE WITNESS:

19                He said y'all can continue.  He is

20             back in now.

21  BY MR. MOST:

22     Q.  A taser could be an effective weapon to

23  repel a dog of this size, even though, of course,

24  there is no guaranty that it would be effective,

25  agreed?

1    MR. ROQUEMORE:

2        Objection, form.

3    THE WITNESS:

4        The issue with using a taser, and

5        specifically at the time we were using

6        what is the X26 model of the taser, and

7        it fires two prongs at once.  Those

8        prongs spread out the further away they

9        get from the officer, so the likelihood

10       of both prongs actually making contact

11       with a moving animal of that size is

12       slim, if it's fired rapidly.  So would

13       a taser be effective if it were able to

14       make contact?  Absolutely, but is there

15       a guaranty that it's going to be able

16       to make contact and actually do what

17       it's intended to do in stopping the

18       advance of the dog, there is no

19       guaranty in that.

20   BY MR. MOST:

21       Q.    Okay.  An officer could use their boot to

22   kick a dog this size out of the way and repel it,

23   correct?

24       A.    So, again, there is no guaranty it would

25   be effective, right.  Let's say an officer were to

1    lose their own balance when trying to kick at a dog

2    and falls, and now they open themselves up for a

3    more dangerous attack, if they were being attacked,

4    right.  Now, there is also no guaranty that a dog

5    would not be able to bite through that officer's

6    boot, right.  So, again, is it an option? Well, of

7    course, it's an option.  Would it be effective?

8    There is no guaranty.

9        Q.    Sure.  No guaranty, but it is plausibly

10   effective that kicking a dog this size could be a

11   way to repel it, correct?

12       A.    I think there is a number of plausible

13   ways of potentially repelling a dog, but there is

14   also no guaranty that any of them will be

15   effective, right.

16       Q.    Right.  There is no guaranty that a

17   firearm would be effective, because you might miss

18   or you might wound the dog in a way that doesn't

19   repel it, correct?

20       A.    That also could be construed that way,

21   yes.

22       Q.    So in terms of plausible tools for

23   repelling a dog this size, those plausible tools

24   would include a taser, a boot, a gun, a baton,

25   agreed?

1      A.    I think any number of those tools could

2    be available to the officer, yeah.

3      Q.    Given that there are a range of plausible

4    tools available to an officer to repel a dog this

5    size, shooting and killing it would not be

6    unavoidable, agreed?

7              MR. ROQUEMORE:

8                  Objection.

9              THE WITNESS:

10                 I'm sorry.  Can you repeat it one

11              more time?

12    BY MR. MOST:

13      Q.    Sure.  Subject to the same objection,

14    given that there are a range of plausible tools

15    that an officer could use to repel a dog of this

16    size, including a taser, boot, shooting and killing

17    the dog would not be unavoidable, agreed?

18      A.    So I don't necessarily agree just because

19    it's a case-by-case basis, right.  When we talk

20    about a reasonableness and response for the use of

21    force, there is so many other factors that come

22    into play during those circumstances.  We could

23    argue any manner of force used on a dog could be an

24    avoidable one.  It really comes down to whether or

25    not the manner used was reasonable when we're

1    making a determination about evaluation, right.

2        Q.    Okay.  So I get that you don't want to

3    make categorical statements, because every

4    situation is different, right, so let's talk

5    specifically about this situation.  Burmaster

6    shooting and killing this dog was not unavoidable

7    agreed?

8            MR. ROQUEMORE:

9                Objection, form.

10           THE WITNESS:

11               So one of the things that we do when

12             we evaluate use of force is really see

13             what other outcomes could have happened

14             if, in that scenario, you know,

15             officers had taken other steps or

16             subjects had taken other steps.  That's

17             one of the things we do when we review

18             use of force, is to determine if there

19             are policy tactics or training that

20             could have been better suited to avoid

21             it, because, realistically, if you

22             approach every use of force as if it

23             was avoidable, which is sort of how we

24             do it, then it gives you a better idea

25             of what you can do in the future to

1              avoid other similar uses of force.  So
2              by that rationale then, yes, pretty
3              much any use of force could be avoided.
4   BY MR. MOST:
5       Q.   Okay.  So Officer Burmaster's shooting of
6   this dog was avoidable, agreed?
7              MR. ROQUEMORE:
8                   Objection, form.  Misstates what he
9              just said.
10             THE WITNESS:
11                  So if any use of force technically
12             could be avoidable, then, yes, Officer
13             Burmaster's use of force also could
14             have been avoidable.
15  BY MR. MOST:
16      Q.   Setting aside the technical use of the
17  term, you said there in the sense that every use of
18  force is avoidable, I mean, some uses of force are
19  avoidable, unavoidable, in the way we commonly use
20  those words, right?
21             MR. ROQUEMORE:
22                  Objection, form.
23             THE WITNESS:
24                  I'm not quite sure I understand the
25             question.

```
 1   BY MR. MOST:
 2        Q.   Sure.  If an officer is confronted by a
 3   suspect who is ten feet away, pointing a gun at the
 4   officer, and saying, "I'm about to shoot you,"
 5   shooting that person would be unavoidable in the
 6   common use of the word, right?
 7        A.   Not necessarily, and that's the real like
 8   fluid concept of a use of force, right.  You would
 9   have to go back and look at all of the tactics that
10   led up to the moment where the officer -- whether
11   that person or that subject is ten feet away
12   pointing a gun at the officer, and how it could
13   have been potentially approached differently to
14   avoid it, right.  That's sort of what we do in use
15   of force investigations and use of force review, is
16   see what other policy, trainings, or tactics we can
17   strive to implement to avoid another type of use of
18   force that was similar in nature, right.  Now, I
19   think we sort of conflate it, because we don't
20   review force as if it was avoidable or unavoidable.
21   We review it as if it is reasonable.  So the
22   question then becomes would it be reasonable to
23   shoot somebody who is ten feet away and pointing a
24   gun at you.  I think most individuals in that
25   circumstance would believe it would be reasonable
```

1  to use deadly force in that situation.  Whether or

2  not it's avoidable or unavoidable begs a much

3  deeper review of the facts and circumstances.

4      Q.   Okay.  So I get that you don't want to

5  say that is avoidable in that context, but --

6  unavoidable, but what about a suspect who is 200

7  feet away and unarmed?  Shooting that suspect using

8  lethal force would be avoidable, agreed?

9      A.   I think shooting that suspect would

10 probably be unreasonable, which anything that is

11 unreasonable would most clearly be avoidable.

12     Q.   So using that understanding of the term,

13 was Burmaster's shooting of this dog, in your

14 understanding, avoidable or unavoidable?

15          MR. ROQUEMORE:

16              Objection, form.

17          THE WITNESS:

18              Using the context that unreasonable

19           means avoidable, is that what you're

20           asking? Because I don't think the two

21           go hand-in-hand.

22 BY MR. MOST:

23     Q.   Just the way you use the word "avoidable"

24 or "unavoidable," in your common language, whether

25 it completely maps onto the reasonableness

1    standard, was this an avoidable shooting of a dog
2    or an unavoidable one?
3                    MR. ROQUEMORE:
4                        Objection, form.
5                THE WITNESS:
6                        So this is, again, where we sort of
7                    have to differentiate behind it.  Just
8                    because something is avoidable doesn't
9                    mean that it's unreasonable, right.  So
10                   I would argue that most shootings in
11                   some way, shape, or fashion, almost all
12                   of them, are avoidable, right.
13                   Certainly that would make Burmaster's
14                   shooting of the dog a potentially
15                   avoidable incident, right, but that
16                   doesn't make it unreasonable based on
17                   the fact that it may have been
18                   avoidable.  Does that make sense?
19   BY MR. MOST:
20       Q.   Yeah.  I agree.  I'm not asking you about
21   reasonableness generally, but when you're saying
22   this was -- setting aside general reasonableness,
23   this was an avoidable shooting of a dog, agreed?
24                MR. ROQUEMORE:
25                        Again, objection.  Asked and

```
1              answered.
2              THE WITNESS:
3                   So, again, I think it would have
4              been avoidable depending upon
5              circumstances, right.  Just like every
6              shooting would be avoidable depending
7              upon the circumstances.
8    BY MR. MOST:
9         Q.   Sergeant, would you have shot this dog?
10             MR. ROQUEMORE:
11                  Objection, form.
12             THE WITNESS:
13                  I don't know.  I can't say, having
14             not been in the position or in the --
15             without the perception of the officer
16             in that position, I don't know whether
17             I would or would not have shot.
18   BY MR. MOST:
19        Q.   Do you think this dog was an immediate
20   danger to the officer?
21        A.   Again, it's hard to tell from just the
22   video of it, without being in the shoes of the
23   officer at the time, whether or not I would have
24   perceived the dog as a danger, right.
25        Q.   Setting aside perception, I mean, you see
```

1    this dog.  Is this dog -- a dog this size, is a dog

2    that size an immediate danger to an officer that is

3    running towards an officer?

4        A.   So I think that varies on the facts and

5    circumstances of everything that go on.  Any kind

6    of case, a case-by-case basis.  Now, generally,

7    would we perceive a smaller dog as a threat?  I

8    think generally individuals don't perceive smaller

9    dogs as threats all the time, but, again, it goes

10   back to the facts and the circumstances of the

11   officer in that position on whether or not they saw

12   what they believed to be a threat, an immediate

13   threat.

14       Q.   You were part of PIB for many years,

15   correct?

16       A.   Correct.

17       Q.   And PIB, in addition to assessing whether

18   an officer perceived danger, would also assess

19   whether there was actually danger to the officer,

20   right?

