```
 1                 UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF LOUISIANA
 3
 4   DEREK BROWN and JULIA            CIVIL ACTION NO.
     BARECKI-BROWN                    22-00847
 5
     VERSUS
 6                                    DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF        SECTION: L
     NEW ORLEANS
 8
 9
10
11   * * * * * * * * * * * * * * * * * * * * * * * * *
12             TRANSCRIPT OF THE DEPOSITION OF:
13                    DAVID DUPLANTIER,
14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE
15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,
16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.
17   * * * * * * * * * * * * * * * * * * * * * * * * *
18
19         REPORTED AT:
20         NEW ORLEANS CITY HALL
21         1300 PERDIDO STREET, ROOM 5E03
22         NEW ORLEANS, LOUISIANA  70112
23
24
25         COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```



EXHIBIT 1

```
 1   them their children.  Do you feel the same way about
 2   your dog?
 3       A.   Yes, sir, I do.
 4       Q.   And I think from -- from reviewing this
 5   document, can you tell that the Brown family also felt
 6   that way?
 7       A.   Yeah, I can.  As I read the document, I
 8   glanced at the picture of the dog, but I didn't really
 9   want to look at it because I understand -- not having
10   gone through it, but I can safely say I understand
11   probably how they feel.
12       Q.   You'd be devastated if somebody shot your dog,
13   right?
14       A.   Yes, sir.
15       Q.   I would be too.  For both.  For both your dog
16   and my dog, if anyone shot either of them.
17            Can you tell me a little bit about what your
18   progression of ranks and roles have been from when you
19   joined the NOPD until now, just generally?
20       A.   Started in NOPD in 1991.  Naturally, like
21   every other officer, patrol for three, four years.
22   They transferred me over to an undercover narcotics
23   unit I worked at for three years.  I think right after
24   narcotics, I went back to the district as a narcotics
25   detective, not working under -- undercover capacity.  I
```



1   did that for about a year.
2           I moved on to -- I earned a position on the
3   SWAT team.  I applied for the SWAT team.  I spent maybe
4   about 12, 13 years there.  And after the SWAT team,
5   they offered me to come teach, so I've been at the
6   academy, I would say -- as a supervisor, but at the
7   academy since maybe 2013.
8           But I also -- there was a break with my
9   SWAT -- my SWAT responsibilities.  They took me back as
10  an instructor there for a few years to teach from a
11  patrolman standpoint.  Went back to the SWAT team.
12  Went back to the -- so it's kind of been back and forth
13  between the SWAT team and the academy.
14          And I've been at the academy now, I would say,
15  consistently for the last maybe -- let's see.  I said
16  '13?  What?  Twelve years, maybe 13 years, somewhere in
17  that category.  My numbers might be off a little, but
18  it's been a while.
19      Q.  Understood, understood.  Thank you.
20          It sounds like you have experienced both
21  patrolling the streets and also training patrolmen and
22  SWAT team members.  Is that right?
23      A.  Yes, sir.
24      Q.  When you were patrolling the streets, have you
25  ever had the occasion to come upon a canine at any of



```
 1         Q.    Yeah.  It's kind of hard to -- has there ever
 2   been any training on, like -- I guess I'm going to call
 3   it threat assessment.  It could be -- I'm not talking
 4   about dogs, necessarily.
 5         A.    Just in general?
 6         Q.    Yeah.  Like --
 7         A.    Officers go through that with use of force.
 8   I mean --
 9         Q.    Okay.
10         A.    -- whenever -- whenever officers go through
11   use-of-force training, which is ongoing all the time.
12         Q.    Sure.
13         A.    And that -- that's applicable to animals,
14   people, what have you.  Naturally, the force has to be
15   reasonable.  So depending on the circumstances, the --
16   what you choose to resort to as an application of
17   force, the circumstances naturally will dictate.
18         Q.    Right.  Of course.
19         A.    So yeah.  They go through -- officers go
20   through that training on a regular.
21         Q.    Okay.  Is part of that training to help
22   officers correctly identify what is reasonably a threat
23   of serious bodily harm or death versus something that
24   is not a threat arising to that level?  Does the
25   training help officers determine whether it's a threat
```



```
 1   that justifies lethal force versus a threat that does
 2   not justify lethal force?
 3       A.   I'll say, yes, the training does cover that.
 4   It's -- it's hard to be because as I -- as I teach
 5   recruits, I say I can take this incident and take one
 6   small factor of it and change it slightly.
 7       Q.   Sure.
 8       A.   And it will dramatically -- or could
 9   dramatically change their response to it.  So once
10   again, I guess the biggest thing is, is the key word is
11   "reasonableness" --
12       Q.   Right.
13       A.   -- if the force -- force being used is
14   reasonable.  Does it fit -- as you're asking me, does
15   it fit the problem at hand.  And even then, we've had
16   situations where the force is justifiable -- would have
17   been justifiable, but there are other factors that fall
18   in -- i.e., who's around?  What's around?  What other
19   elements are present that may stop you from you
20   applying that force?  Which means you got to come up
21   with another quick plan or take what's coming to you.
22   I hate to say it that way, depending on what that
23   something is, you know.
24       Q.   Understood, understood.
25            Does NOPD train their officers on how to
```



