David Duplantier                                           March 08, 2023

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   DEREK BROWN and JULIA          CIVIL ACTION NO.
     BARECKI-BROWN                  22-00847
 5
     VERSUS
 6                                  DIVISION: 4
     DERRICK BURMASTER, SHAUN
 7   FERGUSON, and the CITY OF      SECTION: L
     NEW ORLEANS
 8
 9
10
11   * * * * * * * * * * * * * * * * * * * * * * * * *
12            TRANSCRIPT OF THE DEPOSITION OF:
13                     DAVID DUPLANTIER,
14   TAKEN ON BEHALF OF PLAINTIFF, REPORTED IN THE ABOVE
15   ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,
16   CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.
17   * * * * * * * * * * * * * * * * * * * * * * * * *
18
19        REPORTED AT:
20        NEW ORLEANS CITY HALL
21        1300 PERDIDO STREET, ROOM 5E03
22        NEW ORLEANS, LOUISIANA  70112
23
24
25        COMMENCING AT 1:53 P.M., ON MARCH 8, 2023.
```



```
 1                    A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFF:

 4         JONES WALKER L.L.P.
           (BY:  TARAK ANADA, ESQ.)
 5         201 ST. CHARLES AVENUE, 49TH FLOOR
           NEW ORLEANS, LOUISIANA  70170
 6         (504) 582-8322
           tanada@joneswalker.com
 7

 8     FOR CITY OF NEW ORLEANS AND SHAUN FERGUSON:

 9         NEW ORLEANS CITY ATTORNEY'S OFFICE
           (BY:  JAMES M. ROQUEMORE, ESQ.)
10         1300 PERDIDO STREET, SUITE 5E03
           NEW ORLEANS, LOUISIANA  70112
11         (504) 658-9800
           james.roquemore@nola.gov
12

13     FOR DERRICK BURMASTER:

14         GUSTE, BARNETT, SCHLESINGER & ALPAUGH, LLP
           (BY:  C. THEODORE ALPAUGH III, ESQ.)
15         639 LOYOLA AVENUE, SUITE 2130
           NEW ORLEANS, LOUISIANA  70113
16         (504) 529-4141
           cta@gustebarnett.com
17

18     ALSO PRESENT:

19         SOPHIA CEFOLIA

20
       REPORTED BY:
21
           YOLANDA J. PENA
22         CCR NO. 2017002, RPR
           STATE OF LOUISIANA
23

24

25
```



David Duplantier                                                March 08, 2023
                                                                        Page 5

```
 1                    S T I P U L A T I O N
 2
 3           IT IS STIPULATED AND AGREED by and among the
 4    parties that this deposition is hereby being taken
 5    pursuant to the Federal Rules of Civil Procedure.
 6           All formalities, excluding the reading and
 7    signing of the transcript by the witness, are hereby
 8    waived.
 9           All objections, except as to the form of the
10    question and responsiveness of the answer, are
11    considered reserved until trial or other use of the
12    deposition.
13
14
15
16
17
18
19
20
21
22
23
24
25
```



David Duplantier March 08, 2023
Page 8

David Duplantier March 08, 2023

1  them their children.  Do you feel the same way about
2  your dog?
3      A.   Yes, sir, I do.
4      Q.   And I think from -- from reviewing this
5  document, can you tell that the Brown family also felt
6  that way?
7      A.   Yeah, I can.  As I read the document, I
8  glanced at the picture of the dog, but I didn't really
9  want to look at it because I understand -- not having
10 gone through it, but I can safely say I understand
11 probably how they feel.
12     Q.   You'd be devastated if somebody shot your dog,
13 right?
14     A.   Yes, sir.
15     Q.   I would be too.  For both.  For both your dog
16 and my dog, if anyone shot either of them.
17          Can you tell me a little bit about what your
18 progression of ranks and roles have been from when you
19 joined the NOPD until now, just generally?
20     A.   Started in NOPD in 1991.  Naturally, like
21 every other officer, patrol for three, four years.
22 They transferred me over to an undercover narcotics
23 unit I worked at for three years.  I think right after
24 narcotics, I went back to the district as a narcotics
25 detective, not working under -- undercover capacity.  I



David Duplantier                                          March 08, 2023

1   did that for about a year.
2           I moved on to -- I earned a position on the
3   SWAT team. I applied for the SWAT team. I spent maybe
4   about 12, 13 years there. And after the SWAT team,
5   they offered me to come teach, so I've been at the
6   academy, I would say -- as a supervisor, but at the
7   academy since maybe 2013.
8           But I also -- there was a break with my
9   SWAT -- my SWAT responsibilities. They took me back as
10  an instructor there for a few years to teach from a
11  patrolman standpoint. Went back to the SWAT team.
12  Went back to the -- so it's kind of been back and forth
13  between the SWAT team and the academy.
14          And I've been at the academy now, I would say,
15  consistently for the last maybe -- let's see. I said
16  '13? What? Twelve years, maybe 13 years, somewhere in
17  that category. My numbers might be off a little, but
18  it's been a while.
19      Q.  Understood, understood. Thank you.
20          It sounds like you have experienced both
21  patrolling the streets and also training patrolmen and
22  SWAT team members. Is that right?
23      A.  Yes, sir.
24      Q.  When you were patrolling the streets, have you
25  ever had the occasion to come upon a canine at any of



David Duplantier                                              March 08, 2023

