UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DEREK BROWN, ET AL | CIVIL ACTION |
| VERSUS | NO. 22-847 |
| DERRICK BURMASTER, ET AL | SECTION "L" (4) |

**Memorandum in Support of Plaintiffs' Motion *in Limine* Regarding Defense Witnesses Lubrano, Sanchez, Ganthier, and Kirkpatrick**

This case is about New Orleans Police Department officer Derrick Burmaster's use of lethal force on Plaintiffs' 16-week-old puppy.

On their witness list, Defendants have listed four high-ranking NOPD officials: Superintendents Lubrano, Sanchez, Ganthier, and Kirkpatrick. All four superintendents reviewed Burmaster's actions in the course of the NOPD disciplinary process. Unlike the officers who directly investigated the shooting, these superintendents did not think the shooting was unreasonable.

The testimony of those four officials and the memoranda they wrote should be excluded for at least three reasons. First, none of the four superintendents were percipient witnesses to the shooting. Nor did they conduct any investigation into the shooting. As a result, the only testimony they can offer is their *personal opinion* about whether the shooting was reasonable – but Defendants have not designated any of the four as an expert. Accordingly, they have no competent testimony to offer at trial.

Second, the Supreme Court and the Fifth Circuit have held that the analysis here should be objective, not subjective. Specifically, the jury is to "judge the reasonableness of an officer's

1

#103959587v1

conduct 'objectively,' that is, without reference to the subjective intent or motivation that underlies the officer's conduct."[1] But Lubrano, Sanchez, Ganthier, and Kirkpatrick each assessed Burmaster from either a purely <u>subjective</u> perspective, or were unable to separate objective and subjective factors. For example, Sanchez agreed that he applied a "subjective analysis" that hinged on what Burmaster "believe[d] about the situation."[2] Similarly, Ganthier refused to say whether the dog <u>actually</u> posed a threat of harm to Burmaster, because "Officer Burmaster thought it" was a threat – and that was enough for Ganthier.[3]

And third, the superintendents' testimony would be misleading to the jury because they skipped a key step of the analysis required by both the constitution and NOPD policy. Specifically, to determine whether shooting a dog was reasonable, both the constitution and NOPD policy require an assessment of whether non-lethal alternatives could have addressed the threat.[4] But the superintendents candidly admitted they did not assess that. For example, Sanchez testified:

> Q.  Okay, but you did not assess whether alternative methods were reasonably available or likely to be ineffective, correct?
>
> A.  That's correct.[5]

Accordingly, the superintendent's testimony is not even helpful for determining whether Burmaster complied with *NOPD policy*, much less the U.S. Constitution. For the reasons herein, Plaintiffs' motion should be granted.

---

[1] *See Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).
[2] Ex. A (Sanchez Dep.) at 22:13-23:9.
[3] Ex. B (Ganthier Dep.) at 13:19-14:7.
[4] Compare *Killian v. Ramirez* at 428 (requiring analysis of whether "whether killing [the dog] was unavoidable.") with R. Doc. 208-6 (NOPD Policy Manual Chapter 1.3) at ¶ 32 (requiring analysis of whether non-lethal means were "reasonably available."
[5] Ex. A (Sanchez Dep.) at 36:24-37:8. *See also* Ex. B (Ganthier Dep.) at 33:20-24 ("Q. Right. Got it. You did not conduct any analysis about the effectiveness of non-lethal techniques on Apollo, right? That's not what your job is, right? A. No."); Ex. C (Kirkpatrick Dep.) at 78:25-78:7 ("Do you have any facts that suggest that taser would have been ineffective in this scenario? A. I have no facts to support that, yes. Q. Do you have any facts to suggest that kicking the dog would have been ineffective in this situation? A. No.")

### A.     Meet-and-Confer Compliance.

Pursuant to this Court's standing order, the Parties met by telephone on May 15, 2025 to discuss the motion *in limine* urged here. Defendants did not agree to these limitations.

