UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CIVIL ACTION NO. 22-00847


SECTION: L                    DIVISION: 4


DEREK BROWN AND JULIA BARECKI-BROWN

VERSUS

DERRICK BURMASTER, SHAUN FERGUSON, AND THE CITY OF NEW ORLEANS



DEPOSITION OF CHIEF KEITH SANCHEZ,
given in the above-entitled cause, via Zoom
Videoconferencing, pursuant to the following
stipulation, before Raynel E. Schule, Certified
Shorthand Reporter in and for the State of
Louisiana, commencing at 10:10 o'clock a.m., on
Wednesday, the 7th day of May, 2052.

```
 1                    I N D E X

 2                                        Page

 3    Caption                             1

 4    Appearances                         3

 5    Agreement of Counsel                4

 6    Examination

 7          MR. MOST                      5, 64

 8          MR. ROQUEMORE                 49

 9    Reporter's Certificate              70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    APPEARANCES (VIA ZOOM VIDEOCONFERENCING):

2

     For the Plaintiff:
3
     MOST & ASSOCIATES
4    Attorneys at Law
     BY:  WILLIAM MOST, ESQ.
5    201 St. Charles Avenue, Suite 2500  #9685
     New Orleans, Louisiana    70170
6

7    For the Defendant:

8    CITY OF NEW ORLEANS LAW DEPARTMENT
     BY:  JAMES M. ROQUEMORE, ESQ.
9    ASSISTANT CITY ATTORNEY
     1300 Perdido Street, Suite 5E03
10   New Orleans, Louisiana  70112

11
     Also Present:  Patrick Van Burkleo, Esq.
12                  Tarak Anada, Esq.

13
     Reported By:  Raynel E. Schule
14                 Certified Shorthand Reporter
                   State of Louisiana
15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

1          S T I P U L A T I O N

2          It is stipulated and agreed by and

3     among Counsel for the parties hereto that the

4     deposition of CHIEF KEITH SANCHEZ is hereby

5     being taken pursuant to the Federal Rules of

6     Civil Procedure for all purposes in accordance

7     with law;

8          That the formalities of reading and

9     signing are not specifically waived;

10          That the formalities of sealing,

11     certification, and filing are hereby

12     specifically waived.

13          That all objections, save those as to

14     the form of the question and responsiveness of

15     the answer, are hereby reserved until such time

16     as this deposition or any part thereof is used

17     or sought to be used in evidence.

18               *  *  *  *  *

19          Raynel E. Schule, Certified

20     Shorthand Reporter in and for the State of

21     Louisiana, officiated in administering the oath

22     to the witness.

23

24

25

```
 1        CHIEF KEITH SANCHEZ, having been first
 2        duly sworn by Raynel E. Schule, was examined
 3        and testified on his oath as follows:
 4                        EXAMINATION
 5    BY MR. MOST:
 6    Q.   All right.  Good morning, Chief Sanchez.
 7         My name is Williams Most.  I'm the -- one
 8         of the attorneys for the Plaintiffs in this
 9         case.  How are you doing today?
10    A.   I'm doing well.  How about yourself?
11    Q.   Doing good.  Could you give us name and
12         title for the record, please.
13    A.   Yes.  My name is Keith Sanchez.  I'm the
14         Deputy Superintendent of the Public
15         Integrity Bureau, New Orleans Police
16         Department.
17    Q.   And do people sometimes call you Chief
18         Sanchez?
19    A.   They do, yes.
20    Q.   Okay, and Chief, have you ever given a
21         deposition before?
22    A.   I have in the past, yes.
23    Q.   Just roughly how many depositions have you
24         taken or given?
25    A.   I guess about 10, 15, somewhere in that
```

1        ballpark.

2    Q.    Okay.  So you understand that your answers

3          here today have the same force as if we

4          were in a courtroom with a Judge and Jury?

5    A.    Yes.

6    Q.    And is there anything, whether it's

7          illness, fatigue, substances, distraction,

8          or anything else that would prevent you

9          from giving me your full attention and

10         truthful, complete answers?

11   A.    No.

12   Q.    Okay, and if we need to take a break at any

13         point, we can certainly do so.  This

14         doesn't have to be continuous, but I'll

15         just give you a heads-up that I may ask you

16         after each break who you talked to and what

17         you reviewed, okay?

18   A.    No worries.

19   Q.    Okay, and if I ask a question that is

20         unclear or you don't understand it, will

21         you agree now to tell me that that's the

22         case rather than just trying to answer it

23         anyway?

24   A.    I agree.

25   Q.    Okay, thank you.  And this is a Zoom

1      deposition, so we can't see your entire

2      room.  Is there anyone else in the room

3      with you?

4   A.   No, just me.

5   Q.   Okay.  If during this deposition anyone

6      tries to send you a message or give you a

7      signal, whether it's by text message or

8      email, or another form of messaging or even

9      just waving their hand, would you agree to

10      tell us that that's going on?

11   A.   Yes.

12   Q.   Thank you.  And Chief, are you a lawyer?

13   A.   Yes, I am.

14   Q.   Okay, and you have -- do you have a law

15      degree?

16   A.   I do.

17   Q.   And do you have a law license?

18   A.   I do.

19   Q.   Where are you licensed?

20   A.   Louisiana.

21   Q.   Okay, and what's your broad understanding

22      of the case we're here for today?

23   A.   It's dog bite case where Officer Burmaster

24      shot a dog.

25   Q.   Okay, and you described it as a dog bite

```
 1        case.  Is it your understanding that a dog
 2        bit someone?
 3   A.   No.
 4   Q.   So why did you call it a dog bite case?
 5   A.   Because typically that's how we just refer
 6        to the case as a dog bite.  That's all.
 7   Q.   Okay.
 8   A.   Potential for a bite.  That's all.
 9   Q.   Okay, and roughly when did you begin
10        preparing for this deposition?
11   A.   Roughly I would probably say yesterday.
12   Q.   Okay, and roughly how much time did you
13        spend preparing for this deposition?
14   A.   Maybe a few hours.
15   Q.   Okay, and besides the lawyer, did you talk
16        to anybody to prepare for this deposition?
17   A.   Besides Mr. Roquemore, no.
18   Q.   Okay.  Did you look at any documents to
19        prepare for this deposition?
20   A.   I looked at the reports that was submitted,
21        looked at the video that was from the
22        actual -- from the hearing that we -- that
23        we did.
24   Q.   Okay.  When you say --
25   A.   Body -- bodyworn camera.
```

```
 1    Q.   When you say, "the report," do you mean the
 2         PIB shooting investigation?
 3    A.   Yeah, I went through that and also went
 4         through, not -- not as much detail, but
 5         also went through our -- the report that we
 6         did as it relates to the Deputy Chief
 7         Hearing.
 8    Q.   Okay, and the -- the report that you did
 9         that you described, are you talking about
10         this September 11th, 2023, letter?
11    A.   Yes.
12    Q.   Okay, and that is Deposition Exhibit 58.
13         Okay.  So in addition to the PIB shooting
14         investigation, that letter we just looked
15         at, and the bodyworn camera footage, did
16         you review any other documents to prepare
17         for this deposition?
18    A.   No.
19    Q.   Okay.  Did you take any notes to prepare
20         for this deposition?
21    A.   No.  I did have a copy -- I have a copy of
22         the reports, though, if that's what you're
23         referencing.
24    Q.   Okay.  So you didn't write down anything to
25         prepare for this deposition?
```

