1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DEREK BROWN and JULIA                CIVIL ACTION

BARECKI-BROWN                        NO. 22-00847

VERSUS                               SECTION: L

                                     DIVISION: 4

DERRICK BURMASTER, SHAUN             HON. ELDON FALLON

FERGUSON, and the CITY OF            HON. KAREN W.ROBY

NEW ORLEANS




        DEPOSITION OF ASSISTANT SUPERINTENDENT HANS

GANTHIER, given in the above-entitled cause,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter, in

and for the State of Louisiana at the Office of the

City Attorney, 1300 Perdido Street, Room 5E03, New

Orleans, Louisiana, on the 14th day of May, 2025,

commencing at 2:25 PM.

2

1    APPEARANCES:

2

   REPRESENTING THE PLAINTIFFS:

3
            JONES, WALKER
4           BY:  TARAK ANADA,
            ATTORNEY AT LAW -and-
5           PATRICK M. VANBURKLEO,
            ATTORNEY AT LAW
6           201 St. Charles Avenue
            New Orleans, Louisiana  70170-5100
7           (pvanburkleo@joneswalker.com)

8

   REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON,
9  and the CITY OF NEW ORLEANS:

10           OFFICE OF THE CITY ATTORNEY
            BY:  JAMES ROQUEMORE,
11           ATTORNEY AT LAW
            1300 Perdido Street
12           Suite 5E03
            New Orleans, Louisiana  70112
13           (James.Roquemore@nola.gov)

14

15

   Reported By:
16
            Sandra P. DiFebbo
17           Certified Shorthand Reporter
            State of Louisiana
18

19

20

21

22

23

24

25

3

1    E X A M I N A T I O N        I N D E X

2

3                                        Page

4  BY MR. ANADA:                 5

5

6    E X H I B I T              I N D E X

7

8                      Page

9

10  Exhibit L1                        45

11  Exhibit L2                        20

12  Exhibit L3                        37

13  Exhibit L4                        44

14  Exhibit L5                        48

15

16

17

18

19

20

21

22

23

24

25

4

1          S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of ASSISTANT SUPERINTENDENT HANS

6    GANTHIER is hereby being taken pursuant to the

7    Federal Rules of Civil Procedure for all purposes

8    in accordance with law;

9          That the formalities of reading and

10   signing are specifically waived;

11         That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14         That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                  * * * * *

20         Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25

5

1            ASSISTANT SUPERINTENDENT HANS

2        GANTHIER, 1615 Poydras Street, Suite 1800, New

3        orleans, Louisiana 70112, having been first

4        duly sworn, was examined and testified on his

5        oath as follows:

6    EXAMINATION BY MR. ANADA:

7        Q.   Good afternoon, Superintendent Ganthier.

8        A.   Assistant Superintendent.

9        Q.   Am I pronouncing your name correctly?

10       A.   Yes.  It's Ganthier.

11       Q.   Okay.  Ganthier.  My name is Tarak Anada.

12   Just call me Tarak.  Would you prefer that I call

13   you Assistant Superintendent Ganthier or --

14       A.   Just call me Hans.

15       Q.   Hans. Okay.  Call me Tarak.  I'll call

16   you Hans.  Appreciate that.  It  will make the

17   record much shorter.  This is my partner, Patrick.

18   We represent the Brown family.  They're the family

19   that has filed a lawsuit in this case.  You're

20   familiar with this case?

21       A.   I am.

22       Q.   Did you learn about it -- I saw some --

23   you learned about this case sometime before 2023,

24   correct?

25       A.   I did.

1          Q.   When was that?

2          A.   I think I was the --

3          Q.   I saw your name on some documents.

4          A.   -- academy director, I believe I was,

5     when I saw the case, yeah.

6          Q.   Do you remember when that was? 2021?

7          A.   Sometime around there, yeah.

8          Q.   What did you hear about -- how did you

9     first find out about the case?

10         A.   Well, I mean, I usually have the academy

11    staff sitting in on the Use of Force Boards just

12    for training purposes and so on.  That's how I knew

13    about it.

14         Q.   When you said Use of Force Review Board,

15    who was on that board?

16         A.   Well, the voting members were -- there

17    were three deputy chiefs on it at the time.  I was

18    a captain at the time, so I did not have a vote.

19         Q.   Is that the Force Investigation Team or a

20    different --

21         A.   No.  That's a different hearing panel.

22    They are actually in charge of the hearing.  They

23    run the hearing, the board.  It usually consists of

24    usually the chief of operations, the PIB chief, and

25    another chief.  Doesn't necessarily mean that --

7

1    those are the two that usually run it.

2         Q.   Got it.  You sat in on their

3    deliberations?

4         A.   I sat in, yeah.  I did sit in.

5         Q.   Can you tell what you remember about

6    sitting in on that?

7         A.   Long time ago.  I would have to refresh

8    my memory on that.  I sat in on a lot of them.  So

9    that particular one I just remembered the dog

10   shooting, but I don't know what it is that

11   actually, you know, contributed to it.

12        Q.   Sorry if I already asked you this.  You

13   don't remember who was sitting on that board?

14        A.   I mean, I would presume Chief Westbrook,

15   Arlinda Westbrook, would be one of them.  I don't

16   know who -- I don't remember who the other two were

17   in '21.  It could have been either -- I can't -- I

18   don't want to guess.  It should be on the record

19   someplace.

20        Q.   Yeah.  Would it refresh your memory if I

21   told you it was Chief Goodly, Chief Noel, and Chief

22   Westbrook?

23        A.   I can't be specific on that.  I don't

24   remember exactly who all was on it.

25        Q.   If I were to represent to you that Chief

8

1  Goodly, Chief Noel, and Chief Westbrook all

2  unanimously ruled that the April 10th shooting by

3  Officer Burmaster was "not justified," would you

4  have any reason to disagree with that?

5       A.   I would based on I don't have all the

6  facts of what they looked at, but I did get a

7  chance to review it when I sat in, when I was

8  sharing the Use of Force Board for -- I believe it

9  was -- I don't remember if it was a penalty phase,

10  or -- I don't know why this case came back to us,

11  but I believe it had to do with either a penalty

12  phase, and then we reviewed it.  We did have access

13  to the video and heard the testimony of the

14  officer.  Based on what we saw, I believed -- I

15  won't say the word, but the officers followed the

16  policy and procedures and guidelines of the New

17  Orleans Police Department.

18       Q.   Let me back up a little bit.  How tall

19  are you?

20       A.   Five ten, five eleven.

21       Q.   Have you ever felt threatened by a

22  22-pound dog?

23       A.   Not in my experience, no.  I haven't been

24  in that situation where a dog was coming at me.

25       Q.   You never had a dog run at you before?

1     A.   No.

2     Q.   Have you ever had an occasion where

3 anything that weighed 22 pounds was approaching

4 you?

5     A.   Not really, no.

6     Q.   Do you think a 22-pound dog could give a

7 police officer a reasonable fear of serious bodily

8 harm?

9     A.   It depends on the type of dog, I imagine.

10 I don't know the weight of the dog at the time. I'd

11 be speculating. I don't want to do that. So a 22-

12 pound dog, it depends on the type of dog, I would

13 say.

14     Q.   Fair enough. I heard you say something

15 you didn't have access to the video.

16     A.   I didn't say that. I said I finally was

17 able to look at the videos and everything

18 concerning the video. I was able to hear the

19 officer's testimony. I was able to also see where

20 the officer's time -- where he was at the time of

21 the shooting and what options did he have. These

22 are all considered, the totality of the

23 circumstances. I was able to sit down and look at

24 it as well as the other board members.

25     Q.   You saw the body camera video from

10

1    Officer Burmaster's perspective?

2        A.   I did.

3        Q.   And would you tell the jury, under oath,

4    if you were in his shoes, you would have also shot

5    a 22-pound puppy?

6            MR. ROQUEMORE:

7                Object to the form.

8    BY MR. ANADA:

9        Q.   Go ahead.  He is going to object from

10   time to time.

11       A.   I'm just going to say I couldn't say what

12   I would do at the time, because I wasn't in that

13   position.

14       Q.   So you are not saying to the jury, I also

15   would have shot that dog if I was in that

16   situation?  That's not what you're saying, right?

17       A.   Yes, and I will also say I would not

18   shoot the dog either.

19       Q.   Right.  You won't take a position on what

20   you would have done either way?

21       A.   That's correct.

22       Q.   You're saying, based on what Burmaster

23   experienced, you thought it was within policy for

24   him to have shot the dog?

25       A.   I did.

11

1      Q.   But you are not -- you're only looking --

2  you are only analyzing the situation from

3  Burmaster's unique subjective viewpoint?

4      A.   No.  It's an objective viewpoint, but I

5  have to look at the totality. So based on the

6  officer's action, the only time you can really use

7  deadly force is if you are in danger of receiving

8  serious bodily harm or somebody else or death.  So

9  did he have occasion to possibly receive serious

10  bodily harm?  Possibly.  I can't -- it's his

11  perception of what he was looking at, at the time.

12  That's what we, as a board, have to objectively

13  look at.  What is he thinking about?  What is he

14  experiencing?  I can't sit from a viewpoint of

15  10,000 feet and go, yeah, okay, that's Monday

16  morning quarterbacking.  The law just doesn't allow

17  for it.  It is what the immediate thought process

18  of that officer is.  Was he intentionally -- did he

19  intentionally believe that he was going to receive

20  harm.

21      Q.   So I think I understand your testimony.

22  You believe that Officer Burmaster believed he was

23  about to receive serious bodily harm?

24      A.   Yes.

25      Q.   But you're not saying you independently

12

1   say that I think Officer Burmaster was about to

2   receive serious bodily harm?  That's not what you

3   are telling the jury, right?

4       A.   Clarify that a little bit.  I'm not quite

5   understanding what that question is.

6       Q.   So you understand this case is about

7   Officer Burmaster shooting a 22 year old puppy,

8   right?

9       A.   A 22-year --

10      Q.   Twenty-two-pound puppy.  Did you know

11  that or --

12      A.   I didn't know the weight of the dog, nor

13  did I ask.  I just knew he shot a dog.  The weight

14  of the dog is insignificant.  It is what he

15  believed to be a possible threat to him.

16      Q.   You saw the video.  Did you think the dog

17  depicted in the video that Burmaster shot, from

18  your perspective, posed a risk of serious bodily

19  injury to Burmaster?

20      A.   If you're asking me to put myself in

21  Burmaster's place at the time, Officer Burmaster

22  heard a deep barking, not associated with a

23  22-pound dog.  When he looks over, there is big dog

24  coming out.  He is responding to a domestic

25  violence call, so he doesn't know what that is

1    about.  As he is focusing on the dog, another dog

2    pops up.  Now, whether he had time to size up the

3    dog or not, I don't think he did, the way it

4    looked, but it was coming at him.  Burmaster's size

5    does not allow him to get away from the fence or

6    jump the fence.  There is no way he is going to be

7    able to do that in time, so he reacts.  He shoots

8    at what he perceived to be an imminent threat to

9    him.  So that's what I saw it as what I'm looking

10   at, and that is how I am able to sometimes put

11   myself in the officer's total experience of what he

12   is going through.  Everything taken into account, I

13   felt that it was justified.

14        Q.   So let me just break that down a little

15   bit.  It's very important, because, you know you

16   are listed as a witness to testify on behalf of

17   Officer Burmaster at trial, right?

18        A.   Yeah.  I guess, yes.

19        Q.   You plan to tell the jury that you

20   believe that, based on what you saw, that that 22-

21   pound dog was a legitimate threat of serious bodily

22   harm to Burmaster?  You are going to tell the jury,

23   I, Hans Ganthier, believe that that 22-pound dog

24   posed a legitimate fear -- legitimate threat of

25   serious bodily harm to Burmaster?

14

1           MR. ROQUEMORE:

2               Objection.

3           THE WITNESS:

4               I will not say that.  I'll tell you

5           why.  I'm not going to say I.  I

6           believe Officer Burmaster thought it,

7           so it's not I.  I'm not in it.  I'm

8           looking at -- we have to take -- in

9           that Use of Force Board, we have to

10          look at what the officer's thinking is.

11          That's really what our use of force

12          policy is.  What does the officer have

13          in mind or what does he perceive as a

14          threat at the time of the incident, not

15          for me to sit there and go, oh, yeah, I

16          wouldn't have done that.  That's not

17          what I'm saying.  I'm saying he

18          believed it was a threat.  He acted

19          absolutely the way he was supposed to

20          do based on what is given as our

21          directive.

22    BY MR. ANADA:

23      Q.   Got it.  So your position to the jury is

24    going to be as long as he thought it was a threat,

25    it was okay -- as long as he thought it was a

1    threat to deliver serious bodily harm to him, he

2    was justified with using lethal force within NOPD's

3    policies?

4        A.   I believe that is correct.  He believes

5    he is going to get hurt or imminent danger, he can

6    use deadly force.

