ANNE KIRKPATRICK on 05/01/2025

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF LOUISIANA

 3

 4    DEREK BROWN and JULIA        CIVIL ACTION NO.

 5    BARECKI-BROWN                22-00847

 6

 7    VERSUS                       SECTION: L

 8

 9    DERRICK BURMASTER, SHAUN     DIVISION: 4

10    FURGUSON, and the CITY OF

11    NEW ORLEANS

12

13

14

15          Video deposition of Anne Kirkpatrick, taken

16    in the offices of 1300 Perdido Street, New Orleans,

17    Louisiana on Thursday, May 1, 2025, commencing at

18    1:29 p.m.

19

20

21
      REPORTED BY:
22          BROOKE GARRISON
            CERTIFIED COURT REPORTER
23

24

25
```

 1    A.    Yes.  Depending on the circumstances, the
 2  officers, if they're in a use of force situation,
 3  whether they're in a residential area or not.  So
 4  sometimes those shootings do occur in residential
 5  areas.
 6    Q.    Would you agree with Number 3, that
 7  police should not shoot a dog if alternative
 8  non-lethal means are reasonably available?
 9    A.    I believe our policy addresses the use of
10  alternative, less than lethal.  We don't use the
11  term non-lethal.  That is actually would be a
12  fallacy to use that kind of language.  We have less
13  than lethal alternatives.
14    Q.    So you would agree with this if it said
15  less than lethal means are reasonably available?
16    A.    Well, with respect to your qualification
17  of a dog, I don't think that would be necessary in
18  terms of my understanding of our policies.  Our
19  policies for using force is you weigh also
20  alternative means.
21    Q.    So officers should not shoot their
22  firearm, whether it's a dog or a person, if
23  alternative less than lethal means are reasonably
24  available?
25    A.    Are reasonably available and the

```
 1   circumstances would dictate.  Not every circumstance
 2   allows, because it's unfolding so quickly that a
 3   different alternative use of force could be used.
 4        Q.   Would you agree that shooting a dog
 5   should always be the option of last resort?
 6        A.   I think use of deadly force is an option
 7   of last resort.
 8        Q.   Okay.  And so you're aware that this case
 9   is about an officer, Derrick Burmaster, who shot a
10   dog; correct?
11        A.   Yes.
12        Q.   Have you met Officer Burmaster?
13        A.   I may have.  I wouldn't be able to tell
14   you if he walked in the room that it was Officer
15   Burmaster, but I probably have met him.
16        Q.   Okay, but you don't recall meeting him
17   specifically?
18        A.   No, I don't.
19        Q.   Do you know anything about him other than
20   the context of this case?
21        A.   No, I don't.
22        Q.   Okay.  And at any point, have you seen
23   photos of the dog that was killed?
24        A.   I have not.
25        Q.   Okay.  Have you seen a video of the
```

```
 1   shooting of the dog?
 2        A.   I have not.
 3        Q.   Okay.  So I'll identify it as Defendant's
 4   Trial Exhibit 7.  I'll represent to you Chief that
 5   this is a photo of the dog that was shot not long
 6   before it was shot.  So you've never seen the size
 7   or appearance of this dog before?
 8        A.   I have not.
 9        Q.   Okay.  And if someone describes this dog
10   as the size of a large cat, does it appear from this
11   photo that that might be accurate?
12        A.   From the photo.
13        Q.   Yeah.  And would a taser device be a
14   potentially effective tool to repel a dog of this
15   size?
16        A.   Possibly, yes.
17        Q.   Would an officer kicking a dog of this
18   size also be a potentially effective tool for
19   repelling a dog of this size?
20        A.   Could be.
21        Q.   So if a dog of this size was running at
22   an officer, shooting it and killing it would not be
23   unavoidable, would you agree?
24        A.   I do not.
25        Q.   Okay.  Why not?
```

```
 1      A.    Because there's circumstances as I read
 2   the file, it was dark, and so I don't know what --
 3   you'd have to ask the officer, because subjectively
 4   what was he thinking at that time?  What did he see?
 5   What was his observation?  So I can't answer for
 6   that.
 7      Q.    Sure.  And if you stepped out of the
 8   subjective viewpoint and instead analyzed it from an
 9   objective point of view, would you say that shooting
10   and killing a dog of this size would be unavoidable
11   from an objective point of view?
12            MR. ROQUEMORE:
13                 Objection form.
14            THE WITNESS:
15                 It could be.
16   BY MR. MOST:
17      Q.    Okay.  It could be avoidable?
18      A.    No.  It could be reasonable that deadly
19   force was used.
20      Q.    Okay.  And it could be not reasonable
21   from an objective point of view?
22      A.    It depends on those circumstances and
23   only he has to explain his circumstances.  So it
24   could be objectively reasonable and it could be not
25   reasonable.  And that's why we look at the totality
```

