UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| DEREK BROWN and JULIA | CIVIL ACTION |
| BARECKI-BROWN | NO. 22-00847 |
| VERSUS | SECTION: L |
| | DIVISION: 4 |
| DERRICK BURMASTER, SHAUN | HON. ELDON FALLON |
| FERGUSON, and the CITY OF | HON. KAREN W.ROBY |
| NEW ORLEANS | |


DEPOSITION OF DEPUTY SUPERINTENDENT RYAN
LUBRANO, given in the above-entitled cause,
pursuant to the following stipulation, before
Sandra P. DiFebbo, Certified Shorthand Reporter, in
and for the State of Louisiana at the Office of the
City Attorney, 1300 Perdido Street, Room 5E03, New
Orleans, Louisiana, on the 14th day of May, 2025,
commencing at 12:00 noon.

2

1    APPEARANCES:

2

     REPRESENTING THE PLAINTIFFS:
3
              JONES WALKER
4             BY:  TARAK ANADA,
              ATTORNEY AT LAW -and-
5             PATRICK M. VANBURKLEO,
              ATTORNEY AT LAW
6             201 St. Charles Avenue
              New Orleans, Louisiana  70170-5100
7             (pvanburkleo@joneswalker.com)

8

     REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON, and
9    the CITY OF NEW ORLEANS:

10            OFFICE OF THE CITY ATTORNEY
              BY:  JAMES ROQUEMORE,
11            ATTORNEY AT LAW
              1300 Perdido Street
12            Suite 5E03
              New Orleans, Louisiana  70112
13            (James.Roquemore@nola.gov)

14

15

     Reported By:
16
              Sandra P. DiFebbo
17            Certified Shorthand Reporter
              State of Louisiana
18

19

20

21

22

23

24

25

3

1   E X A M I N A T I O N       I N D E X

2

3                                   Page

4   BY MR. ANADA:              5, 95

5   BY MR. ROQUEMORE:              84

6

7   E X H I B I T       I N D E X

8

9                   Page

10

11  Exhibit L1                    24

12  Exhibit L2                    26

13  Exhibit L3                    32

14  Exhibit L4                    81

15

16

17

18

19

20

21

22

23

24

25

4

1          S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of DEPUTY SUPERINTENDENT RYAN LUBRANO is

6    hereby being taken pursuant to the Federal Rules of

7    Civil Procedure for all purposes in accordance with

8    law;

9              That the formalities of reading and

10   signing are specifically waived;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                   *  *  *  *  *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25

5

1        DEPUTY SUPERINTENDENT RYAN LUBRANO,

2    1615 Poydras Street, Suite 1800, New Orleans,

3    Louisiana 70112, having been first duly sworn, was

4    examined and testified on his oath as follows:

5    EXAMINATION BY MR. ANADA:

6        Q.   Could you please state your name for the

7    record.

8        A.   Deputy Superintendent Ryan Lubrano, New

9    Orleans Police Department, over the Field

10   Operations Bureau.

11       Q.   Thank you.  How would you like me to

12   address you? Deputy Superintendent Lubrano or

13   Mr. Lubrano, Ryan?

14       A.   Chief Lubrano.

15       Q.   Chief Lubrano?

16       A.   You could do Ryan.  Whatever you feel

17   more comfortable with.

18       Q.   Okay.  You can call me Tarak.  My name is

19   Tarak Anada.  I represent the Brown family in this

20   case.  This is my colleague, Patrick.  Tarak and

21   Patrick.  We can be super informal.  I'll call you

22   Ryan, if that's okay.

23       A.   That's fine.

24       Q.   Thank you so much. I want to start by

25   saying thank you for your service as a member of

6

1   the New Orleans Police Department.  I'm a citizen

2   of New Orleans.  I appreciate everything that you

3   do, so thank you.

4        A.   Thank you.

5        Q.   Ryan, did you find out about this case in

6   2021 when it was on nola.com?

7        A.   No.  I found out about this case when I

8   was part of a chief panel hearing.  I don't

9   remember if I would have heard it, you know, in

10  2021 or not.  I was part of a chief panel hearing,

11  the disciplinary portion of it, so that's when I

12  became most familiar with it.

13       Q.   You can't say whether you remember it

14  from 2021 or not, right?

15       A.   No.

16       Q.   Or 2022?

17       A.   Right.

18       Q.   Fair enough.  Have you given a deposition

19  before?

20       A.   Yes.

21       Q.   Numerous times?

22       A.   A couple.

23       Q.   Were they in relation to lawsuits

24  involving the use of force?

25       A.   I don't think I had any involving use of

7

1  force.

2      Q.   Could you just take me through a little

3  bit of the subject matter of the depositions you've

4  done in the past?

5      A.   So I'm saying deposition, but I want to

6  say the last statement I gave was in relation to

7  complaints filed on deputy chiefs, but it was

8  similar to the deposition, you know, the

9  questioning.

10      Q.   Gotcha, gotcha.  Okay.  Well, a

11  deposition is just like a conversation between two

12  people.  The difference is you are under oath.  I

13  am going to try and make my questions make sense,

14  but us lawyers have this way of making our

15  questions make sense to us but confusing when they

16  come out.  Do me a favor.  If my question is

17  unclear or confusing, will you just say, hey,

18  Tarak, can you rephrase that?  I don't quite

19  understand, and I'll be happy to rephrase it.

20  Otherwise, we'll assume that if you respond that

21  you understood the question.  Fair?

22      A.   Okay.

23      Q.   If you want to take a break at any time,

24  just let me know.  I just ask that we don't take a

25  break while a question is pending.  We just take

1    one after the question has been answered.  We can

2    do a bathroom break or anything like that.  Did you

3    review some materials to prepare for today's

4    deposition?

5         A.    Yes.

6         Q.    What did you review?

7         A.    The cover letter.  The -- what is it? The

8    -- I forgot what the form is called.  The case,

9    itself, and I think the initial recommendations.

10        Q.    Did you watch the bodycam video at all to

11   prepare for today?

12        A.    I have not watched it recently.  I

13   watched it during the chief panel hearing.

14        Q.    How many times have you watched the body

15   camera video?

16        A.    We watched it several times during the

17   chief panel hearing.

18        Q.    Do you remember if you watched Roussel's

19   bodycam or Burmaster's bodycam?

20        A.    Burmaster's.

21        Q.    When I say Roussel, do you know who I am

22   talking about?

23        A.    Yeah. The other officer.

24        Q.    Had you met Burmaster before this

25   incident?

1      A.   I've met him before, but I never worked

2   directly with him.

3      Q.   Have you ever heard any complaints about

4   Burmaster other than anything related to this

5   incident?

6      A.   No.  It would have been related to this.

7      Q.   Same questions about Roussel.  You ever

8   met him before?

9      A.   I don't believe so.

10      Q.   Before your involvement in this case?

11      A.   Yeah, I don't believe so.

12      Q.   You ever heard of him before your

13   involvement in this case?

14      A.   Not that I recall, no.

15      Q.   What is your position at NOPD?

16      A.   So currently I'm the Deputy

17   Superintendent over Field Operations.  That's the

18   eight districts, SWAT team, a few other things,

19   preserve the vision.

20      Q.   So you are over all patrol officers?

21      A.   Yes.

22      Q.   What was your role in 2021, April of

23   2021, if you recall?

24      A.   I was either a lieutenant in the Second

25   District or a captain over homicide.  We didn't get

 1   promoted to deputy chiefs until January 3rd of '23,

 2   I believe.

 3        Q.   How long have you been a police officer?

 4        A.   About 27 and a half years.

 5        Q.   That's a long time. You've been with NOPD

 6   the whole time?

 7        A.   Yes.

 8        Q.   Can you tell me just briefly, and I know

 9   this might be a difficult question, but can you

10   give me an understanding of some of the specific

11   technical training that you have been given as a

12   police officer that like a lay person like myself

13   probably would not have had?

14        A.   I'm sorry.  Repeat it.

15        Q.   Yeah.  So I'm trying to get an under-

16   standing.  Like I'm trying to get an overview of

17   the type of training you've had as a police officer

18   over the last, you know, multiple decades you've

19   been a police officer.  So, for example, I know

20   you've been to a police academy called POST, right?

21        A.   Yes.

22        Q.   So what I want to ask you, if this makes

23   sense, is can you take me through the type of

24   specialized training you've had as a police officer

25   that makes you a professional in policing?

1        A.    Yeah.    Defensive tactics, handcuffing.

2   There is legal portions of it, you know, where you

3   learn the law.  You take tests on that, referring

4   to when I was in the academy a long time ago.

5   Firearms, driving.  Back then we utilized pepper

6   spray.  That would have been part of the training

7   that we don't utilize anymore.  Taser training,

8   baton training.  There is probably several I'm

9   forgetting, but just, you know, all-around law

10  enforcement types of training in the academy.

11       Q.    Were you ever trained on something that

12  I'll describe -- and forgive me.  I'm a lay person

13  -- as the use of force continuum?

14       A.    Yes.

15       Q.    Can you tell me about that training?

16       A.    So it's just the levels of force that you

17  would increase based on your situation.  So like I

18  said, you could go from verbal to hands, to a

19  baton, taser, gun.  It's just the levels of forces

20  that you can increase, you know, given the certain

21  situations you are in.

22       Q.    Before you can get to lethal force?

23            MR. ROQUEMORE:

24                 Objection, form.  You can answer.

25  BY MR. ANADA:

12

1      Q.   From time to time, he is going to object

2  to the form.

3      A.   I'm just giving you a general review of

4  the levels.  I can't say it verbatim, but it's like

5  the levels that you would increase based on the

6  situation, or, you know, a person becomes more

7  aggressive or --

8      Q.   The levels you can increase until you can

9  get to using lethal force, correct?

10          MR. ROQUEMORE:

11              Objection, form.

12  BY MR. ANADA:

13      Q.   So from time to time he is going to say

14  objection to form.  It should not disrupt our

15  communication, unless he tells you not to answer

16  it.  So once he is done making his objection to the

17  form, you can answer my question as if he didn't

18  even say anything.

19      A.   I would say it's a guideline.

20      Q.   Is the takeaway from that training you

21  should try non-lethal force before resorting to

22  lethal force?

23      A.   Given the situation.

24      Q.   Yeah. As a general principle, you would

25  agree that NOPD trains its officers to attempt non-

13

1    lethal force when available before resorting to

2    lethal force; is that fair?

3        A.   I would say yes.

4        Q.   So you've told me a little bit about the

5    use of force continuum training you've had.  This

6    is training -- these are concepts that you learned

7    as a police officer that you were not familiar with

8    as a lay person, right?

9        A.   Yes.  Most of them.  I had family that

10   was law enforcement, so I was familiar with some

11   aspects of law enforcement, but, yes, the academy

12   really drills you in on everything.

13       Q.   So this use of force continuum isn't

14   training that, in your mind, you would expect the

15   average lay person to have, right?

16       A.   Probably not.

17       Q.   You talked about defensive tactics

18   training.  That's a little different than use of

19   force continuum training, right?

20       A.   Yes.

21       Q.   Tell me a little bit about the defensive

22   tactics training you've had as a professional

23   police officer.

24       A.   So the defensive tactics is like

25   takedowns and stuff like that.  Now we do a lot of

14

1    -- the training I receive now as a deputy chief is

2    different than what the officers get.  We get like

3    an overview of it so we know what they're teaching

4    them at this point.  I would -- I'm sorry.  But

5    defensive tactics would be like takedowns.  We have

6    CIT, which is like being able to deescalate

7    situations.  We have a lot of that training stuff,

8    you know, talking people down, stuff like that.

9         Q.    These are skills and techniques that only

10   someone who is trained as a professional police

11   officer would have, not the average lay person,

12   right?

13        A.    Right.  That's fair.

14        Q.    And then you said taser training.  Tell

15   me a little bit about the taser training you had as

16   a professional police officer.

17        A.    So we just got new tasers.  It's

18   familiarizing yourself with it.  There is the

19   different techniques you would use like when you

20   draw it out, holding it out, stuff like that.  It

21   just runs you through how to use the taser.  We do

22   -- what do I call it?  We do shoot live tasers to a

23   target, you know, to practice and stuff like that.

24   The different -- so you do a spark test every

25   morning to make sure your battery is good.  What

1    else?  It's just like, really, a lot of practice

2    with the taser, familiarizing yourself with it.

3        Q.   When you were trained on the taser, were

4    you taught about the prongs that come out of the

5    gun?

6        A.   Yes.

7        Q.   Tell me a little bit about what you

8    understand about that.

9        A.   So we went to a new taser system, which

10   is like pretty brand new, so I'm going back to the

11   two-prong one that we just transitioned from,

12   because that's what I had the most training in.

13       Q.   And that's what was in place in April of

14   2021, right?

15       A.   Yes.

16       Q.   Tell me about what you learned from your

17   training about that type of a taser in terms of the

18   prongs.

19       A.   I think the biggest thing with the

20   prongs, other than, you know, removing them and

21   stuff like that, but as far as like the technique.

22   You have to be a certain distance, because the

23   farther you are away, the quicker the prongs

24   separate.  Am I making any sense?

25       Q.   Yeah.  I think so, yeah.

16

1          A.   So if you were -- if I was attempting to

2     taser a subject, you would want to --

3          Q.   Patrick.  Use him as an example.

4          A.   I forgot my taser.

5          Q.   Just kidding.

6          A.   But it would be -- I don't have the

7     distance offhand.  When we do it in the academy,

8     it's in a controlled environment, so you kind of

9     set up at the same place, but the further you are

10    away, the farther the prongs separate, so it's less

11    effective.  So the closer you are, the prongs would

12    be together, but that is not effective either.  You

13    want like a good spread.  Like from upper body to

14    leg would be like probably your best way to get

15    that electrical circuit going.

16         Q.   You learned this during your specialized

17    training as a police officer, right?

18         A.   Yes.  From the academy.  Taser training.

19         Q.   These aren't concepts that you would

20    expect a regular lay person to understand, right?

21         A.   No, I wouldn't.

22         Q.   So you don't want to be too far away from

23    your target.  You don't want to be too close. Am I

24    understanding you correctly?

25         A.   Yeah.  There is a lot more to it.  Like

17

1    you wouldn't want to tase somebody that was on top

2    of a fence or -- well, I don't want to say on a

3    fence, but like on an elevated thing where you

4    would assume they are going to fall, you know.

5    Just certain things like that, that they teach you

6    when we're going through this training.

7        Q.   Gotcha, gotcha.  Because you have this

8    training, this very specific detailed training

9    about the taser, you are able to give opinions on

10   whether a taser would be effective in a certain

11   situation or not, right?

12       A.   I would say yes.

13       Q.   But that's because you have specialized

14   technical training in the taser as a police

15   officer, right?

16       A.   Yes.

17       Q.   And these opinions that you could give,

18   based on that specialized technical knowledge, you

19   would not expect a lay person to be able to give

20   those same opinions, right, accurately?

21       A.   No.

22       Q.   Fair.  Let's move on to the baton.  I

23   think I wrote down baton training.  Tell me a

24   little bit about the baton training that you've

25   had.

1      A.    Are you familiar with a baton?

2      Q.    A little bit.  I've heard the term

3    "expandable" baton thrown around, but, no.  Why

4    don't you kind of help me -- here is what I'm

5    concerned about.  PR-24 expandable baton or ASP.

6      A.    Yes.  So there is the PR-24, which is a

7    baton with a handle and a knob on the end of it. So

8    the training with that is different blocking

9    techniques were taught in the academy.  Different

10   strike modes were taught in the academy.

11            MR. ANADA:

12                I'm really sorry, guys. Can I hit

13                pause for one second?  My dog is at the

14                vet with pneumonia. This is his

15                veterinarian.

16                {INTERRUPTION IN PROCEEDINGS}

17   BY MR. ANADA:

18      Q.    I apologize for that.  You were telling

19   me about the baton training that you received at

20   the police academy.  Do you mind starting over?

21   I'm sorry.  It wasn't the police academy.  I just

22   asked you generally can you take me through the

23   baton training you received as a police officer.

24      A.    Yeah.  So you learn different blocks,

25   techniques, stances, jabs, swings.  It would be

19

1    similar for both the baton and the expandable.  The

2    expandable just doesn't have a handle, but you just

3    can still utilize those blocking techniques, some

4    of the jab movements and stuff like that.

5        Q.   So the PR-24 is the expandable?

6        A.   No.  The PR-24 is the baton with a handle

7    and a knob on the end of it.  Your war knob.  And

8    then the expandable baton is one that's compact and

9    the one that you would --

10       Q.   Like a light saber?

11       A.   Right.  It pops out, and it's a baton,

12   but similar techniques we use for like blocking,

13   jabs, stuff like that.

14       Q.   What is an ASP?

15       A.   I forgot what the ASP stands for.  The

16   ASP is the expandable.  I'm sorry.  I thought you

17   asked me what ASP stood for.

18       Q.   Okay.  Got it.  The ASP is --

19       A.   Yeah.  The ASP is the expandable, and the

20   other one is the PR-24 baton.

21       Q.   Officers, at least in 2021, NOPD officers

22   were required to carry one of those two on them?

23       A.   Yes.

24       Q.   And then there was something about body

25   armor.  They were required to wear body armor?

20

1      A.    Yes.  Bulletproof vest.

2      Q.    Just a vest, right?

3      A.    Yeah.

4      Q.    Okay.  Gotcha.

5      A.    They all know they have outer ones, like

6  an outer vest.  If you ever see an officer like

7  with -- the officers wearing light blue shirts.  It

8  will be like a black outer vest.  So you could

9  either wear them like that or back, you know, when

10  I came up, you wore them under your shirt, under

11  your regular shirt.  It was a little bit thinner.

12  It wasn't that big, black vest like we have today.

13      Q.    Were you trained that a baton, whether

14  it's the standard or the expandable, could be used

15  to repel a threat that you are facing?

16      A.    Yeah.

17      Q.    So given your specialized training that

18  you've had in the baton, are you able to answer

19  questions about whether a baton would or would not

20  be effective in a certain situation that you would

21  expect lay people to not be able to answer?

22      A.    Yes.

23      Q.    Because of your specialized technical

24  training, right?

25      A.    Yes.

21

1    Q.    So I know you are not being offered as an

2    expert witness in this case, but you are, in fact,

3    an expert on the taser, the baton, defensive

4    tactics, and use of force, right?

5    A.    I wouldn't say an expert, but I have

6    training in all of that.

7    Q.    You have highly-specialized technical

8    training in those areas, right?

9    A.    Yes.  Given by the police department.

10    Q.    That gives you a unique perspective to be

11    able to discuss those topics?

12    A.    Yes. When I say I'm not an expert, like,

13    obviously, the guy who teaches taser at the

14    academy, I would consider him an expert, you know.

15    Q.    Right.  You would defer to the taser

16    trainer on the taser, but for me and Patrick as lay

17    people, you would have a better understanding of

18    the taser and its effectiveness than we would?

19    A.    Yes.

20    Q.    Assuming no one on the jury in this case

21    is a police officer, you would expect that you

22    would be in a unique situation to explain the

23    effectiveness of the taser in a particular

24    situation to the jury because of your highly-

25    specialized technical training on the taser, right?

22

1      A.    Yes.

2      Q.    That's why the jury should probably take

3  your testimony about the effectiveness of the taser

4  and put more weight on that over a lay person's

5  testimony about it, right?

6           MR. ROQUEMORE:

7                Objection, form.

8  BY MR. ANADA:

9      Q.    You can answer.

10      A.    Yes.

11      Q.    You can't let him affect your answer.

12  Just let him finish his objection and answer.  Your

13  answer was yes, right?

14      A.    Yes.

15      Q.    You're not on any kind of medications

16  that would affect your ability to give a deposition

17  today, right?

18      A.    No.

19      Q.    You told me some materials that you

20  reviewed to prepare for the deposition.  Have you

21  told me everything you reviewed?

22      A.    It was about five documents.  It might

23  have been the first recommendations, the cover

24  letter, predisposition letter.  I think it was

25  about five documents.  I can't remember them all.

23

1    I think one might have been a 105, because like the

2    superintendent's changed -- corrected like a

3    signature.  I think it was four or five documents.

