ANNE KIRKPATRICK on 05/01/2025

ANNE KIRKPATRICK on 05/01/2025

```
 1              UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF LOUISIANA
 3
 4    DEREK BROWN and JULIA        CIVIL ACTION NO.
 5    BARECKI-BROWN                22-00847
 6
 7    VERSUS                       SECTION: L
 8
 9    DERRICK BURMASTER, SHAUN     DIVISION: 4
10    FURGUSON, and the CITY OF
11    NEW ORLEANS
12
13
14
15         Video deposition of Anne Kirkpatrick, taken
16    in the offices of 1300 Perdido Street, New Orleans,
17    Louisiana on Thursday, May 1, 2025, commencing at
18    1:29 p.m.
19
20
21
      REPORTED BY:
22         BROOKE GARRISON
           CERTIFIED COURT REPORTER
23
24
25
```

New Orleans 504.522.2101          North Shore 985.206.9303
Toll Free 800.526.8720   SerpasCourtReporting.com   Baton Rouge 225.332.3040

```
 1   APPEARANCES:
 2         MOST & ASSOCIATES
           (BY:  WILLIAM MOST, ESQUIRE)
 3         201 ST. CHARLES AVE.
           SUITE 2500
 4         NEW ORLEANS, LOUISIANA  70170

 5               ATTORNEYS FOR THE PLAINTIFF

 6
           THE OFFICE OF THE CITY ATTORNEY
 7         (BY:  JAMES ROQUEMORE, ESQUIRE)
           1300 PERDIDO STREET
 8         NEW ORLEANS, LOUISIANA  70112

 9               ATTORNEYS FOR THE DEFENDANT
```

ANNE KIRKPATRICK on 05/01/2025

E X A M I N A T I O N   I N D E X

|   | PAGE |
|---|---|
| MR. MOST | 6 |
| MR. ROQUEMORE | 49 |
| MR. MOST | 76 |

E X H I B I T   I N D E X

| | |
|---|---|
| Exhibit 1 | 9 |
| Deposition 60 | 10 |
| P20 | 26 |
| P13 | 39 |
| P12 | 39 |
| Exhibit Number 2 | 55 |
| Exhibit Number 3 | 56 |

```
 1                    S T I P U L A T I O N
 2
 3            It is stipulated and agreed by and between
 4    Counsel that the deposition of Anne Kirkpatrick, on
 5    Thursday, May 1, 2025, is hereby being taken under
 6    the Louisiana Federal Rules of Civil Procedure, for
 7    all purposes, as permitted under law.
 8
 9            The witness waives the right to read and
10    sign the deposition.  The original is to be
11    delivered to and retained by the noticing attorney
12    for proper filing with the Clerk of Court.
13
14            All objections, except those as to the form
15    of the question and/or the responsiveness of the
16    answers, are reserved until the time of the trial of
17    this cause.
18
19            Brooke Garrison, Certified Court Reporter,
20    Certificate No. 2024011, in and for the State of
21    Louisiana, officiated in administering the oath to
22    the witness.
23
24
25
```

1    A.    Yes.  Depending on the circumstances, the
2    officers, if they're in a use of force situation,
3    whether they're in a residential area or not.  So
4    sometimes those shootings do occur in residential
5    areas.
6    Q.    Would you agree with Number 3, that
7    police should not shoot a dog if alternative
8    non-lethal means are reasonably available?
9    A.    I believe our policy addresses the use of
10   alternative, less than lethal.  We don't use the
11   term non-lethal.  That is actually would be a
12   fallacy to use that kind of language.  We have less
13   than lethal alternatives.
14   Q.    So you would agree with this if it said
15   less than lethal means are reasonably available?
16   A.    Well, with respect to your qualification
17   of a dog, I don't think that would be necessary in
18   terms of my understanding of our policies.  Our
19   policies for using force is you weigh also
20   alternative means.
21   Q.    So officers should not shoot their
22   firearm, whether it's a dog or a person, if
23   alternative less than lethal means are reasonably
24   available?
25   A.    Are reasonably available and the

