# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DEREK BROWN, ET AL | CIVIL ACTION |
| VERSUS | NO. 22-847 |
| DERRICK BURMASTER, ET AL | SECTION "L" (4) |

**Plaintiffs' Opposition to Defendants' Renewed Motion *in Limine***

This case is about New Orleans Police Department officer Derrick Burmaster's use of lethal force on Plaintiffs' 16-week-old puppy, Apollo. In R. Doc. 230, Defendants filed a motion *in limine* to exclude a range of evidence. This brief provides Plaintiffs' opposition.

**1. The Court should deny NOPD's request to exclude evidence of its own Use of Force Review Board and the testimony of expert NOPD Deputy Superintendent Christopher Goodly.**

In their motion, NOPD seeks to exclude all evidence regarding the conclusions of its own Use of Force Review Board.[1] Defendants also seek to exclude all testimony of former NOPD Deputy Superintendent Christopher Goodly,[2] who is designated as one of Plaintiff's non-retained experts.[3] This motion *in limine* should be denied for several reasons.

A. <u>The Use of Force Review Board employed an objective analysis based on the actual evidence.</u>

Burmaster killed Plaintiffs' puppy Apollo on April 10, 2021. On August 19, 2021, NOPD's Use of Force Review Board convened to review Burmaster's use of lethal force on Apollo. NOPD Deputy Superintendents Goodly, Westbrook and Noel sat on the Board, along with other non-

---

[1] R. Doc. 230-1 at 2.
[2] *Id.*, at n. 2. At the relevant times, Goodly was a NOPD Deputy Superintendent. He is now Deputy Chief Field Operations Bureau for the Orleans Parish Sheriff's Office.
[3] R. Doc. 228 at 18. As discussed below, NOPD also designated Goodly as a non-retained expert, but then later attempted to "un-designate" him.

1

voting members. As reflected in the Board's report,[4] the Board interviewed Officer Burmaster, and reviewed Burmaster's body-worn camera footage of the shooting, photographs of the scene, and Burmaster's statements made to NOPD's Public Integrity Bureau. Based on its review of this evidence, NOPD's Use of Force Review Board made determinations including:[5]

- "The larger dog ran towards Officer Roussel with the smaller of the 2 dogs running towards Officer Burmaster. The smaller dog [Apollo] did not attack or attempt to attack Officer Burmaster. Officer Burmaster was not equipped with a baton and did not attempt any less lethal options."

- Officer Burmaster "had a false perception of a threat that was not there."

- "Officer Burmaster did not articulate any threat towards him."

- Officer Burmaster violated NOPD's Use of Force Policy Ch. 1.3, Para. 13(a) providing that: "Deadly/Lethal force shall be used only when: There is an imminent danger of death or serious physical injury to the officer or another person."

- Officer Burmaster violated NOPD's Use of Force Policy Ch. 1.3, Para. 32 providing that: "Dangerous Animals—Officers are authorized to use firearms to stop an animal in circumstances in which the animal reasonable appears to pose an imminent threat to human safely and alternative methods are not reasonably available or would likely be ineffective. The officer must be cognizant of the surroundings when shooting at an animal and ensure there is no risk to people in the area."

- Officer Burmaster violated NOPD's uniform policy by failing to wear body armor.

- "Training Recommendations: Officer Burmaster will receive De-escalation training."

- The board required the de-escalation training "ASAP."

---

[4] R. Doc. 110-17.
[5] R. Doc. 94-9 (Minutes of Use of Force Review Board).

In light of Officer Burmaster's violation of NOPD's policies, the Use of Force Review Board unanimously determined that his shooting of Apollo was "NOT JUSTIFIED."[6]

After Plaintiffs filed suit, Deputy Superintendent Goodly gave a deposition and testified consistent with the Use of Force Review Board's conclusions. After Goodly's deposition, Plaintiffs designated Goodly as a non-retained expert on March 9, 2023.[7] On March 10, 2023, the City also designated Goodly as a non-retained expert.[8] On March 13, 2023, the City designated Goodly as a non-retained expert again, and noted that Goodly was designated as an expert to testify broadly as to any matter touching on his deposition testimony.[9] Years later in March 2025, in a footnote in a supplemental expert disclosure, NOPD attempted to "un-designate" Deputy Superintendent Goodly as its expert.[10]

