UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DEREK BROWN and JULIA                    CIVIL ACTION

BARECKI-BROWN                            NO. 22-00847

VERSUS                                   SECTION: L

                                         DIVISION: 4

DERRICK BURMASTER, SHAUN                 HON. ELDON FALLON

FERGUSON, and the CITY OF                HON. KAREN W.ROBY

NEW ORLEANS




            30(b)(6) DEPOSITION OF THE CITY OF NEW

ORLEANS, through its designated representative,

LIEUTENANT JOHN HELOU, given in the above-entitled

cause, via Zoom videoconferencing, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana on the 9th day of April, 2025,

commencing at 1:00 PM.

```
 1    APPEARANCES (Via Zoom):
 2    REPRESENTING THE PLAINTIFFS:
 3              MOST & ASSOCIATES
              BY: WILLIAM MOST,
 4            ATTORNEY AT LAW
              201 St. Charles Avenue
 5            Suite 2500, #9685
              New Orleans, Louisiana  70170
 6            Representing the Plaintiffs
              (williammost@gmail.com)
 7
              -and-
 8
              JONES, WALKER
 9            BY:  TARAK ANAND,
              ATTORNEY AT LAW
10            201 St. Charles Avenue
              New Orleans, Louisiana  70170-5100
11
12    REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON, and
      the CITY OF NEW ORLEANS:
13
              OFFICE OF THE CITY ATTORNEY
14            BY:  JAMES ROQUEMORE,
              ATTORNEY AT LAW
15            1300 Perdido Street
              Suite 5E03
16            New Orleans, Louisiana  70112
              (James.Roquemore@nola.gov)
17
      REPRESENTING DERRICK BURMASTER:
18
              GUSTE, BARNETT, SCHLESINGER & ALPAUGH
19            BY:  C. THEODORE ALPAUGH, III,
              ATTORNEY AT LAW
20            639 Loyola Avenue
              Suite 2130
21            New Orleans, Louisiana  70113
              Representing Derrick Burmaster
22            (cta@gustebarnett.com)
23    Reported By:
24            Sandra P. DiFebbo
              Certified Shorthand Reporter
25            State of Louisiana
26
```

```
1

2       E X A M I N A T I O N          I N D E X

3

4                                       Page

5    BY MR. MOST:                        5, 35

6    BY MR. ROQUEMORE:                   28

7

8

9

10      E X H I B I T                  I N D E X

11

12                     Page

13
```

```
14   Plaintiff's Trial Exhibit 20        10

15   Deposition Exhibit 56               12

16   position Exhibit 57                 13

17   Deposition Exhibit 58               14

18   Deposition Exhibit 59               17

19   Demonstrative Exhibit               22
```

```
20

21

22

23

24

25
```

```
 1              S T I P U L A T I O N

 2

 3              It is stipulated and agreed by and

 4   between Counsel for the parties hereto that the

 5   deposition of THE CITY OF NEW ORLEANS, through its

 6   designated representative, LIEUTENANT JOHN HELOU,

 7   is hereby being taken pursuant to the Federal Rules

 8   of Civil Procedure for all purposes in accordance

 9   with law;

10              That the formalities of reading and

11   signing are specifically waived;

12              That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived.

15              That all objections, save those as to

16   the form of the question and responsiveness of the

17   answer are hereby reserved until such time as this

18   deposition or any part thereof is used or sought to

19   be used in evidence.

20                   * * * * *

21              Sandra P. DiFebbo, Certified Shorthand

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the witness

24   remotely.

25
```

```
 1              LIEUTENANT JOHN HELOU, 1340 Poydras
 2         Street, Suite 1900, New Orleans, Louisiana
 3         70112, having been first duly sworn, was
 4         examined and testified on his oath as follows:
 5    EXAMINATION BY MR. MOST:
 6         Q.   Good afternoon, Lieutenant Helou.  How
 7    are you doing today?
 8         A.   Doing well.  How about yourself?
 9         Q.   Doing good.  Thank you.  Could you give
10    us your full name and title for the record.
11         A.   Lieutenant John Helou.
12         Q.   And, Lieutenant Helou, you have been in a
13    number of depositions before, correct?
14         A.   I have.
15         Q.   So you realize you are under oath today?
16         A.   Yes.
17         Q.   And that your answers here today have the
18    same force as if we were in a courtroom with a
19    judge and jury?
20         A.   Yes.
21         Q.   Is there anything, whether it's fatigue,
22    illness, substances, anything else that would
23    prevent you from understanding my questions and
24    giving truthful and complete answers?
25         A.   No.
```

1      Q.   As you know, we can take a break, if

2   needed, although I don't expect this deposition to

3   be long. After any break, I will ask you who you

4   spoke to and what you reviewed, if anything.  All

5   right?

