ANNE KIRKPATRICK on 05/01/2025

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4    DEREK BROWN and JULIA        CIVIL ACTION NO.

 5    BARECKI-BROWN                22-00847

 6

 7    VERSUS                       SECTION: L

 8

 9    DERRICK BURMASTER, SHAUN     DIVISION: 4

10    FURGUSON, and the CITY OF

11    NEW ORLEANS

12

13                          ...

14                          ...

15         Video deposition of Anne Kirkpatrick, taken

16    in the offices of 1300 Perdido Street, New Orleans,

17    Louisiana on Thursday, May 1, 2025, commencing at

18    1:29 p.m.

19

20

21

      REPORTED BY:
22         BROOKE GARRISON
           CERTIFIED COURT REPORTER
23

24

25
```

```
 1   APPEARANCES:

 2           MOST & ASSOCIATES
             (BY:  WILLIAM MOST, ESQUIRE)
 3           201 ST. CHARLES AVE.
             SUITE 2500
 4           NEW ORLEANS, LOUISIANA  70170

 5                 ATTORNEYS FOR THE PLAINTIFF

 6
             THE OFFICE OF THE CITY ATTORNEY
 7           (BY:  JAMES ROQUEMORE, ESQUIRE)
             1300 PERDIDO STREET
 8           NEW ORLEANS, LOUISIANA  70112

 9                 ATTORNEYS FOR THE DEFENDANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ANNE KIRKPATRICK on 05/01/2025

3

```
 1              E X A M I N A T I O N   I N D E X

 2

 3                                          PAGE

 4

 5

 6    MR. MOST                                6

 7    MR. ROQUEMORE                          49

 8    MR. MOST                               76

 9

10

11

12

13              E X H I B I T    I N D E X

14

15

16    Exhibit 1                              9

17    Deposition 60                         10

18    P20                                   26

19    P13                                   39

20    P12                                   39

21    Exhibit Number 2                      55

22    Exhibit Number 3                      56

23

24

25
```

```
 1                    S T I P U L A T I O N

 2

 3           It is stipulated and agreed by and between

 4    Counsel that the deposition of Anne Kirkpatrick, on

 5    Thursday, May 1, 2025, is hereby being taken under

 6    the Louisiana Federal Rules of Civil Procedure, for

 7    all purposes, as permitted under law.

 8

 9           The witness waives the right to read and

10    sign the deposition.  The original is to be

11    delivered to and retained by the noticing attorney

12    for proper filing with the Clerk of Court.

13                              --

14           All objections, except those as to the form

15    of the question and/or the responsiveness of the

16    answers, are reserved until the time of the trial of

17    this cause.

18

19           Brooke Garrison, Certified Court Reporter,

20    Certificate No. 2024011, in and for the State of

21    Louisiana, officiated in administering the oath to

22    the witness.

23

24

25
```

```
 1                    Anne Kirkpatrick,
 2    after being first duly sworn by the above-mentioned
 3    court reporter, did testify as follows:
 4            THE VIDEOGRAPHER:
 5                    We're on the record.  This is the
 6            video deposition of Chief Anne Kirkpatrick,
 7            taking place in New Orleans, Louisiana on
 8            Thursday May 1, 2025 beginning at 1:29.  My
 9            name is Austin Liggeo.  I'm the videographer
10            on behalf of Serpas Court Reporting.  The
11            court reporter is Brooke Garrison with Serpas
12            Court Reporting.  At this time, will we have
13            counsel please introduce themselves?
14            MR. MOST:
15                    William Most for plaintiffs.
16            MR. ROQUEMORE:
17                    James Roquemore on behalf of the
18            City of New Orleans and Derrick Burmaster.
19            THE COURT REPORTER:
20                    Can you raise your right hand?  Do
21            you solemnly swear to tell the truth, the
22            whole truth, nothing but the truth so help you
23            God?
24            THE WITNESS:
25                    I do.
```

ANNE KIRKPATRICK on 05/01/2025

```
 1    policies as they are in the department.  So I don't

 2    think our policies are quite written like that.  So

 3    that's why I object to the overall, what I'm

 4    obligated to stand by.

 5         Q.    Yeah.  Do you see anything in this that

 6    you disagree with or find objectionable?  In Number

 7    1?

 8         A.    I think our use of force policy is not

 9    written like this.  And so I would object that I

10    can't speak to this.

11         Q.    Okay.  Number 2, police should ensure

12    that there's no risk to people in the area before

13    shooting a dog.  Would you agree or disagree with

14    that?

15         A.    I think in all use of force associated

16    with a firearm, the officers do what they can

17    reasonably to assess whether or not that someone is

18    in the background that could be injured.

19         Q.    So for example, police officers should

20    use caution when using their firearm to shoot an

21    animal if they're in a residential neighborhood, for

22    example.

23         A.    Any situation.

24         Q.    And particularly so, if it's a

25    residential area; correct?
```

