UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CIVIL ACTION NO. 22-00847

SECTION: L                    DIVISION: 4

DEREK BROWN AND JULIA BARECKI-BROWN

VERSUS

DERRICK BURMASTER, SHAUN FERGUSON, AND THE CITY OF NEW ORLEANS


DEPOSITION OF CHIEF KEITH SANCHEZ,
given in the above-entitled cause, via Zoom
Videoconferencing, pursuant to the following
stipulation, before Raynel E. Schule, Certified
Shorthand Reporter in and for the State of
Louisiana, commencing at 10:10 o'clock a.m., on
Wednesday, the 7th day of May, 2052.

2

1                    I N D E X

2                                        Page

3    Caption                             1

4    Appearances                         3

5    Agreement of Counsel                4

6    Examination

7         MR. MOST                       5, 64

8         MR. ROQUEMORE                  49

9    Reporter's Certificate              70

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES (VIA ZOOM VIDEOCONFERENCING):

 2
      For the Plaintiff:
 3
      MOST & ASSOCIATES
 4    Attorneys at Law
      BY:  WILLIAM MOST, ESQ.
 5    201 St. Charles Avenue, Suite 2500  #9685
      New Orleans, Louisiana    70170
 6
 7    For the Defendant:

 8    CITY OF NEW ORLEANS LAW DEPARTMENT
      BY:  JAMES M. ROQUEMORE, ESQ.
 9    ASSISTANT CITY ATTORNEY
      1300 Perdido Street, Suite 5E03
10    New Orleans, Louisiana  70112

11
      Also Present:  Patrick Van Burkleo, Esq.
12                   Tarak Anada, Esq.

13
      Reported By:  Raynel E. Schule
14                  Certified Shorthand Reporter
                    State of Louisiana
15

16

17

18

19

20

21

22

23

24

25
```

```
1              S T I P U L A T I O N
2              It is stipulated and agreed by and
3    among Counsel for the parties hereto that the
4    deposition of CHIEF KEITH SANCHEZ is hereby
5    being taken pursuant to the Federal Rules of
6    Civil Procedure for all purposes in accordance
7    with law;
8              That the formalities of reading and
9    signing are not specifically waived;
10             That the formalities of sealing,
11   certification, and filing are hereby
12   specifically waived.
13             That all objections, save those as to
14   the form of the question and responsiveness of
15   the answer, are hereby reserved until such time
16   as this deposition or any part thereof is used
17   or sought to be used in evidence.
18                   *  *  *  *  *
19             Raynel E. Schule, Certified
20   Shorthand Reporter in and for the State of
21   Louisiana, officiated in administering the oath
22   to the witness.
23
24
25
```

```
 1                    I'm sorry.
 2   BY MR. MOST:
 3   Q.   And -- and so that's a subjective analysis,
 4        right, that -- that hinges on what
 5        subjectively is going on in the officer's
 6        head, correct?
 7   A.   I think that's subjective, yes.
 8   Q.   Yes, it's a subjective analysis, correct?
 9   A.   Yes.
10   Q.   And that's the analysis you applied with
11        Officer Burmaster's --
12   A.   We applied the subjective analysis as well
13        as the objective analysis as well.
14   Q.   You -- you applied both the subjective and
15        objective analysis?
16   A.   Yes.
17   Q.   And does your letter reflect that?
18   A.   Does what letter?  I'm sorry.
19   Q.   Yeah, the Chief Annual Report that you
20        described, does that reflect an objective
21        analysis?
22   A.   I think the letter probably reflects the
23        subjective analysis by Officer Burmaster.
24   Q.   Okay, and -- and that's -- that was the
25        basis of your recommendation to the Chief,
```

24

```
 1        correct, the Superintendent?
 2   A.   Yeah, it was based on the totality of the
 3        circumstances, yeah.  Once -- once we had
 4        an opportunity to -- to look at the video,
 5        hear Officer Burmaster, go through the
 6        facts, it's based on totality of
 7        circumstances; not just one particular
 8        factor.
 9   Q.   Okay, and I think this is obvious, but you
10        were not a witness in any way to the -- the
11        facts relevant to Burmaster shooting,
12        correct?
13   A.   No, I was not.
14   Q.   Okay.  So in the Chiefs Hearing document,
15        you were providing your opinion about
16        whether the shooting was reasonable or not,
17        right?
18   A.   Yes.  Yes, sir.
19   Q.   Okay, and -- and have you ever been
20        designated as an expert in a case?
21   A.   No.
22   Q.   Okay.  Would you say that you're an expert
23        in officer use of force?
24   A.   No, sir.
25   Q.   Would you say you're an expert in the use
```

