1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DEREK BROWN and JULIA                    CIVIL ACTION

BARECKI-BROWN                            NO. 22-00847

VERSUS                                   SECTION: L

                                         DIVISION: 4

DERRICK BURMASTER, SHAUN          HON. ELDON FALLON

FERGUSON, and the CITY OF         HON. KAREN W.ROBY

NEW ORLEANS


          DEPOSITION OF DEPUTY SUPERINTENDENT RYAN

LUBRANO, given in the above-entitled cause,

pursuant to the following stipulation, before

Sandra P. DiFebbo, Certified Shorthand Reporter, in

and for the State of Louisiana at the Office of the

City Attorney, 1300 Perdido Street, Room 5E03, New

Orleans, Louisiana, on the 14th day of May, 2025,

commencing at 12:00 noon.

2

1    APPEARANCES:

2

3    REPRESENTING THE PLAINTIFFS:

4            JONES WALKER
         BY:  TARAK ANADA,
         ATTORNEY AT LAW -and-
5        PATRICK M. VANBURKLEO,
         ATTORNEY AT LAW
6        201 St. Charles Avenue
         New Orleans, Louisiana  70170-5100
7        (pvanburkleo@joneswalker.com)

8

9    REPRESENTING DERRICK BURMASTER, SHAUN FERGUSON, and
     the CITY OF NEW ORLEANS:

10           OFFICE OF THE CITY ATTORNEY
         BY:  JAMES ROQUEMORE,
11       ATTORNEY AT LAW
         1300 Perdido Street
12       Suite 5E03
         New Orleans, Louisiana  70112
13       (James.Roquemore@nola.gov)

14

15

     Reported By:
16
             Sandra P. DiFebbo
17           Certified Shorthand Reporter
             State of Louisiana
18

19

20

21

22

23

24

25

3

```
1      E X A M I N A T I O N           I N D E X

2

3                                      Page

4   BY MR. ANADA:                   5, 95

5   BY MR. ROQUEMORE:                  84

6

7      E X H I B I T                 I N D E X

8

9                        Page

10

11  Exhibit L1                       24

12  Exhibit L2                       26

13  Exhibit L3                       32

14  Exhibit L4                       81

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    S T I P U L A T I O N

2

3              It is stipulated and agreed by and

4    between Counsel for the parties hereto that the

5    deposition of DEPUTY SUPERINTENDENT RYAN LUBRANO is

6    hereby being taken pursuant to the Federal Rules of

7    Civil Procedure for all purposes in accordance with

8    law;

9              That the formalities of reading and

10   signing are specifically waived;

11             That the formalities of sealing,

12   certification, and filing are hereby specifically

13   waived.

14             That all objections, save those as to

15   the form of the question and responsiveness of the

16   answer are hereby reserved until such time as this

17   deposition or any part thereof is used or sought to

18   be used in evidence.

19                      *  *  *  *  *

20             Sandra P. DiFebbo, Certified Shorthand

21   Reporter, in and for the State of Louisiana,

22   officiated in administering the oath to the

23   witness.

24

25

1      Q.   Do you understand that you've been listed

2  by the defendants in this case as a witness that

3  will be called to give testimony at trial?

4      A.   Yes.

5      Q.   Do you have any understanding of what

6  testimony you plan to give at trial?

7      A.   I guess that would be based on what they

8  ask me.

9      Q.   Do you plan to give opinions as to

10  whether Officer Burmaster's use of lethal force on

11  the plaintiff's dogs was appropriate or not?

12      A.   Opinions?

13      Q.   Yeah.

14      A.   My responses to that would be more based

15  on what we saw when we did the chief's hearing.

16      Q.   So I think -- let me just make sure I

17  understand your answer.  Are you saying you do plan

18  to give opinions on whether the use of lethal force

19  was appropriate in this case or not, or you do not

20  plan to give such opinions?

21           MR. ROQUEMORE:

22                I object to the form.

23  BY MR. ANADA:

24      Q.   You can still answer.

25      A.   I mean, when you say "opinions," I mean,

28

1    it would be based on everything that we saw when we

2    did the chief's panel hearing.

3         Q.    Right.

4         A.    I mean, if you consider that an opinion,

5    I mean, it would be what we learned during the

6    chief's panel hearing, the review and everything.

7         Q.    You understand that Officer Burmaster

8    shot my client's dog, Apollo, in April 2021, right?

9         A.    Yes.

10        Q.    You reviewed a few videos of that

11   incident?

12        A.    Yes.

13        Q.    And you interviewed Officer Burmaster

14   about the incident?

15        A.    Yes.

16        Q.    After that, did you come to an opinion

17   about whether the shooting was appropriate or not?

18            MR. ROQUEMORE:

19                Objection, form.  You can answer.

20            THE WITNESS:

21                If we're calling it opinion, I

22            guess, yes.

23   BY MR. ANADA:

24        Q.    What was your opinion?

25        A.    That he was within policy.

29

1     Q.   And when you say within policy, do you

2  mean certain specific NOPD policies?

3     A.   So the policy talks about, you know,

4  fearing that you are in grave danger or could

5  receive great bodily harm.  During the chief's

6  panel hearing, unlike some other hearings, the

7  officer is called in to give his side of it.  We

8  always take that into account, the officer's side

9  of it, because you may -- you know, until you are

10  in that certain situation, you don't know how

11  you'll react.

12     Q.   Of course.

13     A.   So I think hearing from the officer

14  during these panels to see what they felt was going

15  on, how they perceived things, you know, is

16  important.

17     Q.   Yeah.  So you determined that Officer

18  Burmaster's shooting of Apollo was within policy?

19     A.   Yes.

20     Q.   And you base that, at least in part, on

21  Officer Burmaster's perception of the danger Apollo

22  posed?

23     A.   Yes.

24     Q.   That's like his subjective perception,

25  right?

30

1      A.   Yes.

2      Q.   What else did you base your decision on

3  that was within policy besides what you've just

4  told me?

5      A.   We took a lot of things into account.  It

6  was nighttime, so, obviously, you know, you can't

7  see things around you as well.  It was a domestic

8  violence call.  That always -- you know, you can

9  look it up.  Domestic violence is one of the most

10 dangerous calls that police officers encounter.

11     Q.   Let me stop you right there.  So I

12 understand that.  Domestic violence is a very

13 dangerous situation, right.  Does that give a

14 police officer, in your opinion, a right to be a

15 little bit more loose with what he uses lethal

16 force on versus what he doesn't?

17     A.   Because it's a domestic violence call?

18     Q.   Yeah.

19     A.   No.  I don't think that gives you the

20 immediate right to use lethal force, but I'm just

21 trying to tell you the things that we took in, you

22 know, that we look at when we look at the entire

23 picture.

24     Q.   I should not have interrupted you.  Let

25 me just finish -- go ahead.  You were saying the

31

1    things you considered.

2         A.    Yeah.   So domestic violence calls,

3    nighttime.   I know the other officer was closer to

4    the gate and was able to flee.   I don't think

5    Burmaster had an immediate way to escape the

6    situation.   You know, like if he was at the gate,

7    he could have shut the gate, or if he could have

8    jumped up on some stairs or something, jumped over

9    a fence or something.   I don't think, from what we

10   reviewed, that he had an option like that.

11        Q.    Got it.   Would your opinion change if --

12   let's just, hypothetically, you said Burmaster --

13   you said Roussel was close to the gate, so he could

14   escape, right?

15        A.    I knew he escapes at one point.   I don't

16   remember how far he came in.   It's been a while

17   since we watched it, but he had definitely a better

18   option of escape than Burmaster had.

19        Q.    Burmaster was, in your opinion, further

20   than the gate, further away from the gate than

21   Roussel, right?

22        A.    Yeah.   I believe Burmaster was on the

23   left side.   He was definitely further away from the

24   gate, from what I remember.

25        Q.    How far away, compared to Roussel, was

92

```
1   whether or not the dog, Apollo, posed an imminent
2   threat of harm to him?
3           MR. ANADA:
4                   Object to form.
5           THE WITNESS:
6                   I believe he believed that the dog
7                   posed an imminent threat of harm to
8                   him.
9   BY MR. ROQUEMORE:
10      Q.   And when you were sitting on the board,
11  did you make a determination as to whether Officer
12  Burmaster's subjective belief was reasonable under
13  the circumstances?
14          MR. ANADA:
15                  Object to form.
16          THE WITNESS:
17                  Do I think it was reasonable?
18  BY MR. ROQUEMORE:
19      Q.   No.  Did you make an evaluation as to
20  whether or not Officer Burmaster's subjective
21  belief was reasonable under the circumstances?
22      A.   Yes.
23          MR. ANADA:
24                  Form.
25  BY MR. ROQUEMORE:
```

93

1      Q.   And the facts -- and did you base that

2  upon facts that were available to you at the

3  hearing?

4            MR. ANADA:

5                 Object to the form.  Leading.

6            THE WITNESS:

7                 Yes.

8  BY MR. ROQUEMORE:

9      Q.   And those facts, are those explained in

10 this letter?

11           MR. ANADA:

12                Object to form.  Leading.

13           THE WITNESS:

14                We're still on L --

15           MR. ROQUEMORE:

16                Yes.

17           THE WITNESS:

18                Yes.

19 BY MR. ROQUEMORE:

20     Q.   Just so I'm -- just to wrap this up.

21 Page 2, when you talk about the following facts,

22 are those some of the facts that were considered by

23 the board in determining whether or not Officer

24 Burmaster's beliefs were reasonable?

25           MR. ANADA: