**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DEREK BROWN, ET AL** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 22-847** |
| | * | |
| **DERRICK BURMASTER, ET AL.** | * | **SECTION L(4)** |

**ORDER & REASONS**

There are presently two motions before the Court. The first is a Partial Motion for Summary Judgment filed by Defendant the City of New Orleans (the "City"). R. Doc. 208. Plaintiffs Derek Brown and Julia Barecki-Brown ("Plaintiffs") oppose the motion. R. Doc. 214. The City replied. R. Doc. 216. The second is another Partial Motion for Summary Judgment filed by Plaintiffs. R. Doc. 224. The City and Defendant Derrick Burmaster oppose the motion. R. Doc. 226. The Plaintiffs replied. R. Doc. 227. After considering the record, briefing, and applicable law, the Court now rules as follows.

## I.    BACKGROUND

This case arises out of the alleged shooting of a pre-adolescent dog by a New Orleans Police Department ("NOPD") officer. On April 14, 2021, NOPD Officers Derrick Burmaster and John Roussel responded to a noise complaint at Plaintiffs' residence in the Lower Garden District neighborhood of New Orleans. R. Doc. 60 at 1. Upon their arrival, Burmaster and Roussel entered the front gate of Plaintiffs' fenced yard and almost immediately noticed two dogs coming down the stairs to the courtyard, one much larger than the other. *Brown v. Burmaster*, No. 23-30180, 2025 WL 227785, at *1 (5th Cir. Jan. 17, 2025). The smaller dog ran toward Burmaster and Roussel, wagging his tail. *Id.* Roussel stepped backwards and exited the gate in response. *Id.* Burmaster, however, who had already drawn his firearm, fired three rounds of bullets at the smaller

1

dog——Plaintiffs' 16-week-old Catahoula puppy named Apollo that stood at about 18 inches tall and weighed approximately 22 pounds. R. Doc. 60 at 1. One of these bullets struck Apollo in the back of the neck, breaking two of his ribs and causing his lungs to fill with blood; shrapnel from another struck Officer Roussel in the hand. *Id.* at 2. Plaintiffs promptly stepped outside of their home to investigate the commotion and found Apollo bleeding on the ground. *Id.* Plaintiffs held Apollo as he died in their arms from the gunshot wound. *Id.* Shortly after the incident, NOPD's Public Integrity Bureau ("PIB") conducted an initial investigation into Burmaster's actions and determined the shooting of Apollo to be unjustified. *Id.* at 7-8. After this suit was filed, however, a NOPD hearing panel exonerated Burmaster of all charges for improper use of force but sustained his violation of police uniform policy for failing to carry a baton on the date of the incident. R. Doc. 194-4.

On March 31, 2022, Plaintiffs filed the instant case against Defendants Derrick Burmaster; the City of New Orleans; and former NOPD Superintendent Shaun Ferguson, asserting multiple causes of action. R. Doc. 60. Plaintiffs allege § 1983 claims against Burmaster in his personal and official capacity, contending that the shooting of Apollo was a constitutional violation of their Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 9-10. More specifically, they contend that the law clearly establishes that "an officer cannot shoot a dog in the absence of an objectively legitimate and imminent threat to him or others." *Id.* at 9. Additionally, they bring *Monell* claims against the City, asserting it is liable for the alleged § 1983 violations for failing in its "constitutional duty" to "adequately train, supervise, and discipline" Burmaster regarding his police work and interactions with dogs in the field. *Id.* at 14-17. In support, Plaintiffs aver Burmaster has had "at least thirty" reported incidents involving an excessive use of force filed against him over a ten-year period while working for NOPD, most notably including a prior

shooting of a dog in 2012. *Id.* Plaintiffs also contend, *inter alia*, that the City provided NOPD officers with a revised copy of a U.S. Department of Justice training program and intentionally took out passages about the low risk and general friendliness of approaching dogs, and information about "specific tactics" for dealing with animals. *Id.* Plaintiffs further allege several Louisiana state law claims, including negligent infliction of emotional distress against all Defendants; negligent hiring, training, retention, and supervision against the City and the Superintendent; and a general negligence claim against Burmaster and the City under a theory of *respondeat superior* as Burmaster's employer. *Id.* at 10-13.

Later, Burmaster filed a motion for summary judgment as to all of Plaintiffs' claims brought against him based upon a theory of qualified immunity, which this Court ultimately denied. R. Doc. 162. Thereafter, on March 30, 2023, the case was administratively stayed pending Burmaster's appeal of this Court's summary judgment determination. R. Doc. 167. On January 17, 2025, the Fifth Circuit issued its opinion affirming the denial of Burmaster's summary judgment motion, and this Court reopened the case for further proceedings. R. Docs. 174, 178.

## II. PRESENT MOTIONS

The City now moves for partial summary judgment as to Plaintiffs' state law claims for negligent infliction of emotional distress as well as negligent hiring, training, retention, and supervision. R. Doc. 208. Additionally, it seeks dismissal of Plaintiffs' *Monell* claim with respect to the City's duty to adequately train and supervise Burmaster and its decision to retain him as an employee despite his alleged history of excessive force violations. *Id.* Plaintiffs generally oppose the motion, which the City rebuts in its reply. R. Doc. 214; R. Doc. 216. Plaintiffs have also moved for partial summary judgment in their own right, contending that they have conclusively established the City's liability regarding their *Monell* claims on the basis of a ratification theory.

R. Doc. 224. In opposition, the City argues that the Fifth Circuit permits the use of ratification to support *Monell* claims under very limited circumstances and is thus not applicable on the facts at hand. R. Doc. 226. Plaintiffs replied, refining the ratification theory argument made in their initial motion. R. Doc. 227.

### III.    APPLICABLE LAW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c)*; Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

### IV.    ANALYSIS

The focus of the parties' present motions centers exclusively upon Plaintiffs' claims against the City and particularly to what extent it can be held liable for Burmaster's shooting of Apollo vis-à-vis his employment with NOPD. The Court will thus consider the following four issues in turn: (1) whether Plaintiffs have provided sufficient evidence to support their negligent infliction of emotional distress claim against the City; (2) whether the City is entitled to discretionary immunity with regard to Plaintiffs' negligent hiring, training, supervision, and retention claims;

4

(3) whether Plaintiffs have a viable *Monell* claim against the City for failure to train, supervise, and discipline Burmaster; and (4) whether Plaintiffs' ratification theory is sufficient to conclusively prove at this stage in the proceedings that the City is liable for Burmaster's alleged § 1983 violations under *Monell*.

### A. Negligent Infliction of Emotional Distress

The Court will first address whether dismissal of Plaintiffs' state law negligent infliction of emotional distress ("NIED") claim based on witnessing their pet dog's death is warranted. In Louisiana, a domestic animal is considered corporeal movable property. *Holland v. Teague,* 43,496, p. 8 (La. App. 2 Cir. 9/17/08), 996 So.2d 325 at 329. A NIED claim premised entirely upon damage to a person's property, such as a pet, originates from La. Civ. Code art. 2315(A), which provides: "[e]very act whatever of man that causes damages to another obliges him by whose fault it happened to repair it." *Kador o/b/o Willis v. Gautreaux*, No. 23-CV-11-SDD-RLB, 2025 WL 967158, at *19 (M.D. La. Mar. 31, 2025). In order to recover for such a claim, the Louisiana Supreme Court recently established a five-part analytical framework that mirrors the duty-risk analysis for general negligence claims. *Spencer v. Valero Ref. Meraux, L.L.C.*, 2022-00469 (La. 1/27/23), 356 So. 3d 936, 949. More specifically, the plaintiff must show:

> (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).

*Id.* at 949 (citing *Mathieu v. Imperial Toy Corp.*, 94-952, pp. 4-5 (La. 11/30/94), 646 So. 2d 318, 322).

Oftentimes, the viability of a NIED claim resulting from property damage turns on the final element of damages. This is so because Louisiana law requires plaintiffs to present sufficient evidence of the nature and extent of their mental anguish caused by the defendant's conduct that shows a "likelihood of genuine and serious mental distress" and "guarantee[s] that the claim is not spurious." *Moresi v. State Through Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1096 (La. 1990). In other words, "the emotional distress must be severe and not merely the result of the usual worry or anxiety attendant to property damage." *Doerr v. Mobil Oil Corp.*, 04-1789, pp. 8-9 (La. App. 4 Cir. 6/14/06), 935 So. 2d 231, 237. Indeed, "[e]very incident of property damage is necessarily accompanied by some degree of worry and consternation," so plaintiff must show that he or she "suffered a psychic trauma in the nature of or similar to physical injury." *Trim v. S.E. Exp., Inc.,* 562 So. 2d 26 (La. App. 5 Cir. 1990). In evaluating the required severity threshold for emotional distress, factors such as whether the plaintiff sought medical, psychiatric, or psychological treatment are instructive, but receiving such care is not necessarily required. *Spencer*, 356 So. 3d at 950 ("Evidence of medical treatment is not required, nor is medical testimony . . . ."). Proof that constitutes "generalized fear" or "mere inconvenience," however, is generally insufficient. *Id.*

Here, the City argues that Plaintiffs' NIED claim should be dismissed on summary judgment because the evidence does not show that they had a "severe emotional reaction to the shooting of their dog that can be said to be different from the 'worry or anxiety' attendant to property damage." R. Doc. 208-1 at 8-10. More specifically, the City takes the position that Plaintiffs have failed to provide medical documentation demonstrating that they received any counseling services or prescriptions for medication after witnessing Apollo's death. *Id.* And while the City concedes that both Plaintiffs met with Dr. Elizabeth Berk——a licensed clinical

6

psychologist——for a psychiatric evaluation, it notes that this meeting was a "single encounter," and the Plaintiffs had "no other contact" with her since then. *Id.* at 9. As such, the City opines that Plaintiffs are relying merely on "self-reported symptoms" that cannot support a finding that they suffered sufficiently severe trauma needed for a valid NIED claim. R. Doc. 216 at 4. Conversely, Plaintiffs argue they have provided sufficient evidence for a reasonable jury to find in their favor on the NIED claim. R. Doc. 214 at 3-8. Upon review of the evidence and record, the Court agrees with Plaintiffs for the following reasons.

Preliminarily, the Court observes that it has already once before addressed Plaintiffs' NIED claims within the context of an earlier motion filed by Burmaster and found that genuine issues of material fact precluded dismissal on summary judgment. R. Doc. 162. The outcome is no different here with respect to the City. As Plaintiffs correctly point out, there is a voluminous amount of evidence that tends to prove the severity of the psychological harm that they suffered from witnessing Apollo's death. For example, video evidence shows both Plaintiffs visibly disturbed and crying over Apollo as he dies in front of them mere feet from their front door. R. Doc. 130-5. Furthermore, Plaintiffs can be heard saying: "He was our baby . . . You shot a puppy; this was the love of our life." *Id.* at 00:04:30. The Plaintiffs' depositions also indicate that it has been hard for them to sleep and get back to day-to-day life, noting the incident had left them with a "pretty permanent . . . vivid horrible memory." R. Doc. 208-18 at 63:5-8; R. Doc. 214-2 at 26:1-5. One of the Plaintiffs even testified to experiencing "massive amounts of anxiety . . . [and] depression" following Apollo's death and ultimately sought out a licensed clinical social worker who he met with "every other week" for over "five or six months." R. Doc. 208-18 at 63:11-12, 64:1-5. Moreover, Dr. Berk diagnosed both Plaintiffs with PTSD and one of them with Major Depressive Disorder, stating in her professional opinion as a licensed psychologist that "it was directly caused

by the death of the dog." R. Doc. 214-3 at 49:8-10, 71:9-18. Surely all this evidence taken together is more than sufficient to show at least a fact question as to whether the Plaintiffs' emotional reactions elicited by Apollo's death were more than just "worry or anxiety attendant to property damage." *See Doerr*, 935 So. 2d at 237.

As for the City's argument regarding the lack of medical documentation evincing Plaintiffs' counseling visits, the Court finds this position to be untenable. The Louisiana Supreme Court has made clear in *Spencer v. Valero Refining Meraux, L.L.C.* that medical documentation or testimony is not required *per se* to prove a NIED claim under Louisiana law. 356 So. 3d at 950. And even if providing such exacting medical evidence were necessary, Plaintiffs have submitted official diagnoses of PTSD and clinical depression directly tied to the death of Apollo, which could be considered evidence as to a "real mental injury" that gives rise to a NIED claim for damages. *Heard v. Affordable Movers, Inc.,* 40,432, pp. 5–8 (La. App. 2 Cir. 12/14/05), 917 So. 2d 722, 726-27. While the Court agrees that it is peculiar that Plaintiffs have yet to produce specific medical records regarding their other alleged counseling visits, the Court concludes that it is more appropriate to address this issue during trial, rather than on summary judgment.

Lastly, the Court recognizes that even though pets are classified as corporeal movable property in Louisiana, Apollo was clearly not an inanimate object. As such, the Court is hesitant to characterize the Plaintiffs' alleged emotional trauma from witnessing their dog's death as simple "worry or anxiety" associated with other types of property in light of the "emotional bond that exists between some pets and their owners and the 'family status' status awarded some pets by their owners." *Barrios v. Safeway Ins. Co.*, 2011-1028 (La. App. 4 Cir. 3/21/12), 97 So. 3d 1019, 1024 (affirming trial court's finding in favor of plaintiffs' NIED claim based on the emotional distress they experience after their pet dog was run over by a negligent driver). Accordingly, the

Court finds that there are genuine issues of material fact as to Plaintiffs' state law NIED claim against the City and will not dismiss it at this time.

### B. Discretionary Immunity

Next, the Court will address the City's discretionary immunity defense under La. R.S. § 9:2798.1 as to Plaintiffs' negligent hiring, training, retention, and supervision state law claims. This statute provides that:

> Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

La. R.S. 9:2798.1(B). Drawing upon this text, Louisiana case law has developed a two-step inquiry for determining whether the statute's policymaking or discretionary acts immunity applies to a given set of facts. First, a court must look to whether a statute, policy, or regulation required the government entity to follow the particular course of conduct at issue. *Aucoin v. Larpenter*, 2020-0792 (La. App. 1 Cir. 4/16/21), 324 So. 3d 626, 637, *writ denied*, 2021-00688 (La. 9/27/21), 324 So. 3d 87. If so, then the act or omission did not involve discretion and the immunity provisions of La. R.S. 9:2798.1 do not apply. *Id.* Second, if the act or omission did involve discretion, "the court must then determine whether that discretion is the kind that is shielded by the statutory immunity, that is, discretion grounded in social, economic or political policy." *Id.* at 637-38. "In other words, when the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures." *Id.* at 638; *see also Gregor v. Argenot Great Cent. Ins. Co.*, 2002-1138 (La. 5/20/03), 851 So. 2d 959, 968; *Dominique v. St. Tammany Par.*, 2019-0452 (La. App. 1 Cir. 9/16/20), 313 So. 3d 307, 315, *writ denied sub nom. Dominque v. St. Tammany Par.*, 2020-01202 (La. 12/22/20), 307 So. 3d 1045. Here, the City argues that it has met

this two-part test and is thus entitled to discretionary immunity. R. Doc. 208-1 at 11-13. The Court disagrees.

At first instance, the Court notes that the defendant bears the initial burden of demonstrating the applicability of discretionary immunity in this case since it is an affirmative defense. *See Dominique*, 313 So. 3d at 314; *Mercadel v. State Through Dep't of Pub. Safety & Corr.*, 2018-0415 (La. App. 1 Cir. 5/15/19), 2019 WL 2234404 at *5; *Sauceberry v. Webre*, 2016-0719 (La. App. 1 Cir. 5/5/17), 2017 WL 1788096, at *4. It is thus the City's responsibility to first show that it did not violate any applicable statutes, regulations, or policies prescribing a mandatory course of action with respect to its hiring, retention, supervision and training of Burmaster. *Id.* The Court finds that the City has met its burden in this respect.

Notably, the Plaintiffs have not alleged in their complaint any applicable laws or regulations that require law enforcement agencies to supervise and train their officers in a specific manner. R. Doc. 60. In an attempt to remedy this problem, the Plaintiffs draw the Court's attention to La. R.S. §§ 40:2404.2 and 40:2405.8, which prescribe a certain amount of hours that a law enforcement agency must train its officers each year in Louisiana. R. Doc. 214-10 (citing *Pierre v. Wellpath, LLC*, No. CV 21-1043, 2022 WL 2263693, at *4 (E.D. La. June 23, 2022)). However, Plaintiffs have presented no evidence that the City failed to comply with these statutory training requirements at any time during Burmaster's employment with NOPD. Rather, the issue here is focused on what topics the City chose in training Burmaster and its decision to retain him despite his past use of force instances and violations of NOPD rules. As such, the Court finds La. R.S. §§ 40:2404.2 and 40:2405.8 to be irrelevant and thus have no bearing on this specific discretionary immunity analysis. Furthermore, the Plaintiffs note that NOPD is subject to an ongoing court-ordered federal consent decree, which specifically addresses requirements for the agency's use-of-

force training. *United States v. City of New Orleans*, 12-cv-01924-SM-JCW, R. Doc. 565. But Plaintiffs' main point of contention with respect to Burmaster's training is an alleged lack of instruction he received regarding best practices for using force against dogs in the field. With this in mind, the Court observes that the NOPD consent decree does not prescribe any specific training programming for dog encounters during police work and in fact fails to address the use of force against dogs whatsoever. *See id.* Accordingly, it cannot be said that the City was in violation of any mandatory course of action required by either positive law in Louisiana or the NOPD consent decree, such that discretionary immunity would be unavailable to the City on this basis.

But the City is not yet off the hook because it still has the burden of offering facts that indicate its decisions to hire, supervise, retain, and train Burmaster were "rooted in some social, economic, or political concern." *Gomez v. City of New Orleans*, No. CV 19-11803, 2023 WL 4351230, at *4 (E.D. La. July 5, 2023). On this point, the City has merely stated in a conclusory fashion that its supervisory and training decisions underlying Plaintiffs' claims are "grounded in policy considerations based on the needs and unique circumstances of the City of New Orleans, the NOPD police force, and the City budget." R. Doc. 216 at 5. The Court finds such a generic assertion to be insufficient to meet the City's burden in proving immunity because it has presented virtually *no* evidence to substantiate this assertion. For instance, the City does not identify what decisions it seeks to protect as exercises in discretion, who made the decisions, when the decisions were made, and the specific basis for the decisions. R. Doc. 208-1 at 11-12; R. Doc. 216 at 4-7. Therefore, the Court finds that fact questions remain in light of the City's failure to articulate with *particularity* any social, economic, or political considerations that drove its decision-making as to the hiring, training, supervision, and retention of Burmaster and how those decisions were made. *See Misuraca v. City of Kenner*, 01-707 (La. App. 5 Cir. 11/14/01), 802 So. 2d 784, 789 (finding

a municipality was not immune where it had failed to articulate policy considerations surrounding a particular officer's actions that gave rise to an alleged constitutional violation).

Moreover, the Court notes that even if it were to find that the City had adequately demonstrated the applicability of discretionary immunity based on the arguments above, the Court would still be unable to grant summary judgment in its favor. This is because once the defendant establishes entitlement to immunity, "the burden then shifts to the plaintiffs to show there is conduct that would except the defendant[ ] from liability." *Id.* at 314 n.6. One such exception to discretionary immunity particularly relevant here is found in La. R.S. 9:2798.1(C)(2), which excludes immunity where a government entity's "acts or omissions . . . constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." Plaintiffs invoke this exception in their opposition, arguing that the City acted recklessly in the training and supervision of Burmaster. R. Doc. 214 at 11. In support of their position, they point to evidence showing that the City omitted or removed information regarding the use of force against dogs from a Department of Justice training document that was ultimately disseminated to NOPD officers. *Compare* R. Doc. 56-2 (NOPD training) *with* R. Doc. 56-3 (DOJ training). Plaintiffs also highlight elsewhere in their brief with respect to their *Monell* claim that the City was aware of Burmaster's involvement in over thirty reported incidents of excessive force and had numerous NOPD rule violations. R. Doc. 122-4 at 3-4; R. Doc. 122-3 at 34:13-35:9. Yet, the City continued to retain Burmaster as an employee and has not offered a clear rationale for its inaction. The Court finds that this evidence, taken together, also raises genuine issues of material fact as to whether the City acted recklessly in its training and supervision of Burmaster within the meaning of La. R.S. 9:2798.1(C)(2), such that a finding in favor of discretionary immunity is not warranted at this stage in the proceedings.

Consequently, it cannot be said that the City is entitled to judgment as a matter of law on its discretionary immunity argument. The Court thus refuses to dismiss Plaintiffs' state law negligent hiring, training, supervision, and retention claims. This outcome comports with Louisiana law and its directive to the Court to construe the discretionary immunity statute strictly against a defendant asserting it. *Dominique*, 313 So. 3d at 314 ("Immunity statues [under Louisiana law] are strictly construed against the party claiming immunity.").

### C.  *Monell* Claim for Failure to Train, Supervise, and Discipline

The Court now moves on to address whether the City can be held liable under § 1983 for the alleged constitutional violations perpetrated by Burmaster. Notably, a municipality is not liable under § 1983 through the standard theory of *respondeat superior*. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (holding § 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"). Rather, a municipality is liable *only* for acts directly attributable to it "through some official action or imprimatur," oftentimes referred to by courts as "*Monell* liability". *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001). This official policy requirement was "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 364-65 (5th Cir. 2020) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Here, Plaintiffs assert that the City is liable under *Monell* for a: (1) failure to train, (2) failure to supervise, and (3) failure to discipline. More specifically, they contend that these failures ultimately led to Burmaster shooting Apollo, which constituted deliberate indifference to their constitutional rights. In the present motion, however, the City argues that Plaintiffs have not

presented sufficient evidence to support an imposition of liability under § 1983 against the City on two separate grounds. The Court takes each in turn.

### 1. Adequate Training

First, the City challenges the Plaintiffs' failure to train allegations alone, contending its training of Burmaster was more than sufficient and thus cannot subject the City to liability. R. Doc. 208 at 13-16. To hold a municipality liable under § 1983 based on a policy of inadequate training of employees, a plaintiff must first demonstrate that the municipality's training policy was "inadequate." *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 484 (5th Cir. 2014). In assessing whether a training policy and procedure is inadequate, courts look to "whether the program 'enable[s] officers to respond properly to the usual and recurring situations with which they must deal.'" *Benavides v. Wilson Cnty.,* 955 F.2d 968, 973 (5th Cir. 1992). On this basis, the City argues that the indisputable facts show "NOPD enacted a facially constitutional policy regarding the use of force, including the use of force against animal[s]." R. Doc. 208-1 at 14. As such, it avers Plaintiffs' "criticism of isolated aspects [of] NOPD's training" fails to demonstrate that its training of Burmaster was inadequate, such that the City cannot be held liable for his actions. *Id.* at 16. In support, the City references NOPD's policy manual, which states that firearms may only be used against animals when it "reasonably appears to pose an imminent threat to human safety and alternative methods are not reasonably available or would likely be ineffective." *Id.* at 14 (citing R. Doc. 208-6 at 10). Furthermore, the City points to two NOPD daily training bulletins ("DTBs")—short training exercises in which an officer reads or watches a video and then answers questions—issued to its officers in 2017 and 2019 that discussed how to interact with dogs safely during the course and scope of police work. *Id.* Finally, the City notes that NOPD trains its officers regarding animal encounters at the police academy prior to entering the force. *Id.* at 14.

Upon review of this evidence, the Court finds the City has taken at least some measures in training its officers with respect to dog encounters. However, to the extent the City characterizes its training program as "robust . . . as to the parameters of constitutional uses of force against animals," such that summary judgment is warranted in this case, the Court must disagree. *Id.* at 16. As the Plaintiffs note in their opposition, the City has only pointed the Court to three relevant items of training concerning the excessive use of force against dogs over Burmaster's twenty-five years on the force: (1) police academy training; (2) a 2017 DTB; and (3) a 2019 DTB. But Burmaster crucially failed to recall anything specific about these training materials. For example, when asked at his deposition about his NOPD police academy experience when he supposedly received his initial training regarding animal encounters, Burmaster testified that he was "instructed to forget all training from that era" and did not elaborate as to what information he was given. R. Doc. 122-2 at 182:6-11. Moreover, when asked what other training he had received since then about interacting with animals on the job, he simply answered: "Be safe." *Id.* at 182:12-15. Any mention of the 2017 DTB that the City so heavily emphasizes is notably absent. And while Burmaster goes on to testify that the 2019 DTB "looks familiar" and that he was "probably" trained on it at some point, the Court can hardly interpret these responses to conclusively prove on summary judgment that Burmaster received meaningful instruction regarding the use of excessive force against dogs without further proof. *Id.* at 182:19-25; *see Coleman*, 113 F.3d at 533 (holding courts must "view evidence in the light most favorable" to the non-movant).

Furthermore, the contents of the 2017 and 2019 DTBs and whether the City improperly cut certain information from them are also seriously in question. Indeed, one of the City's 30(b)(6) witness testified that no one from NOPD "downloaded or captured" any of the videos contained in the 2017 DTB and thus does not "know anything about the[ir] contents." R. Doc. 214-4 87:9-

12. The only information presented to the Court is that the 2017 DTB was created by the ASPCA and that officers were made to watch the videos and then take a short test on certain topics, such as "canine aggression" and "dog bite prevention." *Id.* at 87:4-9; R. Doc. 208-10. And of the questions that NOPD officers were required to answer in the 2017 DTB, there are none that indicate the videos specifically discussed the use of force, like firing a weapon, against dogs. R. Doc. 208-11. The 2019 DTB fairs no better. Plaintiffs have shown that the documents contained in this training session appear to be largely copied-and-pasted from the DOJ's COPS curriculum entitled "The Problem of Dog-Related Incidents and Encounters." *Compare* R. Doc. 56-2 (NOPD training) *with* R. Doc. 56-3 (DOJ training). NOPD's version, however, notably altered key aspects of the DOJ's materials, such as omitting facts that state "serious [dog] bites are relatively rare" and that the "overwhelming majority of dog bites are minor, causing either no injury at all or injuries so minor that no medical care is required." R. Doc. 56-3 at 11. The NOPD version also leaves out clarifying information particularly relevant to the facts leading up to the shooting of Apollo:

> Most dogs happily greet a new human. Some will be so enthusiastic about greeting that they will do this at a full run and then launch themselves at the officer. Absent any of the warning signals described below, an approaching dog is almost always friendly. A dog who feels threatened will usually try to keep his distance.

*Id.* at 25. The City has yet to justify why exactly it chose to excise this pertinent information established by a federal agency from NOPD's materials and whether its decision to do so affected the sufficiency of its officers' training. Lastly, the Court notes that Plaintiffs' witness James Crosby——an expert on law enforcement interactions with dogs——has testified that the City's "cherry-picking" indicated that the "New Orleans Police Department failed to meet recognized best practices regarding police-dog encounter training." R. Doc. 209-3 at 21. More specifically, Crosby opined that the City's omission of "crucial material" from its training "likely contributed

to Burmaster's incorrect perception of Apollo as a threat." *Id.* at 20. In light of these lingering fact questions and Plaintiffs' expert testimony, the Court finds that material disputes still remain as to the adequacy of the City's training and thus will not dismiss the Plaintiffs' failure to train claim for this reason.[1]

### 2. Deliberate Indifference

Next, the City contends that all three of Plaintiffs' failure to train, supervise, and discipline claims should be dismissed because Plaintiffs have not proven "deliberate indifference." Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious action." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (alteration omitted)). There are two "theories" that plaintiffs most commonly argue in order to prove that a defendant's failure to supervise, train, or discipline its employees amounts to "deliberate indifference" to the constitutional rights of those the municipality serves. *City of Canton*, 489 U.S. at 390 n.10. First, a plaintiff can establish notice if a violation by a particular employee occurs "so often" that a factfinder can infer from the pattern of violations that "the need for further training must have been plainly obvious to the . . . policymakers." *Id.* Second, there is a "single incident exception" where, even absent proof of a pattern, deliberate indifference can be inferred if a factfinder determines that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged inadequacies of the municipality. *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003). Because the Plaintiffs have not provided any argument regarding

---

[1]    Because the Court finds there are genuine issues of material fact as to the adequacy of the City's training, the Court rejects its causation argument given that it is premised upon the same reasoning.

the single incident exception in their briefing, the Court deems this theory of deliberate indifference as waived and focuses the remainder of its analysis on the pattern theory.

### a. Pattern Theory

The Fifth Circuit has explained that "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson v. City of Fort Worth*, 588 F.3d 838, 849-50 (5th Cir. 2009). "A pattern requires similarity and specificity." *Id.* at 851. It "also requires sufficiently numerous prior incidents, as opposed to isolated instances." *Id.* A plaintiff pointing "only to his own incident as proof of a policy of deliberate indifference" is generally insufficient. *Anokwuru v. City of Hous.*, 990 F.3d 956, 966 (5th Cir. 2021). Further, "[f]or an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Pompey v. Cheney*, 214 F. App'x 463, 464 (5th Cir. 2007) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)).

Here, Plaintiffs have submitted evidence showing that Burmaster had "thirty or more" reported uses of force, with his NOPD "use of force file" amounting to more than 600 pages. R. Doc. 122-4 at 3-4; R. Doc. 122-3 at 14:1-6. Of these incidents, Burmaster even admits to killing another dog with a firearm while on the job, which makes him the only NOPD officer to have shot two animals from 2012 to present. R. Doc. 122-2 at 191:3-8; 122-3 at 14:1-6. Burmaster has also reportedly discharged a firearm against two people and brandished his firearm at least four times. R. Doc. 208-4 at 2; R. Doc. 208-21. Other use of force incidents involving Burmaster elicited from discovery include multiple instances of: use of hands, causing a take down, and exhibiting a CEW

Exhibit/Laser. R. Doc. 208-21. Moreover, there is proof that NOPD has documented at least 22 rule violations committed by Burmaster, including verbal intimidation, moral conduct, professionalism, performance of duty, and neglect of duty. R. Doc. 122-3 at 25:11-20. And after reviewing all this evidence, Plaintiffs' expert Mr. Crosby, in his capacity as a former lieutenant in a law enforcement agency, notably testified that:

> [T]he disciplinary history of Officer Burmaster documents his poor decision making, lack of professional conduct, and should have, in my experience, resulted in his termination from service. Thus, it appears that the New Orleans Police Department wrongly retained Burmaster prior to this shooting, and wrongfully retained him again in the aftermath of this incident.

R. Doc. 110-18 at 21.

As the Court foreshadowed in a prior order, Burmaster's past uses of force and disciplinary record, now supported throughout the record, are more than sufficient for a reasonable jury to find that the City had "constructive notice" that Burmaster was likely to commit a constitutional violation similar to the one allegedly visited upon the Plaintiffs. R. Doc. 115 at 8 (holding that "if this Court accepts as true Plaintiffs' allegations about Burmaster's past use of force incidents and other rule violations, the complaint does raise factual questions about the 'the inappropriateness of NOPD's choice to continue having Burmaster on the force.'"). The evidence cited by Plaintiffs demonstrates at the very least a fact question as to Burmaster's proclivity for the use of force in his police work, NOPD's knowledge of it, and whether NOPD should have taken action, such as providing him with more training, supervision, or terminating him.

The Court does not make this determination lightly, acknowledging deliberate indifference is a stringent standard that requires sufficiently numerous and similar past violations or complaints. *See Peterson v. City of Fort Worth*, 588 F.3d at 851. The Court finds, however, that Burmaster's "thirty or more" reported instances of use of force coupled with over twenty-two rule violations

19

arising during his tenure with NOPD are sufficiently numerous to support constructive notice on behalf of the City. *See Muslow v. City of Shreveport*, 491 F. Supp. 3d 172, 194 (W.D. La. 2020) (finding seven instances of use of force over four years was sufficient to preclude summary judgment on the deliberate indifference element); *Hayward v. City of New Orleans*, No. 02-3532, 2004 WL 258116 at \*5 (E.D. La. Feb. 12, 2004) (finding fourteen reports of excessive use of force and seven lawsuits over a nine-year period were sufficiently numerous despite the fact that most of the "internal complaints" were withdrawn, not sustained, or dismissed); *Hegeman v. Harrison*, No. 18-613, 2019 WL 1277523 at \*12 (E.D. La. Mar. 20, 2019) (finding eleven use of force instances over an eight-year period were sufficient to create a factual issue as to whether the city's policymakers had notice of the complaints, whether the city's investigation was adequate, and whether the city's failure to discipline the individual officer was the "moving force" behind the plaintiff's injuries). Indeed, the Court averaged Burmaster's uses of force documented in his NOPD employee summary from 2016 to the year of the incident in 2022 and determined that he received at least 2.16 use of force reports per year. R. Doc. 208-21 at 9-10. The Court performed the same calculation as to Burmaster's alleged breaches of NOPD policy, which resulted in a rate of about 5.5 reported violations per year. *Id.* at 2-9. Certainly, these numerous, repeated incidents and violations, taken together, make it questionable whether the City knew or should have known that Burmaster would break from NOPD policy and impermissibly use excessive force against Apollo as alleged by the Plaintiffs here.

And as for the City's argument that Burmaster's past use of force violations against humans are not sufficiently similar to support deliberate indifference because they do not involve dogs, the Court has already patently rejected this argument on Burmaster's motion to dismiss and will not depart from this decision. R. Doc. 115 at 7-8. As the Court noted previously, "it is appropriate to

suggest that it is foreseeable that a failure to train or discipline an officer who use excessive force would result in his continued use of excessive force—whether against humans or against other living beings." *Id.* This reasoning still stands in the present motion given that the summary judgment standard calls for the court to "view the evidence in the light most favorable" to the Plaintiffs. *Coleman*, 113 F.3d at 533. And even more importantly, the Court notes that Plaintiffs now have proof that Burmaster has discharged firearms against others, even shooting and killing a civilian's dog on the job before—exactly what transpired on these facts.

Accordingly, the Court concludes there are genuine issues of material fact as to whether the City acted with deliberate indifference in its alleged failures to train, supervise, and discipline Burmaster in light of the evidence showing sufficiently numerous and similar past instances of excessive force as well as Burmaster's general disciplinary history.

### D. Ratification Theory

Finally, the Court addresses Plaintiffs' Partial Summary Judgment. In the motion, Plaintiffs argue the City may be held liable under § 1983 because NOPD's final policymaker——Superintendent Anne Kirkpatrick——"ratified" Burmaster's shooting of Apollo. R. Doc. 224-1. Thus, whether Plaintiffs can show a failure to train, supervise, and/or discipline on behalf of the City would essentially become moot. Indeed, "[t]he ratification theory provides another way of holding a city liable under § 1983." *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023).

The origins of the so-called "ratification theory" can be traced back to the United States Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). In that case, the Court held that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127. Here, when asked whether she "approved of Burmaster's decision to shoot the dog and his

basis for it," Superintendent Kirkpatrick's unequivocally answered in the affirmative, which appears at first glance to be a valid ratification in light of *Praprotnik*. R. Doc. 224-4 at 4.

Courts, however, have held "a municipality is not liable under the ratification theory where a Police Chief accepts [their] officers' version of events, so long as 'the version did not show that the deputies' actions were manifestly indefensible." *Allen v. City of Galveston, Tex.*, No. G-06-467, 2008 WL 905905, at *8 (S.D. Tex. Mar. 31, 2008) (citing *Coon v. Ledbetter,* 780 F.2d 1158, 1161 (5th Cir. 1986)). Rather, the plaintiff must show that the ratifying policymaker knew that their employees' actions were unlawful and "clearly excessive" to the officer's apparent need to defend themselves but approved them anyways. *Id.; see also Peterson v. City of Fort Worth, Tex.,* 588 F.3d 838, 848 (5th Cir. 2009) (holding "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality"). Indeed, "such limitations on municipal liability are necessary to prevent the ratification theory from becoming a theory of *respondeat superior*, which . . . *Monell* does not countenance." *Milam v. City of San Antonio*, 113 F. App'x 622, 627 (5th Cir. 2004). With this precedent in mind, the Court finds that Plaintiffs have failed to meet their burden on summary judgment because they have not presented any evidence beyond Superintendent Kirkpatrick's mere affirmance of Burmaster's actions to support their ratification theory. But the Court observes that there may still be a fact question as to whether she did so impermissibly such that ratification could be viable here in light of the fact that NOPD's PIB previously found the shooting of Apollo to be unjustified, and NOPD only just recently changed its position, exonerating Burmaster of any wrongdoing during the course of this litigation. R. Doc. 94-8; R. Doc. 208-16.

Moreover, the Court recognizes that the Fifth Circuit has limited the theory of ratification to "extreme factual situations." *Peterson*, 588 F.3d at 848. "[U]nless the subordinate's actions are

sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom." *Id.* As such, there is yet another fact question as to whether the shooting of Apollo rose to the level of "sufficiently extreme" that is required for the imposition of liability against the City based on ratification, which is a fact-intensive inquiry better left for the jury to decide. Accordingly, the Court will not grant the Plaintiffs' motion at this time but will allow them to proceed with their ratification theory at trial.[2]

## V.    CONCLUSION

For the foregoing reasons;

**IT IS HEREBY ORDERED** that the City's Motion for Partial Summary Judgment, R. Doc. 208, is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, R. Doc. 227, is **DENIED**.

New Orleans, Louisiana, this 2nd day of June, 2025.

_____
United States District Judge

---

[2]    Additionally, the Court wishes to clarify that it will not preclude the Plaintiffs from raising their ratification theory just because they failed to allege it in their complaint as suggested by the City and Burmaster. The Defendants have not cited, nor could the Court find, any case law to support the position that a plaintiff must plead ratification in order to assert it on summary judgment or at trial. Rather, the Court agrees with the Plaintiffs that ratification is merely a theory of liability underlying their overarching *Monell* claim, which need not be specifically pled. *Phenix de Tejas, Inc. v. Sentinel Ins. Co.*, No. 5:24-CV-1112-JKP-HJB, 2025 WL 1243912, at *4 (W.D. Tex. Apr. 29, 2025) ("Plaintiffs need not plead the legal basis for a claim"); *Green v. City of Shreveport*, No. CV 5:20-01528, 2024 WL 1341049, at *13 (W.D. La. Feb. 6, 2024), *report and recommendation adopted*, No. CV 5:20-01528, 2024 WL 1340350 (W.D. La. Mar. 28, 2024) (finding a plaintiff "need not plead theories of recovery"). Moreover, Plaintiffs have made clear to the Defendants in prior motions dating back to the beginning of this case that they would pursue a ratification theory if the police chief endorsed Burmaster's actions. R. Doc. 56 at 3-4 (writing in their brief that the "question then is whether the City ratifies Burmaster's actions . . . .  As a result, the City has not formulated its official policy on the Burmaster shooting. Accordingly, the *Monell* question is premature."). It thus cannot be said that the Defendants have had inadequate time to prepare an opposition to this argument.