ANNE KIRKPATRICK on 05/01/2025

```
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF LOUISIANA

 3

 4    DEREK BROWN and JULIA        CIVIL ACTION NO.

 5    BARECKI-BROWN                22-00847

 6

 7    VERSUS                       SECTION: L

 8

 9    DERRICK BURMASTER, SHAUN     DIVISION: 4

10    FURGUSON, and the CITY OF

11    NEW ORLEANS

12

13

14

15          Video deposition of Anne Kirkpatrick, taken

16    in the offices of 1300 Perdido Street, New Orleans,

17    Louisiana on Thursday, May 1, 2025, commencing at

18    1:29 p.m.
```

**Key:**

Red Highlighted Text is text that Defendants seek to exclude.

Yellow Highlighted Text is text that Plaintiffs seek to exclude.

Red Highlighted Text Surrounded by Green is text that Defendants seek to exclude, but Plaintiffs seek to include.

```
 1   APPEARANCES:

 2         MOST & ASSOCIATES
           (BY:  WILLIAM MOST, ESQUIRE)
 3         201 ST. CHARLES AVE.
           SUITE 2500
 4         NEW ORLEANS, LOUISIANA  70170

 5                 ATTORNEYS FOR THE PLAINTIFF

 6

           THE OFFICE OF THE CITY ATTORNEY
 7         (BY:  JAMES ROQUEMORE, ESQUIRE)
           1300 PERDIDO STREET
 8         NEW ORLEANS, LOUISIANA  70112

 9                 ATTORNEYS FOR THE DEFENDANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            E X A M I N A T I O N   I N D E X

 2

 3                                            PAGE

 4

 5

 6    MR. MOST                                  6

 7    MR. ROQUEMORE                            49

 8    MR. MOST                                 76

 9

10

11

12

13            E X H I B I T    I N D E X

14

15

16    Exhibit 1                                9

17    Deposition 60                           10

18    P20                                     26

19    P13                                     39

20    P12                                     39

21    Exhibit Number 2                        55

22    Exhibit Number 3                        56

23

24

25
```

1        S T I P U L A T I O N

2

3        It is stipulated and agreed by and between

4    Counsel that the deposition of Anne Kirkpatrick, on

5    Thursday, May 1, 2025, is hereby being taken under

6    the Louisiana Federal Rules of Civil Procedure, for

7    all purposes, as permitted under law.

8

9        The witness waives the right to read and

10   sign the deposition.  The original is to be

11   delivered to and retained by the noticing attorney

12   for proper filing with the Clerk of Court.

13

14        All objections, except those as to the form

15   of the question and/or the responsiveness of the

16   answers, are reserved until the time of the trial of

17   this cause.

18

19        Brooke Garrison, Certified Court Reporter,

20   Certificate No. 2024011, in and for the State of

21   Louisiana, officiated in administering the oath to

22   the witness.

23

24

25

```
 1                    Anne Kirkpatrick,
 2    after being first duly sworn by the above-mentioned
 3    court reporter, did testify as follows:
 4              THE VIDEOGRAPHER:
 5                   We're on the record.  This is the
 6         video deposition of Chief Anne Kirkpatrick,
 7         taking place in New Orleans, Louisiana on
 8         Thursday May 1, 2025 beginning at 1:29.  My
 9         name is Austin Liggeo.  I'm the videographer
10         on behalf of Serpas Court Reporting.  The
11         court reporter is Brooke Garrison with Serpas
12         Court Reporting.  At this time, will we have
13         counsel please introduce themselves?
14              MR. MOST:
15                   William Most for plaintiffs.
16              MR. ROQUEMORE:
17                   James Roquemore on behalf of the
18         City of New Orleans and Derrick Burmaster.
19              THE COURT REPORTER:
20                   Can you raise your right hand?  Do
21         you solemnly swear to tell the truth, the
22         whole truth, nothing but the truth so help you
23         God?
24              THE WITNESS:
25                   I do.
```

```
 1                   EXAMINATION
 2   BY MR. MOST:
 3        Q.    All right.  Good afternoon, Chief.  Will
 4   you give us your full name and position for the
 5   record, please?
 6        A.    Yes.  My name is Anne, A-N-N-E,
 7   Kirkpatrick.  And my position, my title is
 8   superintendent of police which functions as Chief of
 9   Police.
10        Q.    Would you prefer that I call you chief or
11   superintendent or something else?
12        A.    Chief is the easiest.
13        Q.    Thank you.  And chief you've given a
14   number of depositions in the past?
15        A.    I have.
16        Q.    And so you understand that your answers
17   here today have the same force as if we're in a
18   courtroom with a judge and jury?
19        A.    I do.
20        Q.    Is there anything whether it's illness,
21   fatigue, distractions, substances, or anything else
22   that would prevent you from understanding my
23   questions and answering them truthfully and
24   completely?
25        A.    No.
```

7

```
 1      Q.    If you need to take a break at any point,
 2  whether it's for work or personal reasons, please
 3  just let me know.  Although I'll advise you that,
 4  I'll tell you in advance that I may ask you who you
 5  spoke to and what you reviewed during the break.
 6      A.    That's fine.
 7      Q.    If I ask a question that you don't
 8  understand, either because you can't hear me
 9  completely or because it's confusing or vague, will
10  you agree to tell me that that's the case, rather
11  than just trying to answer it anyway?
12      A.    Yes.
13      Q.    And Chief, what's your understanding
14  broadly of the case that you're here for today?
15      A.    I understand this is a suit against the
16  city by a private party regarding their dog having
17  been shot and killed by a New Orleans police
18  officer.
19      Q.    And roughly, when did you begin preparing
20  for this deposition?
21      A.    I believe as far as this coming to my
22  attention for deposition or for litigation, I'd have
23  to say four months ago, three to four months ago.
24      Q.    And aside from a lawyer, did you talk to
25  anyone to prepare for this deposition?
```

1      A.    I did not.

2      Q.    And did you review any documents to

3  prepare for this deposition?

4      A.    I did.

5      Q.    What documents are those?

6      A.    I believe I reviewed the -- well, the

7  forms and the documents that I signed off associated

8  with it.  The names of them I just, you know, off

9  the top of my head, I know you produced those to me.

10      Q.    Yeah.  So you reviewed a document about

11  the shooting that had your signature on it?

12      A.    Yes.

13      Q.    Any other documents?

14      A.    The ones that were associated with the

15  case.  So I know the ones associated with my final

16  signature associated with the final disposition of

17  the case.

18      Q.    Okay.  And roughly how many documents

19  were those?

20      A.    Four.

21      Q.    Four, okay.  Did you look at the

22  administrative shooting investigation from the

23  Public Integrity Bureau?

24      A.    I believe I did.

25      Q.    Okay.  Did you -- what about the

```
 1  recommendation from the Chief's panel?
 2              MR. ROQUEMORE:
 3                   Objection form.
 4              THE WITNESS:
 5                   I would have to actually see it.
 6  BY MR. MOST:
 7      Q.   Sure.
 8      A.   I apologize that I don't off the top of
 9  my head know the titles.
10      Q.   No apology needed.  So I'm going to mark
11  as, well, so this is one of them.  You see that this
12  is a memo to you from Chief Deputy Superintendents
13  Ganthier, Sanchez, and Lubrano?
14      A.   Yes.
15      Q.   Okay.  I'll mark this as --
16              MR. ROQUEMORE:
17                   Can we use the one with the proper
18       sticker on it?
19              MR. MOST:
20                   Sure.  There we go.  So that's --
21              MR. ROQUEMORE:
22                   That's Exhibit 1 as I marked it.
23              MR. MOST:
24                   Defendant's Exhibit 1.
25  BY MR. MOST:
```

ANNE KIRKPATRICK on 05/01/2025

10

```
 1        Q.     Okay.  So is this one of the documents
 2   you reviewed?
 3        A.     Yes, sir.
 4        Q.     Okay.  So there was this document, the
 5   document with your signature, the PID, shooting
 6   investigation, any other documents?
 7        A.     Off the top of my head, if you show me
 8   something, I'll be happy to review it.
 9        Q.     Okay.  So as we're going through this
10   deposition, if we look at a document that you recall
11   is one of the ones you looked at to prepare for this
12   deposition, will you tell me?
13        A.     Yes.
14        Q.     I'll mark as Deposition 60, a document
15   that is -- this is not an NOPD document, this is
16   just a document of some proposed standards and I
17   want to see if you agree with them.  I want to see
18   if you agree with these statements as general
19   principles for police conduct.
20             Number 1 being, police should not shoot a
21   dog unless it reasonably appears to pose an imminent
22   threat of serious bodily harm or death.  Do you
23   agree with that generally?
24        A.     I can't in this respect.  I don't know
25   where this is from and I have to operate off of
```

 1    policies as they are in the department.  So I don't

 2    think our policies are quite written like that.  So

 3    that's why I object to the overall, what I'm

 4    obligated to stand by.

 5        Q.    Yeah.  Do you see anything in this that

 6    you disagree with or find objectionable?  In Number

 7    1?

 8        A.    I think our use of force policy is not

 9    written like this.  And so I would object that I

10    can't speak to this.

11        Q.    Okay.  Number 2, police should ensure

12    that there's no risk to people in the area before

13    shooting a dog.  Would you agree or disagree with

14    that?

15        A.    I think in all use of force associated

16    with a firearm, the officers do what they can

17    reasonably to assess whether or not that someone is

18    in the background that could be injured.

19        Q.    So for example, police officers should

20    use caution when using their firearm to shoot an

21    animal if they're in a residential neighborhood, for

22    example.

23        A.    Any situation.

24        Q.    And particularly so, if it's a

25    residential area; correct?

1      A.    Yes.  Depending on the circumstances, the

2    officers, if they're in a use of force situation,

3    whether they're in a residential area or not.  So

4    sometimes those shootings do occur in residential

5    areas.

6      Q.    Would you agree with Number 3, that

7    police should not shoot a dog if alternative

8    non-lethal means are reasonably available?

9      A.    I believe our policy addresses the use of

10   alternative, less than lethal.  We don't use the

11   term non-lethal.  That is actually would be a

12   fallacy to use that kind of language.  We have less

13   than lethal alternatives.

14     Q.    So you would agree with this if it said

15   less than lethal means are reasonably available?

16     A.    Well, with respect to your qualification

17   of a dog, I don't think that would be necessary in

18   terms of my understanding of our policies.  Our

19   policies for using force is you weigh also

20   alternative means.

21     Q.    So officers should not shoot their

22   firearm, whether it's a dog or a person, if

23   alternative less than lethal means are reasonably

24   available?

25     A.    Are reasonably available and the

ANNE KIRKPATRICK on 05/01/2025

1  circumstances would dictate.  Not every circumstance

2  allows, because it's unfolding so quickly that a

3  different alternative use of force could be used.

4      Q.    Would you agree that shooting a dog

5  should always be the option of last resort?

6      A.    I think use of deadly force is an option

7  of last resort.

8      Q.    Okay.  And so you're aware that this case

9  is about an officer, Derrick Burmaster, who shot a

10  dog; correct?

11     A.    Yes.

12     Q.    Have you met Officer Burmaster?

13     A.    I may have.  I wouldn't be able to tell

14  you if he walked in the room that it was Officer

15  Burmaster, but I probably have met him.

16     Q.    Okay, but you don't recall meeting him

17  specifically?

18     A.    No, I don't.

19     Q.    Do you know anything about him other than

20  the context of this case?

21     A.    No, I don't.

22     Q.    Okay.  And at any point, have you seen

23  photos of the dog that was killed?

24     A.    I have not.

25     Q.    Okay.  Have you seen a video of the

ANNE KIRKPATRICK on 05/01/2025

14

```
 1   shooting of the dog?

 2        A.    I have not.

 3        Q.    Okay.  So I'll identify it as Defendant's

 4   Trial Exhibit 7.  I'll represent to you Chief that

 5   this is a photo of the dog that was shot not long

 6   before it was shot.  So you've never seen the size

 7   or appearance of this dog before?

 8        A.    I have not.

 9        Q.    Okay.  And if someone describes this dog

10   as the size of a large cat, does it appear from this

11   photo that that might be accurate?

12        A.    From the photo.

13        Q.    Yeah.  And would a taser device be a

14   potentially effective tool to repel a dog of this

15   size?

16        A.    Possibly, yes.

17        Q.    Would an officer kicking a dog of this

18   size also be a potentially effective tool for

19   repelling a dog of this size?

20        A.    Could be.

21        Q.    So if a dog of this size was running at

22   an officer, shooting it and killing it would not be

23   unavoidable, would you agree?

24        A.    I do not.

25        Q.    Okay.  Why not?
```

```
 1        A.      Because there's circumstances as I read
 2   the file, it was dark, and so I don't know what --
 3   you'd have to ask the officer, because subjectively
 4   what was he thinking at that time?  What did he see?
 5   What was his observation?  So I can't answer for
 6   that.
 7        Q.      Sure.  And if you stepped out of the
 8   subjective viewpoint and instead analyzed it from an
 9   objective point of view, would you say that shooting
10   and killing a dog of this size would be unavoidable
11   from an objective point of view?
12                MR. ROQUEMORE:
13                        Objection form.
14                THE WITNESS:
15                        It could be.
16   BY MR. MOST:
17        Q.      Okay.  It could be avoidable?
18        A.      No.  It could be reasonable that deadly
19   force was used.
20        Q.      Okay.  And it could be not reasonable
21   from an objective point of view?
22        A.      It depends on those circumstances and
23   only he has to explain his circumstances.  So it
24   could be objectively reasonable and it could be not
25   reasonable.  And that's why we look at the totality
```

ANNE KIRKPATRICK on 05/01/2025

16

1    of the circumstances, which is what we're dictated

2    to do by both policy and law.

3        Q.    Okay.  I'd like to show you the video of

4    the shooting.

5        A.    Sure.

6        Q.    So I'm going to pull up what is Trial

7    Joint Exhibit J1.  Okay, starting from the

8    beginning.

9              (VIDEO PLAYED)

10             (VIDEO STOPPED)

11   BY MR. MOST:

12       Q.    Okay, I'll pause it there.  We watched

13   this video from the beginning to 2 minutes and 42

14   seconds?

15       A.    Yes.

16       Q.    Do you need to watch any part of it

17   again?

18       A.    No.

19       Q.    Okay.  Would you personally have shot

20   this dog if this puppy was running at you?

21       A.    I may have, but I start from a different

22   premise than you.  These officers are responding to

23   a domestic violence call, and that's a totally

24   different framing of the circumstances in which

25   they're walking into.

1      Q.      Mm-hmm.

2      A.      They're not walking into an animal

3   control issue.  They're walking into a domestic

4   violence call.  So my perspective is totally

5   different than your perspective in terms of my

6   heightened sense of concern for safety.

7      Q.      So I'm not sure I understand.  Are you

8   saying that in responding to a domestic violence

9   call, officers may have sort of a heightened sense

10  of the need for safety?

11     A.      We treat them, we actually teach them for

12  that, because a domestic violence call is probably

13  one of the most dangerous calls that a police

14  officer could possibly be walking into.  So they're

15  walking into knowing and to one of the highest risk

16  calls for a police officer.

17     Q.      Mm-hmm.  And so you saw that Derrick

18  Burmaster shot the smaller of the two dogs that was

19  present?

20     A.      I could only hear it.  I couldn't see

21  that dog.

22     Q.      You couldn't see the dog that Burmaster

23  shot?

24     A.      Not from the video.

25     Q.      Okay.  If this was a puppy that was only

1    about 22 pounds, only about 18 inches tall, would

2    shooting a dog of that size be an avoidable

3    scenario?

4        A.    I don't know.  When I couldn't see, I can

5    hear it, and I heard his position in it, and what he

6    wrote on the -- his report.  So I can't tell you.

7    What I can say is that based on the circumstances,

8    it may, might I determined that it was reasonable.

9        Q.    You determined that it was reasonable?

10       A.    Yes.

11       Q.    But you had not seen the video?

12       A.    No, but I can do it according to the

13   record didn't change what you showed me.

14       Q.    And the record you received spoke

15   primarily to Burmaster's subjective thoughts and

16   fears; correct?

17              MR. ROQUEMORE:

18                  Objection form.

19              THE WITNESS:

20                  I think it's both objective and

21       subjective.  The objectivity is what did they

22       walk into.  The objectivity is the fact that

23       they were going to a domestic violence call.

24                  The objectivity is that we do train

25       and teach officers to be very mindful that

ANNE KIRKPATRICK on 05/01/2025

```
 1        that's one of the most dangerous calls that
 2        they could walk into.  So that is the framing
 3        in which they walked into that gate.
 4                  The objectivity is you have two
 5        officers on that scene.  One of them, both of
 6        them perceived a threat.  One of them ran,
 7        which supports the objective mindset, was
 8        Burmaster, reasonable in thinking that's a
 9        threat, and you have another officer who ran.
10                  So they both perceived a threat.  So
11        as an objective and subjective, the policy and
12        the law says that we are not to do the 20-20
13        hindsight.  The officer has to explain why he
14        saw it as a threat.  And he did that in the
15        report.
16   BY MR. MOST:
17        Q.    You reached your -- you based your
18   determination that Officer Burmaster's shooting was
19   reasonable based on the memo that was provided to
20   you by Lubrano, Sanchez, and Ganthier; correct?
21        A.    Not just their memo, but I did read his
22   statement about why he thought he had that threat to
23   the level in which to use the force that he did.  So
24   I did take that in consideration.  I did take in
25   consideration the other viewpoint that was in the
```

1    PIB investigation.  I took in both viewpoints.  So,

2    yes.

3        Q.    So you read the PIB investigation before

4    signing a document about Burmaster?

5        A.    I remember doing that, yes.

6        Q.    But I want to return to the question of

7    would you have shot this dog?  Can you express any

8    thoughts about that?

9        A.    Well, I'm not allowed to personally say

10    that I'm there.  I'm to go on the records and the

11    information that is presented to me and then to make

12    a decision, do I think it was reasonable?  That's my

13    role.

14            I was not there.  Based on what I have,

15    though, my determination was that, indeed, in the

16    totality of the circumstances, was it reasonable?

17    And I say, my thinking is, yes, it was reasonable.

18        Q.    Mm-hmm.  And in determining whether the

19    shooting was reasonable, you would have had to

20    assess the threat that the dog posed to Officer

21    Burmaster; correct?

22        A.    Yes.  That is a part of that.  But I also

23    have to weigh what I know about the totality of the

24    circumstances and which ones weigh more to me than

25    the other.  All the different factors that weigh my

1   decision one way or the other.  And so there were

2   more factors that supported the reasonableness for

3   his use of force.

4        Q.    Okay.  And what threat did this puppy

5   pose to Officer Burmaster?

6        A.    Well, according to Officer Burmaster,

7   that dog, unfortunately, puppy, dog, could have

8   caused him harm, rather serious harm, if the dog had

9   bitten him in the groin.

10       Q.    Are you aware that the dog was only 18

11   inches tall?

12       A.    Dogs can leap.  So that would not be a

13   deciding factor for me.

14       Q.    Mm-hmm.  You understand that Burmaster

15   expressed particularly that he was afraid that this

16   dog would bite him in the penis?

17       A.    I did read that, yes.

18       Q.    Yeah.

19       A.    Mm-hmm.

20       Q.    In your career, at any point in your

21   career, have you ever heard an officer express that

22   a dog, the fear that a dog would bite him in the

23   penis?

24       A.    I had an officer when I was the chief of

25   police of Federal Way who did have a dog bite him in

1    the penis and he did fatally shoot that dog.

2        Q.    So the -- is that the only time?

3        A.    Yes.

4        Q.    Okay.  So the only time in your career

5    that you've known an officer to be afraid of a dog

6    biting him in the penis was when a dog was actually

7    biting someone in the penis; correct?

8        A.    I can't say it's the only time that the

9    fear was there.  It was the only time that I've

10   experienced where I had an officer fatally shoot a

11   dog for biting him in the groin and the penis.

12       Q.    Right, but my question is, have you

13   ever -- aside from that time, have you ever had

14   officers express to you a fear of dogs biting them

15   in the penis?

16       A.    I can't tell you.

17       Q.    You don't recall any?

18       A.    I don't recall.

19       Q.    So would you agree that it's fairly

20   unusual for an officer to have a fear that dogs will

21   bite him in the penis unless they're actually doing

22   that?

23       A.    I can't say I find that unusual.  It's

24   not often that I've had that experience as I've

25   shared with you.  It's been around a long time.

1      Q.    If Burmaster has shot and killed two dogs

2    and both times said it was because he was afraid

3    that they were going to bite him in the crotch, does

4    that raise a concern for you about his credibility?

5      A.    It was not a part of my factor.  I did

6    not hear about the shooting of a dog.  I knew he had

7    shot another dog, but I don't recall it being

8    associated with him biting in the penis.

9      Q.    Okay.  Well, assume for the moment that

10   Burmaster has shot another dog.  That time he also

11   said, he was afraid it was going to bite him in the

12   crotch.  Would an officer who repeatedly shoots dogs

13   and each time says he did it because he was afraid

14   it would bite him in the crotch raise a credibility

15   issue for you?

16              MR. ROQUEMORE:

17                    Objection form.

18              THE WITNESS:

19                    It is -- I always -- we always, not

20         just I, we are required to assess credibility

21         of everyone who gives statements, whether it's

22         a witness or it's an officer.  So I believe

23         his PIB investigation found Officer Burmaster

24         to be credible.  That would be in that report.

25         I know there's a credibility assessment.  I

ANNE KIRKPATRICK on 05/01/2025

1         don't have the report in front of me.

2    BY MR. MOST:

3        Q.    Yeah.  So let's look at that.

4        A.    Okay.

5        Q.    But just before we turn to it, for you,

6    would it raise a credibility issue if an officer on

7    more than one occasion shot dogs and each time said

8    it was because he was afraid they would -- him, bite

9    him in the crotch?

10       A.    It does not make them incredible.  It

11   doesn't make them incredible.  I look at the

12   people's histories when I also make assessments.

13       Q.    Right.  But I'm not asking if that one

14   fact would make someone not credible, but would it

15   at least raise a red flag for you about their

16   potential credibility?

17       A.    It would not be a red flag, but I do

18   assess credibility along with the investigators who

19   also are required to assess credibility.  So when I

20   get a report and someone says someone's not

21   credible, and you can also be not credible for a

22   reason other than deception.

23            You can have a memory loss and not be

24   credible, right?  You can be so far removed from an

25   event, your memory is not fresh enough, therefore

1   you're not credible, has nothing to do with

2   deception.

3           So when you ask me a question about

4   assessing someone's credibility, it depends on the

5   situation as to whether or not I think it's a

6   deceptive situation or are you impaired for some

7   other reason.

8     Q.    But if Burmaster on multiple occasions

9   shot dogs and on multiple occasions said it was

10  because he was afraid they were going to bite him in

11  the crotch, would that be something that would make

12  you more likely or less likely to find him credible?

13    A.    Speculation, I literally when I assess

14  reports, I assess them for what they are on their

15  face.  We always look at the history of an officer's

16  discipline history and their record.

17          It would be no different, Mr. Most, if

18  five people made a bar complaint against you and

19  each result of that investigation was either

20  unfounded or not sustained.  Does it make you less

21  credible?

22          Not when it's been investigated.  And you

23  have come out with, no, this is not sustained,

24  exonerated, or not credible.  So I think that's an

25  important factor to weigh.

```
 1              So it doesn't make you less credible to
 2    me, even though you may have several bar complaints
 3    against you.
 4        Q.   For the record, I do not.  Let's see.
 5    Okay, let me pull up.  We'll mark this as P20.  And
 6    this is, you want a copy, Jim?  This is the Public
 7    Integrity Bureau investigation to the shooting.  Is
 8    that what it appears to be to you, Chief?
 9        A.   Okay.
10        Q.   Yeah.  So this is the Public Integrity
11    Bureau investigation to the shooting?
12        A.   Yes.
13        Q.   And did you review this before you signed
14    the document about this?
15        A.   I did.
16        Q.   And if you look at page 15, which has the
17    bates number of Plaintiffs 96?
18        A.   Yes.
19        Q.   At the first sentence of the second
20    paragraph, do you see that it says, Detective Brewer
21    deemed Officer Burmaster not to be credible?
22        A.   Yes.
23        Q.   Okay.  So this was different than your
24    recollection?
25        A.   This refreshes it, but yes.
```

```
1        Q.    Yeah.

2        A.    I do know that I remember that.

3        Q.    Okay.  And have at any point, have you

4   reviewed the findings of the Use of Force Review

5   Board about this shooting?

6        A.    I probably did, but it would be

7   speculation at this point.

8        Q.    Okay.  So as the superintendent of NOPD,

9   you make the final decision about whether discipline

10  for an officer will be found or not; correct?

11       A.    At my stage, they can always appeal.  But

12  at my stage, yes.

13       Q.    And one of the ways that happens is that

14  there's what's called, what's known as a chief's

15  review panel of three --

16       A.    That's correct.

17       Q.    Yeah.  And that panel issues a memorandum

18  to you, and then you can agree or disagree with that

19  recommendation?

20       A.    That's correct.

21       Q.    Okay.  And let's see.  We can look that

22  up.  It's Defendants 1.  So this was the, Defendants

23  1 is this memo to you; correct?

24       A.    Correct.

25       Q.    And there's a cover page, which corrects
```

```
 1    that it was originally addressed to Interim

 2    Superintendent Woodfork and then readdressed to you;

 3    correct?

 4        A.    That's correct.

 5        Q.    Okay.  And so this memo on page 3 talks

 6    about the facts that justify the recommended

 7    disposition; correct?

 8        A.    Ask the question again.

 9        Q.    Sure.  On page 3, the Chief's panel

10    describes the facts that they believe justify their

11    recommendation.

12        A.    Let me see.  Yeah.  It says what they've

13    done in this paragraph.  They've articulated the

14    facts that they were weighing in.

15        Q.    And their recommendation to you was to

16    exonerate Burmaster for the use of force?

17        A.    That's correct.

18        Q.    Okay.  And the facts that they

19    recommended to you, is this primarily the basis for

20    your concurrence with this recommendation?

21        A.    You know, no, not fully.  Because as I

22    said, in this particular situation, they're not

23    articulating the fact that he was responding to a

24    domestic violence.  I don't think as well as up

25    here.
```

```
 1        Q.     Right.

 2        A.     Right.  That is a big factor to me.

 3        Q.     Okay.  Any other facts that weighed into

 4   your decision-making other than what was on this

 5   page 3?

 6        A.     I can't answer that question.  I'd have

 7   to take a moment to.  I'm not sure how you're

 8   framing that question.  Any other facts, I think I

 9   gave you my factors that I weighed.

10        Q.     Okay.

11        A.     Well, I'll go ahead and answer.  It was a

12   big factor to me.  When you have another officer who

13   perceived a threat to such a degree that he ran,

14   that's a corroborating kind of assessment of a

15   perceived threat.

16        Q.     Although, that kind of cuts both ways,

17   because that officer was able to exit the scene

18   without hurting anybody; correct?

19             MR. ROQUEMORE:

20                  Objection form.

21             THE WITNESS:

22                  I understand.  However, the officer,

23        Burmaster, said why he didn't get out.  And

24        that was, he gave a reason for why he thought

25        he couldn't get out in time.  So you're
```

ANNE KIRKPATRICK on 05/01/2025

```
 1            correct, it cuts both ways, but they both
 2            perceived a threat.
 3                      Such that the other officer
 4            literally ran away.  That's a pretty
 5            significant threat.  And that was a threat for
 6            me, or a factor that was also not captured in
 7            the last sentence here.  Or in the last
 8            paragraph.
 9   BY MR. MOST:
10        Q.    Any other factors that you recall that
11   affected into your decision making other than what
12   you described and what's in this paragraph?
13        A.    Could be, but as I said, I just
14   interjected one as you were thinking and I was
15   reflecting.
16        Q.    So on page 3, this is almost entirely a
17   subjective analysis.  It describes what the officer
18   believed and thought and didn't believe and believed
19   again; correct?
20                 MR. ROQUEMORE:
21                      Objection form.
22                 THE WITNESS:
23                      It is somewhat subjective, yes.
24        That is important.  We're required to assess
25        what did the officer say.  So that is
```

```
 1        subjective.  But it's also objective.  There

 2        are certain facts here that are very

 3        objective.

 4                   And as I just shared with you, two

 5        facts that are objective that were not

 6        captured in this last paragraph that I

 7        factored, the domestic violence, the fact that

 8        the other officer perceived the threat at the

 9        same time and ran, those were not captured

10        there.  Those were objective facts.  So it's

11        both, and we're required to look at both.

12   BY MR. MOST:

13        Q.    Okay.  But nothing in here talks about

14   whether the dog was a puppy or an adult; correct?

15        A.    No.

16        Q.    Would that be a relevant fact to your

17   decision making?

18        A.    No.

19        Q.    You don't think it's relevant to an

20   officer's use of force whether a dog is a small

21   puppy or a large dog?

22        A.    If the puppy can attack and bite, then it

23   doesn't matter on the size of that dog.  If it can

24   cause harm and create, bite the officer in the

25   groin, it doesn't matter the size of the dog.  It
```

1   would be the amount of harm.

2       Q.    Okay, but the size of the dog is relevant

3   to whether less than lethal means would be available

4   and potentially effective; right?  It would be

5   easier to kick a small dog away than a large dog;

6   agreed?

7       A.    I don't necessarily -- In the

8   circumstances of this case, with what was in front

9   of me, how he articulated his assessment from what I

10  could see, which wasn't anything really.  I could

11  see the darkness.  I could hear the barking.  And I

12  knew they were going into the domestic violence.

13          They even articulated, we heard screaming

14  and so forth.  Those were very objective.  So I

15  can't tell you.  I wasn't there, and so when you ask

16  me the question that you did, I can't really answer

17  that for you.

18      Q.    Sure, but generally in terms of assessing

19  the reasonableness of a use of force against the

20  dog, it wouldn't matter if the dog is a tiny

21  chihuahua or a giant rottweiler; agreed?

22      A.    This wasn't a tiny chihuahua.  And so I

23  hear what you're trying to say, but I cannot agree

24  with the premise.  It was not a tiny chihuahua.  So

25  I can't agree with your premise, Mr. Most.

```
 1      Q.    Wait, but you can agree with the premise
 2   that the size of the dog matters; correct?
 3      A.    It could, but that doesn't apply to this
 4   case.
 5      Q.    The size of the dog didn't matter in this
 6   case?
 7      A.    It was not a chihuahua, and I knew it was
 8   not a chihuahua.
 9      Q.    Okay.  So you thought that this dog was
10   big enough to cause harm?
11      A.    Yes.
12      Q.    Okay.  And how did you know the size of
13   the dog?  It's not mentioned in this chief's memo;
14   correct?
15      A.    I believe from what I understood
16   objectively and what I could hear, it wasn't little
17   barking.  It was a significant barking of animals,
18   of dogs in this case.  That is something for me to
19   assess.  And nowhere along the line was I told this
20   was a Chihuahua or a little teacup type of a dog.
21   So --
22      Q.    Right.  But at the time of you signing
23   the document about Burmaster shooting, you didn't
24   know anything about the size of the dog; correct?
25      A.    I can't tell you that.  I would have to
```

1   go back, but I knew it was not a teacup dog.  I knew

2   that.

3       Q.    Okay.

4       A.    I knew one dog was bigger than the other.

5   I knew that.

6       Q.    Do you know if Burmaster shot the larger

7   or the smaller dog?

8       A.    I know he shot the smaller dog.

9       Q.    Okay.

10      A.    And that was in his report.

11      Q.    This chief's memorandum says on page 2,

12  it says, in the middle of the second paragraph, it

13  says, Officer Burmaster stated the dog was barking

14  and running toward him.  On page 2.

15      A.    Okay, state it for me again.

16      Q.    Yeah, Officer Burmaster stated the dog

17  was barking and running toward him.  Which made him

18  believe the dog was aggressive and would bite him.

19  Do you see that?

20      A.    Yes.

21      Q.    Okay.  This memo doesn't say whether that

22  was true or false, does it?

23      A.    No, but what corroborated was I had a

24  second officer who perceived enough of a threat that

25  he ran.

ANNE KIRKPATRICK on 05/01/2025

35

```
 1        Q.    Do you know if the other officer was
 2   running from the dog Burmaster shot or the other
 3   dog?
 4        A.    I understood the other dog was also
 5   pursuing the other officer.
 6        Q.    So if the other officer ran from the
 7   other dog, how does that speak to the threat posed
 8   by the dog that Burmaster shot?
 9        A.    It speaks to the circumstances of the
10   fact that there are aggressive charging dogs, which
11   is a threat to their safety.
12        Q.    Okay, but if there's two dogs, and one is
13   a threat and one is not, an officer can't shoot the
14   dog that's not a threat, agreed?
15        A.    The officer said it was a threat.
16        Q.    Okay.  So your assessment that this was a
17   reasonable shooting hinges in substantial part on
18   the officer's subjective perception of a threat,
19   agreed?
20              MR. ROQUEMORE:
21                    Objection form.
22              THE WITNESS:
23                    And within the objective totality of
24        circumstances, yes.  So as we've said before,
25        both matter, the subjective view of the
```

ANNE KIRKPATRICK on 05/01/2025

36

```
 1        officer or perspective, and the objective

 2        totality of the circumstances.

 3   BY MR. MOST:

 4        Q.    Okay.  So your assessment and your

 5   signature on the document incorporated both a

 6   subjective and objective component; correct?

 7        A.    Yes.  According to what the officer

 8   thought and the objective totality of the

 9   circumstances.

10        Q.    This memo doesn't say anything about the

11   use of force review board?

12        A.    No.  I don't think in this memo, not this

13   memo.

14        Q.    Were you aware that the use of --

15             MR. ROQUEMORE:

16                  Before we get into that, I'm going

17        to object any reference to the findings of the

18        Use of Force Review Board.  And if I could

19        have just a continuing objection, we'll have a

20        cleaner record.

21             MR. MOST:

22                  Certainly.

23             MR. ROQUEMORE:

24                  Thank you.

25   BY MR. MOST:
```

1       Q.      Are you aware -- was the subject to that
2    objection as a continuing objection.    Are you aware
3    that the Use of Force Review board unanimously found
4    the shooting to be unjustified?
5       A.      Yes.
6       Q.      Were you aware of that when you signed
7    the document about this?
8       A.      I can't tell you I am, but I am aware of
9    that.
10      Q.      Does that influence your decision making?
11      A.      No.  It is a factor of my decision
12   making.  But it didn't -- it obviously did not, it
13   was, if I had factored that for my final conclusion,
14   you can have differences of opinions.  And so it
15   would not have been enough of an influence for me to
16   change my opinion.
17      Q.      Okay.  We talked about your decision
18   making including both the subjective and objective
19   component.  Could you separate those out and talk
20   about just subjective and then just objective or for
21   you are those two things intertwined such that you
22   can't separate them?
23      A.      They're required to be together.  Both
24   the law drives it and the policy which basically
25   mirrors that law drives it to be together.

1        Q.    Okay.  So you would not easily be able to

2    give me your assessment separating out subjective

3    factors, agreed?

4        A.    Subjective is required.  What did the

5    officer think and perceive in the moment?

6        Q.    Okay.  So if I asked you to give me only

7    your assessment based on objective factors, that

8    would be difficult or impossible for you to do?

9        A.    It is not the standard.

10       Q.    Okay.  I want to talk about a baton.

11   Officers are generally required to carry batons in

12   many circumstances?

13       A.    Yes.

14       Q.    Okay.  And a baton is a less than lethal

15   device that could be used to repel a dog that's

16   about the size of a large cat, agreed?

17       A.    It could be, yes.

18       Q.    Okay.  So I want to turn -- Do you need a

19   break?  I want to turn to another topic.

20       A.    No, I'm fine.

21       Q.    Okay.  I want to turn now to NOPD's

22   training about animals.  There's a lot of components

23   of NOPD's policy and training.  I don't expect that

24   you would be off the top of your head knowledgeable

25   about all of them.  Do you know anything about the

```
 1   training that NOPD does for -- with regard to

 2   officers encountering animals in the field?

 3       A.    I do not, because I was fairly new when

 4   this case came to me.

 5       Q.    And you haven't learned anything

 6   specifically about it since?

 7       A.    I know the policy associated by the

 8   force.

 9       Q.    Let's look at P13.  We're going to also

10   sort of compare that with P12.  So P13, I'll

11   represent to you is part of NOPD's training, part of

12   a daily training bulletin for officers about how to

13   interact with animals in the field.  And P12, do you

14   see that this is a document put together by the COPS

15   program of the Department of Justice?

16       A.    Yes.

17       Q.    Are you familiar with the COPS program?

18       A.    I am.

19       Q.    Okay.  And just generally, what's your

20   understanding of it?

21       A.    Well, this is a national COPS office is a

22   nationally recognized office for resources that come

23   out of the Main Justice.

24       Q.    And it provides best practices for police

25   departments?
```

 1      A.      Correct.

 2      Q.      And do you see that the NOPD training has

 3   the exact same title as the COPS document?

 4      A.      Yes, I do.

 5      Q.      Okay.  And we can go through it, but I'll

 6   also represent to you that much of the text of the

 7   NOPD training is copied and pasted from the COPS

 8   training.

 9      A.      It may.  I have not read the report.

10      Q.      Yeah.  So would you agree that it would

11   be a problem if the NOPD training copied verbatim

12   from the COPS document but omitted almost everything

13   about how dogs are not as much of a threat as

14   officers may think?

15      A.      Where is that?

16      Q.      Sure.

17      A.      Is that in the training you're saying or

18   is it in this?

19      Q.      Yeah.  So if NOPD copied and pasted from

20   the COPS training, but selectively omitted parts

21   that suggest dogs are not as much of a threat as

22   officers may think, that would be a problem;

23   correct?

24              MR. ROQUEMORE:

25                      Objection form.

```
 1                THE WITNESS:
 2                     Not necessarily.  I don't know what
 3          the curriculum -- I can't answer that
 4          question.
 5     BY MR. MOST:
 6          Q.    Okay.
 7          A.    I can tell you that this training
 8     supports even all the more the reasonableness of
 9     Officer Burmaster and my thinking, because just
10     right off the top, although I've not seen his
11     training, the officer was using some of the
12     training, obviously, when he approached and he was
13     doing the kissing noises.
14                That shows to me he was kind of following
15     the policy.  It supported his acting within policy.
16     So I didn't know about the training.
17          Q.    Yeah.  Would you agree, though, that if
18     this training was generated by doing sort of a
19     one-sided copying and pasting from the cops
20     document, that would be a problem if it only copied
21     stuff that supported one side but not the other?
22                MR. ROQUEMORE:
23                     Objection form.
24                THE WITNESS:
25                     I can't say that and the reason for
```

```
 1        that just on the cursor here because I've not
 2        seen this, it would be unreasonable for us to
 3        have a policy as thick as this.
 4   BY MR. MOST:
 5        Q.    Sure.
 6        A.    And so it is not reasonable to put every
 7   word of this report into a policy.  So the way
 8   you're framing it, I cannot agree with the way you
 9   articulated it.  So of course, an instructor is not
10   going to put every word into a policy.
11        Q.    Yeah.  I agreed that the training
12   probably has to be shorter than the COPS document.
13        A.    Yes, correct.
14        Q.    But it shouldn't be a one-sided
15   shortening, agreed?
16        A.    I can't tell you how the decisions were
17   made.  I've never seen the documents before, but if
18   we're talking in the principle of the issue, I can't
19   tell you that it was reasonable or unreasonable to
20   put that one point you're making into the document
21   for the policy that was being trained on.
22        Q.    Well, so let's get more specific.  Do you
23   think it would be an issue if an NOPD omitted the
24   COPS statement that serious dog bites are relatively
25   rare?
```

 1      A.    I don't think it was unreasonable.  I
 2    mean, you asked me a question.  I don't think it was
 3    necessarily unreasonable.
 4      Q.    Okay.  What about a statement that absent
 5    warning signals and approaching dog is almost always
 6    friendly?
 7      A.    I can't speak to it.  I don't know if the
 8    instructor actually articulated it and maybe it
 9    wasn't in the policy overhead.
10      Q.    Yeah.
11      A.    I don't know, and so your speculation,
12    questions, I can't really answer for you.  The
13    officer -- the instructor may very well have
14    addressed it.  It's just not always in a PowerPoint.
15      Q.    So this was actually an emailed daily
16    training bulletin that officers would have read
17    without any training.
18      A.    All right.
19      Q.    Okay.  So you can't really speak to
20    whether this training is appropriate or not?
21      A.    I don't know.  If at the roll call and
22    they go over a daily training bulletin, these things
23    are discussed.  I mean, I can't tell you.  It's too
24    speculating for me.
25      Q.    Okay.  Chief, you became superintendent a

```
 1   few years ago?

 2        A.    Yes.

 3        Q.    In that time, you've been briefed on some

 4   of the particular security threats facing officers

 5   in New Orleans?

 6        A.    By security threat, that's pretty broad.

 7        Q.    Sure.

 8        A.    Could you give me some --

 9        Q.    Yeah.  So to be really specific, has

10   anyone told you that there are packs of wild dogs

11   roaming New Orleans?

12        A.    Packs of wild dogs roaming New Orleans?

13   No, I haven't specifically.  That doesn't come to

14   mind.

15        Q.    You haven't heard that officers are at

16   risk from packs of wild dogs on the streets of New

17   Orleans?

18        A.    That hasn't been brought to the

19   superintendent's office, no.

20        Q.    Yeah.  And you explained that your

21   assessment of the reasonableness here of Burmaster's

22   actions, you made your own decisions, but you sort

23   of weighed and incorporated some of the assessments

24   by other members of NOPD; correct?

25        A.    That's correct.
```

```
 1      Q.    Okay.  And you're familiar with the

 2   Office of the Consent Decree Monitor?

 3      A.    I am.

 4      Q.    Okay.  If a member of that officer

 5   suggested that Officer Burmaster might be criminally

 6   charged for reckless conduct about this shooting,

 7   would that be something you'd want to know?

 8           MR. ROQUEMORE:

 9                 Objection form.

10           THE WITNESS:

11                 Yes.

12   BY MR. MOST:

13      Q.    Okay.  And that was not indicated to you

14   at any point before you made your decision?

15           MR. ROQUEMORE:

16                 Same objection.

17           MR. MOST:

18                 It was in this report in this

19          respect, the PIB report you showed me.  I

20          believe it was referred to the district

21          attorney.

22   BY MR. MOST:

23      Q.    The district attorney would be a separate

24   entity from OCDM; right?

25      A.    Yes, but OCDM itself cannot make a
```

```
 1   decision.  They can only make a pointer to have a

 2   case reviewed.  And it's not unlikely or unusual, as

 3   you would use the term, to have certain use of force

 4   cases reviewed by the district attorney and it was

 5   reviewed and the district attorney, even though this

 6   report said no results at this time, the district

 7   attorney did not choose to file charges.

 8           So, you know, that's a factor, but it's a

 9   normal factor to me to have a case reviewed by the

10   district attorney on the use of force.

11       Q.    If OCDM suggested that Burmaster might be

12   criminally charged for his conduct, is that

13   something you would have wanted to know?

14       A.    It is not an unusual thing done, as I

15   said, when force is used.  And so it's kind of a

16   normal thing, frankly, to send a case over to a

17   district attorney for a review because force was

18   used, deadly force was used.  And so that's kind of

19   a normal thing.

20           So they have the OCDM and I don't know

21   the circumstances, but it would be within their

22   purview to say, hey, be sure you do send it off to

23   the district attorney for a review.  That's how I

24   could see it being kind of commonplace, if you will.

25       Q.    Have you known, can you recall any other
```

ANNE KIRKPATRICK on 05/01/2025

```
1    time that OCDM suggested that an officer might be

2    criminally charged for their conduct?

3        A.    Yes.  Yes.  Usually at this stage, we're

4    doing that anyway.  It's kind of a, like I said,

5    it's usual conduct for us at this stage.  But it's

6    not unusual for OCDM.

7            We're in partnership with them.  We work

8    together for them to say something like, hey, be

9    sure.  So that doesn't necessarily mean anything

10   more than be sure you send that case off to the

11   district attorney's office.

12       Q.    Okay.  But can you ever recall OCDM

13   suggesting that an officer's conduct might actually

14   meet the standard for criminal behavior?

15       A.    Yes.

16       Q.    In what context was that?

17       A.    In terms of, we've had reviews associated

18   with sexual misconduct allegations.  We've had

19   reviews associated with, let's say, evidence that is

20   lost.  Is it stolen or is it lost?  Those kind of

21   things.  So there's a lot of consultation we have

22   with our monitors.  So it's not as unusual as it may

23   seem to you, to have those kind of conversations

24   with OCDM.

25       Q.    Okay.  Can you think of another time that
```

 1    OCDM suggested that an officer use of force might

 2    meet the standard for criminal conduct?

 3         A.    That is such a standard thing we do.  As

 4    I said, when we have deadly force used, the

 5    discharge of a firearm, it is pretty common that

 6    you're going to have it reviewed criminally.  As a

 7    matter of fact, it's our policy to run two tracks at

 8    the same time.  So we do an administrative track, we

 9    do a criminal track.  And it's standard protocol,

10    almost.  So they probably, in this case, that

11    happened probably because it was an animal that

12    OCDM, and I'm speculating because I don't know what

13    you're referring to, that OCDM would say, hey, even

14    though it's an animal, it still should be reviewed.

15    That would be kind of a normal, we're doing those

16    things anyway.

17         Q.    Okay.

18         A.    Yeah.

19         Q.    Okay.  You said that you didn't see the

20    dog that Burmaster shot in the video; right?

21         A.    Right.

22         Q.    Just in assessing the threat that that

23    dog posed to Burmaster, were there any facts that

24    you knew of that suggested that that dog was a

25    threat to Burmaster, other than his subjective

```
 1   perception?
 2       A.    Based on the articulations that he did in
 3   his police report, and then the reviews, the several
 4   reviews of different people who assessed that and
 5   their basis for what they were thinking, those were
 6   the factors I had.
 7            As you already know, I had not seen that
 8   video, therefore the video was not a factor.  And
 9   still seeing it, would not have changed my opinion.
10            MR. MOST:
11                All right.  And I'll turn it over to
12       Mr. Roquemore.  Although, saving, redirect.
13            MR. ROQUEMORE:
14                Let's take a break.  If we can.
15            THE VIDEOGRAPHER:
16                Off the record at 2:35.
17                (RECESS TAKEN)
18            THE VIDEOGRAPHER:
19                We're back on the record.  The time
20       is 2:43.
21                EXAMINATION
22   BY MR. ROQUEMORE:
23       Q.    Chief Kirkpatrick, I'm James Roquemore.
24   I represent, as you know, the city and also Officer
25   Burmaster.  We've met before, right?
```

 1      A.    Yes, we have.

 2      Q.    Okay.  I know that Mr. Mose has asked you

 3   a few questions.  Do you understand this is going to

 4   be presented at trial, so I want to kind of back up

 5   and make sure we present our side kind of

 6   cohesively.  All right.

 7      A.    I understand.

 8      Q.    And I'll do my best not to overlap and

 9   everything.  So currently what is your full title?

10      A.    Superintendent of Police.

11      Q.    For New Orleans Police Department?

12      A.    For New Orleans, yes.

13      Q.    And you've been, when was -- when did you

14   start becoming, when did you start your job as

15   superintendent?

16      A.    I was actually hired initially as the

17   interim superintendent.  It was at the end of

18   September of 2023.  I don't have the exact date in

19   mind.

20      Q.    All right.  And before you became

21   superintendent here, what were you doing?

22      A.    Just prior to coming here, I was teaching

23   leadership topics for an organization called FBI,

24   Law Enforcement Executive Development Association.

25   I was on the road teaching around the country.

1        Q.    Okay.  And how long did you do that?

2        A.    I've had several in and out associations

3    with them, but during that time period, three years.

4        Q.    Three years, and before that, where were

5    you?

6        A.    I was the Chief of Police of Oakland,

7    California.

8        Q.    Okay.  And how long were you the chief of

9    police at Oakland?

10       A.    I was there for three years.

11       Q.    And were you -- did you have other --

12   were you a chief of police other places before

13   Oakland?

14       A.    Yes.  The easiest way to just articulate

15   it is that I have been in law enforcement for 43

16   years, almost 43 years.  And I -- New Orleans is my

17   ninth police department, law enforcement

18   organization.

19            And I've been the chief of police of five

20   different cities of the nine.  And the others, I

21   held very high rank positions in two other cities.

22       Q.    Tell me about your educational

23   background.

24       A.    Well, if I may, because it's part of my

25   background, it gives kind of my experience.  I was a

```
 1    bureau chief in Chicago.  And I was an under-sheriff
 2    of a very large sheriff's office, which is Seattle.
 3    And I was a Memphis police officer.
 4              And then I had a couple of other agencies
 5    in between.  So my educational background, I have a
 6    bachelor's degree in business administration.  I
 7    have a master's in counseling.  I have a law degree
 8    and I'm also a licensed attorney.  I've been
 9    licensed for 35 years.
10              MR. MOST:
11                   And we'll just object to this line
12         of questioning on the basis that she's not an
13         expert witness.
14    BY MR. ROQUEMORE:
15         Q.   Do you have any other professional
16    affiliations?
17         A.   Yes.  I'm a member of many of the
18    organizations, associations.  I'm a member of the
19    FBI National Academy Associates.  I'm a graduate of
20    the FBI National Academy.  I'm a graduate of the
21    FBI's Law Enforcement Executive Development Seminar.
22              I am a graduate of the FBI's National
23    Executive Institute.  I'm a member of Major City
24    Police Chiefs Association.
25              I am a member of the Washington State Bar
```

1    Association as an attorney there in that state.  I

2    have a couple of other affiliations, but I think

3    those are the big ones.

4        Q.    Now this case, as you know, involves use

5    of force.  Have you had any specialized education or

6    police officer related education or legal education

7    regarding uses of force?

8        A.    So as a licensed attorney, I certainly

9    have a foundation and understanding of the law.  I

10   did teach criminal law and criminal procedures for

11   many years at the Washington State Police Academy.

12   I was the main instructor for criminal procedures.

13           And then, as I said, through my

14   affiliation with teaching for the FBI LIDA

15   organization, we had elements of liability law that

16   I taught for the FBI LIDA organization around the

17   country.

18       Q.    And the liability law that

19   incorporated --

20       A.    Risk management is associated with use of

21   force issues, and as a chief of police for almost 20

22   years, I have been the top commissioned officer who

23   has made decisions about people's use of force for

24   many, many years.

25       Q.    And during the previous years before you

1    became the superintendent here in New Orleans, who

2    were the students that you were teaching to?

3         A.    All law enforcement, for the most part,

4    not completely, but for the most part, all law

5    enforcement affiliated, men and women who wanted to

6    go into rank of leadership from sergeant all the way

7    up to chief and sheriff around the country.

8         Q.    Let's talk about your duties in New

9    Orleans.  In general, what are the duties of a

10   superintendent?

11        A.    In general, I am the decision maker

12   associated with strategy for a police department.  I

13   have oversight of policies.  I would have oversight

14   about training.  I have oversight on discipline

15   matters and matters such as these, this particular

16   case that would come before me as a decision maker.

17        Q.    In your job as a decision maker of

18   policies, you're familiar with the NOPD policies

19   regarding use of force?

20        A.    Yes, I would be.

21        Q.    Okay.  And that use of force is that's

22   New Orleans Police Department 1.3; is that right?

23        A.    Yes.

24        Q.    Okay, I'm going to show you what's been

25   marked.  In front of you, let's just talk about

1    the -- put it on the record.  You have three

2    documents in front of you.  Exhibit number 1,

3    defendants exhibit number 1, I think we've talked

4    about that, what is that?

5        A.    This is the disciplinary hearing

6    document.

7        Q.    Is this the first time that you became

8    aware that Officer Burmaster was being disciplined

9    or had a disciplinary investigation against him?

10       A.    Yes.  Since I received this within two

11   weeks of my arrival here.

12       Q.    Okay.  And we'll talk a little bit more

13   about that.  The next document is Exhibit Number 2.

14       A.    Yes.

15       Q.    And what is that?

16       A.    This one is a -- this is the PID.  This

17   is the internal -- this is the investigative file

18   known as the PID.

19       Q.    Is this the letter that you --

20       A.    The letter that I would have received

21   about it.

22       Q.    I just wanted to make sure that we're

23   talking about the same document.  This last page has

24   your signature on it.

25       A.    That's correct.

56

1      Q.    And this is a letter dated October 27,

2    2023.  That was issued by you; is that right?

3      A.    That's correct.

4      Q.    And that was -- is this the final

5    decision that you made regarding the PIB

6    investigation into the disciplinary violation?

7      A.    Correct.  So this is the letter that the

8    officer would receive as to my decision.

9      Q.    Okay.  And the last exhibit in front of

10    you is Exhibit Number 3.

11      A.    I'm sorry.

12      Q.    And we'll talk about all this.  I just

13    want to make sure that we're --

14      A.    Number 3 is the policy.

15      Q.    -- you see all the documents.  And this

16    is the policy for use of force; right?

17      A.    This is the policy.

18      Q.    And that's chapter 1.3?

19      A.    Yes, sir.

20      Q.    Okay.  And in chapter 1.3, is there a

21    specific use of force policy with regard to use of

22    force on animals?

23      A.    There is.

24      Q.    And is that chapter 32?

25      A.    That is correct.  That's the number

```
 1   that --

 2        Q.    Paragraph 32.

 3        A.    Yes.  Here it is.

 4        Q.    And you're familiar with that particular

 5   paragraph?

 6        A.    I am.

 7        Q.    And was that, if you look on the first

 8   page, it has the date, the effective date for this

 9   policy.  And does that tell you whether or not this

10   particular policy wasn't enforced in 2021 when this

11   incident, this lawsuit happened?

12            MR. MOST:

13                Objection to the form.

14            THE WITNESS:

15                Yes.  I'm sorry, yes.

16   BY MR. ROQUEMORE:

17        Q.    I think you mentioned a little bit about

18   your role as in the disciplinary process.  What role

19   does the superintendent play in the disciplinary

20   process of an officer?

21        A.    I am the person who reviews the entirety

22   of a case that is presented to me, and after I make

23   my own independent assessment of the facts I make a

24   ruling, a decision on discipline.

25                It's the matter, and we have a couple of
```

1    choices.  We can say a situation is exonerated or

2    not sustained or sustained.  So there I have a set

3    of criteria that I will make a decision within those

4    boundaries.

5        Q.    So the three choices are exonerated,

6    sustained, or not sustained?

7        A.    No.  There are other choices that are

8    there.  So one would be an exonerated.  So you can

9    have sustained, which means the person did it, and

10   it's in violation of a policy.

11       Q.    Okay.

12       A.    You can have not sustained, which means

13   we don't have enough information to be able to say

14   that a violation occurred.  We can have unfounded,

15   where we say the complaint wasn't even legitimate to

16   begin with, and then we can have exonerated, which

17   means the officer engaged in the behavior but it was

18   not a violation of policy.

19       Q.    And before we get into the officer

20   Burmaster's results of his investigation, I just

21   want to back up a little bit.  We've talked a little

22   bit about the Public Integrity Bureau.

23       A.    Yes.

24       Q.    That's also referred to sometimes as PIB.

25       A.    Yes, that's the acronym for Public

 1   Integrity Bureau, which for most of the country,

 2   they'll use the term Internal Affairs.

 3        Q.    Okay.  And so what does that mean with

 4   regard to what they do inside of New Orleans Police

 5   Department?

 6        A.    The unit is staffed with fellow officers

 7   and sergeants who are investigators, and their focus

 8   is on complaints that they receive, which can be

 9   internally generated, and their job is to assess if

10   an officer is in violation of a policy or out or any

11   one of those four categories.  But they are

12   primarily fact finders, the real people who make the

13   assessment.  They can give a recommendation, if you

14   will.

15        Q.    The PIB makes a recommendation?

16        A.    They make a recommendation.  But they're

17   fact finders.  They collect the facts as

18   investigators.  And then they give a recommendation.

19             But then that is assessed by all these

20   different levels of rank.  And then I'm the final

21   assessor.  So I take all that information, and I

22   weigh everybody's assessments, and I come up with a

23   decision.

24        Q.    So you're familiar with Officer

25   Burmaster's disciplinary process; right?

1        A.      Yes.

2        Q.      Okay.  So let's talk a little bit about

3   that.  Let's look at Exhibit Number 1.  The Exhibit

4   Number 1, you mentioned is the first thing that you

5   received about the discipline of Officer Burmaster;

6   is that right?

7        A.      Yes.

8        Q.      Okay.  And you see there, I'm going to

9   refer to the page numbers at the bottom.  City

10  Defendants 5029.  You see that at the bottom?  This

11  is the very first page of Exhibit Number 1.

12       A.      Oh yes, I'm sorry.  City Defendant --

13       Q.      Our office put those on there --

14       A.      Okay.  I'm sorry, yes.

15       Q.      -- just so we can, from time to time, so

16  we know what document we're talking about.

17       A.      I'm with you.

18       Q.      All right.  Now, this cover page, what is

19  the significance of this cover page here?

20       A.      The significance is that we had a change

21  of superintendents, and so the initial report was

22  addressed to Superintendent Woodfork.

23       Q.      And you referred to the second page on --

24       A.      Correct.  But the cover letter is to just

25  simply say that this is now to be addressed to me.

61

```
 1      Q.    And this was addressed to you on
 2  September 28, 2023?
 3      A.    That's correct.
 4      Q.    Okay.  So is that a good estimate of the
 5  time when you actually received what starts a page
 6  city defendants 5030, the second page of this?
 7      A.    That's correct.
 8      Q.    Okay.  So starting with the second page,
 9  if you'll look, what is the second page on?  What
10  does that tell you?
11      A.    This is telling the result of the group
12  of high-ranking officers have evaluated the case and
13  they are now submitting a memo, which initially went
14  to Interim Chief Woodfork describing what their
15  mitigating circumstances or their assessment of
16  mitigating circumstances were in this case.
17      Q.    Just so I make sure that I understand, at
18  this stage, the PIB investigator has made a
19  recommendation --
20      A.    Correct.
21      Q.    -- and provided that to this panel --
22      A.    Right.
23      Q.    -- and this panel has evaluated and sent
24  on their recommendations to you.
25      A.    Right, and it's going to be a higher
```

 1   ranking group of officers.  So the PIB investigators

 2   may be at the rank of an officer and/or sergeant,

 3   and now it's moving up to higher ranks for review.

 4       Q.    Right.  Let's talk about exactly what

 5   happened here.  The first paragraph of this memo,

 6   does that tell you who the higher ranking officers

 7   were in that panel?

 8       A.    Yes.

 9       Q.    Okay.  And who were they?

10       A.    So by name, their chief deputy

11   superintendent Hans Ganthier, they each have the

12   same title.  So Keith Sanchez and Ryan Lubrano.

13       Q.    At the time when these members were on

14   the panel, for Chief Ganthier, was he -- do you

15   remember what his title was, what his role was?

16       A.    He was the Chief Deputy Superintendent

17   over what we call the FOB, which is the Field of

18   Operations for Bureau.  That means all of your rank

19   and file officers you see in the streets answering

20   calls for service, that's our largest bureau, and he

21   was the chief over that bureau.

22       Q.    And the FOB, was that where Burmaster was

23   also assigned?

24       A.    Yes, because he was a patrol officer

25   answering patrol calls.

```
 1        Q.     Okay.   So is it fair to say that Ganthier
 2     was the chief over all of the front line police
 3     officers?
 4        A.     Yes.
 5        Q.     And are you familiar with how experienced
 6     Chief Ganthier was in the field of law enforcement?
 7        A.     Yes.
 8        Q.     And what is your experience?   What can
 9     you say about that?
10        A.     He's around a 25-year veteran.   He was
11     also a member of our SWAT team at one time years
12     ago, and he was also the commander over special
13     operations, which is SWAT, so high-risk unit where
14     forces actually with a higher levels of risk
15     associated with force would be.
16               He also was over the academy at one time
17     as the commanding rank officer.   So he has a very
18     strong background in force and force assessment and
19     operations, very strong operations.
20        Q.     Now, Mr. Most asked you some questions
21     about credibility, etc.
22        A.     Yes.
23        Q.     Given Chief Ganthier's experience and the
24     factors that you just mentioned, did you have an
25     estimate or an evaluation of his credibility when
```

1    you made the recommendation?

2         A.    He's very credible.

3         Q.    All right.  Let's talk about Chief

4    Sanchez.

5         A.    Yes.

6         Q.    Do you know what his role was when he was

7    on this panel?

8         A.    Yes.

9         Q.    What was that?

10        A.    He was the chief over the Public

11   Integrity Bureau.

12        Q.    Meaning, what did that mean?

13        A.    He was the chief of the entire unit.  So

14   all investigators, everybody who were assigned to do

15   investigations of officers for policy violations, as

16   well as the criminal side of a review of an officer.

17   So you want to think of it as two tracks.  He was in

18   charge of all of that.

19        Q.    And Do you know what his experience was?

20        A.    I do.

21        Q.    Tell me along the same lines of what we

22   went through with Ganthier.

23        A.    He was a long-term senior officer here in

24   the New Orleans Police Department at the rank of

25   sergeant, but he was a little unique.  He was also

ANNE KIRKPATRICK on 05/01/2025

1    an attorney, like me, and he taught criminal law at

2    the police academy for several years before we -- So

3    he had retired out.  He was the full-time legal

4    instructor for the police academy.  And then he

5    became the head -- From that position, he became the

6    head of the PIB Bureau.

7        Q.    And did the experience that Chief Sanchez

8    have play into your evaluation of his

9    recommendation?

10       A.    Yeah, he's highly trained legally, and he

11   was practical.  He had practmatic work as a police

12   officer.

13       Q.    Chief Ryan Lubrano was also on the panel?

14       A.    Yes.

15       Q.    And what was his job title?

16       A.    He was the chief over the Bureau of

17   Investigators, and those would be your criminal

18   investigators.  And that bureau had close to 100

19   detectives.  And so he's also a ranked officer with

20   maybe 20 plus years.

21       Q.    If you look on Exhibit Number 2, this is

22   the letter that you received from the panel that

23   Ganthier, Lubrano, and Sanchez were on; is that

24   right?

25       A.    Correct.

1      Q.     And does that tell you who the PIB

2      investigator who made a recommendation was?

3      A.     Yes.

4      Q.     And who was that?

5      A.     Sergeant Shannon Brewer.

6      Q.     Do you know Sergeant Brewer?

7      A.     I do.

8      Q.     And as a sergeant, where did she lie on

9      the rank vis-à-vis the chiefs?

10     A.     Sure.  So a sergeant is what we call the

11     first-line supervisor.  They're just above the rank

12     of officer.  So that's where she lies in that rank.

13     Q.     And the recommendation that she made, did

14     you evaluate?  You said you evaluated that as part

15     of the totality in making this decision.

16     A.     Sure.  Yes, I did.

17     Q.     And in addition, you said you evaluated

18     Officer Burmaster's own statement; right?

19     A.     Yes.

20     Q.     And you evaluated the recommendation made

21     to you by the chief's panel; right?

22     A.     I did.

23     Q.     Was the -- what was your final decision

24     with this case?

25     A.     My final decision was that the shooting,

 1   unfortunately, this dog was within policy.

 2        Q.    What were the specific policy violations

 3   that were being investigated in this case?

 4        A.    It's the first violation, we call it a

 5   Rule 4.  The title of it that we use is Performance

 6   of Duty, and we paragraph 4 because we have several

 7   paragraphs in that policy, neglect of duty.  C6,

 8   failing to comply with instructions, oral or

 9   written, from any authoritative source to wit, NOPD

10   Chapter 13, which is the Use of Force chapter

11   paragraph 11 and that is the --

12        Q.    And paragraph 11 says specifically?

13        A.    It's under the title of authority to use

14   reasonable force and paragraph 11 states officers

15   shall not draw or -- a firearm unless circumstances

16   surrounding the incident create an objectively

17   reasonable belief that a situation may escalate to

18   the point at which lethal force would be authorized

19   once an officer determines that the use of deputy

20   force is no longer likely, the officer shall re

21   holster the weapon.

22        Q.    And your decision as to this particular

23   policy is that you did not violate it?

24        A.    That's correct.

25        Q.    And what was your thinking, analysis in

 1   making that decision?

 2       A.    That there were enough of those objective

 3   totality of circumstances factors that it was

 4   reasonable, in my opinion, and the opinion of

 5   others, that the officer had used the deadly force

 6   within that policy.

 7       Q.    The chapter, the next violation, chapter

 8   13, or paragraph 13.

 9       A.    Yes.

10       Q.    What is paragraph 13 referring to?

11       A.    Deadly, lethal force shall be used only

12   when -- Is that the one we -- that's this paragraph?

13       Q.    We did chapter 11, now there's also

14   chapter 13.

15       A.    I'm not sure we're on the same.  With

16   your permission, I have him point this to me?

17       Q.    Well, we'll back up.  Let's look at

18   Exhibit Number 2.  I'm tracking from the letter.

19       A.    It's a long one.  I apologize.  Okay.

20       Q.    We'll go to the third page of six.

21       A.    That's correct.

22       Q.    And so it says, after all testimony and

23   evidence, the committee recommended the following

24   disposition and penalty.

25       A.    That's correct.

ANNE KIRKPATRICK on 05/01/2025

1        Q.      And then if you look -- It has rule 4 use

2    of force -- chapter 1.3 use of force, paragraph 11.

3    And the next one is rule 4, chapter 1.3 use of

4    force, paragraph 13.

5        A.      I believe I'm at the correct, I'm turning

6    my pages correctly, right here, deadly force.

7        Q.      That's --

8        A.      So paragraph 13 is under the head title

9    of deadly force.  And then deadly lethal force shall

10   be used only when.  Is this where you were expecting

11   that -- am I on the right page?

12       Q.      Yeah, I'm just -- yes?

13       A.      Okay.  There is a subsection A, which is,

14   I believe, what we have here.  Subsection A, there

15   is an imminent danger of death or serious physical

16   injury to the officer or another person.

17       Q.      And in this case, based on the totality

18   of the facts --

19       A.      That's right.

20       Q.      -- you found that he did not violate --

21       A.      I was in an agreement.

22       Q.      All right.  And your decision was to

23   exonerate him for the first for the paragraph 11.

24       A.      That's correct.

25       Q.      And exonerate him for 13 paragraph.  As

1    well as exonerate him for paragraph 32; right?

2        A.    That's correct.

3        Q.    And paragraph 32 is a use of force policy

4    specifically dealing with dangerous animals.

5        A.    Yes, that's correct.

6        Q.    In looking at paragraph 32, I just want

7    to ask you some specific parts of -- some questions

8    as to that.

9        A.    Okay.  I think I'm with you.

10       Q.    Okay.  It starts off, this the policy of

11   NOPD, officers are authorized to use firearms to

12   stop an animal in circumstances in which the animal

13   reasonably appears to pose an imminent threat to

14   human safety.  In your view of the totality, can you

15   explain where the imminent threat for his safety

16   was?

17       A.    Well, the animal is charging, and I think

18   that that's an imminent threat, and to have an

19   animal charging at you, that makes it imminent.  And

20   the fact that the second officer also assessed that

21   threat as imminent, such that he ran.

22       Q.    All right.  This policy continues and it

23   says, and alternative methods are not reasonably

24   available or would likely be ineffective.  Can you

25   explain where you found a reasonable methods not

1    reasonably available or likely to be ineffective?

2        A.    According to the Burmaster, Officer

3    Burmaster, who said he wasn't going to be able to

4    jump over the fence.  The other officer had already

5    run out and was closing the fence.  He didn't think

6    he had time to get out that gate.  He also didn't

7    think he could jump over that gate or over the fence

8    because I think it had spikes at the top, that's my

9    understanding.  And so he's now in an imminent

10   situation and he had already drawn his gun and I

11   actually support the fact that he had pulled his

12   firearm.

13       Q.    I would like to ask you that.  Explain

14   why pulling his firearm when he did was not a

15   violation of NOPD?

16       A.    It's not a violation as a matter of fact

17   because he's going into a domestic violence

18   situation.  The reports that came to them was that

19   they could hear that whoever reported said there was

20   yelling and screaming, which means you, in an

21   officer's mind, is that there's an active,

22   assaultive behavior potentially.

23              And they're walking in, he's hearing

24   these dogs coming out.  How do you know that it

25   wasn't a party involved in the domestic sending dogs

1    out?  You don't know.  And so for him to have drawn

2    his weapon, it's dark.  All of those factors to me

3    are reasonable that you would draw your weapon.

4        Q.    The next line, it says the officer must

5    be cognizant of the surroundings when shooting at an

6    animal and show no risk to people in the area.  Was

7    there evidence that he was cognizant of the

8    surroundings?

9        A.    Yes.  What was interesting because when

10   Mr. Most showed me the training bulletin here.  And

11   as I said, I hadn't seen it before, but it's talking

12   about how to become, you know, what you want to be

13   thinking about.

14            And the fact that he was doing the

15   kissing voices to see if there was a dog, trying to

16   see if he could solicit, that is telling me he's

17   cognizant that there could be some danger issues

18   here.

19       Q.    But is there evidence that he was

20   actively looking to see if dogs were evidence?

21       A.    Yes, and that to me was even more

22   supportive that he is operating under his training

23   and his policy, and he was trying to assess that,

24   sure enough, the dogs come charging.

25       Q.    The other part of that sentence has to do

```
 1   with to ensure there's no risk to people in the
 2   area, in evaluating the totality of the
 3   circumstances and the facts.  What do you have to
 4   say about that factor?
 5        A.    They're unrolling very fast on them, and
 6   the law and the policy says that we're not to do the
 7   20-20 hindsight when things are evolving in
 8   split-second decisions and he apparently had
 9   assessed well enough that no one was injured in his
10   use of deadly force.
11        Q.    The next sentence in this particular
12   policy, deals with reasonable contingency plans.
13        A.    Yes.
14        Q.    How did that factor into your decision?
15        A.    Again, I didn't think it was
16   unreasonable.  When you have this unfolding event,
17   you've got your partner running away on you, that,
18   again, I cannot overemphasize how that corroborated,
19   for me, the fact that there was two different
20   independent people who perceived a threat at the
21   same time.
22              One was able to run out the gate, and so
23   we are having split-second decisions here.  And so I
24   think he squarely was within the policy, because it
25   was cognizant.  He was aware.  He knew what he was
```

```
 1   walking into.  And he was making reasonable efforts
 2   to see, even about the dogs.  That's mindfulness.
 3       Q.    There is a -- I think you were asked some
 4   questions about a baton.
 5       A.    Yes.
 6       Q.    In fact, in your recommendation, if you
 7   look at Exhibit Number 2, you made the decision
 8   about the result of the disciplinary investigation.
 9   It's true that you in fact found that a uniform
10   violation was sustained.
11       A.    I did.
12       Q.    And that part of the uniform violation
13   was not having his baton; is that right?
14       A.    Yes.
15       Q.    And part of it was not having his body on
16   it?
17       A.    That's correct.
18       Q.    And part of it was not having body armor?
19       A.    That's correct.
20       Q.    And how did not having his baton or not
21   having body armor affect the end result of the
22   shooting?
23       A.    Body armor would not have affected, would
24   have been non-consequential, only that.  The having
25   your baton or not having a baton, that didn't for me
```

ANNE KIRKPATRICK on 05/01/2025

```
 1   change the factors in the long run.  They were not a
 2   turning point, pivotal factor for me.
 3        Q.    Let me refer you to page 3 of 6 on
 4   Exhibit Number 2, your letter.
 5        A.    Okay.
 6        Q.    It's a summary of emboldened italics
 7   where you have summarized the recommendations of the
 8   chief's panel.  The last sentence says the panel
 9   believes the outcome of the incident would not have
10   been affected by Officer Burmaster having the PR-24
11   expandable baton and/or the department issued body
12   armor?
13        A.    Right.
14        Q.    This is something you agree with?
15        A.    I do.
16             MR. ROQUEMORE:
17                  Chief, I appreciate your time.
18         Those are all questions I have for you.
19             THE WITNESS:
20                  Okay.
21             MR. MOST:
22                  You need to be out of here by 4:30;
23         is that right?
24             THE WITNESS:
25                  I'm here to answer your questions.
```

```
 1              MR. MOST:
 2                   Okay, we're not going to go that
 3      long.
 4              THE WITNESS:
 5                   Okay.
 6                   RE-EXAMINATION
 7   BY MR. MOST:
 8         Q.    Okay.  I just want to make sure it wasn't
 9   4:30.
10         A.    I appreciate that, but I'm here to
11   answer.
12         Q.    Thank you.  So Chief, you were a witness
13   to the shooting or any of the events around the
14   shooting?
15         A.    That's correct.
16         Q.    So your assessment of the reasonableness
17   of the shooting is your opinion; correct?
18         A.    It is an opinion, but it is one that I
19   think is weighted with a lot of experience and
20   knowledge.
21         Q.    Sure.
22         A.    Frankly, yes.
23         Q.    It's a well-informed opinion.
24         A.    It is a well-informed opinion.
25         Q.    Okay.  And there's references here to
```

ANNE KIRKPATRICK on 05/01/2025

 1    Burmaster being exonerated.  Hat's a determination

 2    within the police department.  It doesn't mean that

 3    the court has exonerated him; correct?

 4              BY MR. ROQUEMORE:

 5                   Objection form.

 6              THE WITNESS:

 7                   That would be correct.

 8    BY MR. MOST:

 9         Q.    And with your signature on the

10    disciplinary document, you approved of Burmaster's

11    decision to shoot the dog and his basis for it;

12    correct?

13         A.    I think it's reasonable that he fell

14    within that range of what would be deemed

15    reasonable.

16         Q.    And so you approved of the decision?

17         A.    Yes.

18         Q.    And his basis for making the decision?

19         A.    His and the weight of all the others who

20    weighed it along the way, which were all those

21    deputy chiefs, everyone who assisted us.

22         Q.    Okay.  And you said that your belief was

23    that no human was injured in this incident?

24         A.    I don't believe I said.  I think the

25    question was posed differently to me.  So what was

1   your question that you asked before?  I don't think

2   you asked that question.

3       Q.    It was actually a question from Mr.

4   Roquemore.  Are you aware that Burmaster's partner

5   was wounded in this incident?

6       A.    Now, that you mention it, I think so.

7   But I didn't recall until you mentioned it.  But

8   yes, I think he refreshed my thinking.

9       Q.    Okay.  So you concluded it was reasonable

10  for Burmaster to fire his firearm; correct?

11      A.    I do.

12      Q.    And would it have been reasonable if he

13  had instead used his taser?

14      A.    That could also be reasonable.

15      Q.    Would it have been reasonable if he had

16  kicked the dog instead of using his gun or his

17  taser?

18      A.    If the circumstances were such where he

19  had kicked the dog, yes, it would have been

20  reasonable.

21      Q.    Okay.  And the taser or kicking could

22  have been effective in this scenario; correct?

23      A.    Possibly.  I'm dealing with what I know,

24  not the possibility of it.

25      Q.    Sure.  Do you have any facts that suggest

1    that taser would have been ineffective in this

2    scenario?

3         A.    I have no facts to support that, yes.

4         Q.    Do you have any facts to suggest that

5    kicking the dog would have been ineffective in this

6    situation?

7         A.    No.

8         Q.    You characterized the threat here as the

9    dog charging at Burmaster.  Do you recall that?

10        A.    Yes, I did.

11        Q.    And you didn't see the dog do that;

12   correct?

13        A.    No.  That's what the report -- I think

14   they used the word aggressive.  I'd have to go back

15   and look.

16        Q.    Sure.  And that's based on Burmaster's

17   telling of the event?

18        A.    That's correct.

19        Q.    Okay.

20        A.    And may I qualify?  And the fact that the

21   other officer ran.  That they coupled together.

22        Q.    But you don't know which dog the other

23   officer was running from?

24        A.    Yes, I was told, I believe, somewhere in

25   the reports that one was a larger dog, one was the

```
 1   smaller dog.
 2        Q.    Okay.  But you don't think the other
 3   officer was running away from the dog that Burmaster
 4   shot; correct?
 5        A.    No.  He started running right before he
 6   saw the dog, so I don't know.  I know what he's -- I
 7   know what the reports state.
 8        Q.    Okay.  Mr. Roquemore asked you about your
 9   assessment of some other NOPD officers, including
10   the Lubrano and Sanchez and Ganthier, are you also
11   familiar with deputy former deputy superintendent
12   Chris Goodley?
13        A.    I only know him.  I've only met him.
14        Q.    Do you also understand that he's a very
15   experienced?
16        A.    I do.
17        Q.    And did you know Deputy Chief Paul Noel?
18        A.    I know of him as well.  I've met him.
19   He's the Chief of Police of Knoxville now.  Yes.
20        Q.    And so he is comparably experienced to
21   the other officers we've discussed, the other
22   ranking officers?
23        A.    That's correct.  Yes.
24        MR. MOST:
25              Okay.  That's all I've got.  Thank
```

```
1   you very much for your time.

2        THE WITNESS:

3            Thanks.

4        THE VIDEOGRAPHER:

5            This concludes the deposition.  The

6   time is 3:25.

7   (Deposition concluded on/or about 3:25 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    REPORTER'S PAGE

 2

 3        I, BROOKE GARRISON, Certified Court Reporter

 4   in and for the State of Louisiana, the officer as

 5   defined in Rule 28 of the Federal Rules of Civil

 6   Procedure and/or Article 1434(B) of the Louisiana

 7   Code of Civil Procedure, before whom this proceeding

 8   was taken, do hereby state on the Record:

 9        That due to the interaction in the

10   spontaneous discourse of this proceeding, dashes

11   (--) have been used to indicate pauses, changes in

12   thought, and/or talkovers; that same is the proper

13   method for a Court Reporter's transcription of

14   proceeding, and that the dashes (--) do not indicate

15   that words or phrases have been left out of this

16   transcript;

17        That any words and/or names which could not

18   be verified through reference material have been

19   denoted with the phrase "(spelled phonetically)."

20

21

22

23

24

25
```

```
 1              REPORTER'S CERTIFICATE

 2         This certification is valid only for a
      transcript accompanied by my original seal on this
 3    page.

 4         I, BROOKE GARRISON, Certified Court
      Reporter, in and for the State of Louisiana, as the
 5    officer before whom this testimony was taken, do
      hereby certify that Anne Kirkpatrick, to whom the
 6    oath was administered, after having been duly sworn
      by me upon authority of R.S. 37:2554, did testify as
 7    hereinbefore set forth in the foregoing 82 pages;

 8         That this testimony was reported by me in
      the steno mask reporting method, was prepared and
 9    transcribed by me or under my personal direction and
      supervision, and is a true and correct transcript to
10    the best of my ability and understanding;

11         That the transcript has been prepared in
      compliance with transcript format guidelines
12    required by statute or by rules of the board;

13         That I have acted in compliance with the
      prohibition on contractual relationships, as defined
14    by Louisiana Code of Civil Procedure Article 1434
      and in rules and advisory opinions of the board;
15
           That I am not related to counsel or the
16    parties herein, nor am I otherwise interested in the
      outcome of this matter.
17
           May 7, 2025, Lacombe, Louisiana.
18

19

20

21

22    _____

23         BROOKE GARRISON, CCR

24         CERTIFIED COURT REPORTER

25
```

**Exhibits**

**EXHIBIT 1**  3:16 9:22,24 55:2,3 60:3,4,11

**EXHIBIT 2**  3:21 55:13 65:21 68:18 74:7 75:4

**EXHIBIT 3**  3:22 56:10

**EXHIBIT 60**  3:17 10:14

**EXHIBIT P12**  3:20 39:10,13

**EXHIBIT P13**  3:19 39:9,10

**EXHIBIT P20**  3:18 26:5

---

**1**

**1**  3:16 4:5 5:8 9:22,24 10:20 11:7 27:22,23 55:2,3 60:3,4,11

**1.3**  54:22 56:18,20 69:2,3

**10**  3:17

**100**  65:18

**11**  67:11,12,14 68:13 69:2,23

**13**  67:10 68:8,10,14 69:4,8,25

**15**  26:16

**18**  18:1 21:10

**1:29**  5:8

---

**2**

**2**  3:21 11:11 16:13 34:11,14 55:13 65:21 68:18 74:7 75:4

**20**  53:21 65:20

**20-20**  19:12 73:7

**2021**  57:10

**2023**  50:18 56:2 61:2

**2024011**  4:20

**2025**  4:5 5:8

**22**  18:1

**25-year**  63:10

**26**  3:18

**27**  56:1

**28**  61:2

**2:35**  49:16

**2:43**  49:20

---

**3**

**3**  3:22 12:6 28:5,9 29:5 30:16 56:10,14 75:3

**32**  56:24 57:2 70:1,3,6

**35**  52:9

**39**  3:19,20

**3:25**  81:6,7

---

**4**

**4**  67:5,6 69:1,3

**42**  16:13

**43**  51:15,16

**49**  3:7

**4:30**  75:22 76:9

---

**5**

**5029**  60:10

**5030**  61:6

**55**  3:21

**56**  3:22

---

**6**

**6**  3:6 75:3

**60**  3:17 10:14

---

**7**

**7**  14:4

**76**  3:8

---

**9**

**9**  3:16

**96**  26:17

---

**A**

**A-N-N-E**  6:6

**above-mentioned**  5:2

**absent**  43:4

**academy**  52:19,20 53:11 63:16 65:2,4

**accurate**  14:11

**acronym**  58:25

**acting**  41:15

**actions**  44:22

**active**  71:21

**actively**  72:20

**addition**  66:17

**addressed**  28:1 43:14 60:22,25 61:1

**addresses**  12:9

**administering**  4:21

**administration**  52:6

**administrative**  8:22 48:8

**adult**  31:14

**advance**  7:4

**advise**  7:3

**Affairs**  59:2

**affect**  74:21

**affected**  30:11 74:23 75:10

**affiliated**  54:5

**affiliation**  53:14

**affiliations**  52:16 53:2

**afraid**  21:15 22:5 23:2,11,13 24:8 25:10

**afternoon**  6:3

**agencies**  52:4

**aggressive**  34:18 35:10 79:14

**agree**  7:10 10:17,18,23 11:13 12:6,14 13:4 14:23 22:19 27:18 32:23,25 33:1 40:10 41:17 42:8 75:14

ANNE KIRKPATRICK on 05/01/2025

**agreed** 4:3 32:6,21 35:14,19 38:3,16 42:11,15

**agreement** 69:21

**ahead** 29:11

**allegations** 47:18

**allowed** 20:9

**alternative** 12:7,10,20,23 13:3 70:23

**alternatives** 12:13

**amount** 32:1

**analysis** 30:17 67:25

**analyzed** 15:8

**and/or** 4:15 62:2 75:11

**animal** 11:21 17:2 48:11,14 70:12,17,19 72:6

**animals** 33:17 38:22 39:2,13 56:22 70:4

**Anne** 4:4 5:1,6 6:6

**answering** 6:23 62:19,25

**answers** 4:16 6:16

**apologize** 9:8 68:19

**apology** 9:10

**apparently** 73:8

**appeal** 27:11

**appearance** 14:7

**appears** 10:21 26:8 70:13

**apply** 33:3

**approached** 41:12

**approaching** 43:5

**approved** 77:10,16

**area** 11:12,25 12:3 72:6 73:2

**areas** 12:5

**armor** 74:18,21,23 75:12

**arrival** 55:11

**articulate** 51:14

**articulated** 28:13 32:9,13 42:9 43:8

**articulating** 28:23

**articulations** 49:2

**assaultive** 71:22

**assess** 11:17 20:20 23:20 24:18,19 25:13,14 30:24 33:19 59:9 72:23

**assessed** 49:4 59:19 70:20 73:9

**assessing** 25:4 32:18 48:22

**assessment** 23:25 29:14 32:9 35:16 36:4 38:2,7 44:21 57:23 59:13 61:15 63:18 76:16 80:9

**assessments** 24:12 44:23 59:22

**assessor** 59:21

**assigned** 62:23 64:14

**assisted** 77:21

**Associates** 52:19

**Association** 50:24 52:24 53:1

**associations** 51:2 52:18

**assume** 23:9

**attack** 31:22

**attention** 7:22

**attorney** 4:11 45:21,23 46:4,5, 7,10,17,23 52:8 53:1,8 65:1

**attorney's** 47:11

**Austin** 5:9

**authoritative** 67:9

**authority** 67:13

**authorized** 67:18 70:11

**avoidable** 15:17 18:2

**aware** 13:8 21:10 36:14 37:1,2, 6,8 55:8 73:25 78:4

---

**B**

**bachelor's** 52:6

**back** 34:1 49:19 50:4 58:21 68:17 79:14

**background** 11:18 51:23,25 52:5 63:18

**bar** 25:18 26:2 52:25

**barking** 32:11 33:17 34:13,17

**based** 18:7 19:17,19 20:14 38:7 49:2 69:17 79:16

**basically** 37:24

**basis** 28:19 49:5 52:12 77:11, 18

**bates** 26:17

**baton** 38:10,14 74:4,13,20,25 75:11

**batons** 38:11

**begin** 7:19 58:16

**beginning** 5:8 16:8,13

**behalf** 5:10,17

**behavior** 47:14 58:17 71:22

**belief** 67:17 77:22

**believed** 30:18

**believes** 75:9

**big** 29:2,12 33:10 53:3

**bigger** 34:4

**bit** 55:12 57:17 58:21,22 60:2

**bite** 21:16,22,25 22:21 23:3,11, 14 24:8 25:10 31:22,24 34:18

**bites** 42:24

**biting** 22:6,7,11,14 23:8

**bitten** 21:9

**board** 27:5 36:11,18 37:3

**bodily** 10:22

**body** 74:15,18,21,23 75:11

**bottom** 60:9,10

**boundaries** 58:4

**break** 7:1,5 38:19 49:14

**Brewer** 26:20 66:5,6

**briefed** 44:3

**broad** 44:6

**broadly** 7:14

**Brooke** 4:19 5:11

**brought** 44:18

**bulletin** 39:12 43:16,22 72:10

ANNE KIRKPATRICK on 05/01/2025

Index: bureau–correct

**bureau** 8:23 26:7,11 52:1 58:22 59:1 62:18,20,21 64:11 65:6,16, 18

**Burmaster** 5:18 13:9,12,15 17:18,22 19:8 20:4,21 21:5,6,14 23:1,10,23 25:8 26:21 28:16 29:23 33:23 34:6,13,16 35:2,8 41:9 45:5 46:11 48:20,23,25 49:25 55:8 60:5 62:22 71:2,3 75:10 77:1 78:10 79:9 80:3

**Burmaster's** 18:15 19:18 44:21 58:20 59:25 66:18 77:10 78:4 79:16

**business** 52:6

**C**

**C6** 67:7

**California** 51:7

**call** 6:10 16:23 17:4,9,12 18:23 43:21 62:17 66:10 67:4

**called** 27:14 50:23

**calls** 17:13,16 19:1 62:20,25

**captured** 30:6 31:6,9

**career** 21:20,21 22:4

**carry** 38:11

**case** 7:10,14 8:15,17 13:8,20 32:8 33:4,6,18 39:4 46:2,9,16 47:10 48:10 53:4 54:16 57:22 61:12,16 66:24 67:3 69:17

**cases** 46:4

**cat** 14:10 38:16

**categories** 59:11

**caused** 21:8

**caution** 11:20

**Certificate** 4:20

**Certified** 4:19

**change** 18:13 37:16 60:20 75:1

**changed** 49:9

**chapter** 56:18,20,24 67:10 68:7,13,14 69:2,3

**characterized** 79:8

**charge** 64:18

**charged** 45:6 46:12 47:2

**charges** 46:7

**charging** 35:10 70:17,19 72:24 79:9

**Chicago** 52:1

**chief** 5:6 6:3,8,10,12,13 7:13 9:12 14:4 21:24 26:8 43:25 49:23 51:6,8,12,19 52:1 53:21 54:7 61:14 62:10,14,16,21 63:2, 6,23 64:3,10,13 65:7,13,16 75:17 76:12 80:17,19

**chief's** 9:1 27:14 28:9 33:13 34:11 66:21 75:8

**chiefs** 52:24 66:9 77:21

**chihuahua** 32:21,22,24 33:7,8, 20

**choices** 58:1,5,7

**choose** 46:7

**Chris** 80:12

**circumstance** 13:1

**circumstances** 12:1 13:1 15:1, 22,23 16:1,24 18:7 20:16,24 32:8 35:9,24 36:2,9 38:12 46:21 61:15,16 67:15 68:3 70:12 73:3 78:18

**cities** 51:20,21

**city** 5:18 7:16 49:24 52:23 60:9, 12 61:6

**Civil** 4:6

**cleaner** 36:20

**Clerk** 4:12

**close** 65:18

**closing** 71:5

**cognizant** 72:5,7,17 73:25

**cohesively** 50:6

**collect** 59:17

**commander** 63:12

**commanding** 63:17

**commissioned** 53:22

**committee** 68:23

**common** 48:5

**commonplace** 46:24

**comparably** 80:20

**compare** 39:10

**complaint** 25:18 58:15

**complaints** 26:2 59:8

**completely** 6:24 7:9 54:4

**comply** 67:8

**component** 36:6 37:19

**components** 38:22

**concern** 17:6 23:4

**concluded** 78:9 81:7

**concludes** 81:5

**conclusion** 37:13

**concurrence** 28:20

**conduct** 10:19 45:6 46:12 47:2, 5,13 48:2

**confusing** 7:9

**Consent** 45:2

**consideration** 19:24,25

**consultation** 47:21

**context** 13:20 47:16

**contingency** 73:12

**continues** 70:22

**continuing** 36:19 37:2

**control** 17:3

**conversations** 47:23

**copied** 40:7,11,19 41:20

**cops** 39:14,17,21 40:3,7,12,20 41:19 42:12,24

**copy** 26:6

**copying** 41:19

**correct** 11:25 13:10 18:16 19:20 20:21 22:7 27:10,16,20, 23,24 28:3,4,7,17 29:18 30:1,19 31:14 33:2,14,24 36:6 40:1,23 42:13 44:24,25 55:25 56:3,7,25 60:24 61:3,7,20 65:25 67:24 68:21,25 69:5,24 70:2,5 74:17, 19 76:15,17 77:3,7,12 78:10,22

79:12,18 80:4,23

**correctly** 69:6

**corrects** 27:25

**corroborated** 34:23 73:18

**corroborating** 29:14

**counsel** 4:4 5:13

**counseling** 52:7

**country** 50:25 53:17 54:7 59:1

**couple** 52:4 53:2 57:25

**coupled** 79:21

**court** 4:12,19 5:3,10,11,12,19 77:3

**courtroom** 6:18

**cover** 27:25 60:18,19,24

**create** 31:24 67:16

**credibility** 23:4,14,20,25 24:6, 16,18,19 25:4 63:21,25

**credible** 23:24 24:14,21,24 25:1,12,21,24 26:1,21 64:2

**criminal** 47:14 48:2,9 53:10,12 64:16 65:1,17

**criminally** 45:5 46:12 47:2 48:6

**criteria** 58:3

**crotch** 23:3,12,14 24:9 25:11

**curriculum** 41:3

**cursor** 42:1

**cuts** 29:16 30:1

**D**

**daily** 39:12 43:15,22

**danger** 69:15 72:17

**dangerous** 17:13 19:1 70:4

**dark** 15:2 72:2

**darkness** 32:11

**date** 50:18 57:8

**dated** 56:1

**deadly** 13:6 15:18 46:18 48:4 68:5,11 69:6,9 73:10

**dealing** 70:4 78:23

**deals** 73:12

**death** 10:22 69:15

**deception** 24:22 25:2

**deceptive** 25:6

**deciding** 21:13

**decision** 20:12 21:1 27:9 30:11 31:17 37:10,11,17 45:14 46:1 54:11,16,17 56:5,8 57:24 58:3 59:23 66:15,23,25 67:22 68:1 69:22 73:14 74:7 77:11,16,18

**decision-making** 29:4

**decisions** 42:16 44:22 53:23 73:8,23

**Decree** 45:2

**deemed** 26:21 77:14

**Defendant** 60:12

**Defendant's** 9:24 14:3

**defendants** 27:22 55:3 60:10 61:6

**degree** 29:13 52:6,7

**delivered** 4:11

**department** 11:1 39:15 50:11 51:17 54:12,22 59:5 64:24 75:11 77:2

**departments** 39:25

**Depending** 12:1

**depends** 15:22 25:4

**deposition** 3:17 4:4,10 5:6 7:20,22,25 8:3 10:10,12,14 81:5,7

**depositions** 6:14

**deputy** 9:12 62:10,16 67:19 77:21 80:11,17

**Derrick** 5:18 13:9 17:17

**describes** 14:9 28:10 30:17

**describing** 61:14

**Detective** 26:20

**detectives** 65:19

**determination** 19:18 20:15 77:1

**determined** 18:8,9

**determines** 67:19

**determining** 20:18

**Development** 50:24 52:21

**device** 14:13 38:15

**dictate** 13:1

**dictated** 16:1

**differences** 37:14

**differently** 77:25

**difficult** 38:8

**disagree** 11:6,13 27:18

**discharge** 48:5

**disciplinary** 55:5,9 56:6 57:18, 19 59:25 74:8 77:10

**discipline** 25:16 27:9 54:14 57:24 60:5

**disciplined** 55:8

**discussed** 43:23 80:21

**disposition** 8:16 28:7 68:24

**distractions** 6:21

**district** 45:20,23 46:4,5,6,10, 17,23 47:11

**document** 8:10 10:4,5,10,14, 15,16 20:4 26:14 33:23 36:5 37:7 39:14 40:3,12 41:20 42:12, 20 55:6,13,23 60:16 77:10

**documents** 8:2,5,7,13,18 10:1, 6 42:17 55:2 56:15

**dog** 7:16 10:21 11:13 12:7,17, 22 13:4,10,23 14:1,5,7,9,14,17, 19,21 15:10 16:20 17:21,22 18:2 20:7,20 21:7,8,10,16,22,25 22:1,5,6,11 23:6,7,10 31:14,20, 21,23,25 32:2,5,20 33:2,5,9,13, 20,24 34:1,4,7,8,13,16,18 35:2, 3,4,7,8,14 38:15 42:24 43:5 48:20,23,24 67:1 72:15 77:11 78:16,19 79:5,9,11,22,25 80:1, 3,6

**dogs** 17:18 21:12 22:14,20 23:1,12 24:7 25:9 33:18 35:10, 12 40:13,21 44:10,12,16 71:24, 25 72:20,24 74:2

ANNE KIRKPATRICK on 05/01/2025

**domestic** 16:23 17:3,8,12 18:23 28:24 31:7 32:12 71:17, 25

**draw** 67:15 72:3

**drawn** 71:10 72:1

**drives** 37:24,25

**duly** 5:2

**duties** 54:8,9

**duty** 67:6,7

---

**E**

**easier** 32:5

**easiest** 6:12 51:14

**easily** 38:1

**education** 53:5,6

**educational** 51:22 52:5

**effective** 14:14,18 32:4 57:8 78:22

**efforts** 74:1

**elements** 53:15

**emailed** 43:15

**emboldened** 75:6

**encountering** 39:2

**end** 50:17 74:21

**enforced** 57:10

**enforcement** 50:24 51:15,17 52:21 54:3,5 63:6

**engaged** 58:17

**ensure** 11:11 73:1

**entire** 64:13

**entirety** 57:21

**entity** 45:24

**escalate** 67:17

**estimate** 61:4 63:25

**evaluate** 66:14

**evaluated** 61:12,23 66:14,17, 20

**evaluating** 73:2

**evaluation** 63:25 65:8

**event** 24:25 73:16 79:17

**events** 76:13

**everybody's** 59:22

**evidence** 47:19 68:23 72:7,19, 20

**evolving** 73:7

**exact** 40:3 50:18

**EXAMINATION** 6:1 49:21

**Executive** 50:24 52:21,23

**exhibit** 3:16,21,22 9:22,24 14:4 16:7 55:2,3,13 56:9,10 60:3,11 65:21 68:18 74:7 75:4

**exit** 29:17

**exonerate** 28:16 69:23,25 70:1

**exonerated** 25:24 58:1,5,8,16 77:1,3

**expandable** 75:11

**expect** 38:23

**expecting** 69:10

**experience** 22:24 51:25 63:8, 23 64:19 65:7 76:19

**experienced** 22:10 63:5 80:15, 20

**expert** 52:13

**explain** 15:23 19:13 70:15,25 71:13

**explained** 44:20

**express** 20:7 21:21 22:14

**expressed** 21:15

---

**F**

**face** 25:15

**facing** 44:4

**fact** 18:22 24:14 28:23 31:7,16 35:10 48:7 59:12,17 70:20 71:11,16 72:14 73:19 74:6,9 79:20

**factor** 21:13 23:5 25:25 29:2,12 30:6 37:11 46:8,9 49:8 73:4,14 75:2

**factored** 31:7 37:13

**factors** 20:25 21:2 29:9 30:10 38:3,7 49:6 63:24 68:3 72:2 75:1

**facts** 28:6,10,14,18 29:3,8 31:2, 5,10 48:23 57:23 59:17 69:18 73:3 78:25 79:3,4

**failing** 67:8

**fair** 63:1

**fairly** 22:19 39:3

**fallacy** 12:12

**false** 34:22

**familiar** 39:17 45:1 54:18 57:4 59:24 63:5 80:11

**fast** 73:5

**fatally** 22:1,10

**fatigue** 6:21

**FBI** 50:23 52:19,20 53:14,16

**FBI's** 52:21,22

**fear** 21:22 22:9,14,20

**fears** 18:16

**Federal** 4:6 21:25

**fell** 77:13

**fellow** 59:6

**fence** 71:4,5,7

**field** 39:2,13 62:17 63:6

**file** 15:2 46:7 55:17 62:19

**filing** 4:12

**final** 8:15,16 27:9 37:13 56:4 59:20 66:23,25

**find** 11:6 22:23 25:12

**finders** 59:12,17

**findings** 27:4 36:17

**fine** 7:6 38:20

**fire** 78:10

**firearm** 11:16,20 12:22 48:5 67:15 71:12,14 78:10

**firearms** 70:11

**first-line** 66:11

---

**flag** 24:15,17

**FOB** 62:17,22

**focus** 59:7

**force** 6:17 11:8,15 12:2,19 13:3,
6 15:19 19:23 21:3 27:4 28:16
31:20 32:19 36:11,18 37:3 39:8
46:3,10,15,17,18 48:1,4 53:5,7,
21,23 54:19,21 56:16,21,22
63:15,18 67:10,14,18,20 68:5,
11 69:2,4,6,9 70:3 73:10

**forces** 63:14

**form** 4:14 9:3 15:13 18:18 23:17
29:20 30:21 35:21 40:25 41:23
45:9 57:13 77:5

**forms** 8:7

**found** 23:23 27:10 37:3 69:20
70:25 74:9

**foundation** 53:9

**framing** 16:24 19:2 29:8 42:8

**frankly** 46:16 76:22

**fresh** 24:25

**friendly** 43:6

**front** 24:1 32:8 54:25 55:2 56:9
63:2

**full** 6:4 50:9

**full-time** 65:3

**fully** 28:21

**functions** 6:8

**G**

**Ganthier** 9:13 19:20 62:11,14
63:1,6 64:22 65:23 80:10

**Ganthier's** 63:23

**Garrison** 4:19 5:11

**gate** 19:3 71:6,7 73:22

**gave** 29:9,24

**general** 10:18 54:9,11

**generally** 10:23 32:18 38:11
39:19

**generated** 41:18 59:9

**giant** 32:21

**give** 6:4 38:2,6 44:8 59:13,18

**God** 5:23

**good** 6:3 61:4

**Goodley** 80:12

**graduate** 52:19,20,22

**groin** 21:9 22:11 31:25

**group** 61:11 62:1

**gun** 71:10 78:16

**H**

**hand** 5:20

**Hans** 62:11

**happened** 48:11 57:11 62:5

**happy** 10:8

**harm** 10:22 21:8 31:24 32:1
33:10

**Hat's** 77:1

**head** 8:9 9:9 10:7 38:24 65:5,6
69:8

**hear** 7:8 17:20 18:5 23:6 32:11,
23 33:16 71:19

**heard** 18:5 21:21 32:13 44:15

**hearing** 55:5 71:23

**heightened** 17:6,9

**held** 51:21

**hey** 46:22 47:8 48:13

**high** 51:21

**high-ranking** 61:12

**high-risk** 63:13

**higher** 61:25 62:3,6 63:14

**highest** 17:15

**highly** 65:10

**hindsight** 19:13 73:7

**hinges** 35:17

**hired** 50:16

**histories** 24:12

**history** 25:15,16

**holster** 67:21

**human** 70:14 77:23

**hurting** 29:18

**I**

**identify** 14:3

**illness** 6:20

**imminent** 10:21 69:15 70:13,
15,18,19,21 71:9

**impaired** 25:6

**important** 25:25 30:24

**impossible** 38:8

**inches** 18:1 21:11

**incident** 57:11 67:16 75:9
77:23 78:5

**including** 37:18 80:9

**incorporated** 36:5 44:23 53:19

**incredible** 24:10,11

**independent** 57:23 73:20

**ineffective** 70:24 71:1 79:1,5

**influence** 37:10,15

**information** 20:11 58:13 59:21

**initial** 60:21

**initially** 50:16 61:13

**injured** 11:18 73:9 77:23

**injury** 69:16

**inside** 59:4

**Institute** 52:23

**instructions** 67:8

**instructor** 42:9 43:8,13 53:12
65:4

**Integrity** 8:23 26:7,10 58:22
59:1 64:11

**interact** 39:13

**interesting** 72:9

**interim** 28:1 50:17 61:14

**interjected** 30:14

**internal** 55:17 59:2

**internally** 59:9

**intertwined** 37:21

**introduce** 5:13

**investigated** 25:22 67:3

**investigation** 8:22 10:6 20:1,3 23:23 25:19 26:7,11 55:9 56:6 58:20 74:8

**investigations** 64:15

**investigative** 55:17

**investigator** 61:18 66:2

**investigators** 24:18 59:7,18 62:1 64:14 65:17,18

**involved** 71:25

**involves** 53:4

**issue** 17:3 23:15 24:6 42:18,23

**issued** 56:2 75:11

**issues** 27:17 53:21 72:17

**italics** 75:6

### J

**J1** 16:7

**James** 5:17 49:23

**Jim** 26:6

**job** 50:14 54:17 59:9 65:15

**Joint** 16:7

**judge** 6:18

**jump** 71:4,7

**jury** 6:18

**Justice** 39:15,23

**justify** 28:6,10

### K

**Keith** 62:12

**kick** 32:5

**kicked** 78:16,19

**kicking** 14:17 78:21 79:5

**killed** 7:17 13:23 23:1

**killing** 14:22 15:10

**kind** 12:12 29:14,16 41:14 46:15,18,24 47:4,20,23 48:15 50:4,5 51:25

**Kirkpatrick** 4:4 5:1,6 6:7 49:23

**kissing** 41:13 72:15

**knew** 23:6 32:12 33:7 34:1,4,5 48:24 73:25

**knowing** 17:15

**knowledge** 76:20

**knowledgeable** 38:24

**Knoxville** 80:19

### L

**language** 12:12

**large** 14:10 31:21 32:5 38:16 52:2

**larger** 34:6 79:25

**largest** 62:20

**law** 4:7 16:2 19:12 37:24,25 50:24 51:15,17 52:7,21 53:9,10, 15,18 54:3,4 63:6 65:1 73:6

**lawsuit** 57:11

**lawyer** 7:24

**leadership** 50:23 54:6

**leap** 21:12

**learned** 39:5

**legal** 53:6 65:3

**legally** 65:10

**legitimate** 58:15

**lethal** 12:10,13,15,23 32:3 38:14 67:18 68:11 69:9

**letter** 55:19,20 56:1,7 60:24 65:22 68:18 75:4

**level** 19:23

**levels** 59:20 63:14

**liability** 53:15,18

**licensed** 52:8,9 53:8

**LIDA** 53:14,16

**lie** 66:8

**lies** 66:12

**Liggeo** 5:9

**lines** 64:21

**literally** 25:13 30:4

**litigation** 7:22

**long** 14:5 22:25 51:1,8 68:19 75:1 76:3

**long-term** 64:23

**longer** 67:20

**looked** 10:11

**loss** 24:23

**lost** 47:20

**lot** 38:22 47:21 76:19

**Louisiana** 4:6,21 5:7

**Lubrano** 9:13 19:20 62:12 65:13,23 80:10

### M

**made** 25:18 34:17 42:17 44:22 45:14 53:23 56:5 61:18 64:1 66:2,13,20 74:7

**main** 39:23 53:12

**Major** 52:23

**make** 20:11 24:10,11,12,14 25:11,20 26:1 27:9 45:25 46:1 50:5 55:22 56:13 57:22,23 58:3 59:12,16 61:17 76:8

**maker** 54:11,16,17

**makes** 59:15 70:19

**making** 30:11 31:17 37:10,12, 18 42:20 66:15 68:1 74:1 77:18

**management** 53:20

**mark** 9:10,15 10:14 26:5

**marked** 9:22 54:25

**master's** 52:7

**matter** 31:23,25 32:20 33:5

35:25 48:7 57:25 71:16

**matters** 33:2 54:15

**Meaning** 64:12

**means** 12:8,15,20,23 32:3 58:9, 12,17 62:18 71:20

**meet** 47:14 48:2

**meeting** 13:16

**member** 45:4 52:17,18,23,25 63:11

**members** 44:24 62:13

**memo** 9:12 19:19,21 27:23 28:5 33:13 34:21 36:10,12,13 61:13 62:5

**memorandum** 27:17 34:11

**memory** 24:23,25

**Memphis** 52:3

**men** 54:5

**mention** 78:6

**mentioned** 33:13 57:17 60:4 63:24 78:7

**met** 13:12,15 49:25 80:13,18

**methods** 70:23,25

**middle** 34:12

**mind** 44:14 50:19 71:21

**mindful** 18:25

**mindfulness** 74:2

**mindset** 19:7

**minutes** 16:13

**mirrors** 37:25

**misconduct** 47:18

**mitigating** 61:15,16

**Mm-hmm** 17:1,17 20:18 21:14, 19

**moment** 23:9 29:7 38:5

**Monitor** 45:2

**monitors** 47:22

**months** 7:23

**Mose** 50:2

**moving** 62:3

**multiple** 25:8,9

---

### N

**names** 8:8

**national** 39:21 52:19,20,22

**nationally** 39:22

**necessarily** 32:7 41:2 43:3 47:9

**needed** 9:10

**neglect** 67:7

**neighborhood** 11:21

**ninth** 51:17

**Noel** 80:17

**noises** 41:13

**non-consequential** 74:24

**non-lethal** 12:8,11

**NOPD** 10:15 27:8 39:1 40:2,7, 11,19 42:23 44:24 54:18 67:9 70:11 71:15 80:9

**NOPD's** 38:21,23 39:11

**normal** 46:9,16,19 48:15

**noticing** 4:11

**number** 3:21,22 6:14 10:20 11:6,11 12:6 26:17 55:2,3,13 56:10,14,25 60:3,4,11 65:21 68:18 74:7 75:4

**numbers** 60:9

---

### O

**Oakland** 51:6,9,13

**oath** 4:21

**object** 11:3,9 36:17 52:11

**objection** 9:3 15:13 18:18 23:17 29:20 30:21 35:21 36:19 37:2 40:25 41:23 45:9,16 57:13 77:5

**objectionable** 11:6

**objections** 4:14

**objective** 15:9,11,21 18:20 19:7,11 31:1,3,5,10 32:14 35:23 36:1,6,8 37:18,20 38:7 68:2

**objectively** 15:24 33:16 67:16

**objectivity** 18:21,22,24 19:4

**obligated** 11:4

**observation** 15:5

**occasion** 24:7

**occasions** 25:8,9

**occur** 12:4

**occurred** 58:14

**OCDM** 45:24,25 46:11,20 47:1, 6,12,24 48:1,12,13

**October** 56:1

**office** 39:21,22 44:19 45:2 47:11 52:2 60:13

**officer** 7:18 13:9,12,14 14:17, 22 15:3 17:14,16 19:9,13,18 20:20 21:5,6,21,24 22:5,10,20 23:12,22,23 24:6 26:21 27:10 29:12,17,22 30:3,17,25 31:8,24 34:13,16,24 35:1,5,6,13,15 36:1,7 38:5 41:9,11 43:13 45:4, 5 47:1 48:1 49:24 52:3 53:6,22 55:8 56:8 57:20 58:17,19 59:10, 24 60:5 62:2,24 63:17 64:16,23 65:12,19 66:12,18 67:19,20 68:5 69:16 70:20 71:2,4 72:4 75:10 79:21,23 80:3

**officer's** 25:15 31:20 35:18 47:13 71:21

**officers** 11:16,19 12:2,21 16:22 17:9 18:25 19:5 22:14 38:11 39:2,12 40:14,22 43:16 44:4,15 59:6 61:12 62:1,6,19 63:3 64:15 67:14 70:11 80:9,21,22

**officiated** 4:21

**omitted** 40:12,20 42:23

**on/or** 81:7

**one-sided** 41:19 42:14

**operate** 10:25

**operating** 72:22

**operations** 62:18 63:13,19

**opinion** 37:16 49:9 68:4 76:17, 18,23,24

**opinions** 37:14

**option** 13:5,6

**oral** 67:8

**organization** 50:23 51:18 53:15,16

**organizations** 52:18

**original** 4:10

**originally** 28:1

**Orleans** 5:7,18 7:17 44:5,11,12, 17 50:11,12 51:16 54:1,9,22 59:4 64:24

**outcome** 75:9

**overemphasize** 73:18

**overhead** 43:9

**overlap** 50:8

**oversight** 54:13,14

---

**P**

**p.m.** 81:7

**P12** 3:20 39:10,13

**P13** 3:19 39:9,10

**P20** 3:18 26:5

**packs** 44:10,12,16

**pages** 69:6

**panel** 9:1 27:15,17 28:9 61:21, 23 62:7,14 64:7 65:13,22 66:21 75:8

**paragraph** 26:20 28:13 30:8,12 31:6 34:12 57:2,5 62:5 67:6,11, 12,14 68:8,10,12 69:2,4,8,23,25 70:1,3,6

**paragraphs** 67:7

**part** 16:16 20:22 23:5 35:17 39:11 51:24 54:3,4 66:14 72:25 74:12,15,18

**partner** 73:17 78:4

**partnership** 47:7

**parts** 40:20 70:7

**party** 7:16 71:25

**past** 6:14

**pasted** 40:7,19

**pasting** 41:19

**patrol** 62:24,25

**Paul** 80:17

**pause** 16:12

**penalty** 68:24

**penis** 21:16,23 22:1,6,7,11,15, 21 23:8

**people** 11:12 25:18 49:4 59:12 72:6 73:1,20

**people's** 24:12 53:23

**perceive** 38:5

**perceived** 19:6,10 29:13,15 30:2 31:8 34:24 73:20

**perception** 35:18 49:1

**Performance** 67:5

**period** 51:3

**permission** 68:16

**permitted** 4:7

**person** 12:22 57:21 58:9 69:16

**personal** 7:2

**personally** 16:19 20:9

**perspective** 17:4,5 36:1

**photo** 14:5,11,12

**photos** 13:23

**physical** 69:15

**PIB** 20:1,3 23:23 45:19 56:5 58:24 59:15 61:18 62:1 65:6 66:1

**PID** 10:5 55:16,18

**pivotal** 75:2

**place** 5:7

**places** 51:12

**plaintiffs** 5:15 26:17

**plans** 73:12

**play** 57:19 65:8

**PLAYED** 16:9

**point** 7:1 13:22 15:9,11,21 21:20 27:3,7 42:20 45:14 67:18 68:16 75:2

**pointer** 46:1

**police** 6:8,9 7:17 10:19,20 11:11,19 12:7 17:13,16 21:25 39:24 49:3 50:10,11 51:6,9,12, 17,19 52:3,24 53:6,11,21 54:12, 22 59:4 63:2 64:24 65:2,4,11 77:2 80:19

**policies** 11:1,2 12:18,19 54:13, 18

**policy** 11:8 12:9 16:2 19:11 37:24 38:23 39:7 41:15 42:3,7, 10,21 43:9 48:7 56:14,16,17,21 57:9,10 58:10,18 59:10 64:15 67:1,2,7,23 68:6 70:3,10,22 72:23 73:6,12,24

**pose** 10:21 21:5 70:13

**posed** 20:20 35:7 48:23 77:25

**position** 6:4,7 18:5 65:5

**positions** 51:21

**possibility** 78:24

**possibly** 14:16 17:14 78:23

**potential** 24:16

**potentially** 14:14,18 32:4 71:22

**pounds** 18:1

**Powerpoint** 43:14

**PR-24** 75:10

**practical** 65:11

**practices** 39:24

**practmatic** 65:11

**prefer** 6:10

**premise** 16:22 32:24,25 33:1

**prepare** 7:25 8:3 10:11

**preparing** 7:19

**present** 17:19 50:5

**presented** 20:11 50:4 57:22

**pretty** 30:4 44:6 48:5

**prevent** 6:22

ANNE KIRKPATRICK on 05/01/2025

**previous** 53:25

**primarily** 18:15 28:19 59:12

**principle** 42:18

**principles** 10:19

**prior** 50:22

**private** 7:16

**problem** 40:11,22 41:20

**Procedure** 4:6

**procedures** 53:10,12

**process** 57:18,20 59:25

**produced** 8:9

**professional** 52:15

**program** 39:15,17

**proper** 4:12 9:17

**proposed** 10:16

**protocol** 48:9

**provided** 19:19 61:21

**Public** 8:23 26:6,10 58:22,25
64:10

**pull** 16:6 26:5

**pulled** 71:11

**pulling** 71:14

**puppy** 16:20 17:25 21:4,7
31:14,21,22

**purposes** 4:7

**pursuing** 35:5

**purview** 46:22

**put** 39:14 42:6,10,20 55:1 60:13

---

**Q**

---

**qualification** 12:16

**qualify** 79:20

**question** 4:15 7:7 20:6 22:12
25:3 28:8 29:6,8 32:16 41:4
43:2 77:25 78:1,2,3

**questioning** 52:12

**questions** 6:23 43:12 50:3
63:20 70:7 74:4 75:18,25

**quickly** 13:2

---

**R**

---

**raise** 5:20 23:4,14 24:6,15

**ran** 19:6,9 29:13 30:4 31:9
34:25 35:6 70:21 79:21

**range** 77:14

**rank** 51:21 54:6 59:20 62:2,18
63:17 64:24 66:9,11,12

**ranked** 65:19

**ranking** 62:1,6 80:22

**ranks** 62:3

**rare** 42:25

**RE-EXAMINATION** 76:6

**reached** 19:17

**read** 4:9 15:1 19:21 20:3 21:17
40:9 43:16

**readdressed** 28:2

**real** 59:12

**reason** 24:22 25:7 29:24 41:25

**reasonable** 15:18,20,24,25
18:8,9 19:8,19 20:12,16,17,19
35:17 42:6,19 67:14,17 68:4
70:25 72:3 73:12 74:1 77:13,15
78:9,12,14,15,20

**reasonableness** 21:2 32:19
41:8 44:21 76:16

**reasons** 7:2

**recall** 10:10 13:16 22:17,18
23:7 30:10 46:25 47:12 78:7
79:9

**receive** 56:8 59:8

**received** 18:14 55:10,20 60:5
61:5 65:22

**RECESS** 49:17

**reckless** 45:6

**recognized** 39:22

**recollection** 26:24

**recommendation** 9:1 27:19
28:11,15,20 59:13,15,16,18
61:19 64:1 65:9 66:2,13,20 74:6

**recommendations** 61:24 75:7

**recommended** 28:6,19 68:23

**record** 5:5 6:5 18:13,14 25:16
26:4 36:20 49:16,19 55:1

**records** 20:10

**red** 24:15,17

**redirect** 49:12

**refer** 60:9 75:3

**reference** 36:17

**references** 76:25

**referred** 45:20 58:24 60:23

**referring** 48:13 68:10

**reflecting** 30:15

**refreshed** 78:8

**refreshes** 26:25

**regard** 39:1 56:21 59:4

**related** 53:6

**relevant** 31:16,19 32:2

**remember** 20:5 27:2 62:15

**removed** 24:24

**repeatedly** 23:12

**repel** 14:14 38:15

**repelling** 14:19

**report** 18:6 19:15 23:24 24:1,20
34:10 40:9 42:7 45:18,19 46:6
49:3 60:21 79:13

**reported** 71:19

**reporter** 4:19 5:3,11,19

**Reporting** 5:10,12

**reports** 25:14 71:18 79:25 80:7

**represent** 14:4 39:11 40:6
49:24

**required** 23:20 24:19 30:24
31:11 37:23 38:4,11

**reserved** 4:16

**residential** 11:21,25 12:3,4

**resort** 13:5,7

**resources** 39:22

---

Index: respect–specifically

**respect** 10:24 12:16 45:19

**responding** 16:22 17:8 28:23

**responsiveness** 4:15

**result** 25:19 61:11 74:8,21

**results** 46:6 58:20

**retained** 4:11

**retired** 65:3

**return** 20:6

**review** 8:2 10:8 26:13 27:4,15
36:11,18 37:3 46:17,23 62:3
64:16

**reviewed** 7:5 8:6,10 10:2 27:4
46:2,4,5,9 48:6,14

**reviews** 47:17,19 49:3,4 57:21

**risk** 11:12 17:15 44:16 53:20
63:14 72:6 73:1

**road** 50:25

**roaming** 44:11,12

**role** 20:13 57:18 62:15 64:6

**roll** 43:21

**room** 13:14

**Roquemore** 3:7 5:16,17 9:2,
16,21 15:12 18:17 23:16 29:19
30:20 35:20 36:15,23 40:24
41:22 45:8,15 49:12,13,22,23
52:14 57:16 75:16 77:4 78:4
80:8

**rottweiler** 32:21

**roughly** 7:19 8:18

**rule** 67:5 69:1,3

**Rules** 4:6

**ruling** 57:24

**run** 48:7 71:5 73:22 75:1

**running** 14:21 16:20 34:14,17
35:2 73:17 79:23 80:3,5

**Ryan** 62:12 65:13

---

**S**

**safety** 17:6,10 35:11 70:14,15

**Sanchez** 9:13 19:20 62:12 64:4

65:7,23 80:10

**saving** 49:12

**scenario** 18:3 78:22 79:2

**scene** 19:5 29:17

**screaming** 32:13 71:20

**Seattle** 52:2

**seconds** 16:14

**security** 44:4,6

**selectively** 40:20

**Seminar** 52:21

**send** 46:16,22 47:10

**sending** 71:25

**senior** 64:23

**sense** 17:6,9

**sentence** 26:19 30:7 72:25
73:11 75:8

**separate** 37:19,22 45:23

**separating** 38:2

**September** 50:18 61:2

**sergeant** 54:6 62:2 64:25 66:5,
6,8,10

**sergeants** 59:7

**Serpas** 5:10,11

**service** 62:20

**set** 58:2

**sexual** 47:18

**Shannon** 66:5

**shared** 22:25 31:4

**sheriff** 54:7

**sheriff's** 52:2

**shoot** 10:20 11:20 12:7,21 22:1,
10 35:13 77:11

**shooting** 8:11,22 10:5 11:13
13:4 14:1,22 15:9 16:4 18:2
19:18 20:19 23:6 26:7,11 27:5
33:23 35:17 37:4 45:6 66:25
72:5 74:22 76:13,14,17

**shootings** 12:4

**shoots** 23:12

**shortening** 42:15

**shorter** 42:12

**shot** 7:17 13:9 14:5,6 16:19
17:18,23 20:7 23:1,7,10 24:7
25:9 34:6,8 35:2,8 48:20 80:4

**show** 10:7 16:3 54:24 72:6

**showed** 18:13 45:19 72:10

**shows** 41:14

**side** 41:21 50:5 64:16

**sign** 4:10

**signals** 43:5

**signature** 8:11,16 10:5 36:5
55:24 77:9

**signed** 8:7 26:13 37:6

**significance** 60:19,20

**significant** 30:5 33:17

**signing** 20:4 33:22

**simply** 60:25

**sir** 10:3 56:19

**situation** 11:23 12:2 25:5,6
28:22 58:1 67:17 71:10,18 79:6

**size** 14:6,10,15,18,19,21 15:10
18:2 31:23,25 32:2 33:2,5,12,24
38:16

**small** 31:20 32:5

**smaller** 17:18 34:7,8 80:1

**solemnly** 5:21

**solicit** 72:16

**someone's** 24:20 25:4

**sort** 17:9 39:10 41:18 44:22

**source** 67:9

**speak** 11:10 35:7 43:7,19

**speaks** 35:9

**special** 63:12

**specialized** 53:5

**specific** 42:22 44:9 56:21 67:2
70:7

**specifically** 13:17 39:6 44:13
67:12 70:4

ANNE KIRKPATRICK on 05/01/2025

Index: speculating–tool

**speculating** 43:24 48:12

**speculation** 25:13 27:7 43:11

**spikes** 71:8

**split-second** 73:8,23

**spoke** 7:5 18:14

**squarely** 73:24

**staffed** 59:6

**stage** 27:11,12 47:3,5 61:18

**stand** 11:4

**standard** 38:9 47:14 48:2,3,9

**standards** 10:16

**start** 16:21 50:14

**started** 80:5

**starting** 16:7 61:8

**starts** 61:5 70:10

**state** 4:20 34:15 52:25 53:1,11 80:7

**stated** 34:13,16

**statement** 19:22 42:24 43:4 66:18

**statements** 10:18 23:21

**states** 67:14

**stepped** 15:7

**sticker** 9:18

**stipulated** 4:3

**stolen** 47:20

**stop** 70:12

**STOPPED** 16:10

**strategy** 54:12

**streets** 44:16 62:19

**strong** 63:18,19

**students** 54:2

**stuff** 41:21

**subject** 37:1

**subjective** 15:8 18:15,21 19:11 30:17,23 31:1 35:18,25 36:6 37:18,20 38:2,4 48:25

**subjectively** 15:3

**submitting** 61:13

**subsection** 69:13,14

**substances** 6:21

**substantial** 35:17

**suggest** 40:21 78:25 79:4

**suggested** 45:5 46:11 47:1 48:1,24

**suggesting** 47:13

**suit** 7:15

**summarized** 75:7

**summary** 75:6

**superintendent** 6:8,11 27:8 28:2 43:25 50:10,15,17,21 54:1, 10 57:19 60:22 62:11,16 80:11

**superintendent's** 44:19

**superintendents** 9:12 60:21

**supervisor** 66:11

**support** 71:11 79:3

**supported** 21:2 41:15,21

**supportive** 72:22

**supports** 19:7 41:8

**surrounding** 67:16

**surroundings** 72:5,8

**sustained** 25:20,23 58:2,6,9,12 74:10

**SWAT** 63:11,13

**swear** 5:21

**sworn** 5:2

---

**T**

**taking** 5:7

**talk** 7:24 37:19 38:10 54:8,25 55:12 56:12 60:2 62:4 64:3

**talked** 37:17 55:3 58:21

**talking** 42:18 55:23 60:16 72:11

**talks** 28:5 31:13

**tall** 18:1 21:11

**taser** 14:13 78:13,17,21 79:1

**taught** 53:16 65:1

**teach** 17:11 18:25 53:10

**teaching** 50:22,25 53:14 54:2

**teacup** 33:20 34:1

**team** 63:11

**telling** 61:11 72:16 79:17

**term** 12:11 46:3 59:2

**terms** 12:18 17:5 32:18 47:17

**testify** 5:3

**testimony** 68:22

**text** 40:6

**thick** 42:3

**thing** 46:14,16,19 48:3 60:4

**things** 37:21 43:22 47:21 48:16 73:7

**thinking** 15:4 19:8 20:17 30:14 41:9 49:5 67:25 72:13 78:8

**thought** 19:22 29:24 30:18 33:9 36:8

**thoughts** 18:15 20:8

**threat** 10:22 19:6,9,10,14,22 20:20 21:4 29:13,15 30:2,5 31:8 34:24 35:7,11,13,14,15,18 40:13,21 44:6 48:22,25 70:13, 15,18,21 73:20 79:8

**threats** 44:4

**Thursday** 4:5 5:8

**time** 4:16 5:12 15:4 22:2,4,8,9, 13,25 23:10,13 24:7 29:25 31:9 33:22 44:3 46:6 47:1,25 48:8 49:19 51:3 55:7 60:15 61:5 62:13 63:11,16 71:6 73:21 75:17 81:1,6

**times** 23:2

**tiny** 32:20,22,24

**title** 6:7 40:3 50:9 62:12,15 65:15 67:5,13 69:8

**titles** 9:9

**today** 6:17 7:14

**told** 33:19 44:10 79:24

**tool** 14:14,18

ANNE KIRKPATRICK on 05/01/2025

**top** 8:9 9:8 10:7 38:24 41:10 53:22 71:8

**topic** 38:19

**topics** 50:23

**totality** 15:25 20:16,23 35:23 36:2,8 66:15 68:3 69:17 70:14 73:2

**totally** 16:23 17:4

**track** 48:8,9

**tracking** 68:18

**tracks** 48:7 64:17

**train** 18:24

**trained** 42:21 65:10

**training** 38:22,23 39:1,11,12 40:2,7,8,11,17,20 41:7,11,12, 16,18 42:11 43:16,17,20,22 54:14 72:10,22

**treat** 17:11

**trial** 4:16 14:4 16:6 50:4

**true** 34:22 74:9

**truth** 5:21,22

**truthfully** 6:23

**turn** 24:5 38:18,19,21 49:11

**turning** 69:5 75:2

**type** 33:20

---

**U**

**unanimously** 37:3

**unavoidable** 14:23 15:10

**under-sheriff** 52:1

**understand** 6:16 7:8,15 17:7 21:14 29:12 50:3,7 61:17 80:14

**understanding** 6:22 7:13 12:18 39:20 53:9 71:9

**understood** 33:15 35:4

**unfolding** 13:2 73:16

**unfounded** 25:20 58:14

**uniform** 74:9,12

**unique** 64:25

**unit** 59:6 63:13 64:13

**unjustified** 37:4

**unreasonable** 42:2,19 43:1,3 73:16

**unrolling** 73:5

**unusual** 22:20,23 46:2,14 47:6, 22

**usual** 47:5

---

**V**

**vague** 7:9

**verbatim** 40:11

**veteran** 63:10

**video** 5:6 13:25 16:3,9,10,13 17:24 18:11 48:20 49:8

**view** 15:9,11,21 35:25 70:14

**viewpoint** 15:8 19:25

**viewpoints** 20:1

**violate** 67:23 69:20

**violation** 56:6 58:10,14,18 59:10 67:4 68:7 71:15,16 74:10, 12

**violations** 64:15 67:2

**violence** 16:23 17:4,8,12 18:23 28:24 31:7 32:12 71:17

**vis-à-vis** 66:9

**voices** 72:15

---

**W**

**Wait** 33:1

**waives** 4:9

**walk** 18:22 19:2

**walked** 13:14 19:3

**walking** 16:25 17:2,3,14,15 71:23 74:1

**wanted** 46:13 54:5 55:22

**warning** 43:5

**Washington** 52:25 53:11

**watch** 16:16

**watched** 16:12

**ways** 27:13 29:16 30:1

**weapon** 67:21 72:2,3

**weeks** 55:11

**weigh** 12:19 20:23,24,25 25:25 59:22

**weighed** 29:3,9 44:23 77:20

**weighing** 28:14

**weight** 77:19

**weighted** 76:19

**well-informed** 76:23,24

**wild** 44:10,12,16

**William** 5:15

**wit** 67:9

**women** 54:5

**Woodfork** 28:2 60:22 61:14

**word** 42:7,10 79:14

**work** 7:2 47:7 65:11

**wounded** 78:5

**written** 11:2,9 67:9

**wrote** 18:6

---

**Y**

**years** 44:1 51:3,4,10,16 52:9 53:11,22,24,25 63:11 65:2,20

**yelling** 71:20