21       A.   So as part of an assessment, it depends

22   on the circumstances, but it's hard to perceive --

23   it's hard to make a determination if there is an

24   actual threat sometimes when you aren't there in

25   the position of the officer at the time, right.

1    And so through the investigations that I've had,

2    we've learned that body camera footage or

3    surveillance camera footage isn't always going to

4    capture what the officer can see in realtime with

5    his eyes.  The same way the eyes aren't always

6    going to capture everything that the camera might

7    capture.  It is only with the benefit of hindsight

8    that we can look at those and make a determination

9    by maybe seeing something that the officer didn't

10   see or realize at the time.

11        Q.   In your opinion, was this a reasonable

12   shooting?

13             MR. ROQUEMORE:

14                  Objection, form.  Calls for a legal

15               conclusion.

16             THE WITNESS:

17                  I would have to review more of the

18               case and the facts and circumstances to

19               come to a solid conclusion on whether

20               or not I believed it was justified. Not

21               having reviewed enough of the facts of

22               the case itself, I don't think I can

23               make that conclusion.

24   BY MR. MOST:

25        Q.   Well, you sat through the entire

1   presentation of the video and the facts at the Use

2   of Force Review Board hearing, right?

3        A.   A while ago when it occurred, correct.

4        Q.   Do you recall your impression at the

5   time?

6        A.   Not specifically.  My role at the Use of

7   Force Review Board hearing is whether or not there

8   is policy that is lacking or policy that governs

9   the actions of the officer in that situation.  It's

10  all for input on that.  If there is anything that

11  is being interpreted incorrectly or needs

12  interpretation in the policy.  So I don't recall

13  any specific impression as to the justification

14  from my side of it but strictly as to the policy

15  portions of it.

16       Q.   Okay.  So you are certainly not saying

17  this was a justified shooting, agreed?

18       A.   So I can agree with it.  I'm not saying

19  it's justified or not justified.  I just have not

20  reviewed the facts in-depth enough to be able to

21  make that determination.

22       Q.   Okay.  Do you recall at any point in your

23  career as an officer expressing a fear that a dog

24  would bite him in the penis?

25       A.   I do not except for at the Use of Force

1   Review Board in this specific case.

2        Q.   A dog this height would have to jump into

3   the air to bite any standing person in the penis,

4   right?

5             MR. ROQUEMORE:

6                  Objection, form.

7             THE WITNESS:

8                  So, again, going back to the size of

9                the dog itself, and I don't know the

10               exact size of the dog in comparison to

11               the officer, so to speak.  There is a

12               number of other factors that come into

13               play on whether or not the dog would be

14               able to easily reach the penis of the

15               officer that it is confronting.

16  BY MR. MOST:

17       Q.   Okay.  You heard Burmaster express that

18  part of the reason he says he shot this dog was the

19  fear that it would bite him in the penis?  Do you

20  recall that?

21       A.   So that was brought up at the review

22  board.  I did not hear it from Burmaster, but I

23  heard it from the investigators at the Use of Force

24  Review Board.

25       Q.   Does that strike you as a credible

1    statement?

2        A.    So I think the fear of being bitten

3    anywhere could be a credible statement.  The fact

4    that he specifically pointed out his penis strikes

5    me as odd but does not -- realistically, it could

6    be any portion of his anatomy for the fear of

7    getting bit.  I think the specifics of that portion

8    tend to diminish from the statement that the fear

9    was of getting bit, right.

10       Q.    Yeah.  Does it strike you as a statement

11   that an officer makes to sort of amp things up to

12   justify their use of force?

13             MR. ROQUEMORE:

14                  Objection.  If you know.

15             THE WITNESS:

16                  I don't know that an officer would

17                specifically say that to "amp" up the

18                justification for use of force, because

19                it wouldn't matter if that's where they

20                were going to get bit or if they were

21                going to get bit in the leg or anywhere

22                else.  It would still be one of the

23                facts under the use of force that they

24                were going to get bit, and you could

25                equate it to I was worried about

```
 1                    getting shot in my penis, right.  I do
 2                    worry about getting shot, period.  It
 3                    wouldn't matter where, right.  I would
 4                    equate the same thing to receiving a
 5                    dog bite.
 6      BY MR. MOST:
 7          Q.   If an officer said I shot this person
 8      because I was afraid they were going to shoot me in
 9      the penis, you would find that to be an odd
10      statement that diminishes that officer's
11      credibility, correct?
12                MR. ROQUEMORE:
13                    Objection, form.
14                THE WITNESS:
15                    Not necessarily diminishes their
16                    credibility, but it is almost like, for
17                    lack of a better term, a red herring,
18                    right.  What matters in the statement
19                    from the perception side of it is more
20                    of the fact that the officer thought
21                    they were going to get shot, not
22                    specifically where.
23      BY MR. MOST:
24          Q.   At any point in your career, have you
25      heard about packs of wild dogs roaming New Orleans
```

1  and threatening people?

2      A.   So I know we've had -- in the past, I

3  believe, we've had packs of stray dogs in certain

4  areas of New Orleans.  I don't know any specific --

5  well, I have no evidence of any specific threats of

6  stray dogs other than we have had in the past packs

7  of stray dogs roaming in areas of New Orleans.

8      Q.   Ever heard of any packs of stray dogs in

9  Uptown New Orleans?

10     A.   I have not.

11     Q.   Sergeant, are you familiar with the Fifth

12 Circuit case from last year, Killian v. Ramirez?

13     A.   Not specifically, no. The name sounds

14 familiar, but.

15     Q.   This is Deposition Exhibit 51.  You see

16 that this is a Fifth Circuit case from -- Federal

17 Fifth Circuit case from 2024?

18     A.   I do.

19     Q.   Do you see on Page 429 the Court holds,

20 "Therefore, 'consistent with every other circuit

21 court to have addressed the issue,' we recognize

22 that the 'killing of a pet dog could be a

23 seizure.'"  Then it goes on, "Such a seizure is

24 reasonable only if the dog 'poses an immediate

25 danger and the use of force is unavoidable.'"  Do

1    you see that?

2         A.    I do.

3         Q.    You see that it says this law was clearly

4    established as of the facts of this case?  As of

5    the time of the facts of this case?

6         A.    I see that, yes.

7         Q.    Do you see that the facts of this case

8    occurred in 2016?

9         A.    Yes.  I see that.

10        Q.    Has NOPD changed its training or policies

11   in any way to respond to Ramirez versus Killian?

12              MR. ROQUEMORE:

13                   Objection, form.

14              THE WITNESS:

15                   So what we train, especially through

16                the DTBs, is consistent with really

17                shooting a dog should be done as a last

18                resort, which I think you can pull it

19                into the same kind of context as they

20                have to pose an immediate danger, and

21                the use of force is unavoidable, right.

22   BY MR. MOST:

23        Q.    So when you say a last resort, meaning an

24   officer should not shoot a dog if there is other

25   plausible, nonlethal mechanisms for deterring the

1    dog, agreed?

2        A.    If they had the opportunity, and in that

3    split-second decisionmaking of the officer, it

4    would be reasonable.

5        Q.    So if there is a dog that an officer can

6    plausibly deter by kicking it, then the officer

7    shouldn't jump straight to shooting it, agreed?

8            MR. ROQUEMORE:

9                Objection, form.

10           THE WITNESS:

11                So if there is another reasonable

12               step that the officer would be able to

13               take at the moment in time, we would

14               certainly want the officer to take that

15               other option, right.  Whether that's

16               kicking it, whether it's using a baton

17               or anything like that.  As long as

18               there is time to be able to make that

19               transition or take that action, right.

20   BY MR. MOST:

21       Q.    It takes about as long to decide to shoot

22   a gun as it does to decide to kick, agreed?

23           MR. ROQUEMORE:

24                Objection, form.

25           THE WITNESS:

```
 1                I think that, again, varies,
 2           depending on the circumstances and the
 3           person and the training of that person
 4           or the -- specifically, when I say
 5           training, like their transitioning
 6           capabilities, right.  How comfortable
 7           they are with whatever option they
 8           choose to take or could choose to take.
 9                There is so many other factors that
10           go into that decisionmaking, and part
11           of it being that it is often a split-
12           second decision under rapidly evolving
13           tense and uncertain circumstances,
14           right.  So I don't know that I can even
15           say that it would take the same amount
16           of time because that process varies
17           from person to person and from
18           situation to situation.
19      BY MR. MOST:
20           Q.   Okay.  So is sounds like the answer is
21      no, NOPD has not changed its policies in response
22      to Ramirez v. Killian.  Is that accurate?
23                MR. ROQUEMORE:
24                     Objection, form.
25                THE WITNESS:
```

1                    So to my knowledge, the policy may

2              not have required an update to be in

3              line with Ramirez v. Killian, because

4              the policy already points to it should

5              be most of, really, an unavoidable or

6              last resort, because there is so many

7              other factors that come into play when

8              shooting a firearm, right.

9    BY MR. MOST:

10        Q.   So it sounds like the answer is NOPD has

11   not changed its training in response to Ramirez v.

12   Killian, and that may be because its policy and

13   trainings are already consistent with Ramirez v.

14   Killian, agreed?

15        A.   So I would agree that I think that our

16   policy and training -- our policy and training has

17   been, specifically the training and the policy, are

18   constantly evolving, right.  They're constantly

19   being updated, specifically whether or not it's in

20   response to Ramirez v. Killian or other factors or

21   updates and input from the DOJ, things like that.

22   We see that with the training from 2017 based on

23   the SPCA to the training of 2019 that was based on

24   the DOJ training to the inservice training this

25   year that is based on the updated DOJ and COPS

1    training.

2        Q.   So when you say the training was being

3    constantly updated, at least with regard to dogs,

4    interaction with dogs, it's been updated three

5    times in eight years?

6        A.   At least three times in eight years.  The

7    training -- when I talk about that, I talk about

8    specifically the DTBs and inservice training,

9    right, has been updated.  Now, as far as the

10   recruit training, the recruit training is updated

11   regularly, and it depends on a number of things,

12   like what POST requires from Louisiana.  So I

13   believe that Sergeant Duplantier would speak better

14   to the updates on recruit training.  I can tell you

15   it's been at least three times as far as the DTBs

16   and inservice training.

17       Q.   But you don't know anything about the

18   content of the academy training, right?

19       A.   I don't know anything about the content

20   of the current recruit training on response to

21   animals.

22       Q.   Do you know anything about the content of

23   the recruit training at any time?

24       A.   I do.

25       Q.   Because you took it when you were in the

1  academy?

2      A.   Well, I took it, but I'm also responsible

3  for overseeing the legal instruction.

4      Q.   Do you know anything about the content of

5  -- well, let me ask you.  What do you know about

6  the content of the academy training with regard to

7  responses to dog bites?

8      A.   I know that it has been updated to

9  include the latest DOJ COPS online training, which

10 is now also the same training that all the officers

11 get in inservice this year.  Other than that, I

12 know that at the time that I had gone through the

13 academy, it did involve members of the Louisiana

14 SPCA, and we've transitioned more into the DOJ COPS

15 programs.

16     Q.   When did you go through the academy?

17     A.   In 2006. End of 2006, beginning of 2007.

18     Q.   So you know, roughly, what was the

19 academy training in 2006, 2007.  You know what it

20 is now, but you don't know anything about what it

21 was in between those dates, correct?

22     A.   My understanding is that it was pretty

23 consistent.  It's only been expanded and expanded.

24 For example, at the time in 2006, 2007, we focused

25 mostly on POST and what -- Louisiana Peace Officers

1    Standards in Training, which is POST council

2    required, and as a result of several other programs

3    that have come through, including, obviously, the

4    consent decree.  The academy has expanded to be

5    approximately 25 to 26 weeks of training at this

6    point.  It's over 900 hours of in-seat time.

7        Q.    But I am specifically talking about

8    officers' interaction with dogs, training about

9    that.  Do you know anything about that in between

10   when you took it in 2006 to 2007 and the present?

11       A.    I don't know any of the specifics other

12   than at some point it transitioned from the SPCA to

13   the online DOJ COPS training.

14       Q.    Does NOPD have a copy of the content of

15   the SPCA training?

16       A.    Again, that's something that the academy

17   would have.  I imagine if there was a lesson plan

18   on it, they may have a copy of that lesson plan.

19   If it was the ASPCA training, then it would have

20   been found from the ASPCA.

21       Q.    Do you see this, which is Plaintiff's

22   Trial Exhibit 13, a printout of a PowerPoint

23   entitled, "The Problem with Dog-Related Incidents

24   and Encounters?"

25       A.    I see that.

1      Q.   So is this the content of the May 2019
2 DTB?
3           MR. ROQUEMORE:
4                Objection to form.  This is a
5           Plaintiff's Bates numbered exhibit.  If
6           I could show him the defendant's
7           exhibit to compare, perhaps.  Maybe he
8           could give an answer to that.
9           MR. MOST:
10               Sure.  What is the Bates on the
11          defendant's --
12          MR. ROQUEMORE:
13               But you can answer, if you can.
14          THE WITNESS:
15               Without reviewing it in its
16          entirety, from the face of it, it looks
17          like it was not the May 2019 but the
18          October of 2019 reference material.
19 BY MR. MOST:
20     Q.   So there was an e-mail that went out in
21 October of 2019 that was the DTB?
22     A.   So there would have been an e-mail
23 notification for officers to review this and take
24 an online like test module that was 20 questions.
25     Q.   So officers were to review this 12-page

1    PowerPoint and then take a test?

2         A.    Yes.

3         Q.    So there was no verbal instruction or

4    audio or video -- nothing other than this

5    PowerPoint in terms of content, correct?

6         A.    Not that I'm aware.

7         Q.    So there was no one teaching this

8    content.  It was a PowerPoint attached to an e-mail

9    that went out to all officers saying read this and

10   take a test, correct?

11        A.    Correct.  DTBs are generally done more as

12   an independent study where they provide you

13   reference material, and then you have to answer a

14   series of questions based on the reference

15   material.  So an e-mail would have gone out with

16   the reference material.  The reference material may

17   have also been uploaded to our learning management

18   software, which I believe at the time that this

19   occurred was Power DMS, and all of those records

20   get even more complicated when you throw in the

21   fact that in December of 2019, we had a cyber

22   attack that wiped out half the city's systems,

23   right, and so that would have been e-mailed out for

24   the officers to review, and then they would have

25   had to have logged in to complete the quiz in Power

1    DMS.  It is based on the material that they
2    received in the e-mail.
3              MR. MOST:
4                  Jim, did you want to show Sergeant
5              Barnes the defendant's Bates stamped
6              version of something similar?
7          MR. ROQUEMORE:
8                  I am going to show him at this time
9              City Defendant's 51 --
10         THE WITNESS:
11                 Jim says his Zoom just went down.
12             He is frozen.  All right.
13         MR. ROQUEMORE:
14                 Mr. Most, you asked me about what I
15             wanted to show him, so I have City
16             Defendant's 5135 to 5146.  It's
17             probably the same document that you
18             were showing him, which it starts at
19             Plaintiff's 59.  I'll just ask
20             Mr. Barnes if he could, Sergeant
21             Barnes, to take a look and perhaps
22             compare those to -- if you want to like
23             give him a side by side.
24         MR. MOST:
25                 Sure.

```
 1   BY MR. MOST:
 2        Q.   Here is Page 2.  Here is Page 3.  It says
 3   SARA.
 4        A.   They are the same.
 5        Q.   Page 4?
 6        A.   And Page 3 is the same.  Page 2 is also
 7   the same.
 8        Q.   Page 4?
 9        A.   Yes.  That's the same.
10        Q.   Page 5?
11        A.   Yep.
12        Q.   Page 6?
13        A.   Yes. Page 7 is the same.
14        Q.   Page 8?
15        A.   Yep.
16        Q.   Page 9?
17        A.   Yep.
18        Q.   Page 10?
19        A.   Yes.  It's the same.
20        Q.   Eleven and 12?
21        A.   Yep.
22        Q.   Okay.  So this document, Plaintiff's
23   Trial Exhibit 13, is the content of that October
24   2019 DTB, correct?
25        A.   Correct.
```

```
1              MR. ROQUEMORE:

2                   I'm going to pose an objection to

3              that last question in that I think it's

4              incomplete as to the content.

5              MR. MOST:

6                   Okay.  When I say content, I mean

7              the training module.

8   BY MR. MOST:

9        Q.   There was some text in the e-mail that

10  was a test, but this twelve-point PowerPoint

11  reflects the training content of the October 2019

12  DTB, correct?

13       A.   So my understanding is that this

14  PowerPoint with the e-mail is the reference

15  material for the training content, right.  So it is

16  where the officers would review and look to find

17  the information that they are tested on, but then

18  the test is also part of the training.

19       Q.   Does the test have any content that is

20  not in this PowerPoint?

21       A.   Not specifically that I'm aware of.  I

22  believe the test that DTB -- the training was not

23  just on dogs, but it was also on the SARA model

24  aspect, S-A-R-A, model aspects of community

25  engagement, but there may have been a couple of
```

1    questions on it that were not directly related to

2    responses to dog-related encounters, right.

3        Q.    So Page 2 of this, which is Plaintiff's

4    60, says that basic and inservice training should

5    include a number of things, right?

6        A.    Correct.

7        Q.    One of the things it says is training on

8    dog behavior by qualified professionals, right?

9        A.    Correct.

10       Q.    Does that mean professionals who are

11   professionals in dog behavior?

12       A.    So I would imagine it would be training

13   consistent with like out of the DOJ COPS training

14   that was put together or the SPCA training that was

15   put together by what I would have hoped were

16   qualified professionals that put that training

17   together.

18       Q.    So basic training means like training in

19   the academy, right?

20       A.    Correct.

21       Q.    Inservice training means supplemental

22   training, not DTBs, but supplemental training over

23   the years of an officer's experience, right?

24       A.    Correct.

25       Q.    And DTBs are not included in inservice

1    training?  That is a different thing, right?

2         A.   So DTBs are a type of form of inservice

3    training, right.  Now, we talked about the core

4    inservice training, which is generally our

5    classroom training each year for officers, right.

6    And so officers, supervisors, certain specialized

7    units, have to go through their own inservice

8    training that we speak of, for our purposes, as

9    inservice, but, realistically, all of the training

10   that takes place after the academy is considered

11   inservice training or some form of it.  We also do

12   roll call trainings.  The academy will put out and

13   have supervisors make sure their officers are up to

14   date mostly on our policies and things like that.

15        Q.   Prior to this year, the only inservice

16   training Officer Burmaster received about

17   interactions with dogs were the two DTBs, correct?

18        A.   So I can't say with 100 percent

19   certainty.  As you remember, earlier I discussed I

20   believe there was another classroom inservice

21   training, but I was unable to find any other record

22   of it, so the only training I have records of are

23   the two DTBs.

24        Q.   Do either of those two DTBs include

25   information on local resources?

1      A.   So I don't know.  I don't believe either

2  of the two DTBs specifically include information on

3  local resources.  That is captured in our chapter,

4  in Chapter 41.34, which it specifically tells them

5  to reach out to the SPCA.  Now, in all of the basic

6  training, when they have the ability to or they

7  know they're going to a call that involves a canine

8  or an animal of some type, we instruct them to sort

9  of plan ahead and organize that, because they can

10  contact SPCA through our communications, through

11  the Orleans Parish communication system.

12      Q.   So NOPD's training says NOPD inservice

13  training should include information on local

14  resources, but you don't see any evidence that

15  Officer Burmaster received any inservice training

16  that included information on local resources,

17  correct?

18      A.   Other than what was learned in the

19  academy, correct.

20      Q.   But NOPD's policy says that should be an

21  inservice training, but it wasn't, right?

22      A.   Well, the policy doesn't say that.  This

23  training says basic and inservice training should

24  include information on local resources.  Now,

25  realistically, it's very common for officers to

1    contact the SPCA if they have an issue with an

2    animal through a radio, which is how we contact

3    SPCA and how we train our officers in the academy

4    to contact SPCA.  So if there is time to contact

5    SPCA, then that's how they would do it, and that's

6    what is taught at the academy on the information on

7    local resources.

8        Q.   I understand, but in at least one way

9    NOPD's training does not comply with its own

10   training, right, because it says inservice training

11   should include information on local resources, but

12   NOPD doesn't do that, right?

13            MR. ROQUEMORE:

14                Objection, form.

15            THE WITNESS:

16                Again, I'm not -- I have to go in

17                and review to make sure that there is

18                no question on that specifically.  In

19                the training for the DTBs, I know that

20                the training in 2017 did include -- I

21                mean, it was SPCA training, so it

22                included local resources, as in the

23                SPCA.

24   BY MR. MOST:

25       Q.   How do you know that?  You didn't review

1    the videos, right?

2         A.   Well, it's put on by the SPCA itself,

3    which is who we would contact as the local

4    resource.

5         Q.   It was put on by the American SPCA,

6    right, like all over America, right?

7         A.   So the Louisiana portion of contacting

8    the SPCA would not have been included in that is

9    what you are saying?

10        Q.   Right. There is nothing local in the 2017

11   DTB, right?

12        A.   I would have to go back and look at the

13   questions for those DTBs to see if it said anything

14   about contacting SPCA, but I can't say for certain

15   there was or wasn't at this point.

16        Q.   Well, let's look and see.  Look at that

17   Exhibit 53.  This was the 2017 DTB e-mail?

18        A.   Yes.

19        Q.   This is the American SPCA?

20        A.   Correct.

21        Q.   You don't see anything local in here,

22   right?

23        A.   I don't see anything specifically local

24   in this, no.

25        Q.   Here is the questions for Deposition

1    Exhibit 55. These are the questions for the 2017
2    DTB; is that right?
3              A.    That's right.
4              Q.    Anything local here?
5              A.    You have to slow down rolling through it
6    a little bit.  No.  I don't see anything
7    specifically specific to, you know, how to contact
8    or providing local resources in here.
9              Q.    In looking through the content of the
10   2019 one, which is also in front of you, anything
11   about local resources in here?
12             A.    So the first -- if you go up.  Right
13   there, I think.  It talks about partnering with
14   animal control and other animal services.  That's
15   kind of redundant with the information on local
16   resources, and I know that with our -- again, with
17   the recruit training, at the time, was taught by
18   members of the LA SPCA, right.  They would come in
19   for the training or representatives would come in
20   for the training with the recruits.  So, really, to
21   answer the questions, I don't know that the
22   inservice training specifically included
23   information on local resources, but the recruit
24   training certainly included that information on
25   local resources, especially through the partnership

1    with animal control and animal services.

2          Q.   That may be so, right, but at least the

3    inservice training does not have any information on

4    local resources, agreed?

5          A.   I have no record that it has any

6    information on local resources.

7          Q.   So as far as we can tell, NOPD's training

8    does not even comply with the recommendations of

9    (inaudible) at least in one regard, agreed?

10              {COURT REPORTER REQUESTED CLARIFICATION}

11   BY MR. MOST:

12         Q.   So in at least one regard, NOPD's

13   inservice training does not comply with the

14   recommendations of NOPD's inservice training,

15   agreed?

16              MR. ROQUEMORE:

17                   Object to form.  You may answer, if

18              you know.

19              THE WITNESS:

20                   So I don't have any record that the

21              training specifically mentioned any

22              information on local resources.

23   BY MR. MOST:

24         Q.   If there wasn't any, then NOPD's

25   inservice training doesn't comply with the

1    recommendations of NOPD's inservice training,

2    agreed?

3              MR. ROQUEMORE:

4                  Objection, form.

5              THE WITNESS:

6                  It is somewhat hard to say.  The

7                  information contained in a training

8                  means that the training doesn't comply

9                  with information that's contained in

10                 the training, right.  So when it is

11                 specific to this, clearly, the

12                 reference material that was put out for

13                 the October 2019 DTB has the bullet

14                 point saying that it should include

15                 information on local resources, right.

16                 I don't have any other record that

17                 information on local resources is

18                 actually provided anyway.

19   BY MR. MOST:

20       Q.    Okay.  Were you involved in the

21   development of this 2019 inservice training?

22       A.    I was not.

23       Q.    Do you know where it came from?

24       A.    So I believe there was a -- I don't know

25   if you'd call it like a policy paper that was put

```
 1    out with whoever was in our policy and planning at
 2    the time, which I know at the time Kevin Seuzeneau
 3    was the one who was in charge of creating the DTBs.
 4    He is no longer with the department.  At the time,
 5    he would have been the one responsible for pushing
 6    it out to the department.  I don't know if he is
 7    the one that came up with the PowerPoint, but from
 8    what I can tell, the PowerPoint was essentially a
 9    copy and paste of portions of other information.
10        Q.   So the NOPD October 2019 PowerPoint has
11    the same exact title as a Department of Justice
12    document from 2011, right?
13              MR. ROQUEMORE:
14                   Objection, form.
15              THE WITNESS:
16                   It would appear.  If you look at the
17                top of that and the top of the
18                reference material, they read exactly
19                the same.
20    BY MR. MOST:
21        Q.   A lot of the content of the NOPD training
22    is verbatim copied from the DOJ document, correct?
23              MR. ROQUEMORE:
24                   Objection, form.
25              THE WITNESS:
```

1              My understanding is that is likely

2                   the case, and I take that specifically,

3                   too, from our -- from the PowerPoint

4                   reference material, because it

5                   references certain things that I know

6                   that we do not use in NOPD, like stun

7                   guns, right.  Like right there.

8    BY MR. MOST:

9         Q.   Right.  So you are looking at Plaintiff's

10   68 which refers to stun guns, right?

11        A.   Yeah, and bite sticks, neither one of

12   which NOPD uses.

13        Q.   Right.  NOPD officers are specifically

14   forbidden, with vary narrow exceptions, from using

15   their tasers in drive-stun mode, which would be the

16   closest thing to a stun gun, right?

17        A.   Correct.

18        Q.   NOPD does not deploy its officers with

19   bite sticks or stun guns, correct?

20        A.   Correct.

21        Q.   So why is NOPD providing its officers

22   with a training that talks about bite sticks and

23   stun guns?

24        A.   So that is what leads me to believe that

25   some of this was copied directly from the report

1    that you just pulled up, because it would be more

2    consistent with a generalization, like a general

3    training or response, instead of specific to

4    certain aspects of NOPD's policies or operations.

5        Q.    So someone at NOPD copied material from

6    -- so we can just look.  You see this paragraph

7    talks about bite sticks and stun guns, which is

8    copied verbatim from the DOJ document, right?

9        A.    It appears -- can you go back to the

10   other document?  Because it appears that they took

11   out the chemical repellents and the chemical

12   capture, so they tailored it some, but it looks

13   like they did not completely tailor it to get rid

14   of the stun gun or the bite stick, but they did get

15   rid of the chemical repellents that are also

16   prohibited truly by the consent decree.

17       Q.    So doesn't this strike you as a problem

18   that NOPD's training copied and pasted from the

19   Department of Justice but didn't even really tailor

20   it to apply to NOPD officers' actual circumstances?

21           MR. ROQUEMORE:

22               Objection, form.

23           THE WITNESS:

24               I don't know that I would call it a

25           problem.  Our officers receive a lot of

```
 1                    training on things like use of force
 2                    regarding stun guns or bite sticks,
 3                    things like that.  So they know about
 4                    the drive-stun, the stun gun, the bite
 5                    stick, things like that that we don't
 6                    have and we don't use.  It would be
 7                    similar to saying, look, in your
 8                    training, if you were going to avoid a
 9                    vehicle pursuit, you can call for the
10                    helicopter, and the helicopter can go
11                    up and follow them safely, right. Well,
12                    all of our officers know we don't have
13                    a helicopter, so that's not an option
14                    for us, right.  So I don't really see
15                    it as a problem to say, look, these are
16                    other things that would be effective
17                    when they know that we don't have
18                    those.
19               MR. ROQUEMORE:
20                    William, can we take a break?  It's
21               been an hour and a half.
22               MR. MOST:
23                    Yeah, sure.  How much time do you
24               want?
25               MR. ROQUEMORE:
```

```
 1                     How about ten?
 2             MR. MOST:
 3                     Sure.  We will reconvene about 2:40.
 4                     {BRIEF RECESS, 2:30-2:40}
 5   BY MR. MOST:
 6        Q.    We took a ten-minute break.  Did you talk
 7   to anybody about this case during the break,
 8   including your attorney?
 9        A.    The attorney, no.  I only spoke for about
10   two seconds with Mr. Roquemore about how we're
11   going to handle the Zoom echo if he needs to ask a
12   question.
13        Q.    Did you review any documents related to
14   this case during the break?
15        A.    No, sir.
16        Q.    So before our break we were talking about
17   how this October 2019 DTB, the content of it, is
18   essentially a copy of an earlier DOJ document,
19   right?
20        A.    Correct.
21        Q.    Do you agree it would be a problem if
22   NOPD largely copied and pasted from the DOJ
23   document but cut out most of the parts that suggest
24   that dogs may not be as dangerous as an officer
25   thinks?
```

```
 1          MR. ROQUEMORE:

 2               Objection, form.

 3          THE WITNESS:

 4               So if they cut out certain portions

 5          that are relevant to what they were

 6          trying to accomplish with the training,

 7          then I think that that could be an

 8          issue, but I don't know that that was

 9          anything that was relevant to what they

10          were trying to accomplish with the

11          training that was in that manner.

12   BY MR. MOST:

13      Q.   So part of the point of the training was

14   to help officers accurately assess the risk of dogs

15   that they encounter so that they can decide what is

16   the appropriate use of force and response, correct?

17      A.   I think part of the training was to help

18   them accurately assess, right, but, also, to be

19   able to accurately or more accurately identify

20   indications that there may be a dog that could

21   present a problem on the property when they

22   approach, right, which was, if you look at the

23   training, it talks about things like looking at the

24   environment, right, to see if there is chains,

25   things like that, or a water bowl or an indication
```

1    that there has been a dog that has been mistreated

2    on the property, things like that.

3        Q.    So generally assessing the risk that

4    there might be a threat from a dog in a call for

5    service?

6        A.    Yes.

7        Q.    Would you agree that it would be relevant

8    if there is a fact that serious dog bites are

9    relatively rare?

10       A.    I think it might be relevant if we talk

11   about the, I guess, the mortality rate of dog

12   bites, right, so to speak.

13       Q.    And that is relevant to assessing risks

14   from dogs, right?

15       A.    So the severity of the risk, yes.  I

16   don't know how relevant it is to the fact that a

17   dog would pose an immediate danger to somebody,

18   right.

19       Q.    Well, severity is part of the danger,

20   right?  Agreed?

21       A.    Well, severity is usually like a back end

22   side of it.  Like whether a dog bite is going to be

23   fatal or not does not speak to whether a dog is

24   going to bite or not, right.  So the immediacy of a

25   threat and the danger of a threat may be two

1    different things.  Like if someone grabs a baseball

2    bat and swings it, and they are 20 feet away, you

3    don't necessarily have the, so to speak, immediacy

4    as you would if they were next to you when they

5    grabbed it as opposed to if they grab a gun, and

6    they are 20 feet away.  Now you've clearly got an

7    immediate threat, because you don't need to swing a

8    gun within arm's reach to be able to hit somebody.

9    So you've got two different levels of severity that

10   are disconnected from the levels of immediacy, so

11   to speak, right.

12        Q.   Sure.

13        A.   Somebody with a baseball bat and a

14   firearm could both be like deadly weapons, but it

15   speaks to the immediacy and the time and distance.

16   So I think the same thing would apply when you are

17   looking at a dog bite.

18        Q.   Right.  So severity is part of the risk

19   and threat assessment, right?

20        A.   I mean, it very easily could be.

21        Q.   So you see that the DOJ's document says

22   that serious bites are relatively rare, but that

23   doesn't appear in NOPD's version, right?

24             MR. ROQUEMORE:

25                  Objection, form.

```
 1              THE WITNESS:
 2                   So I'd have to go through this,
 3                   because I believe that it is mentioned
 4                   in the questions.  I don't know that it
 5                   is in the PowerPoint.
 6    BY MR. MOST:
 7         Q.   I'm pulling up what is Deposition Exhibit
 8    52.  This is what you are talking about?
 9         A.   So if we go down and look through these
10    questions, but I know in the other -- I believe --
11    is this the 2019?  I believe.  Yeah.  This is the
12    2019 questions.  I think it's covered in the 2017
13    questions.
14         Q.   But in terms of the 2019 training, the
15    DOJ document says serious bites are relatively
16    rare, but that wasn't included in the 2019
17    training, right?
18         A.   So I don't see it on this page, but I
19    don't know that it is not in this.
20         Q.   You see I'm searching for the word
21    "serious," and it only appears on this page?
22         A.   Right, but I would search for the word
23    "dangerous" or "danger."
24         Q.   Do you see anything in here that suggests
25    that dangerous bites are rare?
```

1    A.   No.  I don't, again, see anything on

2    there for it, but, again, I'd have to go through

3    the entirety of it.  Now, I don't know that it's in

4    there.  I don't know without certainty that it was

5    omitted, and I also don't know what the reasoning

6    for any omission would be on that.

7    Q.   Sure.  You're prepared to talk about

8    NOPD's training related to dogs, right?

9    A.   Right.  I know in the 2017 it

10   specifically mentioned that dogs generally are not

11   vicious or dangerous, right, and there it is in the

12   first -- in Question 1.  It says, "Most dogs are

13   protective but not vicious or dangerous," right.

14   Q.   But is there anything in either training

15   that says that serious bites are relatively low?

16   A.   Not to my knowledge specifically.

17   Q.   What about -- you see there in the DOJ

18   report, or in the DOJ document it says, "Absent any

19   of the warning signals described below, an

20   approaching dog is almost always friendly."  You

21   see that?

22   A.   I see that, yes.

23   Q.   Do you know if any of that is reflected

24   in NOPD's training?

25   A.   I believe that that is covered in the

1    questions of either of 2017 or the 2019 or perhaps
2    both.
3        Q.    How can it be covered in the questions?
4    The questions don't tell you what the answers are,
5    right?
6        A.    So in the questions, you still got to go
7    through and answer all of the questions and grasp
8    the concept of it, right.  So if it's covered in
9    the questions, and, again, what went out with the
10   e-mail was this reference.  I don't know
11   specifically if the DOJ report or anything else was
12   provided to officers.  The only thing I have record
13   of is the PowerPoint and these questions.
14       Q.    Right.  So can you point to anywhere in
15   any other NOPD training that reflects this idea
16   that absent specific warning signals, an
17   approaching dog is almost always friendly?
18       A.    Without taking the questions out of it,
19   no, I can't point to anything, any of the training
20   off the top of my head or that I've reviewed.
21       Q.    Okay.  In the questions.  Where would
22   that be in the questions?
23       A.    If we look through the questions.
24       Q.    I don't see anything in the questions
25   that suggests that absent warning signals, an

1    approaching dog is almost always friendly.  Do you?

2         A.    No, I don't, reviewing right here.

3         Q.    It sounds like that was something in the

4    DOJ report that was omitted from NOPD's training,

5    agreed?

6         A.    It would appear that it is something that

7    is in that portion of the DOJ report that was not

8    in a lot of the questions, and I don't know that it

9    was in that PowerPoint.

10        Q.    You see this statement in the DOJ

11   document that says, "The overwhelming majority of

12   dog bites are minor, causing either no injury at

13   all or injuries so minor that no medical care is

14   required?"

15        A.    I do see that.

16        Q.    Is that reflected anywhere in NOPD's

17   training?

18        A.    So I think this would go hand-in-hand

19   with the last set of questions, that if it's not in

20   that PowerPoint, or if it's not one of the

21   questions that we have in one of the DTBs, then we

22   don't have a record of that specifically being put

23   into it.

24        Q.    What about the part about fewer than 2

25   percent of the individuals visiting emergency rooms

1    complaining of a dog bite require hospitalization?

2    To your knowledge, is that reflected anywhere in

3    NOPD's training?

4         A.    It would be the same answer for the last

5    two series.  I don't know.  I don't have any record

6    of it being in any other.

7         Q.    You see the part in the DOJ training,

8    "However, even as the canine population has

9    steadily increased over the past few decades, the

10   number of reported dog bites has drastically

11   decreased?"  Do you see that?

12        A.    I do see that.

13        Q.    Is that idea of declining numbers of

14   reported dog bites, is that reflected anywhere in

15   NOPD's training?

16        A.    Not that I know of in my records and what

17   I've been able to find.  Again, it goes back to the

18   questions of the intention of the training, right,

19   whether it's to allow officers to be able to

20   recognize the threat and the, you know, presence of

21   a dog or how to deal with that or how to respond to

22   it as opposed to what the severity of the outcome

23   might be, right, specifically of the bite.  The

24   idea is to be able to recognize it and tactically

25   avoid getting bitten, not avoid getting a serious

1    bite as opposed to a small bite, right.

2         Q.   But some things are dangerous and some

3    things are not, right? Like someone that is coming

4    at you with a knife is very different than someone

5    coming at you with a piece of wet spaghetti.  Both

6    could hit your body, but one could cause a severe

7    injury and one would not cause a severe injury,

8    right?

9         A.   Right, but it is almost akin to the idea

10   of -- there is a difference, and when we talk about

11   like bites and the outcome and the seriousness of

12   it, it is like saying there is a difference between

13   somebody shooting you with a pellet gun and

14   somebody shooting you with a rifle, right.  One is

15   not going to be as severe.  It's very rare that

16   it's going to be a serious injury, but the bottom

17   line is they are still pointing and shooting at

18   you.

19        Q.   But the potential of whether or not it's

20   going to cause serious bodily injury or death to

21   the officer is part of, what, the analysis of

22   whether lethal force is authorized, right?

23        A.   So it can play into it, but what it comes

24   into -- what it really comes down to is under the

25   facts and circumstances, under each individual

1  scenario, was it reasonable that those individuals

2  facing the scenario feared serious bodily injury or

3  death.

4       Q.   Right, but severity of injury, risk the

5  severity of potential injury to the officer, is a

6  core part of the use of force analysis, right?

7            MR. ROQUEMORE:

8                 Object to form.

9            THE WITNESS:

10                It can be, but, again, it is based

11                on the perception.  So to give the

12                example of if someone points an empty

13                gun at someone, is the perception still

14                that they might get shot even though

15                they are not going to, right?  So the

16                severity of an empty gun is slim, you

17                know, like no one is getting shot with

18                an empty gun, right, but the perception

19                of that incident incident isn't I know

20                the gun is empty.  It is someone is

21                pointing a gun at me, so that's what

22                comes into the reasonableness, like the

23                review of it.

24 BY MR. MOST:

25       Q.   Right.  So a core important part of

1    NOPD's training should be to help officers
2    accurately understand the severity of risks that a
3    dog poses to them so that they can make intelligent
4    decisions about when and whether to use force,
5    correct?
6              MR. ROQUEMORE:
7                   Objection, form.
8              THE WITNESS:
9                   So when or whether to use force is
10               often based on, you know, a
11               reasonableness standard, right.  We
12               talk about like Graham v. Connor.  You
13               are looking at a reasonable objective
14               standard for whether or not an officer
15               in that situation would feel that they
16               were either subject to serious bodily
17               injury or death in the case of like
18               lethal force, right.  And so with that
19               being said, yes, to the extent that
20               it's a case-by-case basis, right,
21               whereas, if you have someone pointing a
22               gun that's empty, is the actual threat
23               of serious bodily injury there versus
24               is the perception of the threat of
25               serious bodily injury there.

1    BY MR. MOST:

2        Q.    Right, but a core part of NOPD's training

3    about dogs should be to accurately teach officers

4    about how dangerous dogs are so that they know to

5    make good calls about whether to use force, right?

6            MR. ROQUEMORE:

7                Objection, form.

8            THE WITNESS:

9                So I would say that it is important

10               to learn about that, but if you go up

11               back to where it had the serious dog

12               bites in this paper --

13   BY MR. MOST:

14       Q.    Yep.

15       A.    So specifically right there in the second

16   portion of that sentence, it says that no

17   particular breed is more likely to be responsible

18   for serious bites, so how do you train that there

19   is when the paper itself says that there is no

20   particular breed that could be responsible, right.

21   So what exactly do you narrow down to teach the

22   officers other than just to say that serious bites

23   are relatively rare, and while serious bites may be

24   relatively be rare, they may still exist, right.

25   And so the idea of the training is less about, hey,

```
 1    we don't want you to take this any less --
 2               {Interruption in Proceedings}
 3               THE WITNESS:
 4                   Case in point, if we go back to the
 5               gun analogy, right.  Officers getting
 6               shot at happens more than officers
 7               actually getting shot.  So an officer
 8               actually getting shot, despite the
 9               amount of officers that might get shot
10               at, could be relatively rare, but it
11               doesn't lessen the seriousness of the
12               potential outcome.
13               MR. MOST:
14                   Ted, did you say something about an
15               appointment?
16               MR. ALPAUGH:
17                   My apology.  That was something that
18               came on my computer.  Don't worry about
19               it.  Thank you.
20               THE WITNESS:
21                   So I guess to answer your question,
22               realistically, it would be great, and I
23               know NOPD would love to include as much
24               information as possible in every
25               training that we have, but in some of
```

1           the trainings that we have limited,
2           such as the DTBs, are limited types of
3           inservice trainings.  We want to focus
4           more on the narrowed, tailored topics
5           like how to identify and properly
6           respond.  So I don't know what the
7           reasoning, again, for including certain
8           aspects of the DOJ paper over other
9           aspects of it was, but certainly I
10          don't know that it would be -- it would
11          take away from the rest of the training
12          by leaving out some of those aspects,
13          right.  Specifically on the seriousness
14          of the bite, because the bite could be
15          serious.  It may not be serious.
16  BY MR. MOST:
17      Q.   Okay.  But the NOPD training addresses
18  assessing the risk, right?
19      A.   So, yes, it should.  That's what this
20  slide that you pulled up here shows, that you want
21  to do a careful assessment of the environment.
22      Q.   Right.  So don't you think it's important
23  that NOPD's training tells officers whether serious
24  dog bites are relatively rare; an approaching dog
25  is almost always friendly; the overwhelming

```
1    majority of dog bites are minor; fewer than 2
2    percent of individuals going to an emergency room
3    require -- fewer than 2 percent of dog bites result
4    in emergency room hospitalizations or the dogs are
5    seldom dangerous?  Aren't those important facts for
6    officers to know?
7              MR. ROQUEMORE:
8                   Objection, form.
9              THE WITNESS:
10                  So here is where I think it is
11              important to take note of that the
12              report itself, too, because it provides
13              those statistics, but on the same page,
14              you see it says dog bite statistics are
15              not really statistics, and they don't
16              give an accurate picture of dogs that
17              bite.  So the same report sort of
18              contradicts itself.  So for us to take
19              information from a report that says
20              this is not real information and put it
21              into our training could just cause even
22              more confusion, right.  Now, do I think
23              that we should try and include
24              everything?  Absolutely.  We should
25              probably try and include everything in
```

```
 1                  all of our training, but when the focus
 2                  of training is more about the
 3                  assessment and avoiding the bite in the
 4                  first place, I don't know that the
 5                  seriousness of the bite is as important
 6                  as the assessment of the risk and
 7                  trying to avoid the situation to begin
 8                  with.
 9     BY MR. MOST:
10          Q.   Okay.  But don't you think officers
11     should know that the document that NOPD was talking
12     from says that dogs are seldom dangerous?
13                  MR. ROQUEMORE:
14                       Object to the form.
15                  THE WITNESS:
16                       So I think it would help
17                  tremendously to have, again, as much
18                  information as possible, and that would
19                  include all of that information, but we
20                  go back to the May 2017 training that
21                  was based on the videos.  Again, if I
22                  reviewed the videos, I would be able to
23                  tell you exact content of it, but I
24                  know that the question, Number 1 on it,
25                  was that basically one in four house-
```

1          holds has a dog, and most of those dogs
2          may be protective but are not vicious
3          or dangerous.  So that information is
4          directly relayed to the officers there.
5     BY MR. MOST:
6          Q.   You see in the DOJ document it provides a
7     video of a realtime example of a safe, effective
8     use of a taser to deter a dog?
9          A.   Yes.  I see that in the report there.
10         Q.   That was not provided in NOPD's training
11    to their officers, correct?
12         A.   It was provided in the training but not
13    in the dog training.  It was provided in the taser
14    training.
15         Q.   This video was provided in the taser
16    training?
17         A.   I don't know if it's that specific video,
18    but I know that there was video provided in the
19    taser training specifically about the efficacy of
20    tasers on canines, and, basically, the pros and
21    cons of that with the X26.
22         Q.   This video that the DOJ provides in the
23    report that NOPD copied from, this wasn't included
24    in any officer training, was it?
25         A.   Again, I don't know what video that is,

1    so I can't say whether or not it was a video that

2    was provided in the taser training, but there was

3    video and information related to the use of tasers

4    on dogs in the taser training.

5            Q.    You see that in the DOJ training it talks

6    about insufficiently-trained police officers?

7            A.    I see that.

8            Q.    And you see an example of an

9    insufficiently-trained police officer or an officer

10   who views a dog running towards him as a threat?

11           A.    I see that there.

12           Q.    And that -- I mean, that is consistent

13   with the description of Derrick Burmaster who

14   perceived the dog running at him as a threat,

15   right?

16                 MR. ROQUEMORE:

17                     Objection, form.

18                 THE WITNESS:

19                     So I don't know if this is

20                 specifically consistent, because the

21                 statement in this DOJ report is just a

22                 generalized, blanket statement that a

23                 dog running towards an officer may not

24                 be a threat, but that is, again, always

25                 going to be a case-by-case basis on the

1              officer, right.  And so it depends on

2              the actions of the dog, the actions of

3              the officer, and the situation itself.

4    BY MR. MOST:

5        Q.    But Officer Burmaster was an officer who

6    perceived the dog running at him as a threat,

7    right?

8              MR. ROQUEMORE:

9                  Objection, form.

10             THE WITNESS:

11                 I would hope that if he shot the dog

12             that he perceived it as a threat.

13   BY MR. MOST:

14       Q.    Well, you know that he said he thought it

15   was going to bite him in penis; he thought it was a

16   threat; he shot the dog, right?  You watched the

17   video.  You read the report about and testified

18   about that, right?

19       A.    Yes.  Well, during the Use of Force

20   Review Board, yes, but I would imagine, and I think

21   it's pretty clear based on whatever facts and

22   circumstances that were presented at the Use of

23   Force Review Board, that Officer Burmaster

24   perceived the dogs as a threat.

25       Q.    So Officer Burmaster matches the

1    description of what the DOJ says is an

2    insufficiently-trained police officer, right?

3              MR. ROQUEMORE:

4                   Objection, form.

5              THE WITNESS:

6                   I don't think that you can

7              categorize that based on a bullet point

8              saying officers who view a dog running

9              towards them as a threat, because

10             sometimes a dog running towards them is

11             a threat.  I think it would be a

12             blanket thing if you had multiple

13             officers throughout a department always

14             thinking that any dog running towards

15             them would be a threat could be

16             indicative of an insufficiently-trained

17             police force, right.  I don't think a

18             single incident where an officer shoots

19             a dog that they perceived as a threat

20             is indicative of insufficient training

21             by what's a bullet point in this

22             report.

23   BY MR. MOST:

24        Q.   Regardless of whether you agree with it

25   or not, Officer Burmaster matched the description

1    of what this DOJ document characterizes as an

2    insufficiently-trained police officer, right?

3                  MR. ROQUEMORE:

4                      Objection, form.  Mischaracterizes

5                 what the document says and asked and

6                 answered.  You may answer, if you

7                 understand.  Go ahead and answer it.

8                  THE WITNESS:

9                      I don't think that you can say that

10                Officer Burmaster meets the definition

11                of an insufficiently-trained police

12                officer by this report based on the

13                fact that he perceived a dog running

14                toward him as a threat, right, without

15                taking into account any of the other

16                circumstances.

17    BY MR. MOST:

18         Q.   Do you see the part on Page 37 that says

19    -- of the DOJ document that is talking about taser

20    use on dogs?  It says, "All dogs that were hit with

21    darts and not immobilized fled the scene and did

22    not attack?"

23         A.   Yes, I see that.

24         Q.   Is that reflected anywhere in NOPD's

25    training?

1      A.   I believe that that is reflected in our

2 -- in the taser training.  The effects of the

3 taser.  Bullets also in that taser training is the

4 -- well, the issues with the X26, whereas, you

5 don't have multiple shots, right.  So if you miss

6 with one shot, then you don't get a second bite at

7 it.

8      Q.   Right.  Generally, you need -- when you

9 are using a taser, you need both taser barbs to hit

10 to achieve neuromuscular incapacitation, right?

11     A.   You need -- in order to achieve

12 neuromuscular incapacitation, you need both taser

13 barbs to hit, and you need a certain spread between

14 the different barbs, right.  So it's really

15 anything over seven inches or a foot might achieve

16 some form of neuromuscular incapacitation.

17     Q.   Right.  What the DOJ report is saying is

18 that dogs that were hit with taser darts, even if

19 they weren't immobilized, all of them fled the

20 scene and did not attack, right?

21     A.   They all -- yes.  In this field report,

22 they've got the report on it that all dogs were hit

23 with the darts are not immobilized -- and not

24 immobilized fled the scene and did not attack.

25 That's exactly what the report says.

1    Q.   Is that reflected -- hitting a dog with

2    darts, even if it doesn't immobilize them, causes

3    them to flee and not attack, is that reflected

4    anywhere in the NOPD training?

5    A.   So, again, the use of the taser on dogs

6    is reflected in NOPD's initial -- like in their

7    taser training, right.

8    Q.   Yeah.  I understand, but in that

9    training, does it talk about how dogs that were hit

10   with darts but not immobilized flee and don't

11   attack?  Is that reflected in the taser training?

12   A.   So I believe what is reflected in the

13   taser training is that even if you hit one of the

14   dogs, and you don't achieve NMI, there is a high

15   probability that the dog will flee, right.  It will

16   not continue the attack.  Now, that's not the case

17   with that -- just like everything else in life,

18   there is no guaranties on everything, but I do know

19   that in the training, they said more likely if the

20   dog gets hit with the taser, regardless of whether

21   NMI, which is neuromuscular incapacitation, is

22   achieved, the dog will likely flee.

23   Q.   Where is that reflected? Is that in a

24   PowerPoint, in a written document, in the teacher

25   note?  Where is that found?

1    A.    I'll have to double-check, but I think

2    it's in a taser PowerPoint.  The original taser

3    PowerPoint or the initial taser PowerPoint when you

4    first go through the training.  I think it is -- if

5    it's in that, then it will likely be in the form of

6    a lesson plan.

7        Q.    Let's move on to the -- we don't have a

8    ton left. We are getting close to the end.

9            MR. MOST:

10               Jim, I think Lieutenant Helou will

11             be much shorter, I would expect.

12   BY MR. MOST:

13       Q.    Turning to the other inservice training

14   provided to officers, which was the May 2017 one,

15   the May 2017 DTB.  You are familiar with that?

16       A.    Yes.  I'm familiar with that.

17       Q.    We're looking at Deposition Exhibit 53

18   here.  It looks like an e-mail.  I guess it was

19   actually an e-mail that went out in April, and it

20   says May 2017 DTB.  It told officers to go to a

21   certain website and watch three videos, right, and

22   then take the test?

23       A.    That's correct.

24       Q.    The officers were asked to do this one

25   time in 2017, not each year or anything like that,

1    right?

2         A.    That is correct, to my knowledge.

3         Q.    Does NOPD have these videos?

4         A.    Not that I'm aware of.  I believe the

5    videos were on the ASPCA site.  I don't know that

6    anybody from NOPD had downloaded or captured any of

7    those videos.  I don't have any record of us having

8    the actual videos.

9         Q.    So you don't know anything about the

10   contents of these videos, right?

11        A.    That's correct.  I don't know the

12   specific content of the videos.

13        Q.    When I've been saying you during this

14   deposition, you are our 30(b)(6) deposition witness

15   for the city, so when I say you, you understand

16   through this deposition I mean the city, not you

17   personally, Mr. Barnes, right?

18        A.    That's correct.

19        Q.    So you don't know if these were one-

20   minute videos or hour long videos?

21        A.    No.  I don't know, again, the specifics

22   of the content of the videos.

23        Q.    You watched these videos, though, as an

24   officer?

25        A.    As an officer back in 2017, when it would

1    have gone through, yeah.

2        Q.    Do you have any recollection of the

3    contents of these videos?

4        A.    Not specifically, other than just

5    responding to dog bites, right, and responding to

6    calls where there may be a dog on scene.

7        Q.    Do you remember if they were animated or

8    live videos or -- not live video, but whether they

9    were animated or videos of a real person, anything

10   like that?

11       A.    No.  I don't recall any of the specific

12   content of those videos.

13       Q.    So, Sergeant Barnes, talking about --

14   going back to the DOJ document and the NOPD's

15   training, you would agree with me that there was a

16   large amount of content in the DOJ document about

17   the dangerousness of dogs, specifically that they

18   are not that dangerous, that was omitted from

19   NOPD's training, right?

20            MR. ROQUEMORE:

21                 Objection, form.

22            THE WITNESS:

23                 So there was -- obviously, the NOPD

24            training in 2019 was condensed to the

25            Departmental Training Bulletin, so

```
1                  there was, I'm sure, a large amount of
2                  information and detailed specifics from
3                  the DOJ report that were omitted from
4                  the condensed PowerPoint that was put
5                  together for the NOPD training.
6     BY MR. MOST:
7         Q.   Have you read the DOJ document?
8         A.   I have not read the entirety of the DOJ
9     document.
10        Q.   From what we saw, you saw that a
11    recurrent theme within that document was that dogs
12    are probably not as dangerous as a lot of officers
13    think, correct?
14                  MR. ROQUEMORE:
15                     Objection, form.
16                  THE WITNESS:
17                     So I don't know that I can speak to
18                  any kind of current theme in the
19                  document just because I have not really
20                  reviewed the document in-depth like
21                  that.  It certainly was mentioned in at
22                  least two places.
23    BY MR. MOST:
24        Q.   We saw it talking about how an
25    approaching dog is almost always friendly, right?
```

1    A.   So, again, I have to pull it up.  I only

2   know if it said that they are almost always

3   friendly or if it just said usually friendly or

4   whatever it is friendly.  Certainly it was

5   mentioned that approaching dogs may be friendly,

6   right.

7    Q.   It talked about how rare hospitalizations

8   for dog bites are, right?

9    A.   At least in two places I know it

10   mentioned about the seriousness of dog bites and

11   how they believe that -- well on that one page

12   where it said less than 2 percent or something

13   result in hospitalization, and then it said that

14   dog bite statistics aren't really statistics, so.

15    Q.   It talked about the declining reports of

16   dog bites even though the number of dogs has gone

17   up, right?

18         MR. ROQUEMORE:

19             Objection, form.

20         THE WITNESS:

21             I don't recall the exact reference

22           to the number of dogs, but it

23           definitely had a reference that the

24           number of dog bites was declining over

25           the years.

1  BY MR. MOST:

2      Q.   In fact, it said dog bites are seldom

3  dangerous, right?

4           MR. ROQUEMORE:

5                Objection, form.

6           THE WITNESS:

7                I mean, I think the report speaks

8            for itself in that.

9  BY MR. MOST:

10     Q.   Given all of those things, would you

11 agree that a recurring theme with this document is

12 that it was trying to communicate to officers that

13 dogs may not be as dangerous as a lot of officers

14 think?  Is that your interpretation of all of those

15 facts being included in this DOJ document?

16          MR. ROQUEMORE:

17               Objection, form.

18          THE WITNESS:

19               So I don't know that that would be a

20           recurrent theme as much as the

21           recurrent theme of when officers have

22           time, they should stop and assess,

23           because, obviously, not all dogs are

24           aggressive, and the bites may not be

25           serious, so officers should assess that

1              when they can is more the recurring
2              theme, and that officers have to
3              understand that so that they can
4              properly assess the situation, right.
5              That would seem to be part of a theme
6              in that, but, again, without having
7              reviewed the whole document, I can't
8              really speak to specifics on a DOJ
9              document and what its recurring themes
10             are.
11    BY MR. MOST:
12         Q.   That idea of dog bites may be rarely
13    serious, is that reflected anywhere in NOPD's
14    training?
15         A.   So, again, in the May 2017 training,
16    clearly there is a question that exhibits -- that
17    part of the focus of the 2017 training was that at
18    least one in four households generally have dogs,
19    and that they are very seldom vicious or dangerous.
20         Q.   So you're saying that incorporates the
21    idea that dog bites are rarely serious?
22         A.   It incorporates the idea that dogs are
23    going to protect their territory, right.  They
24    might be protective, but they're generally not
25    vicious or dangerous.  I would think that, you

1    know, saying the dogs generally are not dangerous
2    would mean that they're generally not seriously
3    going to bite somebody.
4           MR. MOST:
5                Ted or Jim, would you like to ask
6             any questions?
7           MR. ROQUEMORE:
8                William, can you give us an
9             inventory of what deposition exhibits
10            we have entered in right now?
11          MR. MOST:
12               Yeah.  Let me pull it up, and I will
13            do an e-mail to circulate them.  I used
14            Plaintiff's Trial Exhibit 12 and 13.
15          MR. ROQUEMORE:
16               What is 12 and what is 13?
17          MR. MOST:
18               Twelve is the DOJ document. Thirteen
19            is the October 2019 PowerPoint, and
20            then I also referenced -- I'll pop
21            these into an e-mail to you. 51 through
22            55 were the Ramirez V. Killian.  The
23            answer key from the 2019 DTB and then
24            the three documents associated with the
25            2017 DTB, and then I also used

1                  Plaintiff's Exhibit 7, which was the

2                  photo of the deceased dog.  So I'll put

3                  this in an e-mail for everyone,

4                  including the court reporter, so that

5                  we've got them all.

6    EXAMINATION BY MR. ROQUEMORE:

7         Q.    David, I have a couple of questions, but

8    I'm going to talk over your shoulder so I don't

9    have an echo. This is the document I'm asking

10   about, the 2017 DTB document.  On the last page

11   they are showing a number of videos.  I believe you

12   testified that, as we're sitting here today, you

13   don't remember the content of those, right?

14        A.    That's right.

15        Q.    If you saw those videos at a later date,

16   would you recognize those?

17        A.    Yeah.  I believe maybe -- well, that is

18   from 2017, so I imagine it would be updated, but if

19   I were able to see the videos at a later date, I

20   would likely recognize them.

21        Q.    For the 2017 DTB, did you look at the

22   NOPD's records to determine whether or not Officer

23   Burmaster actually received that training?

24        A.    I did.

25        Q.    You looked at -- what was the result of

1  what you looked at?

2      A.    So for both the 2017 and -- so right

3  there, that he had actually taken it and passed it

4  with a score of 100 percent.

5              MR. ROQUEMORE:

6                  William, is that one of your

7              exhibits?

8              MR. MOST:

9                  Yeah.  This is Deposition Exhibit

10             54.

11 BY MR. ROQUEMORE:

12     Q.    Same question for the 2019 DTB.  Did you

13 look at the records to see whether or not Officer

14 Burmaster, in fact, received that training?

15     A.    I did.  I pulled up -- our records have a

16 similar spreadsheet, and he also took and passed

17 the October 2019 DTB.

18     Q.    Based on your research, what percentage

19 of NOPD officers received the 2017 DTB training

20 relating to dog bite prevention?

21     A.    So all of our DTB training goes out to

22 100 percent of our commissioned officers.  So any

23 officer who is POST certified is required to go in

24 and do the Departmental Training Bulletins.  So by

25 2017 and 2019, it would have been 100 percent of

1    our commissioned officers.

2                MR. ROQUEMORE:

3                    That's all the questions I have.

4                MR. MOST:

5                    I have a few redirect, but, Ted, do

6                you want to jump in?

7                MR. ALPAUGH:

8                    Nope.

9    BY MR. MOST:

10       Q.    So, Sergeant Barnes, would you agree that

11   a test where almost every officer gets 100 percent

12   on the test is not really a good test to reflect

13   officer comprehension?

14       A.    So it depends on, again, like the facts

15   and circumstances on that. There is two ways you

16   can go with that, right.  You could say, look, if

17   everybody gets a hundred, then it must not be a

18   good test, right, or you could say that if

19   everybody is getting a hundred, then they must be

20   really getting it and understanding the training,

21   right.  So to say which one is indicative of it, I

22   don't think you can look at it based solely on the

23   test scores.  If you -- I believe if you look at

24   the May 2019, that one there is clearly scores that

25   were not at 100 percent as well, too.  And that is

1  -- is this the 2019?

2      Q.    Uh-huh.

3      A.    So you see the 2019 test scores here,

4  they're not all at 100 percent, right.  We require

5  80 percent to pass, and in this one, you can see

6  that there's officers that were failing it, right.

7  Now, if they failed it, so they would try and take

8  it again.  As you can see right there Clifford

9  Thompson had to take it three times, which just

10  further reinforces the training when they have to

11  consistently do it over and over.  So the question

12  -- I don't know that we can say that it is

13  indicative of a poor testing based solely on the

14  test scores, right.

15      Q.    Right, but, I mean, you worked on some of

16  these tests for training, right?

17      A.    Correct.

18      Q.    And so if you see training results or

19  test results, and almost every officer is getting a

20  hundred, a hundred, a hundred, a hundred, that's at

21  least, to you, a red flag that, hey, maybe we need

22  to look at this test, because maybe this is not

23  calibrated correctly, right?

24          MR. ROQUEMORE:

25              Object to the form.  Asked and

1          answered.

2      THE WITNESS:

3              I mean, again, it depends on the

4          training, the testing, and the

5          specifics of it, right.  So like a lot

6          of these with the -- for example, I

7          mean, just because you've got it pulled

8          up right here, if you look at Athena

9          Monteleon, which is about halfway down

10         the page, just above the halfway part

11         of the page, she took the test four

12         times and got a 70, a 70, a 55, and,

13         then ultimately passed it with -- what

14         is that, a 90?  All that did was

15         reinforce the testing information to

16         her repeatedly until she was able to

17         actually pass it with a score of 90,

18         right.

19              Now, I don't know that the 2017 test

20         results had -- I don't know if these

21         are organized by score or what.  If you

22         would find duplicates in it, because, I

23         mean, it doesn't really appear to be.

24         It appears to be almost everybody got a

25         hundred on this one, right.  So, again,

```
1              I don't know that you can answer
2              specifics on this regarding whether it
3              was indicative of the training or
4              indicative of the test being too easy,
5              right.  What I can say is if they're
6              getting the answers right, then they
7              must have the information that we were
8              trying to give to them, right.
9    BY MR. MOST:
10       Q.  Or the answers are so suggestive of what
11   the correct answer of that is, it's really easy to
12   pass, right?
13              MR. ROQUEMORE:
14                  Objection, form.
15              THE WITNESS:
16                  I mean, we have the test there that
17              you can look at that and draw whatever
18              conclusions you wanted to from the test
19              questions.
20   BY MR. MOST:
21       Q.  Correct.  I guess my question was not --
22   I'm not saying that hundreds or almost hundreds
23   across the board definitely is a sign of a problem,
24   but it's a least a red flag that you should look at
25   this test because there could be a problem, right?
```

1      A.    It could be, yes.

2      Q.    And that would be true for this 2017 DTB,

3    right?

4      A.    It could be.  Again, the test scores

5    themselves may not be indicative of anything.

6    You'd have to go through more than that to

7    determine if there was an issue. Certainly, it

8    could give someone pause to take a deeper look.

9      Q.    Do you know if anyone took a pause to

10    take a deeper look into this 2017 DTB?

11      A.    I don't know.

12      Q.    Okay.  Then going to the October 2019

13    one, you see that Burmaster passed it with an 80?

14      A.    I see that.

15      Q.    So that's the lowest possible passing

16    grade?

17      A.    It is.

18      Q.    You see that Deposition Exhibit 52 is the

19    answer key for the October 2019 DTB?

20      A.    I see that, yes.

21      Q.    Candidly, some of these questions don't

22    make any sense to me.  I wonder if you agree.  Like

23    Question Number 4:  It is not equally important to

24    assess the dog's environment?  Does that question

25    make any sense to you, Sergeant Barnes?

1    A.   So consistent with like the PowerPoint

2  and what was recorded in the DOJ report, it is.

3  You need to not just -- if you can't observe the

4  actions of the dog, but -- and we talked about this

5  earlier in the deposition.  You want to, when you

6  first approach, look and see the environment the

7  dog is in.  See if there is a Beware of Dog sign,

8  right, or if there is chains or if there is a water

9  bowl outside, that kind of thing.  That's what it

10 means by to assess the dog's environment.  Does it

11 look like the dog is being kept in an abusive

12 environment.

13    Q.   But the question is, "It is not equally

14 important to assess the dog's environment?"

15 Equally important to what?

16    A.   So to everything else in response, I

17 would assume, but I would agree with you that it is

18 not the best-worded question, right.

19    Q.   What about Number 8?  It says, "First

20 scan the surroundings for escape routes," et

21 cetera.  First of what?

22    A.   So this comes almost directly from the

23 PowerPoint.  If you go back to the PowerPoint, it

24 gives you the steps, and so this is really

25 indicative of whether or not you actually reviewed

1    the reference material.  Do you have the PowerPoint

2    there?

3        Q.    Yeah.  I mean, I know this is copied from

4    the PowerPoint, but in the context of a question,

5    it doesn't seem to make any sense to me.  Like

6    Number 9. "Second, give attention to the behavior

7    of the dogs and the situation.  True or false?"  I

8    don't understand how you can have a true or false

9    question that's like, second do this.

10       A.    Well, if you go to the PowerPoint, the

11   PowerPoint specifically gives you the training, but

12   it is copied from the DOJ thing that first you want

13   to give attention to the dog's behavior.  Second,

14   you want to scan for escape routes and stuff like

15   that, right.

16       Q.    Okay.

17       A.    So that is where it is sort of a question

18   that is designed to trick you up, because rather

19   than focus on the question itself, it is focusing

20   on whether or not you actually paid attention to

21   the PowerPoint on what comes first and what comes

22   second.

23       Q.    Okay.  That's all the questions I've got,

24   Sergeant Barnes.  Thank you again for your time.  I

25   appreciate it.

1                    [End of deposition, 3:36]
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       C E R T I F I C A T E

2

3               This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5               I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that SERGEANT DAVID
7   BARNES, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 102 pages;

9               That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  4/14/25

24

25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**