```
 1   determine whether the use of lethal force is reasonable
 2   versus non-reasonable in any given scenario?  Or is
 3   that just totally left up to the officer?
 4        A.    When you -- well -- and -- and when we
 5   talk about reasonableness, yeah, we take into
 6   consideration -- when we're teaching use of force,
 7   we take into consideration the situation and the facts
 8   at hand.
 9              But at the same time -- using myself as an
10   example and not trying to just limit it to an animal.
11   My response to animal may be different from someone
12   else's, only because of my comfort level with the
13   animal, right.
14        Q.    Right.
15        A.    Or dealing with animals, I should say.  So
16   when we talk about reasonableness and threat levels, it
17   also falls to the mind of that officer, right.
18        Q.    It has some --
19        A.    And it does have to fall in parameters.  Even
20   through -- so what may frighten you may be more than
21   what frightens me.  It still has to fall in a that
22   parameter of will the average person look at it and
23   say, "Yeah, I may not have done it because I may feel
24   more comfortable with this situation."  But I can see
25   where someone did.  I can understand where those
```



```
 1   actions were taken, other -- where other people may
 2   have taken those same actions.
 3        Q.   Understood.  So there's some subjective
 4   component of --
 5        A.   Yes.
 6        Q.   -- this decision-making matrix?
 7        A.   Yes.
 8        Q.   Okay.  And is it correct that NOPD trains
 9   their officers that part of the use of force
10   decision-making process is based on that particular
11   officer's subjective thoughts, experience, comfort
12   level with animals, et cetera?
13        A.   For the most part, yes.
14        Q.   Okay.  Did you -- did you know
15   Officer Burmaster before -- before this incident?
16        A.   Yeah.  He's been on the job for a while.
17        Q.   Okay.  So you've trained him before, before
18   this incident?
19        A.   I mean, he's been in in-service.  Officers go
20   through annual in-service training, so I'm going to say
21   yes on that.  You know, they come in and out for
22   training every year or --
23        Q.   He probably did?
24        A.   Especially -- yes.  I've dealt with him in
25   some case outside of this particular incident.
```



```
 1   with a threat of serious bodily harm or death by a dog,
 2   one of the things to evaluate is, is the dog barking at
 3   me or not?  Is that --
 4       A.   And not all dogs -- I find that certain
 5   breeds, they're not big barkers.  They're presence
 6   alone and that eye contact they make with you is their
 7   way of saying, "You might want to back up."
 8       Q.   Yeah?
 9       A.   Pit bulls are not big barkers all the time.
10   They -- Rottweilers not big barkers.  They -- you'll
11   get more of a stare from them, and they're waiting to
12   give -- see what you're going to do in response to
13   them.  So certain breeds -- not saying they won't bark,
14   but certain breeds, they're not big at barking.
15       Q.   I wish my pit bull mix was not a barker.
16       A.   Some of them -- some of them -- yeah.  I got a
17   bull -- my bulldog, he --
18       Q.   Anytime someone comes on the porch --
19       A.   He can't be quiet.  He's a nonstop bark -- he
20   barks at everything.
21       Q.   Mine too.  Mine too.  Okay.
22            So barking, in your training, would go towards
23   supporting that there is a credible threat posed by the
24   dog, right?
25       A.   Yes.
```



1     Q.   Okay.  But not the breed of the dog?  Does
2  that factor in?
3     A.   Yeah.  I mean -- and once again, it goes to --
4  I'm -- I'm going to say, for me, it would be a factor.
5     Q.   Yeah.
6     A.   But for some people, they don't -- they just
7  see a dog.  They see an animal.  So some people's fear
8  level when it comes to animals -- like people with
9  horses; they won't get near them.  So for me, the breed
10 would be a factor.  For some people -- I can't say for
11 everyone -- that -- that's going to be taken into
12 consideration.
13    Q.   It's one of the subjective components of this,
14 right, based on your own personal experiences,
15 thoughts --
16    A.   Yes, sir.
17    Q.   -- beliefs, and that kind of stuff?
18         And you train the officers that it's fine to
19 factor in your subjective beliefs --
20    A.   Yes, sir.
21    Q.   -- into the overall decision-making rubric.
22 Right?
23    A.   Yes.
24    Q.   There's no reason that they shouldn't, right?
25    A.   No, there's no reason they shouldn't.



```
 1       Q.   What about the size of the dog?
 2       A.   And -- and I'm going to go back to my answer
 3  on the first question.  For me, the size would take --
 4  or play a big factor in it.  You know, I -- the last
 5  thing I want to do is hurt any animal.  But if kicking
 6  the dog would suffice, then I would kick the dog.  If
 7  it -- if I thought it was a credible threat to me.  I
 8  took it as a credible threat, a potential bite.
 9       Q.   That would work really well for a small dog,
10  right --
11       A.   A small dog.
12       Q.   -- kicking?
13       A.   Like, a small.  But then again, like I said,
14  you -- a person's -- when we're going back to talking
15  about use of force and that person's interpretation to
16  the threat level, as long as it stays within reason --
17  so some people, even though it may be a small dog, it
18  still may be a very credible threat to them.
19       Q.   Based on their subjective viewpoint, right?
20       A.   Yes.
21       Q.   And I think I read somewhere -- I don't know.
22  Burmaster will tell you he'd been bitten by small dogs
23  before.  Does that sound familiar?
24       A.   I don't know.  I really don't know.
25       Q.   All right.  So if I'm an officer and I've been
```



```
 1   bitten by small dogs, puppies before, then I'm allowed
 2   to factor that in when I decide whether I use lethal
 3   force or not.  Right?
 4        A.   It -- it is a factor but not --
 5        Q.   Yeah.  Not --
 6        A.   -- the only -- not the only factor.  It is a
 7   factor.
 8        Q.   It's part of the equation?
 9        A.   Yes, sir.
10        Q.   All right.
11        A.   Yes, sir.
12        Q.   If I have this strange ongoing fear for the
13   last ten years that small dogs are going to bite my
14   genitalia, am I allowed to consider that in the overall
15   analysis?
16        A.   I'm not quite sure how to answer.  I'm going
17   to say consider it in the overall analysis.
18        Q.   Well, yeah.  So I have this fear, this concern
19   that -- and I'm an officer you're training.  I have
20   this fear or concern that a small dog is going to bite
21   me in the genitalia.  I just feel that that's going to
22   happen one day.  I can consider that into my
23   decision-making, per the training you provide, right --
24   or per -- that NOPD provides?  Or do I have to set that
25   aside, and I can't think about that?
```



```
 1         A.   I'm a taser instructor, actually.
 2         Q.   Is it -- is there like a difference in how
 3   fast an officer can pull out his service weapon versus
 4   how fast the officer can pull out the taser?
 5         A.   Are you talking about speed of drawing the
 6   weapon.
 7         Q.   Yeah, yeah.
 8         A.   I mean, I guess it varies from officer to
 9   officer.  I mean, some of us move different than
10   others.  The usability of the weapon naturally is
11   different, the way we're able to -- to be effective
12   with a CEW.  So that -- that's really the big factor in
13   that case, not so much drawing it.  It's based off of
14   the -- the direct problem at hand.
15         Q.   The training you give is consistent with the
16   written policies of NOPD, right?
17         A.   Yes, sir.
18         Q.   Okay.  All right.
19              MR. ANADA:  Did we already mark the
20         taser training policy -- taser --
21              MR. ALPAUGH:  I have no idea.
22              MR. ANADA:  Let's see.  The operation
23         manual, 1.7.1?
24              MR. ROQUEMORE:  Twenty-two.
25              MR. ALPAUGH:  Here it is, 22.
```



```
 1                MR. ALPAUGH:  You want to make it
 2          continuing?
 3                MR. ANADA:  You know, I've tried to do
 4          that before, and then some -- I've tried to do
 5          that before, and then some lawyer like put in
 6          a brief that you can't do that.
 7                MR. ALPAUGH:  Okay.  That's fine.
 8                MR. ANADA:  But I would like to.
 9                THE WITNESS:  But -- I'm sorry.  The
10          question was?
11                MR. ALPAUGH:  Can you read that back,
12          ma'am?
13                     (Record read.)
14                MR. ANADA:  Form; scope.  Go ahead.
15       A.   The fact that -- the fact that there were two
16  dogs -- neither dog really took a position that I would
17  consider -- or I think the average person would
18  consider that it was a warning, right.  They were
19  barking, but they were coming towards him.  They were
20  charging towards him.  I didn't find it unreasonable
21  for him to believe that the dog was attacking him.
22  BY MR. ALPAUGH:
23       Q.   Would it be unreasonable to believe that also
24  there's a potential the other dog would attack him as
25  well?
```



```
 1   shooting the dog?
 2              MR. ANADA:  Form; scope.
 3       A.    Yes, actually he was.  He -- I remember him
 4   mentioning he didn't want that to happen.
 5   BY MR. ALPAUGH:
 6       Q.    In fact, he has pets himself?
 7       A.    Pardon?
 8       Q.    In fact, he told you he had pets himself?
 9       A.    Yes.
10              MR. ANADA:  Form; scope.
11                 (Off-record discussion.)
12   BY MR. ALPAUGH:
13       Q.    But even -- so taking all this into account,
14   it was your determination that this was a reasonable
15   use of force?
16              MR. ANADA:  Object to form; outside the
17          scope.
18       A.    Yes, sir.
19   BY MR. ALPAUGH:
20       Q.    And you didn't see anything wrong with what he
21   did?
22              MR. ANADA:  Object to form; outside the
23          scope.
24       A.    No, sir.
25   BY MR. ALPAUGH:
```



```
 1   debrief with a positive attitude.  Officer Burmaster
 2   acknowledged regret for having to shoot the animal and
 3   felt he did what he could to determine if an animal was
 4   present.
 5           "It is the opinion of Sergeant Duplantier that
 6   the incident was tragic and unfortunate; however,
 7   Officer Burmaster acted properly.  He attempted to
 8   identify a potential threat but found himself phased
 9   with a quick difficult decision.  Outside of the animal
10   in question, Officer Burmaster placed no one else in
11   harm's way.
12           "As police officers, our decisions to use
13   force and the amount of force used must be based on
14   reasonableness.  That reasonableness is considered when
15   determining if a situation is considered an imminent
16   threat to ourselves or others.  Though there may be
17   officers that may have addressed the charging animal in
18   a different fashion, Officer Burmaster's decision to
19   use lethal force towards the dog falls within reason."
20   BY MR. ALPAUGH:
21       Q.   All right.  And those comments are still your
22   opinion today?
23                MR. ANADA:  Object to form; scope.
24       A.   Yes, sir.
25   BY MR. ALPAUGH:
```



```
 1   here, given what you saw on the body-worn camera, did
 2   you think that those dogs were friendly?
 3       A.   Once again, I started off saying it was
 4   tragic, being a dog person.  But even I looked at it,
 5   and I thought the dogs were in a mindset where they may
 6   harm an officer.
 7       Q.   Right.  They weren't feeling threatened; they
 8   were protecting their --
 9       A.   I looked at -- I took it as they were
10   protecting their territory, doing what a dog is
11   supposed to do.
12               MR. ALPAUGH:  Yeah.  Okay.  Thank you.
13               MR. ANADA:  I got one.
14                       RE-EXAMINATION
15   BY MR. ANADA:
16       Q.   You would have shot that 22-pound puppy in
17   that situation?
18       A.   Honestly, I'm going to give you an answer
19   that's for you and against you.  I don't know.  I may
20   have.  I'm more likely, having dealt with dogs all my
21   life -- more likely to maybe try and kick at the dog.
22   However, there were two dogs present, so it really,
23   really murks up the water on decision-making.
24       Q.   Fair, fair.
25               MR. ANADA:  Thank you so much.
```



```
 1                    REPORTER'S CERTIFICATE

 2        I, YOLANDA J. PENA, Certified Court Reporter in
      and for the State of Louisiana, Registered
 3    Professional Reporter, and as the officer before whom
      this testimony was taken, do hereby certify that DAVID
 4    DUPLANTIER, after having been duly sworn by me upon
      authority of R.S. 37:2554, did testify as set forth in
 5    the foregoing 146 pages.
          I further certify that said testimony was reported
 6    by me in the Stenotype reporting method, was prepared
      and transcribed by me or under my direction and
 7    supervision, and is a true and correct transcript to
      the best of my ability and understanding.
 8        I further certify that the transcript has been
      prepared in compliance with transcript format
 9    guidelines required by statute or by rules of the
      board and that I have been informed about the complete
10    arrangement, financial or otherwise, with the person
      or entity making arrangements for deposition services.
11        I further certify that I have acted in compliance
      with the prohibition on contractual relationships, as
12    defined by Louisiana Code of Civil Procedure Article
      1434, and in rules and advisory opinions of the board.
13        I further certify that I am not an attorney or
      counsel for any of the parties, that I am neither
14    related to nor employed by any attorney or counsel
      connected with this action, and that I have no
15    financial interest in the outcome of this matter.
          This certificate is valid only for this
16    transcript, accompanied by my original signature and
      original raised seal on this page.
17
          Prairieville, Louisiana, this 10th day of March,
18    2023.

19

20

21

22                         _____
                           YOLANDA J. PENA, CCR, RPR
23                         CCR NO. 2017002, RPR NO. 907346

24

25
```