```
 1   the residence you investigated or entered?
 2        A.   Numerous times.
 3        Q.   Have you ever shot any of the dogs you've
 4   encountered?
 5        A.   I have never shot a dog.  I have been on scene
 6   where a dog was shot by a team member, but I haven't
 7   shot a dog personally.
 8        Q.   Are you able to estimate how many times you've
 9   encountered a dog in the line of duty?
10        A.   Oh, I -- I couldn't give you a number.  I
11   would -- I would be pulling something out the sky.
12        Q.   It would be like more than 50, right?
13        A.   I'm sure.  Thirty-two years, yeah.
14        Q.   Okay.  Have any of those dogs, to your memory,
15   ever acted aggressively towards you?
16        A.   A few of them, yes.  A few of them.
17        Q.   How did you deal with those instances?
18        A.   Well, as I stated, one -- we executed a
19   warrant on a house one time, and we were forced to
20   apply force against dog, which actually ended up
21   killing the dog.
22        Q.   That was a no-knock?
23        A.   Yes, it was a no-knock.  The -- just off the
24   top of my head, there was a dog we had to tase -- use a
25   taser against, and we were fortunate -- actually, not
```



David Duplantier                                          March 08, 2023

```
 1   that justifies lethal force versus a threat that does
 2   not justify lethal force?
 3        A.   I'll say, yes, the training does cover that.
 4   It's -- it's hard to be because as I -- as I teach
 5   recruits, I say I can take this incident and take one
 6   small factor of it and change it slightly.
 7        Q.   Sure.
 8        A.   And it will dramatically -- or could
 9   dramatically change their response to it.  So once
10   again, I guess the biggest thing is, is the key word is
11   "reasonableness" --
12        Q.   Right.
13        A.   -- if the force -- force being used is
14   reasonable.  Does it fit -- as you're asking me, does
15   it fit the problem at hand.  And even then, we've had
16   situations where the force is justifiable -- would have
17   been justifiable, but there are other factors that fall
18   in -- i.e., who's around?  What's around?  What other
19   elements are present that may stop you from you
20   applying that force?  Which means you got to come up
21   with another quick plan or take what's coming to you.
22   I hate to say it that way, depending on what that
23   something is, you know.
24        Q.   Understood, understood.
25             Does NOPD train their officers on how to
```



David Duplantier                                           March 08, 2023

```
 1   determine whether the use of lethal force is reasonable
 2   versus non-reasonable in any given scenario?  Or is
 3   that just totally left up to the officer?
 4        A.   When you -- well -- and -- and when we
 5   talk about reasonableness, yeah, we take into
 6   consideration -- when we're teaching use of force,
 7   we take into consideration the situation and the facts
 8   at hand.
 9             But at the same time -- using myself as an
10   example and not trying to just limit it to an animal.
11   My response to animal may be different from someone
12   else's, only because of my comfort level with the
13   animal, right.
14        Q.   Right.
15        A.   Or dealing with animals, I should say.  So
16   when we talk about reasonableness and threat levels, it
17   also falls to the mind of that officer, right.
18        Q.   It has some --
19        A.   And it does have to fall in parameters.  Even
20   through -- so what may frighten you may be more than
21   what frightens me.  It still has to fall in a that
22   parameter of will the average person look at it and
23   say, "Yeah, I may not have done it because I may feel
24   more comfortable with this situation."  But I can see
25   where someone did.  I can understand where those
```



David Duplantier                                          March 08, 2023

1  actions were taken, other -- where other people may
2  have taken those same actions.
3       Q.   Understood.  So there's some subjective
4  component of --
5       A.   Yes.
6       Q.   -- this decision-making matrix?
7       A.   Yes.
8       Q.   Okay.  And is it correct that NOPD trains
9  their officers that part of the use of force
10 decision-making process is based on that particular
11 officer's subjective thoughts, experience, comfort
12 level with animals, et cetera?
13      A.   For the most part, yes.
14      Q.   Okay.  Did you -- did you know
15 Officer Burmaster before -- before this incident?
16      A.   Yeah.  He's been on the job for a while.
17      Q.   Okay.  So you've trained him before, before
18 this incident?
19      A.   I mean, he's been in in-service.  Officers go
20 through annual in-service training, so I'm going to say
21 yes on that.  You know, they come in and out for
22 training every year or --
23      Q.   He probably did?
24      A.   Especially -- yes.  I've dealt with him in
25 some case outside of this particular incident.



David Duplantier                                                   March 08, 2023
David Duplantier                                                   March 08, 2023
Page 22

```
 1   organization, will you tell me so I don't get confused
 2   about that?
 3        A.   Yes.
 4        Q.   Okay.
 5        A.   Yes.
 6             MR. ROQUEMORE:  I'm going to object to
 7        the extent that that's not a -- I mean,
 8        you-guys -- I'm going to object to the extent
 9        that it's unreasonable for him to always
10        qualify his answers.
11             I think if there's a question, you know,
12        I would suggest that we need to -- like, you
13        know, if there's a question on whether he's
14        testifying on the topic he's designated for,
15        that would be part of the questioner's
16        responsibility to make sure that, you know,
17        the scope of the answer and the applicability.
18             MR. ANADA:  Okay.
19             MR. ROQUEMORE:  So that's my objection.
20             MR. ANADA:  Yes, sir.  Objection is
21        noted for the record.
22             MR. ROQUEMORE:  Yes, sir.
23   BY MR. ANADA:
24        Q.   Do you ever remember Officer Burmaster telling
25   you he was afraid Apollo would bite him in the penis?
```



David Duplantier                                          March 08, 2023

1    A.    I don't recall that.
2    Q.    Okay.  Let's go to the topic you're designated
3  about, Sergeant.  "NOPD trained on how officers are to
4  handle animals in the field."  Let's just stop there.
5        I think the most efficient way is can -- can I
6  just ask you this question, and you answer it to the
7  best of your ability?  What kind of training do NOPD
8  officers get about how to handle animals in the field?
9    A.    Between -- and I don't recall the exact time
10 frame.  But I know there was between -- sometimes
11 between early 2000 to 2000- and, maybe, -14, sometime
12 in there we had training and in-service on handling
13 animals, right.
14   Q.    This is post -- post-academy?  Like after --
15   A.    No.  This was actually -- so the in-service
16 training is annual training that officers go through
17 every year.  They'll come up with a curriculum
18 targeting certain areas that -- some things don't
19 change, other go through legal updates, but some things
20 are added and maybe deleted based off of the -- the job
21 trying to get information out --
22   Q.    Sure.
23   A.    So I know in -- like, I don't recall the exact
24 date, but we did -- at some point for that annual
25 in-service training for police officers, there was a



```
 1   completed the same day.
 2   BY MR. ALPAUGH:
 3        Q.   Okay.  Why don't you tell us about that.
 4        A.   Naturally, he comes in.  I take the time to
 5   sit down and explain to him why he's here, though he
 6   already knows.  And the first thing we do is -- before
 7   I do anything, we sit down and we look at the BWC
 8   together, the body-worn camera footage together.
 9             You'd be surprised how many officers really
10   haven't seen their body-worn camera footage in some of
11   these incidents, so it may be the first time they saw
12   it.  I don't recall if it was his first time or not.
13             He talked about everything leading up to it,
14   to the encounter with the animals.  As we went through
15   it, we talked about it, frame by frame almost.  I said.
16   "It was good that you did that.  The only thing I can
17   tell you is, is maybe give yourself a second longer, a
18   couple seconds longer before entering the yard."
19             However, I didn't know the extent of the
20   domestic call.  I didn't know the particulars on it.  I
21   know they got a domestic call, so that plays a factor
22   into things as well, not only for response but exposure
23   as well.  Domestic call is very dangerous.  It's
24   already a heated situation.  So if it was a true
25   domestic call, we take that into consideration.
```



1        Once he was inside, they actually achieved
2   a combat L. The initial officer -- I don't recall
3   who went through the gate first, but I know
4   Officer Burmaster -- it's what we refer to as
5   "corner-fed" -- corner-fed entrance point, meaning the
6   entrance and exit point to the yard was shifted more to
7   one side than the other. So it was closer to the --
8   facing the house, to the right side of the yard rather
9   than being directly in the center.
10       Q.   Okay.
11       A.   So when Officer Burmaster ended up going to
12  achieve this combat L, he went to the left. The other
13  officer went to the right, which put him closer to the
14  gate, actually. Officer Burmaster -- shortly after
15  getting in there, the dogs came charging out. So by
16  the time, there was really nowhere else for him to go.
17  He wasn't going to jump the fence. He's not going to
18  outrun the dog.
19       And my findings were, based on the response
20  of the dog -- and I'm going to say this for the record.
21  I feel bad about what happened, right. But his
22  decision-making at that point -- I don't know what else
23  he could have done. And I've even reached out, said,
24  "Well, okay. If y'all found him to be wrong, give me
25  an alternative response," which I have not been able to



```
 1   get.
 2        Q.   When you say you reached out, you reached out
 3   to who?
 4        A.   To -- I spoke with PIB.  I spoke with --
 5             MR. ANADA:  Form.
 6        A.   I think it was Sergeant Helou in PIB,
 7   referencing that.  I never spoke with Officer -- I'm
 8   sorry, Sergeant Brewer firsthand with it.  But I did
 9   speak with Sergeant Helou since he was the one that
10   sent me the PTTR.
11             But for the most part -- I mean -- and I
12   didn't -- as we went through it, like I said, the only
13   thing I could tell him was, "Look, maybe if you paused
14   a few seconds, you might have gotten alerted by the
15   dog."  But he did make an attempt to try and alert any
16   animal inside curtilage of the residence.
17             The fact that he got jammed into the corner
18   was a big factor, and the dog's response.  The dog is
19   just being a dog.  It's his house, his domain, so I get
20   it.  But unfortunately, the dog being a dog put the
21   officer in a situation where he had to do something.
22             The taser -- the probability of the taser
23   being effective, slim to probably none.  The fact --
24   if you wanted to go to an impact weapon, i.e. baton,
25   that -- like I said, you got to let the dog get up on
```



```
 1   you.  So it basically almost effect a bite or damn near
 2   effect a bite before you could -- and even then, you
 3   lose leverage because now the dog is on top of you.
 4   You really don't have leverage to swig the impact
 5   weapon.
 6              So unfortunately, to the behest of everybody
 7   else, I didn't find anything wrong with his actions.
 8   Once again, I said I'm open minded.  If somebody can
 9   show me a better tactical response, I'm willing to
10   listen, but I didn't -- I didn't see another
11   alternative method.
12   BY MR. ALPAUGH:
13        Q.   So you felt, in the circumstances, he acted
14   properly?
15        A.   Yes, sir.
16              MR. ANADA:  Object to form; outside the
17        scope.
18   BY MR. ALPAUGH:
19        Q.   And also -- there are also a lot of factors.
20   There was another dog there, correct?
21        A.   Yes.  That -- that's a big factor.  There were
22   two dogs there.
23              MR. ANADA:  Form; outside the scope.
24              Sorry.
25        A.   There were two dogs present.
```



1        MR. ALPAUGH:  You want to make it
2     continuing?
3        MR. ANADA:  You know, I've tried to do
4     that before, and then some -- I've tried to do
5     that before, and then some lawyer like put in
6     a brief that you can't do that.
7        MR. ALPAUGH:  Okay.  That's fine.
8        MR. ANADA:  But I would like to.
9        THE WITNESS:  But -- I'm sorry.  The
10    question was?
11       MR. ALPAUGH:  Can you read that back,
12    ma'am?
13              (Record read.)
14       MR. ANADA:  Form; scope.  Go ahead.
15    A.   The fact that -- the fact that there were two
16 dogs -- neither dog really took a position that I would
17 consider -- or I think the average person would
18 consider that it was a warning, right.  They were
19 barking, but they were coming towards him.  They were
20 charging towards him.  I didn't find it unreasonable
21 for him to believe that the dog was attacking him.
22 BY MR. ALPAUGH:
23    Q.   Would it be unreasonable to believe that also
24 there's a potential the other dog would attack him as
25 well?



```
 1        A.   Dogs are pack animals, so it's not
 2   unreasonable to believe that it.  Is it guaranteed the
 3   second dog would have done it?  Don't know.  But dogs
 4   are pack animals, so it's possible that factor -- that
 5   factor loomed as well.
 6        Q.   Would you describe what "pack animals" means?
 7        A.   Meaning they work together.  There's
 8   generally -- one is over the other.  One is a leader;
 9   one is the follower.  If the bigger dog was the leader,
10   then it's possible that the other dog would followed or
11   vice versa.
12             So they do hang together.  Dogs hunt together.
13   They tend to eat together.  They are individuals, but
14   they function and they feel more comfortable when
15   they're in a group.  As long as they been -- let me say
16   this.  They don't -- like people, they don't all get
17   along.  But generally, if they do have some type bond
18   between them, they will follow each other.
19        Q.   Officer Burmaster told you he felt he and the
20   other officer were both in imminent danger at the time
21   this happened.  Correct?
22             MR. ANADA:  Form; scope.
23        A.   Yes, sir.
24   BY MR. ALPAUGH:
25        Q.   And (inaudible) officer remorseful about
```