### B.     Motions *in Limine* Generally.

In general, the term "*in limine*" "refer[s] to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered."[6] A ruling on evidence *in limine* "aid[s] the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."[7] "[It] also may save the parties time, effort and cost in preparing and presenting their cases."[8] "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the District Court's inherent authority to manage the course of trials."[9]

### C.     Plaintiffs' Requested *In Limine* Topics.

**1.     This Court should exclude Defendants' Superintendents Lubrano, Sanchez, Ganthier, and Kirkpatrick's testimony and memorandum because they are neither percipient witnesses nor expert witnesses, and their analysis was subjective, not objective.**

Generally, for a witness to testify, they must be either (1) a percipient witness to some fact or (2) an expert witness.[10]

Here, Defendants have listed a range of witnesses that are neither percipient witnesses nor

---

[6] *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984).
[7] *Bowden v. Wal-Mart Stores, Inc.*, No. CIV. A. 99-D-880-E, 2001 WL 617521 at *1 (M.D. Ala. February 20, 2001) (citations omitted).
[8] *Id*.
[9] *Luce*, 469 U.S. at 41 n. 4.
[10] F.R.E. Rule 602; *see Chein v. Shumsky*, 373 F.3d 978, 991 (9th Cir. 2004) (witness "was neither a percipient nor an expert witness with regard to that question, and no rational jury would have thought otherwise.")

experts. Superintendent Kirkpatrick (head of NOPD), Chief Deputy Superintendent Ganthier (second in command of NOPD), Deputy Superintendent Lubrano, and Deputy Superintendent are all high-ranking NOPD officials. None of them witnessed the events in question.[11] None of them have been designated as expert witnesses.[12] Nor did they take part in NOPD's investigation. Instead, they simply reviewed the work of other officers and then gave their own opinion about whether Burmaster complied with NOPD policy, as part of NOPD's disciplinary process.[13] In Superintendent Kirkpatrick's case, she did not even see any photos of the dog or watch the video of the shooting before rendering her opinion.[14]

Given that they are not designated as expert witnesses and have no independent knowledge of the events or NOPD's investigation, they have no competent evidence to offer at trial.

Furthermore, their analysis and opinions would be misleading to the jury because each of their analysis was an almost purely *subjective* analysis – but the question for the jury at this trial requires an *objective* analysis. As the Court is aware, the Fifth Circuit "has held that the killing of a dog can constitute a seizure within the meaning of the Fourth Amendment," and has clarified that "[t]he Fourth Amendment requires that a seizure be objectively reasonable."[15]

As the Fifth Circuit has further emphasized, an officer's use of force may only be evaluated "objectively," and "subjective" factors may not be considered:

---

[11] Ex. C (Kirkpatrick Dep.) at 76:12-15 ("Q. Thank you. So Chief, you were [not] a witness to the shooting or any of the events around the shooting? A. That's correct.") (The court reporter omitted the word "not" in error.)
[12] R. Doc. 101, 104.
[13] Ex. C (Kirkpatrick Dep.) at 76:16-24 ("Q. So your assessment of the reasonableness of the shooting is your opinion; correct? A. It is an opinion, but it is one that I think is weighted with a lot of experience and knowledge. . . . Q. It's a well-informed opinion. A. It is a well-informed opinion.")
[14] Ex. C (Kirkpatrick Dep.) at 13:22-14:2 ("Q. Okay. And at any point, have you seen photos of the dog that was killed? A. I have not. Q. Okay. Have you seen a video of the shooting of the dog? A. I have not.")
[15] *Ramirez v. Killian*, 113 F. 4th 415, 426 (5th Cir. 2024) (emphasis added), explaining that the "relevant legal rule" was stated in *Stephenson v. McClelland*, 632 F. App'x 177, 184 (5th Cir. 2015) (unpub.) (citing *Grant v. City of Houston*, No. 14-20653, 625 F. App'x 670, 2015 U.S. App. LEXIS 16240, 2015 WL 5255102, at *3 (5th Cir. 2015); *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

> Assessing the reasonableness of a police officer's use of force involves 'a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.' … We judge the reasonableness of an officer's conduct 'objectively,' that is, <u>without reference to the subjective intent or motivation that underlies the officer's conduct</u>.[16]

Indeed, just this week, the Supreme Court reaffirmed that the "touchstone of the Fourth Amendment is 'reasonableness,' as measured in <u>objective terms</u>."[17]

Therefore, in deciding whether Officer Burmaster violated the constitution when he used lethal force on Apollo, the jury will need to determine whether Officer Burmaster's conduct was "objectively reasonable" under the totality of the circumstances.

But Lubrano, Sanchez, and Ganthier's analysis was almost purely subjective. They concluded that Burmaster had not violated NOPD's use of force policy, and specifically articulated the facts that "justified the recommended disposition" in their memorandum to the Chief of Police:[18]

- That Burmaster "**didn't think** he was fast enough to make it out of the gate";

---

[16] *Lytle v. Bexar Cty. Tex.*, 560 F.3d 404, 411 (5th Cir. 2009) (emphasis added); *see also Skinner v. Ard*, 517 F. Supp. 3d 586, 600 (M.D. La. 2021) (noting that the use of deadly force against a household pet is reasonable only "if the pet poses an imminent threat to the law enforcement officer's safety, viewed from the perspective of an *objectively reasonable* officer") (emphasis added) (citing *Bletz v. Corrie*, 974 F.3d 306, 310 (3d Cir. 2020); *Id.* at 601 ("[K]illing the dog when he was no longer a threat was *objectively unreasonable* and plainly incompetent."); *Sonnier v. Ackal*, 2017 U.S. Dist. LEXIS 112386, at *6-7 (W.D. La. June 27, 2017) ("The Fourth Amendment requires that a seizure be *objectively reasonable*. Therefore, after a determination has been made that there was a seizure, whether the Amendment was in fact violated. . . requires determining if the seizure was reasonable. In determining whether the seizure — in this case, the killing of the dog — was *objectively reasonable*, the court must examine the totality of the circumstances, balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.") (emphasis added) (internal quotations and citations omitted); *Kincheloe v. Caudle*, 2009 U.S. Dist. LEXIS 96371, at *19 (W.D. Tex. Oct. 16, 2009) ("Chief Caudle's actions were only constitutional if it is determined that the killing of Buddy was *objectively reasonable* under the circumstances."); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) ("[A] police officer's use of deadly force against a dog … is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an *objectively reasonable* officer, the dog poses an imminent threat to the officer's safety.") (emphasis added).
[17] *Barnes v. Felix*, __U.S. __ at 6 (2025) (emphasis added), *quoting Brigham City v. Stuart,* 547 U. S. 398, 403 (2006).
[18] Ex. E (Sept. 11, 2023 Memo from Ganthier, Lubrano, and Sanchez to Chief of Police).

- That Burmaster "**didn't believe** he could jump the fence";

- That Burmaster "**believed** the dog would bite him";

- That Burmaster "**believed** the dog was ferocious";

- That Burmaster "**stated** he just wanted to get out safely."[19]

These facts are all subjective facts that view the situation from the perspective of Burmaster and his personal beliefs, not from the objective perspective of a reasonable officer. Indeed, Chief Sanchez conceded that the analysis in the Chief's Memo was subjective:

Q. Yeah. This is almost entirely a subjective analysis, correct? . . .

A. Is it a subjective analysis? Yes.[20]

Thus, the Chief's memo should be excluded because it applies a subjective analysis inconsistent with the legal standard the jury must apply. Indeed, it has no probative value in assisting the jury in determining whether Burmaster's conduct was *objectively* reasonable, but can only serve to confuse the jury into erroneously applying a subjective standard like the superintendents did. It should therefore be excluded under FRE 403.

So too with testimony from the officers. At deposition, Chief Sanchez conceded that his analysis was subjective:

Q. And so in your analysis whether or not the shooting is reasonable hinges on what -- what the officer believes about the situation, correct?

A. Yes. . . .

Q. And -- and so that's a subjective analysis, right, that -- that hinges on what subjectively is going on in the officer's head, correct?

A. I think that's subjective, yes.

---

[19] *Id.* (emphasis added).
[20] *Id.* at 30:7-13.

Q.   Yes, it's a subjective analysis, correct?

A.   Yes.[21]

Ganthier and Lubrano testified similarly. Ganthier characterized his analysis as "objective," but his analysis was actually subjective. He explained that the key questions were what "is [Burmaster] thinking about? What is he experiencing? . . . It is what the immediate thought process of that officer is."[22]

When asked to assess the situation objectively – *i.e.,* whether the dog <u>actually</u> posed a threat of harm to Burmaster – Ganthier refused, saying "I will not say that. I'll tell you why. I'm not going to say I. <u>I believe Officer Burmaster thought it</u>, so it's not I."[23] (Notably, Ganthier's testimony indicates that he completely misunderstands NOPD's policy. He testified that what is going on in an officer's mind "really what our use of force policy is. What does the officer have in mind or what does he perceive as a threat at the time of the incident."[24] But NOPD policy calls for an objective analysis: it asks if the animal "reasonably appears to pose an imminent threat to human safety" and whether non-lethal means are "reasonably available."[25])

Similarly, Chief Lubrano agreed that it was his position that "as long as Burmaster believed that he was about to be imminently attacked by the dog, as long as that's what he believed, he was

---

[21] Ex. A (Sanchez Dep.) at 22:13-23:9. Later, Sanchez contradicted himself and contended that it was both a subjective and objective analysis. But he also conceded that his written analysis "probably reflects the subjective analysis by Officer Burmaster." *Id.* at 23:22-23.
[22] Ex. B (Ganthier Dep.) at 11:13-14.
[23] Ex. B (Ganthier Dep.) at 13:19-14:7 (emphasis added).
[24] *Id.* at 14:12-18 ("That's really what our use of force policy is. What does the officer have in mind or what does he perceive as a threat at the time of the incident, not for me to sit there and go, oh, yeah, I wouldn't have done that. That's not what I'm saying. I'm saying he believed it was a threat."); 14:23-15:4 ("Q. Got it. So your position to the jury is going to be as long as he thought it was a threat, it was okay -- as long as he thought it was a threat to deliver serious bodily harm to him, he was justified with using lethal force within NOPD's policies? A. I believe that is correct.")
[25] R. Doc. 208-6 (NOPD Policy Manual Chapter 1.3) at ¶ 32.

7

justified in using lethal force."[26] He repeatedly affirmed that what Burmaster "believed" is "what matters."[27] He agreed he couldn't answer questions about the use of force "without considering the subjective viewpoint of the officer."[28]

And Superintendent Kirkpatrick reviewed Lubrano, Sanchez, and Ganthier's memo and agreed with their assessment, without even watching the video of the shooting or seeing any photos of the dog.[29] She conceded that her assessment "incorporated both a subjective and objective component."[30] She was unable or unwilling to attempt to separate out the subjective and objective analyses.[31]

Thus, just like their memorandum, the Superintendents' testimony should be excluded under FRE 403 because it has no probative value in assisting the jury in determining whether Burmaster's conduct was objectively reasonable, but can only serve to confuse the jury into erroneously applying a subjective standard. This problem is compounded by the fact that the Superintendents are literally the highest-ranking officers within NOPD, with Superintendent Kirkpatrick being the actual head of the organization. If the head of NOPD tells the jury her opinion that Burmaster's actions were acceptable based on an erroneous subjective analysis, there is a substantial danger that the jury will adopt her legally erroneous analysis based on her high-ranking status alone.

---

[26] Ex. D (Lubrano Dep.) at 38:8-12. See also id. at 38:17-24 ("If he thought it was reasonable to use lethal force based on his beliefs, then it was appropriate, right? . . . Q. That's your position? A. Yes.")
[27] Ex. D (Lubrano Dep.) at 39:19-21 ("Q. That's what matters, right, what he believes? A. Yes.")
[28] Ex. D (Lubrano Dep.) at 53:20-54:2.
[29] Ex. C (Kirkpatrick Dep.) at 13:22-14:2 ("Q. Okay. And at any point, have you seen photos of the dog that was killed? A. I have not. Q. Okay. Have you seen a video of the shooting of the dog? A. I have not.")
[30] Ex. C (Kirkpatrick Dep.) at 36:4-9.
[31] Ex. C (Kirkpatrick Dep.) at 38:1-9 ("Q. Okay. So you would not easily be able to give me your assessment separating out subjective factors, agreed? A. Subjective is required. What did the officer think and perceive in the moment? Q. Okay. So if I asked you to give me only your assessment based on objective factors, that would be difficult or impossible for you to do? A. It is not the standard.")

Furthermore, the superintendents completely skipped a step of the analysis required by both NOPD policy and the Fifth Circuit. The Fifth Circuit held in *Ramirez* that the analysis of whether killing a pet dog is reasonable "centers on whether the pet dog posed an immediate danger and whether killing it was unavoidable."[32] NOPD policy similarly authorizes the use of firearms on animals only if the "animal reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective."[33] But Sanchez, Ganthier, Lubrano, and Kirkpatrick assessed <u>only</u> the danger element – and did not even analyze the unavoidable / alternative methods element. For example, Sanchez testified:

> Q. Okay, and so your analysis went through whether Officer Burmaster believed the animal posed an imminent threat to human safety, right?
>
> A. Yes.
>
> Q. Okay, but you did not assess whether alternative methods were reasonably available or likely to be ineffective, correct?
>
> A. That's correct.[34]

Similarly, Ganthier agreed that he did not "conduct any analysis about the effectiveness of non-lethal techniques on Apollo."[35] Kirkpatrick testified that she had no facts to suggest that non-lethal options would have been ineffective.[36] And Lubrano testified that Burmaster was "justified

---

[32] *Ramirez, supra*, at 428. (Emphasis added). *See also id.* (noting that courts have "held against defendant officers' assertions of qualified immunity for shooting pet dogs on or adjacent to their owners' property because those dogs either were nonaggressive or could have been dealt with through non-lethal means.")
[33] Chapter 1.3 ¶ 32.
[34] Ex. A (Sanchez Dep.) at 36:24-37:8.
[35] Ex. B (Ganthier Dep.) at 33:20-24 ("Q. Right. Got it. You did not conduct any analysis about the effectiveness of non-lethal techniques on Apollo, right? That's not what your job is, right? A. No.");
[36] Ex. C (Kirkpatrick Dep.) at 78:25-78:7 ("Do you have any facts that suggest that taser would have been ineffective in this scenario? A. I have no facts to support that, yes. Q. Do you have any facts to suggest that kicking the dog would have been ineffective in this situation? A. No.")

in using lethal force" as long as he believed he was going to be "imminently attacked by the dog" – without any analysis of alternatives.[37]

Thus, their conclusions would mislead the jury because he entirely omitted a required analytical step, without explanation. Their conclusions are not even relevant to whether Burmaster violated NOPD policy, because they did not apply the analysis required by NOPD policy, which only permits lethal force on animals if "alternative methods are not reasonably available or would likely be ineffective."[38]

Finally, FRE 403 prohibits "needlessly presenting cumulative evidence." Presenting all four of these Superintendents to give the jury the exact same opinion is needlessly cumulative.

Thus, Lubrano, Sanchez, Ganthier, Kirkpatrick should be excluded because they are neither percipient witnesses nor expert witnesses. And furthermore, their opinions are fully intertwined with subjective factors which mislead the jury's analysis in violation of FRE 403. They should be excluded.

### D. Conclusion

For the reasons described above, this Court should grant Plaintiffs' motion *in limine*.

Respectfully Submitted:

/s/ William Most
WILLIAM MOST (La. Bar No. 36914)
HOPE PHELPS (La. Bar No. 37259)
DAVID LANSER (La. Bar No. 37764)
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, # 6825
New Orleans, LA 70170
Tel: 504.509-5023
Email: williammost@gmail.com

TARAK ANADA (#31598)
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8322
Facsimile: (504) 589-8322
E-Mail: tanada@joneswaker.com

---

[37] Ex. D (Lubrano Dep.) at 38:7-12 ("Is it your position that as long as Burmaster believed that he was about to be imminently attacked by the dog, as long as that's what he believed, he was justified in using lethal force? A. Yes.")
[38] R. Doc. 208-6 (NOPD Policy Manual Chapter 1.3) at ¶ 32.