```
 1   A.   No, I didn't write down anything.
 2   Q.   Okay, and Chief, you are currently the head
 3        of the Public Integrity Bureau.  Is that
 4        right?
 5   A.   Yes, sir.
 6   Q.   Okay, and that's the -- essentially the
 7        Internal Affairs Department for NOPD?
 8   A.   Yes.
 9   Q.   Okay, and what was your role before that?
10   A.   I was instructor at the training academy.
11   Q.   Okay, and the PIB investigation into
12        Burmaster's shooting of the dog, that
13        occurred before you were part of PIB,
14        correct?
15   A.   That is correct, yes.
16   Q.   So you didn't have any participation in the
17        investigation of the shooting, correct?
18   A.   No.
19   Q.   Was your first involvement in this -- in
20        this matter when you were part of the
21        Chiefs Hearing?
22   A.   Yes.
23   Q.   Okay.  Did you know about this shooting
24        before that Chiefs Hearing?
25   A.   I don't recall.
```

1    Q.    Do you know Officer Burmaster?

2    A.    I do.

3    Q.    How do you know him?

4    A.    I'm a former police officer, and I know him

5          from the police force.

6    Q.    Okay.  Did you -- did you ever serve in the

7          same department or area?

8    A.    I've been with the NOPD since 1997.  I -- I

9          don't recall whether we served.  I don't

10          think we did, but I don't recall.

11    Q.    Would you describe yourself as friends with

12          Officer Burmaster?

13    A.    No.

14    Q.    I'm going to pull up a document that is

15          Deposition Exhibit 60.  At first, I just

16          want to sort of talk about some general

17          principles.  And as I pull up documents on

18          the screen, if you need me to zoom in, just

19          please -- please ask.  So these are sort of

20          broad principles that we sort of pulled out

21          of NOPD's training and documents and stuff

22          like that as we understand them, but I want

23          to see if you agree.  So No. 1, "Police

24          should not shoot a dog unless it reasonably

25          appears to pose an imminent threat of

```
 1        seriously -- serious bodily harm or death."
 2        Would you agree with that, Chief Sanchez?
 3   A.   Could I ask you a question?  With these,
 4        where -- where did this come from?
 5   Q.   Yeah.  So we generated these broad
 6        principles after looking at the law, NOPD's
 7        training, NOPD's policies, and so sort of
 8        summarizing, and I want to see if you agree
 9        with this summary.  This is not a NOPD
10        document.
11   A.   I mean, just looking at what we consider
12        standards here, I mean, I think that
13        looking at this, I mean, every situation is
14        different, right, and so it's -- it's hard
15        to -- to pinpoint and say yes or no.  Just
16        depends on the circumstances.  You know, as
17        -- as you are aware, every situation is
18        different, and, I mean, it's hard to
19        generalize -- it's hard to generalize
20        particular incidents with these standards
21        in themselves.
22   Q.   Okay.  So given that, do you agree with No.
23        1 that police should not shoot a dog unless
24        it reasonably appears to pose an imminent
25        threat to serious bodily harm or death?
```

```
 1              MR. ROQUEMORE:
 2              Objection, form.  Asked and
 3         answered.
 4              You can -- Chief, you can answer
 5         the question if you know.
 6              THE WITNESS:
 7              So 1, 2, 3, and 4, it's -- it's
 8         -- you know, again, it's -- we --
 9         we're dealing with very generic and
10         general questions that you're asking
11         as it relates to it appears dog
12         shootings.  I think that it is hard
13         to generalize all these different
14         standards and say yes or no.  I
15         think that every circumstance in
16         every situation presents a different
17         challenge.
18    BY MR. MOST:
19    Q.  Well, sure, but NOPD provides training,
20         policy that provides specific guidelines
21         for officer behavior, right?
22    A.   There is -- there -- there are guidelines
23         that they're trained on in the training
24         academy and outside of the training academy
25         as well, yes.
```

1    Q.   Okay.  So let's take No. 3, "Police should
2         not shoot a dog if an alternative nonlethal
3         means are reasonably available."  Do you
4         agree with that or disagree?
5    A.   Again, I -- I can't say that I agree with
6         that because I think that it's -- it's --
7         you say, "should not."  Again, it's -- it's
8         questions or it's the standards that are
9         very generic, and every situation is
10        different.
11   Q.   Okay.  Well, what -- you were the Head of
12        Training Academy, right?
13   A.   No.
14   Q.   What -- what was your role at the Training
15        Academy?
16   A.   I was an instructor at the training
17        academy.
18   Q.   Okay.  Did you ever give officers training
19        about shooting animals?
20   A.   No.
21   Q.   Did you ever give officers training about
22        shooting people?
23   A.   No.
24   Q.   Okay.  Did you ever give officers training
25        about use of force at all?

```
1   A.   No, I was not an use of force instructor in
2        the training academy.
3   Q.   Okay.
4   A.   My -- my area, I dealt with legal -- legal
5        aspects, Fourth Amendment issues, stop and
6        frisk, things of that nature.
7   Q.   So you can't agree or disagree with these
8        standards?
9                 MR. ROQUEMORE:
10                Objection, form, asked and
11            answered.
12                THE WITNESS:
13                As I say it again, I think that
14            it's very hard to -- to agree or
15            disagree with standards that are
16            very, very generic as it relates to
17            any particular situation.  I think
18            every situation is -- is different,
19            and you have to look at it in its
20            totality, based on totality of the
21            circumstances and the standards.
22   BY MR. MOST:
23   Q.   Are you a familiar with NOPD's policy on
24        dangerous animals?
25   A.   I am familiar with it, yes.
```

```
 1   Q.   Okay.  Are you familiar with NOPD Policy
 2        Manual Chapter 1.3, Paragraph 32?
 3   A.   Yes, I think I have a copy right here.
 4   Q.   So you see that the first paragraph says,
 5        "Officers are authorized to use firearms to
 6        stop an animal in circumstances in which an
 7        animal reasonably appears to pose an
 8        imminent threat to human safety and
 9        alternative methods are not reasonably
10        available or would likely be ineffective"?
11         Do you see that?
12   A.   Yes.
13   Q.   Okay.  Do you agree that statement?
14   A.   Yes.
15   Q.   I thought you just said every situation is
16        different, and -- and the totality of the
17        circumstances, you can't agree or disagree
18        with statements about standards.  Why --
19        why can you agree with this one but not the
20        ones we were looking at before?
21   A.   I'm agreeing with the policy.  I'm not sure
22        where your standards came from.  Is -- is
23        that the exact same standard right there?
24   Q.   So you're agreeing with it because it's the
25        policy?
```

```
1   A.   I'm agreeing with -- with NOPD policy.  I'm
2        not sure where your standards came from.
3   Q.   Okay.  Well, did you read this sentence,
4        this first sentence in Paragraph 32 and
5        assess whether you agree or disagree with
6        it?
7                  MR. ROQUEMORE:
8                  Object to form.
9                  THE WITNESS:
10                 Yeah, I think -- I think part of
11              the -- the issue too is that --
12              since you mentioned it, I think part
13              of the issue too is that again, it's
14              -- it's a policy, I agree, but
15              again, every situation is still
16              different, and it is fluid, and it
17              depends on the circumstances.
18  BY MR. MOST:
19  Q.   Okay.
20  A.   What -- what you may consider reasonable or
21       you may consider imminent force or imminent
22       danger.  It's -- it's still -- still --
23       still the same standard.
24  Q.   Okay.  So Sentence -- Sentence 2 says, "The
25       officer must be cognizant of the
```

```
 1          surroundings when shooting at an animal to
 2          ensure that there's no risk to the people
 3          in the area," right?
 4     A.   That's what it says, yeah.
 5     Q.   Do you agree with that statement?
 6     A.   I can't say I agree or disagree.  Once
 7          again, I think every circumstance is
 8          different.  I think every circumstance
 9          dictates based on the circumstances that it
10          may not necessarily be a situation where it
11          may not be safe in terms of the situation
12          itself, so I -- I -- I can't say I agree or
13          disagree, but it is the policy, and in
14          looking at the policy, it's our
15          responsibility to look at the policy and
16          look at a set of facts to determine whether
17          or not the officer was within policy or --
18          or not in policy.
19     Q.   Okay.  So you can't say whether you agree
20          or disagree with NOPD's use of force
21          policies with regard to animals?
22                    MR. ROQUEMORE:
23                    Objection to the form.
24                    THE WITNESS:
25                    Say again.
```

```
 1              MR. ROQUEMORE:
 2              I said, "Objection to form."  So
 3         go.
 4              THE WITNESS:
 5              Yeah, that's a big -- what --
 6         what I can say is this is NOPD's
 7         policy, and we take the set of facts
 8         that we have as it relates to what
 9         happens and say whether or not it
10         fits within this policy or not.
11    BY MR. MOST:
12    Q.  Okay.
13    A.  That's what I can say.
14    Q.   But you can't tell me if you agree or
15         disagree with this policy?
16    A.   I -- once again, I look at the policy as a
17         whole.  I take a look at it, and I look at
18         the set of facts and see if it's within the
19         policy or not.
20    Q.   Okay.  So that's not my question, Chief.
21         My question is, can you tell me whether you
22         agree or disagree with this policy?
23    A.   As a whole just looking at the particular
24         set of facts and how it relates to this
25         particular policy as it relates to
```

```
 1          dangerous animals and looking at these set
 2          of facts, does this policy, does NOPD as a
 3          whole, are we within this policy or not.
 4          Does that answer your question?
 5     Q.   No, I don't think it does.  What set of
 6          facts are you talking about?
 7     A.   Whatever set of facts that are presented to
 8          -- to myself or to the Board.
 9     Q.   Okay.  I'm not asking you about any
10          particular set of facts.  I'm just asking
11          you, do you agree with this policy, NOPD's
12          policy?
13     A.   What do you mean?
14                    MR. ROQUEMORE:
15                    Object to form.  I'm going to
16               object to form.  I'm not sure that
17               he understands the question.
18                    THE WITNESS:
19                    What do you mean?  When you say,
20               "agree," what do you mean "agree"?
21     BY MR. MOST:
22     Q.   Okay.  I mean, do you agree that officers
23          should ensure there is no risk to people in
24          the area when they shoot their weapon at an
25          animal?
```

```
1   A.   Do I agree that officers should not do
2        what?  Say again.
3   Q.   Yeah.  Do you agree that officers should --
4        should ensure there's no risk to people in
5        the area when they shoot at an animal?
6   A.   Do I agree with that?  Yes.
7   Q.   Okay, and so No. 2 on the standards was
8        "Police should ensure there's no risk to
9        people in the area before shooting a dog."
10       So you agree with No. 2, correct?
11  A.   Yes.
12  Q.   Okay.  What about No. 3, "Police should not
13       shoot a dog if alternative nonlethal means
14       are reasonably available"?
15  A.   Not necessarily agree with that, no.
16  Q.   Okay.  In what circumstances would
17       nonlethal means would be reasonably
18       available, police should still shoot --
19       shoot a dog?
20  A.   I think if we're talking about
21       hypotheticals, I think that if you look at
22       a situation where an officer is in imminent
23       danger of receiving grave bodily injury, I
24       think that the use of deadly force is
25       authorized, although the officer may have a
```

```
1          -- a toy (phonetic), but if -- if use of
2          deadly force is authorized, then it's
3          authorized, so I don't agree with that
4          statement.
5     Q.   Okay.  Do you agree that shooting a dog
6          should always be the option of last resort?
7     A.   I'm not sure what that means.
8     Q.   Well, do you think -- I mean if a dog is a
9          problem to an officer, and the officer can
10         solve the problem without shooting the dog,
11         should the officer solve the problem
12         without shooting the dog?
13    A.   If the officer believes that that's the
14         only measure to resolve the situation, then
15         I think the officer's right to use deadly
16         force is -- is present.
17    Q.   And so in your analysis whether or not the
18         shooting is reasonable hinges on what --
19         what the officer believes about the
20         situation, correct?
21    A.   Yes.
22                   MR. ROQUEMORE:
23                   Objection to the form of the
24              question.
25                   THE WITNESS:
```

```
 1                    I'm sorry.
 2   BY MR. MOST:
 3   Q.    And -- and so that's a subjective analysis,
 4         right, that -- that hinges on what
 5         subjectively is going on in the officer's
 6         head, correct?
 7   A.    I think that's subjective, yes.
 8   Q.    Yes, it's a subjective analysis, correct?
 9   A.    Yes.
10   Q.    And that's the analysis you applied with
11         Officer Burmaster's --
12   A.    We applied the subjective analysis as well
13         as the objective analysis as well.
14   Q.    You -- you applied both the subjective and
15         objective analysis?
16   A.    Yes.
17   Q.    And does your letter reflect that?
18   A.    Does what letter?  I'm sorry.
19   Q.    Yeah, the Chief Annual Report that you
20         described, does that reflect an objective
21         analysis?
22   A.    I think the letter probably reflects the
23         subjective analysis by Officer Burmaster.
24   Q.    Okay, and -- and that's -- that was the
25         basis of your recommendation to the Chief,
```

```
 1        correct, the Superintendent?
 2   A.   Yeah, it was based on the totality of the
 3        circumstances, yeah.  Once -- once we had
 4        an opportunity to -- to look at the video,
 5        hear Officer Burmaster, go through the
 6        facts, it's based on totality of
 7        circumstances; not just one particular
 8        factor.
 9   Q.   Okay, and I think this is obvious, but you
10        were not a witness in any way to the -- the
11        facts relevant to Burmaster shooting,
12        correct?
13   A.   No, I was not.
14   Q.   Okay.  So in the Chiefs Hearing document,
15        you were providing your opinion about
16        whether the shooting was reasonable or not,
17        right?
18   A.   Yes.  Yes, sir.
19   Q.   Okay, and -- and have you ever been
20        designated as an expert in a case?
21   A.   No.
22   Q.   Okay.  Would you say that you're an expert
23        in officer use of force?
24   A.   No, sir.
25   Q.   Would you say you're an expert in the use
```

1     of tasers?

2  A.   No, sir.

3  Q.   And so I'm looking at what has been

4       designated as "Deposition Exhibit 58."  You

5       can see this on the screen, correct?

6  A.   Yes, sir.

7  Q.   Okay, and this is a September 11th, 2023,

8       letter from you, Hans Ganthier, Ryan

9       Lubrano to the Superintendent?

10 A.   Yes, we signed off on it.  It was done by

11      Hans Ganthier.

12 Q.   Okay, and so this letter was the result of

13      what's commonly called the Chief's Hearing,

14      also know as the Bureau Superintendent's

15      Disciplinary Hearing?

16 A.   Yes, sir.

17 Q.   Okay, and in that hearing, you reviewed

18      certain information, and then came up with

19      the recommendations to the Chief about

20      whether Burmaster's discipline should be

21      sustained or exonerated or something else,

22      correct?

23 A.   Yes, came with a recommendation, yes, sir.

24 Q.   Okay, and so what did you review in coming

25      up with that recommendation?  What

```
 1         documents or what did you look at or listen

 2         to?

 3    A.   So we looked at the actual investigation

 4         that was done by the officer at the time.

 5         We also looked at the video, and we also

 6         had an opportunity to allow Officer

 7         Burmaster to come in and make whatever --

 8         any statements he wanted to make --

 9    Q.   Sure.

10    A.   -- in regards to -- in regards to the

11         investigation.

12    Q.   Okay, and then -- and then you and Lubrano

13         and Ganthier then sort of held a -- a

14         discussion among the three of you and then

15         you announced your recommendation. Is that

16         correct?

17    A.   So it's not just us in there.  It's -- we

18         invite the -- the Federal Monitors, who are

19         a part of it.  The Independent Police

20         Monitor was part of it as well, and it's a

21         healthy discussion about the facts about

22         this -- this -- the case in its entirety,

23         but ultimately the decision is the three

24         Deputy Chiefs on whether -- you know, what

25         the disposition is going to be or the
```

```
 1           recommendation to -- to the Superintendent
 2           is going to be.
 3      Q.   And is that discussion recorded?
 4      A.   That discussion is not recorded, no.
 5      Q.   Do your recall who was present during that
 6           discussion?  Was the -- was the Consent
 7           Decree Monitor there?
 8      A.   I don't recall whether they were there.
 9           This was back in '23, September '23.  I
10           don't recall whether they were there or
11           not.  Was it September or maybe it was
12           June?  I -- I don't recall, but I don't
13           recall if they were there or not or whether
14           they were on the phone via some type of
15           Zoom or WebX or something.  I -- I don't
16           recall.
17      Q.   Okay, and in this you recommended that
18           Burmaster be exonerated from the use of
19           force violation, correct?
20      A.   Yes.
21      Q.   Okay, and that was based on your opinion
22           that the use of force was reasonable?
23      A.   Based on the circumstances.  Whatever Chief
24           Ganthier wrote, we concurred with that,
25           yes.
```

```
 1   Q.   Well, sure.  Did you -- did you recommend
 2        he be exonerated because you thought the
 3        shooting was reasonable?
 4   A.   Yes.
 5   Q.   Okay, and that was your opinion?
 6   A.   Yes.
 7   Q.   And was that opinion based on your
 8        experience as an officer and your training
 9        as an officer?
10   A.   That opinion was based off of the fact that
11        this particular case, not necessarily my
12        personal experience as an officer, but
13        based off of the facts that was presented
14        at the hearing itself as a whole.
15   Q.   Sure, and -- and in part based on your
16        decades of training and experience as an
17        officer, right?
18   A.   Based off of the -- the -- are you asking
19        me whether or not my personal beliefs had
20        any impact on whether -- on my decision?
21   Q.   No.  I'm asking, was your analysis formed
22        by your training as an officer, you know,
23        all the training you received in your
24        decades as an officer and your experience
25        as an officer?
```

```
1   A.   I guess my analysis was based off of the --
2        the facts that was presented by Officer
3        Burmaster and the videos, and watching the
4        video and the discussion that was held by
5        everybody that was present.
6   Q.   Okay.  And so then on Page 3, this -- this
7        reflects -- it says, "The Panel believed
8        the following facts justified the
9        recommended dispositions," correct?
10  A.   That's correct, yes, sir.
11  Q.   Okay.  So these are the -- all the
12       important facts that led you to the
13       conclusion that this shooting was
14       reasonable, correct?
15  A.   Yes.
16  Q.  Okay, and it says -- it talks about what
17       Officer Burmaster heard, what Officer
18       Burmaster didn't think, what he didn't
19       believe, what he believed, what he
20       believed, what he believed, et cetera, and
21       his statement of his intent.  So this is
22       almost entirely a subjective analysis,
23       correct?  It's an analysis --
24                 MR. ROQUEMORE:
25                 Object --
```

```
 1   BY MR. MOST:
 2   Q.   -- of --
 3               MR. ROQUEMORE:
 4               Finish your question.  Is your
 5          question finished?
 6   BY MR. MOST:
 7   Q.   Yeah.  This is almost entirely a subjective
 8        analysis, correct?
 9               MR. ROQUEMORE:
10               Objection, form.
11               THE WITNESS:
12               Is it a subjective analysis?
13          Yes.
14   BY MR. MOST:
15   Q.   And this doesn't say anything about the
16        size of the dog, right?
17   A.   No, it doesn't.
18   Q.   Okay.  Because in -- in a subjective
19        analysis that may not matter that much
20        because it really depends on what was going
21        on in the officer's head, not whether the
22        animal actually posed a threat, correct?
23               MR. ROQUEMORE:
24               Objection, form.
25               THE WITNESS:
```

```
 1                    Repeat the question, sir.
 2    BY MR. MOST:
 3    Q.   Sure.  I mean, this doesn't say anything
 4         about the size of the dog, and I guess
 5         that's because that's not an important fact
 6         if what you're focused on is what was going
 7         on in the Officer's head.  Is that a fair
 8         summary?
 9                    MR. ROQUEMORE:
10                    Objection, form.
11                    THE WITNESS:
12                    That the size of the dog doesn't
13              matter?  Is that your question?
14    BY MR. MOST:
15    Q.   Yeah.  I mean, does the size of the dog
16         matter?
17    A.   I think it does matter.
18    Q.   Okay, but it's not mentioned here, right?
19    A.   No, it's not mentioned in here, no.
20    Q.   Okay, and it's not mentioned here because
21         this analysis is focused on what was going
22         on in the officer's head, correct?
23    A.   This analysis says that, yeah.
24    Q.   Okay.
25    A.   The way it's written, yes.
```

1    Q.   So suppose there's a dog that's about the

2         size of a large cat, okay.  Could an

3         officer use their taser to repel a dog of

4         that size?

5                   MR. ROQUEMORE:

6                   Objection, form.

7                   THE WITNESS:

8                   Repeat the question, sir.

9    BY MR. MOST:

10   Q.   Sure.  So if there's a dog that's roughly

11        the size of a large cat, can an officer use

12        their taser to repel a dog of that size?

13   A.   You say could he?

14   Q.   Huh-huh.

15   A.   I think anything is possible.  Again, I

16        think that -- I mean, there are several

17        things I guess that -- that could be done,

18        but anything is possible.

19   Q.   Okay.  So a taser is a functionally

20        effective tool at repelling a dog that's

21        the size of a large cat, agreed?

22                   MR. ROQUEMORE:

23                   Objection, form.

24                   THE WITNESS:

25                   I think -- I think it's just

```
 1                again, we're speaking in
 2                generalities based off of -- yeah, I
 3                mean, I guess it's -- I guess it's
 4                possible.
 5      BY MR. MOST:
 6      Q.   And similarly an officer could use --
 7      A.   Depending on the facts.
 8      Q.   Sure.  Did you engage in any analysis of
 9           whether a taser could have been used to
10           repel the dog that Burmaster faced?
11      A.   I think our analysis was based off of
12           whether or not at the time Officer
13           Burmaster had the right to use the deadly
14           force that he used.  I think it was based
15           off of that.
16      Q.   Okay.  So you just --
17      A.   I don't -- I don't -- I don't -- I don't
18           think we got into an analysis of whether or
19           not a taser could have been used or whether
20           or not an expandable baton.  I think the
21           analysis was based off of at the time did
22           he believe he was in imminent danger of
23           receiving great bodily injury, and I think
24           it was based off of that.
25      Q.   Okay.  So you didn't asses whether
```

```
 1        nonlethal tools could have been effective
 2        in that scenario, correct?
 3   A.   No, now, I don't -- I mean, I -- I've never
 4        used a taser before; I've never carried a
 5        taser before; I've never been tased before,
 6        so I really can't speak to that particular
 7        issue as it relates to utilizing nonlethal
 8        -- that type of nonlethal force.
 9   Q.   Okay.  So we're looking back at NOPD Policy
10        Manual Chapter 1.3, Paragraph 32, do you
11        see the first sentence of Paragraph 32?
12   A.   Yes.
13   Q.   Okay, and do you see that one of the
14        required factors for whether officers are
15        authorized to use firearms to stop an
16        animal is that alternative methods are not
17        reasonably available or would likely be
18        ineffective?
19   A.   Yes, yes.
20   Q.   Okay.  So you did not engage in an analysis
21        for that part of the policy, correct?
22   A.   We engaged in an analysis of whether or not
23        the force that was utilized by Officer
24        Burmaster was reasonable based off the set
25        of facts.
```

1   Q.   Right, but you didn't --

2   A.   That -- that -- that was -- that was --

3        that was what we did.

4   Q.   Right, but you did not look into whether

5        other nonlethal methods would have been

6        effective or ineffective, correct?

7   A.   I do not recall.  I think the reports that

8        we have is present.  I don't recall whether

9        or not there was a healthy discussion as it

10       relates to that.

11  Q.   So then how did you determine that this was

12       within policy, the shooting was within

13       policy if you didn't look at these

14       alternative methods that the policy --

15  A.   Well, we --

16  Q.   -- requires analysis of?

17  A.   I guess there's different parts of the

18       policy that speaks to the -- the right to

19       use deadly force, and I think if you look

20       at the policy as a whole as it relates to

21       deadly force, whether you can use deadly

22       force or not, that is -- that is what we

23       looked at, whether or not, the -- the use

24       of force that Officer Burmaster used based

25       on the circumstances were within policy as

```
 1          it relates to the use of the deadly force
 2          itself.  That's what -- that's what we --
 3          we looked at, whether or not he was in
 4          imminent danger -- whether he believed he
 5          was in imminent danger of receiving great
 6          bodily injury, and whether or not deadly
 7          force was authorized.
 8   Q.   Okay, but --
 9   A.   That's -- that's -- that's what we looked
10          at.
11   Q.   Okay, but you would agree that this
12          sentence, this first sentence of Paragraph
13          32 defines when officers are allow to use
14          firearms to stop animals, right, when
15          deadly force is authorized?
16   A.    I -- I -- I agree that Paragraph 32 --
17                   MR. ROQUEMORE:
18                   Object to form.
19                   Go ahead, go ahead, Chief.
20                   THE WITNESS:
21                   I agree that Paragraph 32 does
22             mention that, yes, it does.
23   BY MR. MOST:
24   Q.   Okay, and so your analysis went through
25          whether Officer Burmaster believed the
```

```
 1         animal posed an imminent threat to human
 2         safety, right?
 3    A.   Yes.
 4    Q.   Okay, but you did not assess whether
 5         alternative methods were reasonably
 6         available or likely to be ineffective,
 7         correct?
 8    A.   That's correct.
 9    Q.   If Officer Burmaster had been carrying his
10         baton, could that have been used to repel
11         the dog?
12    A.   I think that what we looked at is whether
13         or not he had the right to utilize the --
14         the force that he used.  I think that was
15         what we looked at.
16    Q.   Right, but I'm asking you, could he have
17         used a baton in those circumstances to
18         repel that dog?
19    A.   I don't -- I don't believe that -- I'm
20         going to have to say no.
21    Q.   Can you recall -- so why would a baton have
22         not been effective?
23    A.   You say why was a baton would not have been
24         effective?  Because I think at the time the
25         officer believed that he was in imminent
```

```
 1        danger of receiving great bodily injury.
 2   Q.   Okay.  If --
 3   A.   I think -- I think that if -- if he would
 4        not have believed that, I think that he
 5        wouldn't have pulled his firearm, utilized
 6        his firearm.  Was that your question, sir?
 7        I'm sorry.
 8   Q.   Okay, but -- okay.  So Officer Burmaster
 9        you believe that he believed he was in
10        danger, right?
11   A.   Yes.
12   Q.   Okay, and he had a number of ways that he
13        could have dealt with that danger.  One
14        would be firing his firearm, correct?
15   A.   Correct.
16   Q.   Okay.  Would another way he could have
17        dealt with that danger have been using his
18        taser?
19   A.   I'm not certain.
20   Q.   Okay.  What about using his boots to kick
21        the dog away?
22   A.   I'm not certain.  Kicking the dog.
23   Q.   Would --
24   A.   I don't -- I don't -- based on what he
25        believed, I mean, I don't -- I don't know
```

```
 1        if it's possible kicking the dog.
 2   Q.   What about using a baton?
 3   A.   Again, I -- I -- I can't say that for
 4        certain.
 5   Q.   Because of what he believed?
 6   A.   Based on the circumstances, yeah.
 7   Q.   Wait, but are you -- I'm trying to figure
 8        out, are you saying a baton wouldn't be
 9        effective because of what Burmaster
10        believed or because of your assessment
11        having watched the video?
12   A.   I think the assessment is based off of
13        objectively what the officer experienced at
14        the time itself.  I -- I -- I can't -- I
15        mean, you know, jumping over the fence.  I
16        mean, there's so many different things that
17        could have happened.  I think, you know, to
18        say that these things are not possible,
19        whether they're possible or not, you know,
20        it's -- it's hard to say.
21   Q.   Because Burmaster was the one who was
22        there, and so you don't want to second
23        guess his decision making.  Is that right?
24                  MR. ROQUEMORE:
25                  Objection.
```

```
 1                    THE WITNESS:
 2                    Well, I -- I think every
 3               situation is different.  I think the
 4               possibilities, you know, I think you
 5               have to look at it in its totality
 6               just based on the circumstances and
 7               not get into specifics about whether
 8               it's possible he could kicked the
 9               dog, ran, all these different
10               factors.
11    BY MR. MOST:
12    Q.   You don't really want to assess the
13         hypotheticals?
14    A.   Assess the hypo -- what hypotheticals?
15    Q.   Well, you're saying you don't want to sort
16         of assess what could have happened?
17    A.    No.  What I'm saying is that I think that
18         you have to look at it -- look at it in --
19         in its totality, and I guess you're asking
20         me could he have kicked the dog; could he
21         have -- I mean, yeah, he could have.  Would
22         -- would it have stopped the dog?  We don't
23         know that.  Could he have, you know, tried
24         to run for the fence, I guess he could
25         have.  We don't -- don't know that whether
```

```
 1        it would have worked or not.  We just don't
 2        know.
 3   Q.   Well, there was another officer present,
 4        right?
 5   A.   There was another officer present that was
 6        -- that is correct, yes, sir.
 7   Q.   And he was able to exit the situation
 8        without using deadly force, correct?
 9   A.   He was -- and again, I guess based on
10        location, yes, he was able to exit without
11        utilizing any -- any type of force, that is
12        correct.
13   Q.   And he was within arm's reach of Officer
14        Burmaster, correct?
15   A.   I can't say whether he was in arm's reach.
16        I -- I don't -- I don't -- that's not what
17        I recall.
18   Q.   Well, do you recall him tapping Burmaster
19        on the shoulder?
20                  MR. ROQUEMORE:
21                  Objection, form.
22                  THE WITNESS:
23                  I don't recall.  I don't recall.
24   BY MR. MOST:
25   Q.   So at least we know for sure that another
```

```
 1        officer was able to exit the scenario
 2        without use of deadly force.  That's not a
 3        hypothetical.  We know that, right?
 4   A.   He was able to exit without utilizing
 5        deadly force with another dog present that,
 6        you know, we don't know what impact the
 7        other dog had that was going towards that
 8        officer, what impact that dog had on the
 9        officer's ability to -- to leave the -- the
10        fencing area.
11   Q.   Okay.  So, I mean, look, you don't know
12        whether the two men were within arm's reach
13        of each other, but let's supposed that two
14        officers were so close to each other that
15        one was able to tap Burmaster on his
16        shoulder, if they were that close, they
17        both should have been able to exit the gate
18        without using deadly force, correct?
19                  MR. ROQUEMORE:
20                  Objection, form.
21                  THE WITNESS:
22                  I can't -- I can't -- I can't say
23               that for certain just based off of
24               the location of the officers.
25               Whether they was in arm's reach or
```

```
 1                    not, you still had to deal with the
 2                    fact that there were two dogs that
 3                    were in the location.
 4    BY MR. MOST:
 5    Q.   Okay, but both officers had to deal with
 6         the fact that there were two office -- two
 7         dogs, right?
 8    A.   Yes.
 9    Q.   Okay, and -- and one officer we know was
10         able to escape that two-dog situation
11         without using any force at all, right?
12    A.   Yes, we are aware of that, yes, sir.
13    Q.   And if he was standing close enough to
14         touch Burmaster, then you would expect that
15         both officers would have had that option
16         available to them, agreed?
17                    MR. ROQUEMORE:
18                    Objection, form.
19                    THE WITNESS:
20                    I -- I -- I can't -- I can't
21                    agree with that.  I can't.  I mean,
22                    I just can't.  I -- I can't say
23                    whether or not he had the option to
24                    -- to leave the fenced-in area,
25                    because the officer was as you say
```

```
 1                within arm's distance.  I can't say
 2                that was the case.
 3    BY MR. MOST:
 4    Q.   Okay.  Do you have any opinion about
 5         whether these nonlethal means, whether
 6         exiting the gate, using a taser, using a
 7         baton, using boots, do you have any opinion
 8         about whether those would have been likely
 9         to be effective or not?
10    A.   No, I mean, I'm -- I'm not an expert in
11         either one of those particular areas, so I
12         don't really have an opinion as it relates
13         to whether or not they would have worked or
14         not.  I -- I -- I just -- I don't know.
15    Q.   So you -- you don't have an opinion about
16         whether those alternative means would have
17         been effective or ineffective, correct?
18    A.   No, I don't have an opinion about it, no,
19         sir.
20    Q.   In your career have you ever heard besides
21         Burmaster an officer say he was worried
22         that the dog was going to bite him on the
23         penis?
24    A.   I don't recall.
25    Q.   Okay.  Are you aware that Burmaster has
```

```
 1         shot and killed two dogs and both times
 2         said that he was afraid the dog was going
 3         to bite him in the crotch?
 4    A.   I -- I do know that there's -- there's
 5         disciplinary record as it relates to
 6         Burmaster.  I -- I can't say whether or not
 7         I knew specifically that he was going to
 8         bite him in the crotch area, no, I'm not
 9         intimately aware of that.
10    Q.   If an officer shoots and kills multiple
11         dogs and each time says that he shot
12         because he was afraid it was going to bite
13         him in the crotch, does that raise for you
14         a red flag about that officer?
15                   MR. ROQUEMORE:
16                   Objection, form.
17                   THE WITNESS:
18                   Not necessarily a red flag.  It
19              depends upon the circumstances.
20    BY MR. MOST:
21    Q.   Okay.
22    A.   I mean, there are very different reasons on
23         why things happen over -- over a span of a
24         career.  I'm not sure how long Officer
25         Burmaster has been on the police force, so
```

```
 1          I can't say whether it raised -- it raised
 2          a red flag or not.
 3     Q.   Okay.  Well, how long did you work on the
 4          streets as an officer?
 5     A.   I worked on the street as an officer, yes,
 6          from I guess depending on what you're
 7          asking, '93 to '97 in Atlanta, and from '97
 8          to 2003 as a patrolman, and 2003, 2005 as a
 9          sergeant, yeah.
10     Q.   Okay.  So in your more than a decade on the
11          streets, you must have been around people
12          with dogs, right?
13     A.   I did, yes.
14     Q.   Did you ever shoot a dog out of fear that
15          it was going to bite you on the penis?
16     A.   Me personally?
17     Q.   Huh-huh.
18     A.   I don't recall ever having a -- a shooting
19          involving a dog myself personally.
20     Q.   Okay.  Have you ever seen any officer shoot
21          a dog?
22     A.   Are you asking me from '93 to -- to present
23          or to when I was on the force.  I'm sure
24          I've seen it in the past.  I just -- I
25          don't recall.
```

1    Q.   Okay.  Did you come up with any basis to

2         disagree with PIB's credibility

3         determination of Officer Burmaster?

4                   MR. ROQUEMORE:

5                   Objection, form.

6                   THE WITNESS:

7                   I don't think -- no, I don't

8              recall that, no.

9    BY MR. MOST:

10   Q.   Okay, and do you know what the Use Of Force

11        Review Board is?

12   A.   I do.

13   Q.   Okay.  Are you aware that the Use Of Force

14        Review Board unanimously found the shooting

15        to be unjustified?

16                   MR. ROQUEMORE:

17                   Objection, form.

18                   THE WITNESS:

19                   Yes.

20   BY MR. MOST:

21   Q.   Okay.  Did you identify any mistake or flaw

22        in their reasoning or other reason why you

23        disagree with them?

24                   MR. ROQUEMORE:

25                   Objection, form.

```
 1                    THE WITNESS:
 2                    Yeah, I -- I'd have to review
 3               their -- their notes.  I don't -- I
 4               don't know if I reviewed their notes
 5               or not.  I'm not really certain, but
 6               I mean, clearly they did, because
 7               you know, there was a totally
 8               different Board back then too as
 9               well.
10                    MR. MOST:
11                    Well, let's take a five-minute
12               break here.  We'll reconvene at
13               11:05.
14                    (Break in proceedings.)
15     BY MR. MOST:
16     Q.   Okay.  So Chief, did you -- did you review
17          any documents during our break?
18     A.   No.  I just looked at the use of force
19          policy.
20     Q.   Okay, and did you talk to anyone during the
21          break?
22     A.   No.
23     Q.   Those are the questions I have for now
24          barring re-direct.
25                    MR. MOST:
```

```
 1                   Jim, do you have any questions?
 2              MR. ROQUEMORE:
 3                   I do.  William, do you mind
 4              pulling up Exhibit 58, Page 2.
 5                        EXAMINATION
 6    BY MR. ROQUEMORE:
 7    Q.   Chief, you were asked about this document
 8         earlier.  This is the September 11th, 2023,
 9         memo to Michelle Woodfork by Hans Ganthier.
10         Do you recall those questions?
11    A.   Yes, sir.
12    Q.   Okay, and you -- and you are familiar with
13         this document, right?  It does have your
14         signature on -- on the last page.  Is that
15         right?
16    A.   That's correct, huh-huh.
17    Q.   Okay.  So we're looking at Page 2, and it
18         -- it starts, "During this hearing the
19         following facts were learned," and it has a
20         couple of -- these two -- two, three
21         paragraphs after that.  You see that?
22    A.   Yes, sir.
23    Q.   Okay.  So I'm just going to walk through a
24         couple of these things, and we're going to
25         talk about subjective versus objective,
```

```
 1         that line of questions.  That's really
 2         where I'm going with this, all right?
 3  A.    Okay.
 4  Q.    Okay.  So the first line, it says Officers
 5         Burmaster and Roussel responded to a
 6         domestic disturbance.  The fact that it was
 7         a domestic disturbance, is that an
 8         objective fact?
 9  A.    Yes.
10  Q.    And is that a significant fact in this
11         analysis?
12  A.    Yes.
13  Q.    Why is the fact that it was a domestic
14         disturbance significant?
15  A.    Because those are -- can be some of the
16         most violent situations in law enforcement
17         and officers can walk into.  In fact, in
18         most cases, that's when an officer gets
19         injured the most is in domestic
20         disturbances.
21  Q.    Are there special ways that an officer is
22         supposed to approach domestic disturbance
23         situations?
24  A.    Yes.  Well, one, they don't -- they don't
25         go on the scene by themselves, and in this
```

```
 1        case, Officer Burmaster waited for the
 2        other officer to come on the scene before
 3        he actually approached the situation mainly
 4        because of the dangers that may be involved
 5        in cases like this.
 6    Q.   All right.  The fact that it was a domestic
 7        disturbance, it was known to Officer
 8        Burmaster; is that right?
 9    A.   Yes.
10    Q.   And is that a subjective fact?
11    A.   That he knew that it was domestic?
12    Q.   Yes.
13    A.   That's -- that's an objective fact.
14    Q.   Yeah, but the fact that he -- that he knew
15        in his mind that it was a domestic
16        disturbance that he was going into, was
17        that part of his subjective state of mind
18        at that time?
19    A.   Yes.
20    Q.   This -- along the same line, the -- the
21        next line -- the next sentence is, "The
22        Officers arrived and entered the front
23        yard."  You see that?
24    A.   I do.
25    Q.   Okay.  The layout of the front yard and the
```

```
 1        driveway, those are objective facts.  Is
 2        that right?
 3   A.   That's --
 4                  MR. MOST:
 5                  Objection, form.
 6                  THE WITNESS:
 7                  That's correct, yes.
 8   BY MR. ROQUEMORE:
 9   Q.   Can you say whether -- whether the layout
10        of the front yard is an objective fact?
11   A.   It is an objective fact, yes.
12   Q.   And as you were sitting on the Board, you
13        were -- where did you get the understanding
14        of what the layout of the front yard was?
15   A.   From -- we got it from the video and also
16        Officer Burmaster I believe in his
17        statement.
18   Q.   All right, and again, Officer Burmaster's
19        understanding what the front yard layout
20        was, was that a subjective understanding of
21        his own?
22   A.   Yes.
23   Q.   And was that also an important fact in your
24        analysis to take into account when deciding
25        whether or not his response was
```

53

```
1         appropriate?
2    A.   Yes.
3    Q.   Now, the next sentence says, "Once inside
4         the gate," is that -- again, is this an
5         objective fact where he was inside the
6         gate?
7    A.   It is.
8    Q.   And you -- you reviewed the bodyworn
9         camera.  Where -- where exactly was he when
10        he first heard the dogs barking?
11   A.   He was inside the gate when he first heard
12        the dogs barking.
13   Q.   Was in the driveway?  Do you recall?
14   A.   I -- I don't recall.
15   Q.   But the bodyworn camera would objectively
16        show where he was.  Is that -- is that
17        fair?
18   A.   That's fair.  That's fair.
19   Q.   All right, and the next -- after that they
20        say, "The Officers heard dogs barking."  On
21        the bodyworn cameras, you can hear the dogs
22        barking.  Is that right?
23   A.   That is correct.
24              MR. MOST:
25              Objection, form.
```

BY MR. ROQUEMORE:

Q.    Is the dogs barking and what that sounded
      like an objective fact?

A.    That is an objective fact, yes, sir.

Q.    It is also subjective of Burmaster hearing
      the -- the dogs barking also, right?

A.    Yes, it is.

Q.    The fact that Officer Roussel ran when he
      saw the dogs coming down the stairs, is
      that an objective fact?

A.    That is.

Q.    And what does it tell you that Officer
      Roussel ran when he saw the dogs coming
      down the stairs?

A.    He was trying to exit the location.

Q.    And why was he trying to exit the location?

A.    Because the dogs were coming towards him.

Q.    And --

A.    He was -- there was some fear as it relates
      to whether or not he was going to be bitten
      by the dogs or injured by the dogs should I
      say.

Q.    Does that objectively inform you as to
      whether or not the dogs posed a danger?

A.    Yeah.

```
 1              MR. MOST:
 2                  Object to form.
 3   BY MR. ROQUEMORE:
 4   Q.   Say again.
 5   A.   It does, yes.
 6   Q.   And explain that a little bit.
 7   A.   Well, just in -- just generally speaking
 8        the fact that the other officer left the
 9        location, it speaks to the totality of the
10        circumstances in relation to what his
11        mindset was at the time, and it is what he
12        did was run out the yard, which was an
13        objective fact, not necessarily subjective
14        based off of Burmaster, but objective that
15        this is what he did, he ran -- he ran from
16        the scene.
17   Q.   And was it also -- how -- how did that
18        affect Officer Burmaster's subjective state
19        at that point?
20   A.   I'm certain that it probably hurt --
21        heightened his subjective state that there
22        was a level of danger when he sees the
23        other officer leave the location or try to
24        run from the location.
25   Q.   The timing of when Officer Burmaster
```

```
 1        removed his weapon in comparison to when he
 2        heard the dogs or when he first saw the
 3        dogs, are those objective facts or are
 4        those subjective facts?
 5   A.   Objective facts.
 6   Q.   The fact that two dogs were running -- ran
 7        down the stairs, is that an objective fact?
 8   A.   That's an objective fact, yes.
 9   Q.   Now, the second paragraph says that Officer
10        Burmaster observed the larger dog running
11        towards Roussel, right?
12   A.   It does say that, yes, sir.
13   Q.   And he fired his weapon at the dog closest
14        to him, fatally wounding it, right?
15   A.   That is correct, yes, sir.
16   Q.   Okay.  Those are objective facts or are
17        those subjective facts?
18   A.   Those are objective facts.
19   Q.   Okay.  The next line, Officer Burmaster
20        stated when the dog was barking or running
21        towards him he then believed the dog was
22        aggressive.  Was that a subjective fact or
23        an objective fact?
24   A.   That was subjective.
25   Q.   Subjective.  And he believed the dog would
```

```
 1          bite him.  That was -- that's also
 2          subjective?
 3     A.   Subjective, yes, sir.
 4     Q.   And when you are sitting there analyzing
 5          his subjective views, do you also see
 6          whether or not it aligns with the objective
 7          facts?
 8     A.   Yes.
 9     Q.   Okay, and explain that process a little bit
10          -- a little bit more how when you analyze
11          his belief that the dog is going to bite
12          him, how that lined up with the -- the
13          objective facts.
14     A.   Well, when you -- when you look at the
15          objective facts in this particular case and
16          what he experienced as an officer in -- in
17          these set of circumstances and his actions
18          what his subjective belief would be, they
19          have to align because otherwise it wouldn't
20          make any sense, right?  So in this case, he
21          sees -- he enters -- in fact -- in fact,
22          first he -- he whistles and sees if there's
23          any dogs in there; they enter the yard.  He
24          sees the dogs coming down the stairs.  All
25          of these are objective facts, right?
```

```
 1   Q.    Huh-huh.
 2   A.    He -- he sees Roussel leave the gate.  He
 3         believes that there is some imminent danger
 4         there, and he takes action based off of not
 5         just the objective portion of it, but then
 6         the subjective factors of what he did was
 7         based off of not just subjective belief but
 8         the objective beliefs as well.
 9   Q.    Yes, sir.
10                   MR. ROQUEMORE:
11                   William, do you mind switching to
12             the next page.  Thank you.
13   BY MR. ROQUEMORE:
14   Q.    So the -- this -- this page starts off,
15         "The Panel believes the following facts
16         justified the recommended dispositions."
17         Let's talk about some of the -- the facts
18         that are listed in this next paragraph.  We
19         discussed the front yard and the fact that
20         that's an objective fact, right?
21   A.    That is.
22   Q.    Yeah, and he proceeded to go to the
23         residence once he was in -- in the front
24         yard, right?
25   A.    Objective fact, yes, sir.
```

```
1    Q.   Yes, sir.  And then he heard barking
2         sounds, correct?
3    A.   Objective fact, yes, sir.
4    Q.   Okay, and it's mention coming fast towards
5         him.  So the sounds were coming fast
6         towards him.  Was that an objective fact or
7         is that subjective or -- or some sort of
8         mixture of the -- of the two?
9    A.   I think it's -- it's a mixture of the two.
10        He heard the sound, but coming fast towards
11        him would be more subjective, but hearing
12        the sounds would be objective.
13   Q.   And some of that was -- was that also some
14        -- somewhat based on the bodyworn camera
15        video?
16   A.   Yes.
17   Q.   All right.  The statement, "He removed his
18        weapon because he did not observe a way
19        out," what he observed, was that his
20        subject -- his subjective view or was, you
21        know, that statement an objective fact?
22   A.   He -- he did not look for a way out.  It is
23        -- it is his subjective view, but it also
24        could be an objective fact as well.
25   Q.   All right.  Well, you saw on the -- on the
```

```
1          bodyworn camera the layout of -- of the
2          yard.  You said that, right?
3     A.   Yes.
4     Q.   Okay.  Was there an -- objectively was
5          there a platform or a car to jump on to
6          escape?
7     A.   No.
8     Q.   Was that an objective fact?
9     A.   Correct.
10    Q.   Okay.
11    A.   Yes, that's correct.
12    Q.   Okay.  Was there a fence with spikes on it?
13    A.   Objective, yes, there was.
14    Q.   And was it an objective fact based on the
15         height of the fence that it was -- that
16         Officer Burmaster would have been able to
17         jump that or not jump that?
18    A.   Objective fact, yes.
19    Q.   Okay, and it's an objective fact of what?
20    A.   Objective fact that there was a fence that
21         was present with spikes on it, and it
22         wasn't possible for him to jump over the
23         fence.
24    Q.   This paragraph says, "He didn't believe he
25         could jump the fence."  Was that also his
```

1          subjective belief?

2     A.    That was.

3     Q.    So if he believes he -- he could have

4          jumped it, but still sat -- stood his

5          ground, then that would be a different

6          analysis, right?

7     A.    Correct, yes, sir.

8     Q.    But in this case he did not believe he

9          could jump it, and objectively it did not

10         seem he could jump it.  Is that correct?

11    A.    That's a fair statement, yes.

12    Q.    All right.  Then there's a statement that

13         he believed it was viscous and coming fast

14         towards him.  Is that objective or

15         subjective or some mixture?

16    A.    It's -- it's subjective, but there is a

17         mixture of some objectivity there as well.

18    Q.    Okay.  What objectivity are you referring

19         to there?

20    A.    The -- the video.  I mean, the fact -- the

21         fact remains that the dogs were coming

22         towards him, and he -- and just looking at

23         the video, that's what we saw that the dogs

24         that were actually going towards Officer

25         Burmaster.

```
1    Q.   How -- how does it affect your analysis
2         here whether or not another officer may
3         have done something different?
4    A.   It affects the analysis based off of the
5         fact that what the officer did, trying to
6         escape, trying to get away, it -- it
7         mounted -- it impacts the thought process
8         of Officer Burmaster as it relates to
9         whether or not he believed he's in imminent
10        danger or whether this other officer is in
11        imminent danger as well.
12   Q.   All right.  So we -- we talked about a lot
13        of factors just right now that were both
14        subjective and objective.  Would you agree
15        to that?
16   A.   Yes.
17                  MR. MOST:
18                  Objection to the form.
19   BY MR. ROQUEMORE:
20   Q.   So when you were asked about whether or not
21        your analysis was just based on subjective,
22        is it -- is it fair to say your analysis
23        was based on objective and subjective
24        facts?
25                  MR. MOST:
```

```
 1                    Objection as to form.
 2                    THE WITNESS:
 3                    Yes, the analysis is based off of
 4              objective as well as subjective
 5              facts.
 6  BY MR. ROQUEMORE:
 7  Q.   Chief, how -- how many years have you been
 8       in law enforcement?
 9  A.   Since 1993 I've been in law enforcement in
10       some capacity off and on from police --
11       police officer to police supervisor to
12       District Attorney's Office to legal
13       instructor to now Public Integrity Bureau
14       Deputy Superintendent.
15  Q.   So is it fair to say you've been in law
16       enforcement one way or another for a little
17       bit more than 30 years?
18  A.   Correct.
19  Q.   And from '93 to 2005, you were actually
20       working on the street as a -- as a --
21       either an officer -- you were a law
22       enforcement officer in one way or another
23       from '93 to 2005.  Is that right?
24  A.   That's right.  That's correct.
25  Q.   So Chief, I appreciate your time.  I think
```

```
1        Mr. Most may have some questions to follow
2        up on.
3   A.   Yes, sir.
4                  MR. ANADA:
5                  Quick break?
6                  MR. MOST:
7                  Yeah, we're going to take a
8               five-minute break, and then we'll
9               come back at 11:30.
10                 (Break in proceedings.)
11                 FURTHER EXAMINATION
12  BY MR. MOST:
13  Q.   Chief, did you talk to anybody or review
14       any documents during that break?
15  A.   No, sir.
16  Q.   Okay.  So I think I heard you say you
17       thought it was an objective fact that
18       Burmaster couldn't jump over the fence.
19       Did I hear that correctly?
20  A.   It's an objective fact based off the video
21       what we saw, yes, sir.
22  Q.   Okay.  So how high can Burmaster jump?
23  A.   I'm not really certain.
24  Q.   Okay.  Did you do any sort of assessment or
25       ask any questions to the determine how high
```

1       Burmaster could jump?

2    A.   We did not.

3    Q.   Okay, and did you do an assessment of how

4       high the fence was?

5    A.   Did we measure the fence?  No.  It appeared

6       to be about five -- five -- at least five

7       to six feet, but not certain.

8    Q.   Five to six feet tall?

9    A.   It seemed, I believe so, yes.

10   Q.   So, like, to Burmaster's head, the top of

11      his head?

12   A.   No, I don't think it was that high.  I

13      don't think Burmaster is five feet tall.  I

14      think he's taller than that.

15   Q.   Okay.

16   A.   I said -- I said between five and six feet

17      so --

18   Q.   Okay.  So if someone said it was, like, a

19      waist-high fence, that would be completely

20      different than your assessment?

21   A.   Not really, sir.  It still had spikes on

22      the fence too.

23   Q.   Well, okay, but it's your testimony that

24      you saw the fence, and it's between five

25      and six feet tall?

1    A.    From what -- what I can recall, yeah.

2    Q.    Okay, and you said that the dogs were going

3          towards Burmaster?

4    A.    It appeared that one of them was going

5          toward Burmaster, yes, sir.

6    Q.    Okay, but your -- I think your testimony

7          was that the dogs, plural, were going

8          towards Burmaster.  Is that correct?

9                    MR. ROQUEMORE:

10                   Objection, form.  He just

11              testified that it was one dog.

12                   THE WITNESS:

13                   I -- I think my testimony was

14              that the dogs were going towards the

15              officers.  I don't -- I don't think

16              I testified that both dogs were

17              going toward Burmaster.

18   BY MR. MOST:

19   Q.    Okay.  At the Chief's hearing Burmaster

20         spoke and sort of made his case for why the

21         shooting was reasonable, right?

22   A.    He -- yes, he explained why he did what he

23         did, yes.

24   Q.    Was anyone there to articulate why the

25         shooting might not have been reasonable?

```
 1   A.   There were different people that were
 2        present during the hearing when we did our
 3        discussion on some of the potential issues
 4        that they may have seen, but I don't recall
 5        verbatim who was it was or what was said.
 6        I -- I don't -- I don't recall.
 7   Q.   Okay.  So you recall Burmaster making his
 8        case for why the shooting was reasonable,
 9        but you don't remember anyone making the
10        case for why it was unreasonable, correct?
11   A.   Yes, because during the discussion, the
12        discussion is not recorded, and there's no
13        information as it relates to the discussion
14        itself, and so that's -- I -- I -- I can't
15        recall if anyone made the argument.  I'm
16        sure there was discussion about
17        alternatives, but I don't -- I don't
18        recall, sir.
19   Q.   And then looking at the document on the
20        screen, Deposition Document 58, this is
21        your letter to the Superintendent, right?
22   A.   The one that I concurred on, yes, sir.
23   Q.   On Page 2 it talks generally about some
24        facts that were learned during the hearing,
25        right?
```

```
 1   A.    Yes.
 2   Q.    Okay, and then Page 3 narrows down to the
 3         -- the facts that the panel thought were
 4         relevant to the recommendation, right?
 5   A.    Yes.
 6   Q.    Okay, and so these facts on Page 3, these
 7         are the ones that informed your analysis of
 8         -- of your recommendation, correct?
 9                   MR. ROQUEMORE:
10                   Objection, form.
11                   THE WITNESS:
12                   Yes.
13   BY MR. MOST:
14   Q.    Okay.  All right.  Thank you very much for
15         your time, Chief.  I think that's all we've
16         got for today.
17                   MR. ROQUEMORE:
18                   We'll read and sign, but I think
19               we're going to need a copy sooner
20               rather than later since next month
21               is -- is the trial.
22                   MR. MOST:
23                   Yeah.
24                   (Whereupon, the taking of the
25               witness' testimony was concluded.)
```

1                    WITNESS' CERTIFICATE

2

3             I, CHIEF KEITH SANCHEZ, have read or

4    have had the foregoing testimony read to me

5    pursuant to Rule 30(e) of the Federal Rules of

6    Civil Procedure and/or Article 1445 of the

7    Louisiana Code of Civil Procedure and do hereby

8    certify that to the best of my ability and

9    understanding, it is a true and correction

10   transcription of my testimony.

11

12

13   Please check one:

14

15   _____Without corrections

16

17   _____With correction (see errata sheet)

18

19   _____    _____

20   WITNESS' SIGNATURE                       DATE

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2              THIS CERTIFICATION IS VALID ONLY FOR
    A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL
 3  SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS
    PAGE.
 4
              I, RAYNEL E. SCHULE, Certified Court
 5  Reporter, #77005, in good standing, in and for
    the State of Louisiana, as the officer before
 6  whom this testimony was taken, do hereby certify
    that CHIEF KEITH SANCHEZ, after having been duly
 7  sworn by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the
 8  foregoing 68 pages; that this testimony was
    reported by me in stenotype reporting method,
 9  was prepared and transcribed by me or under my
    personal direction and supervision, and is a
10  true and correct transcript to the best of my
    ability and understanding; that the transcript
11  has been prepared in compliance with transcript
    format guidelines required by statute or by
12  rules of the Board, that I have acted in
    compliance with the prohibition on contractual
13  relationships, as defined by Louisiana Code of
    Civil Procedure Article 1434 and in rules and
14  advisory opinions of the Board; that I am not of
    counsel, not related to counsel or to the
15  parties herein, nor am I otherwise interested in
    the outcome of this matter.
16
17
18  5-14-2025        _____
    Date                 Raynel E. Schule, CSR
19                       Certified Shorthand Reporter
                         State of Louisiana
20
21
22
23
24
25
```