7        Q.   Got it.  That's totally -- and it's

8    relevant what you think as an outsider watching the

9    video, right?

10       A.   Yeah.  I believe it is relevant what you

11   are looking at, but you have to take everything

12   into consideration, not just that little piece of

13   the video.

14       Q.   You were present when the Use of Force

15   Review Board convened, right?

16       A.   Which one?

17       Q.   Noel, Westbrook, and Goodly.

18       A.   I was.

19       Q.   You sat through their deliberations?

20       A.   Yeah.  I sat through it, yeah, but we're

21   not allowed to say anything.  All we can do is see

22   what the outcome will be, because they kind of talk

23   amongst themselves in deliberations.  We're not

24   privy to that.

25       Q.   Did you disagree with their conclusions?

16

1     A.   I have to say I think I did.  I don't

2  know if I stated it on the record.  I think I had a

3  problem with it. You'll have to tell me if I stated

4  it on the record. I'm not sure if I stated it on

5  the record or not.

6     Q.   What problem did you have with it?

7     A.   Again, like I said, we can't put our --

8  it depends.  Did the officer feel threatened?  Did

9  he feel that he was going to get hurt?  He used the

10 force necessary to stop that.  As an academy

11 director, that is what we teach.

12    Q.   Got it.  The reason you disagreed with --

13    A.   I don't know if I stated I disagreed.  I

14 just personally disagreed at the time.  Like I

15 said, I don't know if I put it on the record.

16    Q.   Why wouldn't you have put it on the

17 record, if you disagreed?

18    A.   They would have to ask me.  They go

19 around the room.  Do I have anything, and then they

20 go down the line, but I don't think they -- I'm not

21 sure if they did.  I might have, but I don't

22 remember.  It's from '21, so I don't remember.

23    Q.   Don't let me put words in your mouth. I

24 just want to make sure I understand.  The reason

25 you disagreed with that board is because they were

1    looking at whether the use of deadly force was

2    justified from their perspective, and they were not

3    looking at it from Officer Burmaster's perspective,

4    right?

5        A.    What I said -- what I believe was I don't

6    know what they perceived to be unjustified.  I

7    don't know.  I never was privy to those talks;

8    however, when I looked at it, my job and the

9    board's job is to look at the totality of

10   circumstances.  What was in the officer's mind at

11   the time of the incident?  Did he feel threatened?

12   Did he feel this dog was going to bite him in a

13   very -- it looks like coming down about -- just

14   about the height of his crotch.  Let's put it that

15   way.  Could he have bitten him there?  Yes.  I

16   believe he could have, and he might have perceived

17   the old dog and focused his attention on which --

18   focused on that, and this dog came out of the blue.

19   I don't know if he just perceived that as a

20   dangerous threat to him, which, if he did, which I

21   believe is the issue, and that's what I believe he

22   stated, and I think he was justified in doing what

23   he did.  Now, again, as we sit there and go back

24   and think about what could have been done better,

25   all of that, but that's not what we go by.  It's

18

1    like what happened.  What was his state of mind at

2    the time.

3        Q.    Understood.  So you're not at all giving

4    any kind of opinions on what he could have done

5    differently?

6        A.    No.  There were certain things I saw that

7    I kind of -- I think he got sustained on some of

8    that, if I'm correct.  We'd have to look at that.

9    Did he have his full uniform on, things like that.

10   Did he have his equipment?  But I think that's a

11   secondary issue.  Basically, I believe that he

12   thought he needed to defend himself, and he did.

13       Q.    Got it.  How many dogs have you come

14   across in the line of duty?

15       A.    Actually, I've come across quite a few.

16   Our own K-9 and dogs in yards.  I've been bitten by

17   our own K-9, so I do know what I'm talking about.

18   As you can see, I have two marks here from

19   apprehension of an armed robber.  The dog got on

20   him, and I was going to handcuff him, and the dog

21   latched onto my elbow, but, again, only the handler

22   was able to pull him off, but, again, I'm not

23   particularly not, you know, engaged with dogs.

24       Q.    What does that mean?

25       A.    I'm very familiar with dogs, but, yeah.

1      Q.   You have a dog?

2      A.   Yes.

3      Q.   Multiple dogs?

4      A.   I've had multiple dogs, yes.

5      Q.   You're a dog guy?

6      A.   I am.

7      Q.   I am, too.  All right.  So you didn't

8   consider shooting that dog that bit your arm,

9   right?

10      A.   No, because I knew the handler was there.

11   Now, if the handler wasn't there, and he would not

12   get off, yes, I would shoot him.

13      Q.   You would shoot him?

14      A.   Yes, I would.

15      Q.   The officers -- I'm glad you mentioned --

16   so you have comfort level with dogs, being a dog

17   guy, right?

18      A.   (Witness nods head.)

19      Q.   An officer is allowed to take into

20   account his specific experience and comfort level

21   with dogs on whether or not he decides to use

22   lethal force or not, right?

23      A.   Yes.

24      Q.   And, in fact, Officer Burmaster stated

25   that he was concerned that this particular dog,

20

1    Apollo, was going to bite him in the crotch area?

2         A.   I think so.  I think -- I remember that

3    for some reason, but, again, I don't have that in

4    front of me.

5         Q.   He was allowed to take that into account,

6    right, his fear of the dog biting him in the --

7         A.   Yes.  I would say so, yes.

8         Q.   -- in the crotch? Sorry.  We are talking

9    over one another.

10        A.   I would say so, yes.

11        Q.   You are familiar with the Public

12   Integrity Bureau Force Investigation Team?

13        A.   I am.

14        Q.   I'm not going to let you review this

15   document.  I am just going to read a couple of

16   things out of it.  If you want to read it, let me

17   know.  Looking at -- we will go ahead and attach

18   this.  I'm going to keep it as L2, since it's

19   already marked as L2.  We'll attach this as Exhibit

20   L2.  Hans, this is the NOPD Public Integrity Bureau

21   Force Investigation Team Administrative Shooting

22   Investigation Report dated 8/4/2021.  Have you ever

23   seen that before?

24        A.   Yeah.

25        Q.   So you are familiar with it?

1      A.    I am.

2      Q.    Let me ask you a couple of questions

3  about it.  Forgive me.  I don't mean to beat a dead

4  horse here, but on Page 10.  I'm just going to read

5  some language here. "Officer Burmaster stated he

6  has been bitten several times by dogs that range in

7  size from small to large.  Officer Burmaster stated

8  he was tired of being bitten by dogs and tired of

9  going to the hospital for treatment for dog bites."

10  Oh, no.  Let me keep reading. "Officer Burmaster

11  stated there is an ongoing problem in the city

12  where people are negligent with their dogs."  He

13  was able to consider this, his past experience with

14  being bitten by dogs, ranging from small to large,

15  in determining whether to use lethal force on

16  Apollo, from your perspective, right?

17      A.    I think that his experiences with dogs

18  certainly would tend to be not good, and,

19  basically, having been bitten several times, as he

20  says, he would consider that another reason why he

21  was in fear of being bitten.

22      Q.    Okay.  Got it.  NOPD policy allows him to

23  consider those experiences in determining whether

24  or not to use lethal force, right?

25      A.    I wouldn't say that, but I do know that

22

1    people's experiences tend to, you know, give

2    thought to how they're going to react to something.

3        Q.    Officer Burmaster clearly stated this to

4    the PIB panel.  He clearly had past experiences

5    being bitten by dogs.  I just want to make sure I

6    understand your testimony.  It was okay for him to

7    factor those experiences in when he made the

8    decision in this case, right?

9        A.    I think that everything is taken into

10   consideration.  So the time of the incident, would

11   that have been important?  At that time, certainly

12   I think his memory of being bitten could have been

13   an influence, but to tell you that is what he acted

14   on, I couldn't tell you that.  I do know that, as

15   every human being is -- let's take the dog out of

16   it.  If you are used to seeing a person behave a

17   certain way, they take out a gun, because they're

18   carrying a weapon, they take out their gun, yes.

19   You realize the person has a gun, and I need to

20   draw my weapon.  So that past experience has now

21   affected how I deal with people when I see an

22   object in their waistband that may or may not be a

23   weapon.

24       Q.    I want to read from Page 11 of this

25   exhibit.  "Officer Burmaster believed the dog would

23

1    bite his genitals and cause serious physical

2    injury."  It was acceptable for him to factor that

3    belief in when he decided to use lethal force,

4    right?

5        A.   I think he factored it in, and I think

6    that he saw -- when he saw the dog close to him, I

7    think that definitely was a deciding -- that was a

8    decision.

9        Q.   That was appropriate for him to consider

10   that, right?

11       A.   I would say so.

12       Q.   "Officer Burmaster stated he had been

13   previously bitten by small dogs on two occasions

14   while on duty."  It was appropriate for him to

15   factor that in when he shot Apollo, correct?

16       A.   As I said before, yeah.  I think his past

17   experiences do factor into decision-making to the

18   present.

19       Q.   And it's appropriate for that to happen,

20   right?

21       A.   I don't say the word "appropriate," but

22   it is certainly worth taking into consideration to

23   make a decision prompt, but to him, again, this is

24   his mindset.  He is in -- to him, he is in

25   imminent danger.  Now, what the reason may be,

24

1  that's for somebody else to figure out, but to him,

2  at that moment in time, this is a dangerous

3  situation, and he has to defend himself.

4      Q.   I understand everything you said, and I

5  follow you.  The only part that I'm unclear on is

6  you said, "I can't say that it would have been

7  appropriate."  That's just what threw me for a

8  loop.

9      A.   In my estimation, I can't judge what he

10  is thinking about to say that's an appropriate

11  thought.  I'm just telling you what I look at is --

12  really, forget about my subjective opinion.  I have

13  to look at the thing in total objectivity.  That's

14  my job.  I can't put my personal opinions on what

15  he is looking at.  I don't know what he was looking

16  at.  I don't know his thought process.  I certainly

17  would think that that is part of his process, what

18  happened to him in the past.

19      Q.   You take no issue with what happened to

20  him in the past being part of his decision-making?

21      A.   No.  I don't take issue with that.

22      Q.   Okay.  Good.  Do you know Detective

23  Shannon Brewer?

24      A.   I do.

25      Q.   Do you have any opinion about her?

25

1       A.    What do you mean?

2       Q.    Do you have any reason to think that she

3    is a credible person or not a credible person?

4       A.    No.  I don't have any --

5             MR. ROQUEMORE:

6                   Objection, form.

7             THE WITNESS:

8                   I don't have anything to say against

9               that.

10   BY MR. ANADA:

11      Q.    Do you have any reason not to trust her

12   judgment?

13            MR. ROQUEMORE:

14                  Objection, form.

15            THE WITNESS:

16                  No.  I don't have a problem.

17   BY MR. ANADA:

18      Q.    I am going to read from Detective Shannon

19   Brewer's report.  This is Exhibit L2.  "A dog

20   fatally wounded by Officer Burmaster did not

21   present an imminent threat towards Officer

22   Burmaster, and upon recognizing the dog, did not

23   present a threat of serious bodily harm, Officer

24   Burmaster should have holstered his weapon."  Did I

25   read that right? The last sentence there?

1      A.    Uh-huh.  You read it right.

2      Q.    Do you disagree with that?

3      A.    I disagree with the fact that is not a

4   fact.  That is her opinion.  I can't say that I

5   would agree with her estimation, based on what I

6   saw, and the officer, what he was facing.  There

7   was no way for that officer to get off that

8   situation, and I would ask her like, "Why would you

9   say that, because what would you have done?"

10      Q.    What would you have done?

11      A.    Me?  I would have tried to get out of

12   there.  I might be a little bit more agile than

13   Burmaster.  Would I have gone in and positioned

14   myself in a situation where I couldn't get out, no,

15   but, again, not everybody is tactically sound.  So

16   I would say that that situation I would hope not to

17   get myself into.  And, again, if I had no way out,

18   and I believed that dog was a danger, I would have

19   shot it.

20      Q.    Would you have tried to kick a small dog

21   that weighed 22 pounds before you shoot it?

22      A.    At that point in time, if I was in that

23   situation, it was coming at me, would kicking work?

24   I don't know.  Would that have worked if I kicked

25   him or would it have got him more angry?  I would

27

```
 1    say probably not a good idea.  I would not attempt
 2    a physical contact with the dog.
 3        Q.   What about the taser?
 4        A.   If I had a taser, I would use it.
 5        Q.   You would?
 6        A.   Yeah.  If I had a taser, but, again, it's
 7    a mindset.  Did the officer have a taser on him?
 8        Q.   If you had a taser, you would have
 9    attempted to use it?
10        A.   Maybe.  It depends on if he was moving
11    quickly, if he was in set position.  The taser has
12    to have distances to be effective.  You put two
13    tasers together really close, it's not going to
14    have an effect.
15             MR. ANADA:
16                  Can you read back the last two
17                questions and answers?
18                  {COURT REPORTER READ BACK}
19    BY MR. ANADA:
20        Q.   Can you give the jury -- can you tell the
21    jury under oath right now that it is your belief
22    that a taser could not have been effective in the
23    situation that Officer Burmaster was presented
24    with, with Apollo, the 22-pound dog?
25             MR. ROQUEMORE:
```

28

1          Objection, form.

2          THE WITNESS:

3              I could not give you an answer to

4          that, because there are times you shoot

5          a human up close, and it has no effect,

6          because the spread of the taser is

7          important.  That's what causes what we

8          call NMI, you know.  You can't -- it

9          affects your nerves or you're not able

10         to do motor skills or not.  If it's not

11         wide enough, and it's a small dog, it

12         may not have any effect, because,

13         again, the spread of the taser is very

14         important.

15    BY MR. ANADA:

16        Q.   The reason I ask is because you are

17    listed as a witness for the defense.  It's very

18    important that I get an understanding of what your

19    testimony at trial is going to be so I'm not

20    surprised.  So if you are asked at trial, can you,

21    Officer Ganthier, tell the jury whether you believe

22    a taser would or would not have been an effective

23    way to mitigate the threat that Apollo presented to

24    Burmaster, you can't say yes or no, right?

25        A.   I could say I don't know it would have an

29

1    effect.  If it's properly hit, properly spread, and

2    if I have -- if you are fast enough to hit and

3    engage both probes in a decent spread, yes, it may

4    have an effect, but I have not seen too many

5    officers using a taser on a dog, and I'll tell you

6    we've had multiple officers that have been faced

7    with that situation and have shot the dog, because

8    they're not sure that the taser has worked.  Some

9    of them actually deployed the taser, and it had no

10   effect.  So those are the kind of things you have

11   to think about.  If you are telling me if I would

12   have used it, maybe, but, again, it depends on the

13   circumstances.  Do I think that dog is a problem or

14   going to hurt me?  Am I going to go to taser first?

15   No.  I'm going to use the tactic I know is going to

16   work immediately.

17       Q.   Is your testimony that maybe you would

18   have used the taser if you were in Burmaster's

19   situation?

20       A.   It's a possibility, yes.

21       Q.   You're not saying that tasers are just a

22   bad choice for dogs, period, right?

23       A.   Yeah.  No.  I'm not saying that.

24       Q.   Because you know about NOPD's policy

25   about tasers and dogs, right?

1      A.   I understand.

2      Q.   Do you disagree with NOPD's taser

3   policies?

4      A.   I don't think any one policy fits all,

5   everything that happens.  So that's why I have a

6   problem with it. You have to look at each

7   individual case.

8      Q.   Exhibit L2, again.  This is the report of

9   Detective Brewer on the NOPD Force Investigation

10  Team.  You see how it is concurred by Sergeant John

11  Helou and Captain Sabrina Richardson?

12     A.   Uh-huh.

13     Q.   I'll show you Page 17.  Can you tell me

14  what on Page 17 would you disagree with versus what

15  on Page 17 you agree with?

16     A.   Well, I don't know what -- are you saying

17  what rules were violated?

18     Q.   Well, there are some conclusions, I

19  think, on this page, and I'm just wanting to get an

20  idea of what conclusions you agree with and what

21  you disagree with.

22     A.   So her summary, which is three lines of

23  this whole incident, is that, "Revealed Officer

24  Burmaster's discharge occurred due to Officer

25  Burmaster's observing the dogs and firing his

31

1    weapon out of fear, not because the dog presented a

2    threat."  I think in his testimony he stated he was

3    bitten a few times.  Yes, he would be fearful, but

4    there is also a fact that he was bitten, according

5    to him, and that, to him, that dog apparently was

6    in a position to cause him bodily harm, and he

7    acted based on that.  I don't think this is a full

8    description of it.  This is just a quick, you know,

9    he acted out of fear, but how does she prove that?

10        Q.    So you disagree with her conclusion?

11        A.    I disagree with the fact that that is all

12   that is written.  It may very well be true he acted

13   out of fear, but it has to be taken into account.

14   The situation.  He didn't have an out.  He didn't

15   really have an option with anything else to do, and

16   he was in fear of getting bitten.  So serious

17   bodily harm could have occurred to him, and that's

18   one of the things you have to look at.  You have to

19   look.  That's why I say you have to look at

20   everything.  That little statement does not

21   describe the entire incident.  It doesn't describe

22   his train of thought or how he would have acted if

23   you follow through his train of thought.

24        Q.    You said he didn't have an out.  Help me

25   understand that.

1      A.   There wasn't a way -- he would have to

2  get by.  There was one dog on the corner who ran

3  after the other officer, by the way, and he jumped

4  the fence, I believe, or got out.  Burmaster was

5  left in the corner.  He was not -- I don't think he

6  is physically capable of jumping that fence just by

7  the size of him and his agility.  He is overweight.

8      Q.   Why couldn't he have just left out of the

9  same gate with Officer Roussel?

10      A.   There is no way.  That other dog was

11  right there. You see the video. It was going to get

12  him.  That was the dog that was more aggressive,

13  too.

14      Q.   Right. I think I follow you.  Roussel was

15  able to get out because he was closer to the gate?

16      A.   Yes, he was.

17      Q.   And Burmaster was far away from Roussel?

18      A.   He was -- yeah.  They were not close.

19      Q.   They were not like next to each other?

20      A.   No.  They were not next to each other.

21      Q.   They couldn't touch?

22      A.   Not that I saw, no, at the time the dogs

23  came out.

24      Q.   Your opinion would change if they were

25  standing right next to each other, right?

33

1       A.   If they could get out, yeah.  I would say

2  yeah.  If he could have gone out, he could have

3  gone out.  He should have.

4       Q.   Right.  Okay.  I'm not saying this is the

5  case, but, hypothetically, let's say in a different

6  reality that at the time the dogs came out,

7  Burmaster was so close to Roussel, that Roussel

8  could just tap him on the arm like that.  That

9  would change your opinion, right?

10            MR. ROQUEMORE:

11                 Objection, form.

12            THE WITNESS:

13                 I would say, let's get out of here.

14  BY MR. ANADA:

15       Q.   Yeah.  That would change your opinion?

16       A.   It would change my opinion about not

17  being -- having to engage, yeah.  Not necessarily

18  that I wouldn't engage if it attacked me, but I

19  don't have to engage if I'm out of there.

20       Q.   Right.  Got it.  You did not conduct any

21  analysis about the effectiveness of non-lethal

22  techniques on Apollo, right?  That's not what your

23  job is, right?

24       A.   No.  It is certainly something to

25  consider, but based on the fact that he actually

34

1   used deadly force, at that point, the only thing I

2   have to consider is was he -- did he believe in his

3   mind and is there a possibility that he could have

4   received serious bodily harm or death or his

5   partner.  So those are the things to consider at

6   this point, not what -- it could have been like,

7   hey, what if I didn't come home -- didn't go to

8   work that day?  I wouldn't have been in this

9   position.  There's a lot of what-ifs.  That is not

10  my job to do that.

11      Q.   Just to be clear, your job was not to

12  evaluate whether non-lethal force would or would

13  have not been effective?  That's not what you --

14      A.   It's a consideration for possibly things

15  that could have been done better, yes, but that's

16  not the facts of what we're looking at.  We're

17  looking at the fact that he did use deadly force

18  and was it justified or not.

19      Q.   Got it.  I fully understand that, but you

20  are not going to go and tell the jury all these

21  non-lethal options would not have been effective to

22  Burmaster?  That's not --

23      A.   I'm not going to say that, because I

24  don't know if they would have been effective or

25  not, like I said.

35

1      Q.   Got it.  Just trying to understand so
2  there is no surprises at trial.  That's all.  The
3  dog that posed the -- there was two dogs, right, a
4  big dog and a little dog.  Do you remember from the
5  video?
6      A.   I do remember two dogs, yeah.
7      Q.   Do you remember one was big and one was
8  little?
9      A.   Yeah.  One was bigger than the other,
10 yes.
11     Q.   The bigger one is the one that posed the
12 threat of serious bodily harm, right?
13          MR. ROQUEMORE:
14               Objection, form.
15          THE WITNESS:
16               Again, I don't know what the little
17            dog could do or couldn't do, but, yes,
18            certainly he seemed to be the more
19            aggressive of the two, or the bark.  He
20            was the one barking the loudest that we
21            heard.
22 BY MR. ANADA:
23     Q.   Do you think the big dog barking is part
24 of the reason Officer Burmaster was justified in
25 shooting the little dog?

36

1          A.    I don't know.  I don't know if that was

2     his thought.  Certainly, if he expected a dog to

3     meet the size of that bark, yeah, I would think he

4     would be like, okay, that's a problem, or that's a

5     danger.  That could be a danger.

6          Q.    He would have had to physically saw the

7     threat before deciding whether or not to use lethal

8     force, right?

9               MR. ROQUEMORE:

10                   Objection, form.

11              THE WITNESS:

12                   I don't know what his -- again, I

13                   don't know what his thought was,

14                   whether he saw it or didn't see it, but

15                   I do know he did see two dogs.  Did he

16                   have time to process which one of them

17                   was the bigger danger?  I don't know.

18     BY MR. ANADA:

19          Q.    Would it be appropriate for a police

20     officer to choose to use lethal force before seeing

21     with your eyes what you are about to use force on?

22          A.    No.  It's not -- that's not a reason to

23     use deadly force.  You have to identify what you

24     are going to shoot at.

25          Q.    With your eyes?

1      A.    Yeah.

2      Q.    So you interviewed Officer Burmaster,

3   right?

4      A.    We asked him did he have anything -- I

5   didn't formally interview him.  We asked him to,

6   hey, give us the circumstances of what occurred.

7      Q.    When you asked him to give you the

8   circumstances of what occurred, he described the

9   actions of the dog that he shot, right?

10     A.    I believe so.  I have to refresh my

11  memory on that.  Like I said, that was about a year

12  or so ago.  I don't remember what he said.

13     Q.    Let me give you this document, and we'll

14  mark it as L3.  Let me see if this refreshes your

15  recollection.  Take your time with it.  I know you

16  have seen that document before.  You authored that

17  document, right?

18     A.    Yes. Okay.

19     Q.    So whether you want to call it an

20  interview or not, you did ask him to tell you what

21  happened that day, right?

22     A.    Uh-huh.

23     Q.    And part of the things he did is he

24  described the actions of the dog that he shot,

25  right?

38

1        A.    Right.

2        Q.    He told you that the bigger dog did not

3   go towards him, right?

4        A.    No.  It ran towards his partner.

5        Q.    Only the smaller dog went towards him,

6   right?

7        A.    Yes.

8        Q.    Would your conclusions be any different

9   if he said, I can't remember the actions of the dog

10  that I shot?  Would that have --

11       A.    No.  That wouldn't have been different,

12  because it doesn't mean you remember everything

13  that happens in that kind of incident. Here is the

14  thing about -- also, as we are kind of answering

15  some of these questions, the second page basically

16  says everything I've said.  When an officer can

17  fire his weapon, and he believes he is in imminent

18  danger of getting serious bodily harm, which he

19  states.  He believes the dog was aggressive and was

20  about to attack him and bite him, so, therefore, he

21  used his weapon.

22       Q.    As long as he believes it?

23       A.    As long as he believes, and there is no

24  other things to disprove otherwise, I believe he

25  acted appropriately.

39

1      Q.   Have you ever reviewed a situation where

2   an officer used deadly force and decided that the

3   use of deadly force was inappropriate?

4      A.   Deadly force, no.

5      Q.   How many times have you reviewed an

6   officer's use of deadly force?

7      A.   I couldn't tell you.  There have been,

8   you know, SWAT rolls, and, you know, there have

9   been times when officers -- but I can't give you a

10  number.  I couldn't tell that off the top of my

11  head.

12     Q.   But you've never disagreed with an

13  officer's use of deadly force when you have been

14  asked to review?

15     A.   I've used -- I've not agreed with

16  officers' use of force, but I don't know if it was

17  deadly or not, and there -- you know, I just

18  probably haven't seen one, but, certainly, you

19  know, what I consider, again, the reason for deadly

20  force is always key.

21     Q.   Was it appropriate for him to consider

22  disfigurement to his genital area when he shot

23  Apollo?

24     A.   Was he in danger of bodily harm?  I would

25  consider that bodily harm, yes.

40

1      Q.   Do you believe that police officers

2 should not shoot a dog unless it appears -- let me

3 state that again.  Do you believe that "Police

4 officers should not shoot a dog unless it

5 reasonably appears to pose an imminent threat of

6 serious bodily harm or death?"

7      A.   Yes.  I agree with that.

8      Q.   Do you believe that police officers

9 should ensure there was no risk to people in the

10 area before shooting a dog?

11      A.   As far as identifying their target and

12 making sure they are responsible for their rounds,

13 yes.

14      Q.   Were you aware that Officer Roussel was

15 struck by some sort of shrapnel?

16      A.   No.  I was not aware of that, nor did I

17 hear that.

18      Q.   Does that matter to you?

19      A.   Well, of course, it matters.  Was he hurt

20 from that?  I have never heard that.

21      Q.   You never heard that he had to be taken

22 to the emergency room to have shrapnel removed from

23 his arm?

24      A.   I didn't hear that, no.

25      Q.   Do you believe that to be a false

41

1    statement?

2        A.   I don't know.  I've never heard -- I

3    never saw it anywhere.

4        Q.   If that was told to you, would that have

5    changed your decision at all? Changed your opinions

6    at all?

7        A.   No, because, again, the officer was

8    trying to deal with what he had in mind.  Now,

9    whether he was accurate or not, that's not the

10   intent.  Was the intent to shoot to hurt somebody?

11   No, it wasn't.  It was probably to get that dog off

12   of him or try to get away from that threat.  Now,

13   what happens after he fires his round is always

14   something of concern, but, however, I don't think

15   that would have changed the ability to use deadly

16   force.

17       Q.   Officer Burmaster fired how many rounds

18   at this dog?

19       A.   I don't know.  I think maybe one.  I

20   can't tell you.  I've got to look at it.

21       Q.   Does this refresh your memory, Exhibit

22   L3?

23       A.   I don't see how many times he fired on

24   here.

25       Q.   Does the amount of times he fired have

1    any bearing on your --

2         A.   He fired three shots it looks like.

3         Q.   That was within policy to fire three

4    shots?

5         A.   The policy is that as long as the threat

6    is neutralized.  So it could take one, it could

7    take three, it could take five.

8         Q.   So when you reviewed Officer -- you

9    reviewed all three of his shots, right?

10        A.   As far as where they went, no.  That's a

11   ballistics thing.  That's not what we do.  We're

12   just basically looking to see was the force

13   authorized, or, in other words, was it within

14   policy or not.

15        Q.   Got it.  But it's not within policy to

16   keep shooting once the threat has been neutralized,

17   right?

18        A.   No, it's not.

19        Q.   You have no opinion on whether the threat

20   was neutralized after the first shot?

21        A.   No.  I don't know what effect the first

22   shot had, second, or third.

23        Q.   If the first shot would have neutralized

24   the dog, would you agree that it would have been

25   against policy for him to continue shooting the

43

1    dog?

2        A.    If it's in a -- if there is a disparity

3    of time, yes.  I would look at that.  If he shot

4    the dog once, and then, you know, the dog stopped,

5    and then shot again, that would be a problem.  If

6    he discharged two rounds at once, and the dog was

7    still coming, a third round would be authorized,

8    yes.

9        Q.    Was the dog still coming?  You saw the

10   video.  Was the dog still coming after the first

11   round?

12       A.    I don't remember if I saw the dog still

13   coming or not.  I couldn't answer that question, in

14   all honesty.

15       Q.    So you have no opinion on whether the

16   second or third shots were justified because you

17   don't know whether the dog --

18       A.    Yeah.  I don't know.  I don't believe I

19   saw the dog was directly affected by the first,

20   second, or third shot.

21       Q.    I don't mean to sound factitious.  I

22   don't mean to sound insulting at all. I just want

23   to make sure that you and I are on the same page on

24   what the words "subjective" versus "objective"

25   mean.  Can you tell me your definition of

44

1    subjective versus objective?

2         A.    Well, all right.  An objective opinion or

3    objective of what we're looking at is basically you

4    don't have -- you don't let your personal opinion

5    matter into what the outcome of what you are

6    looking at.  A subjective opinion is I'm intruding

7    my own beliefs into the outcome of what I'm looking

8    at.

9         Q.    Got it.  Thank you.  That's what my

10   understanding of the words are, too.  We'll attach

11   this as L4.  This was this document that I was

12   asking you if you agree with some of these

13   statements on here.  We left off at do you agree

14   that police should ensure there is no risk to

15   people in the area before shooting a dog, and

16   that's what led us into the conversation about

17   Roussel.  Hans, I hate to ask you this.  It is very

18   important during your deposition that I just need

19   to make sure I know what you are reading during the

20   questions, just to make sure you are not being

21   coached or anything like that.  Not that you are,

22   but, okay.  I'm going to read another statement to

23   you.  Tell me if you disagree or whether you agree.

24   "Police should not shoot a dog if alternative,

25   non-lethal means are reasonably available."  Do you

1  agree with that?

2      A.   Again, that's a general statement.  It

3  should not -- read that again.

4      Q.   "Police should not shoot a dog if

5  alternative, non-lethal means are reasonably

6  available."

7      A.   Generally, yes, I believe that.

8      Q.   Thank you.  What about, "Shooting a dog

9  should always be the option of last resort?"

10     A.   Again, that depends on the circumstances.

11 You don't have sometimes the time to think about

12 what else can you do, so that's a general

13 statement, but I wouldn't absolutely agree to that.

14          MR. ANADA:

15              Just for the sake of completeness, I

16          want to make sure we have attached all

17          the same exhibits.  L1, 2, 3, and 4.

18          MR. ROQUEMORE:

19              Could you describe each one?

20          MR. ANADA:

21              Yeah, 100 percent, 100 percent.  One

22          is a transcript that starts with the

23          words, "Evidence Title, 1340 Poydras,

24          Suite 1900," and I'll let counsel look

25          at it.  This is Exhibit L1.  Exhibit L2

46

1                    is Detective Brewer's administrative

2                    shooting investigation document.  L3 is

3                    the interoffice correspondence dated

4                    9/11/23 authored by Hans Ganthier.  L4

5                    is a document entitled, "Standards."

6                    Those are the four exhibits to this

7                    deposition, which are the same as the

8                    exhibits to Superintendent Lubrano's

9                    deposition.

10   BY MR. ANADA:

11        Q.   You have read the CEW policy?

12             MR. ROQUEMORE:

13                  Can I see L4 just for a second?

14             MR. ANADA:

15                  Yeah.

16   BY MR. ANADA:

17        Q.   Have you read or are you familiar with

18   NOPD's CEW policy?

19        A.   I am.

20        Q.   What is a CEW?

21        A.   It's basically a taser.  It's a

22   controlled electrical device.  Conducted, I'm

23   sorry, energy device is what you call it.

24        Q.   I know you are familiar with this.  Take

25   all the time you need to read it.  It's not as long

47

1    as it feels, but I want to know if you, as the

2    chief deputy superintendent, think that any of

3    these policies are bad policies.

4        A.    No.    I've read them.    They are not bad

5    policies.

6        Q.    Do you disagree with any of them?

7        A.    I don't disagree with any of them, but

8    there are circumstances to every side of an

9    incident you have to look at, but does all rules

10   apply to every situation?  No.  But, in general, I

11   think this is a good policy, and most of it I agree

12   with.  Actually, I don't really see anything that I

13   have a problem with except using this policy to put

14   myself in the officer's position at the time of the

15   incident.  That I don't agree with.  But, however,

16   the policies are good, and they were well thought

17   out before we get them approved.  Generally, people

18   -- actually, people most likely abide by them, so I

19   have no problem with the policy.

20       Q.    None of the subpolicies you have a

21   problem with either, right?

22       A.    No, not really.  Again, they were

23   written, you know, at the time that people believed

24   -- sometimes we change these policies based on

25   circumstances that occur, and we have to take

48

1  accounting to it.  Not everything -- this doesn't

2  cover everything, but, yes, I don't generally have

3  a problem with any of it.

4      Q.  Just for the record, this is Exhibit --

5  we'll mark this as L5.  It is New Orleans Police

6  Department Operation Manual, Chapter 1.7.1, Title

7  Conducted Energy Weapon.  L5.  This was the taser

8  policy in effect in April of 2021, correct?

9      A.  Yeah.  I would say '20 was the last

10  revision date.

11      Q.  You're not going to say any of these

12  policies are bad policies at trial, right?

13      A.  No.  I wouldn't say that.  I think, like

14  I said, they are good policies, however, not every

15  incident fits into a policy.

16      Q.  Got it.  Understood.  After Officer

17  Burmaster shot Apollo, did NOPD take any specific

18  measures to prevent future dog shootings?

19          MR. ROQUEMORE:

20              Objection, form.

21          THE WITNESS:

22              Not that I know of.  I mean, not

23            that I'm aware of.

24  BY MR. ANADA:

25      Q.  You're not going to, at trial, tell the

49

1    jury that in response to Officer Burmaster shooting

2    Apollo, NOPD took any specific measures to prevent

3    future dog shootings, right?

4         A.    Not that I'm aware of.  Like I said, why

5    would I say that and --

6         Q.    Are you second in command at NOPD?

7         A.    I am.

8         Q.    So as second in command, you can't name

9    any measures that NOPD took after this dog shooting

10   to prevent future dog shootings?

11        A.    Not that I'm aware of.  When I say they

12   didn't, I don't think I'm aware of it, though.  I

13   don't think that policy has been revised since '21.

14        Q.    Gotcha.  We have talked about various

15   things today.  None of what we have talked about

16   today are measures that NOPD took after Burmaster

17   shot Apollo to prevent future dog shootings, right?

18        A.    Again, not that I'm aware of.

19        Q.    So your counsel is going to have some

20   questions, but before I turn it over to him, would

21   you mind, because I think I'm like almost done.

22   Would you mind if Patrick and I stepped out for two

23   or three minutes in the hall just to confer with

24   each other?  Then I'm going to turn it over to your

25   counsel. He is going to ask some questions, and

50

1   then I'm going to maybe have like one or two

2   questions after that, so we're almost done.

3        A.   Okay.

4                  {BRIEF RECESS, 3:13-3:15}

5   BY MR. ANADA:

6        Q.   Talk to me a little bit about the

7   technical training you've had.  How long have you

8   been a police officer?

9        A.   Going on 27 years.

10       Q.   That's a long time.  You've had a lot of

11  training, right?

12       A.   Yes.

13       Q.   A lot of specific training on defensive

14  tactics?

15       A.   Yes.

16       Q.   Lethal force?

17       A.   Yes.

18       Q.   Continuum of force?

19       A.   We no longer have a continuum of force.

20  We used to where you go hands, baton, taser.  Now

21  you can go from hands to deadly force.  We don't

22  have a continuum anymore.

23       Q.   So let me rephrase.  You've had a lot of

24  training on the appropriateness of lethal force?

25       A.   Yes.

51

1        Q.    You have had a lot training on tasers?

2        A.    Yes.

3        Q.    Have you ever taught a course about

4    tasers?

5        A.    Have I taught it?  No.

6        Q.    Have you ever trained any other officers?

7        A.    In taser use?

8        Q.    Or in anything.

9        A.    Yes. I'm a SWAT school instructor.  I've

10   been on the SWAT team for 11 years as a supervisor

11   and officer.  I am a SWAT school supervisor.  I

12   taught various techniques on, you know, one, two,

13   several classes about situational avoidance.  I'm a

14   certified instructor in leadership in police

15   organizations.

16       Q.    You have training on the baton?

17       A.    Yes.

18       Q.    This is all specialized training that

19   you've had because you are a police officer who has

20   had a long, decorated career that lay people,

21   ordinary people, typically would not have, right?

22       A.    Yeah.  Obviously, tasers, baton training,

23   weapons, yes.

24       Q.    That gives you a unique insight into

25   those topics?

1         A.    What do you mean by -- describe unique.

2         Q.    Okay.  So let's say you are asked to tell

3    a jury about what force would be appropriate in a

4    certain situation, what type of defensive tactics

5    would work, what type of weapons would be effective

6    and what wouldn't be effective in a particular

7    situation.  You would have more of a basis to give

8    those kinds of opinions than someone like me off

9    the street who doesn't -- who never had any of the

10   training that you had, right?

11        A.    I would say so, yes.

12        Q.    And that specialized training, that

13   specialized job experience, all of that goes into

14   the opinions that you gave me today during your

15   deposition, right?

16        A.    Certainly, my particular training, again,

17   has nothing to do with what I looked at and what we

18   should look at in a board.  Again, it's individual

19   training, individual capabilities, and skill.  It

20   doesn't mean everybody has it.  So what I would do

21   -- again, this is where it gets into the objective,

22   subjective.  I don't want to include my experiences

23   and training on what somebody else is going to do

24   and what their thought process is prior to doing

25   it.

53

1      Q.   If you are going to give any kind of

2   opinions at trial -- okay. You educated me, and I

3   appreciate that.  That actually helped me

4   understand this a little bit better.  You educated

5   me a little bit about how a taser works, right?  Do

6   you remember that, about prongs?

7      A.   Yes.

8      Q.   I just learned that.  The effectiveness

9   of a taser with respect to whether the prongs made

10  contact or not, that's subject matter that you know

11  because of your specialized training, right?

12     A.   Well, everybody in the department knows

13  you have to have -- first of all, both -- you have

14  to make two connections, whether it's two prongs

15  with the needles, or it could be one needle and the

16  actual taser themselves.  So you have to have two

17  connections. Secondly, it has to be wide enough to

18  get what we call NMI, which is basically a

19  decapacitating, you know, effect.

20     Q.   Neuromuscular incapacitation?

21     A.   That's correct.  So you have to have that

22  spread.  If the spread is really small, it's not

23  going to work.  I've seen people get hit with it,

24  and because of the spread and just keep coming and

25  have no effect sometimes.  So that's important.

54

1    That's one of the things they teach.  You have to

2    have -- and every officer knows that.  You have to

3    have that spread to be effective.

4        Q.    And the reason you know about the spread

5    and neuromuscular incapacitation and the

6    effectiveness of the taser in any given situation

7    is because you have had that specialized training,

8    right?

9        A.    No.  Every officer has it.

10       Q.    Right.  Including you?

11       A.    Yes.

12       Q.    And lay people typically don't have this

13   knowledge, right?

14       A.    Not normally.  I wouldn't say no one does

15   but not in general, no.  It's not something

16   everyone would know.

17       Q.    So if anyone asks you at trial whether a

18   taser worked or not, you are going to draw upon

19   that specialized training that you've received to

20   answer that question, right?

21       A.    Yes.

22       Q.    And that's why your answer should be

23   given a little bit more weight than someone off the

24   street who has not had your training, right?

25            MR. ROQUEMORE:

55

```
 1                      Objection, form.
 2    BY MR. ANADA:
 3         Q.    Would you agree?
 4              MR. ROQUEMORE:
 5                      Objection, form.
 6              THE WITNESS:
 7                      I'm not quite sure what that
 8                  question is you're saying.
 9    BY MR. ANADA:
10         Q.    So I don't have that training.  All
11    right.  I've never gone through that training.
12    What if I were to say, all right, jury.  You heard
13    Hans Ganthier say that a taser would not have been
14    effective in this situation, but I think it would
15    be effective in the situation.  Would it make more
16    sense for them to believe you, because you have had
17    that training over me?  I haven't had that
18    training.
19              MR. ROQUEMORE:
20                      Objection, form.
21              THE WITNESS:
22                      I wouldn't know.  I don't know the
23                  answer to what somebody else would be
24                  thinking about.  Whose opinion they
25                  would believe.
```

1  BY MR. ANADA:

2      Q.   If someone has had no taser training,

3  should your opinion on the effectiveness of a taser

4  be given priority over theirs?

5          MR. ROQUEMORE:

6              Objection.  You are asking him for a

7              legal conclusion.  This is something

8              that the judge will instruct the jury

9              as to the weight to be given to any

10             particular witness.  You may answer, if

11             you know.

12         THE WITNESS:

13             Again, my answer to you is I

14             wouldn't know if it would be effective.

15             Even if I have experience and

16             knowledge, I just don't know if that

17             would be effective based on the fact,

18             you know, the closeness of the weapon

19             and the -- did I get that spread I

20             need.  So when you ask me that,

21             normally, I would say yes, if I have a

22             big target, and I believe that the

23             target -- I am going to get that spread

24             I need, and do I have the ability to

25             quickly remove my taser and hit you

```
 1              with it.  I would say, you know, all of
 2              those things considered.  Would it be
 3              effective in a moving dog?  I don't
 4              know.  Especially, if I'm just looking
 5              at the dog's torso.
 6   BY MR. ANADA:
 7       Q.   In giving that answer that you gave, you
 8   are drawing upon your specialized technical
 9   training, right?
10       A.   I would say yes.
11              MR. ANADA:
12                  Thank your.
13              MR. ROQUEMORE:
14                  I don't have any questions.  Thank
15              you.
16                  [End of deposition, 3:25]
17
18
19
20
21
22
23
24
25
```

58

```
 1              C E R T I F I C A T E

 2

 3              This certification is valid only for
    a transcript accompanied by my original signature
 4  and original required seal on this page.

 5              I, SANDRA P. DIFEBBO, Certified
    Court Reporter, in and for the State of Louisiana,
 6  as the officer before whom this testimony was
    taken, do hereby certify that DEPUTY SUPERINTENDENT
 7  HANS GANTHIER, after having been duly sworn by me
    upon authority of R.S. 37:2554, did testify as
 8  hereinbefore set forth in the foregoing 57 pages;

 9              That the testimony was reported by
    me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
    is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
    prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
    board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
    by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
    to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
    Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  5/20/25

24

25
```

**A**

**abide** 47:18
**ability** 41:15
  56:24 58:11
**able** 9:17,18,19
  9:23 13:7,10
  18:22 21:13
  28:9 32:15
**above-entitled**
  1:16
**absolutely** 14:19
  45:13
**academy** 6:4,10
  16:10
**acceptable** 23:2
**access** 8:12 9:15
**accompanied**
  58:3
**account** 13:12
  19:20 20:5
  31:13
**accounting** 48:1
**accurate** 41:9
**acted** 14:18 22:13
  31:7,9,12,22
  38:25 58:13
**action** 1:4 11:6
**actions** 37:9,24
  38:9
**actual** 53:16
**administering**
  4:22
**administrative**
  20:21 46:1
**advisory** 58:15
**afternoon** 5:7
**aggressive** 32:12
  35:19 38:19
**agile** 26:12
**agility** 32:7
**ago** 7:7 37:12
**agree** 26:5 30:15
  30:20 40:7
  42:24 44:12,13
  44:23 45:1,13
  47:11,15 55:3
**agreed** 4:3 39:15
**ahead** 10:9 20:17
**allow** 11:16 13:5

**allowed** 15:21
  19:19 20:5
**allows** 21:22
**alternative** 44:24
  45:5
**amount** 41:25
**Anada** 2:4 3:4
  5:6,11 10:8
  14:22 25:10,17
  27:15,19 28:15
  33:14 35:22
  36:18 45:14,20
  46:10,14,16
  48:24 50:5 55:2
  55:9 56:1 57:6
  57:11
**analysis** 33:21
**analyzing** 11:2
**and-** 2:4
**angry** 26:25
**answer** 4:16 28:3
  43:13 54:20,22
  55:23 56:10,13
  57:7
**answering** 38:14
**answers** 27:17
**anymore** 50:22
**Apollo** 20:1
  21:16 23:15
  27:24 28:23
  33:22 39:23
  48:17 49:2,17
**apparently** 31:5
**APPEARANC...**
  2:1
**appears** 40:2,5
**apply** 47:10
**appreciate** 5:16
  53:3
**apprehension**
  18:19
**approaching** 9:3
**appropriate** 23:9
  23:14,19,21
  24:7,10 36:19
  39:21 52:3
**appropriately**
  38:25
**appropriateness**

  50:24
**approved** 47:17
**April** 8:2 48:8
**area** 20:1 39:22
  40:10 44:15
**Arlinda** 7:15
**arm** 19:8 33:8
  40:23
**armed** 18:19
**Article** 58:14
**asked** 7:12 28:20
  37:4,5,7 39:14
  52:2
**asking** 12:20
  44:12 56:6
**asks** 54:17
**Assistant** 1:15
  4:5 5:1,8,13
**associated** 12:22
**attach** 20:17,19
  44:10
**attached** 45:16
**attack** 38:20
**attacked** 33:18
**attempt** 27:1
**attempted** 27:9
**attention** 17:17
**Attorney** 1:20
  2:4,5,10,11
**authored** 37:16
  46:4
**authority** 58:7
**authorized** 42:13
  43:7
**available** 44:25
  45:6
**Avenue** 2:6
**avoidance** 51:13
**aware** 40:14,16
  48:23 49:4,11
  49:12,18

**B**

**B** 3:6
**back** 8:10,18
  17:23 27:16,18
**bad** 29:22 47:3,4
  48:12
**ballistics** 42:11
**BARECKI-BR...**

  1:5
**bark** 35:19 36:3
**barking** 12:22
  35:20,23
**based** 8:5,14
  10:22 11:5
  13:20 14:20
  26:5 31:7 33:25
  47:24 56:17
**basically** 18:11
  21:19 38:15
  42:12 44:3
  46:21 53:18
**basis** 52:7
**baton** 50:20
  51:16,22
**bearing** 42:1
**beat** 21:3
**behalf** 13:16
**behave** 22:16
**belief** 23:3 27:21
**beliefs** 44:7
**believe** 6:4 8:8,11
  11:19,22 13:20
  13:23 14:6 15:4
  15:10 17:5,16
  17:21,21 18:11
  28:21 32:4 34:2
  37:10 38:24
  40:1,3,8,25
  43:18 45:7
  55:16,25 56:22
**believed** 8:14
  11:22 12:15
  14:18 22:25
  26:18 47:23
**believes** 15:4
  38:17,19,22,23
**best** 58:10
**better** 17:24
  34:15 53:4
**big** 12:23 35:4,7
  35:23 56:22
**bigger** 35:9,11
  36:17 38:2
**bit** 8:18 12:4
  13:15 19:8
  26:12 50:6 53:4
  53:5 54:23

**bite** 17:12 20:1
  23:1 38:20
**bites** 21:9
**biting** 20:6
**bitten** 17:15
  18:16 21:6,8,14
  21:19,21 22:5
  22:12 23:13
  31:3,4,16
**blue** 17:18
**board** 6:14,15,23
  7:13 8:8 9:24
  11:12 14:9
  15:15 16:25
  52:18 58:13,15
**board's** 17:9
**Boards** 6:11
**bodily** 9:7 11:8
  11:10,23 12:2
  12:18 13:21,25
  15:1 25:23 31:6
  31:17 34:4
  35:12 38:18
  39:24,25 40:6
**body** 9:25
**break** 13:14
**Brewer** 24:23
  30:9
**Brewer's** 25:19
  46:1
**BRIEF** 50:4
**Brown** 1:4 5:18
**Bureau** 20:12,20
**Burmaster** 1:8
  2:8 8:3 10:22
  11:22 12:1,7,17
  12:19,21 13:17
  13:22,25 14:6
  19:24 21:5,7,10
  22:3,25 23:12
  25:20,22,24
  26:13 27:23
  28:24 32:4,17
  33:7 34:22
  35:24 37:2
  41:17 48:17
  49:1,16
**Burmaster's** 10:1
  11:3 12:21 13:4

17:3 29:18
30:24,25

**C**

C 58:1,1
**call** 5:12,12,14,15
    5:15 12:25 28:8
    37:19 46:23
    53:18
**camera** 9:25
**capabilities** 52:19
**capable** 32:6
**captain** 6:18
    30:11
**career** 51:20
**carrying** 22:18
**case** 5:19,20,23
    6:5,9 8:10 12:6
    22:8 30:7 33:5
**cause** 1:16 23:1
    31:6
**causes** 28:7
**certain** 18:6
    22:17 52:4
**certainly** 21:18
    22:11 23:22
    24:16 33:24
    35:18 36:2
    39:18 52:16
**certification** 4:12
    58:3
**certified** 1:18
    2:17 4:20 51:14
    58:5,22
**certify** 58:6
**CEW** 46:11,18
    46:20
**chance** 8:7
**change** 32:24
    33:9,15,16
    47:24
**changed** 41:5,5
    41:15
**Chapter** 48:6
**charge** 6:22
**Charles** 2:6
**chief** 6:24,24,25
    7:14,21,21,21
    7:25 8:1,1 47:2
**chiefs** 6:17

**choice** 29:22
**choose** 36:20
**circumstances**
    9:23 17:10
    29:13 37:6,8
    45:10 47:8,25
**city** 1:9,20 2:9,10
    21:11
**Civil** 1:4 4:7
    58:14
**Clarify** 12:4
**classes** 51:13
**clear** 34:11
**clearly** 22:3,4
**close** 23:6 27:13
    28:5 32:18 33:7
**closeness** 56:18
**closer** 32:15
**coached** 44:21
**Code** 58:14
**come** 18:13,15
    34:7
**comfort** 19:16,20
**coming** 8:24
    12:24 13:4
    17:13 26:23
    43:7,9,10,13
    53:24
**command** 49:6,8
**commencing**
    1:22
**completeness**
    45:15
**compliance** 58:12
    58:13
**concern** 41:14
**concerned** 19:25
**concerning** 9:18
**conclusion** 31:10
    56:7
**conclusions**
    15:25 30:18,20
    38:8
**concurred** 30:10
**conduct** 33:20
**Conducted** 46:22
    48:7
**confer** 49:23
**connections**

53:14,17
**consider** 19:8
    21:13,20,23
    23:9 33:25 34:2
    34:5 39:19,21
    39:25
**consideration**
    15:12 22:10
    23:22 34:14
**considered** 9:22
    57:2
**consists** 6:23
**contact** 27:2
    53:10
**continue** 42:25
**continuum** 50:18
    50:19,22
**contractual**
    58:14
**contributed** 7:11
**controlled** 46:22
**convened** 15:15
**conversation**
    44:16
**corner** 32:2,5
**correct** 5:24
    10:21 15:4 18:8
    23:15 48:8
    53:21 58:10
**correctly** 5:9
**correspondence**
    46:3
**counsel** 4:4 45:24
    49:19,25 58:16
**couple** 20:15 21:2
**course** 40:19 51:3
**Court** 1:1 27:18
    58:5
**cover** 48:2
**credible** 25:3,3
**crotch** 17:14 20:1
    20:8

**D**

D 3:1,6
**danger** 11:7 15:5
    23:25 26:18
    36:5,5,17 38:18
    39:24
**dangerous** 17:20

24:2
**date** 48:10 58:23
**dated** 20:22 46:3
**day** 1:21 34:8
    37:21
**dead** 21:3
**deadly** 11:7 15:6
    17:1 34:1,17
    36:23 39:2,3,4
    39:6,13,17,19
    41:15 50:21
**deal** 22:21 41:8
**death** 11:8 34:4
    40:6
**decapacitating**
    53:19
**decent** 29:3
**decided** 23:3 39:2
**decides** 19:21
**deciding** 23:7
    36:7
**decision** 22:8
    23:8,23 41:5
**decision-making**
    23:17 24:20
**decorated** 51:20
**deep** 12:22
**defend** 18:12
    24:3
**defense** 28:17
**defensive** 50:13
    52:4
**defined** 58:14
**definitely** 23:7
**definition** 43:25
**deliberations** 7:3
    15:19,23
**deliver** 15:1
**department** 8:17
    48:6 53:12
**depends** 9:9,12
    16:8 27:10
    29:12 45:10
**depicted** 12:17
**deployed** 29:9
**deposition** 1:15
    4:5,17 44:18
    46:7,9 52:15
    57:16

**deputy** 6:17 47:2
    58:6
**DEREK** 1:4
**DERRICK** 1:8
    2:8
**describe** 31:21,21
    45:19 52:1
**described** 37:8
    37:24
**description** 31:8
**Detective** 24:22
    25:18 30:9 46:1
**determining**
    21:15,23
**device** 46:22,23
**DiFebbo** 1:18
    2:16 4:20 58:5
    58:21
**different** 6:20,21
    33:5 38:8,11
**differently** 18:5
**direction** 58:10
**directive** 14:21
**directly** 43:19
**director** 6:4
    16:11
**disagree** 8:4
    15:25 26:2,3
    30:2,14,21
    31:10,11 44:23
    47:6,7
**disagreed** 16:12
    16:13,14,17,25
    39:12
**discharge** 30:24
**discharged** 43:6
**disfigurement**
    39:22
**disparity** 43:2
**disprove** 38:24
**distances** 27:12
**DISTRICT** 1:1,2
**DIVISION** 1:7
**document** 20:15
    37:13,16,17
    44:11 46:2,5
**documents** 6:3
**dog** 7:9 8:22,24
    8:25 9:6,9,10

9:12,12 10:15
10:18,24 12:12
12:13,14,16,23
12:23 13:1,1,3
13:21,23 17:12
17:17,18 18:19
18:20 19:1,5,8
19:16,25 20:6
21:9 22:15,25
23:6 25:19,22
26:18,20 27:2
27:24 28:11
29:5,7,13 31:1
31:5 32:2,10,12
35:3,4,4,17,23
35:25 36:2 37:9
37:24 38:2,5,9
38:19 40:2,4,10
41:11,18 42:24
43:1,4,4,6,9,10
43:12,17,19
44:15,24 45:4,8
48:18 49:3,9,10
49:17 57:3
**dog's** 57:5
**dogs** 18:13,16,23
18:25 19:3,4,16
19:21 21:6,8,12
21:14,17 22:5
23:13 29:22,25
30:25 32:22
33:6 35:3,6
36:15
**doing** 17:22
52:24
**domestic** 12:24
**draw** 22:20 54:18
**drawing** 57:8
**due** 30:24
**duly** 5:4 58:7
**duty** 18:14 23:14

**E**

**E** 3:1,1,6,6 58:1,1
**EASTERN** 1:2
**educated** 53:2,4
**effect** 27:14 28:5
28:12 29:1,4,10
42:21 48:8
53:19,25

**effective** 27:12,22
28:22 34:13,21
34:24 52:5,6
54:3 55:14,15
56:14,17 57:3
**effectiveness**
33:21 53:8 54:6
56:3
**either** 7:17 8:11
10:18,20 47:21
**elbow** 18:21
**ELDON** 1:8
**electrical** 46:22
**eleven** 8:20
**emergency** 40:22
**energy** 46:23
48:7
**engage** 29:3
33:17,18,19
**engaged** 18:23
**ensure** 40:9
44:14
**entire** 31:21
**entitled** 46:5
**equipment** 18:10
**Especially** 57:4
**estimation** 24:9
26:5
**evaluate** 34:12
**everybody** 26:15
52:20 53:12
**evidence** 4:18
45:23
**exactly** 7:24
**EXAMINATI...**
5:6
**examined** 5:4
**exhibit** 3:10,11
3:12,13,14
20:19 22:25
25:19 30:8
41:21 45:25,25
48:4
**exhibits** 45:17
46:6,8
**expected** 36:2
**experience** 8:23
13:11 19:20
21:13 22:20

52:13 56:15
**experienced**
10:23
**experiences**
21:17,23 22:1,4
22:7 23:17
52:22
**experiencing**
11:14
**eyes** 36:21,25

**F**

**F** 58:1
**faced** 29:6
**facing** 26:6
**fact** 19:24 26:3,4
31:4,11 33:25
34:17 56:17
**factitious** 43:21
**factor** 22:7 23:2
23:15,17
**factored** 23:5
**facts** 8:6 34:16
**Fair** 9:14
**FALLON** 1:8
**false** 40:25
**familiar** 5:20
18:25 20:11,25
46:17,24
**family** 5:18,18
**far** 32:17 40:11
42:10
**fast** 29:2
**fatally** 25:20
**fear** 9:7 13:24
20:6 21:21 31:1
31:9,13,16
**fearful** 31:3
**Federal** 4:7
**feel** 16:8,9 17:11
17:12
**feels** 47:1
**feet** 11:15
**felt** 8:21 13:13
**fence** 13:5,6 32:4
32:6
**FERGUSON** 1:9
2:8
**figure** 24:1
**filed** 5:19

**filing** 4:12
**finally** 9:16
**find** 6:9
**fire** 38:17 42:3
**fired** 41:17,23,25
42:2
**fires** 41:13
**firing** 30:25
**first** 5:3 6:9 29:14
42:20,21,23
43:10,19 53:13
**fits** 30:4 48:15
**five** 8:20,20 42:7
**focused** 17:17,18
**focusing** 13:1
**follow** 24:5 31:23
32:14
**followed** 8:15
**following** 1:17
**follows** 5:5
**force** 6:11,14,19
8:8 11:7 14:9
14:11 15:2,6,14
16:10 17:1
19:22 20:12,21
21:15,24 23:3
30:9 34:1,12,17
36:8,20,21,23
39:2,3,4,6,13
39:16,20 41:16
42:12 50:16,18
50:19,21,24
52:3
**foregoing** 58:8
**forget** 24:12
**Forgive** 21:3
**form** 4:15 10:7
25:6,14 28:1
33:11 35:14
36:10 48:20
55:1,5,20
**formalities** 4:9,11
**formally** 37:5
**format** 58:12
**forth** 58:8
**four** 46:6
**front** 20:4
**full** 18:9 31:7
**fully** 34:19

**future** 48:18 49:3
49:10,17

**G**

**Ganthier** 1:16
4:6 5:2,7,10,11
5:13 13:23
28:21 46:4
55:13 58:7
**gate** 32:9,15
**general** 45:2,12
47:10 54:15
**generally** 45:7
47:17 48:2
**genital** 39:22
**genitals** 23:1
**getting** 31:16
38:18
**give** 9:6 22:1
27:20 28:3 37:6
37:7,13 39:9
52:7 53:1
**given** 1:16 14:20
54:6,23 56:4,9
**gives** 51:24
**giving** 18:3 57:7
**glad** 19:15
**go** 10:9 11:15
14:15 16:18,20
17:23,25 20:17
29:14 34:7,20
38:3 50:20,21
**goes** 52:13
**going** 10:9,11
11:19 13:6,12
13:22 14:5,24
15:5 16:9 17:12
18:20 20:1,14
20:15,18 21:4,9
22:2 25:18
27:13 28:19
29:14,14,15,15
32:11 34:20,23
36:24 44:22
48:11,25 49:19
49:24,25 50:1,9
52:23 53:1,23
54:18 56:23
**good** 5:7 21:18
24:22 27:1

47:11,16 48:14
**Goodly** 7:21 8:1
  15:17
**Gotcha** 49:14
**guess** 7:18 13:18
**guidelines** 8:16
  58:13
**gun** 22:17,18,19
**guy** 19:5,17

**H**

**H** 3:6
**hall** 49:23
**handcuff** 18:20
**handler** 18:21
  19:10,11
**hands** 50:20,21
**Hans** 1:15 4:5 5:1
  5:14,15,16
  13:23 20:20
  44:17 46:4
  55:13 58:7
**happen** 23:19
**happened** 18:1
  24:18,19 37:21
**happens** 30:5
  38:13 41:13
**harm** 9:8 11:8,10
  11:20,23 12:2
  13:22,25 15:1
  25:23 31:6,17
  34:4 35:12
  38:18 39:24,25
  40:6
**hate** 44:17
**head** 19:18 39:11
**hear** 6:8 9:18
  40:17,24
**heard** 8:13 9:14
  12:22 35:21
  40:20,21 41:2
  55:12
**hearing** 6:21,22
  6:23
**height** 17:14
**Helou** 30:11
**Help** 31:24
**helped** 53:3
**hereinbefore**
  58:8

**hereto** 4:4
**hey** 34:7 37:6
**hit** 29:1,2 53:23
  56:25
**holstered** 25:24
**home** 34:7
**HON** 1:8,9
**honesty** 43:14
**hope** 26:16
**horse** 21:4
**hospital** 21:9
**human** 22:15
  28:5
**hurt** 15:5 16:9
  29:14 40:19
  41:10
**hypothetically**
  33:5

**I**

**idea** 27:1 30:20
**identify** 36:23
**identifying** 40:11
**imagine** 9:9
**immediate** 11:17
**immediately**
  29:16
**imminent** 13:8
  15:5 23:25
  25:21 38:17
  40:5
**important** 13:15
  22:11 28:7,14
  28:18 44:18
  53:25
**inappropriate**
  39:3
**incapacitation**
  53:20 54:5
**incident** 14:14
  17:11 22:10
  30:23 31:21
  38:13 47:9,15
  48:15
**include** 52:22
**Including** 54:10
**independently**
  11:25
**individual** 30:7
  52:18,19

**influence** 22:13
**injury** 12:19 23:2
**insight** 51:24
**insignificant**
  12:14
**instruct** 56:8
**instructor** 51:9
  51:14
**insulting** 43:22
**Integrity** 20:12
  20:20
**intent** 41:10,10
**intentionally**
  11:18,19
**interested** 58:17
**interoffice** 46:3
**interview** 37:5,20
**interviewed** 37:2
**intruding** 44:6
**investigation**
  6:19 20:12,21
  20:22 30:9 46:2
**issue** 17:21 18:11
  24:19,21

**J**

**JAMES** 2:10
**James.Roquem...**
  2:13
**job** 17:8,9 24:14
  33:23 34:10,11
  52:13
**John** 30:10
**JONES** 2:3
**judge** 24:9 56:8
**judgment** 25:12
**JULIA** 1:4
**jump** 13:6
**jumped** 32:3
**jumping** 32:6
**jury** 10:3,14 12:3
  13:19,22 14:23
  27:20,21 28:21
  34:20 49:1 52:3
  55:12 56:8
**justified** 8:3
  13:13 15:2 17:2
  17:22 34:18
  35:24 43:16

**K**

**K-9** 18:16,17
**KAREN** 1:9
**keep** 20:18 21:10
  42:16 53:24
**key** 39:20
**kick** 26:20
**kicked** 26:24
**kicking** 26:23
**kind** 15:22 18:4,7
  29:10 38:13,14
  53:1
**kinds** 52:8
**knew** 6:12 12:13
  19:10
**know** 7:10,11,16
  8:10 9:10 12:10
  12:12,25 13:15
  16:2,13,15 17:6
  17:7,19 18:17
  18:23 20:17
  21:25 22:1,14
  24:15,16,22
  26:24 28:8,25
  29:15,24 30:16
  31:8 34:24
  35:16 36:1,1,12
  36:13,15,17
  37:15 39:8,8,16
  39:17,19 41:2
  41:19 42:21
  43:4,17,18
  44:19 46:24
  47:1,23 48:22
  51:12 53:10,19
  54:4,16 55:22
  55:22 56:11,14
  56:16,18 57:1,4
**knowledge** 54:13
  56:16
**knows** 53:12 54:2

**L**

**L** 1:6 4:1
**L1** 3:10 45:17,25
**L2** 3:11 20:18,19
  20:20 25:19
  30:8 45:25
**L3** 3:12 37:14

41:22 46:2
**L4** 3:13 44:11
  46:4,13
**L5** 3:14 48:5,7
**language** 21:5
**large** 21:7,14
**latched** 18:21
**law** 2:4,5,11 4:8
  11:16
**lawsuit** 5:19
**lay** 51:20 54:12
**leadership** 51:14
**learn** 5:22
**learned** 5:23 53:8
**led** 44:16
**left** 32:5,8 44:13
**legal** 56:7
**legitimate** 13:21
  13:24,24
**let's** 17:14 22:15
  33:5,13 52:2
**lethal** 15:2 19:22
  21:15,24 23:3
  36:7,20 50:16
  50:24
**level** 19:16,20
**line** 16:20 18:14
**lines** 30:22
**listed** 13:16 28:17
**little** 8:18 12:4
  13:14 15:12
  26:12 31:20
  35:4,8,16,25
  50:6 53:4,5
  54:23
**long** 7:7 14:24,25
  38:22,23 42:5
  46:25 50:7,10
  51:20
**longer** 50:19
**look** 9:17,23 11:5
  11:13 14:10
  17:9 18:8 24:11
  24:13 30:6
  31:18,19,19
  41:20 43:3
  45:24 47:9
  52:18
**looked** 8:6 13:4

17:8 52:17
**looking** 11:1,11
  13:9 14:8 15:11
  17:1,3 20:17
  24:15,15 34:16
  34:17 42:12
  44:3,6,7 57:4
**looks** 12:23 17:13
  42:2
**loop** 24:8
**lot** 7:8 34:9 50:10
  50:13,23 51:1
**loudest** 35:20
**Louisiana** 1:2,19
  1:21 2:6,12,17
  4:21 5:3 58:5
  58:14
**Lubrano's** 46:8

**M**

**M** 2:5 3:1
**making** 40:12
**Manual** 48:6
**mark** 37:14 48:5
**marked** 20:19
**marks** 18:18
**matter** 40:18
  44:5 53:10
  58:17
**matters** 40:19
**mean** 6:10,25
  7:14 18:24 21:3
  25:1 38:12
  43:21,22,25
  48:22 52:1,20
**means** 44:25 45:5
**measures** 48:18
  49:2,9,16
**meet** 36:3
**members** 6:16
  9:24
**memory** 7:8,20
  22:12 37:11
  41:21
**mentioned** 19:15
**mind** 14:13 17:10
  18:1 34:3 41:8
  49:21,22
**mindset** 23:24
  27:7

**minutes** 49:23
**mitigate** 28:23
**moment** 24:2
**Monday** 11:15
**morning** 11:16
**motor** 28:10
**mouth** 16:23
**moving** 27:10
  57:3
**multiple** 19:3,4
  29:6

**N**

**N** 3:1,1,1,6 4:1
**name** 5:9,11 6:3
  49:8
**necessarily** 6:25
  33:17
**necessary** 16:10
**need** 22:19 44:18
  46:25 56:20,24
**needed** 18:12
**needle** 53:15
**needles** 53:15
**negligent** 21:12
**nerves** 28:9
**neuromuscular**
  53:20 54:5
**neutralized** 42:6
  42:16,20,23
**never** 8:25 17:7
  39:12 40:20,21
  41:2,3 52:9
  55:11
**New** 1:10,20 2:6
  2:9,12 5:2 8:16
  48:5
**NMI** 28:8 53:18
**nods** 19:18
**Noel** 7:21 8:1
  15:17
**non-lethal** 33:21
  34:12,21 44:25
  45:5
**NOPD** 20:20
  21:22 30:9
  48:17 49:2,6,9
  49:16
**NOPD's** 15:2
  29:24 30:2

46:18
**normally** 54:14
  56:21
**number** 39:10

**O**

**O** 3:1 4:1
**oath** 4:22 5:5
  10:3 27:21
**object** 10:7,9
  22:22
**Objection** 14:2
  25:6,14 28:1
  33:11 35:14
  36:10 48:20
  55:1,5,20 56:6
**objections** 4:14
**objective** 11:4
  43:24 44:1,2,3
  52:21
**objectively** 11:12
**objectivity** 24:13
**observing** 30:25
**Obviously** 51:22
**occasion** 9:2 11:9
**occasions** 23:13
**occur** 47:25
**occurred** 30:24
  31:17 37:6,8
**Office** 1:19 2:10
**officer** 8:3,14 9:7
  10:1 11:18,22
  12:1,7,21 13:17
  14:6,12 16:8
  17:3 19:19,24
  21:5,7,10 22:3
  22:25 23:12
  25:20,21,23
  26:6,7 27:7,23
  28:21 30:23,24
  32:3,9 35:24
  36:20 37:2
  38:16 39:2
  40:14 41:7,17
  42:8 48:16 49:1
  50:8 51:11,19
  54:2,9 58:6
**officer's** 9:19,20
  11:6 13:11
  14:10 17:10

39:6,13 47:14
**officers** 8:15
  19:15 29:5,6
  39:9 40:1,4,8
  51:6
**officers'** 39:16
**officiated** 4:22
**oh** 14:15 21:10
**okay** 5:11,15
  11:15 14:25
  21:22 22:6
  24:22 33:4 36:4
  37:18 44:22
  50:3 52:2 53:2
**old** 12:7 17:17
**once** 42:16 43:4,6
**ongoing** 21:11
**Operation** 48:6
**operations** 6:24
**opinion** 24:12,25
  26:4 32:24 33:9
  33:15,16 42:19
  43:15 44:2,4,6
  55:24 56:3
**opinions** 18:4
  24:14 41:5 52:8
  52:14 53:2
  58:15
**option** 31:15 45:9
**options** 9:21
  34:21
**ordinary** 51:21
**organizations**
  51:15
**original** 58:3,4
**orleans** 1:10,21
  2:6,9,12 5:3
  8:17 48:5
**outcome** 15:22
  44:5,7 58:17
**outsider** 15:8
**overweight** 32:7

**P**

**P** 1:18 2:16 4:1
  4:20 58:5,21
**page** 3:3,8 21:4
  22:24 30:13,14
  30:15,19 38:15
  43:23 58:4

**pages** 58:8
**panel** 6:21 22:4
**part** 4:17 24:5,17
  24:20 35:23
  37:23
**particular** 7:9
  19:25 52:6,16
  56:10
**particularly**
  18:23
**parties** 4:4 58:16
**partner** 5:17 34:5
  38:4
**Patrick** 2:5 5:17
  49:22
**penalty** 8:9,11
**people** 21:12
  22:21 40:9
  44:15 47:17,18
  47:23 51:20,21
  53:23 54:12
**people's** 22:1
**perceive** 14:13
**perceived** 13:8
  17:6,16,19
**percent** 45:21,21
**perception** 11:11
**Perdido** 1:20
  2:11
**period** 29:22
**person** 22:16,19
  25:3,3
**personal** 24:14
  44:4 58:10
**personally** 16:14
**perspective** 10:1
  12:18 17:2,3
  21:16
**phase** 8:9,12
**physical** 23:1
  27:2
**physically** 32:6
  36:6
**PIB** 6:24 22:4
**piece** 15:12
**place** 12:21
**PLAINTIFFS**
  2:2
**plan** 13:19

**PM** 1:22
**point** 26:22 34:1
  34:6
**police** 8:17 9:7
  36:19 40:1,3,8
  44:14,24 45:4
  48:5 50:8 51:14
  51:19
**policies** 15:3 30:3
  47:3,3,5,16,24
  48:12,12,14
**policy** 8:16 10:23
  14:12 21:22
  29:24 30:4 42:3
  42:5,14,15,25
  46:11,18 47:11
  47:13,19 48:8
  48:15 49:13
**pops** 13:2
**pose** 40:5
**posed** 12:18
  13:24 35:3,11
**position** 10:13,19
  14:23 27:11
  31:6 34:9 47:14
**positioned** 26:13
**possibility** 29:20
  34:3
**possible** 12:15
**possibly** 11:9,10
  34:14
**pound** 9:12 13:21
**pounds** 9:3 26:21
**Poydras** 5:2
  45:23
**prefer** 5:12
**prepared** 58:9,12
**present** 15:14
  23:18 25:21,23
**presented** 27:23
  28:23 31:1
**presume** 7:14
**prevent** 48:18
  49:2,10,17
**previously** 23:13
**prior** 52:24
**priority** 56:4
**privy** 15:24 17:7
**probably** 27:1

**probes** 29:3
**problem** 16:3,6
  21:11 25:16
  29:13 30:6 36:4
  43:5 47:13,19
  47:21 48:3
**Procedure** 4:7
  58:14
**procedures** 8:16
**process** 11:17
  24:16,17 36:16
  52:24
**prohibition**
  58:14
**prompt** 23:23
**prongs** 53:6,9,14
**pronouncing** 5:9
**properly** 29:1,1
**prove** 31:9
**Public** 20:11,20
**pull** 18:22
**puppy** 10:5 12:7
  12:10
**purposes** 4:7
  6:12
**pursuant** 1:17
  4:6
**put** 12:20 13:10
  16:7,15,16,23
  17:14 24:14
  27:12 47:13
**pvanburkleo@...**
  2:7

**Q**

**quarterbacking**
  11:16
**question** 4:15
  12:5 43:13
  54:20 55:8
**questions** 21:2
  27:17 38:15
  44:20 49:20,25
  50:2 57:14
**quick** 31:8
**quickly** 27:11
  56:25
**quite** 12:4 18:15
  55:7

**R**

**R** 58:1
**R.S** 58:7
**ran** 32:2 38:4
**range** 21:6
**ranging** 21:14
**react** 22:2
**reacts** 13:7
**read** 20:15,16
  21:4 22:24
  25:18,25 26:1
  27:16,18 44:22
  45:3 46:11,17
  46:25 47:4
**reading** 4:9 21:10
  44:19
**reality** 33:6
**realize** 22:19
**really** 9:5 11:6
  14:11 24:12
  27:13 31:15
  47:12,22 53:22
**reason** 8:4 16:12
  16:24 20:3
  21:20 23:25
  25:2,11 28:16
  35:24 36:22
  39:19 54:4
**reasonable** 9:7
**reasonably** 40:5
  44:25 45:5
**receive** 11:9,19
  11:23 12:2
**received** 34:4
  54:19
**receiving** 11:7
**RECESS** 50:4
**recognizing**
  25:22
**recollection**
  37:15
**record** 5:17 7:18
  16:2,4,5,15,17
  48:4
**refresh** 7:7,20
  37:10 41:21
**refreshes** 37:14
**related** 58:16
**relationships**

**58:14
**relevant** 15:8,10
**remember** 6:6
  7:5,13,16,24
  8:9 16:22,22
  20:2 35:4,6,7
  37:12 38:9,12
  43:12 53:6
**remembered** 7:9
**remove** 56:25
**removed** 40:22
**rephrase** 50:23
**report** 20:22
  25:19 30:8
**reported** 2:15
  58:9
**Reporter** 1:18
  2:17 4:21 27:18
  58:5,22
**represent** 5:18
  7:25
**REPRESENTI...**
  2:2,8
**required** 58:4,13
**reserved** 4:16
**resort** 45:9
**respect** 53:9
**responding** 12:24
**response** 49:1
**responsible** 40:12
**responsiveness**
  4:15
**Revealed** 30:23
**review** 6:14 8:7
  15:15 20:14
  39:14
**reviewed** 8:12
  39:1,5 42:8,9
**revised** 49:13
**revision** 48:10
**Richardson**
  30:11
**right** 10:16,19
  12:3,8 13:17
  15:9,15 17:4
  19:7,9,17,22
  20:6 21:16,24
  22:8 23:4,10,20
  25:25 26:1

**27:21 28:24
  29:22,25 32:11
  32:14,25,25
  33:4,9,20,22,23
  35:3,12 36:8
  37:3,9,17,21,25
  38:1,3,6 42:9
  42:17 44:2
  47:21 48:12
  49:3,17 50:11
  51:21 52:10,15
  53:5,11 54:8,10
  54:13,20,24
  55:11,12 57:9
**risk** 12:18 40:9
  44:14
**robber** 18:19
**rolls** 39:8
**room** 1:20 16:19
  40:22
**ROQUEMORE**
  2:10 10:6 14:1
  25:5,13 27:25
  33:10 35:13
  36:9 45:18
  46:12 48:19
  54:25 55:4,19
  56:5 57:13
**round** 41:13 43:7
  43:11
**rounds** 40:12
  41:17 43:6
**Roussel** 32:9,14
  32:17 33:7,7
  40:14 44:17
**ruled** 8:2
**rules** 4:7 30:17
  47:9 58:13,15
**run** 6:23 7:1 8:25

**S**

**S** 4:1
**Sabrina** 30:11
**sake** 45:15
**Sandra** 1:18 2:16
  4:20 58:5,21
**sat** 7:2,4,8 8:7
  15:19,20
**save** 4:14
**saw** 5:22 6:3,5

**39:18 41:11

8:14 9:25 12:16
13:9,20 18:6
23:6,6 26:6
32:22 36:6,14
41:3 43:9,12,19
saying 10:14,16
10:22 11:25
14:17,17 29:21
29:23 30:16
33:4 55:8
says 21:20 38:16
school 51:9,11
seal 58:4
sealing 4:11
second 38:15
42:22 43:16,20
46:13 49:6,8
secondary 18:11
Secondly 53:17
SECTION 1:6
see 9:19 15:21
18:18 22:21
30:10 32:11
36:14,15 37:14
41:23 42:12
46:13 47:12
seeing 22:16
36:20
seen 20:23 29:4
37:16 39:18
53:23
sense 55:16
sentence 25:25
Sergeant 30:10
serious 9:7 11:8,9
11:23 12:2,18
13:21,25 15:1
23:1 25:23
31:16 34:4
35:12 38:18
40:6
set 27:11 58:8
Shannon 24:23
25:18
sharing 8:8
SHAUN 1:8 2:8
shoes 10:4
shoot 10:18 19:12
19:13 26:21

28:4 36:24 40:2
40:4 41:10
44:24 45:4
shooting 7:10 8:2
9:21 12:7 19:8
20:21 35:25
40:10 42:16,25
44:15 45:8 46:2
49:1,9
shootings 48:18
49:3,10,17
shoots 13:7
shorter 5:17
Shorthand 1:18
2:17 4:20 58:22
shot 10:4,15,24
12:13,17 23:15
26:19 29:7 37:9
37:24 38:10
39:22 42:20,22
42:23 43:3,5,20
48:17 49:17
shots 42:2,4,9
43:16
show 30:13
shrapnel 40:15
40:22
side 47:8
signature 58:3
signing 4:10
sit 7:4 9:23 11:14
14:15 17:23
sitting 6:11 7:6
7:13
situation 8:24
10:16 11:2 24:3
26:8,14,16,23
27:23 29:7,19
31:14 39:1
47:10 52:4,7
54:6 55:14,15
situational 51:13
size 13:2,4 21:7
32:7 36:3
skill 52:19
skills 28:10
small 21:7,14
23:13 26:20
28:11 53:22

smaller 38:5
somebody 11:8
24:1 41:10
52:23 55:23
someplace 7:19
sorry 7:12 20:8
46:23
sort 40:15
sought 4:17
sound 26:15
43:21,22
specialized 51:18
52:12,13 53:11
54:7,19 57:8
specific 7:23
19:20 48:17
49:2 50:13
specifically 4:10
4:12
speculating 9:11
spread 28:6,13
29:1,3 53:22,22
53:24 54:3,4
56:19,23
St 2:6
staff 6:11
Standards 46:5
standing 32:25
starts 45:22
state 1:19 2:17
4:21 18:1 40:3
58:5
stated 16:2,3,4
16:13 17:22
19:24 21:5,7,11
22:3 23:12 31:2
statement 31:20
41:1 44:22 45:2
45:13
statements 44:13
states 1:1 38:19
statute 58:13
stenotype 58:9
stepped 49:22
stipulated 4:3
stipulation 1:17
stop 16:10
stopped 43:4
street 1:20 2:11

5:2 52:9 54:24
struck 40:15
subject 53:10
subjective 11:3
24:12 43:24
44:1,6 52:22
subpolicies 47:20
Suite 2:12 5:2
45:24
summary 30:22
superintendent
1:15 4:5 5:1,7,8
5:13 46:8 47:2
58:6
supervision
58:10
supervisor 51:10
51:11
supposed 14:19
sure 16:4,21,24
22:5 29:8 40:12
43:23 44:19,20
45:16 55:7
surprised 28:20
surprises 35:2
sustained 18:7
SWAT 39:8 51:9
51:10,11
sworn 5:4 58:7

— T —

T 3:1,6 4:1,1 58:1
58:1
tactic 29:15
tactically 26:15
tactics 50:14 52:4
take 10:11 14:8
15:11 19:19
20:5 22:15,17
22:18 24:19,21
37:15 42:6,7,7
46:24 47:25
48:17
taken 4:6 13:12
22:9 31:13
40:21 58:6
talk 15:22 50:6
talked 49:14,15
talking 18:17
20:8

talks 17:7
tall 8:18
tap 33:8
Tarak 2:4 5:11
5:12,15
target 40:11
56:22,23
taser 27:3,4,6,7,8
27:11,22 28:6
28:13,22 29:5,8
29:9,14,18 30:2
46:21 48:7
50:20 51:7 53:5
53:9,16 54:6,18
55:13 56:2,3,25
tasers 27:13
29:21,25 51:1,4
51:22
taught 51:3,5,12
teach 16:11 54:1
team 6:19 20:12
20:21 30:10
51:10
technical 50:7
57:8
techniques 33:22
51:12
tell 7:5 10:3
13:19,22 14:4
16:3 22:13,14
27:20 28:21
29:5 30:13
34:20 37:20
39:7,10 41:20
43:25 44:23
48:25 52:2
telling 12:3 24:11
29:11
ten 8:20
tend 21:18 22:1
tested 5:4
testify 13:16 58:7
testimony 8:13
9:19 11:21 22:6
28:19 29:17
31:2 58:6,9
Thank 44:9 45:8
57:12,14
theirs 56:4

**thereof** 4:17
**thing** 24:13 34:1
  38:14 42:11
**things** 18:6,9
  20:16 29:10
  31:18 34:5,14
  37:23 38:24
  49:15 54:1 57:2
**think** 6:2 9:6
  11:21 12:1,16
  13:3 15:8 16:1
  16:2,20 17:22
  17:24 18:7,10
  20:2,2 21:17
  22:9,12 23:5,5
  23:7,16 24:17
  25:2 29:11,13
  30:4,19 31:2,7
  32:5,14 35:23
  36:3 41:14,19
  45:11 47:2,11
  48:13 49:12,13
  49:21 55:14
**thinking** 11:13
  14:10 24:10
  55:24
**third** 42:22 43:7
  43:16,20
**thought** 10:23
  11:17 14:6,24
  14:25 18:12
  22:2 24:11,16
  31:22,23 36:2
  36:13 47:16
  52:24
**threat** 12:15 13:8
  13:21,24 14:14
  14:18,24 15:1
  17:20 25:21,23
  28:23 31:2
  35:12 36:7 40:5
  41:12 42:5,16
  42:19
**threatened** 8:21
  16:8 17:11
**three** 6:17 30:22
  42:2,3,7,9
  49:23
**threw** 24:7

**time** 4:16 6:17,18
  7:7 9:10,20,20
  10:10,10,12
  11:6,11 12:21
  13:2,7 14:14
  16:14 17:11
  18:2 22:10,11
  24:2 26:22
  32:22 33:6
  36:16 37:15
  43:3 45:11
  46:25 47:14,23
  50:10
**times** 21:6,19
  28:4 31:3 39:5
  39:9 41:23,25
**tired** 21:8,8
**Title** 45:23 48:6
**today** 49:15,16
  52:14
**told** 7:21 38:2
  41:4
**top** 39:10
**topics** 51:25
**torso** 57:5
**total** 13:11 24:13
**totality** 9:22 11:5
  17:9
**totally** 15:7
**touch** 32:21
**train** 31:22,23
**trained** 51:6
**training** 6:12
  50:7,11,13,24
  51:1,16,18,22
  52:10,12,16,19
  52:23 53:11
  54:7,19,24
  55:10,11,17,18
  56:2 57:9
**transcribed** 58:9
**transcript** 45:22
  58:3,10,12,12
**treatment** 21:9
**trial** 13:17 28:19
  28:20 35:2
  48:12,25 53:2
  54:17
**tried** 26:11,20

**true** 31:12 58:10
**trust** 25:11
**try** 41:12
**trying** 35:1 41:8
**turn** 49:20,24
**Twenty-two-p...**
  12:10
**two** 7:1,16 18:18
  23:13 27:12,16
  35:3,6,19 36:15
  43:6 49:22 50:1
  51:12 53:14,14
  53:16
**type** 9:9,12 52:4
  52:5
**typically** 51:21
  54:12

---

**U**

**U** 4:1
**Uh-huh** 26:1
  30:12 37:22
**unanimously** 8:2
**unclear** 24:5
**understand**
  11:21 12:6
  16:24 22:6 24:4
  30:1 31:25
  34:19 35:1 53:4
**understanding**
  12:5 28:18
  44:10 58:11
**Understood** 18:3
  48:16
**uniform** 18:9
**unique** 11:3
  51:24 52:1
**UNITED** 1:1
**unjustified** 17:6
**use** 6:11,14 8:8
  14:9,11
  15:6,14 17:1
  19:21 21:15,24
  23:3 27:4,9
  29:15 34:17
  36:7,20,21,23
  39:3,6,13,16
  41:15 51:7
**usually** 6:10,23
  6:24 7:1

---

**V**

**valid** 58:3
**VANBURKLEO**
  2:5
**various** 49:14
  51:12
**versus** 1:6 30:14
  43:24 44:1
**video** 8:13 9:15
  9:18,25 12:16
  12:17 15:9,13
  32:11 35:5
  43:10
**videos** 9:17
**viewpoint** 11:3,4
  11:14
**violated** 30:17
**violence** 12:25
**vote** 6:18
**voting** 6:16

---

**W**

**W.ROBY** 1:9
**waistband** 22:22
**waived** 4:10,13
**WALKER** 2:3
**want** 7:18 9:11
  16:24 20:16
  22:5,24 37:19
  43:22 45:16
  47:1 52:22
**wanting** 30:19
**wasn't** 10:12
  19:11 32:1
  41:11
**watching** 15:8
**way** 10:20 13:3,6
  14:19 17:15
  22:17 26:7,17
  28:23 32:1,3,10
**we'll** 20:19 37:13
  44:10 48:5
**we're** 15:20,23
  34:16,16 42:11
  44:3 50:2
**we've** 29:6
**weapon** 22:18,20
  22:23 25:24
  31:1 38:17,21

48:7 56:18
**weapons** 51:23
  52:5
**weighed** 9:3
  26:21
**weight** 9:10
  12:12,13 54:23
  56:9
**went** 38:5 42:10
**Westbrook** 7:14
  7:15,22 8:1
  15:17
**what-ifs** 34:9
**wide** 28:11 53:17
**witness** 4:23
  13:16 14:3
  19:18 25:7,15
  28:2,17 33:12
  35:15 36:11
  48:21 55:6,21
  56:10,12
**word** 8:15 23:21
**words** 16:23
  42:13 43:24
  44:10 45:23
**work** 26:23 29:16
  34:8 52:5 53:23
**worked** 26:24
  29:8 54:18
**works** 53:5
**worth** 23:22
**wouldn't** 14:16
  16:16 21:25
  33:18 34:8
  38:11 45:13
  48:13 52:6
  54:14 55:22
  56:14
**wounded** 25:20
**written** 31:12
  47:23

---

**X**

**X** 3:1,1,6,6

---

**Y**

**yards** 18:16
**yeah** 6:5,7 7:4,20
  11:15 13:18
  14:15 15:10,20

15:20 18:25
20:24 23:16
27:6 29:23
32:18 33:1,2,15
33:17 35:6,9
36:3 37:1 43:18
45:21 46:15
48:9 51:22
**year** 12:7 37:11
**years** 50:9 51:10

**Z**

**0**

**1**
**1.7.1** 48:6
**10** 21:4
**10,000** 11:15
**100** 45:21,21
**10th** 8:2
**11** 22:24 51:10
**1300** 1:20 2:11
**1340** 45:23
**1434** 58:14
**14th** 1:21
**1615** 5:2
**17** 30:13,14,15
**1800** 5:2
**1900** 45:24

**2**
**2** 45:17
**2:25** 1:22
**20** 3:11 48:9
**201** 2:6
**2021** 6:6 48:8
**2023** 5:23
**2025** 1:21
**21** 7:17 16:22
49:13
**22** 9:3 12:7 26:21
**22-** 9:11 13:20
**22-00847** 1:5
**22-pound** 8:22
9:6 10:5 12:23
13:23 27:24
**22-year** 12:9
**27** 50:9

**3**
**3** 45:17
**3:13-3:15** 50:4
**3:25** 57:16
**37** 3:12
**37:25** 54 58:7

**4**
**4** 1:7 45:17
**44** 3:13
**45** 3:10
**48** 3:14

**5**
**5** 3:4
**5/20/25** 58:23
**57** 58:8
**5E03** 1:20 2:12

**6**

**7**
**70112** 2:12 5:3
**70170-5100** 2:6

**8**
**8/4/2021** 20:22

**9**
**9/11/23** 46:4