```
 1      Q.   Do you know if the other officer was
 2  running from the dog Burmaster shot or the other
 3  dog?
 4      A.   I understood the other dog was also
 5  pursuing the other officer.
 6      Q.   So if the other officer ran from the
 7  other dog, how does that speak to the threat posed
 8  by the dog that Burmaster shot?
 9      A.   It speaks to the circumstances of the
10  fact that there are aggressive charging dogs, which
11  is a threat to their safety.
12      Q.   Okay, but if there's two dogs, and one is
13  a threat and one is not, an officer can't shoot the
14  dog that's not a threat, agreed?
15      A.   The officer said it was a threat.
16      Q.   Okay.  So your assessment that this was a
17  reasonable shooting hinges in substantial part on
18  the officer's subjective perception of a threat,
19  agreed?
20           MR. ROQUEMORE:
21               Objection form.
22           THE WITNESS:
23               And within the objective totality of
24       circumstances, yes.  So as we've said before,
25       both matter, the subjective view of the
```

```
 1      officer or perspective, and the objective
 2      totality of the circumstances.
 3 BY MR. MOST:
 4    Q.   Okay.  So your assessment and your
 5 signature on the document incorporated both a
 6 subjective and objective component; correct?
 7    A.   Yes.  According to what the officer
 8 thought and the objective totality of the
 9 circumstances.
10    Q.   This memo doesn't say anything about the
11 use of force review board?
12    A.   No.  I don't think in this memo, not this
13 memo.
14    Q.   Were you aware that the use of --
15         MR. ROQUEMORE:
16              Before we get into that, I'm going
17      to object any reference to the findings of the
18      Use of Force Review Board.  And if I could
19      have just a continuing objection, we'll have a
20      cleaner record.
21         MR. MOST:
22              Certainly.
23         MR. ROQUEMORE:
24              Thank you.
25 BY MR. MOST:
```

```
 1      Q.    Are you aware -- was the subject to that
 2   objection as a continuing objection.  Are you aware
 3   that the Use of Force Review board unanimously found
 4   the shooting to be unjustified?
 5      A.    Yes.
 6      Q.    Were you aware of that when you signed
 7   the document about this?
 8      A.    I can't tell you I am, but I am aware of
 9   that.
10      Q.    Does that influence your decision making?
11      A.    No.  It is a factor of my decision
12   making.  But it didn't -- it obviously did not, it
13   was, if I had factored that for my final conclusion,
14   you can have differences of opinions.  And so it
15   would not have been enough of an influence for me to
16   change my opinion.
17      Q.    Okay.  We talked about your decision
18   making including both the subjective and objective
19   component.  Could you separate those out and talk
20   about just subjective and then just objective or for
21   you are those two things intertwined such that you
22   can't separate them?
23      A.    They're required to be together.  Both
24   the law drives it and the policy which basically
25   mirrors that law drives it to be together.
```

```
 1      Q.   Okay.  So you would not easily be able to
 2   give me your assessment separating out subjective
 3   factors, agreed?
 4      A.   Subjective is required.  What did the
 5   officer think and perceive in the moment?
 6      Q.   Okay.  So if I asked you to give me only
 7   your assessment based on objective factors, that
 8   would be difficult or impossible for you to do?
 9      A.   It is not the standard.
10      Q.   Okay.  I want to talk about a baton.
11   Officers are generally required to carry batons in
12   many circumstances?
13      A.   Yes.
14      Q.   Okay.  And a baton is a less than lethal
15   device that could be used to repel a dog that's
16   about the size of a large cat, agreed?
17      A.   It could be, yes.
18      Q.   Okay.  So I want to turn -- Do you need a
19   break?  I want to turn to another topic.
20      A.   No, I'm fine.
21      Q.   Okay.  I want to turn now to NOPD's
22   training about animals.  There's a lot of components
23   of NOPD's policy and training.  I don't expect that
24   you would be off the top of your head knowledgeable
25   about all of them.  Do you know anything about the
```

```
 1   training that NOPD does for -- with regard to
 2   officers encountering animals in the field?
 3        A.   I do not, because I was fairly new when
 4   this case came to me.
 5        Q.   And you haven't learned anything
 6   specifically about it since?
 7        A.   I know the policy associated by the
 8   force.
 9        Q.   Let's look at P13.  We're going to also
10   sort of compare that with P12.  So P13, I'll
11   represent to you is part of NOPD's training, part of
12   a daily training bulletin for officers about how to
13   interact with animals in the field.  And P12, do you
14   see that this is a document put together by the COPS
15   program of the Department of Justice?
16        A.   Yes.
17        Q.   Are you familiar with the COPS program?
18        A.   I am.
19        Q.   Okay.  And just generally, what's your
20   understanding of it?
21        A.   Well, this is a national COPS office is a
22   nationally recognized office for resources that come
23   out of the Main Justice.
24        Q.   And it provides best practices for police
25   departments?
```

```
 1   change the factors in the long run.  They were not a
 2   turning point, pivotal factor for me.
 3        Q.    Let me refer you to page 3 of 6 on
 4   Exhibit Number 2, your letter.
 5        A.    Okay.
 6        Q.    It's a summary of emboldened italics
 7   where you have summarized the recommendations of the
 8   chief's panel.  The last sentence says the panel
 9   believes the outcome of the incident would not have
10   been affected by Officer Burmaster having the PR-24
11   expandable baton and/or the department issued body
12   armor?
13        A.    Right.
14        Q.    This is something you agree with?
15        A.    I do.
16              MR. ROQUEMORE:
17                   Chief, I appreciate your time.
18         Those are all questions I have for you.
19              THE WITNESS:
20                   Okay.
21              MR. MOST:
22                   You need to be out of here by 4:30;
23         is that right?
24              THE WITNESS:
25                   I'm here to answer your questions.
```

```
 1            MR. MOST:
 2                 Okay, we're not going to go that
 3       long.
 4            THE WITNESS:
 5                 Okay.
 6                  RE-EXAMINATION
 7   BY MR. MOST:
 8       Q.   Okay.  I just want to make sure it wasn't
 9   4:30.
10       A.   I appreciate that, but I'm here to
11   answer.
12       Q.   Thank you.  So Chief, you were a witness
13   to the shooting or any of the events around the
14   shooting?
15       A.   That's correct.
16       Q.   So your assessment of the reasonableness
17   of the shooting is your opinion; correct?
18       A.   It is an opinion, but it is one that I
19   think is weighted with a lot of experience and
20   knowledge.
21       Q.   Sure.
22       A.   Frankly, yes.
23       Q.   It's a well-informed opinion.
24       A.   It is a well-informed opinion.
25       Q.   Okay.  And there's references here to
```

```
 1   Burmaster being exonerated.  Hat's a determination
 2   within the police department.  It doesn't mean that
 3   the court has exonerated him; correct?
 4              BY MR. ROQUEMORE:
 5                   Objection form.
 6              THE WITNESS:
 7                   That would be correct.
 8   BY MR. MOST:
 9       Q.   And with your signature on the
10   disciplinary document, you approved of Burmaster's
11   decision to shoot the dog and his basis for it;
12   correct?
13       A.   I think it's reasonable that he fell
14   within that range of what would be deemed
15   reasonable.
16       Q.   And so you approved of the decision?
17       A.   Yes.
18       Q.   And his basis for making the decision?
19       A.   His and the weight of all the others who
20   weighed it along the way, which were all those
21   deputy chiefs, everyone who assisted us.
22       Q.   Okay.  And you said that your belief was
23   that no human was injured in this incident?
24       A.   I don't believe I said.  I think the
25   question was posed differently to me.  So what was
```

```
 1   your question that you asked before?  I don't think
 2   you asked that question.
 3        Q.   It was actually a question from Mr.
 4   Roquemore.  Are you aware that Burmaster's partner
 5   was wounded in this incident?
 6        A.   Now, that you mention it, I think so.
 7   But I didn't recall until you mentioned it.  But
 8   yes, I think he refreshed my thinking.
 9        Q.   Okay.  So you concluded it was reasonable
10   for Burmaster to fire his firearm; correct?
11        A.   I do.
12        Q.   And would it have been reasonable if he
13   had instead used his taser?
14        A.   That could also be reasonable.
15        Q.   Would it have been reasonable if he had
16   kicked the dog instead of using his gun or his
17   taser?
18        A.   If the circumstances were such where he
19   had kicked the dog, yes, it would have been
20   reasonable.
21        Q.   Okay.  And the taser or kicking could
22   have been effective in this scenario; correct?
23        A.   Possibly.  I'm dealing with what I know,
24   not the possibility of it.
25        Q.   Sure.  Do you have any facts that suggest
```

```
 1   that taser would have been ineffective in this
 2   scenario?
 3       A.    I have no facts to support that, yes.
 4       Q.    Do you have any facts to suggest that
 5   kicking the dog would have been ineffective in this
 6   situation?
 7       A.    No.
 8       Q.    You characterized the threat here as the
 9   dog charging at Burmaster.  Do you recall that?
10       A.    Yes, I did.
11       Q.    And you didn't see the dog do that;
12   correct?
13       A.    No.  That's what the report -- I think
14   they used the word aggressive.  I'd have to go back
15   and look.
16       Q.    Sure.  And that's based on Burmaster's
17   telling of the event?
18       A.    That's correct.
19       Q.    Okay.
20       A.    And may I qualify?  And the fact that the
21   other officer ran.  That they coupled together.
22       Q.    But you don't know which dog the other
23   officer was running from?
24       A.    Yes, I was told, I believe, somewhere in
25   the reports that one was a larger dog, one was the
```