4        Q.   I'm not going to mark anything as

5    exhibits yet.  I'm going to hand you a couple of

6    things.  I'm just going to ask if these are things

7    that you either reviewed in preparation for this

8    deposition or had ever reviewed at all.  Let me

9    first give you this document.  You can share it

10   with your counsel.  I'm not sure if I am going to

11   make it an exhibit yet.  It's like a -- it is what

12   it is.

13              THE WITNESS:

14                  You want to see it?

15              MR. ROQUEMORE:

16                  He is going to ask you questions on

17           it.

18   BY MR. ANADA:

19       Q.   Take your time and look at it.  I'm

20   curious to see if you've seen this or you are

21   familiar with it.

22       A.   If this is the statement that was part of

23   the DI-1, it would have been reviewed when we did

24   the -- is that what this is?  The statement?

25              MR. ROQUEMORE:

24

```
 1                    Let him ask you questions on it.
 2    BY MR. ANADA:
 3        Q.   I know you have some questions about the
 4    document, but putting those aside, can you tell me
 5    whether you've seen the document I put in front of
 6    you before today?
 7        A.   This exact document, no.
 8        Q.   I'm going to mark this --
 9            MR. ANADA:
10                 Jim, forgive me.  I've been out of
11                 the loop.  Is this one of -- Off the
12                 record.
13                 {OFF-THE-RECORD DISCUSSION}
14    BY MR. ANADA:
15        Q.   I'm going to mark a document as L1, which
16    stands for Lubrano 1.  I apologize for my green
17    sticky notes.  You can just ignore them.  I guess
18    what I want to know is can you tell me whether or
19    not you have ever seen this document before today?
20    Feel free to take your time.
21            MR. ROQUEMORE:
22                 Do you have an extra copy?
23            MR. ANADA:
24                 Sorry, guys.  I could have sworn I
25                 did.  I can go make one, if you let me
```

1          use your photocopier.

2          MR. ROQUEMORE:

3               Let's go ahead and do that.

4          MR. ANADA:

5               If it means anything, I wasn't going

6          to ask him any question about it.  I

7          just wanted to establish whether he has

8          seen it or not.  If that affects your

9          --

10         MR. ROQUEMORE:

11              If that's all you are going to do,

12         then --

13         MR. ANADA:

14              Yeah.  If I change my mind, then we

15         will go do the copies, but for right

16         now I just want to -- that's it.

17         MR. ROQUEMORE:

18              I think he answered that question.

19    BY MR. ANADA:

20    Q.    Okay.  With respect to L1, I believe your

21    testimony was you can't say you've ever seen this

22    document before today, right?

23    A.    If this was an exhibit as part of the

24    case, I probably reviewed it, you know, when we did

25    the hearing, but.

26

1          Q.   I don't know whether it was or it wasn't.

2          A.    It says it's an exhibit, so like I would

3     have reviewed it when we did the hearing -- when we

4     reviewed the actual FBI case.  I also -- this being

5     a statement would have been in the investigation

6     itself.  Throughout the investigation it is

7     summarized as well.

8          Q.    Yeah.  Understood.  Let me ask it a

9     different way.  Can you tell the jury under oath

10    that you have reviewed the entirety of Document L1

11    before today?

12         A.    No.

13         Q.    Thanks.  We'll set this to the side for

14    now.  We'll mark this document as L2.  I'm just

15    going to ask you the same question for L2.

16              MR. ANADA:

17                    Jim, do you want to look at it first

18               before I ask him anything about it?

19              MR. ROQUEMORE:

20                    Yeah.

21    BY MR. ANADA:

22         Q.    My question is can you tell the jury

23    under oath whether you have reviewed Document L2 in

24    its entirety before today?

25         A.    No, I can't.

27

1          Q.    Do you understand that you've been listed

2     by the defendants in this case as a witness that

3     will be called to give testimony at trial?

4          A.    Yes.

5          Q.    Do you have any understanding of what

6     testimony you plan to give at trial?

7          A.    I guess that would be based on what they

8     ask me.

9          Q.    Do you plan to give opinions as to

10    whether Officer Burmaster's use of lethal force on

11    the plaintiff's dogs was appropriate or not?

12         A.    Opinions?

13         Q.    Yeah.

14         A.    My responses to that would be more based

15    on what we saw when we did the chief's hearing.

16         Q.    So I think -- let me just make sure I

17    understand your answer.  Are you saying you do plan

18    to give opinions on whether the use of lethal force

19    was appropriate in this case or not, or you do not

20    plan to give such opinions?

21              MR. ROQUEMORE:

22                   I object to the form.

23    BY MR. ANADA:

24         Q.    You can still answer.

25         A.    I mean, when you say "opinions," I mean,

28

```
 1    it would be based on everything that we saw when we

 2    did the chief's panel hearing.

 3          Q.   Right.

 4          A.   I mean, if you consider that an opinion,

 5    I mean, it would be what we learned during the

 6    chief's panel hearing, the review and everything.

 7          Q.   You understand that Officer Burmaster

 8    shot my client's dog, Apollo, in April 2021, right?

 9          A.   Yes.

10          Q.   You reviewed a few videos of that

11    incident?

12          A.   Yes.

13          Q.   And you interviewed Officer Burmaster

14    about the incident?

15          A.   Yes.

16          Q.   After that, did you come to an opinion

17    about whether the shooting was appropriate or not?

18               MR. ROQUEMORE:

19                    Objection, form.  You can answer.

20               THE WITNESS:

21                    If we're calling it opinion, I

22                 guess, yes.

23    BY MR. ANADA:

24          Q.   What was your opinion?

25          A.   That he was within policy.
```

1        Q.    And when you say within policy, do you

2    mean certain specific NOPD policies?

3        A.    So the policy talks about, you know,

4    fearing that you are in grave danger or could

5    receive great bodily harm.  During the chief's

6    panel hearing, unlike some other hearings, the

7    officer is called in to give his side of it.  We

8    always take that into account, the officer's side

9    of it, because you may -- you know, until you are

10   in that certain situation, you don't know how

11   you'll react.

12       Q.    Of course.

13       A.    So I think hearing from the officer

14   during these panels to see what they felt was going

15   on, how they perceived things, you know, is

16   important.

17       Q.    Yeah.  So you determined that Officer

18   Burmaster's shooting of Apollo was within policy?

19       A.    Yes.

20       Q.    And you base that, at least in part, on

21   Officer Burmaster's perception of the danger Apollo

22   posed?

23       A.    Yes.

24       Q.    That's like his subjective perception,

25   right?

30

1      A.    Yes.

2      Q.    What else did you base your decision on

3  that was within policy besides what you've just

4  told me?

5      A.    We took a lot of things into account.  It

6  was nighttime, so, obviously, you know, you can't

7  see things around you as well.  It was a domestic

8  violence call.  That always -- you know, you can

9  look it up.  Domestic violence is one of the most

10  dangerous calls that police officers encounter.

11      Q.    Let me stop you right there.  So I

12  understand that.  Domestic violence is a very

13  dangerous situation, right.  Does that give a

14  police officer, in your opinion, a right to be a

15  little bit more loose with what he uses lethal

16  force on versus what he doesn't?

17      A.    Because it's a domestic violence call?

18      Q.    Yeah.

19      A.    No.  I don't think that gives you the

20  immediate right to use lethal force, but I'm just

21  trying to tell you the things that we took in, you

22  know, that we look at when we look at the entire

23  picture.

24      Q.    I should not have interrupted you.  Let

25  me just finish -- go ahead.  You were saying the

31

1   things you considered.

2       A.   Yeah.  So domestic violence calls,

3   nighttime.  I know the other officer was closer to

4   the gate and was able to flee.  I don't think

5   Burmaster had an immediate way to escape the

6   situation.  You know, like if he was at the gate,

7   he could have shut the gate, or if he could have

8   jumped up on some stairs or something, jumped over

9   a fence or something.  I don't think, from what we

10  reviewed, that he had an option like that.

11      Q.   Got it.  Would your opinion change if --

12  let's just, hypothetically, you said Burmaster --

13  you said Roussel was close to the gate, so he could

14  escape, right?

15      A.   I knew he escapes at one point.  I don't

16  remember how far he came in.  It's been a while

17  since we watched it, but he had definitely a better

18  option of escape than Burmaster had.

19      Q.   Burmaster was, in your opinion, further

20  than the gate, further away from the gate than

21  Roussel, right?

22      A.   Yeah.  I believe Burmaster was on the

23  left side.  He was definitely further away from the

24  gate, from what I remember.

25      Q.   How far away, compared to Roussel, was

32

Burmaster?

   A.   I couldn't say for sure.

   Q.   Were they within touching distance?

   A.   I don't recall.

   Q.   I'm going to mark as L3 another document.
This one I do have copies of.  You've seen this
document before, right?

   A.   This is the cover letter, correct? Yes.
I've seen this document before.

   Q.   I want to start with Page 1.  Page 1 you
see five bullet points there?

   A.   Yes.

   Q.   These bullet points reflect the NOPD
policies that the -- tell me if I'm wrong here --
the Public Integrity Bureau concluded that
Burmaster violated; is that right?

   A.   Yes.

   Q.   Do you think you are more qualified than
the Public Integrity Bureau officers who opined
earlier in this case about whether Burmaster
violated those policies?

   A.   Do I think I'm more qualified?

   Q.   Yeah.

   A.   I think that you learn more at a chief's
panel hearing where the officer is allowed to come

33

1    in and, you know, give you his insight into it.

2    They take statements from officers, but, like I

3    said, during the chief's panel hearing, they are

4    allowed to come in and tell their side, what they

5    saw, what they thought, how they felt.

6        Q.   So your position is Burmaster was not

7    allowed to tell the Public Integrity Bureau Force

8    Investigation Team his side of the story?

9        A.   Yeah.  He would have given a statement,

10   but, like I said, when we do the panel hearing, we

11   bring the officer in front of us.

12       Q.   So you were able to collect more

13   information than the Public Integrity Bureau was

14   from Burmaster?

15       A.   I wouldn't say more information.

16       Q.   Can you tell me any more information that

17   Burmaster gave you at the chief's hearing that is

18   not contained within Exhibits 1 and 2?

19           MR. ROQUEMORE:

20               Objection, form.

21   BY MR. ANADA:

22       Q.   I'll represent to you that those exhibits

23   contain a summary of Burmaster's -- contain

24   reference to information Burmaster provided to the

25   Public Integrity Bureau.

34

1      A.   Yeah.  I mean, I couldn't say. I'd have

2    to listen to the recording.  The hearings are,

3    obviously, recorded, and then -- I don't want to

4    give you a wrong answer on that.

5      Q.   I'm just trying to understand your

6    previous answer.  You said your -- don't let me put

7    words in your mouth.  I understood you to say you

8    are more qualified to opine on Burmaster's

9    violation or non-violation of police policy because

10   you actually brought Burmaster in to tell his side

11   of the story.  What I'm trying to understand is

12   what part of that story was the PIB not able to

13   get?

14     A.   I understand.  I'm not saying I'm more

15   qualified, but I'm saying as part of that chief's

16   panel hearing, you know, we bring them in, and they

17   tell their side of the story.  I'm not saying

18   that's more qualified.

19     Q.   Is it your position that the jury should

20   put more weight -- let's say the jury is able to

21   hear what the chief's hearing panel concluded

22   versus what the Public Integrity Bureau concluded,

23   as reflected in L1 and L2.  Is it your position

24   that the jury should put more weight on the

25   conclusions contained in L3, which is the chief's

```
 1    hearings, chief's hearing conclusions versus the

 2    PIB hearing conclusions?

 3              MR. ROQUEMORE:

 4                   Object to the form.

 5              THE WITNESS:

 6                   I think they should look at it all.

 7    BY MR. ANADA:

 8         Q.   Let me ask you this.  And, look, I'm not

 9    trying to put you on the spot.  Take your time.

10    These are not incredibly long documents, but I want

11    you to look at L2.  Take your time.  I want you to

12    tell me -- there is conclusions in there.  All

13    right.  A lot of them are circled and tabbed.  I

14    want to know what you specifically disagree with,

15    if anything.

16         A.   I reviewed the highlighted portions of

17    it.

18         Q.   What do you disagree with, if anything,

19    out of what you read?

20         A.   I would say the investigator at one point

21    discusses that the officer shot out of fear and not

22    because he felt that great bodily harm wasn't going

23    to come to him, but I think that's an opinion.  I

24    would disagree with that.  I don't see, you know,

25    if -- like I said, I just think that's an opinion.
```

36

1    How do you prove what the officer felt and what he

2    saw. You know, it's easy to go Monday morning

3    quarterback stuff with BWCs, but looking at a BWC

4    doesn't always give you that first line of sight

5    like you have when you are in an encounter.

6         Q.   Got it.  Okay.  So you are just pointing

7    out that that statement is just that investigator's

8    opinion; you're not necessarily disagreeing with

9    it, right?

10             MR. ROQUEMORE:

11                  Object to the form.

12   BY MR. ANADA:

13        Q.   Just help me understand exactly what your

14   position is on that statement.

15        A.   What I'm trying to say is, and I don't

16   know if she clarifies it in any way that I didn't

17   read.  Like I said, I just read over the

18   highlighted parts, but she says several times that

19   he shot out of fear and not that he felt like -- I

20   can't remember her exact verbiage.

21        Q.   I've give it back to you.

22        A.   I think it's mentioned a couple of times.

23   "Officer Burmaster fired his weapon out of fear,

24   not because the animal presented an imminent threat

25   or serious bodily injury to Officer Burmaster."

37

1      Q.   Gotcha.  What is your position as to what

2   you just read into the record?

3           MR. ROQUEMORE:

4                Object to the form.

5   BY MR. ANADA:

6      Q.   I guess my question was is there anything

7   here you disagree with, and in response to that

8   question, you read me that excerpt out of here.

9   I'm just asking a clarifying question.  Are you

10  saying you disagree with that statement or you are

11  criticizing the statement?  Help me understand.

12  Why did you read that statement to me?

13     A.   I read it to you because you asked is

14  there anything I disagreed with.  To me that sounds

15  like the investigator's opinion.  Like I said, if a

16  officer believes that he is about to get attacked

17  by a dog, you know.  She is saying, oh, he just

18  shot out fear, not because there was an imminent

19  threat of danger.

20     Q.   She has no position to be commenting on

21  what his subjective belief is, right?

22           MR. ROQUEMORE:

23                Object to the form.

24  BY MR. ANADA:

25     Q.   How would she know, I think, is what you

38

1    are trying to say?

2        A.   Yes.

3        Q.   Am I correct that your position is --

4    again, I'm not trying to put words in your mouth.

5    I'm trying to make sure I clearly understand what

6    your position is, because you have been listed as a

7    witness.  Is it your position that as long as

8    Burmaster believed that he was about to be

9    imminently attacked by the dog, as long as that's

10   what he believed, he was justified in using lethal

11   force?

12       A.   Yes.

13       Q.   Okay.  Got it.  It doesn't matter what

14   you or I believe by looking at that video.  It

15   doesn't matter what a judge or jury thinks.  It's

16   what Burmaster believed, because he was the one

17   there.  If he thought it was reasonable to use

18   lethal force based on his beliefs, then it was

19   appropriate, right?

20            MR. ROQUEMORE:

21                 Objection, form.

22   BY MR. ANADA:

23       Q.   That's your position?

24       A.   Yes.

25       Q.   Okay.  Thank you.  Turn to the last page

1    of Exhibit L3.  Staying on that topic, I think what

2    you just told me is consistent with what it says

3    here.  This is, for the record, Page 3 of L3.  This

4    is the cover letter of the chief's hearing.  "The

5    panel believed the following facts justified the

6    recommended dispositions."  Now, this is telling us

7    the facts that the panel believed justified the

8    disposition.  Just stating to you what Burmaster

9    believed, right? It says here that, "He believed it

10   was vicious and coming fast towards him."  Did I

11   read that right?  It is kind of in the middle of

12   the paragraph.

13        A.   Yes.

14        Q.   That's one of the reasons that you signed

15   onto this saying that he did not violate policy,

16   right, because he believed the dog was vicious and

17   coming fast towards him?

18        A.   Yes.

19        Q.   That's what matters, right, what he

20   believes?

21        A.   Yes.

22        Q.   It doesn't matter whether you

23   independently believed the dog was vicious, right?

24   That's not part of the equation, right?

25             MR. ROQUEMORE:

40

1                    Object to the form.

2              THE WITNESS:

3                    Say that again.

4    BY MR. ANADA:

5       Q.   It doesn't matter whether you or I, from

6    watching the video, believes that the dog was

7    "vicious."  That's irrelevant to your determination

8    here.  What's relevant is that he, Burmaster,

9    believed it was vicious, right?

10             MR. ROQUEMORE:

11                   Objection, form.  Misstates.

12             THE WITNESS:

13                   Yes.

14   BY MR. ANADA:

15      Q.   How long were you an officer that

16   patrolled the streets?

17      A.   Maybe a year.

18      Q.   A year?

19      A.   Just regular uniform patrol.  I went on

20   and did, you know, task force, narcotics.  You

21   know, things like that.

22      Q.   SWAT?

23      A.   Never did SWAT.

24      Q.   Never was in SWAT?

25      A.   Never.

1    Q.   So let me ask the question a different

2    way.  How many years were you someone who was out

3    in the community and served as interacting with

4    people at their homes, doing knock and talks,

5    working the streets?  How long were doing that for?

6    A.   I was a patrolman about a year.  Task

7    force would have been slim, whether it was just a,

8    you know, proactive approach.  When I made

9    sergeant, I was in several different units,

10   specialized units, but I was also a patrol sergeant

11   for maybe a year, year and a half.  So I would have

12   been supervising officers on patrol.  As a

13   lieutenant, I was an assistant commander, so you

14   are out in the community.  You might not have been

15   responding to calls for service like the regular

16   patrol officers were, but -- so maybe half of my

17   career.

18   Q.   Long time.  Over a decade.

19   A.   Yeah, but, you know, you talking about

20   just going to calls for service.  So, you know, I

21   did it in different -- even as assistant commander,

22   you are out dealing with the community and stuff.

23   You make scenes and stuff, but you weren't that

24   officer -- and I'm saying that because you said it

25   -- answering calls for service.

42

1      Q.   Right.  Got it.  Okay.  So you were out

2    in the community for about half of your career?

3      A.   Yes.

4      Q.   You have come across many dogs while

5    being a police officer out on the streets, right?

6      A.   I don't know about many, but, yes, you

7    encounter dogs from time to time.

8      Q.   You ever had one run towards you?

9      A.   I never had one that I remember coming

10   directly at me, but, you know, working narcotics,

11   when you knock a door, you know, we've had to run

12   out and stuff before.

13     Q.   Have you ever shot dog in the line of

14   duty?

15     A.   I have not, no.

16     Q.   You ever felt threatened by a dog in the

17   line of duty?

18     A.   Absolutely.

19     Q.   Tell me how many times.

20     A.   This is going back years.

21     Q.   Just give me your best recollection.

22     A.   I remember we used to get calls, you

23   know, dogs -- wild dogs running around and stuff.

24   You were usually dealing with like pitbulls and

25   large dogs and stuff.  Back then, we usually tried

43

1    to call the SPCA, but, I mean, I never had like a

2    direct interaction with a dog, never shot a dog.

3        Q.   But I think you -- maybe I misheard.  I

4    think you said you have felt threatened by a dog in

5    the line of duty, right?

6        A.   I am talking about when you get a call

7    for the police because there is a stray dog running

8    around, and it's -- you know, you get over there in

9    the police car.  I'm not jumping out and grabbing

10   the dog.  We want to try to get the SPCA out there,

11   you know, or some other means, or, hopefully, we

12   can make contact with the owner, so, you know.

13       Q.   Have you ever seen a police officer shoot

14   a dog in the line of duty?

15       A.   I don't think so.

16       Q.   If you had to guess, how many dogs have

17   you or other officers with you come across in your

18   years as a police officer in the line of duty?

19       A.   That would be a guess.

20       Q.   Over ten?

21       A.   Yeah.  About ten.

22       Q.   You've never seen any officer on those

23   occasions shoot any dogs?

24       A.   No.  That I remember, no.

25       Q.   Do you know any other officers besides

44

1  Burmaster who shot dogs?

2      A.   We have them from time to time.  I

3  remember reviewing a case as a deputy chief.  I

4  don't remember if it was a use of force, a Use of

5  Force Review Board or ASI, where an officer shot a

6  dog.

7      Q.   You can remember one other occasion other

8  than Burmaster?

9      A.   I'm talking where like I saw the video.

10 Like you hear about it.  We may even get

11 notifications when an officer shoots a dog.  So

12 like you hear about them, but actually seeing one,

13 like I said, reviewing that case in the last year

14 or so where an officer shot a dog.

15     Q.   When was that, that other one?

16     A.   I'm not 100 percent sure.  We reviewed

17 it.  I've been a deputy chief two and a half years.

18 I think we reviewed that case in the last year,

19 year and a half, but I don't remember when the

20 actual incident happened.

21     Q.   Other than that other example, can you

22 think of any other occasions that you know about

23 where NOPD shot a dog besides Burmaster?

24     A.   Yeah.  There were other occasions.  Like

25 I said, I can't give them to you offhand, but there

45

1    are other occasions.  Like I said, I believe we get

2    alerts on them, like a text message alert when --

3    not just on something with a dog but like anything

4    serious.  Obviously, an officer discharges his

5    firearm, you know.

6         Q.   Is that a pretty standard occurrence, an

7    NOPD officer shooting a dog?

8         A.   When you say standard, what do you --

9         Q.   Is it unusual when an officer shoots a

10   dog at NOPD or not?

11        A.   I would say it's not standard.  It

12   doesn't happen, you know -- any officer involved

13   shooting, it's not like we have every day of the

14   week.  You know, it's occasional.

15        Q.   Would you say it's rare?

16        A.   I wouldn't say it's rare.

17        Q.   You wouldn't?

18        A.   I would not.

19        Q.   You would not say it is rare?

20        A.   If you gave me the numbers, I could give

21   you a better answer on that, but I wouldn't say

22   it's rare.  It's occasional.

23        Q.   Have you heard of the same officer, one

24   police officer, shooting multiple dogs while

25   they're an NOPD officer?

46

1      A.   I'm aware Burmaster had another one back

2   in '08, '09, maybe.  Or '12, maybe.

3      Q.   I think it was like '12.

4      A.   Ten years ago, maybe.

5      Q.   Besides Burmaster, name every other NOPD

6   officer who has ever shot multiple dogs.

7      A.   I can't say, and I'm only familiar with

8   Burmaster, because I sat on the chief's panel

9   hearing.

10      Q.   Can you tell the jury under oath whether

11   or not, to your knowledge, there was any other

12   member of NOPD who has ever shot two dogs in the

13   line of duty?

14          MR. ROQUEMORE:

15             Objection, form.

16          THE WITNESS:

17             I can't.

18   BY MR. ANADA:

19      Q.   You just don't know?

20      A.   It's possible.  I just, you know, I can't

21   say that for sure.

22      Q.   I think we talked a little bit about how

23   you -- so you agreed here with -- how do you

24   pronounce his last name?  Is it "GA-THEE-YAY" or

25   "GAN-THEE-YAY?"

1    A.    "GAN-THEE-YAY."

2    Q.    There is an N, right?

3    A.    Yeah.

4    Q.    So you agree with Deputy Superintendent

5  Ganthier, Deputy Superintendent Sanchez, and

6  Superintendent Kirkpatrick that of the five NOPD

7  policies that Burmaster was said to have violated

8  by PIB, that he only violated two of them, two out

9  of five, right?

10    A.    Yes.

11    Q.    I see you used the term "sustained" and

12  "exonerated," right?

13    A.    Yes.

14    Q.    Exonerated just means that he didn't

15  violate the NOPD policy, right?

16    A.    Yes.

17    Q.    It does not -- you signed off on the

18  term, "exonerated," right?

19    A.    Yes.

20    Q.    You don't mean to communicate that

21  anything more than he did not violate the policy

22  with the term, "exonerated," right?

23    A.    Can you reword that?

24    Q.    Do you mean to say that exonerated means

25  that he can't be held legally liable for the

48

1    shooting? That's not what you are getting into,

2    right?  You can't ask him.  Sorry.

3              MR. ROQUEMORE:

4                   Objection, form.

5              THE WITNESS:

6                   Repeat it one more time.

7    BY MR. ANADA:

8         Q.   No problem.  So we're looking at L3, Page

9    2.  This is where you and the other deputy

10   superintendents and the superintendent conclude

11   which policies Burmaster violated and which ones

12   that he didn't, right?

13        A.   Correct.

14        Q.   You concluded that he only violated two

15   and did not violate the first three?

16        A.   Yes.

17        Q.   Listed here on this page. And you say for

18   the first three exonerated, meaning he didn't

19   violate this specific policy noted in that bullet

20   point, right?

21        A.   That he did not, yes.

22        Q.   So if this document is shown to the jury,

23   I am just trying to understand.  Are you trying to

24   communicate, when you signed off on this, this

25   means that Burmaster should not be legally liable

49

1    for anything?  He should be exonerated from the

2    claims that the plaintiffs have made against him?

3    That is not what you are trying  to say, right?

4              MR. ROQUEMORE:

5                   Let me object to form.  We will also

6                 stipulate that he is not going to be

7                 testifying providing an opinion as to

8                 legal liability in this case.  He is

9                 not here to provide a legal opinion as

10                for the ultimate issue in this case.

11             MR. ANADA:

12                  Got it.  Thank you for that, for

13                your help.

14   BY MR. ANADA:

15        Q.   We've now heard that.  Can you answer the

16   question?

17             MR. ROQUEMORE:

18                  Can you answer the question is a

19                better question.

20             THE WITNESS:

21                  Yeah.  I don't think I can.

22   BY MR. ANADA:

23        Q.   Let me say it a different way.  Let's

24   pretend I am a member of the jury.  Let's say I am

25   looking at this document.  If I were to interpret

50

1   right here on Page 2 the word "exonerated," if I

2   were to interpret that as meaning Superintendent

3   Lubrano, when he signed off on that word

4   "exonerated," he means that, in his opinion,

5   Burmaster is not liable for the plaintiff's claims.

6   If I was the jury, and that's how I interpreted it,

7   that would be a huge misinterpretation, right?

8               MR. ROQUEMORE:

9                    Objection, form.

10              THE WITNESS:

11                   I just don't think I can answer

12              that.

13  BY MR. ANADA:

14      Q.   If I interpreted this as anything other

15  than Burmaster did or did not violate this specific

16  policy, I would be misinterpreting the phrase

17  "exonerated," right?

18              MR. ROQUEMORE:

19                   Objection, form.

20              THE WITNESS:

21                   Us finding those three violations

22              unfounded is basically saying that we

23              agreed with his actions, that he wasn't

24              outside of policy with his actions.

25  BY MR. ANADA:

51

1          Q.   If I were to interpret anything more of

2     than whether or not he was within or outside of

3     policy, I would be misinterpreting the term,

4     "exonerated," right?

5                MR. ROQUEMORE:

6                     Objection, form.  Asked and

7                answered.

8                THE WITNESS:

9                     I mean, I explained to you us

10                exonerating these three charges, we

11                felt he was within policy.  Did not

12                violate the policy with his actions.

13     BY MR. ANADA:

14          Q.   Other than that, you mean nothing else

15     with the term "exonerate," right?

16          A.   Could you --

17          Q.   Well, I asked you -- let me just start

18     again.  What do you mean by the term "exonerated"

19     here on the first bullet point?

20          A.   He was found exonerated of these three

21     charges dealing with the use of force.  Yeah.

22          Q.   Other than what you have just told me, do

23     you mean anything else by exonerated?

24          A.   No.

25          Q.   If I were to think that you meant

 1    anything other than what you just told me, I would

 2    be misinterpreting your use of the word,

 3    "exonerated," right?

 4              MR. ROQUEMORE:

 5                   Objection, form.

 6              THE WITNESS:

 7                   Yeah, I -- I can't answer that.

 8    BY MR. ANADA:

 9        Q.    When you arrived at your decisions

10    reflected on Exhibit L3, there is no mention of an

11    analysis of whether various forms of non-lethal

12    force would or would not have been effective.  That

13    wasn't part of your job, right, in reviewing this

14    incident?

15        A.    In the review of it, we would have

16    discussed that.

17        Q.    There is just no mention here of --

18        A.    Kind of like when I talk about my

19    observations from viewing the BWC.  You know, his

20    placement in the yard, things like that.  I mean,

21    that's something we would have discussed.  We

22    usually discuss training things as well.  I'm

23    sorry.  You said an analysis of the --

24        Q.    I just -- I see some discussion of some

25    facts on Page 2 of the document.  I see a

53

1  discussion of some of Burmaster's beliefs on Page 3

2  of the document.  I just don't see any discussion

3  of, you know, would non-lethal measures have been

4  effective, such as the taser or a baton or kicking

5  the dog.  What I'm trying to establish is none of

6  that was part of your analysis or your

7  responsibility in --

8       A.   Any discussions about that would have

9  been during the hearing.

10      Q.   Did you, under oath, to the jury, can you

11  tell the jury, do you have an opinion on whether or

12  not a taser could have been used instead of a gun

13  on this dog?

14      A.   I would be leery to use a taser on a dog.

15  For one thing, it's fast moving.  It's, you know,

16  not like a five foot nine guy where, you know,

17  those prongs separate where you are still making

18  contact.  I wouldn't say --

19      Q.   Let me -- I'm sorry.

20      A.   I personally probably would not use a

21  taser on a dog, but keep in mind I would also have

22  to be in that situation, and, you know, see it

23  firsthand.

24      Q.   You can't answer that without considering

25  the subjective viewpoint of the officer, right, in

54

1    the situation?

2         A.    Right.

3         Q.    So you can't tell the jury whether a

4    taser would or would not have been effective in the

5    situation that Burmaster was in, right?

6              MR. ROQUEMORE:

7                   Objection, form.

8              THE WITNESS:

9                   No.

10   BY MR. ANADA:

11        Q.    Go ahead.

12        A.    I don't think it would have been

13   effective.

14        Q.    You don't think.  Okay.  You don't think

15   a taser would be effective on dogs, period, right?

16        A.    It would have to be a controlled

17   situation.  Think about like when you are dealing

18   with a dog.  I think back to that other case I told

19   you I reviewed.  Like the dog was constantly

20   flailing, moving, or running.  It's just -- tasers

21   aren't something you really want to be shooting at

22   moving targets with, because give a dog attack

23   instance.  If I were to use a taser, and it's

24   ineffective, which I believe it would be, because

25   an animal is fast moving --

1          Q.   Because of the prongs?

2          A.   Then you definitely are getting attacked,

3    because then you would have to transition to

4    something else.  Yeah.  Me, personally, I would not

5    -- every situation is different, but I wouldn't

6    think a taser would be effective on a moving dog.

7    I don't mean effective.  I'm talking about having

8    the prongs strike where they need to go before you

9    could get that electrical current.

10         Q.   That's what I'm asking you, because I'm a

11   lay person.  I never shot a taser.  I don't know

12   what situations is likely the prongs make contact

13   in or not.  That's why I'm asking you. Okay.  So

14   you have said that you don't think on a moving dog

15   a taser would be effective, because the prongs are

16   not likely to make the contact that they need to

17   make, right?

18         A.   Correct.

19         Q.   The reason you know that better than me

20   is because you, as you started earlier, you have

21   actual technical training expertise in taser and in

22   taser prongs, right?

23         A.   Yes.

24         Q.   That I don't have.

25         A.   Right.

56

1      Q.   That's why you are uniquely qualified to

2  give that opinion better than I am, right?

3      A.   Yes.

4      Q.   Thank you.  What about a baton?  Did you

5  make any analysis of whether Burmaster could have

6  effectively used a baton?  I know he didn't have

7  one.  Let's pretend he had one.  Whether he could

8  have effectively used a baton, whether expandable

9  or not, to repel the threat he felt from this dog?

10     A.   I don't -- again, I don't think a baton

11 would be effective.

12     Q.   Why is that?

13     A.   First off, to utilize a baton, you have

14 to be in immediate contact, so at that point, it's

15 almost already too late.  I don't think a baton

16 would be effective.  I think you are putting

17 yourself too close to the danger.

18     Q.   Again, you know that because of your

19 specialized training in using a baton?

20     A.   Yes.

21     Q.   What is a CEW?

22     A.   Controlled -- it's -- give me a second.

23 Conducted Electrical Weapon.  I got the C wrong.  I

24 can't remember what the C is for.  It's the taser.

25     Q.   You got it right?

57

1        A.   It's the taser.

2        Q.   You got it right.  It is Conducted Energy

3   Weapon.  Have you read NOPD policy -- I'm sorry.

4   Have you read NOPD Operations Manual, Chapter 1.71

5   titled, "Conducted Energy Weapon?"

6        A.   Can I see it?  I've read it before.  If

7   the question is just have I read it before, yes.

8        Q.   Does that look familiar to you?

9        MR. ROQUEMORE:

10            Let him look at it.

11  BY MR. ANADA:

12       Q.   Take your time.

13       A.   Yeah.  It's familiar to me.

14       Q.   Is there anything in that policy you

15  disagree with that you don't subscribe to?

16       A.   That I disagree with?

17       Q.   Yeah.

18       A.   There is probably things in a lot of

19  policies that I disagree with, but, no.  Do you

20  have something you want to point out?

21       Q.   No.  You just read it.  I just generally

22  want to know whether you think it's flawed, or, for

23  the most part, right or wrong, or what?

24       A.   No.  I don't have any disagreements with

25  it.

58

1          Q.   I'm going to read from Paragraph 62.

2     "The CEW has proven to be an effective tool against

3     dangerous animals and may reduce the need for

4     greater, more injurious force against such animals.

5     The use of a CEW on an animal is a safer, more

6     humane and less traumatic conclusion to the

7     incident."  Do you have any reason to disagree with

8     that policy?

9          A.   What?  We're talking about an attacking

10    animal?  Based on something else, possibly, but I

11    told you my opinion, and it's based on experience

12    and training.  A moving target, something like in

13    this situation, where you have a dog running

14    towards you, I would not go to a taser.

15         Q.   And at trial, if asked, you are going to

16    give that opinion to the jury based on your

17    specialized technical knowledge that you uniquely

18    have, right?

19         A.   Yes.

20         Q.   You've not been designated as an expert

21    in this case, true?

22              MR. ROQUEMORE:

23                   Objection, form.

24    BY MR. ANADA:

25         Q.   Have you been designated as an expert in

59

this case?

       MR. ROQUEMORE:

          Objection, form.

       THE WITNESS:

          As a witness?

BY MR. ANADA:

    Q.  Yeah.  As an expert witness. You don't know?

    A.  I'm not sure.

    Q.  Okay.  Fair.  We're getting close.  Your conclusions listed in L3, did you factor in the size of the dog at all when coming to your conclusions?

    A.  I mean, it was talked about.

    Q.  How big was the dog that was chasing -- threatening Burmaster?

    A.  I don't have an exact --

    Q.  You don't know?

    A.  No. We went based on the BWC.  I didn't see any pictures of the dog.  I just saw the BWC.

    Q.  So you don't know what size the dog was?

    A.  No.

    Q.  You don't know whether it was 90 pounds or ten pounds?

    A.  No.  I don't know the weight.

60

1    Q.   But you stand by your opinions regardless

2    of the size of the dog?  That's irrelevant, right?

3         MR. ROQUEMORE:

4              Objection, form.

5         THE WITNESS:

6              Yes.

7    BY MR. ANADA:

8    Q.   It was reasonable for -- I don't mean to

9    retread old ground.  I just want to make sure I

10   understand.  It was appropriate for Roussel to exit

11   because he was close enough to exit through the

12   gate that they walked in, right?

13   A.   Appropriate?

14   Q.   Yeah.

15   A.   I think he had an option to take, and he

16   took it, to be able to get out the gate.

17   Q.   If Roussel would have shot -- given where

18   Roussel was in connection with the gate, would it

19   also have been appropriate, in your mind, for

20   Roussel to have shot a dog in this scenario?

21   A.   If he felt like he was going to be

22   attacked, and, you know, he was going to be caused

23   great bodily harm.

24   Q.   Got it.  So neither Roussel nor

25   Burmaster, in your mind, were required to consider

61

1  any non-lethal tools, right?

2          MR. ROQUEMORE:

3                Objection, form.

4          THE WITNESS:

5                Say that again.  I'm sorry.

6  BY MR. ANADA:

7      Q.   In your mind, neither Roussel nor

8  Burmaster were required to consider any non-lethal

9  uses of force before resorting to lethal force,

10  right?

11          MR. ROQUEMORE:

12                Same objection.

13          THE WITNESS:

14                Required?

15  BY MR. ANADA:

16      Q.   Yeah, by policy.

17      A.   Yeah, no.  They should have taken that

18  into consideration, but, like I said, you are

19  talking about -- I remember it happened so fast.

20  Like from the time they get there to the time the

21  dogs start barking.  They run down.  Like it is so

22  quick.  You have to make a split decision in a

23  situation like that.  Does that answer your

24  question?

25      Q.   A little bit, but it's just -- the reason

62

1    it's hard is because you are an expert in this, and

2    I'm like literally a lay person.  I do oil and gas

3    law for a living.  All right.  So this is all

4    totally Mandarin to me.  Just help me understand,

5    if you don't mind indulging me.  It happened so

6    fast, but they still should have considered

7    non-lethal options before they jumped to lethal,

8    right?

9        A.   So we train to consider non-lethal

10   options, but, like I said, given the situation, you

11   know.  I'm trained in the taser.  I am trained in

12   the baton.  A vicious dog coming at me, I don't

13   think either would be effective.  You know, every

14   situation is different.  If you are dealing with a

15   dog that was maybe latched onto somebody and not

16   moving, maybe some of those other options would be

17   considered, but I'm talking about like a fast-

18   moving animal.  Before you get attacked, I don't

19   know how effective either of those non-lethal

20   options would be.

21       Q.   You don't know how effective or you're

22   saying they would not be effective?

23       A.   I wouldn't go to those options in a

24   similar situation.  That would not be my first

25   choice.

63

1      Q.   Because of your unique --

2      A.   Because, like I said, the baton is going

3  to put you too close to an attacking animal.  The

4  taser is really all about making those proper

5  connections at those proper lengths for it to be

6  effective.  I think both of those situations puts

7  you too close to the danger.

8      Q.   Based on your training as a police

9  officer?

10     A.   Yes.

11     Q.   You would at least agree with me that for

12  Burmaster to be able to make a decision to use

13  lethal force within NOPD's policies, he would at

14  least have to see the threat that he faces before

15  he can make a valid decision, right?

16     A.   See the threat?

17     Q.   Yeah.  He would have to see it to be able

18  to assess it to determine whether he can use lethal

19  force, right?

20     A.   Yes.

21     Q.   Have you ever heard of a police officer

22  expressing fear that a dog would bite his or her

23  genitals?

24     A.   Have I ever heard of any other police

25  officer?

64

1      Q.    Have you heard of any police officer

2  expressing concern that a dog would bite his or her

3  genitals?

4      A.    Outside of this case?

5      Q.    Yeah.

6      A.    No.  Not that I recall.

7      Q.    Never, in your how many years as a

8  police officer?

9      A.    27 and a half.

10     Q.    Burmaster expressed that fear to you,

11 right? He thought this dog was going to bite his

12 genitals?

13     A.    Yeah.  It's in the investigation.

14     Q.    This is the first time you have ever

15 heard any police officer ever say that, right?

16     A.    Yeah.  That I can recall.

17     Q.    That's an unusual fear, right, in your

18 mind?

19     A.    Not the fear of being attacked.  I don't

20 know -- you know, you mentioned those specific

21 parts because that's what the dog was closest to or

22 that's what he -- but, like I said, not the fear of

23 being attacked.

24     Q.    But the fear of being bitten in the

25 genitals by a dog, that is a unique fear that you

1   have only heard Burmaster express and no one else

2   express, right?

3        A.   Well, this is like one of two dog cases

4   I've ever been involved with this closely, so I

5   couldn't say for sure.  Other officers expressed

6   fear of being bitten on certain parts of the body.

7        Q.   I got it.  You don't know what every

8   officer is saying all the time.  What I'm saying is

9   in your 29 years --

10       A.   27 years.

11       Q.   -- other than Burmaster and this one

12  occasion, you have never heard any other officer

13  express a fear of being bitten in the genitals by a

14  dog?

15       A.   I have not, but, like I said, I've only

16  been part of a handful of dog bite cases.

17       Q.   Do you know that Officer Burmaster was

18  also concerned about his crotch when he shot

19  another dog in 2012?

20       A.   I don't recall if I knew that.  I'm aware

21  of the 2012 shooting, but I don't recall if I had

22  the specifics on it.

23       Q.   Let me show you Pages 3 or 4.  It's just

24  a little excerpt about that prior incident.  It

25  goes on to the next page, too.

1        A.    That's the 2012 case, right?

2        Q.    That's right.

3        A.    Or the older case?

4        Q.    Yeah.  That's right.  You see it says he

5   -- when the dog -- I'll read from this Exhibit L2.

6   This is Page 4.  "When the dog made a motion

7   towards Officer Burmaster, the officer grabbed his

8   crotch with his left hand and unholstered his

9   weapon.  Officer Burmaster fired the weapon twice

10  fatally wounding the dog."  Does that suggest to

11  you that Officer Burmaster was concerned about

12  being bitten in the crotch the last time he shot a

13  dog as well?

14       A.    You said does that suggest it to me?

15       Q.    Yes.

16       A.    Yes.

17       Q.    This is an unusual fear, right, of being

18  afraid of being bitten by dogs in the genitals in

19  the line of duty?

20            MR. ROQUEMORE:

21                 Objection, form.

22            THE WITNESS:

23                 I don't know about unusual, but I

24            would -- if I were in a situation

25            similar, I would rather be bit on the

67

1          leg than in certain other parts of the

2          body.

3    BY MR. ANADA:

4        Q.   Fair, fair.  This is a very specific

5    unique concern to Burmaster and Burmaster alone,

6    right?

7              MR. ROQUEMORE:

8                   Objection, form.

9    BY MR. ANADA:

10       Q.   You never heard anyone else talk about

11   being afraid of being bitten by dogs in the crotch,

12   only Burmaster, right?

13       A.   I have not, but I have not been a part of

14   -- I have only been a part of a handful of dog bite

15   investigations.

16       Q.   Would you agree that this is a unique

17   concern to Officer Burmaster?

18       A.   That he is concerned about it? I would

19   say so.

20       Q.   Would you agree that it's a unique

21   concern to Officer Burmaster?

22             MR. ROQUEMORE:

23                  Objection, form.

24             THE WITNESS:

25                  I mean, he is concerned about it,

68

1              obviously, based on his statements.

2    BY MR. ANADA:

3         Q.   But you will not agree with the term

4    "unique?"  You disagree with that?

5         A.   I can only speak for a handful of cases

6    that I reviewed.  I don't know if other officers,

7    you know, have made similar statements about what

8    part of the body they feared being bitten on.

9         Q.   You have never heard anyone but

10   Burmaster's fear of being bitten in the crotch

11   other than Burmaster?

12        A.   Yes.

13        Q.   There was one more thing I wanted to ask

14   you about L3.  Is it true that, "Officer Burmaster

15   stated that he did not have sight of the dog when

16   he removed his weapon?"

17        A.   Yes.

18        Q.   Is it true that Officer Burmaster stated,

19   "He could not recall the dog's actions?"

20        A.   Yes.

21        Q.   I read Exhibit L3.  Wasn't Officer

22   Roussel hit with something, some shrapnel, as a

23   result of this shooting?

24        A.   I don't recall.

25        Q.   You don't know?  That is not information

69

1    you know about, right?

2         A.   I can't recall if it came up at the

3    hearing or not.

4         Q.   Well, it's not referenced in Exhibit 3 at

5    all, right?

6         A.   I don't think any mention of Officer

7    Roussel -- there is any mention of Officer Roussel.

8         Q.   Is whether or not Officer Roussel was in

9    the vicinity to be hit with bullet shrapnel, was

10   that at all relevant to the conclusions of the

11   panel that you were on about whether or not

12   Burmaster violated NOPD policy?

13        A.   I don't recall the shrapnel.

14        Q.   You can't say?

15        A.   I would have to go review it more in

16   depth since we had the hearing.

17        Q.   You can't tell the jury that that was

18   part of your analysis, right?

19        A.   I can't say that, no.

20        Q.   I know we talked about the taser and the

21   baton. I'm sorry.  It's been a lot of information.

22   Can you tell the jury whether you believe simply

23   just kicking the dog that was running towards

24   Burmaster could have been an equally effective way

25   to mitigate the threat the dog posed?

 1          A.    I think kicking the dog would be similar

 2    to what I discussed about the baton and the taser.

 3    You know, if you got a dog coming at you, attacking

 4    you, why would you put a limb out there to kind of

 5    provoke, you know. I don't think that would be a

 6    good option.

 7          Q.    And your opinions and your conclusions

 8    have nothing to do with the size of the dog, right?

 9          A.    No.

10          Q.    That's not a factor there, true?

11          A.    What's that?

12          Q.    The size of the dog is not factored into

13    your analysis?

14          A.    So just like what we discussed with the

15    taser and the PR-24.  Every situation is different.

16    An attacking dog, you know, compared to, like I

17    talked about, a dog latched onto somebody, not

18    running, or moving around.  Every situation is

19    different.

20          Q.    In coming to the conclusions reflected in

21    Exhibit 3, you cannot tell the jury that those

22    conclusions factor in the size of the dog Burmaster

23    shot, correct?

24          A.    If he should have kicked the dog?  Is

25    that what you are asking?

71

1          Q.    Well, yeah.  Say that.

2          A.    Can you reword it?

3          Q.    Yeah.  Okay.  You said that you don't

4     think kicking the dog would have been effective,

5     right?

6          A.    No.  Not an attacking dog.

7          Q.    Right.  That's regardless of the size of

8     dog, right?

9          A.    Right.

10         Q.    Doesn't matter if a dog is 100 pounds or

11    one pound, right?

12         A.    A one-pound dog I think would be a little

13    bit different.  Like I said, every situation is

14    different.  There are, you know, smaller breeds of

15    dogs that are -- you know, can do more damage than

16    some bigger dogs.  I don't think that's something

17    you want to sit there in a situation like that,

18    and, you know.

19         Q.    Understood.  Okay.  When you arrived at

20    these conclusions listed on Page 2 of L3,

21    exonerated, exonerated, exonerated, sustained,

22    sustained, you cannot tell the jury that in

23    arriving at these conclusions you factored in the

24    size of the dog approaching Burmaster, correct?

25         A.    No.

1      Q.   Wait.  No, meaning I'm incorrect?

2      A.   You are saying did we factor in the size

3   of the dog to come to these conclusions?

4      Q.   Yes.

5      A.   I don't think the size was factored in.

6   It was, you know, the incident of an approaching,

7   barking dog, you know, believing -- he was

8   believing that he was going to be attacked.

9      Q.   Size was not factored in?

10     A.   Not for the conclusions.

11     Q.   You don't know the age of the dog, right?

12     A.   No.

13     Q.   That wasn't factored in either for your

14  conclusions, right?

15     A.   I don't think we had that information. I

16  don't think we did.  I don't remember age being

17  discussed.

18     Q.   In coming to your conclusions reflected

19  on Exhibit L3 was whether or not the dog Officer

20  Burmaster shot barking?  Was that factored in?

21     A.   I don't think -- I guess it would have

22  been factored in.  I mean, that added to -- the

23  dogs were barking.

24     Q.   Which ones?  There is two dogs.

25     A.   I believe both of them.

1      Q.   You believe both were?

2      A.   There was barking, because -- I believe

3  there was barking, because the dogs came off like a

4  stairwell or something.  So they were barking

5  before they ran into the yard and approached.

6      Q.   You can't tell the jury whether or not

7  the dog that approached Officer Burmaster was

8  barking, right?

9      A.   Say it again.

10     Q.   You cannot tell the jury one way or the

11  other whether the dog that was approaching Officer

12  Burmaster was barking, true?

13     A.   I believe he was barking.  I'd have to

14  review the BWC again.  It's been a while.

15     Q.   This is Exhibit L2.  I think you looked

16  at this a little bit earlier.  I am going to read

17  from it.  "Officer Burmaster stated he has been

18  bitten several times by dogs that range in size

19  from small to large.  Officer Burmaster stated he

20  is tired of being bitten by dogs and tired of going

21  to the hospital for treatment for dog bites."  Do

22  you see that?

23     A.   Yes.

24     Q.   Did I read that accurately?

25     A.   Yes.

74

1      Q.   So I think earlier you told me whether or

2  not it's appropriate to use lethal force under NOPD

3  policy is based on the subjective viewpoint of that

4  officer at the time, right?

5      A.   Uh-huh.

6      Q.   Is the officer allowed to factor in his

7  past experiences and draw upon those when deciding

8  whether to use --

9      A.   Repeat the last part.

10     Q.   Is the officer allowed to draw upon his

11 past experiences and use those in determining what

12 level of force is appropriate?

13     A.   Are you asking if based on him being bit

14 by dogs in the past?

15     Q.   Right.

16     A.   Repeat the last part again.

17     Q.   The officer has to make some quick

18 decisions on whether he is going to use lethal

19 force or non-lethal force in a situation like

20 Burmaster was put in, right?

21     A.   Yes.

22     Q.   He has to consider various things, right?

23     A.   Yes.

24     Q.   NOPD does their best to try and give the

25 officer some guidelines.  Here are some things you

1    should consider in the way of policies and

2    procedures, right?

3         A.    Correct.

4         Q.    They try and give some advise to the

5    officers.  Here is what you should consider.  Is

6    one of the things that an officer who is put in

7    that situation, is one of the things he should

8    consider his past experiences being bitten by dogs

9    or not?

10        A.    Yes.

11        Q.    When you interviewed Burmaster, did this

12   come up, that he had been bitten by small dogs

13   before?

14        A.    I don't recall.

15        Q.    Was it recorded when y'all interviewed

16   him?

17        A.    So the hearing is recorded, and then we

18   deliberate.  That's not recorded.  That's the

19   conversation we have where we kind of review

20   everything, and then they come back in for the I

21   guess you would say the penalty, and that's

22   recorded.  So some of the things he talked about,

23   and I forget in part.  All of that stuff should be

24   recorded.

25        Q.    There is a recording out there of what he

76

1  told the chief's panel?

2      A.   Yes.

3      Q.   That's something that y'all have and

4  could give to us?

5           MR. ROQUEMORE:

6                It has been produced to you.

7           MR. ANADA:

8                Oh, the audio has?  Okay.  Great.

9             I'm almost done.  Give me like five

10            minute off the record.  I'll look at my

11            papers.

12          MR. ROQUEMORE:

13               Yeah.

14          MR. ANADA:

15               And tell you if I have any more

16            questions. I think I am pretty much

17            done.

18               {BRIEF RECESS, 1:35-1:40}

19  BY MR. ANADA:

20      Q.   Ryan, do you know Detective Brewer,

21  Shannon Brewer?

22      A.   Yes.

23      Q.   Do you have any opinions on Detective

24  Brewer? Do you have any opinions about Detective

25  Brewer?

77

1          MR. ROQUEMORE:

2               Objection, form.

3   BY MR. ANADA:

4      Q.   Anything whatsoever?

5      A.   I have no opinions.

6      Q.   Have you met her?

7      A.   Uh-huh.

8      Q.   You ever find her to be -- do you have

9   any reason to find her credible or not credible?

10          MR. ROQUEMORE:

11               Objection, form.

12   BY MR. ANADA:

13      Q.   For any reason?

14      A.   I don't have a reason to find her

15   uncredible, but I believe that there was a case in

16   the past that she handled when she was at PIB that

17   we had an issue with.

18      Q.   What was the issue?

19      A.   I can't recall offhand, but we ended up

20   initiating discipline on it.  I can't remember if

21   it was like an incomplete investigation.  It was

22   something with the case.  It was like a, I believe,

23   some type of incomplete investigation, but, like I

24   said, discipline was issued on it.

25      Q.   Got it.  Other than that, anything else?

78

1      A.   No.

2      Q.   Same question with Sergeant John Helou.

3  Do you know him?

4      A.   Yeah.  He is a lieutenant now.  I know

5  John.

6      Q.   He concurred here with Detective Brewer

7  that Burmaster's shooting of the dog was outside of

8  policy, right?

9           MR. ROQUEMORE:

10               Objection, form.

11          THE WITNESS:

12               Yes.

13  BY MR. ANADA:

14      Q.   Do you have any reason that -- do you

15  have any criticism of John Helou's credibility?

16      A.   I do not.

17      Q.   What about Captain Sabrina Richardson?

18  She also concurred with Helou and Brewer, right?

19      A.   Yes, she did.

20      Q.   On the PIB decision.  Do you have any

21  reason to criticize Captain Richardson's

22  credibility?

23          MR. ROQUEMORE:

24               Objection, form.

25          THE WITNESS:

79

1              No.

2    BY MR. ANADA:

3         Q.   I'm going to hand you a document.  Let me

4    back up.  You have seen the body camera video,

5    right?

6         A.   Yes.

7         Q.   It is both Roussel's and Burmaster's,

8    from both perspectives?

9         A.   I can't remember if it was both.  We

10   would have probably looked at both.  I definitely

11   saw Burmaster's several times.

12        Q.   Do you think you would have shot the dog

13   if you were in Burmaster's situation?

14        A.   Looking at something from a BWC

15   standpoint and actually being there is different.

16        Q.   You can't say one way or the other

17   whether you would have or wouldn't have?

18        A.   If I had an approaching vicious dog that

19   I felt was going to attack me, more than likely.  I

20   still, you know, told you about those other options

21   that I don't think would be effective in that

22   situation, being the PR-24 and the taser or the

23   foot.

24        Q.   From what you saw on the body camera

25   video, can you tell the jury whether you would or

80

1    would not have shot the dog?

2         A.   From what I see on the BWC footage, I

3    probably would have shot the dog.

4         Q.   You would have yourself?

5         A.   I probably would have, but, like I said,

6    the BWC footage is different from actually being

7    there.  So the BWC footage shows it, but what I'm

8    saying is, you know, watching the BWC footage a

9    year later, and sitting there and being able to

10   replay it back and forth and Monday morning

11   quarterback is different from actually being there

12   in that moment.

13        Q.   Do you agree that what might be

14   reasonable for you to have done might not have been

15   reasonable for what Burmaster should have done?

16             MR. ROQUEMORE:

17                  Objection, form.

18   BY MR. ANADA:

19        Q.   In terms of lethal force?

20        A.   Repeat it.

21        Q.   What might have been reasonable for you

22   to have done with the dog might not have been

23   reasonable for what Burmaster should have done,

24   right?

25             MR. ROQUEMORE:

81

1              Objection, form.

2     BY MR. ANADA:

3          Q.    Reasonableness is different officer from

4     officer, right, in your mind?

5              MR. ROQUEMORE:

6                  Objection to form.

7              THE WITNESS:

8                  I would say yes.

9     BY MR. ANADA:

10         Q.    I'll mark this as L4.  Can you read these

11    statements?

12         A.    "Standards.  Police should not shoot a

13    dog unless it reasonably appears to pose an

14    imminent threat of serious bodily harm or death.

15    Police should ensure there is no risk to people in

16    the area before shooting a dog.  Police should not

17    shoot a dog if alternative, non-lethal means are

18    reasonably available.  Shooting a dog should always

19    be the option of last resort."

20         Q.    With respect to this Standard Number 1 on

21    this document, do you agree with that, that that is

22    a good standard?

23              MR. ROQUEMORE:

24                  Objection, form.

25              THE WITNESS:

82

1              Police should not shoot a dog unless

2         it reasonably appears to pose an

3         imminent threat of serious bodily harm

4         or death, yes.

5    BY MR. ANADA:

6         Q.   Same question with Number 2.

7              MR. ROQUEMORE:

8                   Same objection.

9              THE WITNESS:

10                  Yes.

11   BY MR. ANADA:

12        Q.   Same question with Number 3.

13             MR. ROQUEMORE:

14                  Objection, form.

15             THE WITNESS:

16                  For Question Number 3.  Standard

17             Number 3.  "Police should not shoot a

18             dog if alternate non-lethal means are

19             reasonably available."  I think not

20             only should it say reasonably

21             available, but like I talked about of

22             some of those options.  That wouldn't

23             be good options from my experience.  So

24             just because they are reasonably

25             available, if you did have that option,

83

1              that doesn't mean it would be the best

2              option.  That comes from experience and

3              training with those different options.

4    BY MR. ANADA:

5         Q.   Technical experience?

6         A.   Yes.

7         Q.   Got it.  Okay.  Anything else on 3?

8         A.   Nothing else on 3.

9         Q.   What about 4?

10        A.   "Shooting a dog should always be the

11   option of last resort."  I would agree with that.

12   I think most officers would agree with that, if not

13   all. You know, nobody comes to work, you know,

14   wanting to shoot a dog, a person, you know.

15        Q.   Of course, of course.  Do these standards

16   look familiar to you?  Have you read these before?

17        A.   I have not.

18        Q.   They don't ring a bell to you?

19        A.   No.

20        Q.   Give me and Patrick 60 seconds.  We are

21   going to step outside, make sure he doesn't have

22   anything that I forgot, and then we'll be able to

23   turn it over to your attorney.

24        A.   Okay.

25              {BRIEF RECESS}

84

BY MR. ANADA:

    Q.   Ryan, I'm pretty much done.  Let me ask you this.  All the answers you gave me today were accurate, right?

    A.   Yes.

    Q.   If Mr. Roquemore asks you the same questions, do you plan on giving different answers than you just gave me?

          MR. ROQUEMORE:

              Objection, form.

BY MR. ANADA:

    Q.   Let's say he asks you some of the same questions that I just asked you when it's his turn. Do you plan to give the same answers you gave to me to him?

          MR. ROQUEMORE:

              Objection, form.

          THE WITNESS:

              Yes.

          MR. ANADA:

              Okay.  I turn it over to

           Mr. Roquemore.

EXAMINATION BY MR. ROQUEMORE:

    Q.   Chief, you were -- you don't mind me calling you chief, right?

1          A.    That's fine.

2          Q.    You were asked about the academy and the

3    training the academy does.  Are you familiar with

4    Sergeant David Duplantier?

5          A.    Yes.

6          Q.    Who is he?

7          A.    He was a -- he is retired now.  He was a

8    recruit commander for the academy.

9          Q.    If he testified with regard to his

10   evaluation of Officer Burmaster's use of force in

11   this case, would that be something you would defer

12   to the officer?

13              MR. ANADA:

14                  Object to form.  Go ahead.

15   BY MR. ROQUEMORE:

16         Q.    I mean, you feel that he is qualified to

17   provide his perspective on whether or not Officer

18   Burmaster complied with NOPD policies in shooting

19   the dog in this case?

20         A.    Yes.

21              MR. ANADA:

22                  Object to the form.

23   BY MR. ROQUEMORE:

24         Q.    Are you familiar with David Duplantier's

25   experience in the areas of use of force?

86

1       A.   Yes.

2       Q.   Explain what your understanding of his

3  experience is.

4       A.   He is very experienced.  I knew during

5  the Use of Force Review Boards, chief's panel

6  hearings, you know, he is called on a lot of times

7  as an expert.  We all defer training to him.  Like

8  if we find somebody that needs training in one of

9  these instances, he is very knowledgeable.  He has

10  been there a long time.  I don't remember exactly

11  how long.  Again, I would have no issue with him

12  testifying.

13       Q.   You also testified with regard to, I

14  guess -- Mr. Anada showed you some documents that

15  he derived from the Use of Force Board previous. Do

16  you remember those?

17       A.   I don't remember a Use of Force document.

18       Q.   You are familiar with the Use of Force

19  Board, right?

20       A.   Yes.

21       Q.   Are you familiar with the purpose of the

22  Use of Force Board?

23       A.   Yes.  So I sit on the Use of Force Board.

24  The Use of Force Board is basically to review the

25  use of force and determine whether the member of

1    the department's actions were within policy

2    regulations and guidelines or not within policy

3    regulations and guidelines.

4         Q.   What is the difference between the

5    disciplinary process and the Use of Force Board

6    process?  What are the purposes of those two?

7         A.   So one is for discipline, and one is to

8    determine whether that use of force was in

9    violation or not in violation of the policies and

10   regulations and guidelines.  One different thing

11   about it is the officer is not present at the Use

12   of Force Review Board.

13        Q.   And the decisions that come out of the

14   Use of Force Board, those are used -- are those

15   used to improve the process of the NOPD?

16             MR. ANADA:

17                  Object to form.  Leading.  Go ahead.

18             THE WITNESS:

19                  Yes.

20   BY MR. ROQUEMORE:

21        Q.   Explain how those decisions of the Use of

22   Force Board are used in that regard.

23             MR. ANADA:

24                  Object to form.  Leading.  Go ahead.

25             THE WITNESS:

88

1              Repeat that one more time.

2    BY MR. ROQUEMORE:

3        Q.   Yeah.  Explain with regard to remedial

4    effects on the NOPD how the Use of Force Board

5    decisions are used.

6              MR. ANADA:

7                   Object to form.  Go ahead.

8              THE WITNESS:

9                   They would be looked at during a

10                  disciplinary hearing, but, obviously,

11                  we review all the major uses of force,

12                  because we want to get it right.  We

13                  obviously want to make sure their

14                  actions were within policy or not.  I

15                  think it's used to, you know, give us a

16                  better idea any issues we are possibly

17                  having.

18   BY MR. ROQUEMORE:

19       Q.   When issues are identified, what does the

20   NOPD do with those issues?

21       A.   If it's --

22             MR. ANADA:

23                  Object to form.

24             THE WITNESS:

25                  If it's something that's a training

1              issue, we would, you know, have them go

2              for training.  If it's something that

3              may require like an SFL or a

4              disciplinary thing, we take that,

5              right.  Usually, by the time it gets to

6              the Use of Force Review Board, if there

7              are any discipline issues, it probably

8              would have already been -- that process

9              would have probably already been

10             started or handled.

11   BY MR. ROQUEMORE:

12        Q.   We're going to talk about the 9/11/23

13   letter that has been marked as L3.  Take a look at

14   that. Go to Page 2 of 3.  I just want to ask you

15   about a couple of general things.  Page 2 of 3,

16   this first line says, "During the hearing, the

17   following facts were learned," and it goes through

18   some facts, right?

19        A.   Uh-huh.

20        Q.   Now, are these facts -- these facts were

21   learned from what sources?

22        A.   I mean, these facts would have been

23   learned from our review of the investigation and

24   then whatever additional information was brought up

25   by the officer.

90

1      Q.   You mentioned you looked at the body-worn

2  camera?

3      A.   Body-worn camera.

4           MR. ANADA:

5                Object to form.  Leading. Go ahead.

6           THE WITNESS:

7                Body-worn camera, the actual FBI

8                investigation.  What am I missing?  I

9                am trying to think of any other

10               documents we would have had.

11  BY MR. ROQUEMORE:

12     Q.   In addition to the body-worn camera and

13  the report, you said you also listened to Officer

14  Burmaster; is that right?

15     A.   Correct.

16          MR. ANADA:

17               Object to form.  Leading.

18  BY MR. ROQUEMORE:

19     Q.   You were asked about -- we'll get back to

20  this, but I want to ask you, you were asked about

21  standards.  Would you agree that NOPD policies --

22  this is a -- would you agree that consistent with

23  NOPD policies and procedures, an officer may not

24  kill a pet dog unless he reasonably believes the

25  dog poses a threat, and he is in imminent danger of

1  being attacked?

2      A.   Yes.

3      Q.   That's a yes?

4      A.   Yes.  Sorry.

5           MR. ANADA:

6               Object to form.  Leading.

7  BY MR. ROQUEMORE:

8      Q.   When determining reasonable belief, how

9  does the officer's subjective belief play into

10 that?

11     A.   So it would be training, past

12 experiences, what they feel at that moment.

13     Q.   So when you were asked the questions

14 about subjective belief of Officer Burmaster, what

15 was Officer Burmaster's belief with regard to

16 whether the dog, Apollo, posed a threat to him?

17     A.   I think that --

18          MR. ANADA:

19              Object to form.  Calls for

20            speculation.

21          THE WITNESS:

22              I think he was in fear that the dog

23            was going to attack him.

24 BY MR. ROQUEMORE:

25     Q.   What was his subjective belief as to

92

1  whether or not the dog, Apollo, posed an imminent

2  threat of harm to him?

3           MR. ANADA:

4                Object to form.

5           THE WITNESS:

6                I believe he believed that the dog

7             posed an imminent threat of harm to

8             him.

9  BY MR. ROQUEMORE:

10     Q.   And when you were sitting on the board,

11  did you make a determination as to whether Officer

12  Burmaster's subjective belief was reasonable under

13  the circumstances?

14           MR. ANADA:

15                Object to form.

16           THE WITNESS:

17                Do I think it was reasonable?

18  BY MR. ROQUEMORE:

19     Q.   No.  Did you make an evaluation as to

20  whether or not Officer Burmaster's subjective

21  belief was reasonable under the circumstances?

22     A.   Yes.

23           MR. ANADA:

24                Form.

25  BY MR. ROQUEMORE:

93

```
 1        Q.    And the facts -- and did you base that
 2   upon facts that were available to you at the
 3   hearing?
 4             MR. ANADA:
 5                  Object to the form.  Leading.
 6             THE WITNESS:
 7                  Yes.
 8   BY MR. ROQUEMORE:
 9        Q.    And those facts, are those explained in
10   this letter?
11             MR. ANADA:
12                  Object to form.  Leading.
13             THE WITNESS:
14                  We're still on L --
15             MR. ROQUEMORE:
16                  Yes.
17             THE WITNESS:
18                  Yes.
19   BY MR. ROQUEMORE:
20        Q.    Just so I'm -- just to wrap this up.
21   Page 2, when you talk about the following facts,
22   are those some of the facts that were considered by
23   the board in determining whether or not Officer
24   Burmaster's beliefs were reasonable?
25             MR. ANADA:
```

94

1           Object to form.  Leading.

2           THE WITNESS:

3                Yes.

4    BY MR. ROQUEMORE:

5       Q.   That's a yes?

6       A.   Yes.

7       Q.   The second page on -- the third page

8    where the panel believed the following facts

9    justified the recommended disposition.  There is a

10   paragraph.  Are those also facts that the panel

11   considered when determining whether or not Officer

12   Burmaster's subjective belief was reasonable?

13          MR. ANADA:

14               Object to form.  Leading.

15          THE WITNESS:

16               Yes.

17          MR. ROQUEMORE:

18               I don't have any other questions.

19          MR. ANADA:

20               Give me one moment to consult with

21             my colleague.  I may not have any

22             questions.

23               {BRIEF RECESS}

24          MR. ROQUEMORE:

25               We have no more questions.

95

1    BY MR. ANADA:

2        Q.    I have just one follow-up to yours, if I

3    may.  Ryan, you understand that you are still under

4    oath?

5        A.    Yes.

6        Q.    Okay.  Great.  Has NOPD taken any

7    measures to make future dog shootings less likely

8    to occur after Officer Burmaster shot Apollo?

9            MR. ROQUEMORE:

10                Objection, form.

11            THE WITNESS:

12                I'm not sure of anything after that.

13                You know, I don't want to -- there is

14                some training with it, but I don't know

15                if it happened after Burmaster or if it

16                was just general training.  I would

17                have to double-check that.

18    BY MR. ANADA:

19        Q.    Maybe there was some additional training.

20    Maybe it was before or after Burmaster shot this

21    dog.  Other than that, to your knowledge, you don't

22    know of any additional measures that NOPD took to

23    make dog shootings less likely to occur after April

24    2021, right?

25            MR. ROQUEMORE:

96

```
 1              Objection, form.
 2         THE WITNESS:
 3              I'm not sure.
 4  BY MR. ANADA:
 5     Q.   You can't name any for the jury right
 6  now, right?
 7     A.   No.  I couldn't, no.
 8     Q.   You could not, right?
 9     A.   Any training that took place after
10  Burmaster's incident?
11     Q.   I'm not talking about training.  I didn't
12  say training.  Let me repeat it so it's very clear
13  for the transcript.  You cannot identify, other
14  than putting aside some potential training that you
15  mentioned to me, other than that potential
16  training, you cannot identify to the jury right
17  now, under oath, any measures that NOPD took after
18  Burmaster shot Apollo to make dog shootings less
19  likely to occur, correct?
20         MR. ROQUEMORE:
21              Objection, form.
22         THE WITNESS:
23              I'm sorry.  Word it one more time.
24  BY MR. ANADA:
25     Q.   Can you identify any measures that NOPD
```

97

1    took --

2         A.    Measures.   Okay.

3         Q.    Yes.   Let me ask it again. I know it's

4    kind of a complicated question.   Can you identify

5    any measures that NOPD took after Burmaster shot

6    Apollo to make dog shootings less likely to occur?

7              MR. ROQUEMORE:

8                   Objection, form.

9              THE WITNESS:

10                  I cannot.   That would have been

11              under the prior administration, so I'm

12              not sure if something, you know, took

13              place that I'm unaware of.

14   BY MR. ANADA:

15        Q.    Is there anything that you've testified

16   to today -- you've testified -- so you can't name

17   any measures that NOPD took to make dog shootings

18   less likely to occur.   That's what you just stated.

19   If somebody took something that you said today and

20   said that Lubrano said that X was something that

21   NOPD did after Burmaster shot Apollo to make dog

22   shootings less likely to occur, that would be

23   misleading, right?

24        A.    Not if they had knowledge of it.

25        Q.    Should anything that you've said today --

1   do you mean to communicate any of your testimony

2   today to mean identifying a measure that NOPD took

3   to make dog shootings less likely to occur after

4   Burmaster shot Apollo?

5           MR. ROQUEMORE:

6               Objection, form.

7           THE WITNESS:

8               Could you reword it? I think I've

9             answered it already.

10  BY MR. ANADA:

11      Q.   You've not identified anything today,

12  during your deposition, that NOPD did to make dog

13  shootings less likely to occur after this Burmaster

14  incident, correct?

15          MR. ROQUEMORE:

16              Objection, form.

17          THE WITNESS:

18              I did not identify anything.

19          MR. ANADA:

20              Thank you.  That's all I have.

21          MR. ROQUEMORE:

22              All right.  We're done.

23          MR. ANADA:

24              I really appreciate your time.

25              [End of deposition, 2:15]

99

1              C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4  and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6  as the officer before whom this testimony was
taken, do hereby certify that DEPUTY SUPERINTENDENT
7  RYAN LUBRANO, after having been duly sworn by me
upon authority of R.S. 37:2554, did testify as
8  hereinbefore set forth in the foregoing 98 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12             That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16             That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20                                    

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  5/20/25

24

25

**A**

**ability** 22:16
  99:11
**able** 14:6 17:9,19
  20:18,21 21:11
  31:4 33:12
  34:12,20 60:16
  63:12,17 80:9
  83:22
**above-entitled**
  1:16
**Absolutely** 42:18
**academy** 10:20
  11:4,10 13:11
  16:7,18 18:9,10
  18:20,21 21:14
  85:2,3,8
**accompanied**
  99:3
**account** 29:8
  30:5
**accurate** 84:4
**accurately** 17:20
  73:24
**acted** 99:13
**ACTION** 1:4
**actions** 50:23,24
  51:12 68:19
  87:1 88:14
**actual** 26:4 44:20
  55:21 90:7
**added** 72:22
**addition** 90:12
**additional** 89:24
  95:19,22
**address** 5:12
**administering**
  4:22
**administration**
  97:11
**advise** 75:4
**advisory** 99:15
**affect** 22:11,16
**afraid** 66:18
  67:11
**age** 72:11,16
**aggressive** 12:7
**ago** 11:4 46:4
**agree** 12:25 47:4

63:11 67:16,20
68:3 80:13
81:21 83:11,12
90:21,22
**agreed** 4:3 46:23
  50:23
**ahead** 25:3 30:25
  54:11 85:14
  87:17,24 88:7
  90:5
**alert** 45:2
**alerts** 45:2
**all-around** 11:9
**allowed** 32:25
  33:4,7 74:6,10
**alternate** 82:18
**alternative** 81:17
**Anada** 2:4 3:4
  5:5,19 11:25
  12:12 18:11,17
  22:8 23:18 24:2
  24:9,14,23 25:4
  25:13,19 26:16
  26:21 27:23
  28:23 33:21
  35:7 36:12 37:5
  37:24 38:22
  40:4,14 46:18
  48:7 49:11,14
  49:22 50:13,25
  51:13 52:8
  54:10 57:11
  58:24 59:6 60:7
  61:6,15 67:3,9
  68:2 76:7,14,19
  77:3,12 78:13
  79:2 80:18 81:2
  81:9 82:5,11
  83:4 84:1,11,20
  85:13,21 86:14
  87:16,23 88:6
  88:22 90:4,16
  91:5,18 92:3,14
  92:23 93:4,11
  93:25 94:13,19
  95:1,18 96:4,24
  97:14 98:10,19
  98:23
**analysis** 52:11,23

53:6 56:5 69:18
  70:13
**and-** 2:4
**animal** 36:24
  54:25 58:5,10
  62:18 63:3
**animals** 58:3,4
**answer** 4:16
  11:24 12:15,17
  20:18,21 22:9
  22:11,12,13
  27:17,24 28:19
  34:4,6 45:21
  49:15,18 50:11
  52:7 53:24
  61:23
**answered** 8:1
  25:18 51:7 98:9
**answering** 41:25
**answers** 84:3,7
  84:14
**anymore** 11:7
**Apollo** 28:8
  29:18,21 91:16
  92:1 95:8 96:18
  97:6,21 98:4
**apologize** 18:18
  24:16
**APPEARANC...**
  2:1
**appears** 81:13
  82:2
**appreciate** 6:2
  98:24
**approach** 41:8
**approached** 73:5
  73:7
**approaching**
  71:24 72:6
  73:11 79:18
**appropriate**
  27:11,19 28:17
  38:19 60:10,13
  60:19 74:2,12
**April** 9:22 15:13
  28:8 95:23
**area** 81:16
**areas** 21:8 85:25
**armor** 19:25,25

**arrived** 52:9
  71:19
**arriving** 71:23
**Article** 99:14
**ASI** 44:5
**aside** 24:4 96:14
**asked** 18:22
  19:17 37:13
  51:6,17 58:15
  84:13 85:2
  90:19,20 91:13
**asking** 37:9 55:10
  55:13 70:25
  74:13
**asks** 84:6,12
**ASP** 18:5 19:14
  19:15,16,17,18
  19:19
**aspects** 13:11
**assess** 63:18
**assistant** 41:13
  41:21
**assume** 7:20 17:4
**Assuming** 21:20
**attack** 54:22
  79:19 91:23
**attacked** 37:16
  38:9 55:2 60:22
  62:18 64:19,23
  72:8 91:1
**attacking** 58:9
  63:3 70:3,16
  71:6
**attempt** 12:25
**attempting** 16:1
**attorney** 1:20 2:4
  2:5,10,11 83:23
**audio** 76:8
**authority** 99:7
**available** 13:1
  81:18 82:19,21
  82:25 93:2
**Avenue** 2:6
**average** 13:15
  14:11
**aware** 46:1 65:20

**B**

**B** 3:7
**back** 11:5 15:10

20:9 36:21
42:20,25 46:1
54:18 75:20
79:4 80:10
90:19
**BARECKI-BR...**
  1:5
**barking** 61:21
  72:7,20,23 73:2
  73:3,4,8,12,13
**base** 29:20 30:2
  93:1
**based** 11:17 12:5
  17:18 27:7,14
  28:1 38:18
  58:10,11,16
  59:19 63:8 68:1
  74:3,13
**basically** 50:22
  86:24
**bathroom** 8:2
**baton** 11:8,19
  17:22,23,24
  18:1,3,5,7,19
  18:23 19:1,6,8
  19:11,20 20:13
  20:18,19 21:3
  53:4 56:4,6,8
  56:10,13,15,19
  62:12 63:2
  69:21 70:2
**battery** 14:25
**belief** 37:21 91:8
  91:9,14,15,25
  92:12,21 94:12
**beliefs** 38:18 53:1
  93:24
**believe** 9:9,11
  10:2 25:20
  31:22 38:14
  45:1 54:24
  69:22 72:25
  73:1,2,13 77:15
  77:22 92:6
**believed** 38:8,10
  38:16 39:5,7,9
  39:9,16,23 40:9
  92:6 94:8
**believes** 37:16

39:20 40:6
90:24
**believing** 72:7,8
**bell** 83:18
**best** 16:14 42:21
74:24 83:1
99:10
**better** 21:17
31:17 45:21
49:19 55:19
56:2 88:16
**big** 20:12 59:15
**bigger** 71:16
**biggest** 15:19
**bit** 7:3 13:4,21
14:15 15:7
17:24 18:2
20:11 30:15
46:22 61:25
66:25 71:13
73:16 74:13
**bite** 63:22 64:2
64:11 65:16
67:14
**bites** 73:21
**bitten** 64:24 65:6
65:13 66:12,18
67:11 68:8,10
73:18,20 75:8
75:12
**black** 20:8,12
**blocking** 18:8
19:3,12
**blocks** 18:24
**blue** 20:7
**board** 44:5 86:15
86:19,22,23,24
87:5,12,14,22
88:4 89:6 92:10
93:23 99:13,15
**Boards** 86:5
**bodily** 29:5 35:22
36:25 60:23
81:14 82:3
**body** 8:14 16:13
19:24,25 65:6
67:2 68:8 79:4
79:24
**body-worn** 90:1

90:3,7,12
**bodycam** 8:10,19
8:19
**brand** 15:10
**break** 7:23,25 8:2
**breeds** 71:14
**Brewer** 76:20,21
76:24,25 78:6
78:18
**BRIEF** 76:18
83:25 94:23
**briefly** 10:8
**bring** 33:11
34:16
**brought** 34:10
89:24
**Brown** 1:4 5:19
**bullet** 32:11,13
48:19 51:19
69:9
**Bulletproof** 20:1
**Bureau** 5:10
32:15,19 33:7
33:13,25 34:22
**Burmaster** 1:8
2:8 8:24 9:4
28:7,13 31:5,12
31:18,19,22
32:1,16,20 33:6
33:14,17,24
34:10 36:23,25
38:8,16 39:8
40:8 44:1,8,23
46:1,5,8 47:7
48:11,25 50:5
50:15 54:5 56:5
59:16 60:25
61:8 63:12
64:10 65:1,11
65:17 66:7,9,11
67:5,5,12,17,21
68:11,14,18
69:12,24 70:22
71:24 72:20
73:7,12,17,19
74:20 75:11
80:15,23 85:18
90:14 91:14
95:8,15,20

96:18 97:5,21
98:4,13
**Burmaster's** 8:19
8:20 27:10
29:18,21 33:23
34:8 53:1 68:10
78:7 79:7,11,13
85:10 91:15
92:12,20 93:24
94:12 96:10
**BWC** 36:3 52:19
59:19,20 73:14
79:14 80:2,6,7
80:8
**BWCs** 36:3

## C

**C** 56:23,24 99:1,1
**call** 5:18,21 14:22
30:8,17 43:1,6
**called** 8:8 10:20
27:3 29:7 86:6
**calling** 28:21
84:25
**calls** 30:10 31:2
41:15,20,25
42:22 91:19
**camera** 8:15 79:4
79:24 90:2,3,7
90:12
**captain** 9:25
78:17,21
**car** 43:9
**career** 41:17 42:2
**carry** 19:22
**case** 5:20 6:5,7
8:8 9:10,13
21:2,20 25:24
26:4 27:2,19
32:20 44:3,13
44:18 49:8,10
54:18 58:21
59:1 64:4 66:1
66:3 77:15,22
85:11,19
**cases** 65:3,16
68:5
**cause** 1:16
**caused** 60:22
**certain** 11:20

15:22 17:5,10
20:20 29:2,10
65:6 67:1
**certification** 4:12
99:3
**Certified** 1:18
2:17 4:20 99:5
99:22
**certify** 99:6
**CEW** 56:21 58:2
58:5
**change** 25:14
31:11
**changed** 23:2
**Chapter** 57:4
**charges** 51:10,21
**Charles** 2:6
**chasing** 59:15
**chief** 5:14,15 6:8
6:10 8:13,17
14:1 44:3,17
84:24,25
**chief's** 27:15 28:2
28:6 29:5 32:24
33:3,17 34:15
34:21,25 35:1
39:4 46:8 76:1
86:5
**chiefs** 7:7 10:1
**choice** 62:25
**circled** 35:13
**circuit** 16:15
**circumstances**
92:13,21
**CIT** 14:6
**citizen** 6:1
**City** 1:9,20 2:9
2:10
**Civil** 1:4 4:7
99:14
**claims** 49:2 50:5
**clarifies** 36:16
**clarifying** 37:9
**clear** 96:12
**clearly** 38:5
**client's** 28:8
**close** 16:23 31:13
56:17 59:10
60:11 63:3,7

**closely** 65:4
**closer** 16:11 31:3
**closest** 64:21
**Code** 99:14
**colleague** 5:20
94:21
**collect** 33:12
**come** 7:16 15:4
28:16 32:25
33:4 35:23 42:4
43:17 72:3
75:12,20 87:13
**comes** 83:2,13
**comfortable** 5:17
**coming** 39:10,17
42:9 59:12
62:12 70:3,20
72:18
**commander**
41:13,21 85:8
**commencing**
1:22
**commenting**
37:20
**communicate**
47:20 48:24
98:1
**communication**
12:15
**community** 41:3
41:14,22 42:2
**compact** 19:8
**compared** 31:25
70:16
**complaints** 7:7
9:3
**compliance** 99:12
99:13
**complicated** 97:4
**complied** 85:18
**concepts** 13:6
16:19
**concern** 64:2
67:5,17,21
**concerned** 18:5
65:18 66:11
67:18,25
**conclude** 48:10
**concluded** 32:15

34:21,22 48:14
**conclusion** 58:6
**conclusions**
34:25 35:1,2,12
59:11,13 69:10
70:7,20,22
71:20,23 72:3
72:10,14,18
**concurred** 78:6
78:18
**Conducted** 56:23
57:2,5
**confusing** 7:15
7:17
**connection** 60:18
**connections** 63:5
**consider** 21:14
28:4 60:25 61:8
62:9 74:22 75:1
75:5,8
**consideration**
61:18
**considered** 31:1
62:6,17 93:22
94:11
**considering**
53:24
**consistent** 39:2
90:22
**constantly** 54:19
**consult** 94:20
**contact** 43:12
53:18 55:12,16
56:14
**contain** 33:23,23
**contained** 33:18
34:25
**continuum** 11:13
13:5,13,19
**contractual**
99:14
**controlled** 16:8
54:16 56:22
**conversation**
7:11 75:19
**copies** 25:15 32:6
**copy** 24:22
**correct** 12:9 32:8
38:3 48:13

55:18 70:23
71:24 75:3
90:15 96:19
98:14 99:10
**corrected** 23:2
**correctly** 16:24
**counsel** 4:4 23:10
99:16
**couple** 6:22 23:5
36:22 89:15
**course** 29:12
83:15,15
**Court** 1:1 99:5
**cover** 8:7 22:23
32:8 39:4
**credibility** 78:15
78:22
**credible** 77:9,9
**criticism** 78:15
**criticize** 78:21
**criticizing** 37:11
**crotch** 65:18 66:8
66:12 67:11
68:10
**curious** 23:20
**current** 55:9
**currently** 9:16

———————
**D**
**D** 3:1,7
**damage** 71:15
**danger** 29:4,21
37:19 56:17
63:7 90:25
**dangerous** 30:10
30:13 58:3
**Date** 99:23
**David** 85:4,24
**day** 1:21 45:13
**dealing** 41:22
42:24 51:21
54:17 62:14
**death** 81:14 82:4
**decade** 41:18
**decades** 10:18
**deciding** 74:7
**decision** 30:2
61:22 63:12,15
78:20
**decisions** 52:9

74:18 87:13,21
88:5
**deescalate** 14:6
**defendants** 27:2
**defensive** 11:1
13:17,21,24
14:5 21:3
**defer** 21:15 85:11
86:7
**defined** 99:14
**definitely** 31:17
31:23 55:2
79:10
**deliberate** 75:18
**department** 5:9
6:1 21:9
**department's**
87:1
**deposition** 1:15
4:5,17 6:18 7:5
7:8,11 8:4
22:16,20 23:8
98:12,25
**depositions** 7:3
**depth** 69:16
**deputy** 1:15 4:5
5:1,8,12 7:7
9:16 10:1 14:1
44:3,17 47:4,5
48:9 99:6
**DEREK** 1:4
**derived** 86:15
**DERRICK** 1:8
2:8
**describe** 11:12
**designated** 58:20
58:25
**detailed** 17:8
**Detective** 76:20
76:23,24 78:6
**determination**
40:7 92:11
**determine** 63:18
86:25 87:8
**determined**
29:17
**determining**
74:11 91:8
93:23 94:11

**DI-1** 23:23
**DiFebbo** 1:18
2:16 4:20 99:5
99:21
**difference** 7:12
87:4
**different** 13:18
14:2,19,24 18:8
18:9,24 26:9
41:1,9,21 49:23
55:5 62:14
70:15,19 71:13
71:14 79:15
80:6,11 81:3
83:3 84:7 87:10
**difficult** 10:9
**direct** 43:2
**direction** 99:10
**directly** 9:2 42:10
**disagree** 35:14,18
35:24 37:7,10
57:15,16,19
58:7 68:4
**disagreed** 37:14
**disagreeing** 36:8
**disagreements**
57:24
**discharges** 45:4
**disciplinary** 6:11
87:5 88:10 89:4
**discipline** 77:20
77:24 87:7 89:7
**discuss** 21:11
52:22
**discussed** 52:16
52:21 70:2,14
72:17
**discusses** 35:21
**discussion** 24:13
52:24 53:1,2
**discussions** 53:8
**disposition** 39:8
94:9
**dispositions** 39:6
**disrupt** 12:14
**distance** 15:22
16:7 32:3
**District** 1:1,2
9:25

**districts** 9:18
**DIVISION** 1:7
**document** 23:9
24:4,5,7,15,19
25:22 26:10,14
26:23 32:5,7,9
48:22 49:25
52:25 53:2 79:3
81:21 86:17
**documents** 22:22
22:25 23:3
35:10 86:14
90:10
**dog** 18:13 28:8
37:17 38:9
39:16,23 40:6
42:13,16 43:2,2
43:4,7,10,14
44:6,11,14,23
45:3,7,10 53:5
53:13,14,21
54:18,19,22
55:6,14 56:9
58:13 59:12,15
59:20,21 60:2
60:20 62:12,15
63:22 64:2,11
64:21,25 65:3
65:14,16,19
66:5,6,10,13
67:14 68:15
69:23,25 70:1,3
70:8,12,16,17
70:22,24 71:4,6
71:8,10,12,24
72:3,7,11,19
73:7,11,21 78:7
79:12,18 80:1,3
80:22 81:13,16
81:17,18 82:1
82:18 83:10,14
85:19 90:24,25
91:16,22 92:1,6
95:7,21,23
96:18 97:6,17
97:21 98:3,12
**dog's** 68:19
**dogs** 27:11 42:4,7
42:23,23,25

43:16,23 44:1
45:24 46:6,12
54:15 61:21
66:18 67:11
71:15,16 72:23
72:24 73:3,18
73:20 74:14
75:8,12
**doing** 41:4,5
**domestic** 30:7,9
30:12,17 31:2
**door** 42:11
**double-check**
95:17
**draw** 14:20 74:7
74:10
**drills** 13:12
**driving** 11:5
**duly** 5:3 99:7
**Duplantier** 85:4
**Duplantier's**
85:24
**duty** 42:14,17
43:5,14,18
46:13 66:19

_____

**E**

**E** 3:1,1,7,7 99:1,1
**earlier** 32:20
55:20 73:16
74:1
**EASTERN** 1:2
**easy** 36:2
**effective** 16:11,12
17:10 20:20
52:12 53:4 54:4
54:13,15 55:6,7
55:15 56:11,16
58:2 62:13,19
62:21,22 63:6
69:24 71:4
79:21
**effectively** 56:6,8
**effectiveness**
21:18,22 22:3
**effects** 88:4
**eight** 9:18
**either** 9:24 16:12
20:9 23:7 62:13
62:19 72:13

**ELDON** 1:8
**electrical** 16:15
55:9 56:23
**elevated** 17:3
**encounter** 30:10
36:5 42:7
**ended** 77:19
**Energy** 57:2,5
**enforcement**
11:10 13:10,11
**ensure** 81:15
**entire** 30:12
**entirety** 26:10,24
**environment**
16:8
**equally** 69:24
**equation** 39:24
**escape** 31:5,14,18
**escapes** 31:15
**establish** 25:7
53:5
**evaluation** 85:10
92:19
**evidence** 4:18
**exact** 24:7 36:20
59:17
**exactly** 36:13
86:10
**EXAMINATI...**
5:5 84:23
**examined** 5:4
**example** 10:19
16:3 44:21
**excerpt** 37:8
65:24
**exhibit** 3:11,12
3:13,14 23:11
25:23 26:2 39:1
52:10 66:5
68:21 69:4
70:21 72:19
73:15
**exhibits** 23:5
33:18,22
**exit** 60:10,11
**exonerate** 51:15
**exonerated** 47:12
47:14,18,22,24
48:18 49:1 50:1

50:4,17 51:4,18
51:20,23 52:3
71:21,21,21
**exonerating**
51:10
**expandable** 18:3
18:5 19:1,2,5,8
19:16,19 20:14
56:8
**expect** 13:14
16:20 17:19
20:21 21:21
**experience** 58:11
82:23 83:2,5
85:25 86:3
**experienced** 86:4
**experiences** 74:7
74:11 75:8
91:12
**expert** 21:2,3,5
21:12,14 58:20
58:25 59:7 62:1
86:7
**expertise** 55:21
**explain** 21:22
86:2 87:21 88:3
**explained** 51:9
93:9
**express** 65:1,2,13
**expressed** 64:10
65:5
**expressing** 63:22
64:2
**extra** 24:22

_____

**F**

**F** 99:1
**faces** 63:14
**facing** 20:15
**fact** 21:2
**factor** 59:11
70:10,22 72:2
74:6
**factored** 70:12
71:23 72:5,9,13
72:20,22
**facts** 39:5,7 52:25
89:17,18,20,20
89:22 93:1,2,9
93:21,22 94:8

94:10
**fair** 6:18 7:21
13:2 14:13
17:22 59:10
67:4,4
**fall** 17:4
**FALLON** 1:8
**familiar** 6:12
13:7,10 18:1
23:21 46:7 57:8
57:13 83:16
85:3,24 86:18
86:21
**familiarizing**
14:18 15:2
**family** 5:19 13:9
**far** 15:21 16:22
31:16,25
**farther** 15:23
16:10
**fast** 39:10,17
53:15 54:25
61:19 62:6
**fast-** 62:17
**fatally** 66:10
**favor** 7:16
**FBI** 26:4 90:7
**fear** 35:21 36:19
36:23 37:18
63:22 64:10,17
64:19,22,24,25
65:6,13 66:17
68:10 91:22
**feared** 68:8
**fearing** 29:4
**Federal** 4:6
**feel** 5:16 24:20
85:16 91:12
**felt** 29:14 33:5
35:22 36:1,19
42:16 43:4
51:11 56:9
60:21 79:19
**fence** 17:2,3 31:9
**FERGUSON** 1:9
2:8
**Field** 5:9 9:17
**filed** 7:7
**filing** 4:12

**find** 6:5 77:8,9,14
86:8
**finding** 50:21
**fine** 5:23 85:1
**finish** 22:12
30:25
**firearm** 45:5
**Firearms** 11:5
**fired** 36:23 66:9
**first** 5:3 22:23
23:9 26:17 36:4
48:15,18 51:19
56:13 62:24
64:14 89:16
**firsthand** 53:23
**five** 22:22,25
23:3 32:11 47:6
47:9 53:16 76:9
**flailing** 54:20
**flawed** 57:22
**flee** 31:4
**follow-up** 95:2
**following** 1:17
39:5 89:17
93:21 94:8
**follows** 5:4
**foot** 53:16 79:23
**footage** 80:2,6,7
80:8
**force** 6:24 7:1
11:13,16,22
12:9,21,22 13:1
13:2,5,13,19
21:4 27:10,18
30:16,20 33:7
38:11,18 40:20
41:7 44:4,5
51:21 52:12
58:4 61:9,9
63:13,19 74:2
74:12,19,19
80:19 85:10,25
86:5,15,17,18
86:22,23,24,25
87:5,8,12,14,22
88:4,11 89:6
**forces** 11:19
**foregoing** 99:8
**forget** 75:23

**forgetting** 11:9
**forgive** 11:12
  24:10
**forgot** 8:8 16:4
  19:15 83:22
**form** 4:15 8:8
  11:24 12:2,11
  12:14,17 22:7
  27:22 28:19
  33:20 35:4
  36:11 37:4,23
  38:21 40:1,11
  46:15 48:4 49:5
  50:9,19 51:6
  52:5 54:7 58:23
  59:3 60:4 61:3
  66:21 67:8,23
  77:2,11 78:10
  78:24 80:17
  81:1,6,24 82:14
  84:10,17 85:14
  85:22 87:17,24
  88:7,23 90:5,17
  91:6,19 92:4,15
  92:24 93:5,12
  94:1,14 95:10
  96:1,21 97:8
  98:6,16
**formalities** 4:9,11
**format** 99:12
**forms** 52:11
**forth** 80:10 99:8
**found** 6:7 51:20
**four** 23:3
**free** 24:20
**front** 24:5 33:11
**further** 16:9
  31:19,20,23
**future** 95:7

———————
        **G**
———————
**GA-THEE-YAY**
  46:24
**GAN-THEE-Y...**
  46:25 47:1
**Ganthier** 47:5
**gas** 62:2
**gate** 31:4,6,7,13
  31:20,20,24
  60:12,16,18

**general** 12:3,24
  89:15 95:16
**generally** 18:22
  57:21
**genitals** 63:23
  64:3,12,25
  65:13 66:18
**getting** 48:1 55:2
  59:10
**give** 10:10 17:9
  17:17,19 22:16
  23:9 27:3,6,9
  27:18,20 29:7
  30:13 33:1 34:4
  36:4,21 42:21
  44:25 45:20
  54:22 56:2,22
  58:16 74:24
  75:4 76:4,9
  83:20 84:14
  88:15 94:20
**given** 1:16 6:18
  10:11 11:20
  12:23 20:17
  21:9 33:9 60:17
  62:10
**gives** 21:10 30:19
**giving** 12:3 84:7
**go** 11:18 24:25
  25:3,15 30:25
  36:2 54:11 55:8
  58:14 62:23
  69:15 85:14
  87:17,24 88:7
  89:1,14 90:5
**goes** 65:25 89:17
**going** 7:13 12:1
  12:13 15:10
  16:15 17:4,6
  23:4,5,6,10,16
  24:8,15 25:5,11
  26:15 29:14
  32:5 35:22
  41:20 42:20
  49:6 58:1,15
  60:21,22 63:2
  64:11 72:8
  73:16,20 74:18
  79:3,19 83:21

  89:12 91:23
**good** 14:25 16:13
  70:6 81:22
  82:23
**gotcha** 7:10,10
  17:7,7 20:4
  37:1
**grabbed** 66:7
**grabbing** 43:9
**grave** 29:4
**great** 29:5 35:22
  60:23 76:8 95:6
**greater** 58:4
**green** 24:16
**ground** 60:9
**guess** 24:17 27:7
  28:22 37:6
  43:16,19 72:21
  75:21 86:14
**guideline** 12:19
**guidelines** 74:25
  87:2,3,10 99:13
**gun** 11:19 15:5
  53:12
**guy** 21:13 53:16
**guys** 18:12 24:24

———————
        **H**
———————
**H** 3:7
**half** 10:4 41:11
  41:16 42:2
  44:17,19 64:9
**hand** 23:5 66:8
  79:3
**handcuffing** 11:1
**handful** 65:16
  67:14 68:5
**handle** 18:7 19:2
  19:6
**handled** 77:16
  89:10
**hands** 11:18
**happen** 45:12
**happened** 44:20
  61:19 62:5
  95:15
**happy** 7:19
**hard** 62:1
**harm** 29:5 35:22
  60:23 81:14

  82:3 92:2,7
**hear** 34:21 44:10
  44:12
**heard** 6:9 9:3,12
  18:2 45:23
  49:15 63:21,24
  64:1,15 65:1,12
  67:10 68:9
**hearing** 6:8,10
  8:13,17 25:25
  26:3 27:15 28:2
  28:6 29:6,13
  32:25 33:3,10
  33:17 34:16,21
  35:1,2 39:4
  46:9 53:9 69:3
  69:16 75:17
  88:10 89:16
  93:3
**hearings** 29:6
  34:2 35:1 86:6
**held** 47:25
**Helou** 78:2,18
**Helou's** 78:15
**help** 18:4 36:13
  37:11 49:13
  62:4
**hereinbefore**
  99:8
**hereto** 4:4
**hey** 7:17
**highlighted**
  35:16 36:18
**highly-** 21:24
**highly-speciali...**
  21:7
**hit** 18:12 68:22
  69:9
**holding** 14:20
**homes** 41:4
**homicide** 9:25
**HON** 1:8,9
**hopefully** 43:11
**hospital** 73:21
**huge** 50:7
**humane** 58:6
**hypothetically**
  31:12

———————
        **I**
———————

**idea** 88:16
**identified** 88:19
  98:11
**identify** 96:13,16
  96:25 97:4
  98:18
**identifying** 98:2
**ignore** 24:17
**immediate** 30:20
  31:5 56:14
**imminent** 36:24
  37:18 81:14
  82:3 90:25 92:1
  92:7
**imminently** 38:9
**important** 29:16
**improve** 87:15
**incident** 8:25 9:5
  28:11,14 44:20
  52:14 58:7
  65:24 72:6
  96:10 98:14
**incomplete** 77:21
  77:23
**incorrect** 72:1
**increase** 11:17,20
  12:5,8
**incredibly** 35:10
**independently**
  39:23
**indulging** 62:5
**ineffective** 54:24
**informal** 5:21
**information**
  33:13,15,16,24
  68:25 69:21
  72:15 89:24
**initial** 8:9
**initiating** 77:20
**injurious** 58:4
**injury** 36:25
**insight** 33:1
**instance** 54:23
**instances** 86:9
**Integrity** 32:15
  32:19 33:7,13
  33:25 34:22
**interacting** 41:3
**interaction** 43:2

**interested** 99:17
**interpret** 49:25
  50:2 51:1
**interpreted** 50:6
  50:14
**interrupted**
  30:24
**INTERRUPTI...**
  18:16
**interviewed**
  28:13 75:11,15
**investigation**
  26:5,6 33:8
  64:13 77:21,23
  89:23 90:8
**investigations**
  67:15
**investigator**
  35:20
**investigator's**
  36:7 37:15
**involved** 45:12
  65:4
**involvement** 9:10
  9:13
**involving** 6:24,25
**irrelevant** 40:7
  60:2
**issue** 49:10 77:17
  77:18 86:11
  89:1
**issued** 77:24
**issues** 88:16,19
  88:20 89:7

---

**J**
**jab** 19:4
**jabs** 18:25 19:13
**JAMES** 2:10
**James.Roquem...**
  2:13
**January** 10:1
**Jim** 24:10 26:17
**job** 52:13
**John** 78:2,5,15
**JONES** 2:3
**judge** 38:15
**JULIA** 1:4
**jumped** 31:8,8
  62:7

**jumping** 43:9
**jury** 21:20,24
  22:2 26:9,22
  34:19,20,24
  38:15 46:10
  48:22 49:24
  50:6 53:10,11
  54:3 58:16
  69:17,22 70:21
  71:22 73:6,10
  79:25 96:5,16
**justified** 38:10
  39:5,7 94:9

---

**K**
**KAREN** 1:9
**keep** 53:21
**kicked** 70:24
**kicking** 53:4
  69:23 70:1 71:4
**kidding** 16:5
**kill** 90:24
**kind** 16:8 18:4
  22:15 39:11
  52:18 70:4
  75:19 97:4
**Kirkpatrick** 47:6
**knew** 31:15 65:20
  86:4
**knob** 18:7 19:7,7
**knock** 41:4 42:11
**know** 6:9 7:8,24
  8:21 10:8,18,19
  11:2,9,20 12:6
  14:3,8,23 15:20
  17:4 20:5,9
  21:1,14 24:3,18
  25:24 26:1 29:3
  29:9,10,15 30:6
  30:8,22 31:3,6
  33:1 34:16
  35:14,24 36:2
  36:16 37:17,25
  40:20,21 41:8
  41:19,20 42:6
  42:10,11,23
  43:8,11,12,25
  44:22 45:5,12
  45:14 46:19,20
  52:19 53:3,15

53:16,22 55:11
55:19 56:6,18
57:22 59:8,18
59:21,23,25
60:22 62:11,13
62:19,21 64:20
64:20 65:7,17
66:23 68:6,7,25
69:1,20 70:3,5
70:16 71:14,15
71:18 72:6,7,11
76:20 78:3,4
79:20 80:8
83:13,13,14
86:6 88:15 89:1
95:13,14,22
97:3,12
**knowledge** 17:18
  46:11 58:17
  95:21 97:24
**knowledgeable**
  86:9

---

**L**
**L** 1:6 4:1 93:14
**L1** 3:11 24:15
  25:20 26:10
  34:23
**L2** 3:12 26:14,15
  26:23 34:23
  35:11 66:5
  73:15
**L3** 3:13 32:5
  34:25 39:1,3
  48:8 52:10
  59:11 68:14,21
  71:20 72:19
  89:13
**L4** 3:14 81:10
**large** 42:25 73:19
**latched** 62:15
  70:17
**late** 56:15
**law** 2:4,5,11 4:8
  11:3,9 13:10,11
  62:3
**lawsuits** 6:23
**lawyers** 7:14
**lay** 10:12 11:12
  13:8,15 14:11

16:20 17:19
20:21 21:16
22:4 55:11 62:2
**Leading** 87:17,24
  90:5,17 91:6
  93:5,12 94:1,14
**learn** 11:3 18:24
  32:24
**learned** 13:6
  15:16 16:16
  28:5 89:17,21
  89:23
**leery** 53:14
**left** 31:23 66:8
**leg** 16:14 67:1
**legal** 11:2 49:8,9
**legally** 47:25
  48:25
**lengths** 63:5
**let's** 17:22 25:3
  31:12 34:20
  49:23,24 56:7
  84:12
**lethal** 11:22 12:9
  12:22 13:1,2
  27:10,18 30:15
  30:20 38:10,18
  61:9 62:7 63:13
  63:18 74:2,18
  80:19
**letter** 8:7 22:24
  22:24 32:8 39:4
  89:13 93:10
**level** 74:12
**levels** 11:16,19
  12:4,5,8
**liability** 49:8
**liable** 47:25
  48:25 50:5
**lieutenant** 9:24
  41:13 78:4
**light** 19:10 20:7
**limb** 70:4
**line** 36:4 42:13
  42:17 43:5,14
  43:18 46:13
  66:19 89:16
**listed** 27:1 38:6
  48:17 59:11

71:20
**listen** 34:2
**listened** 90:13
**literally** 62:2
**little** 7:2 13:4,18
  13:21 14:15
  15:7 17:24 18:2
  20:11 30:15
  46:22 61:25
  65:24 71:12
  73:16
**live** 14:22
**living** 62:3
**long** 10:3,5 11:4
  35:10 38:7,9
  40:15 41:5,18
  86:10,11
**look** 23:19 26:17
  30:9,22,22 35:6
  35:8,11 57:8,10
  76:10 83:16
  89:13
**looked** 73:15
  79:10 88:9 90:1
**looking** 36:3
  38:14 48:8
  49:25 79:14
**loop** 24:11
**loose** 30:15
**lot** 13:25 14:7
  15:1 16:25 30:5
  35:13 57:18
  69:21 86:6
**Louisiana** 1:2,19
  1:21 2:6,12,17
  4:21 5:3 99:5
  99:14
**Lubrano** 1:16 4:5
  5:1,8,12,13,14
  5:15 24:16 50:3
  97:20 99:7

---

**M**
**M** 2:5 3:1
**major** 88:11
**making** 7:14
  12:16 15:24
  53:17 63:4
**Mandarin** 62:4
**Manual** 57:4

mark 23:4 24:8
  24:15 26:14
  32:5 81:10
marked 89:13
materials 8:3
  22:19
matter 7:3 38:13
  38:15 39:22
  40:5 71:10
  99:17
matters 39:19
mean 27:25,25
  28:4,5 29:2
  34:1 43:1 47:20
  47:24 51:9,14
  51:18,23 52:20
  55:7 59:14 60:8
  67:25 72:22
  83:1 85:16
  89:22 98:1,2
meaning 48:18
  50:2 72:1
means 25:5 43:11
  47:14,24 48:25
  50:4 81:17
  82:18
meant 51:25
measure 98:2
measures 53:3
  95:7,22 96:17
  96:25 97:2,5,17
medications
  22:15
member 5:25
  46:12 49:24
  86:25
mention 52:10,17
  69:6,7
mentioned 36:22
  64:20 90:1
  96:15
message 45:2
met 8:24 9:1,8
  77:6
middle 39:11
mind 13:14 18:20
  25:14 53:21
  60:19,25 61:7
  62:5 64:18 81:4

84:24
minute 76:10
misheard 43:3
misinterpretati...
  50:7
misinterpreting
  50:16 51:3 52:2
misleading 97:23
missing 90:8
Misstates 40:11
mitigate 69:25
modes 18:10
moment 80:12
  91:12 94:20
Monday 36:2
  80:10
morning 14:25
  36:2 80:10
motion 66:6
mouth 34:7 38:4
move 17:22
movements 19:4
moving 53:15
  54:20,22,25
  55:6,14 58:12
  62:16,18 70:18
multiple 10:18
  45:24 46:6

——————
N
N 3:1,1,1,7 4:1
  47:2
name 5:6,18 46:5
  46:24 96:5
  97:16
narcotics 40:20
  42:10
necessarily 36:8
need 55:8,16 58:3
needs 86:8
neither 60:24
  61:7
never 9:1 40:23
  40:24,25 42:9
  43:1,2,22 55:11
  64:7 65:12
  67:10 68:9
new 1:10,20 2:6,9
  2:12 5:2,8 6:1,2
  14:17 15:9,10

nighttime 30:6
  31:3
nine 53:16
nola.com 6:6
non- 12:25
non-lethal 12:21
  52:11 53:3 61:1
  61:8 62:7,9,19
  74:19 81:17
  82:18
non-violation
  34:9
noon 1:22
NOPD 9:15 10:5
  12:25 19:21
  29:2 32:13
  44:23 45:7,10
  45:25 46:5,12
  47:6,15 57:3,4
  69:12 74:2,24
  85:18 87:15
  88:4,20 90:21
  90:23 95:6,22
  96:17,25 97:5
  97:17,21 98:2
  98:12
NOPD's 63:13
noted 48:19
notes 24:17
notifications
  44:11
Number 81:20
  82:6,12,16,17
numbers 45:20
Numerous 6:21

——————
O
O 3:1 4:1
oath 4:22 5:4
  7:12 26:9,23
  46:10 53:10
  95:4 96:17
object 12:1 27:22
  35:4 36:11 37:4
  37:23 40:1 49:5
  85:14,22 87:17
  87:24 88:7,23
  90:5,17 91:6,19
  92:4,15 93:5,12
  94:1,14

objection 11:24
  12:11,14,16
  22:7,12 28:19
  33:20 38:21
  40:11 46:15
  48:4 50:9,19
  51:6 52:5 54:7
  58:23 59:3 60:4
  61:3,12 66:21
  67:8,23 77:2,11
  78:10,24 80:17
  81:1,6,24 82:8
  82:14 84:10,17
  95:10 96:1,21
  97:8 98:6,16
objections 4:14
observations
  52:19
obviously 21:13
  30:6 34:3 45:4
  68:1 88:10,13
occasion 44:7
  65:12
occasional 45:14
  45:22
occasions 43:23
  44:22,24 45:1
occur 95:8,23
  96:19 97:6,18
  97:22 98:3,13
occurrence 45:6
OFF-THE-RE...
  24:13
offered 21:1
offhand 16:7
  44:25 77:19
Office 1:19 2:10
officer 8:23 10:3
  10:12,17,19,24
  13:7,23 14:11
  14:16 16:17
  17:15 18:23
  20:6 21:21
  27:10 28:7,13
  29:7,13,17,21
  30:14 31:3
  32:25 33:11
  35:21 36:1,23
  36:25 37:16

40:15 41:24
  42:5 43:13,18
  43:22 44:5,11
  44:14 45:4,7,9
  45:12,23,24,25
  46:6 53:25 63:9
  63:21,25 64:1,8
  64:15 65:8,12
  65:17 66:7,7,9
  66:11 67:17,21
  68:14,18,21
  69:6,7,8 72:19
  73:7,11,17,19
  74:4,6,10,17,25
  75:6 81:3,4
  85:10,12,17
  87:11 89:25
  90:13,23 91:14
  91:15 92:11,20
  93:23 94:11
  95:8 99:6
officer's 29:8
  91:9
officers 9:20
  12:25 14:2
  19:21,21 20:7
  30:10 32:19
  33:2 41:12,16
  43:17,25 65:5
  68:6 75:5 83:12
officiated 4:22
oh 37:17 76:8
oil 62:2
okay 5:18,22
  7:10,22 19:18
  20:4 25:20 36:6
  38:13,25 42:1
  54:14 55:13
  59:10 71:3,19
  76:8 83:7,24
  84:21 95:6 97:2
old 60:9
older 66:3
once 12:16
one-pound 71:12
ones 20:5 48:11
  72:24
Operations 5:10
  9:17 57:4

opine 34:8
opined 32:19
opinion 28:4,16
  28:21,24 30:14
  31:11,19 35:23
  35:25 36:8
  37:15 49:7,9
  50:4 53:11 56:2
  58:11,16
opinions 17:9,17
  17:20 27:9,12
  27:18,20,25
  60:1 70:7 76:23
  76:24 77:5
  99:15
option 31:10,18
  60:15 70:6
  81:19 82:25
  83:2,11
options 62:7,10
  62:16,20,23
  79:20 82:22,23
  83:3
original 99:3,4
Orleans 1:10,21
  2:6,9,12 5:2,9
  6:1,2
outcome 99:17
outer 20:5,6,8
outside 50:24
  51:2 64:4 78:7
  83:21
overview 10:16
  14:3
owner 43:12

—————
P
P 1:18 2:16 4:1
  4:20 99:5,21
page 3:3,9 32:10
  32:10 38:25
  39:3 48:8,17
  50:1 52:25 53:1
  65:25 66:6
  71:20 89:14,15
  93:21 94:7,7
  99:4
pages 65:23 99:8
panel 6:8,10 8:13
  8:17 28:2,6

29:6 32:25 33:3
  33:10 34:16,21
  39:5,7 46:8
  69:11 76:1 86:5
  94:8,10
panels 29:14
papers 76:11
paragraph 39:12
  58:1 94:10
part 4:17 6:8,10
  11:6 23:22
  25:23 29:20
  34:12,15 39:24
  52:13 53:6
  57:23 65:16
  67:13,14 68:8
  69:18 74:9,16
  75:23
particular 21:23
parties 4:4 99:16
parts 36:18 64:21
  65:6 67:1
Patrick 2:5 5:20
  5:21 16:3 21:16
  83:20
patrol 9:20 40:19
  41:10,12,16
patrolled 40:16
patrolman 41:6
pause 18:13
penalty 75:21
pending 7:25
people 7:12 14:8
  20:21 21:17
  41:4 81:15
pepper 11:5
perceived 29:15
percent 44:16
perception 29:21
  29:24
Perdido 1:20
  2:11
period 54:15
person 10:12
  11:12 12:6 13:8
  13:15 14:11
  16:20 17:19
  55:11 62:2
  83:14

person's 22:4
personal 99:10
personally 53:20
  55:4
perspective 21:10
  85:17
perspectives 79:8
pet 90:24
photocopier 25:1
phrase 50:16
PIB 34:12 35:2
  47:8 77:16
  78:20
picture 30:23
pictures 59:20
pitbulls 42:24
place 15:13 16:9
  96:9 97:13
placement 52:20
plaintiff's 27:11
  50:5
plaintiffs 2:2
  49:2
plan 27:6,9,17,20
  84:7,14
play 91:9
please 5:6
pneumonia 18:14
point 14:4 31:15
  35:20 48:20
  51:19 56:14
  57:20
pointing 36:6
points 32:11,13
police 5:9 6:1
  10:3,12,17,19
  10:20,24 13:7
  13:23 14:10,16
  16:17 17:14
  18:20,21,23
  21:9,21 30:10
  30:14 34:9 42:5
  43:7,9,13,18
  45:24 63:8,21
  63:24 64:1,8,15
  81:12,15,16
  82:1,17
policies 29:2
  32:14,21 47:7

48:11 57:19
  63:13 75:1
  85:18 87:9
  90:21,23
policing 10:25
policy 28:25 29:1
  29:3,18 30:3
  34:9 39:15
  47:15,21 48:19
  50:16,24 51:3
  51:11,12 57:3
  57:14 58:8
  61:16 69:12
  74:3 78:8 87:1
  87:2 88:14
pops 19:11
portion 6:11
portions 11:2
  35:16
pose 81:13 82:2
posed 29:22
  69:25 91:16
  92:1,7
poses 90:25
position 9:15
  33:6 34:19,23
  36:14 37:1,20
  38:3,6,7,23
possible 46:20
possibly 58:10
  88:16
POST 10:20
potential 96:14
  96:15
pound 71:11
pounds 59:23,24
  71:10
Poydras 5:2
PR-24 18:5,6
  19:5,6,20 70:15
  79:22
practice 14:23
  15:1
predisposition
  22:24
preparation 23:7
prepare 8:3,11
  22:20
prepared 99:9,12

present 87:11
presented 36:24
preserve 9:19
pretend 49:24
  56:7
pretty 15:10 45:6
  76:16 84:2
previous 34:6
  86:15
principle 12:24
prior 65:24 97:11
proactive 41:8
probably 10:13
  11:8 13:16
  16:14 22:2
  25:24 53:20
  57:18 79:10
  80:3,5 89:7,9
problem 48:8
Procedure 4:7
  99:14
procedures 75:2
  90:23
PROCEEDIN...
  18:16
process 87:5,6,15
  89:8
produced 76:6
professional
  10:25 13:22
  14:10,16
prohibition
  99:14
promoted 10:1
prongs 15:4,18
  15:20,23 16:10
  16:11 53:17
  55:1,8,12,15,22
pronounce 46:24
proper 63:4,5
prove 36:1
proven 58:2
provide 49:9
  85:17
provided 33:24
providing 49:7
provoke 70:5
Public 32:15,19
  33:7,13,25

34:22
**purpose** 86:21
**purposes** 4:7
  87:6
**pursuant** 1:17
  4:6
**put** 22:4 24:5
  34:6,20,24 35:9
  38:4 63:3 70:4
  74:20 75:6
**puts** 63:6
**putting** 24:4
  56:16 96:14
**pvanburkleo@...**
  2:7

**Q**
**qualified** 32:18
  32:22 34:8,15
  34:18 56:1
  85:16
**quarterback** 36:3
  80:11
**question** 4:15
  7:16,21,25 8:1
  10:9 12:17 25:6
  25:18 26:15,22
  37:6,8,9 41:1
  49:16,18,19
  57:7 61:24 78:2
  82:6,12,16 97:4
**questioning** 7:9
**questions** 7:13,15
  9:7 20:19 23:16
  24:1,3 76:16
  84:7,13 91:13
  94:18,22,25
**quick** 61:22
  74:17
**quicker** 15:23
**quite** 7:18

**R**
**R** 99:1
**R.S** 99:7
**ran** 73:5
**range** 73:18
**rare** 45:15,16,19
  45:22
**react** 29:11

**read** 35:19 36:17
  36:17 37:2,8,12
  37:13 39:11
  57:3,4,6,7,21
  58:1 66:5 68:21
  73:16,24 81:10
  83:16
**reading** 4:9
**really** 13:12 15:1
  18:12 54:21
  63:4 98:24
**reason** 55:19
  58:7 61:25 77:9
  77:13,14 78:14
  78:21
**reasonable** 38:17
  60:8 80:14,15
  80:21,23 91:8
  92:12,17,21
  93:24 94:12
**Reasonableness**
  81:3
**reasonably** 81:13
  81:18 82:2,19
  82:20,24 90:24
**reasons** 39:14
**recall** 9:14,23
  32:4 64:6,16
  65:20,21 68:19
  68:24 69:2,13
  75:14 77:19
**receive** 14:1 29:5
**received** 18:19,23
**RECESS** 76:18
  83:25 94:23
**recollection**
  42:21
**recommendati...**
  8:9 22:23
**recommended**
  39:6 94:9
**record** 5:7 24:12
  37:2 39:3 76:10
**recorded** 34:3
  75:15,17,18,22
  75:24
**recording** 34:2
  75:25
**recruit** 85:8

**reduce** 58:3
**reference** 33:24
**referenced** 69:4
**referring** 11:3
**reflect** 32:13
**reflected** 34:23
  52:10 70:20
  72:18
**regard** 85:9
  86:13 87:22
  88:3 91:15
**regardless** 60:1
  71:7
**regular** 16:20
  20:11 40:19
  41:15
**regulations** 87:2
  87:3,10
**related** 9:4,6
  99:16
**relation** 6:23 7:6
**relationships**
  99:14
**relevant** 40:8
  69:10
**remedial** 88:3
**remember** 6:9,13
  8:18 22:25
  31:16,24 36:20
  42:9,22 43:24
  44:3,4,7,19
  56:24 61:19
  72:16 77:20
  79:9 86:10,16
  86:17
**removed** 68:16
**removing** 15:20
**repeat** 10:14 48:6
  74:9,16 80:20
  88:1 96:12
**repel** 20:15 56:9
**rephrase** 7:18,19
**replay** 80:10
**report** 90:13
**reported** 2:15
  99:9
**Reporter** 1:18
  2:17 4:21 99:5
  99:22

**represent** 5:19
  33:22
**REPRESENTI...**
  2:2,8
**require** 89:3
**required** 19:22
  19:25 60:25
  61:8,14 99:4,13
**reserved** 4:16
**resort** 81:19
  83:11
**resorting** 12:21
  13:1 61:9
**respect** 25:20
  81:20
**respond** 7:20
**responding** 41:15
**response** 37:7
**responses** 27:14
**responsibility**
  53:7
**responsiveness**
  4:15
**result** 68:23
**retired** 85:7
**retread** 60:9
**review** 8:3,6 12:3
  28:6 44:5 52:15
  69:15 73:14
  75:19 86:5,24
  87:12 88:11
  89:6,23
**reviewed** 22:20
  22:21 23:7,8,23
  25:24 26:3,4,10
  26:23 28:10
  31:10 35:16
  44:16,18 54:19
  68:6
**reviewing** 44:3
  44:13 52:13
**reword** 47:23
  71:2 98:8
**Richardson**
  78:17
**Richardson's**
  78:21
**right** 6:14,17
  10:20 13:8,15

13:19 14:12,13
  15:14 16:17,20
  17:11,15,20
  19:11 20:2,24
  21:4,8,15,25
  22:5,13,17
  25:15,22 28:3,8
  29:25 30:11,13
  30:14,20 31:14
  31:21 32:7,16
  35:13 36:9
  37:21 38:19
  39:9,11,16,19
  39:23,24 40:9
  42:1,5 43:5
  47:2,9,12,15,18
  47:22 48:2,12
  48:20 49:3 50:1
  50:7,17 51:4,15
  52:3,13 53:25
  54:2,5,15 55:17
  55:22,25 56:2
  56:25 57:2,23
  58:18 60:2,12
  61:1,10 62:3,8
  63:15,19 64:11
  64:15,17 65:2
  66:1,2,4,17
  67:6,12 69:1,5
  69:18 70:8 71:5
  71:7,8,9,11
  72:11,14 73:8
  74:4,15,20,22
  75:2 78:8,18
  79:5 80:24 81:4
  84:4,25 86:19
  88:12 89:5,18
  90:14 95:24
  96:5,6,8,16
  97:23 98:22
**ring** 83:18
**risk** 81:15
**role** 9:22
**Room** 1:20
**Roquemore** 2:10
  3:5 11:23 12:10
  22:6 23:15,25
  24:21 25:2,10
  25:17 26:19

27:21 28:18
33:19 35:3
36:10 37:3,22
38:20 39:25
40:10 46:14
48:3 49:4,17
50:8,18 51:5
52:4 54:6 57:9
58:22 59:2 60:3
61:2,11 66:20
67:7,22 76:5,12
77:1,10 78:9,23
80:16,25 81:5
81:23 82:7,13
84:6,9,16,22,23
85:15,23 87:20
88:2,18 89:11
90:11,18 91:7
91:24 92:9,18
92:25 93:8,15
93:19 94:4,17
94:24 95:9,25
96:20 97:7 98:5
98:15,21
**Roussel** 8:21 9:7
31:13,21,25
60:10,17,18,20
60:24 61:7
68:22 69:7,7,8
**Roussel's** 8:18
79:7
**rules** 4:6 99:13
99:15
**run** 42:8,11
61:21
**running** 42:23
43:7 54:20
58:13 69:23
70:18
**runs** 14:21
**Ryan** 1:15 4:5
5:1,8,13,16,22
6:5 76:20 84:2
95:3 99:7

**S**

**S** 4:1
**saber** 19:10
**Sabrina** 78:17
**safer** 58:5

**Sanchez** 47:5
**Sandra** 1:18 2:16
4:20 99:5,21
**sat** 46:8
**save** 4:14
**saw** 27:15 28:1
33:5 36:2 44:9
59:20 79:11,24
**saying** 5:25 7:5
27:17 30:25
34:14,15,17
37:10,17 39:15
41:24 50:22
62:22 65:8,8
72:2 80:8
**says** 26:2 36:18
39:2,9 66:4
89:16
**scenario** 60:20
**scenes** 41:23
**seal** 99:4
**sealing** 4:11
**second** 9:24
18:13 56:22
94:7
**seconds** 83:20
**SECTION** 1:6
**see** 20:6 23:14,20
29:14 30:7
32:11 35:24
47:11 52:24,25
53:2,22 57:6
59:20 63:14,16
63:17 66:4
73:22 80:2
**seeing** 44:12
**seen** 23:20 24:5
24:19 25:8,21
32:6,9 43:13,22
79:4
**sense** 7:13,15
10:23 15:24
**separate** 15:24
16:10 53:17
**sergeant** 41:9,10
78:2 85:4
**serious** 36:25
45:4 81:14 82:3
**served** 41:3

**service** 5:25
41:15,20,25
**set** 16:9 26:13
99:8
**SFL** 89:3
**Shannon** 76:21
**share** 23:9
**SHAUN** 1:8 2:8
**shirt** 20:10,11
**shirts** 20:7
**shoot** 14:22 43:13
43:23 81:12,17
82:1,17 83:14
**shooting** 28:17
29:18 45:7,13
45:24 48:1
54:21 65:21
68:23 78:7
81:16,18 83:10
85:18
**shootings** 95:7,23
96:18 97:6,17
97:22 98:3,13
**shoots** 44:11 45:9
**Shorthand** 1:18
2:17 4:20 99:22
**shot** 28:8 35:21
36:19 37:18
42:13 43:2 44:1
44:5,14,23 46:6
46:12 55:11
60:17,20 65:18
66:12 70:23
72:20 79:12
80:1,3 95:8,20
96:18 97:5,21
98:4
**show** 65:23
**showed** 86:14
**shown** 48:22
**shows** 80:7
**shrapnel** 68:22
69:9,13
**shut** 31:7
**side** 26:13 29:7,8
31:23 33:4,8
34:10,17
**sight** 36:4 68:15
**signature** 23:3

99:3
**signed** 39:14
47:17 48:24
50:3
**signing** 4:10
**similar** 7:8 19:1
19:12 62:24
66:25 68:7 70:1
**simply** 69:22
**sit** 71:17 86:23
**sitting** 80:9 92:10
**situation** 11:17
12:6,23 17:11
20:20 21:22,24
29:10 30:13
31:6 53:22 54:1
54:5,17 55:5
58:13 61:23
62:10,14,24
66:24 70:15,18
71:13,17 74:19
75:7 79:13,22
**situations** 11:21
14:7 55:12 63:6
**size** 59:12,21 60:2
70:8,12,22 71:7
71:24 72:2,5,9
73:18
**skills** 14:9
**slim** 41:7
**small** 73:19 75:12
**smaller** 71:14
**somebody** 17:1
62:15 70:17
86:8 97:19
**sorry** 10:14 14:4
18:12,21 19:16
24:24 48:2
52:23 53:19
57:3 61:5 69:21
91:4 96:23
**sought** 4:17
**sounds** 37:14
**sources** 89:21
**spark** 14:24
**SPCA** 43:1,10
**speak** 68:5
**specialized** 10:24
16:16 17:13,18

20:17,23 21:25
41:10 56:19
58:17
**specific** 10:10
17:8 29:2 48:19
50:15 64:20
67:4
**specifically** 4:10
4:12 35:14
**specifics** 65:22
**speculation** 91:20
**split** 61:22
**spot** 35:9
**spray** 11:6
**spread** 16:13
**St** 6:3
**stairs** 31:8
**stairwell** 73:4
**stances** 18:25
**stand** 60:1
**standard** 20:14
45:6,8,11 81:20
81:22 82:16
**standards** 81:12
83:15 90:21
**standing** 10:16
**standpoint** 79:15
**stands** 19:15
24:16
**start** 5:24 32:10
51:17 61:21
**started** 55:20
89:10
**starting** 18:20
**state** 1:19 2:17
4:21 5:6 99:5
**stated** 68:15,18
73:17,19 97:18
**statement** 7:6
23:22,24 26:5
33:9 36:7,14
37:10,11,12
**statements** 33:2
68:1,7 81:11
**STATES** 1:1
**stating** 39:8
**statute** 99:13
**Staying** 39:1
**stenotype** 99:9

**step** 83:21
**sticky** 24:17
**stipulate** 49:6
**stipulated** 4:3
**stipulation** 1:17
**stood** 19:17
**stop** 30:11
**story** 33:8 34:11
    34:12,17
**stray** 43:7
**Street** 1:20 2:11
    5:2
**streets** 40:16 41:5
    42:5
**strike** 18:10 55:8
**stuff** 13:25 14:7,8
    14:20,23 15:21
    19:4,13 36:3
    41:22,23 42:12
    42:23,25 75:23
**subject** 7:3 16:2
**subjective** 29:24
    37:21 53:25
    74:3 91:9,14,25
    92:12,20 94:12
**subscribe** 57:15
**suggest** 66:10,14
**Suite** 2:12 5:2
**summarized** 26:7
**summary** 33:23
**super** 5:21
**superintendent**
    1:15 4:5 5:1,8
    5:12 9:17 47:4
    47:5,6 48:10
    50:2 99:6
**superintendent's**
    23:2
**superintendents**
    48:10
**supervising**
    41:12
**supervision**
    99:10
**sure** 14:25 23:10
    27:16 32:2 38:5
    44:16 46:21
    59:9 60:9 65:5
    83:21 88:13

95:12 96:3
    97:12
**sustained** 47:11
    71:21,22
**SWAT** 9:18
    40:22,23,24
**swings** 18:25
**sworn** 5:3 24:24
    99:7
**system** 15:9

―――――――
**T**
**T** 3:1,7 4:1,1 99:1
    99:1
**tabbed** 35:13
**tactics** 11:1 13:17
    13:22,24 14:5
    21:4
**take** 7:2,23,24,25
    10:23 11:3
    18:22 22:2
    23:19 24:20
    29:8 33:2 35:9
    35:11 57:12
    60:15 89:4,13
**takeaway** 12:20
**takedowns** 13:25
    14:5
**taken** 4:6 61:17
    95:6 99:6
**talk** 52:18 67:10
    89:12 93:21
**talked** 13:17
    46:22 59:14
    69:20 70:17
    75:22 82:21
**talking** 8:22 14:8
    41:19 43:6 44:9
    55:7 58:9 61:19
    62:17 96:11
**talks** 29:3 41:4
**Tarak** 2:4 5:18
    5:19,20 7:18
**target** 14:23
    16:23 58:12
**targets** 54:22
**tase** 17:1
**taser** 11:7,19
    14:14,15,21
    15:2,3,9,17

16:2,4,18 17:9
    17:10,14 21:3
    21:13,15,16,18
    21:23,25 22:3
    53:4,12,14,21
    54:4,15,23 55:6
    55:11,15,21,22
    56:24 57:1
    58:14 62:11
    63:4 69:20 70:2
    70:15 79:22
**tasers** 14:17,22
    54:20
**task** 40:20 41:6
**taught** 15:4 18:9
    18:10
**teach** 17:5
**teaches** 21:13
**teaching** 14:3
**team** 9:18 33:8
**technical** 10:11
    17:14,18 20:23
    21:7,25 55:21
    58:17 83:5
**technique** 15:21
**techniques** 14:9
    14:19 18:9,25
    19:3,12
**tell** 10:8 11:15
    13:21 14:14
    15:7,16 17:23
    24:4,18 26:9,22
    30:21 32:14
    33:4,7,16 34:10
    34:17 35:12
    42:19 46:10
    53:11 54:3
    69:17,22 70:21
    71:22 73:6,10
    76:15 79:25
**telling** 18:18 39:6
**tells** 12:15
**ten** 43:20,21 46:4
    59:24
**term** 18:2 47:11
    47:18,22 51:3
    51:15,18 68:3
**terms** 15:17
    80:19

**test** 14:24
**testified** 5:4 85:9
    86:13 97:15,16
**testify** 99:7
**testifying** 49:7
    86:12
**testimony** 22:3,5
    25:21 27:3,6
    98:1 99:6,9
**tests** 11:3
**text** 45:2
**thank** 5:11,24,25
    6:3,4 38:25
    49:12 56:4
    98:20
**Thanks** 26:13
**thereof** 4:17
**thing** 15:19 17:3
    53:15 68:13
    87:10 89:4
**things** 9:18 17:5
    23:6,6 29:15
    30:5,7,21 31:1
    40:21 52:20,22
    57:18 74:22,25
    75:6,7,22 89:15
**think** 6:25 8:9
    15:19,25 17:23
    22:24 23:1,3
    25:18 27:16
    29:13 30:19
    31:4,9 32:18,22
    32:24 35:6,23
    35:25 36:22
    37:25 39:1 43:3
    43:4,15 44:18
    44:22 46:3,22
    49:21 50:11
    51:25 54:12,14
    54:14,17,18
    55:6,14 56:10
    56:15,16 57:22
    60:15 62:13
    63:6 69:6 70:1
    70:5 71:4,12,16
    72:5,15,16,21
    73:15 74:1
    76:16 79:12,21
    82:19 83:12

88:15 90:9
    91:17,22 92:17
    98:8
**thinks** 38:15
**thinner** 20:11
**third** 94:7
**thought** 19:16
    33:5 38:17
    64:11
**threat** 20:15
    36:24 37:19
    56:9 63:14,16
    69:25 81:14
    82:3 90:25
    91:16 92:2,7
**threatened** 42:16
    43:4
**threatening**
    59:16
**three** 48:15,18
    50:21 51:10,20
**thrown** 18:3
**time** 4:16 7:23
    10:5,6 11:4
    12:1,1,13,13
    23:19 24:20
    35:9,11 41:18
    42:7,7 44:2,2
    48:6 57:12
    61:20,20 64:14
    65:8 66:12 74:4
    86:10 88:1 89:5
    96:23 98:24
**times** 6:21 8:14
    8:16 36:18,22
    42:19 73:18
    79:11 86:6
**tired** 73:20,20
**titled** 57:5
**today** 8:11 20:12
    22:17 24:6,19
    25:22 26:11,24
    84:3 97:16,19
    97:25 98:2,11
**today's** 8:3
**told** 13:4 22:19
    22:21 30:4 39:2
    51:22 52:1
    54:18 58:11

74:1 76:1 79:20
**tool** 58:2
**tools** 61:1
**top** 17:1
**topic** 39:1
**topics** 21:11
**totally** 62:4
**touching** 32:3
**train** 62:9
**trained** 11:11
14:10 15:3
20:13 62:11,11
**trainer** 21:16
**training** 10:11,17
10:24 11:6,7,8
11:10,15 12:20
13:5,6,14,18,19
13:22 14:1,7,14
14:15 15:12,17
16:17,18 17:6,8
17:8,14,23,24
18:8,19,23
20:17,24 21:6,8
21:25 52:22
55:21 56:19
58:12 63:8 83:3
85:3 86:7,8
88:25 89:2
91:11 95:14,16
95:19 96:9,11
96:12,14,16
**trains** 12:25
**transcribed** 99:9
**transcript** 96:13
99:3,10,12,12
**transition** 55:3
**transitioned**
15:11
**traumatic** 58:6
**treatment** 73:21
**trial** 27:3,6 58:15
**tried** 42:25
**true** 58:21 68:14
68:18 70:10
73:12 99:10
**try** 7:13 12:21
43:10 74:24
75:4
**trying** 10:15,16

30:21 34:5,11
35:9 36:15 38:1
38:4,5 48:23,23
49:3 53:5 90:9
**turn** 38:25 83:23
84:13,21
**twice** 66:9
**two** 7:11 19:22
44:17 46:12
47:8,8 48:14
65:3 72:24 87:6
**two-prong** 15:11
**type** 10:17,23
15:17 77:23
**types** 11:10

**U**

**U** 4:1
**Uh-huh** 74:5
77:7 89:19
**ultimate** 49:10
**unaware** 97:13
**unclear** 7:17
**uncredible** 77:15
**under-** 10:15
**understand** 7:19
15:8 16:20 27:1
27:17 28:7
30:12 34:5,11
34:14 36:13
37:11 38:5
48:23 60:10
62:4 95:3
**understanding**
10:10 16:24
21:17 27:5 86:2
99:11
**understood** 7:21
26:8 34:7 71:19
**unfounded** 50:22
**unholstered** 66:8
**uniform** 40:19
**unique** 21:10,22
63:1 64:25 67:5
67:16,20 68:4
**uniquely** 56:1
58:17
**UNITED** 1:1
**units** 41:9,10
**unusual** 45:9

64:17 66:17,23
**upper** 16:13
**use** 6:24,25 11:13
13:5,13,18
14:19,21 16:3
19:12 21:4 25:1
27:10,18 30:20
38:17 44:4,4
51:21 52:2
53:14,20 54:23
58:5 63:12,18
74:2,8,11,18
85:10,25 86:5
86:15,17,18,22
86:23,24,25
87:5,8,11,14,21
88:4 89:6
**uses** 30:15 61:9
88:11
**usually** 42:24,25
52:22 89:5
**utilize** 11:7 19:3
56:13
**utilized** 11:5

**V**

**valid** 63:15 99:3
**VANBURKLEO**
2:5
**various** 52:11
74:22
**verbal** 11:18
**verbatim** 12:4
**verbiage** 36:20
**versus** 1:6 30:16
34:22 35:1
**vest** 20:1,2,6,8,12
**vet** 18:14
**veterinarian**
18:15
**vicinity** 69:9
**vicious** 39:10,16
39:23 40:7,9
62:12 79:18
**video** 8:10,15
38:14 40:6 44:9
79:4,25
**videos** 28:10
**viewing** 52:19
**viewpoint** 53:25

74:3
**violate** 39:15
47:15,21 48:15
48:19 50:15
51:12
**violated** 32:16,21
47:7,8 48:11,14
69:12
**violation** 34:9
87:9,9
**violations** 50:21
**violence** 30:8,9
30:12,17 31:2
**vision** 9:19

**W**

**W.ROBY** 1:9
**Wait** 72:1
**waived** 4:10,13
**walked** 60:12
**WALKER** 2:3
**want** 5:24 7:5,23
10:22 16:2,13
16:22,23 17:1,2
23:14 24:18
25:16 26:17
32:10 34:3
35:10,11,14
43:10 54:21
57:20,22 60:9
71:17 88:12,13
89:14 90:20
95:13
**wanted** 25:7
68:13
**wanting** 83:14
**war** 19:7
**wasn't** 18:21
20:12 25:5 26:1
35:22 50:23
52:13 68:21
72:13
**watch** 8:10
**watched** 8:12,13
8:14,16,18
31:17
**watching** 40:6
80:8
**way** 7:14 16:14
26:9 31:5 36:16

41:2 49:23
69:24 73:10
75:1 79:16
**we'll** 7:20 26:13
26:14 83:22
90:19
**we're** 17:6 28:21
48:8 58:9 59:10
89:12 93:14
98:22
**we've** 42:11
49:15
**weapon** 36:23
56:23 57:3,5
66:9,9 68:16
**wear** 19:25 20:9
**wearing** 20:7
**week** 45:14
**weight** 22:4
34:20,24 59:25
**went** 15:9 40:19
59:19
**weren't** 41:23
**whatsoever** 77:4
**wild** 42:23
**witness** 4:23 21:2
23:13 27:2
28:20 35:5 38:7
40:2,12 46:16
48:5 49:20
50:10,20 51:8
52:6 54:8 59:4
59:5,7 60:5
61:4,13 66:22
67:24 78:11,25
81:7,25 82:9,15
84:18 87:18,25
88:8,24 90:6
91:21 92:5,16
93:6,13,17 94:2
94:15 95:11
96:2,22 97:9
98:7,17
**word** 50:1,3 52:2
96:23
**words** 34:7 38:4
**wore** 20:10
**work** 83:13
**worked** 9:1

**working** 41:5
  42:10
**wouldn't** 16:21
  17:1 21:5 33:15
  45:16,17,21
  53:18 55:5
  62:23 79:17
  82:22
**wounding** 66:10
**wrap** 93:20
**wrong** 32:14 34:4
  56:23 57:23
**wrote** 17:23

**X**

**X** 3:1,1,7,7 97:20

**Y**

**y'all** 75:15 76:3
**yard** 52:20 73:5
**yeah** 8:23 9:11
  10:15 11:1
  12:24 15:25,25
  16:25 18:24
  19:19 20:3,16
  25:14 26:8,20
  27:13 29:17
  30:18 31:2,22
  32:23 33:9 34:1
  41:19 43:21
  44:24 47:3
  49:21 51:21
  52:7 55:4 57:13
  57:17 59:7
  60:14 61:16,17
  63:17 64:5,13
  64:16 66:4 71:1
  71:3 76:13 78:4
  88:3
**year** 40:17,18
  41:6,11,11
  44:13,18,19
  80:9
**years** 10:4 41:2
  42:20 43:18
  44:17 46:4 64:7
  65:9,10

**Z**

**0**

**08** 46:2
**09** 46:2

**1**

**1** 24:16 32:10,10
  33:18 81:20
**1.71** 57:4
**1:35-1:40** 76:18
**100** 44:16 71:10
**105** 23:1
**12** 46:2,3
**12:00** 1:22
**1300** 1:20 2:11
**1434** 99:14
**14th** 1:21
**1615** 5:2
**1800** 5:2

**2**

**2** 33:18 48:9 50:1
  52:25 71:20
  82:6 89:14,15
  93:21
**2:15** 98:25
**201** 2:6
**2012** 65:19,21
  66:1
**2021** 6:6,10,14
  9:22,23 15:14
  19:21 28:8
  95:24
**2022** 6:16
**2025** 1:21
**22-00847** 1:5
**23** 10:1
**24** 3:11
**26** 3:12
**27** 10:4 64:9
  65:10
**29** 65:9

**3**

**3** 39:3 53:1 65:23
  69:4 70:21
  82:12,16,17
  83:7,8 89:14,15
**32** 3:13
**37:2554** 99:7
**3rd** 10:1

**4**

**4** 1:7 65:23 66:6
  83:9

**5**

**5** 3:4
**5/20/25** 99:23
**5E03** 1:20 2:12

**6**

**60** 83:20
**62** 58:1

**7**

**70112** 2:12 5:3
**70170-5100** 2:6

**8**

**81** 3:14
**84** 3:5

**9**

**9/11/23** 89:12
**90** 59:23
**95** 3:4
**98** 99:8