1  circumstances would dictate.  Not every circumstance
2  allows, because it's unfolding so quickly that a
3  different alternative use of force could be used.
4      Q.   Would you agree that shooting a dog
5  should always be the option of last resort?
6      A.   I think use of deadly force is an option
7  of last resort.
8      Q.   Okay.  And so you're aware that this case
9  is about an officer, Derrick Burmaster, who shot a
10 dog; correct?
11     A.   Yes.
12     Q.   Have you met Officer Burmaster?
13     A.   I may have.  I wouldn't be able to tell
14 you if he walked in the room that it was Officer
15 Burmaster, but I probably have met him.
16     Q.   Okay, but you don't recall meeting him
17 specifically?
18     A.   No, I don't.
19     Q.   Do you know anything about him other than
20 the context of this case?
21     A.   No, I don't.
22     Q.   Okay.  And at any point, have you seen
23 photos of the dog that was killed?
24     A.   I have not.
25     Q.   Okay.  Have you seen a video of the

```
 1   about 22 pounds, only about 18 inches tall, would
 2   shooting a dog of that size be an avoidable
 3   scenario?
 4        A.   I don't know.  When I couldn't see, I can
 5   hear it, and I heard his position in it, and what he
 6   wrote on the -- his report.  So I can't tell you.
 7   What I can say is that based on the circumstances,
 8   it may, might I determined that it was reasonable.
 9        Q.   You determined that it was reasonable?
10        A.   Yes.
11        Q.   But you had not seen the video?
12        A.   No, but I can do it according to the
13   record didn't change what you showed me.
14        Q.   And the record you received spoke
15   primarily to Burmaster's subjective thoughts and
16   fears; correct?
17             MR. ROQUEMORE:
18                  Objection form.
19             THE WITNESS:
20                  I think it's both objective and
21        subjective.  The objectivity is what did they
22        walk into.  The objectivity is the fact that
23        they were going to a domestic violence call.
24                  The objectivity is that we do train
25        and teach officers to be very mindful that
```

```
 1          that's one of the most dangerous calls that
 2          they could walk into.  So that is the framing
 3          in which they walked into that gate.
 4                   The objectivity is you have two
 5          officers on that scene.  One of them, both of
 6          them perceived a threat.  One of them ran,
 7          which supports the objective mindset, was
 8          Burmaster, reasonable in thinking that's a
 9          threat, and you have another officer who ran.
10                   So they both perceived a threat.  So
11          as an objective and subjective, the policy and
12          the law says that we are not to do the 20-20
13          hindsight.  The officer has to explain why he
14          saw it as a threat.  And he did that in the
15          report.
16     BY MR. MOST:
17          Q.   You reached your -- you based your
18     determination that Officer Burmaster's shooting was
19     reasonable based on the memo that was provided to
20     you by Lubrano, Sanchez, and Ganthier; correct?
21          A.   Not just their memo, but I did read his
22     statement about why he thought he had that threat to
23     the level in which to use the force that he did.  So
24     I did take that in consideration.  I did take in
25     consideration the other viewpoint that was in the
```

```
 1    PIB investigation. I took in both viewpoints.  So,
 2    yes.
 3         Q.   So you read the PIB investigation before
 4    signing a document about Burmaster?
 5         A.   I remember doing that, yes.
 6         Q.   But I want to return to the question of
 7    would you have shot this dog?  Can you express any
 8    thoughts about that?
 9         A.   Well, I'm not allowed to personally say
10    that I'm there.  I'm to go on the records and the
11    information that is presented to me and then to make
12    a decision, do I think it was reasonable?  That's my
13    role.
14              I was not there.  Based on what I have,
15    though, my determination was that, indeed, in the
16    totality of the circumstances, was it reasonable?
17    And I say, my thinking is, yes, it was reasonable.
18         Q.   Mm-hmm.  And in determining whether the
19    shooting was reasonable, you would have had to
20    assess the threat that the dog posed to Officer
21    Burmaster; correct?
22         A.   Yes.  That is a part of that.  But I also
23    have to weigh what I know about the totality of the
24    circumstances and which ones weigh more to me than
25    the others.  All the different factors that I see my
```

```
 1   decision one way or the other.  And so there were
 2   more factors that supported the reasonableness for
 3   his use of force.
 4        Q.   Okay.  And what threat did this puppy
 5   pose to Officer Burmaster?
 6        A.   Well, according to Officer Burmaster,
 7   that dog, unfortunately, puppy, dog, could have
 8   caused him harm, rather serious harm, if the dog had
 9   bitten him in the groin.
10        Q.   Are you aware that the dog was only 18
11   inches tall?
12        A.   Dogs can leap.  So that would not be a
13   deciding factor for me.
14        Q.   Mm-hmm.  You understand that Burmaster
15   expressed particularly that he was afraid that this
16   dog would bite him in the penis?
17        A.   I did read that, yes.
18        Q.   Yeah.
19        A.   Mm-hmm.
20        Q.   In your career, at any point in your
21   career, have you ever heard an officer express that
22   a dog, the fear that a dog would bite him in the
23   penis?
24        A.   I had an officer when I was the chief of
25   police of Federal Way who did have a dog bite him in
```

1  unfortunately, this dog was within policy.
2      Q.   What were the specific policy violations
3  that were being investigated in this case?
4      A.   It's the first violation, we call it a
5  Rule 4.  The title of it that we use is Performance
6  of Duty, and we paragraph 4 because we have several
7  paragraphs in that policy, neglect of duty.  C6,
8  failing to comply with instructions, oral or
9  written, from any authoritative source to wit, NOPD
10 Chapter 13, which is the Use of Force chapter
11 paragraph 11 and that is the --
12     Q.   And paragraph 11 says specifically?
13     A.   It's under the title of authority to use
14 reasonable force and paragraph 11 states officers
15 shall not draw or -- a firearm unless circumstances
16 surrounding the incident create an objectively
17 reasonable belief that a situation may escalate to
18 the point at which lethal force would be authorized
19 once an officer determines that the use of deputy
20 force is no longer likely, the officer shall re
21 holster the weapon.
22     Q.   And your decision as to this particular
23 policy is that you did not violate it?
24     A.   That's correct.
25     Q.   And what was your thinking, analysis in

1    making that decision?

2        A.   That there were enough of those objective
3    totality of circumstances factors that it was
4    reasonable, in my opinion, and the opinion of
5    others, that the officer had used the deadly force
6    within that policy.

7        Q.   The chapter, the next violation, chapter
8    13, or paragraph 13.

9        A.   Yes.

10       Q.   What is paragraph 13 referring to?

11       A.   Deadly, lethal force shall be used only
12   when -- Is that the one we -- that's this paragraph?

13       Q.   We did chapter 11, now there's also
14   chapter 13.

15       A.   I'm not sure we're on the same.  With
16   your permission, I have him point this to me?

17       Q.   Well, we'll back up.  Let's look at
18   Exhibit Number 2.  I'm tracking from the letter.

19       A.   It's a long one.  I apologize.  Okay.

20       Q.   We'll go to the third page of six.

21       A.   That's correct.

22       Q.   And so it says, after all testimony and
23   evidence, the committee recommended the following
24   disposition and penalty.

25       A.   That's correct.

```
 1   well as exonerate him for paragraph 32; right?
 2        A.    That's correct.
 3        Q.    And paragraph 32 is a use of force policy
 4   specifically dealing with dangerous animals.
 5        A.    Yes, that's correct.
 6        Q.    In looking at paragraph 32, I just want
 7   to ask you some specific parts of -- some questions
 8   as to that.
 9        A.    Okay.  I think I'm with you.
10        Q.    Okay.  It starts off, this the policy of
11   NOPD, officers are authorized to use firearms to
12   stop an animal in circumstances in which the animal
13   reasonably appears to pose an imminent threat to
14   human safety.  In your view of the totality, can you
15   explain where the imminent threat for his safety
16   was?
17        A.    Well, the animal is charging, and I think
18   that that's an imminent threat, and to have an
19   animal charging at you, that makes it imminent.  And
20   the fact that the second officer also assessed that
21   threat as imminent, such that he ran.
22        Q.    All right.  This policy continues and it
23   says, and alternative methods are not reasonably
24   available or would likely be ineffective.  Can you
25   explain where you found a reasonable methods not
```

```
 1   reasonably available or likely to be ineffective?
 2        A.    According to the Burmaster, Officer
 3   Burmaster, who said he wasn't going to be able to
 4   jump over the fence.  The other officer had already
 5   run out and was closing the fence.  He didn't think
 6   he had time to get out that gate.  He also didn't
 7   think he could jump over that gate or over the fence
 8   because I think it had spikes at the top, that's my
 9   understanding.  And so he's now in an imminent
10   situation and he had already drawn his gun and I
11   actually support the fact that he had pulled his
12   firearm.
13        Q.    I would like to ask you that.  Explain
14   why pulling his firearm when he did was not a
15   violation of NOPD?
16        A.    It's not a violation as a matter of fact
17   because he's going into a domestic violence
18   situation.  The reports that came to them was that
19   they could hear that whoever reported said there was
20   yelling and screaming, which means you, in an
21   officer's mind, is that there's an active,
22   assaultive behavior potentially.
23              And they're walking in, he's hearing
24   these dogs coming out.  How do you know that it
25   wasn't a party involved in the domestic sending dogs
```

1   out?  You don't know.  And so for him to have drawn
2   his weapon, it's dark.  All of those factors to me
3   are reasonable that you would draw your weapon.
4       Q.   The next line, it says the officer must
5   be cognizant of the surroundings when shooting at an
6   animal and show no risk to people in the area.  Was
7   there evidence that he was cognizant of the
8   surroundings?
9       A.   Yes.  What was interesting because when
10  Mr. Most showed me the training bulletin here.  And
11  as I said, I hadn't seen it before, but it's talking
12  about how to become, you know, what you want to be
13  thinking about.
14          And the fact that he was doing the
15  kissing voices to see if there was a dog, trying to
16  see if he could solicit, that is telling me he's
17  cognizant that there could be some danger issues
18  here.
19      Q.   But is there evidence that he was
20  actively looking to see if dogs were evidence?
21      A.   Yes, and that to me was even more
22  supportive that he is operating under his training
23  and his policy, and he was trying to assess that,
24  sure enough, the dogs come charging
25      Q.   The other part of that sentence has to do

```
 1   with to ensure there's no risk to people in the
 2   area, in evaluating the totality of the
 3   circumstances and the facts.  What do you have to
 4   say about that factor?
 5        A.   They're unrolling very fast on them, and
 6   the law and the policy says that we're not to do the
 7   20-20 hindsight when things are evolving in
 8   split-second decisions and he apparently had
 9   assessed well enough that no one was injured in his
10   use of deadly force.
11        Q.   The next sentence in this particular
12   policy, deals with reasonable contingency plans.
13        A.   Yes.
14        Q.   How did that factor into your decision?
15        A.   Again, I didn't think it was
16   unreasonable.  When you have this unfolding event,
17   you've got your partner running away on you, that,
18   again, I cannot overemphasize how that corroborated,
19   for me, the fact that there was two different
20   independent people who perceived a threat at the
21   same time.
22             One was able to run out the gate, and so
23   we are having split-second decisions here.  And so I
24   think he squarely was within the policy, because it
25   was cognizant.  He was aware.  He knew what he was
```

```
 1   walking into.  And he was making reasonable efforts
 2   to see, even about the dogs.  That's mindfulness.
 3        Q.   There is a -- I think you were asked some
 4   questions about a baton.
 5        A.   Yes.
 6        Q.   In fact, in your recommendation, if you
 7   look at Exhibit Number 2, you made the decision
 8   about the result of the disciplinary investigation.
 9   It's true that you in fact found that a uniform
10   violation was sustained.
11        A.   I did.
12        Q.   And that part of the uniform violation
13   was not having his baton; is that right?
14        A.   Yes.
15        Q.   And part of it was not having his body on
16   it?
17        A.   That's correct.
18        Q.   And part of it was not having body armor?
19        A.   That's correct.
20        Q.   And how did not having his baton or not
21   having body armor affect the end result of the
22   shooting?
23        A.   Body armor would not have affected, would
24   have been non-consequential, only that.  The having
25   your baton or not having a baton, that didn't for me
```

```
1    change the factors in the long run.  They were not a
2    turning point, pivotal factor for me.
3        Q.    Let me refer you to page 3 of 6 on
4    Exhibit Number 2, your letter.
5        A.    Okay.
6        Q.    It's a summary of emboldened italics
7    where you have summarized the recommendations of the
8    chief's panel.  The last sentence says the panel
9    believes the outcome of the incident would not have
10   been affected by Officer Burmaster having the PR-24
11   expandable baton and/or the department issued body
12   armor?
13       A.    Right.
14       Q.    This is something you agree with?
15       A.    I do.
16             MR. ROQUEMORE:
17                  Chief, I appreciate your time.
18        Those are all questions I have for you.
19             THE WITNESS:
20                  Okay.
21             MR. MOST:
22                  You need to be out of here by 4:30;
23        is that right?
24             THE WITNESS:
25                  I'm here to answer your questions.
```

```
 1   Burmaster being exonerated.  Hat's a determination
 2   within the police department.  It doesn't mean that
 3   the court has exonerated him; correct?
 4           BY MR. ROQUEMORE:
 5                Objection form.
 6           THE WITNESS:
 7                That would be correct.
 8   BY MR. MOST:
 9       Q.   And with your signature on the
10   disciplinary document, you approved of Burmaster's
11   decision to shoot the dog and his basis for it;
12   correct?
13       A.   I think it's reasonable that he fell
14   within that range of what would be deemed
15   reasonable.
16       Q.   And so you approved of the decision?
17       A.   Yes.
18       Q.   And his basis for making the decision?
19       A.   His and the weight of all the others who
20   weighed it along the way, which were all those
21   deputy chiefs, everyone who assisted us.
22       Q.   Okay.  And you said that your belief was
23   that no human was injured in this incident?
24       A.   I don't believe I said.  I think the
25   question was posed differently to me.  So what was
```