B. <u>NOPD attempted to "walk back" its own conclusions at the Bureau Superintendent's Disciplinary Hearing.</u>

On June 15, 2023, after NOPD was facing a civil lawsuit, an impending jury trial, and a potential monetary judgment over Apollo's death, NOPD held a "Bureau Superintendent's Disciplinary Hearing" where it recommended that Burmaster be "exonerated"[11] from three out of five policy violations that the previous NOPD Board had found. NOPD's shifting positions on Burmaster's shooting of Apollo coalesced with Plaintiffs' lawsuit as follows:[12]

---

[6] R. Doc. 110-17.
[7] **Ex. A**.
[8] **Ex. B**.
[9] **Ex. C**.
[10] **Ex. D**.
[11] Plaintiffs have moved to exclude NOPD's use of the term "exonerated." *See* R. Doc. 229-1, at 5-6.
[12] This chart was developed during the deposition of NOPD 30(b)(6) witness John Helou, who confirmed that it accurately represented the evidence. Ex. E (Helou 30(b)(6) Dep.) at 18:17-21:18 ("Q. I see. So if these green words were changed to exonerated, with that amendment, this would reflect your understanding? . . . Yeah. If you did that, yeah.")

| Aug 2021 PIB | Aug 2021 Use of Force Review Board | 2022 Lawsuit Filed | Sep 2023 Chief's Hearing | Oct 2023 Chief's Decision |
|---|---|---|---|---|
| VIOLATION SUSTAINED | UNJUSTIFIED | | EXONERATED | EXONERATED |
| VIOLATION SUSTAINED | UNJUSTIFIED | | EXONERATED | |
| VIOLATION SUSTAINED | UNJUSTIFIED | | EXONERATED | |

C. <u>The Jury should be permitted to hear the Use of Force Review Board's conclusions and recommendations.</u>

NOPD's attempt to "walk back" the Use of Force Review Board's conclusions at the Bureau Superintendent's Disciplinary Hearing presents serious credibility and bias concerns that Plaintiffs should be permitted to test at trial. First, the Jury should be permitted to hear that all NOPD review board panels that reviewed Burmaster's shooting <u>before a civil suit was filed</u>, including both the Use of Force Review Board and the Public Integrity Bureau Force Investigation Team,[13] unanimously concluded that Burmaster's use of lethal force on Apollo violated NOPD's policies and was therefore unjustified. And that only <u>after</u> a civil suit seeking monetary damages was filed, NOPD unsurprisingly attempted to partially walk back its unfavorable determinations via the Bureau Superintendent's Disciplinary Hearing.

---

[13] The three-member NOPD Public Integrity Bureau Force Investigation Team also independently reviewed Burmaster's shooting of Apollo and also unanimously concluded that Burmaster violated NOPD's use of force and other policies. *See* R. Doc. 110-9. Defendants do not move to exclude the Force Investigation Team's findings in their Motion *in Limine*.

4

#103979508v1

Second, Defendants argue that evidence of the Use of Force Review Board should be excluded because its "conclusion was determined to be incorrect by the NOPD Superintendent, Anne Kirkpatrick," a lay witness whom NOPD plans to call at trial.[14] (Plainly, an expert witness like Goodly cannot be excluded because a lay witness has a different opinion.) At her deposition, however, Kirkpatrick revealed that she came to her conclusions based on Officer Burmaster's biased account <u>without even watching the video</u> of the shooting or <u>seeing what the puppy Apollo looked like</u>:

> Q. Okay. And at any point, have you seen photos of the dog that was killed?
> 
> A. I have not.
> 
> Q. Okay. Have you seen a video of the shooting of the dog?
> 
> A. I have not.
> 
> Q. … So you've never seen the size or appearance of this dog before?
> 
> A. I have not.[15]

Because she did not watch the video of the shooting, when arriving at her conclusions, Kirkpatrick had an erroneous understanding that both of Plaintiffs' dogs (Bucho, the larger dog and Apollo, the small puppy) were pursuing officer Burmaster at the time of the shooting.[16] But Defendants have already conceded that this is false—only the small puppy Apollo ran towards Burmaster; Bucho ran in the opposite direction away from Burmaster.[17] Kirkpatrick's conclusions were therefore based on a demonstrably false critical fact because she never watched the video.

---

[14] R. Doc. 230-1, at 2. Plaintiffs have moved to exclude Superintendent Anne Kirkpatrick's testimony. *See* R. Doc. 225-1.
[15] R. Doc. 225-6, at 3-4 (deposition pp. 13, l. 22 – 14, l.8).
[16] R. Doc. 225-6, at 6 (deposition p. 35, ll. 1-5).
[17] *See* Burmaster's Statement of Uncontested Material Facts (R. Doc. 105-12), at 3, ¶ 15 ("The larger of the two dogs ran towards Officer Roussel while the smaller one ran directly towards Officer Burmaster.").

#103979508v1

Moreover, in arriving at her conclusions, Superintendent Kirkpatrick considered Burmaster's idiosyncratic subjective viewpoints and beliefs[18] rather than conducting a purely objective analysis as required under both NOPD policy[19] and Fifth Circuit and United States Supreme Court precedent.[20] Finally, in rendering her conclusions, Kirkpatrick did not even consider whether less lethal means of dealing with Apollo would have been available or effective.[21]

Because Superintendent Kirkpatrick (1) had never seen Apollo or the video footage of the incident (*i.e.*, the actual evidence in the case) when rendering her opinions and (2) did not consider whether non-lethal alternatives could have been reasonably employed, but instead (3) based her determination solely on Officer Burmaster's subjective and self-serving account of the incident, her alleged conclusion that the Shooting Review Panel's policy violation determinations were "incorrect" has no probative value whatsoever, but instead carries a substantial risk of prejudice and confusing the jury.[22] It is therefore the Bureau Superintendent's Disciplinary Hearing and Kirkpatrick's related opinion that the Use of Force Review Board's conclusions that should be excluded under FRE 403, and not the Use of Force Review Board's objective conclusions that were actually based on a review of the evidence.

Defendants also make reference to the "supremacy of the Superintendent's interpretation of NOPD police over the NOPD's Use of Force Use of Force Review Board."[23] While the

---

[18] R. Doc. 225-6, at 6-9 (deposition pp. 35:12 – 38:9).
[19] R. Doc. 208-6, at 6-7 (applying "objectively reasonable" standard to whether an officer may use his firearm).
[20] *See* discussion in R. Doc. 225-1, at 4-8.
[21] R. Doc. 225-6, at 4 (Deposition 14:13–20).
[22] *See* R. Doc. 225-1 (arguing that Kirkpatrick's lay opinions should be excluded under FRE 403).
[23] R. Doc. 230-1, at 3. Defendants then cite a portion of NOPD's Operations Manual (Sec. 1.3.7) to support this contention, but the excerpt they cite contains no suggestion that the Use Force Review Board's conclusions are somehow inferior to those of the Superintendent.

#103979508v1

Defendants may feel this way, they do not get to dictate what evidence the Jury accepts or rejects—the Jury, as "trier of fact is the sole judge of the weight and credibility of the evidence."[24] The Jury should be permitted to hear the Use Force Review Board's conclusions and determine for themselves what weight they should be given.

D. The Use of Force Review Board's conclusions do not constitute a "subsequent remedial measure" because NOPD never implemented the recommended remedial measures.

NOPD finally moves to exclude its own Use of Force Review Board's conclusions because they constitute a "subsequent remedial measure."[25] This argument should be rejected as well. FRE 407 provides that "when measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures."

As the Fifth Circuit has clarified, "Rule 407 prohibits evidence of measures, and those only if <u>actually implemented</u>."[26] "[T]he text of that rule only prohibits evidence of . . . subsequent measures, not evidence of a party's analysis of its product. The fact that the analysis may often result in remedial measures being taken … does not mean that evidence of the analysis may not be admitted. This argument is persuasive, because by themselves, post-accident investigations would not make the event 'less likely to occur;' <u>only the actual implemented changes make it so</u>."[27]

---

[24] *Shaw v. Davis*, 2018 U.S. Dist. LEXIS 197265, at *9 (N.D. Tex. Nov. 19, 2018).
[25] R. Doc. 230-1, at 3.
[26] *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 431 (5th Cir. 2006) (emphasis added).
[27] *Id.* at 430 (internal citations and quotations omitted) (emphasis added).

Case 2:22-cv-00847-EEF-KWR    Document 232    Filed 06/01/25    Page 8 of 20

"By it terms, this rule is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what did occur. The reason for finding Rule 407 inapplicable is that such reports or inspections are not themselves remedial measures… Although such reports or inspections might represent the first or most preliminary steps that might eventually lead to decisions to make or implement changes, they are not themselves excluded under Rule 407."[28] "There is a distinction … between the actual disciplining of officers for their conduct, which could constitute a remedial measure, and the investigation that precedes a disciplinary process."[29]

    Here, the Use of Force Review Board's review process was a post-incident investigation into the events of April 10, 2021, which preceded any actual remedial measures or discipline (neither of which ever actually occurred). The Board's conclusions that Officer Burmaster violated NOPD's polices (some of which even Superintendent Kirkpatrick and the Bureau Superintendent's Disciplinary Hearing committee agreed with) and that his use of lethal force on Apollo was unjustified are not subsequent remedial measures themselves. They are merely conclusions reached by NOPD in its own internal investigation about what happened on the night in question. And while it is true that the Use of Force Review Board recommended that Officer Burmaster receive de-escalation training "ASAP," NOPD declined to provide such de-escalation training to Burmaster because NOPD's head of training Sgt. Duplantier determined that

---

[28] *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1103 (D. Or. 2013) (citing Christopher Mueller & Laird Kirkpatrick, 2 Federal Evidence § 4:50, at 77 (3d ed. 2007) (internal citations and quotations omitted).
[29] *Id.* at 1104 (denying motion to strike the McMinnville Police Department's "Use of Force Review"); *see also Mays v. Chevron Pipe Line Co.*, 2019 U.S. Dist. LEXIS 5158, at *4 (W.D. La. Jan. 9, 2019) (denying motion to exclude post-incident investigation report because "the report itself is not a measure that would make an injury less likely to occur" and there was no evidence "that the recommended measures were actually implemented.").

8

#103979508v1

Burmaster "acted properly."[30] So no actual remedial measures, training, or discipline ever took place.

To avoid any doubt, Deputy Superintendent Hans Ganthier—NOPD's second in command—confirmed at his deposition that NOPD had taken no measures after Apollo's shooting to make dog shootings less likely to occur:

> Q. … After Officer Burmaster shot Apollo, did NOPD take any specific measures to prevent future dog shootings? . . .
>
> A. Not that I know of. I mean, not that I'm aware of.
>
> Q. You're not going to, at trial, tell the jury that in response to Officer Burmaster shooting Apollo, NOPD took any specific measures to prevent future dog shootings, right?
>
> A. Not that I'm aware of ….[31]

And finally, the Fifth Circuit has held that Federal Rule of Evidence 407 cannot be invoked to exclude evidence of a subsequent remedial measure that was "required in any event by a superior authority" rather than "out of a sense of social responsibility."[32] Here, NOPD's implementation of the Use of Force Review Board is required by a federal court order, as part of the NOPD consent decree.[33] That court order specifically requires the Board to assess whether "the force may have violated NOPD policy."[34] Given that the Use of Force Review Board's analysis is court-ordered, it cannot be excluded under Rule 407.

---

[30] R. Doc. 105-1, at 8.
[31] R. Doc. 225-5 (Ganthier Dep.) 48:16 – 49:4.
[32] *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978) ("Invoking this policy to justify exclusion here is particularly inappropriate since the estimate was prepared not out of a sense of social responsibility but because the remedial measure was to be required in any event by a superior authority, the National Highway Traffic Safety Administration.")
[33] *United States v. City of New Orleans*, 12-cv-01924-SM-DPC, R. Doc. 778 at ¶ 108 (E.D. La. Apr. 8, 2024).
[34] *Id.* at ¶ 108

Because NOPD's Use of Force Review Board's conclusions and recommendations (1) were merely part of a post-incident investigation, (2) are not themselves actual remedial measures, (3) did not result in any actual discipline or additional de-escalation training for Officer Burmaster, and (4) are required by Court order, they cannot constitute subsequent remedial measures under FRE 407.

E. <u>NOPD Deputy Superintendent Christopher Goodly's testimony should not be excluded.</u>

In a footnote, in addition to requesting the exclusion of the Use of Force Review Board's conclusions, Defendants also request the exclusion of the "proposed testimony of Chris Goodly."[35] Goodly was designated as an expert by both Plaintiffs and the City (although the City later attempted to "un-designate" him). As this Court has already held, "expert testimony regarding policies and procedures, and Defendants' compliance with those policies and procedures, is admissible." *Gibbs v. Lopinto*, 2023 U.S. Dist. LEXIS 76866, at *8 (E.D. La. May 3, 2023) (Fallon, J.). And, in evaluating the reasonableness of an officer's use of force, "a policy violation can serve as evidence that an act was objectively unreasonable."[36] "Relatedly, a policy violation may show that a reasonable, alternative course of action was available to the officer."[37] Goodly's testimony about Officer Burmaster's numerous violations of NOPD's policies in killing Apollo is therefore relevant and admissible.[38]

---

[35] R. Doc. 230-1, at 2, n. 2.
[36] *Dawes v. City of Dall.*, No. 17-1424, 2021 U.S. Dist. LEXIS 260494, at *7-8 (N.D. Tex. Sep. 24, 2021) (citing *Anthony v. Morton*, No. 05-0027, 2007 U.S. Dist. LEXIS 101798, 2007 WL 628750, *7 (W.D. Tex. Jan. 31, 2007) (holding that officer's violation of police baton policy "is certainly probative in determining if [officer] acted in an objectively reasonable manner."); *Hope v. Pelzer*, 536 U.S. 730, 743-44, (2002) (holding that official's disregard of prison regulation "provides equally strong support for the conclusion that they were fully aware of the wrongful nature of their conduct.")).
[37] *Dawes*, 2021 U.S. Dist. LEXIS 260494, at *8.
[38] Deputy Superintendent Goodly is both a fact and expert witness. Assistant Superintendent Hans Ganthier is also a fact witness who was designated by the City as a non-retained expert. To the extent Defendants

## 2/3. This Court should deny Defendants' MIL about Burmaster's prior uses of force and other prior NOPD investigations because this Court already addressed the relevance of such evidence.

In R. Doc. 230, Defendants seek to exclude any evidence of any prior use of force by Burmaster (except his prior 2012 dog shooting) and any investigation by NOPD into Burmaster other than the shooting of Apollo.[39]

Defendants' motion should be denied because the Court has already addressed this in its denial of the City's motion to dismiss.[40] There, the City argued that that Burmaster's prior uses of force, reputation for using force, and prior policy violations were irrelevant to Plaintiffs' claims.[41] Plaintiff countered that the evidence was relevant to Plaintiffs' *Monell* claims that the NOPD failed to adequately train, supervise, discipline, and retain Officer Burmaster.[42]

In the context of denying that motion, the Court acknowledged Plaintiffs' allegations that Burmaster is a "frequent user of force," who has used force at least 30 times since 2011, including the discharge of firearms against multiple humans and multiple animals.[43] And that Burmaster's use of force has been the subject of multiple complaints, and that NOPD has sustained at least twenty other rule violations against Burmaster.[44]

---

take the position that Plaintiffs' motion *in limine* to exclude Superintendent Ganthier's testimony (R. Doc. 225) should have been filed in accordance with the Court's *Daubert* motion deadline instead of its motion *in limine* deadline (which Plaintiffs contest), the same argument would hold true as to Defendants' motion to exclude Superintendent Goodly's testimony.

[39] R. Doc. 230-1 at 4-6.
[40] R. Doc. 115.
[41] R. Doc. 68.
[42] R. Doc. 71.
[43] R. Doc. 115 at 2.
[44] R. Doc. 115 at 2.

#103979508v1

Defendants do not deny these allegations. Rather, they argue that the prior uses of force are irrelevant and should be excluded. But in denying the City's motion to dismiss, the Court already ruled:

- "The Court … rejects Movants' argument here that '[t]here is nothing 'obvious' about Defendant Burmaster's unspecified use of force against humans that would necessarily lead to Defendant Burmaster's shooting of Plaintiffs' dog."
- "[I]t is appropriate to suggest that it is foreseeable that a failure to train or discipline an officer who used excessive force would result in his continued use of excessive force—whether against humans or against other living beings."
- "[I]f this Court accepts as true Plaintiffs' allegations about Burmaster's past use of force incidents and other rule violations,[45] the complaint does raise factual questions about 'the inappropriateness of NOPD's choice to continue having Burmaster on the force.'"[46]

Although that ruling was at the motion to dismiss phase and dealt with allegations rather than evidence, it is still indicative of what kinds of facts are legally relevant to Plaintiffs' claims. Thus, Burmaster's frequent prior uses of force—including firing guns at multiple humans and an animal—is substantially probative to the question of whether NOPD adequately trained, supervised, disciplined and retained Burmaster. Indeed, later in their brief, Defendants acknowledge this, conceding that if "the Court admits evidence of prior uses of force by Officer Burmaster, any relevance such evidence may have would be only to the *Monell* claim against the City . . ."[47] The high probative value of this evidence outweighs any potential for prejudice or confusion. Burmaster's frequent prior uses of force should be admitted under the FRE 403 analysis.

---

[45] Which again, the Defendants do not contest factually, but only argue to be irrelevant.
[46] R. Doc. 115 at 7-8.
[47] R. Doc. 230-1 at 9.

Defendants also argue that Burmaster's prior uses of force and related records are inadmissible under FRE 404(a) and (b).[48] However, "Rule 404 is a rule of inclusion."[49] In *Carson v. Polley*,[50] the Fifth Circuit reversed the exclusion of evidence related to the defendant officer's prior "loss of temper" and "hostility" events because they "made it more likely that a similar intent was present in [the officer's] conduct towards [plaintiff],"[51] and were therefore admissible under Rule 404(b)'s "intent" exception.[52] The Fifth Circuit further explained why the evidence was important: "The theory of Carson's case was that the force used by the deputy sheriffs was excessive and was prompted by irrational factors. The defendants countered by attempting to show that the deputy sheriffs responded coolly and reasonably to an obstreperous detainee. One key issue, therefore, was whether the sheriffs reacted to Carson with excessive and unfettered hostility, or with reason and control. This issue is, in part, a matter of intent."[53]

Just like in *Carson*, Plaintiffs' theory of this case is that Officer Burmaster use of lethal force on Apollo was "excessive" and "hostile" (he shot the small puppy three times) and "prompted by irrational factors" (he told the Public Integrity Bureau that he shot Apollo because "he was concerned the dog was going to bite his penis").[54] Therefore, Burmaster's excessive number of prior force incidents, including firing guns at people and animals, makes it more likely that

---

[48] R. Doc. 230-1 at 4.
[49] *United States v. Cline*, 2024 U.S. Dist. LEXIS 99770, at *23 (M.D. La. June 5, 2024) (quoting *United States v. Shaw*, 701 F.2d 367, 386 (5th Cir. 1983)).
[50] 689 F.2d 562, 572-73 (5th Cir. 1982).
[51] *Id.* at 573.
[52] *Id.* at 572.
[53] *Id.* at 573.
[54] R. Doc. 110-9, at 9.

13

Burmaster had a similar intent was present in his conduct towards Apollo. Burmaster's prior force incidents are therefore admissible under FRE 404(b) to show his intent.[55]

As to NOPD's investigations of these prior uses of force, Defendants argue that they are irrelevant because "each of these investigations resulted in a disposition of 'not sustained' or "exonerated,'" and that "Officer Burmaster was not charged with any disciplinary violations based on the use of force from 2016 to 2021."[56] Defendants are only proving Plaintiff's point here—the fact that NOPD did not discipline or give additional training to Officer Burmaster in response to these frequent prior incidents goes to the heart of Plaintiff's inadequate training, supervision and retention claims against NOPD. The probative value of this evidence outweighs any potential prejudicial effect.

4. **This Court should deny as moot Defendants' request to exclude NOPD investigations into Burmaster's post-shooting behaviors.**

Defendants' motion explains that they "are not certain that Plaintiffs will seek to offer evidence concerning Officer Burmaster's conduct as a police officer after the incident involving Plaintiffs' dog," but seek to exclude it out of an "abundance of caution."[57]

In meet and confer correspondence, Defendants identified what specifically they meant: Public Integrity Bureau investigations 2021-0395-P, 2021-7070-R, 2022-0022-R, 2022-0329-R.[58]

Plaintiffs will not refer to these investigations or the underlying allegations, and so this

---

[55] *See also Young v. Rabideau*, 821 F.2d 373, 380 (7th Cir. 1987) (upholding the admission of plaintiff's prior assaults finding that the evidence was admissible to demonstrate the plaintiff's "intent" to harm the correctional officer during a fight; *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) (holding that where plaintiff claimed he was tortured into giving evidence, evidence that the same officers had tortured two other suspects should have been admitted under Federal Rule of Evidence 404(b) to show intent, plan, modus operandi, and absence of mistake).
[56] R. Doc. 230-1, at 6.
[57] R. Doc. 230-1, at 7.
[58] Ex. F.

14

portion of Defendants' motion can be denied as moot.

5.  **This Court should deny Defendants' motion about the comments of the Office of the Consent Decree Monitor.**

Defendants' motion seeks to exclude comments by members of the Office of the Consent Decree Monitor ("OCDM") to the NOPD's Use of Force investigation.[59]

The context here is that in 2021, the court-appointed OCDM reviewed the PIB investigation of Burmaster's killing of Plaintiff's dog, provided comments on the draft PIB investigatory report, and met with PIB about it.[60] (Despite these documents being responsive to Plaintiffs' 2022 discovery requests, the City did not provide them until March 14, 2025.)

The OCDM comments are significant and directly relevant to the issues in this case. Two former chiefs of police – Chief Chet Epperson and Chief Mitch Brown[61] – make comments such as:

- "Was there any consideration of Officer Burmaster being reckless when he discharged his firearm?"

- "If someone was struck by Officer Burmaster's discharge I am assuming you would charge him with reckless conduct?"

- "I submit to you that not only is [the shooting] unreasonable, but unauthorized also."[62]

In 2021, PIB's Lt. John Helou met with Chief Epperson and Chief Brown to go over their comments.[63] At deposition, Lt. Helou explained his understanding of the Chiefs' comments. For example, he understood one comment to be "Chief Epperson pointing out sort of a potential

---

[59] R. Doc. 230-1, at 7.
[60] Ex. G.
[61] Helou Dep. (**Ex. E**) at 11:16-12:11.
[62] **Ex. G**.
[63] Helou Dep (**Ex. E**) at pp. 13:1-14:24.

inconsistency in [Burmaster's] statement."[64] He understood another comment to be that Chief Epperson was "agreeing with the investigator that Officer Burmaster fired his weapon out of fear and not because the animal presented an imminent threat of serious bodily injury."[65] And perhaps most significantly, Helou understood Chief Epperson to be "suggesting a possibility of criminal charges against Burmaster if someone was struck by his discharge."[66] (That did in fact happen – Burmaster's partner was struck.[67]).

Plaintiffs' counsel also sought to depose Chief Epperson, but were informed by the OCDM that "the Consent Decree, which is a Federal Court Order, precludes the Monitoring Team from testifying 'in any other litigation or proceeding with regard to any act or omission of the City or any of its agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of its performance under this Agreement.'"[68] The OCDM was correct; the consent decree does say that.[69]

In their motion, Defendants seek to exclude evidence about the OCDM comments as hearsay. But here, the OCDM comments fall within the FRE 804 "Declarant Unavailable" exception to the rule against hearsay. That rule allows for admission of hearsay if, among other things, the witness is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies" and the hearsay is offered against "a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's

---

[64] Helou Dep. (**Ex. E**) at p. 19:7-9.
[65] Helou Dep. (**Ex. E**) at p. 20:11-14.
[66] Helou Dep. (**Ex. E**) at p. 22:13-23:4.
[67] *See* R. Doc. 228 at 5 ("Roussel was wounded by a fragment of something put in motion by a bullet fired by Burmaster").
[68] **Ex. H**.
[69] *United States v. City of New Orleans*, 12-cv-01924-SM-DPC, R. Doc. 778 at ¶ 463 (E.D. La., April 18, 2024).

#103979508v1

unavailability as a witness, and did so intending that result."[70] Here, both elements are met. The OCDM personnel are "exempted from testifying" based on a court ruling in the form of the consent decree. And the hearsay would be offered against the City that wrongfully caused the witness to be unavailable: by committing the wrongful acts that led to the federal consent decree,[71] and then by consenting to an order making the OCDM personnel immune from testimony.[72]

Alternatively, the OCDM comments fall within the FRE 807 residual exception for hearsay. That rule allows hearsay if the hearsay is "supported by sufficient guarantees of trustworthiness" and "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Here, the OCDM comments are extremely trustworthy – they are made by officials selected by a section of this Court to conduct oversight over NOPD. And they are more probative of the OCDM's position because Plaintiff is unable to depose the OCDM personnel.

Finally, Defendants object on FRE 702 grounds, which addresses "Testimony by Expert Witnesses." But here, Plaintiffs are not offering any testimony by the OCDM personnel. Defendants' motion should be denied.

6. **The Court should deny Defendants' motion about *State v. Loicana* because it is relevant to the City's supervision of Officer Burmaster.**

Defendants' next motion *in limine* addresses *State v. Loicana*, 2018-0497 (La. App. 4 Cir. 8/22/18) 254 So.3d 761, which Plaintiffs propose to use as an exhibit. In that case, the Louisiana

---

[70] FRE 804(a)(1), (b)(6).
[71] See *United States v. City of New Orleans*, 12-cv-01924-SM-DPC, R. Doc. 1 at ¶ 2 (E.D. La., July 24, 2012) ("The United States brings this action to remedy a pattern or practice of conduct by law enforcement officers of the New Orleans Police Department . . . that deprives persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States.")
[72] *Id*. at R. Doc. 2 (Joint Motion for Entry of Consent Decree by New Orleans City, United States of America).

17

#103979508v1

Fourth Circuit Court of Appeals determined that Officer Burmaster had violated the constitution by engaging in a warrantless, unjustified search. The court of appeal also affirmed the lower court's ruling of no probable cause.[73]

It is admittedly atypical to use a court opinion as an exhibit at trial, but the purpose is not "to use this case to impugn Officer Burmaster's character," as Defendants suggest.[74] Instead, it is to show the failure of NOPD to properly supervise Officer Burmaster. That is because the City's 30(b)(6) witness conceded that their system is "supposed to trac[k] when no probable cause is found" for an officer, but NOPD could not find any evidence in its system that this was tracked for officer Burmaster.[75] The 30(b)(6) witness agreed that the fact that courts have found an officer to have violated the Constitution "could be" relevant to whether "NOPD chooses to retain [the] officer."[76] Thus, NOPD's failure to track Officer Burmaster's court-determined constitutional violations is probative evidence of its failure to properly supervise him.

If the Court finds this issue to be relevant but prefers that Plaintiffs not use the Fourth Circuit opinion itself, Plaintiffs request that the Court permit them to address the ruling through NOPD's Corporate representative Helou's testimony or to refresh his recollection. For these reasons, the motion should be denied.

7.  **This Court should deny Defendants' motion as moot because Plaintiffs do not see any need to refer to any witnesses as "non-retained experts" of Defendants.**

Defendants ask this Court to prohibit Plaintiffs from "describing Shannon Jones-Brewer as

---

[73] *Loicana*, 254 So.3d at 773 ("For the above-mentioned reasons, we do not find that the trial court abused its discretion by granting Mr. Loicana's motion to suppress the evidence and statements and by finding no probable cause. The exceptions for a warrantless search do not apply to the facts and circumstances of this case.")
[74] R. Doc. 230-1 at 8.
[75] 30(b)(6) Deposition of NOPD's Corp. Rep. Helou at p. 34:13-21 (attached as **Ex. E).**
[76] *Id*. at 34:23-35:7.

being designated a non-retained expert by the City."[77] Plaintiffs do not intend to refer to her as a "non-retained expert; it is unlikely that jurors would understand the distinction between retained and non-retained, and so they do not intend to describe her as a "non-retained expert by the City."

Plaintiffs do intend, however, to appropriately point out that the City considered her to be an expert, given that they designated her as an expert.[78] To the extent that the City is now withdrawing her as an expert, Plaintiffs will call her and qualify her as a non-retained expert witness.

In this motion, however, the City is only asking that Plaintiffs not describe her as a "non-retained expert by the City." Plaintiffs agree to that, and so the motion can be denied as moot.

**8.  This Court should deny Defendants' motion for a limiting instruction as moot because Plaintiffs agree that it may be included in jury instructions.**

Finally, Defendants ask for a limiting instruction regarding any testimony regarding any prior use of force by Burmaster. They ask that the Court state that: "You have heard testimony regarding one or more prior acts involving use of force by Officer Burmaster. Such evidence, to the extent you find the evidence credible, cannot be used by to infer that Officer Burmaster acted unreasonably or used excessive force on the night in question."[79]

Plaintiffs do not object to this instruction being included in the jury instructions. But Defendants ask that it be read *every time* Burmaster's prior uses of force come up at trial.[80] That would be cumbersome, prejudicial, repetitive, and distracting, and the law does not authorize the repetition of a limiting instruction.[81] Accordingly, the Court should include the limiting instruction

---

[77] R. Doc. 230-1 at 8.
[78] *See* **Exs. B & C.**
[79] R. Doc. 230-1, at 9.
[80] R. Doc. 230-1, at 9.
[81] *See United States v. Winstead,* 890 F.3d 1082, 1085 (D.C. Cir. 2018).

#103979508v1

in the final jury instructions,[82] and deny Defendants' motion.

## Conclusion

Defendants' motions *in limine* should be denied.

Respectfully Submitted:

| | |
|---|---|
| */s/ William Most* | */s/ Tarak Anada* |
| WILLIAM MOST (La. Bar No. 36914) | TARAK ANADA (#31598) |
| HOPE PHELPS (La. Bar No. 37259) | PATRICK VAN BURKLEO (#41471) |
| DAVID LANSER (La. Bar No. 37764) | JONES WALKER LLP |
| MOST & ASSOCIATES | 201 St. Charles Avenue |
| 201 St. Charles Ave., Ste. 2500, # 6825 | New Orleans, Louisiana 70170-5100 |
| New Orleans, LA 70170 | Telephone: (504) 582-8322 |
| Telephone: (504) 509-5023 | Facsimile: (504) 589-8322 |
| E-Mail: williammost@gmail.com | E-Mail: tanada@joneswalker.com |

---

[82] *See U.S. v. Dabish,* 708 F.2d 240, 243 (6th Cir. 1983) (rejecting Defendant's argument that limiting instruction should have been given contemporaneously instead of with the jury instructions at the end of the trial); *U.S. v. Oxford*, 735 F.2d 276, 280 (7th Cir. 1984) (same); *U.S. v. Fetters,* 2011 WL 3715271, *6 (S.D. Iowa May 5, 2011) (recognizing that "evidence suggesting propensity to commit a similar crime could be cured with a limiting instruction in the final jury instructions.").