6      A.   Okay.

7      Q.   And, as before, if I ask a question that

8   is either confusing or you don't understand it,

9   will you agree to tell me that that is the case at

10  that time rather than just trying to answer it?

11     A.   Yes.

12     Q.   And because this is a Zoom deposition, I

13  can't see everyone in the room with you.  Is there

14  anyone besides Mr. Roquemore in the room with you?

15     A.   No.  It is just us two.

16     Q.   And if Mr. Roquemore or anybody tries to

17  communicate with you in a way that we can't hear,

18  whether a hand signal, a face signal, a passed

19  note, whispers, will you agree now to tell us that

20  that's the case?

21     A.   Yes.

22     Q.   Thank you.  Broadly, what is your

23  understanding of what today's deposition is about?

24     A.   I'm supposed to answer one question about

25  the number of times NOPD has found a shooting to be

1    not justified after a civil suit about the shooting
2    has been filed.
3        Q.   And you understand that today you are
4    what's called a 30(b)(6) witness, which means you
5    are speaking on behalf of the City of New Orleans
6    itself?
7        A.   Yes.
8        Q.   And so when I ask a question of you, I'm
9    really asking a question of the City of New
10   Orleans.  Do you understand?
11       A.   I do.
12       Q.   And when you give an answer, you are
13   giving the answer of the City of New Orleans rather
14   than of Lieutenant John Helou, correct?
15       A.   Understand, yes.
16       Q.   Lieutenant, roughly, how much time did
17   you spend preparing for this deposition?
18       A.   Maybe about a couple of hours, maybe.
19   Maybe three hours, something like that.  Two or
20   three hours.
21       Q.   And other than talking to your attorney,
22   did you talk to anyone to prepare for this
23   deposition?
24       A.   No.
25       Q.   Did you review any documents to prepare

1    for this deposition?

2         A.    So the only two documents I reviewed, I

3    reviewed our department's Use of Force policy, and

4    I reviewed our disciplinary matrix, which is also

5    found in the policy.  I couldn't review use of

6    force documentation in such a short period of time,

7    because we've had so many uses of force since 2016

8    when it was first implemented, it just would be too

9    manpower intensive to look through all of those

10   paper files.  So I am kind of just basing it on my

11   knowledge of what has happened at the review

12   boards, which it's been since '16, which covers my

13   entire tenure on the Force Investigation Team plus

14   then some, so.

15        Q.    So you reviewed -- one document you

16   reviewed is the department's Use of Force policy.

17   Is that Section 1.3?

18        A.    1.3, yeah.

19        Q.    And the disciplinary matrix is a document

20   that is not specific to any --

21                  {INTERRUPTION IN PROCEEDINGS}

22             MR. ANAND:

23                  Sorry.

24   BY MR. MOST:

25        Q.    The other document you reviewed is the

1   disciplinary matrix, which is a document that's not
2   specific to any officer, right?
3        A.   Right.  It's part of our policy, though.
4   Don't quote me on it.  I think it's in the fifties.
5   It's in the Chapter 50s.  Somewhere in there, yeah.
6        Q.   So how did that take you three hours to
7   review those documents, or did you do something
8   else to prepare for this deposition other than read
9   those documents?
10       A.   Just thinking back about all of the
11  review boards that we've had, all the cases we've
12  presented, just to see if what -- that topic was
13  ever brought up during the presentation of any of
14  those cases or any type of discussion that occurred
15  afterwards. I mean, it's been -- so many cases have
16  been presented, so that's where most of the time
17  went.
18       Q.   In your role as part of the Public
19  Integrity Bureau, you've attended almost all of the
20  Use of Force Review Board hearings?
21       A.   Yeah.  Yes.  As long as I wasn't out sick
22  or on vacation or something like that, yes, I've
23  basically attended them all.
24       Q.   And there is a use of force -- and in
25  that period of time, there is a Use of Force Review

```
 1   Board hearing for every shooting by an officer,
 2   correct?
 3           A.   Every shooting by an officer, whether it
 4   be intentional or unintentional, and then any other
 5   serious use of force goes before the Use of Force
 6   Review Board.
 7           Q.   So you've been apprised of the context
 8   for almost every shooting by an officer in the last
 9   nine years, correct?
10           A.   Yes.
11           Q.   Okay.  So just sort of for comparison
12   purposes, before we get into the big picture of all
13   shootings, I want to just sort of start and make
14   sure, for comparison purposes, we're in agreement
15   on the process for this case, and then we can kind
16   of compare.  I'm pulling up Plaintiff's Trial
17   Exhibit 20.  This is the ASI report.  The shooting
18   in this case was April 10th, 2021, right?
19           A.   Yes.
20           Q.   Let's see.  So the first review of this
21   shooting was by members of the Public Integrity
22   Bureau.  Three of them, including yourself,
23   concluded that the shooting was not justified,
24   correct?
25                MR. ROQUEMORE:
```

```
 1              I am going to object.  This is
 2         beyond the scope of this 30(b)(6)
 3         witness, and I'll also object on the
 4         grounds that it mischaracterizes the
 5         result of that document, and the
 6         document does speak for itself.
 7    MR. MOST:
 8              Okay.  Objection noted.
 9    THE WITNESS:
10              Can you scroll up one more page?  I
11         want to see what the recommendations
12         were.  Right there.  So under the
13         Summary and Conclusions section of the
14         document, which -- is that 17? Yeah,
15         17.  Page 17.  It says, "Detective
16         Brewer Investigation."  Thank you.
17         "Revealed Officer Burmaster's discharge
18         occurred due to Officer Burmaster
19         observing the dogs and firing his
20         weapon out of fear and not because the
21         dog presented a threat of serious
22         bodily injury or death to Officer
23         Burmaster."  And I'm sorry.  What was
24         the question, William?
25    BY MR. MOST:
```

1    Q.   Right.  So based on that, you and two

2  other members of PIB concluded that it was not a

3  justified shooting, correct?

4           MR. ROQUEMORE:

5              Same objection as I made before.

6           THE WITNESS:

7              Yes.  I would say that.

8  BY MR. MOST:

9    Q.   And then in -- let's see.  The Use of

10  Force Review Board reviewed this shooting as well,

11  correct?

12    A.   That's correct.

13    Q.   That would have been in August 2021?

14    A.   Yes.

15    Q.   And looking at Deposition Exhibit 56, all

16  three members of the Use of Force Review Board

17  found the shooting to be not justified, correct?

18           MR. ROQUEMORE:

19              Again, I am objecting to this

20              question because it's beyond the scope

21              of the 30(b)(6).  It mischaracterizes

22              this document, and the document does

23              speak for itself.

24           MR. MOST:

25              I'll stipulate that that's a

```
 1              continuing objection throughout the
 2              deposition.
 3    BY MR. MOST:
 4         Q.   So, Lieutenant, at the August 2021 Use of
 5    Force Review Board hearing, the three voting
 6    members of the board found the shooting to be not
 7    justified, correct?
 8         A.   Yes.  It was unanimous by the voting
 9    members.
10         Q.   So at least as of 2021, all of the NOPD
11    officials who assessed this and recorded their
12    assessment all agreed it was not a justified
13    shooting, agreed?
14              MR. ROQUEMORE:
15                   Objection, form, speculation.
16              THE WITNESS:
17                   Well, based on the two documents,
18                yeah.  It was agreed to be not
19                justified by PIB and then at the board
20                by the voting members when it was
21                presented before them.
22    BY MR. MOST:
23         Q.   And then pulling up Deposition Exhibit
24    57, do you see that the plaintiffs in this case
25    filed their complaint in March of 2022?
```

1    A.   Yes.

2    Q.   Then in September 2023, there was what is

3    called a chief's hearing or also known as a Bureau

4    of Superintendents disciplinary hearing; is that

5    fair?

6    A.   Yes.

7    Q.   The hearing itself was June 2023, and

8    then there was a memo issued in September of 2023,

9    correct?

10   A.   Yeah.  So Wednesday, June 15, 2023, was

11   the Bureau of Superintendents disciplinary hearing

12   under that formal disciplinary investigation

13   complaint tracking number, and then on September

14   11, 2023, Chief Deputy Superintendent Ganthier

15   authored or his designee authored a memo to then

16   Superintendent Michelle Woodfork regarding some

17   mitigating circumstances regarding this case.

18   Q.   And at the chief's hearing, those members

19   of the chief's hearing decided that the shooting

20   was justified, correct?

21   A.   Well, the document just -- so the

22   document is just dealing with the alleged policy

23   violations that were found that Shannon Brewer

24   recommended sustained dispositions for during her

25   investigation.  So that is what basically this, for

```
1    all intents and purposes, they recommended a
2    different disposition for each of these violations,
3    which I believe -- can you scroll down to the
4    bottom? Which everybody looks like they concurred
5    with.  And then the justification for recommending
6    different dispositions is in that paragraph, you
7    know, preceding those signatures.
8         Q.   Right.  So these officers, the officers
9    of the chief's hearing, decided that Burmaster
10   should be exonerated of the policy violations,
11   including the Use of Force policy, correct?
12              MR. ROQUEMORE:
13                   Objection, form.  The document
14                   speaks for itself.  It is also beyond
15                   the scope of this 30(b)(6) deposition.
16              THE WITNESS:
17                   Can you scroll up to Page 1 or
18                   2? Yeah, right there.  Yeah.  So
19                   originally, he, according to the
20                   document, he was sustained for two,
21                   three -- it looks like three alleged
22                   violations of the Use of Force chapter
23                   and one violation, one alleged
24                   violation, of the Uniform
25                   Specifications chapter, and one alleged
```

```
 1                    violation of the Body Armor chapter.
 2                    If you go to the next page, for the
 3                    three use of force alleged violations,
 4                    they changed it from sustained to
 5                    exonerated, but they left the other two
 6                    violations regarding uniform
 7                    specifications and body armor as
 8                    sustained.
 9   BY MR. MOST:
10       Q.   Right.  So the members of the chief's
11   hearing felt that Burmaster should be exonerated of
12   the use of force violation because the shooting was
13   justified, agreed?
14                    MR. ROQUEMORE:
15                    Objection.  The document speaks for
16                    itself.  This line of questioning has
17                    gone way beyond the background for the
18                    question, which I will remind you that
19                    is the question of the times -- number
20                    of times that NOPD has found a shooting
21                    to be not justified after a civil suit
22                    about the shooting has been filed.  You
23                    are going to get a deposition of all
24                    three signatories to this
25                    documentation.  It doesn't make any
```

1          sense to ask Helou, Lieutenant Helou,

2          who is not a signatory to this paper,

3          to opine about what these individuals

4          meant or were thinking during this

5          time.

6      MR. MOST:

7          Okay.  Objection noted.

8  BY MR. MOST:

9      Q.    So this document reflects that the

10  members of the chief's hearing decided that

11  Burmaster should be exonerated of the use of force

12  violation, right?

13      A.    For the three alleged policy violations

14  that he was originally sustained for, they

15  recommended that he be exonerated on.

16      Q.    And then, as we're looking at Deposition

17  Exhibit 59, in October of 2023, the Chief of Police

18  concurred, correct?

19      A.    Can you go up?  I'm not sure what I'm

20  looking at.  Could you scroll all the way up?  Let

21  me see what we are looking at.

22      MR. ROQUEMORE:

23          And I'll object to form.

24      THE WITNESS:

25          Is that Page 1?

```
 1              MR. MOST:

 2                   Page 1.

 3              THE WITNESS:

 4                   I just want to know what I'm looking

 5              at.  Okay.  So this looks like Officer

 6              Burmaster's disciplinary letter.  Okay.

 7              Cool.  All right.  I'm sorry.  What was

 8              your question, William?

 9  BY MR. MOST:

10      Q.   Yes.  Going down to Page 5, according to

11  Chief Kirkpatrick, the only sustained violations

12  were the uniform violations, correct? Uniform and

13  body armor.

14      A.   Uniform and body armor.  Those remain

15  sustained, and he got an oral reprimand for each

16  one.

17      Q.   So just to summarize.  I just want to see

18  if this is sort of an accurate summary of what we

19  looked at to date.  It looks like the four sort of

20  stages of different decision-making were August

21  2021 PIB, August 2021 Use of Force Review Board,

22  September 2023 the chiefs hearing, and then October

23  2023 Chief Kirkpatrick's decision.

24              MR. ROQUEMORE:

25                   I am going to object.  It
```

```
 1              mischaracterizes the preliminary stages

 2              of the disciplinary process.  The

 3              purpose of the Use of Force Board and

 4              the ultimate decision by the chief as

 5              well imply that there is some

 6              relationship to the lawsuit.  It goes

 7              beyond the scope of this particular

 8              inquiry, which you asked a number of

 9              times.

10                  I think you've established that

11              during the point that Officer Burmaster

12              was being investigated, there was a

13              lawsuit, so we can count that as Number

14              1, but beyond asking Officer --

15              Lieutenant Helou about the meaning and

16              the purpose of all of these other

17              preliminary recommendations, it goes

18              well beyond discovery, so I will

19              object.

20         MR. ANAND:

21                  I am going to object to the coaching

22              of the witness through Mr. Roquemore's

23              long, improper speaking objection.

24         MR. ROQUEMORE:

25                  I'll object to this exhibit, which
```

```
 1                    he's never seen before, which is
 2                    argumentative and is clearly going to
 3                    be something you are going to try to
 4                    introduce at trial, which is misleading
 5                    based on these preliminary decision
 6                    processes.
 7              MR. MOST:
 8                    Okay.
 9     BY MR. MOST:
10         Q.   So with that objection, Lieutenant Helou,
11     does this document sort of summarize the documents
12     that we've looked at, as you understand them?
13              MR. ROQUEMORE:
14                    I'm going to object to form and
15                    allow him to answer if he has anything
16                    on that.
17              THE WITNESS:
18                    So I would have to look at that
19                    document, the original document.  I
20                    just want to see the reasons they noted
21                    for the exoneration.  I don't remember
22                    seeing anything where they wrote in
23                    there that the shooting was justified.
24                    I think they just didn't agree with the
25                    recommended disposition by the original
```

1              investigator.

2   BY MR. MOST:

3       Q.   I see.  So if these green words were

4   changed to exonerated, with that amendment, this

5   would reflect your understanding?

6              MR. ROQUEMORE:

7                   Object to form.

8              THE WITNESS:

9                   So if you change -- I don't know why

10                 I'm pointing on the screen, but August

11                 21 PIB, those should be sustained, and,

12                 I guess -- and I'm assuming we're

13                 talking about the use of force

14                 violations?

15             MR. MOST:

16                  Yeah, yeah.

17             THE WITNESS:

18                  Yeah.  If you did that, yeah.

19  BY MR. MOST:

20      Q.   With these amendments, does it reflect --

21  so we've got under August 2021 violation sustained

22  three times, Use of Force Review Board unjustified

23  three times, and then the chief's hearing and

24  chief's decision exonerated.  Does this now reflect

25  your understanding of the documents?

```
 1              MR. ROQUEMORE:
 2                   Object to form.  Mr. Most, William,
 3               is this going to be an exhibit to this
 4               depo?
 5              MR. MOST:
 6                   Yeah.  We'll provide this.
 7              THE WITNESS:
 8                   So the only thing I'm just going to
 9               clarify is the review board.  The three
10               unjustifieds were the votes by the
11               voting members, so they didn't hear --
12               they didn't vote on each violation,
13               whether it was unjustified or not, but
14               they just voted on the overall
15               justification of the shooting incident,
16               if that makes sense.
17      BY MR. MOST:
18          Q.   I'm not sure it does.
19          A.   So the case was presented to the review
20      board in its totality.  At the end they voted
21      whether or not the use of force by Burmaster was
22      justified or not, and they voted it was not
23      justified.  So they didn't go -- I don't believe
24      they went policy by policy and said, okay, for this
25      paragraph, for the use of force chapter, not
```

1    justified for this paragraph and for this

2    paragraph.  They looked at the incident in its

3    totality.

4        Q.    I see.  So when I enter unjustified here

5    three times, those are the three votes?  Like those

6    are the three people who voted?

7        A.    Yeah.  I agree to that, yeah.

8        Q.    So I guess this provides the context,

9    because at least in this case, there were findings

10   by NOPD officials that the shooting was unjustified

11   before the lawsuit was filed, and then after the

12   lawsuit was filed, there were findings that Officer

13   Burmaster was exonerated of the policy violations,

14   right?

15              MR. ROQUEMORE:

16                  Objection, form.  It

17                mischaracterizes the "findings."

18              THE WITNESS:

19                  One more time, sir.

20   BY MR. MOST:

21       Q.    Before -- in this case, before the

22   lawsuit was filed, there were findings that the

23   shooting was unjustified, and then after the

24   lawsuit is filed, there were findings that the

25   officer was exonerated, right?

1           MR. ROQUEMORE:

2                Objection, form.

3           THE WITNESS:

4                Yeah.  I'd agree to that.  Before

5             the lawsuit, he was sustained --

6             recommended sustained for the

7             violations of the Use of Force policy.

8             Also, before the lawsuit, was ruled

9             unjustified at the review board, and

10            then afterwards exonerated on the use

11            of force taught policies.

12    BY MR. MOST:

13       Q.   Thinking back to all the uses of force

14    that you have seen and the research that you did,

15    can you think of any times where it was reversed,

16    where it was found, you know, justified or

17    violation not sustained before a lawsuit was filed,

18    and then flipped after the lawsuit was filed?

19           MR. ROQUEMORE:

20                Objection, form.

21           THE WITNESS:

22                Could you explain?  Could you

23            clarify that one more time?  I don't

24            believe I understand it.

25    BY MR. MOST:

1    Q.   Sure.  Maybe I can simplify it.  Let me

2    ask this.  What would be the opposite of

3    exonerated?  So if someone is not exonerated in the

4    chief's hearing or chief's decision, it would be

5    sustained? Is that right?

6        A.   Sustained or not sustained depending on

7    whether or not they could -- sustained if they --

8    more likely than not, based on the preponderance of

9    the evidence, the violation occurred, or not

10   sustained if based on the preponderance of evidence

11   they couldn't prove or disprove the violation

12   occurred.

13       Q.   Can you think of any time where a chief's

14   hearing found that a policy violation for a

15   shooting was sustained after a lawsuit was filed?

16              MR. ROQUEMORE:

17                  Objection, form.

18              THE WITNESS:

19                  No.

20   BY MR. MOST:

21       Q.   Can you think of any time that the

22   chief's decision was sustained in a shooting for a

23   policy violation after a lawsuit was filed?

24              MR. ROQUEMORE:

25                  Objection, form.

```
 1              THE WITNESS:
 2                   No, but if I can clarify it.  We
 3              don't -- typically, we're not made
 4              aware of when a lawsuit is filed,
 5              unless it's some kind of press release
 6              or something by the plaintiff attorney
 7              or something high profile where the
 8              media reports it.  Typically, we don't
 9              get notified, hey, you know, a lawsuit
10              has been filed regarding this,
11              regarding this incident or whatever,
12              but, yeah.
13  BY MR. MOST:
14       Q.   At least you know sometimes when there
15  has been a lawsuit filed upon a shooting, right?
16       A.   Yeah.  Sometimes, again, if it's
17  something that we're made aware of, either, you
18  know, communications through the law department,
19  or, like I said, something that the media puts out,
20  you know, from the plaintiff attorney or some other
21  source, yes.
22       Q.   And of those times, you can't think of a
23  single one where there was a finding of a sustained
24  use of force violation in a shooting after there
25  was a lawsuit filed, correct?
```

```
 1        A.    No.

 2              MR. ANAND:

 3                    I'm really sorry if this is

 4                 improper, but the question was correct,

 5                 question mark, and the answer was no.

 6                 That is just going to be unclear for

 7                 the record.

 8              MR. MOST:

 9                    That's a good point.

10    BY MR. MOST:

11        Q.    So, John, you would agree with me that

12    you can't think of any times where you know of a

13    lawsuit, and then after that either the chief's

14    hearing or the chief found the use of force

15    violation to be sustained, agreed?

16        A.    I agree, yes.  I agree with what you just

17    said.

18        Q.    Okay.  Have you ever participated in a

19    chief's hearing?

20        A.    Yes.

21        Q.    Do you happen to know if the

22    deliberations of the committee are recorded or not?

23    Do they tape that or transcribe it?

24        A.    No.  So when they go to deliberate, they

25    pause the recording.  They put on the record we're
```

```
 1   going to pause for deliberations.  They do the
 2   deliberations, and when they pick back up, they say
 3   okay, something like to the effect of, okay, we're
 4   back on the record.
 5        Q.   So you don't know of any sort of
 6   recording or note-taking or any other sort of
 7   method of recording those deliberations at all; is
 8   that right?
 9        A.   I mean, I know it's not recorded.
10   Whether or not somebody is taking notes, I'm not
11   aware of that.  I've never taken notes during those
12   deliberations.
13             MR. MOST:
14                  Let's take a five-minute break, and
15                then we'll come back.  I may have some
16                more questions or I may turn it over to
17                you, Jim, or to Ted.
18                  {BRIEF RECESS, 1:33-1:37}
19             MR. MOST:
20                  So that's the questions that I've
21                got, barring any redirect.  Ted or Jim,
22                would you like to ask any questions?
23             MR. ROQUEMORE:
24                  I do have a couple of questions.
25   EXAMINATION BY MR. ROQUEMORE:
```

1       Q.    Lieutenant Helou, you were asked here
2   today to answer the question of how many times the
3   NOPD has found a shooting to be not justified after
4   a civil suit about that shooting had been filed.
5   Do you have an answer for that question?
6       A.    Yeah.  The answer is none.
7       Q.    What did you do to determine that answer?
8       A.    Again, I've sat in or participated in or
9   presented at almost every Use of Force Review Board
10  that we've held since 2016, again, unless I was out
11  sick or on vacation or something like that.  So
12  just thinking back on all of the cases that have
13  been presented, that's how I mostly prepared by.  I
14  also looked at the policies regarding determining
15  the reasonableness of force as well as our
16  disciplinary matrix.
17      Q.    The question about -- or part of this
18  question has to do with after a civil suit about
19  the shooting has been filed.  What is your under-
20  standing of what was meant by that part of the
21  question?
22      A.    So the way I understood it was did our
23  determination of the reasonableness of force or the
24  justification of force change just because of a
25  civil suit regarding an incident was filed.

1    Q.   Do you have an answer as to whether it
2 changed because of the lawsuit?
3    A.   I do.  It's no.  It doesn't change.  You
4 evaluate the case based on the facts and the policy
5 and the law, and that's what you use to determine
6 whether or not the force used was reasonable.
7    Q.   So just to flip this question around, how
8 many times has the NOPD found a shooting to be
9 justified after a civil suit about the shooting has
10 been filed? Do you have an answer to that?
11    A.   I do not.
12    Q.   Why is that?
13    A.   I mean, again, we don't always get
14 notified about lawsuits once they are -- unless
15 it's something of a public interest or something
16 like that where they release it to the media.  I
17 could tell you of one case that I investigated
18 before I got promoted where there was a shooting
19 incident where we found it to be unjustified, and
20 then at some point a civil suit was filed against
21 the officer, but I couldn't tell you exactly when
22 it was filed, but for whatever reason, I think it
23 came up in a news article or something about it.  I
24 was like, oh, wow, I didn't even know they filed a
25 lawsuit on that.

1    Q.   To your recollection, what was the effect

2  on the decision-making process as a result of that

3  knowledge?

4    A.   It had no effect on it.  I mean, my

5  determination of the force justification remained

6  the same, that it was not -- it was an unjustified

7  use of force.

8    Q.   Take a step back.  Mr. Most showed you a

9  couple of documents.  The first one had your

10  signature on it.  This was the investigation report

11  authored by Shannon Brewer; is that right?

12    A.   Correct.  The administrative shooting

13  investigation.

14    Q.   The purpose of that recommendation is

15  what?

16    A.   The purpose of the recommendation is that

17  I concur with Detective Brewer's findings.

18    Q.   And that is used by -- is that reviewed

19  by the -- is that intended to be reviewed by the

20  superintendent in connection with the ultimate

21  decision-making about whether a policy violation

22  has been made?

23    A.   It can be.  Not always, but it certainly

24  -- if she would have requested, or if he would have

25  requested, it could be.

1      Q.    Is it a final decision?

2      A.    No.  Ultimately, the review board,

3  ultimately, is going to -- the Use of Force Review

4  Board is going to ultimately rule whether or not

5  they concur with the findings of the administrative

6  shooting investigation, or if they don't concur

7  with it.

8      Q.    So this report was given to the Use of

9  Force Review Board?

10     A.    Yes.

11     Q.    It was also given, ultimately, to the

12  superintendent to review with respect to whether or

13  not there is a violation; is that right?

14     A.    I don't know if it was given to the

15  superintendent.  It could have been.

16     Q.    So that would be a question to ask the

17  superintendent?

18     A.    Correct.

19     Q.    And whether there is a chief's panel,

20  that would also be a good question to ask the

21  chief's panel whether they were given this report?

22     A.    Correct.

23     Q.    The Use of Force Review Board.  Do you

24  have an understanding of what the purpose of the

25  Use of Force Review Board is?

1          A.    I do.

2          Q.    In your own words, what is the purpose of

3    the Use of Force Review Board?

4          A.    So it's basically a check and balance

5    system on the Force Investigation Teams'

6    investigations, where, basically, we present our

7    findings, and they serve as like a quality control

8    measure to make sure that our investigations are

9    thorough, the conclusions are reasonable and

10   logical, and, you know, we cover kind of like a

11   holistic review of the incident and note any

12   deficiencies or any areas of improvement, not only

13   for those people involved, but as a department, for

14   the department as a whole, just to ensure that

15   we're doing everything, you know, to the best of

16   our abilities.

17         Q.    The Use of Force Board in 2021 used the

18   terminology "justified" or "unjustified" with

19   regard to use of force; is that fair?

20         A.    Justified and not justified.

21         Q.    Did at some point in time the terminology

22   change?

23         A.    It did.

24         Q.    Why did the terminology change?

25         A.    It was changed at the request of the

1   Office of the Independent Police Monitor.  They

2   found in monitoring our boards that there was some

3   instances where the board members really didn't

4   know -- the voting members didn't really know what

5   they were voting on, so it was Deputy Monitor at

6   that time, Bonycle Sokunbi, that made that

7   recommendation.

8       Q.   So the reasoning, that was gleaned from

9   Bonycle?

10      A.   So Bonycle and other members of the IPM,

11  they serve as nonvoting members.  They are on the

12  board.  They monitor, and they make suggestions and

13  recommendations.  One of the suggestions they made

14  was that, you know, some cases presented before the

15  board, the voting members were questioning what

16  were we really voting on, and, you know, is it

17  appropriate to -- would it be inappropriate to say

18  that this was justified or not justified or was

19  there something else we need to use, so Bonycle

20  came up with a suggestion that we change it.  I

21  believe this was in 2022 that we go from justified

22  to not justified to the member's actions were

23  within departmental policies, procedures, and

24  guidelines, or the department member's actions were

25  in violation of department policies, procedures,

1  and guidelines.

2          MR. ROQUEMORE:

3              Those are the questions I have.

4          Thank you, Lieutenant.

5          THE WITNESS:

6              You're welcome.

7  BY MR. MOST:

8      Q.    Briefly, on follow-up, Lieutenant, you

9  said something to the effect of a civil suit being

10 filed doesn't change decision-making, right?

11     A.    Correct.

12     Q.    I mean, I assume you're saying it doesn't

13 change you, Lieutenant John Helou's, decision-

14 making?

15     A.    Yeah.  I can't speak for anybody else.  I

16 know just because if I was investigating a use of

17 force case, and I knew a civil suit was filed, that

18 wouldn't -- that's not going to affect my findings.

19 I'm going to let the evidence take me to whatever

20 conclusion I reach.

21     Q.    Okay.  But you can't say that's true or

22 not true for the chief or members of the chief's

23 panel or Use of Force Review Board or anybody else,

24 right?

25     A.    I can't, but I can tell you that in the

```
1   use of force policy where it talks about the -- it
2   enumerates -- one of the paragraphs enumerates the
3   factors for determining the reasonableness of  the
4   force, and whether or not a civil suit has been
5   filed isn't listed as one of those factors.
6               MR. MOST:
7                   Okay.  Lieutenant Helou, thank very
8                much for your time today.  Oh, Ted, do
9                 you have any questions?
10              MR. ALPAUGH:
11                  Nope.
12                  [End of deposition, 1:46]
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          C E R T I F I C A T E

2

3               This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5               I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that LIEUTENANT JOHN
7   HELOU, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify as
8   hereinbefore set forth in the foregoing 36 pages;

9               That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12              That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16              That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  ___Sandra P. DiFebbo___

22  Sandra P. DiFebbo,
Certified Shorthand Reporter

23  Date:  4/15/25

24

25