ANNE KIRKPATRICK on 05/01/2025

12

```
 1      A.    Yes.  Depending on the circumstances, the
 2   officers, if they're in a use of force situation,
 3   whether they're in a residential area or not.  So
 4   sometimes those shootings do occur in residential
 5   areas.
 6      Q.    Would you agree with Number 3, that
 7   police should not shoot a dog if alternative
 8   non-lethal means are reasonably available?
 9      A.    I believe our policy addresses the use of
10   alternative, less than lethal.  We don't use the
11   term non-lethal.  That is actually would be a
12   fallacy to use that kind of language.  We have less
13   than lethal alternatives.
14      Q.    So you would agree with this if it said
15   less than lethal means are reasonably available?
16      A.    Well, with respect to your qualification
17   of a dog, I don't think that would be necessary in
18   terms of my understanding of our policies.  Our
19   policies for using force is you weigh also
20   alternative means.
21      Q.    So officers should not shoot their
22   firearm, whether it's a dog or a person, if
23   alternative less than lethal means are reasonably
24   available?
25      A.    Are reasonably available and the
```

```
1    circumstances would dictate.  Not every circumstance
2    allows, because it's unfolding so quickly that a
3    different alternative use of force could be used.
4         Q.    Would you agree that shooting a dog
5    should always be the option of last resort?
6         A.    I think use of deadly force is an option
7    of last resort.
8         Q.    Okay.  And so you're aware that this case
9    is about an officer, Derrick Burmaster, who shot a
10   dog; correct?
11        A.    Yes.
12        Q.    Have you met Officer Burmaster?
13        A.    I may have.  I wouldn't be able to tell
14   you if he walked in the room that it was Officer
15   Burmaster, but I probably have met him.
16        Q.    Okay, but you don't recall meeting him
17   specifically?
18        A.    No, I don't.
19        Q.    Do you know anything about him other than
20   the context of this case?
21        A.    No, I don't.
22        Q.    Okay.  And at any point, have you seen
23   photos of the dog that was killed?
24        A.    I have not.
25        Q.    Okay.  Have you seen a video of the
```

ANNE KIRKPATRICK on 05/01/2025

```
 1       A.    Because there's circumstances as I read
 2   the file, it was dark, and so I don't know what --
 3   you'd have to ask the officer, because subjectively
 4   what was he thinking at that time?  What did he see?
 5   What was his observation?  So I can't answer for
 6   that.
 7       Q.    Sure.  And if you stepped out of the
 8   subjective viewpoint and instead analyzed it from an
 9   objective point of view, would you say that shooting
10   and killing a dog of this size would be unavoidable
11   from an objective point of view?
12            MR. ROQUEMORE:
13                 Objection form.
14            THE WITNESS:
15                 It could be.
16   BY MR. MOST:
17       Q.    Okay.  It could be avoidable?
18       A.    No.  It could be reasonable that deadly
19   force was used.
20       Q.    Okay.  And it could be not reasonable
21   from an objective point of view?
22       A.    It depends on those circumstances and
23   only he has to explain his circumstances.  So it
24   could be objectively reasonable and it could be not
25   reasonable.  And that's why we look at the totality
```

```
 1    of the circumstances, which is what we're dictated
 2    to do by both policy and law.
 3        Q.    Okay.  I'd like to show you the video of
 4    the shooting.
 5        A.    Sure.
 6        Q.    So I'm going to pull up what is Trial
 7    Joint Exhibit J1.  Okay, starting from the
 8    beginning.
 9              (VIDEO PLAYED)
10              (VIDEO STOPPED)
11    BY MR. MOST:
12        Q.    Okay, I'll pause it there.  We watched
13    this video from the beginning to 2 minutes and 42
14    seconds?
15        A.    Yes.
16        Q.    Do you need to watch any part of it
17    again?
18        A.    No.
19        Q.    Okay.  Would you personally have shot
20    this dog if this puppy was running at you?
21        A.    I may have, but I start from a different
22    premise than you.  These officers are responding to
23    a domestic violence call, and that's a totally
24    different framing of the circumstances in which
25    they're walking into.
```

1      Q.    Mm-hmm.

2      A.    They're not walking into an animal

3   control issue.  They're walking into a domestic

4   violence call.  So my perspective is totally

5   different than your perspective in terms of my

6   heightened sense of concern for safety.

7      Q.    So I'm not sure I understand.  Are you

8   saying that in responding to a domestic violence

9   call, officers may have sort of a heightened sense

10  of the need for safety?

11     A.    We treat them, we actually teach them for

12  that, because a domestic violence call is probably

13  one of the most dangerous calls that a police

14  officer could possibly be walking into.  So they're

15  walking into knowing and to one of the highest risk

16  calls for a police officer.

17     Q.    Mm-hmm.  And so you saw that Derrick

18  Burmaster shot the smaller of the two dogs that was

19  present?

20     A.    I could only hear it.  I couldn't see

21  that dog.

22     Q.    You couldn't see the dog that Burmaster

23  shot?

24     A.    Not from the video.

25     Q.    Okay.  If this was a puppy that was only

1    about 22 pounds, only about 18 inches tall, would

2    shooting a dog of that size be an avoidable

3    scenario?

4        A.    I don't know.  When I couldn't see, I can

5    hear it, and I heard his position in it, and what he

6    wrote on the -- his report.  So I can't tell you.

7    What I can say is that based on the circumstances,

8    it may, might I determined that it was reasonable.

9        Q.    You determined that it was reasonable?

10       A.    Yes.

11       Q.    But you had not seen the video?

12       A.    No, but I can do it according to the

13   record didn't change what you showed me.

14       Q.    And the record you received spoke

15   primarily to Burmaster's subjective thoughts and

16   fears; correct?

17           MR. ROQUEMORE:

18               Objection form.

19           THE WITNESS:

20               I think it's both objective and

21       subjective.  The objectivity is what did they

22       walk into.  The objectivity is the fact that

23       they were going to a domestic violence call.

24               The objectivity is that we do train

25       and teach officers to be very mindful that

```
1         that's one of the most dangerous calls that

2         they could walk into.  So that is the framing

3         in which they walked into that gate.

4              The objectivity is you have two

5         officers on that scene.  One of them, both of

6         them perceived a threat.  One of them ran,

7         which supports the objective mindset, was

8         Burmaster, reasonable in thinking that's a

9         threat, and you have another officer who ran.

10             So they both perceived a threat.  So

11        as an objective and subjective, the policy and

12        the law says that we are not to do the 20-20

13        hindsight.  The officer has to explain why he

14        saw it as a threat.  And he did that in the

15        report.

16   BY MR. MOST:

17        Q.   You reached your -- you based your

18   determination that Officer Burmaster's shooting was

19   reasonable based on the memo that was provided to

20   you by Lubrano, Sanchez, and Ganthier; correct?

21        A.   Not just their memo, but I did read his

22   statement about why he thought he had that threat to

23   the level in which to use the force that he did.  So

24   I did take that in consideration.  I did take in

25   consideration the other viewpoint that was in the
```

```
 1   PIB investigation.  I took in both viewpoints.  So,
 2   yes.
 3       Q.    So you read the PIB investigation before
 4   signing a document about Burmaster?
 5       A.    I remember doing that, yes.
 6       Q.    But I want to return to the question of
 7   would you have shot this dog?  Can you express any
 8   thoughts about that?
 9       A.    Well, I'm not allowed to personally say
10   that I'm there.  I'm to go on the records and the
11   information that is presented to me and then to make
12   a decision, do I think it was reasonable?  That's my
13   role.
14            I was not there.  Based on what I have,
15   though, my determination was that, indeed, in the
16   totality of the circumstances, was it reasonable?
17   And I say, my thinking is, yes, it was reasonable.
18       Q.    Mm-hmm.  And in determining whether the
19   shooting was reasonable, you would have had to
20   assess the threat that the dog posed to Officer
21   Burmaster; correct?
22       A.    Yes.  That is a part of that.  But I also
23   have to weigh what I know about the totality of the
24   circumstances and which ones weigh more to me than
25   the other.  All the different factors that weigh my
```

1    decision one way or the other.  And so there were

2    more factors that supported the reasonableness for

3    his use of force.

4        Q.    Okay.  And what threat did this puppy

5    pose to Officer Burmaster?

6        A.    Well, according to Officer Burmaster,

7    that dog, unfortunately, puppy, dog, could have

8    caused him harm, rather serious harm, if the dog had

9    bitten him in the groin.

10       Q.    Are you aware that the dog was only 18

11   inches tall?

12       A.    Dogs can leap.  So that would not be a

13   deciding factor for me.

14       Q.    Mm-hmm.  You understand that Burmaster

15   expressed particularly that he was afraid that this

16   dog would bite him in the penis?

17       A.    I did read that, yes.

18       Q.    Yeah.

19       A.    Mm-hmm.

20       Q.    In your career, at any point in your

21   career, have you ever heard an officer express that

22   a dog, the fear that a dog would bite him in the

23   penis?

24       A.    I had an officer when I was the chief of

25   police of Federal Way who did have a dog bite him in

1   would be the amount of harm.

2       Q.    Okay, but the size of the dog is relevant

3   to whether less than lethal means would be available

4   and potentially effective; right?  It would be

5   easier to kick a small dog away than a large dog;

6   agreed?

7       A.    I don't necessarily -- In the

8   circumstances of this case, with what was in front

9   of me, how he articulated his assessment from what I

10  could see, which wasn't anything really.  I could

11  see the darkness.  I could hear the barking.  And I

12  knew they were going into the domestic violence.

13          They even articulated, we heard screaming

14  and so forth.  Those were very objective.  So I

15  can't tell you.  I wasn't there, and so when you ask

16  me the question that you did, I can't really answer

17  that for you.

18      Q.    Sure, but generally in terms of assessing

19  the reasonableness of a use of force against the

20  dog, it wouldn't matter if the dog is a tiny

21  chihuahua or a giant rottweiler; agreed?

22      A.    This wasn't a tiny chihuahua.  And so I

23  hear what you're trying to say, but I cannot agree

24  with the premise.  It was not a tiny chihuahua.  So

25  I can't agree with your premise, Mr. Most.

ANNE KIRKPATRICK on 05/01/2025

35

```
1       Q.     Do you know if the other officer was

2   running from the dog Burmaster shot or the other

3   dog?

4       A.     I understood the other dog was also

5   pursuing the other officer.

6       Q.     So if the other officer ran from the

7   other dog, how does that speak to the threat posed

8   by the dog that Burmaster shot?

9       A.     It speaks to the circumstances of the

10  fact that there are aggressive charging dogs, which

11  is a threat to their safety.

12      Q.     Okay, but if there's two dogs, and one is

13  a threat and one is not, an officer can't shoot the

14  dog that's not a threat, agreed?

15      A.     The officer said it was a threat.

16      Q.     Okay.  So your assessment that this was a

17  reasonable shooting hinges in substantial part on

18  the officer's subjective perception of a threat,

19  agreed?

20          MR. ROQUEMORE:

21              Objection form.

22          THE WITNESS:

23              And within the objective totality of

24      circumstances, yes.  So as we've said before,

25      both matter, the subjective view of the
```

ANNE KIRKPATRICK on 05/01/2025

36

```
 1        officer or perspective, and the objective
 2        totality of the circumstances.
 3   BY MR. MOST:
 4        Q.    Okay.  So your assessment and your
 5   signature on the document incorporated both a
 6   subjective and objective component; correct?
 7        A.    Yes.  According to what the officer
 8   thought and the objective totality of the
 9   circumstances.
10        Q.    This memo doesn't say anything about the
11   use of force review board?
12        A.    No.  I don't think in this memo, not this
13   memo.
14        Q.    Were you aware that the use of --
15             MR. ROQUEMORE:
16                  Before we get into that, I'm going
17        to object any reference to the findings of the
18        Use of Force Review Board.  And if I could
19        have just a continuing objection, we'll have a
20        cleaner record.
21             MR. MOST:
22                  Certainly.
23             MR. ROQUEMORE:
24                  Thank you.
25   BY MR. MOST:
```

```
 1    OCDM suggested that an officer use of force might
 2    meet the standard for criminal conduct?
 3        A.    That is such a standard thing we do.  As
 4    I said, when we have deadly force used, the
 5    discharge of a firearm, it is pretty common that
 6    you're going to have it reviewed criminally.  As a
 7    matter of fact, it's our policy to run two tracks at
 8    the same time.  So we do an administrative track, we
 9    do a criminal track.  And it's standard protocol,
10    almost.  So they probably, in this case, that
11    happened probably because it was an animal that
12    OCDM, and I'm speculating because I don't know what
13    you're referring to, that OCDM would say, hey, even
14    though it's an animal, it still should be reviewed.
15    That would be kind of a normal, we're doing those
16    things anyway.
17        Q.    Okay.
18        A.    Yeah.
19        Q.    Okay.  You said that you didn't see the
20    dog that Burmaster shot in the video; right?
21        A.    Right.
22        Q.    Just in assessing the threat that that
23    dog posed to Burmaster, were there any facts that
24    you knew of that suggested that that dog was a
25    threat to Burmaster, other than his subjective
```

1  perception?

2      A.    Based on the articulations that he did in

3  his police report, and then the reviews, the several

4  reviews of different people who assessed that and

5  their basis for what they were thinking, those were

6  the factors I had.

7           As you already know, I had not seen that

8  video, therefore the video was not a factor.  And

9  still seeing it, would not have changed my opinion.

10          MR. MOST:

11              All right.  And I'll turn it over to

12      Mr. Roquemore.  Although, saving, redirect.

13          MR. ROQUEMORE:

14              Let's take a break.  If we can.

15          THE VIDEOGRAPHER:

16              Off the record at 2:35.

17              (RECESS TAKEN)

18          THE VIDEOGRAPHER:

19              We're back on the record.  The time

20      is 2:43.

21              EXAMINATION

22  BY MR. ROQUEMORE:

23      Q.    Chief Kirkpatrick, I'm James Roquemore.

24  I represent, as you know, the city and also Officer

25  Burmaster.  We've met before, right?

ANNE KIRKPATRICK on 05/01/2025

```
 1        A.    Yes, we have.

 2        Q.    Okay.  I know that Mr. Mose has asked you

 3   a few questions.  Do you understand this is going to

 4   be presented at trial, so I want to kind of back up

 5   and make sure we present our side kind of

 6   cohesively.  All right.

 7        A.    I understand.

 8        Q.    And I'll do my best not to overlap and

 9   everything.  So currently what is your full title?

10        A.    Superintendent of Police.

11        Q.    For New Orleans Police Department?

12        A.    For New Orleans, yes.

13        Q.    And you've been, when was -- when did you

14   start becoming, when did you start your job as

15   superintendent?

16        A.    I was actually hired initially as the

17   interim superintendent.  It was at the end of

18   September of 2023.  I don't have the exact date in

19   mind.

20        Q.    All right.  And before you became

21   superintendent here, what were you doing?

22        A.    Just prior to coming here, I was teaching

23   leadership topics for an organization called FBI,

24   Law Enforcement Executive Development Association.

25   I was on the road teaching around the country.
```

ANNE KIRKPATRICK on 05/01/2025

51

```
 1      Q.    Okay.  And how long did you do that?
 2      A.    I've had several in and out associations
 3   with them, but during that time period, three years.
 4      Q.    Three years, and before that, where were
 5   you?
 6      A.    I was the Chief of Police of Oakland,
 7   California.
 8      Q.    Okay.  And how long were you the chief of
 9   police at Oakland?
10      A.    I was there for three years.
11      Q.    And were you -- did you have other --
12   were you a chief of police other places before
13   Oakland?
14      A.    Yes.  The easiest way to just articulate
15   it is that I have been in law enforcement for 43
16   years, almost 43 years.  And I -- New Orleans is my
17   ninth police department, law enforcement
18   organization.
19            And I've been the chief of police of five
20   different cities of the nine.  And the others, I
21   held very high rank positions in two other cities.
22      Q.    Tell me about your educational
23   background.
24      A.    Well, if I may, because it's part of my
25   background, it gives kind of my experience.  I was a
```

1    bureau chief in Chicago.  And I was an under-sheriff

2    of a very large sheriff's office, which is Seattle.

3    And I was a Memphis police officer.

4            And then I had a couple of other agencies

5    in between.  So my educational background, I have a

6    bachelor's degree in business administration.  I

7    have a master's in counseling.  I have a law degree

8    and I'm also a licensed attorney.  I've been

9    licensed for 35 years.

10           MR. MOST:

11               And we'll just object to this line

12       of questioning on the basis that she's not an

13       expert witness.

14   BY MR. ROQUEMORE:

15       Q.   Do you have any other professional

16   affiliations?

17       A.   Yes.  I'm a member of many of the

18   organizations, associations.  I'm a member of the

19   FBI National Academy Associates.  I'm a graduate of

20   the FBI National Academy.  I'm a graduate of the

21   FBI's Law Enforcement Executive Development Seminar.

22           I am a graduate of the FBI's National

23   Executive Institute.  I'm a member of Major City

24   Police Chiefs Association.

25           I am a member of the Washington State Bar

```
 1   Association as an attorney there in that state.  I
 2   have a couple of other affiliations, but I think
 3   those are the big ones.
 4        Q.    Now this case, as you know, involves use
 5   of force.  Have you had any specialized education or
 6   police officer related education or legal education
 7   regarding uses of force?
 8        A.    So as a licensed attorney, I certainly
 9   have a foundation and understanding of the law.  I
10   did teach criminal law and criminal procedures for
11   many years at the Washington State Police Academy.
12   I was the main instructor for criminal procedures.
13              And then, as I said, through my
14   affiliation with teaching for the FBI LIDA
15   organization, we had elements of liability law that
16   I taught for the FBI LIDA organization around the
17   country.
18        Q.    And the liability law that
19   incorporated --
20        A.    Risk management is associated with use of
21   force issues, and as a chief of police for almost 20
22   years, I have been the top commissioned officer who
23   has made decisions about people's use of force for
24   many, many years.
25        Q.    And during the previous years before you
```

1    became the superintendent here in New Orleans, who

2    were the students that you were teaching to?

3       A.   All law enforcement, for the most part,

4    not completely, but for the most part, all law

5    enforcement affiliated, men and women who wanted to

6    go into rank of leadership from sergeant all the way

7    up to chief and sheriff around the country.

8       Q.   Let's talk about your duties in New

9    Orleans.  In general, what are the duties of a

10   superintendent?

11       A.   In general, I am the decision maker

12   associated with strategy for a police department.  I

13   have oversight of policies.  I would have oversight

14   about training.  I have oversight on discipline

15   matters and matters such as these, this particular

16   case that would come before me as a decision maker.

17       Q.   In your job as a decision maker of

18   policies, you're familiar with the NOPD policies

19   regarding use of force?

20       A.   Yes, I would be.

21       Q.   Okay.  And that use of force is that's

22   New Orleans Police Department 1.3; is that right?

23       A.   Yes.

24       Q.   Okay, I'm going to show you what's been

25   marked.  In front of you, let's just talk about

57

```
 1    that --

 2        Q.    Paragraph 32.

 3        A.    Yes.  Here it is.

 4        Q.    And you're familiar with that particular

 5    paragraph?

 6        A.    I am.

 7        Q.    And was that, if you look on the first

 8    page, it has the date, the effective date for this

 9    policy.  And does that tell you whether or not this

10    particular policy wasn't enforced in 2021 when this

11    incident, this lawsuit happened?

12            MR. MOST:

13                Objection to the form.

14            THE WITNESS:

15                Yes.  I'm sorry, yes.

16    BY MR. ROQUEMORE:

17        Q.    I think you mentioned a little bit about

18    your role as in the disciplinary process.  What role

19    does the superintendent play in the disciplinary

20    process of an officer?

21        A.    I am the person who reviews the entirety

22    of a case that is presented to me, and after I make

23    my own independent assessment of the facts I make a

24    ruling, a decision on discipline.

25                It's the matter, and we have a couple of
```

```
 1   choices.  We can say a situation is exonerated or
 2   not sustained or sustained.  So there I have a set
 3   of criteria that I will make a decision within those
 4   boundaries.
 5        Q.    So the three choices are exonerated,
 6   sustained, or not sustained?
 7        A.    No.  There are other choices that are
 8   there.  So one would be an exonerated.  So you can
 9   have sustained, which means the person did it, and
10   it's in violation of a policy.
11        Q.    Okay.
12        A.    You can have not sustained, which means
13   we don't have enough information to be able to say
14   that a violation occurred.  We can have unfounded,
15   where we say the complaint wasn't even legitimate to
16   begin with, and then we can have exonerated, which
17   means the officer engaged in the behavior but it was
18   not a violation of policy.
19        Q.    And before we get into the officer
20   Burmaster's results of his investigation, I just
21   want to back up a little bit.  We've talked a little
22   bit about the Public Integrity Bureau.
23        A.    Yes.
24        Q.    That's also referred to sometimes as PIB.
25        A.    Yes, that's the acronym for Public
```

ANNE KIRKPATRICK on 05/01/2025

```
 1    Integrity Bureau, which for most of the country,

 2    they'll use the term Internal Affairs.

 3        Q.    Okay.  And so what does that mean with

 4    regard to what they do inside of New Orleans Police

 5    Department?

 6        A.    The unit is staffed with fellow officers

 7    and sergeants who are investigators, and their focus

 8    is on complaints that they receive, which can be

 9    internally generated, and their job is to assess if

10    an officer is in violation of a policy or out or any

11    one of those four categories.  But they are

12    primarily fact finders, the real people who make the

13    assessment.  They can give a recommendation, if you

14    will.

15        Q.    The PIB makes a recommendation?

16        A.    They make a recommendation.  But they're

17    fact finders.  They collect the facts as

18    investigators.  And then they give a recommendation.

19            But then that is assessed by all these

20    different levels of rank.  And then I'm the final

21    assessor.  So I take all that information, and I

22    weigh everybody's assessments, and I come up with a

23    decision.

24        Q.    So you're familiar with Officer

25    Burmaster's disciplinary process; right?
```

ANNE KIRKPATRICK on 05/01/2025

```
 1    ranking group of officers.  So the PIB investigators

 2    may be at the rank of an officer and/or sergeant,

 3    and now it's moving up to higher ranks for review.

 4         Q.    Right.  Let's talk about exactly what

 5    happened here.  The first paragraph of this memo,

 6    does that tell you who the higher ranking officers

 7    were in that panel?

 8         A.    Yes.

 9         Q.    Okay.  And who were they?

10         A.    So by name, their chief deputy

11    superintendent Hans Ganthier, they each have the

12    same title.  So Keith Sanchez and Ryan Lubrano.

13         Q.    At the time when these members were on

14    the panel, for Chief Ganthier, was he -- do you

15    remember what his title was, what his role was?

16         A.    He was the Chief Deputy Superintendent

17    over what we call the FOB, which is the Field of

18    Operations for Bureau.  That means all of your rank

19    and file officers you see in the streets answering

20    calls for service, that's our largest bureau, and he

21    was the chief over that bureau.

22         Q.    And the FOB, was that where Burmaster was

23    also assigned?

24         A.    Yes, because he was a patrol officer

25    answering patrol calls.
```

ANNE KIRKPATRICK on 05/01/2025

63

```
 1        Q.    Okay.  So is it fair to say that Ganthier
 2    was the chief over all of the front line police
 3    officers?
 4        A.    Yes.
 5        Q.    And are you familiar with how experienced
 6    Chief Ganthier was in the field of law enforcement?
 7        A.    Yes.
 8        Q.    And what is your experience?  What can
 9    you say about that?
10        A.    He's around a 25-year veteran.  He was
11    also a member of our SWAT team at one time years
12    ago, and he was also the commander over special
13    operations, which is SWAT, so high-risk unit where
14    forces actually with a higher levels of risk
15    associated with force would be.
16              He also was over the academy at one time
17    as the commanding rank officer.  So he has a very
18    strong background in force and force assessment and
19    operations, very strong operations.
20        Q.    Now, Mr. Most asked you some questions
21    about credibility, etc.
22        A.    Yes.
23        Q.    Given Chief Ganthier's experience and the
24    factors that you just mentioned, did you have an
25    estimate or an evaluation of his credibility when
```

1    you made the recommendation?

2        A.    He's very credible.

3        Q.    All right.  Let's talk about Chief

4    Sanchez.

5        A.    Yes.

6        Q.    Do you know what his role was when he was

7    on this panel?

8        A.    Yes.

9        Q.    What was that?

10       A.    He was the chief over the Public

11   Integrity Bureau.

12       Q.    Meaning, what did that mean?

13       A.    He was the chief of the entire unit.  So

14   all investigators, everybody who were assigned to do

15   investigations of officers for policy violations, as

16   well as the criminal side of a review of an officer.

17   So you want to think of it as two tracks.  He was in

18   charge of all of that.

19       Q.    And Do you know what his experience was?

20       A.    I do.

21       Q.    Tell me along the same lines of what we

22   went through with Ganthier.

23       A.    He was a long-term senior officer here in

24   the New Orleans Police Department at the rank of

25   sergeant, but he was a little unique.  He was also

```
 1    an attorney, like me, and he taught criminal law at
 2    the police academy for several years before we -- So
 3    he had retired out.  He was the full-time legal
 4    instructor for the police academy.  And then he
 5    became the head -- From that position, he became the
 6    head of the PIB Bureau.
 7         Q.    And did the experience that Chief Sanchez
 8    have play into your evaluation of his
 9    recommendation?
10         A.    Yeah, he's highly trained legally, and he
11    was practical.  He had practmatic work as a police
12    officer.
13         Q.    Chief Ryan Lubrano was also on the panel?
14         A.    Yes.
15         Q.    And what was his job title?
16         A.    He was the chief over the Bureau of
17    Investigators, and those would be your criminal
18    investigators.  And that bureau had close to 100
19    detectives.  And so he's also a ranked officer with
20    maybe 20 plus years.
21         Q.    If you look on Exhibit Number 2, this is
22    the letter that you received from the panel that
23    Ganthier, Lubrano, and Sanchez were on; is that
24    right?
25         A.    Correct.
```

ANNE KIRKPATRICK on 05/01/2025

66

```
1        Q.    And does that tell you who the PIB
2    investigator who made a recommendation was?
3        A.    Yes.
4        Q.    And who was that?
5        A.    Sergeant Shannon Brewer.
6        Q.    Do you know Sergeant Brewer?
7        A.    I do.
8        Q.    And as a sergeant, where did she lie on
9    the rank vis-à-vis the chiefs?
10       A.    Sure.  So a sergeant is what we call the
11   first-line supervisor.  They're just above the rank
12   of officer.  So that's where she lies in that rank.
13       Q.    And the recommendation that she made, did
14   you evaluate?  You said you evaluated that as part
15   of the totality in making this decision.
16       A.    Sure.  Yes, I did.
17       Q.    And in addition, you said you evaluated
18   Officer Burmaster's own statement; right?
19       A.    Yes.
20       Q.    And you evaluated the recommendation made
21   to you by the chief's panel; right?
22       A.    I did.
23       Q.    Was the -- what was your final decision
24   with this case?
25       A.    My final decision was that the shooting,
```

1    unfortunately, this dog was within policy.

2       Q.    What were the specific policy violations

3    that were being investigated in this case?

4       A.    It's the first violation, we call it a

5    Rule 4.  The title of it that we use is Performance

6    of Duty, and we paragraph 4 because we have several

7    paragraphs in that policy, neglect of duty.  C6,

8    failing to comply with instructions, oral or

9    written, from any authoritative source to wit, NOPD

10   Chapter 13, which is the Use of Force chapter

11   paragraph 11 and that is the --

12      Q.    And paragraph 11 says specifically?

13      A.    It's under the title of authority to use

14   reasonable force and paragraph 11 states officers

15   shall not draw or -- a firearm unless circumstances

16   surrounding the incident create an objectively

17   reasonable belief that a situation may escalate to

18   the point at which lethal force would be authorized

19   once an officer determines that the use of deputy

20   force is no longer likely, the officer shall re

21   holster the weapon.

22      Q.    And your decision as to this particular

23   policy is that you did not violate it?

24      A.    That's correct.

25      Q.    And what was your thinking, analysis in

ANNE KIRKPATRICK on 05/01/2025

68

```
 1   making that decision?
 2       A.    That there were enough of those objective
 3   totality of circumstances factors that it was
 4   reasonable, in my opinion, and the opinion of
 5   others, that the officer had used the deadly force
 6   within that policy.
 7       Q.    The chapter, the next violation, chapter
 8   13, or paragraph 13.
 9       A.    Yes.
10       Q.    What is paragraph 13 referring to?
11       A.    Deadly, lethal force shall be used only
12   when -- Is that the one we -- that's this paragraph?
13       Q.    We did chapter 11, now there's also
14   chapter 13.
15       A.    I'm not sure we're on the same.  With
16   your permission, I have him point this to me?
17       Q.    Well, we'll back up.  Let's look at
18   Exhibit Number 2.  I'm tracking from the letter.
19       A.    It's a long one.  I apologize.  Okay.
20       Q.    We'll go to the third page of six.
21       A.    That's correct.
22       Q.    And so it says, after all testimony and
23   evidence, the committee recommended the following
24   disposition and penalty.
25       A.    That's correct.
```

1   well as exonerate him for paragraph 32; right?

2       A.    That's correct.

3       Q.    And paragraph 32 is a use of force policy

4   specifically dealing with dangerous animals.

5       A.    Yes, that's correct.

6       Q.    In looking at paragraph 32, I just want

7   to ask you some specific parts of -- some questions

8   as to that.

9       A.    Okay.  I think I'm with you.

10      Q.    Okay.  It starts off, this the policy of

11  NOPD, officers are authorized to use firearms to

12  stop an animal in circumstances in which the animal

13  reasonably appears to pose an imminent threat to

14  human safety.  In your view of the totality, can you

15  explain where the imminent threat for his safety

16  was?

17      A.    Well, the animal is charging, and I think

18  that that's an imminent threat, and to have an

19  animal charging at you, that makes it imminent.  And

20  the fact that the second officer also assessed that

21  threat as imminent, such that he ran.

22      Q.    All right.  This policy continues and it

23  says, and alternative methods are not reasonably

24  available or would likely be ineffective.  Can you

25  explain where you found a reasonable methods not

1    reasonably available or likely to be ineffective?

2        A.    According to the Burmaster, Officer

3    Burmaster, who said he wasn't going to be able to

4    jump over the fence.  The other officer had already

5    run out and was closing the fence.  He didn't think

6    he had time to get out that gate.  He also didn't

7    think he could jump over that gate or over the fence

8    because I think it had spikes at the top, that's my

9    understanding.  And so he's now in an imminent

10   situation and he had already drawn his gun and I

11   actually support the fact that he had pulled his

12   firearm.

13       Q.    I would like to ask you that.  Explain

14   why pulling his firearm when he did was not a

15   violation of NOPD?

16       A.    It's not a violation as a matter of fact

17   because he's going into a domestic violence

18   situation.  The reports that came to them was that

19   they could hear that whoever reported said there was

20   yelling and screaming, which means you, in an

21   officer's mind, is that there's an active,

22   assaultive behavior potentially.

23            And they're walking in, he's hearing

24   these dogs coming out.  How do you know that it

25   wasn't a party involved in the domestic sending dogs

```
 1   out?  You don't know.  And so for him to have drawn

 2   his weapon, it's dark.  All of those factors to me

 3   are reasonable that you would draw your weapon.

 4        Q.    The next line, it says the officer must

 5   be cognizant of the surroundings when shooting at an

 6   animal and show no risk to people in the area.  Was

 7   there evidence that he was cognizant of the

 8   surroundings?

 9        A.    Yes.  What was interesting because when

10   Mr. Most showed me the training bulletin here.  And

11   as I said, I hadn't seen it before, but it's talking

12   about how to become, you know, what you want to be

13   thinking about.

14            And the fact that he was doing the

15   kissing voices to see if there was a dog, trying to

16   see if he could solicit, that is telling me he's

17   cognizant that there could be some danger issues

18   here.

19        Q.    But is there evidence that he was

20   actively looking to see if dogs were evidence?

21        A.    Yes, and that to me was even more

22   supportive that he is operating under his training

23   and his policy, and he was trying to assess that,

24   sure enough, the dogs come charging.

25        Q.    The other part of that sentence has to do
```

```
 1   with to ensure there's no risk to people in the

 2   area, in evaluating the totality of the

 3   circumstances and the facts.  What do you have to

 4   say about that factor?

 5       A.    They're unrolling very fast on them, and

 6   the law and the policy says that we're not to do the

 7   20-20 hindsight when things are evolving in

 8   split-second decisions and he apparently had

 9   assessed well enough that no one was injured in his

10   use of deadly force.

11       Q.    The next sentence in this particular

12   policy, deals with reasonable contingency plans.

13       A.    Yes.

14       Q.    How did that factor into your decision?

15       A.    Again, I didn't think it was

16   unreasonable.  When you have this unfolding event,

17   you've got your partner running away on you, that,

18   again, I cannot overemphasize how that corroborated,

19   for me, the fact that there was two different

20   independent people who perceived a threat at the

21   same time.

22            One was able to run out the gate, and so

23   we are having split-second decisions here.  And so I

24   think he squarely was within the policy, because it

25   was cognizant.  He was aware.  He knew what he was
```

ANNE KIRKPATRICK on 05/01/2025

74

 1    walking into.  And he was making reasonable efforts
 2    to see, even about the dogs.  That's mindfulness.
 3        Q.    There is a -- I think you were asked some
 4    questions about a baton.
 5        A.    Yes.
 6        Q.    In fact, in your recommendation, if you
 7    look at Exhibit Number 2, you made the decision
 8    about the result of the disciplinary investigation.
 9    It's true that you in fact found that a uniform
10    violation was sustained.
11        A.    I did.
12        Q.    And that part of the uniform violation
13    was not having his baton; is that right?
14        A.    Yes.
15        Q.    And part of it was not having his body on
16    it?
17        A.    That's correct.
18        Q.    And part of it was not having body armor?
19        A.    That's correct.
20        Q.    And how did not having his baton or not
21    having body armor affect the end result of the
22    shooting?
23        A.    Body armor would not have affected, would
24    have been non-consequential, only that.  The having
25    your baton or not having a baton, that didn't for me

```
 1   change the factors in the long run.  They were not a
 2   turning point, pivotal factor for me.
 3       Q.    Let me refer you to page 3 of 6 on
 4   Exhibit Number 2, your letter.
 5       A.    Okay.
 6       Q.    It's a summary of emboldened italics
 7   where you have summarized the recommendations of the
 8   chief's panel.  The last sentence says the panel
 9   believes the outcome of the incident would not have
10   been affected by Officer Burmaster having the PR-24
11   expandable baton and/or the department issued body
12   armor?
13       A.    Right.
14       Q.    This is something you agree with?
15       A.    I do.
16             MR. ROQUEMORE:
17                  Chief, I appreciate your time.
18       Those are all questions I have for you.
19             THE WITNESS:
20                  Okay.
21             MR. MOST:
22                  You need to be out of here by 4:30;
23       is that right?
24             THE WITNESS:
25                  I'm here to answer your questions.
```

ANNE KIRKPATRICK on 05/01/2025

```
 1          MR. MOST:

 2               Okay, we're not going to go that

 3     long.

 4          THE WITNESS:

 5               Okay.

 6               RE-EXAMINATION

 7   BY MR. MOST:

 8     Q.    Okay.  I just want to make sure it wasn't

 9   4:30.

10     A.    I appreciate that, but I'm here to

11   answer.

12     Q.    Thank you.  So Chief, you were a witness

13   to the shooting or any of the events around the

14   shooting?

15     A.    That's correct.

16     Q.    So your assessment of the reasonableness

17   of the shooting is your opinion; correct?

18     A.    It is an opinion, but it is one that I

19   think is weighted with a lot of experience and

20   knowledge.

21     Q.    Sure.

22     A.    Frankly, yes.

23     Q.    It's a well-informed opinion.

24     A.    It is a well-informed opinion.

25     Q.    Okay.  And there's references here to
```

```
 1    Burmaster being exonerated.  Hat's a determination
 2    within the police department.  It doesn't mean that
 3    the court has exonerated him; correct?
 4             BY MR. ROQUEMORE:
 5                  Objection form.
 6             THE WITNESS:
 7                  That would be correct.
 8    BY MR. MOST:
 9       Q.    And with your signature on the
10    disciplinary document, you approved of Burmaster's
11    decision to shoot the dog and his basis for it;
12    correct?
13       A.    I think it's reasonable that he fell
14    within that range of what would be deemed
15    reasonable.
16       Q.    And so you approved of the decision?
17       A.    Yes.
18       Q.    And his basis for making the decision?
19       A.    His and the weight of all the others who
20    weighed it along the way, which were all those
21    deputy chiefs, everyone who assisted us.
22       Q.    Okay.  And you said that your belief was
23    that no human was injured in this incident?
24       A.    I don't believe I said.  I think the
25    question was posed differently to me.  So what was
```

ANNE KIRKPATRICK on 05/01/2025

1    your question that you asked before?  I don't think

2    you asked that question.

3        Q.    It was actually a question from Mr.

4    Roquemore.  Are you aware that Burmaster's partner

5    was wounded in this incident?

6        A.    Now, that you mention it, I think so.

7    But I didn't recall until you mentioned it.  But

8    yes, I think he refreshed my thinking.

9        Q.    Okay.  So you concluded it was reasonable

10    for Burmaster to fire his firearm; correct?

11        A.    I do.

12        Q.    And would it have been reasonable if he

13    had instead used his taser?

14        A.    That could also be reasonable.

15        Q.    Would it have been reasonable if he had

16    kicked the dog instead of using his gun or his

17    taser?

18        A.    If the circumstances were such where he

19    had kicked the dog, yes, it would have been

20    reasonable.

21        Q.    Okay.  And the taser or kicking could

22    have been effective in this scenario; correct?

23        A.    Possibly.  I'm dealing with what I know,

24    not the possibility of it.

25        Q.    Sure.  Do you have any facts that suggest

```
 1   that taser would have been ineffective in this

 2   scenario?

 3        A.    I have no facts to support that, yes.

 4        Q.    Do you have any facts to suggest that

 5   kicking the dog would have been ineffective in this

 6   situation?

 7        A.    No.

 8        Q.    You characterized the threat here as the

 9   dog charging at Burmaster.  Do you recall that?

10        A.    Yes, I did.

11        Q.    And you didn't see the dog do that;

12   correct?

13        A.    No.  That's what the report -- I think

14   they used the word aggressive.  I'd have to go back

15   and look.

16        Q.    Sure.  And that's based on Burmaster's

17   telling of the event?

18        A.    That's correct.

19        Q.    Okay.

20        A.    And may I qualify?  And the fact that the

21   other officer ran.  That they coupled together.

22        Q.    But you don't know which dog the other

23   officer was running from?

24        A.    Yes, I was told, I believe, somewhere in

25   the reports that one was a larger dog, one was the
```

ANNE KIRKPATRICK on 05/01/2025

```
 1   smaller dog.
 2       Q.    Okay.  But you don't think the other
 3   officer was running away from the dog that Burmaster
 4   shot; correct?
 5       A.    No.  He started running right before he
 6   saw the dog, so I don't know.  I know what he's -- I
 7   know what the reports state.
 8       Q.    Okay.  Mr. Roquemore asked you about your
 9   assessment of some other NOPD officers, including
10   the Lubrano and Sanchez and Ganthier, are you also
11   familiar with deputy former deputy superintendent
12   Chris Goodley?
13       A.    I only know him.  I've only met him.
14       Q.    Do you also understand that he's a very
15   experienced?
16       A.    I do.
17       Q.    And did you know Deputy Chief Paul Noel?
18       A.    I know of him as well.  I've met him.
19   He's the Chief of Police of Knoxville now.  Yes.
20       Q.    And so he is comparably experienced to
21   the other officers we've discussed, the other
22   ranking officers?
23       A.    That's correct.  Yes.
24             MR. MOST:
25                 Okay.  That's all I've got.  Thank
```

ANNE KIRKPATRICK on 05/01/2025

81

```
 1   you very much for your time.

 2        THE WITNESS:

 3             Thanks.

 4        THE VIDEOGRAPHER:

 5             This concludes the deposition.  The

 6   time is 3:25.

 7   (Deposition concluded on/or about 3:25 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```