```
 1          nonlethal tools could have been effective
 2          in that scenario, correct?
 3   A.     No, now, I don't -- I mean, I -- I've never
 4          used a taser before; I've never carried a
 5          taser before; I've never been tased before,
 6          so I really can't speak to that particular
 7          issue as it relates to utilizing nonlethal
 8          -- that type of nonlethal force.
 9   Q.     Okay.  So we're looking back at NOPD Policy
10          Manual Chapter 1.3, Paragraph 32, do you
11          see the first sentence of Paragraph 32?
12   A.     Yes.
13   Q.     Okay, and do you see that one of the
14          required factors for whether officers are
15          authorized to use firearms to stop an
16          animal is that alternative methods are not
17          reasonably available or would likely be
18          ineffective?
19   A.     Yes, yes.
20   Q.     Okay.  So you did not engage in an analysis
21          for that part of the policy, correct?
22   A.     We engaged in an analysis of whether or not
23          the force that was utilized by Officer
24          Burmaster was reasonable based off the set
25          of facts.
```

```
 1    Q.   Right, but you didn't --
 2    A.   That -- that -- that was -- that was --
 3         that was what we did.
 4    Q.   Right, but you did not look into whether
 5         other nonlethal methods would have been
 6         effective or ineffective, correct?
 7    A.   I do not recall.  I think the reports that
 8         we have is present.  I don't recall whether
 9         or not there was a healthy discussion as it
10         relates to that.
11    Q.   So then how did you determine that this was
12         within policy, the shooting was within
13         policy if you didn't look at these
14         alternative methods that the policy --
15    A.   Well, we --
16    Q.   -- requires analysis of?
17    A.   I guess there's different parts of the
18         policy that speaks to the -- the right to
19         use deadly force, and I think if you look
20         at the policy as a whole as it relates to
21         deadly force, whether you can use deadly
22         force or not, that is -- that is what we
23         looked at, whether or not, the -- the use
24         of force that Officer Burmaster used based
25         on the circumstances were within policy as
```

```
 1         it relates to the use of the deadly force
 2         itself.  That's what -- that's what we --
 3         we looked at, whether or not he was in
 4         imminent danger -- whether he believed he
 5         was in imminent danger of receiving great
 6         bodily injury, and whether or not deadly
 7         force was authorized.
 8   Q.    Okay, but --
 9   A.    That's -- that's -- that's what we looked
10         at.
11   Q.    Okay, but you would agree that this
12         sentence, this first sentence of Paragraph
13         32 defines when officers are allow to use
14         firearms to stop animals, right, when
15         deadly force is authorized?
16   A.    I -- I -- I agree that Paragraph 32 --
17                   MR. ROQUEMORE:
18                   Object to form.
19                   Go ahead, go ahead, Chief.
20                   THE WITNESS:
21                   I agree that Paragraph 32 does
22              mention that, yes, it does.
23   BY MR. MOST:
24   Q.    Okay, and so your analysis went through
25         whether Officer Burmaster believed the
```

37

```
 1        animal posed an imminent threat to human
 2        safety, right?
 3   A.   Yes.
 4   Q.   Okay, but you did not assess whether
 5        alternative methods were reasonably
 6        available or likely to be ineffective,
 7        correct?
 8   A.   That's correct.
 9   Q.   If Officer Burmaster had been carrying his
10        baton, could that have been used to repel
11        the dog?
12   A.   I think that what we looked at is whether
13        or not he had the right to utilize the --
14        the force that he used.  I think that was
15        what we looked at.
16   Q.   Right, but I'm asking you, could he have
17        used a baton in those circumstances to
18        repel that dog?
19   A.   I don't -- I don't believe that -- I'm
20        going to have to say no.
21   Q.   Can you recall -- so why would a baton have
22        not been effective?
23   A.   You say why was a baton would not have been
24        effective?  Because I think at the time the
25        officer believed that he was in imminent
```

```
 1              Jim, do you have any questions?
 2         MR. ROQUEMORE:
 3              I do.  William, do you mind
 4         pulling up Exhibit 58, Page 2.
 5                   EXAMINATION
 6    BY MR. ROQUEMORE:
 7    Q.   Chief, you were asked about this document
 8         earlier.  This is the September 11th, 2023,
 9         memo to Michelle Woodfork by Hans Ganthier.
10         Do you recall those questions?
11    A.   Yes, sir.
12    Q.   Okay, and you -- and you are familiar with
13         this document, right?  It does have your
14         signature on -- on the last page.  Is that
15         right?
16    A.   That's correct, huh-huh.
17    Q.   Okay.  So we're looking at Page 2, and it
18         -- it starts, "During this hearing the
19         following facts were learned," and it has a
20         couple of -- these two -- two, three
21         paragraphs after that.  You see that?
22    A.   Yes, sir.
23    Q.   Okay.  So I'm just going to walk through a
24         couple of these things, and we're going to
25         talk about subjective versus objective,
```

```
 1          that line of questions.  That's really
 2          where I'm going with this, all right?
 3   A.    Okay.
 4   Q.    Okay.  So the first line, it says Officers
 5          Burmaster and Roussel responded to a
 6          domestic disturbance.  The fact that it was
 7          a domestic disturbance, is that an
 8          objective fact?
 9   A.    Yes.
10   Q.    And is that a significant fact in this
11          analysis?
12   A.    Yes.
13   Q.    Why is the fact that it was a domestic
14          disturbance significant?
15   A.    Because those are -- can be some of the
16          most violent situations in law enforcement
17          and officers can walk into.  In fact, in
18          most cases, that's when an officer gets
19          injured the most is in domestic
20          disturbances.
21   Q.    Are there special ways that an officer is
22          supposed to approach domestic disturbance
23          situations?
24   A.    Yes.  Well, one, they don't -- they don't
25          go on the scene by themselves, and in this
```

1          case, Officer Burmaster waited for the

2          other officer to come on the scene before

3          he actually approached the situation mainly

4          because of the dangers that may be involved

5          in cases like this.

6    Q.    All right.  The fact that it was a domestic

7          disturbance, it was known to Officer

8          Burmaster; is that right?

9    A.    Yes.

10   Q.    And is that a subjective fact?

11   A.    That he knew that it was domestic?

12   Q.    Yes.

13   A.    That's -- that's an objective fact.

14   Q.    Yeah, but the fact that he -- that he knew

15         in his mind that it was a domestic

16         disturbance that he was going into, was

17         that part of his subjective state of mind

18         at that time?

19   A.    Yes.

20   Q.    This -- along the same line, the -- the

21         next line -- the next sentence is, "The

22         Officers arrived and entered the front

23         yard."  You see that?

24   A.    I do.

25   Q.    Okay.  The layout of the front yard and the

```
 1        driveway, those are objective facts.  Is
 2        that right?
 3   A.   That's --
 4                 MR. MOST:
 5                 Objection, form.
 6                 THE WITNESS:
 7                 That's correct, yes.
 8   BY MR. ROQUEMORE:
 9   Q.   Can you say whether -- whether the layout
10        of the front yard is an objective fact?
11   A.   It is an objective fact, yes.
12   Q.   And as you were sitting on the Board, you
13        were -- where did you get the understanding
14        of what the layout of the front yard was?
15   A.   From -- we got it from the video and also
16        Officer Burmaster I believe in his
17        statement.
18   Q.   All right, and again, Officer Burmaster's
19        understanding what the front yard layout
20        was, was that a subjective understanding of
21        his own?
22   A.   Yes.
23   Q.   And was that also an important fact in your
24        analysis to take into account when deciding
25        whether or not his response was
```

53

```
 1        appropriate?
 2   A.   Yes.
 3   Q.   Now, the next sentence says, "Once inside
 4        the gate," is that -- again, is this an
 5        objective fact where he was inside the
 6        gate?
 7   A.   It is.
 8   Q.   And you -- you reviewed the bodyworn
 9        camera.  Where -- where exactly was he when
10        he first heard the dogs barking?
11   A.   He was inside the gate when he first heard
12        the dogs barking.
13   Q.   Was in the driveway?  Do you recall?
14   A.   I -- I don't recall.
15   Q.   But the bodyworn camera would objectively
16        show where he was.  Is that -- is that
17        fair?
18   A.   That's fair.  That's fair.
19   Q.   All right, and the next -- after that they
20        say, "The Officers heard dogs barking."  On
21        the bodyworn cameras, you can hear the dogs
22        barking.  Is that right?
23   A.   That is correct.
24                  MR. MOST:
25                  Objection, form.
```

54

1    BY MR. ROQUEMORE:

2    Q.    Is the dogs barking and what that sounded

3          like an objective fact?

4    A.    That is an objective fact, yes, sir.

5    Q.    It is also subjective of Burmaster hearing

6          the -- the dogs barking also, right?

7    A.    Yes, it is.

8    Q.    The fact that Officer Roussel ran when he

9          saw the dogs coming down the stairs, is

10         that an objective fact?

11   A.    That is.

12   Q.    And what does it tell you that Officer

13         Roussel ran when he saw the dogs coming

14         down the stairs?

15   A.    He was trying to exit the location.

16   Q.   And why was he trying to exit the location?

17   A.    Because the dogs were coming towards him.

18   Q.    And --

19   A.    He was -- there was some fear as it relates

20         to whether or not he was going to be bitten

21         by the dogs or injured by the dogs should I

22         say.

23   Q.    Does that objectively inform you as to

24         whether or not the dogs posed a danger?

25   A.    Yeah.

1              MR. MOST:

2                  Object to form.

3    BY MR. ROQUEMORE:

4    Q.    Say again.

5    A.    It does, yes.

6    Q.    And explain that a little bit.

7    A.    Well, just in -- just generally speaking

8          the fact that the other officer left the

9          location, it speaks to the totality of the

10         circumstances in relation to what his

11         mindset was at the time, and it is what he

12         did was run out the yard, which was an

13         objective fact, not necessarily subjective

14         based off of Burmaster, but objective that

15         this is what he did, he ran -- he ran from

16         the scene.

17   Q.    And was it also -- how -- how did that

18         affect Officer Burmaster's subjective state

19         at that point?

20   A.    I'm certain that it probably hurt --

21         heightened his subjective state that there

22         was a level of danger when he sees the

23         other officer leave the location or try to

24         run from the location.

25   Q.    The timing of when Officer Burmaster

56

1   removed his weapon in comparison to when he

2   heard the dogs or when he first saw the

3   dogs, are those objective facts or are

4   those subjective facts?

5 A. Objective facts.

6 Q. The fact that two dogs were running -- ran

7   down the stairs, is that an objective fact?

8 A. That's an objective fact, yes.

9 Q. Now, the second paragraph says that Officer

10   Burmaster observed the larger dog running

11   towards Roussel, right?

12 A. It does say that, yes, sir.

13 Q. And he fired his weapon at the dog closest

14   to him, fatally wounding it, right?

15 A. That is correct, yes, sir.

16 Q. Okay.  Those are objective facts or are

17   those subjective facts?

18 A. Those are objective facts.

19 Q. Okay.  The next line, Officer Burmaster

20   stated when the dog was barking or running

21   towards him he then believed the dog was

22   aggressive.  Was that a subjective fact or

23   an objective fact?

24 A. That was subjective.

25 Q. Subjective.  And he believed the dog would

57

1          bite him.  That was -- that's also
2          subjective?
3     A.    Subjective, yes, sir.
4     Q.    And when you are sitting there analyzing
5          his subjective views, do you also see
6          whether or not it aligns with the objective
7          facts?
8     A.    Yes.
9     Q.    Okay, and explain that process a little bit
10         -- a little bit more how when you analyze
11         his belief that the dog is going to bite
12         him, how that lined up with the -- the
13         objective facts.
14    A.    Well, when you -- when you look at the
15         objective facts in this particular case and
16         what he experienced as an officer in -- in
17         these set of circumstances and his actions
18         what his subjective belief would be, they
19         have to align because otherwise it wouldn't
20         make any sense, right?  So in this case, he
21         sees -- he enters -- in fact -- in fact,
22         first he -- he whistles and sees if there's
23         any dogs in there; they enter the yard.  He
24         sees the dogs coming down the stairs.  All
25         of these are objective facts, right?

1    Q.    Huh-huh.

2    A.    He -- he sees Roussel leave the gate.  He

3          believes that there is some imminent danger

4          there, and he takes action based off of not

5          just the objective portion of it, but then

6          the subjective factors of what he did was

7          based off of not just subjective belief but

8          the objective beliefs as well.

9    Q.    Yes, sir.

10                   MR. ROQUEMORE:

11                   William, do you mind switching to

12              the next page.  Thank you.

13   BY MR. ROQUEMORE:

14   Q.    So the -- this -- this page starts off,

15         "The Panel believes the following facts

16         justified the recommended dispositions."

17         Let's talk about some of the -- the facts

18         that are listed in this next paragraph.  We

19         discussed the front yard and the fact that

20         that's an objective fact, right?

21   A.    That is.

22   Q.    Yeah, and he proceeded to go to the

23         residence once he was in -- in the front

24         yard, right?

25   A.    Objective fact, yes, sir.

59

1    Q.    Yes, sir.  And then he heard barking
2          sounds, correct?
3    A.    Objective fact, yes, sir.
4    Q.    Okay, and it's mention coming fast towards
5          him.  So the sounds were coming fast
6          towards him.  Was that an objective fact or
7          is that subjective or -- or some sort of
8          mixture of the -- of the two?
9    A.    I think it's -- it's a mixture of the two.
10         He heard the sound, but coming fast towards
11         him would be more subjective, but hearing
12         the sounds would be objective.
13   Q.    And some of that was -- was that also some
14         -- somewhat based on the bodyworn camera
15         video?
16   A.    Yes.
17   Q.    All right.  The statement, "He removed his
18         weapon because he did not observe a way
19         out," what he observed, was that his
20         subject -- his subjective view or was, you
21         know, that statement an objective fact?
22   A.    He -- he did not look for a way out.  It is
23         -- it is his subjective view, but it also
24         could be an objective fact as well.
25   Q.    All right.  Well, you saw on the -- on the

60

1       bodyworn camera the layout of -- of the

2       yard.  You said that, right?

3   A.  Yes.

4   Q.  Okay.  Was there an -- objectively was

5       there a platform or a car to jump on to

6       escape?

7   A.  No.

8   Q.  Was that an objective fact?

9   A.  Correct.

10  Q.  Okay.

11  A.  Yes, that's correct.

12  Q.  Okay.  Was there a fence with spikes on it?

13  A.  Objective, yes, there was.

14  Q.  And was it an objective fact based on the

15      height of the fence that it was -- that

16      Officer Burmaster would have been able to

17      jump that or not jump that?

18  A.  Objective fact, yes.

19  Q.  Okay, and it's an objective fact of what?

20  A.  Objective fact that there was a fence that

21      was present with spikes on it, and it

22      wasn't possible for him to jump over the

23      fence.

24  Q.  This paragraph says, "He didn't believe he

25      could jump the fence."  Was that also his

1      subjective belief?

2  A.   That was.

3  Q.   So if he believes he -- he could have

4      jumped it, but still sat -- stood his

5      ground, then that would be a different

6      analysis, right?

7  A.   Correct, yes, sir.

8  Q.   But in this case he did not believe he

9      could jump it, and objectively it did not

10     seem he could jump it.  Is that correct?

11  A.   That's a fair statement, yes.

12  Q.   All right.  Then there's a statement that

13     he believed it was viscous and coming fast

14     towards him.  Is that objective or

15     subjective or some mixture?

16  A.   It's -- it's subjective, but there is a

17     mixture of some objectivity there as well.

18  Q.   Okay.  What objectivity are you referring

19     to there?

20  A.   The -- the video.  I mean, the fact -- the

21     fact remains that the dogs were coming

22     towards him, and he -- and just looking at

23     the video, that's what we saw that the dogs

24     that were actually going towards Officer

25     Burmaster.

1   Q.   How -- how does it affect your analysis

2        here whether or not another officer may

3        have done something different?

4   A.   It affects the analysis based off of the

5        fact that what the officer did, trying to

6        escape, trying to get away, it -- it

7        mounted -- it impacts the thought process

8        of Officer Burmaster as it relates to

9        whether or not he believed he's in imminent

10       danger or whether this other officer is in

11       imminent danger as well.

12  Q.   All right.  So we -- we talked about a lot

13       of factors just right now that were both

14       subjective and objective.  Would you agree

15       to that?

16  A.   Yes.

17                  MR. MOST:

18                  Objection to the form.

19  BY MR. ROQUEMORE:

20  Q.   So when you were asked about whether or not

21       your analysis was just based on subjective,

22       is it -- is it fair to say your analysis

23       was based on objective and subjective

24       facts?

25                  MR. MOST: